IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

KELTON DAVIS, WILLIAM TURNER,
ALTAGRACIA HERNANDEZ, EDWIN
LARREGUI, ROMAN JACKSON, KRISTIN
JOHNSON, ELEANOR BRITT, ANTHONY
ANDERSON, LASHAUN SMITH, SHAWNE
JONES, HECTOR SUAREZ, ADAM COOPER,
ANDREW WASHINGTON, P.L. BY HIS PARENT
LISA PIGGOTT, DAVID WILSON, AND
GENEVA WILSON, individually and on behalf of a
class of all others similarly situated;

      Plaintiffs,

  -against-

THE CITY OF NEW YORK and NEW YORK
CITY HOUSING AUTHORITY;

      Defendants.



10 CIV 0699

COMPLAINT

[Class Action]

DEMAND FOR JURY TRIAL

RECEIVED
JAN 2 8 2010
U.S.D.C. S.D. N.Y.
CASHIERS

## PRELIMINARY STATEMENT

1. This is a civil rights action in which Plaintiffs Kelton Davis, William Turner, Altagracia Hernandez, Edwin Larregui, Roman Jackson, Kristin Johnson, Eleanor Britt, Anthony Anderson, Lashaun Smith, Shawne Jones, Hector Suarez, Adam Cooper, Andrew Washington, P.L., by his parent Lisa Piggott, David Wilson, and Geneva Wilson, (collectively, "Named Plaintiffs"), on behalf of themselves and a class of similarly situated individuals, seek to remedy the continuing violation of their rights secured by 42 U.S.C. § 1983; 42 U.S.C. § 1981; the Fourth and Fourteenth Amendments to the United States Constitution; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d); Title VIII of the

1

Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.* ("Fair Housing Act"); the United States Housing Act, 42 U.S.C. § 1437, *et seq.*; the Constitution and laws of the State of New York; and the New York City Human Rights Law.

2. The Defendants, the City of New York ("City") and the New York City Housing Authority ("NYCHA") (collectively, "Defendants"), operating through and in conjunction with the New York City Police Department ("NYPD"), have implemented and continue to conduct, enforce and sanction an unlawful vertical patrol and trespass arrest policy which has resulted in a pattern and practice of illegal stops, seizures, questioning, searches, and false arrests of residents of, and authorized visitors to, NYCHA residences.

3. A vertical patrol is a top-to-bottom walk-through patrol or "sweep" of hallways, stairwells, rooftops and landings, elevators, and other common areas of a NYCHA residence. (NYPD Patrol Guide 212-59 and 212-60).   Under the vertical patrol policy and trespass arrest practices, New York City Police Department officers conduct roving pedestrian checkpoints in and around NYCHA residences, wherein they indiscriminately stop and question every person they observe, without objective individualized suspicion of a crime, and unlawfully arrest individuals for trespass without probable cause.

4. In addition to organized and directed vertical patrols in NYCHA residences, some trespass arrests are the result of less formal sweeps.

5. As a result, the number of trespass arrests in NYCHA residences has increased dramatically in recent years, without any reasoned justification or correlative rise in criminal activity. Instead, people with a legitimate reason for being on NYCHA property are being unconstitutionally detained and/or arrested on a routine basis.

6.  Defendants enforce the trespass laws in NYCHA residences in an unlawful manner, and without adequate training and controls, based on the race, ethnicity, and/or national origin of NYCHA residents and visitors.

7.  Defendants implement and apply these policies, practices, and customs in an intentionally discriminatory and race-based manner by focusing the patrols and trespass arrest practices entirely on communities of color, such as NYCHA residences, where historically entrenched racial segregation ensures that African Americans and Latinos will bear the brunt of Defendants' unlawful actions. Defendants also discriminatorily acquiesce in, ratify, and fail to monitor or rectify NYPD officers' widespread unlawful practices because the victims are overwhelmingly African Americans and Latinos.

8.  The rate of trespass stops, arrests, and enforcement in predominantly minority NYCHA residences is, on average, three times higher than surrounding areas with similar rates of crime. The decision to enforce trespass laws in this disproportionate way is not explained or justified by underlying crime levels in NYCHA residences. Moreover, where predominantly minority NYCHA residences are located in predominantly white or gentrifying neighborhoods, the disparities in trespass arrest rates increase even further.

9.  The vertical patrol policy and trespass arrest practices do not affect only visitors who are stopped, seized, questioned, searched, and/or arrested; they also intimidate, threaten, and interfere with NYCHA residents' enjoyment of their homes on the basis of race, ethnicity, and/or national origin. In addition, Defendants' vertical patrol policy and trespass arrest practices interfere with the rights of NYCHA residents to freely associate with individuals whom they invite to their homes.

10. The mandate of the NYPD is to safeguard community members from crime by providing security and otherwise delivering police services. Yet NYCHA residents are not provided protection on the same terms as other community members – instead, they and their invited guests are subject to police harassment and unfounded stops, seizures, questioning, searches, and arrests when merely trying to enter and leave their own homes. A recent report delivered to the NYPD Commissioner by NYCHA tenant leaders critiqued NYPD trespass enforcement and noted that residents feel like they live in "penal colonies." Citywide Council of Presidents of NYCHA, *The Public Housing Police and Public Housing Resident Perceptions* (Nov. 30, 2009) ("CCOP Statement"). The tenant leaders decried this type of "dehumanized policing" which, they allege, has become the norm instead of the exception in NYCHA residences. *Id.*

11. The vertical patrol policy and trespass arrest practices, as applied, are unreasonable conditions that deny NYCHA residents their rights to exclusive use and occupancy of their leased unit, and their right to entertain guests in their home.

12. The pattern and practice of police activity in NYCHA buildings is so aggressive and well known that some people are afraid to visit NYCHA residents. As such, this policy has prevented many NYCHA residents from maintaining and fostering close familial and personal relationships without unjustified government interference.

13. The Named Plaintiffs seek to represent a certified class for the purpose of obtaining injunctive and declaratory relief only. Specifically, the Named Plaintiffs seek a class-wide judgment declaring that Defendants' policies, practices, and/or customs described herein violate Plaintiffs' statutory and constitutional rights under federal, state, and local law. The Named Plaintiffs further request a class-wide injunction enjoining Defendants from

4

continuing such policies, practices, and/or customs. In addition, the Named Plaintiffs seek compensatory damages for their individual claims, an award of attorneys' fees and costs, and such other relief as this Court deems equitable and just.

## JURISDICTION AND VENUE

14. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4), as this action seeks redress for violations of Plaintiffs' rights under the United States Constitution and federal civil rights laws; and by 42 U.S.C. § 3613(a), as Plaintiffs seek relief with respect to discriminatory housing practices in violation of the Fair Housing Act.

15. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

16. This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the Plaintiffs' claims under state and local laws because they are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

17. Venue is proper in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events that gave rise to the claims alleged in this complaint occurred in the Counties of the Bronx and New York. In addition, Defendants conduct business and maintain their principal place of business in the Counties of the Bronx and New York.

## PARTIES

### *Plaintiffs*

18. The Plaintiff Class consists of two subclasses: the "Arrested Plaintiffs" and the "Resident Plaintiffs."

5

19. Arrested Plaintiffs are African-American and Latino NYCHA residents or family members, guests or visitors of NYCHA residents, who were or will be unlawfully stopped, seized, questioned, searched and/or falsely arrested for trespass in or around a NYCHA residence without any reasonable, articulable suspicion or probable cause that they were engaging in criminal activity and on the bases of their race, ethnicity, and/or national origin. All of the Arrested Plaintiffs are still subject to Defendants' unlawful conduct because they continue to lawfully reside in, or visit, NYCHA residences.

20. The Resident Plaintiffs are African-American and Latino NYCHA residents who live in buildings subject to the vertical patrol policy and trespass arrest practices. They, their family members, guests, and authorized visitors have been, or will be, unlawfully stopped, seized, questioned, searched and/or arrested for trespass by NYPD officers when visiting Resident Plaintiffs in NYCHA residences and on the bases of their race, ethnicity, and/or national origin.

21. Plaintiff KELTON DAVIS is an African-American resident of 480 St. Nicholas Avenue in the City of New York, Borough of Manhattan.

22. Plaintiff WILLIAM TURNER is an African-American resident of 77 Locust Hill Avenue in the City of Yonkers, New York.

23. Plaintiff ALTAGRACIA HERNANDEZ is a Latina resident of the NYCHA Carver Houses at 60 East 102nd Street in the City of New York, Borough of Manhattan.

24. Plaintiff EDWIN LARREGUI is a Latino resident of 5045 Linden Road in the City of Rockford, Illinois.

25. Plaintiff ROMAN JACKSON is an African-American resident of 1377 South Beverly Glen Blvd. in the City of Los Angeles, California.

6

26. Plaintiff ELEANOR BRITT is an African-American resident of the NYCHA Taft Rehabs at 131 St. Nicholas Avenue in the City of New York, Borough of Manhattan.

27. Plaintiff KRISTIN JOHNSON is an African-American resident of 236 Frederica Avenue in the City of Jackson, Mississippi.

28. Plaintiff SHAWNE JONES is an African-American resident of the NYCHA Langston Hughes Houses at 301 Sutter Avenue in the City of New York, Borough of Brooklyn.

29. Plaintiff LASHAUN SMITH is an African-American resident of 441 Frizzell Avenue in the City of Norfolk, Virginia.

30. Plaintiff ANTHONY ANDERSON is an African-American resident of 348 East 110th Street in the City of New York, Borough of Manhattan.

31. Plaintiff HECTOR SUAREZ is a Latino resident of the NYCHA Louis H. Pink Houses at 1211 Loring Avenue in the City of New York, Borough of Brooklyn.

32. Plaintiff ADAM COOPER is an African-American resident of NYCHA Louis H. Pink Houses at 1260 Loring Avenue in the City of New York, Borough of Brooklyn.

