IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KELTON DAVIS, WILLIAM TURNER, EDWIN LARREGUI, ROMAN JACKSON, KRISTIN JOHNSON, ELEANOR BRITT, ANTHONY ANDERSON, LASHAUN SMITH, SHAWNE JONES, HECTOR SUAREZ, ADAM COOPER, ANDREW WASHINGTON, P.L. by his parent LISA PIGGOTT, DAVID WILSON, and GENEVA WILSON, individually and on behalf of a class of all others similarly situated; <br><br> Plaintiffs, <br><br> -against- <br><br> THE CITY OF NEW YORK and NEW YORK CITY HOUSING AUTHORITY; <br><br> Defendants. | 10 Civ. 699  (SAS) |

**PLAINTIFFS' RESPONSES TO DEFENDANT CITY OF NEW YORK'S CORRECTED STATEMENT OF FACTS PURSUANT TO LOCAL RULE 56.1 AND PLAINTIFFS' RULE 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANT CITY OF NEW YORK'S
MOTION FOR SUMMARY JUDGMENT**

           Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York (collectively the "Local Rules" and each a "Local Rule"), Plaintiffs hereby submit the following responses to Defendant City of New York's ("Defendant" or the "City") Statement of Facts Pursuant to Local Rule 56.1 ("Defendant's Statement").  In addition, in accordance with Local Rule 56.1(b), Plaintiffs include a Statement of Additional Material Facts as to which Plaintiffs contend there exists a genuine issue to be resolved.

**PLAINTIFFS' RESPONSES TO DEFENDANT CITY OF NEW YORK'S
CORRECTED STATEMENT OF FACTS PURSUANT TO LOCAL RULE 56.1**

**General Objections**

Plaintiffs object to Defendant's Statement to the extent that it includes purported factual assertions about which Plaintiffs do not yet have requested discovery.  As such, Plaintiffs lack the information necessary to respond adequately to, or dispute, Defendant's Statement.  Accordingly, Plaintiffs have filed Rule 56(d) Declaration of Johnathan J. Smith in Support of Plaintiffs' Opposition to Defendant City of New York's Motion for Partial Summary Judgment, dated December 23, 2010 ("Smith Decl."), detailing the need for Defendant City of New York to respond to Plaintiffs' outstanding discovery requests.

Plaintiffs also object to Defendant's Statement to the extent it incorporates improper legal and factual characterizations, neither of which belong in a Rule 56.1 Statement of Uncontested Fact.  It is well-settled that "*Rule 56.1 Statements are not argument.  They should contain factual assertions, with citation to the record.  They should not contain conclusions.*" *Rodriguez* v. *Schneider*, No. 95 Civ. 4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) (emphasis in original).

Plaintiffs object to Defendant's Statement to the extent it relies on mere conclusions, hearsay, or unsupported inferences from the moving declaration of Assistant Chief Edward Delatorre, dated December 10, 2010 ("Delatorre Decl.").  *See generally Giannullo* v. *City of New York*, 322 F.3d 139, 142 (2d Cir. 2003).

Plaintiffs object to Defendant's Statement to the extent assertions are not "followed by citation to evidence which would be admissible."  Local R. 56.1(d); *see also Holtz* v. *Rockefeller & Co., Inc.*, 258 F.3d 62, 74 & n.1 (2d Cir. 2001) ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be

disregarded and the record reviewed independently."); *Am. Auto. Assoc.* v. *AAA Auto. Club of Queens, Inc.*, No. 97 CV 1180, 1999 WL 97918, at *3 (E.D.N.Y. Feb. 8, 1999) (refusing to consider 56.1 statement to the extent it consisted of "bare assertions unsupported by any citations to evidence").

### Specific Responses

Subject to and without waiver of these objections, Plaintiffs respond to the specific statements in the Defendant's Statement as follows:

1.      Deny to the extent it characterizes the policy initiatives of the New York City Police Department ("NYPD") as "comprehensive" and "responsive" as "created" and/or "maintained."  Admit to the extent these are the stated responsibilities of the NYPD Housing Bureau.

2.      Admit.

3.      Admit.

4.      Admit that the "interim order" is dated June 8, 2010.  Deny that it has been "fully effective" as part of the NYPD Patrol Guide ("Patrol Guide"); deny that it has been "fully effective" since that date; and deny that it will be incorporated into the next version of the Patrol Guide because the relevant discovery has not been produced.

