UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KELTON DAVIS, WILLIAM TURNER, EDWIN
LARREGUI, ANTHONY ANDERSON, SHAWNE
JONES, HECTOR SUAREZ, ADAM COOPER,
DAVID WILSON, GENEVA WILSON, ELEANOR
BRITT, ROMAN JACKSON, KRISTIN JOHNSON,
LASHAUN SMITH, ANDREW WASHINGTON,
PATRICK LITTLEJOHN, RAYMOND OSORIO,
VAUGHN FREDERICK, and R.E., by her parent
D.E., individually and on behalf of a class of all
others similarly situated;

                       Plaintiffs,

    -against-

THE CITY OF NEW YORK and NEW YORK
CITY HOUSING AUTHORITY;

                       Defendants.

10 Civ. 0699 (SAS)

AMENDED COMPLAINT

[Class Action]

DEMAND FOR JURY TRIAL

## PRELIMINARY STATEMENT

1.      This is a civil rights action in which Plaintiffs Kelton Davis, William Turner,

Edwin Larregui, Anthony Anderson, Shawne Jones, Hector Suarez, Adam Cooper, David

Wilson, Geneva Wilson, Eleanor Britt, Roman Jackson, Kristin Johnson, Lashaun Smith,

Andrew Washington, Patrick Littlejohn, Raymond Osorio, Vaughn Frederick, and R.E., by her

parent D.E. (collectively, "Named Plaintiffs"),[1] on behalf of themselves and a class of similarly

situated individuals, seek to remedy the continuing violation of their rights secured by 42 U.S.C.

---

1    Plaintiffs Davis, Turner, Larregui, Anderson, Jones, Suarez, Cooper, David Wilson, and
    Geneva Wilson accepted offers of judgment from Defendant City of New York and judgment
    has been entered with regard to their claims against the City, pursuant to Rule 68 of the
    Federal Rules of Civil Procedure. These Plaintiffs' claims against Defendant New York City
    Housing Authority remain pending.

§ 1983; 42 U.S.C. § 1981; the Fourth and Fourteenth Amendments to the United States Constitution; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d); Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.* ("Fair Housing Act"); the United States Housing Act, 42 U.S.C. § 1437 *et seq.*; the Constitution and laws of the State of New York; and the New York City Human Rights Law.

2.      The City of New York ("City") and the New York City Housing Authority ("NYCHA") (collectively, "Defendants"), operating through and in conjunction and collaboration with the New York City Police Department ("NYPD"), conduct, enforce and/or sanction unlawful trespass enforcement policies and practices.  These result in a pattern and practice of unlawful stops, seizures, questioning, frisks, searches, and arrests of residents of, and authorized visitors to, NYCHA public housing residential property ("NYCHA Residences").

3.      Defendants' unlawful trespass enforcement practices include unlawfully-implemented vertical patrols.  A vertical patrol is a top-to-bottom walk-through patrol or "sweep" of hallways, stairwells, rooftops and landings, elevators, and other common areas of NYCHA Residences.  The NYPD's trespass enforcement practices in NYCHA Residences also include formal and informal checkpoints or stops during routine patrols.

4.      NYPD officers have a pattern and practice of stopping, questioning, detaining, and arresting persons in NYCHA Residences, without legal basis.  NYPD officers also regularly approach people observed in or around NYCHA Residences and require them to prove—to the subjective satisfaction of the officer—their residency or their authorization to be in NYCHA Residences.

5.      NYCHA fails to meet its obligation to provide adequate building security to its residents.  NYCHA authorizes these trespass enforcement policies and practices and pays the

2

NYPD, pursuant to the September 16, 1994 Memorandum of Understanding between NYCHA and the City on the Merger of the New York City Housing Authority Police Department and the NYPD (the "MOU"), approximately $80 million each year, financed largely by federal funds.

6.     NYCHA's contractual agreement with the NYPD appoints police officers to enforce NYCHA's House Rules.  The House Rules require, among other things, all NYCHA residents and guests to answer questions posed by NYPD officers, which facilitates the unlawful implementation of trespass enforcement policies and practices.  NYCHA also facilitates the unlawful practices by prohibiting "lingering" in its House Rules, which is not defined.

7.     The NYPD enforces these and other NYCHA House Rules.  NYCHA residents who violate certain House Rules may, therefore, be subject not only to termination of tenancy proceedings but also, under certain circumstances, arrest for trespass.

8.     The NYPD recently revised its Patrol Guide section related to policing in NYCHA Residences.  The recent revisions to the NYPD Patrol Guide ("Patrol Guide") and training fail to achieve compliance with the law, and Defendants' actions and omissions continue to subject NYCHA residents and their visitors to unlawful stops, detention, arrest, and prosecution.

9.     The overwhelming majority of NYCHA residents are people of color.  Defendants implement and apply these policies, practices, and customs in an intentionally discriminatory and race-based manner by focusing the unlawful trespass enforcement policies and practices on communities of color, such as NYCHA Residences, where African Americans and Latinos will bear the brunt of Defendants' unlawful actions.  Defendants also discriminatorily acquiesce in, ratify, and fail to monitor or rectify these widespread, unlawful practices because the victims are overwhelmingly African American and Latino.

10.    The rate of trespass stops and arrests, and enforcement in NYCHA Residences, which are overwhelmingly populated by people of color, is, on average, three times higher than in surrounding areas with similar rates of crime.  The decision to enforce trespass laws in this disproportionate way is not explained or justified by underlying crime levels in NYCHA Residences.   Moreover, these disparities are greater where NYCHA Residences are in predominantly white neighborhoods.

11.    The trespass enforcement policies and practices affect not only NYCHA visitors and residents who are stopped, seized, questioned, frisked, searched, and/or arrested; they also intimidate, threaten, and interfere with NYCHA residents' enjoyment of their homes on the basis of race, ethnicity, and/or national origin.  In addition, Defendants' trespass enforcement policies and practices interfere with the rights of NYCHA residents to associate freely with individuals whom they wish to invite to their homes.

12.    The mandate of the NYPD is to safeguard community members from crime by providing security and delivering other police services.  Yet, NYCHA residents are not provided police protection, a municipal service, on the same terms as other community members.  Instead, NYCHA residents and their invited guests are subject to unjustified stops, seizures, questioning, frisks, searches, and arrests when merely trying to enter and leave their own homes.  In a November 2009 statement provided to the NYPD Commissioner, NYCHA tenant leaders criticized NYPD trespass enforcement policies and practices, noting that residents feel like they live in "penal colonies."  The tenant leaders decried the "dehumanized policing" which they claim has become the norm instead of the exception in NYCHA Residences.

13.     The trespass enforcement policies and practices, as applied, are unreasonable conditions that deny NYCHA residents their rights to exclusive use and occupancy of their leased units, and their right to entertain guests in their homes.

14.     The pattern and practice of police activity in NYCHA buildings is so aggressive and well-known that some people are afraid to visit NYCHA residents. As such, this policy has prevented many NYCHA residents from maintaining and fostering close familial and personal relationships without unjustified government interference.

15.     The unlawful enforcement of trespass laws in NYCHA Residences also results from inadequate training, supervision and disciplining of NYPD officers on issues concerning the stops, seizures, questioning, frisks, searches, and arrests of individuals in or around NYCHA Residences and issues concerning the race, ethnicity, and/or national origin of NYCHA residents and visitors.

16.     The Named Plaintiffs seek to represent a certified class for the purpose of obtaining injunctive and declaratory relief only. Specifically, the Named Plaintiffs seek a class-wide judgment declaring that Defendants' policies, practices, and/or customs described herein violate Plaintiffs' statutory and constitutional rights under federal, state, and local law. The Named Plaintiffs further request a class-wide injunction enjoining Defendants from continuing such policies, practices, and/or customs, and requiring them to provide security and policing in NYCHA Residences in a lawful manner. In addition, the Named Plaintiffs seek compensatory damages for their individual claims, an award of attorneys' fees and costs, and such other relief as this Court deems equitable and just.

## JURISDICTION AND VENUE

17.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4), as this action seeks redress for violations of Plaintiffs' rights under the United States

Constitution and federal civil rights laws, and by 42 U.S.C. § 3613(a), as Plaintiffs seek relief with respect to discriminatory housing practices in violation of the Fair Housing Act.

18.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

19.     This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over Plaintiffs' claims under state and local laws because they are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

20.     Venue is proper in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events that gave rise to the claims alleged in this complaint occurred in the Counties of Bronx and New York.  In addition, Defendants conduct business and maintain their principal place of business in the Counties of Bronx and New York.

## PARTIES

### *Plaintiffs*

21.     The Plaintiff class includes African-American and Latino NYCHA residents and/or family members, guests or visitors of NYCHA residents, who have been or will be unlawfully stopped, seized, questioned, frisked, searched and/or arrested for trespass in or around NYCHA Residences, or whose family members, guests, and/or authorized visitors have been or will be unlawfully stopped, seized, questioned, searched and/or arrested for trespass by NYPD officers when visiting NYCHA residents.  The Plaintiff Class consists of two subclasses:  the "Arrested Plaintiffs" and the "Resident Plaintiffs."

22.     Arrested Plaintiffs are African-American and Latino NYCHA residents and/or family members, guests or visitors of NYCHA residents, who were or will be unlawfully stopped, seized, questioned, frisked, searched and/or arrested for trespass in or around NYCHA

Residences, including on the basis of their race, ethnicity, and/or national origin. All of the Arrested Plaintiffs are still subject to Defendants' unlawful conduct because they continue to lawfully reside in, or visit, NYCHA Residences.

23.    The Resident Plaintiffs are African-American and Latino NYCHA residents who live in buildings subject to Defendants' unlawful trespass enforcement policies and practices, and, as a result, have been unlawfully deprived of their rights to associate freely with invited guests, to enjoy the exclusive use and occupancy of their leased units, and to receive the same quality of police services provided to non-Resident Plaintiffs.

24.    Plaintiff KELTON DAVIS is an African-American resident of Manhattan, New York.

25.    Plaintiff WILLIAM TURNER is an African-American resident of Yonkers, New York.

26.    Plaintiff EDWIN LARREGUI is a Latino resident of Manhattan, New York.

27.    Plaintiff ANTHONY ANDERSON is an African-American resident of Manhattan, New York.

28.    Plaintiff SHAWNE JONES is an African-American resident of Brooklyn, New York.

29.    Plaintiff HECTOR SUAREZ is a Latino resident of Brooklyn, New York.

30.    Plaintiff ADAM COOPER is an African-American resident of Brooklyn, New York.

31.    Plaintiff DAVID WILSON is an African-American resident of Brooklyn, New York.

32.     Plaintiff GENEVA WILSON is an African-American resident of Manhattan, New York.

33.     Plaintiff ELEANOR BRITT is an African-American resident of NYCHA's Taft Rehabs development in New York, New York.

34.     Plaintiff ROMAN JACKSON is an African-American man who now resides in Los Angeles, California.

35.     Plaintiff KRISTIN JOHNSON is an African-American woman who now resides in Jackson, Mississippi.

36.     Plaintiff LASHAUN SMITH is an African-American resident of Queens, New York.

37.     Plaintiff ANDREW WASHINGTON is an African-American resident of NYCHA's Eastchester Gardens in Bronx, New York.

38.     Plaintiff PATRICK LITTLEJOHN is an African-American resident of NYCHA's Eastchester Gardens development in Bronx, New York.

