C2h1davc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

KELTON DAVIS, et al.,

                    Plaintiffs,

          v.                              10-CV-699 (SAS)

CITY OF NEW YORK and NEW YORK
CITY HOUSING AUTHORITY,

                    Defendants.           Conference

------------------------------x

                                          New York, N.Y.
                                          February 17, 2012
                                          11:48 a.m.

Before:

                    HON. SHIRA A. SCHEINDLIN,

                                          District Judge

                         APPEARANCES

THE LEGAL AID SOCIETY
     Attorneys for Plaintiffs
BY:  NANCY ROSENBLOOM, ESQ.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
     Attorneys for Plaintiffs
BY:  DANIEL H. WOLF, ESQ.

NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
     For Plaintiffs
BY:  JOHNATHAN J. SMITH, ESQ.

NEW YORK CITY LAW DEPARTMENT
OFFICE OF THE CORPORATION COUNSEL
     For Defendants
BY:  TONYA JENERETTE, ESQ.
     GEORGE T. SOTERAKIS, ESQ.
     STEVEN J. RAPPAPORT, ESQ.
     PERNELL M. TELFORT, ESQ.

C2h1davc

                         APPEARANCES
                         (Continued)

OFFICE OF THE DISTRICT ATTORNEY, KINGS COUNTY
BY:  PHYLLIS MINTZ, ESQ., Executive ADA

OFFICE OF THE DISTRICT ATTORNEY, BRONX COUNTY
BY:  MARY JO L. BLANCHARD, ESQ., ADA

OFFICE OF THE DISTRICT ATTORNEY, NEW YORK COUNTY
BY:  SARAH HINES, ESQ., Senior Trial Counsel

C2h1davc

1              (In open court)

2              THE COURT:  Good morning, Mr. Smith, Ms. Rosenbloom,

3    and Mr. Wolf.

4              MR. SMITH:  Good morning.

5              MS. ROSENBLOOM:  Good morning.

6              MR. WOLF:  Good morning.

7              THE COURT:  Good morning, Ms. Hines.

8              MS. HINES:  Good morning.

9              THE COURT:  Ms. Blanchard?

10             MS. BLANCHARD:  Good morning, your Honor.

11             THE COURT:  Ms. Mintz?

12             MS. MINTZ:  Good morning.

13             THE COURT:  Ms. Mintz, you have an unusual

14   distinction.  Not only did you misspell my name in an e-mail,

15   but you misspelled yours.

16             MS. MINTZ:  I misspelled mine?

17             THE COURT:  That's the only reason I'm smiling.

18   Usually I'm very upset about misspelling, but you managed to

19   misspell yours.

20             MS. MINTZ:  It's an issue of sleep deprivation.

21   You're just going to have to forgive me.

22             THE COURT:  Now Mr. Soterakis?

23             MR. SOTERAKIS:  Good morning, your Honor.

24             THE COURT:  Good morning.  Ms. Jenerette?

25             MS. JENERETTE:  Good morning, your Honor.

C2h1davc

 1                  THE COURT:  Mr. Telfort?

 2                  MR. TELFORT:  Good morning.

 3                  THE COURT:  Mr. Rappaport?

 4                  MR. RAPPAPORT:  Yes.  Good morning, your Honor.

 5                  THE COURT:  Good morning.  Nice to see you back,

 6      Mr. Rappaport.  Hope you're feeling better.

 7                  MR. RAPPAPORT:  I am.  Thank you.

 8                  THE COURT:  So I think -- tell me if I'm wrong -- the

 9      only agenda item today is the DA records?  That's it?

10                  MS. ROSENBLOOM:  That's correct.

11                  THE COURT:  All right.  There has been an *in camera*

12      submission by Brooklyn, Manhattan, Bronx.  I think there may

13      have been one from Queens and one from Staten Island, but I'm

14      putting Queens and Staten Island to the side.  There's just not

15      enough information there to warrant pursuing those two

16      boroughs.  But in any event, with respect to Brooklyn,

17      Manhattan, and the Bronx, I've looked at a sampling of decline

18      to prosecute production and dismissed after docketing

19      production and I have both the redacted and the unredacted of

20      that information.  And I have some questions because I think

21      that this was sort of the unusual moment when the court

22      actually gets to apply the proportionality factors in Rule 26

23      that's been on the books for years and we always write that

24      they're underutilized; courts and litigants don't cite the

25      proportionality factors really enough.  But this is a classic

C2h1davc

1    case of weighing the benefits against the burdens, taking into

2    account all the factors spelled out in the rule.  And, you

3    know, I lecture on these factors all the time but can't

4    remember them.  So I can certainly read them right out of the

5    book so they're here for the record.

6          Okay.  So we're talking about 26(b)(2)(C), which is

7    the section on limit and scope of discovery, the subsection on

8    limitations on frequency and extent, and the specific section

9    sub (C), it says, "The court must limit the frequency or extent

10   of discovery otherwise allowed by these rules if it determines

11   that," and then we get subsections (i), (ii), and (iii), and

12   (i) is, "The discovery sought is unreasonably cumulative or

13   duplicative or can be obtained from some other source that's

14   more convenient, less burdensome, or less expensive;" (ii) "The

15   party seeking discovery has had ample opportunity to obtain the

16   information by discovery in the action or," and in subsection

17   (iii) there's a series of proportionality factors: "the burden

18   or expense of the proposed discovery outweighs its likely

19   benefit considering the needs of the case, the amount in

20   controversy, the parties' resources, the importance of the

21   issues at stake in the action, and the importance of the

22   discovery in resolving the issues."

23          So it's a great section, underutilized.  It's been

24   there for a long time.  But I think this particular request

25   should really be analyzed under the (b)(2)(C)(iii) factors.

C2h1davc

```
1        So I do start with the burden of the proposed

2   discovery, whether that burden outweighs the likely benefit,

3   and it says "considering," and it gives you about six things to

4   consider.  So when you consider the needs of the case and the

5   amount in controversy, amount in controversy is a little

6   inapplicable here.

7        So the section also talks about the importance of the

8   issues at stake in the action, and the issues at stake in this

9   action of course are important, grave public concern.

10       The parties' resources are important here because the

11  city doesn't have unlimited resources.  I used the word "city."

12  I mean the DAs.  They don't have unlimited resources to put

13  into this.  I know it's going to be both burdensome and

14  expensive.

15       I have to consider the importance of the discovery,

16  and I want to talk about that with the plaintiffs' attorneys in

17  particular; in other words, how much of this they need, so that

18  you're starting to get some that make your point.  Do you need

19  hundreds that make your point, tens of thousands?  I mean, how

20  many do you need to make your point, when we're weighing the

21  benefits and the costs here?

22       And those are pretty much the factors.  So having laid

23  out that framework, let me say that with respect to the

24  sampling I had, with respect to those that were dismissed,

25  those arrests that were dismissed after docketing, I don't
```

C2h1davc

1    think it's worth pursuing.  I don't think there's going to be

2    enough likelihood of finding -- I don't know what you call

3    it -- beneficial information to any side that's worth pursuing.

4    So I'll hear you, but I think that the costs of digging it out

5    are high and the benefits are low, and I'm not seeing a return

6    on the sampling I got.  There weren't enough that I could

7    categorize that would show that there was evidence that the

8    stop was bad or that the arrest was bad, either strong evidence

9    or weak evidence.  I didn't see enough to warrant the effort.

10        However, with respect to decline to prosecute, I

11   looked at the sampling from Brooklyn, Manhattan, and the Bronx.

12   I have to say that I thought both Brooklyn and Manhattan turned

13   up a fair number that I would say lend weight to the

14   plaintiffs' argument here that stops are being made that

15   shouldn't be made; not even reasonable suspicion, much less

16   probable cause.  But probable cause isn't even the issue on a

17   stop; it's reasonable suspicion.  The arrests are bad, the

18   stops are bad.  I have a little more information than you do

19   because I have the unredacted as well as the redacted, but I

20   made a rough categorization for myself, a chart, you know, bad

21   stop, no reasonable suspicion, and there's a high enough

22   percentage with respect to the Brooklyn decline to prosecute

23   and the Manhattan decline to prosecute that would make it worth

24   pursuing.

