**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KELTON DAVIS, *et al.,* individually and on behalf of a
class of all others similarly situated;

Plaintiffs,

- against -

THE CITY OF NEW YORK and NEW YORK CITY
HOUSING AUTHORITY;

Defendants.

10 Civ. 0699 (SAS)
ECF Case

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

Preliminary Statement .................................................................................................... 1

Standard Of Review ....................................................................................................... 3

Argument ........................................................................................................................ 3

I.   The Court Should Deny the City Summary Judgment on Arrested Plaintiffs' Claims Under the Fourth Amendment and Article I, Section 12 of the N.Y. Constitution. ............... 3

  A.  Applicable Legal Standards ................................................................... 4

  B.  The City Does Not Advance Undisputed Objective Facts that Justify the Approach, Questioning, Stop, and Arrest of Arrested Plaintiffs. ................... 6

II.  The Court Should Deny the City Summary Judgment on Arrested Plaintiffs' False Arrest Claims. ........................................................................................ 24

III. The Court Should Deny Defendants Summary Judgment on Plaintiffs' Equal Protection Claims. ............................................................................................ 24

IV.  The Court Should Deny the City Summary Judgment on Plaintiffs' Claims Under Title VI of the Civil Rights Act of 1964. ....................................................... 27

V.   The Court Should Deny Defendants Summary Judgment on Resident Plaintiffs' 42 U.S.C. § 1981 Claims. .................................................................................... 28

VI.  The Court Should Deny Defendants Summary Judgment on Resident Plaintiffs' Fair Housing Act Claims. ....................................................................................... 29

VII. The Court Should Deny Defendants Summary Judgment on Plaintiffs' N.Y. Human Rights Law Claims. ........................................................................................ 30

VIII. The Court Should Deny Defendants Summary Judgment on Plaintiffs' Intimate Association Claims. ......................................................................................... 30

IX.  The Court Should Deny NYCHA Summary Judgment on Resident Plaintiffs' U.S. Housing Act Claims. ....................................................................................... 33

  A.  Resident Plaintiffs Have an Enforceable Right Via § 1983 to Enforce the United States Housing Act's Right to a Lease Free from Unreasonable Terms and Conditions and Providing for the Reasonable Accommodation of Their Guests. .......... 33

  B.  NYCHA Is Violating the Resident Plaintiffs' Right to Have Leases Free from Unreasonable Terms and Conditions. ....................................................... 35

  C.  NYCHA Is Violating Resident Plaintiffs' Right to a Lease Term Protecting Reasonable Accommodation of Their Guests. ............................................. 36

X.   All Plaintiffs Have Standing to Seek Prospective Relief. ................................. 37

XI.  New York State's Notice of Claim Provisions Do Not Bar Plaintiffs' New York State Law Claims. .......................................................................................... 39

Conclusion ................................................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Able* v. *United States*,
    88 F.3d 1280 (2d Cir. 1996)......................................................................................39

*ACORN* v. *N.Y.C. Department of Education*,
    269 F. Supp. 2d 338 (S.D.N.Y. 2003)........................................................................4

*Alexander* v. *Sandoval*,
    532 U.S. 275 (2001)..................................................................................................36

*Alfano* v. *Bridgeport Airport Services, Inc.*,
    373 F. Supp. 2d 1 (D. Conn. 2005)...........................................................................28

*Arlington Heights* v. *Metropolitain Housing Development Corp.*,
    429 U.S. 252 (1977)............................................................................................25, 26

*Board of Directors of Rotary International* v. *Rotary Club of Duarte*,
    481 U.S. 537 (1987)..................................................................................................30

*Berkemer* v. *McCarty*,
    468 U.S. 420 (1984)..................................................................................................20

*Broughton* v. *State*,
    335 N.E.2d 310 (N.Y. 1975).....................................................................................24

*Brown* v. *Texas*,
    443 U.S. 47 (1979).................................................................................................4, 20

*Cabrera* v. *Jakabovitz*,
    24 F.3d 372 (2d Cir. 1994)........................................................................................29

*Cacchillo* v. *Insmed, Inc.*,
    638 F.3d 401 (2d Cir. 2011)......................................................................................38

*Chambers* v. *TRM Copy Centers Corp.*,
    43 F.3d 29 (2d Cir. 1994)............................................................................................3

*Chevron, U.S.A., Inc.* v. *National Resources Defense Council*,
    467 U.S. 837 (1984) .................................................................................................30

*Chi Iota Colony of Alpha Epsilon Pi Fraternity* v. *City University of New York*,
    502 F.3d 136 (2d Cir. 2007).................................................................................30, 33

*City of Dallas* v. *Stanglin,*
   490 U.S. 19 (1989) ........................................................................................31

*City of Indianapolis* v. *Edmond,*
   531 U.S. 32 (2000) ..........................................................................................1

*Committee Concerning Community Improvement* v. *City of Modesto,*
   583 F.3d 690 (9th Cir. 2009) ......................................................................29

*Cody v. County of Nassau,*
   577 F. Supp. 2d 623 (E.D.N.Y. 2008) .......................................................41

*Concerned Tenants Association of Father Panik Village* v. *Pierce,*
   685 F. Supp. 316 (D. Conn. 1988) .............................................................37

*Costello* v. *NYSNA,*
   783 F. Supp. 2d 656 (S.D.N.Y. 2011) .......................................................27

*In re D'Angelo H.,*
   584 N.Y.S.2d 699 (4th Dep't 1992) ...........................................................14

*Davis* v. *Monroe County Board of Education,*
   526 U.S. 629 (1999) ....................................................................................27

*Diggs* v. *Housing Authority of Frederick,*
   67 F. Supp. 2d 522 (D. Md. 1999) .............................................................37

*Dunaway* v. *New York,*
   442 U.S. 200 (1979) ......................................................................................5

*Edwards* v. *District of Columbia,*
   821 F.2d 651 (D.C. Cir. 1987) ...................................................................37

*Floyd* v. *City of New York,*
   --- F.Supp.2d. ----, No. 08 Civ. 1034, 2012 WL 1344514 (S.D.N.Y. Apr. 16, 2012) ............11

*Floyd* v. *City of New York,*
   --- F.R.D. ----, No. 08 Civ. 1034, 2012 WL 1868637 (S.D.N.Y. May 16, 2012) .............11, 39

*Floyd* v. *City of New York,*
   813 F. Supp. 2d 417 (S.D.N.Y. 2011) ..............................................16, 24, 26

*Friends of the Earth* v. *Laidlaw Environmental Services, Inc.,*
   528 U.S. 167 (2000) ....................................................................................39

*Green* v. *City of New York,*
   438 F. Supp. 2d (E.D.N.Y. 2006) ..............................................................40

*Grove City College* v. *Bell*,
465 U.S. 555 (1984)......................................................................27

*Hawkins* v. *1115 Legal Service Care*,
163 F.3d 684 (2d Cir. 1998)..........................................................28

*Herring* v. *Chicago Housing Authority*,
No. 90 Civ. 3797, 1993 WL 489767 (N.D. Ill. 1993)....................35, 40

*Hiibel* v. *Sixth Judicial District Court*,
542 U.S. 177 (2004)......................................................................20

*Horner* v. *Kentucky High School Athletic Association*,
43 F.3d 265 (6th Cir. 1994) ..........................................................28

*Huntington Branch NAACP* v. *Town of Huntington*,
844 F.2d 926 (2d Cir.)...................................................................27

*Illinois* v. *Wardlow*,
528 U.S. 119 (2000)......................................................................11

*Matter of Julio R.*,
492 N.Y.S.2d 912 (Fam. Ct., Richmond Co. 1985)......................14

*People* v. *Kojac*,
671 N.Y.S.2d 949 (Sup Ct., N.Y. Co. 1998) ................................13

*LeBlanc-Sternberg* v. *Fletcher*,
67 F.3d 412 (2d Cir. 1995).............................................................39

*Leon* v. *New York City Housing Authority*,
625 N.Y.S.2d 212 (1st Dep't 1995) ..............................................40

*Longmire* v. *Wyser-Pratte*,
No. 05 Civ. 6725, 2007 WL 2584662 (S.D.N.Y. Sept. 6, 2007)...........28

*Lujan* v. *Defenders of Wildlife*,
504 U.S. 555 (1992)...................................................................38, 39

*Lyng* v. *International Union*,
485 U.S. 360 (1988)......................................................................32

*Marrero* v. *City of New York*,
No. 02 Civ. 6634, 2004 WL 444548 (S.D.N.Y. Mar. 10, 2004) ...........40

*Matican* v. *City of New York*,
524 F.3d 151 (2d Cir. 2008)..........................................................25

*McKenna* v. *Peekskill Housing Authority*,
  647 F.2d 332 (2d Cir. 1981) ........................................................................31

*In re Michael F.*,
  923 N.Y.S.2d 61 (1st Dep't 2011) ...............................................................11

*Mills* v. *Monroe County*,
  451 N.E.2d 456 (N.Y. 1983) ........................................................................40

*Monell* v. *Department of Social Services*,
  436 U.S. 658 (1978) ............................................................................. *passim*

*Northeast Florida Chapter of Associated General Contractors of America* v. *City of Jacksonville*,
  508 U.S. 656 (1993) .....................................................................................39

*Ohana* v. *180 Prospect Place Realty Corp.*,
  996 F. Supp. 238 (E.D.N.Y. 1998) ..............................................................29

*Panetta* v. *Crowley*,
  460 F.3d 388 (2d Cir. 2006) ...........................................................11, 13, 21

*Patel* v. *Searles*,
  305 F.3d 130 (2d Cir. 2002) ........................................................................30

*People* v. *Basch*,
  325 N.E.2d 156 (N.Y. 1975) ........................................................................23

*People* v. *De Bour*,
  352 N.E.2d 562 (N.Y. 1976) .................................................................. *passim*

*People* v. *Hollman*,
  590 N.E.2d 204 (N.Y. 1992) ...............................................................5, 6, 15

*People* v. *Howard*,
  409 N.E.2d 908 (N.Y. 1980) ........................................................................20

*People* v. *James*,
  902 N.Y.S.2d 293 (Crim. Ct., N.Y. Co. 2010) ............................................23

*People* v. *McIntosh*,
  755 N.E.2d 329 (N.Y. 2001) ........................................................................11

*People* v. *Messina*,
  919 N.Y.S.2d 814 (Crim. Ct., Kings Co. 2011) .............................................6

*People* v. *Moore*,
  847 N.E.2d 1141 (N.Y. 2006) ......................................................................15

*People* v. *Powell*,
    691 N.Y.S.2d 263 (Sup. Ct., Bronx Co. 1999) ....................................................1

*People* v. *Ventura*,
    913 N.Y.S.2d 543 (Sup. Ct., N.Y. Co. 2010) ..............................................2, 19

*Personnel Administrator of Massachusetts* v. *Feeney*,
    442 U.S. 256 (1979)........................................................................................25

*Playboy Enterprises, Inc.* v. *Dumas*,
    960 F. Supp. 710 (S.D.N.Y. 1997) ...................................................................4

*Rindfleisch* v. *Wright*,
    No. 09 Civ. 824, 2010 WL 8522545 (N.D.N.Y. Aug. 27, 2010)........................32

*Roberts* v. *U.S. Jaycees*,
    468 U.S. 609 (1984)........................................................................................30

*Roe* v. *City of New York*,
    151 F. Supp. 2d 495 (S.D.N.Y. 2001)...............................................................38

*Rosen* v. *Thornburgh*,
    928 F.2d 528 (2d Cir. 1991)...........................................................................25

*Sanitation & Recycling Industries* v. *City of New York*,
    107 F.3d 985 (2d Cir. 1997)............................................................................31

*Savino* v. *City of New York*,
    331 F.3d 63 (2d Cir. 2003)..............................................................................24

*Segal* v. *City of New York*,
    459 F.3d 207 (2d Cir. 2006)............................................................................25

*Shain* v. *Ellison*,
    356 F.3d 211 (2d Cir. 2004)............................................................................38

*S.W. ex rel. J.W.* v. *Warren*,
    528 F. Supp. 2d 282 (S.D.N.Y. 2007)..............................................................40

*In re Shannon B.*,
    517 N.E.2d 203 (N.Y. 1987).................................................................14, 15, 16

*Taylor* v. *City of New York*,
    No. 03 Civ. 6477, 2006 WL 1699606 (S.D.N.Y. June 21, 2006)........................24

*Terry* v. *Ohio*,
    392 U.S. 1 (1968)................................................................................. *passim*

*Townes* v. *City of New York,*
176 F.3d 138 (2d Cir. 1999)........................................................................24

*United States* v. *Bellamy,*
592 F. Supp. 2d 30 (E.D.N.Y. 2009) .........................................................9, 17, 19

*United States* v. *Lifshitz,*
369 F.3d 173 (2d Cir. 2004).......................................................................16

