SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

KELTON DAVIS, WILLIAM TURNER,
EDWIN LARREGUI, ANTHONY
ANDERSON, SHAWNE JONES, HECTOR
SUAREZ, ADAM COOPER, DAVID
WILSON, GENEVA WILSON, ELEANOR
BRITT, ROMAN JACKSON, KRISTIN
JOHNSON, LASHAUN SMITH, ANDREW
WASHINGTON, PATRICK LITTLEJOHN,
RAYMOND OSORIO, VAUGHN
FREDERICK, and R.E., by her parent D.E.,
individually and on behalf of a class of all
others similarly situated,

                **Plaintiffs,**

       **- against -**

THE CITY OF NEW YORK and NEW
YORK CITY HOUSING AUTHORITY,

              **Defendants.**

------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** _10-4-12_

<u>OPINION AND ORDER</u>

10 Civ. 0699 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

This putative class action challenges the policies and practices that the

New York City Police Department ("NYPD") and the New York City Housing

Authority ("NYCHA") use to enforce prohibitions against trespassing on  public

housing property.  The lawsuit alleges that defendants' actions have resulted in a

widespread pattern of unlawful stops, questioning, frisks, searches, and arrests of

1

NYCHA residents and their invited guests.[1]

This is the second of three lawsuits before this Court that challenge the NYPD's stop and frisk practices.[2]  Like the other two cases, and like many of its predecessors, this suit "thrusts to the fore difficult and troublesome issues regarding a sensitive area of police activity."[3]  Nearly forty-five years ago, faced with a rising tide of urban violence and what Justice William O. Douglas called "powerful hydraulic pressures"[4] to give police an upper hand, the Supreme Court first confronted "the practical and constitutional arguments pressed with great vigor on both sides of the public debate over the power of the police to 'stop and frisk' – as it is sometimes euphemistically termed – suspicious persons."[5]

In *Terry v. Ohio*, the Supreme Court held that the Constitution permits stops when the police have a reasonable suspicion of criminal activity.  But the precise contours of the Fourth Amendment right to be free from *unreasonable* stops remain fiercely debated in the courts, the newspapers, and the streets.

---

[1]     *See* Amended Complaint ("Am. Compl.") ¶ 2.

[2]     *See Floyd v. City of New York*, No. 08 Civ. 1034; *Ligon v. City of New York*, No. 12 Civ. 2274.

[3]     *Terry v. Ohio*, 392 U.S. 1, 9 (1968).

[4]     *Id.* at 39 (dissenting).

[5]     *Id.* at 9-10.

Because they focus on people residing or present in public housing, the practices at issue in this lawsuit are more narrow than those addressed in either *Terry* or *Floyd v. City of New York*, both of which involved street stops. But they are no less consequential. Indeed, for many residents, the tension at the heart of this lawsuit is also a central part of their daily lives: what one scholar has called the "decades-long battle by NYCHA tenants for a life both dignified and safe."[6]

The perspective of plaintiff Eleanor Britt highlights this challenge. Britt, a sixty-four year old African American woman, has lived in NYCHA housing for more than thirty-five years.[7] Like generations of NYCHA residents before her, she is a member of an anti-crime tenant organization.[8] She testified at her deposition that she would like the police to conduct more vertical patrols

---

[6]     Fritz Umbach, *The Last Neighborhood Cops: The Rise and Fall of Community Policing in New York Public Housing* 5 (2010).

[7]     *See* Am. Compl. ¶ 103.

[8]     *See* Deposition of Eleanor Britt ("Britt Dep.") at 42:8-10 ("The Tenant's League, what we do, we have tenant patrol to try to monitor the people coming and going in and out of our building and to try to keep the building safe."). *See also Last Neighborhood Cops* at 6 ("Anticrime organizing by public housing residents in New York City was in many ways representative of the kinds of unheralded grassroots activism that took place around the country after World War II . . . . The activists, most of whom were women, understood their efforts in terms of civil rights. They believed that securing their fair share of municipal services, including police protection, was a fundamental right and that working for safe buildings and courtyards was a chapter in the long history of working-class self-help movements.").

through her building, because "it helps us keep the building safe . . . . [T]he more

their presence is seen, the less problems we would have."[9]  But Britt has also

witnessed serious police misconduct:

> I have seen the police approach young men in the building and I
> have seen them just grab them and thrown them up against the
> wall and frisk them . . . . [I]t seems like there is a disparity in the
> way they deal with Black as opposed to White . . . . [I]t is a little
> excessive when they are dealing with people of color.[10]

Ensuring both dignity *and* safety may be challenging but it is

absolutely necessary.  The police officers who patrol NYCHA buildings must act

within the limits imposed by the federal and state constitutions.  This lawsuit

presents difficult and close questions.  The key one is this: are defendants acting

within constitutional limits in their presumably sincere efforts to provide a safe

environment for the residents of public housing?  Or, in their zeal to provide that

---

[9]     Britt Dep. at 65:22-24.  Britt's sentiment, according to Umbach's
extensive history, is both emblematic and underappreciated: "If the role of
conservative groups in promoting law-and-order politics is well documented, the
efforts of non-elite groups like public housing activists to mobilize around crime in
ways that also challenged some of urban liberalism's ideals is often left
unexamined." *Last Neighborhood Cops* at 10.

[10]    Britt Dep. at 67:6-20.  "[B]efore the merger [of the NYCHA Police
and the NYPD], we had one officer that was stationed in our building.  He knew all
the residents.  If there was a problem, and he would come to the parent and discuss
whatever the problem was and he would talk to the young men in the building and
there was a mutual respect we had for one another.  We don't have that anymore, it
is so impersonal . . . ." *Id.* at 201:16-22.

protection, are they violating the rights of the very residents (and guests) whom they seek to protect?

Nine of the original eighteen plaintiffs settled their claims.  Of the remaining nine, eight have been arrested for trespass by the NYPD[11] and five live in NYCHA housing.[12]  They have brought twelve causes of action against the NYPD and NYCHA under federal, state, and local laws and under the United States and New York State constitutions.  Defendants have moved for partial summary judgment on most of these claims.  The parties agreed to brief these motions in two parts: the first part, adjudicated here, addresses the individual circumstances of plaintiffs' arrests and tenancies.[13]  The second part, which has yet

---

[11]     These plaintiffs, whom the parties call the "arrested plaintiffs," are Roman Jackson, Kristin Johnson, Lashaun Smith, Andrew Washington, Patrick Littlejohn, Raymond Osorio, Vaughn Frederick, and Rikia Evans.  Eleanor Britt is the only remaining plaintiff who was never arrested.

[12]     These "resident plaintiffs" are Eleanor Britt, Rikia Evans, Patrick Littlejohn, Andrew Washington, and Vaughn Frederick.  Washington and Frederick are not authorized by NYCHA to be tenants.

[13]     The parties have made the following submissions: Defendant City of New York's Memorandum of Law in Support of Its Motion for Summary Judgment Based on Plaintiffs' Individual Circumstances ("City Mem."), Memorandum of Law of Defendant New York City [Housing] Authority in Support of Its Motion for Summary Judgment on Plaintiff's (sic) Individual Claims ("NYCHA Mem."), Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for Partial Summary Judgment ("Pl. Mem."), Defendant City of New York's Memorandum of Law in Further Support of Its Motion for Summary Judgment Based on Plaintiffs' Individual Circumstances ("City Rep. Mem."), and

to be briefed, will address defendants' practices and policies.  For the reasons explained below, defendants' motions are granted in part and denied in part.

## II.   LEGAL STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment in defendants' favor is appropriate only if they show "that there is no genuine dispute as to any material fact and [that they are] entitled to judgment as a matter of law."[14]  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit."[15]

Because they are moving for summary judgment, defendants "bear[] the burden of establishing the absence of any genuine issue of material fact."[16]  To

---

Reply Memorandum of Law of Defendant New York City Housing Authority in Further Support of Its Motion for Summary Judgment on Plaintiffs' Individual Claims ("NYCHA Rep. Mem.").  In addition, they have submitted Defendant City of New York's Local Civil Rule 56.1 Statement of Undisputed Facts ("City 56.1"), Local Rule 56.1 Statement in Support of Defendant New York City Housing Authority's Motion for Summary Judgment ("NYCHA 56.1"), and Plaintiffs' Local Rule 56.1 Counterstatement of Additional Material Facts ("Pl. Counter 56.1").  Plaintiffs' responses to defendants' 56.1 statements are abbreviated as "Pl. City 56.1" and "Pl. NYCHA 56.1," respectively.

[14]     Fed. R. Civ. P. 56(a).

[15]     *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010).

[16]     *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

defeat defendants' motions, plaintiffs "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[17] and "may not rely on conclusory allegations or unsubstantiated speculation."[18]

In deciding these motions, I must "construe the facts in the light most favorable to the non-moving party," that is, to plaintiffs, "and must resolve all ambiguities and draw all reasonable inferences against the movant[s]," that is, against defendants.[19]  However, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[20]  "The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[21]

## III.   APPLICABLE LAW

Plaintiffs have brought claims under the Fourth and Fourteenth Amendments to the United States Constitution; Title VI of the Civil Rights Act of

---

[17]     *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

[18]     *Id.*

[19]     *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).

[20]     *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)) (emphasis removed).

[21]     *Brod*, 653 F.3d at 164.

1964; Title VIII of the Civil Rights Act of 1968 (the "Fair Housing Act"); the Civil

Rights Act of 1866 (42 U.S.C. § 1981); the United States Housing Act; Article I,

Sections 11 and 12 of the New York State Constitution; the New York State

Human Rights Law; and the New York City Human Rights Law.  I address the

legal standards applicable to each of these claims below.

## IV.   DISCUSSION

### A.   The Arrested Plaintiffs' Fourth Amendment Claims Against the City for Unlawful *Terry* Stops and False Arrest

#### 1.   Legal Standard for a Stop

The Fourth Amendment guarantees that "[t]he right of the people to

be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures, shall not be violated, and no Warrants shall issue, but upon

probable cause."[22]  "'[T]he police can stop and briefly detain a person for

investigative purposes if the officer has a reasonable suspicion supported by

articulable facts that criminal activity may be afoot, even if the officer lacks

---

[22]  In one of his most popular songs, the rapper Jay-Z – who grew up in NYCHA's Marcy Houses in the Bedford-Stuyvesant section of Brooklyn – showcased his knowledge of these Fourth Amendment rights.  *See 99 Problems*, The Black Album (Roc-A-Fella Records 2003).  *See also* Caleb Mason, *Jay-Z's 99 Problems, Verse 2: A Close Reading with Fourth Amendment Guidance for Cops and Perps*, 56 St. Louis L.J. 567 (2012).

probable cause.'"[23]  This form of investigative detention is now known as a *Terry* stop.[24]  "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."[25]  "'The officer [making a *Terry* stop] . . . must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'"[26]  "Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant."[27]

It is sometimes the case that a police officer may observe, "a series of acts, each of them perhaps innocent in itself, but which taken together warrant[] further investigation."[28]  "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized

---

[23]   *United States v. Swindle*, 407 F.3d 562, 566 (2d Cir. 2005) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  Under New York law, the justifications required for different levels of police intrusion were established in *People v. DeBour*, 40 N.Y.2d 210 (1976).

[24]   *See Terry*, 392 U.S. 1.

[25]   *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

[26]   *Alabama v. White*, 496 U.S. 325, 329 (1990) (quoting *Sokolow*, 490 U.S. at 7).

[27]   *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).

[28]   *Terry*, 392 U.S. at 22.

suspicion that the person is committing a crime."[29]  However, "the fact that the stop

occurred in a 'high crime area' [may be] among the relevant contextual

considerations in a *Terry* analysis."[30]  A court "must look at the totality of the

circumstances of each case to see whether the detaining officer has a particularized

and objective basis for suspecting legal wrongdoing."[31]  "[T]he proper inquiry is

not whether each fact considered in isolation denotes unlawful behavior, but

whether all the facts taken together support a reasonable suspicion of

wrongdoing."[32]

### 2.    Legal Standard for an Arrest

The Fourth Amendment prohibits arrests in the absence of probable

cause.  Such cause exists "when the officers have knowledge or reasonably

trustworthy information of facts and circumstances that are sufficient to warrant a

person of reasonable caution in the belief that the person to be arrested has

committed or is committing a crime."[33]  "While probable cause requires more than

---

[29]     *Wardlow*, 528 U.S. at 124 (citing *Brown v. Texas*, 443 U.S. 47 (1979)).

[30]     *Id.* (quoting *Adams v. Williams*, 407 U.S. 143, 144, 147-48 (1972)).

[31]     *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks and citation omitted).

[32]     *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990).

[33]     *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

'mere suspicion' of wrongdoing, its focus is on 'probabilities,' not 'hard certainties.'"[34] "[N]o probable cause exists to arrest where a suspect's actions are too ambiguous to raise more than a generalized suspicion of involvement in criminal activity."[35]  The lawfulness of an arrest does not require an ultimate finding of guilt.[36]  "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers . . . or may require a trial if the facts are in dispute."[37]

### 3.    Raymond Osorio's Stop and Arrest

Plaintiff Raymond Osorio testified at his deposition that he left the NYCHA apartment of his friend, Andre Smith, in the late afternoon of November 18, 2010.  When he was about six steps out of the building, three officers "charged" him, asked him what he was doing, and then grabbed him and brought him back into the lobby of the building.[38]  Although the City disputes these facts, it acknowledges that summary judgment regarding the stop is inappropriate because,

---

[34]    *Selinger v. City of New York*, 453 Fed. App'x 93, 94 (2d Cir. 2011) (quoting *Mallory v. United States*, 354 U.S. 449, 454 (1957); *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

[35]    *United States v. Valentine*, 539 F.3d 88, 94 (2d Cir. 2008).

[36]    *See Weyant*, 101 F.3d at 852.

[37]    *Id.*

[38]    Deposition of Raymond Osorio ("Osorio Dep.") at 39-42, 83-86.

11

if true, Osorio's version of events describes an unlawful stop.[39]  Nevertheless, the City argues that the following events, as described by Osorio, provide probable cause to justify an arrest.[40]

Osorio testified that once back in the lobby, he told the officers that he had been visiting Smith in apartment 5C and gave them his photo ID.[41]  Two officers went upstairs to investigate while two others stayed with Osorio in the lobby.  When the officers returned, they informed Osorio that a woman in apartment 5C said that she had not seen Osorio in an hour and that he had therefore been trespassing.  Osorio believed that the woman was Andre Smith's sister, Keisha Smith, and he explained to the officers that because Keisha had been in the back room of the apartment, she had not seen him for an hour even though he had

---

[39]      *See* City Mem. at 8.

