UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

KELTON DAVIS, *et al.*, individually and on behalf of a class of all others similarly situated,

                                                                 Plaintiffs,

                -against-                                  10 Civ. 699 (SAS)

THE CITY OF NEW YORK and NEW YORK CITY
HOUSING AUTHORITY,

                                                Defendants.

------------------------------------------------------------------------- x

          **DEFENDANT CITY OF NEW YORK'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT**

Defendant City of New York ("City") respectfully submits this memorandum of law in opposition to plaintiffs' motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiffs' motion is limited, by order of the Court, to a "facial attack" on the constitutionality of Interim Order 23 ("IO 23") (issued by the New York City Police Department ("NYPD") on June 8, 2010), which replaced PG 212-60 and provided enhanced guidance on the NYPD's patrols of New York City Housing Authority ("NYCHA") property and NYCHA facilities. See Docket Entry Nos. 237 & 244. Plaintiffs' motion is not addressing the application, understanding or other implementation of the policy by the NYPD and its officers. Id. With these parameters in mind, plaintiffs fail to identify any express unconstitutionality with respect to the City's official policy, as stated in IO 23. Rather, the undisputed facts establish that IO 23 is an expressly constitutional policy that states that police may only stop individuals when they have reasonable suspicion to do so, and arrest when they have probable cause. Plaintiffs' motion further fails because they have not articulated a harm that has occurred as a result of the purported express unconstitutionality, which is a specific element of plaintiffs' Monell claim.

## RELEVANT FACTS

The NYPD is responsible for patrolling NYCHA properties pursuant to the September 16, 1994 Memorandum of Understanding between the City of New York and NYCHA. The NYPD's Housing Bureau is primarily responsible for such patrols, though some precincts have housing teams that patrol NYCHA developments within the precinct. Such patrols include the enforcement of NYCHA rules and regulations, as well as crime prevention and enforcement. See Pls.' 56.1 St., 12/15/12, at ¶¶ 1-3; Def's Rule 56.1 St., 1/7/13, at ¶ 27. One such method of

enforcement is a "vertical patrol", which is an inspection of the interior of a NYCHA building carried out pursuant to the NYPD's Patrol Guide. See Def's 56.1 St. at ¶¶ 29-31.

In 2009, NYCHA representatives and tenants expressed concerns to the NYPD about the conduct of the NYPD's patrols of NYCHA property. Thereafter, the NYPD provided additional guidance to police officers patrolling NYCHA property. Id. at ¶¶ 37-41. In June 2009, the NYPD met with NYCHA, including its new Chairman, John B. Rhea, to discuss a variety of issues, including the NYPD's patrols of NYCHA property, the enforcement of NYCHA rules and policies, and interaction with residents and guests. It was agreed that further meetings, to include NYCHA residents, also should be held. Id. at ¶¶ 42-44.

Since at least the summer of 2009, the NYPD had been discussing expanding the guidance provided by PG 212-60,[1] and discussions regarding revisions to the Patrol Guide occurred in October 2009. Id. at ¶ 45. On June 8, 2010, IO 23 was issued by the NYPD, which replaced PG 212-60, providing enhanced guidance on the NYPD's patrols of NYCHA property and NYCHA facilities. IO 23 discusses in detail when "a uniformed member of the service may approach and question persons who may be violating Housing Authority rules and regulations, including potentially unauthorized persons found in Housing Authority buildings." However, over and above PG 212-60, IO 23 emphasizes and expands upon matters relating to when an officer may stop suspected trespassers, the factors which may contribute to "reasonable suspicion", and other appropriate procedures when encountering persons who might be violating NYCHA rules or might not be authorized to be within NYCHA property, including "reasonable measures to verify such authority". Id. at ¶¶ 28-36; see also Pls.' 56.1 St. at ¶¶ 5, 10-12.

The NYPD developed a training curriculum for IO 23 and began such training (the

---

[1] Entitled "interior vertical patrol of housing authority buildings" this procedure also provides guidance regarding overall responsibilities on NYCHA property. See Def's 56.1 St. at ¶ 32.

