UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KELTON DAVIS, *et al.*, individually and on behalf of a
class of all others similarly situated;

                     Plaintiffs,

          - against -

THE CITY OF NEW YORK and NEW YORK CITY
HOUSING AUTHORITY;

                  Defendants.

10 Civ. 0699 (SAS)
ECF Case

---

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Citation Conventions ............................................................................................... ii

Table of Authorities ................................................................................................ iv

Preliminary Statement ..............................................................................................1

Argument ...................................................................................................................2

   I.  The City's Policy and Practice of Trespass Enforcement in NYCHA Residences
      Violates the Fourth Amendment to the United States Constitution....................2

      A.  The City's Trespass Enforcement Policy Is Unlawful ............................2

      B.  The City's Unlawful Trespass Enforcement Practices Are Widespread ................4

      C.  The City's Failure To Supervise, Discipline and Train Amounts to Deliberative
          Indifference to the Constitutional Rights of NYCHA Residents and Guests .........9

          1.  The City Fails To Supervise Officers To Prevent Fourth Amendment
               Violations...............................................................................................11

          2.  The City Fails To Discipline Officers Who Make Unlawful Trespass
               Stops and Arrests .................................................................................13

          3.  The City Fails To Train Officers Adequately on Trepass Enforcement
               in NYCHA Residences ........................................................................14

  II.  The Court Should Deny the City Summary Judgment on Plaintiffs' Fourteenth
      Amendment Claims .........................................................................................16

 III.  The Court Should Deny NYCHA Summary Judgment on Plaintiffs' Race Discrimination
      Claims Under Title VI of the Civil Rights Act of 1964, the Fair Housing Act, 42 U.S.C.
      § 1981, and New York State and City Human Rights Laws .............................20

 IV.  The Court Should Deny NYCHA Summary Judgment on Plaintiffs' Claims Under the
      United States Housing Act ................................................................................23

      A.  The House Rules Are Part of the Lease or a Lease Addendum ............................23

      B.  Two House Rules Are Unreasonable Lease Terms .............................................24

  V.  The Court Should Deny the City Summary Judgment on Plaintiffs' Title VI Claims ......25

 VI.  The Court Should Deny the City Summary Judgment on Plaintiffs' Claims Under the
      Fair Housing Act...............................................................................................27

 VII.  The Court Should Deny the City Summary Judgment on Resident Plaintiffs'
      42 U.S.C. § 1981 Claims ..................................................................................28

VIII.  The Court Should Deny the City Summary Judgment on Plaintiffs' Claims Under
      Article I, §12 of the New York Constitution .......................................................29

      A.  Plaintiffs' State Constitutional Claims under Article I, §12 of the New York
          Constitution Are Distinct from Their Federal Constitutional Claims...................29

      B.  Plaintiffs' State Constitutional Claims Are Not Barred by Governmental
          Immunity...............................................................................................30

Conclusion ...............................................................................................................30

## CITATION CONVENTIONS

- "Brooker I" refers to the Declaration of Katharine E.G. Brooker, dated July 20, 2012, and attached exhibits. (ECF Docket No. 194.)

- "Brooker II" refers to the Declaration of Katharine E.G. Brooker, dated January 7, 2013, and attached exhibits, filed contemporaneously with this memorandum of law.

- "City 56.1" refers to Defendant City of New York's Statement of Facts Pursuant to Local Rule 56.1, dated December 4, 2012. (ECF Docket No. 228.)

- "City Br." refers to Defendant City of New York's Memorandum of Law in Support of its Motion for Summary Judgment on Plaintiffs' Claims Against the City, dated December 4, 2012. (ECF Docket No. 227.)

- "City ISJ 56.1" refers to Defendant City of New York's Local Civil Rule 56.1 Statement of Undisputed Facts, dated June 15, 2012. (ECF Docket No. 175.)

- "Clarke" refers to the Declaration of Brian P. Clarke, dated December 4, 2012, and attached exhibits. (ECF Docket No. 234.)

- "Cooke" refers to the Declaration of Brenda E. Cooke, dated December 4, 2012, and attached exhibits. (ECF Docket No. 229.)

- "Fagan ¶ __" refers to the Declaration of Jeffrey Fagan, dated July 18, 2012. (ECF Docket No. 196.)

- "Jaffe" refers to the Declaration of Joanne Jaffe, dated December 4, 2012. (ECF Docket No. 230.)

- "NYCHA 56.1" refers to NYCHA's Rule 56.1 Statement in Support of Its Motion for Summary Judgment, dated December 4, 2012. (ECF Docket No. 238.)

- "NYCHA Br." refers to the Memorandum of Law of Defendant New York City Housing Authority in Support of Its Motion for Summary Judgment, dated December 4, 2012. (ECF Docket No. 236.)

- "NYCHA Reply" refers to the Reply Memorandum of Law of Defendant New York City Housing Authority in Further Support of Its Motion for Summary Judgment on Plaintiffs' Individual Claims, dated August 4, 2012. (ECF Docket No. 206.)

- "PAF" refers to Plaintiffs' Local Rule 56.1 Statement of Additional Material Facts, dated January 7, 2013, filed contemporaneously with this memorandum of law.

- "Pelikow" refers to the Declaration of Alan Pelikow, dated December 4, 2012, and attached exhibits. (ECF Docket No. 233.)

- "Pls. Cross Motion" refers to Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment, dated December 14, 2012. (ECF Docket No. 241.)

- "Pls. Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for Partial Summary Judgment, dated July 20, 2012. (ECF Docket No. 192.)

- "Pls. Supp. Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendant NYCHA's Supplemental Motion for Summary Judgment, dated November 14, 2012. (ECF Docket No. 218.)

- "Soterakis" refers to the Declaration of George T. Soterakis, dated June 15, 2012, and attached exhibits. (ECF Docket No. 178.)

- "Steinberg" refers to the Declaration of Johanna B. Steinberg, dated December 14, 2012, and attached exhibits. (ECF Docket No. 243.)

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                      **Page(s)**

*5 Borough Pawn, LLC* v. *City of New York*,
    640 F. Supp. 2d 268 (S.D.N.Y. 2009)...................................................................................29

*Alfano* v. *Bridgeport Airport Services, Inc.*,
    373 F. Supp. 2d 1 (D. Conn. 2005)....................................................................................26

*Amnesty America* v. *Town of West Hartford*, 361 F.3d 113 (2d Cir. 2004) ...................................9

*Brown* v. *Texas*, 443 U.S. 47 (1979)................................................................................................5, 8

*Castaneda* v. *Partida*, 430 U.S. 482 (1977) ....................................................................................18

*City of Canton* v. *Harris*, 489 U.S. 378 (1989)........................................................................9, 14, 15

*City of Chicago* v. *Morales*, 527 U.S. 41 (1999) ............................................................................8

*City of Indianapolis* v. *Edmond*, 531 U.S. 32 (2000) ...................................................................5

*Comer* v. *Cisneros*, 37 F.3d 775 (2d Cir. 1994) ............................................................................23

*Committee Concerning Community Improvement* v. *City of Modesto*,
    583 F.3d 690 (9th Cir. 2009) ...........................................................................................27

*Connick* v. *Thompson*, 131 S. Ct. 1350 (2011)..............................................................................9

*Daniels* v. *City of New York*, 198 F.R.D. 409 (S.D.N.Y. 2001) ....................................................18

*Davis* v. *City of New York*, 812 F. Supp. 2d 333 (S.D.N.Y. 2011)................................................4

*Davis* v. *City of New York*, No. 10 Civ. 0699,
    2012 WL 4813837 (S.D.N.Y. Oct. 9, 2012)...............................................................*passim*

*Evans* v. *Solomon*, 681 F. Supp. 2d 233 (E.D.N.Y. 2010)............................................................29

*Feingold* v. *State of New York*, 366 F.3d 138 (2d Cir. 2004) ........................................................19

*Fiacco* v. *City of Rensselaer*, 783 F.2d 319 (2d Cir. 1986) ..........................................................9

*Flores* v. *City of Mount Vernon*, 41 F. Supp. 2d 439 (S.D.N.Y. 1998) .........................................29

*Floyd* v. *City of New York*, 813 F. Supp. 2d 417 (S.D.N.Y. 2011).......................................*passim*

*Floyd* v. *City of New York*, 861 F. Supp. 2d 274 (S.D.N.Y. 2012)........................................5, 6, 18

*Gentile* v. *County of Suffolk*, 926 F.2d 142 (2d Cir. 1991) ...............................................10

*Gomez* v. *City of New York*, No. 05 Civ. 2147,
  2007 WL 5210469 (S.D.N.Y. May 28, 2007) ................................................30

*Green* v. *City of New York*, 465 F.3d 65 (2d Cir. 2006) ......................................................4

*Hartford Accident & Indemnity Co.* v. *Wesolowski*,
  305 N.E.2d 907 (N.Y. 1973)...............................................................24

*Hayden* v. *Paterson*, 594 F.3d 150 (2d Cir. 2010)...............................................17

*Matter of Troy F.*, 526 N.Y.S.2d 521 (App. Div. 2d Dep't 1988)...............................30

*McCleskey* v. *Kemp*, 481 U.S. 279 (1987)...........................................................29

*Michigan* v. *Sitz*, 496 U.S. 444 (1990).................................................................5

*Monell* v. *New York City Department of Social Services*,
  436 U.S. 658 (1978)...................................................................2

*Okin* v. *Village of Cornwall-on-Hudson Police Department*,
  577 F.3d 415 (2d Cir. 2009)...............................................................30

*Patterson* v. *County of Oneida*, 375 F.3d 206 (2d Cir. 2004)...............................2, 28

*People* v. *De Bour*, 352 N.E.2d 562 (N.Y. 1976) ............................................29

