# EXHIBIT 7

economic and demographic composition of NYCHA sites and surrounding areas.

- These differences in trespass and total enforcement increase with the magnitude of the difference in racial composition between NYCHA properties and the surrounding areas, after controlling for policing activity, population size, local crime conditions, and the socio-economic and demographic composition of NYCHA sites and surrounding areas.

- Race and ethnicity play an significant role in the conduct of enforcement in public housing, even after controlling for other policy-relevant factors, crime conditions and socio-economic conditions, as well as for the allocation of police resources and the intensity of policing tactics.

- Trespass stops stand out from other stops. They are least likely to be apparently justified (38.7%) compared to any other crime category, well below the average rate of 67.1% for all stops in public housing.

- *High crime area* is one of the two most common items checked off on the NYPD's UF-250 form for all stops in public housing, as well as for trespass stops. *High crime area* is checked off consistently between 60% - 65% of stops across public housing development, regardless of variations in actual crime rates.

- On the UF-250 forms, "other" stop circumstance was checked off in 55% of the citywide stops for suspected trespass, and even more often (65%) for trespass stops in public housing.

- A more detailed analysis of the "other" circumstances, used in nearly two thirds of all trespass stops in public housing, reveals that 8.3% are apparently legally unjustified, 50.3% are apparently justified, and 41.5% are apparently ungeneralizable.

- Even after efforts to re-train NYPD officers in the lawful conduct of trespass enforcement, a significant portion of trespass and other stops in NYCHA sites do not meet legal standards for reasonable and articulable suspicion.

## II.      DATA SOURCES AND MEASURES

This preliminary section describes the empirical foundations of the statistical analyses presented in this report. This section describes the data sources and analytic methods that were used to compile evidence to address the claims in this case. There are three components to this section.

The first is a brief discussion of the spatial units of analysis in which data were aggregated and analyzed. This discussion is relevant and important for two reasons. First, because NYPD enforcement activities are conducted in varying spatial units, each of these units has relevance to the claims in this litigation. Second, comparisons of NYCHA properties to similarly situated areas is fundamental both to the quasi-experimental design of these analyses and to research on some of the discrimination claims.[5] As discussed below, that comparison unit is the area immediately surrounding each NYCHA site. This preliminary discussion identifies the procedure for drawing these boundaries as well as other spatial units relevant to the analyses.

The second component of this preliminary section is a discussion of the several data sources that were used to generate the statistical analyses for this report. The general categories of data and information are: (a) NYPD stop, question, and frisk [hereafter SQF] activity for both trespass and other suspected crimes in NYCHA properties and in the surrounding areas; (b) NYPD trespass arrest activity in NYCHA properties and in the surrounding areas; (c) socio-economic and demographic characteristics of the places where stops occurred that may contribute to stops and other police activity independent of local crime conditions; (d) local crime conditions both in NYCHA sites and in the surrounding areas where stops took place; and (e) characteristics of policing including patrol strength and patrol activity. The analytic strategies to discuss each claim are discussed next, with the rationale for each method. The section concludes with descriptive statistics that provide an overview of SQF activity.

The third component is a brief overview of the methods of the general analytic strategy for the statistical and other analyses that were conducted to prepare this report. More detailed descriptions of these methods appear in the relevant sections.

---

[5] See, e.g., William R. Shadish, Thomas D. Cook, Donald T. Campbell, Experimental and Quasi-Experimental Designs for Generalized Causal Inference (2002). See, also, Panel on Method for Assessing Discrimination & National Research Council, Measuring Racial Discrimination 77 (Rebecca M. Blank et al. eds., 2004).

later on) in the areas surrounding most NYCHA sites. Accordingly, identifying a control group required *a priori* decisions about valid comparators within the framework of quasi-experimental design, rather than relying solely on statistically derived comparators.[15]

