UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

KELTON DAVIS, *et al.*,

                                    Plaintiffs,

            -against-                                    10 Civ. 699 (SAS)

THE CITY OF NEW YORK, *et al.*,

                                    Defendants.

------------------------------------------------------------------------ x

### DEFENDANT CITY OF NEW YORK'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS AGAINST THE CITY[*]

---

[*] The following abbreviations are used herein: "City Mem" refers to Defendant City's Memorandum in Support of Summary Judgment, dated December 4, 2012; "City 56.1" refers to Defendant City's Statement of Facts Pursuant to Local Rule 56.1, dated December 4, 2012; "Ps Mem" refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, dated January 7, 2013; "Ps 56.1" refers to "Plaintiffs' Response to Defendant City's Local Civil Rule 56.1 Statement of Undisputed Facts," dated January 7, 2013; "Opinion", refers to the 10/4/12 Opinion and Order addressing the City's summary judgment motion on the plaintiffs' individual circumstances ("Phase I"); "City Phase I Mem" refers to the City's Phase I Memorandum of Law, dated 6/15/12; "Lee" refers to the Declaration of Jin Hee Lee, dated January 7, 2013; "Brooker II" refers to the Declaration of Katherine E.G. Brooker, dated January 7, 2013, and accompanying Exhibits A-G; and "Cooke Dec." refers to the Declaration of Brenda E. Cooke dated January 18, 2013.

**Fourth Amendment.**  The Arrested Plaintiffs' rebuttal fails for the reasons initially articulated by the City with respect to both parties' motions.[1]  The City further asserts:

First, the City's response to the Arrested Plaintiffs' motion for summary judgment not only rebuts their claim that there is an issue of fact on their express policy claim, Ps Mem at 2-3, but, *a fortiori*, establishes that the City's express policy is constitutional.[2]

Second, the Arrested Plaintiffs' assertion that argument is a substitute for inadequate pleading, Ps Mem at 4 n.7, is insufficient to defeat summary judgment on their unpleaded "widespread practice" claim.[3]

Third, because Fagan's "findings" are based on flawed analysis and are unreliable, they therefore cannot credibly establish the plaintiffs' conclusion that the City has a persistent and

---

[1] Plaintiffs' accusation that the City has failed to timely produce discovery and should therefore be precluded from relying on it for this motion (Pls Mem at 15 n.26) is ludicrous.  First, fact discovery concluded by Court Order on February 13, 2012, but the City continued to make productions throughout 2012, including those referenced by plaintiffs on October 26 ("*Ligon* documents") and November 20 ("NYCHA rules training documents").  Second, the documents plaintiffs complain should be precluded did not exist until sometime <u>after</u> the close of fact discovery in this case (e.g., Rodman's Neck training did not commence until approximately March 2012 and the NYCHA rules training was not final until October 2012).  Third, the Court has allowed *Floyd* plaintiffs to rely (motions and trial) on documents that were never produced and that were <u>only first identified by plaintiffs when relied on in their opposition to the City's summary judgment motion</u>.  Accordingly, there is no basis to preclude documents that were timely produced by the City and in accordance with its obligations under Rule 26 and in plaintiffs' possession long before the filing of their opposition brief on January 7, 2013.

[2] Contrary to Arrested Plaintiffs' apparent assertion, the basic express trespass enforcement policy that a person is subject to arrest by being in a prohibited area is indisputably constitutional.  Extraneous circumstances at best indicate unconstitutionality as applied.  More relevant to the present discussion, however, only Arrested Plaintiffs Jackson and Johnson fit the circumstances discussed, and plaintiffs cannot survive summary judgment on a <u>Monell</u> claim in this case merely by reference to their own incidents.  <u>Connick v. Thompson</u>, 131 S. Ct. 1350, 1360-61 (2011).  Further, as discussed, <u>see</u> City Mem at 3-4, all Arrested Plaintiffs are required to provide pattern evidence specific to their own cases, which they have failed to do.  <u>See id</u>. at 1360.  In this regard, Fagan is long on generalities, but insufficiently short on specifics.

