UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

KELTON DAVIS, WILLIAM TURNER,
EDWIN LARREGUI, ANTHONY
ANDERSON, SHAWNE JONES, HECTOR
SUAREZ, ADAM COOPER, DAVID
WILSON, GENEVA WILSON, ELEANOR
BRITT, ROMAN JACKSON, KRISTIN
JOHNSON, LASHAUN SMITH, ANDREW
WASHINGTON, PATRICK LITTLEJOHN,
RAYMOND OSORIO, VAUGHN
FREDERICK, and R.E., by her parent D.E.,
individually and on behalf of a class of all
others similarly situated,

                Plaintiffs,

            - against -

THE CITY OF NEW YORK and NEW
YORK CITY HOUSING AUTHORITY,

                Defendants.
------------------------------------------------------------X



**OPINION & ORDER**

10 Civ. 0699 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    LEGAL STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . 13

IV.     *MONELL* LIABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V.      DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1

A.    Fourth Amendment Claims Against the City. . . . . . . . . . . . . . . . . . 19
      1.    Plaintiffs' Claim of an Unconstitutional Policy. . . . . . . . . . . 26

            a.    Plaintiffs' Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
                  i.    Plaintiffs' Challenge to IO 23 Arrest Policy. . . . 28
                  ii.   Plaintiffs' Challenge to IO 23 Stop Policy. . . . . 31
            b.    The City's Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . 35

      2.    Plaintiffs' Claim of an Unconstitutional Custom and Practice
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

            a.    Widespread Practice. . . . . . . . . . . . . . . . . . . . . . . . . . 44
                  i.    Documentary and Testimonial Evidence. . . . . . . 44
                  ii.   Dr. Fagan's Analysis. . . . . . . . . . . . . . . . . . . . . 48
            b.    Deliberate Indifference. . . . . . . . . . . . . . . . . . . . . . . . 55

B.    Fourteenth Amendment Equal Protection Claims Against the City
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
C.    Title VI Claims Against the City. . . . . . . . . . . . . . . . . . . . . . . . . . 73
D.    Section 1981 Claims Against the City. . . . . . . . . . . . . . . . . . . . . . 78
E.    FHA Claims Against the City. . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
F.    NYSC Article I Section 12 Claims Against the City. . . . . . . . . . . . 83
G.    Race Discrimination Claims Against NYCHA. . . . . . . . . . . . . . . . . 85
H.    USHA Claims Against NYCHA. . . . . . . . . . . . . . . . . . . . . . . . . . 89

VI.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

## I.    INTRODUCTION

This case, filed in 2010, is one of three cases currently before this

Court challenging aspects of the City of New York's "stop and frisk" practices.[1]

_____

[1]    *Floyd v. City of New York*, filed in 2008, challenges the NYPD's stop and frisk practices for pedestrians, arguing among other things that the NYPD is systematically violating the Fourth and Fourteenth Amendments to the United States Constitution.  *See Floyd v. City of New York*, 283 F.R.D. 153, 159 (S.D.N.Y.

2

What distinguishes this case from the other two is its focus on stop and frisk

practices at public housing properties owned and operated by the New York City

Housing Authority ("NYCHA").  Plaintiffs argue that the New York City Police

Department ("NYPD") uses unlawful stops, searches, and arrests to enforce the

prohibition against trespassing in NYCHA buildings.[2]  According to plaintiffs, the

NYPD's practices violate the Fourth Amendment to the United States Constitution,

which guarantees "[t]he right of the people to be secure . . . against unreasonable

searches and seizures."  Plaintiffs also argue that the NYPD's practices are based

on racial discrimination against African Americans and Latinos, and thus violate

the Fourteenth Amendment, which guarantees "the equal protection of the laws."

 As the Supreme Court of the United States has repeatedly affirmed,

---

2012) (granting class certification); *Floyd v. City of New York*, 813 F. Supp. 2d 417
(S.D.N.Y. 2011), *on reconsideration*, 813 F. Supp. 2d 457 (S.D.N.Y. 2011)
(granting in part and denying in part defendants' motion for summary judgment).
*Ligon v. City of New York*, filed in 2012, deals with trespass stops and arrests in
and around privately owned buildings enrolled in the Trespass Affidavit Program
("TAP").  *See Ligon v. City of New York*, — F. Supp. 2d —, No. 12 Civ. 2274,
2013 WL 628534, at *44 n.461 (S.D.N.Y. Feb. 14, 2013) (granting plaintiffs'
motion for preliminary injunction, but staying relief pending consolidated remedies
hearing in *Floyd* and *Ligon*).

 [2] *See Davis v. City of New York* ("*Davis I*"), — F. Supp. 2d —, No. 10
Civ. 0699, 2012 WL 4813837, at *1 (S.D.N.Y. Oct. 9, 2012) (granting in part and
denying in part defendants' motions for summary judgment regarding individual
plaintiffs' arrests and tenancies).

"the ultimate touchstone of the Fourth Amendment is 'reasonableness.'"[3]  In *Terry*

*v. Ohio*, the Supreme Court held that under the Fourth Amendment, it is

constitutionally reasonable for the police to "stop and briefly detain a person for

investigative purposes if the officer has a reasonable suspicion supported by

articulable facts that criminal activity 'may be afoot,' even if the officer lacks

probable cause."[4]  This form of investigative detention is now known as a *Terry*

stop.[5]

       In the years since *Terry*, the Supreme Court and the Second Circuit

have developed and refined the balance under the Fourth Amendment "'between

the public interest and the individual's right to personal security free from arbitrary

---

[3]    *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  *Accord Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (per curiam) ("The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968))).  In judging reasonableness, a court balances "'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'"  *Illinois v. Lidster*, 540 U.S. 419 (2004) (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)).

[4]    *United States v. Swindle*, 407 F.3d 562, 566 (2d Cir. 2005) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (certain quotation marks omitted).

[5]    *See Davis I*, 2012 WL 4813837, at *2 (citing *Terry*, 392 U.S. at 88).

4

interference by law officers.'"[6]  The long line of cases concerning "the power of

the police to 'stop and frisk' . . . suspicious persons" has frequently presented a

conflict between individual liberty and dignity on the one hand, and public safety

on the other.[7]

       This case illustrates the tensions between liberty and security in

particularly stark form, because it deals with police practices in and around the

home, where the interests in both liberty and security are especially strong.[8]  The

---

[6]     *Mimms*, 434 U.S. at 109 (quoting *United States v. Brignoni-Ponce*,
422 U.S. 873, 878 (1975)).

[7]     *Ligon*, 2013 WL 628534, at *40 (quoting *Terry*, 392 U.S. at 10)
(certain quotation marks omitted).

[8]     On liberty and security in the home, see, for example, *Florida v.
Jardines*, No. 11–564, slip op. at 4 (Mar. 26, 2013) (noting that at the Fourth
Amendment's "'very core' stands 'the right of a man to retreat into his own home
and there be free from unreasonable governmental intrusion'" (quoting *Silverman
v. United States*, 365 U.S. 505, 511 (1961)); *McDonald v. City of Chicago, Ill.*,
130 S. Ct. 3020, 3036 (2010) (noting that "'the need for defense of self, family,
and property is most acute' in the home" (quoting *District of Columbia v. Heller*,
554 U.S. 570, 628 (2008))); *Georgia v. Randolph*, 547 U.S. 103, 115 (2006) ("We
have . . . lived our whole national history with an understanding of 'the ancient
adage that a man's house is his castle [to the point that t]he poorest man may in his
cottage bid defiance to all the forces of the Crown,' *Miller v. United States*, 357
U.S. 301, 307 (1958) (internal quotation marks omitted)."); *Payton v. New York*,
445 U.S. 573, 583–90 (1980) (discussing "'the sanctity of the home'" under the
Fourth Amendment (quoting *United States v. Reed*, 572 F.2d 412, 423 (2d Cir.
1978))); *Boyd v. United States*, 116 U.S. 616, 630 (1886) (discussing the
"indefeasible right of personal security, personal liberty, and private property"
against "all invasions on the part of the government and its employes of the
sanctity of a man's home and the privacies of life" (citing *Entick v. Carrington*, 95

gravity of the alleged injuries to plaintiffs' liberty is reflected in the testimony of

Reginald Bowman, President of the Citywide Council of Presidents, a NYCHA

resident leadership group:

> [W]henever I have an opportunity to talk to someone in law enforcement who might listen, my question to them is:  Suppose I came into your neighborhood tonight and you were in civilian attire and you were on your way to the store to get milk and cookies for your kids, and I stopped you the way that some of your personnel do, what would you do?  How would you feel about that?
> . . .
> When this type of practice is instituted and done to people on a regular basis . . . I use the term "penal colony," it's almost like we have been colonized for a decade.[9]

At the same time, many NYCHA tenants have expressed a desire for

greater security services from the police, including "more officers on foot patrol

like we used to have when officers walked around, knew residents and built

relationships with them."[10]  As I noted in an earlier opinion in this case, there is a

---

Eng. Rep. 807 (C.P. 1765))).

[9]      Excerpts from 3/28/12 Deposition of Reginald Bowman, President of the Citywide Council of Presidents, Exhibit ("Ex.") 18 to 1/7/13 Declaration of Jin Hee Lee, counsel for plaintiffs ("Lee Decl."), at 94–95.

[10]     1/26/12 Declaration of Pamela Thrower, Resident Association President of NYCHA Queensbridge Houses, Ex. 14 to Lee Decl., ¶ 3.  *Accord* 1/26/12 Declaration of Luis Torres, Resident Association President of NYCHA Moore Houses, Ex. 15 to Lee Decl., ¶ 4 ("My residents are constantly complaining to me that the police do not help when they are needed, but, when you do see the police, they are harassing residents for no reason.").

long and often underappreciated history of anti-crime activism by NYCHA tenant organizations: "'The activists, most of whom were women, . . . believed that securing their fair share of municipal services, including police protection, was a fundamental right . . . .'"[11]

This case is solely concerned with whether the NYPD's trespass enforcement practices in NYCHA buildings violate the Constitution, or other laws. If so, the practices must stop, no matter how effective they may be. As the Supreme Court recently noted, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table."[12] Just as public schools face constitutional constraints on religious expression that do not apply to private schools, and public employers face constitutional restrictions that do not apply to private employers, so public security in public housing must operate within constitutional limitations that would not apply in a purely private context. NYPD officers on patrol in NYCHA buildings are members of the City's police force. As a result, they must operate in accord with constitutional rules that would not apply

---

[11]     *Davis I*, 2012 WL 4813837, at *1 n.8 (quoting FRITZ UMBACH, THE LAST NEIGHBORHOOD COPS: THE RISE AND FALL OF COMMUNITY POLICING IN NEW YORK PUBLIC HOUSING 5 (2010)).

[12]     *Heller*, 554 U.S. at 636.  I noted in *Ligon* that "[n]o matter how effective a police practice may be, if it violates the Fourth Amendment, the Constitution requires the government to find other means of achieving its goals." *Ligon*, 2013 WL 628534, at *41 n.453.

to private security in a private building.  The NYPD may not, for example, forcibly stop and question every person who enters a NYCHA building, as a doorman in a private building is free to do.

It is against this backdrop that I address plaintiffs' and defendants' motions for summary judgment.  The parties agreed to brief these motions in two parts.  The first part, adjudicated in October 2012, addressed the individual circumstances of plaintiffs' arrests and tenancies.[13]  The second part, adjudicated here, addresses defendants' practices and policies.

For the reasons set forth below, the parties' motions for summary judgment are granted in part and denied in part.  A summary of the Court's decisions appears in the Conclusion to this Opinion.

## II.   BACKGROUND

I begin by offering a brief summary of the procedural background to plaintiffs' pending claims against the City and NYCHA.  Plaintiffs' Amended Complaint identified the putative plaintiff class in this case as consisting of two overlapping subclasses, the "arrested plaintiffs" and the "resident plaintiffs."[14] Plaintiffs identified the following thirteen plaintiffs as representing the *arrested*

---

[13]     *See Davis I*, 2012 WL 4813837.

[14]     *See* Amended Complaint ("Am. Compl.") ¶¶ 21–23.

plaintiffs:  Anthony Anderson, Adam Cooper, Rikia Evans, Vaughn Frederick, Roman Jackson, Kristin Johnson, Edwin Larregui, Patrick Littlejohn, Raymond Osorio, Lashaun Smith, William Turner, Andrew Washington, and David Wilson.[15] Plaintiffs identified the following eight plaintiffs as representing the *resident* plaintiffs:  Eleanor Britt, Kelton Davis, Frederick, Shawne Jones, Littlejohn, Hector Suarez, Washington, and Evans.[16]  Plaintiff Geneva Wilson, a NYCHA resident and aunt of David Wilson who was eighty years old at the time of the Amended Complaint, was not listed as representing either subclass.[17]

Prior to the filing of the Amended Complaint, nine of the named plaintiffs accepted offers of judgment from the City pursuant to Federal Rule of Civil Procedure 68, but continued to assert their claims against NYCHA: Anderson, Cooper, Davis, Jones, Larregui, Suarez, Turner, David Wilson, and Geneva Wilson.[18]

In the Amended Complaint, plaintiffs brought the following claims:

---

[15]    *See id.* ¶ 46.

[16]    *See id.* ¶ 47.

[17]    *See id.* ¶¶ 46–47, 89–100.

[18]    *See id.* ¶ 1 n.1; *Davis v. City of New York*, No. 10 Civ. 0699, 2011 WL 4946243, at *1 (S.D.N.Y. Oct. 18, 2011) (awarding attorney's fees to settling plaintiffs).

(1)     The arrested plaintiffs who had not accepted offers of judgment from the City (Evans, Frederick, Jackson, Johnson, Littlejohn, Osorio, Smith, and Washington) brought Fourth Amendment, New York State Constitution ("NYSC") article 1 section 12 (which guarantees security against unreasonable searches and seizures), and *respondeat superior* claims against the City.[19]  Plaintiffs also alleged violations of *resident* plaintiffs' Fourth Amendment rights, but did not plead a claim based on these violations.[20]

(2)     The resident plaintiffs brought claims against the City and NYCHA under Title VIII of the Civil Rights Act of 1968 (the "Fair Housing Act" or "FHA"), the United States Housing Act (the "USHA"), the Civil Rights Act of 1866 (42 U.S.C. § 1981, or "section 1981"), and the New York State and City Human Rights Laws (the "NYSHRL" and "NYCHRL").[21]

(3)     All plaintiffs brought claims against the City and NYCHA under the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964 ("Title VI"), and NYSC article 1 section 11 (which guarantees equal protection).[22]

Because it was undisputed in *Davis I* that Frederick and Washington are not

---

[19]     *See* Am. Compl. ¶¶ 237–244 (Fourth Amendment), 281–286 (NYSC article 1 section 12), 287–293 (*respondeat superior*).

[20]     *See id.* ¶¶ 240–244.

[21]     *See id.* ¶¶ 254–259 (FHA), 260–265 (USHA), 266–271 (section 1981), 294–302 (NYSHRL and NYCHRL).

[22]     *See id.* ¶¶ 245–250 (Fourteenth Amendment equal protection), 251–253 (Title VI), 272–274 (due process), 275–280 (article 1 section 11).

authorized NYCHA tenants, I granted summary judgment to the City and NYCHA on their claims as resident plaintiffs.[23]   Based on this and plaintiffs' omission of Davis and Geneva Wilson from the list of resident plaintiffs in their briefing, I concluded that the remaining resident plaintiffs were Britt, Evans, Jones, Littlejohn, and Suarez.[24]   In the briefing prior to *Davis I*, plaintiffs withdrew their claims against the City under the USHA.[25]   I also granted summary judgment in *Davis I* on the following claims to the following parties:  (1) to NYCHA on all plaintiffs' Fourteenth Amendment equal protection and article 1 section 11 claims;[26]  (2) to the City on the resident plaintiffs' NYSHRL and NYCHRL claims;[27]  and (3) to the City and NYCHA on non-resident plaintiffs' Title VI claims,[28] on Britt's equal protection, FHA, section 1981, NYSHRL, NYCHRL, and

---

[23]     *See Davis I*, 2012 WL 4813837, at *17 n.151.

[24]     *See id.*; *Davis v. City of New York*, No. 10 Civ. 0699, 2013 WL 145584, at *1 (S.D.N.Y. Jan. 14, 2013) (addressing NYCHA's supplemental motion for partial summary judgment based on Jones's and Suarez's tenancies).

[25]     *See* 7/20/12 Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for Partial Summary Judgment ("Pl. Opp. (7/20/12)") at 33 n.36.

[26]     *See Davis I*, 2012 WL 4813837, at *16.

[27]     *See id.* at *21.

[28]     *See id.* at *17 n.155.

Title VI claims,[29] and on all plaintiffs' due process claims.[30]

As a result, the following claims from the original three categories of claims, above, remained viable after the first round of summary judgment briefing: *First*, the remaining arrested plaintiffs are Evans (trespass stop and arrest), Frederick (trespass stop and arrest), Jackson and Johnson (trespass arrests), Littlejohn (trespass stop and arrest), Osorio (trespass stop), Smith (trespass stop and arrest), and Washington (trespass stop and arrest). These plaintiffs maintain Fourth Amendment, Fourteenth Amendment equal protection, NYSC article 1 sections 11 and 12, and *respondeat superior* claims against the City.[31] *Second*, the

---

[29]     The City correctly concludes that *Davis I* granted both defendants summary judgment on all of Britt's claims that depended on the impairment of her residency-based rights, except Britt's USHA claim against NYCHA. *Contra* Pl. Opp. at 27 n.20, *see* City Mem. at 14 n.20 (citing *Davis I*, 2012 WL 4813837, at *17 ("Plaintiffs point to no evidence regarding the impairment of Britt's residency-based rights beyond those under the United States Housing Act that guarantee the provision of a reasonable residential lease.")). *See also Davis I*, 2012 WL 4813837, at *15 n.136 (granting summary judgment on Britt's equal protection claims against the City); *id.* at *20 (granting summary judgment on Britt's section 1981 claims against the City and NYCHA).

