**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KELTON DAVIS, *et al*., individually and
on behalf of a class of all others similarly
situated,

              Plaintiffs,

           -against-

THE CITY OF NEW YORK and NEW
YORK CITY HOUSING AUTHORITY,

             Defendants.

10 Civ. 0699  (SAS)

ECF Case

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**<u>MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iv

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS ............................................................................. 3

I.    The City Has a Policy and Practice of Unlawful Trespass Enforcement in NYCHA Residences................................................................................................. 4

    A.    Statistical Analysis Reveals Large Numbers of Unjustified Trespass Stops ............... 6

    B.    Declined Prosecutions of NYCHA Trespass Arrests Show That Putative Class Members Are Routinely Arrested in NYCHA Residences Without Legal Justification ................................................................................................. 7

    C.    Residents, Their Guests, and Community Leaders Confirm the Uniform Injuries Inflicted by the City's Trespass Enforcement Policy and Practice................ 8

    D.    Statistical Analysis Establishes That the City's Trespass Enforcement Practice Targets African Americans and Latinos ...................................................... 9

II.   The City's Trespass Enforcement Policy and Practice Inflict Additional Common Injury on NYCHA Residents, Who Are Unable To Come and Go Freely and Accommodate Guests ........................................................................................ 10

III.  NYCHA Imposes Unreasonable Lease Terms That Affect All NYCHA Residents ........... 11

IV.   Named Plaintiffs Have Been Injured by the City's Policy and Practice of Unlawful Trespass Enforcement and NYCHA's Unreasonable Lease Terms .................................... 12

    A.    The City's Unlawful Policy and Practice of Trespass Enforcement Injure Named Arrested Plaintiffs......................................................................... 12

    B.    The City's Unlawful Policy and Practice of Trespass Enforcement Also Injure Named Resident Plaintiffs ...................................................................... 13

    C.    NYCHA's Unreasonable Lease Terms Injure Named Resident Plaintiffs ................. 13

ARGUMENT ................................................................................................ 14

I.    Named Plaintiffs Meet the Requirements of Rule 23(a).................................................... 15

    A.    The Class and Resident Subclass Are So Numerous That Joinder of All Members Is Impracticable............................................................................. 15

1. The Class Is So Numerous That Joinder Is Impracticable .................................. 15

2. The Resident Subclass Is So Numerous That Joinder Is Impracticable ............. 16

B. The Class and Resident Subclass Members' Claims Share Common Questions of Law and Fact ..................................................................................................... 16

1. Class Members' Claims Share Common Questions Susceptible to Common Proof ..................................................................................................... 17

2. Resident Subclass Members' Claims Against the City Share Common Questions Susceptible to Common Proof ........................................................ 19

3. Resident Subclass Members' Claims Against NYCHA Share Common Questions Susceptible to Common Proof ........................................................ 20

C. Named Plaintiffs' Claims Are Typical of the Class's and Resident Subclass's Claims .............................................................................................................. 21

1. Named Arrested Plaintiffs' Claims Are Typical of the Class Members' Claims ................................................................................................................. 22

2. Named Resident Plaintiffs' Claims Against the City Are Typical of the Resident Subclass's Claims Against the City ................................................... 22

3. Named Resident Plaintiffs' Claims Against NYCHA Are Typical of the Resident Subclass's Claims Against NYCHA .................................................. 22

D. Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class and Resident Subclass ............................................................................................. 23

1. Named Arrested Plaintiffs Will Fairly and Adequately Protect the Interests of the Class ........................................................................................ 23

2. Named Resident Plaintiffs Will Fairly and Adequately Protect the Interests of the Resident Subclass in Their Claims Against the City ............... 23

3. Named Resident Plaintiffs Will Fairly and Adequately Protect the Interests of the Resident Subclass in Their Claims Against NYCHA ............. 24

4. Plaintiffs' Counsel Will Adequately Represent the Class and Resident Subclass and Should Be Appointed Class Counsel ........................... 24

II. This Action Meets the Requirements of Rule 23(b)(2) ...................................... 24

A. The Class Meets the Requirements of Rule 23(b)(2) ................................................ 24

B. The Resident Subclass Meets the Requirements of Rule 23(b)(2) Both With Respect to Their Claims Against the City and Their Claims Against NYCHA ......... 25

CONCLUSION...........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amchem Products, Inc.* v. *Windsor*,
    521 U.S. 591 (1997)...............................................................................................24

*Brooklyn Center for Independence of the Disabled* v. *Bloomberg*,
    287 F.R.D. 240 (S.D.N.Y. 2012) ........................................................................14

*Brown* v. *Kelly*,
    609 F.3d 467 (2d Cir. 2010)................................................................................21

*Casale* v. *Kelly*,
    257 F.R.D. 396 (S.D.N.Y. 2009) ........................................................................14

*Consolidated Rail Corp.* v. *Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995)..................................................................................15

*Cutler* v. *Perales*,
    128 F.R.D. 39 (S.D.N.Y. 1989) ..........................................................................22

*Davis* v. *City of New York*,
    No. 10 Civ. 0699, 2012 WL 4813837 (S.D.N.Y. Oct. 9, 2012) ..................12, 13, 15

*Davis* v. *City of New York*,
    No. 10 Civ. 0699, 2013 WL 1288176 (S.D.N.Y. Mar. 28, 2013) ................. passim

*Escalera* v. *New York City Housing Authority*,
    425 F.2d 853 (2d Cir. 1970)................................................................................16

*Floyd* v. *City of New York*,
    283 F.R.D. 153 (S.D.N.Y. 2012) ................................................................ passim

*Gary Plastic Packaging* v. *Merrill Lynch*,
    903 F.2d 176 (2d Cir. 1990)................................................................................21

*Gulino* v. *Board of Education of City School District of City of New York*,
    201 F.R.D. 326 (S.D.N.Y. 2001) ...................................................................21, 22

*Ligon* v. *City of New York*,
    288 F.R.D. 72 (S.D.N.Y. 2013) ...................................................................4, 14, 18

*Loftin* v. *Bande* (*In re Flag Telecom Holdings, Ltd. Securities Litigation*),
    574 F.3d 29 (2d Cir. 2009)..................................................................................23

*Marisol A.* v. *Giuliani*,
  126 F.3d 372 (2d Cir. 1997)........................................................16,17, 21

*Miles* v. *Merrill Lynch & Co. (In re IPO Securities Litigation)*,
  471 F.3d 24 (2d Cir. 2006)...............................................................14

*Robidoux* v. *Celani*,
  987 F.2d 931 (2d Cir. 1993)..........................................................15, 21

*Rumsfeld* v. *Forum for Academic & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ........................................................................15

*Scaggs* v. *New York State Department of Education*,
  No. 06 Civ. 0799, 2009 WL 890587 (E.D.N.Y. Mar. 31, 2009) ............................15

*Stinson* v. *City of New York*,
  282 F.R.D. 360 (S.D.N.Y. 2012) ........................................................24

*Wal-Mart Stores, Inc.* v. *Dukes*,
  131 S. Ct. 2541 (2011)...............................................................14, 16, 19

**CONSTITUTION AND STATUTES**

U.S. Const. amend. IV ................................................................1, 12, 17

U.S. Const. amend. XIV ..............................................................1, 12, 17

42 U.S.C. § 1981 ........................................................................ passim

Fair Housing Act........................................................................ passim

Title VI................................................................................ passim

United States Housing Act............................................................... passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ...................................................................... passim

Roman Jackson, Kristin Johnson, Rikia Evans, Raymond Osorio, Lashaun Smith, Patrick Littlejohn, Andrew Washington, Vaughn Frederick, Shawne Jones, Hector Suarez, and Eleanor Britt (collectively, the "Named Plaintiffs") hereby move for class certification pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure and request appointment of Plaintiffs' Counsel as Class Counsel pursuant to Rule 23(g).

