# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

DAVID FLOYD, *et al.*,

                    Plaintiffs,

          - against -

CITY OF NEW YORK,

                    Defendant.

-------------------------------------------------------- X

JAENEAN LIGON, *et al.*,

                    Plaintiffs,

          - against -

CITY OF NEW YORK, *et al.*,

                    Defendants.

-------------------------------------------------------- X

**OPINION AND ORDER**

**08 Civ. 1034 (SAS)**

**12 Civ. 2274 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/12/13

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

I.     **INTRODUCTION**

           In an Opinion issued today I found the City of New York liable in the *Floyd* case for violating the Fourth and Fourteenth Amendment rights of the plaintiff class because of the way the New York City Police Department ("NYPD") has conducted stops and frisks over the past decade (the "Liability Opinion"). In an Opinion issued in January 2013, I found that the *Ligon* plaintiffs, representing a putative class of people stopped outside buildings participating in

1

the Trespass Affidavit Program ("TAP") in the Bronx, were entitled to preliminary injunctive relief based on violations of their Fourth Amendment rights.

The purpose of this Opinion (the "Remedies Opinion") is to determine what remedies are appropriate in these cases. I address both cases in one Opinion because the remedies necessarily overlap. Each requires that the NYPD reform practices and policies related to stop and frisk to conform with the requirements of the United States Constitution. I stress, at the outset, that the remedies imposed in this Opinion are as narrow and targeted as possible. To be very clear: I am *not* ordering an end to the practice of stop and frisk. The purpose of the remedies addressed in this Opinion is to ensure that the practice is carried out in a manner that protects the rights and liberties of all New Yorkers, while still providing much needed police protection.

## II.   REMEDIES IN *FLOYD*

### A.   The Court Has the Power to Order Broad Equitable Relief

#### 1.   Plaintiffs Satisfied the Requirements for a Permanent Injunction

Plaintiffs seeking a permanent injunction must demonstrate: (1) that they have suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiffs and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.[1]  Plaintiffs may satisfy the first two factors by demonstrating that they are likely to be deprived of their constitutional rights in the future by the

---

[1]      *See World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 160–61 (2d Cir. 2012) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

2

acts they seek to have enjoined.[2]  The evidence discussed in the Liability Opinion shows that
plaintiffs have suffered violations of their Fourth and Fourteenth Amendment rights, and that the
prevalence of the practices leading to those violations creates a likelihood of future injury.[3]
Thus, plaintiffs have satisfied the first two requirements for obtaining permanent injunctive
relief.

      The balance of hardships tilts strongly in favor of granting a permanent injunction
in *Floyd*.  That is, the burden on the plaintiff class of continued unconstitutional stops and frisks
far outweighs the administrative hardships that the NYPD will face in correcting its
unconstitutional practices.[4]

> The right to physical liberty has long been at the core of our nation's
> commitment to respecting the autonomy and dignity of each person:  "No
> right is held more sacred, or is more carefully guarded, by the common law,
> than the right of every individual to the possession and control of his own
> person, free from all restraint or interference of others, unless by clear and
> unquestionable authority of law."[5]

---

[2]    *See New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir.
1989) (deprivation of constitutional rights "cannot be compensated by money damages"); *New
York Magazine v. Metropolitan Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998) (the "'loss of
First Amendment freedoms, for even minimal periods of time, unquestionably constitutes
irreparable injury'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

[3]    *See* Liability Opinion at Part V (conclusions of law); *Floyd v. City of New York*,
283 F.R.D. 153, 170 (S.D.N.Y. 2012) (citing *National Cong. for Puerto Rican Rights, by Perez
v. City of New York*, 75 F. Supp. 2d 154, 161 (S.D.N.Y. 1999) (later renamed *Daniels*)).  *See also
Floyd*, 283 F.R.D. at 160, 178 (certifying plaintiffs' class).

[4]    *See Association of Surrogates & Supreme Court Reporters Within City of New
York v. State of New York*, 966 F.2d 75, 79, *modified on reh'g*, 969 F.2d 1416 (2d Cir. 1992)
(noting that "state budgetary processes may not trump court-ordered measures necessary to undo
a federal constitutional violation," provided that the equitable relief is proportional to the
constitutional infraction).

[5]    *Floyd*, 283 F.R.D. at 158–59 (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S.
250, 251 (1891)).

Ensuring that people are not seized and searched by the police on the streets of New York City without a legal basis is an important interest meriting judicial protection.

Eliminating the threat that blacks and Hispanics will be targeted for stops and frisks is also an important interest. In addition to the significant intrusion on liberty that results from any stop, increased contact with the police leads to increased opportunities for arrest, even when the reason for the arrest was not the reason for the stop. As a result, targeting racially defined groups for stops — even when there is reasonable suspicion — perpetuates the stubborn racial disparities in our criminal justice system.[6] Although the costs of complying with the permanent injunction in *Floyd* will be significant, they are clearly outweighed by the urgent need to curb the constitutional abuses described in the Liability Opinion.

With regard to the public interest, the City has expressed concern that interference in the NYPD's stop and frisk practices may have a detrimental effect on crime control.[7] However, as previously noted, I am *not* ordering an end to stop and frisk. Moreover, it has been widely reported that as the number of recorded stops has decreased over the past year, the crime

---

[6] *See, e.g.*, MICHELLE ALEXANDER, THE NEW JIM CROW 6–7 (2010) ("No other country in the world imprisons so many of its racial or ethnic minorities. . . . In Washington, D.C., . . . it is estimated that three out of four young black men (and nearly all those in the poorest neighborhoods) can expect to serve time in prison."). Another collateral consequence of stops was highlighted in the recently settled case of *Lino v. City of New York*, No. 106579/10, 2011 WL 2610501 (Sup. Ct. N.Y. Co. June 24, 2011), in which the NYPD agreed to purge personal information from its stop database. Plaintiffs — including named plaintiff Clive Lino — had alleged that the NYPD was using personal information from the stop database to conduct criminal investigations. *See* John Caher, *NYPD Agrees to Purge Stop-Frisk Databank*, N.Y. L.J., August 8, 2013.

[7] *See* 4/11/13 Defendant['s] Memorandum of Law in Opposition to Plaintiffs' Requested Injunctive Relief ("Def. Inj. Mem.") at 17–18.

rate has continued to fall.[8]  The United States Department of Justice ("DOJ") has pointed out that "there is significant evidence that unlawfully aggressive police tactics are not only unnecessary for effective policing, but are in fact detrimental to the mission of crime reduction."[9]  By strictly adhering to the rule of law, the NYPD will achieve greater cooperation between police officers and the communities they serve.  Fostering trust in the police will "promote, rather than hinder, [the] NYPD's mission of safely and effectively fighting crime."[10]

Furthermore, as in *Ligon*, it is "'clear and plain'" that the public interest in liberty and dignity under the Fourth Amendment, and the public interest in equality under the Fourteenth Amendment, trumps whatever modicum of added safety might theoretically be gained by the NYPD making *unconstitutional* stops and frisks.[11]  This Opinion does not call for the NYPD to abandon proactive policing and return to an earlier era of less effective police practices.  Rather, the relief ordered below requires the NYPD to be *even more* proactive:

---

[8]        *See, e.g.*, Tamer El-Ghobashy & Michael Howard Saul, *New York Police Use of Stop-and-Frisk Drops: Plummet in Disputed Tactic Tracks Overall Decrease in Crime*, WALL ST. J., May 6, 2013 (noting that UF-250s fell 51% in the first three months of 2013 compared to 2012, while crime fell 2.7% and murders fell 30% through April 28 compared to 2012).  I note, however, that the number of *unrecorded* stops may have increased over the same period as a result of misleading training at the NYPD's new stop and frisk refresher course at Rodman's Neck.  *See* Liability Opinion at Part IV.C.5 (citing, *inter alia*, 4/25 Trial Transcript ("Tr.") at 5119–5124 (Shea)); *Ligon v. City of New York,* No. 12 Civ. 2274, 2013 WL 628534, at *38 (S.D.N.Y. Feb. 14,  2013).

[9]        6/12/13 Statement of Interest of the United States ("DOJ Inj. Mem.") at 10.  *See id.* at 10–11 (collecting sources).

[10]       *Id.* at 10.  Even NYPD Commissioner Raymond Kelly has recognized that the misuse of stop and frisk can contribute to community mistrust.  In 2000, he criticized "dubious stop-and-frisk tactics" instituted after his first period as Police Commissioner that had "sowed new seeds of community mistrust."  Kevin Flynn, *Ex-Police Head Criticizes Strategies*, N.Y. TIMES, Apr. 5, 2000.

[11]       *Cf. Ligon*, 2013 WL 628534, at *40–41.

proactive not only about crime control and prevention, but also about protecting the
constitutional rights of the people the NYPD serves.  The public interest will not be harmed by a
permanent injunction requiring the NYPD to conform its practices to the Constitution.

> ### 2.     The Court's Broad Authority to Enter Injunctive Relief

"[T]he scope of a district court's equitable powers to remedy past wrongs is
broad, for breadth and flexibility are inherent in equitable remedies."[12]  At the same time, it is
"'the essence of equity jurisdiction' that a court is only empowered 'to grant relief no broader
than necessary to cure the effects of the harm caused by the violation.'"[13]  "Discretion to frame
equitable relief is limited by considerations of federalism, and remedies that intrude
unnecessarily on a state's governance of its own affairs should be avoided."[14]

Nevertheless, as the DOJ notes, "courts have long recognized — across a wide
range of institutional settings — that equity often requires the implementation of injunctive relief
to correct unconstitutional conduct, even where that relief relates to a state's administrative
practices."[15]  "Courts . . . must not shrink from their obligation to enforce the constitutional

---

[12]     *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971).  *Accord Association of Surrogates*, 966 F.2d at 79 ("[F]ederal courts have broad discretion in fashioning equitable remedies for . . . constitutional violations.").

[13]     *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (quoting *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997)).

[14]     *Association of Surrogates*, 966 F.2d at 79.

[15]     DOJ Inj. Mem. at 7 (citing *Brown v. Plata*, 131 S. Ct. 1910 (2011); *Brown v. Board of Educ.*, 349 U.S. 294 (1955)).  *See also id.* at 7 n.3 (criticizing the City's citation of inapposite cases "for the proposition that federal courts should decline to enter injunctive relief that requires operational changes to a State's institutions").

6

rights of all persons."[16]  This duty is not curtailed when constitutional violations arise in the context of law enforcement.  Rather, where "there is a persistent pattern of police misconduct, injunctive relief is appropriate."[17]

I have always recognized the need for caution in ordering remedies that affect the internal operations of the NYPD,[18] the nation's largest municipal police force and an organization with over 35,000 members.[19]  I would have preferred that the City cooperate in a joint undertaking to develop some of the remedies ordered in this Opinion.[20]  Instead, the City declined to participate, and argued that "the NYPD systems already in place" — perhaps with unspecified "minor adjustments" — would suffice to address any constitutional wrongs that

---

[16]     *Plata*, 131 S. Ct. at 1928 (citing *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (*per curiam*)) (quotation marks omitted).  *Accord Todaro v. Ward*, 565 F.2d 48, 53–54 (2d Cir. 1977) ("'[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution.'" (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974))).

[17]     *Allee v. Medrano*, 416 U.S. 802, 815 (1974).  *Accord* DOJ Inj. Mem. at 8–9 (collecting cases and noting that pursuant to statutory authorities "the United States has itself sought and secured the implementation of remedial measures to reform police misconduct in dozens of law enforcement agencies," including measures that "directly address systemic deficiencies in the way officers conduct stops and searches").

[18]     *See, e.g.*, *Patrolmen's Benevolent Ass'n of City of New York, Inc. v. City of New York*, No. 97 Civ. 7895 (SAS), 2000 WL 1538608, at *3–4 (S.D.N.Y. Oct. 18, 2000) (declining to impose injunction on the NYPD where doing so would have been "an undue intrusion into a matter of state sovereignty").

[19]     *See* Def. Inj. Mem. at 1.

[20]     *See* 1/31 Tr. at 101; 1/28/13 Letter from Jonathan C. Moore et al., Counsel for Plaintiffs, to the Court (proposing collaborative procedure involving all the parties in *Floyd*, *Ligon*, and *Davis*, a court-appointed facilitator, and the views of major stakeholders).  The City rejected this proposal.  *See* 1/31 Tr. at 9–10.

might be found.[21]  I note that the City's refusal to engage in a joint attempt to craft remedies

contrasts with the many municipalities that have reached settlement agreements or consent

decrees when confronted with evidence of police misconduct.[22]

### B.     Equitable Relief

Federal Rule of Civil Procedure 65(d) requires that "[e]very order granting an

injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C)

describe in reasonable detail — and not by referring to the complaint or other document — the

act or acts restrained or required."[23]  These specificity provisions are "'no mere technical

requirements,'" but were "'designed to prevent uncertainty and confusion on the part of those

faced with injunctive orders, and to avoid the possible founding of a contempt citation on a

---

[21]     6/12/13 Defendant's Post-Trial Memorandum of Law ("Def. Mem.") at 24–25.
*Accord* Def. Inj. Mem. at 7–18.  The City also argues that no remedy is required because
improper stops can be addressed by individual suits for damages.  *See* Def. Inj. Mem. at 6.  The
DOJ counters that if individual suits were an effective remedy for police misconduct, courts
would not have found it necessary to impose injunctive relief in so many police misconduct
cases.  *See* DOJ Inj. Mem. at 9 & n.5 (also citing arguments from Daryl J. Levinson, *Making
Government Pay: Markets, Politics, and the Allocation of Constitutional Costs*, 67 U. CHI. L.
REV. 345, 354–57 (2000)).  I note that individual suits for damages are particularly ineffective as
a remedy for unconstitutional stops, where individuals often do not know what the basis for their
stop was, and thus cannot know whether the stop lacked a legal basis or was influenced
improperly by race.  In addition, while the indignity of an unconstitutional stop is a serious harm,
few of those stopped will be motivated to dedicate their time and resources to filing a lawsuit —
especially where the standard for recovery may require proof of *Monell* liability.

[22]     *See, e.g.*, *Bailey v. City of Philadelphia*, No. 10 Civ. 5952 (E.D. Pa. June 21,
2011) (consent decree in class action alleging unconstitutional stops and frisks of black and
Hispanic men); DOJ Inj. Mem. at 9 (noting DOJ settlement agreements and consent decrees with
dozens of law enforcement agencies nationwide).  The City's resistance to reform in this case
may reflect a more general skepticism toward judicial interpretation of the Constitution and the
limits it imposes on municipalities.  *See, e.g.*, Jill Colvin, *Bloomberg Says Interpretation of
Constitution Will "Have to Change" After Boston Bombing*, POLITICKER (Apr. 22, 2013).

[23]     Fed. R. Civ. P. 65(d)(1).

decree too vague to be understood.'"[24]  The specificity provisions also ensure '"that the appellate court knows precisely what it is reviewing.'"[25]

Compliance with the prohibition on the incorporation of extrinsic documents is "'essential,' unless the enjoined party acquiesces to the extrinsic reference."[26]  The City has not acquiesced to any extrinsic reference.  Thus, while the sections below refer to NYPD documents that must be revised, the ordered relief is contained entirely within the four corners of this Opinion.[27]

### 1.  Appointment of a Monitor to Oversee Reforms

Because of the complexity of the reforms that will be required to bring the NYPD's stop and frisk practices into compliance with the Constitution, it would be impractical for this Court to engage in direct oversight of the reforms.  As a more effective and flexible alternative, I am appointing an independent monitor (the "Monitor") to oversee the reform process.  I have chosen Peter L. Zimroth to serve as Monitor.

Mr. Zimroth, a partner in the New York office of Arnold & Porter, LLP, is a

---

[24]    *Mickalis Pawn Shop*, 645 F.3d at 143 (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)).

[25]    *Id.* at 144 (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 241 (2d Cir. 2001)).

[26]    *Eyewonder, Inc. v. Abraham*, 293 Fed. App'x 818, 820 (2d Cir. 2008) (quoting *Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000), and citing *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 809 (2d Cir. 1981)).  *Accord Petrello v. White*, 533 F.3d 110, 114 (2d Cir. 2008) ("Rule 65(d) 'is satisfied only if the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden' or required." (quoting *Fonar Corp. v. Deccaid Servs., Inc.*, 983 F.2d 427, 430 (2d Cir. 1993))).

[27]    The remedies ordered below are largely drawn from submissions by plaintiffs and the DOJ.

former Corporation Counsel of the City of New York, and the former Chief Assistant District Attorney of New York County. In both of these roles, Mr. Zimroth worked closely with the NYPD. A graduate of Columbia University and Yale Law School — where he served as Editor in Chief of the Yale Law Journal — he also served as a law clerk on the Supreme Court of the United States and a federal prosecutor. He taught criminal law and criminal procedure as a tenured professor at the New York University School of Law.

Mr. Zimroth has also been appointed to many positions in public service. The Chief Judge of the New York Court of Appeals appointed him as one of three directors of New York's Capital Defender Office. He has also served on the Mayor's Committee on the Judiciary, and on the boards of two schools for children with special needs. He has been a member of the House of Delegates of the American Bar Association, the Executive Committee of the New York City Bar Association, and the Board of Directors of the Legal Aid Society.

It is within the power of a district court to order the appointment of a monitor to oversee judicially ordered reforms.[28] The DOJ recommended the appointment of a monitor in this case, in the event that the Court found the City liable. Based on "decades of police reform efforts across the country," the DOJ concluded that "the appointment of a monitor to guide implementation of . . . injunctive relief may provide substantial assistance to the Court and the parties and can reduce unnecessary delays and litigation over disputes regarding compliance."[29] In addition, the DOJ noted:

---

[28]  *See, e.g.*, *United States v. City of New York*, 717 F.3d 72, 97 (2d Cir. 2013).

[29]  DOJ Inj. Mem. at 11. *Accord* 5/15 Tr. at 7435 (plaintiffs' remedies expert Professor Samuel Walker testifying that if liability is found, the appointment of an independent monitor is "necessary").

> [T]he experience of the United States in enforcing police reform injunctions teaches that the appointment of an independent monitor is a critically important asset to the court, the parties, and the community in cases involving patterns or practices of unlawful conduct by law enforcement officials. A court-appointed monitor in this case would help the Court ensure that . . . any pattern or practice . . . is effectively and sustainably remedied.[30]

The appointment of a monitor will serve the interests of all stakeholders, including the City, by facilitating the early and unbiased detection of non-compliance or barriers to compliance. By identifying problems promptly, the Monitor will save the City time and resources.[31]

I also note that the Monitor will have a distinct function from the other oversight entities identified by the City, such as the NYPD's Internal Affairs Bureau, federal prosecutors, the Civilian Complaint Review Board, and "the public electorate."[32] The Monitor will be specifically and narrowly focused on the City's compliance with reforming the NYPD's use of stop and frisk — although this will inevitably touch on issues of training, supervision, monitoring, and discipline. Finally, the Monitor will operate in close coordination with this

---

[30]     DOJ Inj. Mem. at 5.

[31]     *See id.* at 16 ("Without an independent monitor, the Court will be forced to depend on motions practice between the parties to assess progress; a costly, contentious, inefficient, and time-consuming process.").

[32]     *Id.* at 18 (citing Def. Inj. Mem. at 13). In particular, as the DOJ notes, "it is not realistic to ask 'the public electorate' to monitor the police department to ensure that the department's stop-and-frisk practices are consistent with the Constitution." *Id.* at 20 (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)). If it is true that 76% percent of black voters in New York City disapprove of stop and frisk, as found in a recent Quinnipiac University poll, then the persistence of this policy in heavily black communities might indicate the failure "of those political processes ordinarily to be relied upon to protect minorities," and thus might justify "more searching judicial inquiry." *Carolene Prods.*, 304 U.S. at 152 n.4; Quinnipiac University, *New Yorkers Back Ban on Take-Out Foam More Than 2-1*, at 8 (Feb. 28, 2013), http://www.quinnipiac.edu/images/polling/nyc/nyc02282013.pdf/ (19% of blacks approve and 76% disapprove of "a police practice known as stop and frisk, where police stop and question a person they suspect of wrongdoing and, if necessary, search that person").

11

Court, which retains jurisdiction to issue orders as necessary to remedy the constitutional

violations described in the Liability Opinion.[33]

        I now specify the Monitor's role and functions:

1.      The Monitor will be subject to the supervision and orders of the Court.

2.      The Monitor will not, and is not intended to, replace or assume the role or duties of any

      City or NYPD staff or officials, including the Commissioner. The Monitor's duties,

      responsibilities, and authority will be no broader than necessary to end the constitutional

      violations in the NYPD's stop and frisk practices described in the Liability Opinion.

3.      The Monitor's initial responsibility will be to develop, based on consultation with the

      parties, a set of reforms of the NYPD's policies, training, supervision, monitoring, and

      discipline regarding stop and frisk. These reforms (the "Immediate Reforms") are

      outlined below in Part II.A.2. They will be developed as soon as practicable and

      implemented when they are approved by the Court.

4.      After the completion of the Joint Remedial Process, described below in Part II.A.4, the

      Monitor will work with the Facilitator and the parties to develop any further reforms

      necessary to ending the constitutional violations described in the Liability Opinion.

      These reforms ("Joint Process Reforms") will be implemented upon approval by the

      Court.

5.      The Monitor will inform the City of the milestones the City must achieve in order to

      demonstrate compliance and bring the monitoring process to an end.

6.      The Monitor will regularly conduct compliance and progress reviews to assess the extent

---

[33]      The Monitor's role will also be distinct from the broad advisory role of the NYPD
Inspector General envisioned in N.Y. City Council Introductory No. 1079 of 2013.

to which the NYPD has implemented and complied with the Immediate and Joint Process Reforms.

7.      The Monitor will issue public reports every six months detailing the NYPD's compliance with the Immediate and Joint Process Reforms.  The Monitor will also file these reports with the Court.

8.      The Monitor will work with the parties to address any barriers to compliance.  To the extent possible, the Monitor should strive to develop a collaborative rather than adversarial relationship with the City.

9.      The Monitor may request the Court to modify the Immediate and Joint Process Reforms, if evidence shows that such modifications are warranted.

10.     The Monitor may request technical assistance from outside experts.  He may also employ staff assistance as he finds reasonable and necessary.

11.     The City will be responsible for the reasonable costs and fees of the Monitor, his staff, and any experts he retains.

12.     The Monitor's position will come to an end when the City has achieved compliance with the Immediate and Joint Process Reforms.

## 2.      Immediate Reforms Regarding Stop and Frisk

Ending the constitutional violations inherent in the NYPD's current use of stop and frisk will require reforms to a number of NYPD policies and practices.  It would be unwise and impractical for this Court to impose such reforms at this time, prior to input from the Monitor and the participants in the Joint Remedial Process ordered below.[34]  Instead, as noted

_____

[34]      In particular, the City has not yet provided input regarding specific reforms.  *See* Def. Inj. Mem. at 18 (declining to offer a remedy "other than to respectfully direct the Court to

above, the development of reforms will take place in two stages.  *First*, the Monitor will develop, in consultation with the parties, an initial set of reforms to the NYPD's policies, training, supervision, monitoring, and discipline regarding stop and frisk (the "Immediate Reforms").  These reforms will be developed and submitted to the Court as soon as practicable, and implemented when they are approved.  *Second*, the Facilitator will work with the parties and other stakeholders to develop, through the Joint Remedial Process, a more thorough set of reforms (the "Joint Process Reforms") to supplement, as necessary, the Immediate Reforms. The development of the Joint Process Reforms is discussed below in Part II.A.4.

      If the parties, together with the Monitor, are unable to develop agreed-upon Immediate Reforms, the Court will order the parties to draft proposed revisions to specific policies and training materials, as the parties have already done quite effectively in *Ligon*.[35] Indeed, the remedies proposed in *Ligon* may provide a useful model for some aspects of the Immediate Reforms.[36]

      Based on the liability and remedies evidence presented at trial, the Immediate Reforms must include the following elements:

### a. Revisions to Policies and Training Materials Relating to Stop and Frisk and to Racial Profiling

      *First*, the NYPD should revise its policies and training regarding stop and frisk to adhere to constitutional standards as well as New York state law.  The constitutional standards

---

the trial record for an assessment of the remedies evidence"); 6/12/13 Defendant's Post-Trial Memorandum of Law at 24–25 (declining to propose remedies).

[35]   *See* 7/8/13 Defendants' Proposed Remedial Relief ("*Ligon* Def. Rem.").

[36]   *See Ligon,* 2013 WL 628534, at *41–44.

include the standards for: what constitutes a stop, when a stop may be conducted, when a frisk may be conducted, and when a search into clothing or into any object found during a search may be conducted.[37]  Although the standards may sometimes require the informed use of discretion, they are not complicated and should be stated in policies and training as clearly and simply as possible.

To summarize: an encounter between a police officer and a civilian constitutes a stop whenever a reasonable person would *not feel free to disregard the officer and walk away*. The threat or use of force is not a necessary or even typical element of stops.  Encounters involving nothing more than commands or accusatory questions can and routinely do rise to the level of stops, provided that the commands and questions would lead a reasonable person to conclude that he was not free to terminate the encounter.[38]

In order to conduct a stop, an officer must have *individualized*, reasonable suspicion that the person stopped has committed, is committing, or is about to commit a crime. The officer must be able to articulate facts establishing a minimal level of *objective* justification

---

[37]    *See* Liability Opinion at Part III.B; *Ligon*, 2013 WL 628534, at *41–42.

[38]    There could be a simple way to ensure that officers do not unintentionally violate the Fourth Amendment rights of pedestrians by approaching them without reasonable suspicion and then inadvertently treating them in such a way that a reasonable person would not feel free to leave.  Officers could, for example, begin *De Bour* Level 1 and 2 encounters by informing the person that he or she is free to leave.  There is no constitutional requirement for officers to inform people that they are free to leave.  *Cf. Ohio v. Robinette*, 519 U.S. 33, 35 (1996) (holding that the Fourth Amendment does not require "that a lawfully seized defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary"); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.").  Nevertheless, the Constitution does not prohibit a police department from adopting this policy or a court from ordering it as a *means* of avoiding unconstitutional stops, where — as here — officers have been incorrectly trained on the definition of a stop.

15

for making the stop, which means more than an inchoate and unparticularized suspicion or hunch. "Furtive movements" are an insufficient basis for a stop or frisk if the officer cannot articulate anything more specific about the suspicious nature of the movement. The same is true of merely being present in a "high crime area." Moreover, no person may be stopped solely because he matches a vague or generalized description — such as young black male 18 to 24 — without further detail or indicia of reliability.

       To proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is *armed and dangerous*. The purpose of a frisk is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. Thus, the frisk must be strictly limited to whatever is necessary to uncover weapons that could harm the officer or others nearby. When an officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity as contraband *immediately apparent*, the officer may seize the contraband. If an officer reasonably suspects that a felt object in the clothing of a suspect is a weapon, then the officer may take whatever action is necessary to examine the object and protect himself, including removing the object from the clothing of the stopped person.