33. Plaintiff P.L., by his parent LISA PIGGOTT, is an African-American resident of NYCHA's Eastchester Gardens at 1236 Burke Avenue in the City of New York, Borough of the Bronx.

34. Plaintiff ANDREW WASHINGTON is an African-American resident of NYCHA's Eastchester Gardens at 1240 Burke Avenue in the City of New York, Borough of the Bronx.

35. Plaintiff DAVID WILSON is an African-American resident of 55 Brooklyn Avenue in the City of New York, Borough of Brooklyn.

36. Plaintiff GENEVA WILSON is an African-American resident of NYCHA's Randolph Houses at 255 West 114th Street in the City of New York, Borough of Manhattan.

*Defendants*

37. Defendant City is a municipal entity created and authorized under the laws of the State of New York. It is authorized under the laws of the State of New York to maintain, operate, and govern a police department, the NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The law enforcement activities of NYPD and NYCHA are supported in part by federal funds.

38. Defendant NYCHA is a public housing authority in the City that owns and operates housing for low-income residents in all five boroughs of New York City. NYCHA is responsible for the design and implementation of policing and security policies in NYCHA residences. NYCHA's principal offices are located at 250 Broadway, New York, New York 10007.

## CLASS ACTION ALLEGATIONS

39. The Named Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

40. The Plaintiff Class includes two subclasses described above at paragraphs 19-21.

41. The Named Plaintiffs representing the Resident Plaintiffs are: KELTON DAVIS; ALTAGRACIA HERNANDEZ; ROMAN JACKSON; ELEANOR BRITT; ANDREW WASHINGTON; P.L. by his parent LISA PIGGOTT; SHAWNE JONES; HECTOR SUAREZ, and GENEVA WILSON.

42. The Named Plaintiffs representing the Arrested Plaintiffs are: WILLIAM TURNER; EDWIN LARREGUI; ROMAN JACKSON; KRISTIN JOHNSON; ANDREW WASHINGTON; P.L. by his parent LISA PIGGOTT; LASHAUN SMITH; ANTHONY ANDERSON; ADAM COOPER, and DAVID WILSON.

43. This action is properly maintainable as a class action because the requirements of Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure are met, as explained below.

44. The class and each subclass are so numerous that joinder of all members is impracticable. Upon information and belief, there are presently over 400,000 residents in NYCHA residences, over 95% of whom are nonwhite. In 2008 alone, there were thousands of arrests for trespass in NYCHA residences and the overwhelming majority of those arrested were African American or Latino.

45. Joinder is also impracticable because, upon information and belief, many potential members of the class are not aware that their constitutional, statutory, and common law rights have been violated and that they have the right to seek redress in court. Further, future members of the class are unknown and therefore cannot practically be joined individually. There is no appropriate avenue for the protection of these potential class members' constitutional and statutory rights other than a class action.

46. The claims alleged on behalf of the Named Plaintiffs as class representatives raise questions of law or fact common to the Plaintiffs, and each subclass, and these questions predominate over individual questions. These common questions include, but are not limited to: (a) whether NYPD officers engage in a policy, practice and/or custom of stopping, seizing, questioning, searching, and/or arresting members of the class for trespass in the absence of reasonable, articulable suspicion or probable cause; (b) whether the NYPD has a discriminatory policy, practice, and/or custom of unconstitutional stops, seizures, questioning, searches, and arrests in NYCHA housing that is motivated by the class members' race, ethnicity and/or national origin; (c) whether Defendant City has encouraged, sanctioned, and failed to rectify unconstitutional stops and false arrests for trespass by NYPD

officers, and whether such acts and omissions have caused constitutional violations against class members; (d) whether Defendant City has failed to adequately train, supervise, and discipline NYPD officers in connection with unconstitutional stops and false arrests for trespass, and whether such acts and omissions have caused constitutional violations against class members; (e) whether Defendants City and NYCHA have discriminated against African-American and Latino residents in the provision of services in connection with their rental of a dwelling because of their race; (f) whether Defendants City and NYCHA have discriminated against African-American and Latino residents of NYCHA by intimidating, threatening, and/or interfering with their enjoyment of a dwelling because of their race; (g) whether Defendants' vertical patrol policy and trespass arrest practices in NYCHA residences unreasonably interfere with tenants' ability to entertain guests and visitors; and (h) whether Defendants' vertical patrol policy and trespass arrest practices in NYCHA residences unconstitutionally interfere with familial, business, and other relationships.

47. The claims of the Named Plaintiffs are typical of the class and each subclass they seek to represent, as they all allege violations related to the existence and implementation of the NYPD's vertical patrol policy and trespass arrest practices in and around NYCHA residences.

48. The legal theories under which the Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class and each subclass will rely, and the harms suffered by the Plaintiffs are typical of the harms suffered by all members of the class and each subclass.

49. The Named Plaintiffs are all African-American or Latino residents of NYCHA housing or frequent guests of NYCHA residents. As long as the Defendants continue their policy,

practice, and/or custom of discriminatorily targeting NYCHA residences for unconstitutional stops, seizures, questioning, searches, and arrests, the named Plaintiffs are, and will remain, at high risk of being illegally stopped, seized, questioned, searched, or arrested by the NYPD.

50. The Named Plaintiffs will fairly and adequately protect the interests of other class members. Plaintiffs' counsel includes attorneys from the NAACP Legal Defense and Educational Fund, Inc., the Legal Aid Society of New York, and Paul, Weiss, Rifkind, Wharton & Garrison LLP — all of whom are experienced in federal class-action litigation, including constitutional and civil rights litigation, and have the resources necessary to pursue this litigation.

51. This action is properly maintainable as a class action under Rule 23(b)(1)(A) of the Federal Rules of Civil Procedure because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

52. This action is properly maintainable as a class action under Rule 23(b)(1)(A) of the Federal Rules of Civil Procedure because prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

53. This action is properly maintainable as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or

corresponding declaratory relief with respect to the Named Plaintiffs and the class as a whole. The class members are entitled to injunctive relief to end Defendants' policy, practice, and custom of unconstitutional, discriminatory, and otherwise unlawful trespass enforcement.

54. This action is also properly maintainable as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure because the questions of law and fact common to members of the class predominate over questions affecting only individual members and a class action is superior to other available methods for the fair and efficient resolution of this controversy.

**FACTS**

## I. Facts Regarding the Named Plaintiffs

### A.    Plaintiffs Kelton Davis and William Turner

55. Kelton Davis is a 42-year-old African-American male who lived in NYCHA public housing for over nine years. Mr. Davis lived in NYCHA's Drew Hamilton Houses at 2698 Eighth Avenue, Apt. 5G, in the Borough of Manhattan.

56. Mr. Davis is confined to a wheelchair. Many friends and visitors come to his home due to his limited mobility. On repeated occasions, Mr. Davis's friends and visitors have been unjustifiably stopped, seized, questioned, searched, and/or arrested for trespass while lawfully visiting, or attempting to visit, Mr. Davis.

57. William Turner is a 39-year-old African-American male. Mr. Turner is a consultant to the New York Department of Education, and has been employed in this capacity since approximately 1999. Mr. Turner is a friend of, and authorized visitor to, Kelton Davis.

58. On January 27, 2008, Mr. Turner visited Mr. Davis at his apartment in the Drew Hamilton Houses. At approximately 11:30 p.m., Mr. Turner left Mr. Davis's apartment. Shortly after

exiting the elevator in Mr. Davis's building, Mr. Turner was approached and stopped in the lobby of the building by four NYPD officers. At the time, Mr. Davis was merely walking out of the building and was not engaged in any activity that might indicate or imply that criminal activity was afoot.

59. One of the police officers immediately asked Mr. Turner to present identification. Mr. Turner complied with this request. The same officer asked Mr. Turner where he was coming from. Mr. Turner explained that he had just left Mr. Davis's apartment and showed the police officers a CD he had recorded during his visit. Surrounded by four armed NYPD officers, Mr. Turner did not believe he was free to leave and asked the officer who initially approached him whether there was a problem. The officer told him to "shut up." The officer then pushed Mr. Turner against a wall and proceeded to search him. The officer did not find anything in the search. Mr. Turner was arrested and charged with trespass.

60. None of the NYPD officers who questioned, detained, and ultimately arrested Mr. Turner ever knocked on Mr. Davis's door to verify that Mr. Turner was, in fact, a visitor of Mr. Davis and had just left Mr. Davis's apartment. Mr. Davis did not become aware of Mr. Turner's arrest until the following day when Mr. Turner informed him of the arrest following his release.

61. Mr. Turner was handcuffed, arrested, taken to the 32nd Precinct and placed in a holding cell with at least five other people from approximately midnight on January 28, 2008 until 5:00 a.m. the next day, when he was given a desk appearance ticket and released. Mr. Turner had to appear in court approximately four times over a six-month period before the case was ultimately dismissed.

62. As a direct result of the arrest, Mr. Turner suffered a loss of income and work opportunity, including, but not limited to, teaching with the New York City Board of Education. Because of Mr. Turner's arrest, he was placed on the Department of Education's "ineligible inquiry list" and was suspended from all work with the Department of Education pending resolution of the case. For almost eight months, between his arrest in January 2008 and the dismissal of his case in August 2008, Mr. Turner lost the wages he would have earned as a consultant to the New York City Department of Education. Mr. Turner was also prohibited from his regular paying work with various youth organizations. After his case was dismissed, Mr. Turner resumed work with the Department of Education but the volume of his work and hours decreased significantly and never returned to the level of January 2008. Mr. Turner suffered pain, suffering, humiliation, emotional distress, and loss of liberty as a result of his unlawful arrest and Defendants' actions.