5.      Admit that the stated purpose of Interim Order number 23 ("Interim Order 23") is to address interior vertical patrols.  Deny this statement to the extent it characterizes Interim Order 23 as providing "additional guidance" or that it "illustrates appropriate action to be taken with consideration afforded to the uniqueness and totality of the circumstances surrounding each encounter" as these incorporate improper legal and factual characterizations or conclusions.

6.      Deny this statement to the extent it characterizes these sections as the NYPD's "policy and practice" because that is an improper legal conclusion.

7.      Admit.

8.      Deny the statement to the extent it characterizes Interim Order 23 as providing "guidance" because this is an improper characterization and not a fact.

9.      Admit that this is the stated purpose of Interim Order 23.

10.     Deny the statement to the extent that there is no evidence that Interim Order 23 has been modified.  Rather, Defendant New York City has stated that Interim Order 23 modifies PG 212-60.  *See* Delatorre Decl. at ¶ 8.

11.     Admit that Interim Order 23 discusses the Patrol Guide guidelines for when it is appropriate to approach and question persons on New York City Housing Authority ("NYCHA") property.

12.     Object to the form of the statement to the extent it includes multiple assertions in a single paragraph.  Deny that Interim Order 23 "emphasizes and expands" on existing policies because it is a characterization and not a fact.  Deny the statement that these have been, or are, existing policies as this incorporates improper legal and factual characterizations and conclusions.

13.     Deny because Defendant has not defined what it means by the alleged "process" and because relevant discovery has not been produced.

14.     Deny because the Defendant has not defined what it means by the alleged "process" and because relevant discovery has not been produced.

15.     Admit, except that it does not provide a time frame.

4

16.    Admit that claims were raised *by* the New York City Civilian Complaint Review Board ("CCRB").

17.    Deny the statement to the extent it suggests the NYPD provided guidance to police officers patrolling NYCHA property in the first place.  Deny that the NYPD "recognized the benefit" of guidance "as a result" of the concerns because the relevant discovery has not been produced.

18.    Deny that the Patrol Guide has been "amended" to the extent Interim Order 23 has not yet been incorporated into the Patrol Guide.  Admit that some training has been developed and is being provided.

19.    Deny because the relevant discovery has not been produced.

20.    Deny because the relevant discovery has not been produced.

21.    Deny because the relevant discovery has not been produced.

22.    Admit that representatives of the NYPD and NYCHA met with the Citywide Council of Presidents ("CCOP") on October 15, 2009, but deny it was subsequent to any other meetings because the relevant discovery has not been produced.

23.    Admit that CCOP is an elected tenant association tasked with the responsibility of representing the interests of public housing residents but deny they are "duly" elected because Plaintiffs lack sufficient information.

24.    Deny to the extent that it is misleading to state that there was a "discussion" of additional NYPD training.  In fact, the transcript reveals that there was no real discussion about additional NYPD training.  Joanne Jaffe, Chief of the NYPD's Housing Bureau, merely says that she had "an idea to talk to more of you and the chairman about what I see in public housing, and maybe there is something we can do to enhance [training on community relations and working

with diverse groups of people]."  Delatorre Decl. Ex. D, at 79-80.  Chief Jaffe does not

specifically discuss training with respect to the trespass policy or practices.

25.     Admit except to the extent that it is unclear what is meant by meeting "regularly."

26.     Admit.

27.     Deny because the relevant discovery has not been produced.  Deny this statement

to the extent it relies on a moving affiant with no personal knowledge and/or inadmissible

hearsay.

28.     Deny because the relevant discovery has not been produced.  Deny this statement

to the extent it relies on a moving affiant with no personal knowledge and/or inadmissible

hearsay.

29.     Admit.

30.     Admit.

31.     Admit except to the extent that it is unclear what "addressed" means with regard

to the "NYCHA rules."

32.     Admit.

33.     Admit except to the extent that it is unclear at what point the ongoing meetings

will cease.

34.     Admit except to the extent of how regularly the committees meet or the substance

of those meetings because the relevant discovery has not been produced.