39.     Plaintiff RAYMOND OSORIO is a Latino resident of Bronx, New York.

40.     Plaintiff VAUGHN FREDERICK is an African-American resident of NYCHA's Marlboro Houses in Brooklyn, New York.

41.     Plaintiff R.E. is an African-American resident of NYCHA's Moore Houses in Bronx, New York.  R.E. is a minor and sues as a plaintiff in this lawsuit by her parent, D.E.

### Defendants

42.     Defendant City is a municipal entity created and authorized under the laws of the State of New York.  It is authorized under the laws of the State of New York to maintain, operate, and govern a police department, the NYPD, which acts as its agent in the area of law

enforcement and for which it is ultimately responsible. The law enforcement activities of the NYPD are supported in part by federal funds.

43.     Defendant NYCHA is a public housing authority in the City that owns and operates housing for low-income residents in all five boroughs of New York City. NYCHA is responsible for the creation and implementation of policing and security policies in NYCHA Residences. NYCHA's principal offices are located at 250 Broadway, New York, New York 10007. NYCHA is funded in large part by federal funds.

## CLASS ACTION ALLEGATIONS

44.     The Named Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

45.     The Plaintiff Class includes two subclasses described above at paragraphs 22–23.

46.     The Named Plaintiffs representing the Arrested Plaintiffs are: WILLIAM TURNER; EDWIN LARREGUI; ROMAN JACKSON; KRISTIN JOHNSON; PATRICK LITTLEJOHN; ANDREW WASHINGTON; LASHAUN SMITH; ANTHONY ANDERSON; ADAM COOPER; DAVID WILSON; RAYMOND OSORIO; VAUGHN FREDERICK; and R.E., by her parent D.E.

47.     The Named Plaintiffs representing the Resident Plaintiffs are: KELTON DAVIS; ELEANOR BRITT; ANDREW WASHINGTON; PATRICK LITTLEJOHN; SHAWNE JONES; HECTOR SUAREZ; VAUGHN FREDERICK; and R.E., by her parent D.E.

48.     This action is properly maintainable as a class action because the requirements of Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure are satisfied, as explained below.

49.     The class and each subclass are so numerous that joinder of all members is impracticable. Upon information and belief, there are presently over 400,000 residents in NYCHA Residences, over 95% of whom are non-white. In 2008, there were thousands of arrests

for trespass in NYCHA Residences, and the overwhelming majority of arrestees were African American or Latino.

50.     Joinder is also impracticable because, upon information and belief, many potential members of the class are not aware that their constitutional, statutory, and common law rights have been violated and that they have the right to seek redress in court.  Further, putative class members are unknown and, therefore, cannot practically be joined individually.   There is no appropriate avenue for the protection of these potential class members' constitutional, statutory, and common law rights other than a class action.

51.     The claims alleged on behalf of the Named Plaintiffs as class representatives raise questions of law or fact common to Plaintiffs in the class and each subclass, and these questions predominate over individual questions.  These common questions include, but are not limited to: (a) whether NYPD officers engage in a policy, practice and/or custom of stopping, seizing, questioning, frisking, searching, and/or arresting class members for trespass in the absence of founded suspicion, reasonable, articulable suspicion or probable cause; (b) whether the NYPD has a discriminatory policy, practice, and/or custom of unconstitutional stops, seizures, questioning, frisks, searches, and/or arrests in NYCHA housing that is motivated by the class members' race, ethnicity and/or national origin; (c) whether Defendant City has encouraged, sanctioned, and/or failed to rectify unlawful stops and arrests for trespass by NYPD officers, and whether such acts and/or omissions have caused constitutional violations against class members; (d) whether Defendant City has failed to adequately train, supervise, and/or discipline NYPD officers in connection with unlawful stops, seizures, questions, frisks, searches and/or arrests for trespass, and whether such acts and/or omissions have violated class members' rights; (e) whether Defendants City and NYCHA have discriminated against African-American and Latino

NYCHA residents on the basis of their race, ethnicity and/or national origin in the provision of services in connection with their rental of a dwelling; (f) whether Defendants City and NYCHA have discriminated against African-American and Latino NYCHA residents by intimidating, threatening, and/or interfering with their enjoyment of a dwelling because of their race; (g) whether Defendants City and NYCHA unreasonably interfere with NYCHA residents' ability to entertain guests and visitors as a result of their trespass enforcement policies and practices in NYCHA Residences; (h) whether Defendants City and NYCHA unlawfully interfere with familial, business, and other relationships as a result of the trespass enforcement policies and practices in NYCHA Residences; and (i) whether NYCHA residents receive police services that are inferior to those provided to individuals who do not reside in NYCHA Residences.

52. The claims of the Named Plaintiffs are typical of the class and each subclass they seek to represent, as they all allege violations related to the existence and implementation of the Defendants' unlawful trespass enforcement policies and practices in and around NYCHA Residences.

53. The legal theories under which Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class and each subclass will rely, and the harms suffered by Plaintiffs are typical of the harms suffered by all members of the class and each subclass.

54. The Named Plaintiffs are adequate class representatives. They are African-American or Latino people who are or were either residents of NYCHA Residences or authorized visitors or guests of NYCHA residents. The Named Plaintiffs and/or their authorized guests remain at high risk of being unlawfully stopped, seized, questioned, frisked searched, and/or arrested by the NYPD.

55.    The Named Plaintiffs will fairly and adequately protect the interests of other class members.   Plaintiffs' counsel includes attorneys from the NAACP Legal Defense and Educational Fund, Inc., the Legal Aid Society of New York, and Paul, Weiss, Rifkind, Wharton & Garrison LLP—all of whom are experienced in federal class-action litigation, including constitutional and civil rights litigation, and have the resources necessary to pursue this litigation.

56.    This action is properly maintainable as a class action under Rule 23(b)(1) of the Federal Rules of Civil Procedure because prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that (a) would be inconsistent or varying and, thus, establish incompatible standards of conduct for the parties opposing the class and/or (b) as a practical matter, would be dispositive of the interests of non-parties or would substantially impair or impede non-parties' ability to protect their interests.

57.    This action is properly maintainable as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby rendering final declaratory relief and corresponding injunctive relief appropriate with respect to the Named Plaintiffs and the class as a whole.   The class members are entitled to injunctive relief to end Defendants' policy, practice, and custom of unconstitutional, discriminatory, and otherwise unlawful trespass enforcement.

## FACTS

I.   **Facts Regarding the Named Plaintiffs**

    *A.*    *Plaintiffs Kelton Davis and William Turner*

58.    Kelton Davis is a 43-year-old African-American male who lived in NYCHA public housing for over nine years.  Mr. Davis lived in NYCHA's Drew Hamilton Houses at 2698 Eighth Avenue, Apt. 5G, New York, New York.

59.    Mr. Davis is confined to a wheelchair.  Many friends and visitors come to his home due to his limited mobility.  On repeated occasions, Mr. Davis's friends and visitors have been unjustifiably stopped, seized, questioned, searched, and/or arrested for trespass while lawfully visiting, or attempting to visit, Mr. Davis.

60.    William Turner is a 40-year-old African-American male.  Mr. Turner is a consultant to the New York Department of Education, and has been employed in this capacity since approximately 1999.  Mr. Turner is a friend of, and authorized visitor to, Kelton Davis.

61.    On January 27, 2008, Mr. Turner visited Mr. Davis at his apartment in the Drew Hamilton Houses.  At approximately 11:30 p.m., Mr. Turner left Mr. Davis's apartment.  Shortly after exiting the elevator in Mr. Davis's building, Mr. Turner was approached and stopped in the lobby of the building by four NYPD officers.  At the time, Mr. Davis was merely walking out of the building and was not engaged in any activity that might indicate or imply that criminal activity was afoot.

62.    One of the police officers immediately asked Mr. Turner to present identification.  Mr. Turner complied with this request.  The same officer asked Mr. Turner where he was coming from.  Mr. Turner explained that he had just left Mr. Davis's apartment and showed the police officers a CD he had recorded during his visit.  Surrounded by four armed NYPD officers, Mr. Turner did not believe he was free to leave and asked the officer who initially approached him

whether there was a problem.  The officer told him to "shut up."  The officer then pushed Mr. Turner against a wall and proceeded to search him.  The officer did not find anything in the search.  Mr. Turner was arrested and charged with trespass.

63.     None of the NYPD officers who questioned, detained, and ultimately arrested Mr. Turner ever made any effort to verify that Mr. Turner was, in fact, a visitor of Mr. Davis and had just left Mr. Davis's apartment.  Mr. Davis did not become aware of Mr. Turner's arrest until the following day when Mr. Turner informed him of the arrest following his release.

64.     Mr. Turner was handcuffed, arrested, taken to the 32nd Precinct, and placed in a holding cell with at least five other people from approximately midnight on January 28, 2008 until 5:00 a.m. the next day, when he was given a desk appearance ticket and released.  Mr. Turner had to appear in court approximately four times over a six-month period before the case was ultimately dismissed.

65.     As a direct result of the arrest, Mr. Turner suffered a loss of income and work opportunity, including, but not limited to, teaching with the New York City Board of Education. Because of Mr. Turner's arrest, he was placed on the Department of Education's "ineligible inquiry list" and was suspended from all work with the Department of Education pending resolution of the case.  For almost eight months, between his arrest in January 2008 and the dismissal of his case in August 2008, Mr. Turner lost the wages he would have earned as a consultant to the New York City Department of Education.  Mr. Turner was also prohibited from his regular paying work with various youth organizations.  After his case was dismissed, Mr. Turner resumed work with the Department of Education but the volume of his work and hours decreased significantly and never returned to the level of January 2008.  Mr. Turner suffered

14

pain, suffering, humiliation, emotional distress, and loss of liberty as a result of his unlawful arrest and Defendants' actions.

66.     Many of Mr. Davis's visitors have been stopped and detained by NYPD officers in the lobby and hallways of his apartment building.  In rare instances, an NYPD officer will knock on Mr. Davis's door to verify that someone recently left his apartment or was coming to visit him.  On numerous occasions, however, as was the case with Mr. Turner's arrest, NYPD officers did not attempt to verify that Mr. Davis had a visitor or was expecting a visitor.  As a result of the recurrent unlawful stops and searches in his building, several of Mr. Davis's visitors have been arrested for trespass, and numerous visitors refused to return to his building.  His relationship with Mr. Turner, in particular, suffered significantly because Mr. Turner was hesitant to return to Mr. Davis's building for fear of being subjected to another unlawful stop and/or arrest.

67.     On several occasions, Mr. Davis has been stopped and detained in his own lobby at the Drew Hamilton Houses during a vertical patrol.  During these encounters, Mr. Davis has had to prove his identity and his place of residence in order to avoid arrest and enter his own apartment.  Mr. Davis has suffered pain, suffering, humiliation, and emotional distress.

### B.     Plaintiff Edwin Larregui

68.     Edwin Larregui is a 40-year-old Latino male who lived at 1265 Girard Avenue, Bronx, New York, at the time of his arrest.