25        Now with respect to the Bronx, that one's tricky.  The

C2h1davc

1    percentage is lower, but that's solely because there are so

2    many dismissals for what's called bad paperwork so that the

3    percentage of the total that I could attribute to lack of

4    reasonable suspicion is a lower percentage, but I don't know if

5    that's fair, since it seems to me a lot of people turn in bad

6    paperwork, whatever that means.  There's just no paperwork or

7    inadequate paperwork as a reason for declining to prosecute.

8    There's so many of those that it skews the percentage.  I don't

9    know what to do with the Bronx exactly.  But my sense is it's

10   worth pursuing the decline to prosecute further.

11          But I want to talk to the plaintiffs' lawyers, and the

12   DA lawyers, of course, about how they obtained it.  I forgot

13   already whether some of it was done by database searching or it

14   was all done by hand files.  I've really lost track of that.

15   With respect to the decline to prosecute.  I don't remember for

16   the three DAs I'm talking to, and they're all here.  I don't

17   remember whether you did machine database type searching,

18   computer type searching, or whether you had to do stuff by

19   hand.

20          But let me start -- who's speaking for the plaintiffs

21   today?  Ms. Rosenbloom.  So how many do you need?  I mean, you

22   could say, "I need every one available."  Well, we could be

23   doing this two or three more years too, and that's certainly

24   not what you want for your clients, certainly not what I want

25   for this case.  I want to move this case along.  So you're

C2h1davc

1    really talking about the evidence that supports your theory,

2    what you might offer at trial, what might support your expert's

3    opinion or whatever, but how many do you need?  We started out

4    with a sampling, which is the right thing to do in discovery; a

5    period of time, you know, a certain number of months.  What was

6    it; three months, maybe?

7            MS. ROSENBLOOM:  At various times we've had different

8    samples, your Honor, but what we have been recently talking

9    about was two months each for years 2009, '10, and '11.

10           THE COURT:  Okay.

11           MS. ROSENBLOOM:  So six months total.

12           THE COURT:  Out of what could have been 36 months?

13           MS. ROSENBLOOM:  Or more, your Honor.  We're alleging

14   ongoing pattern and practice.

15           THE COURT:  But what years did we take?

16           MS. ROSENBLOOM:  Oh, yes.  We took three years --

17   2009, '10, and '11.

18           THE COURT:  '9, '10, and '11.

19           MS. ROSENBLOOM:  The months of June and July for each

20   year.

21           THE COURT:  All right.  So we did '9, '10, and '11,

22   two months each.  So that was two months out of 36.

23           MS. ROSENBLOOM:  Correct.

24           THE COURT:  And you said you would want even a longer

25   time.  What would you want?

C2h1davc

1        MS. ROSENBLOOM:  Plaintiffs' original requests had

2   gone back to prior years.

3        THE COURT:  What years?

4        MS. ROSENBLOOM:  I think we started with 2006.

5        THE COURT:  So theoretically you would want '6 through

6   '8, to date?

7        MS. ROSENBLOOM:  To date.  Yes.  Your Honor, very

8   importantly certainly is the time period --

9        THE COURT:  Hold on.  Give me one second.

10        MS. ROSENBLOOM:  Okay.

11        THE COURT:  That's 72 months as opposed to two.

12   That's about 74 months.

13        Okay.  Go ahead.  Very important is?

14        MS. ROSENBLOOM:  Very important, your Honor, is to

15   look at these across time.  As you know, the city made an

16   unsuccessful motion for partial summary judgment last year

17   based on a policy change to the patrol guide.

18        THE COURT:  Yes, they cleaned it up.

19        MS. ROSENBLOOM:  That occurred in June of 2010.  So

20   certainly we need to look at some period of time before that

21   and the ongoing practice to date.

22        THE COURT:  That was June 2010, you said?

23        MS. ROSENBLOOM:  Yes.  June 8th, 2010.

24        THE COURT:  Policy change was June 8th, 2010.

25   Wasn't there something in the paper about stop and frisks

C2h1davc

1   reached record numbers in '11 or '12?  I just saw an article

2   this week.

3          MS. ROSENBLOOM:  There were some recent statistics

4   revealed to the public about stop and frisks overall; not just

5   trespass, but overall.

6          THE COURT:  That's true.  I read that somewhere, this

7   week.

8          MS. ROSENBLOOM:  So your Honor, for us, the length of

9   time is important for us to get a picture of this issue, both

10   before and after that policy change.

11          THE COURT:  Right.  But you're not asking for every.

12          MS. ROSENBLOOM:  Correct.

13          THE COURT:  74 months, every.

14          MS. ROSENBLOOM:  Correct.

15          THE COURT:  So what would you ask for that would

16   satisfy your evidentiary needs?

17          MS. ROSENBLOOM:  I think plaintiffs would be happy to

18   get from the beginning of 2008 to the present, perhaps six

19   months out of each year.

20          THE COURT:  That would be '8, '9, '10, '11, is 48

21   months.  Two months now, 50 months.  It would be 50, but you're

22   willing to take half of that.  You're asking for 25 months.

23   Right?  Well, I have '8, '9, '10, and '11.  Four years times 12

24   is 48.  So that's two months and 12.  That's 50 months.  You

25   would take 50 percent, because you mentioned six months, so

C2h1davc

1    that would be 25 months.

2              MS. ROSENBLOOM:  That's correct.

3              THE COURT:  All right.  So 25 months, and you've

4    gotten six of those 25 already.

5              MS. ROSENBLOOM:  Yes.

6              THE COURT:  Yes.  All right.  So basically you're

7    asking for 19 more months, which is 10 times what was done;

8    right?  Because they did two and you want 20.

9              MS. ROSENBLOOM:  Yes, your Honor, and that would be

10    the decline to prosecute decisions along with the reasons for

11    it.

12              THE COURT:  I understand.  It's what I reviewed.  All

13    right.  So essentially nine times more.  They gave you two

14    months; you want 18 more months, roughly.  So it's nine times.

15              I guess with that request, I'm ready to talk to the

16    three district attorneys.  So Ms. Hines, shall we start with

17    you?  How did you obtain the material on solely decline to

18    prosecute?

19              MS. HINES:  It involved two different sections or

20    bureaus in my office.  The IT section formulates a list and is

21    able to determine by charge what cases.  Once they are

22    unsealed, they can access what the cases are.  And then a

23    separate section in the office runs them through a program to

24    attempt to determine whether they are NYCHA or nonNYCHA

25    premises, which is not always reliable.

C2h1davc

| | |
|---|---|
| 1 | THE COURT:  No.  Now let me pause right there.  If I |
| 2 | recall, the NYCHA/nonNYCHA distinction, that's something |
| 3 | Ms. Jenerette wants; right?  In other words, the plaintiffs |
| 4 | might forgo that but you want it; right, Ms. Jenerette? |
| 5 | MS. JENERETTE:  I do. |
| 6 | THE COURT:  Very definitely. |
| 7 | MS. JENERETTE:  Yes. |
| 8 | THE COURT:  So I can't get away without that, but go |
| 9 | ahead. |
| 10 | MS. HINES:  And at that point we are able to generate |
| 11 | the actual forms, which I usually get them from the analysts, |
| 12 | so I don't go and pull them physically from files. |
| 13 | THE COURT:  So they're printed from a computer |
| 14 | program? |
| 15 | MS. HINES:  I'm not sure whether they're printed from |
| 16 | a computer program or they go back into microfiche or exactly |
| 17 | what the mechanism is, but I can tell you that it involves the |
| 18 | people in one bureau who take a couple of steps and do some |
| 19 | unsealing and that kind of thing and then proceeds to a |
| 20 | different bureau, and I've been working with more than one |
| 21 | person in each of those two bureaus. |
| 22 | THE COURT:  What's the other bureau?  I heard IT. |
| 23 | MS. HINES:  IT is the analysts.  It's analysts -- |
| 24 | THE COURT:  That's what it's called, analysts bureau? |
| 25 | MS. HINES:  Well, I believe it's Bureau of Planning |

C2h1davc

1   and Management.  It's sort of a generic bureaucratic name, but

2   these individuals with whom I've been specifically working are

3   analysts.  They deal with data, categorizing it, cataloging

4   it --

5           THE COURT:  I guess what I'm trying to ask, nobody has

6   to crawl into a warehouse and go through boxes and physically

7   pull pieces of paper.