*United States* v. *McCrae,*
No. 07 Crim. 772, 2008 WL 115383 (E.D.N.Y. Jan. 11, 2008) ........................................19

*United States* v. *Montero-Camargo,*
208 F.3d 1122 (9th Cir. 2000) (*en banc*) ...............................................................10

*United States* v. *Salzano,*
158 F.3d 1107 (10th Cir. 1998) ....................................................................9

*United States* v. *Simmons,*
560 F.3d 98 (2d Cir. 2009).......................................................................5, 19

*United States* v. *Sokolow,*
490 U.S. 1 (1989).............................................................................5, 10

*United States* v. *Valentine,*
539 F.3d 88 (2d Cir. 2008).........................................................................5

*United States* v. *Vasquez,*
638 F.2d 507 (2d Cir. 1980).........................................................................4

*Vivenzio* v. *City of Syracuse,*
611 F.3d 98 (2d Cir. 2010).........................................................................3

*Wright* v. *City of Roanoke Redevelopment and Housing Authority,*
479 U.S. 418 (1987)..............................................................................33

## STATUTES

42 U.S.C. § 1437d(k) ..............................................................................35

42 U.S.C. § 1437d(l) ...............................................................33, 34, 35, 37

42 U.S.C. § 1981 .................................................................................27, 28

42 U.S.C. § 1981(a), (c) ..........................................................................29

42 U.S.C. § 1983 ...............................................................................*passim*

42 U.S.C. § 3604.................................................................................29

42 U.S.C. § 3613(a)(1)(A) .................................................................39

N.Y. Educ. L. § 3205 .......................................................................16

N.Y. Exec. L. § 296(2-a) ..................................................................30

N.Y. Penal Law 140.15 .............................................................. *passim*

**OTHER AUTHORITIES**

24 C.F.R. § 100.400(c)(2) .................................................................29

24 C.F.R. § 955(l)(2) ........................................................................36

53 Fed. Reg. 33216 (codified at 24 C.F.R. § 966) ...........................35

24 C.F.R. § 966.4(d)(1) ...............................................................33, 37

24 C.F.R. § 966.51 ...........................................................................35

28 C.F.R. § 42.102(f) ........................................................................27

Fed. R. Civ. P. 56(a) ...........................................................................3

Roman Jackson, Kristin Johnson, Rikia Evans, Raymond Osorio, Lashaun Smith, Patrick Littlejohn, Andrew Washington, Vaughn Fredrick, Shawne Jones, Hector Suarez, and Eleanor Britt (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion for partial summary judgment filed by Defendant City of New York (the "City") and motion for partial summary judgment filed by Defendant New York City Housing Authority ("NYCHA," and together with the City, "Defendants").

## PRELIMINARY STATEMENT

Plaintiffs are residents of and visitors to NYCHA public housing apartment buildings. Unlike most apartment residents and visitors across New York City, the residents and visitors in NYCHA apartment buildings regularly encounter police officers who patrol hallways, lobbies and stairwells inside these homes, and, all too often, approach, question, stop and arrest individuals for trespass without cause. As the City's highest-ranking housing bureau police official testified, the City believes that in public housing, "hallways are like streets."

Pursuant to the 1994 Memorandum of Understanding ("MOU") between NYCHA and the City, members of the New York City Police Department ("NYPD") are deployed to conduct regular patrols inside NYCHA apartment buildings. During these "vertical patrols," officers begin on the roof and work their way down through the building, approaching and stopping those they encounter, inquiring as to their purpose in the apartment building, and requesting identification.[1] Officers also patrol in lobbies and outside the entrances and exits of NYCHA

---

[1] Vertical patrols are, in essence, roving pedestrian checkpoints wherein "officers stop all who are found, question them as to why they are in the building or on the grounds, and ask for identification showing they live in the building or for an apartment number to verify a legitimate visit." *People* v. *Powell*, 691 N.Y.S.2d 263, 265 (Sup. Ct., Bronx Co. 1999); *cf. City of Indianapolis* v. *Edmond*, 531 U.S. 32, 41 (2000) (striking down narcotics roadblock, noting that the Court had "never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing"); *id.* at 49–50 (Rehnquist, J., dissenting)

buildings.  Certain NYPD officers appear to believe they have "more leeway in their interactions" in NYCHA buildings than they do in private buildings and can "question anyone they encounter to determine whether they are on the premises lawfully."  *People* v. *Ventura*, 913 N.Y.S.2d 543, 545–46 (Sup. Ct. 2010).  Because of defects in NYCHA's and the City's current trespass enforcement policies in NYCHA buildings, as well as the City's failure to train and discipline its police officers properly—issues that will be explored in the upcoming summary judgment motions regarding Plaintiffs' policy and practice claims pursuant to *Monell* v. *Department of Social Services*, 436 U.S. 658 (1978)—these vertical patrols often lead to the illegal stop and arrest for criminal trespass of residents in their own homes, or of residents' lawful guests.

    To remedy the harms caused by Defendants' policies and practices, Plaintiffs, on behalf of themselves and a class of similarly situated individuals, bring claims under federal, state, and local law.  In their present motions, Defendants assert that the material facts relating to Plaintiffs' individual claims are all "undisputed," but Defendants repeatedly ignore substantial contrary evidence and relevant legal standards.  For example:

- Lashaun Smith was arrested for trespass after visiting a friend in NYCHA housing. The City argues that there was reasonable suspicion to stop Mr. Smith for trespass because an officer purported to see Mr. Smith in a stairwell "move backwards, up the stairs a bit" and not "ascend. . . or descend the stairs into the lobby," ignoring Mr. Smith's testimony that he walked directly from the apartment he left down the stairwell without doing anything else.
- Rikia Evans, a lifelong NYCHA resident, was arrested for trespass after visiting a close family friend in NYCHA housing.  The City argues that Ms. Evans was arrested upon probable cause based upon her refusal to answer an officer's questions, ignoring the fact that an individual's refusal to respond to questioning during an investigatory stop does not give rise to probable cause.

---

(noting that a highway checkpoint for detecting illegal aliens had been upheld, as "the standardized operation of the roadblocks was viewed as markedly different from roving patrols, where the unbridled discretion of officers in the field could result in unlimited interference with motorists[]").

- Raymond Osorio was arrested for trespass after visiting a friend in NYCHA housing.  Mr. Osorio had taken six or seven steps out of the lobby when he was accosted by three officers—who had merely seen Mr. Osorio exit the building—and dragged back into the lobby.  At this point Mr. Osorio was seized without reasonable suspicion that he had done anything wrong.
- Patrick Littlejohn was standing with a NYCHA resident who identified Mr. Littlejohn as his guest, but was arrested for trespass in the total absence of probable cause.
- Roman Jackson (a NYCHA resident) and Kristin Johnson (his guest) were arrested for trespass because they were sitting on the "roof landing."  The City argues there was probable cause, despite the fact that there was no way for Mr. Jackson, who lived in the building for the majority of his life, to know he was in a restricted area and that no posted sign in the building speaks of a "roof landing" or otherwise indicates that the top of the stairwell is prohibited to residents.
- Defendant NYCHA ignores the material fact that its standard lease fails to include a term providing for the reasonable accommodation of Resident Plaintiffs' guests, in violation of the United States Housing Act.

Given these and other unsound positions in Defendants' briefing, Defendants cannot meet their heavy burden on summary judgment.  Defendants' motions should be denied.

<u>**STANDARD OF REVIEW**</u>

Summary judgment may be granted only if "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists."  *Vivenzio* v. *City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citation omitted).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  *Chambers* v. *TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citation omitted).

<u>**ARGUMENT**</u>

**I.     The Court Should Deny the City Summary Judgment on Arrested Plaintiffs' Claims Under the Fourth Amendment and Article I, Section 12 of the N.Y. Constitution.**

Summary judgment is not warranted on Plaintiffs' claims under the Fourth Amendment and Article I, Section 12 of the N.Y. Constitution because the purported facts upon which the City's officers relied when approaching, questioning, stopping and arresting Plaintiffs Lashaun Smith, Raymond Osorio, Patrick Littlejohn, Rikia Evans, Roman Jackson, Kristin Johnson, Andrew Washington, and Vaughn Frederick (collectively, "Arrested Plaintiffs") are in dispute. The record is replete with competing sets of objective facts; any suggestion that the objective facts could be undisputed at this point is meritless. The City recognizes this by not moving for summary judgment as to the stops and arrests of Mr. Washington and Mr. Frederick, and as to the stop of Mr. Osorio. Because the City fails to confront the evidence that contradicts its position as to the other approaches, questions, stops and arrests challenged by Arrested Plaintiffs, summary judgment is inappropriate.[2]

A.      Applicable Legal Standards

1.      *The Fourth Amendment*

**Terry *Stops:*** Under both the Fourth Amendment and the N.Y. Constitution, brief investigatory stops that do not rise to the level of an arrest "cannot be made completely at random . . . or at the 'unfettered discretion of officers in the field.'" *United States* v. *Vasquez*, 638 F.2d 507, 520 (2d Cir. 1980) (citations omitted) (quoting *Brown* v. *Texas*, 443 U.S. 47, 51 (1979). These investigatory stops, commonly called "*Terry* stops," are warranted only where "specific and articulable facts which, together with rational inferences from those facts, reasonably warrant" suspicion that a citizen was engaged in criminal activity. *Terry* v. *Ohio*, 392

---

[2]  Even if the City has not waived any additional defenses to Arrested Plaintiffs' N.Y. Constitution claim—and it is clear that it did, *see Playboy Enters., Inc.* v. *Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court.")—ample evidence shows that summary judgment is not warranted for any of Arrested Plaintiffs' claims under Article I, Section 12 of the N.Y. Constitution.

U.S. 1, 21 (1968).  This requires "something more than an 'inchoate and unparticularized

suspicion or hunch.'"  *United States* v. *Sokolow*, 490 U.S. 1, 7 (1989).  Under the Fourth

Amendment, a *Terry* stop occurs when a reasonable person would not feel free to leave due to a

police command, show of authority, or physical force.  *United States* v. *Simmons*, 560 F.3d 98,

105, 107 (2d Cir. 2009).[3]

    ***Warrantless Arrests:*** A warrantless arrest requires probable cause to believe a particular

individual has committed a crime.  *Dunaway* v. *New York*, 442 U.S. 200, 208 (1979).  The City

must establish that there was a quantum of evidence that amounted to more than a "rumor [or]

suspicion" of criminality before each of the Arrested Plaintiffs was arrested.  *Id.* at 213.  Even "a

strong reason to suspect" criminality is insufficient.  *Id.*; *accord United States* v. *Valentine*, 539

F.3d 88, 93 (2d Cir. 2008) ("mere suspicion" not enough).  "[W]here a suspect's actions are too

ambiguous to raise more than a generalized suspicion of involvement in criminal activity,"

probable cause is not present and the arrest would violate the Fourth Amendment.  *Id.* at 94.

        2.    *Article I, Section 12 of the New York Constitution*

    In *People* v. *De Bour*, 352 N.E.2d 562 (N.Y. 1976), the N.Y. Court of Appeals

recognized that Article I, Section 12 of the N.Y. Constitution regulates two levels of police

interference prior to a seizure: (1) approach and request for information ("Level One"), and (2)

questioning pursuant to the common-law right of inquiry ("Level Two").

    The Court of Appeals clarified the distinction between Level One and Level Two

encounters in *People* v. *Hollman*, 590 N.E.2d 204 (N.Y. 1992).  "[B]asic, nonthreatening

questions" by an officer fall within a Level One approach and request for information; an

---

[3]   Because the City's illegal seizures and arrests of Arrested Plaintiffs violated the Fourth
Amendment, they also violated Article I, Section 12 of the N.Y. Constitution, which provides
even broader protections against unreasonable seizures.

officer's "more pointed questions that would leave the person approached reasonably to believe that he or she is suspected of some wrongdoing and is the focus of the officer's investigation" constitute a Level Two inquiry. *Id.* at 206. When the questions are "extended and accusatory and the officer's inquiry focuses on the possible criminality of the person approached, th[at] is not a simple request for information." *Id.* at 210. Furthermore, *Hollman* reaffirmed *De Bour*'s concern with police questioning "undertaken with intent to harass" and questioning that "subject[s a private citizen] to a loss of dignity" and serves to "degrade and humiliate" her. *De Bour*, 352 N.E. at 567, 570.

B.   The City Does Not Advance Undisputed Objective Facts that Justify the Approach, Questioning, Stop, and Arrest of Arrested Plaintiffs.