[40]      In criminal prosecutions, the "fruit of the poisonous tree" doctrine generally requires that evidence obtained through an unlawful stop be suppressed. But the Second Circuit has determined that the doctrine is not applicable in section 1983 lawsuits.  That is, if police officers develop probable cause after having conducted an unlawful stop, they will be liable only for the unlawful stop, not any subsequent arrest or imprisonment.  *See Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999) (establishing this rule).  *Accord DiMascio v. City of Albany,* 205 F.3d 1322 (2d Cir. 2000) (unpublished opinion). Therefore, I must determine whether the officers developed probable cause to arrest Osorio, notwithstanding the fact that material disputes of fact prevent summary judgment regarding the legality of his stop.

[41]      *See* Pl. Counter 56.1 ¶¶ 103-105 (citing Osorio Dep. at 92-96).

12

just left the apartment a few minutes earlier.  Despite this explanation, the officers

arrested Osorio.

One of the two officers who went upstairs, Ruben Arroyo-Perez,

testified at his deposition that he took Osorio's ID and went to apartment 5C,

showed the ID to Keisha Smith, and asked her if Osorio had been visiting with her

or had been in her apartment.[42]  She told him no.  He asked if Andre Smith was

presently in the apartment because (as he explained later) he "wanted to speak to

[Osorio's] friend, if his friend was actually there."[43]  Keisha said that Andre was

not there.

Plaintiffs argue that there are disputes of fact regarding whether

Arroyo-Perez actually asked Keisha Smith if Andre Smith was in the apartment.

But the facts in the record establish no genuine dispute.[44]  After speaking with

---

[42]     *See* Deposition of Ruben Arroyo-Perez ("Arroyo-Perez Dep.") at
89:9-11.

[43]     *Id.* at 89:25-90:3.

[44]     Plaintiffs attempt to create a material dispute of fact by highlighting
Arroyo-Perez's deposition statement that he was only "pretty sure" that he had
asked Keisha Smith whether Andre Smith was in the apartment.  *See* Pl. Mem. at
n.9 (citing to Arroyo-Perez Dep. at 89:21).  Immediately after using the phrase
"pretty sure," however, Arroyo-Perez used unequivocal language ("a hundred
percent sure"), and then, upon being asked to clarify, he again answered in the
affirmative. Arroyo-Perez Dep. at 89:21-90:7.  Plaintiffs argue that "[n]either
Keisha Smith nor Andre Smith provided testimony in this action, and Officer
Arroyo-Perez's account of the arrest lacks credibility."  Pl. Mem. at 12 n.9.

Keisha Smith, Arroyo-Perez was aware of the following facts: (1) Osorio had been in the lobby of the building, (2) Osorio was not a resident of the building, (3) Osorio said he had been in apartment 5C, and (4) the current occupant of 5C said that Osorio had not been there and that the friend whom Osorio identified was not there either. These facts gave officer Arroyo-Perez probable cause to arrest Osorio for trespass.

Osorio's Fourth Amendment claim for an unlawful seizure survives but summary judgment is granted to defendants on his Fourth Amendment claim for unlawful arrest.[45]

### 4.     Patrick Littlejohn's Stop and Arrest

Patrick Littlejohn testified at his deposition that he and his friend David were waiting for the elevator in the lobby of the NYCHA building at 3020 Yates Avenue on January 14, 2009.[46] David lived in the building and the two young men were going to his apartment. Police Officers Carmelo Quiles and

---

However, the absence of testimony from either Keisha or Andre does not establish a material dispute of fact and plaintiffs' statement regarding the credibility of Arroyo-Perez' testimony is conclusory and unsupported by any evidence. In any event, the Court may not assess credibility at the summary judgment stage.

[45]     *See Townes*, 176 F.3d at 145 (noting that an unlawful stop, even if followed by a lawful arrest, "might at most support slight or nominal damages").

[46]     *See* Deposition of Patrick Littlejohn ("Littlejohn Dep.") at 110:22-113:2.

Granit Selimaj entered the building and approached Littlejohn.  According to Littlejohn:

> Quiles says "what are you doing here, where are you going?"  I'm like "I'm going to go with him to his house."  He asked David "do you got ID?"  David said "yeah."  He showed him his ID.  "Is he with you?"  He said "yeah."  Then he told David to go upstairs . . . . [H]is partner Selimaj was like "what you going to do with him?"  He's like "taking him in."  Selimaj was telling him "we not going to take him in."  He's like "there's nothing that we got on them."  Then he's like, "no, I'm taking this one in, I'm taking this one."  Quiles tells me to turn around he put the cuffs on me.[47]

Although Quiles arrested Littlejohn for trespass,[48] the City does not argue that he had probable cause to do so.  Instead, it argues that Quiles had probable cause to arrest Littlejohn for truancy.  The Supreme Court has made clear that the inquiry into whether or not probable cause existed to make an arrest is an objective one that does not turn on the state of mind of the arresting officer and that if there was probable cause to arrest for any offense, then there is no viable claim for false arrest.[49]  Thus, Littlejohn's arrest was lawful if there was objective

---

[47]     *Id.* at 112:11-22 (quotation marks and question marks added for clarity).  According to this testimony, Littlejohn was stopped and arrested at the same moment.

[48]     *See* City 56.1 ¶ 196.

[49]     *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).  *Accord Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) ("[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed,

probable cause to arrest him for any offense.[50]

      If Littlejohn's account of the interaction is true, however, there was no such probable cause.  The arrest took place between noon and 1:00 p.m. on a school day, which in many schools is the standard lunch hour.  As plaintiffs persuasively argue:

> [I]n their brief encounter with Mr. Littlejohn, neither officer asked Mr. Littlejohn his age to determine whether he was of mandatory school age, whether he was enrolled in school, was home for lunch, or had any of several other valid reasons to be away from school.  There is simply no evidence that "school" was even mentioned in the encounter.[51]

---

any charge actually invoked by the arresting officer at the time of arrest.").

    [50]    The parties debate whether or not officers are empowered to make a "criminal" arrest for truancy under New York Education Law § 3213(2)(a) or merely to make a noncriminal seizure.  In *Matter of Shannon B.*, 70 N.Y.2d 458, 464 (1987), the New York Court of Appeals affirmed the power of police officers to enforce that truancy law.  Plaintiffs point to *Matter of Julio R.*, 492 N.Y.S.2d 912, 914 (Fam. Ct. Richmond Co. 1985) in which the court explained that the Education Law authorizes "a noncriminal detention, rather than an arrest in the classic, criminal law sense."  Both according to the case law that plaintiffs cite and the NYPD Patrol Guide, officers should take youths suspected of truancy to school or the Department of Education, not to jail.  *See* Patrol Guide § 215-07, Ex. 36 to Declaration of Katharine Brooker, plaintiffs' counsel ("Brooker Decl."); *In re D'Angelo H.*, 584 N.Y.S.2d 699, 700 (4th Dep't 1992).  Defendants argue that the appropriate post-arrest protocol is irrelevant to the Fourth Amendment question of whether Quiles had probable cause to arrest Littlejohn for truancy.  Ultimately, this debate is immaterial to my holding.

    [51]    Pl. Mem. at 15.  Plaintiffs point out that in *Shannon B.*, 70 N.Y.2d 458, the New York Court of Appeals found sufficient factual basis for a seizure based on truancy when the middle school-aged girl was standing less than a block

As the Supreme Court explained in *Devenpeck v. Alford*, "[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."[52]  At the time of his arrest, Littlejohn was sixteen years old (a fact that the officers do not claim they knew) and was over six feet tall.[53]  Although the officers knew that Littlejohn lived in the area, defendants have not shown that either Quiles or Selimaj knew specific facts that would lead to the reasonable conclusion that Littlejohn was truant from school.[54]  A reasonable juror could conclude that there was no probable cause for this arrest.  Summary judgment in defendants' favor on Littlejohn's Fourth Amendment claim is denied.

### 5.    Lashaun Smith's Stop and Arrest

Plaintiff Lashaun Smith testified at his deposition that he spent the

---

from school at 10:15 a.m. and was unable to explain why she was not in school.

[52]    543 U.S. at 152.

[53]    *See* Pl. Mem. at n.14.  In New York City, education is compulsory "until the last day of session in the school year in which the student becomes seventeen years of age."  N.Y. Educ. L. § 3205; N.Y.C. Chancellor's Regulation A-101.

[54]    The fact that the apartment building was "a known drug-prone location," City Rep. Mem. at 7, and that Quiles had once seen Littlejohn hanging out with other youths who were smoking an unidentified substance, City Mem. at 12, cannot help establish probable cause for truancy at the time of Littlejohn's arrest.

night of May 10, 2009, at the NYCHA apartment of his friend Shawne Jones and

that Jones' brother, Tarion Washington, also spent the night.[55]  Washington is blind

and knows Smith by Smith's nickname, "Nap," not by Smith's legal name.[56]  At

about 10 a.m. on May 11, Smith woke up, left the apartment, and walked down the

stairwell to the lobby.  As he reached the bottom of the stairs, a uniformed officer

came into the stairway and asked him if he lived in the building.[57]  According to

Smith:

> I said no, I was visiting; he asked me do I have ID; I said yes; I
> show him my [current Virginia] ID, and then I showed him my
> other ID, my old [expired] New York ID, and that was it, and he
> asked me to step into the lobby, and I step into the lobby; that's
> when I encountered there was two more officers, a lady and a
> male.[58]

### a.    Smith's *Terry* Stop

Plaintiffs argue that Smith was seized in the stairway when the officer

encountered him and immediately questioned him.[59]  Defendants argue that Smith

---

[55]    *See* Deposition of Lashaun Smith ("Smith Dep.") at 67-68.

[56]    *See* Pl. Counter 56.1 ¶¶ 119-129.

[57]    Smith Dep. at 80:10-81:5.

[58]    *Id.* at 80:14-19.  The police officers recount a significantly different
narrative, *see* City 56.1 ¶¶ 136-168 (recounting many facts on the basis of the
officers' testimony despite Smith's contradictory testimony), but summary
judgment is only appropriate on the basis of *undisputed* facts.

[59]    *See* Pl. Mem. at 7.

was only seized after he provided the two ID cards and was told to step into the lobby.[60]  The Supreme Court has explained that

> [e]ven when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage — provided they do not induce cooperation by coercive means. *See Florida v. Bostick*, 501 U.S. 429, 434-35 (1991) (citations omitted). If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.[61]

Defendants argue that because the officer's tone of voice was normal[62] and because Smith testified that seeing the officer did not make him nervous or scared,[63] the encounter was not coercive.[64]  Plaintiffs argue that a reasonable jury could find that, in the confines of a stairwell, a reasonable person would not feel free to walk past the officer and terminate the encounter.[65]

I need not resolve this dispute because both parties agree Smith was seized once the officer returned Smith's expired New York ID, held on to Smith's

---

[60]     *See* City Rep. Mem. at 2.

[61]     *United States v. Drayton*, 536 U.S. 194, 201 (2002).

[62]     *See* Smith Dep. at 84:13-18.

[63]     *See id.* at 81:6-12.

[64]     *See* City Rep. Mem. at 1 n.4.

[65]     *See* Pl. Mem. at 9.

Virginia ID, and asked him to step into the lobby.[66]  He was not free to leave

because the officer had taken his identification.  Under Smith's version of events,

at the time of the seizure the officer knew that (1) the building was in a high crime

area,[67] (2) Smith said he was a visitor in the building, and (3) Smith produced two

IDs (with matching names and photos of him), one of which was expired and one

current.  Defendants also argue that Smith's "behavior and demeanor" was

somehow suspicious, but they cite to no undisputed facts for that claim.[68]  The facts

of the encounter, as described by Smith, are insufficient to establish reasonable

---

[66]     *See* City Mem. at 10 (conceding that Smith was "stopped" at that
point).

[67]     Plaintiffs acknowledge that the building was in an NYPD "Impact
Zone" and Smith testified that he had lived in the area for a while and said "it's a
very bad neighborhood."  Pl. City 56.1 ¶¶ 139-140; Smith Dep. at 60:16-25.
Plaintiffs argue that based on various findings of this court in *Floyd v. City of New
York*, No. 08 Civ. 1034, I should not credit the officers' statements regarding the
area's high crime.  *See* Pl. Mem. at 10-11.  Nonetheless, assuming, arguendo, that
Smith's account is true, there would still be no reasonable suspicion for this stop
even if the area were "high crime."

[68]     *See* City Mem. at 9.  Defendants' primary evidence supporting
Smith's nervousness, as detailed at page 9 of the City's Memorandum of Law, is
flatly contradicted by Smith's version of events.  But even if defendants could cite
to undisputed actions that Smith took, courts should look skeptically on any claim
that an individual appeared nervous or furtive.  *See United States v. Broomfield*,
417 F.3d 654, 655 (7th Cir. 2005) (Posner, J.) ("Whether you stand still or move,
drive above, below, or at the speed limit, you will be described by the police as
acting suspiciously should they wish to stop or arrest you. Such subjective,
promiscuous appeals to an ineffable intuition should not be credited.").

suspicion for a stop.  There is nothing suspicious about a person walking down the

stairs of a NYCHA building in a high crime area. There is nothing suspicious about

a person stating that he was visiting a friend in a NYCHA building.  And there is

nothing suspicious about a person having two ID cards, one expired and one

current, from two different states.  If a juror credited Smith's testimony, she could

conclude that there was no reasonable suspicion to justify stopping him.  Summary

judgment in defendants' favor on Smith's Fourth Amendment claim for an

unlawful stop is therefore denied.

### b.      Smith's Arrest

According to Smith, there were two other officers waiting in the lobby

when he and the first officer emerged from the stairwell:

> One of the officers asked Mr. Smith which apartment he had been
> visiting, and he responded Apartment 6D.  Officer Mumper left
> the lobby to investigate.   Officer Mumper returned several
> minutes later and reported that the person who answered the door
> [of Apartment 6D] could not identify Mr. Smith.  Mr. Smith asked
> Officer Mumper if "[a] guy with dreads answered the door?"
> Officer Mumper [said yes].  Mr. Smith explained that Tarion
> Washington was blind and would not be able to identify him from
> a photo ID.  Mr. Smith asked the officers to take him upstairs so
> that Tarion Washington could identify him by his voice.  The
> officers handcuffed Mr. Smith and placed him under arrest for
> criminal trespass.[69]

---

[69]      Pl. Counter 56.1 ¶¶ 133-148 (accurately summarizing Smith Dep. at
84:24-88:23).