- 2 -

"NYCHA Patrol Training") in the early fall of 2010. The training curriculum incorporated input from the NYPD Policies and Relationships with Residents subcommittee, including NYCHA resident members. As can be seen from the NYCHA Patrol Training, the following matters were covered in detail: (1) "the purpose and rationale for conducting interior vertical patrols within Housing Authority property"; (2) "the importance of proper interactions between police officers and Housing Authority residents"; and (3) "the revision to Patrol Guide section 212-60, 'Interior Vertical Patrol of Housing Authority Buildings'". The level of detail in the training is extensive, and the concepts are illustrated with numerous scenarios that officers likely would encounter. See Pls.' 56.1 St. at ¶¶ 14-25; Def's 56.1 St. at ¶¶ 46-49.

The NYPD also issued additional training on NYCHA's House Rules to training sergeants, who are in turn disseminating the training to officers in the field. See Def's 56.1 St. at ¶ 52. This training includes a review of IO 23 and the four levels of People v. DeBour, 40 N.Y.2d 210 (1976). Id. at ¶ 53. The training informs officers of those violations of NYCHA rules and regulations that also do or do not warrant criminal enforcement. Id. at ¶¶ 53-55.

## ARGUMENT

### I. DEFENDANTS' VERTICAL PATROL POLICY IS EXPRESSLY CONSTITUTIONAL

**A. Stops (Temporary Detentions) Require Reasonable Suspicion.** Not every encounter between a police officer and an individual is a seizure implicating the Fourth Amendment's protections. See INS v. Delgado, 466 U.S. 210, 215-16 (1984); Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968); United States v. Lee, 916 F.2d 814, 819 (2d Cir. 1990). A police officer is free to approach a person in public and ask a few questions, and such conduct, without more, does not constitute a seizure. Florida v. Royer, 460 U.S. 491, 497 (1983). Rather, an individual can be said to have been seized (temporarily detained) by the police "only if, in view

of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Michigan v. Chesternut, 486 U.S. 567, 573 (1988) (quoting United States v. Mendenhall, 466 U.S. 544, 554 (1980). The test is an objective one, and "presupposes an *innocent* person". See United States v. Drayton, 536 U.S. 194, 200 (2002) (quoting Florida v. Bostick, 501 U.S. 429, 437-38 (1991)); see also, United States v. Glover, 957 F.2d 1004, 1008 (2d Cir. 1992). The Second Circuit has enumerated certain factors that might suggest that a seizure occurred, namely:

> the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; *prolonged retention of a person's personal effects, such as airplane tickets or identification*; and a request by the officer to accompany him to the police station or a police room.

Lee, 916 F.2d at 819 (emphasis added).

As set forth in IO 23, an officer may approach and question persons who may be violating NYCHA rules and regulations, including unauthorized persons found in NYCHA buildings. See People v. Williams, 16 A.D.3d 151 (1st Dept. 2005) (NYPD officers are also "custodians of the New York City Housing Authority buildings, [whose] duties included keeping the buildings free of trespassers."); see also Pls.' 56.1 St. at ¶¶ 10-12; Def's 56.1 St. at ¶¶ 27-28, 33-25. Upon approach, officers may ask a potentially unauthorized person whether they live in, are visiting, or have business in the building. See Pls.' 56.1 St. at ¶ 11; Def's 56.1 St. at ¶¶ 36, 51. Officers may also ask persons for identification or a key to the entrance of the building. Id. It is well-established that this approach and inquiry is permitted, even absent reasonable suspicion, so long as the officer has at minimum an objective credible reason to approach and request information and the encounter is consensual. See Bostick, 501 U.S. at 434 ("Even when officers have no basis for suspecting a particular individual, they may generally ask questions of