*People* v. *Hollman*, 590 N.E.2d 204 (N.Y. 1992)...........................................30

*People* v. *Ventura*, 913 N.Y.S.2d 543 (Sup. Ct. N.Y. Cnty. 2010) ...........................5

*People* v. *West*, 896 N.Y.S.2d 55 (App. Div. 1st Dep't 2010) ...............................30

*Richmond Tenants Oranization., Inc.* v. *Richmond Redevelopment
  & Housing Authority*, 751 F. Supp. 1204 (E.D. Va. 1990),
  *aff'd*, 947 F.2d 942 (4th Cir. 1991).......................................................24

*Santiago* v. *Miles*, 774 F. Supp. 775 (W.D.N.Y. 1991)...........................................18

*Schaefer* v. *Town of Victor*, 457 F.3d 188 (2d Cir. 2006)........................................4

*Sorlucco* v. *New York City Police Department*, 971 F.2d 864 (2d Cir. 1992)...............................2

*Stevens* v. *City of Bridgeport*, 607 F. Supp. 2d 342 (D. Conn. 2009)............................................11

*Taylor* v. *City of New York*, No. 03 Civ. 6477,
     2006 WL 1699606 (S.D.N.Y. June 21, 2006) ......................................................19

*United States* v. *City of New York*, 683 F. Supp. 2d 225 (E.D.N.Y. 2010) ....................19

*United States* v. *City of Yonkers*, 96 F.3d 600 (2d Cir. 1996) .................................19, 22

*United States* v. *Ortiz*, 422 U.S. 891 (1975) ...............................................................5

*U.S. Department of Transportation* v. *Paralyzed Veterans of America*,
     477 U.S. 597 (1986)............................................................................................26, 27

*Vann* v. *City of New York*, 72 F.3d 1040 (2d Cir. 1995) ............................9, 11, 12, 13

*Village of Arlington Heights* v. *Metropolitan Housing Development Corporation*,
     429 U.S. 252 (1977)............................................................................................16, 18

*Walker* v. *City of New York*, 974 F.2d 293 (2d Cir. 1992)........................................14

**DOCKETED CASES**

*Floyd* v. *City of New York*, No. 08 Civ. 1034 (SAS) .................................................18

*Ligon v. City of New York*, No. 12 Civ. 2274 (SAS) ..................................................2

**STATUTES & REGULATIONS**

24 C.F.R. § 966.4 ..........................................................................................................20

28 C.F.R. § 42.102(f)......................................................................................................26

42 U.S.C. § 1437d(l)(2) ..................................................................................................24

42 U.S.C. § 1437g(d)(1)(I) .............................................................................................26

42 U.S.C. § 1437g(e)(1)(C) ............................................................................................26

42 U.S.C. § 2000d...........................................................................................................26

42 U.S.C. § 3604(b) ........................................................................................................27

N.Y. Criminal Procedure Law § 140.50 ........................................................................8

## OTHER SOURCES

Chris Francescani et al., *Under Seige: "Stop and frisk" polarizes New York*,
   Reuters, July 3, 2012..................................................................................................10

Michael M. Grynbaum & Marjorie Connelly, *Majority in City See Police
   as Favoring Whites, Poll Finds*, N.Y. Times, Aug. 20, 2012, at A1 ......................................18

Office of the Attorney General of the State of New York, Civil Rights Bureau,
   New York City Police Department's "Stop & Frisk" Practices:  A Report
   to the People of the State of New York from the Office of the Attorney General
   (Dec. 1, 1999) ............................................................................................................18

Ray Rivera et al., *A Few Blocks, 4 Years, 52,000 Police Stops*,
   N.Y. Times, July 11, 2010, at A1 ..........................................................................10

Wendy Ruderman, *Rude or Polite, City's Officers Leave Raw Feelings in Stops*,
   N.Y. Times, June 26, 2012, at A1............................................................................10

Plaintiffs respectfully submit this memorandum of law in opposition to the motions for partial summary judgment filed by Defendants City of New York (the "City") and New York City Housing Authority ("NYCHA").

## PRELIMINARY STATEMENT

NYCHA residents are denied their fundamental right to be free from unreasonable government intrusions in their homes. They—and their authorized guests—are constantly subject to unlawful questioning, stops, frisks, searches, and arrests in the name of trespass enforcement. As stated by one resident, who has lived in her NYCHA apartment for over 56 years, "[i]t is very humiliating and embarrassing for residents to be stopped and arrested in their own homes for trespassing," and "[r]esidents now feel they need to carry their identification with them at all times."[1] Another NYCHA resident—a teenager wrongfully arrested for trespassing after visiting a friend in the same development—said the experience was "nerve-wracking" and caused him "to avoid visiting friends in other NYCHA housing" for fear of another arrest.[2]

Both Defendants are liable for these widespread constitutional violations. The City has not only adopted a policy that explicitly violates the Fourth Amendment, but has also permitted its officers to engage in a pervasive pattern and practice of unlawful trespass enforcement. At the same time, the City fails to train, supervise, or discipline its officers adequately to prevent these violations. NYCHA does not meaningfully oversee police officers' actions on its property, and facilitates the City's unlawful conduct by promulgating unreasonable rules and abdicating its legal obligation to provide safe and secure homes. Such disregard for the basic rights of

---

[1] PAF ¶ 25 (Declaration of Marcetta Palmer, Resident Association President of NYCHA's George Washington Houses in Manhattan).

[2] PAF ¶ 23 (Declaration of M.P.).

NYCHA residents and their guests, most of whom are African-American and Latino, is

discriminatory.  Defendants' summary judgment motions should be denied.

## ARGUMENT

**I.    The City's Policy and Practice of Trespass Enforcement in NYCHA Residences Violates the Fourth Amendment to the United States Constitution.**

The City's motion for summary judgment should be denied for three separate reasons.  It

is liable under 42 U.S.C. § 1983 for the Fourth Amendment violations caused by (A) its

unconstitutional trespass enforcement policy, (B) its widespread practice of unconstitutional

trespass stops and arrests, and (C) its deliberate indifference to the constitutional violations

caused by failing to train, supervise, and discipline officers.  *See Monell* v. *N.Y.C. Dep't of Soc.*

*Servs.*, 436 U.S. 658, 690-91 (1978); *Patterson* v. *Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir.

2004); *Sorlucco* v. *N.Y.C. Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992).

A.    The City's Trespass Enforcement Policy Is Unlawful.

The City's trespass enforcement policy in NYCHA residences[3]—as articulated in the

New York City Police Department's ("NYPD") Patrol Guide, the associated trainings and

supplementary materials, and the testimony of witnesses deposed in this case—violates the

Fourth Amendment in at least two ways.

*First*, the policy authorizes investigatory stops and pointed questioning without

reasonable suspicion, and the ejection and arrest of NYCHA residents and their guests without

probable cause.  As discussed at length in Plaintiffs' Cross Motion, the City's trespass

---

[3] Reference to trespass enforcement "in NYCHA residences" includes trespass stops and arrests both inside, and outside, of NYCHA apartment buildings.  As evident in this case—as well as the related case of *Ligon* v. *City of New York*, No. 12 Civ. 2274 (SAS)—individuals are often unlawfully stopped and arrested for trespassing outside the building proper.  Indeed, Plaintiffs Vaughn Frederick and Raymond Osorio were both stopped *outside* NYCHA residences by NYPD officers.  City 56.1 ¶ 186; City ISJ 56.1 ¶ 99.

enforcement policy directs NYPD officers to compel people in NYCHA residences to prove their right to be on the premises or leave.  Pls. Cross Motion 4-5; *see also* Cooke Ex. O ¶ 12.[4]  Those who fail to do either, or whose explanation fails to satisfy the officer, are subject to arrest. Cooke Ex. O ¶ 12.  This policy authorizes suspicionless interrogations and arrests, circumventing constitutional protections.  Pls. Cross Motion 6-8.

*Second*, the policy permits the arrest of NYCHA residents and their guests just for being present in areas designated as "prohibited" by NYCHA, such as roofs and roof landings, without adequate notice.  According to Assistant Chief Edward Delatorre, former Executive Officer of the NYPD Housing Bureau, "police officers [should] be arresting people for criminal trespass if they are residents of the building and they are in restricted areas of their own building," including roofs and roof landings.  PAF ¶ 1.[5]  A "No Trespassing" sign is not required to effectuate a trespass arrest.  Steinberg Ex. 3 at 5, Ex. 5 at NYCE00016552.  And signs that do exist fail to provide adequate notice "of what precise conduct is prohibited."  *See Davis* v. *City of New York*, No. 10 Civ. 0699 (SAS), 2012 WL 4813837, at *8-10 (S.D.N.Y. Oct. 9, 2012).[6]  This policy allows for criminal liability without adequate notice of wrongdoing, thus subjecting individuals to trespass arrest without probable cause that they are "knowingly" entering or remaining unlawfully in a prohibited area, as required by the penal law.

---

[4] The NYPD Patrol Guide, as amended by Interim Order 23 ("IO 23"), directs officers, upon "encountering" a person who "may be violating Housing Authority rules, including potentially unauthorized persons" to "approach" that person and ask three pointed questions: (a) if she lives in the building; (b) if she is visiting someone in the building; and (c) if she has business in the building.  Cooke Ex. O ¶ 12.

[5] Other officers testified they "must arrest" people, even residents, in certain prohibited areas, such as roofs or roof landings.  PAF ¶ 2.

[6] Even some senior NYCHA officials were unaware that roof landings were considered prohibited areas.  PAF ¶ 91.