Second, NYCHA sites are not randomly distributed across the City. Rather, they are more often concentrated in the City's poorer neighborhoods. Figure 1 (on the preceding page) shows the locations of NYCHA sites within the City's police precincts, with the tracts shaded according to their poverty rate based on 2007 data from the American Community Survey.[16] A second map on that page shows a blowup of the Bronx to illustrate the concentration of public housing in socio-economically disadvantaged neighborhoods. Neighborhood poverty rates are closely correlated with crime,[17] and overlaying NYCHA sites by this neighborhood descriptor provides a good illustration of the non-random siting of NYCHA developments across the city. In fact, this simplifies the task of identifying a valid comparator, for this reason: defining valid comparators for NYCHA developments required the identification of control areas that were similar in all respects to NYCHA sites *other than* their NYCHA status and the unique enforcement strategies in those sites. The objective of defining a comparison group is to isolate the effects of a specific variable by ruling out other potential confounding or correlated influences. In this case, identifying the neighboring and contiguous (non-NYCHA) border areas allows us to do just that by taking into account the general crime and social conditions in the larger yet immediate neighborhood context. The contiguous area (nearest neighbor) strategy thus allows us to better statistically identify the unique effects of NYCHA status on patterns of enforcement.

To identify the surrounding areas, the census block groups that touched on the borders of each of the NYCHA developments were identified.[18] Block group

---

[15] Shadish et al., supra note 5.

[16] American Community Survey, 2007 Release, available at
http://www.census.gov/acs/www/data_documentation/2007_release/

[17] See, e.g., Robert J. Sampson, Jeffrey D. Morenoff, and Steven Raudenbush, Social Anatomy of Racial and Ethnic Disparities in Violence, 95 *Am. J. Public Health* 224 (2005).

[18] Census block groups are comprised of census blocks. Census blocks are the smallest geographic area for which the Census Bureau collects and tabulates census data. Blocks are formed by streets, roads, railroads, streams and other bodies of water, other visible physical and cultural features, and the legal boundaries shown on Census Bureau maps. A Block Group is a combination of contiguous census blocks that form homogeneous area which share wider boundaries. See,
http://www.census.gov/geo/www/2010census/gtc/gtc_bg.html.

Each graph in this series shows that the ratio of stops to crimes is greater in public housing than in surrounding areas, for all crime measures and all stop measures. The results are consistent regardless of the suspected crime motivating the stop (all stops, drug stops, weapons stops, trespass stops) or the crime benchmark (total crime, violent crime). Even though NYCHA developments have higher overall and violent crime rates, the disparity in enforcement is stark and in some cases, quite wide. For some of the comparisons, the stop-crime ratio in public housing was nearly equal at the outset of the study period, and grew over time. The analyses in later sections of this report will sort out whether these disparities are a function of differences in crime rates, social and economic conditions, or enforcement resources and tactics.

The next set of graphs further illustrates the relationship between crime and enforcement by displaying differences in stop-to-crime ratio by the racial makeup of each public housing site. The 264 public housing sites were divided into quartiles based on the percent Black population or the percent Hispanic population in the NYCHA site. Figures 18-27 show these ratios using total stops, weapons and trespass stops as the denominator, and three different measures of crime as the benchmark.



Figure 18. Ratio of Total Stops to Total Crime in Public Housing and Surrounding Areas by NYCHA Percent Black Population (Quartiles), 2004-11



Figure 19.  Ratio of Total Stops to Total Crime in Public Housing and Surrounding Areas by NYCHA Percent Hispanic Population (Quartiles), 2004-11



Figure 20.  Ratio of Weapons Stops to Violent Crime in Public Housing and Surrounding Areas by NYCHA Percent Black Population (Quartiles), 2004-11



Figure 21. Ratio of Weapons Stops to Violent Crime in Public Housing and Surrounding Areas by NYCHA Percent Hispanic Population (Quartiles), 2004-11



Figure 22. Ratio of Drug Stops to Violent Crime in Public Housing and Surrounding Areas by NYCHA Percent Black Population (Quartiles), 2004-11



Figure 23.  Ratio of Drug Stops to Violent Crimes in Publich Housing and Surrounding Area by NYCHA Percent Hispanic Population, 2004-11



Figure 24.  Ratio of Trespass Stops to Total Crime in Public Housing and Surrounding Areas by NYCHA Percent Black Population (Quartiles), 2004-11



Figure 25. Ratio of Trespass Stops to Total Crime in Public Housing and Surrounding Areas by NYCHA Percent Hispanic Population (Quartiles), 2004-11



Figure 26. Ratio of Trespass Stops to Violent Crime in Public Housing and Surrounding Areas by NYCHA Percent Black Population (Quartiles), 2004-11

- 55 -



Figure 27.  Ratio of Trespass Stops to Violent Crime in Public Housing and Surrounding Areas by NYCHA Percent Hispanic Population (Quartiles), 2004-11

The figures that examine stop to crime ratios by race or ethnic concentration show three distinct trends.  First, each of the figures shows a large disparity in stops per crime, regardless of the metric of crime-specific stops or crime benchmarks that is used.  These disparities are present for both Black and Hispanic population concentrations in NYCHA sites.