[3] Plaintiffs careless assertion that the City has waived summary judgment on this unpleaded claim is wrong.  <u>See</u> City Mem at 2 n.5 (expressly stating that "[s]uch a claim fails for the reasons set forth *infra*"); <u>id</u>. at 3-9 (detailing why any such claim is nevertheless meritless).

wide spread practice of unlawful trespass stops in NYCHA.  Importantly, Fagan concedes he could not make generalizations regarding the apparent lawfulness of 70,142 NYCHA trespass stops – representing 57.4% of all NYCHA stops – because officers frequently checked "other" on the UF250 form, but he nevertheless made generalizations regarding the apparent lawfulness of these 70,142 stops by reviewing the narrative text strings of a sample of only 3,000 (4% ) stops and applying the results to the entire universe of 70,142 stops.  Ps Mem at 6.  Fagan offers no explanation for his sample selection, or methodological support for the application of his conclusions regarding the text strings of 4% of the stops to the entire universe of UF250s.[4]

Fourth, plaintiffs' claim that the CCRB study and "high rates of declinations to prosecute NYCHA trespass arrests" further support and inference that the NYPD is engaged in a widespread practice of conducting unlawful trespass stops and arrests is misplaced.  Ps Mem 6-7.  First the CCRB study pre-dates the implementation of IO23 and the City took action in response to the concerns identified therein.  Plaintiffs have offered no admissible evidence which suggests that following the implementation of IO23 and related training that the CCRB continues to substantiate civilian complaints for unlawful stops and frisks in NYCHA at a rate greater than elsewhere in the city.  In fact, there is no material dispute that in September 2010, the CCRB actually informed the NYPD that the number of complaints against Housing officers regarding improper stops had dropped.  City 56.1 ¶ 207; Ps 56.1 ¶ 207.  Second, the decision to decline to

---

[4] Fagan's analysis is further flawed based on a myriad of inappropriate assumptions, including his persistent attempts to conduct legal analysis - for which he lacks any such qualification - and draw impermissible legal conclusions.  For example, Fagan wrongly assumes that "Proximity to Scene" "provides no added value or information" regarding reasonable suspicion for a trespass stop (Lee Ex. 8 (Fagan Rebuttal) 32 n.72), when, in fact, instances in which an officer arrives at a specific location pursuant to a 911 call or Radio Run (information that is indicated on the face of the UF250 form, but which is _entirely disregarded_ by Fagan in his analysis) are instances in which the proximity of the person stopped to the scene of the reported offense most certainly contributes to reasonable suspicion for the stop.

prosecute a case is an independent, post-arrest determination by the District Attorney's Office and cannot in itself be relied on, as plaintiffs suggest (Ps Mem at 7), to infer that a stop lacked reasonable suspicion or that an arrest was made without probable cause.  See Quinn v. City of New York, 2003 WL 1090205 at 4 (E.D.N.Y. Mar. 12 2003) ("[a] prosecutor's declination provides no indication that plaintiff's arrest was without probable cause.") citing Haussman v. Fergus, 894 F. Supp. 142, 147 (S.D.N.Y.1995) (citing Pierson, 386 U.S. at 555).   Further, plaintiffs' efforts to support any such inference by selective identification of certain declinations to prosecute (See Brooker II, Ex. A-G) is unavailing as they are inadmissible hearsay and cannot be relied on to defeat the City's summary judgment motion.  Finally, because the rates of NYPD Housing Bureau declinations to prosecute following the implementation of IO23 and related training in the fall of 2010 have downwardly declined (see Cooke Dec. Ex. A), the more appropriate inference is that IO23 and the training has improved the quality of stops and arrests.

Fifth, the Arrested Plaintiffs' misconstrue Brown v. Texas, 443 U.S. 47 (1979) as holding that a police officer can ask that a person identify himself only where reasonable suspicion exists.   Rather, Brown merely holds that a person cannot be Terry-stopped without reasonable suspicion for the purpose of determining identity.  INS v. Delgado, 466 U.S. 210, 216 (1984).

Sixth, Criminal Procedure Law ("CPL") § 140.50(1) did not codify Brown and it does not require an officer to demand a person's name, address and an explanation of such person's conduct *only* where reasonable suspicion exists.  See Ps Mem at 8 n.17.  CPL § 140.50(1) was enacted in substance in 1964 as § 180-a of the Code of Criminal Procedure,[5] and the law then (as now) states that a police officer in the situation described *may* demand such information.  As the Court of Appeals clarified in 1970, the statute does not narrow the right of police inquiry to *only*

---

[5] L.1964 ch.86 § 2; see also L.1970 ch.996 § 1 (recodifying § 180-a as CPL § 140.50).

those situations where reasonable suspicion exists.  See People v. Rosemond, 26 N.Y.2d 101,

103-04 (1970) ("It is obvious that [§ 180-a] is not the beginning and the end of the right and duty

of police to make inquiries of people on the public streets.  Nor does it prescribe the full scope of

police activity.  Many subjects, other than the commission of felonies[6], and many grounds,

other than a reasonable suspicion that felony is in budding process, will justify police inquiry.").