[30]     *See Davis I*, 2012 WL 4813837, at *26.

[31]     *See id.* at *2–15; Am. Compl. ¶¶ 118–133 (Washington), 149–155 (Frederick); 12/4/12 Defendant City of New York's Memorandum of Law in Support of Its Motion for Summary Judgment on Plaintiffs' Claims Against the City ("City Mem.") at 1. Because the parties' submissions do not address plaintiffs' *respondeat superior* claims, I will not address those claims in this Opinion.

12

remaining resident plaintiffs are Britt, Evans, Littlejohn, Jones, and Suarez. All maintain USHA claims against NYCHA; all but Britt maintain Title VI, FHA, NYSHRL, NYCHRL, and section 1981 claims against NYCHA; and Evans and Littlejohn maintain Title VI, FHA, section 1981, Fourteenth Amendment equal protection, and NYSC article 1 section 11 claims against the City.

## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is designed to pierce the pleadings to flush out those cases that are predestined to result in a directed verdict."[32] Thus, summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"[33] "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[34]

---

[32]     *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

[33]     *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 692 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)) (other quotations omitted).

[34]     *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012) (quotations and alterations omitted).

"[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[35]  "When the burden of proof at trial would fall on the non-moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim."[36]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.[37]  The non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[38] and cannot "rely on conclusory allegations or unsubstantiated speculation."[39]

In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[40]  "'Credibility determinations, the weighing of the evidence,

---

[35]     *Miner v. Clinton Cnty., N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citation omitted).

[36]     *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

[37]     *See id.*

[38]     *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[39]     *Id.*

[40]     *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

and the drawing of legitimate inferences from the facts are jury functions, not those

of a judge.'"[41]

## IV.   *MONELL* LIABILITY

42 U.S.C. § 1983 ("section 1983") creates "'a species of tort

liability'" for, among other things, certain violations of constitutional rights.[42]  As

the Supreme Court established in *Monell v. New York City Department of Social*

*Services*,[43] in order to have recourse against a municipality or other local

government under section 1983, plaintiffs "must prove that 'action pursuant to

official municipal policy' caused the alleged constitutional injury."[44]  "In other

---

[41]   *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

[42]   *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305 (1986)).

[43]   436 U.S. 658 (1978).  Interpreting the language of section 1983 and the legislative history surrounding its passage in the Civil Rights Act of 1871, the Court in *Monell* held that local governing bodies could be held liable either on the basis of formally approved policies or on the basis of "'customs'" or "'usages.'" *Id.* at 690–91 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)).

[44]   *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1741 (2012) (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011), in turn quoting *Monell*, 436 U.S. at 691 (quotation marks omitted)). Cases after *Monell* "considerably broadened the concept of official municipal action."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) (Sotomayor, J.).

words, municipalities are 'responsible only for their own illegal acts,' and cannot be held 'vicariously liable under § 1983 for their employees' actions.'"[45]  In general, "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."[46]  Such policies "may be pronounced or tacit and reflected in either action or inaction."[47]

One way to establish the existence of a municipal policy is through a showing of "deliberate indifference" by high-level officials.  "'[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983.'"[48]  "Deliberate indifference" requires "'proof that a municipal actor disregarded a known or obvious consequence of his action.'"[49]

_____

[45]   *Cash*, 654 F.3d at 333 (quoting *Connick*, 131 S. Ct. at 1359) (certain quotation marks omitted).

[46]   *Connick*, 131 S. Ct. at 1359 (citing *Monell*, 436 U.S. at 694; *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986); *Adickes*, 398 U.S. at 167–68).

[47]   *Cash*, 654 F.3d at 334.

[48]   *Id.* (quoting *Amnesty*, 361 F.3d at 126).

[49]   *Connick*, 131 S. Ct. at 1359 (quoting *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)).

16

Recognizing that "deliberate indifference" is "a stringent standard of fault," the Second Circuit requires "that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'"[50]  The Second Circuit has also held that municipal liability can be established "by demonstrating that the actions of subordinate officers are sufficiently widespread to constitute the *constructive acquiescence* of senior policymakers."[51]

A municipality may incur *Monell* liability based on deliberate

---

[50]     *Cash*, 654 F.3d at 334 (quoting *Connick*, 131 S.Ct at 1360; *Amnesty*, 361 F.3d at 128).

[51]     *Sorlucco v. City of New York*, 971 F.2d 864, 871 (2d Cir. 1992) (emphasis added), quoted with approval by *Amnesty*, 361 F.3d at 126; *Okin v. Village of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009). Though the Second Circuit has not explicitly reaffirmed the "constructive acquiescence" theory of *Monell* liability articulated in *Sorlucco* since the Supreme Court decided *Connick*, the Second Circuit continues to hold that if a practice of misconduct is sufficiently widespread, the municipality may be assumed to have acquiesced in it, even in the absence of direct evidence of such acquiescence.  *See Ligon*, 2013 WL 628534, at *4 n.32 (discussing *Jones v. Town of E. Haven*, 691 F.3d 72, 82 (2d Cir. 2012)).
    Whether or not the phrase "constructive acquiescence" persists in Second Circuit case law, the theory remains valid under the terms of *Connick*: "practices so persistent and widespread as to practically have the force of law" represent official municipal policy for the purpose of *Monell* liability.  *Connick*, 131 S. Ct. at 1359 (citing *Adickes*, 398 U.S. at 167 ("[A] 'custom or usage, of (a) State' for purposes of § 1983 must have the force of law by virtue of the persistent practices of state officials.")).  *See also City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989) ("It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training *must have been* plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need." (emphasis added)).

17

indifference through its training practices. Although "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train,"[52] the Supreme Court has held that "[w]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."[53] "[D]eliberate indifference may be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,' but the policymaker 'fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs[.]'"[54]

---

[52]    *Connick*, 131 S. Ct. at 1359 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality opinion)).

[53]    *Id.* (citing *Bryan Cnty.*, 520 U.S. at 407).

[54]    *Cash*, 654 F.3d at 334 (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007); *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). *Cash* reaffirmed the validity of the three-part framing of the failure-to-train inquiry in *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992), summarized as:

> (1) policymaker knows "to a moral certainty" that its employees will confront a given situation; (2) either situation presents employees with [a] difficult choice that will be made less so by training or supervision, or there is a record of employees mishandling situation; and (3) wrong choice by employees will frequently cause deprivation of constitutional rights.

## V.    DISCUSSION

### A.    Fourth Amendment Claims Against the City

Both *Davis I* and the preliminary injunction opinion in *Ligon* included detailed discussions of the law of seizures.[55]  As the Supreme Court reaffirmed in *Florida v. Bostick*, the test for determining whether a *Terry* stop has taken place "is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."[56]  Whether a stop has taken place depends on "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"[57]

While the Supreme Court explicitly refrained from determining

---

*Cash*, 654 F.3d at 334.  "Where the plaintiff establishes all three elements, then . . . the policymaker should have known that inadequate training or supervision was 'so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Walker*, 974 F.2d at 298 (quoting *Canton*, 489 U.S. at 390).  In order to establish *Monell* liability based on the *Walker* test, plaintiffs must also, of course, show that the training or supervision was in fact inadequate and that this inadequacy caused plaintiffs' constitutional injuries.  *See Reynolds*, 506 F.3d at 193.

[55]    *See Ligon*, 2013 WL 71800, at *28–29, *41–42; *Davis I*, 2012 WL 4813837, at *2–15.

[56]    501 U.S. 429, 436 (1991).

[57]    *Id.* at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).

whether a seizure occurred in *Bostick*,[58] it noted several types of police encounters that previous cases had identified as not necessarily constituting stops.[59]  The Supreme Court made a point of confirming that even in these types of cases, the "terminate the encounter" standard applies:  "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage — *as long as the police do not convey a message that compliance with their requests is required*."[60]  The *Bostick* majority emphasized that police officers may not "demand of passengers their 'voluntary' cooperation"

---

[58]  *See id.*

[59]  *See id.* at 434–35.

[60]  *Id.* (collecting cases) (emphasis added and citations omitted).  *Accord INS v. Delgado*, 466 U.S. 210, 216 (1984) ("[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation . . . [u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded." (emphasis added)).  The Supreme Court did not rule in *Bostick*, nor in *Delgado*, that questioning, or a request for identification, cannot rise to the level of a *Terry* stop.  Rather, the Court affirmed that the *manner* and *context* of police conduct are relevant to the inquiry into whether a reasonable person would have felt free to terminate the encounter.  As the Second Circuit has noted, this inquiry is essentially "an objective assessment of the overall coercive effect of the police conduct."  *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990) (citing *Chesternut*, 486 U.S. at 573–74).

through "'an intimidating show of authority.'"[61]

The Second Circuit has held that the following factors are indicative of a "seizure," a term that encompasses both *Terry* stops and arrests:

> the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.[62]

In *Ligon*, I noted two examples of police encounters that the Second Circuit held to be *Terry* stops, despite their arguably low level of coercion:

> The Second Circuit has held . . . that a stop took place where an officer twice ordered a person to "hold on a second," and after the second order the person stopped.  The Second Circuit also held that a stop occurred where an officer pointing a spotlight at a person said, "What, are you stupid?  Come here.  I want to talk to

---

[61]     *Bostick*, 501 U.S. at 438 (quoting *Bostick*, 501 U.S. at 447 (Marshall, J., dissenting)) (emphasis omitted).

[62]     *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992) (quoting *Lee*, 916 F.2d at 819).  *Accord United States v. Drayton*, 536 U.S. 194, 203–04 (2002) (concluding, under *Bostick* framework, that reasonable passenger on bus would feel free to leave, where "officers gave the passengers no reason to believe that they were required to answer the officers' questions," and officer asking questions of passengers "did not brandish a weapon or make any intimidating movements," "left the aisle free so that respondents could exit," and "spoke to passengers one by one and in a polite, quiet voice").  The principle of seizure "applies equally to seizures of persons and to seizures of property," and "the arrest of a person is 'quintessentially a seizure.'"  *Payton*, 445 U.S. at 585 (quoting *United States v. Watson*, 423 U.S. 411, 428 (1976) (Powell, J., concurring)).

21

you," and then told the person to show his hands.[63]
By contrast, the Second Circuit held that no *Terry* stop took place "where a person encountered two officers in his dorm lobby, and the officers asked him to show them his hands."[64]

In *Davis I*, the City of New York conceded, and I held, that a person was subject to a *Terry* stop when he encountered an officer in a stairway, the officer asked if he lived in the building, the officer asked for his ID, and then the officer asked him to step out of the stairwell and into the lobby.[65]  I also held that a person was stopped "when she attempted to walk to the elevator, was told to 'come back' by [an officer], and stopped walking," because the officer's "order to 'come back' was an order to stop and [she] obeyed the order."[66]

In *Ligon*, I held that a person was subject to a *Terry* stop when a patrol car pulled in front of the building he was trying to leave; the officer caused the person to stop by asking him pointed questions designed to elicit an incriminating

---

[63]     *Ligon*, 2013 WL 628534, at *36 (citing *United States v. Simmons*, 560 F.3d 98, 101 (2d Cir. 2009); *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 340 (2d Cir. 2000)).

[64]     *Id.* at *36 n.410 (citing *Brown*, 221 F.3d at 341).

[65]     *See Davis I*, 2012 WL 4813837, at *5–6.

[66]     *Id.* at *14.

response; the officer asked for the person's ID and took it; and the officer told the person and his companions that they could not stand in front of their building.[67] By contrast, I held that a person was not subject to a *Terry* stop when two officers approached her in front of a supermarket in her apartment complex, "asked her whether she lived there and whether she had an ID, then took her ID, looked at it, handed it back to her, and said to have a nice day," where there was no evidence that the officers approached or questioned her "in an aggressive, coercive, or threatening manner."[68]

In sum, the test for whether a *Terry* stop has taken place in the context of a police encounter is whether a reasonable person would have felt free to terminate the encounter.[69]  In order for such a stop to comply with the Fourth Amendment, it must be based on reasonable suspicion.  "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making

---

[67]     *See Ligon*, 2013 WL 628534, at *13–14, *29.

[68]     *Id.* at *16–17.

[69]     The Second Circuit has further held:  "[a] seizure occurs when (1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained."  *Simmons*, 560 F.3d at 105 (citing *Swindle*, 407 F.3d at 572).

the stop."[70]  "'The officer [making a *Terry* stop] . . . must be able to articulate

something more than an inchoate and unparticularized suspicion or hunch.'"[71]

"Reasonable suspicion is an objective standard; hence, the subjective intentions or

motives of the officer making the stop are irrelevant."[72]  In general, reasonable

suspicion requires an *individualized* suspicion of wrongdoing.[73]

      Finally, because the NYPD's training materials place great importance

on the New York state common law of stops, as articulated in *People v. De Bour*

and its progeny,[74] a few words regarding the relationship between *De Bour* and the

Fourth Amendment will be useful.  I highlight one important difference between

*De Bour* and the Fourth Amendment:  these two sources of law draw the line

between permissible and impermissible police encounters in different ways; as a

result, *De Bour* is in some respects more protective of liberty from governmental

---

[70]    *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

[71]    *Alabama v. White*, 496 U.S. 325, 329 (1990) (quoting *Sokolow*, 490 U.S. at 7) (certain quotation marks omitted).  Courts are divided over whether reasonable suspicion must be of a particular crime, or may be of criminality in general.  *See* 4 WAYNE R. LAFAVE, SEARCH & SEIZURE § 9.5(c) (5th ed. 2012).

[72]    *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).

[73]    *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (citing *Chandler v. Miller*, 520 U.S. 305, 308 (1997)).

[74]    *People v. De Bour*, 40 N.Y.2d 210 (1976).  *See, e.g.*, City Mem. at 6; *Ligon*, 2013 WL 628534, at *35–39.

24

intrusion than the Fourth Amendment, and in other respects less.[75]

---

[75]    In the words of the Second Circuit, as already noted, whether a stop has taken place under the Fourth Amendment depends on "an objective assessment of the overall coercive effect of the police conduct." *Lee*, 916 F.2d at 819 (citing *Chesternut*, 486 U.S. at 573–74). The line between constitutional and unconstitutional police questioning — in the absence of reasonable suspicion — may depend on how threatening or intimidating an officer's behavior was during the encounter. *See id.* (collecting cases). Thus, the Fourth Amendment places great weight on the *manner* in which police officers carry out questioning, because an officer's manner can convey the message that the questioned person is not free to terminate the encounter. *See Bostick*, 501 U.S. at 436–39.

    By contrast, *De Bour* and its progeny tend to emphasize the *content* of police questioning, not its manner. In *People v. Hollman*, the New York Court of Appeals reaffirmed *De Bour* and stated that "as a general matter, . . . basic, nonthreatening questions regarding, for instance, identity, address or destination . . . need be supported only by an objective credible reason not necessarily indicative of criminality." 79 N.Y.2d 181, 185 (1992). *Accord id.* at 191 ("[A] request for information is a general, nonthreatening encounter in which an individual is approached for an articulable reason and asked briefly about his or her identity, destination, or reason for being in the area."). Only if an officer poses "more pointed questions" is a founded suspicion of criminality required. *Id.* at 185. As the Court of Appeals concluded: "To some extent, . . . our distinction rests on the content of the questions, the number of questions asked, and the degree to which the language and nature of the questions transform the encounter from a merely unsettling one to an intimidating one." *Id.* at 192. In other words, the distinction rests, for the most part, on *what* questions the police ask, not *how* they approach and ask them.

    *De Bour*'s largely content-based approach to police questioning is distinct from the more manner-based approach of the Fourth Amendment. An officer could conceivably comply with *De Bour* but violate the Fourth Amendment by, for example, approaching and questioning a NYCHA resident, without reasonable suspicion, in a hostile, aggressive manner that would make a reasonable person not feel free to terminate the encounter — but asking only questions concerning identity, address, and destination. On the other hand, an officer might comply with the Fourth Amendment but violate *De Bour* by, for example, approaching and questioning a NYCHA resident, without a founded suspicion of criminality, in a polite, respectful, and non-coercive manner — but asking

### 1.    Plaintiffs' Claim of an Unconstitutional Policy

The City and plaintiffs have both moved for summary judgment on plaintiffs' claim that the City's written trespass enforcement *policies* (as opposed to the City's unwritten *practices*) violate the Fourth Amendment.  I will discuss plaintiffs' motion first, and then turn to the City's motion.  For the reasons stated below, both motions for partial summary judgment are denied.

### a.    Plaintiffs' Motion

Plaintiffs' motion argues that it is undisputed that the City's policy, as embodied in Interim Order 23 of 2010 ("IO 23") and associated training materials, instructs NYPD officers that they may do the following:  "without reasonable suspicion or probable cause, NYPD officers can command people to affirmatively establish their right to be in a NYCHA residence or leave the premise, and then arrest those who refuse to comply."[76]  Plaintiffs argue that this scheme authorizes NYPD officers to stop NYCHA residents and guests without reasonable suspicion,

---

questions whose contents fell outside the scope of a "request for information" under *Hollman*.