## PRELIMINARY STATEMENT

The Named Plaintiffs assert constitutional and statutory challenges to a centralized governmental policy and practice affecting hundreds of thousands of people. Defendant City of New York (the "City") has a centralized policy and practice of unlawful trespass enforcement in New York City Housing Authority ("NYCHA") residences, and, as the Court recently recognized, Named Plaintiffs have produced sufficient evidence to support a finding that their injuries stem directly from that unlawful policy and practice. *First*, the City's trespass enforcement policy and practice violate the Fourth Amendment because they cause NYCHA residents and their guests to be stopped without reasonable suspicion and arrested without probable cause. *Second*, the City is liable for Fourteenth Amendment violations because its trespass enforcement policy and practice impermissibly target African Americans and Latinos. *Third*, the City is liable under Title VI, the Fair Housing Act, and 42 U.S.C. § 1981, because its trespass enforcement policy and practice interfere with NYCHA residents' abilities to come and go as they please and to accommodate guests, and subject them to discriminatory provision of police services, on the basis of race or ethnicity.

In addition, Named Plaintiffs have established that they are entitled to a trial against NYCHA to prove that it has adopted unreasonable lease terms that injure all NYCHA residents in violation of the United States Housing Act ("USHA").

These challenges can be resolved fairly and efficiently in a class action. Accordingly, Named Plaintiffs move for certification of a class and subclass of individuals defined as:

**Class**: All African-American and Latino NYCHA residents and/or family members, authorized guests or visitors of NYCHA residents, who, since January 28, 2007, have been or will be unlawfully stopped, seized, questioned, frisked, searched, and/or arrested for trespass by New York City Police Department ("NYPD") officers in or around NYCHA residences, including on the basis of race and/or ethnicity.[1]

**Resident Subclass**: All members of the class who are authorized NYCHA residents.[2]

Through the voluminous evidence submitted in Named Plaintiffs' opposition to Defendants' six previous motions for partial summary judgment, and through additional evidence presented here, Named Plaintiffs satisfy all four of the Rule 23(a) prerequisites for class certification—numerosity, commonality, typicality, and adequacy. *First*, joinder of all members of the proposed Class and Resident Subclass is impracticable. *Second*, all claims raise fundamental questions—susceptible to common proof—regarding the legality of the City's trespass enforcement policy and practice,[3] and NYCHA's lease, including the "Highlights of House Rules, Lease Terms and Policy" ("House Rules"). *Third*, Named Plaintiffs' claims are

---

[1] The Class is represented by Roman Jackson, Kristin Johnson, Rikia Evans, Raymond Osorio, Lashaun Smith, Patrick Littlejohn, Andrew Washington, and Vaughn Frederick (the "Named Arrested Plaintiffs").

[2] The Resident Subclass is represented by Rikia Evans and Patrick Littlejohn in its Title VI, Fair Housing Act, and 42 U.S.C. § 1981 claims against the City. Rikia Evans, Patrick Littlejohn, Shawne Jones, Hector Suarez, and Eleanor Britt (together, the "Named Resident Plaintiffs") represent the Resident Subclass in its USHA claim against NYCHA.

[3] As discussed in greater detail below, NYCHA perpetuates the City's unlawful trespass enforcement policy and practice. For nearly two decades, NYCHA has abdicated its responsibility to provide meaningful oversight to ensure that the City's trespass enforcement activities are being conducted in a lawful and non-discriminatory manner. NYCHA has promulgated unreasonable lease terms that violate the USHA and that have expanded the City's influence over NYCHA residents and their guests.

typical of the putative Class and Resident Subclass members' claims. *Fourth*, Named Plaintiffs and their attorneys will adequately represent the interests of the Class and Resident Subclass. The same evidence also establishes that class certification is appropriate under Rule 23(b)(2) because Defendants have engaged in conduct applying to the Class and Resident Subclass, generally, and the injunctive and declaratory relief sought by the Named Plaintiffs would benefit all members of the Class and Resident Subclass.

For these reasons, and for all the reasons discussed below, Named Plaintiffs' motion for class certification pursuant to Rules 23(a) and 23(b)(2) should be granted.

## STATEMENT OF FACTS

Pursuant to a 1994 Memorandum of Understanding ("MOU") between the City and NYCHA, the NYPD acts as the purported custodian of NYCHA residences, deploying officers to conduct vertical and other patrols inside and outside NYCHA buildings to enforce criminal trespass laws, as well as NYCHA's non-criminal house rules. (Dkt. # 242 (City 56.1) ¶¶ 1–3; Dkt. # 228 (City 56.1) ¶¶ 25–26; Dkt. # 176-1 (MOU).) Named Plaintiffs have previously put forward evidence that the City's policy and practice of trespass enforcement in NYCHA residences are unlawful.[4] (*See Davis* Opps. A, C, D.) The evidence shows that the City's unlawful policy and practice violate the constitutional rights of the putative Class, which consists of thousands of NYCHA residents and their authorized guests. (*See Davis* Opp. D, 2–16.) Additionally, Named Plaintiffs have identified unreasonable and unlawful provisions in

---

[4]   The City and NYCHA have collectively moved for summary judgment six times during the course of this litigation, and Named Plaintiffs have submitted four memoranda in opposition to these motions. *See* Dkt. # 36 (Pls. Opp. to Def. City's Mot. Summ. J. at Dkt. # 31) ("*Davis* Opp. A"); Dkt. # 192 (Pls. Opp. to Def. City's Mot. Summ. J. at Dkt. # 173 and Pls. Opp. to Def. NYCHA's Mot. Summ. J. at Dkt. # 183) ("*Davis* Opp. B"); Dkt. # 218 (Pls. Opp. to Def. NYCHA's Mot. Summ. J. at Dkt. # 183) ("*Davis* Opp. C"); Dkt. # 251 (Pls. Opp. to Def. City's Mot. Summ. J. at Dkt. # 240 and Pls. Opp. to Def. NYCHA's Mot. Summ. J. at Dkt. # 183) ("*Davis* Opp. D").

NYCHA's standard lease agreement that affect all NYCHA residents. (*See Davis* Opp. B, 33–36; *Davis* Opp. C, 6–8.)