       The erroneous or misleading training materials identified in the Liability Opinion must be corrected, including the Police Student Guide's overbroad definition of "furtive behavior;" the misleading training on "unusual firearms" implying that the presence of a wallet, cell phone, or pen could justify a frisk, or search; the complete lack of training on the constitutional standard for a frisk — reasonable suspicion that a stopped person is "armed and dangerous;" and the failure to include self-initiated stops (which make up 78% of street stops) in

16

the role-playing at Rodman's Neck.[39]  These training reforms will be in addition to those

discussed below in the section of this Opinion relating to *Ligon*.[40]

       *Second*, the NYPD should revise its policies and training regarding racial

profiling to make clear that targeting "the right people" for stops, as described in the Liability

Opinion, is a form of racial profiling and violates the Constitution.[41]  Racially defined groups

may not be targeted for stops in general simply because they appear more frequently in local

crime suspect data.  Race may only be considered where the stop is based on a specific and

reliable suspect description.  When an officer carries out a stop based on reasonable suspicion

that a person fits such a description, the officer may consider the race of the suspect, just as the

officer may consider the suspect's height or hair color.  When a stop is not based on a specific

suspect description, however, race may not be either a motivation or a justification for the stop.

In particular, officers must cease the targeting of young black and Hispanic males for stops

based on the appearance of these groups in crime complaints.  It may also be appropriate to

conduct training for officers on the effect of unconscious racial bias.

       *Third*, it is unclear at this stage whether Operations Order 52 ("OO 52"), which

describes the use of performance objectives to motivate officers, requires revision in order to

bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth

Amendments.  The evidence at trial showed that OO 52's use of "performance goals" created

pressure to carry out stops, without any system for monitoring the constitutionality of those

---

[39]     *See* Liability Opinion at Part IV.C.5.

[40]     *See infra* Part III.

[41]     *See* Liability Opinion at Parts IV.C.3, V.B.1.

stops. However, the use of performance goals in relation to stops may be appropriate, once an effective system for ensuring constitutionality is in place.[42] Because the perspective of police officers and police organizations will be particularly valuable to clarifying the role of performance goals in the reform of stop and frisk, these issues should be addressed as part of the Joint Remedial Process rather than the Immediate Reforms.

Finally, I note that where legitimate uncertainty exists regarding the most efficient means of reform, and the parties have differing views, it may be feasible for the Monitor to test the alternatives by applying them in different precincts and studying the results. In some contexts, the size of the NYPD makes it possible, and desirable, to resolve practical disagreements through the rigorous testing and analysis of alternatives at the precinct level before applying these reforms to the department as a whole.

### b. Changes to Stop and Frisk Documentation

Both the trial record and the Liability Opinion document, in detail, the inadequacy of the NYPD's methods of recording *Terry* stops. The UF-250, used by officers in the field to

---

[42]     Plaintiffs' policing expert Lou Reiter testified that "there are circumstances where productivity goals are consistent with generally accepted [police] practices." 4/24 Tr. at 4917. The City's policing expert, James K. Stewart, testified that performance goals are a necessary part of monitoring and supervision:

> In policing, there are disincentives to engaging in some activities, because they are dangerous, they are in unsterile conditions and chaotic conditions, and the officers may not engage in that but yet spend their time on random patrol. They are not out there doing what the department wants them to do, but they do show up and they show up in uniform. The reason that . . . you have to count the activities is to ensure that those officers do respond . . . to the calls for assistance of help, they do address the community issues . . . .

5/17 Tr. at 7756.

record the basis for stops, is flawed and must be revised.[43]  Officers are also required to record

stop and frisk activity in memo books, otherwise known as activity logs.  Quarterly audits of

these memo book entries have revealed significant deficiencies in record keeping practices in

virtually every precinct throughout the City.[44]  The proper use of activity logs to record stop and

frisk activity must be emphasized in training, as well as enforced through supervision and

discipline.  I first address the UF-250 and then the activity logs.

### i.  UF-250

As described in the Liability Opinion, the current UF-250 consists mainly of

checkboxes that officers can and often do check by rote,[45] thus facilitating post-hoc justifications

for stops where none may have existed at the time of the stop.  The UF-250 must be revised to

include a narrative section where the officer must record, in her own words, the basis for the

stop.  The narrative will enable meaningful supervisory oversight of the officer's decision to

conduct the stop, as well as create a record for a later review of constitutionality.

As an independent monitor of the New Orleans Police Department ("NOPD")

recently noted, "the overwhelming belief of experts [is] that a narrative field in which the

officers describe the circumstances for each stop would be the best way to gather information

that will be used to analyze reasonable suspicion" and, relatedly, "prevent[] racially biased

---

[43]  *See* 5/16 Tr. at 7457 (Walker).

[44]  *See* Pl. Findings ¶ 197 (citing Plaintiffs' Trial Exhibit ("PX") 450; Defendant's Trial Exhibit ("DX") G6).

[45]  *See, e.g.*, Liability Opinion at Part IV.B.2.

policing."[46]  The NOPD monitor noted that the City of Oakland recently revised its data collection system to include "a narrative field in which officers are required to state, in their own words, their basis for having reasonable suspicion for a stop."[47]  The Oakland Police Department added this narrative field "because it was the best way to evaluate whether individual officers possessed the requisite reasonable suspicion for a *Terry* stop."[48]  The Philadelphia Police Department has also included a narrative field in its stop form.[49]  Similarly, Professor Walker, a nationally recognized authority on police accountability, opined that a form for recording stops must contain a sufficiently detailed narrative that a reviewer can determine from the narrative alone whether the stop was based on reasonable suspicion.[50]

The UF-250 should also be revised to require a separate explanation of why a pat-down, frisk, or search was performed.  The evidence at trial revealed that people were routinely subjected to these intrusions when no objective facts supported reasonable suspicion that they were armed and dangerous.  It is apparent that some officers consider frisks to be a routine part of a stop.  Because this misconception is contrary to law, the revised UF-250 should include a separate section requiring officers to explain why the stopped person was suspected of being

---

[46]     SUSAN HUTSON, INDEPENDENT POLICE MONITOR, REVIEW OF THE NEW ORLEANS POLICE DEPARTMENT'S FIELD INTERVIEW POLICIES, PRACTICES, AND DATA: FINAL REPORT 45 (Mar. 12, 2013) (footnote omitted).

[47]     *Id.* at 46.

[48]     *Id.*

[49]     *See id.*

[50]     *See* 5/16 Tr. at 7456–7458 (Walker).  Professor Walker testified that a description of reasonable suspicion for a stop will generally require no more than three lines of text.  *See id.* at 7458.

armed and dangerous.

Furthermore, both the DOJ and plaintiffs recommend that the UF-250 contain a tear-off portion stating the reason for the stop, which can be given to each stopped person at the end of the encounter.[51]  A 2007 RAND report, commissioned by the NYPD, similarly recommended that "[f]or a trial period in select precincts, the NYPD could require that officers give an information card to those stopped pedestrians who are neither arrested nor issued a summons."[52]  Any form or card given to stopped persons should provide the stated reasons for the stop, the badge numbers of the stopping officers, and information on how to file a complaint.

Finally, the UF-250 should be revised to simplify and improve the checkbox system used to indicate common stop justifications.   It may also be necessary to reduce the number of "stop factor" boxes in order to permit easier analyses of patterns in the constitutionality of stops.[53]

In addition to changing the UF-250, officers should be further trained in its use. As discussed in the Liability Opinion, some officers check certain boxes (or combinations of boxes) reflexively as part of "scripts," including "Furtive Movements" and "Area Has High

---

[51]     *See* Pl. Rem. Br. at 19 (citing Deborah Ramirez, Jack McDevitt & Amy Farrell, *A Resource Guide on Racial Profiling Data Collection Systems: Promising Practices and Lessons Learned* 38 (United States Department of Justice 2000), and noting that a tear-off form has been used in Great Britain for more than a decade).

[52]     GREG RIDGEWAY, RAND, ANALYSIS OF RACIAL DISPARITIES IN THE NEW YORK POLICE DEPARTMENT'S STOP, QUESTION, AND FRISK PRACTICES 44 (2007), DX K6.

[53]     *See* Report of Jeffrey Fagan, Ph.D. (Oct. 15, 2010), PX 411 ("Fagan Rpt.") at 49 (describing the analytical difficulties created by the number of possible combinations of stop factors and suspected crimes).

Incidence of Reported Offense of Type Under Investigation."[54]  Officers must understand that if

a stop is based on these factors, the officer must provide additional detail in the narrative field —

for example, what was the specific nature of the furtive movement, and why was it suspicious?

What was the geographic scope of the "high crime area," and what was the officer's specific

basis for believing it has a high incidence of the suspected crime?

### ii.  Activity Logs

All uniformed officers are required to provide narrative descriptions of stops in

their activity logs whenever a UF-250 is prepared.[55]  In practice, this does not take place.

Evidence at trial showed that throughout the class period, officers consistently failed to record

stops in their logs, or provided insufficient detail for a supervisor to meaningfully review the

constitutionality of the stop.  This problem is best addressed through training, supervision, and

monitoring.[56]

---

[54]  Suspicious Bulge is another factor — albeit less often used than Furtive Movements and High Crime Area — that should require greater specificity or a narrative description.

[55]  *See* Operations Order 44 (9/11/08), PX 96.  In addition, the Chief of Patrol recently directed all officers in the patrol borough to include nine categories of information in every activity log entry for a stop.  The categories include: the date, time and location of the stop; the name and pedigree of the person stopped; the suspected felony or penal law misdemeanor; an explanation of the suspicion that led to the stop (such as "*looking into windows*," or "*pulling on doorknobs*"); whether the suspect was frisked; the sprint or job number, if applicable; and the disposition of the stop.  The Chief of Patrol's memo also requires officers to elaborate the basis for a stop in the "Additional Circumstances/Factors" section of the UF-250, to photocopy every activity log entry for a stop, and to attach the photocopy to the UF-250 before submitting it to a supervisor.  *See* DX J13.

[56]  *See infra* Part II.B.2.c.  I recognize the risk of inefficiency if officers record the same information on UF-250s and in their activity logs.  Professor Walker argued in favor of requiring both, but also expressed concerns regarding inefficiencies.  *See* 5/16 Tr. at 7458, 7480.  If the parties can agree upon an improved procedure during the Joint Remedial Process described below, those improvements can be included in the Joint Process Reforms.

### iii.     Specific Relief Ordered

The NYPD, with the assistance of the Monitor, is directed to revise the UF-250 to address the criticisms expressed in the Liability Opinion and the direction given in this Opinion, and to provide training with respect to the new form. The NYPD is further ordered, again with the assistance of the Monitor, to ensure that activity logs are completed with the required specificity, and to implement measures to adequately discipline officers who fail to comply with these requirements.

### c.     Changes to Supervision, Monitoring, and Discipline

An essential aspect of the Joint Process Reforms will be the development of an improved system for monitoring, supervision, and discipline. Professor Walker testified that comprehensive reforms may be necessary to ensure the constitutionality of stops, including revisions to written policies and training materials, improved documentation of stops and frisks, direct supervision and review of stop documentation by sergeants, indirect supervision and review by more senior supervisors and managers, improved citizen complaint procedures, improved disciplinary procedures, department-wide audits, and perhaps even an early intervention system based on a centralized source of information regarding officer misconduct. According to Professor Walker, "[a] comprehensive approach is absolutely essential, because if any one of the components is absent or weak and ineffective, the entire accountability system begins to collapse."[57]

---

[57]     5/15 Tr. at 7440. The National Institute of Justice, which the City's policing expert, James K. Stewart, directed from 1982 to 1990, notes that "the management and culture of a department are the most important factors influencing police behavior." National Institute of Justice, *Police Integrity*, *available at* http://www.nij.gov/topics/law-enforcement/legitimacy/integrity.htm#note2. Ultimately, ending unconstitutionality in stop and frisk may require changing the culture of the NYPD so that officials and officers view their

In light of the complexity of the supervision, monitoring, and disciplinary reforms that will be required to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments, it may be appropriate to incorporate these reforms into the Joint Remedial Process negotiations described below.  However, to the extent that the Monitor can work with the parties to develop reforms that can be implemented immediately, the Monitor is encouraged to include those reforms in the proposed Immediate Reforms.

For example, based on the findings in the Liability Opinion, there is an urgent need for the NYPD to institute policies specifically requiring sergeants who witness, review, or discuss stops to address not only the effectiveness but also the *constitutionality* of those stops, and to do so in a thorough and comprehensive manner.[58]  To the extent that Integrity Control Officers witness or review stops, they too must be instructed to review for constitutionality.[59]  The Department Advocate's Office must improve its procedures for imposing discipline in response to the Civilian Complaint Review Board's ("CCRB") findings of substantiated misconduct during stops.  This improvement must include increased deference to credibility determinations by the CCRB, an evidentiary standard that is neutral between the claims of complainants and officers, and no general requirement of corroborating physical evidence.  Finally, the Office of the Chief of Department must begin tracking and investigating complaints

---

purpose not only as policing effectively, but policing constitutionally as well.  If so, the NIJ's first recommendation for improving the integrity of a department is to "[a]ddress and discipline minor offenses so officers learn that major offenses will be disciplined too."  *Id.*

[58]     *See* Liability Opinion at Part IV.C.4.b.

[59]     *See id.*

it receives related to racial profiling.[60]

### d.    FINEST Message

As soon as practicable, the NYPD should transmit a FINEST message explaining the outcome of the *Floyd* litigation and the need for the reforms described above.[61]  The FINEST message should summarize in simple and clear terms the basic constitutional standards governing stop and frisk, the constitutional standard prohibiting racial profiling, and the relation between these standards and New York state law.  The message should order all NYPD personnel to comply immediately with those standards.

### 3.    Body-Worn Cameras

The subject of police officers wearing "body-worn cameras" was inadvertently raised during the testimony of the City's policing expert, James K. Stewart.  The following discussion took place:

> A. . . . But what happens is the departments a lot of times may not have . . . expertise and they may need some technical assistance like body worn cameras is an example and how much technology and where you store the information and stuff like that.  They may not have it.  And there may be other issues like psychological ideas about —
> THE COURT: What do you think of body worn cameras?
> THE WITNESS: I think it's a good idea.  We recommended it in Las Vegas.  And we're doing it in Phoenix as well.
> THE COURT: Thank you.
> . . .
> A. But I have no opinion in this case with respect to body worn cameras.[62]

---

[60]    *See id.* at Part IV.C.6.

[61]    The NYPD's "FINEST" messaging system allows the transmission of legal directives to the NYPD's commands.  *See, e.g.*, 5/10/12 Finest Message Regarding Taxi/Livery Robbery Inspection Program, Ex. 1 to 7/24/13 Plaintiffs' Brief Concerning Defendants' Remedial Proposals ("*Ligon* Pl. Rem.").

[62]    5/17 Tr. at 7817–7818.

The use of body-worn cameras by NYPD officers would address a number of the issues raised in the Liability Opinion. In evaluating the constitutionality of individual stops, I explained the difficulty of judging in hindsight what happened during an encounter between a civilian and the police.[63] The only contemporaneous records of the stops in this case were UF-250s and short memo book entries — which were sometimes not prepared directly after a stop, and which are inherently one-sided. Thus, I was forced to analyze the constitutionality of the stops based on testimony given years after the encounter, at a time when the participants' memories were likely colored by their interest in the outcome of the case and the passage of time. The NYPD's duty to monitor stop and frisk activity is similarly hamstrung by supervisors' inability to review an objective representation of what occurred.[64]

Video recordings will serve a variety of useful functions. *First*, they will provide a contemporaneous, objective record of stops and frisks, allowing for the review of officer conduct by supervisors and the courts. The recordings may either confirm or refute the belief of some minorities that they have been stopped simply as a result of their race, or based on the clothes they wore, such as baggy pants or a hoodie.[65] *Second*, the knowledge that an exchange is being recorded will encourage lawful and respectful interactions on the part of both parties.[66] *Third*, the recordings will diminish the sense on the part of those who file complaints that it is

---

[63]     *See* Liability Opinion at Part IV.D.

[64]     *See id.* at Part IV.C.4.

[65]     By creating an irrefutable record of what occurred during stops, video recordings may help lay to rest disagreements that would otherwise remain unresolved.

[66]     If, in fact, the police do, on occasion, use offensive language — including racial slurs — or act with more force than necessary, the use of body-worn cameras will inevitably reduce such behavior.

their word against the police, and that the authorities are more likely to believe the police.[67]
Thus, the recordings should also alleviate some of the mistrust that has developed between the
police and the black and Hispanic communities, based on the belief that stops and frisks are
overwhelmingly and unjustifiably directed at members of these communities. Video recordings
will be equally helpful to members of the NYPD who are wrongly accused of inappropriate
behavior.

   Because body-worn cameras are uniquely suited to addressing the constitutional
harms at issue in this case, I am ordering the NYPD to institute a pilot project in which body-
worn cameras will be worn for a one-year period by officers on patrol in one precinct per
borough — specifically the precinct with the highest number of stops during 2012. The Monitor
will establish procedures for the review of stop recordings by supervisors and, as appropriate,
more senior managers. The Monitor will also establish procedures for the preservation of stop
recordings for use in verifying complaints in a manner that protects the privacy of those stopped.
Finally, the Monitor will establish procedures for measuring the effectiveness of body-worn
cameras in reducing unconstitutional stops and frisks. At the end of the year, the Monitor will
work with the parties to determine whether the benefits of the cameras outweigh their financial,
administrative, and other costs, and whether the program should be terminated or expanded. The
City will be responsible for the costs of the pilot project.

   It would have been preferable for this remedy to have originated with the NYPD,
which has been a leader and innovator in the application of technology to policing, as Compstat
illustrates. Nevertheless, there is reason to hope that not only civilians but also officers will

---

[67]  *See* Liability Opinion at Part IV.C.6.

benefit from the use of cameras.  When a small police department in Rialto, California

introduced body-worn cameras, "[t]he results from the first 12 months [were] striking.  Even

with only half of the 54 uniformed patrol officers wearing cameras at any given time, the

department over all had an 88 percent decline in the number of complaints filed against officers,

compared with the 12 months before the study."[68]  While the logistical difficulties of using body-

worn cameras will be greater in a larger police force, the potential for avoiding constitutional

violations will be greater as well.

       **4.**       **Joint Remedial Process for Developing Supplemental Reforms**

       A community input component is increasingly common in consent decrees and

settlements directed at police reform.[69]  The DOJ has recognized the importance of community

input in its recent consent decrees and other agreements with police departments.[70]  The

landmark Collaborative Agreement approved in 2002 by Judge Susan J. Dlott of the Southern

District of Ohio as the settlement of class claims against the Cincinnati Police Department has

been widely recognized as a successful model for other police reform.[71]

       Although the remedies in this Opinion are not issued on consent and do not arise

---

[68]     Randall Stross, *Wearing a Badge, and a Video Camera*, N.Y. TIMES, Apr. 7, 2013, at BU4.

[69]     *See* 5/16 Tr. at 7521 (Walker).

[70]     *See* Memorandum of Law in Support of Plaintiffs' Request for Injunctive Relief ("Pl. Inj. Mem.") at 15 (collecting agreements).

[71]     *See In re Cincinnati Policing*, 209 F.R.D. 395, 397 (S.D. Ohio 2002) (discussing development of Collaborative Agreement through a collaborative procedure); *Tyehimba v. City of Cincinnati*, No. C-1-99-317, 2001 WL 1842470 (S.D. Ohio May 3, 2001) ("Order Establishing Collaborative Procedure"); Pl. Inj. Mem. at 14; GREG RIDGEWAY ET AL., POLICE-COMMUNITY RELATIONS IN CINCINNATI (2009).

from a settlement, community input is perhaps an even more vital part of a sustainable remedy in this case. The communities most affected by the NYPD's use of stop and frisk have a distinct perspective that is highly relevant to crafting effective reforms. No amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety.

It is important that a wide array of stakeholders be offered the opportunity to be heard in the reform process: members of the communities where stops most often take place; representatives of religious, advocacy, and grassroots organizations; NYPD personnel and representatives of police organizations; the District Attorneys' offices; the CCRB; representatives of groups concerned with public schooling, public housing, and other local institutions; local elected officials and community leaders; representatives of the parties, such as the Mayor's office, the NYPD, and the lawyers in this case; and the non-parties that submitted briefs: the Civil Rights Division of the DOJ, Communities United for Police Reform, and the Black, Latino, and Asian Caucus of the New York City Council.

If the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful.[72] Neither an independent Monitor, nor a municipal administration, nor this Court can speak for those who have been and will be most affected by the NYPD's use of stop and frisk.[73] The 2007 RAND report, relied on by the City at

---

[72]    *Cf.* 5/16 Tr. at 7522 (Professor Walker discussing the legitimacy of reforms). As a general matter, police departments "depend upon public confidence, public trust, and public cooperation." *Id.* at 7520. This principle applies no less in the context of stop and frisk.

[73]    *Cf. United States v. City of Los Angeles*, 288 F.3d 391, 404 (9th Cir. 2002) (remanding to the district court for a hearing on the permissive intervention of community groups in a DOJ lawsuit against the Los Angeles Police Department, and emphasizing the importance of not "marginalizing those . . . who have some of the strongest interests in the

trial, recognized the importance of "ongoing communication and negotiation with the community about [stop and frisk] activities" to "maintaining good police-community relations."[74] It is surely in everyone's interest to prevent another round of protests, litigation, and divisive public conflicts over stop and frisk.

Drawing on this Court's broad equitable powers to remedy the wrongs in this case,[75] I am ordering that all parties participate in a joint remedial process, under the guidance of a Facilitator to be named by the Court. I hereby order the following specific relief:

1.   All parties shall participate in the Joint Remedial Process for a period of six to nine months to develop proposed remedial measures (the "Joint Process Reforms") that will supplement the Immediate Reforms discussed above. The Joint Process Reforms must be no broader than necessary to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments.

2.   The Joint Remedial Process will be guided by the Facilitator, with such assistance as the Facilitator deems necessary and in consultation with the Monitor.

3.   The initial responsibility of the Facilitator will be to work with the parties to develop a time line, ground rules, and concrete milestones for the Joint Remedial Process. The Cincinnati Collaborative Procedure and subsequent DOJ consent decrees and letters of

_____

outcome").

[74]   RAND Report at 44.

[75]   The equitable power of district courts to order processes involving community input is well-established. *See, e.g.*, *United States v. Yonkers Bd. of Educ.*, 635 F. Supp. 1538, 1545 (S.D.N.Y. 1986), *aff'd*, 837 F.2d 1181 (2d Cir. 1987) (ordering the Yonkers public school system to organize "community meetings with minority groups and organizations to solicit support and assistance in the dissemination of magnet program availability"); Pl. Inj. Mem. at 11–13 (collecting cases and scholarship).

intent may be used as models.[76]

4.    At the center of the Joint Remedial Process will be input from those who are most

affected by the NYPD's use of stop and frisk, including but not limited to the people and

organizations noted above.  Input from academic and other experts in police practices

may also be requested.

5.    The Facilitator will convene "town hall" type meetings in each of the five boroughs in

order to provide a forum in which all stakeholders may be heard.  It may be necessary to

hold multiple meetings in the larger boroughs in order to ensure that everyone will have

an opportunity to participate.  The Facilitator will endeavor to prepare an agenda for such

meetings, through consultation with the various interested groups prior to the meeting.

The Monitor will also attend these meetings to the extent possible.

6.    The NYPD will appoint a representative or representatives to serve as a liaison to the

Facilitator during the Joint Remedial Process.

7.    The Facilitator may receive anonymous information from NYPD officers or officials,

subject to procedures to be determined by the parties.

8.    When the parties and the Facilitator have finished drafting the Joint Process Reforms,

they will be submitted to the Court and the Monitor.  The Monitor will recommend that

the Court consider those Reforms he deems appropriate, and will then oversee their

implementation once approved by the Court.

---

[76]      *See Tyehimba*, 2001 WL 1842470; Pl. Inj. Mem. at 15.  In the interests of
conserving resources and speeding the development of the Joint Process Reforms, the Joint
Remedial Process will not involve the development of an independent analysis by a panel of paid
experts, as proposed by plaintiffs in Pl. Inj. Mem. at 10.  The participants in the Joint Remedial
Process may rely on any sources of facts deemed useful by the Facilitator, including this Court's
findings in the Liability Opinion.

9.      In the event that the parties are unable to agree on Joint Process Reforms, the Facilitator

will prepare a report stating the Facilitator's findings and recommendations based on the

Joint Remedial Process, to be submitted to the parties, the Monitor, and the Court.  The

parties will have the opportunity to comment on the report and recommendations.

10.     The City will be responsible for the reasonable costs and fees of the Facilitator and the

Joint Remedial Process.

## III.    REMEDIES IN *LIGON*

In a January 8, 2013 Opinion and Order, amended on February 14, 2013, I

granted the *Ligon* plaintiffs' motion for a preliminary injunction, and proposed entering several

forms of preliminary relief.[77]  I postponed ordering that relief until after a consolidated remedies

hearing could be held in *Ligon* and *Floyd*.[78]  That hearing has now concluded.  The defendants in

*Ligon* have submitted drafts of the documents discussed in the proposed relief section of the

February 14 Opinion, the *Ligon* plaintiffs have proposed revisions to those drafts, and the

defendants have responded to the proposed revisions.[79]

Having reviewed the parties' submissions, I am now imposing the final order of

preliminary injunctive relief in *Ligon*.  The reasons for the ordered relief, which must be stated

pursuant to Federal Rule of Civil Procedure 65(d)(1)(A), are the reasons stated in the February

---

[77]      *See Ligon*, 2013 WL 628534, at *41–44; *Ligon v. City of New York*, No. 12 Civ. 2274, 2013 WL 227654 (S.D.N.Y. Jan. 22, 2013) (staying the sole immediate relief ordered in the January 8 Opinion).

[78]      *See Ligon*, 2013 WL 628534, at *42.

[79]      *See* 7/8/13 Defendants' Proposed Remedial Relief ("*Ligon* Def. Rem."); *Ligon* Pl. Rem.; 8/2/13 Defendants' Reply Memorandum of Proposed Remedial Relief ("*Ligon* Def. Reply").

14 Opinion.

As set forth in the February 14 Opinion, the relief falls into four categories: policies and procedures; supervision; training; and attorney's fees.  Attorney's fees and costs will be rewarded as appropriate on application.  With regard to policies and procedures, I am ordering the proposed relief from the February 14 Opinion as elaborated below.