63. Many of Mr. Davis's visitors have been stopped and detained by NYPD officers in the lobby and hallways of his apartment building. In rare instances, an NYPD officer will knock on Mr. Davis's door to verify that someone recently left his apartment or was coming to visit him. On numerous occasions, however, as was the case with Mr. Turner's arrest, NYPD officers did not attempt to verify that Mr. Davis had a visitor or was expecting a visitor. As a result of the recurrent unlawful stops and searches in his building, several of Mr. Davis's visitors have been arrested for trespass, and numerous visitors refused to return to his building. His relationship with Mr. Turner, in particular, suffered significantly because Mr. Turner was hesitant to return to Mr. Davis's building for fear of being subjected to another unlawful stop and/or arrest.

64. On several occasions, Mr. Davis has been stopped and detained in his own lobby at the Drew Hamilton Houses during a vertical patrol. During these encounters, Mr. Davis has had to prove his identity and his place of residence in order to avoid arrest and enter his own apartment. Mr. Davis has suffered pain, suffering, humiliation, and emotional distress as a result of Defendants' actions.

**B. Plaintiffs Roman Jackson, Kristin Johnson, and Eleanor Britt**

65. Roman Jackson is a 25-year-old African-American male who lived in NYCHA public housing for over 20 years. At the time of his arrest, Mr. Jackson lived with his grandmother, Eleanor Britt, in NYCHA's St. Nicholas Houses at 131 St. Nicholas Avenue, in the Borough of Manhattan.

66. Although Mr. Jackson is now employed with the Annenberg Foundation in Los Angeles, California, at the time of his arrest he was employed as a research assistant with the Harlem Children's Zone, a non-profit education organization in New York City.

67. Kristin Johnson is a 23-year-old African-American female who lived at 1738 Crotona Park in the City of New York, Borough of the Bronx, at the time of her arrest. Mr. Jackson and Ms. Johnson are friends.

68. Eleanor Britt is a 61-year-old African-American woman who has lived in NYCHA public housing for over 33 years. Ms. Britt is the grandmother and former guardian of Roman Jackson. She still lives in the building where Mr. Jackson was arrested.

69. On January 31, 2009, Kristin Johnson, was an invited guest to Mr. Jackson's home. When Mr. Jackson and Ms. Johnson were outside the apartment, they were approached and stopped by three NYPD officers. The officers asked Mr. Jackson what he and Ms. Johnson were doing, and he explained that he was a building resident and that he and Ms. Johnson were

simply having a conversation.  Neither Mr. Jackson nor Ms. Johnson was engaged in any activity that might indicate that criminal activity was afoot.  The officers demanded that Mr. Jackson and Ms. Johnson stand up and put their hands up against the wall.  The officers then patted them both down and searched Ms. Johnson's bags.  At no time during their interaction with the officers did Mr. Jackson or Ms. Johnson feel free to leave.  The officers did not recover any contraband from Mr. Jackson or Ms. Johnson.

70. One of the officers then asked Mr. Jackson and Ms. Johnson for identification.  Mr. Jackson explained that he did not have his identification on his person, but that it was in his apartment, which was located in the building.  Mr. Jackson offered to take the officers to his apartment in order to provide them with the requested identification and demonstrate that he was a building resident.  The officer denied this request.   Ms. Johnson provided the officers with her identification.

71. Mr. Jackson and Ms. Johnson were handcuffed and placed under arrest for trespass.  The officers took them outside and placed them into a police van.  Once they were inside of the van, Mr. Jackson again tried to explain to the officers that he was a building resident and that his identification was in his apartment.

72. Two of the officers exited the van and went to retrieve Mr. Jackson's identification from his apartment.  When the officers went to the apartment, Mr. Jackson's grandmother, Eleanor Britt, opened the door and explained that Mr. Jackson was her grandson and that he lived in her home.  Ms. Britt gave the officers Mr. Jackson's New York State driver's license, which plainly stated that Mr. Jackson lived in the building.

73. Despite the fact that the arresting officers had determined that Mr. Jackson was a building resident, Mr. Jackson and Ms. Johnson were transported to the police station for processing.

They were fingerprinted, photographed, and locked in a holding cell with other people for almost six hours until they were eventually issued desk appearance tickets. On March 2, 2009, the New York County District Attorney's Office declined to prosecute the cases against Mr. Jackson and Ms. Johnson.

74. Mr. Jackson and Ms. Johnson suffered pain, suffering, humiliation, emotional distress, and loss of liberty emanating from their unlawful arrests and Defendants' actions. Ms. Britt suffered pain, suffering, humiliation, and emotional distress as a result of Defendants' actions.

### C. Plaintiffs Edwin Larregui and Altagracia Hernandez

75. Edwin Larregui is a 39-year-old Latino male who lived at 1265 Girard Avenue in the City of New York, Borough of the Bronx, at the time of his arrest.

76. Altagracia Hernandez is the grandmother of Edwin Larregui's wife. She has lived in the NYCHA Carver Houses at 60 East 102nd Street for 35 years.

77. On the evening of November 9, 2008, Mr. Larregui was visiting Altagracia Hernandez at her home. As he was leaving Ms. Hernandez' building, Mr. Larregui was stopped by three undercover NYPD officers immediately outside of the building lobby. As Mr. Larregui attempted to walk by the officers, he was directed to stop. One officer grabbed Mr. Larregui by the arm and walked him back into the building lobby where he was surrounded by all three officers. Mr. Larregui was seized and detained by the officers, and did not feel free to leave.

78. Although Mr. Larregui was merely leaving Ms. Hernandez's building and was not engaged in any activity that might indicate that criminal activity was afoot, he was asked by one of the officers if he was on the NYCHA premises to buy drugs. Mr. Larregui explained that he was

visiting Ms. Hernandez, in Apartment 6A. Nonetheless, the officers grabbed him, threw him against a wall and searched inside his pockets.

79. After the officers failed to find contraband on Mr. Larregui's person, Mr. Larregui presented his identification. At the time of this incident, Mr. Larregui still carried out-of-state identification.

80. Mr. Larregui was detained in the lobby while one officer stated that he was going to check apartment 6A to determine whether Mr. Larregui was an authorized visitor. Officers went to the apartment but did not ask to speak to Altagracia Hernandez; nor did they identify Mr. Edwin Larregui to the individual who answered the door.

81. Mr. Larregui was handcuffed and arrested for trespass. Mr. Larregui was then taken to a police precinct and strip searched. Nothing was recovered pursuant to the search. Mr. Larregui was then taken to a second police precinct where he was strip searched for a second time. Again, nothing was recovered. Mr. Larregui was then taken to Central Booking where he was strip searched for a third time and placed in a holding cell.

82. Mr. Larregui was arrested at approximately 7:00 p.m. on November 9, 2008. He remained in police custody and did not see a judge until the afternoon of November 10, 2008, at which time he was released.

83. As a result of his arrest, Mr. Larregui was unable to attend work on November 10, 2008 because he was in police custody. He was suspended from his job for two weeks as a result. Mr. Larregui suffered humiliation, pain and suffering, emotional distress, and loss of liberty emanating from Defendants' actions including, but not limited to, his unlawful seizure and arrest, as well as the three consecutive strip searches.

84. Other family members of Ms. Hernandez, including her daughter, have been similarly stopped, questioned, and detained by NYPD officers on NYCHA premises without individualized reasonable suspicion that she was engaged in criminal activity. Ms. Hernandez suffered pain and suffering, humiliation, and emotional distress as a result of Defendants' actions.

### D.   Plaintiffs Lashaun Smith and Shawne Jones

85. Shawne Jones is a 34-year-old African-American female who has lived in NYCHA public housing all of her life. Ms. Jones has been a resident of the NYCHA Langston Hughes Apartments at 301 Sutter Avenue, Apartment 6D for 20 years.

86. Lashaun Smith is a 31-year-old African-American male who lived in New York City for over 29 years. Mr. Smith currently resides in Norfolk, Virginia.

87. Mr. Smith spent the night at Ms. Jones' home on May 10, 2009. When leaving Ms. Jones' apartment on the morning of May 11, 2009, Mr. Smith was stopped by a police officer on the first floor of the building. Mr. Smith was not engaged in any behavior that might indicate that criminal activity was afoot.

88. The officer seized and detained Mr. Smith, then escorted him into the lobby of the building, where two other NYPD officers were waiting. The three officers questioned Mr. Smith about where he was coming from, and he explained that he had just left the home of his friend, Shawne Jones, in Apartment 6D.

89. Shawne Jones was still asleep and did not go to the door when officers came to her apartment. If the officers had spoken to Ms. Jones, she would have verified that Mr. Smith was an authorized visitor who had just spent the night at her apartment. The officers arrested Mr. Smith for trespass.

90. Mr. Smith was arrested at approximately 10:30 a.m. on May 11, 2009. Mr.   Smith   spent
the entire night in jail and first saw a judge at approximately 8:00 a.m. on May 12, 2009.
The charges were dismissed at arraignment.

91. Due to his arrest and delayed return to Virginia, Mr. Smith missed work. As a result, Mr.
Smith had his hours at his job reduced from approximately 35 hours per week to one shift or
less per week. Mr. Smith suffered pain and suffering, humiliation, emotional distress, and
loss of liberty as a result of his unlawful stop, seizure, and arrest and Defendants' actions.
Ms. Jones suffered pain and suffering, humiliation, and emotional distress as a result of
Defendants' actions.

### E.   Plaintiff Anthony Anderson

92. Anthony Anderson lives a few blocks from NYCHA's Thomas Jefferson Houses at 325 East
112th Street, where his sister-in-law lives with her two children.

93. Mr. Anderson routinely picks up and drops off his niece and nephew at his sister-in-law's
home.

94. On January 18th, 2009, Mr. Anderson had spent the day with his 10-year-old niece and then
dropped her off at his sister-in-law's apartment. As he exited the building, he held the door
for three NYPD officers who were entering the building. Mr. Anderson was not engaged in
any activity that might indicate criminal activity was afoot. Nevertheless, the officers
stopped, seized, and detained Mr. Anderson, made him step back into the building and then
asked him where he was coming from. From that point forward, Mr. Anderson did not feel
free to leave. Mr. Anderson explained to the officers that he had just left his sister-in-law's
apartment and identified her apartment number for the officers who were questioning him.