35.     Deny as improper factual characterization.

36.     Admit except to the extent that the meaning of "almost all" of the Safety and

Security Task Force ("SSTF") meetings is unclear and deny Chief Delatorre's attendance at

subcommittee meetings because the relevant discovery has not been produced.

37.     Admit except to the extent that it is unclear by what means the SSTF has "committed . . . to improve the safety, security and quality of life at NYCHA housing developments."

38.     Deny as improper factual characterization.

39.     Admit.

40.     Deny to the extent that "thorough review" is an improper characterization instead of a fact supported by evidence.  Deny what occurred in the subcommittee meetings and when, because the relevant discovery has not been produced.

41.     Deny because the relevant discovery has not been produced.  Deny this statement to the extent it characterizes as providing "additional guidance" or "active" as these incorporate improper legal and factual characterizations or conclusions.

42.      Admit.

43.     Deny that the parties "were engaged in a dialogue" about developing Interim Order 23 as an improper characterization and not a fact, although admit that the parties were communicating.

44.     Admit except to the extent Plaintiffs lack discovery on when the training was developed.

45.     Deny because the relevant discovery has not been produced.

46.     Admit.

47.     Admit that the training materials include scenarios.  Deny the characterization of the scenarios as those "that officers likely would encounter" and the suggestion that the scenarios "illustrate" concepts as improper characterizations and conclusions that are unsupported by the record.

48.     Deny.  CCOP and SSTF do not have one unified voice, there is no citation to evidence that each and every member of CCOP and the SSTF "expressed their satisfaction," and the phrase "expressed their satisfaction" is vague and ambiguous.  Deny this statement to the extent it relies on inadmissible hearsay in the moving declaration.

49.     Deny because the relevant discovery has not been provided.  Deny to the extent the changes are characterized as "legal refinements."

50.     Deny as an improper characterization and conclusion.  Deny also to the extent that the training has not been completed, and thus, it is not possible to determine whether it will address concerns.  *See* Delatorre Decl. ¶¶ 25–31.

51.     Admit.

52.     Deny because the relevant discovery has not been provided.  Deny the improper characterization and conclusion that three hours for the lesson is enough time to "ensure understanding of the material and to provide ample opportunity for question-and-answer sessions."

53.     Deny because the relevant discovery has not been provided.  Note that Defendant admits the training is not yet complete.

54.     Deny because the relevant discovery has not been provided.

55.     Deny because the relevant discovery has not been provided.

56.     Deny because the relevant discovery has not been provided.

57.     Deny because the relevant discovery has not been provided.

58.     Deny because the relevant discovery has not been provided.

59.     Deny because the relevant discovery has not been provided.

60.     Admit.

61.     Deny because the relevant discovery has not been provided.

62.     Deny because the relevant discovery has not been provided.

63.     Deny because the relevant discovery has not been provided.  Deny to the extent the "modified" training does not exist yet and therefore Plaintiffs cannot admit or deny its "substance."

64.     Deny because the relevant discovery has not been provided.  Deny to the extent that it is unclear whether this training as part of Phase II will merely repeat the training from Phase I or whether it will be different or enhanced.

65.     Deny because the relevant discovery has not been provided.  Deny statement as improper because it is a statement of intention rather than fact.

66.     Deny because the relevant discovery has not been provided.  Deny to the extent it is unclear to what extent these materials "reflect[] resident input," and deny because it is a statement of intention rather than fact.

67.     Deny because the relevant discovery has not been provided.

68.     Deny because the relevant discovery has not been provided.  Deny to the extent it is a projection rather than fact.

69.     Deny to the extent that facts are incomplete and deny to the extent that the statement mischaracterizes the letter.  The letter brings to light the practice of "the serious and continuing violations of the rights of NYCHA residents and visitors" and offers to meet and discuss.  In totality, the letter urges the NYPD to cease its violations of rights of NYCHA residents and visitors.   Moreover, plaintiffs dispute the characterization of the letter as a "threat[]."

70.     Deny because the relevant discovery has not been provided.  Admit that representatives of NYCHA met with CCOP on October 15, 2009.

71.     Admit that Reginald Bowman sent a letter but deny the statement to the extent the facts are incomplete.  Mr. Bowman sent a letter but it was not in his official capacity as President of CCOP, it was sent on CCOP letterhead without the knowledge or approval of CCOP members, it was not and never was approved by CCOP, and Mr. Bowman's opinion did not and does not reflect the opinion of the entire CCOP.  Declaration of Katharine E.G. Brooker, dated December 23, 2010 ("Brooker Decl."), Ex. A, at 106-110.