69.     On the evening of November 9, 2008, Mr. Larregui was visiting a family member at her home in NYCHA's Carver Houses in Manhattan.  As he was leaving her building, Mr. Larregui was stopped by three undercover NYPD officers immediately outside of the building lobby.  As Mr. Larregui attempted to walk by the officers, he was directed to stop.  One officer grabbed Mr. Larregui by the arm and walked him back into the building lobby where he was

surrounded by all three officers.  Mr. Larregui was seized and detained by the officers, and did not feel free to leave.

70.     Although Mr. Larregui was merely leaving the building and was not engaged in any activity that might indicate that criminal activity was afoot, he was asked by one of the officers if he was on the NYCHA premises to buy drugs.  Mr. Larregui explained that he was visiting a family member in Apartment 6A.  Nonetheless, the officers grabbed him, threw him against a wall and searched inside his pockets.

71.     After the officers failed to find contraband on Mr. Larregui's person, Mr. Larregui presented his identification.  At the time of this incident, Mr. Larregui was carrying out-of-state identification.

72.     Mr. Larregui was detained in the lobby while one officer stated that he was going to check apartment 6A to determine whether Mr. Larregui was an authorized visitor.  Officers went to the apartment but did not ask to speak to the resident, nor did they identify Mr. Edwin Larregui to the individual who answered the door.

73.     Mr. Larregui was handcuffed and arrested for trespass.  Mr. Larregui was then taken to a police precinct and strip searched.  Nothing was recovered pursuant to the search.  Mr. Larregui was then taken to a second police precinct where he was strip searched for a second time.  Again, nothing was recovered.  Mr. Larregui was then taken to Central Booking where he was strip searched for a third time and placed in a holding cell.

74.     Mr. Larregui was arrested at approximately 7:00 p.m. on November 9, 2008.  He remained in police custody and did not see a judge until the afternoon of November 10, 2008, at which time he was released.

75.     As a result of his arrest, Mr. Larregui was unable to attend work on November 10, 2008 because he was in police custody. He was suspended from his job for two weeks as a result. Mr. Larregui suffered humiliation, pain and suffering, emotional distress, and loss of liberty emanating from Defendants' actions including, but not limited to, his unlawful seizure and arrest, as well as the three consecutive strip searches.

### C.      Plaintiff Anthony Anderson

76.     Anthony Anderson lives a few blocks from NYCHA's Thomas Jefferson Houses at 325 East 112th Street, New York, New York, where his sister-in-law lives with her two children.

77.     Mr. Anderson routinely picks up and drops off his niece and nephew at his sister-in-law's home.

78.     On January 18th, 2009, Mr. Anderson had spent the day with his 10-year-old niece and then dropped her off at his sister-in-law's apartment.  As he exited the building, he held the door for three NYPD officers who were entering the building.  Mr. Anderson was not engaged in any activity that might indicate criminal activity was afoot.  Nevertheless, the officers stopped, seized, and detained Mr. Anderson, made him step back into the building and then asked him where he was coming from.  From that point forward, Mr. Anderson did not feel free to leave.  Mr. Anderson explained to the officers that he had just left his sister-in-law's apartment and identified her apartment number for the officers who were questioning him.

79.     A police officer asked for Mr. Anderson's identification.  As Mr. Anderson pulled out his wallet, he asked the officer to look at his identification.  The officer immediately placed Mr. Anderson in handcuffs.  Upon information and belief, the officers never looked at Mr. Anderson's identification.

80.     While Mr. Anderson was detained in the lobby, two police officers went to his sister-in-law's apartment and asked if she was expecting anybody.  She said she was expecting her son, who was outside at the time, but did not mention Mr. Anderson since he had already departed and she therefore was no longer expecting him.

81.     The officers returned downstairs and Mr. Anderson was placed under arrest for trespass.  Mr. Anderson was taken into custody and incarcerated for nearly two weeks.  The charges against him were ultimately dismissed.

82.     At the time of this incident, Mr. Anderson was employed as a private security guard.  Because he missed 12 days of work while he was incarcerated, Mr. Anderson's employment was terminated.  He has been unemployed since his release from jail in January.  In addition to the loss of employment, Mr. Anderson suffered pain and suffering, humiliation, emotional distress, and loss of liberty emanating from his unlawful stop, seizure, and arrest.

### D.     Plaintiffs Adam Cooper and Hector Suarez

83.     Hector Suarez is a 56-year-old Latino male who has lived in NYCHA public housing for 15 years.  Mr. Suarez is a resident of the NYCHA Louis H. Pink Houses at 1211 Loring Avenue in Brooklyn, New York.

84.     Adam Cooper is a 33-year-old African-American male who has lived in NYCHA public housing for over four years.  Mr. Cooper currently resides in NYCHA's Louis Pink Houses at 1260 Loring Avenue. Mr. Cooper lives with his girlfriend, who is Hector Suarez's niece.

85.     In December of 2008, Mr. Suarez suffered serious back injuries for which he underwent regular hospital treatment.  As a result, his mobility was limited and he often depended on family members and friends to deliver meals to his home.

86.     On December 14, 2008, upon Mr. Suarez's request, Mr. Cooper delivered a hot meal to Mr. Suarez's apartment at approximately 6:00 p.m.  As Mr. Cooper was leaving the building he was stopped by three NYPD officers and asked where he was coming from.  Mr. Cooper possessed no contraband and was simply leaving the building after delivering a meal to Mr. Suarez.  He was not engaged in any behavior that might indicate criminal activity was afoot.  At no time during his interaction with the officers did Mr. Cooper feel free to leave.

87.     Mr. Cooper explained that he was coming from visiting his girlfriend's uncle upstairs and told officers the apartment number.  Mr. Cooper began to leave and the NYPD officers seized and detained him by pulling on his coat.  The officers failed to go upstairs and check with Mr. Suarez.  Instead they arrested Mr. Cooper and charged him with trespass.

88.     Mr. Cooper was in police custody for three days.  The charges were later dismissed.  As a direct result of his arrest, Mr. Cooper missed work, as he was still in police custody.  Mr. Cooper suffered pain and suffering, humiliation, emotional distress, and loss of liberty emanating from his unlawful stop, seizure, and arrest.  Mr. Suarez suffered pain and suffering, humiliation, and emotional distress.

###     E.     *Plaintiffs David Wilson and Geneva Wilson*

89.     David Wilson is a 54-year-old African-American male who lived at 55 Brooklyn Avenue, Brooklyn, New York, at the time of his arrest.

90.     Geneva Wilson is the 80-year-old aunt of David Wilson.  She is a resident of NYCHA Reverend Dr. Martin Luther King Jr. Towers at 255 West 114th Street, New York, New York.  She has lived on that block for over 40 years.

91.     In light of his aunt's advanced age, Mr. Wilson regularly visits her to make sure she has everything she needs and to help her manage her day-to-day activities.

92.     On the night of November 14, 2009, Mr. Wilson was going to visit his aunt at her home.  Before he could get there, however, Mr. Wilson was stopped by two plainclothes NYPD officers.

93.     The NYPD officers asked Mr. Wilson where he was going, at which point Mr. Wilson told the NYPD officers about his aunt.  The NYPD officers kept asking Mr. Wilson questions and would not let him go.  He also showed the NYPD officers his identification.  Mr. Wilson did not feel free to leave.

94.     One of the NYPD officers told Mr. Wilson they were going to his aunt's house. At this point, Mr. Wilson was placed in handcuffs and detained with the other officer.

95.     Geneva Wilson was home at the time and no NYPD officer knocked on her door or rang her doorbell.

96.     The NYPD officer, however, alleged that nobody was home at Geneva Wilson's apartment and the NYPD officers proceeded to place Mr. Wilson under arrest.

97.     Mr. Wilson was searched and no contraband was recovered.  His bags were searched and no contraband was recovered.

98.     Mr. Wilson remained in policy custody and did not see a judge until the following day.

99.     On November 19, 2009, the charges against Mr. Wilson were dismissed when his aunt, Geneva Wilson, came to the courthouse to verify that he was visiting her.  He remained incarcerated until the charges were dismissed.

100.    While Mr. Wilson was incarcerated, he missed a job interview.  Mr. Wilson suffered pain and suffering, humiliation, emotional distress, and loss of liberty emanating from

his unlawful seizure and arrest.  Ms. Wilson suffered pain and suffering, humiliation, and emotional distress.

### F.  *Plaintiffs Roman Jackson, Kristin Johnson, and Eleanor Britt*

101.  Roman Jackson is a 26-year-old African-American man who lived in NYCHA public housing for over 20 years.  At the time of his arrest, Mr. Jackson lived with his grandmother, Eleanor Britt, in NYCHA's Taft Rehabs in New York, New York.

102.  Kristin Johnson is a 24-year-old African-American woman who lived at 1738 Crotona Park, Bronx, New York, at the time of her arrest.  Mr. Jackson and Ms. Johnson are friends.

103.  Eleanor Britt is a 62-year-old African-American woman who has lived in NYCHA public housing for more than 33 years.  Ms. Britt is the grandmother and former guardian of Roman Jackson.  She continues to live in the building where Mr. Jackson was stopped and arrested.

104.  On January 31, 2009, Kristin Johnson was an invited guest to Mr. Jackson's home.  When Mr. Jackson and Ms. Johnson were outside his apartment, they were approached and stopped by three male NYPD officers.  The officers asked Mr. Jackson what he and Ms. Johnson were doing, and he explained that he was a building resident and that he and Ms. Johnson were simply having a conversation.  Neither Mr. Jackson nor Ms. Johnson was engaged in any activity that might indicate that criminal activity was afoot.  The officers demanded that Mr. Jackson and Ms. Johnson stand up and put their hands against the wall.  The officers then patted them both down and searched Ms. Johnson's bag.  Ms. Johnson was patted down by one of the male officers, which caused her emotional distress.  At no time during their interaction with the officers did Mr. Jackson or Ms. Johnson feel free to leave.  The officers did not recover any contraband from Mr. Jackson or Ms. Johnson.

105. One of the officers then asked Mr. Jackson and Ms. Johnson for identification. Mr. Jackson explained that he did not have his identification on his person, but that it was in his apartment, which was located in the building. Mr. Jackson offered to take the officers to his apartment in order to provide them with the requested identification and demonstrate that he was a building resident. The officer denied this request. Ms. Johnson provided the officers with her identification.

106. Mr. Jackson and Ms. Johnson were handcuffed and placed under arrest for trespass. The officers took them outside and placed them inside a police van. Once they were in the van, Mr. Jackson again tried to explain to the officers that he was a building resident and that his identification was in his apartment.

107. Two of the officers exited the van and went to retrieve Mr. Jackson's identification from his apartment. When the officers went to the apartment, Mr. Jackson's grandmother, Eleanor Britt, opened the door and explained that Mr. Jackson was her grandson and that he lived in her home. Ms. Britt gave the officers Mr. Jackson's New York State driver's license, which plainly stated that Mr. Jackson lived in the building.

108. Despite the fact that the arresting officers had determined that Mr. Jackson was a building resident, Mr. Jackson and Ms. Johnson were transported to the police station for processing. They were fingerprinted, photographed, and locked in a holding cell with other arrestees for almost six hours until they were eventually issued desk appearance tickets and released.

109. On March 2, 2009, the New York County District Attorney's Office declined to prosecute the cases against Mr. Jackson and Ms. Johnson.

110.    Mr. Jackson and Ms. Johnson experienced pain, suffering, humiliation, emotional distress, and loss of liberty emanating from their unlawful arrests.  Ms. Britt experienced pain, suffering, humiliation, and emotional distress.