8           MS. HINES:  Not for the most recent DPs.  Now I'm not

9   certain if you go back to 2008 because I have not done that.

10  The more recent the case, the less burdensome it is, the more

11  likely we are to have the paperwork, and the easier the access.

12          THE COURT:  And then what happened?  After the

13  information was pulled, then did attorneys' eyes have to go on

14  it for redaction purposes?

15          MS. HINES:  Yes.  Then it comes to me, and the

16  redactions that you have seen have been my redactions.  So

17  that's page by page by hand and copied --

18          THE COURT:  And I don't know that I have the total

19  numbers in front of me.  How many did you find in the six

20  months you did?

21          MS. HINES:  I believe we did fewer than six months for

22  the Manhattan DA's office because I was also doing

23  postdismissal, postarraignment dismissals, so I did fewer.  I

24  don't have six months' worth.  I believe I did two months'

25  worth, June and July for '09, and I may have done June and July

C2h1davc

1    for 2010, but I did not do as many months --

2              THE COURT:  How many did that total?

3              MS. HINES:  I believe it was 34.  The two months that

4    I gave the court all of, and I'm not sure for the other year.

5              THE COURT:  So the two months, you had 34.

6              MS. HINES:  Approximately.

7              THE COURT:  Right.

8              MS. HINES:  And I can't remember, there was some

9    question, we may have been missing one or two.  As I say, the

10   farther back you go, the less likely you'll find all of the

11   documents.

12             THE COURT:  Right.  Right.  Still, two months.  We're

13   talking about -- I don't really understand your letter.  My

14   clerk handed me your letter of January 18, but I don't think I

15   understand it.  It seems to say, enclosed is 10 decline to

16   prosecute.

17             MS. HINES:  Yes, your Honor.  This was a small

18   sampling that was recent --

19             THE COURT:  That was the 29 you pulled.

20             MS. HINES:  Out of the 29 I pulled, and I believe that

21   was a letter from months and months ago that I didn't bring

22   with me.

23             THE COURT:  No, it's January 18th, 2012.  I can show

24   it to you.  January 18th, 2012.

25             MS. HINES:  Well, that's the one of the 10 that were

C2h1davc

1    sampled.

2              THE COURT:  Yes, right.  10 of 29.

3              MS. HINES:  Okay.

4              THE COURT:  29 in two months.

5              MS. HINES:  I believe so.

6              THE COURT:  Okay.  All right.  29 in two months.  All

7    right.  So that's 15 a month.  And we're talking about

8    roughly -- okay.  My math says you might turn up another 350.

9    Because you did two months and they're looking for 25 months.

10   Unless I got my math wrong.  I don't think my math is wrong.

11   If you're averaging 15 a month and you had to do 18 or 19 more

12   months.

13             MS. HINES:  I believe those particular months were

14   unusually low.

15             THE COURT:  Low.

16             MS. HINES:  This is not based on something that I

17   compiled statistics on or took notes on, but I remember when I

18   requested them, we were surprised that they were as low as they

19   were, and the thinking was that it might have been the summer

20   months.

21             THE COURT:  Yes.

22             MS. HINES:  So I don't know that that's

23   representative --

24             THE COURT:  I think we picked summer thinking it would

25   be high because kids aren't in school.

C2h1davc

1          MS. HINES:  I think that's right.  And whether it was

2     because police officers are on vacation -- I mean, I'm

3     speculating.

4          THE COURT:  Anyway, the rough math for 23 more months

5     is 350 more files.  So what kind of time -- not the IT time or

6     the management time, because that doesn't sound so hard, but

7     how much attorney time would it take to then look through 350

8     decline to prosecutes?  Do you have any sense of that?

9          MS. HINES:  I'm thinking 10 or 15 minutes per DP to

10    read it, consider it, mark it up, copy it.  How many files are

11    you --

12         THE COURT:  350.  So 60 hours.  That would be 60

13    hours.  Okay.  Rough math, I've got it.  It would be 60 hours.

14         MS. HINES:  If you do four an hour for 350.

15         THE COURT:  I didn't do that.  I did six an hour,

16    because you said ten minutes.  But you're making it more hours.

17    I did six an hour and got 60 hours.  If we do four an hour,

18    it's going to be more.

19         MS. HINES:  Exactly.  It's going to be 80 some hours.

20         THE COURT:  So it's two solid weeks doing nothing but

21    that.  Does it have to be you personally to do every one?  You

22    can put a team on it.  80 hours.  A team of four, they could

23    have it done in a week.  20 hours each for four people, it's

24    done.  Get it done and out the door.

25         MS. HINES:  All of us in my bureau are overextended at

C2h1davc

1    this point.  I spent extra days --

2            THE COURT:  But you're a senior attorney there.  Does

3    it take a very senior attorney to do what you did?  I would

4    think a brand new ADA could do it, under your supervision.

5            MS. HINES:  My office doesn't have brand new ADAs in

6    it.  We are all fairly senior.  We are all trial attorneys who

7    have had plenty of time in the courtroom.  Most of us do the

8    civil practice after having spent years doing the criminal

9    prosecution, so we're all senior.

10           THE COURT:  Right.  So I'm saying that's not really

11   necessary.  Having looked at the pieces of paper -- I wouldn't

12   know this if I didn't look, but because I actually studied

13   these, I would think a paralegal could do it, an entry level

14   attorney could do it, as long as they're supervised by a senior

15   attorney so they know what to look for.  Some of them -- and

16   this is not revealing anything that was redacted -- say flat

17   out there was no basis for this stop.  That's the conclusion,

18   there was no basis.  So it's pretty easy to figure out what

19   were the facts that the person had.  Often it seems to be

20   nothing.  Seems to be some of them read, "Entered and exited

21   building."  That was it.  Not good.

22           But anyway, that's the point of why it's important

23   evidence.  So I think the time limits that I have to make

24   pursuant to Rule 26, when you really fairly analyze the burden,

25   only sound awful if you personally, Ms. Hines, one of the

C2h1davc

1    senior-most attorneys there, have to sit in a room for 80

2    hours, more than two weeks of doing nothing, not even having

3    lunch.  That's kind of crazy.  If one thought of a team, four

4    people under your supervision, 20 hours each, it would be done

5    and out the door, you'd be done with me and done with this.  I

6    don't know why it has to be done by such a senior person, so

7    long as that senior person tells the junior people what to do,

8    what to look for.  That's the end of it.  The biggest project

9    is getting IT to identify the numbers and then the next group

10   of analysts to pull the pieces of paper, which we think are by

11   machine, by computer, not crawling around a warehouse, and then

12   you put a team together to look at them.  And you tell them

13   what to redact and they're going to redact, I guess, what, date

14   of birth or something, or age or residence?

15            MS. HINES:  I think as a practical matter, I'm going

16   to be the one ending up doing it, and it is expensive.

17            THE COURT:  But that's not right.  Look, I've done

18   years of discovery supervision and the producing party can make

19   the cost out higher than it ought to be by saying, "The most

20   senior attorney in my firm has to do this and his billable rate

21   is a thousand dollars an hour," and then you say to the person,

22   oh, that's ridiculous, put a $50-an-hour paralegal on it, and

23   all of a sudden the estimated cost does from, it will cost us a

24   million dollars in discovery, to realistically it could be done

25   for 50,000.  So I just don't see why it has to be one of the

C2h1davc

1     most senior attorneys in the place.  Pretty simple stuff.

2              MS. HINES:  I understand your point is logical and

3     well taken, and in a private firm I think that is more easily

4     done.  In my office there's a particular bureau charged with

5     handling civil litigation pertaining to criminal matters.  All

6     of us are senior.  We've lost two attorneys in the last three

7     weeks.  We are all a bit overextended.  And this is the bureau

8     that would be doing it.