Arrested Plaintiffs were arrested for trespassing in a NYCHA building under either N.Y. Penal Law §§ 140.15 or 140.10(e).[4] A person faces criminal liability under N.Y. Penal Law § 140.15 when he "knowingly enters or remains unlawfully in a dwelling." N.Y. Penal L. § 140.15. N.Y. Penal Law § 140.10(e) more specifically concerns trespass in a NYCHA building, and applies criminal liability to individuals that are (1) inside of a NYCHA apartment building where (2) there are conspicuously posted signs indicating trespass is not allowed, and (3) those individuals unlawfully entered or remained in the NYCHA apartment building (4) with knowledge that they were not permitted in the building. N.Y. Penal L. § 140.10(e); *People* v. *Messina*, 919 N.Y.S.2d 814, 822 (Crim. Ct., Kings Co. 2011).

As demonstrated below, material facts are in dispute as to whether officers had sufficient cause to approach, question, stop, and arrest each of the Arrested Plaintiffs.

---

[4]   Arrested Plaintiffs Mr. Jackson, Ms. Johnson, Ms. Evans, and Mr. Osorio were arrested under N.Y. Penal Law § 140.15. Arrested Plaintiffs Mr. Smith, Mr. Littlejohn, Mr. Washington, and Mr. Fredrick were arrested under N.Y. Penal Law § 140.10(e).

6

**Lashaun Smith.**  The City's argument regarding Mr. Smith's detention and arrest ignores key evidence and relies on disputed facts.  The City does not even address whether Mr. Smith was approached and questioned in violation of the N.Y. Constitution.  Mr. Smith was improperly approached, questioned, detained and arrested in violation of both federal and New York constitutional law.

On May 10, 2009, Mr. Smith was invited to the apartment of his friend, Plaintiff Shawne Jones, who lives in the NYCHA building at 301 Sutter Avenue.  (Plaintiffs' 56.1 Statement of Additional Material Facts ("Pls. 56.1") ¶¶ 122–23.)  Mr. Smith slept over at Ms. Jones's apartment.  (Pls. 56.1 ¶ 126.)  Ms. Jones's brother, Tarion Washington, who is blind, also spent the night and slept on the living room couch.  (Pls. 56.1 ¶¶ 127–28.)  Tarion Washington only knew Mr. Smith by his nickname, "Nap."  (Pls. 56.1 ¶ 129.)  In the morning, Mr. Smith woke Tarion Washington as he left, asking him to lock the door behind him.  (Pls. 56.1 ¶ 130.)  Mr. Smith then took the stairs down from the sixth floor, and, while walking between the second and ground floors, was intercepted by a uniformed police officer.  (Pls. 56.1 ¶¶ 131, 133.)  Officer Mumper testified that he approached Mr. Smith after observing him for two minutes as he remained in the stairwell and then retreated up the stairs upon seeing Officer Mumper.[5]  (City Ex. AA (Mumper Tr.) 105:17–106:13, 107:20–108:2.)[6]  But this is in dispute:  Mr. Smith testified that he was walking down the steps when he was stopped by the officer and immediately questioned.  (Pls. 56.1 ¶ 133.)  Officer Mumper also testified that Mr. Smith "seemed nervous"

---

[5]   The City ignores Mr. Smith's testimony that he was stopped by a male Latino officer (City Ex. Y (Smith Tr.) 79), in contrast to Officer Mumper, who is white, who testified that he was the officer who stopped Mr. Smith.  (City Ex. AA (Mumper Tr.) 108:8–23.)  Thus, there is a material dispute as to whether Officer Mumper was even present during the initial seizure of Mr. Smith.

[6]   Plaintiffs refer to exhibits attached to the Declarations of Brenda E. Cooke (Exhibits A–O), Lisa M. Richardson (Exhibits P–DD), and George T. Soterakis (Exhibits EE–UU) as "City Ex.," and exhibits attached to the Declaration of Steven J. Rappaport as "NYCHA Ex."

because he was "looking around a lot." (City Ex. AA (Mumper Tr.) 107:20–108:6.) Yet Mr. Smith expressly testified that he was *not* nervous upon encountering Officer Mumper. (Pls. 56.1 ¶ 134.) This too is a fact in dispute. Although Mr. Smith was on his way out of the building, Officer Mumper immediately asked Mr. Smith if he lived in the building and demanded identification. (Pls. 56.1 ¶¶ 133, 136–37.) Mr. Smith answered the officer's first question by stating that he had just been visiting a resident (Pls. 56.1 ¶ 136), and, in response to the officer's second question, he produced his current Virginia ID and an expired New York State ID. (Pls. 56.1 ¶ 137.) The officer brought Mr. Smith into the lobby and, upon further questioning, Mr. Smith said he had been visiting apartment 6D (Ms. Jones's apartment). (Pls. 56.1 ¶ 140.) Officer Mumper left the lobby to inquire at apartment 6D, and returned several minutes later, reporting that the person who answered the door could not identify a "Lashaun Smith." (Pls. 56.1 ¶¶ 141–42.) However, the City does not credit—or even mention—that Mr. Smith, knowing that only Tarion Washington was awake, asked Officer Mumper, whether "[a] guy with dreads answered the door" and that Officer Mumper answered affirmatively. (Pls. 56.1 ¶¶ 143–44.) The City also fails to acknowledge Mr. Smith's testimony that, before he was handcuffed, he explained that the "guy with dreads," Tarion Washington, was blind and would not be able to identify him from a picture ID. (Pls. 56.1 ¶¶ 146.) Mr. Smith asked to be taken upstairs so that Tarion Washington might identify him by voice. (Pls. 56.1 ¶¶ 147.)

The City concedes that Mr. Smith was seized just after he produced identification, when the uniformed police officer held onto Mr. Smith's ID and instructed Mr. Smith to accompany him to the lobby. (City Br. 9–10.) Plaintiffs contend the seizure occurred earlier, when the police detained Mr. Smith in the stairwell and questioned him. A reasonable jury could conclude that Mr. Smith was seized once Officer Mumper blocked Mr. Smith's path down the stairwell

8

and asked him pointed questions in the confines of the stairwell.  At the very least, the officers'
conduct up to that point violates Article I, Section 12 of the N.Y. Constitution.  The officers'
subsequent actions, beginning with the demand for identification, violate both the N.Y. and
federal constitutional provisions against unreasonable seizure.  Where an individual is engaged
in innocuous behavior, a reasonable jury could infer that a demand for identification following a
question about residency is unjustified.  *People* v. *Riddick*, 894 N.Y.S.2d 260, 261–62 (4th Dep't
2010).

The City contends the reasonable suspicion to stop Mr. Smith was based on three
purported facts: (1) Mr. Smith's conduct in the stairwell (City Br. 9); (2) upon Officer Mumper's
request for identification, Mr. Smith "produced his current Virginia ID and an expired New York
ID" (City Br. 9–10); and (3) he was in a high-crime area.  (*Id.*)  Each of these purported facts is
in dispute, and they are legally insufficient—individually or collectively—to support a stop.

Even if Mr. Smith had appeared nervous, that fact alone cannot support reasonable
suspicion.  *United States* v. *Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998) ("[A]bsent signs of
nervousness beyond the norm, we will discount the detaining officer's reliance on the detainee's
nervousness as a basis for reasonable suspicion.").  And, as a matter of law, reasonable suspicion
cannot be supported only by a purported "stutter step" upon seeing the officer.  *United States* v.
*Bellamy*, 592 F. Supp. 2d 30, 317, 318–20 (E.D.N.Y. 2009) (holding that officers' observation
that defendant momentarily stopped upon seeing the officers and "darted his eyes from side to
side" was insufficient to establish reasonable suspicion).  Second, the City cites no case, and
Plaintiffs are aware of none, that supports its contention that possession of an expired ID along
with a new, valid out-of-state ID—in the same name and with the same picture as a current ID—
is anything but innocuous and could justify police detention.

9

Third, an individual's presence in a high-crime area by itself cannot generate the *particularized* suspicion required for a stop, and whether Mr. Smith was actually in a high-crime area when stopped is in dispute. When assessing whether an area is one of "high crime," district courts must "make a fair and forthright evaluation of the evidence [officers] offer, regardless of the consequences." *United States* v. *Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (*en banc*). The City relies only on officer testimony to support its claim, but an officer's unsupported testimony is inherently suspect, as it may "turn any area into a high crime area based on their unadorned personal experiences." *Id.* at 1143 (Kozinski, J., concurring). Moreover, here the officer's testimony consists solely of a blanket assertion that the building was high crime because it was located in an Impact Zone. (City Ex. AA (Mumper Tr.) 101:5–7.) Impact Zones vary widely and some Impact Zones are as large as entire Police Service Areas. *See*, *e.g*, Declaration of Katharine E.G. Brooker, dated July 20, 2012 ("Brooker Decl."), Ex. 35. Reliance on such a designation to argue that there was high crime in this building at this time is wholly inconsistent with the *particularized* suspicion mandated by law. *Sokolow*, 490 U.S. at 7.

Indeed, this Court recently acknowledged, evidence that NYPD officers claim that a *Terry* stop occurred in a "high-crime area" in "approximately fifty-five percent of all recorded stops, regardless of whether the stop takes place in a precinct or census tract with average, high, or low crime." *Floyd* v. *City of New York*, --- F.R.D. ----, No. 08 Civ. 1034, 2012 WL 1868637, at *8 (S.D.N.Y. May 16, 2012) ("*Floyd III*"). In NYCHA buildings, officers claim a stop occurred in a "high-crime area" consistently in 60–65% of stops, again, regardless of actual variations in crime. This is true for all stops in public housing and for trespass stops, in particular. *See* Declaration of Jeffrey Fagan, dated July 18, 2012 ("Fagan Decl."), ¶ 13.

Notwithstanding the dispute, even if there had been high crime in this building on this day, it would not be determinative.  Reasonable suspicion is not supported merely by "[a]n individual's presence in an area of expected criminal activity," *Illinois* v. *Wardlow*, 528 U.S. 119, 124 (2000), or because an officer observes an individual "in a high crime area at night" or during any other particular time of day.  *Floyd* v. *City of New York*, --- F. Supp.2d ----, No. 08 Civ. 1034, 2012 WL 1344514, at *18 (S.D.N.Y. Apr. 16, 2012) ("*Floyd II*") (citations omitted.).[7]

Disputed issues of fact also preclude summary judgment as to the existence of probable cause to arrest Mr. Smith for criminal trespass.  After Mr. Smith demonstrated his familiarity with the residents of apartment 6D by indicating that the person who answered the door would be blind and would be wearing dreadlocks, a reasonable jury could find that Officer Mumper lacked probable cause to arrest Mr. Smith for trespass.[8]  *See Panetta* v. *Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).

Because there is no undisputed justification for approaching, questioning, stopping, and arresting Mr. Smith, whether the officer's actions violated the Fourth Amendment and the N.Y. Constitution should be determined by a jury.

---

[7]   Nor can an individual's presence in a high-crime area be the sole reason for an officer's initiation of a Level One or Level Two encounter under the N.Y. Constitution.  *People* v. *McIntosh*, 755 N.E.2d 329, 332 (N.Y. 2001) ("The fact that an encounter occurred in a high crime vicinity, without more, has not passed *De Bour* . . . scrutiny.").  *See also In re Michael F.*, 923 N.Y.S.2d 61, 62–63 (1st Dep't 2011) (no justification for Level One encounter where juvenile approached in high-crime area late at night).

[8]   Moreover, even if officers had probable cause to arrest Mr. Smith at the outset—which Plaintiffs maintain they did not—any probable cause was vitiated by intervening acts.  Officer Mumper testified that he obtained a phone number from Tarion Washington.  (City Ex. AA (Mumper Tr.) 115:2–4.)  At the precinct, Mr. Smith was allowed to make a call and the number he asked officers to dial was the same number provided by Tarion Washington.  (Pls. 56.1 ¶ 145, 149.)  Even if officers failed to recognize that the phone numbers were identical—and therefore Mr. Smith must have known the residents—there could have been no mistake when Ms. Jones came to the precinct, showed officers her ID, and verified that Mr. Smith was an authorized guest.  (Pls. 56.1 ¶ 150.)  The City's own witness concedes that, based on these facts, Mr. Smith should have been released.  (Pls. 56.1 ¶ 151.)

11

***Raymond Osorio.*** While the City concedes that material facts are in dispute—and summary judgment is inappropriate—with respect to whether Mr. Osorio was stopped without reasonable suspicion (City Br. 7 & n.16, 8), the City wrongly argues that summary judgment is warranted as to its contention that there was probable cause for Mr. Osorio's trespass arrest. (City Br. 8.)

Between 5:30 p.m. and 6:00 p.m. on November 18, 2010, Mr. Osorio left apartment 5C of 550 Cauldwell Avenue, where his friend, Andre Smith, resides. (NYCHA Ex. T (Osorio Tr.) 39:16–25; City Ex. U (Osorio Tr.) 42:11–17.) After Mr. Osorio had exited the building, and was already "about six, seven steps away" from the entrance of a NYCHA building (City Ex. U (Osorio Tr.) 83) three officers "charged" Mr. Osorio and one of the officers "pointed to [him] and asked [him] what he was doing." (City Ex. U (Osorio Tr.) 83:9–20.) One of the officers then "grabbed [Mr. Osorio] and brought [him] back into [the lobby of] the building," where he was searched. (City Ex. U (Osorio Tr.) 86:10–23; 88:2–7; 93:25–94:9; 184:5–12.)