Neither party solicited the testimony of Tarion Washington, the blind man with dreads who answered the door.  The only admissible evidence regarding that conversation comes from the following deposition testimony of Officer Mumper:

> Q:   Is there anything about your interaction with the man who came to the door that led you to believe that he might be blind?
>
> A:   No, not that I can recall.
>
> Q:   What did you say to this man when he opened the door?
>
> A:   I introduced myself as Officer Mumper. I asked him if he knew a Lashaun Smith and he said no. I asked him if maybe he knew him as Shaun Smith and he said no.  And I asked him one more time . . . and he said no.
>        . . .
>
> Q:   Did you attempt to show Mr. Washington . . . Mr. Smith's ID that you had brought?
>
> A:   . . . I did hold it up to him for him to look at the picture.
>        . . .
>
> Q:   But you asked him to look at the picture?
>
> A:   I think so, yes.
>
> Q:   Did he appear to be looking at the picture?
>
> A:   To the best of my recollection, yes.
>
> Q:   Yes. Did he say anything about whether he recognized the person in the picture?
>
> A:   No.
>
> Q:   Did you ask Mr. Washington if he lived in the apartment?
>
> A:   No.[70]

---

[70]   Deposition of James Mumper ("Mumper Dep.") at 114:14-116:3. Plaintiffs cite to the testimony of Smith's friend (and Washington's sister) Shawne Jones to support the notion that Mumper failed to describe Smith to Washington with enough specificity "so that Tarion Washington could reasonably identify Mr. Smith."  Pl. City 56.1 ¶ 162.  But Jones' testimony regarding what Washington told her about the conversation he had with Mumper is hearsay and inadmissible

Defendants argue that Mumper had probable cause to arrest Smith because the person who answered the door of Apartment 6D did not know anybody who went by Smith's name, which made it likely that Smith had not in fact been visiting that apartment, as he had claimed, and was trespassing.  Plaintiffs respond with the following argument: "After Mr. Smith demonstrated his familiarity with the residents of apartment 6D by indicating that the person who answered the door would be blind and would be wearing dreadlocks, a reasonable jury could find that Officer Mumper lacked probable cause."[71]  For support, plaintiffs cite to the Second Circuit's statement in *Panetta v. Crowley* that "an officer may not disregard plainly exculpatory evidence."[72]

As defendants note, the Second Circuit has simultaneously made clear that "'[t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause,'"[73] and that

_____

for the truth of the matter asserted (that is, the content of Washington's conversation with Mumper).

[71]      Pl. Mem. at 11.

[72]      *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).  *Accord Kerman v. City of New York*, 261 F.3d 229, 241 (2d Cir. 2001); *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999).

[73]      *Panetta*, 460 F.3d at 395 (quoting *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985)).

> once a police officer has a reasonable basis for believing there is
> probable cause, he is not required to explore and eliminate every
> theoretically plausible claim of innocence before making an arrest.
> Although a better procedure may [be] for the officers to
> investigate plaintiff's version of events more completely, the
> arresting officer does not have to prove plaintiff's version wrong
> before arresting him.[74]

The inquiry is therefore highly fact specific.  Although police officers need not "believe with certainty that the arrestee will be successfully prosecuted," they also may not ignore clearly exculpatory evidence.[75]

In this case, Mumper ignored two important pieces of evidence.  The fact that Smith knew that Washington would answer the door at apartment 6D strongly corroborated his earlier statement that he had just been in the apartment. And the fact that Smith told the officer that Washington was blind significantly undercut the probative value of Mumper's act of showing the ID to Washington. Mumper's investigation was also extremely cursory: according to his own testimony, he failed to find out if Washington recognized the person in the ID, failed to observe that Washington was blind, failed to determine whether Washington was the tenant of the apartment, failed to ask Washington if anybody had recently left the apartment, and refused Smith's request to accompany the

---

[74]     *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001).

[75]     *Id.*

officer upstairs so that Washington could identify him by voice.  If Mumper had

conducted a more thorough investigation, he would surely have discovered that

Smith *had* just left the apartment and was an invitee.  "Probable cause requires an

officer to have 'knowledge or reasonably trustworthy information sufficient to

warrant *a person of reasonable caution* in the belief that an offense has been

committed by the person to be arrested.'"[76]  If a juror believes Smith's version of

events, she could reasonably conclude that Mumper ignored clearly exculpatory

evidence and was insufficiently cautious when arresting Smith without conducting

a thorough investigation.  Summary judgment in the City's favor on Smith's

Fourth Amendment claim based on his arrest is therefore denied.

### 6. Roman Jackson and Kristin Johnson's Stop and Arrest

#### a. Facts

The undisputed facts relating to the arrest of Roman Jackson and

Kristin Johnson are as follows.[77]  On January 31, 2009, Jackson was a tenant at the

NYCHA building at 131 St. Nicholas Avenue.  Johnson came to visit him and he

suggested that they sit in the stairwell.  They took the elevator to the seventeenth

floor (the highest floor of the building) and then sat on the platform at the top of

---

[76]     *Panetta*, 460 F.3d at 395 (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (emphasis added)).

[77]     *See* Pl. City 56.1 ¶¶ 6-38.

the stairwell that is connected to the roof through a door.[78]   Approximately twenty

minutes later, three police officers arrived.  Jackson testified at his deposition that

one of the officers asked Jackson and Johnson what they were doing there; Jackson

politely greeted the officers and told them that he was a resident and was having a

conversation with his friend; the officer told Jackson and Johnson that they were

not supposed to be there; the officers ordered them against a wall and frisked them;

Jackson told the officers that they or he could retrieve his identification from his

grandmother, who was at home at the time, in order to verify his residence and said

that he did not understand how he could be trespassing in his own building; the

officers told Jackson and Johnson that they were trespassing and arrested them.[79]

### b.    Legal Background

New York Penal Law section 140.10(e) reads as follows:

A person is guilty of criminal trespass in the third degree when he
knowingly enters *or remains* unlawfully in a building or upon real
property . . . (e) where the building is used as a public housing
project in violation of conspicuously posted rules or regulations
governing entry *and use* thereof. (Emphasis added.)

Thus, it is a crime, even for tenants, to knowingly remain unlawfully

---

[78]     The parties debate whether this location is properly described as a
"roof landing," although the City acknowledges that the question is ultimately
immaterial.  *See* City Rep. Mem. at 3 n.12. I refer to the location as the top of the
stairwell.

[79]     *See* Deposition of Roman Jackson ("Jackson Dep.") at 108-32.

in a NYCHA building in violation of conspicuously posted rules.  There is no
dispute that on the day Jackson and Johnson were arrested, there was a sign posted
in the lobby of 131 St. Nicholas Avenue stating that "loitering and trespassing in
lobby, roof, hallway and stairs is not permitted."[80]  There is a dispute about
whether such a sign was posted in the location where Jackson and Johnson were
sitting.[81]  In order to prevail on summary judgment, the City must show that there
were conspicuously posted rules that put Jackson on notice that he was prohibited
from sitting at the top of the stairwell for twenty minutes.[82]

  Although defendants provide evidence that the tops of stairwells are

---

[80] Pl. Mem. at 23 (citing City Ex. H).

[81] The City has produced a photograph of a sign that Police Officer
Hector Jimenez states is posted on a door at the top of the B stairwell, where
Jackson and Johnson were arrested.  *See* Declaration of Hector Jimenez in Support
of Def. Rep. Mem. ¶ 13.  He does not state that he took the photograph, however,
and three named plaintiffs (Jackson, Johnson, and Jackson's grandmother Eleanor
Britt) testified at their depositions that there was no such sign posted in the area
where Jackson and Johnson were sitting, and that the photograph is of a sign in a
different stairwell.  *See* Pl. Counter 56.1 ¶ 12.  Because there is a dispute of fact on
this issue, I cannot accept defendants' version as true for the purpose of summary
judgment.

[82] *See People v. James*, 902 N.Y.S.2d 293 (Crim. Ct. N.Y. Co. 2010)
(noting that such signs must be "posted strategically or conspicuously enough to
afford adequate notice of the prohibited conduct").

dangerous locations,[83] the NYCHA rule as posted cannot reasonably be read to mean that residents are prohibited from ever being there.  The signs prohibit "trespassing and loitering" in "lobby, roof, hallway and stairs" and if those words meant that merely being present in those locations was prohibited, residents would have no way of getting to or from their apartments.  Defendants' only plausible argument, therefore, is that the signs adequately put residents on notice that they may not "loiter" in those locations.

Prohibitions on loitering have a long and ugly history in New York City[84] and across the United States.[85]  One of New York State's prohibitions on

---

[83]     *See* City Mem. at 4; City 56.1 ¶¶ 19-21 (summarizing testimony of Police Chiefs Edward Delatorre and Joanne Jaffee).

[84]     *See Casale v. Kelly*, 710 F. Supp. 2d 347, 347 (S.D.N.Y. 2010) ("The City of New York, operating principally through the [NYPD], has continuously enforced three unconstitutional loitering statutes for *decades* following judicial invalidation of those laws and despite numerous court orders to the contrary . . . . The human toll, of course, has been borne by the tens of thousands of individuals who have, at once, had their constitutional rights violated and been swept into the penal system.").

[85]     *See Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) (recounting the history of vagrancy statutes, from early English law through the twentieth century, and striking down Jacksonville's vagrancy ordinance with the explanation that "[o]f course, vagrancy statutes are useful to the police. Of course, they are nets making easy the roundup of so-called undesirables.  But the rule of law implies equality and justice in its application. Vagrancy laws of the Jacksonville type teach that the scales of justice are so tipped that even-handed administration of the law is not possible. The rule of law, evenly applied to minorities as well as majorities, to the poor as well as the rich, is the great

loitering was struck down in 1988 by the New York Court of Appeals, which held

that

> this statute is unconstitutionally vague under the Due Process
> Clauses of the Federal and State Constitutions because it fails to
> give fair notice to the ordinary citizen that the prohibited conduct
> is illegal, it lacks minimal legislative guidelines, thereby
> permitting arbitrary enforcement and, finally, it requires that a
> citizen relinquish his constitutional right against compulsory
> self-incrimination in order to avoid arrest.[86]

In striking down the statute as unconstitutionally vague, the Court of

Appeals was vindicating the principle "'that no man shall be held criminally

responsible for conduct which he could not reasonably understand to be

proscribed.'"[87]  That principle requires that criminal laws "give a person of

ordinary intelligence fair notice that [her] contemplated conduct is forbidden by the

statute."[88]  Beyond notice, the void-for-vagueness doctrine also "requires that a

penal law not permit arbitrary or discriminatory enforcement" because

---

mucilage that holds society together.").  *See also* Michelle Alexander, *The New Jim
Crow* at 28-32 (2010).

[86]     *People v. Bright*, 71 N.Y.2d 376, 379 (1988) (striking down Penal
Law § 240.35(7), which provided that "[a] person is guilty of loitering when he . . .
[loiters] or remains in any transportation facility, or is found sleeping therein, and
is unable to give a satisfactory explanation of his presence.").

[87]     *Id.* at 382 (quoting *United States v. Harriss*, 347 U.S. 612, 617
(1954)).

[88]     *Harriss*, 347 U.S. at 617.

[t]he absence of objective standards to guide those enforcing the laws permits the police to make arrests based upon their own personal, subjective idea of right and wrong.  A vague statute "confers on police a virtually unrestrained power to arrest and charge persons with a violation" (*Lewis v. City of New Orleans*, 415 U.S. 130, 135 (1974) [Powell, J., concurring]), and "furnishes a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure'" (*Papachristou*, 405 U.S. at 170 (quoting *Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940))).[89]

The criminal statute at issue in this case is not vague.  It states that a person present in a NYCHA building is guilty of trespass if he fails to comply with "conspicuously posted rules or regulations governing entry and use thereof."[90]  But if NYCHA rules are to be incorporated into the State's criminal laws then the constitutional limits governing vagueness must apply to those rules as well.  And New York's Court of Appeals has made clear that, in general, prohibitions on "loitering" are unconstitutionally vague:

The term "loiter" or "loitering" has a commonly accepted meaning that has evolved over the years, and connotes the act of remaining about or hanging around a place without any apparent purpose . . . .  However, a statute that merely prohibits loitering, without more, is unconstitutionally vague.  Such a generalized law fails to distinguish between conduct calculated to cause harm and conduct that is essentially innocent, thereby failing to give adequate notice of what conduct is prohibited.  Further, such a statute impermissibly places complete discretion in the hands of the

---

[89]    *Bright*, 71 N.Y.2d at 383.

[90]    N.Y. Pen. L. § 140.10(e).

police to determine whom they will arrest.[91]

The Court of Appeals has been more forgiving of loitering statutes that prohibit "loitering in a specific place of restricted public access," such as schools or waterfronts, "since these locations were not open to the public, were places where illegal activity was notorious, and were normally frequented only by those who are affiliated with the activity being carried on there."[92]

### c.    Analysis

Prohibiting trespass and loitering on NYCHA property by uninvited strangers is understandably important to many residents: the buildings are their homes.  The Legislature has reasonably determined that, for the safety and well-being of NYCHA residents, access to the buildings should be restricted to residents and their invited guests.

But a prohibition on "loitering" *by a resident* is unconstitutionally vague.[93]  The sign relied upon by the City prohibits loitering "in lobby, roof, hallway, and stairs."  According to that sign, may two neighbors, meeting each

---

[91]    *Bright*, 71 N.Y.2d at 383-84.

[92]    *Id.* at 384.

[93]    I am not aware of any cases that address the arrest of a NYCHA resident for trespass in his or her own building pursuant to the building's prohibition on loitering.

other in the hallway outside their apartments, talk for fifteen minutes about the

American League pennant race?  Or would doing so subject them to lawful arrest?

If it is cold outside, may an elderly woman wait in the lobby of her building for ten

minutes while her son hails a cab?  Or may she too be punished by up to three

months in prison?[94]  Because the sign prohibits a vast swath of "conduct that is

inherently innocent," it fails to give NYCHA residents notice of what precise

conduct is prohibited and it "places complete discretion in the hands of the police

to determine whom they will arrest."[95]

---

[94]    Trespass in the third degree is a Class B misdemeanor, N.Y. Pen. L. § 140.10, which is punishable by a definite sentence not to exceed three months, *id.* § 70.15(2).  Roman Jackson and Kristin Johnson chose to sit on the top of the stairwell instead of on a bench outside because it was the middle of a cold winter. *See* Pl. Counter 56.1 ¶ 8.