that individual, ask to examine the individual's identification, and request consent to search his or her luggage – as long as the police do not convey a message that compliance with their requests is required."); Lee, 916 F.2d at 819 (police conduct of asking individual for identification and plane ticket, posing several questions about the nature of his travel plans, and, informing the individual that the police suspected he was carrying contraband did not amount to a seizure under the Fourth Amendment); United States v. Williams, 2004 U.S. Dist. Lexis 15593, *2-*4 (S.D.N.Y. Aug. 10, 2004) (held consensual encounter occurred when officers observed defendant standing in front of a doorway to a building with three other individuals, approached defendant and asked him whether he lived at the location and also requested identification); United States v. Bush, 1998 U.S. Dist. Lexis 8551 (S.D.N.Y. June 9, 1998) (no seizure as a reasonable innocent person would have felt free to terminate the encounter even when officer requested train ticket and identification and thereafter the officer walked out of individual's immediate presence with the train ticket and did not promptly return the ticket upon return); People v. Hollman, 79 N.Y.2d 181, at 184, 189-90, 194-96 (1992) (police may approach and request information based simply on "an objective, credible reason, not necessarily indicative of criminality"). Consistent with the limitations of the Fourth Amendment to the United States Constitution, IO 23 expressly states that an officer may not stop an individual without reasonable suspicion.[2] See Def's 56.1 St. at ¶ 36; Terry v. Ohio, 392 U.S. 1 (1968).

---

[2] It is unclear what point plaintiffs are trying to make by citing to United States v. Santiago, 950 F. Supp. 590 (S.D.N.Y. 1996). Pl. Mem. at 8. In that case, occupied taxis – and, in effect, taxi passengers – were being stopped without the neutral criteria necessary for a checkpoint program or the reasonable suspicion required for a targeted stop. The "end run" referred to in that case was the attempt to justify the latter under the guise of the former. See 950 F. Supp. at 596. In this case, the City does not attempt to justify the challenged portion of IO 23 pursuant to cases such as Michigan Dep't of State Police v. Sitz, 496 U.S. 444 (1990), and in any event (as discussed) NYPD police officers have not been given the type of discretion by IO 23 that the court in Santiago held was impermissible. Pursuant to IO 23 an officer must have, at a

Plaintiffs' allegation that IO 23 is akin to the statute requiring persons to "identify themselves" found unconstitutional in People v. Bright, 71 N.Y.2d 376, 385 (1988) is without merit. See Pl. Mem. at 7-8. First, in Bright, the statute specifically stated that a person's failure to speak in response to police inquiry, or failure to justify their conduct, provided ground for arrest. Here, the Patrol Training for IO 23 specifically states, multiple times, a person's silence, refusal or inability to answer an officer's questions will not provide reasonable suspicion to stop (temporarily detain) or probable cause to arrest. See Def's 56.1 St. at ¶ 50. Second, in Bright, the court held that there were no standards set forth in the statute determining what a suspect had to do in order to satisfy the requirement that suspect provide a "satisfactory explanation of his presence". Bright, 71 N.Y.2d at 385. IO 23 and the accompanying Patrol Training, however, provide specific guidance as to steps an officer may take to verify whether a person has valid justification for being in the building, including asking whether the person lives, is visiting, or has business in the building, or whether the person has identification or a key to the building entrance doors, and so forth. See Pls.' 56.1 St. at ¶¶ 20-24; Def's 56.1 St. at ¶¶ 36, 51.

**B. Arrests Require Probable Cause.** Plaintiffs' claim that IO 23 "authorizes an end-run around the guarantees of the Fourth Amendment by impermissibly shifting the burden onto the NYCHA resident or guest to affirmatively disprove trespass, or risk arrest, without any indicia of criminality" (Pl. Mem. at 5) is patently false for several reasons. First, there is no impermissible "burden shifting" as plaintiffs' allege. Plaintiffs' quoting of this Court's October 9, 2012, summary judgment decision that, "[t]here is no probable cause to arrest a person if the only facts known to the police are that the person says she does not live in the building and

---

minimum, an objective credible reason to engage a citizen in an encounter (encounters are not permitted on mere whim) and reasonable suspicion to stop (temporarily detain) a person. See Def's 56.1 St. at ¶ 36.