B.    The City's Unlawful Trespass Enforcement Practices Are Widespread.[7]

In addition to the City's policy infirmities, summary judgment should be denied because Plaintiffs' injuries derive from a longstanding and widespread pattern and practice of unlawfully stopping and arresting people for trespass that is "so manifest as to imply the constructive acquiescence of senior policy-making officials,"[8] thus warranting municipal liability.  *Green* v. *City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (internal quotation marks and citation omitted).

Pursuant to a 1994 Memorandum of Understanding ("MOU") between the City and NYCHA, as well as Defendants' official policies, the NYPD acts as a purported custodian of NYCHA properties and "enforces" NYCHA rules and regulations, including non-criminal rule violations.  Clarke Ex. B ¶ 11.  In this role, officers have a practice of stopping and questioning anyone they encounter in NYCHA residences about the lawfulness of their presence without individualized suspicion that they are trespassing.  *See* PAF ¶¶ 14-15 (statistical evidence of stops based on lingering, loitering, presence in a common area, or mere presence in a NYCHA building); *id.* ¶ 33 (CCRB evidence of officers stating they can "stop anyone in a NYCHA building" without articulated reason); *id.* ¶ 34 (officers in this case admitting practice of questioning individuals without individualized suspicion); *id.* ¶ 81 (Delatorre stating officers can stop and question kids in NYCHA residences for lingering, but not in private buildings); *see also*

---

[7] The City's assertion that Plaintiffs have not alleged a "widespread custom or practice" (City Br. 2 n.5) is simply untrue.  Throughout this litigation, Plaintiffs have argued that the City's "policies and practices" result in a widespread pattern of unlawful stops and arrests of NYCHA residents and their guests.  *See, e.g.*, Am. Compl. ¶¶ 162, 238-242; *Davis* v. *City of New York*, 812 F. Supp. 2d 333, 341 (S.D.N.Y. 2011) (recognizing that Plaintiffs are challenging, *inter alia*, "the City's larger trespass enforcement and arrest practices").  Because the City has not challenged this claim, it is not entitled to summary judgment on it.  *See Schaefer* v. *Town of Victor*, 457 F.3d 188, 210 (2d Cir. 2006) (party waived claim by failing to brief it).

[8] Not only has the City constructively acquiesced to the constitutional violations, *see Green*, 465 F.3d at 80, but they have *actually* acquiesced.  *See infra* pp. 9-10 (evidence of City's actual notice of problems with unlawful trespass stops and arrests in NYCHA residences).

*People* v. *Ventura*, 913 N.Y.S.2d 543, 589 (Sup. Ct. N.Y. Cnty. 2010) (officer testimony that officers can "question anyone they encounter to determine whether they are on the premises lawfully").

This practice of randomly and unjustifiably stopping and questioning individuals in NYCHA residences operates like a roving pedestrian patrol in violation of the Fourth Amendment. *See Mich. Dep't of State Police* v. *Sitz*, 496 U.S. 444, 453 (1990) (roving patrols that stop individuals without suspicion declared unconstitutional); *United States* v. *Ortiz*, 422 U.S. 891 (1975) (roving patrols improperly confer on officers unfettered discretion to stop individuals); *see also City of Indianapolis* v. *Edmond*, 531 U.S. 32 (2000) (police checkpoint for general crime control requires individualized suspicion); *Brown* v. *Texas*, 443 U.S. 47, 50 (1979) (reasonable suspicion required to detain someone even if only purpose is to require that person to identify herself). The City's practice is not limited to unlawful stops; NYCHA residents and their guests are also regularly subjected to arrest in the complete absence of probable cause. *See, e.g.*, *infra* p. 7 and note 14.

*Statistical Evidence of Unlawful Widespread Practice.* The findings of Plaintiffs' expert, Professor Jeffrey Fagan,[9] establish that the City's practice of unlawful trespass stops in NYCHA residences is persistent and widespread.[10] Fagan's statistical analysis of the UF-250 data shows:

- When comparing trespass stops in NYCHA to stops for all other crimes between 2004-2011, trespass stops were the least likely to be "apparently justified" (38.7%), falling well below the average rate of 67.1% for all "apparently justified" stops. PAF ¶ 6.

---

[9] The City's critique of Fagan's analysis (City Br. 3-5) is without merit. The City reiterates many of the same arguments rejected by this Court. *See Floyd* v. *City of New York*, 861 F. Supp. 2d 274, 290 (S.D.N.Y. 2012) (finding Fagan's report largely admissible and that his conclusions are "based on [ ] methodologically sound analyses"). The City's other arguments are based on inaccurate interpretations of Fagan's findings.

[10] There were over 200,000 recorded stops for trespass in NYCHA residences and over 40,000 trespass arrests between 2004 and 2011. PAF ¶¶ 4-5.

- Fagan could not make generalizations regarding 57.4% of these trespass stops due, in part, to officers more frequently checking "other" on the UF-250 form for trespass stops and providing their own handwritten justification, if at all. *Id.* ¶ 7. Consequently, Fagan analyzed the handwritten text from a sample of these trespass stops in which officers checked only "other" as the reason for the stop. *Id.* ¶ 8.

- Of 70,142 trespass stops from 2009-2011—including stops after IO 23 and its associated training—where officers checked "other" on the UF-250 form, 75% lacked apparent legal justification. *Id.* ¶¶ 8-9. Notably, the majority of the handwritten text supported stops with some variation of "keyless entry" (36%) or "loitering" (16.5%) as the basis for the seizure.[11] *Id.* ¶ 9.

- When Fagan expanded the analysis to consider stops with "other" and one "additional circumstance" listed (8,842 additional stops), 83.9% (7,422) of trespass stops were based on facts that did not appear legally sufficient. *Id.* ¶ 10. As before, most of the stops were based on some variation of "keyless entry" or "loitering." *Id.*[12]

- Fagan found that officers consistently identified "high crime area" as a stop factor in 60-65% of all trespass stops in NYCHA residences between 2004-2011, regardless of the building's crime levels. *Id.* ¶ 12. When Fagan isolated stops where officers relied on the "other" stop factor, the number of recorded trespass stops, based in whole or in part on "high crime area," increased to 72%. *Id.* ¶ 13.

Fagan's analysis of UF-250 and arrest data between 2004-2011 also confirmed that NYPD trespass enforcement is disproportionately concentrated in NYCHA residences. *Id.* ¶ 17.

   *Documentary and Testimonial Evidence of Widespread Unlawful Practices.* The City's own Civilian Complaint Review Board ("CCRB") noticed that officers were stating with some frequency that they could stop people simply because they were inside of, entering, or exiting a NYCHA building, and that these stops did not require reasonable suspicion. *Id.* ¶ 33. These concerns prompted the CCRB to conduct a study, which found that the substantiation rates for civilian complaints of unlawful stops and frisks in residences subject to vertical patrols,

----

[11] This Court has observed that UF-250s supported only by handwritten text stating "keyless entry," are likely insufficient to "qualify the stop as justified" and those listing "loitering" are "often more probative of an unlawful stop than a lawful one." *Floyd*, 861 F. Supp. 2d at 294-95.

[12] Overall, Fagan found that only 50% of stops recorded for trespass in NYCHA residences were based on facts supporting reasonable suspicion. PAF ¶ 11.

including NYCHA residences, is three times greater than elsewhere in the city. *Id.* ¶ 32.  The CCRB "felt that [the] discrepancy in . . . substantiation rates, was significant." *Id.*

Fagan's analysis and the CCRB study are corroborated by the testimony of officers in this case (*id.* ¶ 34) and the experiences of NYCHA residents and their guests, who are unlawfully stopped and arrested for trespass in NYCHA residences on a daily basis (*id.* ¶¶ 21-28).[13] Moreover, the high rates of declinations to prosecute NYCHA trespass arrests, for adults and juveniles, further support an inference that the NYPD is engaged in a widespread practice of conducting unlawful trespass stops and arrests.  *See* PAF ¶ 106-08; Brooker II ¶ 2-6, 22-23.[14]

*Interim Order 23 Did Not Change the City's Unlawful Practices.*  Contrary to the City's assertions, IO 23 failed to change the City's trespass enforcement,[15] but instead codified the City's longstanding practices of stopping and arresting people without reasonable suspicion or probable cause.  IO 23 sets out an "approach and question" protocol that, in part, enforces NYCHA's "Highlights of House Rules, Lease Terms and Policy" ("House Rules").[16]  *See* Cooke Ex. O ¶ 12; Brooker I Ex. 28; *see also supra* note 4.  These House Rules include NYCHA's

---

[13] Evidence of the City's practice is also seen through the unlawful stops and arrests of the Plaintiffs. *See Davis*, 2012 WL 4813837, at *3-15.

[14] According to documentation from the District Attorney's Offices ("DAOs") and the City's own database of declinations to prosecute, many NYCHA trespass arrests were declined because there was "insufficient evidence," there was no "evidence of [a] crime," and the officers failed to investigate or verify whether the arrestee was authorized to be in the building.  PAF ¶¶ 106-07.

[15] Whether IO 23 changed the City's practices or whether it merely memorialized and clarified preexisting practices is, at the very least, a disputed fact.  Some officers testified that it did not change anything. *See, e.g.*, PAF ¶ 38.  Others testified that the only thing changed by IO 23 was allowing people the opportunity to leave before arresting them. *See, e.g.*, *id.* ¶ 39. Others identified the questioning protocol as new. *See, e.g.*, *id.* ¶ 40.

[16] A House Rule requires tenants to cooperate with police inquiries "regarding their presence or conduct in any building or on development grounds."  Brooker I Ex. 28, No. 18. Another warns that "NYCHA may start a proceeding to terminate tenancy if a tenant . . . breaches NYCHA rules."  *Id.* at No. 28.

prohibition against "lingering" and presence in certain restricted areas, as well as its mandate that "the lobby or stairwell is meant for resident use to either go in or out of the building or to walk from floor to floor." Brooker I Ex. 28, Nos. 19, 21. This approach and question protocol, as applied by officers on patrol, continues to promote suspicionless seizures in violation of the Fourth Amendment. *See supra* § I.A.