The second distinctive feature of these graphs is the relationship between the disparity and the racial concentrations in NYCHA sites.  The disparity is present in the NYCHA sites with the lowest concentrations of non-Whites.  That is, in each of the graphs, Q1 is the groups of NYCHA sites with the lowest percentage of Black or Hispanic residents.  Even in these sites, disparities in the concentration of enforcement are present.

Third, the disparities in enforcement|crime ratios are greatest for trespass stops. Figures 24-27 show wide gaps in the enforcement|ratio for trespass stops, gaps that are wider than for other crime-specific stop categories.  The wide gap in trespass stop|crime ratios is present for all racial concentrations, and is present regardless of whether the focus of the graph is on Black or Hispanic residential populations.

- 56 -

Again, the analyses in the following sections test whether these disparities are explained by differences in the crime rates, the social or economic conditions, the racial concentrations, or differences in the type or intensity of police patrol.

V.    **Claim I: Discrimination**

## A. Overview

Plaintiffs claim that the Defendants have targeted public housing properties and residences for enforcement of trespass laws through the use of stop and frisk powers as well as the arrest power. Plaintiffs allege that these practices are applied in a discriminatory manner since the large majority of NYCHA residents are persons of racial and ethnic minorities, especially persons of African descent as well as Hispanic origin. The preceding section provided simple descriptions of the distribution of stops by suspect race and location. In this section, the analysis proceeds to multivariate regression models to test each of these claims. Specifically, the analysis tests first for evidence of more intensive enforcement of trespass laws and other penal law sections in public housing sites compared to enforcement in the immediately surrounding area, net of the crime or social conditions in NYCHA and the surrounding areas. The analysis then decomposes the differences in trespass enforcement into specific tests of each of those social conditions, including the racial composition and crime rates of each area, to identify statistically evidence of racial components of the disparities in enforcement.

## B. Specific Tests

### 1. Test 1

To test the first claim, a series of regression analyses were completed that followed the general analytic model discussed earlier:

$$\text{Outcome} = \alpha + \beta_1 * PH + \beta_2 * Crime + \Sigma_i \beta_i *(\text{Plausible Non-Race Influences}) + \varepsilon,$$

*Outcome* is the event or status of interest, *PH* is an indicator for whether the observed unit is in a NYCHA site or in a surrounding area, *Crime* is the local crime conditions disaggregated by type of crime, *Plausible Non-Race Influences* are a set of variables representing both race and non-race factors that also might influence the outcome, and an error term $\varepsilon$ that captures the variation in the outcome that cannot be explained by either Crime or Minority status or the Non-Race Influences. All models are adjusted for the total population of the precinct, which is log transformed due to the extensive skew in those data. Crime is the exposure variable, and is tested in four ways: drug offenses, weapons offenses, violent offenses, and total crime. Crime is log transformed due to heavy skew in the data, and is lagged by one month to avoid statistical confusion due to simultaneity.[75] As discussed earlier,

---

[75] Models were estimated with both contemporaneous and lagged crime exposures, and the results were nearly identical.

unable to be generalized, even if this is the only additional circumstance listed.

5. Stops as **apparently unjustified based on the lack of reasonable suspicion** if (a) only one conditionally justified stop circumstance is indicated and (b) no "additional circumstances" are indicated.

6. Stops are **apparently justified based on reasonable suspicion** if two or more conditionally justified stop circumstances are indicated.

7. Stops are **unable to be generalized** if (a) one conditionally justified stop circumstance is indicated along with the "other" circumstances, and (b) no additional circumstances are listed.