Seventh, the Arrested Plaintiffs provide no evidence of actual causation.  Rather, they

merely argue that causation can be inferred from evidence of a need for supervision, discipline

and/or training.  Ps Mem at 10 (citing Gentile v. County of Suffolk, 926 F.2d 142, 152-53 (2d

Cir. 1991)).  To the extent Gentile supports that proposition, it has been overruled by Connick v.

Thompson, 131 S. Ct.  1350, 1358 n.5 (2011).

Finally, the Arrested Plaintiffs fail to address Reynolds v. Giuliani, 506 F.3d 183 (2d Cir.

2007), which sets for the standard for deliberate indifference in cases like the present case.[7]  See

506 F.3d at 192-93 (the response must be "patently  inadequate", "severe" and "quite deficient").

**Equal Protection.**  The Arrested Plaintiffs continue to fail to articulate a precise basis for

this claim,[8] which remains frustratingly obtuse.  See Ps Mem at 16.  Municipalities do not, as

these plaintiffs indicate, "subject [persons] to a widespread practice".  Ps Mem at 16.  Municipal

---

[6]  At the time, the statute also included certain unbailable offenses, see L.1964 ch.86 § 2, and eventually was extended to all misdemeanors.  See L.1973 ch.714 § 1.

[7]  Arrested Plaintiffs erroneously assume that the Walker test establishes deliberate indifference, see Ps Mem at 14-15, rather than a duty to act.  Reynolds, 506 F.3d at 192.  The City does not dispute that it has, for example, a duty to train its police officers on stop and frisk.  Rather, it is the City's contention is that it meets its duty to train, supervise and discipline its police officers.

[8]  The Resident Plaintiffs are persistent in asserting that they have an equal protection claim, see Ps Mem at 16 n.30, but they are equally persistent in failing to provide any basis therefor.  See City Phase I Mem. at 14 (setting forth the City's argument, to which the Resident Plaintiffs have never substantively responded).  The Resident Plaintiffs' failure in this regard is sufficient grounds for dismissal of these claims.  Broadhurst v. County of Rockland, 2011 WL 5142760 at 7 (S.D.N.Y. Oct. 31, 2011).  Further, the Court's initial ruling with respect to Eleanor Britt, see Opinion at 49 n.136, is equally applicable to any plaintiff who asserts that he or she has an equal protection claim pursuant to his or her status as a Resident (as opposed to Arrested) Plaintiff.

*employees* may create such a practice (or custom) and the municipality faces liability only for acquiescing in such conduct. E.g., Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 126 (2d Cir. 2004). This is what the Floyd plaintiffs argued, see Floyd v. City of New York, 813 F. Supp. 2d 417, 449-53 (S.D.N.Y. 2011), and presumably what the Arrested Plaintiffs contend here.[9] However, where the Floyd plaintiffs may have prevailed, the Davis plaintiffs fall short.

With respect to a showing of disparate impact, the City has nothing to add to its earlier argument that Fagan's "surrounding area" is an improper comparator[10] and his statistics are too equivocal and conclusory to raise an issue of fact. See City Mem at 11-12. Regarding discriminatory purpose, Arrested Plaintiffs' arguments parallel those advanced by the Floyd plaintiffs to the extent they invoke: (1) Fagan's statistical analyses; and (2) certain indications to the City of potential racial disparities in officer stop-and-frisk practices (e.g., the 1999 N.Y. AG's report). As in Floyd, however, plaintiffs' statistics alone cannot establish discriminatory intent. See 813 F. Supp. 2d at 452. Regarding the non-statistical evidence, the court in Floyd further stated: ". . . plaintiffs have presented other proof in addition to the statistical evidence namely, the inadequacy of the City's efforts to take remedial steps to reduce the racial disparity of stops . . ." Id. at 452-53. As set forth in the City's moving brief, the City not only has taken substantial remedial steps to address trespass enforcement in NYCHA, but plaintiffs' own