[76]    12/15/12 Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pl. Mem. (Policy)") at 5.  The City presents IO 23 as the policy that has governed "vertical patrols" in NYCHA buildings since 2010. *See* 12/4/12 Defendant City of New York's Statement of Facts Pursuant to Local Rule 56.1 ¶ 118.  IO 23 should not to be confused with Interim Orders 22 and 23 of 2012, which concern vertical patrols in private TAP buildings. *See Ligon*, 2013 WL 628534, at *24–25.

26

and to arrest NYCHA residents and lawful guests for criminal trespass without probable cause, in violation of the Fourth Amendment.[77]

The City presents plaintiffs' challenge to the stop and arrest policies of IO 23 as a facial rather than as-applied challenge.[78]  Plaintiffs' challenge is facial at least in the sense that plaintiffs focus exclusively on the language of IO 23 and related training materials, and do not argue that they are entitled to summary judgment based on undisputed evidence of how IO 23 is applied.[79]  The Second

---

[77]    Because neither party has argued otherwise, I assume in the following discussion that the same constitutional standards govern police encounters during a vertical patrol and when patrolling a sidewalk.  Neither party has argued, for example, that under the reasonableness analysis of the Fourth Amendment, different standards should apply to vertical patrols in NYCHA buildings, just as special standards apply for vehicle checkpoints.  *See Edmond*, 531 U.S. at 45–46 ("[P]rogrammatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion." (collecting cases)); *Terry*, 392 U.S. at 15 ("[O]f course, our approval of legitimate and restrained investigative conduct undertaken on the basis of ample factual justification should in no way discourage the employment of other remedies than the exclusionary rule to curtail abuses for which that sanction may prove inappropriate."); *Ligon*, 2013 WL 628534, at *35 n.398.

[78]    *See, e.g.*, City Opp. (Policy) at 10.

[79]    The distinction between facial and as-applied challenges is not always clear, and has been defined in various ways.  *See, e.g.*, Richard H. Fallon, Jr., *Fact and Fiction about Facial Challenges*, 99 CAL. L. REV. 915 (2011) (defining facial challenges as "ones that, if accepted, would establish that a statute has no valid applications whatsoever," and on this basis, concluding that the Supreme Court has upheld facial challenges under an "astonishingly large number of constitutional provisions," but also noting that "it is sometimes difficult to differentiate facial from as-applied challenges, partly but not exclusively because the Court is often

27

Circuit has stated that in order to succeed on a facial challenge to a statute, at least outside of the First Amendment context, the challenger must show that "'no set of circumstances exists under which the [statute] would be valid, *i.e.*, that the law is unconstitutional in all of its applications,' or at least that it lacks a 'plainly legitimate sweep.'"[80]   Thus, in the present case, plaintiffs must show, at minimum, that there is no set of circumstances under which the undisputed stop and arrest scheme laid out in IO 23 and related training materials, as described above, would be valid, or at least that the scheme lacks a plainly legitimate sweep.

### i.   Plaintiffs' Challenge to IO 23 Arrest Policy

The City correctly argues that plaintiffs lack standing for their facial challenge of IO 23's arrest policy, because no plaintiff has been subjected to the kind of arrest that plaintiffs contest.[81]   That is, no plaintiff has been arrested for criminal trespass in a NYCHA building simply based on refusal to answer an officer's questions and refusal to leave when requested by an officer.

---

inattentive to the distinction").  As I have previously stated, "[t]here are few areas of the law that are as confused and conflicted as the law governing facial challenges." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab.*, 674 F. Supp. 2d 494, 505 (S.D.N.Y. 2009).

[80]    *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quotation marks and citation omitted)).

[81]    *See* City Opp. (Policy) at 10.

28

"To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"[82]  No plaintiff has suffered an actual, concrete injury from the IO 23 arrest policy that is the focus of plaintiffs' facial challenge.  Plaintiffs' reply brief points to Rikia Evans, a guest in a NYCHA building who was arrested for trespass after refusing to answer an officer's questions and refusing to provide her identification on request.[83]  But Evans specifically alleged that she was not offered the opportunity to exit the building after she refused to establish her right to be there.[84]  Because plaintiffs have offered no evidence of any person being arrested under IO 23's arrest policy simply for refusing to answer questions and refusing to leave on request, plaintiffs' injuries are insufficient to confer standing.[85]

---

[82]     *Clapper v. Amnesty Int'l USA*, — S. Ct. —, 2013 WL 673253, at *7 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010)).

[83]     *See* 1/18/13 Plaintiffs' Reply Memorandum of Law in Further Support of Motion for Partial Summary Judgment ("Pl. Reply (Policy)") at 5; *Davis I*, 2012 WL 4813837, at *10–15.

[84]     *See Davis I*, 2012 WL 4813837, at *11.

[85]     I note, however, that the constitutionality of IO 23's arrest policy could be relevant to the deliberate indifference analysis of plaintiffs' *Monell* claim. If, hypothetically, the City were to cite the development and implementation of IO 23 as evidence that it has not been deliberately indifferent to earlier, problematic

29

arrest practices, then any authorization of unconstitutional conduct in IO 23 would weaken the City's argument.  In order to avoid repetition if the issue of the constitutionality of IO 23's arrest policy arises again in this case, I offer the following observations on the arguments already presented in the parties' briefs:

The City defends IO 23's arrest policy in part by suggesting that NYPD officers have authority under New York Penal Law section 140.10(f) to revoke the permission of any person to be inside a NYCHA building.  *See* City Opp. (Policy) at 6–8.  The City analogizes section 140.10(f) to section 140.10(d), which is similarly phrased but involves trespass on school property "in violation of a personally communicated request to leave the premises from a principal, custodian, school board member or trustee, or other person in charge thereof."  Courts have held that under section 140.10(d), a principal or other person in charge who makes a personally communicated request to leave the premises thereby revokes whatever privilege the person had to be on the premises.  *See Matter of Max X.*, 717 N.Y.S.2d 773, 774–75 (3d Dep't 2000) ("[A]ny license or privilege that respondent may have had at the time he entered the school building was revoked when the principals advised him that he had no right to be on the school premises and was required to leave."); *Arum v. Miller*, 331 F. Supp. 2d 99, 109–10 (E.D.N.Y. 2004) (concluding that when "a person capable of revoking permission to be in the school" asks a visiting parent to leave, and the parent does not comply, this is "sufficient to create probable cause for a police officer to arrest an individual for criminal trespass in the third degree" under section 140.10(d)).

But the City provides no basis for concluding that an NYPD officer has the legal authority to revoke a person's privilege to be in a NYCHA building, as a principal does in a school.  In support of the NYPD's authority to revoke permission to be in a NYCHA building, the City cites *People v. Brown*, which states:  "Since it is clear that defendant lawfully entered the premises, a conviction could be had only if the prosecution established that (1) a lawful order not to remain was personally communicated to the defendant and (2) that he defied such a lawful order."  306 N.Y.S.2d 449, 452 (1969).  Similarly, the City cites a case in which a tenant revoked whatever privilege a guest might have had to be in her apartment.  *See People v. Randolph*, 795 N.Y.S.2d 782, 783 (3d Dep't 2005).  Rather than answering the question of when, if ever, an NYPD officer has the legal authority to revoke someone's privilege to be in a NYCHA building, however, these citations beg the question.  Both deal with circumstances in which the person revoking the privilege clearly had the legal right to do so.

Unless NYPD officers have some legal authority, as yet unidentified,

### ii. Plaintiffs' Challenge to IO 23 Stop Policy

IO 23 states that upon encountering "persons who *may be* violating Housing Authority rules and regulations, including *potentially* unauthorized persons within NYCHA property," officers are to "[a]pproach the person(s) and ask: (1) If he or she lives in the building[;] (2) If he or she is visiting someone in the building[;] (3) If he or she has business in the building."[86]  IO 23 then states, in italics:  "*When a person's authority to be present in the building is in question, take reasonable measures to verify such authority (e.g., asking for identification, a key to the building entrance doors, etc.).*"[87]  IO 23 explicitly warns that "an officer may not stop (temporarily detain) a suspected trespasser unless the officer *reasonably suspects* that the person is in the building without authority."[88]  The City acknowledges in its brief that IO 23 authorizes police to approach and

---

to revoke at will the privilege to be inside a NYCHA building, the refusal to obey an officer's request to leave cannot constitute probable cause for a trespass arrest. A person's refusal to obey a request to leave a NYCHA building from someone who has no authority to revoke the privilege to be in the building provides no evidence that the person is not lawfully in the building.

[86]   IO 23, Ex. O to 12/4/12 Declaration of Brenda E. Cooke, counsel to defendant City ("Cooke Decl."), at ¶ 12 (emphases added).

[87]   IO 23 at 2.

[88]   *Id.* at 1.

question individuals, and to request their identification or keys, without reasonable suspicion of any crime.[89]

Plaintiffs have standing to challenge the stop policy in IO 23, based on plaintiffs' allegations and evidence of having been personally stopped under the policy, and plaintiffs' continued risk of such stops.[90]  Nevertheless, plaintiffs' facial challenge to IO 23's stop procedure fails for two reasons.  *First*, not every police encounter involving the kinds of questions and requests described in IO 23 inevitably constitutes a *Terry* stop.  The test for whether a police encounter rises to the level of a *Terry* stop is whether, in light of the totality of the circumstances, a reasonable person would "feel free to decline the officers' requests or otherwise terminate the encounter."[91]  Because questions and requests concerning purpose and identity could be carried out in such a manner that a reasonable person would feel free to terminate the encounter, such questioning is neither categorically inside or outside the scope of Fourth Amendment protection.  The level of coercive effect will depend on the totality of the circumstances, including, for example, "'the

---

[89]     *See* City Opp. (Policy) at 4.

[90]     Although some of plaintiffs' stops occurred before the promulgation of IO 23, others occurred after.  *See, e.g.*, *Davis I*, 2012 WL 4813837, at *3–4 (Osorio's November 18, 2010 stop), *10–15 (Evans' October 16, 2010 stop). Evans continues to live in NYCHA housing.  *See id.* at *2 & n.12.

[91]     *Bostick*, 501 U.S. at 436.

threatening presence of several officers; . . . language or tone indicating that compliance with the officer was compulsory; [or] prolonged retention of a person's personal effects, such as . . . identification.'"[92]

Plaintiffs offer no evidence in their facial challenge that it is impossible for a police officer to ask the kinds of questions and make the kinds of requests described in IO 23 in such a way that a reasonable person would feel free to terminate the encounter.[93]  The City argues that suspicionless encounters based

---

[92]     *Glover*, 957 F.2d at 1008 (quoting *Lee*, 916 F.2d at 819).

[93]     "[N]o seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage — so long as the officers do not convey a message that compliance with their requests is required."  *Bostick*, 501 U.S. at 437.  *Accord Ligon*, 2013 WL 628534, at *17 (concluding that a plaintiff had not provided adequate evidence that the police conveyed a message that compliance with their requests was required, where officers approached and asked questions politely and without coercion).  It is true that based on the evidence at the preliminary injunction hearing in *Ligon*, I expressed skepticism as to whether an expansive program of suspicionless police encounters involving intrusive field interrogations and ID requests could avoid resulting in widespread constitutional violations — especially where officers received inaccurate training on the Fourth Amendment.  As I stated there:

> If the difference between a *Terry* stop and a less intrusive encounter hinges on indefinite factors such as the demeanor and positioning of the officers; and if it is safe to assume that officers routinely display their authority and power through aggressive behavior, as many of the officers did in their encounters with plaintiffs in the instant case; then a training program that invites officers to approach large numbers of people and question them without reasonable suspicion will inevitably result in frequent *Terry* stops that lack reasonable suspicion, effectively

on IO 23 do not rise to the level of stops;[94] plaintiffs argue the contrary.[95]   The

dispute between the parties represents a genuine issue of material fact that will

have to be resolved by a fact-finder based on evidence of actual police encounters,

not based simply on a textual analysis of IO 23.[96]

   *Second*, it is true, as plaintiffs argue, that IO 23 contains no criteria for

identifying either persons who may be violating Housing Authority rules or

persons whose authority to be in the building is questionable, yet presents both of

---

     guaranteeing the commission of widespread constitutional
     violations.

*Id.* at *38.  For evidence that the NYPD's training misconstrues the Fourth
Amendment, see *id.* at *35–39.  *Ligon* also shows, however, that determining
whether a practice of suspicionless police encounters has actually resulted in
suspicionless *Terry* stops is a fact-intensive inquiry.  *See, e.g.*, *id.* at *10–19,
*28–30 (factual analyses of individual plaintiffs' stops).

   [94]  *See* City Opp. (Policy) at 1, 3–6, 9.

   [95]  *See* Pl. Mem. (Policy) at 1–2; Pl. Reply (Policy) at 2–3.

   [96]  I note that plaintiffs may succeed at trial on an *as-applied* challenge to
the stop policy in IO 23 even though they are not entitled to summary judgment on
their *facial* challenge.  This is so because the stop policy directs officers to engage
in behavior that is constitutional (that is, suspicionless encounters that a reasonable
person would feel free to terminate), but is ambiguous as to whether it directs
officers to engage in additional, unconstitutional behavior (that is, suspicionless
*Terry* stops).  A facial challenge to the policy must fail because the policy may be
interpreted, *in practice*, as directing only the former, constitutional behavior.  But
if evidence shows — again, in practice — that officers interpret the ambiguous
aspect of the policy as directing them to engage in unconstitutional behavior, and
as a result they do so, then the policy would be at least partially unconstitutional.

these factors as justifications to approach and question a person.[97]  As a result, it appears that NYPD officers have complete discretion under IO 23 to approach and question anyone in a NYCHA building.  This discretion, however, is not problematic if the NYPD officers approach and question individuals in ways that do not implicate their Fourth Amendment (or other constitutional) rights.  But whether this is the case, again, cannot be determined from the face of IO 23 and its associated training materials.

For the foregoing reasons, plaintiffs' motion for summary judgment on the unconstitutionality of IO 23's stop policy is denied.

### b.    The City's Motion

The City moves for summary judgment on plaintiffs' claim that the NYPD has a policy of making unconstitutional stops or arrests for trespass on NYCHA property.[98]  Based on the analysis above, the City's motion is rejected with regard to the *stop* policy in IO 23 and its associated training materials.  A reasonable juror could conclude that the NYPD's policy for trespass enforcement

---

[97]    *See* IO 23; Pl. Reply (Policy) at 4–5 (arguing that IO 23 stop policy "fails to establish appropriate limits on officers' discretion").  *Accord* NYCHA Rules & Regulation Training PowerPoints, Bates Nos. NYC0021989-22024, Ex. U to Cooke Decl., at NYC0022020 (offering no criteria for determining when a person's right to be in the building is in question).

[98]    *See* City Mem. at 2.

in NYCHA buildings is to conduct both constitutionally permissible non-coercive questioning and constitutionally impermissible suspicionless *Terry* stops.  Such a policy could form the basis for *Monell* liability whether it was implemented with the intent to violate the Constitution, or merely out of ignorance of the Constitution's requirements.[99]

The City's motion for summary judgment is also denied with regard to the NYPD's trespass *arrest* policies in NYCHA buildings.  While plaintiffs lack standing to challenge the constitutionality of the conjectural type of trespass arrest described above — that is, an arrest based solely on refusing to answer questions and refusing to leave after being requested to do so by a police officer — plaintiffs have also argued that the NYPD's trespass enforcement policy is unconstitutional because it "permits the arrest of NYCHA residents and their guests just for being present in areas designated as 'prohibited' by NYCHA, such as roofs and roof

---

[99]     A policy may be unconstitutional and a source of *Monell* liability under section 1983 even if municipal policymakers believed in good faith that the policy was constitutional, or even if the constitutionality of the policy was not yet clearly established.  *See Skehan v. Village of Mamaroneck*, 465 F.3d 96, 109 (2d Cir. 2006) ("Municipalities are not entitled to qualified immunity for their actions, even where the individual officers who acted on the municipality's behalf would be."), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).

landings, without adequate notice."[100]  Plaintiffs have standing to challenge this type of arrest.  Two plaintiffs, Roman Jackson and Kristin Johnson, were arrested in January 2009 for trespass based on sitting at the top of a stairwell in a NYCHA building.  Jackson was a tenant in the building at the time, and Johnson was his guest.  The parties dispute whether the top of the stairwell was a "roof landing," which has been defined as a prohibited area.  The parties also dispute whether there was a sign at the top of the stairwell:  plaintiffs have presented testimony that there was no sign; the City has argued that there was a sign stating that "loitering and trespassing in lobby, roof, hallway and stairs is not permitted."[101]

In *Davis I*, I held that the City was not entitled to summary judgment on Jackson's and Johnson's Fourth Amendment claims based on the circumstances of their arrest, because a reasonable juror could find that their arrest lacked probable cause.[102]  I did not reach the issue of *Monell* liability.  In order to survive the City's motion for summary judgment on *Monell* liability regarding IO 23's arrest policy, plaintiffs must show not only that a reasonable juror could conclude that Jackson's and Johnson's arrest lacked probable cause, but that Jackson's and

---

[100]    1/7/13 Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for Partial Summary Judgment ("Pl. Opp.") at 3.

[101]    *Davis I*, 2012 WL 4813837, at *8.

[102]    *See id.* at *8–10.