## I.     The City Has a Policy and Practice of Unlawful Trespass Enforcement in NYCHA Residences

The City has a centralized policy and practice of unlawful trespass enforcement in NYCHA residences:[5] the NYPD Patrol Guide is unconstitutional on its face and as applied; the trainings and supplementary materials that accompany the Patrol Guide are similarly unconstitutional; the City is deliberately indifferent to the constitutional violations caused by its failure to appropriately train, supervise, and discipline officers; and the City has a widespread practice of unconstitutional trespass stops and arrests. Both that policy and that practice are part of a law-enforcement strategy developed and adopted at the highest ranks of the NYPD and disseminated through the NYPD's hierarchical structure. In this litigation, the City itself has repeatedly touted its top-down training and supervisory structure regarding police activity in NYCHA residences. (Dkt. # 228 (City 56.1) ¶¶ 6–7, 43–54, 66–111, 142, 151; *see also Davis* Opp. D, 9–16.) Starting at the Police Academy, NYPD officers take part in a "comprehensive training program" through which they receive information about the City's official policy of trespass enforcement in NYCHA residences. (Dkt. # 228 (City 56.1) ¶¶ 6–7, 142.) Officers are also instructed to enforce NYCHA's rules and regulations, including the House Rules, although officers are not instructed as to the content of those rules. These lessons are then reinforced through precinct and Patrol Services Area-level instruction. (*Id.* ¶¶ 24–27, 137–138, 151.)

---

[5]    On two recent occasions in related litigation, this Court has recognized that the City has a centralized policy and practice regarding stop, question, and frisk. *See, e.g.*, *Floyd* v. *City of New York*, 283 F.R.D. 153, 164 (S.D.N.Y. 2012) ("[T]he overwhelming and indisputable evidence shows that the NYPD has a department-wide stop and frisk program."); *Ligon* v. *City of New York*, 288 F.R.D. 72, 77 (S.D.N.Y. 2013) (holding that the challenged stop and frisk program was "a narrow subset" of the "NYPD's overall stop and frisk program" recognized as a centralized policy in *Floyd*).

Plaintiffs have offered substantial evidence that Interim Order 23 ("I.O. 23")—a revision of the NYPD Patrol Guide's written policy on vertical patrols in NYCHA residences adopted after this lawsuit was commenced—and the related training materials codified, rather than corrected, the City's unconstitutional policy and practice. (*See Davis* Opp. D, 7–9; Dkt. # 252 (PAF) ¶¶ 38–39; Dkt. # 175 (City 56.1) ¶¶ 3–5; *see also* Dkt. # 228 (City 56.1) ¶¶ 132–141 (training on I.O. 23).) The City furthers its unlawful trespass enforcement practice by failing to properly supervise, discipline, and train NYPD officers in trespass enforcement (*Davis* Opp. D, 9–16), and by failing to use the NYPD's hierarchical command structure and monitoring, oversight, and disciplinary machinery to combat its unlawful trespass enforcement practice meaningfully and effectively (*Id*.; Dkt. # 228 (City 56.1) ¶¶ 43–53, 66–111).[6]

The City's unlawful trespass enforcement policy and practice injure hundreds of thousands of NYCHA residents and their authorized guests. This is illustrated by, among other things: (1) statistical evidence of trespass stops and arrests made without adequate justification; (2) data indicating that the New York City District Attorney's Offices ("DA Offices") decline to prosecute a large number of trespass arrests, including arrests in NYCHA residences; (3) evidence from NYCHA residents, including Named Plaintiffs, putative Class members, and community organizations, concerning trespass stops and arrests that lacked legal justification and/or were based on race and/or ethnicity; and (4) statistical evidence of trespass stops and arrests based, at least in part, on race and/or ethnicity.

---

[6] The NYPD maintains mechanisms through which it could monitor, oversee, and discipline officers who engage in unlawful trespass enforcement practices. These mechanisms, which the City has previously claimed to be adequate, include direct monitoring by supervisors within the command, the use of Integrity Control Officers at the command level, periodic review of a database of declined prosecutions, and investigations by the Civilian Complaint Review Board ("CCRB") and NYPD Internal Affairs Bureau of serious allegations of misconduct or corruption. (Dkt. # 228 (City 56.1) ¶¶ 43–71; Dkt. # 227 (City Mem. Supp. Summ. J.) 5.)

**A. Statistical Analysis Reveals Large Numbers of Unjustified Trespass Stops**

Between 2007 and 2011, the NYPD made more than 130,000 trespass stops and 26,000 trespass arrests in or around NYCHA residences. (Dkt. # 229-12 (Fagan Rep.) 36–37 & tbls. 4, 6.) These numbers include stops and arrests made after the City adopted I.O. 23 and implemented related training in 2010.

Plaintiffs' expert Dr. Jeffrey Fagan analyzed 70,142 UF-250 forms for trespass stops in public housing between 2009 and 2011 and determined that only 50.26% were apparently justified. (Dkt. # 253-8 (Am. Fagan Rebuttal Rep.) 35 & tbl. 5.) Further, trespass stops were substantially more likely to lack apparent legal justification than stops on suspicion of any other crime in public housing between 2004 and 2011. (Dkt. # 253-7 (Fagan Rep.) 82); *see also Davis* v. *City of New York*, No. 10 Civ. 0699, 2013 WL 1288176, at *13 (S.D.N.Y. Mar. 28, 2013) ("*Davis II*"). Between 2009 and 2011 alone, Dr. Fagan found 12,974 UF-250 forms documenting trespass stops in NYCHA residences that lacked apparent legal justification (Dkt. # 253-8 (Am. Fagan Rebuttal Rep.) 35 & tbl. 5), including, for example, many stops under circumstances that reflect the experiences of Named Arrested Plaintiffs:

- there were 334 UF-250 forms where the only basis for the stop was "mere presence" in a NYCHA building or a "common area" (*id.* at 34 & tbl. 4);
- there were 65 UF-250 forms where the only basis for the stop was "entering and exiting" in a "high crime neighborhood" (*id.* at 32–33 & tbl. 3); and
- there were 42 UF-250 forms where the only basis for the stop was "high crime area" (*Id.* at 34 & tbl. 4.)

Dr. Fagan's findings are corroborated by those of the CCRB. In 2009, the CCRB alerted the NYPD to an alarming statistic: civilian complaints of unlawful stops and frisks in NYCHA residences and Trespass Affidavit Program buildings were being substantiated at a rate of 32%, nearly three times greater than that for similar complaints in other locations. (Dkt. # 252 (PAF)

¶¶ 31–32.)  In fact, officers repeatedly testified before the CCRB that they had knowingly stopped people in NYCHA residences without an individualized basis.[7]

### B.  Declined Prosecutions of NYCHA Trespass Arrests Show That Putative Class Members Are Routinely Arrested in NYCHA Residences Without Legal Justification

The City's database shows that the DA Offices in New York City decline to prosecute a large number of trespass arrests.  (Dkt. # 254 (Brooker Decl.) ¶ 3.)  From 2009 to 2011, the DA Offices declined to prosecute 4,597 non-felony trespass arrests citywide.  (*Id*.)  Of those 4,597 arrests, 34% were not prosecuted due to "Insufficient Evidence," and another 6% were not prosecuted because the arrest "Lack[ed] Evidence of Crime."  (*Id*. ¶ 4.)