With regard to the remaining two categories of relief — supervision and training — I am ordering the proposed relief from the February 14 Opinion, as restated below, and I am also appointing the Monitor from *Floyd*, Mr. Zimroth, to oversee the detailed implementation of these orders.  I am delegating the oversight of the *Ligon* remedies regarding supervision and training to the Monitor because there is substantial overlap between these remedies and the injunctive relief concerning supervision and training in *Floyd*.  For example, both sets of remedies will require alterations to supervisory procedures for reviewing stops, as well as the revision of the NYPD Legal Bureau's slide show at Rodman's Neck.

The purpose of consolidating the remedies hearings in *Ligon* and *Floyd* was to avoid inefficiencies, redundancies, and inconsistencies in the remedies process.[80]  This purpose can best be fulfilled by placing both the preliminary injunctive relief in *Ligon* and the permanent injunctive relief in *Floyd* under the direction and supervision of the Monitor.

For the foregoing reasons, the Monitor is directed to oversee the City's compliance with the following orders.

A.    **Policies and Procedures**

*First*, as proposed in the February 14 Opinion, the NYPD is ordered to adopt a

---

[80]    *Ligon*, 2013 WL 227654, at *4.

33

formal written policy specifying the limited circumstances in which it is legally permissible to
stop a person outside a TAP building on a suspicion of trespass. Specifically, the NYPD is
ordered to amend Interim Order 22 of 2012 ("IO 22") by deleting the paragraph labeled "NOTE"
on page 2 of IO 22,[81] and inserting the following paragraphs in its place:

> *A uniformed member of the service may approach and ask questions of a
> person (that is, conduct a Level 1 request for information under DeBour) if
> the uniformed member has an objective credible reason to do so. However,
> mere presence in or outside a building enrolled in the Trespass Affidavit
> Program is not an "objective credible reason" to approach. A uniformed
> member of the service may not approach a person merely because the person
> has entered or exited or is present near a building enrolled in the Trespass
> Affidavit Program.*

> *Under the Fourth Amendment to the United States Constitution, a person is
> stopped (temporarily detained) if under the circumstances a reasonable
> person would not feel free to disregard the police and walk away. A
> uniformed member of the service may not stop a person on suspicion of
> trespass unless the uniformed member reasonably suspects that the person
> was in or is in the building without authorization.*

> *Mere presence near, entry into, or exit out of a building enrolled in the
> Trespass Affidavit Program, without more, is not sufficient to establish
> reasonable suspicion for a stop on suspicion of trespass.*

The NYPD is ordered to draft a FINEST message explaining the revisions to IO
22 and the need for those revisions. The FINEST message attached as Exhibit 1 to the *Ligon*
Plaintiffs' Brief Concerning Defendants' Remedial Proposals will serve as a model. The draft
will be provided to the Monitor and then to the Court for approval prior to transmission, with a
copy to plaintiffs' counsel.

**B.     Remaining Relief**

The Monitor is directed to oversee the City's compliance with the remaining

---

[81]     *See* Exhibit A to *Ligon* Def. Rem.

orders discussed below.  Plaintiffs do not object to many of the draft revisions submitted by the City in response to the proposed orders.[82]  Where the parties disagree, the Monitor is authorized to resolve the dispute by submitting a proposed order for the Court's approval.

As a model for resolving the parties' disputes, the Monitor may use this Court's revision of IO 22, as presented above.[83]  In arriving at a compromise between the parties' proposed language, I aimed to articulate the relevant legal standards as *simply* and *clearly* as possible.  The goal must be to communicate the law to officers in a way that will be understood, remembered, and followed.  In general, plaintiffs' proposed revisions to the City's draft materials make the achievement of this goal more likely.[84]  I note that the Monitor may depart from the City's draft materials even when they do not contain legally erroneous language, if doing so would decrease the likelihood of constitutional violations.

### 1.  Supervision

*First*, the City is ordered to develop procedures for ensuring that UF-250s are completed for *every* trespass stop outside a TAP building in the Bronx.  A "stop" is defined as any police encounter in which a reasonable person would not feel free to terminate the encounter.

*Second*, the City is ordered to develop and implement a system for reviewing the constitutionality of stops outside TAP buildings in the Bronx.  Needless to say, any system

---

[82]  *See Ligon* Def. Rem. at Exs. B–F; *Ligon* Pl. Rem. at 4–16.

[83]  For the materials used in drafting the Court's revision, see *Ligon* Def. Rem. at Ex. A; *Ligon* Pl. Rem. at 1–4; *Ligon* Def. Reply at 2–4.

[84]  *See, e.g.*, *Ligon* Pl. Rem. at 7–8 (proposing revisions to the City's draft slide show for officer training at Rodman's Neck to emphasize the "free to leave" standard, where confusion might otherwise arise).

developed must not conflict with the supervisory reforms ordered in *Floyd*. To the extent that supervisory review reveals that a stop has not conformed with the revised version of IO 22 described above, the supervisor will ensure that the officer has a proper understanding of what constitutes a stop and when it is legitimate to make a stop. Copies of all reviewed UF-250s shall be provided to plaintiffs' counsel.

### 2.    Training

The City is ordered to revise the NYPD's training materials and training programs to conform with the law as set forth in the February 14 Opinion. The instruction must be sufficient to uproot the longstanding misconceptions that have affected stops outside of TAP buildings in the Bronx. It must include, but need not be limited to, the following reforms: (1) The revised version of IO 22 described above must be distributed to each Bronx NYPD member, and then redistributed two additional times at six-month intervals. (2) The stop and frisk refresher course at Rodman's Neck must be altered to incorporate instruction specifically targeting the problem of unconstitutional trespass stops *outside* TAP buildings. Training regarding stops outside TAP buildings must also be provided to new recruits, as well as any officers who have already attended the Rodman's Neck refresher course and are not scheduled to do so again. (3) Chapter 16 of the Chief of Patrol Field Training Guide must be revised to reflect the formal written policy governing trespass stops outside TAP buildings described above. (4) SQF Training Video No. 5 must be revised to conform with the law set forth in the February 14 Opinion and must be coordinated with the relief ordered in *Floyd*. The revised video must state that the information contained in the earlier video was incorrect and explain why it was incorrect.

36

## IV.   CONCLUSION

The defendant in *Floyd* and the defendants in *Ligon* are ordered to comply with the remedial orders described above.  The Clerk of the Court is directed to close the *Ligon* defendants' motion regarding proposed remedies. [No. 12 Civ. 2274, Dkt. No. 112]

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:         August 12, 2013
               New York, New York

- Appearances -

**For *Ligon* Plaintiffs:**

Christopher Dunn, Esq.
Alexis Karteron, Esq.
Taylor Pendergrass, Esq.
Daniel Mullkoff, Esq.
New York Civil Liberties Union
125 Broad Street, 19th floor
New York, NY 10004
(212) 607-3300

Mariana Kovel, Esq.
The Bronx Defenders
860 Courtlandt Avenue
Bronx, NY 10451
(718) 508-3421

Juan Cartagena, Esq.
Foster Maer, Esq.
Roberto Concepcion, Jr., Esq.
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 219-3360

John A. Nathanson, Esq.
Tiana Peterson, Esq.
Mayer Grashin, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-5222

**For *Floyd* Plaintiffs:**

Darius Charney, Esq.
Sunita Patel, Esq.
Baher Azmy, Esq.
Rachel Lopez, Esq.
Ghita Schwarz, Esq.
Chauniqua Young, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6439

Philip I. Irwin, Esq.
Eric Hellerman, Esq.
Gretchen Hoff Varner, Esq.
Kasey Martini, Esq.
Bruce Corey, Jr., Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1000

Jonathan Moore, Esq.
Jenn Rolnick Borchetta, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, NY 10016
(212) 490-0900

**For *Ligon* and *Floyd* Defendants:**

Brenda Cooke
Linda Donahue
Heidi Grossman
Morgan Kunz
Joseph Marutollo
Suzanna Publicker
Lisa Richardson
Cecilia Silver
Judson Vickers
Richard Weingarten
Mark Zuckerman
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, NY 10007
(212) 788-1300

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>DAVID FLOYD, <em>et al.</em>,</td><td></td></tr>
<tr><td style="text-align:center">Plaintiffs,</td><td></td></tr>
<tr><td style="text-align:center">-against-</td><td></td></tr>
<tr><td>CITY OF NEW YORK,</td><td></td></tr>
<tr><td style="text-align:center">Defendant.</td><td></td></tr>
</table>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___7/30/2014___

**ORDER MODIFYING**
**REMEDIAL ORDER**

08 Civ. 1034 (AT)

JAENEAN LIGON, *et al.*,

                    Plaintiffs,

             -against-

CITY OF NEW YORK, *et al.*,

                    Defendants.

12 Civ. 2274 (AT)

ANALISA TORRES, District Judge:

For the reasons stated in an Opinion and Order of even date, and pursuant to the directive

of the United States Court of Appeals for the Second Circuit to "effectuate a settlement,"

Mandate and Opinion, (Feb. 21, 2014), *Floyd*, ECF No. 426; *Ligon*, ECF No. 166,[1]

IT IS ORDERED that paragraph 12 on page 13 of the Remedial Order, *Floyd*, ECF No.

372; *Ligon*, ECF No. 120,[2]  is deleted and the following is substituted in its place:

12.      a.  The Monitor's position will come to an end in *Floyd* no sooner than
three years after the Court's entry of the final order approving the Immediate
Reforms to be developed in *Floyd* and if and only if the City can show by a
preponderance of the evidence at that time that it has achieved substantial
compliance with all of the Immediate and Joint Process Reforms to be approved
and so-ordered by the Court in *Floyd*.  If the City fails to make such showing, the
Monitor's position will continue until such time as the City can make the required
showing of substantial compliance.

---

[1] Published as *Ligon v. City of New York*, 743 F.3d 362 (2d Cir. 2014).
[2] Published as *Floyd v. City of New York*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013).

b.  The Monitor's position with respect to the preliminary injunctive relief in *Ligon* will come to an end no sooner than three years after the Court's entry of the final order approving the preliminary injunctive relief set forth in Section III of this Order, entitled "Remedies in *Ligon*" (the "*Ligon* Preliminary Injunctive Relief") and if and only if the City can show by a preponderance of the evidence at that time that it has achieved substantial compliance with all of the *Ligon* Preliminary Injunctive Relief.  If the City fails to make such showing, the Monitor's position will continue until such time as the City can make the required showing of substantial compliance.

c.  "Substantial compliance" in *Floyd* shall be defined as compliance with all material aspects of the Immediate and Joint Process Reforms to be approved and so-ordered by the Court.  "Substantial compliance" in *Ligon* shall be defined as compliance with all material aspects of the *Ligon* Preliminary Injunctive Relief. In either case, noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance will not constitute a failure of substantial compliance.  However, temporary compliance during a period of otherwise sustained non-compliance shall not constitute substantial compliance.

d.  Substantial compliance shall be measured using the milestones to be set by the Monitor pursuant to paragraph 5 above.

The Clerk of Court shall terminate the motions at ECF No. 456 in *Floyd* and ECF No. 188 in *Ligon*.

SO ORDERED.

Dated:  July 30, 2014
New York, New York

_____
ANALISA TORRES
United States District Judge

2

# REVISED EXHIBIT C

# PATROL GUIDE

| Section: Command Operations | Procedure No: 212-60 |
|---|---|

## INTERIOR PATROL OF HOUSING AUTHORITY BUILDINGS

| DATE ISSUED: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: 1 of 6 |
|---|---|---|---|

**PURPOSE**  To assist the Housing Authority in enforcing its rules, limiting criminal activity, providing a safe and secure environment and ensuring the habitability of its residential buildings by performing interior patrols (also sometimes referred to as "vertical patrols") in a manner that respects the rights of Housing Authority residents and guests.

**PROCEDURE**  Uniformed members of the service shall frequently inspect the interior of Housing Authority buildings on assigned posts as follows:

**UNIFORMED MEMBER OF THE SERVICE**

1. Notify Communications Section, utilizing radio code 10-75I, and make an **ACTIVITY LOG (PD112-145)** entry of the time and street address upon entering the building.
2. Notify Video Interactive Patrol Enhanced Response (VIPER) unit by radio, if VIPER cameras present.

**VIPER UNIT MEMBER**

3. Advise uniformed member of conditions that:
   a. Require attention.
   b. Significantly affect safety.
4. Provide ongoing assistance to uniformed member of the service performing interior patrol.

**UNIFORMED MEMBER OF THE SERVICE**

5. Inspect front, rear and other exterior doors, mailboxes and the interior of the lobby.
   a. Prepare a **FIELD REPORT (PD313-1511)** and notify the Housing Authority, in accordance with the procedure set forth in *P.G. 207-29, "Field Reports,"* regarding any damaged or defective lobby door or door lock that compromises the security of the building, damaged or defective intercom system, or any other condition that potentially compromises the safety or security of the building, its residents or other authorized visitors.
6. Inspect elevators and ascertain if they are operable.
   a. Notify Housing Authority Emergency Service Department maintenance personnel of inoperable elevators.
7. Proceed to top floor of building by elevator, if operable, otherwise by using the stairs.
   a. Use staircase to gain access to the roof of the building.
8. Conduct inspection of roof, roof landing, elevator rooms, and any other installations.
   a. Prepare a **FIELD REPORT (PD313-1511)** regarding any missing or defective signs that designate restricted areas and prohibit entry in those restricted areas, and/or any missing alarms to restricted areas.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-60 | | | 2 of 6 |

9. Patrol each floor, staircase and hallway within the building from the top floor to the ground floor.
10. Inspect elevator doors on each floor, taking immediate action when necessary.
   a. Notify Housing Authority Emergency Service Department or NYPD Emergency Service Unit personnel immediately and remain at scene and secure location until unsafe condition has been corrected if:
      (1) Elevator door glass is missing
      (2) Outer elevator door opens when elevator is not present
      (3) Any other dangerous condition concerning elevators exists.
11. Inspect all accessible basement areas.
12. Prepare a **FIELD REPORT (PD313-1511)** for any defective building conditions or missing or defective signs.
13. Be alert for persons who may be violating Housing Authority rules and regulations, including potentially unauthorized persons within NYCHA property.
14. Upon encountering persons who are violating a Housing Authority rules, take appropriate police action pursuant to *P.G. 207-29, "Field Reports,"* unless there is a basis for criminal enforcement.
   a. Officers may not conduct a reasonable suspicion stop pursuant to P.G. 212-11 "Stop and Frisk" or arrest any person for a violation of Housing Authority rules, unless the rule violation is also a criminal offense. Mere lingering in a common area, without more, is not a criminal offense for which a person may be stopped or arrested. However, an officer's observation of a violation of any Housing Authority rule, regardless of whether it is also a criminal offense, may, at a minimum, provide an officer with a credible reason to approach the person to inquire further and thereafter complete a Field Report.
   b. A person is stopped, or temporarily detained, if a reasonable person under the facts and circumstances presented would feel that he or she is not free to disregard the police and continue on their way.

*NOTE*     *All officer inquiries, interactions, and enforcement activities in Housing Authority buildings must be conducted with the courtesy, professionalism, and respect to which all persons are entitled in their own homes.*

15. Be alert for persons who may be engaged in criminal activity (including potential trespassers), based on observed behavior or other credible information, and upon encountering such persons:
   a. Approach the person(s) and ask:
      (1) If he or she lives in the building
      (2) If he or she is visiting someone in the building
      (3) If he or she has business in the building.
   b. Take reasonable measures to verify the person's authorization to be in

# NEW • YORK • CITY • POLICE • DEPARTMENT

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-60 | | | 3 of 6 |

the building, including but not limited to:

(1)    Inspecting, and returning, identification; and/or

(2)    Requesting a key to the building entrance doors or apartment door; and/or

(3)    Requesting the apartment number where the person resides; and/or

(4)    Requesting the name or apartment number of the person being visited.

c.    Reasonable suspicion is required to detain a person.  The person questioned is under no legal obligation to answer the officer's questions and is free to leave the building unless the officer has reasonable suspicion to believe that the person has committed, is committing, or is about to commit a Penal Law felony or misdemeanor.

d.    Probable cause is required to make an arrest for trespass.  If unable to determine whether the person is authorized to be in the building, the officer may instruct the person that he or she must leave the building, and that a refusal to comply may result in an arrest for trespass.  If the officer remains unable to determine whether the person is authorized to be in the building, and the person refuses to exit the building, the officer may arrest the person for trespass.

NOTE        *Mere presence near, entry into or exit out of a Housing Authority building, without more, is not sufficient to establish reasonable suspicion for a stop on suspicion of trespass nor is it an objective credible reason to approach and question any person.*

*A person's silence or refusal to provide information or identification when questioned by the police does not support reasonable suspicion to stop or probable cause to arrest.*

16.    Restricted Areas:

a.    Restricted areas are limited to those areas specifically designated as restricted by Housing Authority Rules and Regulations.

b.    Do not arrest a person on the basis of trespassing in a restricted area of a building – including the roof, roof landing or boiler room – in the absence of conspicuously posted rules, unless the officer knows or has other credible information that the person knows that their presence in the restricted area is prohibited (*e.g.* the officer knows that the person has been previously found in that same type of restricted area of a Housing Authority development, notwithstanding the fact it may have been a different Housing Authority development, based on the officer's prior experiences with the person or

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-60 | | | 4 of 6 |

information communicated to the officer).

    c.    In the absence of such conspicuously posted rules or regulations, a person found on a roof or roof landing or in a boiler room, or any other restricted area, should be: (1) instructed to leave such area if he or she is a resident or authorized visitor and there is no other basis to arrest such person, or (2) instructed to leave the building if he or she is an unauthorized visitor and there is no other basis to arrest such person.

        (1)    Prepare a **FIELD REPORT (PD313-1511)**

    d.    Any person may be arrested for trespassing on a roof or roof landing or in a boiler room or in any other restricted area if he or she refuses to leave after instructed.

17.    An officer may not take police action pursuant to *P.G. 212-11, "Stop and Frisk"* unless there is reasonable suspicion to believe that a person has committed, is committing or is about to commit a Penal Law felony or misdemeanor.

    a.    If a person is stopped, a **STOP, QUESTION AND FRISK REPORT WORKSHEET (PD344-151A)** shall be prepared pursuant to P.G. 212-11, "Stop and Frisk" and an ACTIVITY LOG entry shall be made in order to document the encounter.

    b.    If a person is stopped on suspicion of trespass, take reasonable measures to investigate, including but not limited to:

        (1)    Inspecting, and returning, identification; and/or

        (2)    Requesting a key to the building entrance doors or apartment door; and/or

        (3)    Communicating with a building resident with whom the person claims to be visiting through the intercom system or in person; and/or

        (4)    Allowing the person stopped to call a resident to appear and verify his or her presence in the building; and/or

        (5)    Consulting with a Housing Authority employee who is familiar with residents.

**NOTE**    *Merely passing through a door that has a broken lock or that has been propped open does not, alone, constitute reasonable suspicion of criminal activity.*

18.    An officer may not take police action pursuant to *P.G. 208-01, "Law of Arrest"* unless there is probable cause to believe that a person has committed or is committing a Penal Law felony or misdemeanor.

    a.    Upon making an arrest for criminal trespass, prepare **COMPLAINT REPORT (PD313-152),** and **TRESPASS CRIMES – FACT SHEET (PD351-144) and make an ACTIVITY LOG entry in order to document the arrest**.  Prepare **STOP, QUESTION AND FRISK REPORT WORKSHEET (PD344-151A),** if appropriate.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-60 | | | 5 of 6 |

**NOTE**    *Even if there is probable cause to arrest a person for trespassing, officers may exercise their discretion to refrain from arresting that person, and instead instruct that person to leave under appropriate circumstances.*

19.   Notify Communications Section upon exiting building and make an **ACTIVITY LOG** entry indicating time building inspection was completed and any condition noted.
20.   Alternate between outside area patrol and interior patrol of Housing Authority grounds and buildings, unless otherwise directed.
21.   Inspect each building on assigned post.

**MEMBERS ASSIGNED TO RMP DUTIES**
22.   Comply with above requirements, if not on an assignment, when available to perform interior patrol.

**PSA/PRECINCT COMMANDING OFFICER**
23.   Review available sources and identify buildings which are in need of increased interior patrols.
24.   Assign and direct members to perform patrols at directed locations.

**PLATOON COMMANDER/ PATROL SUPERVISOR/ ASSIGNED SUPERVISOR**
25.   Assign at least two uniformed members of the service to conduct directed interior patrols.

**NOTE**    *During the course of conducting directed interior patrols, officers shall be instructed that, absent exigent circumstances, two or more uniformed members of the service must remain together.*

26.   Ensure all interior patrols are performed in a satisfactory manner with specific attention to:
a.   Effectiveness of patrols, including proper tactics
b.   Compliance with all state and federal laws during civilian encounters
c.   Radio transmissions
d.   Proper documentation (*e.g.*, **ACTIVITY LOG** entries, **FIELD REPORTS, STOP, QUESTION AND FRISK REPORT WORKSHEETS**, etc.).

**RELATED PROCEDURES**    *Complaint Reporting System (P.G. 207-01)
Field Reports (P.G. 207-29)
Law of Arrest (P.G. 208-01)
Stop and Frisk (P.G. 212-11)
Vertical Patrol (P.G. 212-59)*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-60 | | | 6 of 6 |

*FORMS AND*    *ACTIVITY LOG (PD112-145)*
*REPORTS*      *COMPLAINT REPORT (PD313-152)*
               *FIELD REPORT (PD313-1511)*
               *STOP, QUESTION AND FRISK REPORT WORKSHEET (PD344-151A)*
               *TRESPASS CRIMES – FACT SHEET (PD351-144)*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

Case 1:10-cv-00699-SAS-HBP Document 329-2 Filed 02/04/15 Page 1 of 56

# REVISED EXHIBIT D



# LESSON PLAN COVER SHEET

| | |
|---|---|
| **COURSE:**<br>BASIC RECRUIT COURSE | **TRAINEE LEVEL:**<br>RECRUIT OFFICER |
| **LESSON:**<br>PATROL OPERATIONS / INTERIOR PATROL | **TIME REQUIRED:**<br>APPROXIMATELY 9 HOURS |
| **PREPARED BY:** NEW YORK CITY POLICE ACADEMY, CURRICULUM AND EVALUATION UNIT | **DATE PREPARED:**<br>SEPTEMBER 2003 |
| **REVISED BY:** SGT AARON LAI, NEW YORK CITY POLICE ACADEMY, CURRICULUM AND EVALUATION UNIT, SPECIALIZED TRAINING SECTION AND OFFICE OF DEPUTY COMMISSIONER OF LEGAL MATTERS | **DATE REVISED:**<br>DECEMBER 2014 |
| **REVIEWED BY:** LT CHRISTINE SEPPA, NEW YORK CITY POLICE ACADEMY, CURRICULUM AND EVALUATION UNIT | **DATE REVIEWED:**<br>DECEMBER 2014 |
| **APPROVED BY: :** LT CHRISTINE SEPPA, NEW YORK CITY POLICE ACADEMY, CURRICULUM AND EVALUATION UNIT | **DATE APPROVED:**<br>DECEMBER 2014 |
| **TRAINING NEED:**<br>ENTRY LEVEL POLICE OFFICER TRAINING | |

**INSTRUCTIONAL GOAL:**
The recruit officer will be able to understand the manner in which the Department provides protection and service to the public is mainly through the work of the patrol force. The recruit officer will also learn to conduct encounters with public housing residents and guests with courtesy and respect and in compliance with all state and federal laws.

*CITY OF NEW YORK POLICE DEPARTMENT*

| LESSON: PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

**LEARNING OBJECTIVES:**

At the completion of this lesson the student will be able to:

A.  Describe the events which occur at roll call.

B.  Identify and discuss Precinct and Transit Patrol.

C.  Explain the proper procedure for interior patrol and its legal implications.

D.  Describe the purpose and rationale for conducting interior patrols within Housing Authority property.

E.  Describe the importance of proper interactions between police officers and Housing Authority residents and guests.

F.  Explain the revision to Patrol Guide section 212-60, "Interior Patrol of Housing Authority Buildings."

G.  Identify situations when an officer (a) may legally approach or stop someone on NYCHA property, and (b) when an officer should prepare a "Field Report."

H.  Identify situations when an officer may legally stop someone for trespass-related crimes on NYCHA property and complete a UF-250 form.

I.  Identify situations when an officer may legally arrest someone for trespass-related crimes on NYCHA property and complete a Trespass Crimes – Fact Sheet.

J.  Identify situations when an officer encounters someone in a restricted area of NYCHA property and the proper actions to take in those situations.

K.  Explain the consequences of failing to adhere to the law in regard to stopping or arresting persons on NYCHA property.

L.  Explain the procedures to take when confronted with a disabled elevator, defective door lock or intercom, or missing or defective signs.

M.  Identify the circumstance when a Field Report will be prepared.

N.  Explain the NYCHA Trespass Notice Program.

O.  Discuss Supplementary procedures involving patrol operations.

P.  List the required Activity Log entries at the beginning and end of tour.

| LESSON: PATROL OPERATIONS | | INSTRUCTOR CUES: |
|---|---|---|
| **METHOD OF PRESENTATION:**<br>Lecture, Question & Answer,<br>Group Discussion | | **CLASSROOM REQUIREMENTS:**<br>Formal Classroom Seating |
| **METHOD OF EVALUATION:** Quizzes | | |
| **STUDENT MATERIAL:**<br>Notebook And Pen, Student Guide, Patrol Guide, Penal Law | | |
| **TRAINING AIDS, SUPPLIES, EQUIPMENT:**<br>Computer and Monitor, PowerPoint, DVD "Preventing Friendly Fire, Prod# 09-035" | | **BIBLIOGRAPHY:**<br>NYPD Police Student's Guide<br>NYPD Patrol Guide<br>NYS Penal Law |

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

### INTRODUCTION

Imagine it is 1:30 a.m. and a person is riding the subway home from a ballgame that went into extra innings. They feel a little nervous about being in the enclosed subway car all by themself.  At the far end of the car they hear the doors open and in walks a police officer patrolling the train. All of a sudden they feel their anxiety disappear and they start to relax. This experience is shared by thousands of New York's citizens every day. Whether it's in the subway, on a jogging path in central park, or on a street corner in Queens, the NYPD's patrol force makes New Yorkers feel safe.

Over the past fifteen years we have seen a historic drop in crime in New York City. Many factors have contributed to this, but one fact cannot be disputed, the men and women who walk a foot post or cruise a patrol sector are no doubt the root cause of this drop in crime.  A key element in crime prevention is police officers' relationships with community members, who are valuable sources of information and assistance. It is, therefore, imperative to maintain good relations with Housing Authority residents and guests. All officer inquiries, interactions, and enforcement activities in Housing Authority buildings must be conducted with the courtesy, professionalism, and respect all persons are entitled to in their own homes.

At the conclusion of this lesson, the student will be able to:

- Describe the events which occur at roll call.

- Identify and discuss Precinct and Transit patrol.