95. A police officer asked for Mr. Anderson's identification. As Mr. Anderson pulled out his wallet, he asked the officer to look at his identification. The officer immediately placed Mr. Anderson in handcuffs. Upon information and belief, the officers never looked at Mr. Anderson's identification.

96. While Mr. Anderson was detained in the lobby, two police officers went to his sister-in-law's apartment and asked if she was expecting anybody. She said she was expecting her son, who was outside at the time, but did not mention Mr. Anderson since he had already departed and she therefore was no longer expecting him.

97. The officers returned downstairs and Mr. Anderson was placed under arrest for trespass. Mr. Anderson was taken into custody and incarcerated for nearly two weeks. The charges against him were ultimately dismissed.

98. At the time of this incident, Mr. Anderson was employed as a private security guard. Because he missed 12 days of work while he was incarcerated, Mr. Anderson's employment was terminated. He has been unemployed since his release from jail in January. In addition to the loss of employment, Mr. Anderson suffered pain and suffering, humiliation, emotional distress, and loss of liberty emanating from his unlawful stop, seizure, and arrest.

### F.    Plaintiffs Adam Cooper and Hector Suarez

99. Hector Suarez is a 55-year-old Latino male who has lived in NYCHA public housing for 14 years. Mr. Suarez is a resident of the NYCHA Louis H. Pink Houses at 1211 Loring Avenue in the City of New York, in the Borough of Brooklyn.

100.    Adam Cooper is a 32-year-old African-American male who has lived in NYCHA public housing for over three years. Mr. Cooper currently resides in NYCHA's Louis Pink Houses at 1260 Loring Avenue. Mr. Cooper lives with his girlfriend, who is Hector Suarez's niece.

101.    In December of 2008, Mr. Suarez suffered serious back injuries for which he underwent regular hospital treatment. As a result, his mobility was limited and he often depended on family members and friends to deliver meals to his home.

102.    On December 14, 2008, upon Mr. Suarez's request, Mr. Cooper delivered a hot meal to Mr. Suarez's apartment at approximately 6:00 p.m. As Mr. Cooper was leaving the building he was stopped by three NYPD officers and asked where he was coming from. Mr. Cooper possessed no contraband and was simply leaving the building after delivering a meal to his friend, Mr. Suarez. He was not engaged in any behavior that might indicate criminal activity was afoot. At no time during his interaction with the officers did Mr. Cooper feel free to leave.

103.    Mr. Cooper explained that he was coming from visiting his girlfriend's uncle upstairs and told officers the apartment number. Mr. Cooper began to leave and the NYPD officers seized and detained him by pulling on his coat. The officers failed to go upstairs and check with Mr. Suarez. Instead they arrested Mr. Cooper and charged him with trespass.

104.    Mr. Cooper was in police custody for three days. The charges were later dismissed. As a direct result of his arrest, Mr. Cooper missed work, as he was still in police custody. Mr. Cooper suffered pain and suffering, humiliation, emotional distress, and loss of liberty emanating from his unlawful stop, seizure, and arrest. Mr. Suarez suffered pain and suffering, humiliation, and emotional distress as a result of Defendants' actions.

      **G.**     **Plaintiffs Andrew Washington and P.L. by his parent Lisa Piggott**

105.  Lisa Piggott is the mother and legal guardian of P.L., a 17-year-old African-American male who has lived in NYCHA housing for his entire life. P.L. lives in NYCHA's Eastchester Gardens at 1236 Burke Avenue with his mother, Ms. Piggott.

106. Andrew Naiku Washington is an 18-year-old African-American male who has lived in NYCHA public housing for his entire life. Mr. Washington lives in NYCHA's Eastchester Gardens at 1240 Burke Avenue with his grandmother, Regina McCray.

107. P.L. and Andrew Washington are lifelong friends and neighbors. They are both currently enrolled as high school students. P.L. and Mr. Washington often travel between each other's homes. Although they have different addresses, P.L. and Mr. Washington actually live in the same physical building with separate entrances across a shared courtyard.

108. On the afternoon of June 29, 2009, P.L. spent time with Mr. Washington in his apartment. When Mr. Washington left, he was stopped by two NYPD officers as he was exiting the lobby of P.L.'s building. Mr. Washington was not engaged in any behavior that might indicate criminal activity was afoot. Without making any inquiry of Mr. Washington, the officers stopped Mr. Washington, pushed him back into the building and immediately placed one handcuff on his wrist. Officers seized and detained Mr. Washington who, at that point, did not feel free to leave.

109. After placing one handcuff on Mr. Washington, the officers began questioning him. The officers asked where Mr. Washington was coming from. He explained that he had been visiting his friend in Apartment 5B. The officers then escorted Mr. Washington upstairs to Apartment 5B.

110. Lisa Piggott, P.L.'s mother, answered the door when the police officers knocked. The officers asked Ms. Piggott if she knew Mr. Washington and she identified Mr. Washington as an authorized visitor. Officers continued to question Ms. Piggott, however, and asked her to identify Mr. Washington by name. Unaware that Mr. Washington had identified himself as "Andrew," to the officers, Ms. Piggott identified Mr. Washington by his commonly used

middle name, Naiku. Noting the discrepency, the officers took Mr. Washington into a nearby stairwell where he was frisked and arrested for trespass. Mr. Washington was never given the opportunity to show the officers identification demonstrating that he lived in the section of the building located across the courtyard.

111. Mr. Washington has been stopped and questioned routinely by NYPD officers in Eastchester Gardens while going to and from his own home and the homes of his friends and neighbors. He still lives in the same building and visits P.L. regularly.

112. Mr. Washington's case was ultimately dismissed. Mr. Washington was held in custody overnight. Mr. Washington suffered pain and suffering, humiliation, emotional distress, and loss of liberty emanating from his unlawful stop, seizure, and arrest.

113. P.L.was also unlawfully arrested for trespass in June 2009 when visiting a nearby friend in a NYCHA residence. His case was also dismissed. P.L. suffered pain and suffering, humiliation, emotional distress, and loss of liberty emanating from his unlawful stop, seizure, and arrest.

### H.   David Wilson and Geneva Wilson

114. David Wilson is a 53-year-old African-American male who lived at 55 Brooklyn Avenue in the City of New York, Borough of Brooklyn, at the time of his arrest.

115. Geneva Wilson is the 79-year-old aunt of David Wilson. She lives at 255 West 114th Street in the City of New York, Borough of Manhattan. She has lived on that block for over 40 years.

116. In light of his aunt's advanced age, Mr. Wilson regularly visits her to make sure she has everything she needs and to help her manage her day-to-day activities.

117. On the night of November 14, 2009, Mr. Wilson was going to visit his aunt at her home. Before he could get there, however, Mr. Wilson was stopped by two plainclothes NYPD officers.

118. The NYPD officers asked Mr. Wilson where he was going, at which point Mr. Wilson told the NYPD officers about his aunt. The NYPD officers kept asking Mr. Wilson questions and would not let him go. He also showed the NYPD officers his identification. Mr. Wilson did not feel free to leave.

119. One of the NYPD officers told Mr. Wilson they were going to his aunt's house. At this point, Mr. Wilson was placed in handcuffs and detained with the other officer.

120. Geneva Wilson was home at the time and no NYPD officer knocked on her door or rang her doorbell.

121. The NYPD officer, however, alleged that nobody was home at Geneva Wilson's apartment and the NYPD officers proceeded to place Mr. Wilson under arrest.

122. Mr. Wilson was searched and no contraband was recovered. His bags were searched and no contraband was recovered.

123. Mr. Wilson remained in policy custody and did not see a judge until the following day.

124. On November 19, 2009, the charges against Mr. Wilson were dismissed when his aunt, Geneva Wilson, came to the courthouse to verify that he was visiting her. He remained incarcerated until the charges were dismissed.

125. While Mr. Wilson was incarcerated, he missed a job interview. Mr. Wilson suffered pain and suffering, humiliation, emotional distress, and loss of liberty emanating from his unlawful seizure and arrest. Ms. Wilson suffered pain and suffering, humiliation, and emotional diress as a result of Defendants' actions.

**II.    Vertical Patrols and a Pattern and Practice of Unconstitutional Stops, Seizures, and Arrests in NYCHA buildings**

126.    The experiences of the Named Plaintiffs are the direct result of the NYPD's policy, practice, and custom of operating roving pedestrian checkpoints, otherwise known as "vertical patrols" or "vertical sweeps," in NYCHA residences.

127.    The NYPD first implemented vertical patrols in 1991.  The protocol was adopted to address crime, and specifically drug activity, in NYCHA residences.  It is considered an "important component of the [NYPD]'s drug control strategy."  (NYPD Patrol Guide Procedure 212-59).

128.    In the course of a vertical patrol, multiple NYPD officers approach anyone they observe in the common areas of a building and require them either to present identification proving their residency in the building or to affirmatively establish a connection to a specific building resident.  If an individual stopped and seized pursuant to a vertical patrol fails to identify himself to the satisfaction of the officer, or is unable to demonstrate to the satisfaction of the officer that he or she is going to, or coming from, a visit to a resident or his or her own home, he or she is arrested for trespass.  If the individual has not already been searched for contraband pursuant to the seizure, they are subjected to a search for contraband pursuant to their arrest.

129.    Defendants' policy amounts to a roving pedestrian checkpoint wherein NYPD officers indiscriminately stop, seize, question, and even search individuals in the common areas of NYCHA residences in the absence of individualized objective facts.

130.    In 2005, the NYPD Housing Bureau alone conducted approximately 181,000 vertical patrols in NYCHA residences, and an average of 142,000 annually over the previous six

years. *Testimony of Chief Joanne Jaffe, NYPD Housing Bureau*, New York City Council Committee on Public Safety and Subcommittee on Public Housing (November 2, 2006) at 24. These figures understate the actual number of vertical patrols, however, since NYPD officers outside of the Housing Bureau also patrol NYCHA residences, also conduct vertical patrols in NYCHA residences, and also arrest people for trespass in NYCHA residences.