72.     Deny the improper characterizations "dismay" and "progress" which are not part of the letter.  Deny the statement to the extent the facts are incomplete.  *See* citation in response to Paragraph 71.

73.     Admit that Mr. Bowman stated he was aware of the issues raised in the Plaintiffs' letter.  Deny to the extent the quote is misrepresented and inaccurate.  The letter says *CCOP* has "been actively at work to address this matter" but does not state the same for NYCHA or the NYPD.  *See* citation in response to Paragraph 71.

74.     Admit.  Note that Mr. Bowman also said the "creation" of the SSTF was a "genuine gesture" to meet Plaintiffs' request to revise the vertical patrol and trespass policies.  *See* citation in response to Paragraph 71.

75.     Deny as an improper characterization.  Deny because the relevant discovery has not been produced.

### PLAINTIFF'S RULE 56.1 STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO CITY'S MOTION FOR SUMMARY JUDGMENT

**Evidence of Longstanding and Widespread Violations Resulting from
New York City's Unlawful Trespass Enforcement Practices on NYCHA Property**

1.      The Criminal Practice of the Legal Aid Society of New York ("Legal Aid")

serves as the primary provider of indigent defense services in New York City.  Declaration of

Anthony Elitcher, dated December 22, 2010 ("Elitcher Decl."), at ¶¶ 3–4.

2.      Between September 1 and November 30, 2010, Legal Aid handled 1,749 criminal

trespass arrests in New York City Criminal Courts.  *Id.* ¶ 5.  One-third of those cases were

specifically premised on allegations of trespass occurring on NYCHA public housing

development grounds under Sections 140.10(e) and 140.10(f) of the New York Penal Law.  *Id.*

This one-third figure is necessarily under-inclusive since it excludes those cases in which the

allegation is solely a violation of  Section 140.15 of the New York Penal Law, whose place of

occurrence may have been a public housing development.  *Id.*

3.      According to Legal Aid records, approximately 15% of these NYCHA-specific

cases have resulted in outright dismissals and adjournments in contemplation of dismissal

("ACD") thus far.  *Id.* ¶ 6.  This figure excludes a substantial number of cases that are still

pending and therefore have no identifiable disposition at present, as well as cases in which

district attorneys declined to prosecute and, thus, never filed charges.  *Id.*

4.      A recent study of New York City criminal cases from 2005 to 2008 shows that

prosecutors declined to press charges in 11.2% (7,412) of all trespass arrests.  Josh Bowers,

*Legal Guilt, Normative Innocence, and the Equitable Decision Not To Prosecute*, 110 Colum. L.

Rev. 1655, 1720 (2010).  Among the nineteen highest volume crimes in the study, trespass has

the fifth highest declination rate.  *Id.* at 1718.

5.      Vertical patrols first began in NYCHA buildings in 1991.  Complaint ("Compl.")

¶ 127.  Pursuant to a Memorandum of Understanding, the Housing Authority Police Department

and the NYPD merged in 1995.  *Id.* ¶ 173.  Since that time, NYCHA residences have been patrolled by the NYPD.

6.      One of the ways that the NYPD polices NYCHA properties is through the use of vertical patrols.  A "'vertical patrol' [is] where police officers are on foot patrol in public housing to prevent trespassing, loitering, drug-related activity and other illicit behavior."  *People* v. *Hendricks*, 84 N.Y.S.2d 94 (N.Y. App. Div. 2007); *see also People* v. *Roque*, 780 N.E.2d 976 (N.Y. 2002).  During a vertical patrol, "officers stop all who are found, question them as to why they are in the building or on the grounds, and ask for identification showing they live in the building or for an apartment number to verify a legitimate visit."  *People* v. *Powell*, 691 N.Y.S.2d 263, 265 (N.Y. Sup. Ct. 1999).

7.      Once a police officer encounters a civilian during the course of a NYCHA vertical patrol, the burden is on the resident or visitor to prove to the satisfaction of the individual officer that he is not a trespasser.  *People* v. *Ventura*, No. 2696/10, 2010 WL 5155983, at *1 (N.Y. Sup. Ct. Dec. 17, 2010).