### G.    Plaintiffs Lashaun Smith and Shawne Jones

111.    Lashaun Smith is a 32-year-old African-American man who resides in Queens, New York.  At the time of his arrest, Mr. Smith lived in Norfolk, Virginia.

112.    Shawne Jones is a 35-year-old African-American woman who has lived in NYCHA public housing her entire life.  She has been a resident of the NYCHA Langston Hughes Apartments at 301 Sutter Avenue, Apartment 6D, Brooklyn, New York, for approximately 20 years.

113.    On May 10, 2009, Mr. Smith spent the night at the home of Shawne Jones.  When Mr. Smith was leaving Ms. Jones's apartment on the morning of May 11, 2009, Mr. Smith was stopped by a police officer on the first floor of the building.  Mr. Smith was not engaged in any behavior that might indicate that criminal activity was afoot.

114.    The officer seized and detained Mr. Smith, then escorted him into the lobby of the building, where two other NYPD officers were waiting.  Mr. Smith was not free to leave.  The three officers asked Mr. Smith where he was coming from, and he explained that he had just left the home of his friend in Apartment 6D.

115.    Mr. Smith's friend was still asleep and did not answer the door when the police came to her apartment.  If the police had spoken to her, she would have verified that Mr. Smith was an authorized visitor who had just spent the night at her apartment.  The officers arrested Mr. Smith for trespass.

116. Mr. Smith was arrested at approximately 10:30 a.m. on May 11, 2009. Mr. Smith spent the entire night in jail and first saw a judge at approximately 8:00 a.m. on May 12, 2009. The charges against Mr. Smith were dismissed at arraignment at the District Attorney's request.

117. Due to his arrest and delayed return to Virginia, Mr. Smith missed work. Also, Mr. Smith's hours at his job were subsequently reduced. Mr. Smith experienced pain and suffering, humiliation, emotional distress, and loss of liberty as a result of his unlawful stop, seizure, and arrest. Ms. Jones suffered pain and suffering, humiliation, and emotional distress.

### H.    Plaintiffs Andrew Washington and Patrick Littlejohn

118. Patrick Littlejohn is an 18-year-old African-American man who has lived in NYCHA housing his entire life. Patrick Littlejohn lives in NYCHA's Eastchester Gardens at 1236 Burke Avenue, Bronx, New York.

119. Andrew Naiku Washington is a 19-year-old African-American man who has lived in NYCHA public housing for his entire life. Mr. Washington stays in NYCHA's Eastchester Gardens at 1240 Burke Avenue, Bronx, New York, with his grandmother.

120. Patrick Littlejohn and Andrew Washington have been friends since childhood. Although Mr. Littlejohn and Mr. Washington have different addresses, they live in the same physical building with separate entrances across a shared courtyard.

121. On the afternoon of June 29, 2009, Mr. Washington went to visit Mr. Littlejohn. When Mr. Washington left Mr. Littlejohn's apartment, he was stopped by two NYPD officers as he was exiting the lobby of Mr. Littlejohn's building. Mr. Washington was not engaged in any behavior that might indicate criminal activity was afoot. The officers stopped Mr. Washington, pushed him back into the building, and placed one handcuff on his wrist. Officers seized and detained Mr. Washington who, at that point, did not feel free to leave.

122.    After placing one handcuff on Mr. Washington, the officers began questioning him.  The officers asked where Mr. Washington was coming from.  He explained that he had gone to visit his friend upstairs in Apartment 5B.  The officers then took Mr. Washington upstairs to Apartment 5B.

123.    Patrick Littlejohn's mother answered the door when the police officers knocked. The officers asked her if she knew Mr. Washington, and she identified Mr. Washington as an authorized visitor.  The officers continued to question her, and asked her to identify Mr. Washington by name.  She identified Mr. Washington as "Naiku," his commonly-used middle name.  The officers had identified Mr. Washington by his first name.  Over her protestations that she knew Mr. Washington, officers took Mr. Washington into a nearby stairwell where he was frisked and arrested for trespass.  Mr. Washington was held in custody overnight.

124.    Mr. Washington's case was ultimately dismissed at the District Attorney's request.

125.    Mr. Washington experienced pain and suffering, humiliation, emotional distress, and loss of liberty emanating from his unlawful stop, seizure, and arrest.

126.    Mr. Washington has been stopped and questioned more than once by NYPD officers in Eastchester Gardens while going to and from his own home and the homes of his friends and neighbors.  He still lives in the same building and visits Patrick Littlejohn.

127.    Patrick Littlejohn was also unlawfully stopped and arrested for trespass when visiting another friend in his NYCHA development, Eastchester Gardens.  He was only 16 years old at the time of this arrest.

128.    On January 14, 2009, Mr. Littlejohn was with a friend, a Latino resident of NYCHA's Eastchester Gardens at 3020 Yates Avenue, Bronx, New York.  Mr. Littlejohn and his

friend were entering the lobby of his friend's building when police officers came out of the stairwell and stopped them.  Neither Mr. Littlejohn nor his friend was engaged in any behavior that might indicate criminal activity was afoot.  When asked, Mr. Littlejohn's friend showed officers his identification, which verified that he was a resident of the building.

129.   Mr. Littlejohn and his friend told officers that Mr. Littlejohn was authorized by the friend to enter the building.  Officers nonetheless seized Mr. Littlejohn and searched him, recovering no contraband.  Mr. Littlejohn did not feel free to leave and was eventually handcuffed and arrested by the officers.

130.   Mr. Littlejohn was held more than twenty-four (24) hours before seeing a judge and being released.

131.   The charges against Mr. Littlejohn were dismissed at the District Attorney's request.

132.   Patrick Littlejohn experienced pain and suffering, humiliation, emotional distress, and loss of liberty emanating from his unlawful stop, seizure, and arrest.

133.   Mr. Littlejohn has been stopped and questioned more than once by NYPD officers in Eastchester Gardens while going to and from his own home and the homes of his friends and neighbors.  Mr. Littlejohn's friends have been stopped and arrested while trying to visit him, as well.

### I.    *Plaintiff Raymond Osorio*

134.   Raymond Osorio is a 21-year-old Latino man who resides in Bronx, New York.

135.   On November 18, 2010, Mr. Osorio was visiting a friend at 550 Cauldwell Avenue, Bronx, New York, a NYCHA development.

136.    When Mr. Osorio left his friend's apartment in the early evening, he was stopped by NYPD officers just outside the lobby after leaving the building.  Mr. Osorio was not engaged in any behavior that might indicate that criminal activity was afoot.

137.    The officers seized and detained Mr. Osorio, then brought him back into the lobby of the building.  Additional NYPD officers entered the lobby.  Mr. Osorio was not free to leave.

138.    One officer asked Mr. Osorio questions.  At the same time, Mr. Osorio observed another officer questioning a man whom Mr. Osorio does not know, and then arresting that man.

139.    The officers put Mr. Osorio against a wall, frisked him, and searched him.  They did not find any weapons, drugs, or other contraband.

140.    The officer asked Mr. Osorio if he knew someone in the building.  Mr. Osorio explained that he was visiting his friend in Apartment 5C and provided the officer with the resident's name.

141.    While NYPD officers held Mr. Osorio in the lobby, other officers went upstairs with Mr. Osorio's New York State driver's license.

142.    A resident in Apartment 5C verified to officers that Mr. Osorio was an authorized visitor who had been visiting the apartment that afternoon.

143.    Despite the tenant's identification of Mr. Osorio, the NYPD arrested Mr. Osorio for trespass.  The NYPD handcuffed Mr. Osorio and put him in a police van, and transported him to the 40th Precinct station house.

144.    Mr. Osorio was arrested at approximately 6:30 p.m. on November 18, 2010.  Mr. Osorio spent the entire night in jail and was not arraigned until the late afternoon of the following day, November 19, 2010.  He was released.

145.   Mr. Osorio returned to court in January 2011 and the charges against Mr. Osorio were dismissed at the District Attorney's request, based on representations from Mr. Osorio's friend that he was an authorized visitor.

146.   Mr. Osorio has changed his behavior as a result of the NYPD's unlawful arrest. He visits his friend at 550 Cauldwell Avenue less often, asks someone to pick him up in a car when he is leaving that NYCHA building, and regularly wears his work uniform on NYCHA property in the hope that officers will be less likely to stop, question, search or arrest him.

147.   Mr. Osorio has been stopped, questioned and searched by the NYPD repeatedly on NYCHA property.  He is regularly stopped and asked where he is going, and is frisked or searched.  Mr. Osorio has been stopped at least once in a NYCHA development since his arrest.

148.   Mr. Osorio experienced pain and suffering, humiliation, emotional distress, and loss of liberty as a result of his unlawful stop, seizure, and arrest.

### J.   *Plaintiff Vaughn Frederick*

149.   Vaughn Frederick is a 23-year-old African-American man who has lived in NYCHA housing for most of his life.  Mr. Frederick lives in NYCHA's Marlboro Houses at 30 Avenue V, Brooklyn, New York, with his grandmother.

150.   When Mr. Frederick was younger, he lived with his mother for several years in the building next door, 29 Avenue W, also in NYCHA's Marlboro Houses.

151.   On November 13, 2009, Mr. Frederick was leaving 29 Avenue W with a friend who lives there.  He and that friend, along with a second friend, were stopped and detained by three plainclothes NYPD officers.  The second friend also lives in NYCHA's Marlboro Houses at 30 Avenue V, in the same building as Mr. Frederick.

28

152.   Neither Mr. Frederick nor his two friends were engaged in any behavior that might indicate criminal activity was afoot.  They were walking to a waiting taxi when officers approached and stopped them.  They did not feel free to leave.

153.   The officers questioned and searched Mr. Frederick and one of his friends. Officers also searched the friend's bag.  No contraband was recovered from any of the searches. Pursuant to a demand by one of the officers, the friend showed identification verifying that he lived in 29 Avenue W and was released.   Pursuant to questioning by a different officer, Mr. Frederick explained that he was visiting his friend and, upon demand, showed his identification verifying that he lived in the building next door at 30 Avenue V.  A fourth officer arrived at the scene, and Mr. Frederick was arrested for criminal trespass.  Neither of Mr. Frederick's friends was arrested.

154.   Mr. Frederick was detained overnight before his arraignment the following day at which he was released.  His friend had to go to court several times on behalf of Mr. Frederick. Finally, after approximately six court appearances and several months, Mr. Frederick's case was dismissed at the District Attorney's request.  He missed school and work.  In the meantime, his license to work as a security guard was suspended.

155.   Mr. Frederick experienced pain and suffering, humiliation, emotional distress, and loss of liberty emanating from his unlawful stop, seizure, and arrest.

### K.   Plaintiff R.E., by her parent D.E.

156.   R.E. is a 17-year-old African-American woman who has been a resident of NYCHA's Monsignor E. Roberts Moore Houses ("Moore Houses") in Bronx, New York, for her entire life.

157.   On October 17, 2010, R.E. was in the lobby of NYCHA's Mitchel Houses at 175 Alexander Avenue, Bronx, New York.   After visiting a friend who lives in 175 Alexander

Avenue, she went down to the lobby to wait for another friend to walk her home because R.E. did not feel safe traveling alone at such a late hour.  She was not engaged in any behavior that might indicate criminal activity was afoot.