9              THE COURT:  Well, it is a big office.  It's a very big

10    office.  Tell your boss, "I've been ordered to this in a week,

11    and we have to borrow paralegals or junior attorneys from

12    another bureau so we can get it done and out the door, and

13    she'll be done with us."  I really think this is the last time

14    we're coming back.  Looks like you need to get a fair sampling

15    of those four years.  Still negotiable whether it has to be 25.

16    Maybe they can cut it to 20.  I can negotiate more with the

17    number of months, but I am going to send you back for more.  So

18    it's just a matter of how much more.

19             MS. HINES:  I have come to understand that.  And all

20    I'm seeking now is the fewest possible months to reduce the

21    burden on an already overextended public office.

22             THE COURT:  I do appreciate it's a public office.  I

23    started out saying that, when I looked at the factors, I said,

24    don't think, oh, it's the government; they can afford anything.

25    Quite the contrary.  I'm perfectly aware of the constraints

C2h1davc

1    that that public entities have been operating under, whether

2    it's the federal government or the state or the city.  These

3    are hard times, and there is not an endless budget.

4           That said, this is an important case, public interest,

5    important issues, and I think it's important evidence, which

6    are all factors to be weighed under the rule.  I didn't make

7    them up.  I didn't write this particular rule.  It was before

8    my time.

9           MS. HINES:  But I do think the balancing that you're

10   involved in is extremely important --

11          THE COURT:  Yes.

12          MS. HINES:  -- and the burden to taxpayer resources

13   is --

14          THE COURT:  It's true, but I'm weighing that against

15   the benefits of the information to be obtained, and I have a

16   good basis to make that conclusion based on the sampling, and I

17   cut it back a lot already by saying two boroughs are out of

18   this picture and I'm not even going to go for just the

19   docketing because it's not enough return based on the sampling.

20   So I've already cut it a lot.  The question is what number of

21   months for what period of time is fair.

22          All right.  Let me talk to your colleagues for a

23   minute, but know that I'm going to say you have to go back and

24   do something.  And really, how should your office handle it is

25   an internal matter.  But I can't be scared off by saying, "It

C2h1davc

 1  all has to be me.  I'll be in a locked room for two weeks."  It

 2  just doesn't make sense to me.  Your office has paralegals.

 3  You can borrow them.  Somehow.

 4          All right.  Let's turn to Ms. Blanchard?  Or maybe

 5  Ms. Mintz next.  It doesn't matter.  You're in the same

 6  position on this one.  Okay.  How do you obtain your data,

 7  Ms. Blanchard?  Yes.

 8          MS. BLANCHARD:  Your Honor, I believe it's comparable

 9  to what Manhattan does.  We do have the IT unit go to the

10  computer systems.  We wrote a program that would differentiate

11  NYCHA v. nonNYCHA.  Our IT unit, once we have unsealed the

12  documents, goes through the computer program, figures out which

13  cases are applicable, and then I believe that they then pull

14  the actual DP from the computer system, they pull that together

15  into a file and they send that to me.  And then the way it has

16  worked in the past, I had an assistant who was an attorney, and

17  she initially went through them and redacted and then I oversaw

18  the redactions, and had to do many corrections, even though

19  this was an assistant and the assistant had been working for

20  some time in our office.  Unfortunately, that person is no

21  longer in our office.  She had left and has not been replaced.

22  So at this point in time it, again, would be probably myself

23  having to go through all of them.  What we have produced so

24  far, though, we have produced seven months.  We did --

25          THE COURT:  You've done seven months?

C2h1davc

1              MS. BLANCHARD:  Correct.  We have done seven months so
2      far.
3              THE COURT:  What numbers?
4              MS. BLANCHARD:  June --
5              THE COURT:  No, no, what numbers for those months?
6              MS. BLANCHARD:  Okay.  Over seven months, it was
7      approximately -- I don't have the exact number.  I believe it's
8      in the range of 565 for seven months.
9              THE COURT:  565.  This is NYCHA and non.
10             MS. BLANCHARD:  Correct.  Averaging out to about 80
11     per month.
12             THE COURT:  80 per month.  That's helpful.
13             MS. BLANCHARD:  Correct.  So if you're looking at 18
14     more months to get us to --
15             THE COURT:  No, you did seven.
16             MS. BLANCHARD:  We already did seven.  To get to the
17     25 number, we would have 18 more months.  That would bring us
18     to 1,440 more DPs, which is --
19             THE COURT:  2,000.
20             MS. BLANCHARD:  Yes, total of 2,000.
21             THE COURT:  Okay.  I don't know why you need 2,000.
22             MS. BLANCHARD:  I --
23             THE COURT:  Wait.  Ms. Rosenbloom, 2,000 in the Bronx
24     alone and few hundred from Manhattan, and we haven't gotten to
25     Brooklyn?  I think this is far too much than needs to be done.

C2h1davc

1   I appreciate you want to see it over time.  But what if it were

2   three months per year, going back to '06?  Now I don't know

3   whether the programs are going to go back to 2006, but --

4          MS. ROSENBLOOM:  Your Honor, today we proposed

5   starting from January of '08, not '06.  That's where you got

6   your 25 number.

7          THE COURT:  Oh, that was '08 to the present.  That's

8   right.

9          MS. ROSENBLOOM:  If we were to reduce the six months

10  to four months, that might make more sense, because we already

11  have two summer months from each office.  We could perhaps add

12  January and February, which are the months during which we now

13  know there are more trespass arrests, based on some trespass

14  arrest data we recently received from the city in this case.

15  So January and February appear to be the months with

16  significant numbers.

17         THE COURT:  So '8, '9, '10, '11, and '12, because we

18  have January, February.  So 10 more months.  That would be 800

19  more.  That would be a big help.  So for the Bronx -- that was

20  the Bronx I was speaking to -- that would be 10 more months.

21  January and February of '08 to the present.  Ms. Blanchard,

22  that's 10 more months.  800 more files.  What's the amount of

23  time that you think that will take, based on the time you've

24  already spent?

25         MS. BLANCHARD:  Well, I can tell you, each time we

C2h1davc

1    produced even a month at a time, between my time, the person

2    who was going through them, as well as the IT department, it

3    took us about, you know, three to four days, sometimes a week,

4    depending on how big of a month it was, to pull everything

5    together and get it out.

6            THE COURT:  Why three or four days for one month?

7            MS. BLANCHARD:  I'm sorry.  Let me retract that.  For

8    each time that we pulled something.  So normally it would be

9    two months or more at a time.  So we're still looking at at

10    least several days per month.

11            THE COURT:  No, no.  Two months.

12            MS. BLANCHARD:  I'm sorry.  Let me just do the math on

13    this.

14            THE COURT:  It sounds like 28 days, something like

15    that, three or four weeks.  If you've done seven already.  How

16    many did you say you did already, Ms. Hines?  I lost track.

17            MS. HINES:  I think only two, because I was doing the

18    postarraignment dismissals.

19            THE COURT:  Let's put that aside.  You only did two

20    months.

21            MS. HINES:  I think that's why it was so few months of

22    DPs.

23            THE COURT:  And that was just August '09 and August

24    '10.  Yeah.  That's what your letter says.  Your letter says

25    August '09, August '10.  So you have three more months for

C2h1davc

1    those four years.  And the two this year.  You're going to have

2    14 months, Ms. Blanchard would have 10.  14 is a big change

3    from 25.

4              MS. ROSENBLOOM:  Your Honor, if I might add,

5    plaintiffs did not request the nonNYCHA arrests.  This would

6    cut it roughly in half.  It was our subpoena to these

7    nonparties.  I know that your Honor's taking into account the

8    city's request.

9              THE COURT:  I know, but I can't do one thing for one

10   litigant and one thing for the other.  Ms. Jenerette somehow

11   thinks it's important to contrast the NYCHA and nonNYCHA.  I'm

12   not going to get into the strategy on the case.  I don't know

13   why that's so, but she said so.  So my instinct is to accept

14   that.