Once in the lobby, Mr. Osorio told the officers that he had been visiting his friend, Andre Smith, in apartment 5C. (Pls. 56.1 ¶¶ 103, 105.) While other officers detained Mr. Osorio, Officer Arroyo-Perez brought Mr. Osorio's photo ID to apartment 5C and asked Andre Smith's sister, Keisha Smith, whether Mr. Osorio had just left the apartment. (City Ex. V (Arroyo-Perez Tr.) 87:3–13; 88:9–90:23.) Ms. Smith denied that Mr. Osorio had *recently* left apartment 5C, but it is disputed whether Officer Arroyo-Perez asked to speak to Mr. Smith in order to verify Mr. Osorio's claim.[9] Upon returning to the lobby, Officer Arroyo-Perez told Mr. Osorio "[Ms.

---

[9]   Whether Officer Arroyo-Perez asked Keisha Smith if Andre Smith was in the apartment should be determined by a jury. (Pls.' Responses to Def. City of New York's L.R. 56.1 Statement of Undisputed Facts ¶¶ 122–23). Neither Keisha Smith nor Andre Smith provided testimony in this action, and Officer Arroyo-Perez's account of the arrest lacks credibility. (*See* Pls. 56.1 ¶¶ 116–18.)

Smith] didn't just see you. . . . The last time she [saw] you was an hour ago."  (City Ex. U

(Osorio Tr.) 100:4–9.)  Despite Mr. Osorio's response to Officer Arroyo-Perez that "Keisha is

always in the back room" and "[t]hat's probably why she just said I ain't seen him in an hour"

(City Ex. U (Osorio Tr.) 100:13–16), Officer Arroyo-Perez arrested Mr. Osorio without making

any further attempt to speak to Andre Smith.  Accordingly, facts material to the probable cause

analysis are in dispute.[10]  *See Panetta*, 460 F.3d at 395 ("Courts should look to the 'totality of the

circumstances'" when assessing probable cause, and "an officer may not disregard plainly

exculpatory evidence.").

    In addition, although the City does not address whether Mr. Osorio was approached and

questioned in accordance with the N.Y. Constitution, a reasonable jury could find that the

officers approached and questioned Mr. Osorio after observing him doing nothing more than

exiting the front door of a NYCHA a building.  That is not permissible under the N.Y.

Constitution, *see People* v. *Kojac*, 671 N.Y.S.2d 949, 952–53 (Sup Ct. N.Y., 1998), and is

contrary to the City's own training, *see* Brooker Decl., Ex. 33 p. 16.

    **Patrick Littlejohn.**  The City makes no effort to demonstrate undisputed objective facts that

would justify the officers' stop and arrest of Mr. Littlejohn for trespass on January 14, 2009.  Nor

could it.  Mr. Littlejohn testified that he was standing with a resident of 3020 Yates Avenue who

identified himself as such when Mr. Littlejohn was approached, questioned, stopped, and

arrested for trespass at 3020 Yates Avenue.  (City Ex. DD (Littlejohn Tr.) 112:11–18.)

---

[10]   The City's assertion that 550 Cauldwell Avenue is a "dangerous, high-crime building" (City
Br. 7) relies on conclusory testimony from Officer Arroyo-Perez that is in dispute.  *See supra*
pp. 10–11.  In any event, even if Mr. Osorio exited a building known to be one of "high
crime," that fact alone cannot support reasonable suspicion, let alone probable cause.
*Wardlow*, 528 U.S. at 124; *Floyd II*, 2012 WL 1344514, at *18.

Instead of defending Mr. Littlejohn's trespass arrest, the City advances a new theory: it now asserts that summary judgment as to Mr. Littlejohn's claims is appropriate "because [Officer] Quiles had probable cause to seize Littlejohn for truancy." (City Br. 12–13.) This theory lacks legal merit[11] and is completely unsupported by the evidence.

When NYPD Officers Quiles and Selimaj entered the lobby of 3020 Yates Avenue, Mr. Littlejohn was waiting for the elevator in the lobby with his friend, David, who lived in that NYCHA apartment building. (City Br. 11–12; City Ex. DD (Littlejohn Tr.) 111:1–6; 14–25.) Officer Quiles immediately asked Mr. Littlejohn, "what are you doing here, where are you going" (City Br. 12; City Ex. DD (Littlejohn Tr.) 112:11–19) to which Mr. Littlejohn answered that he was going with David to David's apartment. (City Br. 12; City Ex. DD (Littlejohn Tr.) 112:11–19.)

The City fails to mention that David corroborated Mr. Littlejohn's answer and presented his own identification to Officer Quiles. (City Ex. DD (Littlejohn Tr.) 112:11–19.) Nor does the City acknowledge that, before Officer Quiles placed Mr. Littlejohn under arrest, Officer Selimaj

---

[11]   Truancy is not a criminal—or even arrestable—offense under New York law. New York Education Law § 3213(2)(a) authorizes an "arrest without warrant [of] any minor who is unlawfully absent from attendance upon instruction," but "the 'arrest' which the Education Law authorizes is, in fact, a noncriminal detention, rather than an arrest in the classic, criminal law sense." *Matter of Julio R.*, 492 N.Y.S.2d 912, 914 (Fam. Ct., Richmond Co. 1985). While suspicion of truancy may justify some type of *seizure*, it cannot generate probable cause for a warrantless *arrest*. Indeed, police officers generally take a juvenile suspected only of truancy to his school or a Department of Education ("DOE") site—not a precinct house. *See, e.g.*, *In re D'Angelo H.*, 584 N.Y.S.2d 699, 700 (4th Dep't 1992); *see also* Brooker Decl., Ex. 36 (Patrol Guide § 215-07) (directing officers to deliver minors suspected of truancy to the principal of the school he attends or to the DOE borough truancy site). Moreover, *seizure*—as opposed to *arrest*—of a minor for truancy should be supported by a "sufficient factual basis" that the minor is unlawfully absent from school. *In re Shannon B.*, 517 N.E.2d 203, 205 (N.Y. 1987). There is no evidence that such a basis existed here.

explained to Officer Quiles that "there's nothing we got on" Mr. Littlejohn, to which Officer

Quiles responded, "no, I'm taking this one in."  (City Ex. DD (Littlejohn Tr.) 112:16–20.)[12]

Assuming that suspicion of truancy can justify an approach, stop, or noncriminal seizure

under these circumstances, it is clear that a genuine issue of material fact exists as to whether a

reasonable officer could have inferred that Mr. Littlejohn, who was then 16 years old, was

improperly absent from school.  The City asserts that Mr. Littlejohn's purported status as a truant

on the day of his arrest was supported because the officers stopped Mr. Littlejohn between noon

and 1:00 p.m. on a school day.  (City Br. 11.)  But in their brief encounter with Mr. Littlejohn,

neither officer asked Mr. Littlejohn his age to determine whether he was of mandatory school

age, whether he was enrolled in school, was home for lunch, or had any of several other valid

reasons to be away from school.  There is simply no evidence that "school" was even mentioned

during the encounter.[13]

The City also points to Officer Quiles's general testimony that he "looked out for truancy

during [vertical patrols]" but points to no undisputed particularized evidence that Officer Quiles

was "looking out" for truancy *on January 14, 2009* (City Br. 12) or that he thought Mr.

Littlejohn might have been of compulsory school age or a truant.  The officers' familiarity with

---

[12]  Even Officer Quiles describes the entire encounter as consisting of only four brief questions
of the following substance: (1) do you live here?; (2) do you have relatives in the building?;
(3) what are you doing in the building?; and (4) do you have any weapons or drugs?  (City
Ex. EE (Quiles Tr.) 180:16–181:16.)  A reasonable jury could find that these pointed and
progressively intimidating questions, which were in response to Mr. Littlejohn's otherwise
innocuous behavior (City Ex. DD (Littlejohn Tr.) 111:1–6, 111:14–25), were not justified by
the Fourth Amendment and Article I, Section 12 of the N.Y. Constitution.  *Hollman*, 590
N.E.2d at 205–06; *People* v. *Moore*, 847 N.E.2d 1141, 1144 (N.Y. 2006).

[13]  The City supports Officer Quiles's "seizure" of Littlejohn for truancy by citing to the
distinguishable *Shannon B*.  There, the New York Court of Appeals found a "sufficient
factual basis" to detain an individual for truancy when the individual was of junior high age,
standing on a sidewalk less than a block from a school at 10:15 a.m. on a school day, and
unable to answer pointed questions about why she was not in school.  517 N.E.2d at 204–06.

Mr. Littlejohn as a "kid from the area" similarly lacks any connection to whether Mr. Littlejohn was improperly absent from school. The City cites no facts known to the officers *prior* to detaining Mr. Littlejohn that would support a "sufficient factual basis"—let alone probable cause for a warrantless arrest—that Mr. Littlejohn was of school age.[14]

The City asserts several additional facts—none of which are as clear as the City suggests—while making little, if any, attempt to connect those facts to the non-criminal offense of truancy and ignoring that these same facts are insufficient to establish reasonable suspicion of, or probable cause for, criminal trespass. The City states that Officer Quiles had previously received a "complaint" about crack sales in the lobby and had made "marijuana arrests" at 3020 Yates Avenue. (City Br. 12.) But Officer Quiles was unable to recall when exactly he received the "complaint" about crack sales, and he testified only to being "pretty sure" he had made multiple marijuana arrests prior to January 14, 2009, which in any event did not involve Mr. Littlejohn. (City Ex. EE (Quiles Tr.) 166:20–170:25.) A vague—and uncorroborated—tip that crack sales occurred in the lobby at some previous time lacks sufficient indicia of reliability to support the officers' detention of Mr. Littlejohn. *Floyd* v. *City of New York*, 813 F. Supp. 2d 417, 445 (S.D.N.Y. 2011) ("*Floyd I*") (general report of a gun "does not support reasonable suspicion to stop and frisk any individual in the area").

In addition, whether Officer Quiles previously observed Mr. Littlejohn smoking an unidentified substance with "other kids" six months prior to January 14, 2009 (City Ex. EE (Quiles Tr.) 173:13–174:19), is immaterial, considering even a past *criminal conviction* "is not

---

[14]   In New York City, education is compulsory for students through the school year in which they turn 17. N.Y. Educ. L. § 3205; N.Y.C. Chancellor's Regulation A-101. Unlike in *Shannon B.*, where the arrested child was a junior high school student, here there was no "sufficient factual basis" to conclude that Mr. Littlejohn was under 17 on the date of his arrest. On January 14, 2009, Mr. Littlejohn was 16 years old and over six feet tall. (City Ex. FF; City Ex. EE (Quiles Tr.) 180:16–181:16.)

enough" to support reasonable suspicion "that someone has committed a particular crime."
*United States* v. *Lifshitz*, 369 F.3d 173, 188 (2d Cir. 2004).  Similarly, Officer Quiles's
subjective belief that Mr. Littlejohn, while pacing back and forth waiting for an elevator,
appeared "confused and puzzled" and "out of place and jittery"—which is in conflict with Mr.
Littlejohn's testimony (City Ex. DD (Littlejohn Tr.) 112)—is also insufficient to establish
reasonable suspicion of criminality.  *Bellamy*, 592 F. Supp. 2d at 318 ("[F]urtive behavior absent
additional indicia of suspicion generally does not suffice to establish reasonable suspicion.")
(citing cases).  Finally, it is of no moment that Officer Quiles believed that 3020 Yates Avenue
was a drug-prone location on January 14, 2009, since that fact is, at best, in dispute and not
sufficient by itself to support the officer's approach and seizure of Mr. Littlejohn.  *See supra* pp.
10-11.

    ***Rikia Evans.***  The City argues that Ms. Evans's "statements, behavior and refusal to
provide sufficient information to establish her lawful purpose on NYCHA premises" provided
the NYPD with probable cause to arrest Ms. Evans for trespass.  (City Br. 6.)  Yet the City can
only reach this result by overlooking genuine disputes of material fact and misapplying well-
settled law.

    Between 11:15 p.m. and 11:30 p.m. on October 16, 2010, Ms. Evans, then 17 years old,
was standing in the doorway of a NYCHA building at 175 Alexander Avenue while waiting for
her friend, Hakeem Shavers, to walk her home.  (City Br. 5.)  Ms. Evans had been visiting
residents Victoria Suarez and Tiffany Corley[15] in apartment 12J of the same building before
taking the elevator directly to the building's lobby.  (City Ex. P (Evans Tr.) 100:2–3; 110:14–

---

[15]    Ms. Evans refers to Victoria Suarez, a close family friend, as her "aunt." (*See* Pls. 56.1 ¶ 47.)