[95]    *Bright*, 71 N.Y.2d at 383, 384.  It is also worth noting that the sign uses confusing language: it prohibits "loitering and trespassing" not "loitering or trespassing" and says that "loitering and trespassing" "is" prohibited, not "are prohibited."  Both of these semantic choices suggest that the rules prohibit the single unified act of "loitering and trespassing," not each of the separate acts of loitering and of trespassing, and therefore suggest that a resident like Jackson who is loitering but not trespassing will not have violated the rule.  *See Crooks v. Harrelson*, 282 U.S. 55, 58 (1930) ("We find nothing in the context or in other provisions of the statute which warrants the conclusion that the word 'and' was used otherwise than in its ordinary [conjunctive] sense."); *Reese Bros., Inc. v. United States*, 447 F.3d 229, 235-36 (3d Cir. 2006) ("The usual meaning of the word 'and,' however, is conjunctive, and unless the context dictates otherwise, the 'and' is presumed to be used in its ordinary sense" (quotation and citation omitted)).  But no tenant should be expected to perform such a close reading in order to determine what behavior is and is not permitted in his own building; it is defendants' obligation to put tenants on clear notice of what constitutes unlawful

Subsequent to the arrest of Jackson and Johnson, NYCHA issued a
new document entitled "Highlights of House Rules, Lease Terms and Policy" that
expressly prohibits residents' presence on roof landings, that is, at the top of
stairwells.[96]  The document also says that "the lobby or stairwell is meant for
resident use to either go in or out of the building or to walk from floor to floor,"
and says that "lingering" is prohibited in "the lobby, corridors, and stairwell."[97]  I
sympathize with the desire of NYCHA residents (including plaintiff Eleanor Britt,
Jackson's grandmother) to keep their homes safe.[98]  But, as written, the
prohibitions do not clearly distinguish between harmful and innocuous activity –
indeed, Britt's act of sitting at the Tenant Patrol table in the lobby of buildings and
requesting that all visitors sign a log book could itself fall under the criminal
prohibition against "loitering" or "lingering" in the lobby because she is not using
the lobby "to either go in or out of the building."  The vagueness of the terms (and
the discretionary enforcement that accompanies it) may be acceptable in the

_____

conduct.

[96]     *See* Highlights of House Rules, Lease Terms and Policy, Ex. 28 to
Brooker Decl., at 2.

[97]     *Id.*

[98]     *See* Britt Dep. at 42:2-44:2, 59:24-66:2 (describing her efforts through
the Tenant's League to improve the quality of life in her building and her support
for a higher police presence).

context of residential leases, where landlords and tenants need flexibility and are entitled to a measure of discretion.  But it is unconstitutional when incorporated into the criminal statutes.

Because a reasonable jury could find that there was no probable cause to arrest Jackson or Johnson, defendants' motion for summary judgment on their Fourth Amendment claim is denied.

### 7.   Rikia Evans' Stop and Arrest

#### a.   Facts

According to Rikia Evans, the facts of her arrest are as follows: she was standing in the doorway of the lobby of 175 Alexander Avenue at approximately 11:45 p.m. on October 16, 2010, looking to see if her friend was coming to the building to pick her up and walk her home as they had arranged.[99] Officer Keith Devine, who was there conducting a patrol, exited the building and said to Evans "either in or out."  Evans complied with his directive by walking into the building and toward the elevator.[100]  Before she reached the elevator, Devine said "hey, come back, you heard me call you three times."[101]  Evans then stopped

---

[99]   *See* Pl. Counter 56.1 ¶¶ 50, 52, 56 (citing to Deposition of Rikia Evans ("Evans Dep.")).

[100]   *See id.* ¶¶ 57-58.

[101]   *Id.* ¶ 61.

and told Devine that he had not called her three times.[102]  Devine asked whether

she lived in the building; she said that she lived on Jackson Avenue; Devine said

that she was trespassing; Evans said, "I'm not trespassing, my aunt lives here."[103]

Evans told Devine that her aunt lived on the twelfth floor; he asked her what

apartment and she did not respond.  In her deposition, she explained the interaction

as follows:

> Q:   What do you mean when you say you didn't tell him?
> A:   I didn't answer.
> Q:   Did you know the apartment number?
> A:   Yes.
> Q:   But you decided not to tell him?
> A:   Yes.
> Q:   Why did you make that decision?
> A:   Because I didn't want no trouble.
> Q:   You didn't want any trouble?
> A:   Yes.
> Q:   You thought that by not telling him your aunt's apartment number, then you would avoid having any trouble?
> A:   Yes.
> Q:   Why did you believe that?
> A:   I just thought if I didn't say anything that he would leave me alone.[104]

At that point, according to Evans, Devine started screaming at her that

she was trespassing and asked for her aunt's apartment number two or three times;

---

102    *See* Evans Dep. at 126:13-128:7.

103    *Id.* at 126:25-130:1.

104    *Id.* at 130:7-23.

she refused to provide it.  He asked for identification and although she had it with her, she refused to provide it because "[she] didn't think he needed to see it."[105] She then tried to walk away, but Devine's supervisor, Lieutenant Christopher Allen, grabbed her by the jacket, pushed her against a wall, and asked Devine if they should "take her in."[106]  Evans then told the officers that she "could call [her] aunt to come down" but the officers told her "No, to hang up the phone."[107]  She then started crying and the officers told her she was under arrest.[108]

### b.    Legal Background

Evans' arrest squarely presents an important and discrete Fourth Amendment question: whether the police are permitted to rely on a visitor's refusal to answer questions about her destination in order to establish probable cause for a trespass arrest.  New York State courts appear to have reached conflicting answers about whether probable cause exists to arrest a person who acknowledges that he is not a tenant but does not identify whom he is visiting.[109]

---

[105]    *Id.* at 132:10.

[106]    *Id.* at 142:11-17.

[107]    *Id.* at 142:23-143:2.

[108]    *See id.* at 143:3-11.

[109]    In these cases, the courts generally have examined whether the prosecutor's charging instrument provides  "reasonable cause" to believe that the defendant committed a crime. As the Second Circuit has explained, "'[r]easonable

cause' under the Criminal Procedure Law is substantially the same as 'probable cause' within the meaning of the Fourth Amendment." *Williams v. Ward*, 845 F.2d 374, 387 (2d Cir. 1988). *Accord Stinson v. City of New York*, No. 10 Civ. 4228, 2012 WL 1450553, at *16 (S.D.N.Y. April 23, 2012) ("the term 'reasonable cause' is synonymous with 'probable cause'").

        *Compare Matter of Daniel B.*, 768 N.Y.S.2d 230, 231 (2d Dep't 2003) ("Although the appellant advised the officer that he did not live in the building and was just 'hanging [out],' and did not offer an explanation for his presence, it was not his obligation to do so. Rather, it was the [government's] burden to prove unlawful entry or remaining, and it failed to do so."); *People v. Spann*, 796 N.Y.S.2d 227, 229 (Crim. Ct. N.Y. Co. 2005) (no reasonable cause if a defendant was seen leaving a private apartment and was unable to give the full name of the apartment's tenant because "[t]here are many instances where a person may be lawfully in an apartment, or an invitee of a resident, without knowing that resident's full name. Deliverymen, repairmen, inspectors, and the like often do not know or cannot recall the names of the persons whose apartments they visit for legitimate reasons. That does not mean that these people do not have a proper reason to be there."); *People v. Ruiz*, 841 N.Y.S.2d 822 (Sup. Ct. Bronx. Co. 2007) (no reasonable cause to prosecute defendant who was in a Clean Halls building in which he did not live, even though he did not give a reason for his presence); *People v. Charles Lee*, (no number in original), 1999 N.Y. Misc. Lexis 706 (Crim. Ct. Bronx Co. Sept. 20, 1999) ("allegation that the defendant 'could not give an [apartment] number' is . . . insufficient to establish reasonable cause to believe that he was not a legitimate invitee" because "such ignorance is hardly unusual and, by itself, simply does not [tend] to prove that one is a trespasser rather than an invitee"), *with People v. Hendricks*, 841 N.Y.S.2d 94, 96 (1st Dep't 2007) ("Once the officer determined defendant was not a resident, he was justified in asking if defendant was visiting someone in the building and who that someone was. When defendant *could not* supply that information, even after taking the officer to two separate floors, the officer had probable cause to arrest him for trespass." (emphasis added)) ; *People v. Quinones*, No. 01-371, 2002 N.Y. Misc. Lexis 139 (1st Dep't Mar. 5, 2002) (same); *People v. Taveras*, 851 N.Y.S.2d 73 (Crim. Ct. N.Y. Co. 2007) (charging instrument was facially sufficient when it alleged that defendant was found in lobby and "was *unable* to name any tenant by whom he had been invited into the premises." (emphasis added)). *Cf. People v. Sanders*, 568 N.Y.S.2d 77 (1st Dep't 1991) (upon inquiry by police officer, defendants' response that they were "just passing through" the lobby of a building did not give rise to

Judge Robert Mandelbaum of the New York Criminal Court has concluded that the relevant distinction is between individuals who are unable to identify the tenant whom they are visiting and those who remain silent or refuse to provide the information.  If a woman is unable to identify the tenant or location that she is visiting, Judge Mandelbaum reasoned, then the police have probable cause to believe that she is trespassing.  In contrast, "a failure to cooperate by identifying oneself or answering questions cannot 'be the predicate for an arrest absent other circumstances constituting probable cause.'"[110]  Thus, "evidence that a defendant, when approached by police in the lobby of an apartment building, advised the officer that he did not live in the building and was just 'hanging out,' is legally insufficient to establish criminal trespass" because "although the accused 'did not offer an explanation for his presence, it was not his obligation to do so.'"[111]

Last year, Judge Kevin McGrath of Brooklyn Criminal Court

---

probable cause for trespass arrest).

[110]    *People v. Easton*, 841 N.Y.S.2d 827, at *4 (Crim. Ct. N.Y. Co. 2007) (quoting *People v. Howard*, 50 N.Y.2d 583, 586 (1980)).

[111]    *Id.* (quoting *Matter of Daniel B.*, 768 N.Y.S.2d at 231).

38

addressed the same question in *People v. Messina*.[112]  Messina was standing in the

lobby of a NYCHA building when a police officer approached him and asked

whether he was a tenant; he responded that he was visiting a friend but did not

provide an apartment number.[113]  Judge McGrath began by explaining that

> it is beyond dispute that the defendant has a right not to answer
> questions posed to him by law enforcement personnel (*see* U.S.
> Const. Amend. V) and that the invocation of that right may not
> give rise to criminal consequences (see *Brown v. Mississippi*, 297
> U.S. 278, 286 (1936)). It is equally clear to this court that no
> essential element of a prima facie case can be established, at the
> pleading stage, by an allegation that the defendant declined to
> respond to a police inquiry.[114]

However, Judge McGrath cited a recent New York Court of Appeals

case to support his holding that because the police knew Messina was not a tenant

in the building, it was his burden to establish that he was there by invitation.  In

*People v. Davis*, the Court of Appeals considered a trespassing rule that prohibits

presence in a New York City park after its closing time, unless "'upon order by a

Police Officer or designated [Parks] Department employee.'"[115]  Davis sought to

---

[112]    919 N.Y.S.2d 814, 820 (Crim. Ct. Kings Co. 2011).

[113]    It is unclear whether the defendant was unable to or chose not to
provide an apartment number.

[114]    *Messina*, 919 N.Y.S.2d at 818.

[115]    13 N.Y.3d 17 (2009) (quoting 56 R.C.N.Y. 1-03[c][2]).

dismiss the charge on the grounds that the state could not establish that he did not

have the permission of a police officer or parks department employee to be in the

park.  The question, according to the Court of Appeals, was whether the law's

reference to the "order by a Police Officer" was "a true 'exception' that must be

pleaded by the People or whether it operates as a 'proviso' that defendant was

required to raise as a bar to prosecution."[116]  According to the Court, the answer

depends on the legislative intent, and it concluded that

> the City's Parks Department [which promulgated the rule] did not
> intend that the People plead and prove that no police officer or
> Parks Department employee had authorized defendant to ignore
> a posted closing time.  Such information is uniquely within a
> defendant's knowledge, and to require the People to plead and
> negate the existence of the relevant permission would require
> them to go to "intolerable lengths," including innumerable
> interviews of officers and employees in the area during the date in
> question.[117]

In *Messina*, Judge McGrath concluded that when charging trespass in

a NYCHA building under section 140.10(e), the prosecution has the burden of

establishing (or, in the case of an information, alleging) that an individual is not a

tenant in the building.  However, relying on *Davis*, he held that a non-tenant has

the burden of establishing that he is an invited guest:

---

[116]   *Id.* at 31.

[117]   *Id.* at 31-32 (quotation omitted).

> In order for the People to adequately allege facts that would establish that the defendant was not an invited guest inside the building, the police officer who observed the defendant would be forced to question each and every resident of that building in order to determine that the defendant had, in fact, not been invited into the building . . . . [M]uch like the knowledge that the defendant in *Davis* was authorized to ignore the posted park rules, information concerning whether the instant defendant was an invited guest of one of the building's tenants was peculiarly within the defendant's knowledge.[118]

Much of Judge McGrath's reasoning is persuasive. He did not, however, consider the two cases that I believe are most relevant to the analysis. *First*, in *People v. Brown*, the New York Court of Appeals considered Brown's challenge of his conviction for criminal trespass. The court overturned the conviction because the prosecution had failed in its "burden of proving each and every element of [trespass] . . . specifically, the absence or loss of a statutory privilege or license to enter and remain."[119] This determination applied specifically

---

[118]   *Messina*, 919 N.Y.S.2d at 820 ("[T]he existence of such an invitation can be raised as a defense at trial and must be proven by the defendant. To the extent that *Daniel B.* and *James C.* have held to the contrary, this court believes that the Court of Appeals's holding in *Davis* overruled those holdings."). *See also People v. Richardson*, No. 2011 NY 2298, 2012 WL 1939971 (Crim. Ct. N.Y. Co. Apr. 23, 2011) (following *Messina* where defendant's identification card listed a different residence and he was unable to identify an apartment to which he was invited).

[119]   *People v. Brown*, 25 N.Y.2d 374, 377 (1969) (Fuld, C.J.). The statute defined criminal trespass as follows: "A person is guilty of criminal trespass in the second degree when he knowingly enters or remains unlawfully in a building or upon real property which is fenced or otherwise enclosed in a manner designed to

to the trespassing statute, which for these purposes has not changed since 1969.[120]

In its *Davis* decision addressing presence in the park, the Court of Appeals did not

mention *Brown* and I have no reason to believe that *Brown* is no longer good law.