refuses to say more about her license or privilege to be there" (Pl. Mem. at 7) in support of their claim that there is impermissible burden shifting under P.L. 140.10(f), is both misleading and inappropriate. The statement plaintiffs' selectively lift from the Court's decision was discussing probable cause requirements for P.L. 140.10(e); at no time did the Court's decision ever address the distinct probable cause requirements for a trespass arrest pursuant to P.L. 140.10(f). Further, as discussed below, the procedure, as set forth in IO 23, for circumstances in which a person refuses to explain or is unable to explain his or her presence in the building is that the officer may thereafter instruct the person that he or she must leave the building or be subject to arrest for trespass. See Pls.' 56.1 St. at ¶¶ 21-24; Def's 56.1 St. at ¶ 36. An officer may only arrest such a person for trespass if he or she "refuses to exit the building and does not promptly establish a right to be in the building". Id. Consistent with the law, IO 23 does not require that a person answer an officer's questions regarding their identity, license to be in the building or otherwise during a stop based on reasonable suspicion or some lesser level encounter, nor does IO 23 instruct that a person's silence escalates the level of an officer's suspicion.

Second, as plaintiffs concede, P.L. 140.10(f), specifically provides that a person commits trespass when they knowingly enter or remain unlawfully in a public housing building in violation of a *personally communicated request to leave the premises from a housing police officer*. See Pl. Mem. at 2 and 6, quoting P.L. 140.10(f). Accordingly, probable cause to arrest an individual for trespass pursuant to P.L. 140.10(f) arises when a person refuses to leave a public housing building after being personally requested to do so by a police officer.[3] It is

---

[3] It is not inconsequential to the analysis of P.L. 140.10(f) that the language is virtually identical to the language used in P.L. 140.10(d), which states that [a] person is guilty of criminal trespass...when she knowingly enters or remains unlawfully in a building...where the building or real property is utilized as an elementary or secondary school in violation of a personally communicated request to leave the premises from a principal, custodian, school board member or

- 7 -

irrelevant, therefore, to the analysis under P.L. 140.10(f) whether the person had lawfully or unlawfully gained access to the building prior to the police officer's personally communicated request to leave the premises. See, e.g., People v. Brown, 25 N.Y. 2d 374, 377 (N.Y. 1969) ("[s]ince it is clear that defendant lawfully entered the premises, a conviction could be had only if the prosecution established that (1) a lawful order not to remain was personally communicated to the defendant and (2) that he defied such a lawful order."); People v. Randolph, 18 A.D.3d 1013, 1015 (N.Y. App. Div. 3d Dep't 2005) ("[w]hile the People failed to prove the defendant's entry into the apartment was unlawful, there was adequate evidence that defendant was directed...to cease his activity and to leave the apartment...[t]his evidence...established that defendant remained unlawfully.") IO 23 is explicit that probable cause to arrest for trespass pursuant to P.L. 140.10(f) is not predicated on a person's refusal to speak or explain their presence in a public housing building, but rather based on a person's conduct – remaining in the building – following a personally communicated request to leave by a police officer. See Pls.' 56.1 St. at ¶ 19; Def's 56.1 St. at ¶ 36. While plaintiffs claim that P.L. 140.10(f) "...cannot pass constitutional muster where it does not require the officer to have *any* indicia of criminality, let alone indicia of trespassing, to make the request to leave." (Pl. Mem. at 6), the City is not aware that any court has issued a decision declaring P.L. 140.10(f) unconstitutional.

Third, arrests for trespass pursuant to P.L. 140.10(f) are not, as plaintiffs claim, the result of an officer's unfettered discretion to request that individuals leave NYCHA premises.[4]

---

trustee, or other person in charge thereof...". Pursuant to P.L. 140.10(d), "any license or privilege that [an individual] may have had at the time he entered the...building was revoked..." when a person with authority under the statute to do so informed him that he had to leave. In re Max X., 278 A.D.2d 774, 775 (N.Y. App. Div. 3d Dep't 2000); see also Arum v. Miller, 331 F. Supp. 2d 99, 109-110 (E.D.N.Y. June 8, 2004).

[4] No plaintiff can claim a harm in connection with this alleged unconstitutional policy as none were arrested pursuant to P.L. 140.10(f).