In *Brown* v. *Texas*, the United States Supreme Court held that an officer must have reasonable, particularized suspicion before stopping individuals and requiring that they identify themselves. 443 U.S. at 52-53.[17] Absent "specific, objective facts," these investigatory stops would occur at "the unfettered discretion of officers in the field." *Id.* at 51; *see also City of Chicago* v. *Morales*, 527 U.S. 41 (1999). Here, although the City assumes that people are not seized during the pointed questioning that occurs pursuant to IO 23, and cautions police not to stop citizens in the absence of reasonable suspicion (Cooke Ex. O ¶ 3), evidence of the actual practice demonstrates that NYCHA residents and guests are, in fact, not free to leave.

For example, according to the UF-250 data, between 2009-2011, officers "stopped" 813 people on suspicion of trespass based solely on lingering, loitering, presence in a NYCHA common area, or mere presence in a NYCHA building.[18] PAF ¶ 14.[19] When including UF-250s that also identify the dubious "high crime" factor as the only additional basis—or the only basis—for the stop, there were 2,931 trespass "stops" for loitering, lingering, or mere presence in a NYCHA common area in that same time period. *Id.* ¶ 14. Indeed, Plaintiffs Rikia Evans and

---

[17] New York State has codified the holding of *Brown*. *See* N.Y. Crim. Proc. Law § 140.50 (police officer may stop a person and demand "his name, address and an explanation of his conduct" only if the officer has reasonable suspicion that such person is committing, has committed, or is about to commit a felony or misdemeanor).

[18] This Court already determined that some of these rules are unconstitutionally vague when criminally enforced. *Davis*, 2012 WL 4813837, at *10.

[19] Fagan's analysis did not include lingering or loitering in a stairwell. PAF ¶ 14.

Raymond Osorio were both unlawfully stopped and arrested for trespass after IO 23 was issued. Soterakis Ex. OO, RR.  The experiences of other NYCHA residents and guests confirm that they are not alone.  *Id.* ¶ 41.  Tellingly, in July 2012, more than two years after IO 23 was promulgated, the Bronx District Attorney's Office announced that it would no longer prosecute trespass arrests in NYCHA residences unless the arresting officer is interviewed, with the goal of "eliminating tenants and invited guests from being prosecuted unlawfully."  *Id.* ¶ 42.

### C.  The City's Failure To Supervise, Discipline and Train Amounts to Deliberate Indifference to the Constitutional Rights of NYCHA Residents and Guests.

Under well-settled law, the City is liable under 42 U.S.C. § 1983 because it has failed to supervise, discipline, and train its police officers to ensure lawful trespass enforcement, despite an obvious need to do so.  *See City of Canton* v. *Harris*, 489 U.S. 378, 388 (1989) (failure to train); *Amnesty Am.* v. *Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004) (failure to supervise); *Vann* v. *City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (failure to discipline).  Each of these failures independently establish the City's deliberate indifference to Plaintiffs' constitutional rights in the context of trespass enforcement.  *See City of Canton*, 489 U.S. at 388; *Vann*, 72 F.3d at 1049; *Fiacco* v. *City of Rensselaer*, 783 F.2d 319, 327 (2d Cir. 1986).[20]

In the face of compelling evidence of a widespread problem of unconstitutional trespass enforcement, *see supra* § I.B, the City must provide adequate supervision, discipline, and training to prevent officers from violating the constitutional rights of NYCHA residents and

---

[20] The City's assertion that Plaintiffs are unable to show a "pattern of *similar* constitutional violations" (City Br. 3) is without merit.  The evidence, including Fagan's expert analyses of City data, demonstrates that unlawful stops and arrests occur across the City.  Courts have regularly held that such evidence is sufficient, especially at the summary judgment stage. *See, e.g., Amnesty Am.*, 361 F.3d at 128; *Floyd* v. *City of New York*, 813 F. Supp. 2d 417, 453 (S.D.N.Y. 2011).  *Connick* v. *Thompson*, 131 S. Ct. 1350 (2011), on which the City primarily relies, is not inconsistent.  *See id.* at 1366 (recognizing entitlement to relief if a pattern of similar violations had been established).

guests.  Indeed, it is undisputed that the City had actual notice of the constitutional violations

occurring in NYCHA residences, given the admission by the NYPD Legal Bureau's executive

officer that the NYPD had received complaints "from housing tenants, more formally through

CCRB, and through the district attorney's offices that they had some concerns about the quality

of arrests [made in NYCHA residences] and the ability of officers to articulate reasonable

suspicion and probable cause."  PAF ¶ 36; *see also id.* ¶ 31 (CCRB "wanting to put [NYPD] on

notice as soon as possible"); *id.* ¶ 35 ██████████████ REDACTED ██████████████

███████████████████████.[21]  Joanne Jaffe, Chief of the NYPD Housing Bureau,

testified at a 2006 City Council Hearing that she "get[s] some complaints . . . at community

council meetings" and "when interact[ing] with the public" on the subject of "officers stopping

Black and Latino youth [in NYCHA residences] and asking for ID."  *Id.* ¶ 37.  Yet, even after the

issuance of IO 23 and the associated instructional programs, trespass enforcement in NYCHA

residences remains a pervasive problem.  *See supra* § I.B.  A causal connection may be

reasonably inferred between the City's inadequate supervision, discipline, and training of its

officers and the subsequent constitutional violations.  *See Gentile* v. *Cnty. of Suffolk*, 926 F.2d

142, 152-53 (2d Cir. 1991).

---

[21] NYCHA residents and tenant leaders have, for years, publicly complained about the City's unlawful practices in NYCHA residences.  PAF ¶¶ 25-30.  Media coverage has also frequently documented the extensive problems with NYCHA trespass enforcement.  *See, e.g.*, Chris Francescani et al., *Under Seige:  "Stop and frisk" polarizes New York*, Reuters, July 3, 2012; Wendy Ruderman, *Rude or Polite, City's Officers Leave Raw Feelings in Stops*, N.Y. Times, June 26, 2012, at A1; Ray Rivera et al., *A Few Blocks, 4 Years, 52,000 Police Stops*, N.Y. Times, July 11, 2010, at A1; *see also* Compl. ¶ 161 (listing news articles published from 2007 to 2009).

1.   *The City Fails To Supervise Officers To Prevent*
     *Fourth Amendment Violations.*

Although the need for more or better supervision is obvious from officers' widespread

practice of unlawfully stopping and arresting NYCHA residents and guests for trespassing, *see*

*supra* § I.B, the City has made "no meaningful attempt . . . to investigate or to forestall further

incidents." *Vann*, 72 F.3d at 1049; *see also Stevens* v. *City of Bridgeport*, 607 F. Supp. 2d 342,

356 (D. Conn. 2009).  By arguing that its *written* policies and procedures establish adequate

supervision (City Br. 7), the City ignores evidence that—*in practice*—officers are not provided

with the necessary oversight to ensure compliance with the Fourth Amendment.  The City is,

therefore, deliberately indifferent to the resultant violations of the constitutional rights of

NYCHA residents and guests, and is liable for those violations.

For example, Chief Jaffe testified that the City relies on integrity control officers

("ICOs") to conduct proactive policing inspections where they review arrests "for probable cause

. . . to make an arrest, and if that arrest was a result of first having reasonable suspicion, how you

got from reasonable suspicion to probable cause."  City 56.1 ¶ 49.  Yet Lieutenant Robert

O'Hare, the witness designated to testify about the practices of ICOs, stated that he has never

heard of "proactive policing inspections" and that ICOs do not conduct self-initiated inspections

to look for unlawful stops and arrests because supervisors perform that function.  PAF ¶ 52.

Moreover, not a single supervising officer deposed in this litigation testified to observing

a stop or arrest that lacked sufficient evidence. *Id.* ¶ 46.  The testimony of these supervisors—in

light of overwhelming evidence that unlawful trespass stops and arrests in NYCHA residences

occur at elevated rates, *see supra* § I.B—indicates either a failure to watch their officers

engaging in civilian encounters or an inability to distinguish legal, from illegal, stops and arrests.

Indeed, from his "decades of experience in law enforcement," Plaintiffs' policing expert, Joseph

Brann, considered it "almost inconceivable . . . that a supervising officer has *never* observed . . . a stop without reasonable suspicion or an arrest without probable cause."[22]  PAF ¶ 48.

NYPD supervisors seldom—if ever—recognize when unlawful stops or arrests[23] take place because they do not scrutinize the legality of stops and arrests.  *Id.* ¶ 47.  Procedures cited by the City, such as "supervisor verification of arrests at the scene, scratching officer memobooks during a tour, and paperwork review" (City Br. 7), constitute "little more than 'processing' documents and [supervisors] hav[e] little or no responsibility for the actions or behavior of their direct reports (subordinates)."  PAF ¶¶ 44-45.  These supervisory deficiencies are exacerbated by the fact that officers patrolling NYCHA are likely to be inexperienced and require more supervision.  *Id.* ¶¶ 30, 49-51.

The City also fails to monitor the quality of arrests.  In practice, officers and supervisors rarely, if ever, learn about arrests that are not prosecuted and/or ultimately dismissed, including the arrests of Plaintiffs in this case.  *Id.* ¶ 58.  And, while the City has a robust system to track and evaluate all types of policing data, there is no system in place to monitor arrests that are dismissed after arraignment.  PAF ¶ 54.[24]  In contrast, some municipal police departments have

---

[22] The expert opinion of Joseph Brann, a former police chief and the founding director of the Office of Community Oriented Policing Services for the U.S. Department of Justice, supports the denial of summary judgment.  *See Vann*, 72 F.3d at 1049 ("Deliberate indifference may also be shown through expert testimony that a practice condoned by the defendant municipality was contrary to the practice of most police departments and was particularly dangerous because it presented an unusually high risk that constitutional rights would be violated." (internal quotation marks and citations omitted)).