8. Stops are **unable to be generalized** if the only stop circumstance is the "other" circumstance.

The resulting estimates of legal sufficiency are most likely generous. That is, this coding scheme overestimates the extent to which stops are legally justified since some of the combinations of "conditionally justified" stop circumstances and additional circumstances are still insufficient to justify a stop without detailed circumstantial information.[103]

### a.   "Other" Stop Circumstances

As noted in the seventh and eighth classifications above, one other combination of RAS indicia requires additional analysis before a full categorization can take place. These are stops where the "other" stop circumstance is indicated, and the narrative accompanying the "other" category is legally insufficient to justify the stop. These include stops where (a) the only stop circumstance indicated is "other," (b) the "other" stop circumstance is indicated with one additional circumstance is indicated and the "other" stop circumstance is indicated, or (c) only one conditionally justified stop circumstance is indicated and the "other" stop circumstance is indicated. Generalizations about these stops are extremely difficult without a precise understanding of the descriptions and conditions that define the "other" stop circumstances.[104]   To better estimate the RAS indicia present in these stops, an additional analysis was completed to examine the entries in the text field on the UF-250 form that accompany "other" stop circumstances. This analysis proceeded in two stages.

---

[103] See Appendix F for discussion of the subjective and conditional nature of each Stop Circumstance and Additional Circumstance.

[104] *Floyd*, 2012 WL 1344514, *18-19.

First, to address the uncertainty in cases that are most relevant for the issues in the *Davis* litigation, an analysis of the exact text strings in these "uncertain" cases was completed for trespass stops on NYCHA property. The method was similar to the process of crime coding for "suspected crime" that was necessitated by the uneven utterances of NYPD officers written into the "other" field. Here, I examined the texts strings for a sample of 3,000 cases where "other" was a stop circumstance indicated in a trespass stop. In the second stage, the text strings were reduced to a set of common themes or categories, and further sorted into a set of meta-categories. These categories were then re-classified using the shorthand of ***apparently justified, apparently unjustified*** or ***not generalizable.*** Examples of the coding instructions that resulted from this procedure appear in Table 26. From these cases, the constitutional validity of the various meanings of "other" stop circumstances were examined and estimated as part of the larger body of trespass stops in public housing.

### 3.  Results

### a.  Apparent Legal Sufficiency by Crime Type

The analyses in this section address trespass and other stops in public housing only, focusing on the combinations of stop factors to generate a tripartite framework for viewing the apparent legality of stops.  Sufficient data are not available to assess the Fourth Amendment justifications for trespass arrests or other arrests in public housing.

**Table 24: Apparent Legal Sufficiency of Stops in Public Housing by Suspected Crime, 2004-2011 (% of Stops)**

| Public Housing | N | *Apparent Legal Sufficiency* | | |
|---|---|---|---|---|
| | | *Apparently Justified* | *Not Generalizable* | *Apparently Unjustified* |
| Total Stops | 526,103 | 67.10% | 27.83% | 5.07% |
| Violent Crime Stops | 57,050 | 91.27% | 4.90% | 3.83% |
| Property Crime Stops | 27,926 | 76.77% | 18.99% | 4.24% |
| Drug Stops | 67,385 | 83.45% | 13.40% | 3.15% |
| Weapon Stops | 153,694 | 87.21% | 4.83% | 7.95% |
| Trespass Stops | 205,916 | 38.68% | 57.39% | 3.94% |
| QOL Stops | 3,062 | 67.08% | 26.32% | 6.60% |
| Other Stops | 11,070 | 67.96% | 26.15% | 5.89% |

Table 24 shows the percentage of cases that fall into each category in this framework.  In addition to trespass stops, the apparent legal sufficiency of stops for other suspected crimes also are analyzed.  Trespass itself is a status crime whose direct harms are perhaps different than other crimes – such as drug transactions –

- 81 -

that often are linked to it. Apart from its place in substantive criminal law, and the opportunities that trespass enforcement presents to pursue the goals of order maintenance and regulation of quality of life crimes, trespass motivates other forms of enforcement in public housing through its presumed links to violence and drug trafficking.[105] Within this logic, stops for suspicion of weapons possession, drug selling, or violent crimes are important to a full understanding of the implementation of trespass enforcement as a police tactic.