---

[9] For the reasons set forth in Floyd v. City of New York, *supra*, the Arrested Plaintiffs have failed to sufficiently advance any claim that the City has intentionally targeted blacks and Hispanics for law enforcement based on their race. See 813 F. Supp. 2d at 449-50. They only argue disparate impact–discriminatory purpose, fail to discuss any discriminatory deployment of law enforcement cases, e.g., Pyke v. Cuomo, 567 F.3d 74 (2d Cir. 2009), and provide no evidence of an express racial classification. See City Mem at 9-10 n.13 (citing cases). Merely asserting that the crime conditions on NYCHA property should be addressed differently from a law enforcement standpoint than those in the "surrounding area" is not sufficient. E.g., Brown v. City of Oneonta, 221 F.3d 329, 339 (2d Cir 1999).

[10] Plaintiffs provide inconsistent assertions about whether they are required to provide a statistically appropriate comparator. See Ps Mem at 18 n.31. The City reasserts its view that, in "adverse effect" cases like the present case, they must. See generally City Mem at 9-10 n.13.

statistics show that such measures are working.[11]  City Mem at 12 & 14.

**Title VI.**  Plaintiff Britt's assertion that she has a viable Title VI (and FHA) claim against the City is incorrect.  See Opinion at 55 ("[p]laintiffs point to no evidence regarding the impairment of Britt's residency-based rights beyond those under the United States Housing Act").[12]  With respect to Littlejohn and Evans (the "Remaining Resident Plaintiffs"), none of their rebuttal points alter the legal conclusion that the NYPD is not a statutory recipient of HUD funds for Title VI discrimination purposes.  The fact that the NYPD receives funds through NYCHA merely begs (rather than answers) the question of the circumstances that make a contractual recipient funds a Title VI recipient.  That the funds are within the scope of the grant also is irrelevant because such a rule would mean that only the receipt of illegal, *ultra vires* funds would make an indirect recipient not subject to Title VI.  The possibility that the NYPD could "reject" HUD funds by breaking its "voluntary contractual relationship" with NYCHA also places the NYPD on the same footing as a mere contractor not subject to Title VI.[13]  In sum, the Remaining Resident Plaintiffs have not established anything more than a contractual arrangement that does not implicate Title VI.  See Alfano v. Bridgeport Airport Servs., Inc., 373

---

[11]  The Court therefore need not address the extent to which a municipality's failure to address known discrimination constitutes evidence of discriminatory intent.  The City notes, however, that a municipality's mere failure to address known racial discrimination does not constitute discriminatory purpose.  See McCleskey v. Kemp, 481 U.S. 279, 297-98 (1987).  *De jure* discrimination is not alleged in the present case.  United States v. City of Yonkers, 96 F.3d 600, 614-16 (2d Cir. 1996); see also Jana-Rock Constr., Inc. v. New York State Dep't of Econ. Dev., 438 F.3d 195, 204-05 (2d Cir. 2006) (extrinsic showing of discriminatory purpose not required where the discrimination is pursuant to an express policy).

[12]  Because Britt is not an Arrested Plaintiff and plaintiffs' United States Housing Act claim was withdrawn as to the City, see Opinion at 69, Britt no longer has *any* claims against the City.

[13]  The additional bootstrap argument that accepting HUD funds from NYCHA makes the NYPD subject to Title VI is merely a restatement that Congress intended *statutory recipients* (not indirect recipients like the NYPD) to be subject to Title VI.  See United States Dep't of Transp. v. Paralyzed Veterans of America, 477 U.S. 597, 604 (1986).  That NYPD and NYCHA agreed to comply with applicable law again begs the question of what the applicable law is.

F. Supp. 2d 1, 6-7 (D. Conn. 2005).  Plaintiffs have also failed to address the City's additional

arguments that warrant dismissal of these *residency*-based claims.  See City Mem at 17 & 18-19.

**The FHA.**  The Remaining Resident Plaintiffs' § 3617 claim did not survive the initial

round of briefing and need not be revisited here.  See Opinion at 62-66 (upholding only the §

3604 claim); City Phase I Mem at 22-23 & n.34 (citing Frazier v. Rominger and Woods-Drake v.