Johnson's constitutional injuries resulted from a municipal policy.[103]

Plaintiffs have offered sufficient evidence to create a genuine issue of material fact as to whether the NYPD has a policy of arresting the residents of NYCHA buildings for trespass in areas that lack the requisite "conspicuously posted rules or regulations" defining them as prohibited areas.[104]  There is also

---

[103]    *See Cash*, 654 F.3d at 333.  I note that in *Davis I*, I assumed based on the parties' briefing that Jackson and Johnson had been arrested for *loitering* in the stairway, in violation of the prohibition on such loitering contained in the sign that the City alleges was conspicuously posted at the top of the stairway.  *See Davis I*, 2012 WL 4813837, at *8–10.  Proceeding from this assumption, I analyzed the constitutionality of applying the sign's loitering prohibition to a resident and concluded that the prohibition was unconstitutionally vague and thus could not provide a basis for probable cause or punishment.  *See id.*

It now appears that there is uncertainty regarding why Jackson and Johnson were arrested.  The City argues that Jackson and Johnson "fit the circumstances" of someone who has been arrested for "being in a prohibited area," and not for loitering.  1/18/13 Defendant City of New York's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment on Plaintiffs' Claims Against the City ("City Reply") at 1 n.2.  If Jackson and Johnson were arrested not for violating a prohibition on loitering but for violating a prohibition on trespassing in prohibited spaces, my earlier discussion of the vagueness of the loitering prohibition may no longer be material to the analysis of named plaintiffs' individual circumstances.

[104]    *See, e.g.*, Pl. Opp. at 3; 1/7/13 Plaintiffs' Local Rule 56.1 Statement of Additional Material Facts in Opposition to Defendant City of New York's and Defendant New York City Housing Authority's Motion for Summary Judgment ("PAF") ¶¶ 1–2, 91; Policing Housing Developments, Including Conducting Interior Vertical Patrols (Lesson Plan for the Patrol Guide Revision of 212–60), Ex. 3 to 12/15/12 Declaration of Johanna B. Steinberg, counsel for plaintiffs ("Steinberg Decl.), at 5 (noting that "[t]he absence of a [No Trespassing] sign does not preclude effecting a trespass arrest").  New York Penal Law sections 140.10(e) and (f) state:

38

sufficient evidence for a reasonable juror to conclude that some version of this

policy was already in effect when Jackson and Johnson were arrested.[105]

---

> A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in a building or upon real property . . .
>      (e) where the building is used as a public housing project in violation of conspicuously posted rules or regulations governing entry and use thereof; or
>      (f) where a building is used as a public housing project in violation of a personally communicated request to leave the premises from a housing police officer or other person in charge thereof.

Some New York courts have held that a person unlawfully present in the common or "public" areas of a NYCHA building may be charged with second degree criminal trespass under Penal Law section 140.15 (knowingly entering or remaining unlawfully in a dwelling) whether or not the requirements of sections 140.10(e) or (f) are satisfied.  *See, e.g.*, *People v. Quinones*, No. 01-371, 2002 WL 432917, at *1 (1st Dep't Mar. 5, 2002); *People v. Delossantos*, 924 N.Y.S.2d 258, 260 (Crim. Ct. N.Y. Co. 2011) (defending *Quinones* and similar cases based on statutory text and policy).  *But see People v. Siton*, 906 N.Y.S.2d 703, 706 (Crim. Ct. Kings Co. 2010) (calling into doubt *Quinones* and similar cases based on legislative history).  In the present case, plaintiffs have been arrested under both laws:

> Arrested Plaintiffs Mr. Jackson, Ms. Johnson, Ms. Evans, and Mr. Osorio were arrested under N.Y. Penal Law § 140.15. Arrested Plaintiffs Mr. Smith, Mr. Littlejohn, Mr. Washington, and Mr. Fredrick were arrested under N.Y. Penal Law § 140.10(e).

Pl. Opp. (7/20/12) at 6 n.4.

[105]   *See, e.g.*, Excerpts from 3/25/11 Deposition of Police Officer Granit Selimaj, Ex. 2 to Lee Decl., at 78–79 (officer referring to "automatic arrests for anybody if you are on the rooftop or rooftop landing," in discussion of June 2009

The Constitution does not prevent NYCHA from prohibiting residents from entering certain areas of its buildings, such as roofs and roof landings, nor does it prevent the NYPD from arresting residents for trespassing into those areas. The Constitution does, however, require that criminal statutes, and any rules or regulations they incorporate, "'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited.'"[106] Drawing all reasonable inferences in favor of plaintiffs, a reasonable juror could find (1) that the NYPD has a policy of arresting people in prohibited areas of NYCHA buildings, such as roofs and roof landings, even where there are no sufficiently conspicuous rules to put a resident or guest on constitutionally adequate notice that access to the areas is prohibited; (2) that Jackson and Johnson were arrested without probable cause in January 2009 pursuant to some version of this policy; and (3) that plaintiffs have therefore established the City's *Monell* liability for an unconstitutional trespass arrest policy resulting in Jackson's and Johnson's arrest.

The City's motion for partial summary judgment on plaintiffs' claim of an unconstitutional trespass arrest policy in NYCHA buildings is therefore

---

arrest).

[106]     *Gonzales v. Carhart*, 550 U.S. 124, 148–49 (2007) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

denied.[107]

## 2. Plaintiffs' Claim of an Unconstitutional Custom and Practice

The preceding sections addressed the parties' motions for summary judgment on plaintiffs' claim that the City bears *Monell* liability for its express trespass enforcement *policies* in NYCHA buildings. I now turn to plaintiffs' claim that the City bears *Monell* liability for its trespass enforcement *practices* in NYCHA buildings. Plaintiffs argue (1) that the City's unconstitutional trespass enforcement practices are sufficiently widespread to serve as a basis for *Monell* liability, either based on a theory of constructive acquiescence, or based on actual acquiescence;[108] and (2) that the City has displayed deliberate indifference to the

---

[107]     The City also argues that even if Jackson's and Johnson's arrest was unconstitutional, plaintiffs have failed to provide evidence of a *pattern* of arrests like theirs, which the City argues would be necessary to show that the City's policy is unconstitutional. *See* City Reply at 1 n.2 (citing *Connick*, 131 S. Ct. at 1360–61). In *Connick*, the Supreme Court stated: "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." 131 S. Ct. at 1360 (quoting *Bryan Cnty.*, 520 U.S. at 409). This rule has no bearing on the current discussion, which addresses plaintiffs' *policy* theory of *Monell* liability, not its *deliberate indifference* theory. "[O]nce a municipal policy is established, 'it requires only one application . . . to satisfy fully *Monell*'s requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy.'" *Pembaur*, 475 U.S. at 478 n.6 (quoting *Tuttle*, 471 U.S. at 822).

[108]     *See* Pl. Opp. at 4 & n.8. The City contends that plaintiffs waived some or all of their "custom" theory of *Monell* liability by not including the phrase

41

constitutional rights of NYCHA residents and guests based on its failure "to supervise, discipline, and train its police officers to ensure lawful trespass enforcement, despite an obvious need to do so."[109]   The former argument focuses on the City's widespread practices, while the latter argument focuses on the City's deliberate indifference.

As an initial matter, the implementation of IO 23 and its associated training *after* the commencement of this litigation creates complications regarding the temporal scope of plaintiffs' claim.  Some of plaintiffs' evidence of unlawful stops and arrests predates IO 23, while other evidence postdates the policy.  In the *Ligon* preliminary injunction hearing, I addressed a similar issue involving the even more recent implementation of new policies and training.  In that case, I conducted a two-stage analysis.  *First*, I analyzed plaintiffs' evidence of deliberate

---

"constructive acquiescence" in their Amended Complaint.  *See* City Mem. at 2 n.5. However, plaintiffs clearly pleaded both policy-based and custom-based *Monell* claims, and the parties have argued these claims throughout the years of litigation. *See, e.g.*, Am. Compl. ¶¶ 238–242; *Davis v. City of New York*, 812 F. Supp. 2d 333, 341 (S.D.N.Y. 2011).  The City has cited no basis for concluding that the term "constructive acquiescence" must be recited in every custom-based claim of *Monell* liability based on the prevalence of unconstitutional practices.  As noted above, if a municipality engages in sufficiently persistent and widespread unconstitutional practices, *Monell* liability will attach, even in the absence of direct evidence of acquiescence by policymakers.  *See Connick*, 131 S. Ct. at 1359 (citing *Adickes*, 398 U.S. at 167); *Canton*, 489 U.S. at 390 n.10; *Ligon*, 2013 WL 628534, at *4 n.32 (discussing *Jones*, 691 F.3d at 82).

[109]    Pl. Opp. at 9.

indifference arising prior to the new policies and training.  *Second*, I analyzed

whether defendants had rebutted plaintiffs' evidence of deliberate indifference

based on the recent steps taken by the NYPD.[110]

A two-stage analysis may also be appropriate here.  I reserve decision

on that issue, however, because plaintiffs have raised a genuine issue of material

fact as to whether IO 23 and its associated training significantly altered the

NYPD's trespass enforcement practices in NYCHA buildings.[111]  Drawing all

reasonable inferences in favor of plaintiffs, as I must, I assume in the following

discussion that IO 23 and its associated training materials did *not* significantly alter

the NYPD's trespass enforcement practices.  As a result, evidence of

unconstitutional practices before the implementation of IO 23 remains relevant to

determining whether the NYPD continues to engage in unconstitutional practices.

---

[110]     *See Ligon*, 2013 WL 628534, at *28.

[111]     *See* Pl. Opp. at 7 & n.15, 9 (noting that NYCHA residents and guests testified to unlawful stops and arrests after the introduction of IO 23, that two named plaintiffs raised genuine issues of material fact regarding post-IO 23 unlawful stops, and that one did so regarding a post-IO 23 unlawful arrest).  More than one officer testified that IO 23 did not change either the NYPD's stop policy or trespass enforcement practices in general.  *See, e.g.*, Excerpts from 11/29/11 Deposition of Police Officer Keith Devine, Ex. 5 to Lee Decl., at 192–193.  In addition, plaintiffs offer evidence that more than two years after the introduction of IO 23, the Bronx District Attorney's Office announced a policy that was intended in part to address the problem of NYCHA "'tenants and invited guests . . . being prosecuted unlawfully'" for trespass.  Pl. Opp. at 9 (quoting PAF ¶ 42).

### a.  Widespread Practice

### i.  Documentary and Testimonial Evidence

Plaintiffs offer various forms of documentary and testimonial evidence supporting the conclusion that the City has a persistent and widespread practice of performing unconstitutional trespass stops and arrests in NYCHA buildings.  In addition to the testimony of named plaintiffs discussed in *Davis I*, plaintiffs' evidence includes the following:

(1) According to plaintiffs, the City's Civilian Complaint Review Board ("CCRB") became concerned about complaints that officers were stopping people without reasonable suspicion in and around NYCHA buildings.  In many cases, the officers stated that they could stop anyone inside a NYCHA building. The CCRB conducted a study that revealed substantiated complaints regarding suspicionless stops in and around NYCHA and TAP buildings at a thirty-two percent rate, nearly three times the substantiation rate for similar complaints in other locations.[112]

The City does not meaningfully contest these allegations in its brief.[113] Rather, the City argues that the CCRB study predates the implementation of IO 23

---

[112]    *See* Pl. Opp. at 6–7.  For convenience, I cite the parties' briefs, which in turn cite evidence in the record.

[113]    *See* City Reply at 2–3.

and its associated training materials, and thus can no longer provide evidence of the City's practices.  As I noted above, however, there is at minimum a genuine issue of material fact as to whether IO 23 significantly changed the City's practices.[114]

   (2) A sample of decline to prosecute forms from various District Attorney's offices provides further evidence of NYPD officers stopping individuals merely for exiting a NYCHA building.[115]  According to plaintiffs' analysis, "[o]f the 64 DP Forms for trespass arrests on NYCHA Property, 24 DP Forms indicate that the 'individual was observed exiting a New York City Housing Authority building.  Based on this information, the individual was stopped and questioned.'"[116]

   The City argues that these forms are inadmissible hearsay.[117]  "The Federal Rules of Evidence define hearsay as a declarant's out-of-court statement

---

[114] *See* Pl. Opp. at 7–9 & n.15.

[115] *See id.* at 7.

[116] 1/7/13 Declaration of Katharine E.G. Brooker, counsel for plaintiffs ("Brooker Decl."), at ¶ 9 (quoting and citing, as an example, the Decline to Prosecute form at Ex. A to Brooker Decl.).

[117] *See* City Reply at 3.

45

'offer[ed] in evidence to prove the truth of the matter asserted in the statement.'"[118] The decline to prosecute forms, which contain written assertions by out-of-court declarants and are offered in evidence to prove the truth of those assertions, are hearsay, but may be admissible under one of the exceptions to the hearsay rule.

Because the City's hearsay argument is made in its reply brief, plaintiffs have not yet had an opportunity to respond.  In *Ligon*, I allowed the admission of decline to prosecute forms describing stops outside TAP buildings, as rebuttable evidence of the basis for the stops.[119]  Unlike in this case, however, the City had conceded the admissibility of the records for that limited purpose.[120]

Based on the record at this stage, I am inclined to allow the admission of the decline to prosecute forms in this case as well, based either on the public records exception under Federal Rule of Evidence 803(8)(A)(iii),[121] or on the

---

[118]     *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (quoting Fed. R. Evid. 801(c)).

[119]     *See Ligon*, 2013 WL 628534, at *7–8.

[120]     *See id.*

[121]     "The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: . . . (8) *Public Records.*  A record or statement of a public office if:  (A) it sets out: . . . (iii) in a civil case . . ., factual findings from a legally authorized investigation; and (B) neither the source of information nor other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8)(A)(iii).

residual hearsay exception under Rule 807.[122]  But I reserve any final decision until the parties have had an opportunity to make further arguments specifically addressing the issue of whether the decline to prosecute forms are inadmissible hearsay.[123]  In any case, the admission or exclusion of the decline to prosecute forms is not dispositive of any issue at the summary judgment stage.

(3) According to plaintiffs, the testimony of officers, as well as

---

[122]     Rule 807 states:

(a) *In General.*  Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:
> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
> (2) it is offered as evidence of a material fact;
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

[123]     In support of the City's argument that decline to prosecute forms cannot be relied on to infer that a stop lacked reasonable suspicion or that an arrest was made without probable cause, the City cites an unreported three-page 2003 opinion from the Eastern District, which quite correctly concluded that a prosecutor's decision not to prosecute a charge against a section 1983 plaintiff "provides no indication that plaintiff's arrest was without probable cause." *Quinn v. City of New York*, No. 99 Civ. 7068, 2003 WL 1090205, at *4 (E.D.N.Y. Mar. 12, 2003).  *See* City Reply at 3.  To say that the *decision* to decline to prosecute is insufficient to support a section 1983 claim for false arrest is quite different from saying that the *information* contained in decline to prosecute forms is irrelevant to an analysis of police practices.

NYCHA residents and guests, further corroborates the existence of an unconstitutional practice of stops and arrests in and around NYCHA buildings.[124] Plaintiffs have offered abundant testimony regarding residents and guests, young and old, male and female, being stopped and arrested without basis in and around NYCHA buildings.[125]

### ii.    Dr. Fagan's Analysis

Officers are required to complete a UF-250, also known as a "Stop, Question and Frisk Report Worksheet," after each *Terry* stop.[126]  The front and back of the form contain various checkboxes and fields in which officers are required to indicate the nature of the stop and the circumstances that led to and justified the stop.[127]  Officers are required to record all the reasons justifying a stop, and the UF-250 provides spaces for officers to record any reason.[128]  There is a checkbox for "Other Reasonable Suspicion Of Criminal Activity (Specify)" (the "Other" box) that officers can check and then supplement with a handwritten

---

[124]    *See* Pl. Opp. at 7.

[125]    *See* PAF ¶¶ 21–28.

[126]    *See Ligon*, 2013 WL 628534, at *9 n.92; *Floyd*, 861 F. Supp. 2d at 278, 280–81.

[127]    *See Ligon*, 2013 WL 628534, at *19–20, *31–34 (discussing Dr. Fagan's analysis of UF-250 forms), App. B (copy of UF-250 form).

[128]    *See id.*

48

note.[129]

Plaintiffs' expert, Dr. Jeffrey Fagan, has conducted a statistical analysis of UF-250 forms and arrest data between 2004 and 2011.[130]  Based on his analysis, Dr. Fagan concluded that there were roughly 200,000 stops on suspicion of trespass in NYCHA buildings between 2004 and 2011.[131]  In order to determine how many of these stops were apparently unjustified, Dr. Fagan analyzed the boxes checked on the forms, as well as a sample of the notes that officers wrote after checking the "Other" box.[132]  Although the details of Dr. Fagan's reports are somewhat unclear based on the excerpts offered by the parties, Dr. Fagan also appears to have conducted a more detailed analysis of the apparent legal sufficiency of trespass stops in NYCHA buildings from 2009 to 2011.[133]  If a jury were to find Dr. Fagan's analysis of these stops credible, and if the legal

---

[129]    *See id.* at \*31, App. B.

[130]    *See* Pl. Opp. at 5–6.

[131]    *See* Excerpts from the 7/25/12 Corrected Expert Report of Jeffrey Fagan, Ph.D. ("Fagan Report"), Ex. 7 to Lee Decl., at 81.

[132]    *See id.* at 80, 81 tbl. 24, 86.

[133]    *See* Excerpts from the 10/11/12 Amended Rebuttal Report of Jeffrey Fagan, Ph.D. ("Fagan Rebuttal"), Ex. 8 to Lee Decl., at 35.

underpinnings of Dr. Fagan's analysis are sound,[134] it would follow that only fifty

percent of the NYCHA trespass stops between 2009 and 2011 were apparently

justified, while nineteen percent of the stops — or nearly thirteen thousand stops

— apparently lacked reasonable suspicion.[135]

       In support of partial summary judgment, the City argues that "[Dr.]