Many of the trespass arrests that the DA Offices decline to prosecute occur in NYCHA residences.  Within a sample of 1,177 trespass "decline to prosecute" forms ("DP Forms") produced to the parties by the DA Offices,[8] 306 (26%) concerned arrests that occurred in NYCHA residences.  (*Id*. ¶ 6.)

The sample illustrates the common circumstances under which NYPD officers make unjustified trespass arrests.  (*Id*. ¶¶ 9–12, 16–18, 20–21.)  At least twenty DP Forms from New York and Bronx Counties, for example, indicated that residents or guests were on the roof or roof landing of a NYCHA building, and the DA Offices declined to prosecute those arrests due to inadequate signage prohibiting their presence there.  (*Id*. ¶¶ 10, 11, 21.)  In at least thirty declined cases from New York and Kings Counties, the DP Forms show the DA Offices declined to prosecute arrests that were based on mere presence in NYCHA buildings.  (*Id*. ¶¶ 9, 16.)

---

[7]  For examples of CCRB substantiated cases, *see* Dkt. # 252 (PAF) ¶ 33 (unredacted copy filed under seal).

[8]  After extensive discovery, the parties received DP Forms from New York, Brooklyn, Kings, and Queens counties, covering designated date ranges between 2008 and 2012.  (Dkt. # 254 (Brooker Decl.) ¶ 5 n.1.)

Finally, at least forty DP Forms from New York, Kings, and Bronx Counties contain fact patterns in which a visitor was questioned, the visitor said he or she was visiting a resident of the building, and the officer failed to investigate whether the person named was in fact a resident, instead proceeding directly to arrest the visitor. (*Id.* ¶¶ 12, 17, 20.)

C.      **Residents, Their Guests, and Community Leaders Confirm the Uniform Injuries Inflicted by the City's Trespass Enforcement Policy and Practice**

Multiple putative Class members have attested to being stopped, frisked, and/or arrested by NYPD officers for trespass in NYCHA residences without adequate cause. (*See, e.g.*, Dkt. # 253-12 (Johnson Decl.) ¶ 4 (John Johnson, a member of NYCHA's Safety and Security Task Force and an African-American NYCHA resident, was unlawfully stopped and detained for questioning just outside his front door in late 2011); Dkt. # 253-11 (Brown Decl.) ¶¶ 4–10 (Aaron Brown, an African-American man, was cornered by four NYPD officers and then unlawfully frisked and arrested while visiting his mother in a NYCHA residence in Manhattan in 2011); Dkt. # 253-16 (Lopez Decl.) ¶¶ 3–10 (Isis Lopez, a Latina woman, was improperly arrested for trespass in August 2011 after exiting a NYCHA building in Manhattan); Dkt. # 253-19 (Baez Decl.) ¶ 5 (Mary Baez, an African-American NYCHA resident in Manhattan, was unlawfully approached and questioned by an NYPD officer in February 2011 when using her key to enter the Tenant Patrol/Resident Watch office where she was a supervisor); Dkt. # 253-17 (M.P. Decl.) ¶¶ 3–11 (Minor M.P., a 17-year-old African-American NYCHA resident, was arrested for trespass without cause while returning to his apartment after visiting a friend in the same housing development); *see also* Ex. A (Owens Decl.) ¶¶ 3-9[9] (Elizabeth Owens, an African-American woman, was illegally stopped and questioned by police while carrying

---

[9]     Citations in the form "Ex. __" refer to Exhibits to the Declaration of Matthew Moses in Support of Plaintiffs' Motion for Class Certification.

groceries to a friend in a NYCHA residence in January 2012); Ex. B (Caban Decl.) ¶¶ 3-8 (William Caban, a Latino NYCHA resident, was improperly arrested for trespass after visiting his uncle in a different building in Caban's development); Ex. C (D.D. Decl.) ¶¶ 3-10 (D.D., a 17-year-old African-American NYCHA resident, was unlawfully arrested while visiting his grandmother, who lives in his housing development).)

Resident Association Presidents in NYCHA residences citywide,[10] as well as community organizations that serve NYCHA residents,[11] confirm that the experiences of their putative Class members are common. Indeed, in 2009, the Citywide Council of Presidents ("CCOP"), a group of NYCHA resident leaders, informed Police Commissioner Raymond Kelly that unlawful trespass stops and arrests are not "isolated incidents," but "the norm." (Dkt. # 37-9 (CCOP Statement) 2.) Reginald Bowman, the President of CCOP, testified in 2012 that, as a result of the City's trespass enforcement policy and practice, NYCHA residents feel like they live in a "penal colony." *Davis II*, 2013 WL 1288176, at *2.

**D.** **Statistical Analysis Establishes That the City's Trespass Enforcement Practice Targets African Americans and Latinos**

Dr. Fagan's analysis also establishes that the City's decision to subject NYCHA residents and their guests to its unlawful trespass enforcement regime is impermissibly motivated by race or ethnicity. Dr. Fagan observed that law enforcement activity in general, and trespass

---

[10] *See, e.g.*, Dkt. # 39 (Crawford Decl.) ¶ 4 (Resident Association President of the Davidson Houses); Dkt. # 38 (Barber Decl.) ¶¶ 7–8 (Resident Association President of the Andrew Jackson Houses); Dkt. # 253-9 (Palmer Decl.) ¶ 4 (Resident Association President of the George Washington Houses); Dkt. # 253-14 (Thrower Decl.) ¶ 5 (Resident Association President of the Queensbridge Houses); Dkt. # 253-15 (Torres Decl.) ¶ 5 (Resident Association President of the Moore Houses).

[11] *See, e.g.*, Ex. D (Liem Decl.) ¶ 6 (Justice Committee); Ex. E (Barry Decl.) ¶¶ 5-8 (Voices of Community Advocates & Leaders-NY); Ex. F (Rivera Decl.) ¶¶ 3-6 (Community Voices Heard); Ex. G (Jean Decl.) ¶¶ 4-8 (Families United for Racial and Economic Equality).

enforcement in particular, is concentrated in communities of color.[12]  (*See* Dkt. # 252 (PAF)

¶ 18.)  Dr. Fagan then sought to control for possible policy-relevant factors that could explain

increased enforcement activity, such as crime and patrol strength.  After controlling for these and

other factors, Dr. Fagan concluded that race and ethnicity play an "important role" in trespass

enforcement in public housing.  (Dkt. # 253-7 (Fagan Rep.) 5; Dkt. # 229-12 (Fagan Rep.) 70–

74.)  Indeed, he found that race and ethnicity are more significant predictors of the observed

differences in trespass enforcement patterns than other commonly cited explanations such as

crime and patrol strength.  (Dkt. # 229-12 (Fagan Rep.) 73–74.)  Dr. Fagan also concluded that

the racial disparities in enforcement activity were greatest in NYCHA residences with the

highest concentration of African-American residents.  (Dkt. # 253-7 (Fagan Rep.) 51–56 & figs.

19–27.)  Moreover, racial disparities were most significant among stops on suspicion of trespass.