- Explain the proper procedure for interior patrol and its legal implications:

  A. Describe the purpose and rationale for conducting interior patrols within Housing Authority property.
  B. Describe the importance of proper interactions between police officers and Housing Authority residents.
  C. Explain the revision to Patrol Guide section 212-60, "Interior Patrol of Housing Authority Buildings."
  D. Identify situations when an officer (a) may legally approach or stop someone on NYCHA property, and (b) when an officer should prepare a "Field Report."
  E. Identify situations when an officer may legally stop someone for trespass-related crimes on NYCHA property and complete a UF-250 form.
  F. Identify situations when an officer may legally arrest someone for trespass-related crimes on NYCHA property and complete a Trespass Crimes – Fact Sheet.

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

G.  Identify situations when an officer encounters someone in a restricted area of NYCHA property and the proper actions to take in those situations.

H.  Explain the consequences of failing to adhere to the law in regard to stopping or arresting persons on NYCHA property.

I.  Explain the procedures to take when confronted with a disabled elevator, defective door lock or intercom, or missing or defective signs.

J.  Identify the circumstance when a Field Report will be prepared.

K.  Explain the NYCHA Trespass Notice Program.

- Discuss Supplementary procedures involving patrol operations.

- List the required Activity Log entries at the beginning and end of tour.


## **BODY**

**I.  EVENTS THAT OCCUR AT ROLL CALL**

Learning Objective #1

A.  Patrol

1. Patrol is the first stage of police work that challenges a newly graduated officer from the police academy.  Your primary function when on patrol is to be a visible presence in the community and at the same time be available to respond to requests for assistance.

P.G. 212-01, Roll Call

B.  Roll Call

1. Before leaving your command your tour starts with a roll call.

Muster or sitting room at the discretion of commanding officer

Note:  Roll Call starts five minutes after the start of the tour of duty.

2. Takes place in all commands which provide patrol services. (Pct, PSA, Transit District…)

3. Conducted by a supervisor

4. In a designated area of the command

5. Purpose is to conduct roll call for UMOS five minutes after the start of tour.

**Review purpose of Command**

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

|  | **Conditions Report, two primary conditions to be addressed, correct Activity Log entries to be made at start of tour <u>including two primary conditions to be addressed</u>.** |
|---|---|

a) Reading of daily assignments
b) Briefing of special conditions / crime trends
c) Inspecting officers readiness for patrol
    (1)  Protective vest
    (2)  List deficiencies/Reprimand and instruct/Follow up
d) May include precinct level training

C.  Expiration of Tour

   1.  Members assigned to a particular command must return to that command at the completion of their tour in order to:

     a)  Hand in completed forms prepared during the tour (PAR, aided, summonses…)
     b)  Return department equipment (RMP, AED, etc.)
     c)  Sign the return roll call
     d)  If on a post which requires relief the officer must notify the desk officer **one hour** prior to the end of tour
     e)  If performing duty which will cause overtime the officer must notify the desk officer of such condition.

D.  Interrupted Patrol

   1.  A member of the service while on patrol has the need to return a command (could be his / her command but doesn't have to be) for a specific reason.

   2.  The officer must report to the desk officer and state the reason for such interruption. Upon completion the officer must inform the desk officer of their departure.

   3.  Some common reasons to interrupt patrol:

     a) On meal
     b) Vouchering property
     c) Personal necessity

## II.  PRECINCT AND TRANSIT PATROL

  A.  Patrol Precinct

    1.  The majority of police officers are assigned to patrol precincts.

     Example:   A foot post in the 46th precinct, sector 19 Boy

Instructor cues (right column):

Refer to Patrol Guide # 212- 03 *Expiration of Tour*

Learning Objective #2

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

patrolling the east side of Manhattan.

   2.  Patrol  serves three functions:
      a) To deter crime
      b) To enhance feelings of public safety
      c) To make officers available for service

   3.  Patrol within a precinct typically involves two (2) areas:
      a) Foot Patrol
      b) RMP Patrol.

B.  Foot Post

   1.  Usual post for probationary police officers.
      a) Heavy public contact.
      b) Become familiar with conditions on your post.
      c) Some specific duties of officers on a foot post.
      d) Report any unusual crimes or occurrences to the
         patrol supervisor and platoon commander.
      e) Report conditions not requiring immediate attention to
         the command clerk.
      f)  Must **signal or ring** the command each hour if not
         issued a radio.
      g) Other rings:

        (1)  On 1st platoon between 0200 – 0700
        (2)  If assigned to school or church crossing post
        (3)  Ring before and after condition.
        (4)  Do not signal if assigned to a traffic post

      h) Don't leave post except for meal and then return to
         post upon completion.
      i) Notify radio dispatcher:

        (1)  Of the beginning of meal
        (2)  Of the location of where meal will be taken.
        (3)  Make Activity Log entries prior to leaving post.
        (4)  Keep the T/S operator updated as to service
           rendered when given assignments from the
           command.

C.  Sector Car Patrol (Radio Motor Patrol)

   1.  A sector car covers a defined area within a command.

      a) A sector car consists of two officers working together
         in the role of an **operator** and a **recorder**.

| LESSON: PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

Note: In accordance with Patrol Guide procedures the officers must switch duties at the fourth hour of the tour.

b) Radio Motor Patrol (RMP) Operator

   (1)   Driver of the RMP.
   (2)   Must inspect the RMP before starting patrol.
   (3)   The operator must make Activity Log entries of conditions of the RMP, odometer reading and amount of gasoline in the tank as registered by the indicator, in addition to all other entries required by P.G. 212-08 Activity Logs.
   (4)       Make minor repairs as warranted
   (5)   Notify the desk officer if the RMP requires any major repair work.

c) Radio Motor Patrol (RMP) Recorder

   (1)   In charge of all radio communications with central and land line communications with the command.
   (2)   The recorder will document in Activity Log radio messages directed to car, including time, location of call and type of case, in addition to all other required entries as per patrol guide 212-08 Activity Logs.
   (3)   Responsible for preparing all reports.
   (4)   Will coordinate security when transporting prisoners or EDP's
   (5)   Will inform central when transporting a non – member of the service ( prisoner , EDP's, victim…)  - (Activity Log entry: time entered, gender, mileage)
   (6)   Upon completion of the transport notify central as to the time exited and the closing mileage.

Note:  Together the operator and recorder make up a **sector team**.

D.  A Sector Team

  1.  Do not leave your assigned sector unless instructed by competent authority or in response to an emergency situation.
  2.  Respond to messages of serious police emergencies within

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

**five (5) blocks** even if not directed to you.

3. Upon leaving the RMP lock the doors, take the keys.  Do not leave the radio in the RMP.
4. Notify the radio dispatcher when taking assigned meal.

E. Police Attendant

  1. Maintain the cell area and tend to prisoners;

  2. Remove and safeguard firearms prior to entering the detention cell area;

  3. Assume control of, search and inspect prisoners;

  4. Ensure that property that is dangerous to life, may facilitate escape or may damage or deface other property is removed from prisoner;

  5. Document inspection of prisoners on the **Prisoner Roster**, and notify desk officer of inspection results immediately after reporting for duty;

  6. Remain inside cell block at all times while prisoners are confined therein, and be alert to conditions and needs of such prisoners;

  7. Document results of inspection of prisoners on Prisoner Roster every thirty (30) minutes;

  8. Report to desk officer any physical condition or unusual need of prisoner in custody or in the detention area and report necessary command/detention area repairs to the Commanding Officer.

F. Patrolling the Transit System

  1. Procedures to follow when patrolling the transit system include:

       a) Inspect concession stands, toilets, stairways and all booths.
       b) Confer with the booth clerk regarding police conditions at the station.
       c) Visit each station comprising your post at least ounce during the tour.
       d) Investigate suspicious conditions in the station.
       e) Make Activity Log entries concerning any conditions

| LESSON: PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

informed of.

f) Prevent persons from entering the system who are unable to care for themselves. (request assistance for such people as needed)

g) Know the hours of operation for concessions stands in the station.

2. Train Patrol

When assigned to conduct train patrol, the uniformed member of the service will do the following:

a) Record lead car number of train in Activity Log when boarding.

b) Be aware of location at all times including the previous stop, next stop, train line, direction of travel and location on train. (i.e., third car from front)

c) Exercise extreme caution when taking police action on board a train, especially when patrolling alone.

**Note:** Officer safety is of paramount concern, violator should be detrained when taking police action. Officer should interview subjects in the vicinity of Station Agents or request additional units if necessary.

d) Inspect each car of train.

e) Patrol separate from other UMOS unless assignment directs otherwise.

f) Avoid remaining in a single car for more than three stops unless conditions warrant.

g) Ensure all unoccupied conductor and train operator cabs are secured.

h) Pay special attention to the rear car of train.

i) Visually inspect station platforms when train has stopped by leaning or stepping out of train car.

j) Make Activity Log entry when de-training.

k) Minimize time spent at terminal points unless engaged in police activity, meal or personal necessity.

3. Conducting "Ride-Throughs" in Subway Cars with Full Width Train Operator Cabs

a) Uniformed members of the service assigned to the Transit Bureau are often called upon to conduct "ride-through". A ride-through is performed by riding in the front of the lead car of a train and instructing the Train

**INSTRUCTOR CUES:**

Train Patrol, Ride Throughs, Train Order Maintenance Sweeps and NYC Student's MetroCard material extracted from *Transit Bureau Orientation Training Manual – March 2012*

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

Operator to proceed at a low rate of speed, visually searching the tunnel and track area for any unauthorized persons or suspicious items.  A ride-through is conducted for a variety of reasons including searching a tunnel area for perpetrators, and performing "sweeps" for suspicious persons or packages, particularly in under water tubes.

b) To properly conduct a ride-through the member of the service must have a clear and unobstructed view of the track area.  On the new subway cars, this view is obstructed by train operator's cab which occupies the entire width of the subway car.  Members of the service cannot effectively conduct a ride-through by looking through the Train Operator's cab on these train cars. In train cars with this design, the uniformed member of the service must enter the Train Operator's cab to conduct a ride through.  The Transit Bureau has reached an agreement with New York City Transit to allow officers this access.  However, before a Train Operator will allow a UMOS into the cab, the following must be taken:

(1) The UMOS conducting the ride-through MUST be in uniform.

(2) The UMOS MUST identify him/herself to the Train Operator and provide a shield number before entry into the Train Operator's cab.

c) When conducting a ride-through safety is paramount.  UMOS should exercise good judgment and sound tactics at all times.  UMOS should also avoid placing New York City Transit personnel at risk unnecessarily.

4. Train Order Maintenance Sweep (T.O.M.S.)

a) Train Order Maintenance Sweep is a patrol tactic involving the deployment of optimally one (1) supervisor and eight (8) police officers to a subway platform, where they will conduct aggressive train inspections.  During a T.O.M.S., the officers are spread along the platform so that the entire train may be quickly inspected.  For instance, one (1) officer at each of the first four cars and one (1) officer at each of the last four cars, with the supervisor at the center

| LESSON: PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

two cars and conductor position. The supervisor will usually request the conductor to announce to passengers, "The train will be momentarily delayed for a police inspection." This provides omnipresence to passengers and permits observations and corrections of disorder and unlawful behavior. In addition, T.O.M.S. is an effective counterterrorism tool.

5. New York City Transit Student MetroCard

    a) All students eligible for transportation passes are issued a Student MetroCard. The following are specifics on the use of a Student MetroCard:

        (1) Student MetroCard activates a yellow light on the turnstiles.
        (2) It is valid from 0530 to 2030, Monday through Friday.

        **Note:** A "Valid on Sundays Pass" is valid from 0530 to 2030, Sunday through Friday, for Private School students who attend school on Sundays.
        **Note:** A "Night High School Pass" is valid from 1300 to 0100, Monday through Thursday and from 0800 to 2000 on Sunday for night school students.

        (3) It is valid for three (3) rides per day (not limited to home/school stations).
        (4) Some Student MetroCards are valid for four (4) rides per day (at the discretion of School Principal).
        (5) May be used on both subways and buses.
        (6) May be used by students who are pregnant or accompanied by children attending schools established by the Department of Education in each borough.
        (7) May be used by persons up to twenty-one (21) years of age attending Department of Education District 75 to and from school or work sites. These students may be experience learning or developmental disabilities and should be treated with proper tact. These students must carry NYC Department of Education Identification to be presented to police upon

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

request.

b) A Student MetroCard is to be used by the person whose name appears on the pass, for transportation to and from school ONLY on days when school is in session.  A Student MetroCard is to be confiscated if:

   (1) Offered for use by any other person
   (2) Altered
   (3) Misused
   (4) Cardholder commits any felony or misdemeanor against a transit employee, passenger or property

c) In all cases of confiscation, comply with P.G. 215-15, *Confiscation of New York City Transit Student MetroCards* and prepare a School Transportation Pass Confiscation Report (PD516-170).  In addition to confiscation, if the MetroCard is also illegally possessed, further summary police action, i.e., arrest should be taken as appropriate.

d) If a Student MetroCard is unlawfully used by a non-named student (including adults) or used by a named student during non-school days or non-school hours:

   (1) Determine valid identity, and conduct warrant/ recidivist check.
   (2) Issue TAB/NOV (Transit Adjudication Bureau Summons / Notice of Violation) for fare evasion if eligible.
   (3) Effect arrest for fare evasion if violator is ineligible for TAB/NOV (e.g., active warrant, transit recidivist, no identification, etc.).
   (4) MUST arrest if violator is a Department of Education employee unlawfully using a Student MetroCard.
   (5) Prepare a Juvenile Report System Worksheet if violator is under sixteen (16) years old.

e) If a Student MetroCard is lawfully used by named student cardholder, but not all captions are filled out:

   (1) Direct student to fill-out captions.
   (2) Return Student MetroCard to student if no other violation has been committed.
   (3) Take no further enforcement action if the only

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

violation is that a Student MetroCard has not been completely filled out.

    f) If a person is arrested for a felony or misdemeanor against New York City Transit, its property or its customers/employees and upon search incident to a lawful arrest is found to be in possession of a Student MetroCard, the Student MetroCard will be confiscated.

6. Subway train signaling for police assistance

    a) A train operator and or conductor may utilize a horn or whistle to request police assistance. The signal consist of a long horn, follow by a short horn, then another long horn follow by a short horn.

    b) UMOS upon hearing the signal shall proceed tactically in a safe manner to the subway conductor or operator to investigate the police condition.

7. Removal of power in the subway

    a) Removal of power in the subway can be extremely hazardous, dangerous and disruptive to police personnel, passengers and New York City Transit employees; this request should only be made in extreme emergencies involving life-threatening situations.  Before requesting the removal of power, consider the wide-scale ramifications of this action. Some of the factors to be considered, but not limited to, are:

        (1) The time of day (rush hour/non-rush hour);

        (2) Weather conditions (extreme heat);

        (3) Type of station (elevated or below ground);

        (4) Location of trains;

        (5) Extent of injuries in aided cases;

        (6) Risk to the riding public, if a crime is involved.

    b) When it becomes necessary to request the removal of power in the subway:  Notify the radio dispatcher in the usual manner and provide complete details of the

Transit Officers will receive Track

| LESSON: PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

situation. Then request the response of the Patrol Services Bureau and Transit Bureau patrol supervisors, and additional units necessary to secure the platform area and points of entry to the tunnel. ***DO NOT ENTER THE TRACK AREA, EXCEPT IN EXTREME EMERGENCIES!***

c) When it is necessary to immediately remove power from track area due to imminent danger: Open the emergency alarm box (located in subway tunnels, spaced about 400 to 600 feet apart, beneath the blue light) and pull lever down as far as it will go and release the lever. Power on all tracks in the vicinity will be immediately turned off. Use the telephone (located at the alarm box), immediately after removing power, to notify the Rapid Transit Operations Command Center Desk Superintendent of the situation. Notify the radio dispatcher via radio, if telephone notification cannot be made, and request that immediate notification be made to the Desk Superintendent concerned.

**Note:** New York City Transit will ***automatically restore*** the power if notification is not made immediately.

8. Ejecting passengers from the system

a) A person on the transit system may be ejected (removed to the street) for a specified reason (violating any portion of NYCRR Part 1050)

(1) Advise the passenger of the reason
(2) Give the passenger an opportunity to leave without interference
(3) If unwilling to leave voluntarily, use no more force than is necessary to effect the ejection
(4) Make Activity Log entries and prepare a Transit System Ejection Report if a TAB summons was not issued in conjunction with the ejection.

**Note:** If a TAB summons was issued and an ejection is effected, check off the "Ejection" box on the front of the TAB summons.

(5) Submit this report to the desk officer upon completion of your tour.

Certification Training upon assignment to the Transit Bureau

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

9. Photography in the New York City Transit System

    a) When UMOS observes a person engaging in photography in the transit system:

        (1) Take no action if person is not using ancillary equipment or interfering with safe operation of transit operations.

        (2) Ascertain whether person has valid press identification issued by the New York City Police Department if person is using ancillary equipment such as tripods, lights, or reflectors.

    b) If person using ancillary equipment does not have valid identification or is creating a hazard to the public:

        (1) Warn person he/she is in violation of New York City Transit rules and ask person to cease.

        (2) Issue NOV/TAB or Criminal Court Summons, eject from system or arrest as appropriate if person does not desist.

*Learning Objective #3*

## III. EXPLAIN THE PROPER PROCEDURE FOR INTERIOR PATROL AND ITS LEGAL IMPLICATIONS

  A. Describe the purpose and rationale for conducting interior patrols within Housing Authority property.

    1. NYCHA and the New York City Police Department collaborate to provide residents with decent and affordable housing in a safe and secure living environment throughout the five boroughs.  The NYC Police Department inherited responsibility for NYCHA property from the Housing Authority police.  Although NYC Police Department Members of the Service are not employees of NYCHA, they act on behalf of NYCHA in providing security for NYCHA buildings and grounds.

    2. In performing interior patrols (also sometimes referred to as "vertical patrols"), the New York City Police Department's primary role is providing a safe and secure living environment for NYCHA residents by ensuring the habitability of NYCHA buildings, enforcing NYCHA rules, providing access control for NYCHA buildings, and deterring criminal behavior.  The proper performance of these functions will create a safe and secure environment to protect residents from crime and

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

respect the rights they possess as residents.

3.  In order for the NYC Police Department to be effective in achieving such goals, it is important that all members of the department understand the legal boundaries that accompany their role.  Understanding these legal boundaries, and conducting all interactions in a courteous, professional and respectful manner, are critical parts of building a positive relationship with NYCHA residents.  As with any residential area, there are residents who abide by rules and laws under which they are bound and there are those who do not.  Our job is to fairly and impartially enforce laws and regulations to create a safe and orderly residential environment.

4.  The main purpose of this lesson is to demonstrate a methodical procedure for officers to:
    a)  Identify problems with NYCHA buildings that need to be brought to the attention of NYCHA management, including hazardous conditions, conditions in need of repair, and improper signage.
    b)  Identify potential NYCHA rule violations, and provide access control for NYCHA buildings.
    c)  Identify when to prepare Field Reports to document unsafe conditions and rule violations, so as to apprise NYCHA management of their existence.
    d)  Identify potential criminal behavior, and approach, forcibly stop, and arrest individuals when appropriate.
    e)  Perform these functions in a residential setting without exceeding their legal authority, and in a respectful, courteous and professional manner.

B.  Describe the importance of proper interactions between police officers and Housing Authority residents and guests.

1.  It is often the goal of the police officer to gain voluntary compliance amongst the public in regard to sets of laws and rules and regulations.  This is especially true in relation to this lesson.  Officers enforcing the regulations that will be discussed in this lesson must ensure that their inquiries, interactions, and enforcement activities are conducted in a courteous, professional and respectful manner.  The importance of tactical communication is preeminent in these situations because these interactions routinely take place in the common areas of resident's *homes*, and successful policing of NYCHA buildings depends upon consistently positive interactions with residents.

| LESSON: PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

2. <u>Why are positive interactions important?</u>
    a) The public trusts (or should trust) us to come into their lives when conditions require it to help them.
    b) Oftentimes a resident may become an ally and offer information on residents who are creating negative impacts on the development by their actions.
    c) A single negative interaction can make a lasting impression on individuals that may cause them to distrust police in all future interactions.
    d) The incidence of CCRB complaints and resultant disciplinary actions in founded cases may be reduced by the use of Courtesy, Professionalism, and Respect and Tactical Communication processes.

3. <u>How may officers have the best chance that their interactions with the public will be positive?</u>
    a) Use professional language.
    b) Be sharp, neat, well spoken….not sloppy, belligerent or hostile.
    c) Look and sound professional to attain respect from the public.
    d) Improve communication skills and tone of voice (lose the attitude).
    e) Do not fall into the trap of considering all interactions to be with the criminal element. This is especially true when officers approach persons to determine their justification for being in a NYCHA building. The vast majority of persons present in public housing are law abiding residents and their guests. These persons want to live in or visit an orderly, crime free environment and they should not be subject to accusatory questions in their own homes unless an officer has an articulable reason for believing that criminal activity is afoot.
    f) Remember that by de-escalating a situation, you are helping yourself stay in control of the interaction.

<u>NOTE</u>: In all cases, remember that proper, professional and tactically sound interactions reduce needless complaints and enhance the Police Department's ability to work with residents to control crime, reduce disorder and trespassing in housing developments and enhance their quality of life.

C. Explain Patrol Guide section 212-60, "Interior Patrol of Housing Authority Buildings."

1. The purpose for conducting interior patrols in NYCHA

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

buildings is to assist the Housing Authority in enforcing its rules, to limit criminal activity, to provide a safe and secure environment, and to ensure the habitability of its residential buildings for Housing Authority residents and their guests.

2.  Uniformed members of the service shall frequently inspect the interior of Housing Authority buildings on their assigned posts as follows:

    a)  Notify the Communications Section, <u>utilizing radio code 10-75I</u>, and make *Activity Log* entries of the time and street address upon entering the building.

    b)  Inspect <u>front, rear, and other exterior doors</u> for any damaged or defective door locks or doors that are propped open, which may compromise the security of the building. If locks are damaged or defective, prepare a *Field Report*.

    c)  Inspect intercom systems to ensure they are working properly. If intercom system is damaged or defective prepare a *Field Report*, and notify Housing Authority in accordance with the procedure set forth in P.G. 207-79, *"Field Reports"*.

    d)  Inspect mailboxes, and the interior of the lobby.

    Ascertain if NYCHA "No Trespassing" signs are posted and legible.  For any missing, damaged or defective signs, prepare a *Field Report*.

    <u>NOTE</u>: The absence of a sign does not preclude effecting a trespass arrest except possibly for an arrest based on an individual's presence in a restricted area of the Housing Authority building.

    e)  Inspect elevators and ascertain if they are operable. Notify the <u>Housing Authority Emergency Service Department</u> maintenance personnel of inoperable elevators <u>by calling (718) 707-5900</u>.

    f)  Proceed to the top floor by elevator, if operable, <u>otherwise by using the stairs</u>.  Use the staircase to gain access to the roof of the building.

    g)  Conduct an inspection of the <u>roof</u>, roof landing, elevator rooms, and any other installations.

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

Ascertain if NYCHA "Restricted Roof Access" signs and "Restricted Roof Landing Access" signs are posted and legible.  For any missing, damaged or defective signs, prepare a *Field Report*.

Ascertain if alarms to the roof are functioning. For any missing, damaged or defective alarms, prepared a *Field Report*.

h) Patrol each floor, staircase and hallway within the building from the top floor to the ground floor.

i) Inspect elevator doors on each floor, taking immediate action when necessary.

(1) Notify the Housing Authority Emergency Service Department at (718) 707-5900 or the NYPD Emergency Service Unit immediately and remain at the scene and secure location until unsafe condition has been corrected if:

(a)   Elevator door glass is missing,
(b)   Outer elevator door opens when elevator is not present,
(c)   Any other dangerous condition concerning elevators.

(2) Prepare a *Field Report*.

j) Inspect all accessible basement areas.

k) Be alert for persons who may be violating Housing Authority rules and regulations, including potentially unauthorized persons within NYCHA property.

l) Be alert for persons who may be engaged in criminal activity (including potential trespassers) based on observed behavior and other credible information, and upon encountering such persons:

(1) Approach the person(s) and ask:

(a)   If he or she lives in the building.
(b)   If he or she is visiting someone in the building.
(c)   If he or she has business in the building.

Upon encountering persons who are violating Housing Authority rules, take appropriate police action pursuant to P.G. 207-29 ("Field Reports") unless there is a basis for criminal enforcement. Officers may not conduct a reasonable suspicion stop pursuant to P.G. 212-11 ("Stop and Frisk") or arrest any person for a violation of Housing Authority rules, unless the rule violation is also a criminal offense.