131.   In addition to directed or organized vertical sweeps in NYCHA residences, NYPD officers also sweep NYCHA residences for alleged trespassers on an informal basis.

132.   Trespassing in public housing is a Class B misdemeanor under subsection (e) of NYPL §140.10, which was enacted in 1992, shortly after the inception of the vertical patrol program. (L. 1992 ch.434).

133.   The number of trespass arrests in NYCHA residences has surged. The City has not provided any legitimate and neutral explanation for this rise in the arrest rate.

134.   Officers who make trespass arrests are now required by the local District Attorney's office to complete a special supporting deposition that sets forth the officer's observations and basis for stopping, seizing, and arresting an individual. *See, e.g.*, Supporting Deposition SD-4 for NYPL §§ 140.15, 140.10 (e) and 140.05, rev'd 04/06/2009 ("Manhattan SD"); Supporting Deposition SD-4 for NYPL §§ 140.15 & 140.10(e), rev'd 06/05/2007 ("Bronx SD"); Supporting Deposition; Criminal Trespass Fact Sheet ("Brooklyn SD").

135.   In Manhattan and the Bronx, the "Observations" section of the supporting deposition merely lists the location where the defendant was observed, the existence of conspicuously posted signs, and whether the entry was locked. *Id.* at ¶¶ 1-3. An officer is not required to identify individualized, objective facts supporting suspicion that criminal activity is afoot. These supporting depositions are reflective of, and consistent with, Defendants' policy,

practice and custom of indiscriminately stopping, questioning, and seizing every person they observe in NYCHA residences without individualized reasonable suspicion.

136.    The NYPD Patrol Guide on vertical patrols provides NYPD officers no guidance on who is to be stopped, seized, questioned, searched or arrested for trespass.  It simply directs uniformed patrol officers to "take note of unauthorized persons remaining in lobbies, basements, stair cases and roof landings and take appropriate police action when necessary." (NYPD Patrol Guide 212-60).  Yet the vertical patrol provision contains no criteria for determining who is – and who is not – an "unauthorized person."

137.    The vertical patrol policy and trespass arrest practices implemented by NYPD officers fails to require that an arresting officer act upon observed behavior that reliably differentiates a suspected trespasser or "unauthorized person" in a NYCHA hallway from a lawful visitor in transit, or a building resident enjoying the common area of his own home.  Given the large number of people legally permitted in a NYCHA residence, a police officer who is unfamiliar with building residents and visitors cannot consistently or reliably differentiate between a suspected trespasser and a building resident, visitor, permittee, or licensee based on this policy.

138.    Defendants' failure to provide adequate guidance, training, and support to NYPD officers regarding how to conduct vertical patrols, including whom to stop, question, seize, search and arrest for trespass, results in a *de facto* roving checkpoint and a pattern and practice of unlawful stops, seizures, and arrests.

139.    The only guiding principles provided to NYPD officers are consistent with, and reflective of, a policy, practice, and custom of reckless arrests based on less than probable cause.  In Manhattan and the Bronx, the supporting deposition requires NYPD officers to select an

"arrest element" for the arrestee's "reason for presence in the building."  Manhattan SD at ¶ 5; Bronx SD ¶ 5.  Some of the reasons include, but are not limited to: (a) defendant admitted he was not a resident and did not know the surname or apartment number of a tenant; (b) defendant identified the person and apartment they were visiting but the officer "could not locate" the person; or (c) a defendant gives no reason, is not on the tenant roster, and the officer "could not locate" anyone who gave them permission to enter.  *Id.*

140.    Under this policy, as written, people are or can be arrested for trying to visit someone who is not at home or based solely on their mere presence in or around a NYCHA residence. People are also arrested in instances in which they only know their friend's first name or nickname, or only know the apartment by the location rather than by number.  Individuals who remain silent upon questioning for trespass by NYPD officers are subject to arrest.  This is true even if the only basis for the NYPD officer's questioning is the fact that the individual was present in a common area of a NYCHA residence.

141.    Defendants' vertical patrol policy and trespass arrest practices, even if diligently followed, cause a pattern and practice of false arrests of many people who are lawfully on the premises.  Without probable cause to suspect criminal activity, the individual is forced to defeat a presumption of guilt with the presentation of documents or witnesses at the time of arrest.

142.    In addition to screening for suspected trespassers, another purported purpose of the vertical patrol program and trespass arrest practices is to screen and police the NYCHA residents themselves.  According to Inspector Michael C. Phipps, Commanding Officer, Housing Bureau Manhattan, the NYPD has the authority to arrest building residents and charge them with second degree trespass for entering certain areas of their own building,

"namely, the roof landings, the rooftops, store rooms, maintenance areas and basements." *Testimony of Insp. Michael C. Phipps*, New York City Council Committee on Public Safety and Subcommittee on Public Housing (April 29, 2004) at 24 ("Phipps Testimony"). Inspector Phipps testified that "[w]hen tenants sign lease agreements with the Housing Authority, they are advised not to enter" these areas in their buildings. *Id.*

143.    In fact, NYCHA leases do not contain any such clause.    A NYCHA lease merely provides that, when given proper notice, tenants must comply with all lawful rules and regulations promulgated by the Landlord.  For example, signs posted in or around the lobbies of NYCHA residences, if any, may state "No Trespassing" or "Loitering and trespassing in lobby, roof, hallway and stairs is not permitted.    Violators are subject to arrest and prosecution by Police Department."

144.    Trespass is an offense which requires that a person unlawfully enter or remain in a prohibited area.   There is no law prohibiting a resident's mere presence in or around the stairwells, hallways, roofs, or roof landings in his or her own apartment building.   Indeed, there could be no lawful regulation or notice provision prohibiting entirely a resident's mere presence in his or her own hallway or stairwell.

145.    Loitering also requires a specified unlawful purpose for being present at a location, such as "begging," P.L. § 240.35(1); gambling, P.L. § 240.35(2); sexual conduct, P.L. § 240.35(3); possessing a controlled substance," P.L. § 240.36 or engaging in prostitution, P.L. § 240.37.

146.    Thus, there is no legal basis for wholesale stopping, seizing, questioning, searching, and arresting individuals, including residents, for mere presence in lobbies, roofs, hallways, and

stairwells in and around NYCHA residences. Yet Defendants have enforced, promoted, encouraged and sanctioned these customs and practices.

147.   Defendants have failed to supervise and discipline NYPD officers who unlawfully stop, question, seize, search, and arrest individuals for trespass. On information and belief, Defendants do not monitor improper stops, scizures, and searches for trespass. Nor have Defendants instituted any follow up procedure or disciplinary action when charges are dismissed or where it is otherwise established that an individual was arrested without probable cause.

148.   As tenant leaders recently noted to NYPD Commissioner Raymond Kelly, the trend of "dehumanizing policing" in NYCHA residences is no longer about "isolated incidences [but] has become the norm in [their] communities." CCOP Statement.

**III.   The Vertical Patrol Policy and Trespass Arrest Practices are Racially Discriminatory**

149.   Defendants have chosen to enforce the trespass laws in NYCHA residences in an unlawful manner, and to do so without adequate training and controls, because of the race of NYCHA residents and visitors. Defendants apply this unlawful vertical sweep policy and trespass arrest practices in an intentionally discriminatory and race-based manner by focusing vertical patrols and trespass arrests on communities of color.

150.   For example, Defendants choose to target NYCHA residences where historically entrenched racial and residential segregation ensures that African Americans and Latinos will bear the brunt of NYPD sweeps and trespass arrests. According to demographic data maintained by NYHCA, over 95% of their residents are nonwhite.

151. The rate of trespass stops is significantly higher in predominantly minority NYHCA residences than in surrounding areas or in the rest of the city. The disparities in arrest rates are even more extreme. These disparities are not explained or justified by underlying crime levels.

152. The role that race plays in Defendants' enforcement and officer deployment decisions is further illustrated by the fact that the rate of trespass stops and arrests is higher, and the disparity in arrest rates increases, when there is a substantial difference between the racial composition of a housing development and the population in its surrounding neighborhood. Thus, where predominantly minority NYCHA residences are in white or gentrifying neighborhoods, there is a greater difference in trespass arrests and total enforcement. This remains true after controlling for other relevant factors.

153. These disparities are the result of a unique and separate enforcement process consistent with intentional targeting based on race. Essentially, the enforcement practices in NYCHA residences are not related to the enforcement practices in the surrounding areas. This too is true after controlling for other relevant factors or possible explanations.

154. Because vertical patrols and trespass arrests are conducted in an intentionally discriminatory fashion, the overwhelming majority of persons arrested for trespass in New York City are African American or Latino, despite the fact that African Americans and Latinos constitute only 54% of the city's population. This disparity has increased over time.

155. African Americans are more likely to be stopped for suspicion of trespass and more likely to be arrested for trespass. This is true in NYCHA residences just as it is true in communities of color throughout the city.

156. African Americans in New York City are stopped for trespass approximately 19 times more often than whites. Within NYCHA residences, African Americans are stopped on suspicion of trespass 2 ½ more often as whites.

157. African Americans in New York City are arrested for trespass almost ten times more often than whites. In NYHCA residences, African Americans have over a 25% higher chance of being arrested for trespass.

158. Although whites represent 45% of the citywide population, they are only 4% of those stopped on suspicion of trespass and 6.7% of those arrested for trespass.

159. Although African Americans represent approximately 25% of the citywide population, 61.5% of trespass stops are of African Americans and 51.6% of trespass arrests are of African Americans.

160. Defendants' policy, practice, and custom of stopping individuals without reasonable suspicion, and arresting individuals for trespass without probable cause in NYCHA residences, also has an easily foreseeable discriminatory impact on African Americans and Latinos.