8.      Davidson Houses Resident Association President Erik Crawford has been the President of his Resident Association for thirteen years.  During that time he has noticed a change in the way officers enforce trespass laws.  Beginning around 2004, he started getting more complaints from his residents about being stopped or arrested for trespassing in their own buildings.  He noted that these problems have gotten worse and remain a problem.  Declaration of Erik Crawford, dated December 20, 2010 ("Crawford Decl.") ¶ 4.

9.      Residents in the Davidson Houses "who do not have identification, and cannot otherwise prove they are residents or visiting residents, are accused of trespassing.  Rather than

verifying whether they are residents or guests, officers usually just give tickets and tell people to show their proof to a judge."  Crawford Decl. ¶ 11.

10.     Andrew Jackson Houses Resident Association President Daniel Barber says buildings in his NYCHA development are being patrolled almost entirely by rookies who are "using our homes as a training ground for making arrests."  Declaration of Daniel Barber, dated December 20, 2010 ("Barber Decl.") ¶ 6.

11.     Mr. Barber reports that his impression is that "the way officers enforce trespass laws has gotten especially bad in the last six years" and he has noticed increased complaints from residents about getting "stopped, and sometimes arrested," in their own developments.  Barber Decl. ¶ 7.  He has heard similar complaints coming from other developments.  *Id.* ¶ 8.

12.     Mr. Barber has had first-hand experience with NYPD trespass enforcement.  He has personally "been stopped repeatedly and asked for identification, whether [he] live[s] in the building, and where [he] is going."  *Id.* ¶ 9.  He was most recently stopped two months ago.  *Id.* ¶ 10.

13.     At an April 29, 2010 meeting, NYCHA Chairman John Rhea noted that hostility between officers and residents was a result of the loss of mutual familiarity following the merger of the NYCHA police into NYPD in 1995.  Chairman Rhea stated, "[r]ight now the hostility in the community is so bad, it really reflects what's going on with the police officers, whereas before, the police officers really engaged a little bit more in the community.  I want to know if that was any consideration?  Nobody ever evaluated the fact that they started this new system, you know?"  Brooker Decl. Ex. G, at 112.

**NYPD's Statements Regarding Its Trespass Enforcement Practices**

14.     During the October 15 Meeting, NYPD Housing Bureau Chief Executive Officer Edward Delatorre stated that there is a "unique" advantage to having the NYPD function as

NYCHA's "doorman" because NYPD officers are empowered to swear out trespassing

complaints on their own initiative, without consulting anyone from NYCHA.

*Id.* Ex. B, at 41–42.

15.    Chief Delatorre further noted that the NYPD is authorized by NYCHA to enforce

not only New York Penal Law, but also NYCHA "[house] rules," which include a rule against

"lingering" in the halls.  *Id.* Ex. B, at 43.

16.    During the April 29, 2010 Meeting, Delatorre acknowledged that NYPD lacks the

resources to "put officers back out in developments on steady foot, where they knew that one

development," which he acknowledged "would be a nice thing."  *Id.* Ex. G, at 112.

17.    Inspector Dieckmann also stated at the October 15 Meeting:  "I wish I could tell

you that every one of my officers acts professionally all the time, but I can tell you we had forty

thousand contacts in Brooklyn this year, between UF-250s, which is when we stop somebody

. . . . Those can all be seen as negative contacts."  *Id.* Ex. B, at 64.


**The City's Notice of Unlawful Trespass Stops and Arrests in NYCHA Buildings**

18.    Newspaper articles dating back to at least 2007 have chronicled the unlawful

trespass enforcement practices alleged in Plaintiffs' Complaint.  *See, e.g.*, Barbara Ehrenreich, *Is

It Now a Crime to Be Poor?*, N.Y. Times, Aug. 9, 2009, at WK9; Rocco Parascandola, *Victim

Down On a Policy*, Newsday, Oct. 25, 2007, at A19; Rocco Parascandola, *Trespassing Charge

Nixed*, Newsday, Aug. 4, 2007, at A11; Rocco Parascandola, *The Trouble With Trespassing Law*,

Newsday, July 30, 2007, at A6; Rocco Parascandola, *Questions Don't End as Teen Beats

Charges*, Newsday, June 25, 2007, at A12; Rocco Parascandola, *The Crime Column; Stop-and-

frisk Stats Suggest Flaws in NYPD Practices*, Newsday, Apr. 10, 2007, at A4; Cara Tabachnick,

*Trespass Laws Questioned; Stricter Rules Aimed at Curbing Crime and Violence in Projects Often Catch Innocent Bystanders in Wake*, Newsday, Apr. 10, 2007, at A4.