158.    Officers entered the building and asked R.E. what she was doing there.  She explained that she had just visited a resident of the building.  When officers persisted in questioning her, she attempted to walk away.  The officers physically detained her.  The NYCHA resident whom R.E. was visiting came to the lobby and told officers that R.E. was an authorized visitor.  Officers did not otherwise attempt to verify R.E.'s authority to be in the building.  Instead, they placed her under arrest.

159.    R.E. was detained overnight and was not arraigned until the following day, when she was released.  R.E. had to miss school when she was required to return to court more than two months later.  At that court appearance, the charges against her were dismissed at the District Attorney's request.

160.    R.E. has also been stopped unlawfully by officers in her own NYCHA building. People visiting R.E.'s home have also been stopped unlawfully by officers in her building.

161.    R.E. experienced pain and suffering, humiliation, emotional distress, and loss of liberty emanating from her unlawful stop, seizure, and arrest.  As a result of the arrest, she no longer participates in the after-school activities she used to participate in, and visits her friend less often.  In addition, R.E.'s part-time employer at the time, a daycare center, was notified of her arrest and placed her on probation with the possibility of termination.  R.E. had to miss more school to meet with a representative of the New York City Administration for Children's Services in order to keep her employment.

## II. Trespass Enforcement Policies and Practices in NYCHA Residences

162.    The experiences of the Named Plaintiffs and putative class members directly result from the NYPD's unlawful trespass enforcement policies and practices in or around NYCHA Residences.    NYCHA fails to provide adequate building security and instead outsources its security obligations to the NYPD, designating the NYPD as its agent.

163.    One of Defendants' primary trespass enforcement practices is the use of vertical patrols.  The NYPD's trespass enforcement practices in NYCHA Residences also include formal or informal checkpoints or stops during routine patrols.  For example, NYPD officers congregate in a fixed location—in or near a lobby—and stop people who are entering or exiting the building.

164.    Vertical patrols began in 1991 as a general crime control measure and as a component of the City's drug control strategy.

165.    A vertical patrol is a top-to-bottom walk-through patrol or "sweep" of hallways, stairwells, rooftops and landings, elevators, and other common areas of NYCHA Residences.

166.    In 1992, legislation was enacted which allowed trespass arrests in public housing. Trespassing in public housing was codified as a Class B misdemeanor under Sections 140.10(e) and (f) of the New York Penal Law.  Individuals arrested for trespass in NYCHA Residences are sometimes charged under Section 140.15 of the New York Penal Law, a Class A misdemeanor, in addition to or instead of being charged with the Class B misdemeanor.  After this legislation was passed, vertical patrols were implemented in NYCHA Residences.

167.    In the course of vertical patrols and other activity on NYCHA property, NYPD officers approach people in or around NYCHA Residences and require them to prove—to the subjective satisfaction of the officer—their residency or their authorization to be in NYCHA Residences.  If an officer is not satisfied with the results of the initial questioning, the individual can be ejected from the premises or further detained until the individual's authorized presence in

the building is confirmed to the subjective satisfaction of the officer. The detention is often accompanied by a frisk and/or search of the individual's person for contraband. The detained person must affirmatively convince the individual officer that the individual has authority to be on NYCHA Residences, in order to avoid arrest for trespass. If the individual has not already been searched for contraband pursuant to the seizure, he or she is subject to a search for contraband pursuant to the arrest. In a significant number of trespass arrests in NYCHA Residences, the NYPD fails to recover drugs, weapons or other contraband.

168.    When they effectuate trespass arrests, NYPD officers sometimes complete supporting depositions which, on information and belief, the District Attorneys' offices have requested. The supporting depositions substantiate the basis for the officer's initial approach and memorialize factual information from which a probable cause determination can be made. The arresting officer checks as applicable from a list of standard bases for trespass arrests, such as: (a) person admitted he or she was not a resident and did not know the surname or apartment number of a tenant; (b) person identified the resident and apartment he or she was visiting but the officer could not locate the resident; or (c) person gave no reason, is not on the tenant roster, and the officer could not locate anyone who gave him permission to enter.

### A.    *Defendants' Trespass Enforcement Policies and Practices are Unlawful.*

169.    The NYPD's trespass enforcement policies and practices constitute a custom and practice wherein officers stop and question persons they observe without sufficient legal basis, seize persons without reasonable suspicion, and unlawfully arrest individuals for trespass without probable cause.

170.    The NYPD reported that from May 2008 through April 2009, it conducted over 225,000 vertical patrols in NYCHA Residences. Law-abiding residents and their family and

friends are repeatedly subject to stops, seizures, questioning, frisks, searches, and/or arrests in connection with unlawful trespass enforcement policies and practices.

171.    NYPD officers have characterized the lobbies of NYCHA Residences as a "well," or a ready source of subjects to stop, question, and frisk.  These encounters, reported in the NYPD's UF-250 forms, are one of the NYPD's indicators of productivity.  According to one former officer, "Once they walk into the building, every UF-250 can come from a do-not-enter, meaning entering without a key . . . .  But once you ask them for an ID, 90 percent of the people live in the building.  That's why the arrest rate is so low.  They're not acting suspiciously, but . . . they don't have a key to enter."  Rivera, Baker, and Roberts, *A Few Blocks, 4 Years, 52,000 Police Stops*, N.Y.Times, July 11, 2010, at A1.

172.    Recordings of officers from the 81st Precinct confirm these practices.  When discussing a NYCHA building at 120 Chauncey Street in Brooklyn, NYPD officers were told that "no one walks out, out there without being stopped, all right?  Nobody . . . .  You ask everybody, 'You live here?  Let me see ID.'  You grab everybody.  They get zero tolerance."  81st Precinct Recordings, produced in the matter of *Floyd, et al.* v. *City of New York, et al.*, 08 Civ. 01034 (SAS) ("81st Precinct Recordings"), December 2008.

173.    In these recordings, officers also describe criminal trespass as an easy means of increasing arrest percentages by arresting more individuals.  An NYPD sergeant was recorded stating that "if they don't belong in Stuy Gardens or any housing buildings, you can lock them up for criminal trespass, all right?  If they give you a story about my aunt lives in the third floor, well you're not with your aunt, okay?"  81st Precinct Recordings, November 2008.

174.    On October 13, 2008, NYPD officers were advised to make trespass arrests to prevent people from congregating in front of buildings, even if officers have no other basis for

detaining those individuals. On January 19, 2009, an NYPD sergeant told officers that arresting people for trespass is a way to arrest people who are suspected of committing other crimes. 81st Precinct Recordings, January 2009.

175.   According to a survey conducted in 2007 and 2008 by New York Lawyers for the Public Interest in the Thomas Jefferson Houses in East Harlem and the Walt Whitman Houses in Fort Greene, Brooklyn, large numbers of NYCHA residents have been subjected to stops, frisks and/or arrests for trespass. Seventy-two percent of households in the Thomas Jefferson Houses reported that they and their regular visitors had been stopped by police regularly or repeatedly in the previous year. Thirty percent of participating NYCHA households included a person who had been charged with trespassing.

176.   Between 2004 and 2008, stops on suspicion of trespass on NYCHA Residences increased almost fifty percent and trespass arrests in NYCHA Residences increased thirty-six percent. The City has not provided any legitimate and neutral explanation for this rise in the stop and arrest rates.

177.   According to a review by the Civilian Complaint Report Board ("CCRB") of its files, the substantiation rate for complaints of unlawful stops and frisks in public housing is three times higher than similar complaints from non-NYCHA locations. The CCRB has met with the NYPD to discuss the rise in allegations of improper stops in and around NYCHA buildings.

178.   According to the CCRB, the number of complaints received by the CCRB regarding unjustified stops and frisks comprises roughly 30% of the complaints received by the CCRB. In 1999, there were 1,240 complaints for unjustified stops and frisks. That number increased to 5,089 in 2006.

179.    Based on New York State data, from 2005 to 2008, prosecutors declined to press charges in 11.2% of all trespass arrests in New York City.  Among the nineteen highest-volume crimes, trespass has the fifth-highest declination rate.

180.    The superseded NYPD Patrol Guide ("Patrol Guide") provision on vertical patrols in NYCHA Residences, Patrol Guide 212-60, directed uniformed patrol officers to "take note of unauthorized persons remaining in lobbies, basements, stair cases and roof landings and take appropriate police action when necessary."  The direction included no criteria for determining who is—and who is not—an "unauthorized person" and provided insufficient guidance as to the factors pursuant to which a person can lawfully be stopped, seized, questioned, frisked, searched, or arrested for trespass.

**B.    _Defendants Fail to Remedy the Problem_**

181.    On June 8, 2010, the NYPD promulgated Interim Order No. 23 ("Interim Order"), which supersedes the previous Patrol Guide provision on conducting vertical patrols on NYCHA Residences.  It promises little or no relief from the unlawful and entrenched practices to which NYCHA residents and their guests have been subject for several years.

182.    For instance, the Interim Order reiterates that officers may "approach and question . . . potentially unauthorized persons," but fails to sufficiently define "potentially unauthorized persons."   The Interim Order, like Patrol Guide 212-60 beforehand, does not require that an officer act upon observed behavior that reliably differentiates between a potential trespasser, a lawful visitor, or a building resident enjoying the common area of his own home. Indeed, given the large number of people legally permitted in NYCHA Residences, it is impossible for a police officer who is unfamiliar with building residents and visitors to distinguish a potential trespasser from a building resident, visitor, permittee, or licensee based on the language of the Interim Order.

183.    As Plaintiffs' experiences demonstrate, law-abiding individuals can be arrested for trying to visit someone who is not home, whose proper name or apartment number is not known, who knows the visitor by a different name or nickname, or even in their own building.

184.    In the fall of 2010, the NYPD began to offer training on the Interim Order ("I.O. Training"). This training fails to remedy the pattern and practice of unlawful trespass enforcement in NYCHA buildings and, instead, perpetuates some of the same violations.

185.    According to the I.O. Training, officers can approach and question individuals simply because they enter a building through a known unlocked door. Officers admit that there is nothing suspicious about entering through an unlocked door without a key.

186.    Nonetheless, the I.O. Training provides that officers can ask these individuals whether they are residents or have identification or a key, and may also accompany them to their apartments. According to the I.O. Training, if a person does not answer and/or does not affirmatively establish his or her authority to be in the building, the officer may order the person to leave the building. Anyone who refuses to leave the building is subject to arrest. As a result, residents who enter their building without identification—or who exercise their legal right not to respond to an officer's questions—may be removed from their own homes or subject to arrest.

187.    The I.O. Training has not remedied the NYPD's unlawful trespass enforcement policies and practices wherein officers stop and question persons without sufficient legal basis, seize persons without reasonable suspicion, and arrest individuals for trespass without probable cause.

188.    In a November 2010 court hearing, an NYPD officer testified that officers have "more leeway in their interactions" in NYCHA Residences and can "question anyone they encounter to determine whether they are on the premises lawfully." Based on the officer's full

testimony, the Court found the evidence to suggest that it was the NYPD's practice to "routinely engage in random, unjustified questioning" on NYCHA properties, in systemic violation of the law. *People* v. *Ventura*, 913 N.Y.S.2d 543, 545, 546–47 (N.Y. Sup. Ct. 2010).