15             Oh, Ms. Blanchard?

16             MS. BLANCHARD:  If I may, your Honor, I did the math.

17   If we are considering 10 minutes for each DP and it's

18   approximately 800 more DPs you expect for 10 months, that would

19   take 19 days.

20             THE COURT:  Yes.  I got to that a completely a

21   different way, but I got to 20.

22             Now, Ms. Mintz, how many months have you done already?

23             MS. MINTZ:  I thought I had done six months.

24             THE COURT:  Probably so.

25             MS. MINTZ:  July and August of --

C2h1davc

1          THE COURT:  Of '8, '9, and '10.

2          MS. MINTZ:  '8, '9, and '10.  And I believe what I had

3     was approximately in the range of 200 DPs for the entire six

4     months.

5          THE COURT:  Okay.  So you didn't figure out per month,

6     but we could do that.

7          MS. MINTZ:  But I don't have any of those figures in

8     front of me.

9          THE COURT:  No.  But, I don't know, that's roughly 33

10    a month, and if we now total to 10 more months, that's 350

11    more.

12         MS. MINTZ:  Approximately 350 more.

13         THE COURT:  Let's see.  If you've got 350 more, then

14    you'd be up to 550, the Bronx would be up to 1300, and

15    Manhattan would be -- all right.  So look, Ms. Rosenbloom,

16    that's still giving you 2100, which sounds excessive.  I mean,

17    I understand you cut back the number of months, but to get 2100

18    each, it's enormous.  Why do you need so many?

19         MS. ROSENBLOOM:  Your Honor, it does a bit prove our

20    point, which is that there are quite a few of these decline to

21    prosecute decisions made, and from that number, those that show

22    improper --

23         THE COURT:  Sure does.  I mean, it sure helps to make

24    your case, but when are we gilding the lily?  You could say you

25    need a thousand, you need 10,000, you need a hundred thousand?

C2h1davc

Where does it stop?  You don't need all of that, I would think,
to make your point, because if you want to tell the jury, "We
looked at thousands, and of those thousands we can show you,
case after case," put it on the screen, "that, you know, 400 or
something are bad.  That's intolerable."  I'm making this up,
of course, but that's what you could do with the sample size.
And you explain this is a sample, that this is not every
trespass arrest.  "We were given by the judge three months per
year for four years, and look what we can show you.  That's not
all there was, ladies and gentlemen.  That's just three
months."  So --

            MS. ROSENBLOOM:  Correct.  Your Honor, two things to
say about that.  One is, you know, if we had the same sample
and cut it to half of each month, that would certainly reduce
it by half.

            The second though, is, both with regard to class
certification and with regard to our *Monell* claims, the
defendants have indicated through every word and deed that they
intend to oppose strenuously both the numerosity and -- they
said it on the record, your Honor, the numerosity and also the
fact --

            THE COURT:  I never understood the numerosity.  I
mean, the law of the circuit, over 40 is presumptively large
enough.  Why don't they move on to what they want to talk
about, which is predominance.

C2h1davc

1          MS. JENERETTE:  I would ask that you not adopt

2     Ms. Rosenbloom's characterization of the city's --

3          THE COURT:  Are you raising numerosity as one of the

4     challenges to class certification or not?  Because I understand

5     predominance.  I really do.  Big argument.  But numerosity?

6          MS. JENERETTE:  Your Honor, I have not written my

7     class certification motion yet.

8          THE COURT:  I know, but you're thinking.

9          MS. JENERETTE:  It's not due for over -- until three

10     days after you make a decision.

11          THE COURT:  But you're thinking.

12          MS. JENERETTE:  I'm not prepared to take a position

13     either way, your Honor.

14          THE COURT:  Well, you know what, that's not helpful,

15     because if numerosity was not being contested -- and you might

16     want to think about it -- apparently that might change the

17     requests for information from these three hard-working and

18     overworked and overburdened DA offices.

19          MS. JENERETTE:  Ask her if that's the case.

20          THE COURT:  If what's the case?

21          MS. JENERETTE:  If the city and NYCHA say right now,

22     we'll forgo numerosity, how that's going to affect the demand

23     she makes on the district attorneys.

24          THE COURT:  Okay.  I will do that.  So if you knew

25     that there will be many challenges to class cert but one of

C2h1davc

 1   them would not be numerosity, in other words, they would

 2   concede the point that it's going to be more than 40 class

 3   members, okay, let's say, would that reduce your demand in

 4   terms of numbers for these DPs?

 5          MS. ROSENBLOOM:  Your Honor, Mr. Rappaport has stood

 6   up here twice in court and said they're going to contest --

 7          THE COURT:  I know, but that doesn't help.  It's a

 8   hypothetical question.  Assuming for the sake of argument that

 9   numerosity would not be one of the many challenges that will be

10   made to class cert.  There are others they're going to bring

11   for sure, but let's say they forgo and say, "We won't do that.

12   There will be more than 40 class members.  It's not worth our

13   paper to write that point.  We're not going to write that

14   point."  Let's say that were the case.  Would that affect the

15   size of the demand here or request or whatever you call it?

16          MS. ROSENBLOOM:  It could, your Honor, if we had such

17   a stipulation, but also the city and NYCHA -- and I will agree

18   with Ms. Jenerette that only NYCHA has said on the record they

19   will contest numerosity.  We don't know what the city will do.

20   But both --

21          THE COURT:  Why are you going back to that?  I'm

22   asking a hypothetical question.  For purposes of this

23   discussion they're both waiving numerosity.  I know they

24   haven't yet, but for purposes of this discussion, they are.

25          MS. ROSENBLOOM:  I was just trying to be polite.

C2h1davc

1          THE COURT:  Yes, but we don't need it here.  For

2     purposes of this discussion, they're waiving it.

3          MS. ROSENBLOOM:  And the city and NYCHA have both

4     indicated they will contest strongly our *Monell* claims, and we

5     need to prove pattern and practice over time, we need to prove

6     citywide practice.  This is a strong reason for us to have

7     these large numbers.  Again, your Honor, the number would be

8     cut in half if we cut the nonNYCHA decline to prosecute

9     decisions.  I know that the city is asking for it.

10          THE COURT:  I can't because the city thinks it's part

11     of their defense strategy, I guess, to show the same rate as

12     NYCHA and nonNYCHA.

13          MS. JENERETTE:  They claimed disparate impact in their

14     complaint.  I mean, their theory changes with every discovery

15     motion they make.  The last I checked --

16          MS. ROSENBLOOM:  I object to that characterization.

17          THE COURT:  I didn't hear you because somebody spoke

18     over you.

19          MS. JENERETTE:  Ms. Rosenbloom did.

20          THE COURT:  I realize that, but what did you say?

21          MS. JENERETTE:  They're claiming disparate impact and

22     they also claim in their complaint overdeployment and that the

23     police department makes more unlawful stops and trespass

24     arrests in NYCHA developments that are located in gentrified,

25     predominantly white neighborhoods across the city than they

C2h1davc

make in NYCHA developments that are located in predominantly

black neighborhoods, and they also assert that we treat what

they call black and brown people who reside in NYCHA

developments differently than the NYPD treats people similarly

situated in white neighborhoods outside the NYCHA developments.

So if they're making these kind of arguments, we have to look

at the stops and trespass arrests citywide.  We can't confine

it to NYCHA.

THE COURT:  Well, ruling out Queens and Staten Island,

they've already got a bigger problem -- they're more

predominantly white, I would think, than the other three

boroughs.

MS. JENERETTE:  I would think so, too.  And there are

fewer NYCHA developments in Queens and Staten Island.

THE COURT:  But there are.

MS. JENERETTE:  But they're there, and I do think that

this sample size skews the results in favor of plaintiffs and

will make it more difficult for the city to rebut it.

The other thing is, the city has produced a large

volume of decline to prosecute information to the plaintiffs.

As I disclosed to both the city and the court, NYPD takes

decline to prosecutes very seriously.  They track it, they

retrain officers as a result of it.  We produced all of that to

them.  We produced the spreadsheet, we produced documents

showing that retraining that takes place based on that.