15.)  No one else was in the lobby, and Ms. Evans's friend was late, so Ms. Evans used her cell phone to call another friend.  (City Ex. P (Evans Tr.) 111:14–17, 111:25–112:4.)

While on the phone, Ms. Evans stood in the doorway to "see if [she could] see Hakeem coming down the block."  (Pls. 56.1 ¶ 52.)  NYPD Lieutenant Allen and Officer Devine then entered the lobby, "walk[ing] past" Ms. Evans as she stood in the doorway.  (City Ex. P (Evans Tr.) 120:10–12.)  For three minutes, the police officers inspected the lobby without addressing Ms. Evans.  (City Ex. P (Evans Tr.) 122:14–16; 123:10–13.)  As the officers exited the lobby through the front door—where Ms. Evans remained talking on her phone—Officer Devine looked at Ms. Evans and ordered, "either in or out."  (City Ex. P (Evans Tr.) 124:11.)  Ms. Evans responded "by walking into the building" and toward the elevator.  (City Ex. P (Evans Tr.) 124:20–21; Pls. 56.1 ¶ 58.)  She planned to return to Ms. Suarez's and Ms. Corley's home, apartment 12J.  (Pls. 56.1 ¶¶ 45, 59.)  Ms. Evans never reached "the elevator call button . . . [b]ecause [Officer] Devine had called [her] back before [she] could get to the elevator."  (Pls. 56.1 ¶ 61.)  The City does not mention this crucial fact or that the officers then walked back into the lobby toward Ms. Evans and that she neither felt free to ignore them nor to proceed to the elevator.  (Pls. 56.1 ¶ 60, 63–64.)  Later during her encounter with the police, as Ms. Evans tried to go to the elevator, Officer Devine blocked her path and Lieutenant Allen pushed her against a wall, confirming that she was not free to leave.  (Pls. 56.1 ¶ 73.)

While she was stopped and questioned, Ms. Evans explained to the police that she was in the lobby "waiting for a friend," that she did not live in the building, and that she lived in an area not far from 175 Alexander Avenue.  Officer Devine reacted to Ms. Evans's explanation by accusing her of trespassing, and Ms. Evans replied that her aunt, Ms. Suarez, lived on the 12th floor.  (Pls. 56.1 ¶ 67.)  Officer Devine then asked Ms. Evans to identify the specific apartment

on the 12th floor where Ms. Suarez resided, and she declined to answer the officer's questions. (Pls. 56.1 ¶¶ 68–69.)  When subsequently asked to provide her ID, Ms. Evans first replied that she did not have it and, upon Officer Devine repeating his request, she did not answer "because [she] was really scared at [that] moment."  (Pls. 56.1 ¶¶ 70–72.)  Officer Devine then arrested Ms. Evans.  (City Ex. P (Evans Tr.) 142:13–143:11.)

The facts—in particular, those facts ignored by the City—support a finding that Officer Devine initiated a *Terry* stop when he instructed Ms. Evans to "come back," and she stopped short of the elevator.  *Simmons*, 560 F.3d at 107 ("[A] person's compliance with an officer's order to stop where a reasonable person would not feel free to leave is a seizure.").  *United States* v. *Bellamy* holds that "the fact that an individual appears to be waiting for someone [in the lobby to an apartment building] does not establish reasonable suspicion that an individual is engaged in criminal activity."  592 F. Supp. 2d at 317.  As in *Bellamy*, Lieutenant Allen and Officer Devine observed an individual standing in a lobby for a short length of time—no more than three minutes—during a time of day when it would not be uncommon for a young woman to be waiting for a friend to walk home.  *See id.*[16]

The City has made no showing that, before demanding that Ms. Evans "come back," the officers were aware of *any* relevant facts indicative of criminality.[17]  *See, e.g.*, *United States* v. *McCrae*, No. 07 Crim. 772, 2008 WL 115383, at *3 (E.D.N.Y. Jan. 11, 2008) ("Simply

---

[16]   It is clear that a violation of the N.Y. Constitution also occurred.  "[P]resence [in a NYCHA apartment building] alone" will not support a Level One approach or Level Two inquiry, *Ventura*, 913 N.Y.S.2d at 546; *cf. Moore*, 847 N.E.2d at 1144 ("[I]nnocuous behavior alone will not generate founded or reasonable suspicion that crime is at hand."), yet, based on no more than Ms. Evan's presence in the lobby, Officer Devine ordered her to "come back" and began asking her pointed questions.

[17]   Although not detailed here, the officers proffer a completely different description of what transpired, confirming that disputed issues of fact preclude summary judgment.  (*Compare, e.g.*, City Ex. P (Evans Tr.) 119:12–14 *with* Brooker Decl., Ex. 37 (Devine Tr.) 116:12–25, 117:11–15 and Ex. 18 (Allen Tr.) 99:20–24.)

19

beginning to walk, absent additional indicia of evasion, is not closely correlated with criminality.")[18]  Under such circumstances, a jury could readily conclude that the police detained Ms. Evans without reasonable suspicion of criminal activity.[19]

Even assuming the officers could have lawfully stopped Ms. Evans, the City concedes that Ms. Evans's "*refusal* to provide sufficient information to establish her lawful purpose on NYCHA premises" was the basis for her arrest.  (City Br. 6 (emphasis added).)  But under the Fourth Amendment and N.Y. Constitution, an individual briefly detained upon reasonable suspicion for questioning "is not obliged to respond" and must be released unless probable cause develops.  *Berkemer* v. *McCarty*, 468 U.S. 420, 439–40 (1984); *People* v. *Howard*, 408 N.E.2d 908, 914 (N.Y. 1980) (holding that "the failure to stop or co-operate by identifying oneself or answering questions [cannot] be the predicate for an arrest absent circumstances constituting probable cause").[20]

The City fails to proffer undisputed facts that explain why Ms. Evans's behavior or the information she provided was suspicious or supported escalating the detention to an arrest.

---

[18]   The City's own training regarding patrolling NYCHA apartment buildings admits that an officer is not justified  to forcibly stop an individual who exits an elevator into the lobby amidst the smell of marijuana.  (Pls. 56.1 ¶ 222.)  If the smell of marijuana is insufficient to justify a stop—let alone a seizure—surely talking on a cell phone cannot provide a proper basis for the seizure of Ms. Evans.

[19]   If the Court were to find that Ms. Evans was not seized until after she failed to provide identification, her seizure would nonetheless be in violation of the Fourth Amendment.  *See Brown*, 443 U.S. at 52–53 (police officers lacking "reasonable suspicion to believe [a person] was engaged or had engaged in criminal conduct  may not demand identification and arrest the person for failing to provide it").

[20]   Similarly, because the officers' stop of Ms. Evans was not "justified at its inception," as a matter of law, their arrest of Ms. Evans could not have been supported by her failure to provide the officers a government-issued identification.  *Hiibel* v. *Sixth Judicial Dist. Ct.*, 542 U.S. 177, 188 (2004).  Nevertheless, even if the officers' stop was "justified at its inception," the Supreme Court has cast doubt on whether probable cause can be supported by an individual's failure to provide an officer with a "'driver's license or any other document.'" *Id.* at 184–85 (quoting *Kolender* v. *Lawson*, 461 U.S. 352, 360 (1983)).

Indeed, although not mentioned by the City, after Officer Devine initiated his arrest of Ms. Evans, she asked the officers if she "could call [Ms. Suarez] to come down" to provide additional assurance that Ms. Evans was a guest, only to be told by the police "to hang up the phone." (City Ex. P (Evans Tr.) 142:23–143:2.)  Not only did Officer Devine arrest Ms. Evans for her constitutionally protected refusal to answer his questions, but he compounded his error by failing to investigate clearly exculpatory evidence when he ignored her request to call Ms. Suarez.  *See Panetta*, 460 F.3d at 395.  The City has failed not only to advance a set of undisputed objective facts to support an officer's approach, questioning, and stop of Ms. Evans, but also her arrest. Summary judgment as to Ms. Evans claims under the Fourth Amendment and N.Y. Constitution is therefore unwarranted.

*Roman Jackson & Kristin Johnson:*  The City, relying on facts in dispute, asserts that Roman Jackson and Kristin Johnson were properly stopped and arrested for *knowingly* trespassing in a NYCHA apartment building.  The City contends that Mr. Jackson, then a resident of a NYCHA apartment building at 131 Saint Nicholas Avenue, and his guest, Ms. Johnson, were lawfully arrested for trespass on January 31, 2009 because Mr. Jackson and Ms. Johnson were sitting at the top of a stairwell in 131 Saint Nicholas Avenue, and "conspicuously posted signs clearly state that loitering and trespassing in the lobby, roof, hallway and stairs is prohibited." (City Br. 3–5.)  Their presence in the stairwell aside, the City does not claim that either Mr. Jackson or Ms. Johnson was engaged in any suspicious conduct.

The City does not contest that Mr. Jackson was a building resident, or that Ms. Johnson was his welcome guest.  (City Br. 3.)  After the officers approached Mr. Jackson and Ms. Johnson, Mr. Jackson politely greeted the officers and explained this.  (Pls. 56.1 ¶ 23.)  In response, one of the officers told the two that they were "not supposed to be [t]here," and asked,

21

"[W]hy are you guys up here again?"  (Pls. 56.1 ¶ 24.)  Indeed, at one point during his encounter

with the officers, Mr. Jackson told the officers they could retrieve his identification ("ID") from

his apartment in order to prove his residency.  (Pls. 56.1 ¶ 29.)  Disregarding Mr. Jackson's

residency, the officers told the pair, "[Y]ou're breaking the law, you are trespassing and in the

stairwell."  (Pls. 56.1 ¶ 31.)

The signs which the City claims put Mr. Jackson and Ms. Johnson on notice that the top

of the stairwell was prohibited to residents simply state "loitering and trespassing in lobby, roof,

hallway and stairs is not permitted" (City Ex. H).  These signs may put non-residents on notice

that trespassing was prohibited, but there was no reason for *residents* to believe that the lobby,

hallway, and stairs were barred to them.  (*Cf.* Pls. 56.1 ¶ 17 ("I didn't think that [the "no

trespassing" sign] pertained to residents of the building," but only to "a stranger or just

somebody coming into the building off of the street.").)  These areas, especially the lobby and

stairwells, must be open to residents of the building, for otherwise they would be unable to reach

their apartments.

Indeed, there is a genuine factual dispute as to whether the so-called "roof landings"

were, at the time in question, prohibited areas to residents.  The City simply has no support, in

any written rule or policy in the record or in law, for characterizing this portion of the stairwell

as "the roof landing" or insisting that it was a restricted area at the time of Plaintiffs' arrest.[21]

The "no trespassing" signs on which the City relies (City Br. 3–4) speak exclusively of the

"lobby, roof, hallway and stairs."  At the time of Plaintiffs' arrest there were no "conspicuously

posted rules or regulations" indicating that the "roof" includes the top of the stairwell leading to

---

[21]   *Subsequent* to Mr. Jackson and Ms. Johnson's arrest, NYCHA issued the Highlights of
House Rules Lease Terms and Policy (the "House Rules"), which now expressly prohibit
residents' presence on roof landings.  *See* Brooker Decl. Ex. 28.

the roof, which is within the building's interior.  Indeed, Mr. Jackson repeatedly testified during

his deposition that, as a resident of more than twelve years, he did not believe he was in a

restricted area.[22]  (Pls. 56.1 ¶ 18.)  Even high-ranking NYCHA officials were not aware that

"roof landings" were prohibited areas or that residents could be arrested there.  (Pls. 56.1 ¶¶ 19–

20.)

Moreover, it is disputed whether a "no trespassing" sign was even posted in the stairwell

in which Mr. Jackson and Ms. Johnson were arrested.[23]  (Pls. 56.1 ¶ 12.)  Though there was a

sign in the building lobby—17 floors down from where Mr. Jackson and Ms. Johnson were

seated—that stated that "loitering and trespassing in lobby, roof, hallway and stairs is not

permitted" (City Ex. H), the City ignores that there was no such sign posted in the stairwell in

which Mr. Jackson and Ms. Johnson were sitting.  (Pls. 56.1 ¶ 12.)

Given these many factual disputes concerning the presence and effect of these "no

trespassing" signs, on which the City's argument hinges, summary judgment on Mr. Jackson and

Ms. Johnson's claims under the Fourth Amendment and Article I, Section 12 of the N.Y.

Constitution is plainly inappropriate.  Mr. Jackson repeatedly told the officers he was a resident

and that he and Ms. Johnson did not know they were doing anything wrong, and he offered to go

two flights down to his apartment to get his identification.  (City Ex. F (Jackson Tr.) 123:6–13.)

Mr. Jackson and Ms. Johnson have the right to prove to a jury that no reasonable officer could

have had probable cause to believe that they were knowingly breaking the law.