The Court of Appeals' interpretation of state law settles the question: it is the

state's burden to prove that an invitee does not have privilege or license to remain

on the premises.  Because it is an element of the crime, officers must have probable

cause to believe that a person does not have permission to be where she is before

they arrest her for trespass: "Probable cause must extend to every element of the

crime for which a person is arrested."[121]  And, of course, the state cannot rely on a

person's exercise of her Fifth Amendment right to remain silent in order to satisfy

that burden.[122]

------

exclude intruders." N.Y. Pen. L. § 140.10.  Further, "Section 140.00 (subd. 5)
defines the phrase 'enter or remain unlawfully' as follows: 'A person 'enters or
remains unlawfully' in or upon premises when he is not licensed or privileged to
do so.'" *Brown*, 25 N.Y.2d at 377.  That definition remains the same as it did in
1969.

[120]     The addition of subdivision (e), which criminalizes the failure to
comply with NYCHA rules and regulations, does not affect the question of
whether the prosecution bears the burden of proving that a person has "enter[ed] or
remain[ed] unlawfully" in the building.

[121]     *Alhovsky v. Paul*, 406 Fed. App'x 535, 536 (2d Cir. 2011).

[122]     *See People v. Howard*, 50 N.Y.2d 583, 590-92 (1980) ("[W]hile the
police had the right to make the [*Terry*] inquiry, defendant had a constitutional
right not to respond . . . . Nor can the failure to stop or co-operate by identifying

The United States Supreme Court's recent dicta in *Hiibel v. Sixth Judicial District Court* supports this conclusion.[123]  In that case, the Supreme Court considered the constitutionality of a Nevada statute that criminalized the refusal to identify oneself when stopped by the police.[124]  Hiibel challenged his conviction, arguing that the Fifth Amendment protected his right not to answer any questions by police officers, including their demand that he identify himself.  The Supreme Court rejected Hiibel's argument because it found that a disclosure of one's name would not tend to incriminate him:

> While we recognize petitioner's strong belief that he should not have to disclose his identity, the Fifth Amendment does not override the Nevada Legislature's judgment to the contrary *absent a reasonable belief that the disclosure would tend to incriminate him.*[125]

The Court's determination turned on the limited nature of the statute:

---

oneself or answering questions be the predicate for an arrest absent other circumstances constituting probable cause.").  *Accord Bright*, 71 N.Y.2d at 385 ("Requiring a person suspected of violating the loitering statute [to] provide a 'satisfactory explanation' to avoid arrest is also violative of a citizen's right not to answer questions posed by law enforcement officers.").

[123]    542 U.S. 177 (2004).

[124]    Although New York permits police officers to "demand of [any person stopped on reasonable suspicion] his name, address and an explanation of his conduct," unlike Nevada it does not criminalize the refusal to provide that information.  *See Howard*, 50 N.Y.2d at 590-92.

[125]    *Hiibel*, 542 U.S. at 190-91 (emphasis added).

43

The narrow scope of the disclosure requirement is also important. One's identity is, by definition, unique; yet it is, in another sense, a universal characteristic. Answering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances.[126]

### c.    Analysis

The present circumstances are different from those in *Hiibel*.

Defendants argue that Evans could be arrested because she refused to identify her aunt's apartment number.  According to their argument (and Judge McGrath's conclusion in *Messina*), a person has the obligation not only to disclose her name but also to disclose the name and apartment number of her host.  This information, however, is often incriminating.  Numerous cases, including the arrests of Osorio and Smith in this case, involve situations in which a person who was stopped by police officers is arrested because they do not believe that his or her answer to the question "where are you going?" was credible.  Although police may obviously consider a person's lies when assessing probable cause, the Supreme Court's limiting language in *Hiible* strongly suggests that the Fifth Amendment prohibits police from arresting an individual for refusing to provide "testimonial" evidence.

The New York Court of Appeals' holding in *Brown* and the Supreme Court's dicta in *Hiibel* support the conclusion that New York City police officers

---

[126]    *Id.* at 191.

44

may not arrest a person for trespass in a NYCHA building solely on the basis of her refusal to identify the resident who has given her permission to be in the building, even if they know that she herself is not a resident.[127]  With the preceding legal analysis in mind, I turn to its application in this case.

### i.   Evans' *Terry* Stop

Evans alleges that she was both stopped (that is, "seized") and arrested unlawfully.  Evans was seized, for the purpose of the Fourth Amendment, when  she attempted to walk to the elevator, was told to "come back" by Officer Devine, and stopped walking.  The Second Circuit has held that "[a] seizure occurs when [] a person obeys a police officer's order to stop."[128]  Devine's order to "come back" was an order to stop and Evans obeyed the order.

Rather than argue that Devine had reasonable suspicion to stop Evans at that time, the City describes Devine's words as merely a "request" that Evans

---

[127]    I fully understand Judge McGrath's concern that this determination makes enforcement of the trespass statute more difficult.  But respect for the individual liberties protected by our Constitution often makes criminal law enforcement more difficult.  Police officers and judges alike are required to ensure compliance with criminal and constitutional law.  There are surely a number of ways in which the legislature and/or NYCHA might amend the law and regulations so as to facilitate constitutional enforcement of the trespass statute.

[128]    *United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009).

45

come back and argue that it did not constitute a seizure.[129]  The City cites to two state court decisions holding that police may instruct a person to "stop" without having seized them under the Fourth Amendment and *Terry*.[130]  These cases do support defendants' position but they are squarely contradicted by the Second Circuit's decision in *United States v. Simmons*.  It is the Second Circuit, not the Appellate Division or the New York Court of Appeals, whose interpretations of the Fourth Amendment are binding on this Court.  When told by a police officer to "come back" in the lobby of a building, a reasonable person would believe that he was not free to leave.  According to the facts as she describes them, Evans was seized when she complied with the order.[131]

If a juror were to believe Evans' version of events, she could reasonably conclude that at the time of the seizure Devine did not have reasonable suspicion to believe that Evans was committing a crime.  The only information

---

[129]   City Rep. Mem. at 4.

[130]   *See People v. Reyes*, 199 A.D.2d 153 (1st Dep't 1993), *aff'd*, 83 N.Y.2d 945 (1994); *People v. Mitchell*, 637 N.Y.S.2d 450 (2d Dep't 1996).

[131]    *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").

46

available to Devine was that, late at night in an allegedly high-crime area,[132] Evans

had been waiting in the doorway of the lobby for approximately three minutes and

went inside the building after Devine told her "either in or out."  There is nothing

suspicious about waiting in a lobby for three minutes (even in a high-crime area at

night)[133] and there is nothing suspicious about complying with an officer's

instruction to go "either in or out."  Because these facts, if true, may establish that

Evans was stopped unlawfully, summary judgment on Evans' claim for an

unlawful stop is denied.

### ii.   Evans' Arrest

According to Evans' testimony, at the time that Devine told her that

she was under arrest, he knew the following facts: (1) Evans said she did not live in

the building, (2) Evans said her aunt lived on the twelfth floor, (3) Evans

repeatedly refused to tell him what apartment number her aunt lived in, and (4)

Evans offered to call her aunt to come down to the lobby.  For the reasons just

discussed, if a jury were to believe this version of events, it could reasonably

---

[132]   *See* City Rep. Mem. at 4 (citing to Declaration of Erik Hernandez, NYPD Captain, regarding crime rates near the building where Evans was arrested).

[133]   *See United States v. Bellamy*, 592 F. Supp. 2d 308, 317 (E.D.N.Y. 2009) ("the fact that an individual appears to be waiting for someone [in the vestibule of a building] does not establish reasonable suspicion that an individual is engaged in criminal activity" even if the building is in a high-crime, drug-prone area and the person makes "furtive gestures").

conclude that these facts did not establish probable cause to arrest Evans for trespass.

There is no probable cause to arrest a person if the only facts known to the police are that the person says she does not live in the building and refuses to say more about her license or privilege to be there.  Even if the burden is on the visitor to identify the resident who has given her permission to be in the building, a jury crediting Evans' testimony could reasonably find that there was no probable cause to arrest Evans.  She identified her aunt's floor and offered to call her aunt down to the lobby to verify her authorization to be there.  This offer would have made it easy for the police officers to evaluate her claims, which fully addresses the pragmatic concerns raised by Judge McGrath in *Messina*.  Instead, the officers improperly chose to "disregard plainly exculpatory evidence" and arrested Evans.[134]

Additionally, in *Hiibel* the Supreme Court addressed Hiibel's concern that the Nevada statute "circumvents the probable-cause requirement, in effect allowing an officer to arrest a person for being suspicious" by pointing to "the requirement that a *Terry* stop must be justified at its inception" and that "an officer may not arrest a suspect for failure to identify himself if the request for

---

[134]     *Panetta*, 460 F.3d at 395.

identification is not reasonably related to the circumstances *justifying* the stop."[135]
The officers in this case (allegedly) arrested Evans after making an unlawful stop
so their reliance on her silence is squarely foreclosed by *Hiibel*.

Evans' testimony, if credited by the trier of fact, establishes that she
was arrested unlawfully.  Accordingly, defendants' motion for summary judgment
on this claim is denied.

### B.    The Arrested Plaintiffs' Equal Protection Claims Against the City for Unlawful *Terry* Stops and False Arrest

The City seeks summary judgment on the arrested plaintiffs' claim
that their stops and arrests were based on their race and therefore violated the
Fourteenth Amendment to the United States Constitution and Article 1 of the New
York Constitution.[136]  The City argues that "there is no evidence in the record that

---

[135]    542 U.S. at 188 (emphasis added).

[136]    *See* City Mem. at 13-14; Am. Compl. ¶¶ 245-250, 275-280.  Plaintiffs
argue that even plaintiff Eleanor Britt, who has never been stopped or arrested, is
"subjected to Defendants' racially discriminatory trespass enforcement policies on
a daily basis" and thus has standing to bring equal protection claims against the
City.  *See* Pl. Mem. at 39.  But plaintiffs put forward *no* evidence showing that
Britt has been subject to discrimination or injured in a concrete way.  *See id.* at 24-
25 (discussing only the arrested plaintiffs); Pl. City 56.1 ¶¶ 30-31 (acknowledging
the undisputed fact that Britt has eight grandchildren who visit her regularly and
that she "testified that her visitors have never mentioned that they do not want to
visit her because they are intimidated by the police.").  She has not proffered any
evidence that would permit a juror to find that the City has discriminated against
her. Summary judgment is therefore granted to the City on Britt's equal protection
claims.

the Arrested Plaintiffs' stops and/or arrests were motivated by racial animus by the individual officers."[137]   The statement is incorrect,[138] but even if it were true it would be insufficient to establish the City's entitlement to summary judgment.

The Fourteenth Amendment prohibits intentional discrimination on the basis of race, not government action that has a disproportionate racial impact.[139] Thus, in order to survive summary judgment, the arrested plaintiffs must proffer evidence that would support a jury's determination that the officers stopped and arrested them "at least in part because of" their race.[140]   As the Second Circuit and the Supreme Court have explained:

> Because discriminatory intent is rarely susceptible to direct proof, litigants may make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.  The impact of the official action – whether it bears more heavily on one race than another – may provide an important starting point." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).[141]

---

[137]   City Mem. at 13.

[138]   As the City acknowledges, both Washington and Evans testified that the officers who arrested them referred to them as "nigger."  *See* City 56.1 ¶¶ 80, 219.  Whether that testimony is credible or not – *see* City Rep. Mem. at 8 n.26 – is a question for the jury, not for a court at summary judgment.

[139]   *See Washington v. Davis*, 426 U.S. 229 (1976).

[140]   *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

[141]   *Hayden v. Paterson*, 594 F.3d 150, 163 (2d Cir. 2010).  *Accord Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 988 (D. Ariz. 2011) (denying

The consequences of government action are sometimes evidence of the government's intent: "proof of discriminatory intent must necessarily usually rely on objective factors . . . . The inquiry is practical. What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid."[142]

Plaintiffs argue correctly that the existence (or absence) of a City-wide statistically significant racial disparity in stops and arrests on NYCHA property would constitute circumstantial evidence regarding the intent of the arresting officers.  As the late Judge Robert Carter explained in 2006, a plaintiff can establish his equal protection claim if he can "show a causal connection between the unconstitutional policy and the violation of his rights."[143]  If the plaintiff can raise an issue of fact regarding "the NYPD's practice of wrongfully stopping and detaining African-Americans," then evidence that the stop was

---

cross motions for summary judgment on the equal protection claims for race-based stops).

[142]    *Arlington Heights*, 429 U.S. at 279 n.24.  "An invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another."  *Washington v. Davis*, 426 U.S. 229, 242 (1976).

[143]    *Taylor v. City of New York*, No. 03 Civ. 6477, 2006 WL 1699606, at *7 (S.D.N.Y. June 21, 2006).

unlawful and was "in line with" that policy will be enough to survive summary judgment.[144]

The parties chose to brief defendants' motion for summary judgment in two parts. The first part, adjudicated here, involves only those questions pertaining to the plaintiffs' individual circumstances. The second part will address defendants' *Monell* liability. Plaintiffs state that they intend to present statistical evidence showing "substantial, statistically significant racial differences in terms of who is stopped and/or arrested on NYCHA property."[145] The City will surely dispute the probative value of this evidence. But because such evidence – if admissible – would provide important context to the jury, I cannot rule on the City's motion for summary judgment regarding plaintiffs' claims of racial discrimination without it. Thus, the City's motion is denied without prejudice and with leave to renew subject to further briefing with respect to plaintiffs' *Monell* claims.

### C.    The Arrested Plaintiffs' Claims Against NYCHA for Violations of

---

[144]    *Id. Accord Floyd v. City of New York*, 813 F. Supp. 2d 417, 446 (S.D.N.Y. 2011) ("Because a reasonable jury could find that [plaintiff's] stop was unconstitutional [under the Fourth Amendment], and that the stop occurred in the context of citywide racial disparities in stop-and-frisk patterns unexplainable by chance, crime patterns, or officer deployment patterns, there is a triable issue of fact as to whether [his] stop was racially motivated.").

[145]    Pl. Mem. at 26

**Equal Protection**

The arrested plaintiffs have brought their federal and state constitutional claims for false arrest against only the City, not NYCHA.[146]  But the claims under the Equal Protection clause of the Fourteenth Amendment and Article I, Section 11 of the New York Constitution were brought by "All Plaintiffs against All Defendants."[147]  Plaintiffs' argument on these claims focuses exclusively on the *arrested* plaintiffs (that is, every plaintiff but Britt) and does not explain how NYCHA could be liable for a false arrest based on racial discrimination if it had no liability for the arrest to begin with.[148]  NYCHA's motion for summary judgment on plaintiffs' second and eighth claims for relief is therefore granted.