Plaintiffs' cherry-pick language from a portion of the opinion in City of Chicago v. Morales, 527 U.S. 41 (1999) – supported by only *three justices* – that merely stands for the proposition that where a criminal statute gives police officers absolute discretion to determine what constitutes a crime (loitering, in that case) then a dispersal order made pursuant to that discretion does not cure the statute's vagueness. See 527 U.S. at 56-59. In the present case, however, such vagueness is lacking because any dispersal order is based on the officer's reasonable belief that the person asked to disperse is not authorized to be on NYCHA premises (i.e., he or she is neither a resident, a licensee or invitee). See 56.1 St. at ¶¶ 36, 51. As subsequently clarified by the Court – in a portion of the opinion not cited by plaintiffs and supported by *six justices* – "the requirement that the officer reasonably believe that a group of loiterers contains a gang member does place a limit on the authority to order dispersal [and] no doubt be sufficient if the ordinance only applied to loitering that had an apparently harmful purpose or effect, or possibly if it only applied to loitering by persons reasonably believed to be criminal gang members." 527 U.S. at 62; see also id. at 65-67 (O'Connor, J., concurring) and 69-70 (Kennedy, J., concurring); Price v. Mount Wachusett Community College, 2012 WL 3596859 at 7 n.8 (D. Mass. Feb. 17, 2012) (Morales inapplicable to a criminal statute prohibiting willful trespass onto premises of a public institution after notice to leave).

For all the reasons discussed in Point I, the City's policy does not expressly authorize officers to make stops (temporary detentions) without reasonable suspicion or arrests without probable cause, nor does the City's policy require persons to surrender their right to refuse to answer an officer's questions, or cause persons whose answers fail to satisfy the officer's inquiry into a person's right to be present in the building to be stopped without reasonable suspicion or arrested without probable cause.

## II. PLAINTIFFS' FAILED TO COMPLY WITH REQUIREMENTS OF MONELL AND CONSTITUTIONAL STANDING

Plaintiffs' partial "facial" challenge to IO 23 also should be dismissed because of its failure to comply with the requirements of Monell and constitutional standing. Monell liability requires a plaintiff to establish, *inter alia*, the existence of a policy or practice *and* causation. E.g., Board of the County Comm'rs v. Brown, 520 U.S. 397, 403 (1997). Even assuming plaintiffs have identified a constitutionally deficient aspect of IO 23, there is no plaintiff in this case who has been affected by that policy. As the Court stated in Brown:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

520 U.S. at 404; see also Batista v. City of Bridgeport, 702 F.2d 393, 397-98 (2d Cir. 1983) (establishing the existence of an official policy or custom is insufficient in the absence of proof that it caused the plaintiff any compensable injury).

Furthermore, the Article III case-or-controversy requirement requires a plaintiff to "demonstrate a 'personal state in the outcome' . . . Abstract injury is not enough." City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)). Because no plaintiff in this case can establish that he or she has sustained or is in immediate danger of sustaining some direct injury as the result of the challenged portion of IO 23, constitutional standing is absent. Id. at 102; see also Kerr v. City of West Palm Beach, 875 F.2d 1546, 1552-54 (11th Cir. 1989) (declining to rule in the abstract whether a police department use-of-force policy was constitutional *vel non*).

## CONCLUSION

For all of the foregoing reasons, the City respectfully requests that the Court deny plaintiffs' motion for partial summary judgment against the City on plaintiffs' claim of an express unconstitutional policy in violation of the Fourth Amendment and in so doing, necessarily grant the City's motion for summary judgment (Docket Entry No. 226) regarding the same.

Dated: New York, New York
January 7, 2013

                                    MICHAEL A. CARDOZO
                                    Corporation Counsel of the City of New York
                                    *Attorney for Defendant City of New York*
                                    100 Church Street, Room 3-174
                                    New York, New York 10007
                                    (212) 513-0462

By: _/s/ Brenda E. Cooke_
      Brenda E. Cooke
      Senior Counsel

Of counsel:
Judson Vickers, Esq.
Lisa Richardson, Esq.

- 11 -