[23] The danger of unlawful trespass stops and arrests is caused, in part, by the NYPD's "numbers-driven approach that is tethered to lowering crime statistics and increasing enforcement activity."  PAF ¶ 53.  Although "members of service are faced with the pressure to maintain high levels of enforcement activity," there is no "substantial oversight to make sure those activities are carried out in a manner that is correct and proper."  *Id.*

[24] Although the ICOs are now tasked with monitoring at least some arrests that the DAOs decline to prosecute, that responsibility was only recently added last year.  PAF ¶ 55.  Even now, NYPD officials continue to justify "declined prosecutions" as a result of bad paperwork or

"full-time police personnel [who] serve as court liaisons [and] whose responsibilities include[] determining why cases might be rejected for filing by the prosecutor and then ensuring the officer and supervisor were made aware of this to correct the problem and improve . . . performance." *Id.* ¶ 59.

> 2. *The City Fails To Discipline Officers Who Make Unlawful Trespass Stops and Arrests.*

The City also fails to discipline officers to curb future constitutional violations. *See Vann*, 72 F.3d at 1049 ("[D]eliberate indifference may be inferred if the complaints are followed by no meaningful attempt . . . to investigate or to forestall further incidents."). Tellingly, not one of the officers involved in Plaintiffs' arrests was disciplined in any manner. PAF ¶ 61.

NYPD Deputy Commissioner Julie Schwartz testified that because unlawful stops and arrests do not rise to the level of "serious misconduct," it is more appropriate to impose a "training tool," like instructions, rather than a serious reprimand.[25] PAF ¶¶ 62-63. That response is patently inadequate because, as Brann has found: "[S]tops of civilians without reasonable suspicion or cause may be a sign of 'serious misconduct,' especially where a pattern may exist or become evident. In such instances this may deserve more than instructions or counseling as the remedy. . . . Retraining as a constant solution does not send a message to the rest of the organization that certain types of conduct will not be tolerated." *Id.* ¶ 64.

The City's almost exclusive reliance on the CCRB to identify improper stops and arrests (City 56.1 ¶¶ 55-62) is insufficient because: (1) over half of the complaints are not fully

prosecutorial discretion rather than officer misconduct. PAF ¶ 56. REDACTED

PAF ¶ 57; *see also* PAF ¶ 107.

[25] Moreover, when disciplining an officer for an unlawful stop or arrest, the NYPD may consider the officers' level of enforcement activity, including the number of stops and arrests, as an explanation for a high number of civilian complaints. PAF ¶ 70.

investigated due to insufficient information (PAF ¶ 66); (2) complaints with disputed facts are

considered "unsubstantiated," thus likely leading to significant underreporting of valid

complaints (*id.* ¶ 67); (3) the NYPD does not consult with the CCRB when determining what, if

any, discipline to impose (*id.*); (4) officers rarely know the outcome of the CCRB complaints

filed against them (*id.* ¶ 69; *see also id.* ¶ 60 (officer did not know if he was still on performance

monitoring due to excessive civilian complaints)); (5) the CCRB takes a long time to process and

adjudicate complaints (*id.* ¶ 65; *see also id.* ¶ 68 (full CCRB investigation takes an average of

240 days)); and (6) the City improperly relies on victims to report police misconduct.

### 3. The City Fails To Train Officers Adequately on Trespass Enforcement in NYCHA Residences.

The City is liable for a failure to train when it "amounts to deliberate indifference to the

rights of persons with whom the police come into contact."  *See City of Canton*, 489 U.S. at 388.

Deliberate indifference is met when evidence shows:  (i) "a policymaker knows 'to a moral

certainty' that her employees will confront a given situation," (ii) "the situation either presents

the employee with a difficult choice of the sort that training or supervision will make less

difficult or that there is a history of employees mishandling the situation;" and (iii) "the wrong

choice by the city employee will frequently cause the deprivation of a citizen's constitutional

rights." *Walker* v. *City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).

All three elements are met here.  *First*, the City knows "to a moral certainty" that NYPD

officers patrolling NYCHA residences will be involved in trespass enforcement.  In fact, IO 23

expressly directs officers to "be alert for persons who may be violating [NYCHA] rules and

regulations, including potentially unauthorized persons with in NYCHA Property."  Cooke Ex. O

¶ 12. *Second*, the City has acknowledged receiving complaints that officers have had difficulty

determining whether they had reasonable suspicion or probable cause to stop and arrest

individuals for trespassing. *See supra* p. 10. And, *third*, officers making the wrong decision—namely, unlawfully stopping and arresting NYCHA residents and guests for trespassing—has led to Fourth Amendment violations in public housing all across the city. *See supra* § I.B.

The mere existence of the NYPD's new lesson plans, including the materials associated with IO 23 and more recent programs,[26] does not disprove a finding of deliberate indifference because the training is still inadequate. *See City of Canton*, 489 U.S. at 390 (training must be "adequa[te] in relation to the tasks the particular officers must perform").[27] The training on IO 23 instructs officers to unlawfully stop people and seek identification without reasonable suspicion, and arrest individuals without probable cause. *See supra* §§ I.A-B. Moreover, the IO 23 training provides scant guidance on how to conduct a constitutionally sound investigation when encountering NYCHA residents or guests. The text of IO 23 instructs officers to "take reasonable measures to verify" potentially unauthorized persons' authority to be in NYCHA residences, but none of the trainings provide meaningful instruction on determining who is "unauthorized" or how that verification should occur. PAF ¶ 72.[28]

---

[26] Despite the City's continuing discovery obligations, instructional materials relating to the 2012 In-Tac training at Rodman's Neck and the 2012 training on NYCHA rules and regulations were produced only in response to Plaintiffs' demand on October 23, 2012, after learning about their existence while observing the *Ligon* preliminary injunction hearing. Even then, the City did not produce the training on NYCHA rules and regulations until November 20, 2012—just two weeks before filing its summary judgment motion. Given the City's failure to timely produce this discovery, it should be precluded from relying upon it for this motion.

[27] Notably, some officers have testified that the new trainings have not changed their trespass enforcement practices in NYCHA residences (PAF ¶ 38), calling into question whether the training had any effect at all.

[28] The City has failed to articulate how decreases in the number of stops and arrests in NYCHA residences—which Chief Jaffe believes "very well may be" due to the effects of the IO 23 training—negates deliberate indifference. City Br. 8; Jaffe ¶ 22. In fact, the numbers cited by Chief Jaffe show a stark discrepancy in the ratio of trespass stops to trespass arrests taking place in NYCHA residences, indicating a need for *more effective training*. Jaffe ¶¶ 12, 19 (numbers for 2011 showing less than one-seventh of trespass arrests occur in NYCHA

The City's training is additionally inadequate because it fails to provide meaningful instruction about the NYPD's enforcement of NYCHA rules and regulations, another crucial function performed by officers patrolling NYCHA residences. *Id.* ¶¶ 73-74. Although IO 23 directs officers to "be alert for persons who may be violating Housing Authority rules and regulations," the City did not provide training on NYCHA rules and regulations along with its training on IO 23. *Id.* ¶ 75. That the City first started training on this crucial topic in October 2012, on the eve of this briefing and a preliminary injunction hearing in the related *Ligon* litigation, provides powerful evidence that the City has consciously disregarded the continuing constitutional violations suffered by NYCHA residents and their authorized guests.[29]

## II.   The Court Should Deny the City Summary Judgment on Plaintiffs' Fourteenth Amendment Claims.[30]

The City's decision to subject NYCHA residents and guests to a widespread practice of unconstitutional trespass enforcement—and the City's failure to correct these systemic violations—is due, in part, to racial discrimination against NYCHA residents, more than 90% of whom are African-American or Latino, and their guests. Plaintiffs need only show that race is "a motivating factor" in the City's acts. *Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). Plaintiffs are not required to prove that race is the sole factor, or even a

---

residences; yet, the number of trespass *stops* in NYCHA and non-NYCHA areas is nearly identical).

[29] Indeed, that training is still insufficient because it does not prevent officers from fabricating probable cause for trespass, based solely on a potential House Rule violation. *See* Pls. Cross Motion 5-6. At a minimum, the City's motion for summary judgment on this claim is premature because the training was only recently issued, Plaintiffs have not been given the opportunity to conduct discovery on it, and the effects, if any, are still unknown.

[30] The City's suggestion that Resident Plaintiffs have "concede[d]" their claim for violations of the Equal Protection Clause (City Br. 9 n.12) is wrong. Plaintiffs Rikia Evans, Patrick Littlejohn, Shawne Jones, and Hector Suarez maintain that they are adversely affected by the City's racially discriminatory practices in NYCHA residences.

dominant one, and are entitled to rely on circumstantial, as well as direct, evidence of discriminatory purpose. *See id.* at 265-68; *Hayden* v. *Paterson*, 594 F.3d 150, 163 (2d Cir. 2010). Accordingly, pursuant to 42 U.S.C. § 1983, the City is liable for the race discrimination suffered by Plaintiffs through its racially-targeted, trespass enforcement practices.

The City's pattern and practice of unconstitutional trespass stops and arrests in NYCHA residences is directed at—and is more likely to harm—the overwhelmingly African-American and Latino resident and guest population in those residences. PAF ¶ 17. Although incomes in both NYCHA residences and their surrounding areas are lower than the rest of the City, there are higher concentrations of African-American and Latino residents in NYCHA as compared to their surrounding neighborhoods. *Id.* Thus, any differences in trespass enforcement between NYCHA residences and the surrounding areas are more likely determined by race than income.