The 526,103 total stops in public housing from 2004-11 are 12.87% of the 4,088,825 stops in that period. Applying the decision rules listed earlier in this section, about one stop in 20 overall (5.07%) apparently lacks sufficient legal justification. About two in three appear to be justified under these prevailing caselaw, and the remainder (27.83%) lack sufficient information to generalize as to their legal sufficiency with respect to reasonable and articulable suspicion.

Trespass stops stand out from other stops. They are least likely to be apparently justified (38.7%) compared to any other crime category, well below the average rate of 67.1% for all stops in public housing. They also are more likely than any other crime category to be ungeneralizable (57.4%), twice the average rate of 27.8% for all public housing stops. The reason for this is the frequent use of the "other" stop circumstance category.

The RAS classification rates for public housing stops for other suspected crimes vary depending on the suspected crime. Weapons stops, drug stops, and stops for suspected violent crimes are least likely to be ungeneralizable. These stops are more likely than the other categories of suspected crimes to appear as either apparently justified or apparently unjustified.

### b. Decomposing "CS_OTHER"

The high rate of ungeneralizable legality in trespass stops may result from the design of the stop factors, since "other" stop circumstance was checked off in 55% of the citywide stops for this suspected crime, and even more often (65%) for trespass stops in public housing. By checking off "other" as a stop factor in the majority of trespass stops, the question of the circumstances of the stop become highly subjective and, in turn, raise constitutional concerns.[106]

---

[105] Fagan et al., Drug Control in Public Housing, supra note 6; Ireland et al., Violence Among Adolescents in Public Housing, supra note 7.

[106] Similarly, if stops that take place during vertical patrols turn out to be systematic seizures, then the practice may violate the Supreme Court's ruling in *City of Indianapolis v. Edmond*, which struck down a narcotics roadblock because it constituted systematic,

| Table 25. (Continued) | | |
|---|---|---|
| 18. | *Sitting* | Sitting<br>Multiple (Sitting and any location <u>other than</u> Prohibited Area) |
| 19. | *Trespass* | |
| 20. | *Unintelligible* | Missing<br>Unintelligible |

## Table 26. Recode Statements for RAS Classification of Meta-Categories from Sample of "Other" Stop Circumstances in Trespass Stops, 2009-11

*Variable "classvar" refers to broad category of stop circumstance
*Variable "disposition" refers to assessment of apparent justification (or not)
replace disposition= "APPARENTLY UNJUSTIFIED" if classvar = = "Common Area"
replace disposition= "APPARENTLY UNJUSTIFIED" if classvar = = = "Entering & Exiting"
replace disposition= "APPARENTLY UNJUSTIFIED" if classvar = = "High Crime"
replace disposition= "APPARENTLY UNJUSTIFIED" if classvar = = "Keyless Entry"
replace disposition= "APPARENTLY UNJUSTIFIED" if classvar = = "Lingering"
replace disposition= "APPARENTLY UNJUSTIFIED" if classvar = = "Loitering"
replace disposition= "NOT GENERALIZABLE" if classvar = = "Loitering Stairwell"
replace disposition= "NOT GENERALIZABLE" if classvar = = "Lingering Stairwell"
replace disposition= "NOT GENERALIZABLE" if classvar = = "Hanging Out Stairwell"
replace disposition= "NOT GENERALIZABLE" if classvar = = "Miscellaneous Indeterminate"
replace disposition= "APPARENTLY JUSTIFIED" if classvar = = "Miscellaneous Justified"
replace disposition= "APPARENTLY UNJUSTIFIED" if classvar = = "Miscellaneous Unjustified"
replace disposition= "NOT GENERALIZABLE" if classvar = = "Multiple"
replace disposition= "APPARENTLY UNJUSTIFIED" if classvar = = "NYCHA"
replace disposition= "APPARENTLY UNJUSTIFIED" if classvar = = "Outside"
replace disposition= "APPARENTLY JUSTIFIED" if classvar = = "Rooflanding"
replace disposition= "APPARENTLY UNJUSTIFIED" if classvar = = "Sitting"
replace disposition= "APPARENTLY UNJUSTIFIED" if classvar = = "Trespass"
replace disposition= "APPARENTLY UNJUSTIFIED" if classvar = = "Unintelligible"

*ii. Results*

Before presenting the results, it is important to note that *all* the trespass stops in public housing from 2004-11 that were initially coded as not generalizable included an "other" stop circumstance as one or more of the stop factors in that event. The re-classification was extended to the full sample of trespass stops in public housing from 2009-2011.