Lundy).  With respect to § 3604, the Remaining Resident Plaintiffs have withdrawn their FHA

"disparate impact" claim.  Ps Mem at 28 n.48.  However, to prevail on a "disparate treatment",

these plaintiffs must initially show discriminatory intent "was a significant factor".  E.g., Quad

Enters. Co., LLC v. Town of Southold, 369 Fed. Appx. 202, 207 (2d Cir. 2010).  As with Title

VI, their FHA claims fail for reasons over and above equal protection claims brought by

*arrestees*.   Even assuming the Remaining Resident Plaintiffs can support their FHA

discriminatory treatment claim with statistical impact evidence unrelated housing opportunities

or availability, see City Mem at 15, they have provided no statistical evidence of any other effect

on residents (as opposed to arrestees) in NYCHA housing or the "surrounding area".  See id. at

16 n.22 & 18-19.  For example, there is no statistical evidence that the Remaining Resident

Plaintiffs have been denied access to police services.  See Committee Concerning Community

Improvement v. City of Modesto, 583 F.3d 690, 707 (9th Cir. 2009).

**Section 1981.**  The City further emphasizes that there is a difference between establishing

an *individual* § 1981 contract claim, see Opinion at 62 (Evans' and Littlejohn's arrests coupled

with a feeling of being unable "to come and go from their buildings and to have guests visit

them" sufficient to establish their § 1981 claim) and showing that *the City* sufficiently acted with

discriminatory purpose towards NYCHA residents in that regard.  See City Mem at 18.  The

Remaining Residential Plaintiffs cannot establish the latter by relying on what amounts to

"transferred intent". See Personnel Adm'r v. Feeney, 442 U.S. 256, 279 (1979).

   **No Private Right of Action.**  The Arrested Plaintiffs have withdrawn their State equal protection claim, New York State Constitution ("NYSC") art. I § 11, but assert their NYSC art. I § 12 claim is viable because its scope of is broader that the Fourth Amendment.  However:  (1) they ultimately conclude that "[t]he 'approach and question' protocol, memorialized in IO 23 . . . *violates both the state and federal constitutions*", Ps Mem at 30 (emphasis added); (2) as the court reasoned in Wahad v. Federal Bureau of Investigation, 994 F. Supp. 237 (S.D.N.Y. 1998), only an *adequate* (not *identical*) remedy is needed, see 994 F. Supp. at 240 n.4[14]; (3) the availability of common law tort remedies (e.g., *respondeat superior*) provides an additional alternative remedy, Felmine, 2012 U.S. Dist. LEXIS 77299 at 21; and (4) there is no indication of any plaintiff who falls in this alleged constitutional gap.[15]  In any event, the NYSC art. I § 12 claim should be dismissed based on the doctrine of governmental function immunity, *infra*.

   **Governmental Function Immunity.**   Plaintiffs confuse governmental function immunity, which serves to bar state law claims against a municipality, see In re World Trade Center Bombing Litig., 17 N.Y.2d 428, 452 (2011), with qualified immunity, a potential bar to officer § 1983 liability with no application to the present case.  See Okin v. Vill. of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 433 (2d Cir. 2009).  Accordingly, for the reasons previously set forth by the City, see City Mem at 19-20, these state law claims should be dismissed. [16]

---

[14]   Accord Felmine v. City of New York, 2012 U.S. Dist. LEXIS 77299 at 20-21 (E.D.N.Y. June 4, 2012).  Plaintiffs cite no authority for the proposition that the argued constitutional variances are sufficient to create a private right of action under NYSC art. I § 12. In fact, Flores v. City of Mount Vernon, 41 F. Supp. 2d 439 (S.D.N.Y. 1999), follows Wahad.

[15]   The two constitutional claims, which all allege illegal stops, are identical.  City Mem at 19.

[16]   Regarding plaintiffs' state law claims, only the *respondeat superior* claims should remain. The City is not arguing here for dismissal of these claims pursuant to the separate state law doctrine that prohibits municipality liability for the discretionary acts of its non-policymaking employees.  See Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 470 (S.D.N.Y. 2008).

## CONCLUSION

For the foregoing reasons the City's motion should be granted in its entirety.

Dated:     New York, New York
           January 18, 2013

                                        MICHAEL A. CARDOZO
                                        Corporation Counsel of the City of New York
                                        *Attorney for Defendant City of New York*
                                        100 Church Street, Room 3-174
                                        New York, New York 10007
                                        (212) 513-0462

                                        By:  *Brenda E. Cooke*
                                             Brenda E. Cooke
                                             Senior Counsel

Of counsel:
Judson Vickers, Esq.

9