Fagan's analysis fails to connect any pattern [of constitutional violations] with the

alleged constitutional violations at issue here."[136]  This is incorrect.  Plaintiffs have

---

    [134]    Dr. Fagan assumes that the narrative "loitering" does not indicate
apparent justification for a trespass stop in a NYCHA building.  *See* PAF ¶ 9;
Fagan Report at 86 tbl. 27.  I note that neither my prior opinions in *Floyd* nor
*Davis I* addressed the difficult question of whether, on a UF-250 form recording a
trespass stop in a NYCHA building, the narrative "loitering" could indicate that an
officer apparently had reasonable suspicion.  Even if "loitering" *outdoors in a
public space* most likely does not provide reasonable suspicion of any crime, *see
Floyd*, 861 F. Supp. 2d at 299, and a general *criminal* prohibition on "loitering" by
a resident in her own NYCHA building is unconstitutionally vague, *see Davis I*,
2012 WL 4813837, at *8–10, behavior that could reasonably be described as
"loitering" in a NYCHA building could conceivably provide a sufficient basis for a
*Terry* stop during a vertical patrol.  NYCHA buildings are the homes of NYCHA
residents, not public streets for "'carefree . . . fellow[s]'" to use as they "walk or
loaf or loiter or stroll," to borrow some of Justice William O. Douglas' celebrated
language from *Papachristou v. City of Jacksonville*, 405 U.S. 156, 171 (1972)
(extolling public idleness and other "amenities of life," and quoting Anthony
Amsterdam, *Federal Constitutional Restrictions on the Punishment of Crimes of
Status, Crimes of General Obnoxiousness, Crimes of Displeasing Police Officers,
and the Like*, 3 CRIM. L. BULL. 205, 226 (1967)).

    [135]    *See* Fagan Rebuttal at 35.

    [136]    City Mem. at 3.

alleged that the NYPD engages in an unconstitutional practice of making trespass stops without reasonable suspicion and trespass arrests without probable cause in NYCHA buildings.  Dr. Fagan's study attempts to quantify the magnitude of such stops and arrests.  It is hard to see what connection the City finds lacking: based on plaintiffs' evidence, a reasonable juror could find that the constitutional injuries suffered by named plaintiffs are the same injuries quantified by Dr. Fagan's report and further supported by the other documentary and testimonial evidence discussed above.[137]

The City also reiterates its longstanding arguments against the use of

---

[137]     The City also attempts to analogize the instant case to *Connick*, where the Supreme Court determined that a district attorney's office may not be "held liable under § 1983 for failure to train based on a single *Brady* violation." *Connick*, 131 S. Ct. at 1356.  *See* City Mem. at 3 (citing *Connick*, 131 S. Ct. at 1360).  In *Connick*, the Supreme Court held that the plaintiff did "not contend that he proved a pattern of similar *Brady* violations," and that the four other *Brady* violations noted by the plaintiff were "not similar to the violation at issue" and thus "could not have put [the municipality] on notice that specific training was necessary to avoid this constitutional violation."  *Connick*, 131 S. Ct. at 1360.
The City's reliance on *Connick* is puzzling.  *Connick* delimits the periphery of custom-based municipal liability under section 1983, in order to prevent *Monell* from becoming a back door to *respondeat superior* liability for aberrant constitutional torts by rogue municipal employees.  *See Connick*, 131 S. Ct. at 1365 & n.12.  That risk is not remotely present in the current case.  While *Connick* involved an individual plaintiff's claim regarding a single *Brady* violation, the instant case is a putative class action based on evidence of tens of thousands of similar Fourth Amendment violations over a number of years, during which the alleged violations were the subject of frequent and intense public dispute.  The allegations in this case lie close to the core of custom-based *Monell* liability, not at the periphery like the claim in *Connick*.

UF-250 data as evidence of the rough magnitude of unconstitutional stops and arrests.[138]  I have repeatedly emphasized that it would be inappropriate to rely on a UF-250 form alone to definitively determine the legality or illegality of an individual stop.[139]  But given the unfeasibility of taking live testimony regarding a sufficient sample of the stops and arrests in this case, "it would be an injustice to prevent the jury from hearing about the extremely rich and informative material" contained in the UF-250 database.[140]  The City cites three cases where courts have expressed skepticism regarding the use of statistics in drawing conclusions regarding the constitutionality of criminal justice practices.[141]  All three cases, however, involved equal protection claims where plaintiffs attempted to prove discriminatory intent through statistics indicating disparate impact.[142]  None of these cases address the validity of relying on statistical evidence to estimate the magnitude of an ostensible practice involving stops and arrests in violation of the

---

[138]     *See* City Mem. at 3–5.

[139]     *See, e.g.*, *Floyd*, 861 F. Supp. 2d at 278, 291, 293; *Ligon*, 2013 WL 628534, at *20 & nn.230, 234.

[140]     *Floyd*, 861 F. Supp. 2d at 291.

[141]     *See* City Mem. at 3–4 (citing *McCleskey v. Kemp*, 481 U.S. 279, 297 (1987); *Ricketts v. City of Columbia*, 36 F.3d 775, 781–82 (8th Cir. 1994); *Watson v. City of Kansas City*, 857 F.2d 690, 695 (10th Cir. 1988)).

[142]     *See id.*

Fourth Amendment, where a plaintiff has also offered documentary and testimonial evidence of the practice.[143]  Nor do the cases stand for the general proposition that where the criminal justice system is concerned, the ordinary laws of statistical inference do not apply.[144]

The City's remaining arguments were either sufficiently addressed in the *Daubert* decision regarding Dr. Fagan's opinions in *Floyd*,[145] or raise factual

---

[143]   It is true that the Tenth Circuit in *Watson* stated:  "Whether or not probable cause exists is not susceptible to statistical quantification."  *Watson*, 857 F.2d at 695.  This dictum, however, appeared in the context of a *defense* of the probative value of statistics regarding arrest rates.  The Tenth Circuit concluded that the plaintiff's failure to include statistical data regarding probable cause was not fatal to the plaintiff's use of arrest rate statistics, because there was no feasible way for the plaintiff to provide statistical evidence of probable cause.  *See id.* Presumably if the plaintiff or the defendants had succeeded in offering reliable statistical evidence regarding probable cause, the Tenth Circuit would have considered this evidence just as it considered the statistical evidence that was introduced.

[144]   Even in the distinct and highly sensitive context of equal protection claims, the Supreme Court "has accepted statistics as proof of intent to discriminate in certain limited contexts."  *McCleskey*, 481 U.S. at 293.

[145]   *See, e.g.*, City Mem. at 3–5, 3 n.7; City Reply at 2.  The City is incorrect to suggest that there is an inconsistency between Dr. Fagan's analysis of the text strings offered as "Other" stop justifications and my conclusion in *Floyd* that it would mislead the jury to admit "expert testimony that makes generalizations about the level of reasonable suspicion indicated by the forms [that contain only an 'Other' factor on Side 1]."  *Floyd*, 861 F. Supp. 2d at 299–300. This statement appeared in the context of my rejection of Dr. Fagan's initial conclusion "that *all* . . . of the UF-250s on which the only box checked on Side 1 is 'Other' are 'Indeterminate.'"  *Id.* at 296.  I continue to hold that it would mislead the jury if experts were to testify about the general character of the forms that

issues that argue in favor of, rather than against, submitting the case to a jury.[146]

Whether Dr. Fagan's conclusions are persuasive is a mixed question of fact and

law for the jury, not a question susceptible to legal resolution by this Court.[147]

       In sum, based on plaintiffs' documentary and testimonial evidence, as

well as Dr. Fagan's opinions, a reasonable juror could conclude that the City has

---

contain only an "Other" factor on Side 1 — for example, by describing these forms as "Indeterminate," "Presumptively Justified," "Apparently Unjustified," or under any other general label. But the *Daubert* decision in *Floyd* did not prohibit expert testimony based on a closer inspection of the "Other" text strings. To the contrary, I stated that "one can make certain determinations" regarding "a particular UF-250" containing "Other" text strings "with the same or more confidence" as one can make such determinations regarding other UF-250s. *Id.* *Accord* Fagan Rebuttal at 31 n.71. In *Ligon*, I relied in part on the analysis of "Other" text strings, *see Ligon*, 2013 WL 628534, at *31–34, and Dr. Fagan's text string analysis is no less relevant in *Davis*. Finally, to the extent that the City's argument rests on the quality of Dr. Fagan's sampling of text strings and inferences based on them, *see* City Reply at 4, the City's arguments have not yet shown in what sense Dr. Fagan's methods depart from reliable, garden-variety random sampling and statistical inference. Such proof may be developed at trial.

[146]    *See, e.g.*, City Mem. at 4; City Reply at 2 n.4. Even if there were merit to some of the City's criticisms of Dr. Fagan's analysis, it would be inappropriate to grant summary judgment to the City on the basis of such arguments, because the magnitude of unconstitutional stops identified by Dr. Fagan leaves significant room for error. *Cf. Ligon*, 2013 WL 628534, at *33–34 (accepting for the sake of argument that some of the City's criticisms might have merit, but noting that even then, "plaintiffs have succeeded in showing a clear likelihood that they will be able to prove that the City of New York and its agents displayed deliberate indifference toward the violation of the constitutional rights of hundreds and more likely thousands of individuals").

[147]    *See Floyd*, 861 F. Supp. 2d at 287, 300.

engaged in a practice of making unconstitutional stops and arrests in and around

NYCHA buildings as part of its trespass enforcement practices, and that this

practice is sufficiently persistent and widespread to serve as a basis for *Monell*

liability.  Plaintiffs have raised genuine issues of material fact regarding their

widespread practice claim.  Thus, the City's motion for partial summary judgment

on this claim is denied.

### b.    Deliberate Indifference

If a jury were to find either that the City has a *policy* of making

unconstitutional stops and arrests in NYCHA buildings, or that the City has a

sufficiently persistent and widespread *practice* of making such stops and arrests to

establish *Monell* liability, it would be unnecessary to reach the issue of deliberate

indifference.  At the same time, in turning to this issue, I must draw all reasonable

inferences in favor of plaintiffs.  As a result, I will assume in the following

analysis, as I did earlier, that a reasonable juror could conclude that IO 23 and its

associated training materials represent an unconstitutional trespass enforcement

policy, and that the widespread practice of making unconstitutional trespass stops

and arrests in NYCHA buildings both preceded and followed the introduction of

IO 23.  The only questions remaining under the deliberate indifference analysis

would be (1) whether the City had sufficient notice of the unconstitutionality of its

practices, either constructively through the obviousness of the unconstitutionality, or based on actual notice,[148] and (2) whether the City failed "'to make meaningful efforts to address the risk of harm to plaintiffs.'"[149]

---

[148]     *See Cash*, 654 F.3d at 334.  On the issue of notice, the City is incorrect to suggest that plaintiffs must show the City "had notice that a particular training or other supervisory flaw was *obviously* causing such violations."  City Mem. at 5.  Actual notice that a training program is causing constitutional violations is sufficient:  such notice by itself makes the need for more or different training obvious.  It is only in the *absence* of actual notice that the deficiencies of a training program must be "obvious" in order to satisfy the requirements of *Monell* liability.  *See Cash*, 654 F.3d at 334 (noting that "deliberate indifference requires proof that [a] 'municipal actor disregarded a *known or* obvious consequence of his action'" (quoting *Brown*, 520 U.S. at 407) (emphasis added)).

          The City is also incorrect to suggest that plaintiffs have not identified the inadequacies in the City's training with sufficient specificity.  *See* City Mem. at 5 (citing *Reynolds*, 506 F.3d at 193).  As discussed in the following paragraphs, plaintiffs have offered abundant evidence that adequate training, supervision, and discipline of officers who engage in vertical patrols in NYCHA buildings could have prevented the constitutional harms allegedly suffered by plaintiffs, but that the City chose not to provide that training.  It would also be incorrect to suggest that plaintiffs must point to one or more particular elements of the NYPD's training program that specifically cause officers to perform unconstitutional stops or arrests.  Deliberate indifference does not require that officers be trained to commit constitutional violations.  Rather, "where 'the need for more or better supervision to protect against constitutional violations [is] obvious,'" *Cash*, 654 F.3d at 334 (quoting *Vann*, 72 F.3d at 1049), mere *failure* to "'make meaningful efforts to address the risk of harm to plaintiffs,'" *Cash*, 654 F.3d at 334 (quoting *Reynolds*, 506 F.3d at 192), is enough.  If a "'city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution,'" *Cash*, 654 F.3d at 334 (quoting *Connick*, 131 S. Ct. at 1360), then *a fortiori* a city's policy of inaction in light of notice that its program has caused, continues to cause, and will cause widespread constitutional violations is sufficient to establish *Monell* liability.

[149]     *Cash*, 654 F.3d at 334 (quoting *Reynolds*, 506 F.3d at 192).

Drawing all reasonable inferences in favor of plaintiffs, both questions raise triable issues of fact.  With regard to notice, a reasonable juror could find that the NYPD had actual notice from numerous sources of a widespread pattern of unconstitutional trespass stops and arrests in NYCHA buildings of precisely the kind that plaintiffs allege in this case.  Not only did the City receive notice of the unconstitutionality of its practices through individual CCRB reports and the CCRB study noted above, but plaintiffs have offered evidence that "NYCHA residents and tenant leaders have, for years, publicly complained about the City's unlawful practices in NYCHA residences."[150]  Plaintiffs also cite the abundant media coverage over several years of alleged unconstitutional trespass enforcement practices at NYCHA buildings.[151]  Indeed, based on this and other evidence,[152] it is questionable whether any reasonable juror could find the City *failed* to receive actual notice of the alleged constitutional infirmities at issue in this case.

With regard to whether the City took meaningful efforts to address the risk of harm, plaintiffs bear a heavy burden in establishing the inadequacy of the

---

[150]     Pl. Opp. at 10 n.21 (citing PAF ¶¶ 25–30).

[151]     *See id.*

[152]     *See generally id.* at 9–10.

57

NYPD's supervision, discipline, and training of its officers.[153]  For the purposes of

surviving summary judgment, however, plaintiffs have cited sufficient evidence to

raise a genuine issue of material fact on this point.  For nearly every laudatory-

sounding supervisory, disciplinary, or training procedure cited by the City in its

brief, plaintiffs cite evidence that the procedure does not operate as described, is

ineffective, or fails to address the allegedly unconstitutional practices at issue in

this case.[154]

Plaintiffs do not dispute that in recent years the City has made various

policy and training changes that relate to stops and arrests in NYCHA buildings.

The City developed IO 23 and its associated training materials, revised other

_____

[153]    "A municipality's culpability for a deprivation of rights is at its most
tenuous where a claim turns on a failure to train."  *Connick*, 131 S. Ct. at 1359
(citing *Tuttle*, 471 U.S. at 822–23).

[154]    *Compare, e.g.*, City Mem. at 7 (citing evidence that Integrity Control
Officers ("ICOs") ensure that officers follow rules and policies), *and id.* (citing
evidence that supervisors verify arrests at the scene and review paperwork to
ensure proper officer performance), *with, e.g.*, Pl. Opp. at 11–12 (citing evidence
that no supervising officer deposed in this case testified to having ever observed a
stop that lacked reasonable suspicion or an arrest that lacked probable cause), *and
id.* at 11–12 (citing evidence that ICOs do not behave as the City describes).
Similar disputes of fact regarding training, monitoring, supervising, and
disciplining appeared in the *Floyd* summary judgment briefing, with a similar
result.  *See Floyd*, 813 F. Supp. 2d at 429–35 (detailing a sample of the "numerous
disputed issues of fact as to the constitutional sufficiency of the NYPD's practice
of training, monitoring, supervising, and disciplining its officers for stops and
frisks conducted in violation of the Fourth Amendment" (footnote omitted)).

training materials and procedures, and in 2012 implemented a refresher course at

Rodman's Neck on Stop, Question and Frisk in general.[155]  However, for many of

the same reasons that IO 23 and its associated training materials may constitute

unconstitutional policies, as discussed above,[156] plaintiffs have at minimum raised

a genuine issue of material fact as to whether the City's response to its alleged

notice of unconstitutional stops and arrests was sufficient to avoid *Monell*

liability.[157]  I also note that some of the training materials at issue in this case are

the same as those I criticized in the *Ligon* preliminary injunction opinion.[158]

---

[155]    *See* City Mem. at 5–7.

[156]    *See supra* Part V.A.1.

[157]    *See also* Pl. Opp. at 15–16.  Plaintiffs criticize the City's production
of "instructional materials relating to the 2012 . . . training at Rodman's Neck and
the 2012 training on NYCHA rules and regulations," which "were produced only
in response to Plaintiffs' demand on October 23, 2012, after learning about their
existence while observing the *Ligon* preliminary injunction hearing."  *Id.* at 15
n.26.  I accept the City's representation that the latter training was not finalized
until October and was produced on November 20, 2012.  *See* City Reply at 1 n.1.
While the City's failure to produce the Rodman's Neck instructional materials until
after they had already appeared in the *Ligon* hearing is troubling, it is not
sufficiently problematic to justify granting plaintiffs' request to preclude the City
from relying on these materials in its summary judgment motion.  *See* Pl. Opp. at
15 n.26.