(*Id*. at 54–57 & figs. 24–27.)

## II. The City's Trespass Enforcement Policy and Practice Inflict Additional Common Injury on NYCHA Residents, Who Are Unable To Come and Go Freely and Accommodate Guests

More than 400,000 New Yorkers live in housing owned and operated by NYCHA and are

subject to the City's trespass enforcement policy and practice.  (Ex. J (Resident Databook) iv-1.)

More than 90% of all NYCHA residents are African-American or Latino.  (*Id.*)

The City's trespass enforcement policy and practice regularly interfere with NYCHA

residents' abilities to come and go as they please and to accommodate guests.  *See supra* pp. 8–9

(declarations regarding the inability to freely come and go); *see also* Dkt. # 253-9 (Palmer Decl.)

¶ 5 (the nephew of Marcetta Palmer, an African-American woman and President of the George

---

[12]  For illustrations of the difference in the number of criminal trespass stops and arrests across
New York City neighborhoods, *see* Exs. H (depicting trespass stops from 2007–2012 in New
York City neighborhoods by percentage Black or Latino), I (depicting trespass arrests from
2007–2012 in New York City neighborhoods by percentage Black or Latino).

Washington Houses Resident Association, was stopped and questioned for trespass for no reason after visiting her in the fall of 2011); Dkt. # 253-10 (Forbes Decl.) ¶ 4 (Maria Forbes, an African-American woman and the President of the Clay Avenue Tenants Association, had to intervene when NYPD officers stopped her 23-year-old son after he stepped outside their front door in the summer of 2010); Dkt. # 193 (PAF) ¶¶ 85–87 (Named Resident Plaintiff Rikia Evans's guests have been stopped while visiting her home in NYCHA housing, and now visit less frequently); *Id.* ¶¶ 133–148, 152–156 (detailing the stop and arrest of Named Arrested Plaintiff Lashaun Smith, an authorized guest of Named Resident Plaintiff Shawne Jones, when Mr. Smith visited Ms. Jones at her home).

### III.   NYCHA Imposes Unreasonable Lease Terms That Affect All NYCHA Residents

NYCHA's standard Resident Lease Agreement requires all residents and their guests to "comply with and obey all rules and regulations prescribed from time to time by the Landlord." (Dkt. # 233-2 (NYCHA Lease Agreement) 7.)  As discussed above, NYPD officers enforce NYCHA's rules pursuant to the MOU.  These rules include the House Rules, which contain a prohibition on "lingering" and a mandate that tenants and their guests cooperate with police officers.  (Dkt. # 194-28 (House Rules).)  As this Court noted, the House Rules document "contains a list of apparently legally binding requirements, was mailed to all NYCHA residents in December 2010, and states on its final page that 'NYCHA requires' that all tenants and household members sign the document."  *Davis II*, 2013 WL 1288176, at *24.  The document itself warns that failure to comply with the House Rules puts tenants at risk of eviction.  (Dkt. # 194-28 (House Rules).)  All residents of NYCHA buildings are subject to these provisions.

**IV.    Named Plaintiffs Have Been Injured by the City's Policy and Practice of Unlawful Trespass Enforcement and NYCHA's Unreasonable Lease Terms**

The effects of Defendants' unlawful conduct are borne out in the individual experiences of the Named Plaintiffs.

**A.    The City's Unlawful Policy and Practice of Trespass Enforcement Injures Named Arrested Plaintiffs**

As detailed in the *Davis* Opp. D, Named Arrested Plaintiffs Roman Jackson, Kristin Johnson, Rikia Evans, Raymond Osorio, Lashaun Smith, Patrick Littlejohn, Andrew Washington, and Vaughn Frederick are eight African-American or Latino individuals who were stopped and arrested pursuant to the City's policy and practice of trespass enforcement in NYCHA residences. *See Davis* v. *City of New York*, No. 10 Civ. 0699, 2012 WL 4813837, at *3–15 (S.D.N.Y. Oct 9, 2012) ("*Davis I*"). As explained at length in the *Davis* Opp. D, none of the Named Arrested Plaintiffs was engaged in conduct that could give rise to reasonable suspicion, much less probable cause, of criminality. Instead, each was stopped, frisked, and arrested for criminal trespass under innocuous circumstances, such as conversing with friends in a stairwell of their own home (Dkt. # 193 (Pls. 56.1) ¶ 11), leaving NYCHA residences (*id.* ¶¶ 95–96), or waiting for an elevator (*id.* ¶ 168). Their experiences and beliefs that the City's trespass enforcement policy and practice target African-American and Latino individuals cause them to fear that they will also be unlawfully stopped and/or arrested for trespass in NYCHA residences in the future. (*Id.* ¶¶ 36, 187–190, 195.) Named Arrested Plaintiffs serve as representatives of the Class regarding the Fourth and Fourteenth Amendments, and *respondeat superior* claims against the City. *Davis II*, 2013 WL 1288176, at *4.

## B. The City's Unlawful Policy and Practice of Trespass Enforcement Also Injures Named Resident Plaintiffs

Similarly, Named Resident Plaintiffs Patrick Littlejohn and Rikia Evans are African-American NYCHA residents (Dkt. # 193 (Pls. 56.1) ¶¶ 45, 158–159) who have been unlawfully stopped themselves, or whose authorized guests have been unlawfully stopped, frisked, and/or arrested by the NYPD while visiting them (*id.* ¶¶ 56–81, 85–87, 169–179). *See also Davis I*, 2012 WL 4813837, at *17–25. Several of the Named Resident Plaintiffs have had guests targeted by officers for trespass enforcement because of their race and/or ethnicity. (*See* Dkt. # 193 (Pls. 56.1) ¶¶ 37–39, 157.) The City's trespass enforcement policy and practice have also impaired Named Resident Plaintiffs' abilities to come and go freely, and to receive guests in their homes. (*Id.* ¶¶ 85–87, 152–156, 204.) As one Named Resident Plaintiff explained, this treatment by NYPD officers—those sworn to protect them—is "humiliating and embarrassing." (Dkt. # 252 (PAF) ¶ 25.) Named Resident Plaintiffs Patrick Littlejohn and Rikia Evans serve as representatives of the Resident Subclass with regard to the Title VI, Fair Housing Act ("FHA"), and 42 U.S.C. § 1981 ("Section 1981") claims against the City for discriminatory interference with their contractual rights as tenants and discriminatory provision of police services.

## C. NYCHA's Unreasonable Lease Terms Injure Named Resident Plaintiffs

Named Resident Plaintiffs Patrick Littlejohn, Rikia Evans, Eleanor Britt, Shawne Jones, and Hector Suarez, five African-American or Latino NYCHA residents, are further injured by the unreasonable terms and conditions contained in NYCHA's standard Resident Lease Agreement. The Named Resident Plaintiffs serve as representatives of the Resident Subclass with regard to the USHA claims.