A officer's observation of a

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

|  |  |
|---|---|
| (2) Take reasonable measures to verify the person's authorization to be in the building, including but not limited to: | violation of any Housing Authority rule, regardless of whether it is also a criminal offense, may, at a minimum, provide an officer with a credible reason to approach the person to inquire further and thereafter complete a *Field Report*. |
|     (a)    Inspecting and returning identification; and/or | |
|     (b)    Requesting a key to the building entrance doors or apartment door; and/or | |
|     (c)    Requesting the apartment number where the person resides; and/or | |
|     (d)    Requesting the name or apartment number of the person being visited. | |
| (3) Mere presence near, entry into or exit out of a Housing Authority building, without more, is not an objective credible reason to approach and question any person. | An officer should have, and be able to articulate, an objective credible reason for making this approach if the officer is merely requesting information. |
| NOTE: Requests for information must be made in a polite, non-threatening manner. Questions should not be asked in a manner whereby a reasonable person would believe, under facts and circumstances presented, that he or she is not free to disregard the questions and continue on their way. Although an officer may ask further clarifying questions such as, "What apartment do you live in?" or "Who are you visiting?" the person's refusal to answer these questions or comply with requests, such as requests for identification, may not raise the level of suspicion. | If the officer's questions become pointed and accusatory and more extended, the officer should have, and be able to articulate, a founded suspicion that criminal activity is afoot. |
| Police officers can be intimidating to many individuals. The manner of an officer's questioning may cause a reasonable person to feel like he or she cannot terminate the encounter and walk away.  Examples include the use of language or tone indicating that compliance with the officer was compulsory; the display of a weapon; obstructing a person's path; holding onto identification. In such circumstances, the officer needs reasonable suspicion that the person is engaged in criminal activity. | The key question is whether a reasonable person under the circumstances would feel able to walk away from the officers. |
| *Factors that may raise the level of suspicion include*: a person's contradictory or inconsistent statements, the smell of marihuana or other evidence of drug use, the officer has patrolled the building for a long period of time knows most of the building's residents and has never seen the person before, the officer has previously arrested that person for trespass in that building, or the person's presence in area that has a high | This list is not exhaustive; remember |

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|
| incidence of reported criminal activity.<br><br>When a person establishes his or her residency or other lawful purpose for being in the building, make an *Activity Log* entry.<br><br>    (4) <u>If a person who may be engaged in criminal activity, based on observed behavior or other credible information, refuses to explain or is unable to explain his or her presence in the building, the officer may instruct the person that he or she must leave the building or be subject to arrest for trespass.</u><br><br>    (5) <u>If at any time during an interaction an officer develops probable cause to believe a person is trespassing, the officer may arrest the person for criminal trespass without asking the person to leave the building.  A person's refusal to explain his or her presence in a building, however, will not by itself raise reasonable suspicion or probable cause.</u><br><br>    (6) <u>The officer may arrest a person for trespass if the person, who may be engaged in criminal activity, based on observed behavior or other credible information, does not promptly establish a right to be in the building **and** refuses to exit the building.</u><br><br>    (7) <u>An officer may not immediately arrest a person solely for failure to answer the officer's questions.  The officer must permit the person to promptly establish a right to be in the building, for example, by providing credible information leading the officer to believe the person has business in the building.</u><br><br>  m) If reasonable suspicion develops that a person has committed, is committing, or is about to commit a felony or a Penal Law misdemeanor, take appropriate police action (P.G. 212-11, "Stop and Frisk.")<br><br>    (1) <u>A UMOS may **NOT** stop (temporarily detain) a suspected trespasser unless the officer reasonably suspects that the person is in the building without valid justification.</u> | Reasonable Suspicion and Probable Cause are fact specific.  The key is to be able to articulate the factors.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>You must complete a Stop, Question and Frisk Report |

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|
| (2)   A *Stop, Question, and Frisk Report Worksheet* <u>shall be prepared every time a person has been stopped or, in other words, whenever a reasonable person would not have felt able to terminate the encounter and walk away</u>. | Worksheet every time you have stopped a person, even if the stop did not lead to an arrest. |
| (3)   <u>The following are factors which may contribute to reasonable suspicion:</u> | Be mindful that people can make honest mistakes and may reasonably not know certain information, such as the resident's last name or the resident's specific apartment number. |
|     (a) <u>Contradictory assertions made to justify presence in the building</u> *(e.g., person expresses that they live in the building and then recants by stating they are just visiting a resident).* | |
|     (b) <u>Assertions lacking credibility made to justify presence in the building</u> *(e.g., person claims they live in apartment 9B on the 9th floor when the actual building is only 7 stories tall).* | |
| (4)   If you have reasonable suspicion that the person is trespassing, you  may stop that person and take reasonable measures to conduct further investigation, such as: | You must complete a UF-250 for any stop and articulate the basis of your reasonable suspicion. You must also make an Activity Log entry. |
|     (a)     Inspecting and returning identification; | |
|     (b)     Requesting a key to the building entrance doors or apartment door; | |
|     (c)     Communicating with a building resident whom the person claims to be visiting through the intercom system or in person; | Must articulate investigative steps |
|     (d)     Allowing the person stopped to call a resident to appear and verify their authority to be in the building; and/or | |
|     (e)     Consulting with a Housing Authority employee who is familiar with residents. | |
| (5)   Be mindful that people can be alarmed or intimidated when a police officer questions them in their homes, especially when an officer goes to their apartment. Thus, when verifying a person's authority to be in the building, take reasonable measures to avoid such alarm or | |

| LESSON: PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

intimidation by first using the intercom system to contact the resident or permitting the stopped person to call the resident by phone.

n) <u>If probable cause develops that a person has committed or is committing an offense or crime, take appropriate action pursuant to P.G. 208-01, "Law of Arrest."</u>

An officer may arrest a person for criminal trespass when, after reasonable investigation, he or she has probable cause to believe that a person is not a resident of the building nor an invited guest of a resident, nor otherwise authorized to be in the building.

Upon making an arrest for criminal trespass, prepare Complaint Report and Trespass Crimes – Fact Sheet. If the arrest arose out of a stop, prepare a Stop, Question and Frisk Report Worksheet. Also make an Activity Log entry.

Even if an officer has probable cause to arrest a person for trespassing, officers may exercise their discretion to refrain from arresting that person and instead instruct that person to leave under appropriate circumstances.

<u>NOTE:</u> An officer always has the discretion not to arrest this person, but instead instruct the person to leave, given the appropriate circumstances.

o) <u>If a person is found to be violating a Housing Authority rule or regulation, take appropriate police action pursuant to P.G. 207-29, "Field Reports," unless criminal enforcement is appropriate</u>.

Whenever an officer instructs a person to leave the building, and they comply, a *Field Report* should be prepared and an *Activity Log* entry should be made.

p) Notify Communication Section upon exiting the building and make *Activity Log* entries indicating time building inspection was completed and any conditions noted. Prepare *Field Report*, <u>*Stop Question & Frisk Report Worksheet*</u> or *Complaint Report*, or *Trespass Crimes – Fact Sheet* if necessary.

Members assigned to

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

q)  Alternate between outside area patrol and interior patrol of Housing Authority grounds and buildings, unless otherwise directed.

r)  Inspect each building on assigned post.

s)  The platoon commander/patrol supervisor/assigned supervisor shall:

    (1) Assign at least two (2) officers to conduct directed interior patrols.  During the course of conducting directed interior patrols, officers shall be instructed that, absent exigent circumstances, two (2) or more officers must remain together.

t)  <u>Ensure all interior patrols are performed in a satisfactory manner with specific attention to</u>:

    (1) <u>Effectiveness of patrols, including proper tactics;</u>

    (2) <u>Compliance with all state and federal laws regarding encounters with civilians;</u>

    (3) <u>Radio transmissions;</u>

    (4) <u>Proper documentation (e.g., *Activity Log* entries; *Field Reports; Stop Question and Frisk Report Worksheets*</u>).

D. Identify situations when an officer (a) may legally approach or stop someone on NYCHA property, and (b) when an officer should prepare a "Field Report."

    1. The following are sample scenarios describing the types of action an officer should take when on NYCHA property.  See Appendix "A" for a review of Levels of Suspicion.

**THE APPROACH**

a)  During an interior patrol, an officer notices someone standing near the elevators.  The officer has been assigned to this development fairly regularly over the past several months and has gotten to know many of the residents of the building.  The officer has never seen this person before.  When requested, the person voluntarily shows valid identification establishing a right

**Instructor Cues:**

RMP duties will comply with this procedure when not on an assignment.

Stress that a recent QAD audit found deficiencies in *Activity Log* entries in connection with *Stop, Question &Frisk Report Worksheet* preparation.  *Activity Log* entries should be complete and are required.

Level 1: Request for Information

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

to be in the building.  An *Activity Log* entry was made and no further action is required.  Neither a *Field Report* nor a *Stop, Question and Frisk Report Worksheet* was prepared.

*Why is this action appropriate?*
The officer had an objective credible reason to approach the person at the **Request for Information** level because the officer was familiar with the residents. If the officer was not familiar with the residents, there would be no objective credible reason to approach the person.

**Same facts as above**, except the officer questions the person in an accusatory manner, as if the person is suspected of doing something wrong.  The officer demands identification and holds onto it while he/she asks additional questions about the person's authority to be in the building.

Level 1: Request for Information

*Why is this action inappropriate?*
Given the circumstances, the officer had only an objective, credible reason to make a Request for Information, which means questions must be asked in a non-accusatory manner.  While the officer was allowed to request identification, she was not permitted to *demand* identification at this level of inquiry. Additionally, a reasonable person would not have felt free to leave when the officer held onto the identification during the continued questioning, requiring at least reasonable suspicion of criminal activity.

**THE APPROACH - Requesting individuals, who have not established a right to be in the building, to leave**

b)  While conducting an interior patrol in a NYCHA building an officer notices someone sitting with no reasonable purpose in a staircase that is known to be a popular area for illegal drug use in the building.  The officer approaches the person and asks if he is either a resident or visiting someone in the building.  The person tells the officer to "take a hike."  The officer tells the person he must either establish his reason for being in the building or leave the location.  He complies by leaving the location.  A *Field Report* was prepared, an *Activity Log* entry was made and no further action was needed (i.e., No *Stop, Question and Frisk Report Worksheet*, etc.).

Level 1: Request for Information

*Why is this action appropriate?*

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

The officer's approach at **Request for Information** was reasonable given the circumstances; the officer had an objective credible reason for requesting information from the person.

### THE APPROACH – Handling situations without articulable evidence of criminal activity

c) While on interior patrol an officer observes a person standing for more than ten minutes in the lobby of a building where robberies have occurred in the lobby and other common areas of the building in the recent past. The officer approaches the person and, in a non-accusatory manner, asks if he lives in the building.  The person says, "No, I was visiting my friend John in apartment 3B."  The officer explains that residents are concerned about unauthorized people being in the building and asks the person if he would come with him to 3B.  The person says he is waiting for a cab and he would rather not leave the lobby.  Although the officer is unable to determine if person is authorized to be in the building and may therefore instruct the person that he must leave the building and that a refusal to comply may result in an arrest for trespass, the officer elects to wait with the man.  Shortly thereafter a cab comes and the man leaves the building.  An *Activity Log* entry was made and no further action was needed.

Level 1: Request for Information

*Why is this action appropriate?*
The officer initially had an objective credible reason to approach the person at the **Request for Information** level.

### THE APPROACH – Confirming individual's assertions, leading into uncooperative individual – no articulable evidence of criminal activity

d) Upon entry into a NYCHA building to conduct an interior patrol, an officer becomes aware that the front door lock is broken and she stops in the lobby for several minutes to prepare a Field Report.  While in the lobby, the officer observes through the lobby windows that a person, a male, has approached the front door of the NYCHA building, but has not attempted to enter the building.  As the officer prepares the Field Report, she continues to observe the man standing outside near the front door of the building with no apparent purpose.  After the officer has completed the Field Report, she observes a second

Level 1: Request for Information

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

person, also male, approach the building with a key in hand.  As the male begins to insert his key into the front door, he realizes that no key is required because the lock is broken, so he removes his key and enters the lobby.  The officer then observes the other male, who had been observed for more than 5 minutes waiting outside near the front door with no apparent purpose, run towards the front door and enter the lobby without attempting to use a key.

The officer approaches the male – who had been waiting outside for some time before running into the building – and explains the concern of unauthorized persons entering the building due to the broken front door lock, and asks in a non-accusatory manner whether he is a resident of the building.  The person says he lives in Apartment 6C.  The officer politely asks the person if he has identification or a key to the front door and reiterates the concern of unauthorized persons in the building given the broken lock.  He says that he left both in his apartment.  The officer then asks the man if he would mind coming with her up to 6C.  The man complies, and the officer accompanies him to his apartment where the man's wife confirms he is a resident of the building.  An *Activity Log* entry was made, and no further action was needed.

*Why is this action appropriate?*
The officer had an objective credible reason to approach the person at the **Request for Information** level.

> **Same facts as above**, except when the officer asked the man if he would mind coming with her up to 6C, the man refuses.  The officer advises the man he must establish a right to be in the building or leave the location.  The man refuses to exit the building and informs the officer, "I'm not leaving the building."  The officer arrests the person for criminal trespass.  A Stop Question and Frisk Report Worksheet was completed following this stop, in addition to all required arrest paperwork.  An Activity Log entry was made, detailing the encounter.

Level 1: Request for Information & Level 4: Probable Cause

*Why is this action appropriate?*
The officer had **Probable Cause** to arrest the man for criminal trespass because the person refused to exit the building and did not promptly establish a right to be in the

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

building.

    **Same facts as above**, except when the officer returns to the stationhouse she notices that the man's identification shows that he was in fact a resident of the building.  The officer should follow appropriate police procedures to void the arrest pursuant to P.G. 210-13 ("Release of Prisoners").

    **Same facts as above**, except the officer's questions are not polite, but accusatory with no context as to the officer's legitimate concerns about unauthorized persons getting into the building through the broken lock.  The man gets upset when asked for identification or a key and states that, as a resident, he shouldn't have to prove anything to anybody.  The officer calmly and politely states that he did not intend to accuse the man of doing anything wrong, but instead wanted to make sure that residents, like himself, are safe from unlawful trespassers since the lock is broken.  The officer then explains that he has no way of knowing whether or not the man is actually a resident, which is why he is asking for identification or a key.  The man voluntarily shows his identification, indicating that he is a resident.  An Activity Log entry was made, and no further action was needed.

*Why is this action appropriate?*
The officer recognized that he escalated the situation by questioning the man in an aggressive, accusatory manner.  In order to achieve the primary goal of confirming the man's residency, the officer changed his tone to speak more politely and carefully explained the purpose of his questions and his overall concerns for the man's safety as a resident.

e)  An officer on an interior patrol in a NYCHA building observes a woman approach the front door with a set of keys in her hand.  The woman uses her key to enter the door and walks towards the elevators.  As the door is closing, another woman walks up, catches the door, and props it open with a brick before entering the building.

    The officer approaches the second woman and asks whether she is a resident of the building.  The woman responds by saying she doesn't think she needs to answer that question.  The officer politely explains that he is just trying to make sure that everyone in the

**Level 1**:
Request for Information

**Level 1**:
Request for Information

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

building is safe and explains the concern of unauthorized persons in the building. The officer then asks whether the woman has identification or a key to the front door.  The woman produces her identification which shows her as a resident of the building.  The officer thanks the woman, removes the brick from the door, and reminds her that propping the door open could leave the building vulnerable to trespassers.  An *Activity Log* entry was made, and no further action was needed.

*Why is this action appropriate?*
The officer had an objective credible reason to approach the second woman at a **Request for Information** level.  The woman entered the building without using her key and then was observed propping the door open with a brick.  Further, the officer correctly did not approach the first woman due to the lack of an objective credible reason to approach, as that individual was observed using her key to enter the building and did not prop the door open with a brick.

   f)  Upon entry into a NYCHA building to conduct an interior patrol, an officer becomes aware that the front door lock is broken and she stops in the lobby for several minutes to prepare a Field Report.  While in the lobby, the officer observes through the lobby windows a man sitting on a bench near the front door with no apparent purpose. The officer then sees an elderly woman approaching the building carrying several shopping bags filled with groceries. The man the officer previously observed sitting on the bench stands up as the elderly woman walks past him and catches the door behind her, following her into the building.

The officer approaches the man, explains the concern of unauthorized persons entering the building, and asks in a non-accusatory manner whether he is a resident of the building.  The man says he lives in Apartment 5D.  The officer politely asks the person if he has identification or a key to the front door and reiterates the concern of unauthorized persons in the building given the broken lock. The man says that he left both in his apartment. The officer then asks the man if he would mind coming up with him to 5D.  The man complies, and the officer accompanies him to his apartment where the man retrieves his identification showing that he resides in the building.  An *Activity Log* entry was made, and no further action was needed.

**Level 1**: Request for Information

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

*Why is this action appropriate?*
The officer had an objective credible reason to approach the man at a **Request for Information** level.  The man only attempted to enter the building after catching the door when it had been opened by an elderly woman who was clearly a resident of the building.

**Level 1 STOPS – which upon investigation lead to reasonable suspicion or probable cause**

g)  While conducting an interior patrol, two officers observe a group of 9-10 persons congregating in the lobby of a building.  As the officers approach, one person abruptly leaves the group and begins walking in the opposite direction.  The officers approach the person and ask her whether she lives in the building.  She responds that she lives there.  The officer asks her what apartment she lives in.  She changes her answer and says she was visiting her friend Barbara in apartment 7B.  One officer detains her while the other officer investigates and learns that no one named Barbara lives in 7B.  The residents of 7B state they did not have a visitor.  The person is arrested for criminal trespass.  A *Stop Question and Frisk Report Worksheet* was completed following this stop in addition all required arrest paperwork.  An *Activity Log* entry was made noting the presence of "No Trespassing" signs in the lobby and functioning door locks.

*Why is this action appropriate?*
The officers initially had an objective credible reason to approach the person at the **Request for Information** level.  When she abruptly changed her story the officer developed **Reasonable Suspicion** to temporarily detain her to conduct an investigation.  When subsequent investigation revealed that the person's story was false, the officer had **Probable Cause** to arrest for trespass.

NOTE:  Inability to immediately verify a person's explanation does not necessarily mean that the person is trespassing.  Individuals may honestly be mistaken as to the specific apartment number or may know only certain individuals, but not others, residing in an apartment.  Officers should take into consideration these possibilities when conducting investigations and prior to making a decision to

*Instructor cues (right column):*
Level 1:
Request for Information
&
Level 3:
Reasonable Suspicion
&
Level 4:
Probable Cause

| LESSON: PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

arrest.

**Same facts as above**, except Barbara does reside in apartment 7B and recently had a visitor, but does not recognize the name you provided of the person being detained. The officer asks Barbara the name of her visitor and she admits not knowing her full name, but rather just her nickname. The officer returns to the person and asks if she has a nickname. The nickname provided is the same nickname provided by Barbara. The officer instructs the person to leave since she is no longer visiting Barbara, and she complies. A *Stop, Question and Frisk Report Worksheet* was completed following this stop, as well as an *Activity Log* entry, and no further action was needed.

<u>Level 1</u>: Request for Information & <u>Level 3</u>: Reasonable Suspicion

**<u>Situations where reasonable suspicion of criminal activity is present – leading to probable cause</u>**

h) While conducting an interior patrol at 23:30 an officer observes two persons he does not recognize talking in the lobby of a building for an unreasonably long period of time. The officer is aware that the building lobby has recently been afflicted by trespassing and drug activity. The officer approaches the persons and asks one of the persons if he lives in the building. The person says he does not. The officer then asks the person if he is visiting, or has just recently visited, a resident of the building. He says he is not. The officer then asks what he is doing in the building and he replies, "Hanging out." The suspect is arrested for criminal trespass. A *Stop, Question and Frisk Report Worksheet* was prepared for this stop in addition to all required arrest paperwork. An *Activity Log* entry was made noting the presence of "No Trespassing" signs in the lobby and functioning door locks.

<u>Level 1</u>: Request for Information & <u>Level 4</u>: Probable Cause

*<u>Why is this action appropriate?</u>*
The officer initially had an objective credible reason to approach the person at the **Request for Information** level. When the suspect admitted that he had no legitimate reason to be in the building, the officer had **Probable Cause** to arrest for trespass.

<u>NOTE</u>: An officer always has the discretion not to arrest this person, but instead instruct that person to leave, given the appropriate circumstances

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

**Situations where probable cause for an arrest is present**

    i)   An officer on an interior patrol observes a person on the roof landing in violation of conspicuously posted signs forbidding access to the roof landing, including for residents.  The sign additionally explains what the roof landing is.  The officer asks the person if he is a resident.  The person says he is not.  The officer then asks why he is on the roof landing and the person is unable to give any valid justification for his presence.  The officer arrests the person for trespass and makes an *Activity Log* entry noting the presence of the sign.  A *Stop, Question and Frisk Report Worksheet* was prepared for this stop in addition to all required arrest paperwork.

*Why is this action appropriate?*
There was **Probable Cause** to believe the person was trespassing.

NOTE:   It is important that the content of the sign gives sufficient notice that being on the roof landing is prohibited, including a clear explanation as to what the roof landing is.  In some circumstances, a non-English speaker may not be able to read a sign that is not written in his or her native language. If there is uncertainty as to the sufficiency of the sign, give the person an opportunity to leave before making an arrest for trespass.

    **Same facts as above**, but the person observed on the roof landing identifies as a resident, who states that she did not know that it was illegal to be on the roof landing. The officer asks the person if she has identification or a key to the building, and she shows him an identification stating that she resides in apartment 7C. The officer has never encountered this person before, and has no reason to believe she is lying about not knowing that her presence on the roof landing is prohibited. Although there may be probable cause for a trespass arrest, the officer should exercise the discretion to instruct the resident to leave the roof landing rather than make an arrest.

**Situations where reasonable suspicion of criminal activity is present – leading to probable cause**

Instructor cues:

Level 3:
Reasonable Suspicion
&
Level 4:
Probable Cause

Level 3:
Reasonable Suspicion
&
Level 4:
Probable Cause

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|
| j) A sector team receives an assignment of a man selling drugs inside the lobby of a NYCHA building.  The caller provides the 911 operator with his name and phone number and gives a detailed description of the suspect.  Upon entering the building the officers see the suspect in the lobby and forcibly stop the person.  Investigation based on **Reasonable Suspicion** reveals that the person did not live in the building nor was he there for any legitimate reason.  The suspect is arrested for criminal trespass.  A *Stop, Question and Frisk Report Worksheet* was prepared for this stop in addition to all required arrest paperwork.  An *Activity Log* entry noted "No Trespassing" signs in the lobby and functioning door locks.<br><br>*Why is this action appropriate?*<br>There was **Probable Cause** to believe the person was trespassing.<br><br>NOTE: In the above example, if the scenario were changed to state that the complainant was anonymous, the officers would NOT automatically be at Reasonable Suspicion. In order to rise to the level of Reasonable Suspicion, a more thorough investigation (observations) would need to be conducted. | Level 3:<br>Reasonable Suspicion<br>&<br>Level 4:<br>Probable Cause |
| **Situations where reasonable suspicion of criminal activity is present – leading to probable cause**<br><br>k) Two officers are on patrol and enter the lobby of NYCHA building to conduct an interior patrol.  While in the lobby, which has a functioning magnetic lock door, the officers observe an individual force open the door without a key.  Having Reasonable Suspicion of Criminal Trespass, they stop the individual.  Investigation reveals the individual is not a resident, and claims to be visiting a friend in apartment 3C.  The individual appears nervous and is holding his hands over his waist area.  The officers see a suspicious bulge in his waist area, and a frisk reveals a loaded firearm.  With Probable Cause, the individual is placed under arrest for Criminal Possession of a Weapon.  Later investigation reveals that no one in apartment 3C knows the individual, and the charge of Criminal Trespass (Felony) is added to the charges.  The officers prepare a *Stop and Frisk Report*, all applicable arrest paperwork, and a comprehensive *Activity Log* entry is made, including a notation regarding the functional door lock. | Level 3:<br>Reasonable Suspicion<br>&<br>Level 4:<br>Probable Cause |

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

*Why is this action appropriate?*
Seeing an individual force their way into a lobby through a locked entrance door provides Reasonable Suspicion of Criminal Trespass.  This permits a forcible stop and in this case the officers would be able to articulate a clear reason to frisk.  An arrest based on Probable Cause is effected.

E.   Explain the consequences of failing to adhere to the law in regard to stopping persons on NYCHA property.

1.   Police officers in public housing developments must remember that the basic principles outlined in the prior Terminal Learning Objective provide examples of legally valid encounters, under varying levels of suspicion of criminal activity.  Members conducting approaches, forcible stops, or arrests without the appropriate legal authority may face the possibility of the suppression of any evidence obtained during such stop and subject themselves to Departmental disciplinary consequences, including founded CCRB allegations of Abuse of Authority, prosecution by the Department Advocate's Office, and appropriate penalties.

2.   Unjustifiable interactions also contribute to community distrust of the police, and poor relations with the very community we are trying to serve and protect.  A single negative interaction can make a lasting impression on a community member that will taint future interactions with police officers.

**Consider the examples below:**

➢   While patrolling a part of NYCHA property known for its drug activity at 23:30, an officer sees a person exit a NYCHA building.  The officer approaches the person and asks if he is a resident of the building he just visited.

What was *wrong* with the above scenario?
The person had already left a NYCHA building, and when the purpose of an approach is to verify a person's justification for being in a NYCHA building, officers should not approach a person if the person has already exited the building unless there are other indications of criminality, or an independent objective and credible reason for the approach.

_____

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

> While conducting an interior patrol of a NYCHA building, an officer notices someone enter the building using a key. The officer approaches the person and asks him if he is a resident.

<u>What was *wrong* with the above scenario?</u>
The person had established their right to be in the building by using a key.  Absent any other objective and credible reason, the officer was not authorized to approach the person.

---

> While conducting an interior patrol in a NYCHA building, police officers observe a group of five teenage boys entering the building together.  One of the teenagers uses a key to enter the building, and it is clear from their interactions that all of the teenagers are friends.  The officers approach the teenagers and ask if they are residents of the building.

<u>What was *wrong* with the above scenario?</u>
One of the teenagers had established a right to be in the building, and it was clear that the other teenagers were authorized guests (if not residents themselves).  Absent any other objective and credible reason, the officer was not authorized to approach any of them.

> A sector team observes two individuals exiting the elevators in the lobby of a NYCHA building.  The officers note the smell of marihuana in the elevator.  The officers approach the two individuals and ask them their reason for being in the building. The individuals mention that their aunt lives in the building.  The police officers **forced** the two individuals to take them to their aunt's apartment, to verify that they belonged in the building before they let them leave.

<u>What was *wrong* with the above scenario</u>?
The level had never risen to Reasonable Suspicion – therefore a forcible stop was not authorized.

<u>What would have made the scenario acceptable</u>?
If the brothers *voluntarily* agreed to stop and *voluntarily* agreed to accompany the officers to the apartment to verify the legitimacy of their presence in the building.

---

> An officer on an interior patrol observes a person standing

| LESSON: PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

in the lobby for several minutes. Upon seeing the officer the person looks nervous and evasive. The officer approaches the person and asks if he is a resident of the building. The person replies, "I'm just passing through." The officer then arrests the person for criminal trespass.

What was *wrong* with the above scenario?
According to the N.Y. Appellate Division in <u>People v. Sanders</u> (1991), the person's comments did not establish Probable Cause, and, therefore, an arrest was not authorized. An officer can only arrest when the officer has Probable Cause to believe that the person is neither a resident, nor visiting someone in the building, nor otherwise authorized to be in the building.

What would have made the scenario acceptable?
The officer should have asked the person if he was visiting someone in the building or otherwise authorized to be in the building. If the person said he was not visiting someone in the building or otherwise authorized to be in the building there would have been Probable Cause to arrest.

**<u>Same facts as above</u>**, but the person says that he is visiting a resident in the building. The officer accompanies the person to the apartment, but no one is home. The officer then arrests the person for criminal trespass

What was *wrong* with the above scenario?
The fact that a resident is not home does not necessarily mean that the person was not authorized to be in the building. An authorized visitor should not be arrested for trespassing simply because the resident happens not to be at home when the person is trying to visit.

What would have made the scenario acceptable?
Since the person's stated purpose for being in the building was to visit a resident, and that resident was not home, the officer should have asked the person to leave the building. If, after giving the person the opportunity to leave the building, the person still refused to leave, the officer may have arrested the person for criminal trespass

F.   Explain the procedures to take when confronted with a disabled elevator.

Unoccupied Disabled Elevator

1.   If, during interior patrol, you come across an

*CITY OF NEW YORK POLICE DEPARTMENT*          *PAGE* 36

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

**UNOCCUPIED** disabled elevator, your obligation would be to notify Housing Authority Emergency Service Department maintenance personnel by calling (718) 707-5900.  You must also inspect elevator doors on each floor and notify Housing Authority Emergency Service Department maintenance personnel or NYPD Emergency Service Unit immediately and remain at scene and secure location until unsafe condition has been corrected if:

    a)   The elevator door glass is missing, or if the outer elevator door opens when elevator is not present;

    b)   There are any other dangerous conditions concerning elevators.