161. Defendants are aware of these constitutional violations and their disparate impact on minority residents of NYCHA and their visitors. *See, e.g., People v. Ruiz*, 2007 N.Y. Misc. LEXIS 3530, at *4 (N.Y. Sup. Ct. 2007); Citywide Council of Presidents of NYCHA, *The Public Housing Police and Public Housing Resident Perceptions* (Nov. 30, 2009); New York Lawyers for the Public Interest, *No Place Like Home: A Preliminary Report on Police Interactions with Public Housing Residents in New York City* 10 (2008); Barbara Ehrenreich, *Is It Now a Crime to Be Poor?*, N.Y. Times, Aug. 9, 2009, at WK9; M. Chris Fabricant, *Rousting the cops: One man stands up to the NYPD's apartheid-like trespassing crackdown,*

33

Vill. Voice, Oct. 30, 2007; Rocco Parascandola, *Victim down on a policy*, Newsday, Oct. 25, 2007, at A19; Rocco Parascandola, *Trespassing charge nixed*, Newsday, Aug. 4, 2007, at A11; Rocco Parascandola, *The trouble with trespassing law*, Newsday, July 30, 2007, at A6; Rocco Parascandola, *Questions don't end as teen beats charges*, Newsday, June 25, 2007, at A12; Rocco Parascandola, *The Crime Column; Stop-and-frisk stats suggest flaws in NYPD practices*, Newsday, Apr. 10, 2007, at A4; Cara Tabachnick, *Trespass laws questioned; Stricter rules aimed at curbing crime and violence in projects often catch innocent bystanders in wake*, Newsday, Apr. 10, 2007, at A4.

162.    Nevertheless, Defendants intentionally allow the constitutional violations to persist because of the race, ethnicity, and/or national origin of NYCHA residents and visitors. Further, the City does not pursue similar law enforcement policies, practices, or customs, or permit similar levels of constitutional violations by NYPD officers in white communities.

163.    The reckless and unregulated character of vertical patrols, and the discriminatory nature of Defendants' trespass arrest practices, are well-illustrated by the recent trespass arrest of NYPD Sargeant Reginald McReynolds on October 26, 2009. *Cop:  I Was Profiled*, N.Y. Daily News, Dec. 30, 2009, at 21.  Sargeant McReynolds, who is assigned to the NYPD Quality Assurance Division, said "[t]his incident has opened my eyes . . . I can think of no other reason for being stopped but my skin color." *Id.*

164.    The NYPD has a long history of conducting high numbers of stop-and-frisks in New York City neighborhoods largely populated by racial minorities.  The NYPD's efforts to aggressively police "high-crime" areas have included stop-and-frisks resulting in repeated litigation and close scrutiny of policing practices.

165.    African Americans are over six times more likely to be stopped and frisked by NYPD officers than are whites. (1999 Office of the Attorney General "Stop & Frisk" Report ("OAG Report") at 95.)  In addition, stop-and-frisks in predominantly minority precincts in New York City happen at a significantly higher rate than stops in predominantly white precincts. (OAG Report at 101.)  When stops do occur in white neighborhoods, the disparity between racial minority and white "stop" rates is pronounced.  (OAG Report at 106.)  Racial minorities are also more likely to be unjustly stopped, insofar as stops of racial minorities are less likely to lead to arrests than stops of whites.  (OAG Report at 92-3.)

166.    According to the New York City Civilian Complaint Review Board ("CCRB"), the number of complaints received by the CCRB regarding unjustified stop-and-frisks now comprises a majority of complaints received by the CCRB.  In 1999, there were 1,240 complaints for unjustified stops and frisks.  That number increased to 5,089 in 2006.

167.    In 1999, the Center for Constitutional Rights filed a class action lawsuit, *Daniels, et al. v. City of New York, et al.,* No. 99-1695 (S.D.N.Y. filed 1999) ("*Daniels*"), on behalf of African-American and Latino plaintiffs challenging the NYPD's policy and practice of stopping-and-frisking people of color without reasonable suspicion of criminal activity as required by the Fourth Amendment.  The plaintiffs further alleged that NYPD officers selectively targeted them on the basis of their race, ethnicity, and/or national origin in violation of the Equal Protection Clause of the Fourteenth Amendment.

168.    After that lawsuit settled, updated data revealed that there was a demonstrable increase in stop-and-frisks from 2002 to 2006, including extreme disparities in "stop" rates based on race, ethnicity, or national origin.  In the first half of 2008 alone, the NYPD conducted over 270,000 stops, a pace that would make this rate of stops the highest ever. *Statement of Marc*

*Krupanski*, Center for Constitutional Rights, New York City Council Committee on Public Safety (January 29, 2009) at 2. From 2005 through the first half of 2008, 80% of NYPD stops were of African Americans and Latinos; 85% of NYPD frisks were of African Americans and Latinos; only 2.6% of stops resulted in the discovery of contraband; stops of whites were more likely to yield contraband; and only 4-6% of stops resulted in an arrest. *Racial Disparity in NYPD Stops-and-Frisks*, Center for Constitutional Rights Report at 1-2.

169.    In response to this updated data, another class-action lawsuit was filed against the City, *Floyd v. City of New York*, No. 08-1034 (S.D.N.Y. filed 2008), challenging the NYPD's pervasive policy, custom and/or practice of stop-and-frisks under the Fourth and Fourteenth Amendments to the United States and New York Constitutions.

## IV.    NYCHA's Express Approval and Adoption of the Vertical Patrol Policy and Trespass Arrest Practices

170.    NYCHA is a public entity that receives federal financial assistance. It owns and operates approximately 340 public housing developments encompassing more than 2,600 residential buildings in New York City, which house more than 400,000 residents.

171.    NYCHA's mission is to provide decent and affordable housing in a safe and secure living environment for low- and moderate-income residents throughout the five boroughs in New York City. *See,* http://www.nyc.gov/html/nycha/html/about/about.shtml (last visited on January 7, 2009).

172.    The NYPD's vertical patrol policy and trespass arrest practices are specifically authorized by NYCHA. NYCHA "has given the Police Department permission to enter [NYCHA] buildings and inquire of those they encounter the reasons for them being there. If an unauthorized person is found there, the Housing Authority has granted the Police

Department permission to act as a complainant on their behalf and to arrest that violator for the crime of trespass." Phipps Testimony at 23-4.

173.   Prior to 1995, NYCHA maintained its own police services, the Housing Authority Police Department ("HAPD"). Pursuant to a Memorandum of Understanding entered into by the City Council and then-Mayor Rudy Guiliani, the HAPD merged with NYPD in 1995. *See* Public Safety in Public Housing Report by Committee on Public Safety and Subcommittee on Public Housing, p. 2.

174.   This Memorandum of Understanding required NYCHA to make annual payments to the NYPD equal to NYCHA's previous HAPD expenditures, adjusted for inflation. *See* NYCHA Housing: Access Granted, A Staff Report by the Council of the City of New York to the Committee on Oversight and Investigations and the Sub-Committee on Public Housing, p. 4. The agreement provides for NYPD to provide a level of policing that is "over and above baseline services."

175.   These payments from NYCHA to the NYPD ranged from $58 million to $88 million annually, between 1995 and 2008. *See generally id.* at 4; *see also* Testimony of Molly Wasow Park, Senior Analyst, Before the City Council Committee on Public Safety And the Subcommittee on Public Housing on Public Safety in Public Housing, April 29, 2004, p. 1 ("Park"); FY 2008 Budget Presentation, NYCHA Website. The cost of staffing the vertical patrols has been defrayed with United States Housing and Urban Development funds received by NYCHA and transferred to the NYPD as part of a program known as "Operation Safe Home"(1995 Memorandum of Understanding, "Operation Safe Home").

176.   The NYPD maintains a dedicated Housing Bureau to police NYCHA residences. More than 1,700 uniformed officers were assigned to the Housing Bureau as of 2004. NYCHA

residences receive additional police services from other NYPD officers and units, sometimes through programs such as Operation Impact. *See* NYCHA Housing: Access Granted, A Staff Report by the Council of the City of New York to the Committee on Oversight and Investigations and the Sub-Committee on Public Housing, p. ii.

177.    Residents of NYCHA are unable to use and enjoy their residences because the vertical patrol policy and trespass arrest practices are conducted in such a consistently unlawful and disproportionate manner that the residents are not free to come and go as they wish and their family, friends, and guests are constantly harassed and intimidated by NYPD officers.

178.    The NYPD's policy and practice of conducting its vertical patrol policy and trespass arrest practices within NYCHA hallways, stairwells, and other common areas frequently disrupts the domestic lives of NYCHA residents. A door-to-door survey of 181 households in the Thomas Jefferson Houses in East Harlem and the Walt Whitman Houses in Fort Greene, Brooklyn demonstrated that 30% of these households include a person who has been charged with trespass. In addition, 72% of households in the Thomas Jefferson Houses reported that, in 2008, they and their regular visitors have been stopped by police between 5 to 20 times that year. "No Place Like Home: A Preliminary Report on Police Interactions with Public Housing Residents in New York City (New York Lawyers for the Public Interest Community Oversight of Policing Project, Sept., 2008) p. 2,10, 16-17, *available at* http://stage.nylpi.org/pub/2008NOPLACELIKEHOMEREPORT.

179.    The recent statement delivered to the NYPD Commissioner Kelly by NYCHA tenant leaders critiqued NYPD trespass enforcement and noted that residents feel like they live in "penal colonies" instead of public housing communities. CCOP Statement.

180.   Defendants' policy, practice, and custom of conducting vertical patrols and trespass arrests practices in NYCHA residences disproportionately violates the rights of minorities living in or visiting residences controlled by Defendant NYCHA.  NYPD officers engage in a pattern and practice of indiscriminately stopping, seizing, questioning, and searching individuals in the common areas of NYCHA residences in the absence of individualized objective facts suggestive of criminality.   Coupled with Defendants failure to provide adequate guidance, training and support to NYPD officers, this causes a pattern or practice of improper stops, seizures, searches, and arrests of residents and visitors who are lawfully on the premises of NYCHA housing.