19.   On April 12, 2007, the National Latino Officers Association and 100 Blacks in Law Enforcement Who Care issued a joint press release alleging "widespread racial bias and unlawful application" of trespass laws by the NYPD.  Brooker Decl. Ex. D.  The officers alleged that the NYPD was "routinely charging innocent people with [t]respass" and targeting enforcement in the African-American and Latino communities.  The officers called for "immediate investigations of [] the NYPD's trespass enforcement strategy."  *Id.*

20.   In a 2008 publicly-issued report that was provided to Police Commissioner Raymond W. Kelly, New York Lawyers for the Public Interest ("NYLPI") detailed "disturbing levels" of police abuse on NYCHA properties.  Brooker Decl. Ex. E.

21.   The NYLPI report further documented an investigation and survey of these concerns by NYCHA residents beginning in 2007.  In one development, 30% of residents described being arrested for trespass in their own homes and 70% described being "repeatedly stopped by police officers when simply coming and going around their homes."  *Id.*  In response to this "chronic problem," NYLPI recommended that the NYPD meet with residents and explore alternative security methods.  *Id.*

22.   The CCRB reported meeting with the NYPD in April 2009 "to discuss the rise in allegations of improper stops in and around NYCHA buildings."  *Id.* Ex. F.  The CCRB informed the NYPD that many "officers were unaware that merely observing someone in, entering or exiting a NYCHA building was an insufficient reason to stop that person" and "recommended retraining, specifically that stops in NYCHA building[s] still require *reasonable suspicion*."  *Id.* (emphasis in original).

23.    On November 30, 2009, CCOP delivered a written statement to Commissioner Kelly of the NYPD critiquing the NYPD's trespass enforcement practices.  CCOP noted that residents feel like they live in "penal colonies" and that this "dehumanized policing" in NYCHA residences is no longer about "isolated incidents [but] has become the norm."  *Id.* Ex. I, at 2.

24.    Resident leaders, such as members of CCOP, report telling NYCHA and NYPD about the problem for "many years."  *Id.* Ex. H, at 62.

25.    Andrew Jackson Houses Resident Association President Daniel Barber has complained about trespass enforcement to people from the NYPD and NYCHA for the last six years.  Barber Decl. ¶ 12.  According to Mr. Barber, other Resident Association presidents have complained "open[ly] and freely for years" at NYCHA meetings and at NYPD Community Council meetings.  *Id.*

26.    Davidson Houses Resident Association President Erik Crawford also reports complaining to government officials as early as five years ago about trespass enforcement. Crawford Decl. ¶ 5.  He complained either in person, by email, or by phone to John Rhea, Joanne Jaffe, Robert Martinez, and Phillip Banks III.  *Id.*

27.    Despite having notice of widespread complaints about the City's trespass enforcement practices since at least 2007, the City took no corrective action until after the filing of Plaintiffs' Complaint in the instant litigation in January 2010.

### NYCHA House Rules' Requirement of Cooperation and Sanctions

28.    NYCHA issued "Highlights of House Rules, Lease Terms and Policy," which implements and provides notice to NYCHA tenants of twenty-eight selected house rules ("House Rules").  Delatorre Decl. Ex. F, at 1.  NYCHA reserves the right to commence a termination of tenancy proceeding against a tenant or family member who "breaches NYCHA rules."  *Id.* Ex. F,

at 2.  All NYCHA residents over age eighteen are required to sign a document that signifies that they have received and reviewed the House Rules.  *Id.* Ex. F, at 4.

29.     NYCHA House Rule 18, entitled "Trespassing Prohibited," provides that "[a]ll persons are expected to cooperate with inquiries from [NYCHA] and the police regarding their presence or conduct in any building or on development grounds."  *Id.* at 2.  Rule 21 bans "lingering" in lobbies, corridors, and stairwells.