189.    New York City Council members have noted publicly the persistence of unlawful trespass enforcement policies and practices in NYCHA Residences.  In one instance, the Chair of the Public Housing Committee criticized the NYPD for indiscriminate use of stop and frisk tactics in NYCHA Residences and for targeting people in public housing because of where they live and because of their race.

190.    Defendants have failed to supervise and discipline NYPD officers who unlawfully stop, question, seize, frisk, search, and arrest individuals for trespass.  On information and belief, Defendants do not monitor improper stops, seizures, frisks, and searches for trespass.  Nor have Defendants instituted any follow-up procedure or disciplinary action when criminal charges are dismissed or when it has been otherwise established there was no probable cause for the arrest.

191.    Defendants have long been aware that their trespass enforcement policies and practices are unlawful.  Since at least 2007, numerous court decisions, reports, and newspaper articles have publicly identified the Defendants' unlawful policies and practices.

192.    Defendants' unlawful trespass enforcement polices and practices subject NYCHA residents to a greater risk of deprivation of their rights than other residents of New York City.

### C.    *NYPD Officers Enforce NYCHA's House Rules*

193.    NYCHA's contractual agreement with the NYPD appoints officers to enforce NYCHA's House Rules.

194.    NYCHA's House Rule 18 requires: "All persons are expected to cooperate with inquiries from NYCHA . . . and the police regarding their presence or conduct in any building or

on development grounds." This Rule facilitates the Defendants' unlawful trespass enforcement policies and practices.

195.    The House Rules also prohibit "lingering" in lobbies, hallways and stairwells. "Lingering" is not defined in the House Rules, yet the NYPD is called upon to enforce this ban.

196.    Under Rule 28, NYCHA reserves the right to commence a termination of tenancy proceeding against a tenant or family member who breaches House Rules.

197.    Read together, the NYPD Interim Order and the NYCHA House Rules in effect establish an impermissible "stop-and-identify" scheme specific to NYCHA Residences.

## III.    Defendants' Vertical Patrol and Trespass Enforcement Practices are Racially Discriminatory

198.    Defendants have chosen to enforce the trespass laws in NYCHA Residences in an unlawful manner, and to do so without adequate training, supervision, and oversight, because of the race of NYCHA residents and visitors.  Defendants apply their trespass enforcement policies and practices in an intentionally discriminatory and race-based manner by focusing vertical patrols and trespass stops and arrests on communities of color.

199.    According to demographic data maintained by NYCHA, more than 95% of NYCHA residents are non-white. Thus, insofar as Defendants target trespass enforcement in NYCHA Residences, non-white residents will bear the brunt of Defendants' unlawful actions.

200.    The rate of trespass stops is significantly higher in predominantly minority NYCHA Residences than in surrounding areas or the rest of the city.  The disparities exist even when controlling for other factors.

201.    City-wide, the rate of stops on suspicion of trespass is higher in neighborhoods with larger African-American populations, even accounting for the effects of the number of officers deployed on patrol.  African Americans and Latinos are more likely to be stopped on

suspicion of trespass than suspicion of drug possession, distribution, or use. Because trespass enforcement is conducted in an intentionally discriminatory fashion, the overwhelming majority of persons stopped or arrested for trespass in New York City are African American or Latino.

202.    African Americans in New York City are stopped for trespass approximately nineteen times more often than whites. African Americans in New York City are arrested for trespass almost ten times more often than whites.

203.    Although whites represent approximately 45% of the city wide population, they are only 4% of those stopped on suspicion of trespass and 6.7% of those arrested for trespass citywide.

204.    Although African Americans represent approximately 25% of the citywide population, African Americans make up 61.5% of trespass stops and 51.6% of trespass arrests across the city.

205.    Within NYCHA Residences, African Americans are stopped on suspicion of trespass two and one-half times more often than whites. In NYCHA Residences, African Americans have a more than 25% higher chance of being arrested for trespass.

206.    The role that race plays in Defendants' enforcement and officer deployment decisions is further illustrated by the fact that the rate of trespass stops and arrests is higher, and the disparity in arrest rates increases, when there is a substantial difference between the racial composition of a public housing development and the population in its surrounding neighborhood. Thus, the disparities are greater where NYCHA Residences are in predominantly white neighborhoods. These disparities remain after controlling for other relevant factors.

207.    These disparities are the result of a unique and separate trespass enforcement process consistent with intentional targeting based on race. Essentially, the trespass enforcement

practices in NYCHA Residences are distinct from the trespass enforcement practices in the surrounding areas. These distinct enforcement practices are identifiable even after controlling for other relevant factors or possible explanations.

208.   Defendants' policy, practice, and custom of stopping individuals without reasonable suspicion, and arresting individuals for trespass without probable cause in NYCHA Residences also has a foreseeable discriminatory impact on African Americans and Latinos.

209.   Defendants have been on notice that their trespass enforcement practices are unlawful and have a disparate impact on minority NYCHA residents and their visitors. As stated above, numerous court decisions, reports, and newspaper articles have publicly identified the Defendants' unlawful practices in NYCHA Residences. The National Latino Officers Association and 100 Blacks in Law Enforcement Who Care, for example, have highlighted this issue. On April 12, 2007, these organizations issued a joint press release discussing "widespread racial bias and unlawful application of the Trespass laws by the NYPD," and calling for an immediate investigation.

210.   Nevertheless, Defendants intentionally allow the unlawful implementation of vertical patrols and trespass enforcement practices to persist because of the race, ethnicity, and/or national origin of NYCHA residents and visitors. Further, the City does not pursue similar law enforcement policies, practices, or customs, or permit similar levels of constitutional violations by NYPD officers, in predominantly white communities.

211.   The unlawful and discriminatory trespass enforcement practices are well-illustrated by the trespass arrest of NYPD Sergeant Reginald McReynolds. Sergeant McReynolds said "[t]his incident has opened my eyes . . . I can think of no other reason for being stopped but my skin color." John Marzulli, *NYPD Sergeant Reginald McReynolds Roughed Up*

*by Two Cops, Says He Was Racially Profiled*, N.Y. Daily News, Dec. 30, 2009, *available at* http://articles.nydailynews.com/2009-12-30/local/17942166_1_cops-domestic-case-girlfriend.

212.   The NYPD has a long history of conducting excessive numbers of stop-and-frisks in New York City neighborhoods largely populated by racial minorities.  In 1999, for example, the Office of the New York State Attorney General reported that stop-and-frisks in predominantly minority precincts in New York City occurred at a significantly higher rate than stops in predominantly white precincts.  The report also found that when stops did occur in white neighborhoods, the disparity between racial minority and white "stop" rates was pronounced.

213.   In 1999, African-American and Latino plaintiffs filed a class action lawsuit, *Daniels, et al.* v. *City of New York, et al.,* No. 99-1695 ("*Daniels*"), in the U.S. District Court for the Southern District of New York challenging the NYPD's policy and practice of stopping and frisking people of color without reasonable suspicion of criminal activity as required by the Fourth Amendment.  The plaintiffs in *Daniels* further alleged that NYPD officers selectively targeted them on the basis of their race, ethnicity, and/or national origin in violation of the Equal Protection Clause of the Fourteenth Amendment.

214.   After the parties in *Daniels* settled, updated data revealed a demonstrable increase in stop-and-frisks from 2002 to 2006, including extreme disparities in "stop" rates based on race, ethnicity, or national origin.  In the first half of 2008 alone, the NYPD conducted more than 270,000 stops, a pace that would make the annual rate of stops the highest ever.  From 2005 through the first half of 2008, 81% of NYPD stops were of African Americans and Latinos; 85% of NYPD frisks were of African Americans and Latinos; only 2.6% of stops resulted in the discovery of contraband; stops of whites were more likely to yield contraband; and only 4–6% of stops resulted in an arrest.

215.    In response to this updated data, another class-action lawsuit, *Floyd* v. *City of New York*, No. 08-1034, was filed against the City in the U.S. District Court for the Southern District of New York, challenging the NYPD's pervasive policy, custom and/or practice of stop-and-frisks under the Fourth and Fourteenth Amendments to the United States and New York Constitutions.

216.    These disparities have only grown worse.  In 2010, 87% of NYPD stops were of African Americans and Latinos.

## IV.    NYCHA Fails to Provide Requisite Building Security, and Has Approved and Adopted the City's Unlawful Trespass Enforcement Practices

217.    NYCHA fails to provide adequate building security in NYCHA residences and, by contracting out the security function to the NYPD, participates in and enables NYPD's unlawful trespass enforcement practices.

218.    NYCHA is a public entity that receives federal financial assistance.  It owns and operates approximately 340 public housing developments encompassing more than 2,600 residential buildings in New York City, which house more than 400,000 residents.

219.    NYCHA has a duty to maintain its property and provide security to its residents. NYCHA fails to provide the rudiments of building security to its residents, such as operational door locks, intercoms, and cameras maintained and monitored by on-site personnel.

220.    A study commissioned by the New York City Council in 2004 documented that a trespasser trying to gain access to a NYCHA building by the front door succeeded nearly half the time without a key or entry card.  The report noted that 16% of front door locks were broken, and 46% of doors were propped open: in one large development in the Bronx, 86% of front doors were not secured, in a Brooklyn development 92%, and in a Manhattan development 87% were not secured.

221. NYCHA Chairman Rhea has expressed the need for non-NYPD staff to participate in safety and security efforts in NYCHA developments. Defendants' Joint Safety and Security Task Force admits that NYCHA would benefit from non-NYPD security personnel being deployed to perform access control, respond to emergencies, and act as liaisons with NYPD.

222. Defendants, however, have failed to develop and implement meaningful initiatives for dedicated on-site, non-NYPD security measures or staffing.

223. Instead, NYCHA spends approximately $80 million each year to outsource certain security services to the NYPD, designating the NYPD as its agent.

224. Prior to 1995, NYCHA maintained its own police agency, the Housing Authority Police Department ("HAPD"). Pursuant to the 1994 MOU, the HAPD merged with the NYPD in 1995.

225. The MOU required NYCHA to make annual payments to the NYPD equal to NYCHA's previous HAPD expenditures, adjusted for inflation. These payments from NYCHA to the NYPD have ranged from $58 million to $88 million annually between 1995 and 2008. NYCHA continues to make these payments to the NYPD.

226. Pursuant to the MOU, NYPD officers are supposed to provide services to NYCHA that are above and beyond the "baseline" police services provided to residents citywide. Vertical patrols are specifically designated as one of these "above baseline services."

227. The MOU further mandates that the NYPD "evaluate, advise, and coordinate with NYCHA management, on a permanent and ongoing basis" to ensure that these "above baseline services" are provided in an acceptable manner. The NYPD must also consult with NYCHA before changing or eliminating certain designated services, including vertical patrols.

228.    As part of this contractual agreement, NYCHA has designated the NYPD and NYPD officers to act as NYCHA's agents in NYCHA Residences. NYCHA has given the NYPD authority to enter all NYCHA buildings, question people they encounter, and act as a complainant on NYCHA's behalf in criminal trespass cases on NYCHA property.

229.    The NYPD and NYCHA collaborate on the provision of security services.

230.    The terms of the MOU also require that the NYPD "provide appropriate specialized training for all NYPD officers assigned to the Housing Bureau who have not previously received similar training" and that supervisors "receive appropriate training in public housing supervision procedures." The NYPD fails to provide appropriate training.