C2h1davc

1          THE COURT:  Yes, but that doesn't give the

2     case-to-case facts of the stop.  I looked at these documents

3     myself so I can see, you know, arresting officer says this or

4     that happened, and some of them are troubling.

5          MS. JENERETTE:  Well, the problem is, your Honor, that

6     is the district attorney's characterization of the conversation

7     with the arresting officer, and I think this raises other

8     issues in terms of how does the city rebut this and whether or

9     not we're going to have to have small hearings on each of these

10    things.

11         THE COURT:  Oh, I don't think so.  If there was more

12    to say, A, we probably wouldn't have a decline to prosecute,

13    and B, it probably would have been put in there.

14         MS. JENERETTE:  That's not fair.

15         THE COURT:  Well, that's your view and that's my view.

16    We'll deal with the evidentiary issues down the road.

17         MS. JENERETTE:  At trial, we will, and so that's fine

18    enough, but the fact discovery with respect to the city has

19    closed.  But we would maybe require some opportunity to review

20    this and determine what rebuttal evidence we'll need.

21         THE COURT:  Aren't you getting whatever it is that the

22    plaintiffs are getting?

23         MS. JENERETTE:  Yeah, we're getting it, but my only

24    argument, your Honor, is that it may not necessarily end with

25    these forms.

C2h1davc

1           MS. ROSENBLOOM:  Your Honor, might I speak --

2           THE COURT:  Yes.

3           MS. ROSENBLOOM:  -- with regard to the burden versus

4      benefit balancing test?

5           THE COURT:  Yes.

6           MS. ROSENBLOOM:  My only point in talking about the

7      nonNYCHA arrests, which plaintiffs did not request, is that the

8      city's request is adding to the DA office's burden.  It is a

9      bit unfair, we feel, to have that factor weighed against the

10     plaintiffs, who are seeking only the NYCHA-related decline to

11     prosecute forms.

12          THE COURT:  Well, actually, I'm viewing it as

13     producing party, requesting party.  I'm not thinking of it as

14     plaintiff and defendant.  I mean, I have nonparties here.  So

15     I'm really thinking of it as producing party, requesting party.

16     So there are two requesting parties.  There's the plaintiff and

17     there's the city.

18          MS. ROSENBLOOM:  NYCHA issued the subpoena, the city

19     did not, but you're considering it a request by the city.

20          THE COURT:  Okay, I am.  But I still was figuring,

21     doing the rough math here, how many you'd get between the three

22     boroughs who are here, and it's over 2,000.

23          MS. MINTZ:  Excuse me?  One small comment --

24          THE COURT:  Yes.

25          MS. MINTZ:  -- which is that it was stated here that

C2h1davc

1   January and February would have more numerous arrests and DPs.

2          THE COURT:  She thought so from information that's

3   been gathered from another source.

4          MS. MINTZ:  I just wanted your Honor to appreciate the

5   fact that there will probably be more than the estimate from

6   these numbers.

7          THE COURT:  Oh, I see.  The average.  If the average

8   was 33 in the months you did, it could be --

9          MS. MINTZ:  50 or 60, or I don't know.

10          THE COURT:  That's a good point.  Now it turns out

11   that June and July are the lower months.

12          MS. MINTZ:  July and August.

13          MS. JENERETTE:  It is true.  I can verify that

14   trespass arrests are higher in the winter because people who

15   don't belong in NYCHA buildings seek shelter in those

16   buildings, hang out in stairwells, on roof landings when it's

17   cold outside, so there are a higher number of arrests during

18   those months.

19          MS. MINTZ:  I believe there was a suggestion that

20   there would be --

21          THE COURT:  Half a month.  I heard that.  I wonder how

22   that would work with your computer program.  What would it be?

23   Would it be the arrest date, January 1st to 15th and

24   February 1st to 15th, your computers could do it that way?

25   Instead of pulling all February arrests, you can put all

C2h1davc

1    arrests between February 1 and 15?

2              MS. MINTZ:  14, yes.

3              THE COURT:  Whatever.  You can do it.

4              MS. MINTZ:  Yes, yes.  We have approximately the same

5    system that has been described, and once the actual physical --

6              THE COURT:  I think that's about as low as we can go.

7    What about seeking January and February from '08 to the present

8    by half a month for all those months, and for the ones that

9    didn't already do six to seven months, which is Manhattan, they

10   have to go back and do June and July too.

11             MS. MINTZ:  July and August.

12             THE COURT:  Whatever months.  July and August.  Thank

13   you.  Manhattan would have to do July and August for those

14   years, Bronx and Brooklyn would just have to do half of January

15   and February to date, to date.  '8, '9, '10, '11, and '12.

16             MS. ROSENBLOOM:  If your Honor feels that's a

17   reasonable resolution, we are willing to take it.

18             THE COURT:  Okay.  I think that's where we're going

19   then.  So the order would be -- of course I can put it in an

20   order -- after applying the balancing factors in the rules, the

21   three DA's offices here are directed to produce the decline to

22   prosecute information for the years 2008 through 2012, the

23   months of January and February, 1st through 14th -- well, 1st

24   through 15th in January, 1st through 14th in February,

25   and Manhattan DA should do July and August also for '9, '10,

C2h1davc

1    and '11, like the other DAs did not need, because they didn't

2    do '8.

3            Who wanted to speak, Ms. Blanchard or Ms. Mintz?

4    Ms. Mintz?

5            MS. MINTZ:  Now, your Honor, you do understand that

6    this takes some time.

7            THE COURT:  Yes, I do.  I think two weeks is fair.

8            MS. MINTZ:  Except that in my office, the way it works

9    is, I'm the only person dealing with civil litigation.  There

10   is no bureau.  It's me and my boss, and that's it, and then the

11   DA.  I mean, that's it.  So I do have access or I will seek

12   access to some paralegals, assistants.  However, right now I am

13   working late, every day of the weekend, until I get a grant

14   application in on March 1st.  I do not have a moment to do

15   any supervision, supervising until after March 1st.

16           THE COURT:  Well, I don't think I can accommodate

17   that.  The order is directed at the district attorney of

18   Brooklyn.  He can take his chances of being in contempt of a

19   court order.  He also has hundreds of assistants and hundreds

20   of paralegals.  While you have the knowledge to supervise it,

21   they have to assign a little team for a couple weeks and get it

22   done.  That's it.  I don't want you to work any harder.  You

23   can't.  But you can go back and say, "She said you're going to

24   have to put a team together of three or four junior people,

25   I'll tell them what to do, and they've got to do it."  That's

C2h1davc

1    it.  You're not a one-person office, you're a

2    several-hundred-person office, and while I appreciate that

3    there's no division that does civil litigation, this is

4    important, it's time sensitive, and the DA is directed to do

5    it.  The DA will have to risk violating a federal court order.

6    I don't know what else to tell you.

7              MS. MINTZ:  Today is the 17th.

8              THE COURT:  Yes, that's true.  Oh.

9              MS. MINTZ:  I'm only asking that there be two weeks

10   after March 1st.

11             THE COURT:  I don't know about that.  I don't know the

12   urgency of getting this data, what it's going to be used for.

13             MS. MINTZ:  I can actually put the order in with IT

14   and the order in with ECAP to then print out, and then it will

15   be ready for me to supervise after March 1st.

16             THE COURT:  Yes.  Okay.

17             MS. JENERETTE:  Your Honor, discovery with respect to

18   NYCHA closes March 15th, so maybe Ms. Mintz can be

19   accommodated in that regard.  I'm just offering that.

20             THE COURT:  I don't know.  Seems like there's a whole

21   logical line of attorneys wanting to speak to this.

22             Ms. Blanchard, did you have your hand up at that

23   point?

24             MS. BLANCHARD:  Yes, I did.  My question was just

25   clarification.  You're saying January and February of '08, '09,

C2h1davc

'10, and '11.

THE COURT:  '12.

MS. BLANCHARD:  So it's five years, not four.

THE COURT:  Yes.  Yes.  We always said 10 more months.

Okay.  Yes, Ms. Hines?

MS. HINES:  For the Manhattan DA, it's July and August

for -- at one point I believe your Honor said '9, '10, and '11,

and at another --

THE COURT:  I did.  '9, '10, and '11, what the other

DAs did.