---

[22]  The N.Y. Court of Appeals has held that "a person who enters upon premises accidentally, or
who honestly believes he is licensed or privileged to enter is not guilty of any degree of
criminal trespass."  *People* v. *Basch*, 325 N.E.2d 156, 159 (N.Y. 1975).

[23]  *See, e.g.*, *People* v. *James*, 902 N.Y.S.2d 293, 298 (N.Y.C. Crim. Ct. 2010) (holding that
"[t]he mere posting of a no trespassing sign is not enough to establish that the lobby of the
premises is not open to the public," when there is no indication that such a sign is "posted
strategically or conspicuously enough to afford adequate notice of the prohibited conduct")
(internal quotation marks omitted).

## II.   The Court Should Deny the City Summary Judgment on Arrested Plaintiffs' False Arrest Claims.

The evidence establishes—or at the very least presents disputed factual issues—that the arresting officers intended to confine each Arrested Plaintiff, that Arrested Plaintiffs were conscious of their confinement, and that none of the Arrested Plaintiffs consented to their confinement.  In addition, as set forth above, a reasonable jury could find that there was no probable cause for the arrests of each of the Arrested Plaintiffs.[24]  Summary judgment for the City as to Arrested Plaintiffs' false arrest claims (Am. Compl. ¶¶ 287–93) should therefore be denied.  *See Broughton* v. *State*, 335 N.E.2d 310, 312–14 (N.Y. 1975); *Savino* v. *City of New York*, 331 F.3d 63, 75–76 (2d Cir. 2003).

## III.   The Court Should Deny Defendants Summary Judgment on Plaintiffs' Equal Protection Claims.

In arguing that they are entitled to summary judgment on Plaintiffs' equal protection claims, the City and NYCHA misconstrue the evidence presented by Plaintiffs and rely on a fundamental misunderstanding of the law.  (City Br. 13; NYCHA Br. 13–15.)

Summary judgment for Defendants is not appropriate on a plaintiff's equal protection claim where she was stopped and/or arrested in violation of the N.Y. Constitution or Fourth Amendment and that stop and/or arrest "occurred in the context of citywide racial disparities in [trespass arrest] patterns unexplainable by chance, crime patterns, or officer deployment patterns." *Floyd I*, 813 F. Supp. 2d at 446; *Taylor* v. *City of New York*, No. 03 Civ. 6477, 2006 WL 1699606, at *20–22 (S.D.N.Y. June 21, 2006).  It is well established that courts, when determining whether there is discriminatory intent, are not limited to direct evidence, but can

---

[24]   The City's reliance on *Townes* v. *City of New York*, 176 F.3d 138 (2d Cir. 1999) (City Br. 8), is misplaced.  Here, each of the officer's unlawful stops of Arrested Plaintiffs was the proximate cause of Arrested Plaintiffs' confinement.

also consider circumstantial evidence of discriminatory purpose.  *See Arlington Heights* v.

*Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977); *Rosen* v. *Thornburgh*, 928 F.2d 528,

533–34 (2d Cir. 1991).  Relatedly, a plaintiff, when establishing an equal protection claim, need

not demonstrate that discriminatory intent was the sole factor.  All that is required is that the

decision-maker "selected or reaffirmed a particular course of action at least in part 'because of,'

not merely 'in spite of,' its adverse effects upon an identifiable group."  *See Personnel Adm'r of*

*Mass.* v. *Feeney*, 442 U.S. 256, 279 (1979); *see also Arlington Heights*, 429 U.S. at 265–66.

Plaintiffs meet this standard.

     First, as demonstrated above, the City has failed to prove conclusively that for each

encounter between Arrested Plaintiffs and officers, the respective NYPD officers had a valid,

constitutional reason to approach, question, stop and arrest.  Not only does the City fail to contest

that NYPD officers lacked cause under the N.Y. Constitution or Fourth Amendment to approach,

question, stop and arrest Plaintiffs Andrew Washington and Vaughn Frederick, but for the

remainder of the Arrested Plaintiffs, there are material facts in dispute that preclude summary

judgment for the City on Arrested Plaintiffs' claims under the Fourth Amendment and Article I,

Section 12 of the N.Y. Constitution.  *See supra* pp. 6–23.  Moreover, for two of the Arrested

Plaintiffs—Andrew Washington and Rikia Evans—the use of racial epithets by officers involved

in each of those arrests constitutes direct evidence of discriminatory intent.  (Pls. 56.1 ¶¶ 78,

185.)[25]  For the incidents involving other Arrested Plaintiffs there is strong circumstantial

---

[25]    The City's reliance on *Matican* v. *City of New York*, 524 F.3d 151 (2d Cir. 2008), and *Segal* v. *City of New York*, 459 F.3d 207 (2d Cir. 2006), is misplaced.  Plaintiffs are not relying on the use of racial epithets during the arrests of Mr. Washington or Ms. Evans, by itself, to establish the claim that Defendants' trespass enforcement practices violate Plaintiffs' right to equal protection.  In addition, that the City disputes whether Officer Devine used a racial epithet while arresting Ms. Evans (City Br. at 14 n.22) demonstrates only that summary judgment as to Ms. Evans's racial discrimination claims is improper.

evidence to support a determination that race was a motivating factor.[26]  (Pls. 56.1 ¶¶ 37–39, 191–92, 195.)  As such, for each of the Arrested Plaintiffs, a reasonable fact-finder could conclude not only that the respective NYPD officers lacked a constitutional basis to conduct the stops and/or arrests, but also that the racial background of the Arrested Plaintiffs was a motivating factor in the encounter.

Second, because a reasonable jury could find that the stop and/or arrest of each of the Arrested Plaintiffs lacked a legitimate basis, Plaintiffs are permitted to demonstrate racial discrimination by demonstrating that the stops and/or arrests took place in the context of a longstanding, statistically significant racial disparity in trespass enforcement policies on NYCHA properties that cannot be explained by crime rates or other non-race reasons.  *See Arlington Heights*, 439 U.S. at 265–66; *Floyd I*, 813 F. Supp. 2d at 446.[27]  Although such evidence is not currently at issue, on the *Monell* briefing Plaintiffs intend to rely on quantitative analyses conducted by Professor Jeffrey Fagan, who has been retained as an expert by Plaintiffs, and whose expert report was provided to Defendants on June 29, 2012, which demonstrate that there are substantial, statistically significant racial differences in terms of who is stopped and/or arrested on NYCHA property, even after controlling for crime, NYPD deployment decisions, and other relevant factors.  *See* Fagan Decl., ¶ 9–11.[28]  Plaintiffs will further demonstrate each Defendant's policy and practice of racial discrimination when and if Defendants move for

---

[26]   The City is incorrect to argue that Plaintiffs may only rely on evidence of "racial animus by individual [ ] officers."  *See Arlington Heights*, 429 U.S. at 266–68; *Rosen*, 928 F.2d at 533.

[27]   The City concedes this point by reserving its right to address "intentional discrimination . . . in the second phase of the summary judgment briefings."  (City Br. 16 n.25.)

[28]   If the Court determines it needs to consider all of the evidence regarding Defendants' racially discriminatory patterns and practices in order to resolve whether Defendants meet the summary judgment standard as to Plaintiffs' individual racial discrimination claims, Plaintiffs are prepared to submit such evidence at the Court's invitation.

summary judgment on Plaintiffs' *Monell* claims.  Accordingly, summary judgment as to

Plaintiffs' equal protection claims is not warranted.[29]

## IV.   The Court Should Deny the City Summary Judgment on Plaintiffs' Claims Under Title VI of the Civil Rights Act of 1964.

The City denies that it is subject to suit under Title VI, 42 U.S.C. § 2000d et seq., on the

basis that it is not a recipient of federal funds.  (City Br. 14–15.)[30]  But both precedent and Title

VI's implementing regulations make clear that in the context of Title VI, the word "recipient"

encompasses entities, such as the City and NYCHA, to which "[f]ederal financial assistance is

extended, *directly or through another recipient*."  28 C.F.R. § 42.102(f) (emphasis added); *cf.*

*Grove City Coll.* v. *Bell*, 465 U.S. 555, 564–65 (1984), *abrogated on other grounds* by Civil

Rights Restoration Act of 1987, P.L. No. 100–259, 102 Stat. 28 (1988).  Here, the City is a

"recipient" of federal funds because the City receives a portion of the subsidies that the U.S.

Department of Housing and Urban Development ("HUD") provides to NYCHA.  (Pls. 56.1 ¶¶

203–05.)  The City is off the mark in its reliance on *Davis* v. *Monroe County Board of*

*Education*, 526 U.S. 629, 640–41 (1999), for the proposition that, as a matter of law, the City is

---

[29]  For the same reasons, genuine issues of material fact also exist as to the following claims that require proof of racially discriminatory intent: Article I, Section 11 of the N.Y. Constitution (Am. Compl. ¶¶ 275–80); 42 U.S.C. § 1981 (Am. Compl. ¶¶ 266–71); and Title VI of the Civil Rights Act of 1964 (Am. Compl. ¶¶ 266–71).  In addition, the quantitative analyses conducted by Professor Fagan, as well as other evidence not yet before the Court, supports Plaintiffs' claims of racial discrimination under the Fair Housing Act (Am. Compl. ¶¶ 254–59) and New York State Human Rights Law (Am. Compl. ¶¶ 294–98), both of which permit a showing of disparate impact to prove racial discrimination.  *See Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 934–35 (2d Cir.)*, aff'd in part,* 488 U.S. 15 (1988) (FHA claim may be premised on disparate impact evidence); *Costello* v. *NYSNA*, 783 F. Supp. 2d 656, 674 (S.D.N.Y. 2011) (claims under State Human Rights Law may be premised on disparate impact evidence).

[30]  NYCHA does not dispute that it is a proper defendant under Title VI but seeks dismissal of Resident Plaintiffs' Title VI claims on the theory that there is no evidence of race discrimination.  (NYCHA Br. 14.)  As Plaintiffs have demonstrated, NYCHA is incorrect. *See supra* pp. 24–28.

27

not a "recipient" of federal funds.  *Davis* actually supports Plaintiffs' position because it noted that "an agent of the recipient" of federal funds can be held liable under a provision such as Title VI.[31]  *Id.* at 645; *see also Horner* v. *Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 272, 272 n.5 (6th Cir. 1994) (holding a high school athletic association to be a recipient of federal funds for purposes of Title IX where it "performs the statutory duties of a recipient of federal funds, and directly receives income in the form of dues from schools that receive federal funds").  Thus, Resident Plaintiffs[32] can maintain a cause of action against the City under Title VI.[33]

## V.   The Court Should Deny Defendants Summary Judgment on Resident Plaintiffs' 42 U.S.C. § 1981 Claims.

Under § 1981, Plaintiffs have the same right "as is enjoyed by white citizens" to enjoy the "benefits, privileges, terms, and conditions of [their] contractual relationship" with NYCHA, free from "impairment" by state actors.  42 U.S.C. § 1981(a), (c).  Defendants' suggestion that Resident Plaintiffs' § 1981 claims must be dismissed because the Resident Plaintiffs do not live in complete seclusion is contrary to law.  Proof of "impairment" of a contractual right under § 1981 does not require plaintiffs to suffer an absolute denial or deprivation of the right.  *See Hawkins* v. *1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998) (noting that Congress intended 1991 amendments to § 1981 "to bar *all* race discrimination in contractual relations," such as discriminatory harassment, demotion, promotion, and transfer (emphasis added)); *see, e.g., Longmire* v. *Wyser-Pratte*, No. 05 Civ. 6725, 2007 WL 2584662, at *12–13 (S.D.N.Y. Sept.

---

[31]   At this stage, these facts are sufficient to defeat the City's claim that it is entitled to dismissal of Resident Plaintiffs' Title VI claims.  *See Alfano* v. *Bridgeport Airport Servs., Inc.*, 373 F. Supp. 2d 1, 7 (D. Conn. 2005).  On the next round of briefing, Plaintiffs will come forward with additional evidence concerning "the nature of the contract" between the City and NYCHA and the nature of the services provided under the MOU.  *See id.* at 5-7.

[32]   Resident Plaintiffs are Eleanor Britt, Patrick Littlejohn, Andrew Washington, Shawne Jones, Hector Suarez, and Vaughn Frederick.

[33]   Plaintiffs concede that Title VI is applicable only to Resident Plaintiffs.

28

6, 2007) (recognizing disparate pay for employees as a valid § 1981 claim).  As demonstrated

below, Resident Plaintiffs have suffered significant impairment of their contractual rights that

warrants a trial.

**VI.    The Court Should Deny Defendants Summary Judgment on Resident Plaintiffs'
        Fair Housing Act Claims.**

Section 3604(b) of the Fair Housing Act ("FHA") makes it unlawful "[t]o discriminate

against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the

provision of services or facilities in connection therewith."  42 U.S.C. § 3604(b).  This provision

encompasses Resident Plaintiffs' claim for discriminatory provision of police services.  *See*

*Cmte. Concerning Cmty. Improvement* v. *City of Modesto*, 583 F.3d 690, 711–14 (9th Cir. 2009).