**D.    Resident Plaintiffs' Contract-Based Claims Under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the Fair Housing Act, and the New York State and New York City Human Rights Laws**

The resident plaintiffs bring a host of claims alleging that defendants' discriminatory policing practices have diminished their ability to enjoy the benefits of their homes.  Although the claims are brought under an array of contract, housing, and civil/human rights laws, they are founded on the same basic

---

[146]    *See* Am. Compl. ¶¶ 237-244; 281-286.

[147]    *Id.* ¶¶ 245, 275.

[148]    *See* Pl. Mem. at 24-27.

allegation, namely that the resident plaintiffs

> have been denied the enjoyment of the benefits, privileges, terms, and conditions of their contractual relationship with NYCHA, because they are limited in their ability to enter and exit their own homes, and in their ability to receive guests, due to Defendants' trespass enforcement policies and practices, which are conducted in a [racially] discriminatory and unlawful manner.[149]

Only the resident plaintiffs maintain these claims.[150]   Although their

brief displays some confusion about the matter, the only remaining plaintiffs who

are lawful tenants of NYCHA apartments are Britt, Littlejohn, and Evans.[151]   All of

---

[149]   Am. Compl. ¶ 267 (specifically addressing plaintiffs' claim under 42 U.S.C. § 1981 for deprivation of the right to enjoy the benefits of contracts free from racial discrimination).

[150]   Although the Title VI claim was initially brought on behalf of all plaintiffs, it has only been pursued on behalf of the resident plaintiffs.  *See* Pl. Mem. at 28 n.33.

[151]   According to plaintiffs, the "Resident Plaintiffs are Eleanor Britt, Patrick Littlejohn, Andrew Washington, Shawne Jones, Hector Suarez, and Vaughn Frederick." Pl. Mem. at 28 n.32.  However, Jones and Suarez settled their claims on February 7, 2011.  *See* Judgment Pursuant to Rule 68 [Docket No. 59]. Furthermore, it is undisputed that Washington and Frederick are not authorized NYCHA tenants.  *See* Pl. City 56.1 ¶¶ 200, 217.  Plaintiffs explicitly concede that this status precludes Washington and Frederick from asserting claims under the United States Housing Act, Pl. Mem. at 33 n.36, and they fail to make any argument regarding the ability of Washington and Frederick to bring other residency-based claims.  Such arguments are therefore waived and defendants' motion for summary judgment on Washington and Frederick's residency-based claims is granted.  Plaintiffs' list of "resident plaintiffs" omits Rikia Evans, but the City acknowledges that she is an authorized NYCHA tenant and plaintiffs address her residency-based claims.

their residency claims appear to depend on the following limited set of facts:

> Both Ms. Evans's father and uncle have been stopped while visiting her. After he was stopped, Ms. Evans's uncle's visits declined from twice weekly to fewer than three times per month. Similarly, Ms. Evans's father no longer visits Ms. Evans at her residence; instead, he meets her outside her apartment building. After Ms. Evans was arrested for trespass while visiting a close family friend, whom she considers an aunt, she stopped her daily visits. In addition, Ms. Evans has stopped visiting other friends who live in NYCHA developments and no longer has close friends who are NYCHA residents . . . .[152]

> Mr. Washington and Mr. Littlejohn, both residents of NYCHA's Eastchester Gardens development, have been close friends since childhood. While Mr. Washington previously visited Mr. Littlejohn "all the time," after he was arrested while visiting Mr. Littlejohn, he now visits only "once in a while." Because both Mr. Washington and Mr. Littlejohn live in NYCHA housing, Defendants' practices completely inhibit them from visiting one another in the safe havens of their homes. Mr. Washington testified that his inability to visit a friend "next door" leaves him with "no freedom at all."[153]

Plaintiffs point to no evidence regarding the impairment of Britt's residency-based rights beyond those under the United States Housing Act that guarantee the provision of a reasonable residential lease. With these facts in mind, I turn to the evaluation of each of the plaintiffs' residency-based claims.

### 1.   Title VI of the Civil Rights Act of 1964

---

[152]   Pl. Mem. at 31 (citations to 56.1 statements, Evans' deposition, and 7/17/12 Declaration of Rikia Evans ("Evans Decl.") omitted).

[153]   *Id.* at 32 (citations to Pl. Counter 56.1 omitted).

Title VI of the Civil Rights Act of 1964 states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[154]  The resident plaintiffs allege that they are "unable to use and enjoy their residences because Defendants' vertical patrol and trespass enforcement practices are conducted in such a consistently unlawful and discriminatory manner that the residents are not free to come and go as they wish."[155]

The City argues that Title VI creates a cause of action only for discrimination by grant recipients, not for discrimination by third parties.[156]

_____

[154]  42 U.S.C. § 2000d.

[155]  Am. Compl. ¶ 252.  This claim was brought on behalf of all plaintiffs but non-resident plaintiffs now acknowledge that it cannot be brought on their behalf.  *See* Pl. Mem. at 28 n.33.  Summary judgment for defendants is therefore granted on the Title VI claims of non-resident plaintiffs Jackson, Johnson, Smith, Osorio, Washington, and Frederick.

[156]  *See* City Mem. at 15 (citing *Davis v. Monroe Cnty. Bd. of Educ.* ("*Monroe*"), 526 U.S. 629, 640 (1999) ("a recipient of federal funds may be liable in damages under Title IX only for its own misconduct"); *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) ("Congress modeled Title IX after Title VI of the Civil Rights Act of 1964 . . . and passed Title IX with the explicit understanding that it would be interpreted as Title VI was.")).  The City's reliance on *Monroe* is misplaced: in that case, the Supreme Court held that a school could not be directly liable for one student's sexual harassment of another student.  But the offending student in *Monroe* was not acting as the school's agent.  Here, the

56

Because NYCHA is the grant recipient and the City merely provides policing

services to NYCHA, the City argues that it cannot be held liable under Title VI.

The statutory language at issue is convoluted.  Stripped of its subsections and

semicolons, the statue says that the non-discrimination provisions apply to "all of

the operations of [] a department . . . of a local government . . . any part of which is

extended Federal financial assistance."[157]  Both parties cite to *Alfano v. Bridgeport

Airport Services*, in which Judge Janet Arterton of Connecticut District Court

analyzed the claims of a disabled worker under a federal law prohibiting

discrimination "under any program or activity receiving Federal financial

assistance."[158]  After a thorough review of the caselaw, Judge Arterton explained

that

> [w]hile an indirect recipient of federal aid is covered by [the anti-

---

City receives funding from NYCHA to help NYCHA fulfill its statutory duties and
it is therefore NYCHA's agent.

[157]     42 U.S.C. § 2000d-4a.

[158]     373 F. Supp. 2d 1, 3 (D. Conn. 2005) (quoting section 504 of the
Rehabilitation Act, 29 U.S.C. § 794(a)).  Judge Arterton was interpreting the
Rehabilitation Act, not Title VI.  According to the Supreme Court, the same
standard governs analysis of these laws' nondiscrimination provisions: "Under the
program-specific statutes, Title VI, Title IX, and § 504, Congress enters into an
arrangement in the nature of a contract with the recipients of the funds: the
recipient's acceptance of the funds triggers coverage under the nondiscrimination
provision."  *United States Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S.
597, 605 (1986).  *Accord Monroe*, 526 U.S. at 639-42.

> discrimination law] if it is Congress's intended [financial] recipient, a program that merely benefits from the use of the [federal] aid is not covered . . . . Whether financial payment may be deemed a government subsidy or mere compensation for services, however, is a complex question that depends on the particular facts and circumstances of the contract and project at issue.[159]

Because this round of briefing dealt only with plaintiffs' individual circumstances, the parties have not submitted evidence regarding the nature of NYCHA's contract with the NYPD.  I cannot at this point determine whether the City is "extended Federal financial assistance" pursuant to that contract and cannot determine whether it is amenable to suit under Title VI, let alone whether there is a material dispute of fact regarding its compliance with the nondiscrimination mandates of Title VI.  Thus, defendants' motion for summary judgment on this claim is denied without prejudice and with leave to renew at the second round of summary judgment briefing on plaintiffs' *Monell* claims.

### 2.   42 U.S.C. § 1981

The Civil Rights Act of 1866, now codified at 42 U.S.C. § 1981, protects the rights of all persons "to make and enforce contracts" free from discrimination on the basis of race.  After the Supreme Court reaffirmed a narrow

---

[159]   *Alfano*, 373 F. Supp. 2d at 6.

construction of that provision in 1989,[160] Congress passed the Civil Rights Act of

1991, which, among other changes, added section 1981(b):

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of *all benefits, privileges, terms, and conditions* of the contractual relationship. (Emphasis added).

Section 1981 "offers relief when racial discrimination . . . impairs an

existing contractual relationship, so long as the plaintiff has or would have rights

under the existing or proposed contractual relationship."[161]  Evans, Littlejohn, and

Britt are authorized residents on a lease (that is, a contract) with NYCHA.  There is

no doubt that the three resident plaintiffs have rights under the existing contractual

relationship.  The question is whether that relationship has been impaired because

of racial discrimination.

The City and NYCHA argue that Evans, Littlejohn, and Britt cannot

make out a claim under section 1981:  Any evidence that they are merely *limited* in

their ability to enter and exit their homes and to receive guests is insufficient

because "there is no record evidence to establish that any of the Resident Plaintiffs

---

[160]    *See Patterson v. McLean Credit Union*, 491 U.S. 164, 171 (1989) (section 1981 "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations").

[161]    *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

have *actually* lost the ability to enter and exit their own homes and/or receive any guests."[162]   As defendants point out correctly, the plaintiffs "continue to enter and exit their homes" and "continue to receive guests."[163]

       According to plaintiffs, "[d]efendants' suggestion that Resident Plaintiffs' § 1981 claims must be dismissed because the Resident Plaintiffs do not live in complete seclusion is contrary to law."[164]   Plaintiffs point out that Congress intended the 1991 amendments "to bar *all* race discrimination in contractual relations,"[165] not merely discrimination that impairs contracts completely.  For example, the law reaches discriminatory disparities in salaries, not only a discriminatory failure to pay any salary whatsoever.[166]  The City's support for its position that section 1981 prohibits only complete evisceration of a contract, and not merely partial impairment of the terms or conditions of a contract, is particularly weak: it cites to an unpublished Third Circuit decision that rejected a

---

[162]    City Mem. at 16; NYCHA Mem. at 20-21.

[163]    *Id.* at 17.

[164]    Pl. Mem. at 28.

[165]    *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998) (quoting H.R. Rep. No. 102-40, at 92 (1991)) (emphasis added).

[166]    *See Kim v. Dial Serv. Int'l*, No. 97 Civ. 9142, 1998 WL 514297 (2d Cir. June 11, 1998) (affirming applicability of section 1981 to claims for discriminatory pay scales); *Longmire v. Wyser-Pratte*, No. 05 Civ. 6725, 2007 WL 2584662 (S.D.N.Y. Sept. 6, 2007).

plaintiff's section 1981 claim because he had not "sought to enter into a contract for goods or services" with the defendants.[167]   That decision is not relevant to the facts here, where the three resident plaintiffs clearly do have contractual rights.

Plaintiffs' residential leases must entitle them to come and go as they wish.  Under federal regulations, NYCHA is required to include in its leases a provision for the "reasonable accommodation of guests."[168]  The Second Circuit has held that this right is constitutional, not merely statutory: the Constitution protects public housing residents' "freedom to have whomever they want[] visit their homes," subject only to narrowly tailored intrusions that advance the government's "legitimate interests in maintaining safe, decent housing and in keeping track of occupancy and eligibility in public housing."[169]  Both the right to come and go as they please and the right to accommodate guests are material to

---

[167]   *Crane v. Cumberland County*, 64 Fed. App'x 838, 841 (3d Cir. 2003). The City's citation to *Garrett v. Tandy Corp.*, 295 F.3d 94 (1st Cir. 2002) is similarly unavailing: in that case a plaintiff attempted to show the existence of an ongoing contract arising out of the purchase of electronics because he had the right to return the items.  The court held that "a complaint must allege the actual loss of a contract interest, not simply the theoretical loss of a possible future opportunity to modify the contract."  *Id.* at 102.  In neither of these cases did the plaintiff present evidence of impairment of an existing contract.

[168]   24 C.F.R. § 966.f(d)(1).

[169]   *McKenna v. Peekskill Housing Authority*, 647 F.2d 332, 335 (2d Cir. 1981).

plaintiffs' contracts; whether those contracts have been legally impaired is a fact-intensive inquiry.

Plaintiffs Evans and Littlejohn have proffered concrete evidence showing that since their arrests, they feel less free to come and go from their buildings and to have guests visit them.  Evans has testified that police officers referred to her as "nigger" when she was arrested and Littlejohn testified that his friend Washington was also called a "nigger" in Littlejohn's building while he was attempting to visit Littlejohn.[170]  If she believes plaintiffs' testimony, a reasonable juror could find that the City has impaired Evans' and Littlejohn's residential leases in violation of section 1981.  Summary judgment on this claim is therefore denied.

In contrast, plaintiffs have offered no evidence regarding the alleged impairment of Britt's contract.[171]  Therefore, defendants' motions for summary judgment on Britt's section 1981 claim is granted.

### 3.  Fair Housing Act

Section 3604(b) of the Fair Housing Act ("FHA") makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services of facilities in connection

---

[170]   *See* Pl. Counter 56.1 ¶¶ 78, 185.

[171]   *See* Pl. Mem. at 28-29, 31-33 (failing even to mention Britt's contract impairment claim); NYCHA Mem. at 20-21.

therewith."[172]  Plaintiffs rely on this provision to support their allegation against the

City for discrimination in the provision of police services.  The City argues that this

claim fails because "section 3604 does not, in the absence of proof of constructive or

actual eviction, reach post-acquisition conduct" – that is, the provision prohibits only

discrimination prior to and at the time of the sale or initial rental of a dwelling, not

during the term of lease.[173]  The Second Circuit has not addressed this question, and

other circuits have reached differing conclusions.[174]

---

[172]    42 U.S.C. § 3604(b).

[173]    City Mem. at 22.