Fagan found that law enforcement activity—defined as the ratio of stops to crime complaints—is greater in public housing than in surrounding areas. *Id.* ¶ 18. He also found that there are large racial disparities in law enforcement activity; that these disparities are not explained by crime levels, *id.*; and that the disparity is highest in NYCHA residences with the highest concentration of African-American residents. *Id.* The racial disparity is greatest for stops on suspicion of trespass. *Id.*

Controlling for other possible policy-relevant factors, such as differences in crime rates, patrol activity, population size, socioeconomic and demographic composition, Fagan concluded:

- Race plays a "significant role in the conduct of enforcement in public housing even after controlling for other policy-relevant factors, crime conditions and socioeconomic conditions, as well as for the allocation of police resources and the intensity of policing tactics." *Id.* ¶ 19.
- Trespass enforcement disparities are predicted more by the racial composition of public housing than by any observed differences in the policy-rationalizing categories such as crime, policing activity, vertical patrols, or socioeconomic conditions. *Id.*

17

- For both African Americans and Latinos, the difference in the racial composition of the population between NYCHA residences and the surrounding areas is a significant predictor of the difference in trespass enforcement between those two places. *Id.*

- "The disparities in both trespass and total police enforcement increase with the magnitude of the difference in racial composition between NYCHA developments and the surrounding areas." *Id.*

Fagan's analyses constitute powerful evidence of discriminatory intent.[31] *See Arlington Heights*, 429 U.S. at 564 (state action that "'bears more heavily on one race than another' . . . may provide an important starting point" toward showing an Equal Protection violation, and "a clear pattern, unexplainable on grounds other than race" is sufficient on its own to establish such a violation). The high rates of errors in these arrests, *see supra* pp. 6-7, are further evidence of the discriminatory effect of unlawful trespass enforcement on a large segment of the City's African-American and Latino communities.

The stark statistical evidence of racial disparities is sufficient by itself to establish an inference of intentional discrimination. *See Arlington Heights*, 429 U.S. at 564; *Castaneda* v. *Partida*, 430 U.S. 482, 495 n.13 (1977); *Santiago* v. *Miles*, 774 F. Supp. 775, 798 (W.D.N.Y. 1991). In the instant case, the racial disparities exist in the context of the NYPD's long history of biased stop, question, and frisk activity. *See generally Floyd* v. *City of New York*, No. 08 Civ. 1034 (SAS); *see also Daniels* v. *City of New York*, 198 F.R.D. 409 (S.D.N.Y. 2001).[32] Where a

---

[31] The City's attempts to discredit Fagan are irrelevant, ignore the analyses in his rebuttal report, and serve only to underscore that there are triable issues of fact. For example, the City disputes whether residents of the surrounding areas are appropriate comparators (City Br. 10-12), overlooking the facts that: (i) Plaintiffs are not required to identify a similarly situated group of individuals of a different race; and (ii) Fagan accounted for non-comparability in his rebuttal report (PAF ¶ 20). To the extent that the City disagrees with Fagan, it can cross-examine him at trial. *See Floyd*, 861 F. Supp. 2d at 291.

[32] *See also* Office of the Attorney General of the State of New York, Civil Rights Bureau, New York City Police Department's "Stop & Frisk" Practices: A Report to the People of the State of New York from the Office of the Attorney General (Dec. 1, 1999) 174 ("[T]he types of 'stops' to which [racial minorities] have been subjected tend to have been more intrusive [and] tend to have occurred in minority neighborhoods."); Michael M. Grynbaum & Marjorie

municipality adheres to its practice with knowledge of the racial disparities, a factfinder may conclude that the municipality acted with discriminatory intent. *See United States* v. *City of Yonkers*, 96 F.3d 600, 612 (2d Cir. 1996).[33] Here, the City was fully aware of residents' public complaints about its racially discriminatory trespass enforcement activities in NYCHA residences. PAF ¶¶ 25-30, 83.

A fact finder could reasonably conclude, based upon the statistical evidence of racial disparities and other confirmatory evidence of discrimination, that the City's trespass enforcement practices are motivated impermissibly by race. *See Feingold* v. *State of New York*, 366 F.3d 138, 152-56 (2d Cir. 2004) (reversing grant of summary judgment and finding that factfinder could reject defendant's explanations as pretextual); *Floyd* v. *City of New York*, 813 F. Supp. 2d 417, 452-53 (S.D.N.Y. 2011) (citing *United States* v. *City of New York*, 683 F. Supp. 2d 225, 266-67 (E.D.N.Y. 2010)); *Taylor* v. *City of New York*, No. 03 Civ. 6477, 2006 WL 1699606, at *7 (S.D.N.Y. June 21, 2006).

---

Connelly, *Majority in City See Police as Favoring Whites, Poll Finds*, N.Y. Times, Aug. 20, 2012, at A1 (*New York Times* poll found that 64% of New Yorkers believe the NYPD favors whites over African Americans, and the perception of bias was as prevalent in 2012 as in 2001).

[33] The City's attempt to use IO 23 and the associated instructional program to negate the inference of discriminatory intent (City Br. 13) is inadequate given that the purportedly remedial policy is, itself, constitutionally infirm. *See supra* § I.A.

**III.   The Court Should Deny NYCHA Summary Judgment on Plaintiffs' Race Discrimination Claims Under Title VI of the Civil Rights Act of 1964, the Fair Housing Act, 42 U.S.C. § 1981, and New York State and City Human Rights Laws.[34]**

Even though the City's unlawful and discriminatory stop and arrest practices are well-known to NYCHA officials, NYCHA has voluntarily contracted with the City to perform *additional* services in NYCHA residences; empowered NYPD officers to act as agents of NYCHA with unfettered discretion; failed to provide the necessary oversight or controls to ensure its residents are not subjected to routine constitutional violations; and abdicated its responsibility to provide adequate security measures that would minimize the potential for unlawful police incursions.  Where, as here, over 90% of the affected resident community is African American or Latino, the influence of racial bias cannot be ignored.

NYCHA's claim that it "cannot[] control" the NYPD (Clarke ¶ 28) disregards important facts.  Despite its legal obligations as a landlord, *see* Pelikow Ex. B ¶ 13(a); 24 C.F.R. § 966.4, NYCHA fails to provide safe and secure premises to its over 400,000 residents, spending scarce funding on NYPD enforcement.  NYCHA hired the City to go "above and beyond" what officers do elsewhere in the city (PAF ¶ 79) and, thus, provided NYPD officers with open access to patrol inside its residential buildings and conferred expanded power to act as its agents (*Id.* ¶¶ 80-81).[35]  NYCHA's lack of oversight is evidenced by senior officials' ignorance that residents

---

[34] Plaintiffs who maintain claims against NYCHA are Rikia Evans, Patrick Littlejohn, Eleanor Britt, Shawne Jones, and Hector Suarez.  The Court ruled that Ms. Evans, Mr. Littlejohn, and Ms. Britt have viable residency-based claims against NYCHA, but dismissed Ms. Britt's § 1981 claim against NYCHA.  *Davis*, 2012 WL 4813837, at *18-21.  NYCHA's motion for summary judgment as to Ms. Jones and Mr. Suarez is pending before the Court.  ECF Docket Nos. 215-220, 225.

[35] This includes serving as the complainant in trespass cases (PAF ¶ 82) and, as discussed above, enforcing NYCHA rules and regulations, such as lingering (*Id.* ¶ 81).

are prohibited from being on roof landings, or that the NYPD arrests residents on roof landings. *Id.* ¶ 91.[36]

NYCHA granted, and continues to grant, the City expansive authority with full knowledge of the City's unlawful trespass enforcement practices. *See supra* § I.B. Indeed, NYCHA Chairman John Rhea has admitted that there are "stopping issues that we all know exist." PAF ¶ 84. In the nearly two decades since NYCHA executed the MOU, residents have complained repeatedly to NYCHA officials that the police unjustifiably stop and arrest them and their guests while they go about routine activities, such as taking out the trash, waiting for an Access-a-Ride transport, or visiting a friend or family member. *Id.* ¶¶ 29-30. Gloria Finkelman, the recently retired Deputy General Manager for Operations of NYCHA, testified that, throughout her decades-long career at NYCHA, she has heard residents complaining about NYPD officers "stop[ping] people who were in the hallways or were walking through the grounds or in the lobbies" or "for no reason at all." *Id.* ¶ 85.

NYCHA also has no meaningful oversight of the NYPD's behavior in its buildings. NYCHA pays the City over $70 million annually for so-called "above baseline" services. (NYCHA 56.1 ¶¶ 31-35), but fails to conduct "any review of services" whatsoever, according to Carlos Serrano, NYCHA's former Director of Budget and Financial Planning (PAF ¶¶ 103-105). It is no surprise, therefore, that public officials, NYCHA residents and tenant leaders have long complained about this double taxation, arguing that the NYPD subsidy could be better spent addressing NYCHA's repair backlog or providing other forms of security. *Id.* ¶¶ 98-102.

---

[36] NYCHA's argument that people are not stopped for lingering in stairways, hallways, or lobbies and that people cannot be ejected from the premises for lingering (NYCHA Br. 6) is contradicted by the record in this case. *See supra* p. 8; *see also* PAF ¶¶ 81, 88-89.

NYCHA's failure to take basic security precautions provides additional circumstantial evidence of discrimination.  Based on site visits and the record in this case, Plaintiffs' building security expert, Professor Robert M. McCrie,[37] determined that NYCHA does not provide the minimum standards of adequate security because many buildings:  (i) lack functioning exterior locks; (ii) lack functioning intercom systems; (iii)  fail to secure prohibited areas properly; (iv) fail to provide sufficient signage; and (v) lack requisite lighting.  *Id.* ¶¶ 93-94.