- 85 -

**Table 27. Reclassification of All Trespass Stops in Public Housing with Only "Other" Stop Circumstance (2009-11)**

| Category | Classification | | | |
| --- | --- | --- | --- | --- |
| | Not Generalizable | Apparently Justified | Apparently Unjustified | Total |
| Common Area | | | 81 | 81 |
| Entering and Exiting | | | 7 | 7 |
| Hanging/Loitering/Lingering* | 102 | | | 102 |
| High Crime | | | 5 | 5 |
| Keyless Entry | | | 1,236 | 1,236 |
| Lingering | | | 121 | 121 |
| Loitering | | | 555 | 555 |
| Misc. Justified | | 50 | | 50 |
| Misc. Unjustified | | | 14 | 14 |
| Multiple | 8 | | | 8 |
| "NYCHA" | | | 56 | 56 |
| Outside | | | 6 | 6 |
| Rooflanding | | 13 | | 13 |
| Sitting | | | 16 | 16 |
| "Trespass" | | | 386 | 386 |
| Unintelligible | | | 35 | 35 |
| Total | 110 | 63 | 2,518 | 2,691 |

\* In "stairwell" or "stairway"
Note: Empty cells are zero.

Table 27 presents the results of the extension of the new categories to the full sample of *ungeneralizable* cases where the only factor identified is "other circumstance." When these re-codes are applied the classification of apparent legal justification for these stops changes dramatically. Table 27 shows that 75% of these stops were reclassified as *apparently unjustified*.[107] Only 1.8% were reclassified as *apparently justified*. Among those reclassified as apparently unjustified, the majority were narratives stating just one of several expressions of "keyless entry" (36%) or an expression of "loitering" (16.5%). The remainder was spread across several other meta-categories.

---

[107] The coding design for this reclassification was based on a sample of 3,000 UF-250s with the "other" category indicated. That sample did not anticipate all the variations on the core themes that the text narratives presented. Inevitable, there will be text strings to describe motive and perceptions that continuously expand the range of possible codes. In those circumstances, a coding design that anticipates 75% or more of the actual codes in a larger sample is in fact efficient. In this reclassification there were a total of 3,349 entries, 658 of which were variations not anticipated.

- 86 -

Of the 70,142 trespass stops in public housing between 2009-11, 8,842 indicate only one "additional circumstance" along with "other additional circumstance." Because four of the sixteen meta-categories – Outside, NYCHA, Trespass, and Unintelligible – fail to provide any additional information supporting an articulation of reasonable suspicion, stops falling within any of those four meta-categories are classified as *apparently unjustified* even in combination with one additional circumstance. This is because these four meta-categories add no indicia of suspicion, rendering stops in these circumstances to be equivalent to those indicating only one "additional circumstance." There are 1296 additional stops that are *apparently unjustified* based on this reclassification.

Table 29 shows the results of the reclassification of the full set of 70,142 cases of trespass stops in public housing. The table shows the original and revised classifications. The percent that are *apparently justified* remains largely unchanged. But there is a significant shift in the percentage of cases that are *apparently unjustified*, from 2.8% prior to the reclassification to 8.3% after recoding and reclassification. Similarly, the percentage that was *not generalizable* declined from 47.7% to 41.5%. The shift was the result of the reclassification of the cases where NYPD officers marked down "other" circumstances and then recorded a narrative explanation for that determination. Again, all the not *generalizable* cases included an "other" circumstance, which resulted in its leverage in the reclassification.

**Table 29. Reclassification of Apparent Legal Sufficiency of Trespass Stops in Public Housing, 2009-11, with Revised Codes for "Other" Stop Circumstance**

| Classification | N | *Legal Sufficiency* | | |
| | | *Apparently Justified* | *Not Generalizable* | *Apparently Unjustified* |
|---|---|---|---|---|
| Initial Classification | 70,142 | 34,666 | 33,480 | 1,996 |
| *Percent* | | *49.4%* | *47.7%* | *2.8%* |
| Revised Classification | 70,142 | 35,254 | 29,078 | 5,810 |
| *Percent* | | *50.3%* | *41.5%* | *8.3%* |