[158]    *See Ligon*, 2013 WL 628534, at *35–39.  I note with concern that the
City's briefs point to evidence of training on the four levels of *De Bour*, *see* City
Mem. at 6, but make no reference to training on what constitutes a stop under the
Fourth Amendment.  *See Ligon v. City of New York*, No. 12 Civ. 2274, 2013 WL
227654, at *2 n.23 (S.D.N.Y. Jan. 22, 2013) ("If [the City] accept[s] that *Bostick*'s

In evaluating plaintiffs' claim that the City has displayed deliberate indifference to a widespread practice of constitutional violations, a reasonable juror might also note that the City continues to contest *in this litigation* whether a constitutionally problematic practice of trespass stops and arrests in NYCHA buildings has *ever* existed.[159]   The City is not arguing that its police officers engaged in constitutional violations in the past, but that the City was unaware of this, and that as soon as it received notice of the violations, it altered its policies and training to prevent them, and therefore is not deliberately indifferent.   Rather, the City argues that plaintiffs have failed to offer reliable evidence of constitutional violations,[160] and that any changes to policy and training in recent years have

---

view of the Fourth Amendment governs the NYPD, then the NYPD should train its officers in accordance with that standard.").   I am also concerned that at least some of the City's most recent training materials direct officers to complete a UF-250 *only* when they have reasonable suspicion, rather than each time they have made a *Terry* stop.   *Compare Ligon*, 2013 WL 628534, at *38–39 (criticizing training materials), *with, e.g.*, 12/4/12 Declaration of Michele Irizarry, counsel to City (including as exhibits training materials that are similar or identical to those criticized in *Ligon*).   The City draws attention in its briefs to the recent decline in apparently unjustified stops, according to Dr. Fagan's own metrics.   *See, e.g.*, City Mem. at 11–12, 14.   If this decline, however, is attributable to officers interpreting the NYPD's new policies as an instruction not to fill out UF-250 forms when a *Terry* stop was not based on reasonable suspicion, then the decline would not necessarily show an improvement in the NYPD's practices.

[159]      *See* City Mem. at 2–9; City Reply at 1–4.

[160]      *See* City Mem. at 1 n.3 (arguing that named plaintiffs' stops and arrests complied with constitutional standards), 3–4 (arguing that Dr. Fagan's

simply "improved the quality" of stops and arrests.[161]

Finally, the City argues that plaintiffs have failed to provide evidence of "actual causation," that is, evidence that "specific deficiencies in the City's training and/or supervision program(s) *actually caused* their alleged constitutional deprivations."[162]  The City argues that plaintiffs bear the "burden of ruling out those causes of the alleged [Fourth Amendment] violations that would not support City liability, such as negligent program administration or officers' negligent or intentional disregard of training."[163]  But a reasonable juror could conclude that plaintiffs have adequately shown causation.  As discussed above, plaintiffs have provided evidence that NYPD officers have engaged in a widespread practice of unconstitutional trespass stops and arrests in NYCHA buildings *as a result of* receiving inadequate training and supervision regarding constitutional standards, and inadequate discipline in response to violations of those standards.  As the

---

analysis shows no pattern of constitutional violations); City Reply at 1–2 (further arguments against Dr. Fagan's analysis), 2 (acknowledging that CCRB study identified "concerns," but not acknowledging the validity of those concerns), 3 (denying that decline to prosecute forms provide evidence of unlawful stops or arrests).

[161]    City Reply at 3.

[162]    *Id.* at 4 (citing *Connick*, 131 S. Ct. at 1358 n.5).  *See also* City Mem. at 9.

[163]    City Mem. at 9 (citing *Amnesty Am.*, 361 F.3d at 130).

Supreme Court phrased the causation issue in *City of Canton v. Harris*: "Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?"[164]  Plaintiffs have clearly raised a genuine issue of material fact as to whether the unconstitutional stops and arrests in this case would have been avoided had NYPD officers received adequate training, supervision, and discipline relating to the constitutional standards governing trespass stops and arrests in NYCHA buildings.

For the foregoing reasons, the City's motion for summary judgment on plaintiffs' deliberate indifference claims, like the City's motion for summary judgment on plaintiffs' widespread practice claims, is denied.

**B.      Fourteenth Amendment Equal Protection Claims Against the City**

The Equal Protection Clause of the Fourteenth Amendment prohibits intentional discrimination on the basis of race, not government action that has a disproportionate racial impact.[165]  Plaintiffs argue that the City bears *Monell* liability for violations of the equal protection rights of African-American and Latino residents and guests of NYCHA buildings based on the City's alleged

---

[164]     489 U.S. at 391.

[165]     *See Washington v. Davis*, 426 U.S. 229 (1976).

racially discriminatory trespass enforcement practices.[166]  In order to succeed on

their equal protection claims, plaintiffs must show that the City's practices (1) have

an "'adverse effect'" on African-American and Latino residents and guests in

NYCHA buildings,[167] and (2) that the practices were "'motivated by discriminatory

animus.'"[168]  In other words, plaintiffs must prove both disproportionate impact

and discriminatory purpose.[169]

        As noted above, the plaintiffs who maintain Fourteenth Amendment

claims against the City are the remaining arrested plaintiffs, and two of the

remaining resident plaintiffs, Evans and Littlejohn, who also happen to be arrested

plaintiffs.  The City argues that all the resident plaintiffs conceded any equal

protection claim by failing to respond to the City's arguments during the first stage

of summary judgment briefing.[170]  Plaintiffs deny such a concession and argue that

---

[166]    Plaintiffs do not argue that the City's trespass enforcement *policies* contain express racial classifications, nor that the City bears *Monell* liability based on having a policy of carrying out NYCHA trespass enforcement in a racially discriminatory manner.  Rather, plaintiffs' Fourteenth Amendment claims against the City are based on the City's alleged *practices.  See* Pl. Opp. at 16–17.

[167]    *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009) (quoting *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001)).

[168]    *Id.*

[169]    *See Hayden v. Paterson*, 594 F.3d 150, 163–64 (2d Cir. 2010).

[170]    *See* City Mem. at 9 n.12 (citing 6/16/12 City's Memorandum of Law in Support of Its Motion for Summary Judgment Based on Plaintiffs' Individual

Evans, Littlejohn, Jones, and Suarez "maintain that they are adversely affected by the City's racially discriminatory practices in NYCHA residences."[171]  Neither side is completely correct.  Because Jones and Suarez withdrew their claims against the City, they cannot serve as representative resident plaintiffs against the City.  On the other hand, Evans and Littlejohn have not withdrawn their equal protection claims against the City and remain valid representatives of both the arrested and resident plaintiffs' putative subclasses.  As I stated in denying the City's motion for summary judgment on Evans' and Littlejohn's section 1981 claims, they have both

> proffered concrete evidence showing that since their arrests, they feel less free to come and go from their buildings and to have guests visit them.  Evans has testified that police officers referred to her as "nigger" when she was arrested and Littlejohn testified that his friend Washington was also called a "nigger" in Littlejohn's building while he was attempting to visit Littlejohn.[172]

Evans and Littlejohn were both arrested as NYCHA residents, and are both African-American.[173]  They are entitled to proceed on their equal protection claims as representatives of both the arrested and resident plaintiffs' putative subclasses.

---

Circumstances at 14; 8/3/12 City's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment Based on Plaintiffs' Individual Circumstances at 7 n.22); City Reply at 4 n.8.

[171]   Pl. Opp. at 16 n.30.

[172]   *Davis I*, 2012 WL 4813837, at *19.

[173]   *See* Am. Compl. ¶¶ 38, 41.

Turning now to the *Monell* aspects of plaintiffs' equal protection claims:  with regard to discriminatory purpose, plaintiffs need not prove that the "'challenged action rested solely on racially discriminatory purposes,'"[174] or even that a discriminatory purpose "was the 'dominant' or 'primary' one."[175]  Rather, plaintiffs must prove that "a discriminatory purpose has been *a* motivating factor" in the City's acts.[176]  That is, plaintiffs must show that the City "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."[177]  As the Second Circuit and the Supreme Court have explained:

> Because discriminatory intent is rarely susceptible to direct proof, litigants may make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.  The impact of the official action — whether it bears more heavily on one race than another — may provide an important starting point."[178]

The consequences of government action are sometimes evidence of the

---

[174]    *Hayden*, 594 F.3d at 163 (quoting *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).

[175]    *Arlington Heights*, 429 U.S. at 265.

[176]    *Id.* at 265–66 (emphasis added).

[177]    *Hayden*, 594 F.3d at 163 (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (citation and footnote omitted)) (certain quotation marks omitted).

[178]    *Id.* (quoting *Arlington Heights*, 429 U.S. at 266).

65

government's intent: "proof of discriminatory intent must necessarily usually rely on objective factors . . . . The inquiry is practical. What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid."[179]  "Once it is shown that a decision was motivated at least in part by a racially discriminatory purpose, the burden shifts to the defendant to show that the same result would have been reached even without consideration of race."[180]

With regard to disproportionate impact, plaintiffs rely primarily on Dr. Fagan's study.[181]  Drawing all reasonable inferences in favor of plaintiffs, the study shows that the level of "law enforcement activity" — defined as the ratio of stops to crime complaints — is greater in NYCHA buildings than in the surrounding areas.  Because there are higher concentrations of African Americans and Latinos in NYCHA buildings than in the surrounding areas, the presence of greater law enforcement activity in the former would by itself create a racial disparity.  Dr. Fagan also found that the racial disparity in enforcement activity is

---

[179]   *Arlington Heights*, 429 U.S. at 279 n.24.  "An invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another."  *Washington*, 426 U.S. at 242.

[180]   *United States v. City of Yonkers*, 96 F.3d 600, 612 (2d Cir. 1996) (citing *Arlington Heights*, 429 U.S. at 270 n.21).

[181]   *See* Pl. Opp. at 17–18.

greatest in NYCHA residences with the highest concentration of African-American

residents, and that the disparity in all residences is greatest for stops on suspicion

of trespass.  Indeed, based on multivariate regression analysis, Dr. Fagan found

that the racial composition of NYCHA buildings is a better *predictor* of trespass

enforcement disparities than any racially neutral policy-rationalizing variables,

including crime, policing activity, vertical patrols, or socioeconomic conditions.[182]

The City argues that there are non-discriminatory law enforcement

rationales for dedicating disproportionate law enforcement resources to NYCHA

buildings.[183]  Indeed, there could be good, racially neutral reasons for dedicating

law enforcement resources to certain areas out of proportion to those areas' crime

rates, and this could result in higher stop-to-crime ratios in those areas.  In theory,

race may even be correlated with some racially neutral factor that would justify

---

[182]  *See id.* (citing PAF ¶¶ 18–20).  I reject the City's unsupported argument that Dr. Fagan's comparison between NYCHA buildings and the areas surrounding them is not "statistically appropriate" as a matter of law, or that Dr. Fagan has failed as a matter of law to identify a "statistically appropriate comparator."  City Mem. at 9–10 n.13; City Reply at 10.

[183]  *See* City Mem. at 13; City Reply at 5 n.9.  The City also raises valid points for a jury to consider involving the relatively small size of the difference in racial composition between NYCHA buildings and surrounding areas, *see id.* at 10–12 n.15, the negative correlation between stop-to-crime ratios and the concentration of Hispanics in NYCHA residences, *see id.* at 11–12, and recent changes in the enforcement statistics cited by Dr. Fagan, *see id.* at 12.

increased law enforcement activity, and for which Dr. Fagan has not controlled.[184] But the City has not yet proven the existence of such a factor, and in any case this discussion is more relevant to the question of discriminatory purpose than disproportionate impact.  Drawing all reasonable inferences in favor of plaintiffs, a reasonable juror could find based on Dr. Fagan's study that the City's stop practices and its trespass enforcement practices in NYCHA buildings disproportionately impact African Americans and Latinos.

On the issue of discriminatory purpose, the City offers similar arguments to those it offered in favor of its motion for summary judgment in *Floyd*.  There, I concluded that "[t]he statistical evidence in the instant case, while strong enough to show a disparate impact, is not strong enough to show discriminatory purpose standing alone.  However, plaintiffs have presented other proof in addition to the statistical evidence — [including] the inadequacy of the

---

[184]     Perhaps, as the City suggests in another context, the NYPD's deployment of its resources can be explained in racially neutral terms by a decision to focus on crime in buildings with high population density or entrenched criminality.  *See* City Mem. at 11.  Of course, even if the City were to produce evidence that the correlation between law enforcement activity and racial concentration disappears once population density and entrenched criminality are controlled for, the plausibility of these explanations for the NYPD's law enforcement activity, as opposed to a race-based explanation, would still have to be weighed by a jury.

City's efforts to take remedial steps to reduce the racial disparity of stops . . . ."[185]   I
also stated:

> This is clearly not a situation in which the City has taken no
> remedial steps.  Nonetheless, considering the statistical evidence
> in conjunction with the narrative evidence of significant
> shortcomings in the ways that the City's policies have been put
> into practice, I find that there is a triable issue of fact as to
> whether the NYPD leadership has been deliberately indifferent to
> the need to train, monitor, supervise, and discipline its officers
> adequately in order to prevent a widespread pattern of
> suspicionless and race-based stops.[186]

Although plaintiffs' evidence of discriminatory purpose in the present

case is more tenuous than in *Floyd*, I conclude that a similar analysis ultimately

applies.  Plaintiffs' statistical evidence of racial disparities is likely not strong

enough to support an inference of discriminatory purpose, standing alone,[187] but it

provides a "starting point" for an examination of "circumstantial and direct

evidence of intent."[188]

*First*, while there is nothing inherently problematic in the City

---

[185]   *Floyd*, 813 F. Supp. 2d at 452–53.

[186]   *Id.* at 456.

[187]   *See Arlington Heights*, 429 U.S. at 266 (citing, as examples of rare
cases where "a clear pattern, unexplainable on grounds other than race, emerges
from the effect of the state action," *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), and
*Gomillion v. Lightfoot*, 364 U.S. 339 (1960)).

[188]   *Id.*

dedicating disproportionate resources to policing in NYCHA buildings, and indeed residents may favor such an approach, the City offers no explanation of why it might be desirable or how it might be non-discriminatory to dedicate greater law enforcement attention to NYCHA residences with greater concentrations of African Americans.[189]  In the absence of any racially neutral explanation for this correlation, a reasonable juror could draw the troubling inference that the NYPD regards crimes by African Americans in NYCHA housing as a source of greater concern than identical crimes by similarly situated non-African Americans, and treats similar crime levels more aggressively when they occur in NYCHA buildings containing a higher proportion of African Americans.  Dr. Fagan's statistical study thus represents a circumstantial starting point for at least a prima facie finding of discriminatory intent.

*Second*, plaintiffs argue that "the City was fully aware of residents' public complaints about its racially discriminatory trespass enforcement activities in NYCHA residences," but failed to take adequate steps to address those complaints, leading to an inference that it intended the racially discriminatory practices to continue.[190]  None of the materials cited by plaintiffs includes evidence

---

[189]    *See* Pl. Opp. at 17; PAF ¶ 18.

[190]    Pl. Opp. at 19.

of NYHCA residents making public complaints, or complaints to the NYPD, that

explicitly allege racially discriminatory trespass enforcement activities.[191]   Other

exhibits provided by plaintiffs, however, adequately make this showing.   For

example, Pearl Barkley, a fifty-seven year old African-American woman who has

lived in NYCHA housing in East Harlem for approximately fourteen years,

testified that "[b]ased on my experience, young black and Latino men living in the

Jefferson Houses suffer the most from these abusive NYPD practices," and that

"[a]s a result of what I have seen and experienced, I attended a number of meetings

with NYPD officials to complain about the way in which the officers patrol

NYCHA property, and the way they treat young people who reside in the Jefferson

---

[191]   *See id.* (citing PAF ¶¶ 25–30, 83).   In fact, of these citations, the only
one that explicitly alleges racial discrimination is the following, a declaration from
a sixty-seven year old African-American woman who has been a NYCHA resident
since 1975 and a tenant patrol supervisor for ten years:

> I have heard many complaints about the ways in which [NYPD]
> officers interact with people in the Smith Houses.   The NYPD
> officers are often very rude and disrespectful to the people who
> live in the Smith Houses, particularly young black and Latino
> male residents.   In my opinion, officers often stop, question, and
> harass people based on what they are wearing, and not because
> they are doing anything illegal.

1/23/12 Declaration of Mary Baez, Tenant Patrol/Resident Watch Supervisor in
NYCHA Smith Houses, Ex. 19 to Lee Decl., ¶ 3.   Because the declaration does not
include evidence that Baez's allegation of racial discrimination was conveyed to
the NYPD, it does not by itself provide evidence of notice to the City of a racially
discriminatory practice by the NYPD.

71

Houses."[192]  A reasonable juror drawing all inferences in favor of plaintiffs could find that such testimony, alongside the factual allegations in the *Davis* litigation itself, shows that the City was on notice of possible racially discriminatory trespass enforcement activities in NYCHA buildings.[193]  A reasonable juror could also conclude that the City's response to these allegations has been insufficient to negate the inference of discriminatory intent.  Other than a cursory reference to IO 23, whose relevance to the issue of racial discrimination is not explained, the City provides no evidence that it has attempted to address the racially discriminatory practices alleged in plaintiffs' Amended Complaint, or even acknowledges their existence.[194]

*Third*, and most importantly, as plaintiffs note, the alleged racial disparities in *Davis* "exist in the context of the NYPD's long history of biased stop, question, and frisk activity."[195]  The overlap and similarities between this litigation and the *Floyd* case, which is now on trial, provide an independently sufficient ground for denying summary judgment on the issue of discriminatory intent.  The

---

[192]    1/26/12 Declaration of Pearl Barkley, Resident of NYCHA Jefferson Houses, Ex. 13 to Lee Decl., ¶¶ 3, 8.

[193]    *See* Am. Compl. ¶¶ 198–216.

[194]    *See* City Mem. at 12–14; City Reply at 5–6.

[195]    Pl. Opp. at 18.