# ARGUMENT

In order to certify a class, a court must determine that each of the prerequisites of Rule 23(a) has been satisfied and that the proposed class meets the requirements of one of the three categories of classes listed in Rule 23(b). *See Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541, 2548-49 (2011).[13] Rule 23 sets forth a two-step procedure for determining the propriety of a class action. *First*, Rule 23(a) establishes four criteria for class certification:

(1) the class [must be] so numerous that joinder of all members is impracticable,

(2) there [must be] questions of law and fact common to the class,

(3) the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class, and

(4) the representative parties [must] fairly and adequately protect the interests of the class.

*Second*, in addition to meeting the Rule 23(a) criteria, a class must fit into one of three types listed in Rule 23(b). Under Rule 23(b)(2), certification is appropriate where the Court finds that the defendant acted or refused to act on grounds generally applicable to the class, so that declaratory or injunctive relief is appropriate with respect to the entire class.

---

[13] In addition, some courts have imposed an "implied requirement of ascertainability." *Miles* v. *Merrill Lynch & Co., Inc. (In re IPO Sec. Litig.)*, 471 F.3d 24, 41 (2d Cir. 2006). However, "[i]t is not clear that the ascertainability requirement applies to Rule 23(b)(2) class actions" because Rule 23(b)(2) does not require notice or compensatory damages. *Brooklyn Ctr. for Independence of the Disabled* v. *Bloomberg*, 287 F.R.D. 240, 249 n.3 (S.D.N.Y. 2012); *see also Floyd*, 283 F.R.D. at 161–62, 171 n.116. Even if the ascertainability requirement did apply, here the Class is "sufficiently definite." *See Casale* v. *Kelly*, 257 F.R.D. 396, 406 (S.D.N.Y. 2009); *cf. Ligon*, 288 F.R.D. at 83; *Floyd*, 283 F.R.D. at 172. The Resident Subclass is also readily ascertainable since it is limited to authorized African-American and Latino NYCHA residents.

Because Named Plaintiffs satisfy the requirements of Rule 23(a) and 23(b)(2), and because class certification is essential to the fair and efficient adjudication of this case, Named Plaintiffs' motion for class certification should be granted.[14]

## I.     Named Plaintiffs Meet the Requirements of Rule 23(a)

### A.     The Class and Resident Subclass Are So Numerous That Joinder of All Members Is Impracticable

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Impracticable means that joinder would be difficult or inconvenient, not that joinder would be impossible. *See Robidoux* v. *Celani*, 987 F.2d 931, 935 (2d Cir. 1993); *Scaggs* v. *New York State Dep't of Educ.*, No. 06 Civ. 0799, 2009 WL 890587, at *4 (E.D.N.Y. Mar. 31, 2009). The Second Circuit has directed district courts to presume numerosity if plaintiffs can demonstrate that there are at least 40 members of the putative class. *Consol. Rail Corp.* v. *Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

#### 1.     The Class Is So Numerous That Joinder Is Impracticable

The proposed Class easily satisfies the numerosity requirement. Between 2009 and 2011 alone, NYPD officers conducted, at a minimum, 12,974 trespass stops in NYCHA residences that lacked apparent legal justification from the face of the City's own paperwork. *See supra* pp. 6–7. And this is only a small subset of the proposed Class, which consists of individuals who were, or will be, unlawfully stopped and/or arrested between January 2007 and the present, including individuals who were unlawfully stopped and/or arrested but not recorded in the City's

---

[14] "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld* v. *Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006)). This Court has already held that Named Plaintiffs have standing to seek declaratory and injunctive relief. *See Davis I*, 2012 WL 4813837, at *26; *Davis II*, 2013 WL 1288176, at *9–10.

UF-250 forms. Attempting to join the claims of tens of thousands of individual Class members in this action would be infeasible and inefficient.

2.    <u>The Resident Subclass Is So Numerous That Joinder Is Impracticable</u>

The proposed Resident Subclass, which has claims against both the City and NYCHA, also satisfies the numerosity requirement. NYCHA provides housing to more than 400,000 authorized residents, over 90% of whom are "Black" or "Hispanic."[15] (Ex. J (Resident Databook) iv-1.) *First*, the City's trespass enforcement policy and practice are therefore applied to more than 360,000 African-American or Latino NYCHA residents. *Cf. id.*; *see also supra* pp. 3–11. *Second*, more than 360,000 African-American or Latino NYCHA residents are subject to NYCHA's unreasonable lease terms. *See supra* pp. 10–11. As with the proposed Class, joining more than 360,000 people in this action is not feasible, so the Resident Subclass is sufficiently numerous to warrant certification.

**B.    The Class and Resident Subclass Members' Claims Share Common Questions of Law and Fact**

Rule 23(a)(2) requires that there be "questions of law or fact common to the class," and members of the class must also have "suffered the same injury," *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551 (citation and quotation marks omitted). The "claims must depend upon a common contention," whose determination "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Commonality is satisfied when the injuries of all class members "derive from a unitary course of conduct by a single system," *Marisol A.* v. *Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997), and where defendants have engaged in standardized conduct toward members of the proposed class, *see Escalera* v. *NYCHA*, 425 F.2d 853, 867 (2d Cir. 1970).

---

[15]   The terms "Black" and "Hispanic" have been used interchangeably with "African-American" and "Latino," respectively, for the purposes of class certification. *See, e.g.*, *Floyd*, 283 F.R.D. at 159 n.6.

1.      Class Members' Claims Share Common Questions
        Susceptible to Common Proof

Here, Class members' putative claims turn on the answers to common questions of law and fact. Named Arrested Plaintiffs' claims, as well as the claims of putative Class members, all arise under the same set of laws, specifically, the Fourth Amendment, Fourteenth Amendment, and New York common law. All members of the proposed Class are African-American or Latino individuals who have been stopped, seized, questioned, frisked, searched, and/or arrested in their homes and/or while visiting NYCHA residents because of the City's policy and practice of unlawful trespass enforcement in NYCHA residences. *See supra* pp. 4–10.

The City has a centralized policy and practice of trespass enforcement in NYCHA residences that constitutes a "unitary course of conduct," *Marisol A.*, 126 F.3d at 377, and uniformly affects members of the putative Class. As a result, the Class shares the following common questions of law and fact that are susceptible to common proof:

- Do NYPD officers stop, seize, question, frisk, search, and/or arrest individuals for criminal trespass in and around NYCHA residences in the absence of reasonable, articulable suspicion, or probable cause?

- Do NYPD officers stop, seize, question, frisk, search, and/or arrest individuals for criminal trespass in and around NYCHA residences at least in part because of race and/or ethnicity?

- Has the City encouraged, sanctioned, and/or failed to rectify unconstitutional stops and arrests for criminal trespass in and around NYCHA residences by NYPD officers, and did such acts and omissions cause the constitutional violations against Class members?

- Have the City's actions concerning trespass enforcement amounted to a system-wide policy that has caused the constitutional, statutory, and common-law violations alleged in the Amended Complaint?

- Has the City failed to adequately train, supervise, and/or discipline officers in connection with trespass enforcement in and around NYCHA residences, and have such acts and omissions caused or exacerbated the constitutional violations against Class members?

- Has the City induced or increased the likelihood of constitutional violations by imposing "performance objectives" that require NYPD officers to perform a required number of "enforcement actions"?