P.G. 212-28, Disable Housing Authority Elevator Car with Passengers

Occupied Disabled Elevator

    1. If, during interior patrol, you come across an **OCCUPIED** disabled elevator, your obligation would be to notify the radio dispatcher and request the response of Housing Authority Emergency Service Department maintenance personnel.  Also notify the NYPD Emergency Service Unit and ambulance, if the situation requires the immediate removal of passengers in cases involving, but not limited to a cardiac condition, or a seriously ill passenger, etc.

        Note: If a delay in the response of Housing Authority Emergency Service personnel is expected, a request for N.Y.P.D. Emergency Service Unit personnel will be made even in situations deemed to be of a non-emergency nature.

        Note:  Members of the service shall NOT attempt to remove passengers from a disabled elevator car without the assistance of Housing Authority and/or N.Y.P.D. Emergency Service Unit personnel who are trained in the removal of passengers from disabled elevators.

    2. The officer must prepare a Field Report and Aided Report Worksheet, if necessary, upon completion of assignment. Include names and addresses of passengers and names and shield numbers of responding Emergency Service personnel.

G.   Identify the circumstance when a Field Report will be prepared.

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

1. Used to record corrective action taken on non – criminal conditions which occur on the property of NYCHA. Such conditions include:
    a)    Disabled elevators
    b)    Noise complaints
    c)    Breach of housing authority rules and regulations
    d)    Follow – up dispositions
    e)    Damage, accidental
    f)    Damage, non – criminal
    g)    Damage, cause unknown
    h)    Abandoned and derelict vehicles
    i)    Resident disputes
    j)    Fire, non – suspicious
    k)    Other conditions as specified by appropriate patrol guide procedures

Note:  A Complaint Report Worksheet is prepared for **CRIMES** occurring on NYCHA property.

H. Explain the NYCHA Trespass Notice Program

1. Under this program, any individual who is arrested for felony sale of controlled substance or marihuana on a Queens, Manhattan and Brooklyn NYCHA development is permanently excluded from entering all NYCHA property.

2. NYCHA "On-Development" (defined)
    a)    All NYCHA buildings, apartments, offices, maintenance areas, etc.
    b)    All walkways, streets, grounds, and parking areas located within NYCHA Developments.
    c)    All stores, laundries, community centers, childcare centers, senior centers, health stations, etc. within NYCHA Developments.
    d)    From the center line of the street inward towards NYCHA buildings.
    e)    All NYC parks and all NYC school playgrounds within or immediately adjacent to NYCHA grounds.
    f)    Piers or bulkheads immediately adjacent to NYCHA Grounds.

3. When effecting the arrest of an individual "On-

| LESSON: PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

Development" for felony sale of controlled substance or marihuana, in addition to normal arrest procedures:

    a) Prepare a NYCHA Trespass Notice
        (1) Enter the Notice log number, obtained by calling the Housing Bureau wheel
    b) Have the defendant sign and date the notice
        (2) If defendant refuses, so state on signature line and initial and date
    c) Make four copies of the Notice
        (1) Personally serve the defendant with one **copy** of the notice
        (2) The remaining three copies are for the Desk Officer
    d) Fax a copy of the notice to the Housing Bureau Wheel and call to confirm receipt
    e) Prepare a "Trespass Notice Package" containing:
        (1) Original signed Trespass Notice
        (2) Computer copy of OLBS and Complaint Report
        (3) Copy of PCI and Request for Laboratory Analysis (if prepared)
        (4) Copy of Search Warrant when applicable
    f) Deliver the package and 3 copies of Notice to the Desk Officer

**Note:** If the defendant claims that he or she is a NYCHA resident, confirm that the address given by the defendant is a NYCHA location by contacting any PSA or Housing Bureau Wheel. A NYCHA resident will still be served with the Notice and will not be allowed in any NYCHA area other than their resident building and common areas of that development.

**Note:** Common areas include most areas within the resident's development. It does not include apartments other than their own or areas where residents are not normally allowed (e.g., rooftops).

**IV. SUPPLEMENTARY PROCEDURES FOR PATROL OPERATIONS**

Learning Objective #4

P.G. 212-59, Interior

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

|  | Patrol |
|---|---|

A.      Interior Patrol

     1. Patrolling multiple dwelling private buildings for criminal activity including trespassing under the Trespass Affidavit Program is a valuable problem solving tool, as well as an important component of the Department's crime control strategy.  Authorization for interior patrol, the tactically planned patrol of the interior hallways, stairways, lobbies, basements, rooftops and other common areas of multiple dwelling buildings that are **not** owned by the New York City Housing Authority is obtained through the Department's Trespass Affidavit Program.

     2. To conduct interior patrol in a residential multiple dwelling private building in the Department's Trespass Affidavit Program, uniformed members of the service will:

         a) Respond in teams of two to location at designated time and coordinate activities with other assigned uniformed members.
         b) Notify Communication Section dispatcher utilizing radio code 10-75I and make Activity Log entry of the time and street address upon entering the building.
         c) Inspect front, rear and other exterior door and interior of lobby.
         d) Document in Activity Log that signs stating "NO TRESPASSING, TENANTS AND THEIR GUEST ONLY" are prominently displayed and legible.

             (1) Signs should be prominently displayed in areas where persons entering the building can readily observe them (e.g., vestibule entrance, vestibule, above the elevator, courtyard, roof, etc.)

         e) Proceed to top floor of building by elevator, if operable and conduct inspection of roof, roof landing, elevator rooms and any other installations.
         f) Patrol each floor, staircase and hallway

**Instructor Cues:**

This procedure applies to privately owned buildings, NOT NYCHA.

| LESSON: PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

within the building from the top floor to the ground floor.

g) Inspect all accessible basement areas.

h) Be alert for persons who may be engaged in criminal activity including potential trespassers and upon encountering such persons:

    (1) Approach the person(s) and ask:
        (a) If he or she lives in the building
        (b) If he or she is visiting someone in the building
        (c) If he or she has business in the building

**Note:** A uniformed member of the service may approach and question persons if they have an *objective credible reason* (Level 1 - Request for Information) to do so. However, a uniformed member may not stop (temporarily detain) a suspected trespasser unless the uniformed member reasonably suspects (Level 3 – Reasonable Suspicion) that the person is in the building without authorization.

    (2) Take reasonable measures to verify a person's authority to be present in the building when such authority is in question (e.g., asking for identification, keys to the building entrance doors, etc.)

    (3) When a person refuses to explain or is unable to explain his/her presence in the building the uniformed member may instruct the person that he or she must leave the building or be subject to arrest for trespass. The uniformed member may then arrest the person for trespass if:
        (a) The person refuses to exit the building and does not promptly establish a right to be in the building.

    (4) When reasonable suspicion develops that a person has committed, is committing or is about

| LESSON: PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

to commit a felony or a Penal Law misdemeanor, conduct a stop question and possibly frisk.

(5) If probable cause develops that a person has committed or is committing an offense, effect an arrest.

(6) When a trespass arrest is made, prepare "Trespass Crimes - Fact Sheet (PD351-144)".

(7) Copies of the "Trespass Crimes – Fact Sheet (PD351-144)" and "Trespass Crimes – Owner's Affidavit (PD651-051)" or New York County District Attorney's supporting affidavit, as appropriate for the building must be included in arrest package.

i) Notify Communications Section Dispatcher upon exiting building and make Activity Log entry indicating time building inspection was completed and any conditions noted.

3. The "Trespass Crimes – Owner's Affidavit (PD651-051)", will be utilized for Department Trespass Affidavit Program buildings in the Bronx, Brooklyn, Staten Island and Queens. The New York Count District Attorney's Office manages a Trespass Affidavit Program in Manhattan and utilizes its own supporting affidavits. The "Trespass Crimes – Fact Sheet (PD351-144)", will be prepared in every instance, including Manhattan where a uniformed member of the service effects a trespass arrest in a building participating in a Trespass Affidavit Program.

B. Fire scenes

1. Primary duty is to protect life and property.

2. Upon arrival at the scene insure that an alarm has been sent, if not send one.

P.G. 212-58, Fire Scenes

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

3. Make sure the RMP is not parked in a way to impede FDNY response.

4. If you begin to assist in the evacuation of the building leave a responsible person outside to direct responding personnel

5. When establishing police lines at a fire scene only the following persons or vehicles will be permitted to enter:

   a) Police and Fire Dept. vehicles
   b) Ambulances
   c) City agency vehicles for duty in connection with the fire
   d) Public service corporation vehicles for duty in connection with the fire
   e) Persons holding valid working press cards or fire line cards
   f) Employees of public service corporations in performance of emergency duties
   g) Members of governmental agencies in performance of duty
   h) The Mayor
   i) The Mayor's car
   j) U.S. mail vehicles
   k) Prison vans transporting prisoners

C. Response to Fires by Uniformed Members of the Service

1. Uniformed members of the service assigned to a fire will notify the radio dispatcher when they arrive on scene.  In addition, they will inform the dispatcher of any pertinent details regarding the fire.

2. The radio dispatcher will immediately, whether requested or not, call the originating caller and ascertain an update on the fire condition.

3. The radio dispatcher will communicate immediately to UMOS on the scene any new information, including the number of individual calls received for that particular assignment and will also notify the patrol supervisor and any other responding supervisor of all available information.

4. The on-scene UMOS will communicate, prior to

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

entering the building, all observations made in connection with the fire to the radio dispatcher for transmittal to the responding supervisor and other UMOS.

5. The radio dispatcher will notify the patrol supervisor for all building fire assignments whether received through 911 or as a pick-up assignment and the supervisor assigned must respond to all fires.

Building Entry/Elevator Use:

6. Upon entering the building, note the distance of the stairwell to the elevator and note the locations of all exits in the event of an evacuation or tactical retreat becomes necessary.

7. If multiple UMOS are entering the building at the same time, UMOS should utilize separate stairwells/elevators.

8. Whenever possible UMOS will utilize stairs and walk up to the floor reported to be affected by fire.

9. Prior to deciding to use the elevator to ascend to the fire, UMOS will inspect the elevator shaft for signs of smoke by directing their flashlights through any visible space between the elevator and the open shaft.

10. If smoke is detected in the elevator shaft **DO NOT** use the elevator as a method of ascent.

11. UMOS should stop the elevator on every 5th floor on the way up to the reported fire to repeat the visual inspection of the shaft.

12. If there is no smoke detected in the elevator shaft , the UMOS may elect to use the elevator, but must exit the elevator at least 2 floors below the affected floor and proceed cautiously via the stairs to the affected floor.

13. UMOS should transmit the chosen method of ascent, either stairs or elevator, to the communications dispatcher prior to advancing to the affected floor.

NOTE:  UMOS must be aware that fires can spread rapidly and



| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

expand to other floors.  In addition, smoke in these fires may contain poisons and carcinogens.  UMOS should proceed cautiously at all times; maintain communication with the radio dispatcher to relay their locations and to ascertain the estimated time of arrival of the Fire Department.

14. Upon arrival to the floor of the reported fire, UMOS must first conduct a visual inspection of the hallway through the window of the stairwell door, if possible.  Next, touch the stairwell door to detect the presence of heat in the hallway.

15. If heat is detected, adjust tactics accordingly prior to entering the hallway, including but not limited to retreating to a floor below the reported fire.

NOTE:  An unusually warm door or the presence of smoke are indicators that there is a fire in the hallway or in an apartment where a door has been left open.  This can be an extremely dangerous condition.  Therefore, whether or not UMOS decide to enter the hallway, ensure that the door between the stairwell and the hallway remains closed to reduce the risk of the chimney effect which can draw fire to the stairwell and cause the fire to spread.

16. If UMOS suddenly encounter smoke and heat, drop to your knees, move      closer to the wall and retreat to a predetermined exit.

D.     Natural Gas Hazards

1. It is important that a UMOS know how to recognize a gas leak and what to do if you encounter a suspected gas leak while responding to a call for service. Signs of a gas leak includes:

a) Smell – A distinctive strong odor similar to rotten eggs.
b) See – White cloud, mist, fog, bubbles in standing water, blowing dust or vegetation that appears to be dead or dying for no reason.
c) Hear – Roaring, hissing, or whistling.

2.  If you detect a gas leak:

a) If the odor is strong, evacuate immediately and take others with you. Establish a minimum safe distance in accordance with P.G.  212-37,

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

Hazardous Materials.

b) If the odor is faint, and is consistence with personal safety, open windows before leaving.

c) If you are outside, establish a frozen zone and evacuate civilians from the source of the leak if known.

d) Do not light a match or smoke, turn appliances or lights on or off (including flashlights) use the portable radio, cell phone, landline phone or start a car. Doing so can produce sparks that might cause the gas to explode.

e) Notify FDNY to respond through communications.

**P.G. 212-43, Vacate Orders**

E. Vacate Orders

1. An order generated after a representative of the department of buildings, housing department or fire department has deemed a premise hazardous.

2. Can be a residential or non - residential building.

3. Upon being assigned to assist in the execution of a vacate order of a **residential building** a member of the service will:

    a) Verify the credentials and authority of the agency representative.

    b) Obtain facts concerning the reason for the vacate order being issued.

    c) Assist in the evacuation when there is an immediate danger that the building will collapse or any existing dangerous condition to human life.

    d) Notify operations if conditions call for an immediate evacuation.

    e) Request a patrol supervisor to respond when:

        (1)  Persons are actually being evacuated.
        (2)  Premises are to be sealed.
        (3)  For any other appropriate reason.

    f) Remain with the agency representative until service or evacuation is complete, if requested.

    g) Check with agency representative to ensure that the vacated premise will be safeguarded.

    h) Make Activity Log entries

*CITY OF NEW YORK POLICE DEPARTMENT*          *PAGE* 46

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

|  |  |
|---|---|
|           i) Report facts to the desk officer upon completion of assignment.<br><br>F. Animal Bites<br><br>   1. The NYC Health Code section 11.64 requires that all animal bites be reported in addition to animal diseases that are communicable to humans that are of public health concern is reported to Bureau of Communicable Diseases.<br><br>   2. Exposure to rabies is characterized as either a bite or non-bite exposure; each carries the highest risk of rabies infection.<br><br>   3. Bite: (higher risk) Any penetration of skin by animal's teeth. Bites to the face and hand carry the highest risk of rabies infection.<br><br>   4. Non-bite: (lower risk) Scratches or abrasions received from an animal, or the contamination of open cuts, mucous membranes, or wounds with an animal's saliva (or brain and other neural tissue.) Non-bite transmission of rabies is extremely rare.<br><br>   5. The Department form "Dangerous Animal Bite/ Report (PD311-152) will be prepared in every instance regardless of whether a person was injured by the animal or not.  This rule will be followed even if the animal is gone upon arrival at the scene. The officer must include the I/CAD Event number on the form. Upon completion deliver Dangerous Animal/Bite Report and Aided Report Worksheet if applicable to desk officer.<br><br><br><br>G.   Confrontation Situations - Encountering Other Law Enforcement Officers<br><br>   1. While on patrol a member of the service may encounter a person from another law enforcement agency.<br><br>   2. This other person may be on – duty or off – duty, may be an active member or a retired member. The person may belong to a city, state, or federal agency.<br><br>   3. Remember the **On Duty / Uniform Officer** is in | P.G. 216-09, Animal Bites<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>P.G. 212-33, Confrontation Situations |

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

charge.

4. Challenging Officer - For the purposes of this procedure the uniformed member of the service who comes upon the scene where an unidentified person states he/she is a police officer or whose actions may indicate he/she is taking police action.(i.e. on duty or off duty uniformed member of the service or an enforcement officer from an outside criminal justice agency)

5. Confronted Officer -The uniformed member of the service (usually civilian clothed) either on or off duty, who may be armed and taking police action and whose identity and objectives  are not immediately apparent to the challenging officer.

Note:  Members of the service are reminded to immediately take cover to the rear, not to the side of the person being challenged, if possible.  A challenge from the rear allows more time for the challenging officer to evaluate the subject's reaction and also gives the challenging officer a tactical advantage.  A challenge from the side reduces response time.

6. Challenging Officer

    a) Immediately take cover to the rear, not to the side of the person being challenged, if possible Identify self (Police! Don't move!)
    b) Utilize any cover available (e.g., car, garbage can, lamppost, mailbox, etc.)
    c) Any object is a form of protection, even though its value might be only of a concealment nature.
    d) Identify yourself in a loud, clear voice, stating "Police!  Don't Move";
    e) Avoid using slang terms such as "Freeze" or Hold It."
    f) Avoid using directives which are contradictory and can cause confusion such as, "Don't move and raise your hands."
    g) Do not use stereotypes which are based on a person's race, color, ethnicity, hairstyle, clothing or physical appearance.
    h) Members of the service are reminded that the Department is multicultural and stereotypes

**Show video "Preventing Friendly Fire, Prod# 09-035"**

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

based on the above *WILL NOT BE USED TO JUSTIFY YOUR ACTIONS.*

i)  Members of the service are reminded that racial and ethnic profiling is a violation of the Fourth Amendment to the United States Constitution, Article 1 Section 12 of the New York State Constitution, New York City Administrative Code Section 14-151 and other applicable laws.

j)  Request person to give exact location of identification and to produce identification slowly, in a <u>controlled manner</u>, if person states he or she is a police officer;

k)  Examine credentials to ensure validity and photo or description (if any) fits individual.

l)  Remain alert until you are <u>completely</u> satisfied as to person's identity.

m)  Return credentials, if satisfied with identification;

n)  Make Activity Log entry;

o)  Request the response of the patrol supervisor, precinct of occurrence and supervisory officer of on duty member of the service confronted.

7.  Confronted Officer

a)  Remain motionless even if it means a fleeing suspect may escape. **DO NOT** turn body especially if holding a firearm.

b)  Obey all directions from the officer making the challenge.

c)  Inform challenging officer exact location of identification before moving.

d)  If requested to do so, remove identification card from wallet, holder, etc. and hand it to the challenging officer.

e)  Civilian clothed uniformed members of the service should make it a practice to carry their shields in a pocket opposite their shooting hands.

f)  Members of the service performing duty in civilian clothes should ensure that they are aware of the "color of the day" and that it is displayed in a conspicuous manner.

g)  Department Policy – The identification card is the primary form of identification for uniformed members of the Department and must <u>always</u>

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

be carried.  However, uniformed members of the service do not have to carry their shields when unarmed.

H.    Tactical Considerations

    1.   When challenged; **DO NOT** simultaneously reach for your identification and tell the challenging officer who you are. **DO NOT** turn and face the challenging officer with a firearm in hand. **DO NOT** move your hands in any manner that can be interpreted as a hostile or menacing movement. It is a natural reaction to turn when challenged from behind, you should resist this urge.

    2.   The on duty and/or uniformed officer must ensure that they are aware of important information that may prove vital during a confrontation situation. One such piece of information is the **COLOR OF THE DAY**. All officers must be made aware of the color of the day upon turnout by the supervisor. The color of the day is transmitted via the FINEST terminal on a daily basis. Non-uniformed members of the service are required to wear the color of the day when performing enforcement duty so that it is visible to all patrol officers in the event of a confrontation with uniformed members of the service. The colors of the day may be: Green, White, Yellow, Red, or Orange rotated on a daily basis.

    3.   Use extreme caution in judging the challenged officer's response to commands. Do not fall victim to the **"Symbolic Opponent Syndrome"** - Preconceived notion that places a suspect into a "criminal" category because of race, nationality, grooming, or mode of dress. Looks can be deceiving and should not form the basis for action to be taken. Do not reach any definite conclusions that may lead to irreversible police action, because of a suspect's appearance.

I.    Threats to Members of the Service

    1.    When assigned to the station house as the telephone Switchboard operator, the command clerk, the cell attendant, or stationhouse

**Instructor Cues:**

**Stress that *Color of the Day* is not to be given over the radio.**

P.G. 212-31, Threats Against Members of the Service

| LESSON: PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

security you may receive a threat against a member of the service.

2. Via telephone, record the following:

    a) The telephone number of the telephone on which the call is received
    b) The exact time of the call
    c) Name of the threatened officer
    d) Motive or reason for the threat
    e) Manner in which the threat will be carried out
    f) Identity of the caller
    g) Location from which the call is being made
    h) Inquire if the threat stems from a prior arrest made by the threatened officer.

3. If threat is received in writing:

    a) Avoid unnecessary handling of the envelope or document
    b) Place document into a plastic security envelope
    c) Make note if document was received by U.S. mail or other means
    d) Identify the postal employee who delivered the document
    e) If delivered by a delivery service, interview private individual as to circumstances of how he / she receive the document.

4. Threat received by fax:

    a) Record the time of receipt
    b) Record the telephone number of receiving fax machine
    c) Obtain a transmission report, if the fax machine is so equipped.

5. Threat made in person:

    a) Ascertain all available information from the individual making the threat
    b) Identify of the member of the service being threatened
    c) Motivation of the threat

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

| | |
|---|---|
|         d)     Pedigree of the person making the threat | Learning Objective #5 |

**V. LIST THE REQUIRED ACTIVITY LOG ENTRIES AT THE BEGINNING AND END OF TOUR.**

    A. The following entries must be included in the Activity Log:

        1.    At the start of your tour

                a)    Day/Date/Tour
                b)    Assignment
                c)    Meal Period
                d)    Name of Supervisor Conducting Roll Call
                e)    Name of Operator / Recorder (If Applicable)
                f)    Results of Vehicle Inspection (RMP Operator); Amount of Gas, Odometer Reading and Overall Condition of Vehicle

        2.    At the end of your tour

                a)    Time EOT
                b)    Odometer Reading (If Applicable)
                c)    Signature
                d)    Shield Number

## CONCLUSION

    Whether an officer is in a precinct, Transit District, or a Housing Police Service Area (PSA), the basic premise is the same: to provide safety and security to citizens, riders and residents.  For many citizens, security is knowing the cop on patrol.  The objective is to establish ties and relations with the public.  Police Officers should feel, and be perceived as, part of the community that they serve.  The citizens' concerns should be their concerns.  The Police officer's job is to protect life and property, and to actively pursue violators of the law.  Police department cannot accomplish this task without the support of the citizens of this city; it is through daily vigilant patrol that police officer gain that support.

### MANDATORY PATROL GUIDE READING

- P.G. 202-21        Police Officer – Duties and Responsibilities
- P.G. 202-22        Radio Motor Patrol Operator – Duties and Responsibilities
- P.G. 202-23        Radio Motor Patrol Recorder – Duties and

| LESSON: PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|

Responsibilities
- P.G. 202-40    Police Attendant – Duties and Responsibilities
- P.G. 207-29    Field Reports
- P.G. 212-01    Roll Call Formations
- P.G. 212-03    Expiration of Tour
- P.G. 212-10    Interrupted Patrol
- P.G. 212-16    Evacuations of New York City Transit Trains
- P.G. 212-17    Procedures at Scenes of Critical Situations on New York City Transit
- P.G. 212-18    Searches for Armed/Dangerous Persons on New York City Transit Tracks
- P.G. 212-19    Animals on New York City Public Transportation
- P.G. 212-20    Ejection from New York City Transit Property
- P.G. 212-21    Photography in New York City Transit Property
- P.G. 212-23    Inspection of Rapid Transit Station on Post
- P.G. 212-24    Removal of Power in the Subway
- P.G. 212-25    Revenue Escorts
- P.G. 212-26    Inspection of New York City Housing Authority Facilities
- P.G. 212-28    Disabled Housing Authority Elevator Car With Passengers
- P.G. 212-31    Threats Against Members of the Service
- P.G. 212-33    Confrontation Situations
- P.G. 212-43    Vacate Orders for Residential Buildings
- P.G. 212-58    Fire
- P.G. 215-15    Confiscation of New York City Transit Student MetroCards
- P.G. 212-59    Interior Patrol of Trespass Affidavit Buildings
- P.G. 212-60    Interior Patrol of Housing Authority Buildings
- P.G. 212-76    New York City Housing Authority Trespass Notice Program
- P.G. 212-77    Processing Arrests Made Pursuant to the New York city Housing Authority Trespass Notice Program
- P.G. 216-09    Animal Bites
- P.G. 219-01    Inspection of Department Vehicles Each Tour by Operator

At the conclusion of this lesson, the student will be able to:

- Describe the events which occur at roll call.

- Identify and discuss Precinct and Transit patrol.

- Explain the proper procedure for interior patrol and its legal

| LESSON:  PATROL OPERATIONS | INSTRUCTOR CUES: |
|---|---|
| implications:<br><br>    A.   Describe the purpose and rationale for conducting interior patrols within Housing Authority property.<br>    B.   Describe the importance of proper interactions between police officers and Housing Authority residents,<br>    C.   Explain the revision to Patrol Guide section 212-60, "Interior Patrol of Housing Authority Buildings".<br>    D.   Identify situations when an officer (a) may legally approach or stop someone on NYCHA property, and (b) when an officer should prepare a "Field Report".<br>    E.   Explain the consequences of failing to adhere to the law in regard to stopping persons on NYCHA property.<br>    F.   Explain the procedures to take when confronted with a disabled elevator.<br>    G.   Identify the circumstance when a Field Report will be prepared.<br>    H.   Explain the NYCHA Trespass Notice Program.<br><br>•  Discuss Supplementary procedures involving patrol operations.<br><br>•  List the required Activity Log entries at the beginning and end of tour. | |

# REVISED EXHIBIT E



# LESSON PLAN COVER SHEET

| COURSE:<br>NYCHA Rules, Regulations & Signage | TRAINEE LEVEL:<br>In-Service |
|---|---|
| **LESSON:** NYCHA Rules & Regulations *(Related to Patrol Guide 212-60, "Interior Patrol of Housing Authority Buildings" and "Field Reports, Patrol Guide 207-29)* | **TIME REQUIRED:**<br>45 Minutes |
| **PREPARED BY: NYPD Police Academy** | **DATE PREPARED: 12/2014** |
| **APPROVED BY: NYPD Legal Bureau** | **DATE APPROVED:** |
| **REVISED BY: NYPD Legal, In-Service Tactical Training** | **DATE REVIEWED/REVISED:** |

**TRAINING NEED:** To ensure that UMOS are familiar with the posted Rules & Regulations, which are restrictions put on NYCHA property, and the proper manner of performing interior patrols (also sometimes referred to as "vertical patrols") that respects the rights of NYCHA residents and guests.

**INSTRUCTIONAL GOAL:** At the conclusion of this lesson, the student will possess essential information regarding posted Rules & Regulations which are restrictions put on NYCHA property and the proper performance of interior patrols that may result in civilian encounters so that the rights of NYCHA residents and guests are respected and that police-community relationships can be improved.

**PERFORMANCE OBJECTIVES:**

At the completion of this lesson the student will be able to:

I.   Identify the persons to which NYCHA Rules & Regulations apply and locations of where these Rules & Regulations are disseminated.