181.   Defendants have enforced, promoted, encouraged and sanctioned the above-described policy of vertical patrols and trespass arrests practices and continue to do so.  As a result, over 90% of people arrested for trespass in New York City are African American or Latino, despite the fact that African Americans and Latinos only account for 54% of New York City's population.   Residents of NYCHA are unable to enjoy their residences because Defendants' vertical patrol policy and trespass arrest practices are conducted in such a manner that the residents are not free to come and go as they wish and their family, friends and guests are constantly harassed, intimidated and arrested by NYPD officers.

182.   Because the vertical patrol policy and trespass arrest practices target African-American and Latino individuals for unlawful stops and false arrests in areas where Arrested Plaintiffs and/or Resident Plaintiffs reside and/or visit, a real and immediate threat exists that the Fourth Amendment and Fourteenth Amendment rights of the Arrested Plaintiffs and Resident Plaintiffs and other class members will be violated by NYPD officers in the future.

Similarly, there is a real and immediate threat that NYPD officers will violate the Arrested Plaintiffs' and Resident Plaintiffs' rights under federal and state civil rights laws.

183.    Moreover, because Defendants' policies, practices and/or customs subject the Named Plaintiffs and other class members to stops, seizures, questions, and searches without any reasonable articulable suspicion of criminality, including on the basis of race, ethnicity, and/or national origin, the Named Plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of Defendants without sacrificing fundamental rights.

184.    The Plaintiffs and other members of the class have no adequate remedy at law and will continue to suffer serious and irreparable harm to their constitutional and statutory rights unless Defendants are enjoined from continuing the NYPD's policy, practice and/or custom of the present vertical patrol policy and trespass arrest practices, which encourages and authorizes NYPD officers to stop, seize, question, and search individuals without reasonable suspicion that criminal activity is afoot, and to arrest people without probable cause, including on the basis of race, ethnicity, and/or national origin.

## CLAIMS FOR RELIEF

First Claim for Relief
Violations of the Fourth Amendment
(All Plaintiffs against the City)

185.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 184 above.

186.    The vertical patrol policy and trespass arrest practices involve systematic stopping, seizing, questioning, and searching of any and all persons observed in common areas of NYCHA residences absent individualized suspicion.  Thus, each vertical patrol involves a

series of temporary seizures that implicate the Fourth Amendment to the United States Constitution.

187. By adopting and implementing the vertical patrol policy and trespass arrest practices in this manner, the City has enforced, promoted, encouraged and sanctioned a policy, practice and/or custom of roving pedestrian checkpoints for general crime control wherein they indiscriminately stop and seize individuals in the absence of objective, individualized criteria in violation of the Fourth Amendment to the United States Constitution.

188. By adopting and implementing the vertical patrol policy and trespass arrest practices in this manner, the City has enforced, promoted, encouraged and sanctioned a policy, practice and/or custom of stopping, seizing, questioning, and searching Resident and Arrested Plaintiffs, and the members of the class they seek to represent, without the reasonable articulable suspicion of criminality required by the Fourth Amendment to the United States Constitution.

189. By adopting and implementing the vertical patrol policy and trespass arrest practices in this manner, the City has enforced, promoted, encouraged and sanctioned a policy, practice and/or custom of arresting Resident and Arrested Plaintiffs for trespass, and the members of the class they seek to represent, without probable cause to establish that a criminal offense has been or is being committed, as required by the Fourth Amendment to the United States Constitution.

190. By sanctioning and enforcing the vertical patrol policy and trespass arrest practices in this manner, the City intentionally and under color of state law has stopped, seized, questioned, searched and/or arrested Resident and Arrested Plaintiffs, without reasonable suspicion or

probable cause that a crime has been committed, in violation of the Fourth Amendment to the United States Constitution.

191.     These constitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, promoted, encouraged and sanctioned by the City, including but not limited to: (a) the failure to adequately and properly screen, train, and supervise NYPD officers; (b) the failure to properly and adequately monitor and discipline NYPD officers; and (c) the overt and tacit encouragement and sanctioning of, and the failure to rectify, the NYPD's suspicionless stops, seizures, questions, searches and arrests for trespass.

192.     The City has acted with deliberate indifference to the Fourth Amendment rights of the Resident and Arrested Plaintiffs and other members of the class.  As a direct and proximate result of the acts and omissions of the City, Resident and Arrested Plaintiffs, and members of the class they seek to represent, have been deprived of their rights under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

Second Claim for Relief
Violations of the Equal Protection Clause
(All Plaintiffs against All Defendants)

193.     Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 192 above.

194.     Acting under color of state law, Defendants have applied the vertical patrol policy and trespass arrest practices against All Plaintiffs and similarly situated individuals in an intentionally discriminatory and race-based manner.  Defendants have focused enforcement of the vertical patrol policy and trespass arrest practices in African-American and Latino communities.

195.   Defendants have targeted communities of color, such as NYCHA residences, for focused implementation of vertical patrols and trespass arrest enforcement, as residents in, and visitors to, these buildings are inhabited almost entirely by African Americans and Latinos. This pattern of targeted enforcement is not explained or justified by underlying crime rates in NYCHA residences.

196.   Defendants have acquiesced in, ratified, and failed to check widespread violations of the Plaintiffs' constitutional rights to be free from unreasonable searches and seizures, because of the Plaintiffs' race.

197.   These constitutional abuses were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City and NYCHA, including: (a) targeted implementation of vertical sweeps and trespass arrests in communities of color; (b) the discriminatory failure to adequately and properly screen, train, support, and supervise NYPD officers; (c) the discriminatory failure to adequately and properly monitor and discipline the NYPD officers.

198.   As a direct and proximate result of Defendants' practices,   Resident and Arrested Plaintiffs, and members of the class they seek to represent, have been deprived of their right to Equal Protection of the laws under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.


Third Claim for Relief
Claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d), *et seq.*
(All Plaintiffs against All Defendants)


199.   Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 198 above.

200. Residents of NYCHA are unable to use and enjoy their residences because Defendants' vertical patrol policy and trespass arrest practices are conducted in such a consistently unlawful and disproportionate manner that the residents are not free to come and go as they wish. Residents' family, friends, and guests are harassed and intimidated by Defendant NYPD.

201. Plaintiffs are among the intended beneficiaries of Defendants' programs and/or activities receiving federal financial assistance. The Defendants' discriminatory practices prevent the Plaintiffs from fully participating in and receiving the benefits of the programs and activities supported by federal funds. Resident Plaintiffs are unable to enjoy the normal rights and privileges associated with tenancy in NYCHA residences. All Plaintiffs, who are entitled to receive police protection from the NYPD, are instead victimized by the NYPD's unlawful and discriminatory police activities.

Fourth Claim for Relief
Unlawful Discrimination Under the Fair Housing Act of 1968 (Title VIII)
(Resident Plaintiffs Against All Defendants)

202. Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 201 above.

203. Defendants have, as described above, violated, and/or continue to violate, the rights of Resident Plaintiffs, and the members of the class they seek to represent, under the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* and implementing regulations by:

   a. Discriminating on the basis of race, ethnicity, and/or national origin in the terms, conditions, or privileges of the provision of services or facilities in connection with the sale or rental of a dwelling, in violation of 42 U.S.C. § 3604(b) and the corresponding implementing regulations; and

b.  Discriminating on the basis of race, ethnicity, and/or national origin in the exercise or enjoyment of a dwelling by coercion, intimidation, or interference, in violation of 42 U.S.C. § 3617 and implementing regulations.

204.  By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against African American and Latino NYCHA residents due to their race, or the racial composition of their building, in violation of the Fair Housing Act.

205.  The past and continuing acts and conduct of Defendants described above, were and are intentional, and have been carried out with deliberate indifference to the federally protected rights of the Resident Plaintiffs and the members of the class they seek to represent.

206.  Defendants' policies, patterns, and practices have had, and continue to have, an adverse and discriminatory impact on African Americans and Latinos that is not justified by necessity.

207.  Defendants have intentionally, knowingly, and continuously engaged in the practices described above, with the intent of denying equal housing opportunities to the Resident Plaintiffs and the members of the class they seek to represent.

<u>Fifth Claim for Relief</u><br>Claims Under the United States Housing Act, 42 U.S.C. § 1437d(1)(2)<br>(Resident Plaintiffs Against All Defendants)

208.  Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 207 above.

209.  Acting under color of state law, Defendants have, as described above, violated, and/or continue to violate, the rights of Resident Plaintiffs, and the members of the class they seek to represent, under the United States Housing Act, 42 U.S.C. § 1437(d)(1)(2), its implementing regulations, 42 U.S.C. § 1983, and the federal and New York State

Constitutions, by failing to provide reasonable accommodation of the Resident Plaintiffs' guests or visitors.

210.    Residents of NYCHA are unable to use and enjoy their residences and accommodate guests because Defendants' vertical patrol policy and trespass arrest practices are conducted in such an oppressive manner that the residents are not free to come and go as they wish and their family, friends, and guests are constantly harassed and intimidated.

211.    The past and continuing acts and conduct of Defendants, described above, were and are intentional, and have been carried out with deliberate indifference to the federally protected rights of the Resident Plaintiffs and the members of the class they seek to represent.

212.    Defendants' policies, patterns, and practices interfere with Resident Plaintiffs' ability to accommodate guests because their family, friends, and guests are harassed, intimidated and arrested by Defendants. Defendants' policies are unreasonable and have had, and continue to have, an adverse impact on African Americans and Latinos that is not justified by necessity.

213.    Defendants have intentionally, knowingly, and continuously engaged in the practices described above, with the intent of denying adequate housing to the Resident Plaintiffs and the members of the class they seek to represent.

Sixth Claim for Relief
Unlawful Discrimination under 42 U.S.C. § 1981
(All Plaintiffs against All Defendants)

214.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 213 above.