30.     The House Rules were referenced in a letter from NYPD Commissioner Raymond W. Kelly to NYCHA, dated September 27, 2010, which stated the NYPD's intention to assist NYCHA to enforce its House Rules in order to facilitate enforcement of the vertical patrols.  *Id.* Ex. E, at 3.

**The NYPD's Revised Patrol Guide for Vertical Patrols in NYCHA Buildings**

31.     On June 8, 2010, the NYPD issued Interim Order 23.  *Id.* Ex. A.  Interim Order 23 directs officers on vertical patrol to "approach and question . . . potentially unauthorized persons," but not to "stop (temporarily detain)" a potential trespasser "unless the officer reasonably suspects that the person is in the building without authority."  *Id.* Ex. A, at 1 (emphasis in original).  Under Interim Order 23, a "potentially unauthorized person" could be someone who is "lingering" in violation of the House Rules.  *Id.* Ex. A, at 1; *id.* Ex. F, at 5. However, neither "potentially unauthorized person" nor "lingering" is defined in the House Rules or elsewhere.  *Id.*

32.     Training on Interim Order 23 instructs recruits to "[b]e alert for potentially unauthorized persons," but, based on the training, an observable characteristic justifying an approach may include entering without a key via a broken door or simply not being recognized by the officers.  *Id.* Ex. H, at 6-7, 9, 11.  Upon "approach," NYPD officers are authorized to

question individuals—with the specific purpose of eliciting information about possible criminal trespass activity. *Id.* Ex. H, at 6-7, 9-11.

33.     A person's refusal to submit to questioning or furnish evidence that he was visiting a resident "will not by itself raise reasonable suspicion or probable cause." *Id.* Ex. H, at 6-7.  However, a non-response or an inadequate response to questioning is grounds for ejection and subjects a person to arrest if he does not obey a request to voluntarily depart. *Id.* Ex. A, at 1; *id.* Ex. H at 6-7, 9-11.

### Evidence of Continuing Unlawful Trespass Enforcement Practices
### After Implementation of the Revised Patrol Guide

34.     On September 28, 2010, the New York City Council Committees on Public Housing, Civil Rights, and Public Safety held a public hearing entitled "Oversight—Stop and Frisk Practices in New York City Housing Authority Developments."  Brooker Decl. Ex. C, at 5.

35.     Several City Council members, along with members of the public, expressed continuing concern about the City's trespass arrest practices on NYCHA property despite the issuance of Interim Order 23.

36.     Council Member Rosie Mendez, Chair of the Public Housing Committee, stated: "It is my belief and the belief of the many of the residents that reside in public housing, that the New York Police Department is targeting people in public housing because of where they live and because of their demographic composition." *Id.* Ex. C, at 5.  Council Member Mendez further noted that "[n]inety-five percent of NYCHA residents just happen to be people of color" and expressed concern about the "indiscriminate use of stop and frisk tactics in NYCHA development[s]." *Id.* Ex. C, at 5-6.

37.     Council Member Deborah Rose, Chair of the Civil Rights Committee, stated: "An unfair stop or arrest can result in economic hardship, the loss of NYCHA housing and

emotional pain." *Id.* Ex. C, at 9.  She went on to comment that "Blacks and Latinos are disproportionately affected . . . .  As a result, there is a sense of distrust among NYCHA residents." *Id.* Ex. C., at 9.  Council Member Rose called for an examination of "whether the continued rise in the number of people stopped, questioned and frisked in New York City is a result of pressures within the NYPD." *Id.* Ex. C, at 10.

38.    Council Member Rose also stated at the hearing:  "Only after litigation . . . have we been able to even crack the lid on this problem.  Clearly, with more open reporting by NYPD and NYCHA, we would be able to truly learn the scope and severity of the problems facing the residents." *Id.* Ex. C, at 11.  She referred in this discussion to "the police department's overzealous use of stop and frisk practices." *Id.*

39.    Bishop Taylor of the CCRB testified that this issue must be examined:  "In order to get the clearest and fullest picture, we believe that it is important to do a larger study of police misconduct complaints stemming from these incidents." *Id.* Ex. C, at 19.