231.    NYCHA has abdicated its responsibility to ensure the safety and security of its NYCHA Residences and, has chosen to retain, pay, and maintain the NYPD as its agent for security services.

232.    NYCHA Chairman Rhea has acknowledged that much of the hostility between the NYPD and NYCHA residents stems from the loss of mutual familiarity after the elimination of the HAPD.

233.    Leaders of both NYPD and NYCHA have admitted that they are not providing all of the security services to NYCHA Residences that they believe are desirable.

234.    Residents in NYCHA Residences are unable to use and enjoy their residences because the vertical patrol and trespass enforcement practices are conducted in a consistently unlawful and discriminatory manner, rendering residents unable to come and go freely as they wish and causing their families, friends, and guests to be subject to harassment and intimidation by NYPD officers.

235.    The NYPD's policy and practice of conducting its vertical patrol and trespass enforcement practices within NYCHA hallways, stairwells, and other common areas frequently disrupts the domestic lives of NYCHA residents.

236.    Moreover, because Defendants' policies, practices and/or customs subject the Named Plaintiffs and other class members to stops, frisks, seizures, questions, and/or searches without any reasonably articulable suspicion of criminality and on the basis of race, ethnicity, and/or national origin, Plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of Defendants without sacrificing their fundamental rights to associate freely, enjoy the benefits of their homes without government interference, and receive the same quality of police services as other New York City residents.

## CLAIMS FOR RELIEF

### First Claim for Relief
Violations of the Fourth Amendment
(Arrested Plaintiffs against the City)

237.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 236 above.

238.    The trespass enforcement policies and practices involve systematic stopping, seizing, questioning, and searching of any and all persons observed in common areas of NYCHA Residences without individualized suspicion.   Thus, each vertical patrol involves a series of temporary seizures that implicate the Fourth Amendment to the United States Constitution.

239.    By adopting and implementing the vertical patrol and trespass enforcement practices in this manner, the City has enforced, promoted, encouraged, and sanctioned a policy, practice and/or custom of roving pedestrian checkpoints for general crime control wherein they

stop and seize individuals in the absence of objective, individualized criteria in violation of the Fourth Amendment to the United States Constitution.

240.    By adopting and implementing the vertical patrol and trespass enforcement practices in this manner, the City has enforced, promoted, encouraged, and sanctioned a policy, practice and/or custom of stopping, seizing, questioning, and searching Resident and Arrested Plaintiffs, and the members of the class they seek to represent, without the reasonably articulable suspicion of criminality required by the Fourth Amendment to the United States Constitution.

241.    By adopting and implementing the vertical patrol and trespass enforcement practices in this manner, the City has enforced, promoted, encouraged, and sanctioned a policy, practice, and/or custom of arresting Resident and Arrested Plaintiffs for trespass, and the members of the class they seek to represent, without probable cause to establish that a criminal offense has been—or is being—committed, as required by the Fourth Amendment to the United States Constitution.

242.    By sanctioning and enforcing the vertical patrol and trespass enforcement practices in this manner, the City intentionally and under color of state law has stopped, seized, questioned, searched, and/or arrested Resident and Arrested Plaintiffs, without reasonable suspicion or probable cause that a crime has been committed, in violation of the Fourth Amendment to the United States Constitution.

243.    These constitutional abuses and violations were, and are, directly and proximately caused by policies, practices, and/or customs devised, implemented, enforced, promoted, encouraged, and sanctioned by the City, including, but not limited to: (a) the failure to adequately and properly screen, train, and supervise NYPD officers; (b) the failure to properly and adequately monitor and discipline NYPD officers; and (c) the overt and tacit encouragement

and sanctioning of, and the failure to rectify, the NYPD's suspicionless stops, seizures, questions, searches, and arrests for trespass.

244.    The City has acted with deliberate indifference to the Fourth Amendment rights of the Resident and Arrested Plaintiffs and other members of the class.  As a direct and proximate result of the acts and omissions of the City, Resident and Arrested Plaintiffs, and members of the class they seek to represent, have been deprived of their rights under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

Second Claim for Relief
Violations of the Equal Protection Clause
(All Plaintiffs against All Defendants)

245.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 244 above.

246.    Acting under color of state law, Defendants have applied the vertical patrol and trespass enforcement practices against all Plaintiffs and similarly situated individuals in an intentionally discriminatory and race-based manner.  Defendants have focused enforcement of the vertical patrol and trespass enforcement practices in African-American and Latino communities.

247.    Defendants have targeted communities of color, such as NYCHA Residences, for unlawful trespass enforcement, as residents in—and visitors to—these buildings are inhabited almost entirely by African Americans and Latinos.  This pattern of targeted enforcement is evident even when controlling for other factors.

248.    Defendants have acquiesced in, ratified, and/or failed to check widespread violations of Plaintiffs' constitutional rights to be free from unreasonable searches and seizures, because of Plaintiffs' race, ethnicity, and/or national origin.

249.    These constitutional abuses were—and are—directly and proximately caused by policies, practices, and/or customs devised, implemented, enforced, encouraged, and/or sanctioned by the City and NYCHA, including: (a) targeted implementation of vertical sweeps and trespass arrests in communities of color; (b) the discriminatory failure to adequately and properly screen, train, support, and/or supervise NYPD officers deployed in communities of color; and (c) the discriminatory failure to adequately and properly monitor, investigate and/or discipline NYPD officers charged with racial bias.

250.    As a direct and proximate result of Defendants' practices, Resident and Arrested Plaintiffs, and members of the class they seek to represent, have been deprived of their right to Equal Protection of the laws under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

Third Claim for Relief
Claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*
(All Plaintiffs against All Defendants)

251.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 250 above.

252.    Residents of NYCHA are unable to use and enjoy their residences because Defendants' vertical patrol and trespass enforcement practices are conducted in such a consistently unlawful and discriminatory manner that the residents are not free to come and go as they wish.  Residents' family, friends, and guests are harassed and intimidated by unlawful trespass enforcement policies and practices.

253.    Plaintiffs, and the members of the class they seek to represent, are among the intended beneficiaries of Defendants' programs and/or activities receiving federal financial assistance.  The Defendants' discriminatory practices prevent Plaintiffs from fully participating in and receiving the benefits of the programs and activities supported by federal funds.  Resident

Plaintiffs are unable to enjoy the normal rights and privileges associated with tenancy in NYCHA Residences. All Plaintiffs, who are entitled to receive police protection from the NYPD, are instead victimized by the NYPD's unlawful and discriminatory police activities.

### Fourth Claim for Relief
Unlawful Discrimination Under the Fair Housing Act of 1968 (Title VIII)
(Resident Plaintiffs against All Defendants)

254. Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 253 above.

255. Defendants have, as described above, violated, and/or continue to violate, the rights of Resident Plaintiffs, and the members of the class they seek to represent, under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and implementing regulations by: (a) discriminating on the basis of race and/or national origin in the terms, conditions, or privileges of the provision of services or facilities in connection with the sale or rental of a dwelling, in violation of 42 U.S.C. § 3604(b) and the corresponding implementing regulations; and (b) discriminating on the basis of race and/or national origin in the exercise or enjoyment of a dwelling by coercion, intimidation, or interference, in violation of 42 U.S.C. § 3617 and implementing regulations.

256. By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against African-American and Latino NYCHA residents due to their race, ethnicity, and/or national origin—or the racial composition of their building—in violation of the Fair Housing Act.

257. The past and continuing acts and conduct of Defendants described above, were and are intentional, and have been carried out with deliberate indifference to the federally protected rights of the Resident Plaintiffs and the members of the class they seek to represent.

258.    Defendants' policies, patterns, and practices have had, and continue to have, an adverse and discriminatory impact on African Americans and Latinos that is not justified by necessity.

259.    Defendants have intentionally, knowingly, and continuously engaged in the practices described above, with the intent of denying equal housing opportunities to the Resident Plaintiffs and the members of the class they seek to represent.

Fifth Claim for Relief
Claims Under the United States Housing Act, 42 U.S.C. § 1437d(l)(2)
(Resident Plaintiffs against All Defendants)

260.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 259 above.

261.    Acting under color of state law, Defendants have, as described above, violated, and/or continue to violate, the rights of Resident Plaintiffs, and the members of the class they seek to represent, under the United States Housing Act, 42 U.S.C. § 1437d(1)(2), its implementing regulations, 42 U.S.C. § 1983, and the federal and New York State Constitutions, by failing to provide reasonable accommodation of the Resident Plaintiffs' guests or visitors.

262.    Residents of NYCHA are unable to use and enjoy their residences and accommodate guests because Defendants' unlawful trespass enforcement policies and practices render NYCHA residents unable to come and go freely as they wish and cause their family, friends, and guests to be subject to constant harassment and intimidation.

263.    The past and continuing acts and conduct of Defendants, described above, were and are intentional, and have been carried out with deliberate indifference to the federally protected rights of the Resident Plaintiffs and the members of the class they seek to represent.

264.    Defendants' policies, patterns, and practices interfere with Resident Plaintiffs' ability to accommodate guests because their family, friends, and guests are harassed, intimidated

50

2em

and arrested by Defendants.  Defendants' policies are unreasonable and have had, and continue to have, an adverse impact on African Americans and Latinos that is not justified by necessity.

265.    Defendants have intentionally, knowingly, and continuously engaged in the practices described above, with the intent of denying adequate housing to the Resident Plaintiffs and the members of the class they seek to represent.

<u>Sixth Claim for Relief</u>
Unlawful Discrimination under 42 U.S.C. § 1981
(Resident Plaintiffs against All Defendants)

266.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 265 above.

267.    By the actions described above, Defendants have continually denied Resident Plaintiffs, and the members of the class they seek to represent, the same rights to make and enforce contracts as enjoyed by white citizens of the United States, in violation of 42 U.S.C. § 1981.  Resident Plaintiffs have been denied the enjoyment of the benefits, privileges, terms, and conditions of their contractual relationship with NYCHA, because they are limited in their ability to enter and exit their own homes, and in their ability to receive guests, due to Defendants' trespass enforcement policies and practices, which are conducted in a discriminatory and unlawful manner.

268.    By the actions described above, Defendants have also denied all Plaintiffs the full and equal benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens, and have subjected them to disparate forms of punishment, pains, penalties, taxes, licenses, and exactions, as compared to white citizens of the United States, in violation of 42 U.S.C. § 1981.  All Plaintiffs have been injured by Defendants' discriminatory and unlawful trespass enforcement policies and practices.

269.   By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against African-American and Latino NYCHA residents due to their race, ethnicity, and/or national origin—or the racial composition of their building—in violation of 42 U.S.C. §§ 1981 and 1983.

270.   The past and continuing acts and conduct of Defendants, described above, were and are intentional, and have been carried out with deliberate indifference to the federally protected rights of the Resident Plaintiffs and the members of the class they seek to represent.

271.   Defendants have intentionally, knowingly, and continuously engaged in the practices described above, with the intent of denying equal housing opportunities to the Resident Plaintiffs and the members of the class they seek to represent.

Seventh Claim for Relief
Violation of Due Process Under the Fourteenth Amendment
(All Plaintiffs against All Defendants)

272.   Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 271 above.