MS. HINES:  So those three years for July and August.

THE COURT:  Correct.  And like the other DAs, '8, '9,

'10, '11, and '12, half of January and February.  You have more

because you did less already in terms of this decline to

prosecute.  And you have six months in the summer years for

those three years, although you've done two of them.  You've

done August '09 and August '10.  So you have four new months to

deal with in the summer months.  Got it?  Because you've done

two Augusts.

MS. HINES:  I did not understand we were being asked

to do the January and February in addition.

THE COURT:  Oh, yes.  Oh, absolutely.  That's the

whole point.  Track it for five years and at a heavier time of

year so they can see the flow.  But I cut it back as much as I

could.  It's half a month for each of those ten months.  It's

C2h1davc

January 1st through 15th and February 1st through 14th.

Now with respect to redaction, yes, I know that's the next thing the plaintiff wants.  Yes?

MS. JENERETTE:  Can I have just one question.  Just further to the point you made earlier, that the results are somewhat skewed without the results of DPs in Queens and Staten Island.  Is there any way you can apply this to all five district attorney's offices instead of just three?

THE COURT:  First of all, I don't have those DAs here today.  I don't remember what they told me.  I think one of them, maybe Staten Island, said, "We don't have any computers.  It's all by hand."

MS. JENERETTE:  Staten Island just does it by hand.  Queens was here last time.  They did submit something that was computerized.  It's not as burdensome for them.

THE COURT:  I don't know.  They're not here right now and I really don't want to deal with that.  Why don't I just take that request under advisement, not deal with that right now.

So there are two things left to deal with, which is the timing of producing this and then the reasons for the DPs.  The reasons in many of these cases have been redacted, right, but the fact statement gives you essentially the reasons.  I don't know why you need what they want to talk about as work product.  I can tell you that the redacted information -- and

C2h1davc

1    I'm not giving you anything specific, but generically, the

2    reason for declination, insufficient evidence.  That's what's

3    redacted.  I'm not giving you any one of these, I'm not

4    violating the redaction, but they're in evidence.  Here's

5    another one.  Detail, insufficient evidence to prove beyond a

6    reasonable doubt that defendant was trespassing.  That's what's

7    redacted.  And it's the same over and over again.  Insufficient

8    evidence to prosecute.  The reason and the detail list

9    insufficient evidence to prove beyond a reasonable doubt that

10   defendant was trespassing.  That's what it reads like.  I don't

11   think that adds to what you already know, which is the

12   statement of fact, which you can work with just as well.  We

13   know it was declined and you can assume it's insufficient

14   evidence, and you have the facts that tell you why it was

15   insufficient.  Same reason the ADA concluded it, you're going

16   to conclude it.  Many of these say:  Observed so and so

17   entering and leaving the building.  Stopped.  Doesn't sound

18   like much reasonable suspicion to me, much less probable cause.

19   Because you have the facts.  I've looked at what was redacted

20   and what wasn't, so I don't think the reason adds much.  It

21   always says insufficient evidence.

22           MS. ROSENBLOOM:  Your Honor, we can't speak to what's

23   under the redactions --

24           THE COURT:  But I can.  I'm giving you the summaries.

25   I can pull any one of these.  They're all the same:

C2h1davc

1    Insufficient evidence to prosecute.

2              MS. ROSENBLOOM:  What we would like, your Honor, then

3    is a stipulation or an order that, wherever they're saying

4    insufficient evidence, that means it's insufficient evidence to

5    prove beyond a reasonable doubt.

6              THE COURT:  Oh, yeah.  They're happy to say that

7    because that's not the standard for a stop.  I mean, they're

8    happy to say --

9              MS. JENERETTE:  We can stipulate to that.

10             THE COURT:  Yeah.  They're happy to say it's

11   insufficient evidence to prove beyond a reasonable doubt.  I

12   don't know how that helps you, because it's not a standard for

13   a stop.

14             MS. ROSENBLOOM:  Well, everything is contested in this

15   case.  We don't know what else is under the redaction.

16             THE COURT:  But I do.

17             MS. ROSENBLOOM:  If it's anything beyond insufficient

18   evidence.

19             THE COURT:  Sometimes it says no probable cause.  But

20   that's the same thing, in essence.  You can glean from the

21   facts no probable cause.  I mean, it's a big concession.

22   That's why I'm requiring these.  They know, they looked at the

23   facts, and some ADA says:  Can't do this one.  Bad stop.  Bad

24   arrest.  No probable cause.

25             MS. ROSENBLOOM:  If there are any that say bad stop,

C2h1davc

1     your Honor, we certainly want those.

2              THE COURT:  No, none of them say bad stop.  I don't

3     think any say that.  I'll look at the redactions I have.  I

4     don't think any used the words "bad stop."  Most of them say

5     insufficient evidence to prosecute.  Insufficient evidence to

6     prove beyond a reasonable doubt somebody was trespassing.

7     Insufficient evidence to prosecute.  Insufficient evidence to

8     prosecute.  Insufficient evidence to prosecute.  This is one

9     that we like better:  No basis for search or demand

10    identification.  And no probable cause.  There are a couple

11    that say that.  Oh, here's one:  No legal basis to stop

12    defendant.

13             MS. ROSENBLOOM:  That's the type of thing, your Honor,

14    where we feel the work product provision should be overcome by

15    the importance of --

16             THE COURT:  By the way, the reason for declining

17    prosecution on that one is, again, insufficient evidence to

18    prosecute.  Then there's a space called Details.  And the

19    details say:  No legal basis to stop.

20             MS. ROSENBLOOM:  To plaintiffs, your Honor, whatever

21    is redacted is redacted.  Whatever section it's in, if it

22    overcomes the work product protection --

23             THE COURT:  Except when you look at the facts, you

24    also know there's no legal basis for the stop, because you're a

25    lawyer.

C2h1davc

1          MS. ROSENBLOOM:  Your Honor, we do believe a jury

2     would be very convinced by the fact that the district

3     attorney's office themselves --

4          THE COURT:  Themselves held that there was no basis to

5     stop someone.

6          MS. JENERETTE:  Which is exactly why it shouldn't be

7     admitted, because it's unduly prejudicial and it also violates

8     the Second Circuit's ruling in *Cameron*.  The city prevailed at

9     trial in front of Judge Crotty in *Cameron v. the City of New*

10    *York*.  We introduced evidence from the ADA saying that there

11    was probable cause for the challenged arrest and there was

12    reasonable suspicion for the challenged stop.  The ADA opined

13    that there was, that the cop should have made the stop, should

14    have made the arrest.  Based in part on that testimony, the

15    jury found in favor of the city.  Plaintiffs appealed that

16    verdict to the Second Circuit.  The circuit reversed, sent it

17    back, said Judge Crotty should never have allowed it because

18    the ADA's opinion on probable cause/reasonable suspicion is

19    inadmissible.

20          THE COURT:  Well, I wasn't aware of all that.

21          MS. JENERETTE:  We cited that case to your Honor.

22          THE COURT:  Doesn't mean I remember it.  Do you know

23    how many cases I have?  Would you like to know how many cases I

24    have?

25          MS. JENERETTE:  I apologize, your Honor, but the point

C2h1davc

```
 1    is that Ms. Rosenbloom knows because it's been in our

 2    submission.

 3               THE COURT:  That is the point.  So if that is the law,

 4    if indeed a whole trial was reversed because they let in the

 5    ADA's opinion of no probable cause, what's the point?  I mean,

 6    I gave it to you now in a generic way.  No legal basis to stop.

 7    That's why I'm requiring the discovery, so you can see the

 8    facts and have your own conclusions drawn or your own expert

 9    conclusions, and who needs the DA's conclusion, because

10    apparently the circuit says it's not admissible.

11               MS. ROSENBLOOM:  Your Honor, if we were briefing it,

12    we would argue that in the context of a civil rights class

13    action, it's a little bit different.  The discovery rules are

14    different.

15               MS. JENERETTE:  This was a Section 1983 civil rights

16    lawsuit, civil rights trial.  It was no different.  It's

17    reversible error for Judge Crotty to have admitted that.  The

18    city retried the case.

19               THE COURT:  He's a former corporation counsel.  Don't

20    say his name so many times.

21               MS. JENERETTE:  Well, your Honor, let me tell you

22    this.  It was remanded, we had to retry it, and without the

23    ADA's opinion, the jury returned a verdict against the city.

24    So --

25               THE COURT:  Well, it made a big difference.
```

C2h1davc

1            MS. JENERETTE:  Yeah.

2            THE COURT:  So I'm saying you have the facts, you can

3   draw your own conclusions.