The authority on which the City relies for the proposition that § 3604(b) should be limited to

discrimination in the acquisition of a dwelling, and not discrimination in the provision of

services to current residents, is inconsistent with the congressional mandate that "the provisions

of 42 U.S.C. § 3604 are to be given broad and liberal construction."  *Cabrera* v. *Jakabovitz*, 24

F.3d 372, 388 (2d Cir. 1994).

Even if § 3604 were limited as the City suggests, Resident Plaintiffs' claim is also

cognizable under § 3617 of the FHA and its implementing regulations, which specifically

prohibit "interfering with persons in their enjoyment of a dwelling" because of race.  24 C.F.R. §

100.400(c)(2); *Ohana* v. *180 Prospect Place Realty Corp.*, 996 F. Supp. 238, 242 (E.D.N.Y.

1998).  The implementing regulations' provision concerning the "enjoyment of a dwelling," 24

C.F.R. § 100.400(c)(2), clearly encompass the claims of current residents and is entitled to

deference under *Chevron, U.S.A., Inc.* v. *Nat'l Resources Defense Council*, 467 U.S. 837 (1984).

*Ohana*, 996 F. Supp. at 242.

**VII.    The Court Should Deny Defendants Summary Judgment on Plaintiffs' N.Y. Human Rights Law Claims.**

The City's contention that it is not a proper defendant under the State Human Rights Law ("SHRL") is wrong.  The SHRL bars discrimination by any "person having the right of . . . possession" of a public housing building.  N.Y. Exec. L. § 296(2-a).  The City's admission that the NYPD controls certain areas of NYCHA developments (Pls. 56.1 ¶ 221) plainly subjects the City to liability under the SHRL.[34]

**VIII.   The Court Should Deny Defendants Summary Judgment on Plaintiffs' Intimate Association Claims.**

Defendants' trespass enforcement policies have directly and substantially interfered with some of Plaintiffs' most intimate relationships.  The right to intimate association is derived from both the First and Fourteenth Amendments and protects Plaintiffs' "highly personal relationships" from "undue intrusion by the state."  *Roberts* v. *U.S. Jaycees*, 468 U.S. 609, 617–19 (1984); *see also Chi Iota Colony of Alpha Epsilon Pi Fraternity* v. *City Univ. of New York*, 502 F.3d 136, 143–44 (2d Cir. 2007) (adopting a balancing test for intimate association claims).  Plaintiffs have identified strong associational interests and proffered sufficient evidence of "undue intrusion" on such relationships to warrant a trial.

Plaintiffs' relationships with their family and close friends are entitled to substantial constitutional protection.  While familial relationships receive the strongest constitutional protection, *Patel* v. *Searles*, 305 F.3d 130, 137 (2d Cir. 2002), the right to intimate association is not limited to the family context, *see Bd. of Dirs. of Rotary Int'l* v. *Rotary Club of Duarte*, 481 U.S. 537, 545 (1987).  Rather, the Constitution recognizes a "spectrum" of human relationships, "'reflect[ing] the realization that individuals draw much of their emotional enrichment from

---

[34]    Resident Plaintiffs concede that the City is not subject to liability under the City Human Rights Law for the conduct alleged in the Amended Complaint.

close ties with others.'" *Chi Iota*, 502 F.3d at 143–44 (quoting *Roberts*, 468 U.S. at 619). Thus,

the Second Circuit has recognized that even a college fraternity enjoys a constitutional interest,

albeit a "relatively weak" one, in intimate association. *Id.* at 149. Here, unlike the relationships

described in Defendants' briefs between dance-hall patrons who arrive as strangers to one

another, *see City of Dallas* v. *Stanglin,* 490 U.S. 19, 24–25 (1989); (City Br. 20; NYCHA Br.

19), or the business relationships among corrupt mobsters, *see Sanitation & Recycling Indus.* v.

*City of New York*, 107 F.3d 985 (2d Cir. 1997); (City Br. 20), the relationships between NYCHA

residents and their family and close friends are of high importance and warrant substantial

constitutional protection. *See, e.g.*, *McKenna* v. *Peekskill Hous. Auth.*, 647 F.2d 332, 335 (2d

Cir. 1981).

Defendants' unlawful trespass enforcement policies have directly and substantially

impaired the rights of Ms. Evans, Mr. Washington, Mr. Littlejohn, and Ms. Jones to maintain

constitutionally protected relationships. Both Ms. Evans's father and uncle have been stopped

while visiting her. (L.R. 56.1 Statement in Supp. of Def. NYCHA's Mot. for Summ. J. ¶¶ 110–

11.) After he was stopped, Ms. Evans's uncle's visits declined from twice weekly to fewer than

three times per month. (Pls. 56.1 ¶ 86.) Similarly, Ms. Evans's father no longer visits Ms. Evans

at her residence; instead, he meets her outside her apartment building. (*See* Declaration of Rikia

Evans, dated July 17, 2012 ("Evans Decl."), ¶ 6.) After Ms. Evans was arrested for trespass

while visiting a close family friend, whom she considers an aunt, she stopped her daily visits.

(NYCHA Ex. V (Evans Tr.) 27:15–28:7.) In addition, Ms. Evans has stopped visiting other

friends who live in NYCHA developments and no longer has close friends who are NYCHA

residents. (*See* Evans Decl., ¶¶ 7–8.)

Mr. Washington and Mr. Littlejohn, both residents of NYCHA's Eastchester Gardens development, have been close friends since childhood.  (Pls. 56.1 ¶¶ 183–84.)  While Mr. Washington previously visited Mr. Littlejohn "all the time," after he was arrested while visiting Mr. Littlejohn, he now visits only "once in a while."  (Pls. 56.1 ¶ 187.)  Because both Mr. Washington and Mr. Littlejohn live in NYCHA housing, Defendants' practices completely inhibit them from visiting one another in the safe havens of their homes.  (Pls. 56.1 ¶¶ 188–90.)  Mr. Washington testified that his inability to visit a friend "next door" leaves him with "no freedom at all."  (Pls. 56.1 ¶ 190.)  Finally, Ms. Jones's relationships with her son's godfather, Mr. Smith, and her cousins have been similarly affected by Mr. Smith's arrest.  (Pls. 56.1 ¶¶ 121, 152–56 (Ms. Jones tells her cousins to call before arriving to "avoid the cops stopping them and taking them in for nothing," and Mr. Smith has not stayed overnight since the arrest and is quick to "get out of the building" when he visits.).)

Plaintiffs have identified concrete instances of interference with intimate relationships that warrant a trial.  Unlike *Lyng* v. *International Union*, 485 U.S. 360, 365 n.3 (1988), where plaintiffs offered *no* evidence that individuals had ceased associations with family members because of defendants' challenged policy, Plaintiffs here have produced evidence that Defendants' policies caused them to substantially reduce time spent with family and friends.  *See Patel*, 305 F.3d at 137 (rejecting "draconian and formalistic vision of how severe the impairment to the right to intimate association must be").[35]  The strength of Plaintiffs' associational interests and the degree of undue intrusion are factual questions that should not be resolved on a motion

---

[35]   Likewise, the City's reliance on *Rindfleisch* v. *Wright*, No. 09 Civ. 824, 2010 WL 8522545 (N.D.N.Y. Aug. 27, 2010), for the proposition that Plaintiffs must establish that its policies specifically targeted protected relationships (City Br. 20) is misplaced.  The Second Circuit has never found such a requirement, *see Patel*, 205 F.3d at 137, and in any event *Rindfleisch* involved the specific intent of individual defendants in discrete situations—wholly unlike the implementation of an across-the-board policy at issue here.

for summary judgment.  This Court should assess the claims on the merits in the context of the evidence presented in the *Monell* briefing.  As Plaintiffs will show at that stage, the interference with Plaintiffs' intimate associations could be minimized if Defendants tailored their policies more narrowly to meet the objectives of crime prevention.  *See Chi Iota*, 502 F.3d at 143.

IX.    **The Court Should Deny NYCHA Summary Judgment on Resident Plaintiffs' U.S. Housing Act Claims.**

In order to protect the rights of tenants in public housing, the U.S. Housing Act ("USHA") expressly prohibits public housing authorities ("PHAs") such as NYCHA from utilizing leases that contain "unreasonable terms and conditions."  42 U.S.C. § 1437d(l).  The implementing regulations further require that the lease provide for the "reasonable accommodation of [residents'] guests."  24 C.F.R. § 966.4(d)(l).  The Court should deny summary judgment to NYCHA, a PHA subject to USHA,[36] on Resident Plaintiffs' USHA claims because NYCHA violates Resident Plaintiffs' rights under USHA in two ways.  First,  NYCHA imposes unreasonable lease terms on Resident Plaintiffs through NYCHA's House Rules.  Second, NYCHA fails to provide in Resident Plaintiffs' leases the required lease term concerning reasonable accommodation of guests.

A.    Resident Plaintiffs Have an Enforceable Right Via § 1983 to Enforce the United States Housing Act's Right to a Lease Free from Unreasonable Terms and Conditions and Providing for the Reasonable Accommodation of Their Guests.

Resident Plaintiffs may enforce § 1437d(l) of the USHA via 42 U.S.C. § 1983.  Section 1983 provides a remedy for the violation of federal rights by state actors.  In *Wright* v. *City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418, 423 (1987), the Supreme Court held that public housing residents enjoy a private right of action to enforce § 1437a of USHA,

---

[36]   Plaintiffs concede that the City is not subject to the USHA.  Moreover, if Mr. Washington and Mr. Frederick are not identified on the respective leases, they may not assert claims arising under the USHA.

which limits the rent and utility charges that PHAs may impose on resident families.  479 U.S. at

430.  Section 1437d(l) of USHA, like § 1437a, is "undeniabl[y]" intended to benefit public

housing tenants and creates an enforceable right for which Resident Plaintiffs may seek a remedy

under § 1983.  *See id.*

　　　*Gonzaga University* v. *Doe*, on which NYCHA relies, supports this result.  536 U.S. 273,

276, 280 (2002) (holding that Family Educational Rights and Privacy Act of 1974 ("FERPA")

did not create personally enforceable rights).  *Gonzaga* stands for the proposition that a statute

creates an enforceable right only where "Congress intended to confer individual rights upon a

class of beneficiaries."  *Id.* at 285–86.  By definition, § 1437d(l) regulates individual rights—

those contained in a specific lease between a public housing authority and each tenant—and not

aggregate rights stemming from "institutional policy and practices."  *Cf. Gonzaga*, 536 U.S. at

288.  And § 1437d(l) imposes obligations directly on PHAs rather than indirectly, through HUD.

*Cf. Gonzaga*, 536 U.S. at 287 (explaining that FERPA's mandate that "[n]o funds shall be made

available" is "two steps removed" from individual rights).  Finally, unlike FERPA, USHA

envisions decentralized enforcement in which *individual tenants* bring claims against their

respective PHAs for violations.  *See* 42 U.S.C. § 1437d(k) (explicitly envisioning that "tenants"

will challenge adverse actions by PHAs, including enforcement of rights under § 1437d(l));

*Wright*, 479 U.S. at 426.  *Cf. ACORN* v. *N.Y.C. Dep't of Educ.*, 269 F. Supp. 2d 338, 346–47

(S.D.N.Y. 2003) (contrasting the schemes in the No Child Left Behind Act and FERPA with

USHA).

　　　Therefore, the text and structure of § 1437d(l), as distinguished from FERPA, evinces

Congressional intent to confer individual rights on public housing tenants that are enforceable

under § 1983.[37]  NYCHA's contention that the administrative grievance procedure required by

§ 1437d(k) supplants Resident Plaintiffs' remedies under § 1983 is squarely foreclosed by

*Wright.*  479 U.S. at 424–28.[38]  Resident Plaintiffs' rights under the USHA have been violated in

the following two ways.

> **B.**     **NYCHA Is Violating the Resident Plaintiffs' Right to Have Leases Free from Unreasonable Terms and Conditions.**

Each of the leases signed by the Resident Plaintiffs includes a term requiring them "[t]o

comply with and obey all rules and regulations prescribed from time to time by the Landlord

concerning the use and care of the Leased Premises or any common or community spaces or

other places in the Development."  (Pls. 56.1 ¶ 211.)  Because they are incorporated in the lease,

which all NYCHA tenants and authorized household members eighteen and older must sign and

return, the House Rules constitute lease terms with which Resident Plaintiffs must comply.[39]

Provisions of the NYCHA House Rules—especially when considered in the context of

the MOU, which requires that they be enforced by NYPD personnel—are unreasonable.[40]  For

---

[37]  *See also Herring* v. *Chi. Hous. Auth.*, No. 90 Civ. 3797, 1993 WL 489767, at *17 (N.D. Ill. 1993) ("[T]he provision in the Housing Act governing leases, § 1437d(l), read in conjunction with the grievance procedures in § 1437d(k) and the HUD regulations which accompany each section, create a private right of enforcement for § 1983 plaintiffs.").