[174]    *Compare Cox v. City of Dallas*, 430 F.3d 734, 745 (5th Cir. 2005)
(finding that the law does not prohibit post-acquisition discrimination unless there
has been constructive eviction), *with Committee Concerning Cmty. Improvement v.
City of Modesto* ("*Modesto*"), 583 F.3d 690, 711 (9th Cir. 2009) (holding that the
law does apply to post-acquisition discrimination).  *See also Bloch v. Frischholz*,
587 F.3d 771, 779 (7th Cir. 2009) (agreeing with *Cox* in dicta but holding that the
law prohibits post-acquisition discriminatory practices if they are incorporated into
the terms and conditions of the initial sale or lease).  Defendants attempt to tip the
scales in their favor by citing to *Clifton Terrace Assoc. v. United Techs. Corp.*, 929
F.2d 714, 719 (D.C. Cir. 1991) and *Jersey Heights Neighborhood Ass'n v.
Glendening*, 174 F.3d 180, 192 (4th Cir. 1999), but both of these cases support
plaintiffs' position.  In *Clifton Terrace*, the D.C. Circuit determined that the owner
of a low-income housing complex could not sue a company that had installed
elevators in the complex for failure to provide elevator maintenance.  The court
determined that the FHA imposed no obligation on the elevator company to
provide non-discriminatory elevator maintenance services.  But it did not base its
holding on the pre- versus post-acquisition question.  Indeed, in dicta, the court
very clearly explained that section 3604(b) *does* apply to post-acquisition conduct
by landlords: it explained that the law is "directed at those who provide housing
*and then* [that is, post-acquisition] discriminate in the provision of attendant

63

For three reasons, I conclude that the law is best understood to prohibit post- as well as pre-acquisition discrimination in the provision of housing-related services.  *First*, the statute prohibits discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in provision of services or facilities in connection therewith."  As Judge Louis Pollock (siting by designation for the Ninth Circuit) explained,

> the inclusion of the word 'privileges' implicates continuing rights, such as the privilege of quiet enjoyment of the dwelling . . . . [Furthermore, t]here are few 'services or facilities' provided at the moment of sale, but there are many 'services or facilities' provided to the dwelling associated with the occupancy of the dwelling.[175]

---

services or facilities, or those who otherwise control the provision of housing services and facilities. In the case of rental units, the provision of such services primarily falls under the control of the provider of housing – the owner or manager of the property."  *Id.* at 720 (emphasis added).  *Clifton Terrace* may support the argument (which no party has raised) that NYCHA – and not the NYPD – is liable under the FHA, but it does not support the City's post-acquisition argument.

In *Jersey Heights*, the Fourth Circuit rejected plaintiffs' claim that Maryland's decision to site a new highway near their homes violated section 3604(b) because the decision was "too remotely related to the housing interests that are protected by the Fair Housing Act."  174 F.3d at 192.  But, again, the court's explanation strongly suggested that it *would* apply the law to post-acquisition housing services: "This provision by its terms extends only to housing and housing-related services. . . . [It] simply requires that such things as garbage collection and other services of the kind usually provided by municipalities not be denied on a discriminatory basis.  It does not extend to every activity having any conceivable effect on neighborhood residents."  *Id.* at 193 (quotation and citation omitted).

[175]     *Modesto*, 583 F.3d at 713.

*Second*, the Second Circuit has determined that in order to advance congressional intent, "'the provisions of 42 U.S.C. § 3604 are to be given broad and liberal construction.'"[176]  Limiting section 3604(b) claims as advocated by defendants would insulate egregious post-acquisition actions from the law's reach.  It would not be a violation, for example, "to refuse to provide maintenance to [] Hispanic tenants . . . [or] to sexually harass a tenant or to raise the rent of only Jewish tenants."[177]  Such a construction makes little sense.

*Finally*, this reading comports with the interpretation of the Department of Housing and Urban Development ("HUD") and with the interpretation of the Department of Justice.   24 C.F.R. § 100.65, entitled "Discrimination in terms, conditions and privileges and in services and facilities," says that "(b) Prohibited actions under this section include . . . failing or delaying maintenance or repairs [and] limiting the use of privileges, services or facilities associated with a dwelling."  Both of these phrases address post-acquisition activity[178] and "the Supreme Court has . . . recognized that HUD's views about the meaning of the FHA are entitled to 'great

---

[176]    *Cabrera v. Jakabovitz*, 24 F.3d 372, 388 (2d Cir. 1994) (quoting *Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982)).

[177]    Rigel Oliveri, *Is Acquisition Everything? Protecting the Rights of Occupants Under the Fair Housing Act*, 43 Harv. C.R.-C.L. L. Rev. 1, 32 (2008).

[178]    *See Bloch*, 587 F.3d at 781 (citing these regulations for support of the holding that some post-acquisition discrimination is covered by the law).

weight.'"[179]  Finally, in its recent amicus brief on the subject, the United States argued that "[n]othing in the statute indicates that it is limited to discrimination in the initial sale or rental transaction."[180]

The FHA's prohibition on discrimination is generally interpreted in accordance with Title VII's prohibition on discrimination in employment – that is, it prohibits disparate impact, not only disparate treatment.[181]  Therefore, I cannot fully adjudicate defendants' summary judgment motion without examining the admissible evidence regarding the City's allegedly discriminatory provision of police services.  I am therefore denying defendants' motion at this time without prejudice and with leave to renew at the second stage of briefing.

### 4.  New York State and New York City Human Rights Laws

Plaintiffs' eleventh claim is for violations of the New York State Human Rights Law ("NYSHRL"), which prohibits racial discrimination "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith" by any

---

[179]     *Id.* (citing *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 210 (1972)).

[180]      Brief for the United States as Amicus Curiae at 15, *Bloch v. Frischholz*, No. 06-3376 (7th Cir. Jan. 16, 2009).

[181]     *See, e.g.*, *Cox*, 430 F.3d at 746 (the FHA "does not require proof of both discriminatory impact and intent").

66

"person having the right of ownership or possession" to those accommodations.[182]

The City argues that because NYCHA – and not the City – is the owner of the

public housing at issue in this lawsuit, the City is not susceptible to suit under the

NYSHRL.[183]  Plaintiffs respond by arguing that because the NYPD controls certain

portions of NYCHA developments – on which it operates its bases – it has the

requisite "right of . . . possession" to be sued under the law.[184] But, as the City
properly notes, the police bases that the City controls do not fit the statute's
definition of "housing accommodations" because they are not "intended, arranged
or designed to be used or occupied, as the home, residence or sleeping place of one
or more human beings."[185]  Because plaintiffs have proffered no evidence that the
City is in possession of housing accommodations, summary judgment is granted to
the City on plaintiffs' NYSHRL claim.

Plaintiffs' twelfth claim is for violations of the New York City Human
Rights law, which, like the FHA, prohibits discrimination "in the terms, conditions
or privileges of the sale, rental or lease of any such housing accommodation or an
interest therein or in the furnishing of facilities or services in connection
therewith."[186]  Plaintiffs acknowledge that this claim cannot be maintained against
the City,[187] and the City's motion for summary judgment on this claim is therefore
granted.

NYCHA raises two general objections to plaintiffs' State and City law
claims: *First*, NYCHA argues that plaintiffs have presented no evidence of racial
discrimination.  As with the summary judgment motions on the other

---

[182]   N.Y. Exec. L. § 296(2-a).

[183]   *See* City Mem. at 25.

[184]   *See* Pl. Mem. at 30.

[185]   N.Y. Exec. L. § 292(10).

[186]   N.Y.C. Admin. Code § 8-105(2).

[187]   *See* Pl. Mem. at 30 n.34.

67

discrimination claims, NYCHA's motion is denied without prejudice and with leave to renew.  *Second*, NYCHA argues that the plaintiffs failed to file a notice of claim prior to bringing suit and that their claims are therefore barred.[188]  But the New York Court of Appeals has determined that notice of claim requirements do not apply to

> actions that are brought to protect an important right, which seek relief for a similarly situated class of the public, and whose resolution would directly affect the rights of that class or group [because these actions] are deserving of special treatment. The interests in their resolution on the merits override the State's interest in receiving timely notice before commencement of an action.[189]

The cases cited by NYCHA to support its argument that the notice of claim requirement nonetheless applies here were brought by individuals on their own behalf.[190]  This class action, involving matters of grave public concern, is

---

[188]   *See* NYCHA Mem. at 24 (quoting N.Y. Pub. Housing L. § 157(1), which states: "In every action or special proceeding, for any cause whatsoever, prosecuted or maintained against an authority, other than a claim arising out of a condemnation proceeding, the complaint or necessary moving papers shall contain an allegation that at least thirty days have elapsed since the demand, claim or claims upon which such action or special proceeding is founded were presented to the authority for adjustment and that it has neglected or refused to make an adjustment or payment thereof for thirty days after such presentment.").

[189]   *Mills v. County of Monroe*, 59 N.Y.2d 307, 311 (1983).

[190]   *See, e.g.*, *423 South Salina St., Inc. v. Syracuse*, 68 N.Y.2d 474, 493 (1986) (distinguishing between the case at bar (involving a corporation's lawsuit against Syracuse regarding back taxes), which required a notice of claim, and "class action type proceedings normally involving a private Attorney-General type of action," which do not).

entirely different.  NYCHA's motion for summary judgment based on plaintiffs'
failure to file a notice of claim is therefore denied.

### E.   United States Housing Act Claim

The Amended Complaint's fifth claim, based on the resident
plaintiffs' rights under the United States Housing Act ("USHA") and brought
pursuant to section 1983, is maintained only against NYCHA.[191]  Plaintiffs allege
that NYCHA contravenes the USHA's prohibition on "unreasonable terms and
conditions" in its leases by including the following two elements in the document
that accompanies NYCHA's leases[192]: *First*, the document mandates that all
persons are "expected to cooperate with inquiries from . . . the police regarding
their presence or conduct in any building," which plaintiffs argue pressures tenants
to interact with police officers without regard to the Fifth Amendment right to
remain silent.  *Second*, it prohibits "lingering" in common areas, as discussed

---

[191]     *See* Pl. Mem. at 33 n.36.

[192]     The parties dispute whether NYCHA's "Highlights of House Rules,
Lease Terms and Policy," Ex. 28 to Brooker Decl., is a lease addendum.  The
document says that it "is NOT a lease and NOT a lease addendum."  *Id.* at 1.  But
by its own terms, the document "is intended to remind NYCHA residents of these
important requirements."  *Id.*  The document notifies all tenants that "NYCHA may
start a proceeding to terminate tenancy if a tenant . . . breaches NYCHA rules," *id.*
at 3, and NYCHA residents are required to sign the document to confirm that they
have received and reviewed it, *id.* at 4.

69

earlier in this Opinion.  Because their tenancies are subject to termination for the

violation of these provisions, plaintiffs argue, they are unreasonable lease terms.

In addition to their allegation regarding unreasonable lease terms,

plaintiffs argue that because their leases "do not contain the required provision for

the reasonable accommodation of guests," the leases violate HUD's implementing

regulations.[193]  NYCHA seeks summary judgment on these claims, arguing that

because plaintiffs do not have a private right under 42 U.S.C. § 1437d(l), they may

not sue under section 1983, and that, even if they do have such a private right, it

has not been infringed.[194]

Section 1983 creates a cause of action for "the deprivation of any

rights, privileges, or immunities secured by the Constitution and laws."  The

Supreme Court has

> traditionally looked at three factors when determining whether a
> particular statutory provision gives rise to a federal right.  First,
> Congress must have intended that the provision in question benefit
> the plaintiff. *Wright v. Roanoke Redevelopment & Housing
> Authority*, 479 U.S. 418, 430 (1987).  Second, the plaintiff must
> demonstrate that the right assertedly protected by the statute is not
> so "vague and amorphous" that  its enforcement would strain
> judicial competence. *Id.*, at 431-432.  Third, the statute must
> unambiguously impose a binding obligation.  In other words, the

---

[193]     Pl. Mem. at 37.

[194]     *See* NYCHA Mem. at 15-17; NYCHA Rep. Mem. at 5-7.

provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.[195]

More recently, the Supreme Court has emphasized that the legislative inquiry must examine whether a law has "unambiguously conferred [a] right to support a cause of action brought under § 1983."[196]  "The ultimate question, in respect to whether private individuals may bring a lawsuit to enforce a federal statute, through 42 U.S.C. § 1983 or otherwise, is a question of congressional intent."[197]

In *Gonzaga University v. Doe*, the Supreme Court considered a lawsuit brought by a student against his university because it had disclosed confidential information about him (namely, that he had been accused of sexual misconduct) to a prospective employer.  The Court determined that the Family Educational Rights and Privacy Act ("FERPA"), which provides federal funding for educational institutions contingent upon the institutions' compliance with federal mandates regarding student privacy, did not confer an individual right to that privacy.[198]  The Court concluded that

---

[195]    *Blessing v. Freestone*, 520 U.S. 329, 341 (1997).

[196]    *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).

[197]    *Id.* at 291 (Breyer, J. concurring).

[198]    The statute, in relevant part, read: "No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally

the provisions entirely lack the sort of "rights-creating" language critical to showing the requisite congressional intent to create new rights. *Alexander v. Sandoval*, 532 U.S. 275, 288-89 (2001); *Cannon v. University of Chicago*, 441 U.S. 677, 690 n.13 (1979). Unlike the individually focused terminology of Titles VI and IX ("no person shall be subjected to discrimination"), FERPA's provisions speak only to the Secretary of Education, directing that "no funds shall be made available" to any "educational agency or institution" which has a prohibited "policy or practice." 20 U.S.C. § 1232g(b)(1). This focus is two steps removed from the interests of individual students and parents and clearly does not confer the sort of "individual entitlement" that is enforceable under § 1983.[199]

With the Supreme Court's guidance in mind, I now examine the

Housing Act's relevant provision, section 1437d(l)(2), which reads:

> § 1437d. Contract provisions and requirements; loans and annual contributions . . .
> . . .
> (l) Leases; terms and conditions; maintenance; termination. Each public housing agency shall utilize leases which –
> . . .
> (2) do not contain unreasonable terms and conditions.

This statutory language satisfies the first and third prongs of the

*Blessing* test: it benefits a specific group of individuals (NYCHA residents) and it

is phrased in mandatory rather than precatory terms. The application of *Blessing*'s

---

identifiable information contained therein . . . ) of students without the written consent of their parents to any individual, agency, or organization." 20 U.S.C. § 1232g(b)(1).

[199]   *Gonzaga*, 536 U.S. at 287.

second prong is less clear.  The statute's requirement that leases not contain unreasonable terms is not so "so 'vague and amorphous' that its enforcement would strain judicial competence."[200]   But it is not especially concrete either.

In its 1987 decision *Wright v. Roanoke Redevelopment & Housing Authority*, the Supreme Court determined that 42 U.S.C. § 1437a, which sets ceilings on the percentage of a family's income that it must pay in monthly rent for a public housing dwelling unit, does create an individual right enforceable under section 1983.[201]   As the Court later summarized in the *Gonzaga* decision, "[t]he key to our inquiry [in *Wright*] was that Congress spoke in terms that 'could not be clearer,' and conferred entitlements 'sufficiently specific and definite to qualify as enforceable rights.'"[202]   The language of section 1437a is more focused on individual tenants than is the language of section 1437d(l)(2).  The former delineates which families are included under the law and how much those families "shall pay"; the latter, under which plaintiffs sue, specifies certain terms and conditions that public housing agencies must include in their leases.