McCrie concluded that NYCHA's lack of basic security features, which is contrary to statutory requirements and industry standards, subjects NYCHA residents to unwarranted police encounters.  *Id.* ¶ 95.  For example, although residents may enter their residence without a key when the door lock is broken, officers are instructed to approach and question individuals in such circumstances—even when the officer is aware that the front door lock is broken.  Pls. Cross Motion 4-5; *see also* PAF ¶ 86.[38]  Even Patrick O'Hagan, the director of NYCHA's Off ce of Security, admitted that if NYCHA residences were properly secured, "there [would] be less opportunity for arrests to be made."  PAF ¶ 92; *see also id.* ¶ 97 (Delatorre testifying that working intercoms would enable NYPD to be more effective).[39]

In sum, NYCHA has created the conditions wherein African Americans and Latinos are more likely to be approached, questioned, stopped and/or arrested by NYPD officers enforcing criminal trespass laws.  *See City of Yonkers*, 96 F.3d at 613-14 (section 1983 liability may be

---

[37] Professor McCrie is Professor of Security Management at John Jay College of Criminal Justice at the City University of New York.

[38] Officers who were deposed in this case confirmed that their practice is to approach and question individuals for so-called "keyless entry."  PAF ¶ 87.  Moreover, Fagan's analysis confirms that "keyless entry" was a fact cited in support of at least 13,360 trespass stops between 2009-2011.  *Id.* ¶ 16.

[39] NYCHA cannot disobey the law and elect not to provide safe and secure housing because it allegedly does not have the funds.  Furthermore, as stated by McCrie, there are basic and inexpensive steps that NYCHA may take to protect its residents and their guests.  PAF ¶ 96.

premised on knowledge of intentional discrimination and refusal to take steps to remedy

discrimination); *Comer* v. *Cisneros*, 37 F.3d 775, 804 (2d Cir. 1994) (section 1983 liability may

be premised on knowledge of discriminatory practices and failure to intervene).

## IV. The Court Should Deny NYCHA Summary Judgment on Plaintiffs' Claims Under the United States Housing Act.

NYCHA has offered no new evidence or law to alter this Court's conclusions on

NYCHA's earlier summary judgment motion that Plaintiffs are entitled to a trial on their claims

under the United States Housing Act ("USHA").[40]

### A. The House Rules Are Part of the Lease or a Lease Addendum.

This Court has ruled that "[a] dispute of fact exists about whether the 'Highlights of

House Rules, Lease Terms and Policy' constitutes a lease addendum." *Davis*, 2012 WL

4813837, at *25. Although the Court indicated that additional briefing might assist the Court in

evaluating the *reasonableness* of the House Rules, *see id.*, NYCHA should not be permitted to

renew its argument, raised on reply in the individual summary judgment motion (NYCHA Reply

7), as to whether the House Rules are incorporated into the standard NYCHA lease. NYCHA

now contends that the House Rules are not "regulations . . . incorporated by reference into th[e]

Lease" pursuant to ¶ 12(d) of the Lease because the House Rules document was not subject to

notice and comment and not filed with the New York State Department of Housing and

Community Renewal. NYCHA Br. 14-16. NYCHA's argument concerning ¶ 12(d) is irrelevant

because Plaintiffs maintain that the House Rules constitute lease terms pursuant to ¶ 12(bb) of

the lease, not ¶ 12(d). *See* Pls. Opp. 35.

---

[40] The Court concluded that the USHA provides "important substantive and procedural rights," which Plaintiffs may enforce via 42 U.S.C. § 1983. *Davis*, 2012 WL 4813837, at *24. NYCHA does not challenge that conclusion.

Paragraph 12(bb) of the lease requires tenants "[t]o comply with and obey all rules and regulations prescribed from time to time by the Landlord concerning the use and care of the Leased Premises or any common or community spaces or other places in the Development, including but not limited to stairs, halls, laundries, community rooms, storage rooms, walks, drives, playgrounds, and parking areas." Pelikow Ex. B ¶ 12(bb). That paragaph incorporates certain provisions of NYCHA's House Rules concerning common areas—including the prohibition against "lingering" and the requirement that tenants cooperate with inquiries from the police. Under these circumstances, the Court properly ruled that there is a factual dispute as to whether the House Rules are incorporated into the lease or constitute a lease addendum. *See Hartford Accident & Indem. Co.* v. *Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973) (contract interpretation involving evaluation of extrinsic evidence must be made by a jury and not the court as a matter of law).[41]

B.     Two House Rules Are Unreasonable Lease Terms.

Two separate provisions of the House Rules constitute "unreasonable terms and conditions" in violation of the USHA. 42 U.S.C. § 1437d(l)(2).

*First*, the House Rule prohibiting "lingering" in "the lobby, corridors, and stairwell" and mandating that "the lobby or stairwell is meant for resident use to either go in or out of the building or to walk from floor to floor" is unconstitutionally vague where, as here, they are enforced by the police. *See Davis*, 2012 WL 4813837, at *10 (internal quotation marks omitted). These overbroad and unconstitutionally vague provisions encompass a substantial amount of innocent conduct and are unreasonable under the USHA. *See Richmond Tenants Org., Inc.* v. *Richmond Redevelopment & Hous. Auth.*, 751 F. Supp. 1204, 1205-06 (E.D. Va. 1990) ("Lease

---

[41] If the Court intends to reconsider its previous ruling, Plaintiffs request an opportunity to provide additional briefing.

provisions which are arbitrary and capricious, or excessively overbroad or under-inclusive, will be invalidated."), *aff'd*, 947 F.2d 942 (4th Cir. 1991). Also, the rules are amorphous enough that they "can potentially be applied in an arbitrary or discriminatory manner." *Id.* at 1207.

NYCHA's argument that these terms are reasonable as a matter of law (NYCHA Br. 16-18) rests on its assertion that non-criminal House Rules are not criminally enforced by the NYPD and, for example, that people lingering in stairways, hallways, or lobbies should not be stopped for trespass. NYCHA's position is belied by Fagan's analysis, *supra* p. 8, and the arrests of Plaintiffs Roman Jackson and Kristin Johnson.[42] As with Plaintiffs' Fourth Amendment claim, *see supra* p. 3, NYCHA also fails to provide adequate notice of what conduct is prohibited. Under these circumstances, the House Rule against "lingering" is unreasonable.[43]

*Second*, the House Rule requiring residents to "cooperate with inquiries from . . . the police regarding their presence or conduct in any building" pressures NYCHA residents to interact with NYPD officers without regard to residents' federal and state constitutional rights, including the Fifth Amendment right to remain silent. *See Davis*, 2012 WL 4813837, at *22 (internal quotation marks omitted).

## V. The Court Should Deny the City Summary Judgment on Plaintiffs' Title VI Claims.

Although the City denies that it is a recipient of federal financial assistance, it receives approximately $74 million in annual funds for capital and operating expenditures from the U.S. Department of Housing and Urban Development ("HUD") via NYCHA. NYCHA 56.1 ¶¶ 31-

---

[42] This Court stated it was "skeptical" of NYCHA's ability to prevail at summary judgment given the arrests of "Jackson and Johnson at the top of the stairwell and the corresponding vagueness of the prohibition against 'lingering' in common areas." *Davis*, 2012 WL 4813837 at *25.

[43] NYCHA's prohibition against "lingering" is also unreasonable because breach of this or other House Rules may subject tenants to eviction under NYCHA's published "Termination of Tenancy Procedures." NYCHA 56.1 ¶¶ 10-14.

35; Clarke Ex. B ¶¶ 13-14.  Thus, the City is properly subject to suit under Title VI of the Civil

Rights Act of 1964 ("Title VI").  *See* 42 U.S.C. § 2000d; *see also* 28 C.F.R. § 42.102(f).

Whether an entity receives federal financial assistance for Title VI purposes turns on

(i) whether the entity is Congress's intended recipient, or whether it merely benefits from the use

of federal funds; and (ii) whether the entity has the ability to accept or reject the federal aid.  *See*

*Alfano* v. *Bridgeport Airport Servs., Inc.*, 373 F. Supp. 2d 1, 5-6 (D. Conn. 2005).[44]  Both

conditions are satisfied as to the City.

The City is an intended recipient of federal operating subsidies:

"The Secretary [of HUD] shall establish an Operating Fund for the purpose of making
assistance available to public housing agencies for the operation and management of
public housing, including . . . anticrime and antidrug activities, including the costs of
providing adequate security for public housing residents, *including above-baseline police
service agreements*."

42 U.S.C. § 1437g(e)(1)(C) (emphasis added).  Pursuant to the MOU, the City agrees to conduct

vertical patrols and other "above baseline services" in NYCHA residences in exchange for a

portion of NYCHA's operating subsidy from HUD.  NYCHA 56.1 ¶ 31; Clarke Ex. B ¶¶ 10, 13.

Thus, the operating subsidy falls squarely within the express purpose of the federal grant

program.  *See U.S. Dep't of Transp.* v. *Paralyzed Veterans of Am.*, 477 U.S. 597, 604 (1986).

The City is also an intended recipient of the federal capital subsidy:

"The Secretary [of HUD] shall establish a Capital Fund for the purpose of making
assistance available to public housing agencies to carry out capital and management
activities, including: . . . *capital expenditures to improve the security and safety of
residents*."