The shift in cases is the result of a careful analysis of the utterances of NYPD officers about the bases of their suspicion of trespass. The estimates remain extremely generous, however. The coding scheme overestimates the extent to which stops are legally justified, as well as underestimates the number of stops that are unjustified due to the considerable number of trespass stops that remain not *generalizable*. For example, 39.8% (13,360) of the uncertain "other" stops involve the narrative stating one of several expressions of "keyless entry." Although the majority of these stops (7997 out of 13,360) indicate more than one "additional circumstances," a close inspection of the additional circumstances reveals that the overwhelming majority of stops relies on questionable support. For example, of the

13,360 "keyless entry" stops, 10,332 (77%) identify "high crime area" and 7,584 (56.7%) identify "time of day first crime incidence."

The results suggest a simple truth: police officers use a set of subjective factors to embroider the messier facts of trespass stops in public housing when their suspicion may be cued more by archetypes and subjective interpretation of vague behavioral cues. Given the unusually high and uniform invocation of inchoate stop factors ("furtive movements") and subjectively perceived additional circumstances ("high crime area"), as discussed below, the rate of *apparently unjustified* trespass stops suggests deep structural flaws in the design implementation of this form of legal regulation.

### c.  Common Stop Factors and Additional Circumstances

Two stop factors in particular are quite prevalent in the conduct of stops in public housing. In fact, furtive movements and high crime area are the two most common items checked off on the UF-250 for all stops in public housing, as well as for trespass stops. As discussed in Appendix G, these two categories are notable in two ways: they both are prone to subjective and highly contextualized interpretation, and they both – either separately or in conjunction with one another – are legally insufficient to justify a stop. Both high crime area and furtive movement in fact turn out to be poor indicia that "crime is afoot," to use the language and jurisprudential meaning in Terry, or the notion of high crime area as articulated in Wardlow. In an analysis of stops across the City from 2004-2009, stops based on either of these criteria had far lower "hit" rates of arrest compared to stops based on other criteria.

This commonly cited factor of individualized suspicion in fact, as practiced by the City, is also an inefficient marker in the search for criminal offenders. It seems to be invoked so often and in such disparate circumstances as to suggest that it is almost meaningless. Table 30 and Figure 28 shows that both furtive movement and high crime area are used somewhat promiscuously and often in circumstances that may not justify the characterization. For example, when NYCHA sites are divided into five groups (quintiles) based on their average crime rate (from crime complaints per capita) over the 2004-11 analysis period, the percentage of cases where high crime area is checked off exceeds 60%, even in the NYCHA developments with the lowest crime counts. In the safest public housing sites and also in the most crime-ridden developments, police characterize public housing constant, even as the average number of stops increases across the quintiles. No doubt there are high crime public housing developments, but there also are very low crime sites. However, there seems to be no sensitivity in the use of this marker of RAS to the actual crime rates in the area.

**Table 30. Percent of Stops in Public Housing Marking *Furtive Movement* or *High Crime Area*, 2004-11**

| Crime Quintile | % Stops with *Furtive Movements* | | % Stops with *High Crime Area* | |
|---|---|---|---|---|
| | *Total Stops* | *Trespass Stops* | *Total Stops* | *Trespass Stops* |
| 1 | 45% | 27% | 65% | 63% |
| 2 | 45% | 28% | 63% | 60% |
| 3 | 44% | 27% | 62% | 60% |
| 4 | 42% | 24% | 64% | 62% |
| 5 | 42% | 23% | 64% | 65% |

The pattern of cases where *furtive movements* are checked off suggests a similar pattern of indiscriminate use of this criterion to justify stops. Its repetitive use suggests that the most vague of the RAS standards are invoked to select individuals for stops in public housing, regardless of the actual crime conditions in which the stop is effected. This pattern led one retired NYPD officer, speaking at a New York City Bar Association forum on "stop and frisk" in March 2010, to state that the high rate of checking off furtive movements on the UF-250 suggests that:

> "Furtive movements ... tells me that the cops are out there winging it a bit..... they're really not looking for individuals".[108]

---

[108] See, Statement of Peter Mancuso, John Jay College of Criminal Justice, The New York Police Department's Stop and Frisk Policies (transcript), 40-41, March 9, 2010, Association of the Bar of the City of New York.