*Davis* plaintiffs, following Dr. Fagan's approach, have focused their arguments for the most part on evidence of *differences* between law enforcement practices in and around NYCHA buildings and practices beyond those buildings.[196]  If the *Floyd* plaintiffs succeed in showing that a discriminatory purpose has been a motivating factor for the NYPD's stop and frisk practices in general, however, it is possible that the *Davis* plaintiffs could show a discriminatory purpose in part based on evidence of *similarities* and *connections* between the NYPD's trespass enforcement program in NYCHA buildings and the stop and frisk policies outside of those buildings.[197]

       For the foregoing reasons, the City's motion for summary judgment on plaintiffs' equal protection claims is denied.

## C.   Title VI Claims Against the City

       Title VI of the Civil Rights Act of 1964 states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded

---

[196]     *See id.* at 17.

[197]     As an example of evidence of the City's notice of racially discriminatory police practices involving stop and frisk generally, plaintiffs cite the following report: OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF NEW YORK, CIVIL RIGHTS BUREAU, NEW YORK CITY POLICE DEPARTMENT'S "STOP & FRISK" PRACTICES: A REPORT TO THE PEOPLE OF THE STATE OF NEW YORK 174 (1999) (stating that racial minorities have been subjected to more intrusive stops). *See* Pl. Opp. at 18 n.32.

from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[198]   The remaining resident plaintiffs have alleged that they are "unable to use and enjoy their residences because [the City's] vertical patrol and trespass enforcement practices are conducted in such a consistently unlawful and discriminatory manner that the residents are not free to come and go as they wish."[199]

The parties agree that the remaining resident plaintiffs can prevail on their Title VI claim only if they can show that the City is the recipient of federal assistance, and does not merely benefit from that assistance.[200]   Whether an entity indirectly receives, rather than merely benefits from, federal financial assistance is a fact-specific inquiry that depends on factors such as (1) whether the entity is Congress's intended recipient, and (2) whether the entity was in a position to

---

[198]   42 U.S.C. § 2000d.

[199]   Am. Compl. ¶ 252.

[200]   *See* City Mem. at 16–17 (citing *United States Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 604 (1986); *Alfano v. Bridgeport Airport Servs., Inc.*, 373 F. Supp. 2d 1, 6 (D. Conn. 2005)); Pl. Opp. at 25–27 (same).  The cited cases discuss section 504 of the Rehabilitation Act, but there is no dispute that the same standard governs Title VI.  *See Paralyzed Veterans*, 477 U.S. at 600 & n.4 ("Title VI is the congressional model for subsequently enacted statutes prohibiting discrimination in federally assisted programs or activities.  We have relied on case law interpreting Title VI as generally applicable to later statutes.").

74

accept or reject the funds.[201]

Even based on the City's presentation of the facts, both factors support the conclusion that the City has been a recipient of federal financial assistance for Title VI purposes.  *First*, the City does not contest that under the Memorandum of Understanding ("MOU") between the City and NYCHA, the City receives funding from NYCHA that NYCHA in turn receives from the federal government under, among other programs, the USHA, 42 U.S.C. § 1437g, and the Public and Indian Housing Drug Elimination Program, 42 U.S.C. §§ 11901 *et seq.* ("PIHDEP").[202]  PIHDEP states that "[g]rants under this subchapter may be used in public housing or other federally assisted low-income housing projects for . . . (1)

---

[201]    *See Alfano*, 373 F. Supp. 2d at 5–6; *Paralyzed Veterans*, 477 U.S. at 605–06 ("By limiting coverage to recipients, Congress imposes the obligations of § 504 upon those who are in a position to accept or reject those obligations as part of the decision whether or not to 'receive' federal funds.").

[202]    *See* City Mem. at 16–17; MOU, Ex. B to 12/5/12 Declaration of Brian P. Clarke, ¶¶ 13–18; NYCHA's Rule 56.1 Statement in Support of Its Motion for Summary Judgment ("NYCHA 56.1") ¶ 31.  The MOU clearly envisions NYCHA and the NYPD working together to apply for federal money for the NYPD's police services in NYCHA buildings.  *See, e.g.*, MOU ¶ 19 ("NYCHA and the City agree to work together in the preparation of applications for grants and subsidies under existing and future federal and state programs that may provide funding for public housing safety and law enforcement functions . . . .").  This general commitment appears immediately after a series of specific commitments by NYCHA to seek federal funding for the NYPD's police services in NYCHA buildings, which NYCHA will then pay to the NYPD.  *See id.* ¶¶ 13–18.  The MOU also envisions "that the parties shall comply with all such laws and regulations in the expenditure of monies deriving from federal and state grant and subsidy programs." *Id.* ¶ 25.

75

the employment of security personnel; [or] (2) reimbursement of local law

enforcement agencies for additional security and protective services . . . ."[203]

Congress clearly intended and authorized public housing agencies to distribute

PIHDEP funds to local law enforcement agencies, just as NYCHA agreed to

distribute PIHDEP funds to the NYPD under the MOU.[204]   Under Department of

Justice regulations implementing Title VI, the "primary recipient" of federal

financial assistance is "any recipient which is authorized or required to extend

Federal financial assistance to *another recipient.*"[205]   Thus, under the MOU,

NYCHA is the "primary recipient" of PIHDEP funding, and the NYPD, through

NYCHA, is "another recipient," no less bound by the non-discrimination

requirements of Title VI.

The NYPD is not, like the airlines in *Paralyzed Veterans* that

benefitted from federal aid to airports for construction projects, a mere

"beneficiary" of federal financial assistance given to a recipient of aid.[206]   Nor is

---

[203]     42 U.S.C. § 11903(a)(1)–(2).

[204]     *See* MOU ¶ 16.

[205]     28 C.F.R. § 42.102g (emphasis added); *id.* § 42.102f (defining "recipient").

[206]     *See Paralyzed Veterans*, 477 U.S. at 607.

the NYPD's receipt of funding simply an "'economic ripple effect[]'"[207] of

NYCHA's use of its federal financial assistance.  Rather, through PIHDEP and

other programs, Congress intended to subsidize police services for public housing.

As a law enforcement agency providing police services to public housing, the

NYPD is an intended recipient of Congress's subsidies.[208]

     *Second*, the NYPD could have rejected the federal financial assistance

envisioned in the MOU.  The NYPD was free to avoid the burdens of non-

discrimination by not entering into the MOU, and remains free to reject the federal

financial assistance it receives through NYCHA.  The City's position is quite

different from that of the airlines in *Paralyzed Veterans*, who never received "a

single penny of the money" distributed to airport operators and therefore could not

---

[207]    *Id.* (quoting *Grove City Coll. v. Bell*, 465 U.S. 555, 572 (1984) (finding that a college was Congress's intended recipient of federal money despite checks being sent to individual students, who then used money to pay tuition)).

[208]    Because the statutory language of PIHDEP is particularly clear in its authorization of indirect financial assistance to local law enforcement, and because plaintiffs need only establish that the City's police services in NYCHA are supported by *some* federal funding, it is unnecessary to address congressional intent under the other sources of federal funding invoked in the MOU.  But I note that a similar analysis would apply to, for example, 42 U.S.C. § 1437g(e)(1)(C) (authorizing public housing agencies to use federal financial assistance to pay "the costs of providing adequate security for public housing residents, including above-baseline police service agreements").  *See also id.* § 1437g(d)(1)(I) (authorizing "capital expenditures to improve the security and safety of residents"); MOU ¶ 14 (agreeing to transfer funding from NYCHA to the NYPD under a predecessor of this provision).

refuse it.[209]

Based on the preceding analysis, which is based on undisputed facts, I conclude that the City is a recipient of federal financial assistance for Title VI purposes.  There is, however, a genuine issue of material fact as to whether the City has violated Title VI by providing police services in NYCHA buildings in a discriminatory manner.  "[T]he reach of Title VI's protection extends no further than the Fourteenth Amendment,"[210] but it extends just as far.  As I stated above with regard to plaintiffs' Fourteenth Amendment claims under section 1983, a reasonable juror drawing all reasonable inferences in favor of plaintiffs could conclude that the City has failed to negate the inference that a discriminatory purpose played a role in its police services in NYCHA buildings.

For the foregoing reasons, the City's motion for summary judgment on plaintiffs' Title VI claims is denied.

### D.    Section 1981 Claims Against the City

The Civil Rights Act of 1866, now codified at 42 U.S.C. § 1981 ("section 1981"), protects the rights of all persons "to make and enforce contracts"

---

[209]    *Paralyzed Veterans*, 477 U.S. at 605.

[210]    *United States v. Fordice*, 505 U.S. 717, 732 n.27 (1992) (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) (opinion of Powell, J.); *id.* at 328 (opinion of Brennan, White, Marshall, and Blackmun, JJ., concurring in judgment in part and dissenting in part)).

78

free from discrimination on the basis of race.  After the Supreme Court reaffirmed a narrow construction of that provision in 1989,[211] Congress passed the Civil Rights Act of 1991, which, among other changes, added section 1981(b):

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of *all benefits, privileges, terms, and conditions* of the contractual relationship. (Emphasis added).

Section 1981 "offers relief when racial discrimination . . . impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship."[212]  As I noted in *Davis I*, the remaining resident plaintiffs

> are authorized residents on a lease (that is, a contract) with NYCHA.  There is no doubt that [they] have rights under the existing contractual relationship.  The question is whether that relationship has been impaired because of racial discrimination.[213]

---

[211]     *See Patterson v. McLean Credit Union*, 491 U.S. 164, 171 (1989) (stating that section 1981 "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations").

[212]     *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

[213]     *Davis I*, 2012 WL 4813837, at *18.  The City's brief does not contest that the City may be liable under section 1981 for impairing plaintiffs' contract with NYCHA based on racial discrimination.  Indeed, even if NYCHA were not a defendant in this case, there is precedent for concluding that the City could be held liable for such interference.  *See Ginx, Inc. v. Soho Alliance*, 720 F. Supp. 2d 342, 358 (S.D.N.Y. 2010) (noting that allegation of "interference with a contractual

I concluded that under federal regulations, as well as the Second Circuit's recognition of a constitutional protection of public housing residents' freedom of association, "[b]oth the right to come and go as they please and the right to accommodate guests are material to plaintiffs' contracts."[214]

If plaintiffs succeed in showing that the City's trespass enforcement practices in NYCHA buildings are based at least in part on a discriminatory motive, then a reasonable juror could conclude, based on the evidence of contractual impairment introduced by plaintiffs, that the racially discriminatory aspects of the City's trespass enforcement practices prevent the remaining resident plaintiffs from coming and going and having guests as they wish.  Contrary to the City's suggestion, there is no need as a matter of law for plaintiffs to produce statistical evidence regarding the proportion of NYCHA residents whose contractual rights have been impaired by the City's practices.[215]  Of course, the City will be free to argue that plaintiffs have not provided persuasive evidence that the contractual rights of the putative class of NYCHA residents have in fact been

---

relationship between Plaintiffs and someone other than Defendants does not bar a claim under § 1981" (citing *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000))).

[214]    *Davis I*, 2012 WL 4813837, at *19.

[215]    *See* City Mem. at 18–19.

impaired sufficiently to give rise to *Monell* liability.  But plaintiffs' evidence of contractual impairment is sufficient to survive summary judgment.[216]

For the foregoing reasons, the City's motion for summary judgment on plaintiffs' section 1981 claims is denied.

E.    **FHA Claims Against the City**

Section 3604(b) of the Fair Housing Act ("FHA") makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith."[217]  In *Davis I*, I concluded that the law is best understood to prohibit post- as well as pre-acquisition discrimination in the provision of housing-related services.[218]  I also noted that the FHA is generally interpreted as allowing claims based on disparate impact, even in the absence of evidence of discriminatory intent.[219]  Plaintiffs have now stated that they "consent to the dismissal of their

---

[216]    *See Davis I*, 2012 WL 4813837, at *19.

[217]    42 U.S.C. § 3604(b).

[218]    *See Davis I*, 2012 WL 4813837 at *20.  I also noted that no party had raised the argument that NYCHA and not the NYPD is liable under the FHA.  *See id.* at *20 n.174.

[219]    *See id.* at *21 (citing *Cox v. City of Dallas*, 430 F.3d 734, 746 (5th Cir. 2005); *Smith v. NYCHA*, 410 Fed. App'x 404, 406 (2d Cir. 2011) (citing *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003))).

disparate impact claim against both Defendants," and continue only with their

disparate treatment claim.[220]

   To establish a prima facie case of disparate treatment (that is,

intentional discrimination) under the FHA, resident plaintiffs "'must present

evidence that animus against the protected group was a significant factor in the

position taken by the municipal decision-makers themselves or by those to whom

the decision-makers were knowingly responsive.'"[221]  Thus, for resident plaintiffs

to survive summary judgment on their FHA claim against the City, resident

plaintiffs must present sufficient evidence for a reasonable juror to conclude that

racial animus against African Americans or Latinos was a significant factor in the

City's provision of police services in connection with resident plaintiffs' NYCHA

---

[220] Pl. Opp. at 28.  The City also argues that plaintiffs' claims under 42 U.S.C. § 3617 ("section 3617") are barred by *Frazier v. Rominger*, 27 F.3d 828, 833–34 (2d Cir. 1994).  *See* City Mem. at 14 n.21.  Plaintiffs offer no defense to this challenge.  *See* Pl. Opp. at 28 n.46 (noting that this Court did not reach the section 3617 claims in *Davis I*, but offering no defense of the claims).  Plaintiffs' section 3617 claims against the City are therefore also dismissed.

[221] *Smith*, 410 Fed. App'x at 406 (quoting *Regional Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002)).  "If the plaintiffs make out a prima facie case, then the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their decision." *Middletown*, 294 F.3d at 49 (explaining how the burden-shifting framework proceeds under various evidentiary showings).

rentals.[222]

For the same reasons that a reasonable juror could find plaintiffs'
evidence in support of their equal protection claim, discussed above, to be
sufficient to show that racial animus was a significant factor in the City's provision
of police services in NYCHA buildings, the City's motion for summary judgment
on the FHA claims of the remaining plaintiffs bringing these claims (Evans and
Littlejohn) is denied.

## F.    NYSC Article I Section 12 Claims Against the City

Plaintiffs now consent to the dismissal of their equal protection claims
under Article I section 11 of the New York Constitution as duplicative.[223]  As a
result, plaintiffs' only remaining claims under the New York Constitution are
under Article I section 12, which provides similar but in some circumstances

---

[222]    The City also argues that plaintiffs' claim must fail because section
3604 "only remedies conduct that affects housing opportunities or availability."
City Mem. at 15 (emphasis omitted).  As plaintiffs correctly note, this issue was
resolved in *Davis I*, 2012 WL 4813837, at *20–21.  To be sure, plaintiffs' claims
would be more closely bound to the FHA's core concern with housing availability
for protected groups if plaintiffs had offered statistical evidence of African
Americans and Latinos leaving, or not entering, NYCHA housing in order to avoid
the City's allegedly racially discriminatory police services there.  At the same time,
where the choice may be between public housing and no housing at all, it would
surely be contrary to the FHA's goals to require protected groups to opt for the
latter in order to demonstrate the severity of a discriminatory post-acquisition
practice.

[223]    *See* Pl. Opp. at 29 n.51.

broader protections than the Fourth Amendment to the United States Constitution.[224]  The Court of Appeals of New York has "demonstrated its willingness to adopt more protective standards" under Article I section 12 than those that exist under the Fourth Amendment "when doing so best promotes 'predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens.'"[225]

On the other hand, "New York courts will only imply a private right of action under the state constitution where no alternative remedy is available to the plaintiff."[226]  In order to survive summary judgment, plaintiffs must at least show that they have suffered constitutional injuries under Article I section 12 that are not recognized under the Fourth Amendment.  Plaintiffs have failed to do so. Plaintiffs argue, persuasively, that the City's trespass enforcement practices in NYCHA buildings may involve both conduct that violates the Fourth Amendment, and conduct that does not violate the Fourth Amendment but does violate the New

---

[224]    *See Evans v. Solomon*, 681 F. Supp. 2d 233, 255 (E.D.N.Y. 2010).

[225]    *People v. Torres*, 74 N.Y.2d 224, 228 (1989) (quoting *People v. P. J. Video*, 68 N.Y.2d 296, 304 (1986)) (certain quotation marks omitted).

[226]    *Felmine v. City of New York*, No. 09 Civ. 3768, 2012 WL 1999863, at *6 (E.D.N.Y. June 4, 2012).  *Accord Flores v. City of Mount Vernon*, 41 F. Supp. 2d 439, 446–47 (S.D.N.Y. 1999) ("[N]o private right of action exists for violations of the New York State Constitution where a Plaintiff has alternative damage remedies available.").

York state law of *De Bour* and its progeny.[227]  As the Court of Appeals of New

York made clear in *People v. Hollman*, however, *De Bour* and its progeny are

rooted not in federal or state constitutional law, but in state common law.[228]

For the foregoing reasons, the City's motion for summary judgment

on plaintiffs' NYSC claims is granted.[229]

### G.   Race Discrimination Claims Against NYCHA

Resident plaintiffs have brought race discrimination claims against

NYCHA under a number of laws, including some of those discussed above:  Title

VI, the FHA, section 1981, and the NYSHRL and NYCHRL.[230]  NYCHA argues,

---

[227]     *See* Pl. Opp. at 29–30; *People v. Ventura*, 913 N.Y.S.2d 543, 547 (Sup. Ct. N.Y. Co. 2010) ("To the extent that . . . in public housing the police routinely engage in random, unjustified questioning — and there is evidence that they do — the practice would amount to a systematic violation of *De Bour*." (citing Adam Carlis, *The Illegality of Vertical Patrols*, 109 COLUM. L.REV. 2002 (2009)).