- Have the Fourth Amendment, Fourteenth Amendment, and/or New York common law been violated?

The City's policy and practice were promulgated by the highest levels of NYPD leadership, disseminated to rank-and-file officers through the NYPD's "comprehensive training program," and implemented pursuant to a hierarchical supervisory structure. *See supra* pp. 3–5. Indeed, the City does not dispute that its trespass enforcement policy and practice, as partially codified in I.O. 23 and the NYPD's training materials, comprise a department-wide initiative enforced in NYCHA residences citywide. *Id.* The City's trespass enforcement policy and practice in NYCHA residences, like the policy and practice at issue in *Ligon*, represent one aspect of the City's widespread stop, question, and frisk program.

The City's trespass regime is implemented by NYPD personnel in NYCHA residences citywide; therefore, the injuries derived from the City's trespass enforcement policy and practice are substantially similar across the Class and implicate common issues of proof. Pursuant to that policy and practice, African-American and Latino residents and authorized guests are routinely stopped and/or arrested in or around NYCHA residences without adequate cause. *See supra* pp. 6–10. The testimonial evidence of the putative Class declarants and community leaders, the DP Forms, and the expert analysis of UF-250s demonstrate that the same fact patterns—unlawful stops and/or arrests of African-Americans and Latinos in and around NYCHA residences—occur repeatedly. *Id*. And both statistical and testimonial evidence suggest that race and/or ethnicity is a motivating factor. *See supra* pp. 8–10.

All members of the proposed Class share injuries similar to those of the Named Arrested Plaintiffs because each is injured by the City's policy and practice in that each has been, or will

be, arrested in their homes and/or while visiting a NYCHA resident. Consequently, each of the Class claims turns on common questions of law and fact regarding the City's trespass enforcement policy and practice in NYCHA residences that will establish the City's liability. *See Wal-Mart*, 131 S. Ct. at 2551. Accordingly, this action satisfies the commonality requirement of Rule 23(a).

2.    Resident Subclass Members' Claims Against the City Share Common Questions Susceptible to Common Proof

The Resident Subclass of authorized NYCHA residents is additionally injured by the City's trespass enforcement policy and practice. These claims are exemplified by the claims of Named Resident Plaintiffs.

The City's trespass enforcement policy and practice inflict additional and specific injuries on the Resident Subclass that uniformly affect NYCHA residents. As a result, the Resident Subclass shares the following common questions of law and fact that are susceptible to common proof:

- Is race and/or ethnicity a factor in the City's provision of police services, including trespass enforcement, in NYCHA residences?
- Are the City's trespass enforcement policy and practice in NYCHA residences based in part on a discriminatory motive, and, as a result, do the policy and practice impair the contractual rights between residents and NYCHA?
- Have Title VI, the FHA, and/or Section 1981 been violated?

By routinely stopping and arresting residents and their authorized guests on the basis of race and/or ethnicity and without adequate cause, the City impermissibly impedes NYCHA residents' ability to freely enter and exit their homes and to accommodate guests. In so doing, the City interferes with all African-American and Latino residents' contractual rights as NYCHA lessees and denies them the full use and enjoyment of their homes. Further, the City's trespass

enforcement policy and practice discriminate against all putative members of the Resident Subclass in the provision of police services.

These similarities are illustrated by the testimony of putative Resident Subclass members, who identify injuries substantially similar to those alleged by Named Resident Plaintiffs. *See supra* pp. 8–9. Declarants allege that the City's policy and practice have not only impeded their right to come and go as they please, but that the City's policy and practice have also obstructed their ability to lawfully accommodate guests in their homes. *See supra* pp. 10–11. These injuries—and the claims they give rise to—are typified by the experiences of the Named Resident Plaintiffs. *See supra* p. 13. Similar to the Class claims, these harms have been felt across the Resident Subclass and are wholly derived from the City's unlawful trespass enforcement policy and practice in NYCHA residences.

Resolution of the common questions concerning the City's trespass enforcement policy and practice will drive the resolution of this litigation, for the benefit of every member of the Resident Subclass. Rule 23(a)(2)'s commonality requirement is therefore satisfied.

### 3. Resident Subclass Members' Claims Against NYCHA Share Common Questions Susceptible to Common Proof

The Resident Subclass's claim against NYCHA under the USHA raises the following common questions of law and fact that are susceptible to common proof:

- Are the House Rules incorporated into the residents' lease agreement with NYCHA, thereby representing terms and conditions of their leases?

- Are the provisions in the House Rules prohibiting lingering and mandating cooperation with police officers unreasonable?

- Has NYCHA violated the USHA?

The Resident Subclass is uniquely harmed by the unreasonable terms contained in NYCHA's standard lease agreement including the House Rules. NYCHA's use of a

standardized lease and its creation and distribution of the House Rules to all tenant households

are self-evidently a "unitary course of conduct by a single system." *Marisol A.*, 126 F.3d at 377.

The NYCHA standard lease governs residents' relationships and interactions with both NYCHA

and the NYPD, *see supra* pp. 11–12, and, by including the unreasonable House Rules, it causes

an identical injury to all members of the Resident Subclass.

Resolution of the common questions concerning NYCHA's lease terms will drive the

resolution of this litigation and benefit every member of the Resident Subclass. Rule 23(a)(2)'s

commonality requirement is therefore satisfied.

### C. Named Plaintiffs' Claims Are Typical of the Class's and Resident Subclass's Claims

Rule 23(a)(3) requires a showing that "the claims or defenses of the representative parties

are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "This requirement is

satisfied when each class member's claim arises from the same course of events, and each class

member makes similar legal arguments to prove the defendant's liability." *Brown* v. *Kelly*, 609

F.3d 467, 475 (2d Cir. 2010) (citations and quotations omitted). Typicality does not require that

the representative claims be identical to those of the class members, and factual variations among

plaintiffs may exist. *See Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner &*

*Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) ("[I]t is settled that the mere existence of

individualized factual questions with respect to the class representative's claim will not bar class

certification." (citations omitted)); *Robidoux*, 987 F.2d at 936–37 ("When it is alleged that the

same unlawful conduct was directed at or affected both the named plaintiff and the class sought

to be represented, the typicality requirement is usually met irrespective of minor variations in the

fact patterns underlying individual claims." (citations omitted)). In addition, "named plaintiffs

satisfy the typicality requirement when all members of the class would benefit from the named

plaintiffs' action." *Gulino* v. *Bd. of Educ. of City Sch. Dist. of New York*, 201 F.R.D. 326, 332

(S.D.N.Y. 2001) (citations omitted).

### 1. Named Arrested Plaintiffs' Claims Are Typical of the Class Members' Claims

The Named Arrested Plaintiffs' claims are typical of all putative Class members' claims

because they arise from the same illegal conduct by the City, *i.e.*, the same centralized policy and

practice of trespass enforcement in NYCHA residences. *See Cutler* v. *Perales*, 128 F.R.D. 39,

45 (S.D.N.Y. 1989) ("The claims of the named plaintiff are typical of the putative class in that all

have allegedly suffered from the practices of defendants."). And, because Named Arrested

Plaintiffs seek declaratory and injunctive relief, all of the proposed Class members would benefit

from the success of the Named Arrested Plaintiffs' claims. *See Gulino*, 201 F.R.D. at 332

("[N]amed plaintiffs satisfy the typicality requirement when all members of the class would

benefit from the named plaintiffs' action." (citations omitted)). Typicality is therefore satisfied.