II.   Conduct all encounters with NYCHA residents and their guests with courtesy and respect and in compliance with all state and federal laws.

III.   List and define the POSTED Rules & Regulations and related signage that applies to both NYCHA residents and non-residents and locations for where they are enforced.

IV.   Discuss the range of options for enforcing the NYCHA Rules & Regulations.

V.   Review Patrol Guide 212-60, "Interior Patrol of Housing Authority Buildings."

| METHOD OF PRESENTATION:<br>Lecture | CLASSROOM REQUIREMENTS:<br>Traditional Classroom Seating |
|---|---|
| **METHOD OF EVALUATION:** | |
| **STUDENT MATERIAL:**<br>Notebook & Pen | |
| **TRAINING AIDS, SUPPLIES, EQUIPMENT:**<br>PowerPoint presentation | **BIBLIOGRAPHY:**<br>Patrol Guide 212-60, Patrol Guide 207-29, NYCHA posted "No Trespassing" signage |

*CITY OF NEW YORK POLICE DEPARTMENT*

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR<br>CUES: |
|---|---|

| | |
|---|---|
| **Introduction**<br><br>Patrol Guide procedure number 212-60 outlines proper interior patrol procedures within Housing Authority property.  In addition to interior patrol, there are additional Rules & Regulations that are set to govern NYCHA property.<br><br>It is essential for members of the service to be aware of, and understand, these Rules & Regulations as they are intended and to interact with NYCHA residents and their guests with courtesy and respect and in compliance with all state and federal laws<br><br><u>At the end of this lesson the student will be able to</u>:<br><br>I.    Identify the persons to which NYCHA Rules & Regulations apply and locations of where these Rules & Regulations are disseminated.<br><br>II.    Conduct all encounters with NYCHA residents and their guests with courtesy and respect and in compliance with all state and federal laws.<br><br>III.    List and define the POSTED Rules & Regulations signage that applies to both NYCHA residents and non-residents and locations for where they are enforced.<br><br>IV.    Discuss the range of options for violating the NYCHA Rules & Regulations.<br><br>V.    Review Patrol Guide 212-60, "Interior Patrol of Housing Authority Buildings." | |

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR CUES: |
|---|---|

| | |
|---|---|
| **Body**<br><br>I.  **Identify the persons to which NYCHA Rules & Regulations apply and locations of where these Rules & Regulations are disseminated.**<br><br>  A.  Persons to which NYCHA Rules & Regulations apply:<br><br>    1.  All NYCHA tenants, any member of the household, guests, or any other person under the tenant's control are obligated to obey the NYCHA Rules & Regulations.<br><br>    2.  Non-residents and visitors to NYCHA developments are also required to obey posted rules.<br><br>  B.  All NYCHA residents are notified of the Rules & Regulations in three ways.<br><br>    1.  "NYCHA Resident Lease Agreement" / "Highlights of House Rules, Lease Term and Policy"<br><br>      a.  All tenants and authorized household members, age 18 and older, are directed to review and sign, therefore agreeing to follow, all NYCHA Rules & Regulations.<br><br>    2.  "The NYCHA Resident Handbook"<br><br>      a.  Portions of the Handbook give an abbreviated list of the Rules & Regulations as well as current pet policies.<br><br>    3.  Notice:<br><br>      a.  Signs conspicuously posted at the NYCHA buildings and developments. A sign is conspicuously posted when it identifies who is excluded and what is prohibited, and is posted strategically enough to afford adequate notice of the prohibited conduct, for example posted at the building entrances or elsewhere where the resident has to pass or posted adjacent to an area that has been designated as restricted.<br><br>      b.  Non-English speakers may not be able to read conspicuously posted signs if they are not written in their native language. | Learning Objective #1 |

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR CUES: |
|---|---|

    c.  In the absence of such conspicuously posted signs, officers may instruct a resident or authorized guest found in an area designated as restricted by Housing Authority rules and regulations to leave the area.

    d.  Officers may complete a FIELD REPORT (PD313-1511) upon encountering persons who are violating Housing Authority rules, even if the sign is missing or defaced.  In such a circumstance, officers should also prepare a FIELD REPORT regarding the missing or defaced sign itself.

    e.  Verbal communication by UMOS or NYCHA representative.

C.  Non-residents are made aware of such Rules & Regulations with relevant signage on development grounds.

    1.  Notice:

        a.  Signs conspicuously posted at the NYCHA buildings and developments.  Signs are conspicuously posted and identify who is excluded and what is prohibited.  These signs are posted frequently enough to afford adequate notice of prohibited conduct; for example, they are posted at the building entrances or elsewhere where the non-resident has to pass or adjacent to an area that has been designated as restricted.

        b.  Non-English speakers may not be able to read conspicuously posted signs if they are not written in their native language.

        c.  In the absence of such conspicuously posted signs, officers may instruct an unauthorized visitor found in an area designated as restricted by Housing Authority rules and regulations to leave the building.

        d.  Officers may complete a FIELD REPORT (PD313-1511) upon encountering persons who are violating Housing Authority rules, even if the sign is missing or defaced.  In such a circumstance, officers should also prepare a FIELD REPORT regarding the missing or defaced sign itself.

        e.  Verbal communication by UMOS or NYCHA representative.

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR CUES: |
|---|---|

| | |
|---|---|
| **II. Conduct all encounters with NYCHA residents and their guests with courtesy and respect and in compliance with all state and federal laws.**<br><br>It is always the goal of the police officer to gain voluntary compliance amongst the public in regard to sets of laws and rules and regulations. This is especially true in relation to this lesson. Officers enforcing the regulations that will be discussed in this lesson must ensure that their inquiries, interactions, and enforcement activities are conducted in a courteous, professional and respectful manner. The importance of tactical communication is preeminent in these situations because these interactions routinely take place in the common areas of residents' *homes*, and successful policing of NYCHA buildings depends upon consistently positive interactions with residents.<br><br>Why are positive interactions important?<br>    A) The public trusts (or should trust) us to come into their lives when conditions require it to help them.<br>    B) Oftentimes a resident may become an ally and offer information on residents who are violating NYCHA rules or committing other crimes.<br>    C) Exhibiting Courtesy, Professionalism and Respect during encounters and employing Tactical Communications when interacting with NYCHA residents will reduce the incidence of CCRB complaints and the discipline that sometimes results.<br><br>How can officers ensure positive interactions?<br>    A) Use professional language.<br>    B) Be sharp, neat, well spoken….not sloppy, belligerent or hostile.<br>    C) Look and sound professional to attain respect from the public.<br>    D) Improve communication skills and tone of voice (lose the attitude).<br>    E) Do not fall into the trap of considering all interactions to be with the criminal element. This is especially true when officers approach persons to determine their justification for being in a NYCHA building. The vast majority of persons present in public housing are law abiding residents and their guests. These persons want to live in or visit an orderly, crime free environment. | Learning Objective #2 |

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR CUES: |
|---|---|

F) Remember that by de-escalating a situation, you are helping yourself stay in control of the interaction.

NOTE: In all cases, remember that proper, professional and tactically sound interactions reduce needless complaints and enhance the Police Department's ability to work with residents to control crime, reduce disorder and trespassing in housing developments and enhance their quality of life.

Learning Objective #3

III.    **List and define the Rules & Regulations contained on the posted signs that applies to both NYCHA residents and non-residents and locations for where the rules are enforced.**

A. Trespassing is prohibited.  NYCHA premises are for the use of residents, invited guests, and persons with legitimate business.  For the purpose of this training program, residents include individuals residing in the household even if not registered with NYCHA.  All such persons are asked to cooperate with inquiries from NYCHA Management, Security Guards, Resident Watch, and the NYC Police Department regarding their presence or conduct in any building or on development grounds. All such persons are not, however, required to cooperate with inquiries from the NYC Police Department.  Mere failure to answer questions or cooperate on its own does not give rise to reasonable suspicion or probable cause of trespassing.  Unless a person is stopped based on reasonable suspicion of criminal activity, that person is free to walk away when questioned.

**NOTE:** DEVELOPMENT GROUNDS are

1. All NYCHA buildings, apartments, manager's offices, maintenance areas, storage rooms, etc.
2. All walkways, grounds, parking areas and development driveways located within NYCHA developments.
3. Laundries, community centers, childcare centers, senior citizen centers, etc. which operate within NYCHA buildings.

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR CUES: |
|---|---|

B.  As indicated on posted signs, the below listed activities are prohibited on NYCHA property. NYCHA property includes lobbies, corridors, stairs, elevators, terraces, balconies and development grounds.

1. Alcohol Consumption and Possessing Open Containers of Alcohol

2. Barbecuing except by permit

3. Bicycle Riding / Skateboarding / Rollerblading except in designated areas

4. Creating a Disturbance / Engaging in Dangerous Activity

5. Defacing NYCHA Property by graffiti or other means

6. Dogs:

   - *Failing to curb your dog or pick up solid dog waste*

   - *Possessing dogs not registered with NYCHA*

   - *Possessing unleashed dogs*

7. Drug Sale, Use, or Possession

8. Entering restricted areas, including a building roof or roof landing (area at the top of the stairwell)

9. Lingering in common areas of building (Lingering occurs when, based on objective facts and circumstances, an individual is observed in a vestibule, lobby, stairwell, hallway or other similar common area of a NYCHA residential building for an unreasonable period of time in light of the area's intended purpose. The primary purpose of these locations is to enable entrance to and exit from the building as well as movement within the building. Activities associated with the primary purpose of such locations are permissible, including but not limited to: standing and talking for a reasonable period of time; waiting for food deliveries, visitors, and transportation; meeting and greeting neighbors and friends; picking up and dropping off children; checking mailboxes, and any similar activity that occurs in the ordinary course of entrance, exit and movement within the building.).

10. Littering

11. Playing loud music or creating unreasonable noise

12. Smoking in common areas of building

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR CUES: |
|---|---|
| 13. Riding / Driving unauthorized vehicles on development grounds.<br><br>C. It is prohibited for any person to obstruct, damage or deface any common area, including **playgrounds, picnic or barbecue areas**, **gardens, trees, shrubs, grass or groundcover**, or to violate any of the aforementioned posted Rules & Regulations.<br><br><br><br>**IV.  Discuss the range of options for enforcing the NYCHA Rules & Regulations.**<br><br>A. The observation of the violation of any of the posted Rules & Regulations allows the officer, at the very least, an objective credible reason to approach the violator and may prompt the preparation of a Field Report (Patrol Guide 207-29) and accompanying Activity Log entry.<br><br><u>** NOTE</u> - Officers are to be aware that some, but not all, violations of NYCHA rules warrant concurrent criminal enforcement.<br><br><u>**NOTE</u> – Non-English speakers may not be able to read the posted Rules & Regulations if the signs are not written in their native language.<br><br>B. Signs posted at NYCHA buildings and developments, with the following restrictions, may be reported and/or enforced in ways listed below.<br><br>   1. Alcohol Consumption and Possessing Open Containers of Alcohol (also prohibited in community centers)<br><br>     a. Field Report & Activity Log entry<br><br>     b. C Summons<br><br>      • *Drinking in Public Admin Code 10-125(b)*<br><br>   2. Barbecuing except by NYCHA permit<br><br>     a. Field Report & Activity Log entry<br><br>     b. C Summons<br>      • *NYC Fire Code 307.1*<br><br>    **\*\* <u>NOTE</u>** | Learning Objective #4 |

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR CUES: |
|---|---|

- *Take no action* NYCHA Permit and a garden hose or fire extinguisher is nearby

- *Issue Field Report* NO Permit and a garden hose or fire extinguisher is nearby

- *Issue C Summons* NO Permit and NO garden hose or fire extinguisher is nearby

3. Bicycle Riding / Skateboarding / Rollerblading (except in designated areas)

   a. Field Report & Activity Log entry

   b. May eject (non-resident only) if condition is not corrected

   c. C Summons

   - *Bicycle on Sidewalk - NYC Traffic Rules 4 07(c)(3)(i)*

   - *Recklessly Operating a Skateboard or Rollerblading - NYC Traffic Rules 19-176.1*

4. Creating a Nuisance or Disturbance / Engaging in Dangerous Activity

   a. Field Report & Activity Log entry

   b. May eject (non-resident only) if condition is not corrected

   *c.* *C Summons*

   - *Disorderly Conduct PL 240.20 (appropriate subsection)*

5. Defacing NYCHA Property by graffiti or other means

   a. Field Report & Activity Log entry

   b. C Summons / Arrest

   - *Criminal Mischief PL 145.00 (as appropriate based on dollar amount)*

   - *Making Graffiti PL 145.60*

6. Dogs:

   - *Possessing a dog not registered with NYCHA (must wear valid NYCHA tag) - this INCLUDES service dogs*

   a. Field Report & Activity Log entry

   b. Ejection (non-resident only)

Dogs: (does not apply to service dogs)

---

**CITY OF NEW YORK POLICE DEPARTMENT**          **PAGE 8**

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR CUES: |
|---|---|

- *Failing to curb your dog / Failing to pick up solid dog waste or*

- *Possessing an unleashed dog (leash must be six feet or less in length)*

a. Field Report & Activity Log entry

b. Ejection (non-resident only)

c. C Summons

- *Failing to curb / Fail to pick up solid waste  NY State Public Health Law 1310*

- Possessing unleashed dog  NYC Health Code 161.05

7. Drug Sale, Use, or Possession

a. C Summons / Arrest

- *Penal Law Articles 220 and 221 (as appropriate)*

8. Entering restricted areas, including a building roof, roof landing (area at the top of the stairwell), maintenance rooms <u>except for authorized and emergency personnel</u>)

a. If there is a conspicuously posted sign: arrest (and prepare Field Report)

- *Criminal Trespass PL 140.10(e) is defined as knowingly entering or remaining unlawfully in a NYCHA building in violation of conspicuously posted rules or regulations governing entry and use thereof.*

- A conspicuously posted sign must identify who is excluded and what is prohibited, and must be posted strategically enough to afford adequate advance notice of the prohibited conduct.  The signs will be posted at the building entrances or elsewhere where the resident has to pass or posted adjacent to an area that has been designated as restricted. Even if there is probable cause to arrest a person for trespassing in a restricted area, officers may exercise their discretion to refrain from arresting that person.

- Discretion is the authority to decide how to resolve situations in different ways.  A police officer cannot take action or refrain from taking action because of a person's gender, race, class, ethnicity, sexual orientation, or religion.  Instead, a police officer must base his or her actions only on such objective considerations as the individual's actions and/or information the officer may have received from sources such as members of the

*A police officer's primary job is to protect life, and every decision a police officer makes should give highest priority to the preservation of life.*

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR CUES: |
|---|---|

public, other officers, and the radio dispatcher.

- When an officer encounters a person trespassing in a restricted area, the officer may exercise discretion given the circumstances and not arrest that person and instead instruct that person to leave the restricted area, or the building, under appropriate circumstances.

- For example, a non-English speaker may not have been able to read a conspicuously posted sign that was not written in his or her native language and, thus, may not have known the area was restricted.

- If an officer encounters a building resident in a restricted area, such as the roof or roof landing, and there is no other basis to arrest such person, the officer should exercise such discretion and ask the resident to leave the restricted area. Such discretion need not be exercised if the officer knows that the resident had previously been instructed to leave that particular restricted area.

b. If there are no conspicuously posted signs, but the area is designated as restricted by Housing Authority Rules and Regulations, the following applies. If the person is a resident or authorized visitor, ask them to leave the area. If the person is an unauthorized visitor and there is no other basis to arrest such person, ask him or her to leave the building.

- Any person may be arrested for trespassing in a restricted area if he or she refused to leave after instructed.

** NOTE   MOS should:

- Take note of posted, missing or defective signs.

- Document defendant's statements.

- Document any other relevant information.

9. Lingering in common areas of building

a. Field Report & Activity Log entry

***LINGERING IS NOT A VIOLATION OF THE LAW – IT IS ONLY A VIOLATION OF THE RULES***

| LESSON: | INSTRUCTOR |
|---|---|
| NYCHA Rules & Regulations | CUES: |

**Definition of "Lingering":** *Lingering occurs when, based on objective facts and circumstances, an individual is observed in a vestibule, lobby, stairwell, hallway or other similar common area of a NYCHA residential building for an unreasonable period of time in light of the area's intended purpose. The primary purpose of these locations is to enable entrance to and exit from the building as well as movement within the building. Activities associated with the primary purpose of such locations are permissible, including but not limited to: standing and talking for a reasonable period of time; waiting for food deliveries, visitors, and transportation; meeting and greeting neighbors and friends; picking up and dropping off children; checking mailboxes, and any similar activity that occurs in the ordinary course of entrance, exit and movement within the building.*

\*\* Members of the Service are directed to use common sense and good judgment when addressing this NYCHA Rule violation. Officers are further reminded that Lingering in and of itself is **NOT** a violation of law.

Example of "Lingering" is:

- (Stairway) Three people are sitting on the stairs in a stairwell.

  \*\* Since the purpose of the stairs is to allow people to walk from one floor to another, a group of people sitting in the stairwell would be "Lingering" and subject to a Field Report.

  \*\* NOTE  A person cannot be arrested for mere lingering in a stairwell.

The following examples would NOT be "Lingering":

- (Lobby) - Someone is standing in the lobby engaging in a brief conversation with another person while getting their mail from the mail box.

\*\* *This is not lingering*.  One of the functions of the lobby is to provide a place for residents to retrieve mail.  Furthermore, it is also a place where residents will most likely meet each other and engage in conversation.

- (Lobby)  A resident waiting in the lobby for a cab or for a delivery

  10. Littering

  Inside building

  a.  Field Report & Activity Log entry

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR CUES: |
|---|---|

Outside building

    b. Field Report & Activity Log entry

    c. C Summons

       Littering   Admin Code 16-118(1)

11. Playing loud music (with sound reproductive device, e.g. portable stereo device)

    a. Field Report & Activity Log entry

    b. C Summons for Admin Code 24-244(a)


** **NOTE:** In certain circumstances NYPD Permits can be issued for sound reproductive devices, e.g., Family Day, National Night Out.

Creating unreasonable noise (WITHOUT sound reproductive device)

    a. Field Report & Activity Log entry

    b. ECB Summons

      • Admin Code 24-218


12. Smoking

    • In elevator

    a. C Summons

      • NYC Health Code 181.17(a)

      • In common areas of building (other than elevator)

    b. Field Report & Activity Log entry


13. Riding / driving unauthorized vehicles on development grounds - (stopping / standing / parking on sidewalks / internal roadways / walkways, except emergency vehicles, authorized maintenance and repair trucks, and authorized NYCHA vehicles)

    a. Field Report & Activity Log entry

    b. A or B Summons

      • Obedience to required Traffic Control Devices - VTL 1110 (a)

Learning

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR CUES: |
|---|---|

| | Objective #5 |
|---|---|

**Only if a sign is posted which limits driving on development grounds to official and specifically authorized vehicles.

- Driving on Sidewalk - VTL 1225 (a)

** **NOTE**  NYC Traffic Regulations apply on NYCHA property.

**V.   Review P.G. 212-60, "Interior Patrol of Housing Authority Buildings."**

A.  The four (4) levels of DeBour apply to NYCHA buildings.

- Request for Information (objective credible reason to approach)
- Common Law Right of Inquiry (founded suspicion that criminal activity is afoot)
- Reasonable Suspicion
- Probable Cause

B.  UMOS must perform interior patrols and engage citizens in a manner that respects the rights of NYCHA residents and guests.

C.  **Reminder**: UMOS need an objective credible reason to approach a person inside a NYCHA building.

D.  Violations of NYCHA rules are an **objective credible reason to approach a person**.

E.  **NOTE**:  *Mere presence near, entering or exiting a NYCHA building, without more, is not sufficient to establish reasonable suspicion for a stop on suspicion of trespass nor is it an objective credible reason to approach and question any person.*

F.   Arrest for Criminal Trespass if you reach probable cause that the person knowingly entered or remained unlawfully in a NYCHA apartment building.

G.  When encountering persons who may be engaged in criminal activity (including potential trespassers), based on observed behavior or other credible information, you may:

1.  Approach the person and ask if he or she lives in the building, is visiting someone in the building, or has business in the building.

2.  Take reasonable measures to verify the person's

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR CUES: |
|---|---|

authorization to be in the building (ask if they have I.D., keys, other resident can verify, apartment number of residence, name or apartment number of resident being visited etc…)

H.   Questions about a person's authority to be in a NYCHA residence can escalate to the level of a stop if a reasonable person under the facts and circumstances presented would feel that he or she is not free to disregard the police and continue on their way.

1. If you stop any person, you must complete a STOP, QUESTION AND FRISK REPORT WORKSHEET (PD344-151A) and make an ACTIVITY LOG entry.

2.   A UMOS may NOT stop (temporarily detain) a suspected trespasser unless the officer reasonably suspects that the person is in the building without valid justification.

3. If a person is stopped on suspicion of trespass, take reasonable measures to investigate (ask for keys, verify with resident, allow person to call resident for verification, consult with NYCHA employee)

4. *NOTE:  Be mindful that residents may be alarmed or intimidated when a police officer questions them in their homes, especially when an officer goes to their apartment.  Thus, when verifying a person's authority to be in the building, take reasonable measures to avoid such intimidation by first using the intercom system to contact the resident or permitting the stopped person to call the resident by phone.*

5. *NOTE: Individuals may honestly be mistaken as to the specific apartment number or may know only certain individuals, but not others, residing in an apartment. Officers should take into consideration these possibilities.*

6. *NOTE:  Merely passing through a door that has a defective lock or that has been propped open does not, alone, constitute reasonable suspicion*

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR<br>CUES: |
|---|---|

*of criminal activity.*

    7. *NOTE: Upon encountering persons who are violating Housing Authority rules, take appropriate police action pursuant to P.G. 207-29 ("Field Reports") unless there is a basis for criminal enforcement. Officers may not conduct a reasonable suspicion stop pursuant to P.G. 212-11 ("Stop and Frisk") or arrest any person for a violation of Housing Authority rules, unless the rule violation is also a criminal offense. An officer's observation of a violation of any Housing Authority rule, regardless of whether it is also a criminal offense, may, at a minimum, provide an officer with a credible reason to approach the person to inquire further and thereafter complete a Field Report.*

I.  *NOTE - Probable cause is required to make an arrest for trespass. If unable to determine whether the person is authorized to be in the building, the officer may instruct the person that he or she must leave the building, and that a refusal to comply may result in an arrest for trespass. If the officer remains unable to determine whether the person is authorized to be in the building, and the person refuses to exit the building, the officer may arrest the person for trespass.*

J.  You may arrest for Criminal Trespass if you reach probable cause that the person knowingly entered or remained unlawfully in a NYCHA apartment building.

    1. Make an ACTIVITY LOG entry

    2. Prepare Trespass Criminal Fact Sheet

    3. Do not arrest anyone for trespassing in a restricted area of the building, including the roof or roof landing, in the absence of adequate notice provided by a "conspicuously posted sign"

    4. In the absence of a "conspicuously posted sign," instruct a resident or authorized visitor to leave the restricted area and instruct an unauthorized visitor to leave the building. If, after being instructed to leave, the person refuses to do so, you may arrest for Criminal Trespass.

    5. Even if there is probable cause to arrest a person for trespassing, officers may exercise

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR<br>CUES: |
| --- | --- |

their discretion to refrain from arresting that person, and instead instruct that person to leave the building or the restricted area under appropriate circumstances.

6.  For example, a non-English speaker may not have been able to read a conspicuously posted sign that was not written in his or her native language and, thus, may not have known the area was restricted.

7.  If an officer has probable cause to arrest a building resident for being in a restricted area, such as the roof or roof landing, and the officer has not seen the resident in that area before and has no other reason to believe that the resident has actual knowledge that the area is restricted, the officer should exercise discretion and ask the resident to leave the restricted area as long as there is no other basis to arrest such a person.

8.  You cannot arrest someone for trespassing based solely on the fact that the person is visiting a resident who is not home. Inability to immediately verify a person's status as a resident or visitor does not alone provide probable cause to arrest for trespassing.

9.  A person's silence when questioned, alone, does not support reasonable suspicion to stop or probable cause to arrest.

**<u>Conclusion</u>**

Police officers must be aware of the specific procedures for policing NYC Housing Authority developments, including the non-criminal Rules & Regulations.

In enforcing these Rules & Regulations, the New York City Police Department's primary role is providing a safe and secure living environment for NYCHA residents.