215.    By the actions described above, Defendants have continually denied Resident Plaintiffs, and the members of the class they seek to represent, the same right to make and enforce contracts as is enjoyed by white citizens of the United States, in violation of 42 U.S.C. § 1981. Resident Plaintiffs have been denied the enjoyment of the benefits, privileges, terms,

and conditions of their contractual relationship with NYCHA, because they are limited in their ability to enter and exit their own homes, and in their ability to receive guests, due to the Defendants' discriminatory and unlawful vertical patrol policy and trespass arrest practices.

216.    By the actions described above, Defendants have also denied all Plaintiffs the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and have subjected them to disparate forms of punishment, pains, penalties, taxes, licenses, and exactions, as compared to white citizens of the United States, in violation of 42 U.S.C. § 1981. All Plaintiffs have been injured by the Defendants' discriminatory and unlawful vertical patrol policy and trespass arrest practices.

217.    By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against African-American and Latino NYCHA residents due to their race, or the racial composition of their building, in violation of 42 U.S.C. §§ 1981 and 1983.

218.    The past and continuing acts and conduct of the Defendants, described above, were and are intentional, and have been carried out with deliberate indifference to the federally protected rights of the Resident Plaintiffs and the members of the class they seek to represent.

219.    Defendants have intentionally, knowingly, and continuously engaged in the practices described above, with the intent of denying equal housing opportunities to the Resident Plaintiffs and the members of the class they seek to represent.

Seventh Claim for Relief
Violation of Due Process Under the Fourteenth Amendment
(All Plaintiffs against All Defendants)

220.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 219 above.

47

221.   Defendants' vertical patrol policy and trespass arrest practices, as written and as applied, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution, in that it authorizes and causes NYPD officers to stop, seize, question, search, and arrest individuals for the mere exercise of their constitutional rights to freedom of association and assembly and their constitutional rights to intimate association, in the absence of constitutionally required procedural protections.

222.   By enforcing the unconstitutional vertical patrol policy and trespass arrest practices through the initiation and pursuit of criminal charges against certain Arrested Plaintiffs, which charges have directly resulted in arrest and detention of certain Arrested Plaintiffs, Defendants intentionally and under color of law have denied Plaintiffs their right to due process of law, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

Eighth Claim
Violation of the New York Constitution, Article 1, Section 11
(All Plaintiffs against All Defendants)

223.   Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 222 above.

224.   Defendants have applied the vertical patrol policy and trespass arrest practices against All Plaintiffs and similarly situated individuals in an intentionally discriminatory and race-based manner.  Defendants have focused enforcement of the vertical patrol policy and trespass arrest practices in African-American and Latino communities.

225.   Defendants have targeted communities of color such as NYCHA residences for focused implementation of vertical patrols and trespass arrest enforcement because residents in, and visitors to, these buildings are almost entirely African Americans and Latinos.

226.   Defendants have acquiesced in, ratified, and failed to address widespread violations of the Plaintiffs' constitutional rights to be free from unreasonable searches and seizures, because of the Plaintiffs' race.

227.   These constitutional abuses were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City and NYCHA, including: (a) targeted implementation of vertical sweeps and trespass arrests in communities of color; (b) the discriminatory failure to adequately and properly screen, train, support, and supervise NYPD officers; and (c) the discriminatory failure to adequately and properly monitor and discipline the NYPD officers.

228.   As a direct and proximate result of Defendants' practices, Resident and Arrested Plaintiffs, and members of the class they seek to represent, have been deprived of their right to equal protection of the laws under Article 1, Section 11 of the Constitution and the laws of the State of New York.

Ninth Claim
Violation of the New York Constitution, Article 1, Section 12
(Arrested Plaintiffs against the City)

229.   Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 228 above.

230.   By adopting and implementing the vertical patrol policy and the trespass arrest practices in this manner, the City has enforced, promoted, encouraged and sanctioned a policy, practice and/or custom of stopping and frisking Arrested Plaintiffs, and the members of the class they seek to represent, without the reasonable articulable suspicion of criminality required by the Constitution and laws of the State of New York.

231.   By adopting and implementing the vertical patrol policy and trespass arrest practices in this manner, the City has enforced, promoted, encouraged and sanctioned a policy, practice

and/or custom of arresting Arrested Plaintiffs for trespass, and the members of the class they seek to represent, without probable cause to establish that a criminal offense has been or is being committed as required by the Constitution and laws of New York.

232.    By sanctioning and enforcing the vertical patrol policy and trespass arrest practices in this manner, the City intentionally and under color of state law has stopped, seized, questioned, searched, and/or arrested Arrested Plaintiffs, without reasonable suspicion or probable cause that a crime has been committed, in violation of the Constitution and laws of the State of New York.

233.    These constitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, promoted, encouraged and sanctioned by the City, including but not limited to: (a) the failure to adequately and properly screen, train, and supervise NYPD officers; (b) the failure to properly and adequately monitor and discipline NYPD officers; and (c) the overt and tacit encouragement and sanctioning of, and the failure to rectify, the NYPD's suspicionless questioning and false arrest practices.

234.    As a direct and proximate result of the acts and omissions of the City, Resident and Arrest Plaintiffs, and members of the class they seek to represent, have been deprived of their rights under the Constitution and laws of the State of New York.

<u>Tenth Claim</u>
Respondeat Superior for False Arrest and False Imprisonment
(Arrested Plaintiffs Against the City)

235.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 234 above.

236.    NYPD Officers have unlawfully and unjustifiably detained, arrested, deprived of their liberty against their will, and imprisoned Arrested Plaintiffs.

237.  The unjustifiable and unlawful stops, seizures, questioning, searches, arrests, and imprisonments were carried out without a warrant.

238.  At all times mentioned, the unlawful false arrests and imprisonments of the Arrested Plaintiffs were without probable cause, were forcible, and against their will.

239.  All of the foregoing occurred without any fault on the part of Arrested Plaintiffs.

240.  At all relevant times, these NYPD officers were employees of the City and were acting for, upon, and in furtherance of the business of their employer and within the scope of their employment.

241.  Consequently, the City is liable under the doctrine of *respondeat superior* for their tortious actions.

Eleventh Claim
Violation of the New York State Human Rights Law
(Resident Plaintiffs Against All Defendants)

242.  Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 241 above.

243.  Defendants have discriminated and continue to discriminate against Plaintiffs on the basis of race in the terms, conditions or privileges of the sale, rental, or lease of a housing accommodation, or in the furnishing of facilities or services in connection therewith, in violation of the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq*.

244.  Defendants have also discriminated and continue to discriminate against Plaintiffs on the basis of race in the terms, conditions or privileges of publicly-assisted housing accommodations, or in the furnishing of facilities or services in connection therewith, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*.

245.  By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against African American and Latino NYCHA

residents due to their race, or the racial composition of their building, in violation of the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.*

246.    Resident Plaintiffs have been and continue to be harmed by Defendants' violations of the New York State Human Rights Law.

Twelfth Claim
Violation of the New York City Human Rights Law
(Resident Plaintiffs against All Defendants)

247.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 246 above.

248.    Defendants have discriminated and continue to discriminate against Plaintiffs on the basis of race in the terms, conditions or privileges of the sale, rental, or lease of a housing accommodation or in the furnishing of facilities or services in connection therewith in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*

249.    By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against African American and Latino NYCHA residents due to their race, or the racial composition of their building, in violation of the New York City Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*

250.    Plaintiffs have been, and continue to be, harmed by Defendants' violations of the New York City Human Rights Law.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

      a)    Certify this action as a class action on behalf of the proposed class pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure, consisting of the following subclasses of:

   a. African-American and Latino NYCHA residents ("Resident Plaintiffs") who live in buildings where they and their family, friends, and guests have been, or will be, subjected to unconstitutional stops, seizures, questions, searches, and arrests for trespass when visiting Resident Plaintiffs in NYCHA residences, including those targeted based on race, ethnicity, and/or national origin, as a result of Defendants' policies, practices, and/or customs; and

   b. African-American and Latino persons who have been, or will be, subjected by NYPD officers to Defendants' policy, practice, and/or custom of stopping, seizing, questioning, searching, and/or falsely arresting for trespass ("Arrested Plaintiffs") persons visiting Resident Plaintiffs in NYCHA buildings, including those targeted based on race, ethnicity, and/or national origin.

b) Declare that the Defendants' acts, practices, policies, and omissions have deprived Plaintiffs of their rights under the Fourth and Fourteenth Amendment of the United States Constitution; 42 U.S.C. § 1981; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d); Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.* ("Fair Housing Act"); the United States Housing Act, 42 U.S.C. § 1437, *et seq.*; the Constitution and laws of the State of New York; and the New York City Human Rights Law.

c) Order all appropriate injunctive relief as warranted, including but not limited to, ordering Defendants to cease immediately their violation of Plaintiffs' rights, and to remedy the invidious effects of their violations by patrolling NYCHA residences and effectuating trespass stops and arrests in a reasonable and nondiscriminatory manner;

d) Award compensatory damages to the Named Plaintiffs.

e)  Order reasonable attorneys' fees and costs to be paid by Defendants pursuant to 28 U.S.C. § 2414 and 42 U.S.C. §§ 1988, 3613; and

f)  Grant such other and further relief as the Court deems just and equitable.

Dated:  New York, New York
        January 28, 2010

NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.

By: _____

John Payton
     President and Director-Counsel
Debo P. Adegbile
Christina Swarns
Johanna B. Steinberg
Joy Milligan

99 Hudson Street, Suite 1600
New York, NY  10013-2897
(Tel.) 212-965-2200
(Fax) 212-219-2052


*-and-*


THE LEGAL AID SOCIETY OF NEW YORK

By: _____

Steve Banks
        Attorney-in-Chief
Seymour James
William Gibney
Steven Wasserman

199 Water Street 6th Fl.
New York , NY 10038
(Tel.) (212) 577-3300
(Fax) (212) 509-8141


*-and-*


55

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____

Julia Tarver Mason
David G. Clunie
Jason D.Williamson

1285 Avenue of the Americas
New York, New York 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990