40.    According to Davidson Houses Resident Association President Erik Crawford, "[j]ust a few weeks ago" officers stopped four teenaged residents of the Davidson House who were "just hanging out in front of their home."  Crawford Decl. ¶ 3.  Similarly, Andrew Jackson Houses Resident Association President Daniel Barber recognizes that "[t]he problems [with the police] continue."  Barber Decl. ¶ 3.  In fact, Mr. Barber himself was stopped himself by the police just two months ago.  He states:  "I went to a building to visit a family member at 785 Courtlandt Avenue in the Bronx.  An officer asked me if I lived in the building, and I told him no.  When he asked me for identification, I said no and asked him why he wanted it.  I told him I was going to the 15th floor, gave him my name, explained that I am the [Resident Association]

President and [he] could call Officer Angel Irizarry or Chief Joanne Jaffe if there was a problem." *Id.*

41.     Legal Aid's statistical data supports the concerns expressed by City Council members and members of the public: New York City's unlawful trespass enforcement practices continue even after the issuance of the revised Patrol Guide.  Legal Aid handled at least 1,749 criminal trespass arrests in New York City Criminal Courts from September 1 through November 30, 2010, of which approximately one-third were specifically premised on allegations of trespass occurring on public housing development grounds.  Elitcher Decl. ¶ 5. Approximately 15% of these public housing-specific cases have resulted in outright dismissals and "adjournments in contemplation of dismissal" ("ACD").  *Id.* ¶ 6.  This figure excludes a substantial number of cases which are still pending and, therefore, have no identifiable disposition at present, as well as cases in which district attorneys declined to prosecute and thus charges were never filed.  *Id.*  These numbers are statistically significant to demonstrate that New York City's unlawful trespass arrest practices on NYCHA property continue despite the issuance of Interim Order 23.  *Id.*

42.     As a representative case, on June 15, 2010, in the NYCHA Redfern Houses in Rockaway, Queens, an NYPD officer arrested an 18-year-old NYCHA resident for trespassing under Arrest No. Q10636456.  *Id.* ¶ 7.  The young man was arrested immediately after visiting his friend in NYCHA housing.  *Id.*  The court dismissed the resulting prosecution under Docket No. 2010QN005950, upon presentation of an affidavit from his friend.  *Id.*

43.     As a representative case, on August 25, 2010, in the NYCHA Boulevard Houses in Brooklyn, an NYPD officer arrested a 19-year-old teenager for trespassing under Arrest No. 075681677 at 630 Stanley Avenue.  *Id.*  The young man had just left his uncle's Boulevard

Houses apartment.  *Id.*  The court dismissed the resulting prosecution in the interest of justice under Docket No. 2010KN068144.  *Id.*

44.      As a representative case, on November 18, 2010, in the NYCHA St. Mary's Park Houses in the Bronx, an NYPD officer arrested a 21-year-old man under Arrest No. B10694046 at 550 Cauldwell Avenue for trespassing.  *Id.*  The man had just visited a friend who lives in St. Mary's Park Houses.  *Id.*  This case is pending.  *Id.*

45.      As a representative case, on August 15, 2010, in the NYCHA Clinton Houses in Manhattan, an NYPD officer arrested a 16-year-old NYCHA resident for trespassing under Arrest No. M10672919.  *Id.*  The teenager was arrested immediately after visiting a friend in a neighboring building.  *Id.*  According to his mother, he has been stopped by police five times on NYCHA property.  *Id.*  On December 16, 2010, the court adjourned his case, Docket No. 2010NY073508, until February 2011 for trial or consideration of documentary proof that the teenaged NYCHA resident was coming from his friend's house.  *Id.*

Dated:  December 23, 2010
New York, New York

By:  /s/ Johanna B. Steinberg
           Johanna B. Steinberg

NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, NY 10013-2897
Tel.:  (212) 965-2200
Fax:  (212) 219-2052

John Payton
Debo P. Adegbile
Christina Swarns
Johanna B. Steinberg
Jin Hee Lee
Johnathan Smith
-of Counsel-

THE LEGAL AID SOCIETY
199 Water Street 6th Fl.
New York , NY 10038
Tel: (212) 577-3300
Fax: (212) 509-8141

Steven Banks
William Gibney
Steven Wasserman
Amanda Moretti
Nancy Rosenbloom
-of Counsel-

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Tel.: (212) 373-3000
Fax: (212) 757-3990

Jason D. Williamson
Katharine E. G. Brooker
Matthew J. Moses
-of Counsel-