273.   Defendants' vertical patrol and trespass enforcement practices, as written and as applied, violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, by authorizing and causing NYPD officers to unlawfully stop, seize, question, frisk, search, and/or arrest individuals, thus depriving Plaintiffs of their rights to freedom of association, freedom of assembly, and intimate association, in the absence of constitutionally required procedural protections.

274.   By enforcing the unconstitutional vertical patrol and trespass enforcement practices through the initiation and pursuit of criminal charges against Arrested Plaintiffs— charges that have directly resulted in the arrest and detention of Arrested Plaintiffs—Defendants

intentionally and under color of law have denied all Plaintiffs their right to due process of law, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

Eighth Claim
Violation of the New York Constitution, Article 1, Section 11
(All Plaintiffs against All Defendants)

275.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 274 above.

276.    Defendants have applied the vertical patrol and trespass enforcement practices against all Plaintiffs and similarly situated individuals in an intentionally discriminatory and race-based manner.  Defendants have focused enforcement of the vertical patrol and trespass enforcement practices in African-American and Latino communities.

277.    Defendants have targeted communities of color, such as NYCHA Residences, for focused implementation of vertical patrols and trespass arrest enforcement because residents in, and visitors to, these buildings are almost entirely African Americans and Latinos.

278.    Defendants have acquiesced in, ratified, and/or failed to address widespread violations of Plaintiffs' constitutional rights to be free from unreasonable searches and seizures, because of Plaintiffs' race.

279.    These constitutional abuses were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged, and/or sanctioned by the City and NYCHA, including: (a) targeted implementation of vertical sweeps and trespass arrests in communities of color; (b) the failure to adequately and properly screen, train, support, and supervise NYPD officers deployed in communities of color; and (c) the discriminatory failure to adequately and properly monitor, investigate, and/or discipline the NYPD officers charged with racial bias.

53

280.    As a direct and proximate result of Defendants' practices, all Plaintiffs, and members of the class they seek to represent, have been deprived of their right to equal protection of the laws under Article 1, Section 11 of the Constitution and the laws of the State of New York.

Ninth Claim
Violation of the New York Constitution, Article 1, Section 12
(Arrested Plaintiffs against the City)

281.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 280 above.

282.    By adopting and implementing the vertical patrol policy and the trespass enforcement practices in an unlawful manner, the City has enforced, promoted, encouraged, and/or sanctioned a policy, practice, and/or custom of stopping and frisking Arrested Plaintiffs, and the members of the class they seek to represent, without the reasonable articulable suspicion of criminality required by the Constitution and laws of the State of New York.

283.    By adopting and implementing the vertical patrol and trespass enforcement practices in this unlawful manner, the City has enforced, promoted, encouraged and/or sanctioned a policy, practice and/or custom of arresting Arrested Plaintiffs for trespass, and the members of the class they seek to represent, without probable cause to establish that a criminal offense has been—or is being—committed as required by the Constitution and laws of New York.

284.    By sanctioning and enforcing the vertical patrol and trespass enforcement practices in this unlawful manner, the City intentionally and under color of state law has stopped, seized, questioned, frisked, searched, and/or arrested Plaintiffs, without reasonable suspicion or probable cause that a crime has been committed, in violation of the Constitution and laws of the State of New York.

285.    These constitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, promoted, encouraged, and/or sanctioned by the City, including, but not limited to: (a) the failure to adequately and properly screen, train, and supervise NYPD officers; (b) the failure to properly and adequately monitor, investigate, and discipline NYPD officers; and (c) the overt and tacit encouragement and sanctioning of, and the failure to rectify, the NYPD's practice of suspicionless questioning and false arrests.

286.    As a direct and proximate result of the acts and omissions of the City, all Plaintiffs, and members of the class they seek to represent, have been deprived of their rights under the Constitution and laws of the State of New York.

Tenth Claim
*Respondeat Superior* for False Arrest and False Imprisonment
(Arrested Plaintiffs against the City)

287.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 286 above.

288.    NYPD officers have unlawfully and unjustifiably detained, arrested, deprived the liberty of, and imprisoned Arrested Plaintiffs.

289.    The unjustifiable and unlawful stops, seizures, questioning, frisks, searches, arrests, and imprisonments were carried out without a warrant.

290.    At all relevant times, the unlawful false arrests and imprisonments of the Arrested Plaintiffs were with force, without probable cause, and against their will.

291.    All of the foregoing occurred without any fault on the part of Arrested Plaintiffs.

292.    At all relevant times, these NYPD officers were employees of the City and were acting for, upon, and in furtherance of the business of their employer and within the scope of their employment.

293.    Consequently, the City is liable under the doctrine of *respondeat superior* for the NYPD officers' tortious actions.

Eleventh Claim
Violation of the New York State Human Rights Law
(Resident Plaintiffs against All Defendants)

294.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 293 above.

295.    Defendants have discriminated, and continue to discriminate, against Plaintiffs on the basis of race, ethnicity, and/or national origin in the terms, conditions, or privileges of the sale, rental, or lease of a housing accommodation, or in the furnishing of facilities or services in connection therewith, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*

296.    Defendants have also discriminated, and continue to discriminate, against Plaintiffs on the basis of race, ethnicity, and/or national origin in the terms, conditions, or privileges of publicly-assisted housing accommodations, or in the furnishing of facilities or services in connection therewith, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*

297.    By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against African-American and Latino residents of NYCHA Residences due to their race, ethnicity, and/or national origin—or the racial composition of their building—in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*

298.    Resident Plaintiffs have been and continue to be harmed by Defendants' violations of the New York State Human Rights Law.

<u>Twelfth Claim</u>
Violation of the New York City Human Rights Law
(Resident Plaintiffs against All Defendants)

299.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 298 above.

300.    Defendants have discriminated, and continue to discriminate, against Plaintiffs on the basis of race in the terms, conditions, and/or privileges of the sale, rental, or lease of a housing accommodation or in the furnishing of facilities or services in connection therewith in violation of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.*

301.    By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against African-American and Latino residents of NYCHA Residences due to their race, ethnicity, and/or national origin—or the racial composition of their building—in violation of the New York City Rights Law, N.Y.C. Admin. Code §§ 8–101 *et seq.*

302.    Plaintiffs have been, and continue to be, harmed by Defendants' violations of the New York City Human Rights Law.

**<u>REQUEST FOR RELIEF</u>**

WHEREFORE, Plaintiffs respectfully request that this Court:

303.    Certify this action as a class action on behalf of the proposed class and subclasses, pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure:

(a)    a Plaintiff class of African-American and Latino NYCHA residents and/or family members, guests, or visitors of NYCHA residents, who have been or will be unlawfully stopped, seized, questioned, frisked, searched, and/or arrested for trespass in or around NYCHA Residences, or whose family members, guests, and/or authorized visitors have been or will be unlawfully stopped, seized,

questioned, searched, and/or arrested for trespass by NYPD officers when visiting NYCHA residents;

(b)     an Arrested Plaintiff subclass consisting of African-American and Latino NYCHA residents and/or family members, guests, or visitors of NYCHA residents, who were or will be unlawfully stopped, seized, questioned, frisked, searched, and/or arrested for trespass in or around NYCHA Residences, including on the basis of their race, ethnicity, and/or national origin; and

(c)     a Resident Plaintiff subclass consisting of African-American and Latino NYCHA residents who live in buildings subject to Defendants' unlawful trespass enforcement policies and practices, and, as a result, have been unlawfully deprived of their rights to associate freely with invited guests, to enjoy the exclusive use and occupancy of their leased units, and to receive the same quality of police services provided to non-Resident Plaintiffs;

304.     Declare that Defendants' acts, practices, policies, and/or omissions have deprived Plaintiffs of their rights under the Fourth and Fourteenth Amendments to the United States Constitution; 42 U.S.C. § 1981; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d); Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.* ("Fair Housing Act"); the United States Housing Act, 42 U.S.C. § 1437 *et seq.*; the Constitution and laws of the State of New York; and the New York City Human Rights Law;

305.     Order all appropriate injunctive relief as warranted, including, but not limited to:

(a)     enjoining Defendants immediately to cease their violation of Plaintiffs' rights, and to remedy the invidious effects of their violations by providing adequate security measures, patrolling NYCHA Residences, and

effectuating trespass stops and arrests in a lawful, reasonable, and nondiscriminatory manner;

(b)     enjoining Defendant City from subjecting individuals observed on or around NYCHA Residences to identification requests and destination inquiries, unless the inquiring officer either observes individuals acting in a manner that is indicative of criminality or believes, based upon actual knowledge, that the individuals are not authorized to be in the building;

(c)     enjoining Defendant City and its NYPD officers from arresting any person for trespassing in NYCHA Residences without conducting a valid inquiry to establish the person's authorized presence;

(d)     enjoining Defendants to submit for the review of Plaintiffs and the Court a protocol that substantially reduces the risk of unjustified stops, frisks, searches, detentions, and false arrests of NYCHA residents, their visitors, and other persons lawfully on the premises of NYCHA Residences; and

(e)     enjoining Defendant NYCHA to provide adequate security to NYCHA residents, including operable door locks, operable intercom systems, and cameras monitored by on-site personnel;

306.   Award compensatory damages to the Named Plaintiffs;

3**07**.    Order reasonable attorneys' fees and costs to be paid by Defendants pursuant to

28 U.S.C. § 2414 and 42 U.S.C. §§ 1988, 3613; and

3**08**.    Grant such other and further relief as the Court deems just and equitable.


Dated:      New York, New York
            May 2̶7̶, 2011

                                   Respectfully submitted,

                                   By: _____

                                   John Payton
                                     *Director-Counsel*
                                   Debo P. Adegbile
                                   Christina Swarns
                                   Johanna B. Steinberg
                                   Jin Hee Lee
                                   Johnathan Smith

                                   NAACP Legal Defense and Educational Fund, Inc.
                                   99 Hudson Street, Suite 1600
                                   New York, New York 10013
                                   (Tel.) 212.965.2200
                                   (Fax) 212.219.2052

                                   *-and-*

                                   By: _____

                                   Steve Banks
                                   *Attorney-in-Chief*
                                   Seymour James
                                   William Gibney
                                   Steve Wasserman
                                   Nancy Rosenbloom
                                   Amanda Moretti

                                   The Legal Aid Society of New York
                                   199 Water Street, 6th Fl.
                                   New York, NY  10038

By: _____
Katharine E.G. Brooker
Damian Williams
Matthew J. Moses
Michele Hirshman

Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(Tel.) 212.373.3000
(Fax) 212.757.3900

AFFIDAVIT OF SERVICE BY HAND

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK  )

KENDALL V. DACEY, being duly sworn, deposes and says:

1.  I am not a party to this action, am over 18 years of age and am employed by

Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New

York, New York 10019.

2.  On May 27, 2011, I served true copies of the AMENDED COMPLAINT on

the following:

> Steven Jay Rappaport
> New York City Housing Authority
> 250 Broadway, 9th Floor
> New York, NY 10007

> Tonya Jenerette
> Corporation Counsel, Special Federal Litigation Division
> 100 Church Street
> New York, NY 10007

3.  I made such service by personally delivering a true copy of the aforementioned

document to each of the offices at the above stated addresses.

_Kendall V. Dacey_
KENDALL V. DACEY

Sworn to before me this
27th day of May, 2011.

Notary Public

DANIEL FUERST
Notary Public, State of New York
No. 01FU6236272
Qualified in New York County
Commission Expires Feb. 22, 2015