4            MS. ROSENBLOOM:  Your Honor, the other thing that we

5   had asked your Honor to view *in camera* was whether there were

6   overredactions, whether redactions went beyond work product

7   type things.

8            THE COURT:  No.  They looked reasonable; they really

9   did.

10           So then we don't have dates figured out.  They've

11  asked to have all this done no later than -- I don't know

12  what -- March 9, March 16.  What's your opinion on all of that?

13           MS. ROSENBLOOM:  That is fine, your Honor.  We will

14  want to use them perhaps for our experts with regard to summary

15  judgment motions, but we can do it with that deadline, with mid

16  March.

17           THE COURT:  All right.  Mid March.  So I know you want

18  the later of the two.  I, of course, would like to say

19  March 9th, period, for all of them.  March 9th.

20           Now what's left?  Oh, Queens.  What's your view on

21  Queens?  Ms. Jenerette wants it, asked for it.  Really she

22  wants Queens.

23           MS. JENERETTE:  And I would point out that they did

24  serve a subpoena on Queens and Staten Island.

25           THE COURT:  Yeah, but I looked at it.  I don't think

C2h1davc

1    we'll get much of a return.  You're the one who wants it

2    because you want to make arguments --

3              MS. JENERETTE:  To rebut the claims in the case.

4              THE COURT:  No.  You've got a mix of neighborhoods

5    throughout Manhattan and Brooklyn and Bronx too.  It's just

6    that that whole borough would be left minority, more whites, or

7    I don't know really know the breakdown of each borough.  It's

8    only my own guess.

9              MS. JENERETTE:  I would forgo Staten Island and ask

10   that your Honor direct the order to Queens.

11             THE COURT:  What's your view, Ms. Rosenbloom?

12             MS. ROSENBLOOM:  Your Honor, we asked for it

13   originally.  We'd like to have it.  We're not going to go to

14   the mat on that one, and I do believe the Queens district

15   attorney's office should probably be able to get a say on this

16   if your Honor is raising it again.

17             THE COURT:  We have a letter dated January 18th from

18   the ADA in Queens.  They produced all of one, and I don't know

19   whether that was one for a two-month sample or a six-month

20   sample.  So I don't know what they searched, but they came out

21   with one.  So I'd have to go back to them and figure out what

22   they did already.

23             MS. JENERETTE:  Well, then it shouldn't be a huge

24   burden on them to do --

25             THE COURT:  Well, I understand, but I don't know why

C2h1davc

1      there's one, whether he sampled and decided to send me one of

2      all they found or that's all he found.  We have to follow up.

3      We'll follow up and speak to him.

4              All right.  Yes, Ms. Blanchard?

5              MS. BLANCHARD:  Your Honor, if we go to March 9th,

6      I'm afraid that may not be enough time.  We're talking 10

7      months, and we're assuming that there are many more during

8      these winter months, even though we're only doing half a month.

9      We could potentially still be looking at somewhere around the

10     standard 80 per month, or half month, I don't know if that's

11     the case or not.  But what we were looking at right now for

12     time frame is three weeks, which is only 15 days.

13             THE COURT:  But now you're down to 40 a month, not 80.

14             MS. BLANCHARD:  But the reason we went to the half

15     month is because we understand that there were more arrests in

16     January and February, so there may be more than just -- I'm

17     thinking there might be closer to 80.

18             THE COURT:  I can't do hypotheticals and I don't want

19     to give you a further date, because inevitably you're going to

20     end up telling me, the day before, you need another week, and

21     I'm cutting that out of the equation and saying March 9th,

22     and I'm sure you'll have something to say on March 8th.

23             What is it, Ms. Hines?

24             MS. HINES:  I have a scheduling issue too, your Honor.

25     Two of them.  One is that I have a family trip out of state

C2h1davc

1   planned from March 7th to March 20th.

2          THE COURT:  Oh, that's good, because you can be done

3   by March 6th.

4          MS. HINES:  I would love nothing more than to be done

5   by March 6th, but I have almost double the number of months

6   than the other DA's offices.

7          THE COURT:  But I've already gone over this.  As I

8   said to Ms. Mintz, the order is not directed to you, it's to

9   the district attorney.  He's going to have to find a way to

10   staff this.  You're going to have to go back to the office and

11   say so.  "She's adamant.  That's the schedule.  You've got to

12   get me help because I'm out of here on the 7th.  My family's

13   going away from the 7th to the 20th, Mr. District Attorney.

14   You've got to help me get it out the door.  But if you give me

15   that, I'll accomplish it."  They just have to lend you a few

16   bodies for a couple weeks and it will be done.  But like

17   Ms. Mintz said, first you set it up anyway, the IT people, the

18   Bureau of Planning and Management people, and when it's all

19   ready to be looked at, that's when you need to borrow a couple

20   people.

21          MS. HINES:  I can make those requests today to get it

22   under way.

23          THE COURT:  Of course.  Of course.

24          MS. HINES:  I am concerned about doing nine months.

25          THE COURT:  I know, but your telling me you're alone

C2h1davc

1    is not convincing.  There's a district attorney's office.  They

2    have to help you.  It's a human factor.  They can't say, well,

3    you can't go on your family vacation or you have to work

4    20-hour days.  They won't do that to you.  You tell them you

5    want their help because they don't want to be in contempt of a

6    federal court order, so they'll lend you some paralegals or

7    ADAs or whatever it is.  You'll have to work that out with the

8    DA.  But it's not a matter of you personally.  You won't be in

9    contempt.  If anybody will be, it's not you, it's the DA.  But

10   there's no reason for contempt.  Just get it done.

11          MS. JENERETTE:  Your Honor, if it's helpful, this

12   mostly goes to the *Monell* summary judgment briefing.  That's

13   not due until sometime in April anyway.  The city would consent

14   to giving them a little more time if they need it.

15          THE COURT:  No, but they need to get this data, look

16   at it, get their expert to look at it, work with it.  You have

17   to work backwards.  It's already mid March and the briefing

18   starts in mid April.  They need that time to work with what

19   they get.

20          MS. JENERETTE:  We need it too.  I'm just trying to be

21   helpful.

22          THE COURT:  You are, and they love you for it, but I

23   need it mid March, because then everybody gets the chance to

24   work with it in time for the briefing.

25          Yes, Ms. Blanchard.

C2h1davc

1          MS. BLANCHARD:  If we could just have an oral order

2     that all of the documents on the DPs that we're producing are

3     unsealed.

4          THE COURT:  Yes.  It is hereby ordered that all of the

5     DPs that are produced are ordered unsealed.  But I think I

6     should make this a written order all around because of the fear

7     of contempt.  I have to give a specific order of what you're

8     directed to do and by when, including the unsealing.  I'll put

9     that in it, to help you get the help you need.  I'm helping you

10    with your DAs is what I'm trying to do.  You'll explain the

11    importance of this order to your top bosses.

12         MS. MINTZ:  I have to concur with that.  I'd need a

13    written order.

14         THE COURT:  Yes, you need a written order, sure.  That

15    might help you get the help.  It's not an informal thing.  It's

16    an important case.  And I'm weighing the factors under the law.

17         I will draft an order and hopefully get it out today.

18    Worse case Monday, or Tuesday.

19         All right.  I think that takes care of this

20    conference.  Is there anything further?

21         Not today.  Thank you.

22         Of course, DA folks, you'll always reserve the
      unredacted in case I ever want to do an *in camera* review and
23    check things, of course.  Looks like you did before.  Okay.
      Thank you.

24                              o0o

25