[38]  Also, as explained in *Wright*, 479 U.S. at 426, § 1437d(k) does not require a resident to adjudicate grievances through administrative, rather than judicial, review.  *See also* Tenancy and Administrative Grievance Procedure for Public Housing, 53 Fed. Reg. 33216 (codified at 24 C.F.R. § 966) ("HUD believes that availability of an opportunity for administrative review through the PHA grievance procedure should not constrict the tenant's otherwise available access to the courts).  Moreover, for a putative class action such as this one, the grievance procedure is not the proper mechanism at all.  *See* 24 C.F.R. § 966.51 ("The PHA grievance procedure shall not be applicable to . . . class grievances.").

[39]  While the House Rules include a disclaimer providing that it is neither a lease nor a lease addendum, that language is belied by the unambiguous requirement in NYCHA leases mandating compliance with all NYCHA-issued rules and regulations.

[40]  Given that the USHA claims do not relate to the Arrested Plaintiffs' individual stops and/or arrests, the facts and circumstances surrounding the unreasonableness of NYCHA's House

example, the provision that "[a]ll persons are expected to cooperate with inquiries from NYCHA management, contract security hired by NYCHA, Resident Watch, and the police regarding their presence or conduct in any building or on development grounds," pressures NYCHA residents to interact with the NYPD officers who patrol NYCHA properties without regard to residents' federal and state constitutional rights to, for example, decline to answer an officer's questions. (Pls. 56.1 ¶ 217.)  Another provision prohibiting "lingering" in lobbies, corridors, and stairwells is unreasonable, both because NYCHA provides no definition of what behavior constitutes "lingering," and because NYPD officers use "lingering" as an unjustified basis for approaching, questioning, and stopping people on NYCHA property.  (Pls. 56.1 ¶ 218.)  Tenants who do not comply with NYCHA regulations find themselves in danger of eviction, as the "failure to fulfill household obligations" is adequate grounds for termination of tenancy.  24 C.F.R. § 955(l)(2). Because Resident Plaintiffs have an enforceable right under § 1437d to challenge the unreasonableness of the House Rules, NYCHA is not entitled to summary judgment.

        C.    <u>NYCHA Is Violating Resident Plaintiffs' Right to a Lease Term Protecting Reasonable Accommodation of Their Guests</u>.

       Because Resident Plaintiffs have an enforceable right under § 1437d, it follows that they also may sue to enforce valid implementing regulations.  *Alexander* v. *Sandoval*, 532 U.S. 275, 284 (2001).  HUD's implementing regulations, which require NYCHA to include in its leases a provision for the "reasonable accommodation of guests," 24 C.F.R. § 966.4(d)(1), are a valid interpretation of § 1437d(l)(2).  *See Diggs* v. *Hous. Auth. of Frederick*, 67 F. Supp. 2d 522, 531 (D. Md. 1999) ("[I]t would be patently unreasonable to prohibit public housing tenants from entertaining guests.").  Resident Plaintiffs are therefore entitled to enforce this requirement

---

Rules are not before the Court during this round of briefing.  The Court need only decide at this juncture that the Resident Plaintiffs have standing to assert their USHA claims.

against NYCHA via § 1983.  At a minimum, § 1437d(l) confers the right to a lease that facially conforms to USHA and its implementing regulations.[41]

Resident Plaintiffs' leases do not contain the required provision for the reasonable accommodation of guests.  (Pls. 56.1 ¶ 212.)  That omission defeats NYCHA's claim that it is entitled to judgment as a matter of law on Resident Plaintiffs' § 1437d(l)(2) claim.  Moreover, Ms. Jones, Ms. Evans, Mr. Littlejohn, and Mr. Suarez have shown that NYCHA has impaired their substantive rights to reasonably accommodate guests because each had a guest subjected to unlawful stop and arrest while visiting the Resident Plaintiff.[42]  Summary judgment for NYCHA on Resident Plaintiffs' USHA claim should be denied.

## X.   All Plaintiffs Have Standing to Seek Prospective Relief.

Defendants erroneously challenge Plaintiffs' standing to bring claims for prospective relief.  To establish standing, Plaintiffs must demonstrate they have suffered and will suffer an injury, that the injury is fairly traceable to Defendants' conduct, and a favorable decision from this court is likely to redress the injury.  *See Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  At the summary judgment stage, a plaintiff is only required to demonstrate that he has an arguable claim of right and need not prove the merits of his case to establish standing.  *Cacchillo* v. *Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (citing *Lujan*, 504 U.S. at 561).  As

---

[41]   *Edwards* v. *District of Columbia*, 821 F.2d 651, 653 n.3 (D.C. Cir. 1987) ("The only rights created by § 1437d(l) itself are rights to a lease that in turn requires proper maintenance and termination."); *Concerned Tenants Ass'n of Father Panik Vill.* v. *Pierce*, 685 F. Supp. 316, 319 (D. Conn. 1988) ("Tenants would have an enforceable right under § 1437d(l)(2) and the regulations promulgated thereto to a lease that contains the requirements provided in the statute and the regulations.").

[42]   *See supra* pp. 6–24 (Ms. Jones's son's godfather, Mr. Smith, was arrested exiting her NYCHA building after spending the night in her apartment); (Ms. Evans and Littlejohn both had guests stopped and their guests visited less frequently as a result); Mr. Suarez's guest, Adam Cooper, was unlawfully arrested for trespass while leaving Mr. Suarez's NYCHA apartment after bringing Mr. Suarez a meal because Mr. Suarez has health problems.

37

demonstrated by the ample evidence outlined above—and additional evidence that will be

presented on any motions for summary judgment regarding Plaintiffs' *Monell* claims—Plaintiffs

meet their burden because they have suffered past injury and are likely to suffer future injury, the

injury is a product of Defendants' conduct, and the injury will be redressed by issuance of

prospective relief. *See, e.g.*, *Roe* v. *City of New York*, 151 F. Supp. 2d 495, 502–03 (S.D.N.Y.

2001) ("[T]here is no per se rule requiring more than one past act, or any prior act, for that

matter, as a basis for finding a likelihood of future injury.").

Indeed, it can hardly be said that Plaintiffs, who continue to live in and visit NYCHA

buildings regularly, face a risk of injury that is indistinguishable from the general public.[43]  *Cf.*

*Shain* v. *Ellison*, 356 F.3d 211, 215 (2d Cir. 2004).  NYCHA is wrong to suggest that Plaintiffs

Roman Jackson and Kristin Johnson lack standing because neither lives in New York City at the

moment.  (NYCHA Br. 23–24.)  Although Ms. Johnson was living in Mississippi at the time of

her deposition, she has since moved back to New York City and continues to visit friends who

live in NYCHA housing.  *See* Declaration of Kristin Johnson, dated July 18, 2012, ¶¶ 4–7.  And

while Mr. Jackson lives in California, he is subject to future injury based on more than a "some-

day intention" to visit NYCHA housing.  *See* Declaration of Roman Jackson, dated July 20,

2012, ¶¶ 2–8.  *Cf. Lujan*, 504 U.S. at 563.  In the eight months between his arrest and deposition,

Mr. Jackson twice visited and stayed with his grandmother, who lives in NYCHA.  (Pls. 56.1 ¶

41.)  On each occasion, he stayed for "around two weeks" and "visited other people in the

building."  (*Id.*)  Mr. Jackson's conduct does not establish, let alone suggest, that he will not face

---

[43]   To provide just one example, Andrew Washington—who continues to live in NYCHA
housing—"see[s] police officers either in [his] building or around [his] building . . . [a]ll the
time" and has "been stopped inside of a [NYCHA] building but not arrested . . . two times."
(NYCHA Ex. J (Washington Tr.) 93:7–9.)  These facts plainly establish a substantial
likelihood of future injury.

future injury.  *Cf. Friends of the Earth* v. *Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 182–83

(2000) (finding standing to challenge mercury discharges based on sworn statements from

plaintiffs that they lived near and would use the affected areas).

NYCHA's attempt to distinguish this Court's recent decision finding standing in *Floyd*

*III*, 2012 WL 1868637, at *9–10, which involves facts that are substantially similar to those here,

is futile.  (NYCHA Br. 24.)  In fact, NYCHA's point that "the sheer number of stops citywide

led the Court [in *Floyd*] to be confident that some plaintiffs were likely to suffer an unlawful stop

again" (NYCHA 24) is actually an argument in favor of finding standing here.  As NYCHA is

well aware, Plaintiffs will put forth evidence that Plaintiffs' injuries occurred within the context

of a policy and practice on any motion for summary judgment as to Plaintiffs' *Monell* claims.[44]

Finally, the City's argument that Resident Plaintiffs lack standing to assert equal

protection claims because they have not been stopped is without merit.  (City Br. 13–14.)  As the

Supreme Court has recognized, in an equal protection case, "[t]he 'injury in fact' . . . is the

denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to

obtain the benefit."  *Associated Gen. Contractors of Am.*, 508 U.S. at 666; *Able* v. *United States*,

88 F.3d 1280, 1291 (2d Cir. 1996).  The Resident Plaintiffs are subjected to Defendants' racially

discriminatory trespass enforcement policies on a daily basis.  Accordingly, each of the

Residents Plaintiffs has standing to bring equal protection claims against the City.

**XI.   New York State's Notice of Claim Provisions Do Not Bar Plaintiffs' New York State**
**Law Claims.**

---

[44]   To the extent NYCHA is challenging Plaintiffs' standing to remedy racially discriminatory
policies and practices, it is well settled that personal injury suffered through unequal
treatment is judicially cognizable.  *See, e.g.*,  *Ne. Fla. Chapter of Associated Gen.*
*Contractors of Am.* v. *City of Jacksonville*, 508 U.S. 656, 666 (1993).  NYCHA also ignores
that the FHA itself confers standing upon any "aggrieved person" to challenge discriminatory
housing practices.  42 U.S.C. § 3613(a)(1)(A); *id.* § 3602(i); *see LeBlanc-Sternberg* v.
*Fletcher*, 67 F.3d 412, 424 (2d Cir. 1995).

The City argues that Arrested Plaintiffs are barred from asserting claims alleging violation of New York law because for failure to comply with New York State's notice of claim requirements.  (City Br. 23–24.)  The City's argument—and for that matter, NYCHA's similar argument related to state law claims asserted against NYCHA (NYCHA Br. 24–25)—is a red herring.  State notice of claim requirements do not apply where, as here, plaintiffs bring a class action that primarily seeks prospective relief on behalf of the public interest.  *See, e.g., Mills* v. *Monroe County*, 451 N.E.2d 456, 458 (N.Y. 1983) (no notice of claim required for "actions that are brought to protect an important right, which seek relief for a similarly situated class of the public, and whose resolution would directly affect the rights of that class or group are deserving of special treatment").[45]  This exception applies to state claims brought against a public housing agency such as NYCHA, *see Leon* v. *N.Y.C. Hous. Auth.*, 625 N.Y.S.2d 212, 213 (1st Dep't 1995), and a municipality such as the City, *see Green* v. *City of New York*, 438 F. Supp. 2d at 111, 125 (E.D.N.Y. 2006); *Marrero* v. *City of New York*, No. 02 Civ. 6634, 2004 WL 444548, at *3 (S.D.N.Y. Mar. 10, 2004).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' partial motions for summary judgment.

---

[45] *Accord Cody* v. *County of Nassau*, 577 F. Supp. 2d 623, 648 (E.D.N.Y. 2008), *aff'd*, No. 08-5127, 2009 WL 2958742 (2d Cir. Sept. 16, 2009); *S.W. ex rel. J.W.* v. *Warren*, 528 F. Supp. 2d 282, 300 (S.D.N.Y. 2007).

Dated:   New York, New York
         July 20, 2012

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____

Katharine E.G. Brooker
Daniel H. Wolf
1285 Avenue of the Americas
New York, New York 10019
Tel:  212.373.3000
Fax:  212.492.0139
kbrooker@paulweiss.com

NAACP LEGAL DEFENSE AND EDUCATIONAL
FUND, INC.
    Debo P. Adegbile
    Christina Swarns
    Johanna B. Steinberg
    Jin Hee Lee
    Johnathan Smith
    Ria Tabacco
    99 Hudson Street, Suite 1600
    New York, New York 10013-2897
    Tel: 212.965.2200
    Fax: 212.219.2052
    jsmith@naacpldf.org

THE LEGAL AID SOCIETY
    Steven Banks
    William D. Gibney
    Steven Wasserman
    Nancy Rosenbloom
    Marlen S. Bodden
    199 Water Street, 6th Floor
    New York, New York 10038
    Tel: 212.577.3300
    Fax: 212.509.8141
    nrosenbloom@legal-aid.org

*Attorneys for Plaintiffs*

41