_____

[200]     *Blessing*, 520 U.S. at 341.

[201]     479 U.S. 418 (1987).  At the time, section 1437a read: "Dwelling units assisted under this chapter shall be rented only to families who are lower income . . . . A family shall pay as rent for a dwelling unit . . . ."

[202]     536 U.S. at 280.

The preceding subsection of the law, section 1437d(k), which plaintiffs do not invoke, provides detailed administrative grievance protections to which tenants are entitled when a housing agency seeks to take adverse action against them.[203]  Multiple courts have held that subsection 1437d(k) unambiguously confers enforceable rights.[204]  Both subsections 1437d(k) and 1427d(l) were enacted by Congress in 1983 as part of a supplemental appropriations bill in a section entitled "Lease and Grievance Procedures."[205]

Subsection 1437d(l)(2) sits somewhere between the provisions at section 1437a (*Wright*) and section 1437d(k) (*Stevenson* and other cases), on the

---

[203]   "The Secretary shall by regulation require each public housing agency receiving assistance under this Act to establish and implement an administrative grievance procedure under which *tenants will*--

  (1) *be advised* of the specific grounds of any proposed adverse public housing agency action;

  (2) *have an opportunity* for a hearing before an impartial party upon timely request within any period applicable under subsection (l) . . .

  (4) *be entitled* to be represented by another person of their choice at any hearing." 42 U.S.C. § 1437d(k) (emphasis added).

[204]   *See Stevenson v. Willis*, 579 F. Supp. 2d 913 (N.D. Ohio 2008) (finding that section 1437d(k) creates federal rights enforceable through section 1983); *Gammons v. Massachusetts Dep't of Housing & Cmty. Dev.*, 523 F. Supp. 2d 76, 84 (D. Mass. 2007) (same); *Fields v. Omaha Housing Auth.*, No. 04 Civ. 554, 2006 WL 176629, at *8-10 (D. Neb. Jan. 23, 2006) (same).

[205]   *See* Domestic Housing and International Recovery and Financial Stability Act, Pub. L. No. 98-181, §204, 97 Stat. 1153 (1983).

one hand, and the provisions of FERPA, which the Supreme Court addressed in

*Gonzaga*, on the other.[206]   Plaintiffs correctly note that in *Gonzaga*, the Supreme

Court found an absence of rights in part because the statute mandated that "no

funds shall be made available" by the Department of Education to schools that

have "a policy or practice of permitting the release of education records."[207]   This

statutory language was "two steps removed" from establishing individual rights

because it spoke to the Department of Education's duties given certain institutional

practices.   In contrast, section 1437d(l)(2) states that housing authorities shall

utilize leases that do not contain unreasonable terms and conditions; it is an

---

[206]    Three courts have said that section 1437d(l) creates enforceable rights
to a lease with specific provisions set forth in the statute (such as provisions
mandating that the housing authority keep the building in "decent" condition), but
that it does not create a right to sue for a *violation* of the lease (*e.g.*, alleging that a
housing authority breached the lease or infringed a federal right by failing to keep
the building in decent condition).   *See Edwards v. District of Columbia*, 821 F.2d
651, 653 n. 2 (D.C. Cir. 1987); *Concerned Tenants Assoc. v. Pierce*, 685 F. Supp.
316, 322 (D. Conn. 1988) ("Tenants would have an enforceable right under §
1437d(1)(2) and the regulations promulgated thereto to a lease that contains the
requirements provided in the statute and the regulations."); *and Herring v. Chicago
Housing Auth.*, No. 90 Civ. 3797, 1993 WL 489767, at *17 (N.D. Ill. Apr. 22,
1993) (report and recommendation) (concluding that section 1437d(l) "read in
conjunction with the grievance procedures in § 1437d(k) and the HUD
regulations," creates a private right enforceable through section 1983).   *See also
Delgado v. New York City Housing Auth.*, 888 N.Y.S.2d 19, 22 (1st Dep't 2009)
(following *Concerned Tenants* and finding no right to compliance with the
obligatory lease terms described in section 1437d(l) in an action under this
section).

[207]    *Gonzaga*, 536 U.S. at 287.

affirmative command mandating that housing authorities contract with tenants in a particular way, not an indirect command to the federal agency overseeing the housing authorities to withhold funding if the agencies have certain policies.

Isolated from the section's other provisions, section 1437d(l)(2) may appear to impose duties on housing agencies rather than confer rights upon tenants. But I find that it does establish an individual right to a reasonable lease because it must be read in context. The preceding sentence, in section 1437d(l)(1), requires that leases be automatically renewed and "that nothing in this title shall prevent a resident from seeking timely redress in court for failure to renew"; two sentences later, in section 1437d(l)(4), the law requires that housing agencies give notice a specific number of days prior to the termination of leases; and, most importantly, section 1437d(k) ensures procedural protections for tenants who are being evicted for violations of the lease provisions governed by section 1437d(l)(2).[208] It would make little sense for Congress to give tenants federal rights to procedural protections before they are evicted but no substantive right not to be evicted on unreasonable grounds. The text of these subsections is most reasonably read as providing tenants of public housing important substantive and procedural rights.

---

[208]      "42 U.S.C. § 1437d(k) mandates the creation of procedural rights for tenants faced with adverse action. The language of the statute unambiguously confers rights for the[ir] benefit." *Gammons*, 523 F. Supp. 2d at 84.

This lawsuit alleges that NYCHA has included in its lease addendum unreasonable terms and conditions, not that NYCHA has violated the terms or conditions of the lease. Because section 1437d(l)(2) gives the resident plaintiffs a right to a lease free from unreasonable terms and conditions, the suit alleges an infringement of a federal right actionable under section 1983.[209]

A dispute of fact exists about whether the "Highlights of House Rules, Lease Terms and Policy" constitutes a lease addendum. There is also a dispute of fact as to whether the provisions in that document – mandating that tenants cooperate with police officers and avoid "lingering" in common areas – are unreasonable. Because the question of these provisions' reasonableness involves an inquiry into NYCHA's practices and policies rather than into plaintiffs' individual circumstances, the parties have not fully briefed the issue. Based on my evaluation of the arrest of Jackson and Johnson at the top of the stairwell and the corresponding vagueness of the prohibition against "lingering" in common areas, I am skeptical that NYCHA will be able to prevail at summary judgment.

---

[209] Plaintiffs may also sue to enforce the valid and reasonable regulations that implement the statute. *See Sandoval*, 532 U.S. at 284. 24 C.F.R. § 966.4(d)(l) requires NYCHA to include in its leases a provision for the "reasonable accommodation of guests." I question whether such a regulation is a valid interpretation of statutory language that prohibits the inclusion of "unreasonable terms and conditions." Although it would be unreasonable to *prohibit* NYCHA residents from inviting guests into their homes, it is not clear to me that the absence of explicit permission to do so constitutes an "unreasonable term and condition."

Nevertheless, so that both parties have the full opportunity to present their case,

NYCHA's motion is denied without prejudice and with leave to renew.

**F.    Plaintiffs' Claim for Violation of Due Process Under the Fourteenth Amendment**

Plaintiffs' seventh claim for relief alleges that defendants' actions

have "directly and substantially interfered with some of plaintiffs' most intimate

relationships," in violation of the Fourteenth Amendment's guarantee of due

process.[210]  Although it was pled on behalf of all plaintiffs, their brief addresses

only the "constitutionally protected relationships" of Evans, Washington, and

Littlejohn.[211]

According to plaintiffs' evidence, Evans' right to intimate

relationships has been impaired in the following ways: her father, who was stopped

by the NYPD while visiting her at her home, "no longer visits [her] at her

---

[210]    Pl. Mem. at 30. *See also* Am. Compl. ¶¶ 272-275.  Supreme Court doctrine has located the right to intimate association both in the Fourteenth Amendment – as "a fundamental element of personal liberty" – and in the First Amendment – "a right to associate for the purpose of engaging in . . . speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984).  Some cases implicate one of the two concerns and some implicate both.  Plaintiffs have not pled a violation of the First Amendment and their briefing mentions it only in passing.

[211]    *See* Pl. Mem. at 31.  The brief also addresses Shawne Jones' rights, but as noted above, she has fully settled her claims.

residence; instead, he meets her outside her apartment building."[212]  Her uncle, who was also stopped by the police while visiting her, visits less frequently than he did before his stop.[213]  Evans no longer visits the close family friend, her "aunt," whom she had been visiting the night of her arrest and she "has stopped visiting other friends who live in NYCHA developments and no longer has close friends who are NYCHA residents."[214]  Washington and Littlejohn are both residents of NYCHA buildings and have been close friends since childhood.[215]  Washington states that since his arrest, he feels "no freedom at all" to come and go as he pleases and that as a result he visits Littlejohn less frequently than he used to.[216]

Plaintiffs argue that their "relationships with their family and close friends are entitled to substantial constitutional protection," and that is no doubt correct.[217]  But their allegation that defendants have interfered with those

---

[212]    *Id.* (quoting Evans Decl. ¶ 6).

[213]    *See id.* (citing Pl. Counter 56.1 ¶ 86).

[214]    *Id.* (citing Evans Decl. ¶¶ 7-8).

[215]    *See id.* at 32.

[216]    Pl. Counter 56.1 ¶¶ 187-190.

[217]    Pl. Mem. at 30.  "[B]ecause the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State. . . . [T]he constitutional shelter afforded such

79

relationships hinges entirely on the claim that defendants are *unlawfully* stopping and arresting plaintiffs and their friends and family members.[218]  That is to say, unlike the claims in the intimate association cases to which they cite, plaintiffs' claims are grounded entirely in violations of the Fourth Amendment.[219]

Defendants point to *Tenenbaum v. Williams*, in which the Second Circuit explained that

> "where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J.) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "Substantive due process analysis is therefore inappropriate in this case . . . if [the] claim is

---

relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty." *Roberts*, 468 U.S. at 618.

[218]    *See* Am. Compl. ¶ 273; Pl. Mem. at 30-33.

[219]    *See McKenna*, 647 F.2d 332 (public housing authority's policy requiring tenants to register their guests and obtain permission for overnight visitors unlawfully impinged upon tenants' freedom of association); *Patel v. Searles*, 305 F.3d 130 (2d Cir. 2002) (plaintiff claimed that police concocted false evidence about him, leading to the complete ostracization of his family, but he was never arrested).

'covered by' the Fourth Amendment." *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998).[220]

The Fourth Amendment guarantees that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  The force of the Amendment is at its zenith in the context of the home:

> Since we hold to the "centuries-old principle of respect for the privacy of the home," *Wilson v. Layne*, 526 U.S. 603, 610 (1999), "it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people," *Minnesota v. Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring). We have, after all, lived our whole national history with an understanding of "the ancient adage that a man's house is his castle [to the point that t]he poorest man may in his cottage bid defiance to all the forces of the Crown," *Miller v. United States*, 357 U.S. 301, 307 (1958) (internal quotation marks omitted).[221]

Respect for the privacy of the home is the "central value of the Fourth Amendment."[222]  Plaintiffs are both residents and non-residents of NYCHA; they allege a pattern and practice of violating the Fourth Amendment; they intend to seek certification as representatives of a class of similarly situated people.  Because the Fourth Amendment provides an explicit textual source of constitutional

---

[220]     193 F.3d 581, 599 (2d Cir. 1999).

[221]     *Georgia v. Randolph*, 547 U.S. 103, 115 (2006).

[222]     *Id.*

protection against the government behavior that plaintiffs allege has interfered with their most intimate relationships, their substantive due process allegations are duplicative and unnecessary.  Summary judgment is therefore granted to defendants on plaintiffs' seventh claim for relief.

### G.    Standing to Seek Injunctive Relief

NYCHA argues that plaintiffs lack standing to seek injunctive relief because they cannot show that they are threatened with real and immediate – not conjectural or hypothetical – future injury.[223]  I addressed this issue extensively in *Floyd v. City of New York* and the same analysis applies here.[224]

NYCHA does not suggest that the resident plaintiffs lack standing to seek prospective relief regarding their residency-based claims.  However, for the reasons articulated in *Floyd*, plaintiffs also have standing to seek injunctive relief regarding unlawful stops and arrests.  Plaintiff Andrew Washington has been stopped inside a NYCHA building two times and arrested once.[225]  This is

---

[223]    *See* NYCHA Mem. at 23 (citing to *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)).

[224]    82 Fed. R. Serv. 3d 833, at *37 (S.D.N.Y. 2012).

[225]    *See* Pl. Mem. at 38 n.43.  "The possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." *Nicacio v. United States Immigration & Naturalization Serv.*, 768 F.2d 1133, 1136 (9th Cir. 1985).

sufficient, as "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."[226]  In addition, I note that defendants' policies are targeted at NYCHA residents and people present on NYCHA property; the fact that plaintiffs are members of that relatively narrow community is relevant to the standing inquiry.[227]  Plaintiffs who have already been stopped or arrested and regularly return to NYCHA property allege sufficient risk of future injury to satisfy Article III.

## V.    CONCLUSION

Defendants' motions for summary judgment are granted in part and denied in part.  The Clerk of the Court is directed to close these motions [Docket Nos. 173, 183].

SO ORDERED:

Dated:      New York, New York          Shira A. Scheindlin
            October 4, 2012              U.S.D.J.

---

[226]    *Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47, 53 (2006).

[227]    *Cf. Lyons*, 461 U.S. at 111 ("Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.").

83

## Appearances

**For Plaintiffs:**

Katharine E.G. Brooker, Esq.
Daniel H. Wolf, Esq.
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

Debo P. Adegbile, Esq.
Christina Swarns, Esq.
Johanna B. Steinberg, Esq.
Jin Hee Lee, Esq.
Johnathan Smith, Esq.
Ria Tabacco, Esq.
NAACP Legal Defense &
Educational Fund, Inc.
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 965-2200

Steven Banks, Esq.
William D. Gibney, Esq.
Steven Wasserman, Esq.
Nancy Rosenbloom, Esq.
Marlen S. Bodden, Esq.
Legal Aid Society of New York
199 Water Street
New York, New York 10038
(212) 577-3419

**For Defendant City of New York:**

Brenda E. Cooke
Judson Vickers
Wesley Bauman
Lisa Richardson
George Soterakis
Pernell Telfort
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, New York 10007
(212) 788-0993

**For Defendant NYCHA:**

Steven Jay Rappaport, Esq.
New York City Housing Authority
250 Broadway, 9th Floor
New York, New York 10007
(212) 776-5152