42 U.S.C. § 1437g(d)(1)(I) (emphasis added).  Pursuant to the MOU, the City is entitled to 1.5%

of NYCHA's yearly capital budget from HUD for "NYPD services and equipment for the

---

[44] Although *Alfano* involved Section 504 of the Rehabilitation Act, not Title VI, the same
standard governs both statutes.  *See U.S. Dep't of Transp.* v. *Paralyzed Veterans of Am.*, 477
U.S. 597, 600 n.4 (1986); *Davis*, 2012 WL 4813837, at *18.

furtherance of security in public housing." NYCHA 56.1 ¶¶ 34-35; Clarke Ex. B ¶ 14. Thus, the capital subsidy to the NYPD also falls within the purpose of public housing funds allocated under 42 U.S.C. § 1437g.

Furthermore, the City has the ability to accept or reject the federal subsidies since it receives the funding pursuant to a voluntary contractual relationship. The City's argument that NYCHA alone is the recipient of the relevant HUD funding is unsupportable. Unlike *Paralyzed Veterans*, where the purported recipients received "[n]ot a single penny of the money," here the City receives over $70 million per year to carry out the services described in 42 U.S.C. § 1437g. Having agreed to accept the funds, the City must also accept Congress's condition that it not use those funds to discriminate. *See Paralyzed Veterans*, 477 U.S. at 605-06; Clarke Ex. B ¶ 25. For the reasons stated above in connection with Plaintiffs' Fourteenth Amendment claims, *see supra* § II, the City is not entitled to summary judgment on Resident Plaintiffs' race discrimination claims under Title VI.[45] *See Floyd*, 813 F. Supp. 2d at 456.

## VI. The Court Should Deny the City Summary Judgment on Plaintiffs' Claims Under the Fair Housing Act.

Section 3604(b) of the Fair Housing Act ("FHA") makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." 42 U.S.C. § 3604(b). This provision encompasses Resident Plaintiffs' claim for discriminatory provision of police services. *See Comm. Concerning Cmty. Improvement* v. *City of Modesto*, 583 F.3d 690, 711-14 (9th Cir. 2009).

---

[45] The City's assertion that Eleanor Britt's "residency-based claims against the City (*i.e.*, FHA, Title VI, and Section 1981 claims)" were dismissed by the Court (City Br. n.20) is incorrect. The Court allowed Ms. Britt's claims under Title VI and the FHA to proceed. *Davis*, 2012 WL 4813837, at *18, 21. Plaintiffs Rikia Evans and Patrick Littlejohn also maintain residency-based claims against the City.

This Court already concluded that Plaintiffs have cognizable FHA claims against the City for discrimination in the provision of police services. *Davis*, 2012 WL 4813837, at *20-21.[46] The City now seeks a second bite at the apple, arguing that the FHA remedies only disparate impact discrimination that creates a housing shortage or otherwise limits the availability of housing. City Br. 15.[47] That argument, if accepted, "would insulate egregious post-acquisition actions from the law's reach"—precisely the result that this Court already rejected as a matter of law. *Davis*, 2012 WL 4813837, at *20. In any event, the City's argument is irrelevant because Plaintiffs are proceeding on a theory of disparate treatment, not disparate impact.[48] For the reasons already discussed, *see supra* § II, Plaintiffs have presented sufficient evidence of racially discriminatory policing in NYCHA residences to warrant a trial.

## VII. The Court Should Deny the City Summary Judgment on Resident Plaintiffs' 42 U.S.C. § 1981 Claims.

This Court has already concluded that "a reasonable juror could find that the City has impaired Evans' and Littlejohn's residential leases in violation of section 1981." *Davis*, 2012 WL 4813837, at *19. As with Plaintiffs' Equal Protection claim against the City, *see supra* § II, there is sufficient evidence that "the challenged [discriminatory] acts were performed pursuant to

---

[46] The City's suggestion that the Court "implicit[ly]" held that Plaintiffs' claims were not cognizable under a separate provision of the FHA, 42 U.S.C. § 3617 (City Br. 14 n.21) is baseless. The Court did not reach the question of whether 42 U.S.C. § 3617 also applies. *Davis*, 2012 WL 4813837, at *20-21.

[47] Although the Court granted the City leave to renew its motion concerning "admissible evidence regarding the City's allegedly discriminatory provision of police services," *Davis*, 2012 WL 4813837, at *21, the Court did not give the City permission to file what amounts to a motion for reconsideration regarding the viability of post-acquisition claims under the FHA.

[48] Plaintiffs alleged both disparate treatment and disparate impact liability under the FHA. Am. Compl. ¶¶ 254-59. Although Plaintiffs continue to claim disparate treatment, Plaintiffs now consent to the dismissal of their disparate impact claim against both Defendants.

a municipal policy or custom" to proceed to trial. *See Patterson*, 375 F.3d at 226.[49]  Plaintiffs

have established the necessary "causal link" between the City's unlawful trespass enforcement

practices, on the one hand, and the impairment of their contractual rights, on the other.  Pls. Opp.

31-32.[50]

## VIII.  The Court Should Deny the City Summary Judgment on Plaintiffs' Claims Under Article I, § 12 of the New York Constitution.

    A.    Plaintiffs' State Constitutional Claims Under Article I, § 12 of the New York Constitution Are Distinct from Their Federal Constitutional Claims.[51]

The New York Constitution "provides broader protections" than the Fourth Amendment

to the United States Constitution. *Evans* v. *Solomon*, 681 F. Supp. 2d 233, 255 (E.D.N.Y. 2010)

(quoting *5 Borough Pawn, LLC* v. *City of New York*, 640 F. Supp. 2d 268, 299 (S.D.N.Y. 2009)

(internal quotation marks omitted).  There is no alternative remedy available to redress Plaintiffs'

claims for violations of the law articulated in *People* v. *De Bour*, 352 N.E.2d 562 (N.Y. 1976),

which established prohibitions against police intrusion in New York that are not included in the

federal constitution. *See Floyd*, 813 F. Supp. 2d at 438.  The availability of a remedy under

42 U.S.C. § 1983 for Fourth Amendment violations, therefore, does not bar Plaintiffs' right of

---

[49] The City's reliance on *McCleskey* v. *Kemp*, 481 U.S. 279, 292 (1987), is misplaced. City Br. 18.  *McCleskey* held that a plaintiff must show proof of discriminatory intent in his particular case, *see* 481 U.S. at 292, a standard that has already been satisfied here. *See Davis*, 2012 WL 4813837, at *19.

[50] For the same reasons, and for the reasons discussed in connection with Plaintiffs' race discrimination claims against NYCHA, Plaintiffs Rikia Evans, Patrick Littlejohn, Shawne Jones, and Hector Suarez have established a "causal link" between NYCHA's discriminatory practices and the impairment of their contractual rights as leaseholders to establish a claim under § 1981. Pls. Opp. 31-32; Pls. Supp. Opp. 8-11.  Contrary to NYCHA's argument (NYCHA Br. 19), Plaintiffs' § 1981 claims are not limited to harms stemming from the House Rules document.

[51] Plaintiffs consent to the dismissal of their equal protection claims under Article I, § 11 of the New York Constitution as duplicative of their claims under the Fourteenth Amendment to the United States Constitution.

action to redress separate and distinct violations of Article I, § 12 of the New York Constitution. *See Flores* v. *City of Mount Vernon*, 41 F. Supp. 2d 439, 447 (S.D.N.Y. 1999).

The "approach and question" protocol, memorialized in IO 23, cannot be reconciled with Article I, § 12 of the New York Constitution. New York recognizes a level of police interference with personal liberty that does not trigger the protections of the Fourth Amendment. *See People* v. *Hollman*, 590 N.E.2d 204, 206 (N.Y. 1992). IO 23 authorizes NYPD officers to initiate, at the very least, Level Two encounters—pointed questioning—without suspicion of wrongdoing.[52] This policy, and its application in practice, violates both the state and federal constitutions.

B.    Plaintiffs' State Constitutional Claims Are Not Barred
      by Governmental Immunity.

Governmental immunity shields a police officer only if her conduct was reasonable. *See Okin* v. *Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009). This Court has already found that there are disputed issues of material fact as to whether the stops and/or arrests of Plaintiffs were lawful. *Davis*, 2012 WL 4813837, at *3-15. Those material fact disputes preclude a finding as a matter of law that the officers' actions were reasonable. *See Floyd*, 813 F. Supp. 2d at 444, 446; *Gomez* v. *City of New York*, No. 05 Civ. 2147, 2007 WL 5210469, at *12 (S.D.N.Y. May 28, 2007). Because there are triable issues as to whether the officers' actions were reasonable, there remains a fact dispute concerning the reasonableness of the City policy pursuant to which the officers acted.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' motions for partial summary judgment.

---

[52] *Cf. People* v. *West*, 896 N.Y.S.2d 55, 56 (App. Div. 1st Dep't 2010) (analyzing similar questioning in NYCHA building as Level Two encounter); *Matter of Troy F.*, 526 N.Y.S.2d 521, 522-23 (App. Div. 2d Dep't 1988) (same).

Dated:   New York, New York
         January 7, 2013

NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.

By:      _s/ Jin Hee Lee_____

         Debo P. Adegbile
         Christina Swarns
         Johanna B. Steinberg
         Jin Hee Lee
         Johnathan J. Smith
         Ria A. Tabacco
         99 Hudson Street, Suite 1600
         New York, New York 10013-2897
         Tel: (212) 965.2200
         Fax: (212) 219.2052
         jlee@naacpldf.org

THE LEGAL AID SOCIETY
         Steven Banks
         William Gibney
         Steven Wasserman
         Nancy Rosenbloom
         Marlen S. Bodden
         199 Water Street, 6th Floor
         New York, New York 10038
         Tel: (212) 577.3300
         Fax: (212) 509.8141
         nrosenbloom@legal-aid.org

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
         Katharine E.G. Brooker
         Matthew Moses
         1285 Avenue of the Americas
         New York, New York 10019
         Tel: (212) 373.3000
         Fax: (212) 492.0139
         kbrooker@paulweiss.com

         *Attorneys for Plaintiffs*