[228]     *See Hollman*, 79 N.Y.2d at 195–96 (affirming *De Bour* "as a matter of State common law").

[229]     Because I conclude that plaintiffs have failed to show how section 1983 does not provide an adequate alternative remedy for their NYSC claims, I do not reach the City's argument that plaintiffs' claims are barred under the New York State law doctrine of "governmental immunity."  *See* City Mem. at 19–20 (citing *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 470 (S.D.N.Y. 2008)).

[230]     *See* Pl. Opp. at 20.  Plaintiffs do not dispute that all of their claims against NYCHA under these laws depend, at minimum, on a showing that NYCHA engaged in race discrimination, either directly through its own acts or indirectly through its relationship with the City.  *Compare* Memorandum of Law of

and plaintiffs do not contest, that plaintiffs must show a racially discriminatory *purpose* in order to succeed on their Title VI, section 1981, and NYSHRL and NYCHRL claims.[231]  In addition, because plaintiffs have now abandoned their disparate impact claims against both the City and NYCHA under the FHA,[232] plaintiffs must also show intentional discrimination in order to succeed on their FHA claims.  Thus, all of plaintiffs' race-discrimination claims against NYCHA require that plaintiffs show NYCHA engaged in intentional racial discrimination.

Plaintiffs' brief in opposition to NYCHA's motion for summary judgment on the race-discrimination claims is remarkably lacking in legal argument.  Plaintiffs criticize NYCHA for having failed to provide safe and secure premises to its residents, and for empowering NYPD officers to act "with unfettered discretion" as NYCHA's agents despite NYCHA's alleged knowledge that the NYPD's stop and arrest practices are racially discriminatory.[233]  Plaintiffs do not explain, however, how this proves *intentional* race discrimination.[234]

---

Defendant New York City [Housing] Authority in Support of Its Motion for Summary Judgment ("NYCHA Mem.") at 9, *with* Pl. Opp. at 20.

[231]     *See* NYCHA Mem. at 9–10 (collecting cases).

[232]     *See* Pl. Opp. at 28 n.48.

[233]     *Id.* at 20.

[234]     Plaintiffs' only legal citations are to two cases involving state and municipal liability under section 1983 for equal protection violations.  *See id.* at

Even if plaintiffs are able to prove that NYCHA has failed to provide safe and secure premises to its residents, the fact that "over 90% of the affected resident community is African American or Latino"[235] would not, by itself, convert NYCHA's failure into a form of intentional race discrimination. According to plaintiffs' logic, nearly any shortcoming by NYCHA would provide evidence of racial bias — because NYHCA knows that nine out of ten of the people who will be affected by the shortcoming are African Americans and Latinos. This cannot be correct. Yet plaintiffs provide no other argument in support of their claim that NYCHA discriminates based on race through failing to provide adequate safety and security.[236]

Plaintiffs have also failed to raise a genuine issue of material fact as to whether NYCHA displayed racial bias by empowering the NYPD to conduct vertical patrols and other services in NYCHA buildings. Plaintiffs' argument is based on the premise that "the City's unlawful and discriminatory stop and arrest

---

22–23 (citing *City of Yonkers*, 96 F.3d at 613–14; *Comer v. Cisneros*, 37 F.3d 775, 804 (2d Cir. 1994)). NYCHA is a municipal agency, *see United States v. Torres*, 703 F.3d 194, 202 (2d Cir. 2012), but I dismissed plaintiffs' equal protection claims against NYCHA in *Davis I*, 2012 WL 4813837, at *16.

[235]    Pl. Opp. at 20.

[236]    For its part, NYCHA has provided uncontested evidence of a Non-Discrimination Policy and related procedures, as well as of numerous security measures. *See* NYCHA Mem. at 7–8, 10–14.

87

practices are well-known to NYCHA officials."[237]  While I denied summary judgment, above, on plaintiffs' claim that the City's trespass enforcement practices in NYCHA buildings discriminate in violation of the Equal Protection Clause, I noted that plaintiffs' evidence was tenuous.  Plaintiffs' attempt to establish NYCHA's liability for various race discrimination claims based on NYCHA's knowledge of the City's equal protection violations is a step too far.  Even if a jury were to find that the City's trespass enforcement practices violate the Equal Protection Clause, plaintiffs cite no evidence that NYCHA continued to rely on the City's services despite *constructive or actual notice* that the City's practices were discriminatory.[238]  All of plaintiffs' evidence of notice to NYCHA of unlawful trespass enforcement practices concerns notice of stops and arrests based on inadequate legal justification under the Fourth Amendment, not based on race discrimination.[239]

For the foregoing reasons, NYCHA's motion for summary judgment on plaintiffs' remaining race discrimination claims is granted.[240]

---

[237]   Pl. Opp. at 20.

[238]   *See id.* at 20–23.

[239]   *See id.* at 21 (citing sources contained in PAF ¶¶ 29–30, 84–85).

[240]   As noted above, I already granted summary judgment to NYCHA on plaintiffs' equal protection claims in *Davis I*, 2012 WL 4813837, at *16.

### H.    USHA Claims Against NYCHA

In *Davis I*, I concluded that because 42 U.S.C. § 1437d(l)(2) "gives the resident plaintiffs a right to a lease free from unreasonable terms and conditions, [plaintiffs'] suit alleges an infringement of a federal right actionable under section 1983."[241]  I went on to note:

> A dispute of fact exists about whether the "Highlights of House Rules, Lease Terms and Policy" constitutes a lease addendum.  There is also a dispute of fact as to whether the provisions in that document — mandating that tenants cooperate with police officers and avoid "lingering" in common areas — are unreasonable. . . .  Based on my evaluation of the arrest of Jackson and Johnson at the top of the stairwell and the corresponding vagueness of the prohibition against "lingering" in common areas, I am skeptical that NYCHA will be able to prevail at summary judgment.  Nevertheless, so that both parties have the full opportunity to present their case, NYCHA's motion is denied without prejudice and with leave to renew.[242]

NYCHA has renewed its motion for summary judgment on resident plaintiffs' USHA claims, and the parties have submitted briefing on whether the provisions in the Highlights document are unreasonable.  NYCHA also renews its argument that the Highlights document is not a part of the lease.[243]  Based on the

---

[241]    *Id.* at *24.

[242]    *Id.* at *25.  *See also id.* at *22 n.192 (detailing dispute over "Highlights").

[243]    *See* NYCHA Mem. at 14–16.

89

parties' submissions, there is a genuine issue of material fact concerning whether the requirements in the Highlights document were effectively incorporated into the standard NYCHA lease for the purposes of the USHA.

As I suggested in *Davis I*, the Highlights document is highly ambiguous.[244]  On the one hand, the Highlights document states, in bold, near the top of the first page:  "*Note* that this document is NOT a lease and NOT a lease addendum."[245]  In addition, NYCHA argues that lease changes and the adoption of formal rules and regulations require various procedures that were not followed in issuing the Highlights document.[246]  NYCHA concludes that the Highlights document cannot have been incorporated into the standard NYCHA lease under paragraph 12d of that lease, which requires all tenants to "abide by all necessary and reasonable regulations promulgated from time to time by the Landlord, which shall be posted in the Property Management Office and incorporated by reference in this Lease."[247]

---

[244]  *See Davis I*, 2012 WL 4813837, at *22 n.192.

[245]  Highlights of House Rules, Lease Terms and Policy ("Highlights"), Ex. 28 to 7/20/12 Declaration of Katharine E.G. Brooker, at 1.

[246]  *See* NYCHA Mem. at 15–16 (citing 24 C.F.R. § 966.3; New York Public Housing Law § 56).

[247]  NYCHA Resident Lease Agreement ("NYCHA Lease"), Ex. B to 12/5/12 Declaration of Alan Pelikow, counsel for NYCHA ("Pelikow Decl."),

On the other hand, the top of the Highlights document presents the document as containing "requirements" for "NYCHA residents."[248]  The document in fact contains a list of apparently legally binding requirements, was mailed to all NYCHA residents in December 2010, and states on its final page that "NYCHA requires" that all tenants and household members sign the document.[249]  The warning on the first page that the document is not a lease or lease addendum could be read, in context, not as implying that the requirements are optional, but rather as clarifying that signing the Highlights document confers no legal rights:  the next line states that "[t]he act of signing this document will not grant any rights of tenancy or authorized occupancy."[250]  Plaintiffs also argue that the Highlights document was incorporated into the lease under paragraph 12bb, which requires all tenants to "comply with and obey all rules and regulations prescribed from time to time by the Landlord concerning the use and care of the Leased Premises or any common or community spaces . . . ."[251]  The distinction between the word "prescribed" in paragraph 12bb and "promulgated" in paragraph 12d may suggest

---

¶ 12d.

[248]    Highlights at 1.

[249]    *Id.* at 4; Pelikow Decl. at ¶ 17.

[250]    Highlights at 1.

[251]    Pl. Opp. at 23 (citing NYCHA Lease ¶ 12bb).

91

that two different types of rules are at issue, both legally binding under the terms of the lease and for the purpose of the USHA's "unreasonable terms" prohibition, but only one requiring the formal procedures laid out in 24 C.F.R. § 966.3 and New York Public Housing Law § 56.

As noted above, section 1437d(l)(2) of the USHA states that "[e]ach public housing agency shall utilize leases which . . . do not contain unreasonable terms and conditions."  Drawing all reasonable inferences in favor of plaintiffs, the preceding evidence raises a genuine issue of material fact as to whether some or all of the requirements listed in the Highlights document are "contained" in the standard NYCHA lease by way of paragraph 12bb.  A public housing agency may not evade the requirements of section 1437d(l)(2) simply by introducing unreasonable lease terms and conditions for tenants in a document that nominally purports not to be a lease or lease addendum.  On the other hand, there is a question as to whether a public housing agency exposes itself to liability under the USHA if it deliberately conveys to residents the belief that a set of rules are legally binding requirements and could result in eviction, while at the same time knowing that the rules have no legal status or practical effect.  Extrinsic evidence will likely be decisive in determining the meaning and effect of the Highlights document, as even NYCHA seems to acknowledge, implicitly, by encouraging the Court to

92

interpret the Highlights document based on a detailed factual declaration accompanying NYCHA's brief.[252]   The significance and credibility of this extrinsic evidence is for a jury, and cannot be determined as a matter of law.

Assuming that a reasonable juror could find that some or all of the Highlights document rules were "contained" in the standard NYCHA lease for the purposes of the USHA, I now turn to what constitutes an "unreasonable term or condition" under section 1437d(l)(2).   At least one court has held that section 1437d(l)(2) "require[s] that lease terms be *rationally related* to a legitimate housing purpose."[253]   Courts have looked to statutes, legislative history, and HUD regulations for evidence of relevant housing purposes.[254]   "Lease provisions which are arbitrary and capricious, or excessively overbroad or under-inclusive, will be invalidated" as unreasonable.[255]   The possibility of applying a rule "in an arbitrary or discriminatory manner" may weigh in favor of finding unreasonableness.[256]

---

[252]     *See* NYCHA Mem. at 14–16 (citing Pelikow Decl.).

[253]     *Richmond Tenants Org., Inc. v. Richmond Redevelopment*, 751 F. Supp. 1204, 1205 (E.D. Va. 1990) (emphasis added), *aff'd*, 947 F.2d 942 (4th Cir. 1991) (unreported) (per curiam).

[254]     *See, e.g.*, *Thompson v. Ashe*, 250 F.3d 399, 409 (6th Cir. 2001).

[255]     *Richmond*, 751 F. Supp. at 1205.   *Accord Cabrini-Green Local Advisory Council v. Chicago Hous. Auth.*, No. 29 C 6949, 2007 WL 294253, at *2 (N.D. Ill. Jan. 29, 2007) (citing *Richmond*, 751 F. Supp. at 1205–06).

[256]     *Richmond*, 751 F. Supp. at 1206.

93

Plaintiffs argue that two of the rules in the Highlights document are unreasonable. *First*, plaintiffs argue that the rule prohibiting "lingering" in "the lobby, corridors, and stairwell" and mandating that "[t]he lobby or stairwell is meant for resident use to either go in or out of the building or to walk from floor to floor" is excessively overbroad and invites arbitrary or discriminatory enforcement.[257] *Second*, plaintiffs argue that the rule requiring residents to "cooperate with inquiries from . . . the police regarding their presence or conduct in any building" unreasonably pressures residents to interact with NYPD officers without regard to their constitutional rights, including the Fifth Amendment right to remain silent.[258]

NYCHA does not meaningfully defend the reasonableness of either rule. Instead, NYCHA continues its earlier argument that the rules in the Highlights document are not enforceable lease terms, and indeed are of little consequence. Perhaps NYCHA means to imply that the rules challenged by plaintiffs cannot be unreasonable terms, because they have no unreasonable effects. NYCHA argues that under IO 23, NYPD officers who observe a resident violating a NYCHA rule can, at most, fill out a "Field Report" and submit it to NYCHA

---

[257]    *See* Pl. Opp. at 24 (citing Highlights ¶ 21).

[258]    *See id.* at 25 (citing Highlights ¶ 18).

Management, which might then call the resident "to ascertain the circumstances."[259]  NYCHA also notes that New York's criminal trespassing laws do not permit NYPD officers to stop or arrest someone for violating NYCHA's rule against "lingering."  NYCHA suggests that if Dr. Fagan's study shows that many officers have, in fact, stopped many people in NYCHA buildings based on lingering, the officers did so prior to the issuance of the Highlights document and not based on the rule against lingering contained in it.[260]  Finally, NYCHA states that a Field Report based on lingering cannot lead to the termination of tenancy.[261]

NYCHA's disavowals of the practical significance of the Highlights document provide further evidence in support of finding that the rules in the document are not contained in the standard NYCHA lease for the purposes of the USHA.  Nevertheless, drawing all reasonable inferences in favor of plaintiffs, a reasonable juror could reject NYCHA's evidence that the Highlights rules have little or no effect,[262] and could also conclude that the rules are unreasonable for the

---

[259]     Pelikow Decl. at ¶ 25.  *See* NYCHA Mem. at 16, 18.

[260]     *See* NYCHA Mem. at 16–18.

[261]     *See id.* at 18.

[262]     For example, the Highlights document states that "NYCHA may start a proceeding to terminate tenancy if a tenant or family member . . . breaches NYCHA rules."  Highlights ¶ 28.  *But see* 12/5/12 NYCHA's Rule 56.1 Statement in Support of Its Motion for Summary Judgment ¶¶ 10–17 (suggesting that tenants

reasons stated by plaintiffs.  As a result, NYCHA's motion for summary judgment

on plaintiffs' USHA claim is denied.[263]

## VI.   CONCLUSION

The City's, NYCHA's, and plaintiffs' motions for summary judgment

are granted in part and denied in part:

> (1)   The City's and plaintiffs' motions for summary judgment on plaintiffs' Fourth Amendment claims are denied, leaving the remaining arrested plaintiffs with viable claims.

> (2)   The City's motion for summary judgment on the remaining arrested plaintiffs' Fourteenth Amendment equal protection claims is denied.

> (3)   The City's motion for summary judgment on resident plaintiffs' Fourteenth Amendment equal protection, Title VI, section 1981, and FHA claims is denied, leaving Evans and Littlejohn with viable claims.

> (4)   The City's motion for summary judgment on plaintiffs' remaining NYSC claims is granted.

---

may only be evicted based on rules violations where the rules have been formally promulgated).

[263]   My conclusion is unaffected by the issue, discussed above, of whether Jackson and Johnson were stopped for presence in a prohibited area or for loitering or lingering.  *See supra* Part V.A.1.b.  Resident plaintiffs have standing to sue under section 1983 regarding unreasonable terms and conditions in their NYCHA leases whether or not any one of them has already been stopped or arrested based on those terms.  *See Richmond*, 751 F. Supp. at 1205 (adjudicating claims by public housing tenants who challenged "various provisions of a new dwelling lease" as unreasonable under the USHA, prior to implementation of the new lease).

(5)    NYCHA's motion for summary judgment on plaintiffs' remaining race discrimination claims is granted.

(6)    NYCHA's motion for summary judgment on plaintiffs' USHA claim is denied, leaving all remaining resident plaintiffs (Britt, Evans, Littlejohn, Jones, and Suarez) with viable claims.

The Clerk of the Court is directed to close these motions [Docket Nos. 226, 240].

A conference is scheduled for April 5, 2013 at 4:30 p.m.

SO ORDERED:

Dated:      New York, New York
            March 28, 2013

SHIRA A. SCHEINDLIN
U.S.D.J.

97

**Appearances**

**For Plaintiffs:**

Katharine E.G. Brooker, Esq.
Matthew J. Moses, Esq.
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

Debo P. Adegbile, Esq.
Christina Swarns, Esq.
Johanna B. Steinberg, Esq.
Jin Hee Lee, Esq.
Johnathan Smith, Esq.
Ria Tabacco, Esq.
NAACP Legal Defense &
Educational Fund, Inc.
99 Hudson Street, 16th Floor
New York, New York 10013
(212) 965-2200

Steven Banks, Esq.
William D. Gibney, Esq.
Steven Wasserman, Esq.
Nancy Rosenbloom, Esq.
Marlen S. Bodden, Esq.
Legal Aid Society of New York
199 Water Street
New York, New York 10038
(212) 577-3419

**For Defendant City of New York:**

Brenda E. Cooke
Judson Vickers
Wesley Bauman
Lisa Richardson
George Soterakis
Pernell Telfort
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, New York 10007
(212) 788-0993

**For Defendant NYCHA:**

Steven Jay Rappaport, Esq.
New York City Housing Authority
250 Broadway, 9th Floor
New York, New York 10007
(212) 776-5152