### 2. Named Resident Plaintiffs' Claims Against the City Are Typical of the Resident Subclass's Claims Against the City

Named Resident Plaintiffs assert that the City's unlawful trespass enforcement policy and

practice discriminate against NYCHA residents in the provision of housing and impairs their

contractual rights to access, use, and enjoy their homes as NYCHA lessees. *See supra* pp. 10–

11. These are the same legal arguments under Title VI, the FHA, and Section 1981 that would

be asserted by putative members of the Resident Subclass. Named Resident Plaintiffs' legal

arguments are therefore typical of the Resident Subclass as to their claims against the City.

### 3. Named Resident Plaintiffs' Claims Against NYCHA Are Typical of the Resident Subclass's Claims Against NYCHA

Additionally, all putative Resident Subclass members are injured by the House Rules's

provisions on lingering and cooperating with police via NYCHA's standard Resident Lease

Agreement. Therefore, Named Resident Plaintiffs' legal arguments are identical to those that would be brought by putative members of the Resident Subclass under the USHA.

### D. Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class and Resident Subclass

Rule 23(a)(4) requires that plaintiffs seeking to certify a class demonstrate that "the representative parties will fairly and adequately protect the interests of the class." Class counsel must also be qualified and experienced to conduct the litigation, pursuant to Fed. R. Civ. P. 23(g)(1). Proposed class representatives are generally considered to be adequate if the plaintiffs' interests are not antagonistic to the interests of other members of the class. *See Loftin* v. *Bande* (*In re Flag Telecom Holdings, Ltd. Sec. Litig.*), 574 F.3d 29, 35 (2d Cir. 2009). Class certification is appropriate unless conflicts between the class representative and putative class members are so great they are deemed "fundamental." *Id.*

#### 1. Named Arrested Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

Named Arrested Plaintiffs and their counsel satisfy the adequacy requirement. *First*, there are no actual or potential conflicts of interest between the Named Arrested Plaintiffs and the other Class members. *Second*, Named Arrested Plaintiffs have been subjected to the same types of unlawful trespass stops and arrests as members of the putative Class. *Finally*, Named Arrested Plaintiffs are informed about, and actively involved in, this litigation. *See, e.g.*, Ex. K (Jackson Tr. 153:13-25); Ex. L (Littlejohn Tr. 144:24-145:10); Ex. M (Osorio Tr. 159:9-160:6).

#### 2. Named Resident Plaintiffs Will Fairly and Adequately Protect the Interests of the Resident Subclass in Their Claims Against the City

For the reasons set forth above, Rikia Evans and Patrick Littlejohn—both Named Resident Plaintiffs—satisfy Rule 23(a)(4)'s adequacy requirement with respect to the Resident Subclass's claims against the City. Rikia Evans and Patrick Littlejohn have been subjected to the

same unlawful trespass enforcement policy and practice as the other members of the putative Resident Subclass. *See supra* pp. 10–11; *see also Stinson* v. *City of New York*, 282 F.R.D. 360, 371 (S.D.N.Y. 2012).

3.  Named Resident Plaintiffs Will Fairly and Adequately Protect the Interests of the Resident Subclass in Their Claims Against NYCHA

The Named Resident Plaintiffs are also adequate representatives as to their claim under the USHA against NYCHA. The interests of the Named Resident Plaintiffs are "identical" to those of the putative Resident Subclass because all are injured by, and seek redress for, the same unreasonable lease terms. *See supra* p. 13.

4.  Plaintiffs' Counsel Will Adequately Represent the Class and Resident Subclass and Should Be Appointed Class Counsel

Finally, the Named Plaintiffs have retained counsel with extensive experience in complex class action litigation in federal and state courts. Counsel will prosecute this action vigorously and competently.[16] For these reasons, this Court should appoint the NAACP Legal Defense and Educational Fund, Inc., The Legal Aid Society, and Paul, Weiss, Rifkind, Wharton & Garrison LLP as joint Class Counsel.

## II.  This Action Meets the Requirements of Rule 23(b)(2)

Rule 23(b)(2) mandates a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

### A.  The Class Meets the Requirements of Rule 23(b)(2)

"Civil rights cases" are the "prime examples" of Rule 23(b)(2) class actions. *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 614 (1997). The City's policy and practice of unlawful trespass stops and arrests of residents and guests in NYCHA residences harm the entire Class.

---

[16] *See* Declaration of Nancy Rosenbloom, submitted in support of this motion.

*Cf. Floyd,* 283 F.R.D. at 177 ("The vast majority of New Yorkers who are unlawfully stopped will never bring suit to vindicate their rights. It is precisely for cases such as this that Rule 23(b)(2) was designed." (footnotes omitted)). Consequently, Class-wide declaratory and injunctive relief, including detailed policies and procedures, robust training, supervision, reporting, and oversight specific to trespass stops and arrests would benefit all members of the Class. Accordingly, the proposed Class satisfies the requirements of Rule 23(b)(2).

> **B.      The Resident Subclass Meets the Requirements of Rule 23(b)(2) Both With Respect to Their Claims Against the City and Their Claims Against NYCHA**

The City's policy and practice of unlawful trespass stops and arrests of residents and guests in NYCHA residences harm the entire Class, including the Resident Subclass. Similarly, NYCHA's promulgation of unreasonable terms and conditions in its standardized lease injures all members of the Resident Subclass. The declaratory and injunctive relief sought by the Named Resident Plaintiffs is necessary to protect the rights of both the Named Resident Plaintiffs and the Resident Subclass. The proposed Resident Subclass, therefore, satisfies the requirements for Rule 23(b)(2) for both their claims against the City and NYCHA.

<u>CONCLUSION</u>

For the foregoing reasons, Named Plaintiffs respectfully request that the Court certify the Class and Resident Subclass pursuant to Rules 23(a) and 23(b)(2) and appoint Plaintiffs' Counsel as Class Counsel pursuant to Rule 23(g).

Dated: May 3, 2013
      New York, New York

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: _Matthew Moses_

Matthew Moses
Daniel J. Leffell
Katharine E. Brooker
Jason L. Meizlish
James E. Stanley
1285 Avenue of the Americas
New York, New York 10019-6064
Tel.: (212) 373-3000
Fax: (212) 757-3990

NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, NY 10013-2897
Tel.: (212) 965-2200
Fax: (212) 219-2052

Christina Swarns
Johanna B. Steinberg
Jin Hee Lee
Johnathan J. Smith
Ria Tabacco Mar

THE LEGAL AID SOCIETY
199 Water Street, 6th Fl.
New York, NY 10038
Tel: (212) 577-3300
Fax: (212) 509-8141

Steven Banks
William Gibney
Steven Wasserman
Nancy Rosenbloom
Marlen S. Bodden

*Attorneys for Plaintiffs and the
Proposed Class*