Successful policing of NYCHA buildings requires positive interactions between police officers and residents. This can only be achieved by conducting all interactions in NYCHA buildings with the courtesy, professionalism and respect all persons are entitled to in their own

| LESSON:<br>NYCHA Rules & Regulations | INSTRUCTOR<br>CUES: |
|---|---|
| homes.<br><br>By properly conducting police activity on NYCHA property, officers will assist the NYC Housing Authority in enforcing its rules, limiting criminal activity, and ultimately providing a safe and secure environment for residents and their guests.<br><br><br>At the end of this lesson the student will be able to:<br><br>  I.  Identify the persons to which NYCHA Rules & Regulations apply and locations of where these Rules & Regulations are disseminated.<br><br>  II. Conduct all encounters with NYCHA residents and their guests with courtesy and respect and in compliance with all state and federal laws.<br><br>  III. List and define the POSTED Rules & Regulations signage that applies to both NYCHA residents and non-residents and locations for where they are enforced.<br><br>  IV. Discuss the range of options for enforcing the NYCHA Rules & Regulations.<br><br>  V.  Review P.G. 212-60, "Interior Patrol of Housing Authority Buildings." | |

# EXHIBIT F



**TRESPASS CRIMES – FACT SHEET**
PD 351-144 (Rev. 01-15) — DRAFT

## Complete all Captions on BOTH Sides of This Form

| Defendant's Name | Arrest No. |
|---|---|

| Date of Arrest | Time of Arrest | Location |
|---|---|---|

| Arresting Officer's Name | Shield No. | Tax No. | Command |
|---|---|---|---|

| Observing Officer's Name | Shield No. | Tax No. | Command |
|---|---|---|---|

1. Were there "No Trespassing" and/or "Tenants and Guests Only"
   signs conspicuously posted at the location?     ☐ Yes
                                                    ☐ No

   IF YES, Where? _____

   **For NYCHA arrests ONLY:** If the defendant was arrested for presence in a restricted area, were there conspicuously posted signs at the location that prohibit entry in that specific restricted area?     ☐ Yes     ☐ No

   IF YES, where were those signs? _____

2. Was defendant seen entering the location?     ☐ Yes     ☐ No

   IF YES, how did the defendant gain access to the building? _____

3. How long did you observe the defendant in the building before you approached? _____

4. Where was the defendant when he was stopped? _____

5. Describe the factors that led to the decision to approach and question the defendant:

   _____

   _____

   _____

   _____

   _____

6. Did you approach the defendant and ask:

   a) Do you live in the building?  ☐ Yes  ☐ No  If Yes, (response) _____

   b) Are you visiting someone in the building?  ☐ Yes  ☐ No  If Yes, (response) _____

   c) Do you have business in the building?  ☐ Yes  ☐ No  If Yes, (response) _____

**OVER**

7. How was it determined that the defendant was not a tenant, guest or on business in the building, prior to arrest?

_____

_____

   a) Did defendant provide an apartment number? ☐ Yes ☐ No  IF YES, Apt No._____

   b) Did defendant provide a name of an alleged tenant he/she was visiting?　☐ Yes ☐ No

    Name Provided _____

   c) Did you go to apartment defendant indicated?　　☐ Yes ☐ No

8. Did defendant make <u>any</u> statements?　　☐ Yes ☐ No　IF YES, defendant stated in sum and substance:

_____

_____

_____

Statement made to _____ Shield No. _____ Tax No. _____

at approximately _____(time) at _____(location)

on _____(date)

9.　Was evidence recovered from the defendant?　 ☐ Yes ☐ No

   a) IF YES, describe the evidence and EXACTLY where the evidence was recovered from _____

_____

   b) Did you recover the evidence?　　☐ Yes ☐ No

   IF NO, did you observe the recovery of the evidence?　　☐ Yes ☐ No

   c) Indicate officer who recovered evidence:

   Rank/Name _____ Shield No. _____ Tax No. _____

| Reporting Officer's Signature | Date |
| --- | --- |
|  |  |

# EXHIBIT G

# New York City Housing Authority (NYCHA)
## Highlights of House Rules, Lease Terms and Policy

**This document contains highlights of NYCHA lease requirements, "house rules and regulations," general provisions of law and NYCHA policy. The document is intended to remind NYCHA residents of these important requirements.
<u>Note</u> that this document is NOT a lease and NOT a lease addendum.
The act of signing this document will not grant any rights of tenancy or authorized occupancy.
This document does not waive any lease provision, rule or policy not included here. All provisions of other NYCHA rules, policy or lease clauses not mentioned here remain in full force and effect.**
*Contact your development housing assistant for more details.*

| | FINANCIAL INFORMATION |
|---|---|
| 1 | **Annual Review**: Every household must submit to NYCHA every year the Annual Review booklet.<br>This lists both the tenants (person(s) who signed the lease) and family members who did not sign the lease but are authorized by NYCHA to reside in the household.<br>Include in the booklet income information for **ALL** household members. Examples of income include: employment wages, Social Security benefits, Supplemental Security Income (SSI), pension, public assistance, unemployment benefits and income from a business.<br>NYCHA verifies the accuracy of the information reported through US Department of Housing and Urban Development (HUD) databases and other sources. |
| 2 | **Rent**: Rent is based on the income of **all** household members. Rent is based on 30% of household income (less allowable deductions) or the welfare rent, and cannot go higher than any rent ceiling in effect. |
| 3 | **Rent Due:** Rent for the entire month is due the **first** day of the month and must be paid entirely, unless the family pays by *automatic rent payment* (see #5 below), where rent can be paid twice a month. |
| 4 | **Rent Payment Options**: Rent is paid **once** a month, due on the first of the month:<br>• <u>by mail</u>: mail your check or money order along with the monthly rent bill,<br>• <u>by phone:</u> call (866) 942-3104,<br>• <u>with cash at a bank</u>, or<br>• <u>with cash at a check cashing store</u>: At Pay-O-Matic. |
| 5 | **Automatic Rent Payment Options** – rent is paid **twice** a month:<br>• <u>Payroll Rent Deduction</u>: available to most New York City municipal employees, including NYCHA employees<br>• <u>Automatic Rent set up by computer</u>: available to any resident whose source of income (for example: wages, pension, Social Security) is <u>directly deposited</u> to their bank account **and** the resident signs up for automatic rent payment (go to <u>www.nyc.gov/nycha</u> and select "Online Rent payment").<br>• <u>Public Assistance</u>: PA recipients whose rent is paid by the Department of Social Services twice monthly. |
| | APARTMENT INFORMATION |
| 6 | **Repairs and Inspection**: Report needed repairs and emergencies to the Customer Contact Center (CCC) at (718) 707-7771. Residents must help facilitate repairs and inspections by providing access to their apartment as needed. |
| 7 | **Window Guards**: Every window in every apartment must have a window guard, even if you don't have children living in your apartment. If you remove a window guard to install an air conditioner (A/C), you must call the development office because NYCHA must inspect the window to see that the A/C is securely installed. |
| 8 | **Major Appliances**: If you want to get a major appliance (air conditioner, freezer, dishwasher or clothes washing machine) you must contact the development office and sign a special appliance agreement. There may be a small electricity or water usage fee involved. ***Clothes dryers are prohibited.*** |
| 9 | **Occupancy**: Only the tenant(s) and people authorized by NYCHA may reside in your apartment. Unauthorized occupants are not permitted. If an authorized member of your household leaves, you must notify NYCHA and verify that the person moved out. |

| |
|---|
| A translation of this document is available in your management office and online at nyc.gov/nycha. |
| La traducción de este documento está disponible en su oficina de administración y en Internet en nyc.gov/nycha. |
| 文件譯本可到屋邨管理辦事處或上網址 nyc.gov/nycha 索取。 |
| Перевод этого документа находится в Вашем домоуправлении и на интернете nyc.gov/nycha. |
| Please call the Language Services Unit at 212-306-4443 for an oral interpretation of this document in other languages |

NYCHA 040.821 (Rev. -//15)

# New York City Housing Authority (NYCHA)
## Highlights of House Rules, Lease Terms and Policy

| | |
|---|---|
| 10 | **Additions to Your Household**: Tenants may request permission from NYCHA for another person to reside with them in their apartments. NYCHA may grant permission for an additional person(s), upon certain conditions, including: the tenant is in occupancy and in good standing, and if the additional person is one of the acceptable relationship categories (such as child, sibling, parent, grandparent, spouse or registered domestic partner), meets the occupancy standards and passes a criminal background check. |
| 11 | **Transfers**: A tenant may request a transfer to another apartment. NYCHA may grant the transfer if the tenant is in good standing and the reason for transfer falls within one of the allowable transfer categories. If a family is allowed to transfer, the entire family must move and no one is allowed to remain in the old apartment. NYCHA may require a family to transfer if the family underoccupies the apartment or NYCHA needs the apartment for some NYCHA purpose. |
| 12 | **Emergency Transfers**: NYCHA has an emergency transfer program for Victims of Domestic Violence (VDV), Intimidated Witnesses (IW), Intimidated Victims (IV) or Child Sexual Victims (CSV) who meet certain requirements, including submitting documents to prove their status, and who are willing to move to a development selected by NYCHA within their borough of choice. If a family is allowed to transfer, the entire family must move and no one is allowed to remain in the old apartment. The abuser does not transfer and must be excluded from the old apartment. |
| 13 | **Violence Against Women Act (VAWA)**: NYCHA will not consider an incident of domestic violence, dating violence or stalking as grounds to terminate the tenancy or occupancy rights of the victim of abuse. A victim of abuse may request an Emergency Transfer if the victim is the tenant and meets the requirements of the Emergency Transfer Program (see #12 above). NYCHA may proceed to terminate the tenancy or occupancy rights of the abuser. |
| 14 | **Apartment Condition**: The apartment must be maintained in a good, clean and sanitary condition. Residents and their guests may not damage, deface or destroy the apartment or any NYCHA property. The tenant will take every reasonable precaution to prevent fires and will not store gasoline or other hazardous flammable substances in the apartment. |
| 15 | **Waste:** The tenant must dispose of all waste and trash properly. Kitty litter shall be placed in the compactor chute with other household garbage and **not** flushed down the toilet. Large items such as mattresses and other furniture must be disposed of properly and may **not** be left in common areas. |
| 16 | **Smoke Alarm / CO Detector:** The tenant must keep in good condition all smoke or Carbon Monoxide (CO) detectors. The tenant is responsible for changing the batteries so that they function properly. |
| 17 | **Moving:** <ul><li>Moving is permitted by permit only. Residents must obtain a moving permit from the management office prior to moving.</li><li>Moving is permitted only on weekdays, Monday through Friday, between 9:00 AM to 5:00 PM.</li><li>Special moving situations must be approved by development management.</li></ul> |
| | **BUILDING AND DEVELOPMENT INFORMATION** |
| 18 | **Trespassing Prohibited:** NYCHA premises are for the exclusive use of residents, invited guests, and persons with legitimate business. All persons are asked to cooperate with inquiries from NYCHA management, contract security hired by NYCHA, Resident Watch, and the police performing interior patrols (also sometimes referred to as "vertical patrols") regarding their presence or conduct in any building or on development grounds. |
| 19 | **Restricted Areas:** No persons (including residents) are permitted in restricted areas, for example: roofs, roof landings and maintenance rooms, except for authorized and emergency personnel. |
| 20 | **TV Antenna / Cable TV Dish Antenna**: A resident is prohibited from installing a TV antenna or cable dish antenna either on the roof or on the exterior of the building outside an apartment. |
| 21 | **Lobby / Stairwell / Elevator:** The lobby or stairwell is meant for resident use to either go in or out of the building or to walk from floor to floor. <ul><li>Unlawful activity, lingering, smoking, the consumption of alcohol, and the possession of an open container of alcohol, are prohibited in the lobby, corridors, and stairwell. Lingering occurs when, based on objective facts and circumstances, an individual is observed in a vestibule, lobby, stairwell, hallway or other similar common area of a NYCHA residential building for an unreasonable period of time in light of the area's intended purpose. The primary purpose of these locations is to enable entrance to and exit from the building as well as movement within the building. Activities associated with the primary purpose of such locations are permissible, including but not limited to: standing and</li></ul> |

## New York City Housing Authority (NYCHA)
## Highlights of House Rules, Lease Terms and Policy

|  | talking for a reasonable period of time; waiting for food deliveries, visitors, and transportation; meeting and greeting neighbors and friends; picking up and dropping off children; checking mailboxes; and any similar activity that occurs in the ordinary course of entrance, exit and movement within the building.<br>• Tampering with an elevator or riding on top of an elevator cab is prohibited.<br>• Leaving an entrance or exit door propped open or unlocked is prohibited. |
|---|---|
| 22 | **Parking**: NYCHA maintains parking lots as part of its residential developments and permits parking by both residents and non-residents. <u>No one may park in a parking lot without a current year parking registration sticker displayed in the windshield.</u> A sticker is valid for one year beginning May 1st. NYCHA charges different parking rates depending on whether the parking applicant is a resident or non-resident, or if the lot desired is a reserved or non-reserved lot. NYCHA also provides parking for persons with disabilities.<br>**Vehicle repair *other than the changing of tires* is NOT permitted in parking areas.**<br>Vehicles in violation of these provisions may be subject to summons and/or tow at the owner's expense. |
| 23 | **Closed Circuit TV**: NYCHA installs closed circuit television cameras in various development locations, such as lobby and mail box areas, building entrances and exits, elevators, shops, community centers and other development rooms and ground locations. The cameras are intended to deter objectionable conduct and consequently improve the safety and security of residents, employees and property. Persons may not damage or destroy cameras or obstruct camera views. |
| 24 | **Common Areas, Development Grounds and Recreational Areas**: NYCHA common areas are for the benefit of all residents. It is prohibited for any person to obstruct, damage or deface any common area, including playgrounds, picnic or barbecue areas, gardens, trees, shrubs, grass or groundcover, or to violate any of the following:<br>• Creating a nuisance or disturbance is prohibited.<br>• Rollerblading, bicycle riding and skateboarding are prohibited.<br>• The consumption of alcohol and possession of an open container of alcohol are prohibited, including in community centers.<br>• Drug Sale, Use or Possession<br>• Barbecues without a NYCHA permit are prohibited.<br>• Basketball courts close at 10:00PM. All other parks close at dusk, unless otherwise indicated.<br>• Sound amplification devices are prohibited except by NYPD permit.<br>• Littering and illegal dumping are prohibited.<br>• The use of vehicles on sidewalks, internal roadways, and walkways is prohibited except for emergency vehicles and NYCHA authorized vehicles.<br>All persons must comply with specific signs posted throughout the development regarding their use of or conduct in any area. |
| | <center>**GENERAL INFORMATION**</center> |
| 25 | **Pets**:<br>• A family may maintain <u>one dog</u> **or** <u>one cat</u>, provided that it is registered with the development office. Dogs registered after February 1, 2010 may not weigh more than 25 pounds when full grown. Doberman Pinchers, Pit Bulls and Rottweilers are not permitted.<br>• Dogs or cats NOT registered with NYCHA are prohibited from common areas and development grounds.<br>• All dogs (including dogs that are Service Animals) in common areas and on development grounds must wear a currently valid metal tag issued by NYCHA and must also have a Department of Health and Mental Hygiene metal tag with license number displayed on a collar about its neck at all times.<br>• A family may obtain a Service Animal if a doctor verifies that the animal assists, supports or provides service to a resident with disabilities. Service Animals must be registered with the development office.<br>• Small caged animals, birds or fish (for example: parakeets, canaries, goldfish, hamsters and gerbils - this does **NOT** include dogs or cats) reasonably maintained are permitted, provided they are not prohibited by law. These animals do not have to be registered with NYCHA.<br>• Dogs in common areas must be restrained by a leash 6 feet or less. Pets are prohibited from roofs.<br>• Dogs must be curbed. Solid dog waste must be picked up. |
| 26 | **Reasonable Accommodation**: NYCHA provides reasonable accommodation to meet the needs of persons with disabilities. To request a reasonable accommodation, contact your development manager or the NYCHA Department of Equal Opportunity, Services for the Disabled. |

**New York City Housing Authority (NYCHA)**
<u>**Highlights of House Rules, Lease Terms and Policy**</u>

| 27 | **Community Service:** Every resident must perform 8 hours every month of Community Service or Economic Self-Sufficiency activities unless he or she is exempt. NYCHA notifies a family every year of Community Service requirements. |
|---|---|
| 28 | **Termination of Tenancy**: NYCHA may start a proceeding to terminate tenancy if a tenant or family member commits a crime, is a source of danger to other residents, causes damage to people or property, creates a nuisance, breaches NYCHA rules or is chronically delinquent in the payment of rent. |

**New York City Housing Authority (NYCHA)**
**Highlights of House Rules, Lease Terms and Policy**

*NOTE: The Lease requires that a tenant (lessee) is responsible for the behavior of his/her family members and guests.*

NYCHA requires that the tenants and all authorized household members age 18 and older sign below to indicate they have received and reviewed these highlights of NYCHA's House Rules, Lease Terms and Policy.

If a household member cannot sign because of a physical or mental disability, or because the person is temporarily away from the apartment (such as in an out-of-town school or away in the military), print that person's name on a line and state the reason that he or she can not sign.

**Note** that you must separately inform your development housing assistant if a household member was permanently removed from the household.

***Attach an additional sheet with signature lines if necessary.***

_____     _____
Tenant – person who signed the NYCHA lease (*print and sign name*)          Date

_____     _____
Tenant - person who signed the NYCHA lease (*print and sign name*)          Date

_____     _____
Authorized Household Member over age 18 (*print and sign name*)          Date

_____     _____
Authorized Household Member over age 18 (*print and sign name*)          Date

_____     _____
Authorized Household Member over age 18 (*print and sign name*)          Date

_____     _____
Authorized Household Member over age 18 (*print and sign name*)          Date

_____     _____
Authorized Household Member over age 18 (*print and sign name*)          Date

_____     _____
Authorized Household Member over age 18 (*print and sign name*)          Date

NYCHA 040.821 (Rev. -//15)

# REVISED EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KELTON DAVIS, *et al.*, individually and on behalf of a class of all others similarly situated; <br><br> Plaintiffs, <br><br> - against - <br><br> THE CITY OF NEW YORK and NEW YORK CITY HOUSING AUTHORITY; <br><br> Defendants. | 10 Civ. 0699 (SAS) <br> ECF Case |

## NOTICE OF PROPOSED CLASS ACTION SETTLEMENT

Eleanor Britt, Rikia Evans, Vaughn Frederick, Roman Jackson, Kristin Johnson, Shawne Jones, Patrick Littlejohn, Raymond Osorio, Lashaun Smith, Hector Suarez, and Andrew Washington, individually and on behalf of a class of all others similarly situated ("Plaintiffs"), Defendant City of New York ("City"), and Defendant New York City Housing Authority ("NYCHA"), who are parties to the *Davis, et al.* v. *City of New York, et al.* class action now pending in the United States District Court, have reached an agreement, subject to approval of the Court, to settle this case ("Settlement Agreement"). This Notice describes the proposed Settlement Agreement and how it may affect your legal rights. The proposed Settlement Agreement will not go into effect until: (1) individuals whose rights may be affected by the proposed Settlement Agreement have had the chance to object to it; and (2) the Court has a hearing and approves the Settlement Agreement as fair, adequate, and reasonable, and all appeals from that approval have been exhausted.

Your rights as a member of the Plaintiff Class are affected by this Settlement Agreement if you are:

(1) an African-American or Latino resident of a NYCHA apartment—or a family member, authorized guest or visitor of a NYCHA resident—who, since January 28, 2007, has been or would be unlawfully stopped, seized, questioned, frisked, searched and/or arrested for trespass by New York City Police Department ("NYPD") officers in or around NYCHA residences; and/or

(2) a NYCHA resident whose family member, authorized guest or visitor, since January 28, 2007, has been or would be unlawfully stopped, seized, questioned, frisked, searched, and/or arrested for trespass by NYPD officers in or around NYCHA residences.

In this lawsuit, the Plaintiff Class alleges that (1) NYPD officers violated federal and state law in their enforcement of New York State trespass laws in public housing residences, and (2) NYCHA violated federal law by creating unreasonable lease terms when issuing its "Highlights of House Rules, Lease Terms and Policy."

Below is a brief summary of what the Settlement Agreement will address and provide if it is approved by the Court:

- Revisions to the NYPD Patrol Guide that instruct NYPD officers how to conduct interior (or "vertical") patrols of NYCHA residences in a manner that respects the rights of NYCHA residents and their authorized visitors;

- Revisions to certain NYPD training materials that instruct NYPD officers how to conduct interior (or "vertical") patrols of NYCHA residences, and how to enforce NYCHA rules when conducting those interior patrols, in a manner that respects the rights of NYCHA residents and their authorized visitors;

- Revisions to a "Trespass Crime Fact Sheet" and a requirement that NYPD officers complete this form after making any arrest for trespass in or around NYCHA residences;

- Revisions to NYCHA's "Highlights of House Rules, Lease Terms and Policy," which makes clear that (1) NYCHA residents are asked, but not required, to cooperate with inquiries from NYPD officers, and (2) clarifies the prohibited activity of "lingering" in common areas of NYCHA residences; and

- Full participation in a Court-ordered monitoring process with the parties in the "stop-and-frisk" case, *Floyd* v. *City of New York*, 08 Civ. 1034, which will reform the NYPD's training, supervision, monitoring, and discipline policies and practices with respect to trespass enforcement in or around NYCHA residences, and will provide an opportunity for community members, including NYCHA residents, to voice their opinions and experiences during the development of those reforms. This process will be overseen by the Court.

Upon approval by the Court, the Settlement Agreement will resolve and release pending claims of the Plaintiff Class against Defendant City and Defendant NYCHA relating to trespass enforcement that have been or, could have been, asserted in *Davis, et al.* v. *City of New York, et al.* prior to the date that the Settlement Agreement goes into effect. This Notice does not constitute a determination by the Court concerning the merit or lack of merit of the allegations made by Plaintiffs against Defendants in this case. Further, Defendants do not admit to any liability of any kind in the Settlement Agreement.

The entire Settlement Agreement is available on the following websites:

> http://www.naacpldf.org/DavisClass

> http://www.legal-aid.org/en/criminal/criminalpractice/davissettlement.aspx

In addition, the Settlement Agreement is available for review at the Office of the Clerk of the Court, United States District Court for the Southern District of New York, 500 Pearl Street, New York, NY 10007-1312.

If you have questions about the proposed Settlement Agreement, or wish to receive a copy of the Settlement Agreement but do not have access to the Internet to download a copy online, you may contact the following civil rights organization, which serves as counsel for the Plaintiff Class, by telephone or email:

> Jin Hee Lee or Rachel Kleinman
> NAACP Legal Defense & Educational Fund, Inc.
> (877) 301-2201
> DavisClass@naacpldf.org

You may, of course, seek the advice and guidance of your own attorney if you desire. The Court cannot respond to any questions regarding this Notice, the lawsuit, or the proposed Settlement Agreement.

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, a hearing ("the Fairness Hearing") will be held before the Honorable Shira A. Scheindlin, U.S. District Judge, to determine whether a proposed settlement of this action, on the terms and conditions set forth in the Settlement Agreement, should be approved as fair, reasonable, and adequate, as recommended by both the attorneys representing the Plaintiff Class and those representing the Defendants. THE FAIRNESS HEARING WILL TAKE PLACE IN COURTROOM 15C OF THE UNITED STATES COURTHOUSE, 500 PEARL STREET, NEW YORK, NEW YORK, ON WEDNESDAY, APRIL 22, 2015, BEGINNING AT 4:00 P.M. Any interested person may attend the Fairness Hearing.

YOU DO NOT NEED TO APPEAR AT THE FAIRNESS HEARING OR TAKE ANY OTHER ACTION TO INDICATE YOUR APPROVAL OF THE SETTLEMENT AGREEMENT. You do not need to take any action in response to this Notice.

If, however, you are a Class Member, you have the right to object to and/or comment on the proposed Settlement Agreement. Your comment may be in favor of the proposed Settlement Agreement, or you may object to any aspect of the proposed Settlement Agreement.

**IF YOU HAVE ANY OBJECTIONS OR COMMENTS TO THIS SETTLEMENT AGREEMENT AND/OR WISH TO STATE YOUR OBJECTIONS AT THE FAIRNESS HEARING, YOU MUST FOLLOW THE INSTRUCTIONS SET FORTH BELOW**.

**If you wish to submit written objections or comments to the proposed Settlement Agreement**, you must complete and deliver (by mail, private delivery service, personal delivery, or email) a Written Objection Submission Form together with your written objections to the NAACP Legal Defense & Educational Fund, Inc. by April 1, 2015.

**If you wish to submit written objections or comments to the proposed Settlement Agreement and speak at the Fairness Hearing**, you must complete and deliver (by mail, private delivery service, personal delivery, or email) a Request to Speak Form together with your Written Objection Submission Form and your written objections to the NAACP Legal Defense & Educational Fund, Inc. by April 1, 2015.

Written Objection Submission Forms and Request to Speak Forms are available from Plaintiffs' Counsel by accessing the website addresses or contacting the telephone number and email address listed above. Addresses for Plaintiffs' Counsel are:

NAACP Legal Defense & Educational Fund, Inc.
Attn: Davis Class Settlement
40 Rector Street, 5th Floor
New York, NY 10026
DavisClass@naacpldf.org

Copies of all objections will be forwarded by Plaintiffs' Counsel to Counsel for Defendants and provided to the Court before the Fairness Hearing.

# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KELTON DAVIS, *et al*., individually and on behalf of a
class of all others similarly situated;

Plaintiffs,

- against -

THE CITY OF NEW YORK and NEW YORK CITY
HOUSING AUTHORITY;

Defendants.

10 Civ. 0699 (SAS)
ECF Case

## STIPULATION AND [PROPOSED] ORDER

      **WHEREAS**, on _____, the above-captioned class action was dismissed with prejudice after and pursuant to the Final Approval of the Stipulation and Order of Settlement, dated _____ (annexed hereto as Exhibit A) (the "Settlement");

      **WHEREAS**, pursuant to the Settlement, the district court retained jurisdiction to enforce the Settlement and to issue and enforce orders related to the Settlement in the above-captioned action;

      **WHEREAS**, pursuant to the Settlement, the above-captioned action was transferred to this Court after the dismissal with prejudice for the purposes of enforcing the Settlement;

      **WHEREAS,** pending before this Court, is enforcement of the Opinion and Order, dated August 12, 2013, Doc. No. 372, as modified by the Order Modifying Remedial Order, dated July 30, 2014, Doc. No. 466, Order in *Floyd* v. *City of New York*, 08-CV-1034, attached as

Exhibit B and Exhibit C to this Stipulation[1] (the "Remedies Order"), which included the court-appointment of a Monitor to develop a set of reforms of the New York Police Department policies, training, supervision, monitoring and discipline regarding stop and frisk practices; and

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND ORDERED**, by and between the undersigned, as follows:

1.      The terms and provisions of the Remedies Order are incorporated in full into the above-captioned case for the purpose of enforcing the Settlement as it pertains to reforms to the NYPD's policies and practices regarding trespass enforcement in or around NYCHA residences, including training, supervision, monitoring, and discipline of officers.

2.      All orders issued by this Court in connection with the Remedies Order will have full force and effect in the above-captioned action.

2.      The Monitor's duties in the Remedies Order are hereby ordered to include implementation of paragraphs D, E, F, G, and H of the Settlement and any related necessary reforms developed by the Monitor in consultation with the parties concerning training, supervision, monitoring, and discipline of officers regarding trespass enforcement in or around NYCHA residences, for purposes of ensuring, to the Court's satisfaction, that trespass enforcement in or around NYCHA residences are conducted in compliance with all applicable law.

---

[1] See also Opinion and Order, dated August 12, 2013, Doc. No. 120, as modified by the Order Modifying Remedial Order, dated July 30, 2014, Doc. No. 198, Order in *Ligon* v. *City of New York*, 12-CV-2274 (S.D.N.Y.) (SAS).

Dated:    New York, New York
          _____, 2015


_____          _____
Sherrilyn Ifill                      Zachary W. Carter
  Director Counsel                     Corporation Counsel of the City of New York
Janai Nelson                         Brenda E. Cooke
Christina Swarns                     Muriel Goode-Trufant
Jin Hee Lee                          NEW YORK CITY LAW DEPARTMENT
Rachel Kleinman                      100 Church Street
NAACP LEGAL DEFENSE AND              New York, New York 10007
  EDUCATIONAL FUND, INC.             Tel: (212) 513-0462
40 Rector Street, 5th Floor          Fax: (212) 356-3509
New York, NY 10006
Tel: (212) 965-2200
Fax: (212) 226-7592                  *Attorneys for Defendant City of New York*


_____
Seymour James
  Attorney-in-Chief
William Gibney
Steven Wasserman
THE LEGAL AID SOCIETY OF NEW
YORK
199 Water Street, 6th Floor
New York, NY 10038
Tel: (212) 577-3419
Fax: (212) 509-8141


_____
Michele Hirshman
Erin E. Elmouji
Elana R. Beale
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Fax: (212) 492-0740

*Attorneys for the Plaintiff Class and*
*Individual Plaintiff Class Representatives*

IT IS SO ORDERED:

_____

Analisa Torres, United States District Judge