EQUAL JUSTICE UNDER LAW

# NEW YORK CITY
# JOINT REMEDIAL PROCESS

## On NYPD's Stop, Question, and Frisk, and Trespass Enforcement Policies



# FINAL REPORT AND RECOMMENDATIONS

**Hon. Ariel E. Belen (Ret.)**
**Facilitator**

# NEW YORK CITY STOP & FRISK
# JOINT REMEDIAL PROCESS

## Facilitation Team

| | |
|---|---|
| Facilitator | Hon. Ariel E. Belen (Ret.) |
| Senior Advisor | Reinaldo Rivera |
| Project Manager | Jeanene Barrett, Ph.D. Candidate |
| Assistant Project Manager | Valerie Paul |
| Project Attorney | Cliff Bloomfield, Esq. |
| Project Assistant | Jennifer Dionicio |

## JAMS Administrative Team

| | |
|---|---|
| JAMS General Manager | Matthew York |
| JAMS Case Manager | Alicia Jantsch |
| JAMS Case Manager | Anne Goodwin |

*Cover Photo: The cover page contains a photograph of an abandoned warehouse visible from Third Street in the Gowanus section of Brooklyn. The graffiti on the parapet reads "End Stop and Frisk Hands off the Kids"*

## TABLE OF CONTENTS

SECTION I: EXECUTIVE SUMMARY ........................................................................ i

SECTION II: INTRODUCTION ............................................................................... 1

SECTION III: GENERAL OVERVIEW OF THE JOINT REMEDIAL PROCESS.................. 14

SECTION IV: RECENT HISTORY OF POLICE-COMMUNITY RELATIONS IN IMPACTED COMMUNITIES: .............................................................................................. 42

SECTION V: JOINT REMEDIAL PROCESS DESIGN AND IMPLEMENTATION ............ 125

  1.  Convening Phase ...................................................................................... 125

  2.  Focus Group Phase .................................................................................. 135

  3.  Leadership Meeting Phase ........................................................................ 171

  4.  Community Forum Phase .......................................................................... 193

SECTION VI: JOINT PROCESS REFORM RECOMMENDATIONS .................................. 218

  1.  Creation of Permanent Structures for Feedback Regarding Officer Conduct – Feedback Loops ................................................................................................... 219

  2.  Monthly NYPD Discipline Report ............................................................ 222

  3.  Disciplinary Recommendations ................................................................ 223

  4.  Body-Worn Cameras ............................................................................... 225

  5.  Recording Level 1 and Level 2 Encounters ................................................ 230

  6.  Accessing Stop Reports ........................................................................... 236

  7.  Community Engagement ........................................................................... 236

  8.  Public Education Campaign ...................................................................... 247

  9.  Community Surveys ................................................................................. 250

  10. Use of Stop, Question, and Frisk to Develop Youth Informants ................... 251

  11. Mental Health and Disability Training ....................................................... 253

  12. LGBTQ-Specific Training and Community Engagement ............................. 254

  13. Implementing the Use of Civil Summonses for Trespass Enforcement by Extending the Criminal Justice Reform Act of 2016. ....................................................... 257

  14. Trauma Informed Training – Community Impact ........................................ 259

SECTION VII: AREAS FOR POLICY CONSIDERATION ................................................ 260

  1.  Need for Greater Resources to Accommodate Homeless Youth .................... 260

2. NYCHA/TAP Responsibility ........................................................................................ 262

3. Interactions Between NYCHA Tenants and the NYPD ............................................ 264

4. NYPD Practices at Subway Stations ........................................................................ 265

5. Community Investment .............................................................................................. 266

6. Repeal of Civil Rights Law § 50-A ........................................................................... 267

7. Cultural Competency Training .................................................................................. 272

8. Neighborhood Coordination Officers ....................................................................... 274

9. Community Engagement – Reconciliation ............................................................... 275

10. Police Trauma – NYPD Employee Assistance Program ......................................... 276

11. Training for Plainclothes Police Officers ................................................................ 277

12. Criminal Court Search and Seizure Inquiry at Arraignment ................................. 277

SECTION VIII: PROCESS OBSERVATIONS AND LESSONS LEARNED ........................ 280

SECTION IX: CONCLUSION ................................................................................................ 303

## SECTION I: EXECUTIVE SUMMARY



Justice Ariel E. Belen (Ret.) was appointed by Judge Analisa Torres of the Southern District of New York in November 2014 to serve as the Facilitator to guide the Joint Remedial Process described in the "Remedies Opinion" in *Floyd v. City of New York* and *Ligon v. City of New York* Nos. 08 Civ. 1034 and 12 Civ. 2274. *See* 959 F. Supp. 2d 668 (S.D.N.Y. 2013). The Remedies Opinion highlighted community input as a "vital part of a sustainable remedy in this case," and placed the input of those communities "most affected by [the New York City Police Department's ("NYPD")] use of stop and frisk" at the "center of the Joint Remedial Process." In the Court's view, "If the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful." *Id.* at 686. The Remedies Opinion ordered the Joint Remedial Process to provide supplemental reform ideas in addition to the "Immediate Reforms" overseen by Monitor Peter Zimroth. These supplemental reforms may be no broader than necessary to bring the NYPD into constitutional compliance.

### CONVENING PHASE

In his role as Facilitator, Justice Belen conducted, along with the parties and various stakeholders, a civic engagement process to build relationships with individuals and

organizations most directly impacted by the NYPD's unconstitutional stop, question and frisk ("SQF") and trespass enforcement policies. The Facilitator and his Team met with over 40 organizations to obtain input concerning proposed reforms related to the SQF and trespass enforcement practices of the NYPD and to help develop the process by which this community engagement should be conducted.

### FOCUS GROUP PHASE

The Facilitation Team conducted a total of 64 focus group meetings — 40 groups focused on street stops and 24 groups focused on trespass enforcement. These focus groups were done in collaboration with community organizations, advocacy groups, community centers within New York City Housing Authority ("NYCHA") developments, and the NYPD. The Facilitation Team also participated with the Monitor in focus groups of NYPD patrol officers, sergeants, lieutenants, commanding officers, and executives. Focus Groups were conducted between October 2015 and February 2017.

### LEADERSHIP MEETING PHASE

The Facilitation Team conducted a total of 19 leadership meetings over the course of the Joint Remedial Process. The goal of the leadership meetings was to seek reform ideas from thought leaders at community, advocacy, clergy and policy organizations. The views shared at these meetings represented the judgement of professionals often based on their direct work with individuals and communities impacted by unconstitutional SQF and trespass enforcement practices. The formal meetings took place between July 2016 and February 2017.

### COMMUNITY FORUM PHASE

The Facilitation Team conducted 28 community forums throughout the 5 boroughs between October and December of 2016. The Community Forum Phase produced a series of public proceedings that included collaboration with the NYPD and many grassroots, community, clergy, and police reform organizations. These organizations worked in conjunction with the Facilitation Team to bring communities most impacted by SQF to solutions-oriented conversations in the form of community forums. Nine of the forums included the attendance and active participation of NYPD officers.

### FINAL REPORT PHASE

From January 2017 to March 2018, the Facilitation Team met with the plaintiff teams in the *Floyd*, *Davis*, and *Ligon* cases, as well as the Monitor's team and the NYPD to further develop and contextualize proposed reforms related to the NYPD's SQF and trespass enforcement policies. Concurrently, the Facilitation Team collated reform suggestions from the Focus Group, Leadership Meeting, and Community Forum Phases to extract overarching themes for the Final Report.

In total, the Joint Remedial Process was able to reach nearly 2700 civilians and police officers across New York City, and over 80 different organizations both nationally and locally, over a three-year course of proceedings (*see* Figure 1).

**Figure 1:** Estimated number of participants

| PHASE | ESTIMATED NUMBER OF PARTICIPANTS |
|---|---|
| Convening (Relationship Building) Phase | 240[1] |
| Focus Group Phase | 516 |
| Leadership Meeting Phase | 132 |
| Community Forum Phase | 1,777 |
| **TOTAL** | 2,665 |

This Final Report will provide by sections an Introduction; General Overview of the Joint Remedial Process; Recent History of Police-Community Relations in Impacted Communities with Calls for Greater Respect, Transparency, and Accountability; Joint Remedial Process Design and Development; Joint Remedial Process Findings and Recommendations; Areas for Policy Consideration; Process Observations; and an Appendix. In addition, nine white papers from community groups and the NYPD on the needs and current status of reforms are appended. The Final Report makes 14 specific reform recommendations based on the community input that we received during the Joint Remedial Process. It also contains several areas for policy consideration that although outside the scope of the Joint Remedial Process merit consideration by stakeholders and policy makers alike.

---

[1] Estimate based on roughly 80 organizational meetings with an average of three community leaders per meeting.

## SECTION II: INTRODUCTION

Although many Americans may not be able to articulate the basis for their opinion, they would agree that as a general rule a police officer cannot approach, detain, question, frisk, or search someone on a mere whim. Most Americans probably believe that because we do not live in a police state, the police are not at liberty to just stop a person on the street and question them much less search them without having a good reason to do so.

The legal reason that police officers cannot do so is because of an interpretation of the Fourth Amendment prohibition against unlawful searches and seizures rendered fifty years ago by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). In thousands of opinions issued over the past half century, state and federal courts have relied on *Terry's* holding that a police officer may only stop and briefly detain a person for questioning if that officer has a reasonable suspicion, supported by articulable facts, that that person has engaged in criminal activity or is about to engage in criminal activity. And under *Terry*, a pat down (that is, a frisk) is only permitted when an officer reasonably suspects that the person he or she has stopped is armed or dangerous: the purpose of a frisk is only to see if the person who has been stopped has a weapon, it is not a generalized search for contraband.

Imagine then that you live in one of the tonier sections of New York City, say the Upper East Side of Manhattan, and that you are white, middle or upper class. Imagine that your teenage son tells you that he was stopped, questioned, manhandled, searched, and left standing with his book bag emptied on the sidewalk by some New York City Police Department ("NYPD") officers who never explained why they had done this to him. Imagine further that he says that this is happening to him on his way back and forth from school, sometimes every day, sometimes

1

once or twice a week, sometimes once or twice a month. Imagine further that you are satisfied that he has not been breaking the law, and in fact he has not been arrested or issued a summons during any of these encounters, and that he can't tell you the name of any of the officers involved since the one or two times he asked for a name, the officers became extremely hostile if not violent. Imagine that you tried repeatedly to find out who was doing this to your son, and for what reason, and that you could never get any explanation from the local precinct or the NYPD. Imagine further that over the course of many months, if not years, your son was being subjected to what you can't ever imagine happening to you because you are not a criminal, you live in a nice neighborhood, and nothing in your life experience remotely suggests that police officers can do this to you precisely because you live in New York City, in America, and pay taxes to support the very same police department that is treating your son in this unimaginable way.

At some point, you go on the Internet and find out the police can only stop you in this way if they have reasonable suspicion to believe you have committed a crime. Your research also tells you that reasonable suspicion means things like a police officer sees you take cash in exchange for a glassine envelope, or sees you at night trying to break into some closed stores, or sees you in a parking lot moving from car to car trying to jimmy the locks. Then you might think: "Well I have never done these things and my son may have some issues, but he would never do these things — what is going on here? Is this America?"

All of the above is not just the product of someone's imagination. It happened repeatedly in New York City over the course of roughly two decades. But it happened in places that most middle class Americans neither work nor live.

It was commonplace in neighborhoods such as Harlem, Washington Heights, and the Lower East Side in Manhattan; East New York, Bedford Stuyvesant and Red Hook in Brooklyn; Stapleton in Staten Island; and in the South Bronx; as well as in New York City Housing Authority ("NYCHA") developments around the City. Hundreds of thousands of these stops were reported by the NYPD from 2003 to the present. The vast majority, indeed 87%, of those stopped were black or Latino youth between the ages of 14 and 24. Although the stops were nominally based on reasonable suspicion that a crime had occurred or was in progress, an average of only 12% of these stops resulted in an arrest or a summons. It is, of course, difficult to reconcile the notion of "reasonable" suspicion with a failure rate of over 80%.[2]

Presumably, the reason that most New Yorkers were unaware that so many fellow New Yorkers had suffered the shock and indignity of these unlawful stops was that they occurred in poor, isolated neighborhoods and housing developments that although sometimes only blocks away, were far removed from the lives and consciousness of middle and upper class New Yorkers.

The number of recorded stops went from approximately 150,000 annually in 2003 to about 684,000 in 2011. The number of recorded stops then started to drop to the point that in 2017, the NYPD reported less than 10,000. Although there is a serious concern with underreporting now, it is generally agreed that the overall number of stops has been reduced significantly. Besides the obvious concerns raised by the unlawful and widespread violation of constitutional rights, these policies also had the effect of traumatizing an entire generation of

---

[2] It should be noted that statistics mentioned within this paragraph were based on several analyses of NYPD publicly available Stop, Question and Frisk Data retrieved from http://www1.nyc.gov/site/nypd/stats/reports-analysis/stopfrisk.pag

young people. Sadly and ironically, the NYPD itself now accepts that there was no correlation between these stops and public safety as crime in the City has consistently decreased through this period of time even as these unlawful stops increased and then decreased so dramatically.

The Joint Remedial Process was ordered as a result of findings after a trial by Judge Shira Scheindlin of the Southern District of New York that the NYPD had engaged in widespread violations of the civil rights of hundreds of thousands of New York City residents by conducting these stops and in the manner they enforced trespass laws in public housing. The Court issued its post-trial findings in an opinion we will refer to as the "Liability Opinion." *See* 959 F. Supp. 2d 540 (S.D.N.Y. 2013). The Court found not only that these practices violated the federal and New York state constitutional right to be free from unreasonable searches and seizures, but that there had also been widespread racial profiling in the manner in which the NYPD implemented its stop, question, and frisk and trespass enforcement practices.

The NYPD polices the largest, most diverse city in the United States. New York City has a resident population of approximately 8.5 million with a daytime population including commuters and tourists that far exceeds that number. It comprises 302.6 square miles spread out over five boroughs, four of which are non-contiguous and three of which are on separate islands with only the Bronx forming part of the mainland United States. Within its borders are vast skyscrapers, two international airports, several major transportation hubs, 472 subway stations, some of the richest real estate on the planet, and some of the poorest, most crime-affected neighborhoods in the country. It is a world capital of finance and culture, and home to national landmarks and historic icons such as the Statue of Liberty, the Empire State Building, and the World Trade Center. Tragically, this made it the victim of the worst terrorist attack in U.S. history on September 11, 2001.

All of these social, geographic, demographic, and structural elements present unique challenges to the NYPD. The NYPD must respond to and protect all of the City's residents against a constant terrorist menace as well as the more mundane but just as potentially deadly threats of street crime, drug profiteering, and gun violence.

The NYPD is arguably the most technologically advanced and efficient police force in the world. Its crime fighting strategies are renowned and serve as a model for urban police departments worldwide. The NYPD is also the largest police force in the country with approximately 50,000 employees including 35,000 police officers, with approximately 20,000 officers on patrol on any given day. It has managed to reduce crime to unimaginably low levels lessening the incidence of homicides, for example, from 1,444 in 1970 to fewer than 300 in 2017. It has broken all previous records in crime reduction and New York City is now arguably the safest large city in America.

Policing is a dangerous activity. It entails responding to natural or manmade emergencies on a regular basis, the kinds of situations that most people avoid at all costs. The overwhelming majority of police officers do their very dangerous and often unappreciated work out of a deep sense of devotion to their fellow New Yorkers. It often requires that an officer confront violent criminals who have little if no respect for accepted norms of civilized behavior. From the date of the commencement of the Joint Remedial Process in November, 2014, to the present, seven police officers, 6 men and 1 woman, have been killed in the line of duty. These honorable public servants lost their lives by putting on a uniform and agreeing to put themselves between criminals and the residents of New York City. This commitment to serve and protect even at the risk of one's own life must always be kept top of mind in the context of recommending reforms.

New York City is a far different place than the City of the late 1980's and early 1990's when certain stop, question, and frisk policies were beginning to be implemented. Any New Yorker who has lived through these decades can remember a time when crime was the order of the day. No one would think of riding a subway train after 9:00 p.m. for fear of being mugged or assaulted. Chain snatchings, robberies, car thefts, pickpocketing, prostitution, open drug dealing, shootings, and homicides were commonplace. Entire neighborhoods would shut down at dark and people walked the streets at night at their own peril. Even though it may have seemed appropriate to adopt proactive policies and procedures in response to this epidemic, it is now recognized that crime levels consistently dropped throughout this period even as the number of unconstitutional stops, and thus the total number of stops, began to significantly decrease after 2011. In other words, even if one thought it appropriate to subject the residents of the neighborhoods most beset by high crime to wholescale violations of their constitutional rights and the indignity and trauma this inflicted in the name of reducing crime, there just wasn't any good reason to do so since there was no correlation between the number of stops and reductions in crime.

Which is not to say that widespread unjustified stops and racial profiling means that the officers making these stops are racist or don't care about the communities they police. Officers in New York City felt great pressure to increase the number of stops they made. This pressure came from the NYPD itself. As has been well-chronicled both in the Liability Opinion and in the Monitor's Seventh Report dated December 13, 2017, one source of this pressure was the reliance on certain metrics in measuring performance. In essence, commanding officers felt pressure at CompStat meetings to demonstrate that the officers they supervised were very active on the job. Line officers in turn responded to this pressure by making many stops. The pressure was

institutionalized in a performance evaluation system which tracked activity such as summonses, arrests, and stops as the basis for determining assignments, promotions, and other personnel matters. A new performance evaluation system put into place during the Monitorship specifically excludes such metrics as a measure of performance.

This report should not be read in any respect as a condemnation of the NYPD and its officers. The effort, instead, is to illustrate how these unconstitutional stop, question, and frisk and trespass enforcement policies led to widespread trauma, fear, and deep mistrust across many neighborhoods in New York City and to give a forum for these impacted communities to propose any recommendations they may have for further reforms to the NYPD.

In order to maintain civil society and democratic processes, we expect police officers to act with great restraint and proceed carefully and deliberately in their encounters with the public. The NYPD fully embraces this concept in its current leadership and has made significant reforms both as part of the pending Monitorship and on its own. These reforms include the development of one the most enlightened police training curriculums in the country and the institution of community policing through the Neighborhood Coordinating Officers Program. As set forth in the Monitor's Seventh Report, Commissioner James O'Neill himself appears in a training video acknowledging the ongoing problems, saying the following:

> There was a debate in New York City during the past several years about the NYPD's use of stop, question, and frisk. It was a tool that was over-used and sometimes misused. And that led to widespread resentment and distrust of our department, especially in communities of color. To be clear: I'm not laying fault for this on you. You did what the leadership of the department asked, and the leadership bears responsibility for the consequences. The NYPD has since scaled back on stops dramatically. The Department is now working with a court-appointed federal monitor to ensure that stop, question, and frisk in New York City meets

constitutional standards. The law surrounding this policing tactic can seem complicated. But it is critically important that we learn the law and work within its confines. Doing so will protect you from legal action. It will also help preserve an essential policing tool.

In 1968, the U.S. Supreme Court recognized [in *Terry*] that – to do our job — officers must have the authority to conduct lawful stops based on reasonable suspicion of criminality. Cops know that stops help prevent and solve crimes every day. But it is also clear that their overuse, or misuse, undercuts both the legitimacy of the stops and the legitimacy of the police. As we move forward with neighborhood policing and seek greater connectivity with every community across the city, it is essential that enforcement generally — and investigative encounters in particular — are conducted with precision. Large numbers of arrests, summonses, and stops are not our goal. A safe city is our goal. And we can best achieve it by working more closely with the people in every neighborhood, and by exercising our police powers with discretion and good judgment.

The NYPD deserves great credit for these reforms. However, the communities most adversely affected by the widespread abuse of stop, question, and frisk and trespass enforcement policies point out that these abuses, while significantly diminished, still continue and are underreported. There remains considerable doubt in these communities that there were less than 10,000 stops in 2017. There exists deep levels of mistrust of the NYPD, and great skepticism remains about the NYPD's willingness to be transparent and to hold its officers and managers accountable, especially around the discipline of police officers engaging in misconduct. Aided by the plaintiffs' presentation of testimony from policing experts, the Court ordered certain "Immediate Reforms" to be developed by the Court-appointed Monitor in consultation with the parties. At the same time, the Court was not satisfied with only relying on the advice of policing experts. The Court recognized that "The communities most affected by the NYPD's use of stop and frisk have a distinct perspective that is highly relevant to crafting effective reforms." And

that "No amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety."[3]

The Court ordered the appointment of a Facilitator to conduct a Joint Remedial Process in consultation with the parties to obtain this community input. It is important to bear in mind that much has happened since the commencement of the Joint Remedial Process more than three years ago. Cell phones and other devices have been used to record instances of excessive force and of unjustified shootings of unarmed civilians by police officers that have gone viral through social media and otherwise and have resulted in civil unrest. As a consequence, there have been federal civil rights investigations and consent decrees in cities throughout the United States. In New York City alone, there have been prosecutions and administrative disciplinary proceedings brought against police officers for the deaths of Eric Garner and Ramarley Graham.

While the Joint Remedial Process has evolved in this historical and political context, its jurisdiction is limited to reporting on recommendations for additional reforms from those communities most adversely affected by the stop, question, and frisk and trespass enforcement policies of the NYPD. At the same time, the legacy effects of stop, question, and frisk and trespass enforcement abuses are still being felt in impacted communities, as is the historical trauma caused by decades upon decades of police misconduct not limited to stop, question, and frisk and trespass enforcement abuses.

While the continuing challenges of other criminal justice issues such as unjustified police violence and mass incarceration are not within the specific scope of the Joint Remedial Process,

---

[3] Remedies Opinion, 959 F. Supp. 2d at 686.

it is difficult to divorce stop, question, and frisk and trespass enforcement abuses and reform from these contexts. This is because they are clearly important and contribute to worsening relations between the NYPD and impacted communities. This, in turn, has a direct impact on how the police perceive people and how they react to those they approach and question and how members of the community perceive and react both before and after being approached and questioned by the police. The legal definition of a stop, for example, is that a reasonable person approached by an officer does not feel free to leave. An individual living in a community awash with destructive police-community interactions is likely to be more apt to believe they have been stopped when an officer approaches than a well-heeled resident of the Upper East Side for whom stop and frisk, excessive force, and mass incarceration are just things they may read about in the New York Times. And for many reasons, including distrust and implicit bias, an officer approaching members of these disparate communities is more apt to find "reasonable suspicion" of criminal activity, the circumstance warranting a stop, in one community than in the other. The possibility of escalation is also heightened as these encounters are fraught with tension.

*       *       *

This Final Report provides by sections a General Overview of the Joint Remedial Process; Recent History of Police-Community Relations in Impacted Communities with Calls for Greater Respect, Transparency, and Accountability; Joint Remedial Process Design and Development, with its component phases; Joint Remedial Process Findings and Recommendations; Areas for Policy Consideration; Process Observations; and an Appendix.

The Final Report makes 14 specific reform recommendations based on the community input that we received during the Joint Remedial Process. It also contains several areas for policy

10

consideration that although outside the scope of the Joint Remedial Process merit consideration by stakeholders and policy makers alike.

The overarching theme of the input received during the Joint Remedial Process, which is reflected in the recommendations in this Final Report, is that the NYPD must demonstrate greater respect, transparency, and accountability in order to gain greater trust, goodwill, and collaboration in impacted communities. There are many organizations and individuals who seek this collaboration in these communities. We hopefully have charted a course for the NYPD to pursue this collaboration.

I would like to thank Michael D. Young, who served as Deputy Facilitator, for his great interest and assistance in the development, implementation, and administration of the Joint Remedial Process. Mr. Young helped developed and participated in the Convening and Leadership Phases of the Joint Remedial Process. His guidance and insights were invaluable. Mr. Young is a nationally recognized full-time neutral at JAMS since 1989. He received an A.B. with Honors from Brown University and a J.D. cum laude from Harvard Law School.

I would like to thank the following members of the Facilitation Team for their tremendous diligence and devotion to this multi-year project.

JRP Senior Advisor Reinaldo Rivera recently retired from the United States Department of Justice Community Relations Service where he served as a National Program Manager and Regional Director for Region II which includes New York, New Jersey, Puerto Rico, and the United States Virgin Islands. Mr. Rivera completed advanced graduate study in Administration, Planning and Social Policy at the Harvard Graduate School of Education, where he received a

Master's Degree.  He received a B.A. from Middlebury College graduating with Departmental Honors in Anthropology-Sociology.

JRP Project Manager Jeanene Barrett is a Ph.D. Candidate with The Graduate Center of the City University of New York - John Jay College of Criminal Justice. Ms. Barrett has a M.Phil. in Criminal Justice from The Graduate Center of the City University of New York, an A.M. in Social Work from the University of Chicago School of Social Service Administration, an M.S. in Human Services Administration from Spertus College, and a B.S. in Administration of Justice from Southern Illinois University, Carbondale. Ms. Barrett is an Adjunct Faculty member with appointments at John Jay College of Criminal Justice, Brooklyn College, and St. Joseph's College.

JRP Assistant Project Manager Valerie Paul holds a B.S. cum laude from the University of Central Florida. Ms. Paul completed two years of postgraduate research in Educational Psychology at The Graduate Center of the City University of New York where she served as a Research Assistant. She has also served as an Adjunct Faculty member at Hunter College. Ms. Paul is finalizing her thesis for an M.A. in Liberal Studies at The Graduate Center of the City University of New York.

JRP Project Attorney Cliff Bloomfield is associated with JAMS where he has worked on a wide range of commercial arbitrations. Mr. Bloomfield began his legal career as a litigation associate in New York where his practice focused on complex commercial litigation. Before joining JAMS, he served as a law clerk at both the United States District Court for the Southern District of New York and the United States Bankruptcy Court for the Eastern District of New

York. Mr. Bloomfield received his J.D. from the University of Pennsylvania Law School and his B.A. cum laude from the College of Arts and Sciences of Cornell University.

JRP Project Assistant Jennifer Dionicio holds a B.A. in Criminology from John Jay College of Criminal Justice where she is also a candidate for a M.A. in Criminal Justice.

Finally, I would like to thank Hon. Analisa Torres, United States District Judge for the Southern District of New York, for giving me this incredible opportunity to serve the people of the City of New York.

**SECTION III: GENERAL OVERVIEW OF THE JOINT REMEDIAL PROCESS**

This section will describe the genesis and mandate of the Joint Remedial Process. It will then look at similar community engagement efforts seeking input and community collaboration in developing reforms to local police departments in the United States. Finally, we discuss the initial efforts made to develop a community input process for a city the size of New York.

The Joint Remedial Process, and the appointment of a Facilitator to lead that process, is the result of three federal class action lawsuits filed in the United States District Court for the Southern District of New York: *Floyd v. City of New York*, which challenged the NYPD's "stop and frisk" policies and practices; *Ligon v. City of New York*, which challenged the NYPD's criminal trespass enforcement practices in privately owned buildings in the Bronx enrolled in the Trespass Affidavit Program ("TAP"); and *Davis v. City of New York*, which challenged stops and arrests for criminal trespass in New York City Housing Authority ("NYCHA") buildings.

In August 2013, after a nine-week trial in *Floyd*, the Court found that the NYPD's use of stop and frisk violated the Fourth and Fourteenth Amendments of the U.S. Constitution. In the *Floyd* Liability Opinion, the Court held that the NYPD violated the Fourth Amendment because officers were both making stops without reasonable suspicion and conducting frisks without a reasonable belief that the person who had been stopped was armed and dangerous. The Court found that the NYPD had violated the Fourteenth Amendment by "targeting young black and Hispanic men for stops based on the alleged criminal conduct of other young black or Hispanic men" — that is, the NYPD had been discriminating on the basis of race.[4]

---

[4] Liability Opinion, 959 F. Supp. 2d at 664.

In the Remedies Opinion, also issued in August 2013, the Court established a multi-stage framework to bring the NYPD's use of stop and frisk into compliance with the law. The Court appointed a "Monitor" to oversee the reforms and, in the first instance, to work with the parties to develop and implement certain Immediate Reforms. But the Court also recognized that lasting reform was unlikely to occur without input from a broad spectrum of stakeholders. The Court explained that "The communities most affected by the NYPD's use of stop and frisk have a distinct perspective that is highly relevant to crafting effective reforms. No amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety."[5] Likewise, stakeholder participation contributes to the legitimacy of the reform process because "[n]either an independent Monitor, nor a municipal administration, nor this Court can speak for those who have been and will be most affected by the NYPD's use of stop and frisk."[6] The Court also determined that "'ongoing communication and negotiation with the community about stop and frisk activities'" is important to building strong "'police-community relations.'"[7]

In order to solicit stakeholder/community input, the Court appointed a "Facilitator" to engage in a "Joint Remedial Process." This process included "work[ing] with the parties and other stakeholders to develop . . . a more thorough set of reforms to supplement, as necessary, the Immediate Reforms."[8] Justice Ariel E. Belen (Ret.) was appointed by Judge Analisa Torres of the Southern District of District of New York in November 2014 to serve as the Facilitator to

---

[5] Remedies Opinion, 959 F. Supp. 2d at 686.

[6] *Id.* at 686-87.

[7] *Id.* at 687 (brackets omitted) (quoting Greg Ridgeway, RAND, *Analysis of Racial Disparities in the New York Police Department's Stop, Question, and Frisk Practices*, at 44 (2007), a report commissioned by the NYPD, *available at* https://www.rand.org/content/dam/rand/pubs/technical_reports/2007/RAND_TR534.pdf).

[8] *Id.* at 678.

guide the Joint Remedial Process. In the Court's view, the heart "of the Joint Remedial Process [is] input from those who are most affected by the NYPD's use of stop and frisk, including but not limited to" the following stakeholders:

> members of the communities where stops most often take place; representatives of religious, advocacy, and grassroots organizations; NYPD personnel and representatives of police organizations; the District Attorneys' offices; the [Civilian Complaint Review Board ("CCRB")]; representatives of groups concerned with public schooling, public housing, and other local institutions; local elected officials and community leaders; representatives of the parties, such as the Mayor's office, the NYPD, and the lawyers in this case; and the non-parties that submitted briefs: the Civil Rights Division of the [Department of Justice (DOJ)], Communities United for Police Reform, and the Black, Latino, and Asian Caucus of the New York City Council.[9]

The Court thus defined "stakeholder" broadly to include, among others, community members, police officers, and grassroots organizations.

The Court envisioned that the Joint Remedial Process would include "'town hall' type meetings in each of the five boroughs in order to provide a forum in which all stakeholders may be heard," while recognizing that "[i]t may be necessary to hold multiple meetings in the larger boroughs in order to ensure that everyone will have an opportunity to participate."[10] Aside from this town hall directive, the Court granted the Facilitator, in consultation with the parties, broad discretion in developing a process to reach and solicit input from stakeholders.

---

[9] *Id.* at 686, 687; *see also id.* at 687 ("Input from academic and other experts in police practices may also be requested.").

[10] *Id.* at 687.

The Court thought that "[t]he Cincinnati Collaborative Procedure and subsequent DOJ consent decrees and letters of intent [in other police reform cases could] be used as models"[11] It is clear from the record that the DOJ consent decrees and settlements the Court had considered included, at the very least, those in New Orleans, Louisiana and Seattle, Washington, in addition to Cincinnati.

"Community engagement" can take on different forms and serve different purposes. Before reviewing the stakeholder and community engagement efforts in Cincinnati, Seattle, and New Orleans, it is useful to consider:

> (i) the stages at which community input can play a role in police reform, such as during an investigation, before a consent decree is entered, and as part of the relief ordered in a consent decree;
>
> (ii) the potential objectives of such engagement, such as understanding the community's perspective, identifying reforms, reporting on progress, soliciting feedback on the implementation of the reforms, and auditing/accountability;
>
> (iii) the various types of stakeholders, including affected citizens, police officers, community leaders, community service-based organizations, and advocacy groups;
>
> (iv) the various possible forms and formats of engagement — including meetings in small groups, town hall meetings, and surveys — as well as the possible participants in any given meeting, such as whether the participants are homogenous or the forum is open to the public or is in a more controlled, confidential environment; and
>
> (v) the difficulties inherent in reaching members of certain vulnerable populations, such as homeless youth or citizens who are distrustful of authority.

---

[11] *Id.*

A review of Department of Justice practices, for instance, indicates that, as a general rule, stakeholder engagement begins during the pattern-or-practice investigation, and continues prior to the DOJ's negotiation with the police department of the terms of a settlement (usually taking the form of a consent decree), which is typically a private, bilateral negotiation between the DOJ and the police department. Thereafter, the resulting agreement will include a framework for continued stakeholder or community input.

During the investigation stage, the DOJ begins by meeting with key stakeholders, including "law enforcement leadership, local political leadership, police labor unions and affinity groups, and local community groups[,]" and also later conducts interviews with these groups.[12] It then attempts to reach members of the community through town hall meetings, and creates voice and email mailboxes to receive information from community members. Depending on community input, the DOJ also may "reach out through neighborhood listservs, community blogs, social media, and radio stations;" the DOJ "also canvasses places communities gather — places of worship, street corners, apartment complexes, parks, shopping malls, and local businesses."[13] The DOJ's "engagement involves outreach to civic leaders, faith leaders, neighborhood groups, advocacy organizations, local business owners, and individuals."[14] Prior to negotiating reforms with the police department, the DOJ:

> holds community meetings and draws on relationships built during the investigation stage to involve the community in building solutions. Often the Division will present specific briefings on its findings to community representatives and hold meetings focused on particular aspects of those findings designed to drill down on

---

[12] The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present (January 2017), at 10.

[13] *Id.* at 13.

[14] *Id.*

> specific remedies. The Division always encourages community representatives to present specific proposals for reform, in writing or at a community meeting, and works to incorporate those proposals into its reform agreements.[15]

Reform agreements entered into with the DOJ between 2012 and 2016 include additional forms of community engagement — typically not conducted by the DOJ itself. First, the police department is required to develop and implement a plan to increase police-community engagement. Second, the court-appointed monitor is required to hold regular public meetings updating the community on the reform process. Third, reform agreements require periodic community surveys to create a baseline to track community perceptions of the department over time.

Finally, many agreements call for the creation of community committees or councils made up of stakeholders, including representatives of rank and file officers. These committees hold public meetings and communicate community concerns and reform proposals to law enforcement. Unlike Civil Complaint Review Boards, they typically are not responsible for investigating or resolving civilian complaints about misconduct. Perhaps the leading example of such a committee is Seattle's Community Police Commission, which became a permanent body through legislation enacted in 2017.

As a useful comparison to community engagement efforts developed during the Joint Remedial Process, we now consider various forms of community engagement utilized during the

---

[15] *Id.* at 17.

police reform efforts in Cincinnati, Seattle, and New Orleans.[16] Elements of the various forms of community engagement described in the foregoing are seen in each of these cities.

**Cincinnati (2001-2008)**

**Size of Population/ Number of Sworn Personnel**

**331,159 (2001)/1047 (2003)**

In March 2001, the American Civil Liberties Union ("ACLU") and the Cincinnati Black United Front ("CBUF") brought a class action lawsuit alleging that Cincinnati's police department had discriminated against African Americans for decades, including with respect to its use of stop and frisk and incidents of excessive force. Rather than litigate the issues raised in the complaint, the parties agreed to engage in a "collaborative procedure" to reach a settlement based on stakeholder input.[17]

Under the collaborative procedure, a facilitator was appointed to gather input from the community, stakeholders, and policing experts. As explained by Judge Dlott:

> The . . . complaint alleges social conflicts of great public interest to the community. To the extent possible, the collaborative will include an opportunity to receive the viewpoints of all persons in the Cincinnati community regarding their goals for police-community relations. The participants will state their goals for police-community relations; why these goals are important; and how they would achieve these goals (What, Why, and How data). The collaborative will include an opportunity for dialogue about these responses in structured group sessions. As described below, the collaborative will also include a process for expert analysis of

---

[16] It must also be noted that police reform consent decrees post-dating the Remedies Opinion and the initiation of the Joint Remedial Process, particularly those entered into in Newark, New Jersey and Baltimore, Maryland, have called for extensive community engagement.

[17] *In re Cincinnati Policing*, 209 F.R.D. 395, 397 (S.D. Ohio 2002); *Tyehimba v. City of Cincinnati*, No. C-1-99-317, 2001 WL 1842470 (S.D. Ohio May 3, 2001).

the current practices of the Cincinnati Police Division (CPD) and
practices in other communities.[18]

CBUF, the ACLU, the Cincinnati City and Police Administration, and the Cincinnati Fraternal

Order of Police acted as an advisory group. The advisory group organized the population into

eight stakeholder groups: (1) African American citizens; (2) city employees; (3) police and their

families; (4) white citizens; (5) business and education leaders; (6) religious and social service

leaders; (7) youth; and (8) other minorities.[19]

As an initial step in gathering community input, all citizens were asked to complete a

questionnaire seeking input on goals for police-community relations:

> Instructions for access to the online questionnaire were broadcast
> and published by all of the local media outlets, hard copies were
> distributed through churches and social service agencies and in the
> police department, and, to assure participation of inner city
> African-American and Appalachian youth, interviewers canvassed
> youth clubs, street corners, and basketball courts to record
> responses from young residents of the city.[20]

Roughly 3,500 questionnaires were completed, including 750 from youth.

Next, 10 to 25% of those who had completed the questionnaire, about 800 people,

participated in separate "four-hour follow-up dialogue and agenda-setting meetings within their

respective identity groups."[21] These feedback sessions

> consisted of carefully facilitated small-group discussions regarding
> people's motivations and values. A staff of some thirty volunteer
> Facilitators expertly guided this process. As part of the feedback

---

[18] *Tyehimba*, 2001 WL 1842470, at *1.

[19] *See* Jay Rothman, Ph.D., *Identity and Conflict: Collaboratively Addressing Police-Community Conflict in Cincinnati, Ohio*, 22 Ohio St. J. on Disp. Resol. 105, 114 (2006).

[20] *Id.* at 115-16.

[21] *Id.* at 116.

> sessions, these facilitated dialogue groups enabled participants to have an opportunity to express deeply held feelings and find resonance with others in their group, as well as to provide an underlying value basis for constructive steps for addressing the broader issues of race and police-community relations. Following the small sessions, each group was provided with a set of shared goals compiled from [the facilitator's] analysis of their group's questionnaire responses. Representatives from each group then negotiated and reached agreement on their group's goals.[22]

Ultimately, the facilitator sought consensus on five shared goals from representatives of the eight stakeholder groups (about 60 to 80 of the stakeholders in total). These goals were incorporated into the parties' negotiations leading to the entry of a Collaborative Agreement in April 2002.

The Collaborative Agreement included additional opportunities for community engagement. For instance, the parties agreed to "develop and implement a plan of community engagement to prepare Cincinnati residents, business owners, non-profit agencies, community and religious organizations, and others as partners with the City in problem solving activities."[23] In addition, periodic citywide surveys were to be conducted to assess public "attitudes toward and satisfaction with the police."[24] The department also conducted district "town hall" meetings in each of the City's five divisions.

A rather significant component of the agreement in Cincinnati was implementing a strategy of community problem oriented policing ("CPOP").[25] As Rothman explains, "The main concept of CPOP is that problem solving should become the principal policing strategy and that

---

[22] *Id.* at 130.

[23] Collaborative Agreement in *In re Cincinnati Policing*, No. C-1-99-317 (S.D. Ohio), at 4, *available at* https://www.cincinnati-oh.gov/police/linkservid/27A205F1-69E9-4446-BC18BD146CB73DF2/showMeta/0/

[24] *Id.* at 11.

[25] *See id.* at 4-10.

citizens and police working together provides the foundation for improving community safety."[26]

One mechanism for stakeholders to play a role in CPOP was the Community-Police Partnering

Center:

> The Community-Police Partnering Center at the Urban League of Greater Southwestern Ohio led the CPOP work in partnership with the police department, and it received substantial private funding ($1 million per year for five years) to do so. It also solicited individuals from throughout the community to join the Friends of the Collaborative, a loosely organized community advisory group that consulted on CPOP and [Collaborative Agreement] implementation. This group engaged in dialogue with police representatives about problem-oriented policing practices and reviewed use of force and investigation statistics of the civilian-governed Citizen Complaint Authority established under the CA. The Friends of the Collaborative did not meet regularly, and it was never intended to exclusively review department policies, or to make formal recommendations or prepare reports. Subsequently, the City Manager's Advisory Group (MAG) assumed responsibility for advising the city and police department informally on general police issues of concern to the community. The city manager appoints its members without specific terms and there is no defined number of members or representation. The city manager chairs MAG, which meets about three times each year, and is not responsible for preparing reports or recommendations.[27]

Although court supervision of the Collaborative Agreement ended in 2008, in June 2017,

City officials retained a panel of experts to examine the progress that had been made and issues

that had arisen. In January 2018, the group issued a report that began, "The November 2017

report from the City — Community Problem-Oriented Policing Strategy — strongly signals that

---

[26] Rothman, *Identity and Conflict: Collaboratively Addressing Police-Community Conflict in Cincinnati, Ohio*, 22 Ohio St. J. on Disp. Resol. at 127.

[27] Betsy Graef, *The Seattle Community Police Commission: Lessons Learned and Considerations for Effective Community Involvement*, 14 Seattle J. for Soc. Just. 1, 43-44 (2015) (based on interviews by the author).

the City of Cincinnati has abandoned the principles of the Collaborative Agreement."[28] Among

other reform proposals, the panel recommended strengthening MAG:

> Strengthen the MAG so it can provide robust oversight of the
> Collaborative Agreement. The MAG should focus on patterns of
> practice and not on specific incidents (except in so far as they
> relate to patterns). Important decisions about major provisions of
> the Collaborative Agreement should not be made unilaterally. The
> MAG is the obvious forum for raising concerns about resources,
> priorities, abilities, conflicts, and commitments should any party
> find it difficult to live up to its obligations in the Collaborative
> Agreement or in any subsequent refreshed agreement. Rather than
> MAG members discovering changes after one party has made
> them, the MAG should be informed about difficulties prior to any
> commitment to a solution, and the MAG's participants should
> undertake an exploration of what needs to be done (if anything).
> The City should examine Seattle's Police Commission for ideas
> about collaborative problem-solving that might be applicable to
> Cincinnati.[29]

It remains to be seen whether the MAG, once further empowered, will be able to help align

stakeholder interests with the goals of the Collaborative Agreement.

---

[28] Saul A. Green, Joseph E. Brann, Jeffrey Fagan, Ph.D., John E. Eck, Ph.D., *Progress Report: City of Cincinnati Collaborative Agreement, The Status of Community Problem Orientated Policing Strategy* (1/4/2018), at 1, *available at* https://www.cincinnati-oh.gov/police/assets/File/Community%20Problem-Oriented%20Policing%20-%20Progress%20Report%20-%20Saul%20Green%20et%20al%201-04-18.pdf

[29] *Id.* at 12.

**New Orleans and Seattle**

The settlements in New Orleans and Seattle arose after investigations pursuant to 42 U.S.C. § 14141 by the Department of Justice. As indicated above, the DOJ seeks stakeholder and community input during the investigative process; that type of community engagement, which the DOJ has described only in general terms, is not including in the following.

**New Orleans (2012-Open)**
**Size of Population / Number of Sworn Personnel**
**343,829 (2010) / 1452 (2010)**

In March 2011, the Department of Justice concluded an investigation into the New Orleans Police Department ("NOPD") pursuant to section 14141. The DOJ began its report on that investigation by stating that "Basic elements of effective policing — clear policies, training, accountability, and confidence of the citizenry — have been absent for years. Far too often, officers show a lack of respect for the civil rights and dignity of the people of New Orleans."[30] The DOJ found a pattern and practice of excessive use of force, unconstitutional stops, searches, and arrests, and discriminatory policing.

Even before the DOJ issued its findings, the Mayor and the NOPD, with assistance from the DOJ, created a neighborhood participation plan known as the Police-Community Advisory Board ("PCAB") as well as a "Community-Based Restorative Justice Project," although this latter project never came into existence. Launched in February 2011, the PCAB is made up of seven community volunteer members for each of NOPD's eight districts. The District Commander and district Community Coordinating Sergeant for each district also participate in

---

[30] Investigation of the New Orleans Police Department, United States Department of Justice Civil Rights Division (3/16/2011), at v, available at https://www.justice.gov/sites/default/files/crt/legacy/2011/03/17/nopd_report.pdf

the PCAB. The consent decree, which was signed in July 2012 and entered by the court in January 2013, "acknowledge[d] that NOPD and community representatives have acted jointly to create a PCAB to facilitate regular communication and cooperation between the Department, the City, and community leaders, including youth leaders, such as through the development of a community advisory panel and the collaborative development of policing strategies and priorities."[31] Under the consent decree, the "NOPD agree[d] to seek PCAB's assistance, counsel, and input to build community consensus on potential recommendations in areas" ranging from community policing strategies to police accountability and sharing information with the community.[32]

The PCABs hold quarterly community meetings. According to the current PCAB manual:

> As participation platforms, PCABs do not have any decision-making authority over NOPD finances, policies, or practices. As authorized recommendation platforms, PCAB's have the responsibility to vet community ideas/suggestions, work with NOPD to understand operations, processes, and challenges, and build consensus on priority items important to the community before submitting recommendations to NOPD for consideration.[33]

Notably, criticism has been levied by some, including the extent to which the PCAB is an effective accountability tool:

> Very few meeting minutes are publicly available, but those that are show the PCAB functions as a conduit to gather and share information for law enforcement activity. Nothing suggests the PCAB has embraced its accountability function, nor does anything suggest the PCAB has a relationship with the court monitor or

---

[31] Consent Decree, *United States v. City of New Orleans*, No. 12-cv-01924 (1/1/13), at 107.

[32] *Id.*

[33] New Orleans Police Department Police Community Advisory Board (PCAB) (8/9/2016), at 3, *available at* https://www.nola.gov/getattachment/Neighborhood-Engagement/Projects/New-Orleans-Police-Community-Advisory-Board-(PCAB)/PCAB-Policy-Manual-June-2016-revisions-(1).pdf/

organized constituents working to reform the police department. Thus, the PCAB does little to foster democratic policing, but rather legitimizes law enforcement activity and a process that neither promotes self-determination nor a power shift toward impacted communities.

The second independent structure referenced in the consent decree, the Community-Based Restorative Justice Project, presents a unique concept among DOJ policing consent decrees. This structure's goal is to remedy mistrust between the NOPD and the broader New Orleans community and to create an environment for successful problem-solving partnerships. To date, this body has not been created.[34]

The consent decree also requires the NOPD and the City of New Orleans to conduct, with the assistance of the court-appointed monitor, a biennial community survey meant to capture the community's "experiences and perceptions of NOPD and of public safety."[35] The first biennial survey was completed by 425 police officers, 57 detainees within the Orleans Parish Jail, and 549 community members.[36]

In addition, the consent decree requires the monitor to "meet with community stakeholders to explain the [m]onitor's reports[,] to inform the public about the Agreement implementation process, and to hear community perspectives of police interactions."[37] The monitor has met with various stakeholder groups, primarily at its quarterly meetings, and has also met with and surveyed community organizations.

---

[34] Sunita Patel, *Toward Democratic Police Reform: A Vision for "Community Engagement" Provisions in DOJ Consent Decrees*, 51 Wake Forest L. Rev. 793, 835 (2016).

[35] Consent Decree at 62-63.

[36] *See* Report of the Monitoring Team for the Fourth Quarter of 2014 (4/28/2015), at 16, *available at* http://consentdecreemonitor.com/Media/Default/Documents/April%202015%20Report%20of%20the%20Consent%20Decree%20Monitor.pdf

[37] Consent Decree at 115.

It should also be noted that in August 2009, well before the DOJ's pattern-and-practice investigation, New Orleans established the Office of the Independent Police Monitor ("IPM"), after it was voted into the city charter by over 70% of New Orleans' electorate. Among other things, this civilian police oversight agency is charged with ensuring that complaints about police misconduct are investigated and that discipline arising from such complaints is fair; monitoring NOPD investigations into use of force; reviewing complaints, investigations, and community concerns and making recommendations for reforms; listening to the community; repairing police-community relationships; and monitoring police training and supervision. Although IPM was originally tied to the Office of Inspector General, in 2016 New Orleans voters approved a charter amendment creating separate funding streams for both agencies.

**Seattle (2010-Open)**

**Size of Population/ Number of Sworn Personnel**

**608,660 (2010) / 1,300 (2010)**

In December 2010, the ACLU of Washington along with 34 community organizations requested that the DOJ conduct a pattern-and-practice investigation into the Seattle Police Department. The DOJ's December 2011 findings stated that the Seattle Police Department had engaged in a pattern or practice of using unnecessary or excessive force in violation of the Fourth Amendment. In July 2012, the parties entered into a settlement agreement and a separate memorandum of understanding ("MOU").

Community organizations were active prior to the entry of these agreements. The parties received recommendations from thought leaders, notably

> the Minority Executive Directors Coalition Multiracial Task Force on Police Accountability (MEDC Task Force), comprised of the ACLU of Washington, American Friends Service Committee,

> Asian Counseling & Referral Services, CAIR–WA, Columbia
> Legal Services, El Centro de la Raza, Fred T. Korematsu Center
> for Law and Equality, John T. Williams Organizing Committee,
> Minority Executive Directors Coalition, Mothers for Police
> Accountability, The May First Action Coalition, NAACP—Seattle
> Chapter, Red Eagle Soaring Native Youth Theater, Seattle Human
> Rights Commission, The Defender Association, and Tlingit &
> Haida of Washington.[38]

Furthermore, as a result of the agreements and the work of the court-appointed monitor, community input has continued throughout the implementation of the agreed upon reforms. The monitor has conducted community forums to update the community on implementation and to solicit feedback.[39] In 2013, the monitor hired a team to survey 900 Seattle residents by telephone to capture community perceptions of the Seattle Police Department.[40] The survey was repeated in 2015.[41] In the view of the monitor, "Community surveys and community meetings are the most objective way to judge whether greater trust and cooperation are occurring. No single individual or group represents the entire community. There are many voices and many groups in Seattle."[42]

Perhaps most significantly, the parties agreed in the Settlement Agreement and MOU to establish the Community Police Commission ("CPC"). The CPC was designed "to leverage the ideas, talent, experience, and expertise of the community."[43] The Ordinance officially

---

[38] *See* 3/15/12 Letter to the DOJ, at 4 (recommending community involvement in overseeing the settlement).

[39] *See, e.g.*, Seattle Police Monitor, Fourth Semiannual Report, at 100 (12/2014) ("To facilitate continuous dialogue with the community in 2014, the Monitoring Team is holding an ongoing series of town hall-style community forums, which are open to all and held in community centers and other venues. During the community forums, the Monitoring Team provides a report on current progress. More importantly, it seeks feedback and discussion on the current relationship between the community and the Department, any noted changes in that relationship, and suggestions for areas of focus in 2014 and 2015."). All reports from the Seattle Police Monitor are available at http://www.seattlemonitor.com/reports-resources/

[40] *See* Seattle Police Monitor, Second Semiannual Report, at 47-54 (12/2013).

[41] *See* Seattle Police Monitor, Sixth Semiannual Report, at 5-8, (12/2015).

[42] Seattle Police Monitor, Compliance Status & Seventh Semiannual Report, at 3 n.4 (9/2016).

[43] Settlement Agreement ¶ 3; *see id.* ¶ 4 ("Certain aspects of the reform efforts embodied in the Agreements are best developed by dialogue and wide-spread input. Moreover, ongoing community input into the development of

establishing the CPC stated that the goal of the CPC was to "institute a[n] . . . oversight system that ensures that police services are delivered to the people of Seattle in a manner that fully complies with the Constitution and laws of the United States . . ., effectively ensures public and officer safety, and promotes public confidence in SPD and the services that it delivers."[44]

The CPC, which started work in March 2013, has been composed of 15 commissioners appointed by the mayor and confirmed by the City Council, including one member from the Seattle Police Officers Guild, one member from the Seattle Police Management Association, and 13 Seattle residents representative of Seattle's diverse population; recently the CPC increased the number of commissioners to 21. The CPC also has full-time staff, and an annual budget of over $800,000 a year. CPC's areas of concentration include community engagement, police accountability, investigatory stops and data collection, officer assistance and support, and transparency and public reporting. Under the MOU, the CPC is authorized to review recommendations and reports issued by the monitor, to provide input and make its own recommendations, to issue reports, including biannual progress reports, and to hold public meetings.

In January 2014, the CPC issued a report which described the community outreach undertaken by the CPC, much of which occurred in October 2013. The CPC contracted with 13 social service providers serving affected communities, such as low-income, minority, and non-English speaking populations, who in turn worked with other organizations to coordinate outreach. Together they hosted over 150 community meetings, with attendance ranging from one

---

reforms, the establishment of police priorities, and mechanisms to promote community confidence in SPD will strengthen SPD and facilitate police/community relationships necessary to promote public safety.").

[44] Ordinance No. 124021 (10/22/2012) ¶ K.

to 300, and averaging 20 per event. In all, over 3,400 individuals attended these outreach events. In addition, the CPC itself met with police department officers and advisory groups, and "with neighborhood and crime prevention councils."[45]

"The CPC supplied its contracted partners and conveners with a toolkit of outreach materials, including background information on the CPC, its charge and its draft policy recommendations, as well as surveys to capture feedback."[46] Facilitators led discussions, and "[p]articipants provided feedback through paper and online surveys, and by discussing their concerns and ideas during community meetings. [F]acilitators documented the comments received in these sessions and summarized them in final reports to the CPC."[47] Feedback was kept confidential. In addition, "Meeting attendees were encouraged to spread the word about the outreach effort to their friends, family and associates and told that all materials, including an online survey, were available on the CPC's website. The CPC also sent out e-newsletters and encouraged community members to sign up for its listserv."[48] Significantly, the CPC took into account public feedback received during its community engagement process in October 2013 before adopting final reform recommendations in November 2013.

The CPC's work is ongoing. For instance, in January 2016, the CPC issued its assessment of the police department's community engagement. That report was based on information gathered from diverse sources, and reflected interviews with police department officials, officers,

---

[45] CPC, Community Outreach Report (1/2014), at 12-13, *available at* https://www.seattle.gov/Documents/Departments/CommunityPoliceCommission/Outreach%20Report%2001-24-14.pdf

[46] *Id.* at 13.

[47] *Id.*

[48] *Id.*

and staff. The CPC contracted with community-based organizations to conduct eight listening sessions, which altogether were attended by some 230 community members. In addition, the CPC attended six police-department-organized Demographic Advisory Councils. In 2017, a law was passed making CPC permanent.

Having discussed the community engagement efforts in Cincinnati, New Orleans, and Seattle, we now provide an overview of the Joint Remedial Process.

**New York**
**Size of Population / Number of Sworn Officers**
**Over 8.5 million / roughly 34,500**

Following an appeals process during which reform work was stayed, the Joint Remedial Process began in November 2014 after the Second Circuit affirmed the denial by Judge Torres of the police unions' motion to intervene and all stays in the Monitorship were lifted. The City withdrew its appeals and agreed to abide by the relief set out in the Remedies Opinion.

Convening Phase

The first step in the Joint Remedial Process was the Convening Phase. During this time, the Facilitation Team met with advocacy groups, community organizations, members of NYPD leadership, New York City government officials, Members of Congress, District Attorneys from each borough, the Borough Presidents, the Speaker of the City Council, Members of the City Council, the Civilian Complaint Review Board management, police union leaders, minority police fraternal and advocacy organizations, officials from the President's Task Force for 21st Century Policing, religious leaders, and counsel for the parties, as well as with the plaintiffs in *Floyd*, *Ligon*, and *Davis*.

A frequent topic of conversation as these meetings was how best to obtain input from a diverse group of stakeholders, in a city with over 8.5 million residents spread out across five boroughs. What may be appropriate in Cincinnati or Seattle, which during the relevant time period had populations of 331,159 and 608,660, respectively, was not guaranteed to work in New York. As noted by the DOJ, it is important to "seek[] out input from groups that may experience police misconduct in unique ways, such as young people, people with disabilities, LGBTQ people, people of color, and immigrant communities."[49] The Facilitation Team could not meet the Court's mandate of soliciting input from the groups most affected by the NYPD's use of stop and frisk without reaching these communities.

The Convening Phase not only helped the Facilitation Team devise a multi-phase process for obtaining stakeholder input, but the relationships and alliances developed during these meetings provided a broad platform for outreach. The Facilitation Team also decided to form an advisory committee through which it could continue to receive advice and input from stakeholders about the remedial process itself on a going forward basis; a Joint Remedial Process Advisory Committee composed of representatives from various stakeholders in the Joint Remedial Process was created to gather "process" input for the JRP. While the Committee was structured as an avenue to receive advice and input from stakeholders about the remedial process itself on an ongoing basis, it was purely advisory. It was explained and understood by all invitees that its deliberations were confidential and any recommendations made through the Committee were not in any manner binding on the Facilitator. Again, the Committee's primary concern was with providing process recommendations.

---

[49] The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present (January 2017), at 13.

The Committee met monthly except for a short hiatus from August 2016 to January 2017. Although the main purpose of the Joint Remedial Process Advisory Committee was to provide, in a structured way, continued input into the process choices the Facilitation Team made, it became a vehicle for dialogue on substantive issues.

Focus Group Phase

During the Focus Group Phase, the Facilitation Team organized and structured meetings with members of the communities most affected by the NYPD's stop and frisk practices. The Facilitation Team viewed this stage as a crucial, if not the most crucial, part of the JRP because we believed that we would gain the most input from directly affected communities through focus groups. It was therefore imperative that each aspect of this phase be planned with the utmost care.

We laid the groundwork for these meetings with the introductory meetings during the Convening Phase. During that time, various community organizations, advocacy groups, and religious figures agreed to help us engage their membership and staff in these meetings, and helped us identify other organizations that were willing to participate. Many of the community organizations and advocacy groups agreed to assist with the Focus Group Phase by populating focus groups using their member base.

Ultimately, the Facilitation Team conducted 64 focus groups, approximately 40 relating to *Floyd* and 24 relating to *Ligon*. Participation in the focus groups was both confidential and anonymous. The focus groups typically had between 8 to 10 participants, who were overwhelmingly young people of color. The interviews were transcribed and subjected to qualitative analysis. In all there were 516 participants from the following collaborative

organizations: Broome Street Academy; Covenant House; The Door; Streetwise & Safe; Safe Horizon; Cardinal Hayes High School; Cardinal Spellman High School; Brotherhood – SisterSol; Cure Violence SOS – Bronx; Cure Violence SOS – Far Rockaway; BronxConnect; The Fortune Society; Cure Violence SOS – East Flatbush; VOCAL-NY; Police Athletic League; Picture the Homeless; Man Up, Inc.; Ali Forney Center; Malcolm X Grassroots; Exponents; Make the Road NY; and Central Family Life Center.

We gained the most input from directly affected communities through these meetings. The groundwork for these meetings was laid during the Convening Phase during the first several months of the Joint Remedial Process. Meetings were highly structured and centered around specific, well-thought-out and directed questions that were replicated across all groups. They were held in different parts of the City, as well as in public housing. The meetings gathered responses to standard sets of questions that were developed through an extensive collaboration process. This collaboration included the parties and Communities United for Police Reform, an umbrella group representing roughly 60 grassroots police reform organizations throughout the City.

While the meetings centered upon minority youth in highly policed and high crime neighborhoods, we also sought to meet with other distinct groups of people that were affected by stop and frisk such as the homeless, the LGBTQ community, and the mentally ill.

As a supplement to the rich information gathered during the Focus Group Phase, a Leadership Meeting Phase was created. The Leadership Meeting Phase included a number of structured meetings with individuals and institutions that had given much thought to these issues

and were believed to be in a position to give substantive policy recommendations. These thought leaders included academics, criminal justice professionals, and community representatives.

To further add to the richness of the data gathered from the focus groups and leadership meetings, input from patrol officers, line supervisors, and executives were gathered during NYPD-specific focus groups. These meetings were critical to the Facilitator's mandate. The Remedies Opinion states that "[t]he Facilitator may receive anonymous information from NYPD officers or officials, subject to procedures to be determined by the parties."[50]

The data from all of the civilian focus groups were collected and a system was created whereby reports to the file were maintained after each meeting. The data was then compiled from notes and taped recordings of each meeting that were later transcribed. The transcriptions were later provided on a confidential basis to the parties and Communities United for Police Reform.

Leadership Meeting Phase

While our mandate was to receive input from affected communities, as recognized by the Court, "[i]nput from academic and other experts in police practices may also be" useful to the development of reforms.[51] We therefore devised a process to solicit input from persons and organizations that have given much thought about these issues and might be in a position to give more substantive policy recommendations, such as academics, criminal justice professionals, community representatives, and other thought leaders.

Following the Focus Group Phase, the Facilitation Team conducted 18 meetings with thought leaders and community organizations, including The President's Task Force on 21st

---

[50] Remedies Opinion, 959 F. Supp. 2d at 688.

[51] *Id.* at 687.

Century Policing, the Police Executive Research Forum, Safe Horizon, National Police Accountability Project, Vera Institute of Justice, Legal Aid Society, Micah Group, Fortune Society, Osborne Association, Covenant House, National Association for Civilian Oversight of Law Enforcement ("NACOLE"), The Door, Open Society Foundations, Police Reform Organizing Project, Morris Justice Project, Trinity Wall Street, Brooklyn Defenders, Communities United for Police Reforms ("CPR"), and Citizens Union.

Community Forum Meetings

In the final phase, the Facilitation Team held community forums. These forums were attended by 1,777 participants. At the outset we recognized that these meetings were vitally important. If well planned and executed, they would give public expression to the ideas developed in the focus groups, elicit further input by providing a public forum for serious policy proposals from all stakeholders, and provide an opportunity to receive public comments on the current reforms as well as potential additional reforms. The forums could also serve as an opportunity for facilitated and structured dialogue between the NYPD, primarily rank and file officers, and members of affected communities. It bears noting that while the Joint Remedial Process was ordered mainly to seek input, it is also a *remedial* process that should help to improve community and police relations.

There were two sets of forums — Plaintiff Assisted ("PA") and Joint Remedial Process ("JRP") forums. Generally speaking, the Facilitator presented a brief introduction to the Joint Remedial Process at each forum, followed by a short presentation by a representative of the hosting community organization. Typically, at this point, a short educational video was shown at each JRP community forum. The video was developed in collaboration with the stakeholders. It was produced by grassroots community members and was intended to be a reflection of the

history and context of the unconstitutional stop, question, and frisk and trespass enforcement policies from the perspective of impacted community members.

After this introductory phase, we then invited the attendees — comprised of, on average, from 50 to 100 or more community members and police officers seated at pre-designated tables — to engage in conversation around pre-determined questions and issues. These conversations were recorded by a note taker at each table and guided by a forum facilitator (*e.g.*, community organization staffers or community mediators that were recruited from the Association for Conflict Resolution Greater New York Chapter). Community mediators were hired as co-facilitators for each small group discussion for the JRP forums. Notes from these conversations were taken and collected by members of the JRP Team following each community forum. The individual table facilitators then announced their results to the entire meeting. An attempt was then made to present and synthesize the results of all the table reports to the meeting participants. That is, each forum included small break-out group discussions followed by larger collective discussions stemming from the reports presented by the smaller groups. This was very constructive as commonalities developed between the police and community participants in their responses. All this data was then collected and analyzed in written reports for each forum.

Final Report Phase

The Facilitation Team has now completed its three-year-long community engagement effort. As discussed above, in order to fulfill his mandate, the Facilitator together with the Facilitation Team developed and then executed various programs for canvassing a wide array of stakeholders and held focus group sessions, community forums, and leadership meetings with civilians, police officers, and policy and thought leaders in the fields of criminal justice, policing, and police reform.

The Remedies Opinion requires in paragraph 8 that the Facilitator attempt to draft "Joint Process Reforms" along with the parties to the various litigations. Once drafted, those Reforms would then be reviewed by the Monitor, who in turn would recommend those reforms he deems appropriate to the Court for ultimate review and approval. To this end, in March 2017 the Facilitator circulated to all of the parties a draft and confidential set of twelve Ideas for Discussion that were intended to begin the conversation among the parties as to what might be agreed to as Joint Process Reforms. The Facilitator alerted the parties at the time that this was a beginning set of ideas that could be withdrawn, amended, or supplemented as the discussion around the ideas developed. The Facilitation Team convened separate meetings with each of the parties, as well as three "All Parties Meetings," to discuss these ideas. Communities United for Police Reform ("CPR") was also invited to attend the last two of these All Parties Meetings. Plaintiffs' counsel provided extensive verbal feedback during these meetings. In addition, the parties were invited to submit written responses to the Ideas for Discussion document.

On August 3, 2017, plaintiffs' counsel in the *Floyd* and *Davis* cases circulated a "Memorandum" in which they listed four proposed JRP reforms that they asserted "should be implemented," in addition to other reforms that they sought to have the Facilitator recommend for implementation. The NYPD circulated its own response to the Ideas for Discussion document, entitled "NYPD Change Agenda" that included, in an appendix, an item-by-item discussion of the proposed Ideas for Discussion.

After reviewing the parties' written submissions and hearing from them during the joint and individual meetings, it was apparent that the parties would likely not be agreeing to a set of Joint Process Reforms for submission by the Facilitator to the Monitor and the Court. As paragraph 9 of the Remedies Opinion directs that, where the parties cannot reach agreement on

Joint Process Reforms, the Facilitator is to make findings and recommendations and prepare a Final Report, the Facilitator then advised the parties that he was drafting a Final Report pursuant to paragraph 9 of the Remedies Opinion.

Following an application by the plaintiffs to the Court for a scheduling order and a status conference regarding the JRP, the Court issued an order which provided for further discussion of the Joint Process Reforms after submission to the parties of a confidential Draft Final Report, which was to occur on March 2, 2018. The effect of that order was that we were again acting pursuant to paragraph 8 of the Remedies Opinion. After receiving the confidential Draft Final Report, the parties provided comments on the proposed Joint Process Reforms and the confidential Draft Final Report. While the parties agreed to certain aspects of the proposed Joint Process Reforms, a consensus was not reached. Accordingly, we now issue this Report pursuant to paragraph 9 of the Remedies Opinion.

After receiving the confidential Draft Final Report, the parties provided comments on the proposed Joint Process Reforms and the confidential Draft Final Report. The NYPD in its written response to the Draft Final Report indicated a willingness to consider some of the reform recommendations, pending further discussion with the Facilitator.

On April 18, 2018, the New York Times published a previously submitted op-ed piece by counsel to the plaintiffs. In that op-ed, plaintiffs' counsel stated, among other things, the following: "The problem is the police department suggested that it might oppose reforms that black and Latino New Yorkers are asking for. As much as the department wants to be seen as listening to community members, it doesn't actually want to be responsive to their needs."

However, as mentioned above, the NYPD in its written response to the Draft Final Report, which had been shared with plaintiffs' counsel, had indicated a willingness to discuss and consider certain of the reform recommendations. Although the Facilitator was not confident that a consensus would be reached on all, or even most, of the reform recommendations, at no point did the NYPD ever indicate that it was not willing to discuss the recommendations. There have been no further discussions regarding the Joint Process Reforms between the parties and the Facilitator.

While, as indicated above, the positions of the parties overlap with respect to certain aspects of the proposed Joint Process Reforms, a consensus was not reached, and we now issue this Final Report pursuant to paragraph 9 of the Remedies Opinion. The Facilitator considered all of the written and oral submissions from all parties, including non-party stakeholders, in preparing the Final Report.

**SECTION IV: RECENT HISTORY OF POLICE-COMMUNITY RELATIONS IN IMPACTED COMMUNITIES:**

**Calls for Greater Respect, Transparency and Accountability**

The Monitorship and Joint Remedial Process ("JRP") are only the latest efforts to reform the New York City Police Department ("NYPD"). A constant theme throughout all of these efforts has been the need for the NYPD to show greater respect to the communities it polices, to increase transparency, and to improve both internal and external accountability.

**Part 1**

**Brief History, Legal Context, and the Immediate Reforms**

Both the U.S. and New York Constitutions prohibit unreasonable searches and seizures and discrimination based on race. Under the Fourth Amendment of the U.S. Constitution, as explained in the landmark case *Terry v. Ohio*, a "stop" is when an officer "briefly detain[s] a person for investigative purposes" and is permitted only "if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."[52] A frisk is defined as a "limited protective search for concealed weapons." An officer may frisk a person only when he or she is "'justified in believing that the individual whose suspicious behavior he [or she] is investigating at close range is armed and presently dangerous to the officer or to others[.]'"[53]

---

[52] *United States v. Swindle*, 407 F.3d 562, 566 (2d Cir. 2005) (citations omitted).

[53] *Adams v. Williams*, 407 U.S. 143, 146 (1972) (quoting *Terry*, 392 U.S. at 24); *id.* ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law.").

In the 1990s the use of stop, question, and frisk ("SQF") by the NYPD escalated, and then — despite the issuance of a critical report by the New York attorney general in 1999 and the settlement of the *Daniels* litigation in 2003, both of which will be described below — increased even more dramatically over the next decade. The 1990s also ushered in increased trespass enforcement and SQF activity in both privately-owned buildings and New York City Public Housing Authority ("NYCHA") developments.

This escalation of SQF and trespass enforcement was the predicate for the *Floyd*, *Davis*, and *Ligon* cases, filed in 2008, 2010, and 2012, respectively. Here we consider the historical and legal context that led to these cases, as well as reforms that have been implemented over the years.

The Street Crime Unit, "Broken Windows" Policing, and CompStat

In 1971 the NYPD established the Street Crime Unit ("SCU"), a plain-clothes "City Wide Anti-Crime Unit" assigned to "high-crime" neighborhoods, with the goal of recovering guns. Members of the SCU were required to fill out a form, known as the "UF-250," following a stop based on "reasonable suspicion."[54] As will be discussed, the UF-250 and the later-created UF-

---

[54] The NYPD reports that use of an earlier version of UF-250 had been mandatory since 1964 and was amended in 1973. *See* U.S. Comm'n on Civil Rights, *Police Practices and Civil Rights in New York City: Chapter 5 Stop, Quest, and Frisk*, n.62 (2000), *available at* http://www.usccr.gov/pubs/nypolice/ch5.htm; *but see* Jeffrey Fagan and Garth Davies, *Street Stops and Broken Windows: Terry, Race, and Disorder in New York City*, 28 Fordham Urb. L.J. 457, 488 n.138 (2000) ("Although initially designed as a tool for investigation, completion of the UF-250 form has been required by the NYPD Patrol Guide since 1986. In 1997, the police commissioner assigned a high priority to filing UF-250s."). New York's first statute relating to stop and frisk was enacted in 1964. N.Y. Code Criminal Procedure (CCP) § 180-a. In 1968, on the same day that *Terry* was decided, the Supreme Court heard a case that, in part, challenged that statute. *See Sibron v. New York*, 392 U.S. 40 (1968). The Court explained that, "New York is, of course, free to develop its own law of search and seizure to meet the needs of local law enforcement, and in the process it may call the standards it employs by any names it may choose. It may not, however, authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct." *Id.* at 60-61 (citation omitted). Two years later, in 1970, the New York State Legislature enacted replacement legislation authorizing police to use stop, question, and frisk. That law, codified as CPL § 140.50, is still in place, but has been amended several times over the years, with the last amendment in 2010. The 2010 amendment prohibited the recording in a database of "information that establishes the personal identity of an individual who has

250 database have played a crucial role in the ability of actors outside of the NYPD, including the public, to assess the effectiveness and constitutionality of the NYPD's SQF practices over time.[55]

Although much happened in the intervening years, we shift our focus to the early 1990s. Providing an overview of events leading to the imposition of the NYPD's SQF policies, Professor Jeffrey Bellin explains that:

> The origins of NYC Stop and Frisk can be traced to an epic crime wave that crested in New York City in the early 1990s. In 1990, the City hosted 2,245 homicides, a "record high." News accounts chronicled the populace's fear. New Yorkers claimed to be afraid to wear jewelry in public, and some citizens reported sprinting to subway exits when train doors opened to avoid victimization. In 1993, nearly half of the City's residents said they had been victimized by crime in the past year. The NYPD's own publications reflected the public mood: "Whatever we are doing to reduce violent — especially handgun related — crime is not working."[56]

It was also this climate that led to the launch in 1991 of the Trespass Affidavit Program ("TAP"), known as Operation Clean Halls in the Bronx. Under that program, private landlords give permission to police to enter and search their buildings for the purpose of combating criminal activity. News reports note that TAP is "the only [program] of its kind in a major U.S. city that gives police standing permission to roam the halls of private buildings."[57] Then, in 1994, the City

---

been stopped, questioned and/or frisked by a police officer or peace officer, such as the name, address or social security number of such person[.]"

[55] But it was not until 1999 that UF-250 data was first shared outside of the Department, when New York's Attorney General required that the information be turned over following the shooting of Amadou Diallo by members of the SCU. And it was not until 2008, after being ordered to do so by a court, that the NYPD gave nongovernmental actors access to data from the UF-250 database.

[56] Jeffrey Bellin, *The Inverse Relationship Between the Constitutionality and Effectiveness of New York City "Stop and Frisk,"* 94 B.U. L. Rev. 1495, 1503 (2014).

[57] Colleen Long, "NYPD program patrols inside private buildings," Associated Press, Mar. 11, 2013, *available at* https://www.yahoo.com/news/nypd-program-patrols-inside-private-buildings-063214226.html

and NYCHA entered into a Memorandum of Understanding under which the NYPD enforced both criminal laws and NYCHA-specific rules and regulations.[58]

The 1990s also saw the NYPD's shift from community policing to, at least in name, "broken windows" policing.[59] Proponents of the broken windows theory believe that serious crimes can be reduced by aggressively pursuing enforcement of petty offenses. As explained by criminologists Jeffrey Fagan and Garth Davies:

> The originators of the Broken Windows theory, James Q. Wilson and George L. Kelling, argued that police should address minor disorders to strengthen police-citizen interactions, and consequently, informal social control. For Wilson and Kelling, signs of physical and social disorder invite criminal activity. Disorder indicates to law-abiding citizens that their neighborhoods are dangerous places, leading to their withdrawal from informal social control and regulation. The theory suggests that there is a tipping point at which disorder trumps order by defeating the willingness of citizens to interact with the police and with each other to co-produce security. Accordingly, disorder invites more disorder in a contagious process that progressively breaks down community standards and also suggests to would-be criminals that crime will not be reported. Disorder ultimately invites criminal invasion.[60]

In 1994, "CompStat" was developed under then Police Commissioner William Bratton. CompStat evolved from meetings Bratton and his team had with commanders to ask questions relating to criminal activity and measures taken to address that activity within their precincts.

---

[58] It should also be noted that the Civilian Complaint Review Board ("CCRB") in its present, all-citizen form was established in 1993.

[59] The efficacy of "broken windows" policing is difficult to measure and existing studies have yielded mixed results. The Center for Evidence-Based Crime Policy (2016), *available at* http://cebcp.org/evidence-based-policing/what-works-in-policing/research-evidence-review/broken-windows-policing/, reviewed literature that looked specifically at the effect of "broken windows" policing in New York City in the 1990s, finding: "Broken windows policing alone did not bring down the crime rates (Eck & Maguire, 2000), but it is also likely that the police played some role. Estimates of the size of this role have ranged from large (Bratton & Knobler, 1998; Kelling & Sousa, 2001) to significant but smaller (Messner et al., 2007; Rosenfeld et al., 2007) to non-existent (Harcourt & Ludwig, 2006)."

[60] Fagan and Davies, *Street Stops and Broken Windows*, 28 Fordham Urb. L.J. at 264.

Because commanders were unable to readily provide this information, the NYPD resolved to create a database. By collecting data on criminal activity, CompStat enabled the NYPD to concentrate officers in neighborhoods where there were higher recorded incidents of criminal conduct. CompStat also permitted data-driven management. As a data-drive management tool, CompStat was used to hold "commanders accountable for addressing crime conditions and improving the quantitative measures of their performance."[61]

By 1994, the NYPD was touting the effectiveness of street searches at removing guns from the streets.[62] This focus on guns, reflected in "Police Strategy No. 1: Getting Guns of the Street of New York," led to an expansion of the Street Crime Unit. It is thought that that expansion led to less effective training as well as a shortage of experienced officers to pair with the new recruits sent out on their assignments. At the same time, CompStat emphasized the number of stops officers made, leading to even greater number of stops, with UF-250 forms reflecting roughly 175,000 recorded stops around the City from January 1998 through March 1999 alone.[63]

Writing in 2000, Fagan and Davies described the NYPD's approach as a form of "order-maintenance policing" or OMP[64] — "aggressive[] enforce[ment] of laws against social disorder

---

[61] Liability Opinion, 959 F. Supp. 2d at 592.

[62] *See generally* Clifford Krauss, *New York City Crime Falls but Just Why Is a Mystery*, N.Y. Times, Jan. 1, 1995.

[63] While Bratton left in 1996, and new Commissioner Howard Safir instituted certain programs aimed at community relations and community engagement — *e.g.*, the NYPD courtesy, professionalism, and respect or CPR campaign, Precinct Community Councils, the Citizens' Police Academy, and the Model Block Program — the use of CompStat and aggressive policing continued.

[64] A review by Antony A. Braga, Brandon C. Welsh, and Cory Schnell in 2015 found no significant impact of order-maintenance policing on reducing crime. *See Can Policing Disorder Reduce Crime? A Systematic Review and Meta-analysis*, Journal of Research in Crime and Delinquency, Vol. 52(4), *available at* http://journals.sagepub.com/doi/pdf/10.1177/0022427815576576

with 'zero tolerance' that requires arrest for any law infraction."[65] Consistent with this, the NYPD enforced petty offenses such as laws against graffiti, public drinking, riding a bicycle without a helmet, and aggressive panhandling. As Bellin argues, "[a] program of mass 'stop and frisk' is not geared toward reversing neighborhood perceptions of disorder, but instead aims to decrease actual incidents of gun-carrying and resulting violence citywide[;]" and, he argues, quoting Barnard Harcourt, "'the primary mechanism' of any aggressive-policing-based crime decrease in New York City 'is probably not the broken windows theory,' but is instead 'a policy of aggressive stops and frisks and misdemeanor arrests'— something quite distinct"[66]

As a consequence of the increased interactions between officers and civilians, complaints against the Department started to rise. In 1996, the Department launched the NYPD's CPR campaign, a program intended to bolster the mission of courtesy, professionalism, and respect within and outside of the Department. Additionally, the Department implemented several other community-based functions, such as the Precinct Community Councils, the Citizens' Police Academy, and the Model Block Program.

In 1997, Abner Louima, a Haitian Immigrant, was beaten and sodomized with a broomstick by NYPD officers. The incident provoked outrage among Haitian and other communities across the nation. On August 29, 1997, an estimated 7,000 demonstrators marched to City Hall and to the 70th Precinct station where the attack took place. The march was dubbed

---

[65] Fagan and Davies, *Street Stops and Broken Windows*, 28 Fordham Urb. L.J. at 467.

[66] Bellin, *The Inverse Relationship Between the Constitutionality and Effectiveness of New York City "Stop and Frisk,"* 94 B.U. L. Rev. at 1505 (quoting Bernard E. Harcourt, ILLUSION OF ORDER (Harvard University Press 2001), at 10-11).

"Day of Outrage Against Police Brutality and Harassment."[67] The incident was mentioned in the 1998 Amnesty International Report on cases of reported police brutality, torture, and abuse. Mayor Rudolph Giuliani commissioned a task force to convene on the issue of police-community relations, seeking recommendations to improve police-community relations.[68] The task force, comprised of 33 community leaders, published a report with 91 recommendations for changes to the NYPD.[69] Later that year, a dissenting report, with its own recommendations, was filed in response to the report issued by the Mayor's Task Force.[70]

Although the quality of police-community relations had been in steep decline, it was the shooting of Amadou Diallo in February of 1999 that instigated a surge of protests and demonstrations calling for reforms to the NYPD. In December of 1999, New York's Attorney General released a report analyzing the data from the 175,000 stops conducted between January 1998 and March 1999.[71] In addition to finding that roughly a fourth of the UF-250 forms failed to provide information sufficient to determine if the stop was lawful, the report found that "blacks and Hispanics were significantly more likely than whites to be 'stopped' after controlling for race-specific precinct crime rates and precinct population composition by race."

---

[67] Peg Tyre and Jonathan Karl, "Demonstrators in New York protest police brutality," CNN, Aug. 29, 1997, archived from the original Jan. 5, 2007.

[68] *See* U.S. Comm'n on Civil Rights, *Police Practices and Civil Rights in New York City: Chapter 3 Police-Community Relations* (2000), *available at* http://www.usccr.gov/pubs/nypolice/ch3.htm

[69] *See* Task Force on Police/Community Relations, Report to the Mayor. New York, New York (1998). The recommendations included in this Report to the Mayor, as well as other reports issued between 1999 and 2015 are summarized in Part 2 of this Section.

[70] *See* Meyers, M., Fung, M., Siegel, N, *Deflecting Blame: The Dissenting Report of Mayor Rudolph W. Giuliani's Task Force on Police/Community Relations* (1998); *see* Part 2 of this Section.

[71] Spitzer, E, *The New York City Police Department's "Stop & Frisk" Practices: A report to the People of the State of New York from the Office of the Attorney General* (1999); *see* Part 2 of this Section. As also discussed in Part 2 of this Section, in 2000, the United States Commission on Civil Rights also issued a report critical of the NYPD's stop and frisk practices, including, among other things that racial profiling had been practiced. *See* U.S. Comm'n on Civil Rights, *Police Practices and Civil Rights in New York City* (2000).

_Daniels_, Reforms, and the End of the Street Crimes Unit

In March 1999, the Center for Constitutional Rights filed a class action lawsuit against the NYPD challenging the Street Crime Unit's SQF practices. Specifically, the plaintiffs alleged that "SCU officers have been repeatedly conducting stops and frisks of individuals without the reasonable articulable suspicion required by the Fourth Amendment. Rather, SCU officers have improperly used racial profiling, not reasonable suspicion, as the basis for the stops and frisks. The victims of such racial and/or national origin profiling are principally Black and Latino males."[72]

The plaintiffs in _Daniels_ sought to enjoin the continued operation of the SCU. But they also requested alternative relief including an order:

> (3) enjoining the use of formal or informal productivity standards or other de facto quotas for arrests and/or stops and frisks by SCU officers; . . .
>
> (7) requiring the City, NYPD, [Commissioner] Safir and [Mayor] Giuliani to institute and implement appropriate measures to ensure compliance with departmental directives that SCU officers complete UF-250's on each and every stop and frisk they conduct;
>
> (8) requiring the City, NYPD, Safir and Giuliani to institute and implement appropriate measures to mandate that UF-250's or other documentation be prepared and maintained in a computerized database for each stop conducted by an SCU officer, regardless of whether the stop is followed by the use of force, a frisk, a search or an arrest; and
>
> (9) requiring the City, NYPD, Safir and Giuliani to monitor stop and frisk practices of the SCU, including periodically and regularly reviewing form UF-250's to determine whether reported stops and frisks have comported with constitutional requirements.[73]

---

[72] _Daniels v. City of New York_, 198 F.R.D. 409 (S.D.N.Y. 2001) (internal citations omitted).

[73] Amended Complaint, Wherefore Clause, _Daniels v. New York_, No. 99 Civ. 1695 (S.D.N.Y.).

In 2002, while *Daniels* was still pending, the NYPD disbanded the SCU. The following year, the Court approved a settlement between the parties that included certain remedial measures. Among other things, the NYPD was required to develop a written policy prohibiting the use of racial profiling, and NYPD officers and recruits were to receive training on the legal basis for SQF, as well as training in cultural diversity, integrity, and ethics. In complying with this aspect of the settlement, the NYPD developed a Racial Profiling Policy which prohibited the use of race, color, ethnicity or national origin as a determinative factor in taking law enforcement action.

Under the terms of the settlement, NYPD officers were required to track each stop, question, and frisk — defined as "[a]ny incident in which a police officer temporarily detains a person for questioning and physically runs his/her hands over the clothing of the person detained, feeling for a weapon"— on a new version of the UF-250. The NYPD was further required to continue to compile and maintain a UF-250 database, and the data collected was to be provided to counsel for the plaintiffs on a quarterly basis. The NYPD Quality Assurance Division ("QAD") was directed to conduct internal audits to determine whether the forms were properly completed and that each SQF was based on reasonable suspicion (as reflected in the forms).[74]

The NYPD also agreed to conduct Joint Community Forums and 40 to 50 workshops at high schools to inform and educate about the rights of citizens when stopped, questioned, and frisked. In addition, the NYPD agreed to revise and disseminate its pamphlet entitled "Understanding Your Rights," and to design and create a palm card providing contact information and procedures, including the telephone number of the Civilian Complaint Review

---

[74] As the Court later found in *Floyd*, "[a]fter signing the settlement, however, QAD simply continued to use audit protocols that it had introduced in 2002." Liability Opinion, 959 F. Supp. 2d at 609.

Board ("CCRB"), to be distributed "when appropriate, as determined by the NYPD, in connection with" community engagement events.[75]

The settlement did not, however, call for a monitor. And as recognized by the Court nearly four years later, while the settlement did call for certain reforms, it did

> not include any provisions regarding plaintiffs' use or analysis of the UF-250 data. Nor [did it] contain any remedies or obligations regarding any trends or patterns reflected in the UF-250 database. Moreover, [the settlement did] not require any specific outcomes and ma[de] no specific assurances with respect to the supervision, monitoring and training of NYPD officers with regard to the Racial Profiling Policy.[76]

Notably, while the settlement required that the NYPD share the data with class counsel, it did not require that the data be shared with the general public. And it was not until March 2006 that the NYPD directed that all of the information from UF-250 forms be entered into a centralized database.

Access to UF-250 data later helped establish the allegations in *Floyd*. With regard to access to UF-250 data, in 2007 the New York Civil Liberties Union ("NYCLU") submitted a Freedom of Information Law ("FOIL") request to the NYPD for "the complete NYPD database of information entered from SQF worksheets for 2006, for the first two quarters of 2007, and for any calendar year prior to 2006 for which data exists in electronic form." The NYPD denied the request, citing several exceptions to disclosure under FOIL. In May 2008, Justice Marylin G. Diamond of the New York County Supreme Court issued a decision requiring the NYPD to provide UF-250 database information to the NYCLU in electronic form "with the exception of

---

[75] Stipulation of Settlement, *Daniels v. New York*, No. 99 Civ. 1695 (S.D.N.Y. Sept. 24, 2003).

[76] *Daniels v. City of New York*, No. 99 Civ. 1695, 2007 WL 2077150, at *1 (S.D.N.Y. July 16, 2007).

the names and addresses of the persons forcibly stopped and the names, addresses and tax ID numbers of the officers who made the stops and/or completed the form, which shall be redacted prior to disclosure."[77] And in September 2008, in connection with the *Floyd* case, the Court ordered the NYPD to produce to plaintiffs' counsel the UF-250 data from 1998 to 2004.[78]

Operation Impact and Continued Litigation

Ironically, while the Street Crimes Unit was disbanded in 2002, and *Daniels* was settled in 2003, the use of SQF increased nearly seven-fold between 2002 and 2011, when over 685,000 stops were recorded. The Street Crimes Unit might have been defunct, but an emphasis on activity and a focus on the quantity of stops continued. In addition, in 2003, the NYPD implemented Operation Impact, where large numbers of newly minted police officers — roughly 1,500 in 2003 alone — were sent to "impact zones" with instructions to conduct stops and enforce misdemeanor laws. These impact zones, identified by CompStat as having high crime rates, were almost always in communities of color. Meanwhile, under Operation Clean Halls, the NYPD continued to regularly conduct "vertical patrols" inside of NYCHA residences, and as alleged by the *Ligon* plaintiffs in 2012, "[i]n some Bronx neighborhoods, virtually every private apartment building is enrolled in the program . . . [and i]n Manhattan alone, there are at least 3,895 Clean Hall Buildings."

In 2005 and 2008, as Operation Impact continued in full force, two lawsuits were filed challenging the NYPD's continued enforcement of loitering laws which had been invalidated by the courts years before. Despite having been struck down, roughly 22,000 people were charged

---

[77] *New York Civil Liberties Union v. New York City Police Dep't*, 20 Misc.3d 1108(A), 866 N.Y.S.2d 93 (Sup. Ct. N.Y. Co. 2008).

[78] *See Floyd v. City of New York*, No. 08 Civ. 1034, 2008 WL 4179210 (S.D.N.Y. Sept. 10, 2008).

under these laws from 1983 to 2012. And for a 16-month period ending in 2006, the police issued at least 10 improper summonses a week. These cases, *Brown v. Kelly* and *Casale v. Kelly*, ultimately settled in 2012, with the City agreeing to pay $15 million to the class action plaintiffs.

In 2007, Bronx Assistant District Attorney Jeannette Rucker ("ADA Rucker"), who oversaw the arrest to arraignment process in the Bronx, "started to become concerned about cases in which people were being stopped and then arrested based solely on their having entered or exited a Clean Halls building. Especially in 2009, judges began dismissing these cases frequently, sometimes saying that the police had no right to approach the arrested person in the first place."[79] In 2010, consistent with complaints coming out of the defense bar, the Legal Aid Society, and the Bronx Defenders, "[ADA Rucker's] staff began telling her that judges were not only dismissing trespass cases, but were finding evidence that the defendant lived in the building where the trespass was said to have occurred."[80] Then, in 2011, she "investigated the law governing trespass stops based on entry to and exit from a Clean Halls building, and she determined that the [District Attorney's] position on the prerequisites for a legal stop had been wrong. She sent memos to a number of commanders and other police officials clarifying that, contrary to previous statements, observing someone exiting a Clean Halls building is not by itself a sufficient justification for a stop."[81]

Indeed, by 2010 the NYPD itself had been looking into issues concerning vertical patrols and trespass in NYCHA-owned properties and in connection with the TAP program.[82] And by

---

[79] *Ligon v. City of New York*, 925 F. Supp. 2d 478, 492 (S.D.N.Y. 2013).

[80] *Id.* at 493.

[81] *Id.*

[82] In 2000 section 212-60 of the NYPD Patrol Guide stated that officers should "be alert for persons loitering within [NYCHA-owned] buildings, or suspicious conditions." In 2010, the NYPD issued Interim Order 23 of 2010,

May 2012, the NYPD issued Interim Order 22 of 2012 defining when stops were lawful based on suspicion of trespass within a TAP building. However, Interim Order 22 of 2012 did not address the issue of stops outside of a TAP building.[83]

In September 2010, the CCRB completed a systematic review of trespass-related cases in patrolled housing, including both NYCHA-owned buildings and private buildings participating in TAP. That review, which looked at data from July 1, 2008 through October 31, 2009, concluded that out of 76 criminal trespass related complaints, 32% were substantiated. This substantiation rate was far higher than other types of complaints, meaning that in the CCRB's view there was reason for concern about how officers were enforcing trespass under TAP. In addition, in both 2010 and 2011, the CCRB issued reports stating that officers were failing to complete UF-250 forms following stops.

Both *Davis* and *Stinson v. City of New York* were filed in the Southern District of New York in 2010. The *Stinson* plaintiffs alleged that the NYPD had a policy of issuing unconstitutional summonses in violation of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments. The action "concern[ed] hundreds of thousands of New Yorkers who, over the course of many years, were issued summonses later dismissed after a finding of facial

---

revising Patrol Guide 212-60. It states that when encountering "persons who may be violating Housing Authority rules and regulations, including potentially unauthorized persons within NYCHA property," officers are to "[a]pproach the person(s) and ask: (1) If he or she lives in the building[;] (2) If he or she is visiting someone in the building[;] (3) If he or she has business in the building." It further states "*When a person's authority to be present in the building is in question, take reasonable measures to verify such authority (e.g., asking for identification, a key to the building entrance doors, etc.).*" It warns that "an officer may not stop (temporarily detain) a suspected trespasser unless the officer *reasonably suspects* that the person is in the building without authority." *Davis v. City of New York*, 959 F. Supp. 2d 324, 345 (S.D.N.Y. 2013) (internal quotation marks omitted).

[83] *See Ligon*, 925 F. Supp. 2d at 519.

insufficiency or were ticketed without probable cause."[84] The *Stinson* case was settled in 2017. Under the settlement, the plaintiffs received $56.5 million, and the NYPD agreed to:

> undertake remedial measures related to quotas, including: sending Department-wide communications informing officers that quotas and other numeric measures of performance are improper and subject to investigation by the NYPD's Internal Affairs Bureau; revising the training new NYPD recruits receive with regard to quotas and teaching recruits how to report observed issues without fear of reprisal; and improving public relations by simplifying the process for individuals who receive summons to identify officers responsible and for voicing complaints about summons if individuals believe the summons was issued unfairly.[85]

*Floyd, Davis,* and *Ligon*

*Floyd*, filed in 2008, contests the NYPD's SQF practices, including its disparate application to communities of color. *Davis*, brought in 2010, alleges that the NYPD uses unlawful stops, searches, and arrests to enforce the prohibition against trespassing in NYCHA buildings. *Ligon*, filed in 2012, challenges the NYPD's SQF practices in connection with stops made on suspicion of trespass outside of privately-owned TAP buildings in the Bronx.

In January 2013, the Court found that the *Ligon* plaintiffs were entitled to preliminary injunctive relief based on violations of their Fourth Amendment rights. In addition to making findings with respect to the conduct alleged by named plaintiffs, the Court made findings based on ADA Rucker's testimony and Dr. Fagan's analysis of UF-250 forms completed in 2011 by NYPD officers in the Bronx. As to the former, the Court found that

> ADA Rucker's testimony and the supporting exhibits, including the decline to prosecute forms, contained more than enough evidence to support the conclusion that there is a clear and

---

[84] *Stinson v. City of New York*, 256 F. Supp. 3d 283, 287 (S.D.N.Y. 2017).

[85] *Stinson*, 256 F. Supp. 3d at 287-88.

55

substantial likelihood that plaintiffs will be able to prove at trial that NYPD officers in the Bronx repeatedly stopped and questioned people on suspicion of trespass simply because they were observed exiting or entering and exiting a Clean Halls building.[86]

In August 2013, the Court held in the *Floyd* Liability Opinion that the NYPD's use of SQF violated the Fourth and Fourteenth Amendments to the U.S. Constitution. With respect to the Fourth Amendment, the Court began by "noting the inherent difficulty in making findings and conclusions regarding 4.4 million stops." The Court explained:

> Because it is impossible to *individually* analyze each of those stops, plaintiffs' case was based on the imperfect information contained in the NYPD's database of forms ("UF-250s") that officers are required to prepare after each stop. The central flaws in this database all skew toward underestimating the number of unconstitutional stops that occur: the database is incomplete, in that officers do not prepare a UF-250 for every stop they make; it is one-sided, in that the UF-250 only records the officer's version of the story; the UF-250 permits the officer to merely check a series of boxes, rather than requiring the officer to explain the basis for her suspicion; and many of the boxes on the form are inherently subjective and vague (such as "furtive movements"). Nonetheless, the analysis of the UF-250 database reveals that *at least* 200,000 stops were made without reasonable suspicion.
>
> The actual number of stops lacking reasonable suspicion was likely far higher, based on the reasons stated above, and the following points: (1) Dr. Fagan was unnecessarily conservative in classifying stops as "apparently unjustified." For example, a UF-250 on which the officer checked only Furtive Movements (used on roughly 42% of forms) and High Crime Area (used on roughly 55% of forms) is not classified as "apparently unjustified." The same is true when only Furtive Movements and Suspicious Bulge (used on roughly 10% of forms) are checked. Finally, if an officer checked only the box marked "other" on either side of the form (used on roughly 26% of forms), Dr. Fagan categorized this as "ungeneralizable" rather than "apparently unjustified." (2) Many UF-250s did not identify *any* suspected crime (36% of all UF-250s in 2009). (3) The rate of arrests arising from stops is low (roughly 6%), and the

---

[86] *Ligon*, 925 F. Supp. 2d at 495.

yield of seizures of guns or other contraband is even lower
(roughly 0.1% and 1.8% respectively). (4) "Furtive Movements,"
"High Crime Area," and "Suspicious Bulge" are vague and
subjective terms. Without an accompanying narrative explanation
for the stop, these checkmarks cannot reliably demonstrate
individualized reasonable suspicion.[87]

With respect to equal protection, the Court found that "targeting young black and Hispanic men
for stops based on the alleged criminal conduct of other young black or Hispanic men violates
bedrock principles of equality."[88] As should be clear, the Court's findings in *Floyd* would not
have been possible without the existence of, and access to, the UF-250 database.

Notably, a month after the Liability Opinion, the Vera Institute published a report, based
on a study launched in the fall of 2011, examining the question of how being stopped by police
affects those who experience these stops at a young age.[89] Although we will list the
recommendations made by the Vera Institute in Part 2, there is ample reason to list them first
here:

1.      Continue to recalibrate stop and frisk practices to remedy
the serious consequences to police-community relations and public
safety that the study revealed.

2.      Expand upon existing trainings to encourage respectful
policing that makes people feel that they are treated fairly (including
informing them of the reason for the stop), and emphasize
strategies aimed at reducing the number of stops that escalate to
the point where officers make threats and use physical force.

3.      Collaborate     with     the     predominantly     black     and
Hispanic/Latino communities where stop and frisk has been

---

[87] Liability Opinion, 959 F. Supp. 2d at 559-60.

[88] *Id.* at 664.

[89] Fratello, J., Rengifo, A. F., Trone, J., Velazquez, B. *Coming of Age with Stop and Frisk: Experiences,
Perceptions, and Public Safety Implications*, Center on Youth Justice, Vera Institute (2013), *available at*
https://www.vera.org/publications/coming-of-age-with-stop-and-frisk-experiences-self-perceptions-and-public-
safety-implications; *see* Part 2 of this Section.

concentrated to improve relationships by finding tangible strategies to put into practice.

4.      Partner with researchers to better understand the costs and benefits of various proactive policing strategies as well as individual practices such as stop and frisk.

*Davis* settled on April 28, 2015, and enforcement of the settlement was joined as related to *Floyd* and *Ligon*. In the settlement, the parties agreed that "further development of cooperative and trusting relationships between NYPD officers and NYCHA residents facilitates effective policing, and that negative interactions between NYPD officers and NYCHA residents and their authorized visitors have a long-lasting, harmful impact on those relationships."[90]

In 2015, Commissioner William Bratton announced that Operation Impact would be discontinued. In making this announcement, Bratton noted that under Operation Impact, supervision of new officers was inadequate, which led to problems in both (1) how SQF was being used and (2) with officer morale. According to the Monitor, the number of reported stops made by NYPD officers has gone from 532,911 in 2012 to 22,939 in 2015. Studies have suggested that the benefit of Operation Impact as a crime fighting tool is largely in the deployment of officers, and not in the number of stops conducted.[91] Viewed differently, the unconstitutional use of SQF which has had such a detrimental and lasting impact on individuals and communities and their view of the police, has not been shown to reduce crime.

---

[90] Settlement ¶ 2.

[91] *See, e.g.*, John MacDonald, Jeffrey Fagan, and Amanda Geller, *The Effects of Local Police Surges on Crime and Arrests in New York City*, 11 PLOS ONE e0157223, 10-11 (2016).

58

**Legal Context and Remedies**

Before discussing the remedies ordered by the Court in these cases, is useful to consider some New York law relating to stop, question, and frisk and trespass. New Yorkers have even greater rights under New York's constitution than the rights afforded by Supreme Court precedent under the federal constitution. In *People v. De Bour*, New York's highest court articulated a standard of reasonableness for police encounters with the public even before a stop is permitted, such as when an officer requests information.

*De Bour* defined four levels of police interaction. Level 3 is a *Terry* stop and Level 4 is an arrest. A Level 1 encounter is "a request for information" and "involves basic, non-threatening questions regarding, for instance, identity, address or destination."[92] While officers have "broad authority" to ask such questions, they may not do so "on whim or caprice" and must "have an articulable reason, [although that reason need] not necessarily [be] related to criminality[,] for making the approach."[93] Such encounters must be brief and cannot involve either harassment or intimidation, and it is impermissible to create the impression that the subject of questioning is suspected of a crime. Finally, an officer cannot ask the subject of a Level 1 encounter for consent to conduct a search.[94]

A Level 2 encounter is an interaction where an officer is permitted to ask pointed, accusatory questions, but not allowed to actually detain (or stop) the person. A Level 2 inquiry is permitted where there is a "founded suspicion" of criminality. In *Hollman*, New York's highest court explained the difference between Level 1 and Level 2 this way:

---

[92] *People v. Hollman*, 79 N.Y.2d 181, 185 (1992).

[93] *Id.* at 190.

[94] *See id.* at 191-92.

> Once the officer asks more pointed questions that would lead the
> person approached reasonably to believe that he or she is suspected
> of some wrongdoing and is the focus of the officer's investigation,
> the officer is no longer merely seeking information. This has
> become a common-law inquiry that must be supported by a
> founded suspicion that criminality is afoot.[95]

Unlike in Level 1, the questions can focus on potential criminality. Notably, at Level 2 officers

are permitted to ask for consent to conduct a search.

The *De Bour* nomenclature is certainly relevant in the context of these cases. Consider,

for example, the testimony of Inspector Kerry Sweet, the executive officer of the NYPD Legal

Bureau, who by 2010 was involved in examining vertical patrols and trespass issues in NYCHA

and TAP buildings.[96] After conducting focus groups with sergeants and lieutenants, Inspector

Sweet thought there was "some confusion" regarding TAP stops:

> [O]fficers believe their role might have been as doorman [or]
> custodian, rather than a strict application of *De Bour*. And once
> again, understanding that they needed that articulate reason to
> approach somebody and that if you were a doorman, you could
> approach everybody, but that is not the case. . . . [I]n TAP
> buildings, you have to have a reason to approach people. . . .
>
> I wasn't getting the sense necessarily that they were stopping
> people in their tracks, but they may have been asking everybody
> coming into a building, what are you doing here, what is your
> reason for being here. And that obviously isn't what we want them
> to do nor is it probably the right thing to do under the *De Bour*
> standard.[97]

---

[95] *Id.* at 185.

[96] *See Ligon*, 925 F. Supp. 2d at 517-18.

[97] *Id.* at 518: With respect to trespass, the Court explained in *Ligon*:

> Criminal trespass is defined under section 140 of the New York Penal Law. . . . :
>
> A person is guilty of criminal trespass in the second degree when, in pertinent
> part, he "knowingly enters or remains unlawfully in a dwelling[.]" A person
> "enters or remains unlawfully" in or upon premises "when he is not licensed or
> privileged to do so[.]" "In general, a person is 'licensed or privileged' to enter

Moreover, just as police officers have had trouble understanding the distinctions under *De Bour*, from the perspective of the citizen being asked pointed, accusatory questions, it is difficult to know whether he or she is engaged in a "consensual" Level 2 encounter, and free to leave, or a Level 3 detention (*i.e.*, a *Terry* stop).

Significantly, the Court drew a connection between violations of the Fourth Amendment and reforms related to Level 1 and Level 2 interactions in the Remedies Opinion. First, the Court explained that:

> an encounter between a police officer and a civilian constitutes a stop whenever a reasonable person would not feel free to disregard the officer and walk away. The threat or use of force is not a necessary or even typical element of stops. Encounters involving nothing more than commands or accusatory questions can and routinely do rise to the level of stops, provided that the commands and questions would lead a reasonable person to conclude that he was not free to terminate the encounter.[98]

Second, the Court posited that:

> There could be a simple way to ensure that officers do not unintentionally violate the Fourth Amendment rights of pedestrians by approaching them without reasonable suspicion and then inadvertently treating them in such a way that a reasonable person

---

> private premises when he has obtained the consent of the owner or another whose relationship to the premises gives him authority to issue such consent[.]" The prosecution bears the burden of proving the absence of such license or privilege.

The trespass law also states:

> A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or other authorized person. A license or privilege to enter or remain in a building which is only partly open to the public is not a license or privilege to enter or remain in that part of the building which is not open to the public.

*Id.* at 490-91 (citations omitted).

[98] Remedies Opinion, 959 F. Supp. 2d at 679.

would not feel free to leave. Officers could, for example, begin *De Bour* Level 1 and 2 encounters by informing the person that he or she is free to leave. There is no constitutional requirement for officers to inform people that they are free to leave. Nevertheless, the Constitution does not prohibit a police department from adopting this policy or a court from ordering it as a *means* of avoiding unconstitutional stops, where — as here — officers have been incorrectly trained on the definition of a stop.[99]

Likewise, with respect to the reforms in *Ligon*, the Court directed that Interim Order 22 of 2012 specify the circumstances in which is it permissible to interact with or stop a person *outside* a TAP building on suspicion of trespass, and that it include the following language:

A uniformed member of the service may approach and ask questions of a person (that is, conduct a Level 1 request for information under *DeBour*) if the uniformed member has an objective credible reason to do so. However, mere presence in or outside a building enrolled in the Trespass Affidavit Program is not an "objective credible reason" to approach. A uniformed member of the service may not approach a person merely because the person has entered or exited or is present near a building enrolled in the Trespass Affidavit Program.

Under the Fourth Amendment to the United States Constitution, a person is stopped (temporarily detained) if under the circumstances a reasonable person would not feel free to disregard the police and walk away. A uniformed member of the service may not stop a person on suspicion of trespass unless the uniformed member reasonably suspects that the person was in or is in the building without authorization.

Mere presence near, entry into, or exit out of a building enrolled in the Trespass Affidavit Program, without more, is not sufficient to establish reasonable suspicion for a stop on suspicion of trespass.[100]

Finally, as another example of the relevance of Level 1 and Level 2 encounters to the issues raised in these cases, in the *Davis* settlement the parties agreed that enforcement of New York

---

[99] *Id.* at 679 n.38.

[100] *Id.* at 689.

trespass law should conform to New York law, including with respect to police-citizen encounters starting at Level 1.

Remedies Ordered in These Cases

It should be recognized at the outset, that the Court's goal in ordering reforms was not to have "the NYPD [ ] abandon proactive policing and return to an earlier era of less effective police practices."[101] Rather, the reform process was intended to "require[] the NYPD to be *even more* proactive: proactive not only about crime control and prevention, but also about protecting the constitutional rights of the people the NYPD serves. The public interest will not be harmed by a permanent injunction requiring the NYPD to conform its practices to the Constitution."[102]

In addition to appointing the Monitor and Facilitator and ordering the JRP, the Court ordered Immediate Reforms in both *Floyd* and *Ligon*. In *Floyd* this included:

> (1) revisions to NYPD policies to make clear
>
>> (a) the circumstances in which a stop can be conducted; and
>>
>> (b) that targeting based on race is not permitted;
>
> (2) changes to stop and frisk documentation (required to be completed after a Level 3 stop) including
>
>> (a) revisions to the UF-250, including the addition of a narrative section, changes to the check boxes, and "a tear-off portion stating the reason for the stop, which can be given to each stopped person at the end of the encounter"; and
>>
>> (b) a requirement that officers provide narrative descriptions of stops in their activity logs whenever a UF-250 is prepared;

---

[101] *Id.* at 673.

[102] *Id.*

(3) changes to supervision, monitoring, and discipline, including

> (a) policies requiring sergeants who witness, review, or discuss stops to address not only the effectiveness but also the constitutionality of those stops;

> (b) policies requiring Integrity Control Officers who witness or review stops to review for constitutionality;

> (c) requiring that the Department Advocate's Office "improve its procedures for imposing discipline in response to [CCRB] findings of substantiated misconduct during stops," including "increased deference to credibility determinations by the CCRB, an evidentiary standard that is neutral between the claims of complainants and officers, and no general requirement of corroborating physical evidence" and

> (d) requiring the Office of the Chief of Department to track and investigate complaints of racial profiling;

(4) issuance of a FINEST message explaining the outcome of the litigation and "summariz[ing] in simple and clear terms the basic constitutional standards governing stop and frisk, the constitutional standard prohibiting racial profiling, and the relation between these standards and New York state law."; and

(5) implementation of a Body-Worn Camera ("BWC") pilot.[103]

In *Ligon*, Immediate Reforms included changes to written policies, such as to Interim Order 22 of 2012. With respect to supervision, the City "was ordered to develop procedures for ensuring that UF-250s are completed for *every* trespass stop outside a TAP building in the Bronx. A 'stop' is defined as any police encounter in which a reasonable person would not feel free to terminate the encounter."[104] In addition, the City was ordered to develop a system for reviewing the constitutionality of stops outside of TAP buildings in the Bronx. Finally, the City was ordered to make revisions to its training materials and programs.

---

[103] We note that neither this list of reforms nor the following descriptions of reforms related to *Davis* and *Ligon* are intended to be exhaustive.

[104] Remedies Opinion, 959 F. Supp. 2d at 690.

The *Davis* settlement included revisions to certain NYPD training materials and documentation requirements specific to NYPD trespass enforcement practices in or around NYCHA residences. The parties further agreed that additional reforms would be made as part of the Court-ordered Monitorship.

We next highlight the status of Immediate Reforms and additional reform measures both implemented and contemplated in *Floyd*, *Davis*, and *Ligon*.

Changes to NYPD Policies and Documentation

Many of the Immediate Reforms ordered by the Court have been implemented, including the creation of new stop report form and the "What Is A Stop?" receipt that is required to be given to people who have been stopped (but not those who are arrested or summonsed). The NYPD has additionally revised its written policies for street stops and vertical patrols.[105]

Supervision: Focus on Quality Not Quantity of Stops

In the Liability Opinion, the Court found that NYPD "officers [were] routinely subjected to significant pressure to increase their stop numbers, without corresponding pressure to ensure that stops [were] constitutionally justified."[106] In the Court's view, the two sources of this pressure were weekly "CompStat meetings" at which NYPD leadership urged local commanders to increase the number of stops and NYPD Operations Order 52, which the Court found "made clear that supervisors must evaluate officers based on their activity numbers, with particular

---

[105] *See* NYPD Patrol Guide §§ 212-11, 212-59, & 212-60. Section 212-11 provides a description of the four *De Bour* levels.

[106] Liability Opinion, 959 F. Supp. 2d at 602.

emphasis on summonses, stops, and arrests, and that officers whose numbers are too low should be subjected to increasingly serious discipline if their low numbers persist."[107]

In 2014, internal NYPD surveys reflected widespread dissatisfaction with legacy performance evaluation systems. This included the feeling that there was too much pressure to produce high numbers of stops without concern for the quality of the stops, echoing the Court's findings in the Liability Opinion. After internal deliberations and based on input received from outside parties, a new system was developed for evaluating patrol officer performance which takes into account qualitative measures of performance, including both good and bad conduct.

This new performance evaluation system has four main components. The first is a monthly-generated electronic form known as the Officer Profile Report. While the Officer Profile Report does not track the number of stops conducted by each officer, it compiles the number of stops resulting in corrective action by a supervisor. The second is the Supervisory Feedback Form, which enables supervisors to note commendable conduct and areas that may need improvement. The Officer Self Report Form allows officers to document conduct which they regard as important. Finally, the new system makes use of Quarterly Evaluations during which supervisors review the three forms just described. Supervisors must then rate officers based on 12 "dimensions," including "Application of Law and Procedures" and "Quality and Timeliness of Reports." In the context of these two dimensions, the supervisor will also rate the officer on the lawfulness of stops and the accuracy and completeness of the officer's stop reports.

---

[107] *Id.* at 590, 592-94, 600. The Department has since developed a new version of the performance evaluation for sergeants and lieutenants which will be implemented in 2018.

Notably, the NYPD's Performance Evaluation Guide, which explains the systems to officers, states that "The overall message from the 12 performance dimensions is clear: it is about the quality and effectiveness of work. It's not purely about quantitative metrics." With respect to *Terry* stops, the Guide provides:

> It should be noted that *Terry* stops (i.e., investigative stops or detentions that require the completion of a Stop Report) are no longer recognized as a quantitative performance metric in any way. However, if the member could not articulate a reasonable suspicion to justify a *Terry* stop, improperly prepared a Stop Report, or failed to complete stop documentation, supervisory members should take appropriate action, depending on the severity and frequency of the error, including guidance, training, preparing a feedback card, discipline or consideration in a quarterly evaluation.[108]

On November 6, 2017, Judge Torres issued an order requiring the Monitor to review and assess the NYPD's performance-evaluation system to ensure that it does not reinstate pressures that result in a focus on the quantity of stops without regard to their lawfulness or that would undermine the goals of the remedial process. Furthermore, Judge Torres' order provides that Court approval is required before the NYPD implements a proposed change that would introduce a mechanism to count the number of stops conducted by an officer or otherwise affect the manner in which the quality and lawfulness of stops are assessed. These requirements only exist during the period of Court supervision.

---

[108] The Monitor reports that one or more members of the team have attended CompStat meetings from April 2016 through August 2017 and that there is seldom any mention of stops and never a criticism of number of stops or lack of stops. Notably, the evaluation system currently only covers officers.

Police Stop Data

On March 25, 2016, the Court approved the Monitor's proposal regarding (1) a revised stop report form and accompanying instructions and (2) a draft NYPD Interim Order that reconciles NYPD SQF procedures with the new stop report form.

The new form requires documentation of stops as well as any related frisk or search, but not of Level 1 or 2 encounters. The form has a narrative section in which officers are required to describe the facts that formed the basis for the stop and, if conducted, the frisk, replacing the old forms which relied heavily on checkboxes. The prior use of checkboxes, such as "furtive movement," were thought to be susceptible to abuse in that they provided rote justifications. The form also has a section for supervisors to document that they have conducted the review required by NYPD policy and follow-up action, if any, called for by that review. In the Monitor's view, this new form "balances well the several goals of such a form — documenting stop, question, frisk and search activity, providing some guidance about when these interventions are permissible, and facilitating their review by supervisors and others in the Department."[109]

In addition, the NYPD has developed a new records management system called FORMS or "Finest Online Records Management System." On November 22, 2016, the Court approved the electronic version of the Court-approved stop report form. Once included in FORMS, officers can access and complete the stop report form on their smartphones and tablets, and supervisors can review the report electronically for approval or correction. FORMS is able to capture the narratives, the supervisory review, and the other fields on the Court-approved stop report form.

---

[109] 3/23/16 Ltr. from Monitor to Judge Torres at 3.

As required by section 140.50(4) of New York's Criminal Procedure Law, the database does not record the name and identifying information (address, date of birth and phone number) of the person stopped. However, that information is required to be recorded in officer activity logs, and a copy of the activity log is attached to a hard copy of the stop report and kept in a binder at each precinct, which facilitates audits and investigations related to CCRB complaints.

Body-Worn Camera Pilot

In the Remedies Opinion, the Court required that the NYPD implement a Body-Worn Camera pilot program over a one-year period to measure "the effectiveness of body-worn cameras in reducing unconstitutional stops and frisks" and to evaluate "whether the benefits of the cameras outweigh their financial, administrative, and other costs."[110] In ordering this relief, the Court explained the various purposes video recordings could serve:

> Video recordings will serve a variety of useful functions. *First*, they will provide a contemporaneous, objective record of stops and frisks, allowing for the review of officer conduct by supervisors and the courts. The recordings may either confirm or refute the belief of some minorities that they have been stopped simply as a result of their race, or based on the clothes they wore, such as baggy pants or a hoodie. *Second*, the knowledge that an exchange is being recorded will encourage lawful and respectful interactions on the part of both parties. *Third*, the recordings will diminish the sense on the part of those who file complaints that it is their word against the police, and that the authorities are more likely to believe the police. Thus, the recordings should also alleviate some of the mistrust that has developed between the police and the black and Hispanic communities, based on the belief that stops and frisks are overwhelmingly and unjustifiably directed at members of these communities. Video recordings will be equally helpful to members of the NYPD who are wrongly accused of inappropriate behavior.[111]

---

[110] Remedies Opinion, 959 F. Supp. 2d at 687-88.

[111] *Id.* at 685.

Significantly, the Remedies Opinion left the decision of whether to expand the Body-Worn Camera ("BWC") pilot an open issue. The decision provides that "[a]t the end of the year, the Monitor will work with the parties to determine whether the benefits of the cameras outweigh their financial, administrative, and other costs, and whether the program should be terminated or expanded."[112] At this time, the Department has already begun the process of expanding the BWC program beyond the pilot, and is now beginning the process of disseminating cameras to over 17,000 patrol officers.

The BWC pilot was launched in April 2017. The goal is to have approximately 1,200 officers — including uniformed patrol officers, plainclothes officers from specialized anti-crime units, and traffic enforcement officers — in 20 precincts wear cameras for the one-year program. The comparison control group will also include uniformed and plainclothes officers.[113] Notably, from December 2014 through March 2016, the NYPD instituted a trial BWC program in which 54 officers in five precincts and one housing Police Services Area volunteered to wear BWCs.

It is important to understand some of the considerations that went into the development of the BWC pilot, including what the pilot is intended to measure and the protocols for the program developed by the Monitor.

---

[112] *Id.*

[113] The Monitor is also developing a separate method of evaluating the use of BWCs by NYPD officers working in Public Housing Services Areas (*i.e.*, patrolling in and around NYCHA-owned properties).

Outcome Measures

According to the Monitor, the study[114] will assess four sets of outcomes measures: (1) civility of police-citizen interactions, including de-escalation (2) arrest numbers and other policing activities, (3) police lawfulness, and (4) police-community relationships. With respect to civility and de-escalation, the pre-test and post-test data will be collected to analyze outcomes compromised of: CCRB complaints, officer arrest reports listing force, officer use of force reports, officer injury reports, resisting arrest data, and Disorderly Conduct and Obstructing Government Administration arrests and summonses. It also appears that lawsuits against officers will be considered.[115] The metrics considered for arrest numbers and other policing activities include the monthly number of responses to calls for service (per unit); officer initiated-calls (per unit); complaints by citizens of crime; domestic incident reports; arrests; summonses; stop reports; and interior patrols.

To assess police lawfulness, each quarter the monitor team will review stop reports to assess constitutionality and compliance with the orders in *Floyd*, *Ligon*, and *Davis* and to compare the extent to which stop reports in camera and non-camera precincts differ. According to the Monitor, "[t]he monitor team will be looking at whether the presence of cameras influenced the officers' justifications for the stops, frisks and searches and also whether wearing cameras affected the demographic makeup of those stopped, such as their race, gender and age."

---

[114] The Monitor has provided greater detail on the design of the experiment. *See, e.g.*, Sixth Report of the Independent Monitor, The NYPD's Body-Worn Camera Pilot: Research and Evaluation Plan (June 29, 2017).

[115] *See id.* ("Variables in these datasets will be analyzed to determine whether cameras influence the types of CCRB complaints filed, lawsuit settlement amounts (if data is available), the types of force used (hand strike, baton, etc.), and other relevant subcategories for camera officers and control officers over the course of the study period. The monitor team will also examine the impact of cameras on the CCRB complaint process and outcomes, looking, for example, at dispositions, time-to-disposition of complaint, and disciplinary actions taken. The aim is to gauge differences in post-complaint experiences of treatment officers relative to control officers.").

The Monitor will also compare trespass enforcement in NYCHA and TAP buildings between officers outfitted with cameras and those without cameras to see whether the arrests were lawful and whether officers completed the required arrest and stop reports. In its June 29, 2017 report, the Monitor cautioned that this assessment depended on "the availability of data in a readily accessible format."

Finally, to evaluate the impact of BWCs on police-community relations, surveys will be conducted before and after the introduction of the cameras. This includes both telephonic and in-person surveys. The details of the survey methods are available in the Monitor's June 29, 2017 report.

BWC Pilot Policies and Procedures

The Court directed the Monitor to establish certain policies and procedures for the BWC pilot:

> The Monitor will establish procedures for the review of stop recordings by supervisors and, as appropriate, more senior managers. The Monitor will also establish procedures for the preservation of stop recordings for use in verifying complaints in a manner that protects the privacy of those stopped. Finally, the Monitor will establish procedures for measuring the effectiveness of body-worn cameras in reducing unconstitutional stops and frisks.[116]

The NYPD initially developed procedures in connection with its trial BWC program, and the Monitor has accepted the recommendations of the NYPD as to the procedures to be used during the BWC pilot. In establishing these procedures, the NYPD drew upon: (i) the policy for the trial BWC program in place from December 2014 through March 2016, which had been

---

[116] Remedies Opinion, 959 F. Supp. 2d at 685.

developed after, among other things, consideration of model policies issued by the International Association of Chiefs of Police ("IACP"), the Police Executive Research Forum ("PERF"), and the American Civil Liberties Union ("ACLU") and the policies in use at 20 police departments; (ii) feedback from stakeholders, including plaintiffs' counsel in *Floyd*, *Davis*, and *Ligon*, police reform advocacy groups, and NYPD's five unions; (iii) results from an NYPD-commissioned survey of police officers and the public regarding the proposed policy; and (iv) the NYPD's feedback based on informal meetings with stakeholders. As part of the NYPD's outreach effort described above, on April 7, 2017, the NYPD submitted revised draft procedures for approval and made public its analysis of the two surveys, including an explanation of why it had accepted or rejected certain recommendations.[117]

In approving the policy, the Monitor focused on four core areas: (1) when the camera is required to be activated, (2) when notice of activation is given, (3) supervisory review, and (4) documentation and retention. As a general matter, the BWC is required to be turned when responding to radio calls of a crime in progress, during interior patrols of NYCHA and TAP buildings, and prior to Level 2 encounters. For officers on patrol, apart from officers on interior patrols of NYCHA or TAP building, this means that BWCs must be activated for Level 2 encounters, but not with respect to Level 1 encounters (although officers may activate cameras at Level 1 when they deem it appropriate to do so).[118] Activation of the BWC is also required for

---

[117] *See* Monitor's Memorandum Regarding Approval of Policies for NYPD Body-Worn Camera Pilot Program (April 11, 2017), Attachment 3, NYPD Response to Public and Officer Input on the Department's Proposed Body-Worn Camera Policy, *available at* http://nypdmonitor.org/wp-content/uploads/2018/02/2017-04-11-Floyd-Ligon-Davis-Monitors-Ltr.-to-Court-Encl.-Memo-re-Approval-of-Policies-for-NYPD-BWC-Pilot-as-filed.pdf

[118] As noted, the NYPD retained researchers to conduct two surveys. The researchers surveyed 5,419 uniformed officers and 25,000 members of the public (unfortunately, the survey of the public was not representative of New York City's population in that it was disproportionately white: according to the report conducted by the Policing Project to the NYPD Summarizing Public Feedback on its proposed BWC Policy, 60% of respondents were white, even though whites make up just 33% of New York City's population). On the issue of when an officer should be

consent searches, inventory searches, searches incident to arrest, and searches of a person's belongings, but not for strip searches.

The Monitor believed that it was beneficial to record Level 2 encounters because (1) it may be difficult for officers to turn on the BWC where the Level 2 encounter escalates to a Level 3 *Terry* stop; and (2) it would permit the Monitor to evaluate whether officers are confusing Level 2 encounters with Level 3 stops. The latter is particularly important because an officer who fails to realize that a Level 3 stop has occurred will also not submit a stop report because stop reports are not required for Level 2 encounters. In addition, the Monitor noted that he believed that because officers are required to activate their BWCs during interior patrols of NYCHA and TAP buildings and when responding to a radio call, "a sufficient number of Level 1 encounters will be recorded under the [policy] to determine whether, in practice, Level 1 encounters raise questions that need addressing by the Department or the monitor."[119]

Notice of recording is required "[a]s soon as reasonably practicable" whenever the BWC is active "unless notification could compromise the safety of any person or impede an investigation."[120] Consent is not required to start or to continue recording.

Supervisors are required to review BWC video "in conformance with the self-inspection program promulgated by the [NYPD's] Quality Assurance Division," and also periodically to

---

required to inform a person that the camera is recording, the choices given were "As soon as the officer approaches the person," "As soon as possible without compromising safety or other law enforcement interests," "Never," and "No opinion," 65% of officers responded never, whereas 27% of public participants answered as soon as the officer approaches and 46% responded as soon as possible.

[119] Monitor's Memorandum on Approval of Body-Worn Camera Policies, at 7.

[120] *Id.*, Attachment 1, Step 4.

provide feedback and address deficiencies.[121] Currently, the NYPD is implementing a new self-inspection program run by the Risk Management Bureau.

Changes to Local Laws

On August 3, 2016, Mayor Bill de Blasio signed into law Intro. 606, also known as the "NYPD Use of Force Encounter Reports Law." The bill requires the NYPD to issue quarterly reports on "use of force incidents" and "their relationships to quality of life offenses."

In addition to this bill, Intro. 539 requires the NYPD to "provide a quarterly report on the number of use of force incidents disaggregated by type of force used, precinct or unit of that officer that used force, and whether the officer was on or off duty when the force was used." Intro. 824 requires the NYPD to "post an annual report of the total number and percentage of officers in each precinct that: have two or more substantiated [CCRB] complaints in the last three calendar years, have been the subject of an Internal Affairs Bureau Investigation that resulted in a suspension in the last five years, use of excessive force in the last three years or have been arrested in the last 10 years for police-related behaviors."[122]

A version of the "Right to Know Act" has been enacted. Under this legislative package, (1) officers are required to inform individuals during Level 2 and 3 encounters that they have the right to refuse to be searched and proof of consent to search must be provided in writing or by

---

[121] *Id.* at Step 26.

[122] *See* Zaria Howell, "De Blasio Signs 'NYPD Use of Force Encounters Reports Law,'" Amsterdam News, Aug. 11, 2016 (internal quotation marks omitted), *available at* http://amsterdamnews.com/news/2016/aug/11/de-blasio-signs-nypd-use-force-encounter-reports-l/

video (Intro. 541-C); and (2) officers are required to identify themselves and provide a business card as well as the reason for questioning at the initiation of Level 2 encounters (Intro. 182-D).[123]

*   *   *

<strong>Part 2</strong>

<strong>Calls for Greater Respect, Transparency and Accountability</strong>

The JRP has endeavored to engage the communities most affected by the NYPD's misuse of SQF and trespass enforcement practices in developing supplemental reforms beyond the Immediate Reforms, additional reforms implemented during the course of the Court-ordered Monitorship, and efforts by the New York City Council. The findings and recommendations of this process have been underscored by three primary issues which we review in sum and substance — respect, transparency, and accountability. These sections are organized as follows:

1. Public Investigations and Reports on Police-Community Relations in New York City from 1999 to 2015
2. Reasons to Address Police-Community Relations
3. Defining Transparency and Accountability
4. Reasons to Address Transparency and Accountability
5. Summary of Relevant Themes on Respect, Transparency, and Accountability

---

[123] Under earlier versions of Intro. 182, officers would have also been required to identify themselves at the start of Level 1 encounters that had a law-enforcement purpose. As enacted, Intro. 182 has received some criticism: "Under prior versions, officers would need to identify themselves in any nonemergency encounter involving investigative questioning. These types of encounters represent the vast majority of police[-citizen encounters]. The new version only requires officer identification when a person is 'suspected of criminal activity.' The problem is that police don't need to suspect someone of criminal activity to approach them, disrupt their daily routines, and question or harass them." https://www.aclu.org/blog/criminal-law-reform/reforming-police-practices/backroom-deal-threatens-weaken-real-police

**Public Investigations and Reports on Police-Community Relations
in New York City
1999 – 2015**

The following segment of this report is a brief chronicle in memorandum form of the various efforts in the form of public investigations and reports about the NYPD, its relationship with impacted communities, and recommendations for reform. It lends additional context to the necessity of reforms to address respect and police community relations, and lays the foundation for interpreting both suggestions from community members, and the Joint Remedial Process recommendations outlined in Section VI.

**Report Name & Citation:**
The Task Force on Police/Community Relations. (1998). *Report to the Mayor*. New York, New York.

**Summary of Process:**
Ten days after the assault of Abner Louima by two NYPD officers in August of 1997, Mayor Giuliani assembled the Task Force on Police-Community Relations. The task force was comprised of 33 members appointed by the Mayor. Among those selected were civil liberties administrators, former high-ranking New York City Police Department administrators, three City Council members, a borough president, several media representatives, as well as civic, religious, and community leaders. The task force worked for 6 months and generated 91 specific recommendations for improving police-community relations. Of those 91 recommendations, 87 were implemented in some way. Below you will find 26 recommendations directly or closely related to the most recent reform efforts to the NYPD.

**Recommendations:**
1. CPR (Courtesy, Professionalism, and Respect) advisory board to develop and disseminate a Code of Professional Standards; supplemented with lecture and video based roll call training briefs.
2. Institutionalize CPR training in the same way as firearms training.
3. Establish separate CPR Academies for leadership.
4. Independent body to develop and disseminate rank-specific, anonymous CPR evaluation surveys to leadership. Surveys should be complemented by open-ended, rank-specific focus groups designed to capture qualitative feedback.
5. Adopt policy/procedure manual for all Precinct Community Councils.
6. Convene and facilitate mandatory quarterly meetings, with all Precinct Commanders, and Precinct Council Executive Board Members.
7. Submit copy of monthly minutes.

8. Mandated to establish a Membership Recruitment Sub-Committee.
9. NYPD should design and implement a Comp-Stat like strategy to continuously measure and assess the effectiveness of all operational CPR components and the overall status of police-community relations, as well as to hold precinct and select operational unit commanders accountable for these measures.
10. Precinct Commanders should develop and implement a Citizen-Police Information Seminar Series.
11. Citizen-Police Town Hall dialogues should be instituted to address police-related issues/concerns raised by citizens and incidents of police-community tension.
12. Precinct Commanders and Community Precinct Council Presidents should receive facilitation skills training in order to more effectively and efficiently facilitate these forums.
13. Precinct Commanders should develop and implement a Citizen-Police Information Seminar Series.
14. Develop and implement a Community Affairs Response Team (CART) pilot in a precinct subject to community unrest. The mission is to de-escalate the risk of community unrest and through the strategic deployment of a team of select, specially trained police officers and community members.
15. Department should create a proactive curriculum which exposes student officers to the diverse and changing nature of the City's communities, challenges them to become cognizant of and question the feelings, assumptions and perceptions which influence their behavior, and equips them with the necessary tools to effectively serve all communities with courtesy, professionalism and respect.
16. Include video vignettes which comprehensively explore diverse groups in New York City.
17. Recommends the creation of a Board of Visitors for the New York Police Academy to act as advisors to the Mayor and the Police Commissioner. The BoV should conduct a top to bottom review and assessment of the Police Academy curriculum and to make appropriate recommendations for improvement.
18. Elimination of the 48 hour rule.
19. Create an independent auditor/monitor board to monitor and evaluate civilian complaint processes administered by the CCRB and the NYPD.
20. Propose the designation of both a senior NYPD official and a CCRB board member to act as liaisons between their respective agencies and the auditor-monitor.
21. The creation of a screening body composed of CCRB personnel and community representatives. (This body would screen complaints to identify the less serious complaints and refer them without a full investigation for resolution by either mediation or conciliation.)
22. NYPD should make the status information known to the CCRB, and the CCRB should then be responsible for reforming the complainant.
23. The NYPD's disciplinary choices, the reasons for making those choices and the specific disciplinary action the Police Department takes on CCRB-substantiated complaints should be public information.
24. Police disciplinary matters should be left solely in the hands of the Police Commissioner, and that the Police Commissioner's disciplinary determinations be accorded great

deference. Further, reviews by intermediate-level bodies should not interfere with a matter deserving of great deference to the Police Commissioner.

**Report Name & Citation:**
Meyers, M., Fung, M., Siegel, N. (1998). *Deflecting Blame: The Dissenting Report of Mayor Rudolph W. Giuliani's Task Force on Police/Community Relations*. New York, NY.

**Summary of Process:**
Following the finalization of the Task Force Report, three members of the task force wrote a dissenting report highlighting many of the issues existing throughout the 6 month long task force convening and the writing of the final recommendations. Task force members involved in the dissenting report included Michael Meyers, Executive Director of the New York Civil Rights Coalition, Margaret Fung, Executive Director of Asian-American Legal Defense and Education Fund, and Norman Siegel, Executive Director of NYCLU. The report was published in March of 1998; the same month as the initial report.

**Recommendations:**
1. To effectively develop a comprehensive approach to combating police misconduct there must be a mechanism for precinct level monitoring of police activity. It was recommended that there be an elected Police Community Advisory Board in each of the city's police precincts. Each board would have five members elected from the general population living within precinct boundaries. By monitoring and reporting on local police activity, this body would make precinct commanders accountable to neighborhood concerns and provide local residents and community organizations with a channel for addressing problems. (These boards are distinctly different from Precinct Community Councils)
2. Propose a six-month weekly class given to thirty police officers from all 97 precincts. It is recommended that this training is co-instructed with a well-trained NYPD officer and community member.
3. A residency requirement tied to an affirmative action plan for police officers as a condition of employment is strongly recommended to improve police community relations and increase the effectiveness of the NYPD.
4. Recommendation that that the NYPD implement an aggressive affirmative action plan designed to create a police force more reflective of the city's population.
5. Removal of the 48-hour rule.
6. Increase Academy Training from six months to one year.
7. As part of this effort, the NYPD must undertake a serious effort to make police precinct station houses client friendly. Some of the city's station houses today are no different than liquor stores with their small bulletproof plastic vestibules. With minimal costs, station houses can be transformed into places where neighborhood residents would be welcome to ask for assistance or just some basic information about city services.
8. Police Officers should be required to undergo periodic psychological testing.
9. In addition, clear written guidelines and procedures should be established by the NYPD for the handling of police encounters and incidents in which non-English speaking individuals are involved.

10. New York City's Human Rights Commission should develop workshops and materials for distribution directed towards young people to inform them of their rights and responsibilities in their interactions with the police.

11. The NYPD and the CCRB compile a broad range of statistics, from the number and type of arrests made, to complaints filed, to the number of bullets discharged, on a daily, weekly, monthly, and annual basis. A suggestion that as soon as this information is collected that it be posted on the NYPD and CCRB Websites for the widest available dissemination. Regular access to statistics on crime fighting and police misconduct would compel a form of accountability that does not currently exist.

12. The Police Commissioner must act on CCRB complaints within 30 days from when he receives them.

13. The Police Commissioner must act on the Administrative Law Judge's decision within 30 days from when he receives it.

14. The CCRB must hold public town-hall meetings at least once a month. At these meetings, the community would be invited and police management would be required to attend.

15. The Mayor's Executive Order issued on October 21, 1997 requiring the NYPD and CCRB to work more cooperatively and specifically to develop procedures to better inform complainants about the status of their complaint must be implemented. (The members did not believe that this Executive Order had been adequately implemented).

**Report Name & Citation:**

Spitzer, E. (1999). *The New York City Police Department's "Stop & Frisk" Practices: A Report to the People of the State of New York from the Office of the Attorney General.* New York, New York: Civil Rights Bureau.

**Summary of Process:**

In March of 1999, Attorney General Eliot Spitzer commissioned an investigation into the NYPD's Stop and Frisk practices. Stop data were reviewed to compare the extent to which minorities and whites were the subject of "stop & frisk" activity for the period of January 1, 1998 through March 31, 1999. The Office of the Attorney General published the report on December 1, 1999.

**Issues Identified:**

● Steady deterioration in the relations between the City's minority population and the NYPD.

● In 1999, the climate in New York's minority neighborhoods were resentment and distrust of the NYPD.

● Relative to their percentages within the population of New York City, Blacks were stopped at a much higher rate than whites.

**Recommendations:**

1. That NYPD attends to the data and respond to the serious concerns set forth in the report.

**Report Name & Citation:**

U.S. Commission on Civil Rights. (August, 2000). *Police Practices and Civil Rights in New York City*. Washington D.C.: U.S. Commission on Civil Rights.

**Summary of Process:**
The USSCR is composed of eight Commissioners: four appointed by the President and four by Congress.  At the time of the Policing Practices report, Chairperson Mary Frances Berry, Vice Chairperson Cruz Reynoso, and Commissioners Christopher F. Edley, Jr., Yvonne Y. Lee, Elsie M. Meeks,  Victoria Wilson, Carl A. Anderson and Russell G. Redenbaugh. Anderson and Redenbaugh dissented with the findings of the commission in a statement appended to the final report. The hearing took place May 26, 1999 and the final report was published in August of 2000.

**Issues Identified:**
1. Racial profiling had been practiced as part of NYPD's stop and frisk practices.
2. Cadets did not receive sufficient training time and experience - especially diversity training.
3. NYPD used materials that were offensive, and had prejudicial/racial, ethnic, religious, sexual, and gender stereotypes.
4. Sexual harassment training was inadequate.
5. The quality of instructors for the diversity and sexual harassment training, and number of instructors of color need improvement.
6. NYPD's in-service stop and frisk training did not occur regularly and was of a questionable benefit. It failed to instill respect for adherence to constitutional procedures.
7. There was a lack of regular continuing education courses on stop and frisk procedures, thereby contributing to misunderstanding by police officers.
8. NYPD lacked clarity in their articulation to the media and public the recommendations put forth by the mayor's Task Force on Police/Community relations and how they would be implemented and with what impact.
9. Open dialogue between NYPD and community members on a regular basis is a necessary effort toward building police community relations. When these regular dialogues do not take place on a regular basis the result is deterioration in police community relations.
10. NYPD training academy should be reformed.
11. Precinct Community Councils lacked oversight and accountability to a centralized authority, while not governed by any mission statement, with goals and a scope of responsibilities.
12. PCC lacked centralized technical support, and a mechanism for inter-council communication and idea sharing, they also like centralized accountability for membership diversity and activities.
13. NYPD had not been clear enough on articulating - both to the media and to the general public - the extent to which recommendations put forth by the mayor's Task Force on Police/Community Relations were being implemented, and with what impact.

**Recommendations:**

1. NYPD should change its diversity training and sexual harassment programs, including enhancing such training at the borough and precinct levels. Community members should be included in developing these trainings.
2. There should be more training time devoted to diversity training.
3. Negative stereotypes within training materials should be eliminated.
4. Materials should explore the meaning of racism, sexisms, bias, oppression, stereotyping, peer pressure, and related concepts.
5. Mandates under settlement agreement with the United States should be implemented to address the inadequate sexual harassment training.
6. Trainees should be tested on training material.
7. Continuing education courses on stop and frisk is necessary and should highlight relevant constitutional requirements. This training should be implemented for all officers regardless of rank.
8. Officers should be prepared following their academy training to develop community relationships and partnerships; while also receiving rewards for developing these community relationships and partnerships.
9. Creation of a website that provides public access to data collected by both the NYPD and by the CCRB.
10. Public forums involving both the police and community members should occur regularly throughout the year.
11. Participation in Precinct Community Councils should be actively promoted throughout the department and communities. Community members should receive regular updates in newsletter or other communication.
12. Creation of an independent temporary commission to investigate and examine the practices and training materials which are currently in use by the academy.
13. With a focus on Courtesy, Professionalism, and Respect (CPR) - in-service CPR training should be institutionalized and mandated like the firearms training.
14. Since Precinct Community Councils were not accountable to a centralized authority, it was recommended that NYPD adopt a mandated police and procedure manual for the PCC, placing significant emphasis on defining a mission statement, goals, scope of responsibilities, and scope of activities specifically designed to ensure that councils continuously and aggressively work to maximize improvements in the areas of quality of life, police-community relations, and community assisted policing.
15. Implement Police-Community dialogues in the form of a citizen-police information seminar series to complement the Citizens Police Academy.
16. Implement "citizen-police town hall dialogues"
17. Precinct commanders and CPP presidents should receive facilitation skills training to more effectively and efficiently facilitate dialogues.
18. NYPD should work harder to include community members in planning and policy development.

**Report Name & Citation:**
Vera Institute, Center on Youth Justice. Fratello, J., Rengifo, A. F., Trone, J., Velazquez, B. (2013). *Coming of Age with Stop and Frisk: Experiences, Perceptions, and Public Safety Implications.*

**Summary of Process:**

A study conducted by the Vera Institute, launched in the fall of 2011. This study sought to answer the unexplored question of: How does the being stopped by police, and the frequency of those stops, affect those who experience these stops at a young age? Using survey and in-depth research methods this study focused on young people (between the ages of 18-25) in highly patrolled, high-crime areas who have been stopped by police. There were approximately 500 respondents for the survey, with a smaller sample of in-depth interviews conducted with 13 to 21 year olds. The report was published September 2013.

**Recommendations:**

1. The NYPD should continue to recalibrate its stop and frisk practices to remedy the serious consequences to police-community relations and public safety that the study revealed.
2. Expand upon existing trainings to encourage respectful policing that makes people feel they are treated fairly (including informing them of the reason for the stop), and emphasize strategies aimed at reducing the number of stops that escalate to the point where officers make threats and use physical force.
3. Collaborate with the predominantly black and Hispanic/Latino communities where stop and frisk has been concentrated to improve relationships by finding tangible strategies to put into practice.
4. Partner with researchers to better understand the costs and benefits of various proactive policing strategies as well as individual practices such as stop and frisk.

**Report Name & Citation:**

Adams, E. L., Brewer, G., Siegel, N. (2015). *Improving Police Community Relations: A Report from a Series of Town Hall Meetings in Brooklyn and Manhattan*, New York, NY.

**Summary of Process:**

A partnership effort between the Manhattan and Brooklyn Borough Presidents Gale Brewer and Eric Adams, as well as NYCLU Executive Director, Norman Siegel, this report followed a series of community dialogues in Brooklyn and Manhattan beginning in January 2015. The final report was published in September 2015.

**Recommendations:**

1. Increase eligibility to take officer entrance exam.
2. Create a career ladder for auxiliary police officers into Department.
3. Assign a Special Prosecutor for cases of fatal police encounters.
4. Utilize early intervention systems to monitor officers' performance and behavior.
5. Create an accountability-driven culture in the NYPD.
6. Create meaningful community engagement and oversight mechanisms:
   a. While the department's new Neighborhood Policing initiative emphasizes community engagement and the value of relationships, participants at their roundtables emphasized that nonconfrontational everyday interactions with police

officers were essential to changing the culture of policing. Community members also noted that community engagement is a two-way street.

b. While officers should be respectful and friendly to community members, community members should also welcome officers into their communities. As such, community engagement should be a required component of the job, and quantitative parameters should be set requiring officers to attend a number of community meetings and neighborhood events each month. Some ideas for officer-community engagement included:

   i. Officers visiting schools and teaching civics classes
   ii. Utilizing the precinct as a community space with access to computers and Wi-Fi for young people
   iii. Hosting Open Houses at precincts (in similar manner to the recent Open Houses sponsored by the Fire Department of New York/FDNY)
   iv. Ensuring that officers on front desk are apprised of all events that precinct is sponsoring (i.e. a block party or basketball game)
   v. Connecting constituents calling precincts to Community Affairs officers in a user-friendly manner
   vi. Organizing regular sports events with the community
   vii. Hosting block parties

7. The Department should provide ongoing anti-racism training for the entire department that is interactive and applicable to officers' daily duties.

8. Make de-escalation the norm as a matter of practice in NYPD encounters

9. Require the NYPD to issue quarterly public reports detailing officers' use of force by precinct and area of deployment

10. Require the NYPD to issue quarterly public reports detailing officers' use of force as they related to quality-of-life crimes

11. Ensure that language in the NYPD Patrol Guide and training material intended to provide guidance to officers on how to conform to the law while conducting a "stop and frisk" based on "reasonable suspicion" follows the standards established by the Supreme Court of the United States in *Terry v. Ohio*.

12. Establish a permanent Statewide Independent Special Prosecutor to investigate allegations of police misconduct in order to avoid possible conflicts of interest by District Attorneys who, due to the nature of their everyday work with the police, are subject to an inherent risk of such conflict or the perception of it.

13. Implement a new NYPD Diversity Plan: "Experience Equals Education." New York City's peace officer forces such as School Safety Agents, Traffic Enforcement Agents, and Health and Hospital Corporation Officers are more diverse than the NYPD as a whole, yet they are not allowed to take the NYPD exam unless they have two years of college. We propose to allow these and other peace officers to take the NYPD exam if they have served honorably for more than two years in their current positions.

14. All NYPD officers should receive basic training in Community Affairs policing and engage in outreach to communities for New York City programs like "Pre-K for All" and "ID-NYC."

15. Reform "Broken Windows" policing by decriminalizing many non-threatening behaviors such as bike riding on the sidewalk, jaywalking, taking an extra seat on the train, drinking

(moderately) from an open container, and other activities that traditionally were not summonsed or prosecuted.

16. Put body cameras on officers, developing clear guidelines for their use, before full deployment.

17. Since schools are too often left empty after school hours when community sports, arts, and civic activity space is needed the most. NYPD should partner with the Department of Education to expand school building hours to create safe spaces for community activities.

18. Community Ownership and Accountability: To improve the quality of "neighborhood policing" and make neighborhoods safer, the community should take more of a leadership role.

19. Create an "Improve Police-Community Relations Coalition" made up of community-based and civil rights organizations, clergy, and concerned New Yorkers to monitor the progress of the city and NYPD in implementing the recommendations of this report.

20. Require the annual publication of a police-community relations status report prepared by the NYPD, to be provided to the Mayor, Comptroller, Public Advocate, City Council, the NYPD Inspector General, the Federal Monitor, the CCRB, and other appropriate agencies.

21. Create a seven-member oversight panel consisting of a City Council Member, a Borough President or designate, a civil rights lawyer, a community member, a union representative of NYPD members, a current NYPD Community Affairs officer, and a journalist of a local print news organization.

---

### Reasons to Address Respect and Police-Community Relations

While the Department has in the past made efforts to address police-community relations, critics have long highlighted the lack of meaningful engagement in communities of color. In addition, the NYPD lacks an institutionalized component for community partnerships in the pursuit of public safety. These issues have meant, in the past, that efforts at reform are often limited to the incumbency of current elected officials who make changes that fail to become part of the culture of the NYPD.

Early notions of law enforcement are said to be inspired by Robert Peel's principles of policing, which were developed around 1829.[124] Peel propounded some general principles of

---

[124] See generally Keith L. Williams, *Peel's Principles and Their Acceptance by American Police: Ending 175 Years of Reinvention*, The Police Journal, Volume 76 (2003); see Nick Pinto, "The Point of Order," N.Y. Times, Jan. 13,

police-community relations that were in his view foundational to the maintenance of public

safety. In his summary Peel highlighted the necessity for both public cooperation and public

respect as tantamount to the task of policing effectively. Peel's principles are so central to

modern policing that former Police Commissioner William Bratton was said to have kept a copy

of them in his office during his tenure at the NYPD.[125] What Peel recognized nearly two hundred

years ago was the basic need for community trust and cooperation.[126] Unfortunately, generations

---

2015 ("Peel's vision was highly influential in the formation of the New York City Police Department in 1845, and he is now regarded as a father of modern policing."), *available at* https://www.nytimes.com/2015/01/18/magazine/the-point-of-order.html

[125] *See* "Sir Robert Peel's Nine Principles of Policing," New York Region, N.Y. Times, Apr. 15, 2014, *available at* https://www.nytimes.com/2014/04/16/nyregion/sir-robert-peels-nine-principles-of-policing.html

[126] Scholars disagree whether there are nine or 12 Peel principles. When viewed as nine, they are often listed this way:

> PRINCIPLE 1 "The basic mission for which the police exist is to prevent crime and disorder."
>
> PRINCIPLE 2 "The ability of the police to perform their duties is dependent upon public approval of police actions."
>
> PRINCIPLE 3 "Police must secure the willing cooperation of the public in voluntary observance of the law to be able to secure and maintain the respect of the public."
>
> PRINCIPLE 4 "The degree of cooperation of the public that can be secured diminishes proportionately to the necessity of the use of physical force."
>
> PRINCIPLE 5 "Police seek and preserve public favor not by catering to the public opinion but by constantly demonstrating absolute impartial service to the law."
>
> PRINCIPLE 6 "Police use physical force to the extent necessary to secure observance of the law or to restore order only when the exercise of persuasion, advice and warning is found to be insufficient."
>
> PRINCIPLE 7 "Police, at all times, should maintain a relationship with the public that gives reality to the historic tradition that the police are the public and the public are the police; the police being only members of the public who are paid to give full-time attention to duties which are incumbent on every citizen in the interests of community welfare and existence."
>
> PRINCIPLE 8 "Police should always direct their action strictly towards their functions and never appear to usurp the powers of the judiciary."

of fractured relationships between police and minority communities has contributed to perceptions of the Department as a perpetrator of racism and homophobia in impacted communities. In recent years with the deaths of Eric Garner and Ramarley Graham, that schism has grown and produced a culture of fear and distrust that has, for some time now, diminished the police-community cooperation at the heart of Peel's thesis.

Poor police-community relations have several implications for officers from both a personal and professional standpoint. Distrust between officers and community members may instill officers with a sense of apprehension when approaching suspects, increasing the likelihood of escalation, the use of excessive force, and traumatization. Officers who are confronted regularly with depictions of themselves and their profession as abusive and racist are more likely to become defensive and disillusioned with the concept of community oversight or approval.[127] Such depictions can have a deleterious effect on officers whose work already exposes them to vicarious and actual trauma, with exposure to vicarious trauma occurring on a routine basis. Research shows that exposure to trauma produces hypervigilance and hypersensitivity to perceived threats for both the person being stopped and the police officer. Officers experiencing a sense of threat may, therefore, unnecessarily escalate civilian encounters, which, among other things, makes maintaining respectful relationships with the community even more difficult.[128]

Moreover, poor police-community relations have several implications for the direction of public safety. For example, when citizens do not trust officers they are less inclined to report

---

PRINCIPLE 9 "The test of police efficiency is the absence of crime and disorder, not the visible evidence of police action in dealing with it."

[127] *See* Susan Watt, *Future of Civilian Oversight of Policing*, 33 Canadian J. Criminology 347 (1991).

[128] *See* U.S. Comm'n on Civil Rights, *Police Practices and Civil Rights in New York City: Chapter 3 Police-Community Relations*.

incidents[129] and violence in communities may increase.[130] Citizens who are distrustful of officers are also more inclined to run from officers seeking to question them.[131] While fleeing the scene does not necessarily denote guilt,[132] it increases the likelihood of escalation and arrest. A history of racially-biased policing tactics or the perception thereof has contributed to a greater fear of police in communities of color, and as a consequence residents of impacted communities may be more likely than others to run in the presence of police.

Dr. Judith Lewis Herman in her revised 1992 book entitled *Trauma & Recovery*[133] defines "psychological interpersonal trauma" as occurring when an individual has an experience that threatens his or her life or bodily integrity, which overwhelms his or her ability to cope by creating feelings of hopelessness or intense fear. The hopelessness and fear described by Dr. Herman is what many community members expressed that they experienced during the varied phases of the JRP. Since thoughts and feelings are antecedents to actions, these experiences are

---

[129] Robert F. Kidd and Ellen F. Chayet (1984), *Why Do Victims Fail to Report? The Psychology of Criminal Victimization*, Journal of Social Issues 40(1) 39-50.

[130] *See* https://thecrimereport.org/2015/01/22/2015-01-columbus-cops-session/

[131] *See, e.g., Commonwealth v. Warren*, 475 Mass. 530, 539 (2016) ("[W]here the suspect is a black male stopped by the police on the streets of Boston, the analysis of flight as a factor in the reasonable suspicion calculus cannot be divorced from the findings in a recent Boston Police Department (department) report documenting a pattern of racial profiling of black males in the city of Boston. According to the study, based on [ ] data collected by the department, black men in the city of Boston were more likely to be targeted for police-civilian encounters such as stops, frisks, searches, observations, and interrogations. Black men were also disproportionally targeted for repeat police encounters. We do not eliminate flight as a factor in the reasonable suspicion analysis whenever a black male is the subject of an investigatory stop. However, in such circumstances, flight is not necessarily probative of a suspect's state of mind or consciousness of guilt. *Rather, the finding that black males in Boston are disproportionately and repeatedly targeted for [police-citizen] encounters suggests a reason for flight totally unrelated to consciousness of guilt. Such an individual, when approached by the police, might just as easily be motivated by the desire to avoid the recurring indignity of being racially profiled as by the desire to hide criminal activity.* Given this reality for black males in the city of Boston, a judge should, in appropriate cases, consider the report's findings in weighing flight as a factor in the reasonable suspicion calculus.") (internal citations omitted; emphasis added).

[132] *See, e.g., id.* ("Where a suspect is under no obligation to respond to a police officer's inquiry, we are of the view that flight to avoid that contact should be given little, if any, weight as a factor probative of reasonable suspicion. Otherwise, our long-standing jurisprudence establishing the boundary between consensual and obligatory police encounters will be seriously undermined").

[133] Herman, J. L., *Trauma & Recovery*. New York: Basic Books (2015).

reflected in the behaviors of both police officers and community members and often misread by both sides.

An op-ed written by Dr. Phillip Goff in January 2018, highlighted the need for continued research studying the traumatic effects to SQF in New York City.[134] The article asserted that still very little has been done to either assess or address the residual trauma that continues to fester in affected communities. Although a recommendation for this type of scholarly research is beyond the scope of the JRP, it is not beyond the scope to suggest that the NYPD take some initial steps to address trauma in ongoing reform efforts.

Unfortunately, there are no quick fixes for this problem. In order to nurture community partnerships, foster meaningful engagement between civilians and their local police officers, and rebuild police legitimacy, the NYPD should make intentional strides toward reconciliation with directly affected communities. This should include but not be limited to a reconciliatory strategy with a long-term committed effort toward change.

Fostering legitimacy requires more than just the implementation of strong new programs, it also requires addressing the harms that have taken place prior to reform. Following national trends around improving legitimacy like The National Initiative for Building Community Trust and Justice,[135] the NYPD can begin the necessary work of addressing past harms and reconciling its relationship with the communities most affected by years of unconstitutional SQF and trespass enforcement policies.

---

[134] *See* Phillip Atiba Goff, "On Stop-and-Frisk, We Can't Celebrate Just Yet," N.Y. Times, Jan. 7, 2018, *available at* https://www.nytimes.com/2018/01/07/opinion/stop-and-frisk-celebrate.html

[135] *See* https://trustandjustice.org/

### Defining Accountability and Transparency

Police departments, like all government entities, require citizen support and legitimacy to function effectively.[136] Social contract theorists maintain that public trust in institutions provides institutional legitimacy. In turn, institutional legitimacy encourages compliance with the law.[137] Moreover, academics, policing experts, and police departments generally agree that a mutual, trusting relationship between the police and community members is critical to effective policing.[138]

There is wide agreement and support for the proposition that when communities trust the police, community members are more cooperative during police interactions.[139] Community members are also more likely to seek assistance when needed, provide valuable information, and work with the police to solve community-wide problems.[140] Community members who trust the

---

[136] *See generally* David A Harris, *How Accountability-Based Policing Can Reinforce – or Replace – the Fourth Amendment Exclusionary Rule*, 7 Ohio St. J. Crim. L. 149 (2009).

[137] *See generally* Eileen Luna and Samuel Walker, *Institutional Structure vs. Political Will: Albuquerque as a Case Study in the Effectiveness of the Civilian Oversight of the Police*, CIVILIAN OVERSIGHT OF POLICING: GOVERNANCE, DEMOCRACY, AND HUMAN RIGHTS (2000); Tom R. Tyler and Jeffrey Fagan, *Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities*, 6 Ohio St. J. Crim. L. 231 (2008).

[138] *See generally* Tom R. Tyler, Jonathan Jackson, and Avital Mentovich, "The consequences of being an object of suspicion: Potential pitfalls of proactive police contact," Journal of Empirical Legal Studies 12, no. 4 (2015) (hereafter "Tyler, Jackson & Mentovich 2015"); Samuel Walker and Morgan Macdonald, *An Alternative Remedy for Police Misconduct: A Model State 'Pattern or Practice' Statute*, 19 Geo. Mason U. Civ. Rts. L.J. 479 (2009); Anthony M. Pate, Wesley G. Skogan, Mary Ann Wycoff, and Lawrence W. Sherman, "Reducing the 'Signs of Crime': The Newark Experience, Executive Summary." Washington, D.C.: Police Foundation (1985); Robert J. Sampson, Stephen W. Raudenbush, and Felton Earls. "Neighborhoods and violent crime: A multilevel study of collective efficacy." Science 277, no. 5328 (1997): 918-924; Tom R. Tyler and Robert J. Bies. "Beyond formal procedures: The interpersonal context of procedural justice." Applied social psychology and organizational settings 77 (1990): 98.

[139] *See, e.g.*, Kami Chavis Simmons, *The Legacy of Stop and Frisk: Addressing the Vestiges of A Violent Police Culture*, 49 Wake Forest L. Rev. 49 849, 867 (2014) (citing Dan M. Kahan, *Reciprocity, Collective Action, and Community Policing*, 90 Calif. L. Rev. 1513, 1525 (2002)); Jack R. Greene, "Community policing in America: Changing the nature, structure, and function of the police." Criminal justice 3, no.3 (2000): 299-370; Tyler and Fagan, *Legitimacy and Cooperation*, 6 Ohio St. J. Crim. L. 231.

[140] *See* Tyler, Jackson & Mentovich 2015; Simmons, *The Legacy of Stop and Frisk: Addressing the Vestiges of A Violent Police Culture*, 49 Wake Forest L. Rev. 49 at 867.

police seek to operate within the institutional structures of the police department, reaffirming its legitimacy.

Environments of distrust, on the other hand, foster interactions that are "laden with tension, and tension can lead to regrettable behavior (often escalating) on both sides," resulting in what Simmons calls "the perverse effect of perpetuating more violence."[141] As compared to white communities, communities of color "report lower levels of confidence in the police and the[] honesty and integrity [of the police] than white communities."[142] When communities distrust the police, they are less likely to ask for assistance or provide assistance and information,[143] thus undermining police effectiveness and mission.

Policing and police departments today must build trust in an environment permeated by historic wrong-doings by police across the nation and other government institutions. Erik Luna writes:

> A history of racial oppression at the hands of law enforcement provides the backdrop, while the demoralizing statistics on race, drugs, and law enforcement in the inner-cities supply an ostensible reason for community distrust. Personal experiences and popular images of police brutality or prejudice only confirm widely held suspicions, solidifying distrust on both an individual and group level.[144]

---

[141] Simmons, *The Legacy of Stop and Frisk: Addressing the Vestiges of A Violent Police Culture*, 49 Wake Forest L. Rev. 49 at 867.

[142] Stephens, Darrel W., *Police Discipline: A Case for Change*, Washington, D.C.: U.S. Department of Justice, National Institute of Justice, 2011, at 5-6, *available at* https://www.ncjrs.gov/pdffiles1/nij/234052.pdf

[143] *See* Erik Luna, *Transparent Policing*, 85 Iowa L. Rev. 1107, 1119 (2000) ("In the end, mistrusting community members are less likely to cooperate with law enforcement, less likely to voluntarily provide information to police, and less likely to comply with legal commands.").

[144] *Id*. at 1163.

Luna also argues that mistrust of and lack of confidence in the police by communities of color largely result from "perceptions of racial animus in the enforcement of drug laws . . . [in the 1990s,]" pointing out that "[o]nly a decade ago, sixty percent of blacks believed that it was or might be true that the federal government makes drugs available in minority neighborhoods in order to harm black citizens."[145] Thus, the community's perception of police today is colored by federal decisions, historic distrust, and egregious incidents of abuse of power over which current police leadership has little or no control. That being said, Weitzer and Tuch[146] found individual experiences with police officers "strongly influence citizen attitudes" often "increasing citizens' belief that police misconduct and racially biased policing occur," as do exposure to media reports on police abuse and misconduct. The NYPD's values appear to recognize this, "pledg[ing] to … maintain a higher standard of integrity than is generally expected of others because so much is expected of us."[147]

While trust is easily lost, it is difficult to rebuild. Moreover, as Brian Jackson notes in his testimony before the Republican Policy Committee for the United States House of Representatives, "even under the best of circumstances, the role of police means that they interact with citizens at their most vulnerable, must contend with stressful and volatile situations, and may have to take actions that every individual involved is unlikely to view positively."[148] Research on government institutions, and policing in particular, suggests that transparency and

---

[145] *Id.* at 1157 (citing Jason DeParle, "Talk of Government Being Out to Get Blacks Falls on More Attentive Ears," N.Y. Times, Oct. 29, 1990).

[146] Weitzer, Ronald, and Stephen Tuch. "Rethinking Minority Attitudes Toward the Police." *Washington, D.C: George Washington University* (2004).

[147] http://www1.nyc.gov/site/nypd/about/about-nypd/mission.page

[148] Brian A. Jackson, RAND, Testimony: *Strengthening Trust Between Police and the Public in an Era of Increasing Transparency*, at 2 (2015), *available at* https://www.rand.org/content/dam/rand/pubs/testimonies/CT400/CT440/RAND_CT440.pdf

accountability are required to build trust, increase legitimacy, and, ultimately, improve an institution's ability to achieve its mission.[149]

Accountability refers to procedures and controls requiring members of an organization "to follow established rules defining acceptable processes and outcomes, and to demonstrate that they have followed those procedures."[150] Accountability also requires that organizations ensure members are adhering to organizational standards, rules, values, and expectations.[151] This may be achieved through ongoing enterprise risk management, the implementation of effective internal controls, clear ways to escalate identified risks, internal "watchdog" groups, rewards for operating within the established framework, clear directives from leadership, willingness to correct noncompliance, and a fair disciplinary process.

A fair disciplinary process is one that "help[s] address police misconduct while supporting officers who have exercised their discretion appropriately and within the framework of law and policy."[152] Police departments, as institutions, in addition to showing the public they are holding their employees accountable to departmental requirements, are also accountable to the elected officials and managers in their chain of command and to the public. Providing transparency in the accountability framework increases police legitimacy.[153]

---

[149] *See generally id.*; Simmons, *The Legacy of Stop and Frisk: Addressing the Vestiges of A Violent Police Culture*, 49 Wake Forest L. Rev. 49 849; Tyler and Fagan, *Legitimacy and Cooperation*, 6 Ohio St. J. Crim. L. 231; Walker and Macdonald, *An Alternative Remedy for Police Misconduct: A Model State 'Pattern or Practice' Statute*, 19 Geo. Mason U. Civ. Rts. L.J. 479.

[150] Johnston, Michael. Good Governance: Rule of Law, Transparency, and Accountability, at 2 (2006) (hereafter "Johnston 2006").

[151] *See* Stephens, *Police Discipline: A Case for Change*, at 3-4.

[152] *Id.* at 2.

[153] *See id.* at 17.

By contrast, if "police disobey the law, the law will seem to apply only to those who do not have power. When that happens, law emerges as little more than force cloaked in legal authority, and the police, the literal embodiment of state power, teach people by their illegal actions that the law means nothing," thus undercutting their own legitimacy.[154] Ensuring individual and organizational accountability not only engenders community trust, but is required in order to maintain command, control and legitimacy, especially within a large organization.

Transparency refers to procedures and controls being understandable and available to the public.[155] Greater transparency builds trust and provides information communities can use to make informed decisions, instead of "connect[ing] the dots and fill[ing] in their own theory of racial prejudice in policing."[156] Erik Luna argues that opaqueness in law enforcement policy and practice allow for "unwritten code[s] of enforcement" to flourish that often contradict statutory or constitutional law.[157] Opaqueness is likely also in contradiction to official departmental policy and the understanding of departmental officials. Transparency may be achieved through the use of plain language, adherence to freedom of information requests, protection of whistleblowers, distribution of information through available technology, and publication of key performance indicators.[158]

---

[154] Harris, *How Accountability-Based Policing Can Reinforce – or Replace – the Fourth Amendment Exclusionary Rule*, 7 Ohio St. J. Crim. L. at 161.

[155] *See* Johnston 2006 at 2.

[156] Luna, *Transparent Policing*, 85 Iowa L. Rev. at 1157.

[157] *Id.* at 1155.

[158] There is, of course, no expectation of full transparency. For example, police departments do not disclose details of ongoing criminal investigations in order to not affect the integrity of the investigation. In other cases, personally identifiable information is not shared when an individual's safety may be jeopardized by disclosure. However, these exceptions should be in "well-defined scenarios" and must balance the potential risks of disclosure with the need for transparency. *Id.* at 1165.

Transparency also includes providing meaningful opportunities for both community and front-line officers to provide input, perspective, and influence in the policy formation process, explaining how community and officer input was considered, and providing a rationale and a statement of intent for all decisions. Bayley affirms this, writing that "historically, rank-and-file officers have only rarely been asked for input so that reforms can be developed based on their day-to-day experiences."[159] Bayley also recognizes that police reform is typically a result of people or events external to police organizations, making transparency particularly important to ensure pressure for needed reforms is maintained.[160]

Accountability and transparency together fall under "procedural justice." Procedural justice requires that police departments demonstrate "the fairness and impartiality of their processes, . . . treat individuals during those processes with dignity and respect, and . . . give the public the opportunity to participate."[161] Tyler and Fagan write that studies "suggest that experiencing procedural justice during a personal experience increases legitimacy, irrespective of the favorability of the outcome. These results suggest that the police can generally enhance their legitimacy by using fair procedures."[162] Ultimately, building and sustaining mutual trust depends upon the interdependent pillars of accountability and transparency both internally within the organization and externally to the public.

---

[159] Bayley, David H. "Police reform: Who done it?." *Policing & Society* 18, no. 1 (2008): 7-17.

[160] *See id.* ("In short, significant police reforms have been top-down and outside-inside.").

[161] Jackson, RAND, Testimony: *Strengthening Trust Between Police and the Public in an Era of Increasing Transparency*, at 3.

[162] Tyler and Fagan, *Legitimacy and Cooperation*, 6 Ohio St. J. Crim. L. at 232.

Best Practices

Academics, researchers, and police practice experts have accumulated, through trial and error, a number of best practices. Many of the more recent best practices make use of improved technology and data collection to help managers make data driven decisions both about individual officer performance and the performance of the department as a whole. Data driven practices have garnered support by academics, practitioners, and community members alike.[163]

Below, we discuss some of the most common strategies. Although not specifically addressed below a key best practice is clarity in policies, rules, and procedures, and in how those policies, rules, and procedures are taught (*i.e.*, training).[164] Describing how police departments can improve compliance, Harris writes that commitment to any policy or procedure must come from the top-down: officers will comply when "(1) the leadership of the department says so, in no uncertain terms, and (2) when the leadership act accordingly, if necessary, by punishing officers who refuse to comply."[165] Indeed, many of the immediate and subsequent reforms in *Floyd*, *Davis*, and *Ligon* were designed to address these issues.

Early Intervention Systems

Early Intervention Systems ("EIS") have "four basic components: performance indicators, identification and selection process, intervention, and post-intervention

---

[163] *See, e.g.*, Lum, Cynthia, and Daniel S. Nagin. "Reinventing American Policing." Crime and Justice 46, no. 1 (2017): 339-393 (hereafter "Lum & Nagin 2017"); McCarthy, Garry F. "Accountability for Respectful Policing." Police Chief (2015) (hereafter "McCarthy 2015"); Tyler, Jackson & Mentovich 2015.

[164] *See generally* Johnston 2006.

[165] Harris, *How Accountability-Based Policing Can Reinforce – or Replace – the Fourth Amendment Exclusionary Rule*, 7 Ohio St. J. Crim. L. at 170.

monitoring."[166] These components align to basic enterprise risk management systems utilized throughout the government and private sector to identify, manage, and control risks. The Police Executive Research Forum ("PERF") report on Civil Rights Investigations of Local Police states that standard features of EIS systems are:

- The system must be maintained and used by supervisors and managers

- An EIS should have policies and protocols for data collection, inputting of historical and current data, maintenance, retrieval, analysis, data security, and access.

- Personnel establishing or using the system must have proper training.

- Threshold criteria for flagging risk patterns must be developed.

- Follow-up actions for supervisors using EIS data analysis must be specified.

- Interventions by supervisors must be implemented in a timely manner.

- Intervention progress must be reviewed by a supervisor.[167]

EIS provides data on key metrics (*e.g.*, citizen complaints, use of force, resisting arrest incidents, civil litigation, firearm-discharge, etc.) for managers to make data-driven decisions to both identify individual officers in need of intervention and to make decisions regarding what intervention tools should be used that are tailored to the specific issues identified.[168] After determining the appropriate metrics, a police department would set thresholds for alerting

---

[166] Walker, Samuel. *Early Intervention Systems for Law Enforcement Agencies: A Planning and Management Guide*. U.S. Department of Justice, Office of Community Oriented Policing Services, 2003, *available at* https://cops.usdoj.gov/html/cd_rom/inaction1/pubs/EarlyInterventionSystemsLawEnforcement.pdf

[167] Police Executive Research Forum, Critical Issues in Policing Series, *Civil Rights Investigations of Local Police: Lessons Learned* (2003).

[168] *See generally* Walker, Samuel, Geoffrey P. Alpert, and Dennis J. Kenney. Early Warning Systems: Responding to the Problem Police Officer. Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, 2001 (hereafter "Walker, Alpert & Kenney 2001"); Samuel Walker, *Institutionalizing Police Accountability Reforms: The Problem of Making Police Reforms Endure*, 32 St. Louis U. Pub. L. Rev. 57 (2012).

supervisors for each metric, who would in turn investigate and determine what further action, if any, is required.[169]

Intervention tools may include "informal or formal counseling by supervisors, referral to professional counseling (e.g., family or substance abuse counseling), retraining, or other options."[170] Walker explains that "the special power of an EIS is that is has the capacity to identify an officer's specific performance problem (e.g., use of force, rudeness, special problem with dealing with young men or people of color), and its sources (personal family problems, substance abuse), and select an intervention related to the identified problem."[171] Most interventions are non-disciplinary, and the early intervention system is designed to identify and mitigate risks before formal disciplinary action is warranted.[172] In other words, police departments do not act upon data alone; instead, supervisors use data and their own analysis to determine root causes and select appropriate risk treatments. Walker asserts that "Some law enforcement experts involved with EIS talk in terms of the system's purpose being to 'save' officers' careers . . . [by] saving them from the costs of use of force or citizen complaint investigations as well as having such incidents on their performance record."[173] This type of performance evaluation represents a move from anecdotal and subjective evaluation to evaluation based on data and fact, and from generalized group-based interventions to those targeted to an officer's specific needs.

---

[169] *See, e.g.*, Tyler, Jackson & Mentovich 2015; Lum & Nagin 2017; McCarthy 2015.

[170] Walker, *Institutionalizing Police Accountability Reforms: The Problem of Making Police Reforms Endure*, 32 St. Louis U. Pub. L. Rev. at 77.

[171] *Id.*

[172] *See, e.g.*, Walker, Alpert & Kenney 2001; Walker, *Early Intervention Systems for Law Enforcement Agencies: A Planning and Management Guide* at 18.

[173] Walker, *Institutionalizing Police Accountability Reforms: The Problem of Making Police Reforms Endure*, 32 St. Louis U. Pub. L. Rev. at 82.

EIS allows for the data metrics, threshold counts, and interventions to be passed up the chain so that departmental leadership can make better policy decisions and department-wide interventions, creating a chain of accountability.[174] Initial research findings suggest that early intervention systems foster a culture of accountability and give managers better data with which to make decisions.[175] For example, a National Institute of Justice study in 2001 found that EIS programs "appeared to reduce problem behaviors significantly," as measured by the number of complaints filed and use of force incidents.[176]

The theory and use of early intervention systems have had a place in many police departments for decades due to the "belief that '10 percent of officers cause 90 percent of the problems,'"[177] which has been supported by subsequent analytical research.[178] However, Walker, Simmons, and Armacost, in separate reviews, argue that evidence supporting this theory is overly simplistic: misconduct occurs when police departments formally and informally support misconduct.[179] In 1981, the U.S. Commission on Civil Rights first recommended the adoption of early intervention systems by all police departments, which was later endorsed in 1989 by the

---

[174] *See* Harris, *How Accountability-Based Policing Can Reinforce – or Replace – the Fourth Amendment Exclusionary Rule*, 7 Ohio St. J. Crim. L. at 166-67, 193-94.

[175] *See* Stephen Rushin, *Structural Reform Litigation in American Police Departments*, 99 Minn. L. Rev. 1343, 1382-83 (2015); *see generally* Walker, *Institutionalizing Police Accountability Reforms: The Problem of Making Police Reforms Endure*, 32 St. Louis U. Pub. L. Rev. 57.

[176] Walker, Alpert & Kenney 2001.

[177] Rushin, *Structural Reform Litigation in American Police Departments*, 99 Minn. L. Rev. at 1382-83.

[178] *See generally* Walker, Alpert & Kenney 2001; Stephens, *Police Discipline: A Case for Change*, at 6 (citing a 1991 study by the Independent Commission on the Los Angeles Police Department).

[179] *See* Samuel Walker, The New World of Police Accountability (2005); Kami Chavis Simmons, *New Governance and the "New Paradigm" of Police Accountability: A Democratic Approach to Police Reform*, 59 Cath. U. L. Rev. 373, 395-98 (2010); Barbara E. Armacost, *Organizational Culture and Police Misconduct*, 72 Geo. Wash. L. Rev. 453, 457-59 (2004).

IACP and in 2001 by CALEA.[180] Not surprisingly, recommendations related to early intervention systems have been included in the majority of settlement agreements police departments have entered into with the Department of Justice, including with departments representing Los Angeles, Pittsburgh, Cincinnati, Steubenville, Washington, D.C., New Jersey, New Orleans, and the Virgin Islands.[181]

<u>Complaint Procedures and Investigations</u>

Another common strategy employed in settlement agreements relates to revising procedures for dealing with citizen complaints. Generally, the procedural changes fall into three tranches: the intake of complaints, the investigation of complaints, and the evaluation of the data collected.[182] Harris examines the perception of complaints and feedback in police departments, drawing an analogy to private sector businesses:

> [F]orward-looking organizations will look at complaints as a vital source of information and feedback — real data that can tell them exactly what at least some of their "customers" think regarding the organization's product or service. In the world of business, many organizations see those who complain as customers the business has failed and who the business must win back. Thus, private industry regards complaints as valuable information. Many businesses therefore go to some lengths to encourage their customers to fill out surveys or complaint cards or online versions of these; they view them as information that will give them a chance to get better.

---

[180] *See* Harris, *How Accountability-Based Policing Can Reinforce – or Replace – the Fourth Amendment Exclusionary Rule*, 7 Ohio St. J. Crim. L. at 166.

[181] *See* Police Executive Research Forum, Critical Issues in Policing Series, *Civil Rights Investigations of Local Police: Lessons Learned* (2003); Los Angeles Consent Decree at 9-22 (describing the development of the TEAMS II system, the management and coordination of risk assessment responsibilities, and the performance evaluation system); Pittsburgh Consent Decree at 6-9; Cincinnati MOA at 57-66; Steubenville Consent Decree at 28-29 (information system meant to supervise officer behavior); Washington, D.C. MOA at 106-17 (personnel performance management system (PPMS)); New Jersey State Police Consent Decree at 40-56; New Orleans Consent Decree at 80-83 (new early warning system to be implemented as part of the consent decree); Virgin Islands Consent Decree at 12-16 (planned development of a management and risk supervision system).

[182] *See* Rushin, *Structural Reform Litigation in American Police Departments*, 99 Minn. L. Rev. at 1383.

> Public agencies, and perhaps especially police departments . . . see complaints as attacks on them, as attempts by people who know nothing about police work to stick their noses in where they have no business, or as harbingers of lawsuits. This dovetails well with the unfortunate "nobody understands us but us, so no one has any right to pass judgment on us" attitude that prevails in many modern police departments. Complaints against police regarding how officers stop and search may not always reflect a correct understanding of the powers police officers have to stop, search, and arrest them. [But] for police departments, learning about citizens' lack of knowledge concerning police powers would tell the agency that it might increase public support . . . by making greater . . . effort to educate the public . . . .[183]

In other words, police departments should take affirmative steps to encourage individual and community feedback and make it easy to file complaints.[184] Method by which individuals can file complaints can be broadened to include means such as email and confidential hotlines or other means for receiving verbal complaints.[185]

Other recommendations relate to the integrity of the process. For example, the Los Angeles consent decree "required the police department to make audio or video recordings of all complainants . . . in addition to investigating the scene of the incidents to secure evidence."[186] This measure is also an example of ensuring that evidence and testimony is not subject to interpretation or coercion — that is, the "data" is allowed to speak for itself.

The complaint process, including time frames, should be presented to all parties. Too often these processes take "an excessive amount of time to complete," particularly in large

---

[183] Harris, *How Accountability-Based Policing Can Reinforce – or Replace – the Fourth Amendment Exclusionary Rule*, 7 Ohio St. J. Crim. L. at 173-74.

[184] *See id.*; Stephens, *Police Discipline: A Case for Change*, at 4.

[185] *See* Simmons, *New Governance and the "New Paradigm" of Police Accountability: A Democratic Approach to Police Reform*, 59 Cath. U. L. Rev. at 398.

[186] *Id.*

departments; and if the determination is appealed, can take far longer.[187] During an investigation, all parties should be provided regular updates as to progress, delays, and information regarding the outcome.[188]

Settlement agreement requirements have generally matched those recommended or required by the IACP, the Office of Community Oriented Police Services ("COPS"), and the Commission on Accreditation for Law Enforcement ("CALEA").[189] All three organizations contend that following complaint procedure best practices results in increased accountability and awareness both internally and externally, which can lead to improved public trust.[190]

<u>Body-Worn Cameras</u>

The most well-known recent response to the call for greater accountability and transparency has been the adoption of BWC programs by police departments across the country. BWCs were developed as an evidence-gathering tool and a deterrent, to complement and supplement existing recording systems, such as car-mounted video systems, CCTV, and, today, cameras on mobile telephones.[191] Stephens reports that "most police agencies believe that it serves that purpose."[192]

In part, whether BWC programs are effective depends on the extent to which they actually increase transparency in police interactions. For instance, PERF recommends

---

[187] Stephens, *Police Discipline: A Case for Change*, at 7.

[188] *See, e.g.*, *id.* at 4.

[189] *See* Rushin, *Structural Reform Litigation in American Police Departments*, 99 Minn. L. Rev. at 1383-84.

[190] *See id.* at 1384.

[191] *See* Harris, *How Accountability-Based Policing Can Reinforce – or Replace – the Fourth Amendment Exclusionary Rule*, 7 Ohio St. J. Crim. L. at 177.

[192] Stephens, *Police Discipline: A Case for Change*, at 4.

maintaining statistics on the use and outcomes of BWCs in criminal prosecutions and internal affairs and releasing that information to the public on a periodic basis.[193]

Another benefit of BWCs is that the information recorded, similar to the use of EIS, is a significantly less subjective way to assess performance during a stop and frisk, which benefits both police officers and community members. As with open data, research shows, the existence of an objective record supports both positive and negative claims by the police department and the public, minimizing time spent investigating unfounded complaints or misconduct.[194] This in turn provides a mechanism for greater accountability.[195] Research further suggests that because neither officers nor the public wish to be recorded engaging in inappropriate behavior, BWCs promote better behavior and thus impact the overall civility of police-citizen interactions.[196] BWCs can also help assist supervisors provide training, evaluation, coaching, and discipline to officers.

---

[193] Legitimacy and Procedural Justice: A New Element of Police Leadership. Police Executive Research Forum, 2014.

[194] *See generally* Harris, *How Accountability-Based Policing Can Reinforce – or Replace – the Fourth Amendment Exclusionary Rule*, 7 Ohio St. J. Crim. L. 149.

[195] *But see generally* Jordan M. Hyatt et. al., *The Effects of A Mandatory Body-Worn Camera Policy on Officer Perceptions of Accountability, Oversight, and Departmental Culture*, 62 Vill. L. Rev. 1005, 1019, 1034 (2017) (explaining that the "available evidence suggests that when officers have the discretion to activate — or not to activate — the BWCs are not only ineffective but can even backfire" but reporting their finding "that the implementation of a mandatory BWC usage policy in a large transit police department was associated with significant and overall negative changes in officer perceptions regarding accountability, oversight, and departmental culture").

[196] *See generally* Barak Ariel et al., *The Effect of Police Body-Worn Cameras on Use of Force and Citizens' Complaints Against the Police: A Randomized Controlled Trial*, 31 J. Quantitative Criminology 509 (2015). It is unclear whether the presence of BWCs will affect the overall number of police-citizen interactions. One study suggests, rather counterintuitively, that officers issued BWCs increased activity (such as issuing citations) compared to officers without cameras. *See* Justin Ready and Jacob Young, *The Impact of On-officer Video Cameras on Police-Citizen Contacts: Findings from a Controlled Experiment in Mesa, AZ*, J. of Experimental Criminology, 11:445-458 (2015).

Early studies of BWCs are promising. In the United Kingdom, an evaluation of a pilot program found BWCs provided significant benefits, including providing more accurate evidence, freeing up officer time spent record keeping, reducing public order offenses, and reducing adjudication times.[197]

Open Data

Ensuring the openness and transparency of data and decision making documentation may build trust by both providing event level detail, as well as providing data which the community can use to identify trends, changes, and equity across the community.[198] It is important to have open data but it is also important to identify additional data collection elements that are needed, such the key metrics for early intervention systems and overall effectiveness. Erik Luna, in his article *Transparent Policing*, writes that, "police might be required to record the age, race, and gender of all individuals subjected to traffic stops or *Terry* searches."[199] Data also helps support both positive and negative claims by the police department and the public. Particularly in an environment with eroded trust, data helps bolster arguments and provides a mechanism for greater accountability.

Inclusive and Participatory Rulemaking

Similar to requirements on federal agencies promulgating new rules and policies, police departments may adopt inclusive rulemaking processes to more effectively capture the views of the public and its officers. In traditional federal rulemaking, agencies draft a proposed rule for

---

[197] *See* Harris, *How Accountability-Based Policing Can Reinforce – or Replace – the Fourth Amendment Exclusionary Rule*, 7 Ohio St. J. Crim. L. at 177-78.

[198] *See, e.g.*, Stephens, *Police Discipline: A Case for Change*, at 21.

[199] 85 Iowa L. Rev. at 1170.

publication in the Federal Register. The public, including both individuals and interested organizations, are invited to submit formal written comments. Comments may be submitted by mail or online using the Federal Register website. The agency must review all the comments, analyze and evaluate each comment, and either incorporate comments into the rule or state with specificity why a comment was not incorporated. Agencies may conduct multiple rounds of solicitations of comments. The final rule is published in the Federal Register and incorporated into the Code of Federal Regulations. Responses to comments are also published in the Federal Register. Negotiated rulemaking further incorporates public input by having agencies directly engage with industry groups, academics, thought leaders, and other interested organizations at the beginning of the policy formation process. Police departments seeking to adopt a participatory rulemaking process may seek to broadly solicit and engage community members, targeting those most likely to be effected, and provide detailed responses and/or justifications to comments, improving transparency, accountability and overall legitimacy. This type of transparency helps both officers and the external community understand the values and objectives of policy changes.

Rulemaking, as described, may result in better decision making, provide accountability, promote community participation, increase organizational legitimacy, and help people to better understand rules (thus increasing compliance and reducing vagueness).[200] Inclusive, open rulemaking also limits the risk of abuse and bad policy.[201] Rulemaking processes are not without criticism, however. Some academics have attested that rulemaking actually moves policy

---

[200] *See generally* Erik Luna, *Principled Enforcement of Penal Codes*, 4 Buff. Crim. L. Rev. 515 (2000).

[201] *See* Luna, *Transparent Policing*, 85 Iowa L. Rev. at 1167.

formation away from community participation.[202] Critics contend that the promulgation of rules by unelected government officials result in overreach and a lack of accountability. However, many of the criticisms are based on how rulemaking plays out at the federal level, not the actual principles and processes.

This may fall into the broad rubric of the "New Governance" model that promotes "decentralized problem solving by local stakeholders, and the ongoing adjustment of rules and policies informed by on-the-ground monitoring and feedback," as opposed to the "'command-and-control' governance model, which emphasizes top-down decision making and static rules."[203] Assuming that police department officials making policy-level decisions do not have the expertise of the officers who work more directly with the community, it is important that officer expertise be included in future policies. In Sabatier's 1986 review of top-down and bottom-up policy formation, he writes that one of the primary criticisms of top-down approaches is that they "ignore, or at least underestimate, the strategies used by street level bureaucrats and target groups to get around (central) policy and/or to divert it to their own purposes."[204] In other words, officers perceive top-down policies, particularly those provided by external parties (*e.g.*, the courts, city councils, mayors, etc.) as less legitimate.[205] The key is to provide meaningful

---

[202] *See* Simmons, *New Governance and the "New Paradigm" of Police Accountability: A Democratic Approach to Police Reform*, 59 Cath. U. L. Rev. at 403 (citing Philip J. Harter, *Negotiating Regulations: A Cure for Malaise*, 71 Geo. L.J. 1, 113 (1982)).

[203] Jaime Alison Lee, *Can You Hear Me Now: Making Participatory Governance Work for the Poor*, 7 Harv. L. & Pol'y Rev. 405, 406 (2013).

[204] Sabatier, Paul A. "Top-down and bottom-up approaches to implementation research: a critical analysis and suggested synthesis." Journal of public policy 6, no. 1 (1986): 21-48.

[205] *See generally id.*; Simmons, *New Governance and the "New Paradigm" of Police Accountability: A Democratic Approach to Police Reform*, 59 Cath. U. L. Rev. 373.

opportunities for participation, and for the department to evaluate and incorporate the range of responses in a way that actually alters and shapes policy formation.[206]

<u>Police Auditors</u>

Another best practice is the use of a police auditor. Citizen review boards have long been used as a means to provide greater accountability.[207] New York City's CCRB as an all-civilian entity has existed since 1993. It is responsible for receiving, investigating, and making findings regarding complaints of police misconduct involving use of force, abuse of authority, discourtesy, or use of offensive language.[208]

Luna recounts, however, that "civilian [or citizen] review boards were once viewed as an antidote for police misconduct and a means of restoring public trust in the institution of law enforcement," but are largely seen as ineffective, due to local politics, underfunding, and lack of transparency, and not inclusive of actual community members.[209] In large part, the concept of a police auditor developed in the 1990s as an alternative to citizen review boards. Police auditors are charged with auditing, monitoring, and/or reviewing the entire department with a focus on policy-related reviews and recommendations.[210] Police auditors generally "have the power to

---

[206] *See generally* Lee, *Can You Hear Me Now: Making Participatory Governance Work for the Poor*, 7 Harv. L. & Pol'y Rev. 405.

[207] *See* James R. Hudson, *Police Review Boards and Police Accountability*, 36 Law & Contemp. Probs. 515, 517-18 (1971) (explaining that external oversight was viewed as necessary, as reflected in, for example, the 1968 Report of the National Advisory Commission on Civil Disorders, known as the Kerner Report, because police were "not perceived as impartial, neutral enforcers of the law, particularly by the citizens of ghetto neighborhoods").

[208] *See* City Charter Section 440; Rules of the Civilian Complaint Review Board, Section 1-02.

[209] Luna, *Transparent Policing*, 85 Iowa L. Rev. at 1167-68.

[210] *See* Walker, *Institutionalizing Police Accountability Reforms: The Problem of Making Police Reforms Endure*, 32 St. Louis U. Pub. L. Rev. at 84-86.

initiative investigations of any issue at their own discretion and are not limited to the terms of a consent decree or MOA," like that of a monitor.[211]

### Reasons to Address Transparency and Accountability

Effective, constitutional policing depends in large part on transparency and accountability both within the NYPD and in the NYPD's relationship with the public. As with any organization, effective performance depends on a shared understanding of organizational objectives and task-specific requirements, the ability of supervisors to monitor performance, and the expectation that both good and bad performance will be met with the appropriate response. Morale, which is dependent on many of these same factors, will also affect performance.

As a public institution, broad notions of democracy also require that the NYPD be transparent with and accountable to the public. Transparency in this regard includes not only public education and media releases, but access to information that enables the public to assess the performance of the police, including whether officers that violate rules are held accountable. Public accountability can, of course, take many forms, including the very lawsuits that led to appointment of the Monitor and the Facilitator and to this Joint Remedial Process.

The JRP and the NYPD's own internal surveys establish that there is a crucial link between constitutional and effective policing, and that accountability and transparency are fundamental to both. Policing experts agree that effective policing requires that the community trust and believe in the legitimacy of the police. Without trust, community members are reluctant to approach the police to share information needed for effective policing; without trust, interactions between officers and the community are ripe for conflagration.

---

[211] *Id.* at 85.

It cannot be forgotten that people want and depend on the police to help make their communities safe, to make sure the halls in their buildings are policed so that they feel comfortable in their homes. But a clear lesson of the JRP is that past stop and frisk practices in New York City have played a substantial role in eroding the historically fragile trust between members of communities of color and the police.

Because it is not just that rights were violated. Yes, the Fourth Amendment of the U.S. Constitution protects against unreasonable searches and seizures and the Fourteenth Amendment guarantees equal protection under the law, but there's more. As recognized by Chief Justice Warren in *Terry v. Ohio* over 45 years ago, "it is simply fantastic to urge that [a stop and frisk] performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.' It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly."[212] Likewise, stops, frisks, searches, and arrests of people, particularly those later found to be innocent, in and around their homes — what ought to be a sanctuary, a place of comfort — can be humiliating, embarrassing, and traumatizing.

Excessive force and unjustified killings are not the focus of the reforms ordered in *Floyd*, *Ligon*, and *Davis*, but their impact on trust and legitimacy clearly cannot be ignored. While citizens felt (and feel) that their complaints about SQF were (and are) not being addressed, that officers had free reign, the even more publicized action or inaction in response to excessive force and unjustified killings has created the sense that there simply is no accountability when police officers break the rules and cause great harm. And as we describe here, a program which

---

[212] *Terry*, 392 U.S. at 16-17.

permitted hundreds of thousands of stops a year, creates an environment of fear and intimidation, a group of communities under siege, and is an indispensable part of the sense that officers who break the rules are not held accountable.

Taking measures to improve accountability and transparency alone will not solve the problems identified in these lawsuits, but are nonetheless necessary to the development of the trust and legitimacy needed to ensure the future of effective, constitutional policing in New York City in the short and long term. Educating the public on police policies, listening to the public, and being responsive to the concerns of the community are important ways in which the NYPD can be more transparent and accountable to the public. Another is ensuring that police officers who break the rules are held accountable, and making that information public.

### Summary of Relevant Themes in Respect, Transparency, and Accountability

In the following section, we highlight suggestions that community members offered for consideration to improve respect, transparency, and accountability. These suggestions were gathered during the Focus Group, Leadership Meeting, and Community Forum Phases. We first provide a review of feedback on respect and police-community relations, followed by suggestions around transparency and accountability. Many of these themes directly echo the best practices described by researchers and academics, adding additional credence to the promise of their application.

**Themes on Respect**

***Floyd* and *Davis* Focus Groups**

Direct and Vicarious Trauma

Throughout the course of the JRP community members in the focus groups exhibited signs of direct and vicarious trauma over the perceived abuses they had suffered at the hands of officers in their community. In many cases, community members highlighted their fear and resentment toward abusive officers as underpinning a lack of trust in police.

Disrespect

Focus group participants often felt disrespected by officers, a consistent theme throughout all 64 groups. Participants did not limit this feeling of disrespect to stops by officers but also shared that they felt disrespected by officers in encounters separate from stops. Some basic solutions recommended by participants to address the issue of respect was community policing, officer assignments based on the needs of the community, customer service and implicit bias trainings, and providing civilians business cards or something similar with name, badge number, and precinct at the end of an encounter. Participants also felt that abuse of power and consistent disrespect were at the core of police interactions with community members, and expressed a need for officers to receive training on properly engaging with special populations such as the mentally ill, homeless individuals, and the LGBTQ community.

Stereotyping

Participants also expressed concerns that officers interacted with them based on stereotypes. They reasoned that these stereotypes were a result of officers' limited exposure and engagement with people from diverse backgrounds. As a result, it was suggested that officers should be required to participate in cultural awareness and competency trainings.

Need for Training

Training was a recurrent theme during the focus groups. Participants suggested that many of the constitutional abuses suffered by them were a result of inadequate training of officers by the NYPD. An overarching training theme was "Customer Service." Focus group participants expressed a desire for officers to participate in "customer service" type trainings that included a community engagement component. Participants felt that this would equip officers with the basic skills to engage community members respectfully. There was a consistent theme of respect, or the lack of it, throughout the focus group transcripts. Many participants expressed that officers did not speak while patrolling their communities. This same lack of engagement was present if the interaction was initiated by the individual instead of the police officer. As a result of this, participants provided the following suggestions for community engagement trainings:

- Officers should engage and have conversations with community members before patrolling communities.

- New hires should train within the communities prior to being assigned for patrol. Said trainings should be conducted by community leaders.

- The NYPD should implement Leadership/Supervisory trainings. Supervisory and Command officers should understand how management style affects the way officers interact with community members.

**Leadership Meetings**

During the leadership meetings there was a consistent call for improvements in the relationship between community and the police. Several organization leaders provided insights and pointed to potential initiatives which they believed might begin to repair this fractured dynamic, and make way for other improvements in public safety.

112

Mistrust and Respect

One of the most often cited issues raised by thought leaders on the issue of police-community relations was the perceived lack of respect between civilians and police. Organizations with comments on the matter pointed to a lack of courtesy in law enforcement, which includes the use of intimidation and aggression toward community members, and in many cases young people. Groups also pointed out that community members may feel as if they cannot voice their rights for fear that officers may retaliate against them. Individuals suggested that this lack of respect creates a fear of officers that feeds into a lack of trust in directly impacted communities.

Many groups suggested that this mistrust means that people do not feel protected by police and are much less likely to reach out to the Department for help. Coupled with the idea that officers may not feel trusted or respected, many groups suggested that the divide has negative consequences for both police and the community. Several community groups suggested possible ways to address the divide, including the Department being open to and working with thoughtful independent community leaders to begin to address issues that the community feels are being neglected by the Department.

Community Engagement

Several groups suggested that more meaningful engagement with the community could be a way to address poor relations between the police and community. Group members cited several examples which included expanded outreach, funding community programs, developing policies to promote engagement, and meeting with community member in safe spaces to both teach and learn about public safety issues in local neighborhoods. Meeting attendees suggested

that more familiarity and quality interactions with police in their areas could go a long way in easing the tension between groups.

Public Education

Another significant concept highlighted by leadership groups was the idea of an education campaign. Several of the groups thought it would be helpful for the NYPD to develop an initiative to inform community members of their rights, and/or new reforms to the NYPD. A couple of community groups thought this endeavor would be best undertaken in partnership with community groups through the selection of a precinct liaison, and in the case of schools, a youth delegate.

Community Oversight

One of the last significant themes around improving police-community relations was the call for community oversight. Group members suggested that the development of a structure for community leaders to work with the Department to review and make suggestions on additional changes to the Department could foster greater community security in the Department, which would have a more positive effect on relations on overall.

## Community Forums

During the public meeting phase of the JRP, community members consistently asked for greater respect from officers, and improved relations between the police and the communities they serve. Several relevant themes have been highlighted from the forum transcripts as they relate to bridging the gap between the NYPD and impacted communities.

Collaboration with Community Stakeholders

A consistent call from community members during the forum was for greater collaboration between community leadership and the police. Community members and thought leaders alike suggested community members should have a stake in the co-construction of public safety, and that the police should take initiative to rebuild trust in communities. Concrete examples for undertaking these collaborative efforts included providing community access and input into training, the appointment of community liaisons, developing more meetings in community spaces, and the undertaking of a campaign to educate communities about their rights.

Training for Improved Relations

As with the Focus Group Phase, training was a significant theme for reform. With regard to improving police-community relations, community members often stated that officers should receive training on respectful conduct, cultural competence (*i.e.*, learning more about the culture and customs of the communities they patrol), harm reduction in special populations (*e.g.*, mentally ill, undocumented, LGBTQ, disabled, etc.), communication skills, empathy, de-escalation, and trauma. Community leaders suggested that trainings on restorative justice might also be helpful for the Department in healing the break between the community and the Department.

Community Engagement Broadly Defined

Community policing was a popular idea among participants in the community forums. Youth and adults alike highlighted several examples of the type of community policing they wanted to see in their communities which includes expanding the Neighborhood Coordination Officer ("NCO") program, mentorship programs, and participation in community events. Community members also suggested that officers participate in community service, attend community meetings, and have more positive engagement with youth. The majority of community members felt it was important that there be consistent officers in their communities, that officers be placed strategically in communities and know the culture, and that officers are walking the beat and engaging with the people. In their interactions with civilians, many members emphasized the need for greater respect, and less aggressive interactions with officers. Generally, community members said they desired more communication between the precincts and neighborhoods and that the precincts should provide community members with a means for providing feedback to commanders about community concerns.

Officer Recruitment

Many community members stated they believed it is extremely important for officers to know the communities they patrol. For that reason, many people suggested that the NYPD recruit officers from impacted communities and/or mandate community service as part of field training for all officers.

Addressing Residual Trauma

At several points different individuals highlighted the residual trauma that still exists in directly-impacted communities as a result of unconstitutional SQF and trespass enforcement. Several suggested that meaningful change would require addressing this trauma in order to

restore police legitimacy. Examples that were provided included larger restorative justice healing exercises with community, and instituting mediation for rude or aggressive officers.

Restorative Justice

As restorative justice appeared to be a popular theme for community members for improving relations, the NYPD should develop initiatives to address the residual trauma that still abounds in many of the most marginalized communities. Resources like the National Initiative for Building Community Trust and Justice are already doing considerable work in the area of rebuilding police legitimacy, and have a number of pilot sites across the nation. The NYPD should consider a pilot program in consultation with this group to address the lingering issues which still exist for many communities in New York City.

Communication Input

Community members in attendance at forums also suggested that the NYPD take steps to include community members in the planning and development of policy initiatives. They suggested that the Department make a concerted effort to collaborate with community organizations, schools, and faith-based groups toward the creation and implementation of reforms that work for community members, not against them.

## Themes on Transparency and Accountability
### *Floyd* and *Davis* Focus Groups

Accountability

Members of both the *Floyd* and *Davis* focus groups consistently voiced disappointment that officers were not held accountable for misconduct. The focus groups also believed supervisors in officers' chains of command should be held accountable for the actions of their

staff. Accountability should include progressive discipline in order to appropriately target disciplinary actions to individual officer behavior over time.

Participants felt officers should be held accountable to a customer service or community engagement standard as part of performance reviews and promotion assessments. A customer service standard may review how an officer handles and responds to power dynamics, how an officer engages with special populations (*e.g.*, deaf and hard of hearing, disabled, homeless, LGBTQ), and the level of professionalism (*i.e.*, respect) afforded to community members. The *Davis* focus group further described specific metrics that should be included in performance reviews, including how well an officer follows NYPD procedures, the level of professionalism or respect afforded to community members, the number of complaints filed against the officer, and the officer's level of community engagement. Both focus groups were interested in how either individual community members or an oversight committee could provide assessments on individual officer behavior, both positive and negative. Participants suggested that performance evaluations be held at both an individual and a precinct level.

The *Floyd* focus group expressed a need for an independent, third-party entity with which they could file misconduct complaints and which had the authority to take action based on the results of the complaints. They noted that the complaint process could be streamlined and simplified to make it easier for individuals to file complaints, and, thereby, minimize the risk of further trauma. Participants suggested using technology, such as websites or mobile applications, to make it easier to file complaints and to enhance continual feedback mechanisms. The focus group also felt the complaint investigation and determination processes should be more transparent, providing regular updates on the status of individual cases.

<u>Transparency</u>

The *Floyd* focus group members would like greater transparency regarding community members' rights during a stop. For example, focus group members thought that officers should advise people of their right not to consent to searches.

Both groups suggested that a precinct-level "report card" regarding effectiveness and engagement with community members be made publicly available. The "report card" would provide data-driven metrics and report on progress over time.

Participants also expressed the need for transparency in connection with NYPD policies and discipline guidelines. Some participants suggested that organizational statements, policies, operating procedures, and training materials be publicly available; while others expressed the need for transparency in terms of discipline disposition.

## Community Forums

<u>Accountability</u>

During all of the community forums, participants stated that there needs to be greater accountability. Participants felt that the current disciplinary system was obscure, flawed, and arbitrary, and needed both reform and greater transparency. Community members called for meaningful and timely consequences that escalated for repeat misconduct. Attendees at the forums requested greater accountability at the officer, precinct, and departmental level.

Like the focus groups, the community forum participants suggested a "report card" system at the precinct level. Forum participants further stated that the NYPD should analyze the results to address identified issues and trends within each precinct and in its surrounding community.

Forum participants noted a need to protect whistleblowing officers and hold those who have knowledge of wrongdoing but do not report it as complicit in any wrongdoing. Community members also suggested the use of oversight procedures such as body-worn cameras, community oversight boards, and more stringent oversight of anti-crime detective units.

<u>Transparency</u>

Across the City, participants in the community forums requested more transparency and openness in data reporting and organizational structure. Participants felt that the public should have open access to data via a website or online portal. Examples of the types of information that participants thought should be made available include stop reports and officer complaints; participants also thought there should be a database of officers by precinct.

Community forum participants felt there should be greater transparency during stops. Many stated that officers should always clearly identify themselves and should ensure that community members understand the reason for a stop.

## Leadership Meetings

During the Leadership Meeting Phase, the Facilitation Team received reform ideas from thought leaders and advocates. The Facilitation Team also received white papers attached to this report. Many of these ideas called for measures to improve transparency and accountability.

<u>Transparency</u>

Thought leaders recommended the development of robust early intervention systems both internally and with respect to the ability to monitor the effectiveness of the NYPD's supervision, training, and discipline policies, procedures, and outcomes. In addition to traditional internal mechanisms for supervisors and managers to supervise data, an external monitor was also

proposed. Among other items to be included in the data collected was information from the courts regarding suppressions and findings of incredibility. It was recommended that any tracking system be robust enough to track patterns from officers working together, in squads, or precincts.

Continued and proactive community engagement was a constant theme. This included developing ways to make sure that the public is fully aware of all the reforms that have been implemented.

It was emphasized that the NYPD needed to engage communities in a meaningful way. This included police interaction at a more local level, as well as police interaction through the private sector and the Department of Education. It was also recommended that there be mandated community surveys to be reviewed, analyzed, and evaluated at the community level. The development of feedback mechanisms where citizens can report back to the NYPD in a consequence free atmosphere was also recommended.

The following recommendations were made with respect to open data:

- Create a searchable record on accountability.

- Create a feedback loop between the courts and the Department. When the court makes a decision in a case, it should get back to the involved officer's supervisor.

- Ensure that any oversight team is comprised of people living in impacted communities, organizations representing impacted community, and representatives of police reform organizations.

● Create a commission in the mold of the Seattle Community Police Commission ("CPC"), which, recently made permanent by the City, is a civilian commission with a mandate to develop reform recommendations and represent the community's interests.[213]

Furthermore, several groups stressed the importance of documentation. This included a recommendation for a mandate that the NYPD document "Level 1" requests for information and "Level 2" encounters and consensual searches. It also included a requirement that officers provide identifying information in the form of a card with respect to all citizen-police encounters (or on demand). And because homeless, youth of color, LGBTQ individuals, and people with substance abuse problems are very frequently the subject of unconstitutional SQF and trespass enforcement, the NYPD should record on the stop form that the individual stopped falls within one of these groups (but only when that information is provided by the person stopped). In addition, it was suggested that officers inform individuals subject to a stop or a Level 2 encounter of their right to refuse a consent search.

There was also concern with the current criminal discovery rules set forth in article 40 of the Criminal Procedure Law and their application. In that regard, because most cases result in a

---

[213] The CPC now has 21 Commissioners with the Mayor, the City Counsel, and the CPC each appointing seven. As stated on the CPC website:

> Commissioners should represent the diversity of Seattle and include individuals from communities of color, ethnic and faith communities, immigrant communities, the urban Indian community, the lesbian/gay/bisexual/transgender/queer/intersexual/asexual community, and the business community. Commissioners also should include youth representatives, civil rights advocates, and individuals familiar with the challenges faced by homeless people and those with mental illness or substance abuse issues. Two positions are designated for public defense and civil liberties lawyers, one position is designated for a member of the Seattle Police Officers Guild, and one position is designated for a member of the Seattle Police Management Association. Commissioners live or work in Seattle.

http://www.seattle.gov/community-police-commission/faqs#whoisonthecommunitypolicecommission.

plea deal, there is no discovery before trial and therefore no opportunity to discern and raise concerns before a plea is entered.

While many groups were in favor of body-worn cameras, there was a general sense that without access to the footage BWCs would not serve their purpose. At is most basic, access requires that footage be available to litigants and their counsel in civil and criminal proceedings. It was also recommended that footage be maintained by a third party government oversight agency (perhaps the CCRB or the Office of the NYPD Inspector General). There was a call for greater community involvement in developing the policies governing the BWC pilot as well as any program that is developed as a result. This included involving community members, advocates, and policing experts in the evaluation of the program.

Specific recommendations were also made regarding the BWC program, including establishing a clear process for filing complaints, a clear written policy that states the consequences for officers who fails to comply with the BWC policy, and a retention policy for video footage, and prohibiting officers from reviewing footage before a written complaint or arrest report has been submitted.

Accountability

There was a sense that behavioral changes required buy-in throughout the Department, but especially by leadership, managers, and supervisors. In other words, the people entrusted to ensure accountability must understand, support, and proactively push for more accountability.

It was suggested that there be increased disciplinary severity for repeated unlawful stops and frisks, and supervisor accountability for individual officers engaging in pretextual stops.

Likewise, it was suggested that officers who intervene when needed should be supported, and the ones who do not should be punished.

It was stressed that accountability should extend beyond the officer level, and that there should be police accountability at the precinct level. In this regard, precinct commanders should be trained on levels of sharing information with the public and public outreach, and evaluated on those grounds.

Recommendations included:

- Evaluate systems and publish reports, findings, data and any changes resulting from those evaluations on a regular basis.
- Establish uniform guidelines for the Commissioner's disciplinary determinations and the CCRB's disciplinary recommendations.
- Require the Commissioner to explain divergence from NYPD trial judge and CCRB disciplinary recommendations via reporting to the issuing body and the public.
- Ensure that District Attorneys report suspect and irregular patterns and practices.
- Strengthen the CCRB, including by increasing its budget and giving the CCRB authority to prosecute officers who lie under oath during the course of their investigations.
- Require officers to receive training resulting in certification; continuing training to obtain recertification; and, if officers violate the law, decertification.
- Appoint a special prosecutor for police misconduct cases.

**SECTION V: JOINT REMEDIAL PROCESS DESIGN AND IMPLEMENTATION**



### 1. Convening Phase

In January 2015, the Facilitator and Deputy Facilitator began the process of convening a series of small group meetings for the purposes of gathering information from, and building alliances with, community organizations that have contact with or provide services to persons in impacted communities that were adversely affected by unconstitutional stop, question, and frisk and trespass enforcement practices. Organizations across a variety of fields and specialties, including clergy, social workers, local government, police unions and affinity groups, and academia, were among the first outreach efforts on the part of the Joint Remedial Process ("JRP") administrative team. Organizations were selected for outreach based on criteria that prioritized work with affected communities and/or work on issues related to the *Floyd, Davis,* and *Ligon* cases.

Over 40 organizations participated in the early convening stage of the process. These meetings are part of what the JRP Team called the Convening Phase (*see* Figure 1).

**Figure 1:** Participating Organizations

| ORGANIZATIONS |
|---|
| 49 Strong, First Central Baptist Church |
| Arab American Association of New York |
| Bronx Connect |
| Bronx Fathers Taking Action |
| Brotherhood/SisterSol |
| Brownsville Community Justice Center |
| Center for Court Innovation |
| Citizens Crime Commission |
| Communities United for Police Reform ("CPR") |
| Covenant House |
| Dominican Officers' Society |
| DRUM – South Asian Organizing Center |

| |
|---|
| Esperanza |
| Exponents |
| First Corinthian Baptist Church |
| Fortune Society |
| George Walker Coalition |
| Getting Out, Staying Out |
| Good Old Lower East Side (GOLES) |
| High School for Law Enforcement and Public Safety |
| InterVarsity Christian Fellowship, John Jay College |
| John Jay College of Criminal Justice |
| Justice Committee |
| Law Enforcement High School |
| Legal Aid Society – Anti Gun Violence Unit |
| Make the Road New York |
| Malcolm X Grassroots Movement |

| |
|---|
| Man Up, Inc. |
| Mayor's Office of Community Affairs |
| Micah Group, Interfaith Center of New York |
| NYCHA Citywide Council of Presidents |
| Osborne Association |
| Picture the Homeless |
| Police Athletic league ("PAL") |
| Rock Safe Streets |
| Safe Horizon |
| Save Our Streets |
| Sikh Coalition |
| St. Paul Community Baptist Church |
| Streetwise and Safe |
| Theatre for the Oppressed |
| The Door |

| VOCAL-NY |
| :---: |
| Youth Represent |

Originally conceived of as a way for "a wide array of stakeholders to be offered the opportunity to be heard in the reform process" as required by the Remedies Opinion, the JRP was a multi-phase community engagement which placed at the center of its efforts, the goal of realizing and identifying reforms beyond those already ordered. To ensure that all stakeholders were included within the JRP, the following five phases were developed:

1. Convening Phase
2. Focus Group Phase
3. Leadership Meeting Phase
4. Community Forum Phase
5. Final Report Phase

**Process Development**

After a period of internal meetings, the Facilitator called for a series of preliminary meetings with the litigants in the *Floyd, Davis*, and *Ligon* cases. The goal of this process was to gather background information on the cases and seek out community organizations with a stake in these cases. At this time, the Facilitator and Deputy Facilitator had several internal discussions with the New York City Law Department, the NYPD, and plaintiffs' counsel to identify key stakeholder groups, potential JRP participants, conduct an overview of available resources, and brainstorm options for the function and design of the JRP.

Initial Assessment of *Floyd, Davis* and *Ligon*

The Facilitator's first step in the convening of the JRP was to determine the Court's mandate, and figure out the goals of the process. In the Remedies Opinion, a Monitor was appointed to oversee the Immediate Reforms ordered by the Court in 2013. Rather than develop a simple conflict resolution process, the Remedies Opinion required that the parties engage in a community-based remedial process to develop sustainable reforms to the SQF practices of the NYPD.[214] Central to this task, the Court highlights the need for most directly affected communities to be at the center of the remedial process. These basic stipulations then made it possible for the Facilitator to devise ground rules and a basic structure for the next steps of community process.

Stakeholder Identification

Following the development of an initial framework, the Facilitator had to identify a sample of interested stakeholders to participate in the process. The Remedies Opinion provided the Facilitator with an extensive list of stakeholder groups including representatives from grassroots, religious, and advocacy organizations, the Civilian Complaint Review Board, the District Attorneys, police organizations, schools and elected officials, and naming Community United for Police Reform ("CPR") and the Black, Latino/a, and Asian Caucus of the New York City Council as specific parties in the JRP. Using the Remedies Opinion as a template, the Facilitation Team then began the process of conducting extensive outreach to organizations with an interest in SQF and trespass enforcement. Once groups were identified, the Facilitator scheduled a series of small group meetings to determine party representatives and resource allocations for groups.

---

[214] *See* Remedies Opinion, 959 F. Supp. 2d at 686-88.

The Facilitator met with several representatives of police unions and affinity groups. They included representatives of the Sergeants Benevolent Association, Detectives' Endowment Association, NYPD Captains' Endowment Association, National Latino Officers Association, 100 Blacks in Law Enforcement Who Care, The NYPD Guardians Association, and the Dominican Officers Association. Additionally, the Facilitator attempted to meet with the New York City Patrolmen's Benevolent Association and the NYPD Hispanic Officers Society. The Facilitator was advised by the Monitor that he had apprised the Patrolmen's Benevolent Association of his interest to meet with them to discuss the Joint Remedial Process. Unfortunately, the Association declined the request.

Resource Determinations

The Facilitator, in consultation with the City, then had to develop a relationship and structure for funding the project. As required by the Court, the Joint Remedial Process would be funded by the City; funding was required to cover the expenses of acquiring staff, purchasing materials, renting venues, and other costs integral to the work of the process. Once a funding structure was determined, the Facilitation Team began the process of seeking staff and proposals for implementation of the JRP.

Design and Implementation

The final step of the Convening Phase required the Facilitator to organize a strategic plan for completion. Initially the Facilitator decided on a survey design and met with a City University of New York ("CUNY") research team to review proposals for a community input survey. The Facilitator declined to move forward with the CUNY proposal. Instead, the Facilitator sought to develop an information gathering process that would allow the Facilitation Team to go out into impacted communities to connect with and learn from individuals.

131

Joint Remedial Process Advisory Committee

The Facilitation Team thought of creating an Advisory Committee to help guide the JRP. The Advisory Committee was conceived of as a structure through which the JRP Team could receive advice and input on, primarily, the process itself. The Committee was a vehicle for us to obtain advice and counsel from stakeholders as we developed the JRP. Additionally, the JRP Advisory Committee was a sounding board for the ideas that the Facilitator would present to the Monitor and the Court. The Committee met monthly except for a short hiatus from August 2016 to January 2017. While the primary purpose of the JRP Advisory Committee was to offer in a structured way continued input into the process, it also became a vehicle for dialogue on substantive issues.

With respect to the composition of the Advisory Committee, the Facilitator decided that the committee should be composed of representatives from various stakeholders in the JRP (*see* Figure 2).

**Figure 2:** Joint Remedial Process Advisory Committee Members

| MEMBERS |
| --- |
| Adilka Pimentel – Make the Road New York |
| Alyssa Aguilera – Vocal-New York |
| Benjamin Tucker – NYPD First Deputy Commissioner |
| Chris Bilal – Streetwise and Safe |

| |
|---|
| Ed Mullins – Sergeants Benevolent Association[215] |
| Eleanor Britt – Plaintiff for Davis |
| Gabriel Strachota – Communities Voices Heard |
| Jackie Yates – Plaintiff for Ligon |
| Lalit Clarkson – Malcolm X. Grassroots Movement[216] |
| Nicholas Peart – Plaintiff for Floyd |
| Priscilla Gonzalez – CPR |
| Reginald Bowman – NYCHA Citywide Council of Presidents |
| Reinaldo Rivera – U.S. Department of Justice |
| Rev. Chloe Breyer – Interfaith Center of New York |
| Steve Kohut – Justice Committee |
| Steve Zeidman – CUNY Law School |
| Susan Herman – NYPD Deputy Commissioner |

It was decided that the Advisory Committee would take a purely advisory role and it was explained to all invitees that its deliberations would be confidential and any recommendations made through the Committee would not be in any manner binding on the Facilitator. The Committee's primary concern was with providing process recommendations. During Committee

---

[215] The Facilitator met with Sergeant Ed Mullins, President of the Sergeants Benevolent Association on two occasions. Sergeant Mullins accepted an invitation to participate on the Advisory Committee, but did not attend any meetings.

[216] Some advisory members were replaced by different individuals by the representative organizations during the term of the JRP.

proceedings, major issues concerning the implementation of the civic engagement process were presented to the Committee members and members were invited to comment.

**SECTION V: JOINT REMEDIAL PROCESS DESIGN AND IMPLEMENTATION**



**2. Focus Group Phase**

The aim of the Focus Group Phase of the Joint Remedial Process was to gather additional ideas for changes to the NYPD beyond those ordered in the Remedies Opinion as part of the Immediate Reform Process. People from communities most affected by SQF and trespass enforcement practices were selected as participants for the focus groups. The Facilitation Team conducted a total of 64 focus group meetings with 516 participants. Forty focus groups emphasized street stops, while 24 groups concerned trespass enforcement experiences. These groups were done in conjunction with community organizations, advocacy groups, and community centers within New York City Housing Authority ("NYCHA") developments. We also participated in focus groups of NYPD patrol officers, sergeants, lieutenants, commanding officers, and executives.

It is important to note that the JRP was developed as an information gathering process. Best practices of qualitative research were used to gather and analyze all the information that was collected.

Generally speaking, participants were forthcoming and excited to participate in the focus groups. It was not uncommon at the beginning and end of focus groups for participants to inquire about the legitimacy of the JRP, specifically if anything would actually come of their recommendations. Participants were informed that this was a Court-ordered process and the Court would make the final decision regarding ordering additional reforms. This concern aside, focus group participants actively discussed ways in which the NYPD could better engage communities that were impacted by unconstitutional SQF and trespass enforcement. With the exception of some focus group participants, participants expressed a desire to work with the Department toward improving relations between the police and communities.

## Methodology

The identification of communities most affected by SQF began with an analysis of the NYPD SQF public data for 2011, 2012, 2013, and 2014. Using these data, there were 11 variables created and organized to identify those communities with higher rates of SQF. The data were ordered based on the top 10 SQF precincts for each year and prioritized based on the presence of variable and special circumstances where applicable. These variables were defined as follows:

**Table 1.** Factors used to prioritize precincts

| Variable # | Variable Name | Definition |
|---|---|---|
| 1 | SQF11 | Top 10 precincts with the highest number of stops in 2011 |
| 2 | SQF12 | Top 10 precincts with the highest number of stops in 2012 |
| 3 | SQF13 | Top 10 precincts with the highest number of stops in 2013 |
| 4 | SQF14 | Top 10 precincts with the highest number of stops in 2014 |
| 5 | SAL14 | Precincts that participated in the 2014 "Summer All Out" policing initiative |
| 6 | SAL15 | Precincts that participated in the 2015 "Summer All Out" policing initiative |
| 7 | ARR11 | Precincts where in stops in 2011 did not result in an arrest 95% of the time |
| 8 | ARR12 | Precincts where stops in 2012 did not result in an arrest 95% of the time |
| 9 | ARR13 | Precincts where stops in 2013 did not result in an arrest 95% of the time |
| 10 | ARR14 | Precincts where stops in 2014 did not result in an arrest 95% of the time |

Based on our analysis, there were 25 precincts identified and of those 25, 13 precincts were prioritized as high or mid priority. Precincts were prioritized to assist with identifying

137

participants for the focus groups. Participants who either lived within or frequented these precincts were given preference.

**Table 2.** Selection and prioritization of NYPD precincts

| Pct | SQ F11 | SQ F12 | SQ F13 | SQ F14 | SA L14 | SA L15 | AR R11 | AR R12 | AR R13 | AR R14 |
|---|---|---|---|---|---|---|---|---|---|---|
| **23** | X | X | | | | | | | | |
| **25****** | | | | | | | | | | |
| **33**** | | | | | | | | | | |
| **34**** | | | | | | | X | | | |
| **40** | X | X | X | | | | | | | |
| **43*** | X | | | | X | X | | | | |
| **44** | X | X | | X | | X | | | | |
| **60** | | | X | | | | | | | |
| **67** | | | X | X | X | X | X | X | | |
| **70** | | X | | | | | X | X | X | |
| **73** | X | X | X | | X | X | X | X | X | |
| **75** | X | X | X | | X | X | X | X | | |
| **79****** | | X | X | | | | X | X | | |
| **83** | | X | | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **90** | X | | | | | X | X | | | |
| **100\*\*** | | | | | | | | | | X |
| **101\*\*** | | | X | X | | | X | X | X | X |
| **102** | | | | X | | | | | | |
| **103\*\*\*** | X | X | X | | | | | | | |
| **105** | | | | X | | | | | | |
| **106** | | | | X | | | X | | | |
| **107** | | | | X | | | | | | |
| **115\*\*\*** | X | | | | | | X | | | |
| **120** | X | X | X | | | X | | | | X |
| **121** | | | | | | | | | | X |

*A top 10 precinct for at least one year and participating in SAL 2014, 2015
**Participating in the New Neighborhood Policing Model Pilot Program 2015
***Specialized population (large percentage of South Asians and other impacted people)
****Special circumstances

| | |
|---|---|
| **High Priority** | |
| **Mid Priority** | |
| **Priority** | |

Using the same data, 15 variables were created and organized to identify those communities with higher rates of housing trespass enforcement. The data were ordered based on the top precincts and Police Service Areas ("PSA") with at least 10% housing stops. The variables were defined as follows:

**Table 3**. Variables used to prioritize PSAs and precincts

| Variable # | Variable Name | Definition |
|---|---|---|
| 1 | HOU11 | Precincts where at least 10% of stops were housing stops in 2011 |
| 2 | HOU12 | Precincts where at least 10% of stops were housing stops in 2012 |
| 3 | HOU13 | Precincts where at least 10% of stops were housing stops in 2013 |
| 4 | HOU14 | Precincts where at least 10% of stops were housing stops in 2014 |
| 5 | DEBLASIO15 | Housing developments within this precinct were on DeBlasio's list of 15 most dangerous developments |
| 6 | SAL2014 | PSA and/or Precinct that participated in the 2014 "Summer All Out" policing initiative |
| 7 | SAL2015 | PSA and/or Precinct that participated in the 2015 "Summer All Out" policing initiative |
| 8 | ARR2011 | Precincts where in stops in 2011 did not result in an arrest 95% of the time |
| 9 | ARR2012 | Precincts where stops in 2012 did not result in an arrest 95% of the time |
| 10 | ARR2013 | Precincts where stops in 2013 did not result in an arrest 95% of the time |

| 11 | ARR2014 | Precincts where stops in 2014 did not result in an arrest 95% of the time |
| 12 | SQF2011 | Top 10 precincts with the highest number of stops in 2011 |
| 13 | SQF2012 | Top 10 precincts with the highest number of stops in 2012 |
| 14 | SQF2013 | Top 10 precincts with the highest number of stops in 2013 |
| 15 | SQF2014 | Top 10 precincts with the highest number of stops in 2014 |

Based on our analysis, there were 29 precincts identified within the nine PSA's, and of those 29 precincts, 22 were prioritized as high or mid priority. Precincts were prioritized to assist with identifying participants for the focus groups. Participants who either lived within or frequented these precincts and identified housing developments were given preference.

**Table 4.** Selection and prioritization of NYPD precincts and PSAs

| PSA | hou11 | hou12 | hou13 | hou14 | Delhaio's 15 | sal14 | sal15 | arr11 | arr12 | arr13 | arr14 | sq11 | Sqfl2 | sq13 | sq14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1** | | | | | | X | | | | | | | | | |
| 60th | X | X | X | X | | | | X | X | X | | | | X | |
| 61st | | | | X | | | | X | X | | | | | | |
| 63rd | | | | X | | | | X | X | | | | | | |
| 69th | X | X | | X | | X | | X | | X | | | | | |
| 76th | X | X | X | X | X | | | X | | X | | | | | |
| 78th | X | | X | | | | | X | X | X | X | | | | |
| **2** | | | | | | X | X | | | | | | | | |
| 73rd | X | X | X | X | X | X | X | X | X | X | | X | X | X | |
| 75th | X | X | X | X | X | X | X | X | X | X | | X | X | X | |
| 77th | X | | | X | | X | | X | X | X | | | | | |
| **3** | | | | | | X | X | | | | | | | | |
| 79th | X | X | X | X | X | | | X | X | | | | | X | X |
| 81st | X | X | X | X | | | | X | X | | | | | | |
| 84th | | X | | | | | | | X | | | | | | |
| 88th | X | X | X | X | X | | | | | X | | | | | |
| 90th | X | X | X | X | | | | X | X | | | | X | | |
| **4** | | | | | | | | | | | | | | | |
| 5th | | | | X | | | | | | | | | | | |
| 7th | X | X | X | X | | | | | | | | | | | |
| 9th | X | X | X | X | | | | | | | | | | | |
| 10th | X | X | X | X | | | | | | | | | | | |
| **5** | | | | | | | | | | | | | | | |
| 23rd | X | X | X | X | | | | X | X | | | X | X | | |
| 25th | X | X | X | X | X | | | | | | | | | | |
| 28th | X | X | X | X | X | | | | X | | | | | | |
| **6** | | | | | | | | | | | | | | | |
| 24th | X | X | X | X | | | | | | | | | | | X |
| 26th | X | X | X | X | | | | | | | | | | X | X |
| 32nd | X | X | X | X | X | | | | | | | | | X | X |
| **7** | | | | | | X | X | | | | | | | | |
| 40th | X | X | X | X | X | | | | | | | X | X | X | |
| 42nd | X | X | X | X | | X | | | | | | | | | |
| **8** | | | | | | X | X | | | | | | | | |
| 43rd | X | X | X | X | | X | X | | | | | X | | | |
| 45th | X | | | | | | | | | | | | | | |
| **9** | | | | | | | | | | | | | | | |
| 103 | | | | X | | | | | | | | X | X | X | |
| 107 | X | X | X | | | | | | | | | | | | X |
| 113 | | | | | | X | X | X | | X | X | | | | |
| 114 | X | X | X | X | X | | | | | | | | | | |



| PSA | hou11 | hou12 | hou13 | hou14 | Delhaio's 15 | sal14 | sal15 | arr11 | arr12 | arr13 | arr14 | sq11 | Sqfl2 | sq13 | sq14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 44th | | | | X | | | | X | | | | | X | X | | X |
| 100th | X | X | X | | | | | | | | | X | | | |
| 101st | X | X | X | X | | | | X | X | X | X | | | X | X |
| 120th | X | | | X | X | | X | | | | X | X | X | X | |
| 122nd | | | | | | | | | | | | | | | |

| High Priority – Phase I | |
| --- | --- |
| Mid Priority – Phase II | |

142

Once all precincts and PSAs were identified and prioritized, they were then disaggregated by zip code and neighborhood. Using a combination of the high and mid-priority precincts and PSAs and an organizational list developed during the Relationship Building Phase, the Facilitation Team asked organizations to populate focus groups with people from the identified geographical neighborhoods.

Of the 64 focus groups with 516 participants, 53.3% of the people participating in the focus groups discussing street stops lived within identified areas; and 78% of the people participating in the focus groups discussing housing trespass stops lived within identified areas.

Many organizations worked in collaboration with the Facilitation Team to populate focus groups of 8 to 10 participants discussing street stops, these organizations are found in Table 5 below.

**Table 5:** List of organizations who populated focus groups for the *Floyd* case

| ORGANIZATIONS |
|---|
| Ali Forney Center |
| Arches |
| Bronx Clergy Criminal Justice Round Table |
| BronxConnect |
| Broome Street Academy |

| |
|---|
| Brotherhood - SisterSol |
| Cardinal Hayes High School |
| Cardinal Spellman High School |
| Center for NuLeadership |
| Central Family Life Center |
| Community Voices Heard |
| Covenant House |
| Cure Violence SOS – South Bronx |
| East Side Settlement House |
| Exponents |
| Gangstas Making Astronomical Community Changes INC ("GMACC-Inc.") |
| Life Camp, Inc. |
| Make the Road New York |
| Malcolm X Grassroots Movement |
| Man Up, Inc. |

| |
|---|
| New York Center for Interpersonal Development ("NYCID") |
| Osborne Association |
| Picture the Homeless |
| Police Athletic League ("PAL") |
| Safe Horizon |
| Safe Space Far Rockaway |
| Streetwise & Safe |
| The Anti-Violence Project |
| The Door |
| The Fortune Society |
| True 2 Life - Central Family Life Center |
| VOCAL-NY |

People who participated in the housing trespass groups were recruited directly from NYCHA developments with the assistance of community organizations and the New York City Housing Development Department of Resident Engagement. Those developments can be found below in Table 6.

145

**Table 6:** List of NYCHA developments in which organizations populated *Davis* focus groups

| NYCHA DEVELOPMENTS |
|---|
| Baisley Park |
| Brownsville |
| Carey Gardens |
| Castle Hill |
| Ingersoll |
| Linden |
| Mill Brook |
| Mitchel |
| Mott Haven |
| Ocean Bay |
| Patterson |
| Red Fern |
| Red Hook, Hammel |

| |
|---|
| Richmond Terrace |
| Seth Low |
| Smith |
| Sotomayor |
| St. Mary |
| Stapleton |
| Tilden |
| Tompkins |
| Unity Plaza |
| Wagner |
| West Brighton |
| Wilson and East River Houses |

The criteria for participation in the "street stop" groups were that the individual either lived in the prioritized area or had street stop experiences within the identified areas. The criteria for participation in the "housing stop" groups were that the individual lived in or had been stopped in NYCHA developments within identified precincts/PSAs. We did not limit participation to only people who have been stopped but also welcomed participants who may

have had vicarious experiences by way of a friend or family member or simply by being a resident within a neighborhood or development where frequent stops occur. Individuals were provided a round-trip MetroCard and a meal for participating.

**Figure 1.** Race of focus group participants for 'street stop' groups



**Figure 2.** Gender of focus group participants for 'street stop' groups



148

**Figure 3.** Race of focus group participants for 'housing stop' groups



**Figure 4.** Gender of focus group participants for 'housing stop' groups



**Focus Group Development**

Focus Group Questions

The Facilitation Team developed focus group questions in collaboration with plaintiffs' attorneys, the NYPD, and Communities United for Police Reform ("CPR"). The final list of questions for both focus groups included six open-ended questions and probes. Probes were

149

created and used with some questions to ensure complete coverage of particular topics. Copies of the questionnaires are included in Appendix E.

### *Floyd* Questions

For the "street stop" groups the questions were grouped into three main themes that are discussed in this section. The discussion began with an introductory count question (Question 1) to ensure that the participants met the general criteria for participation in the focus group. Question 1 was followed by two transition questions (Question 1A. i & Question 1A. ii) that asked participants to share their experiences with being stopped — either personal or observed experience. If participants mentioned a stop which they believe occurred because of what they look like, the way they were dressed, where they live, or who they were with, Question 2 was asked. Questions 2 – 6 were key questions, and focused on reform ideas to the NYPD. Although they were focused on specific themes such as "feeling free to walk away," "consent to search," "complaints," and "supervision and evaluation," if participants provided commentary beyond what was asked, they were allowed to continue answering. Finally, the focus group concluded with a question asking for additional thoughts around reforms to SQF and any topic not covered.

### *Davis* & *Ligon* Questions

For the "housing stop" groups, the questions were grouped into four main themes that are discussed in this section. The discussion began with two introductory count questions (Questions 1 & 2) to ensure that the participants met the general criterion for participation in the focus group. Questions 1 & 2 were followed by two transition questions (Question 2A. i & Question 2A. ii) that asked participants to share their experiences with being stopped while on the property of a public housing development and suspicion of and/or arrest for trespassing. Questions 3, 4, and 6 were key questions, and focused on reform ideas to the NYPD. Question 5 was asked in an

attempt to secure ideas for alternatives to policing in ensuring a safe neighborhood. Finally, the focus group concluded with a question asking for additional thoughts around reforms to SQF and trespass enforcement, and any topic not covered.

Participant Consent

Before the start of each focus group, participants were asked to sign an informed consent that outlined the purpose of the focus group. The consent explained that participation was voluntary and that individuals could discontinue participation at any time. When a participant was younger than 18 years of age, parental/guardian written consent was provided in advance. A copy of the informed consent is provided in Appendix E.

Once written consent was given, participants were asked to complete a demographic questionnaire seeking information about their race, age, type of residence (*e.g.*, renting, homeless, NYCHA, owner), zip code, LGBTQ identification, and gender identification. Participants did not include their name on the questionnaire, only the hosting agency/organization, time and date of the focus group. Copies of the demographic questionnaires are provided in Appendix E.

Protecting Focus Group Participants' Privacy

To ensure anonymity, each participant was assigned a color used as their identifier during the discussion.

Personal Prose Worksheet and Introduction

Once participants completed the demographic questionnaire, consent to participate, and "personal prose" worksheet, a short introduction was provided. Copies of the personal prose template and introduction script are provided in Appendix E.

Focus Group Debriefs

At the conclusion of each focus group, the group facilitator and assistant facilitator would complete a recorded debrief.  The focus group debrief would include a discussion of impressions, challenges presented during the focus group, and anything found to be of importance during the focus group.

Additionally, the primary role of the assistant focus group facilitator was to take typed written notes of the discussion, especially when there may have been audio issues. The assistant facilitator was also responsible for taking detailed behavioral notes. The focus group transcripts, behavioral notes, and debrief sessions were used as data during analysis.

## Analysis of Focus Group Responses

Atlas.ti qualitative software was used to organize, code, and analyze 64 transcripts containing approximately 1600 pages of transcription and notes from the focus groups. The purpose of the analysis was to identify reform ideas as offered by focus group participants. The analysis involved line by line coding, resulting in 24 street stops and 9 housing stops larger themes, originating from 927 codes. These codes were developed based on the participants' responses to each focus group question. The assistant focus group facilitator reviewed and coded the transcripts as well. Copies of the larger thematic categories and suggested reforms are provided in the Appendix.

In this next section, you will find a summary of the larger themes identified within the focus groups. These themes were organized into two sections — themes specific to "street stops" (*Floyd*) and themes specific to "housing trespass enforcement" (*Davis*).

**Summary of Focus Group Themes**

***Floyd* Focus Groups**

Accountability

There was an overarching theme throughout the focus groups centered around accountability. Focus group participants felt that officers were not held accountable for their actions on a consistent basis. They also felt that accountability should not be limited to individual officers but should also include NYPD supervisors, executives, and in some instances, the Mayor.

Assertion of Right to Consent to a Search and the Freedom to Walk Away

When asked the question about consent for searches, many participants felt that they were often searched without consent. Participants regularly expressed that they felt that they were unable to refuse a search in appropriate instances and that the act of asserting their rights would escalate the encounter often making it worse. One participant shared, "They don't ask permission; if you ask them they tell you don't ask me no questions."

When asked about feeling free to walk away, almost all participants felt that they did not feel free to walk away from police officers. This fear of walking away was grounded in the possibility that doing so could lead to some form of escalation. The fear of escalation would cause some to run instead of walk away. According to one participant, "Most of the time we ain't walking away, we running away." Although some participants stated that they would walk away if the officer informed them that they were free to leave, others stated they would not leave even if the officer stated that they were free to leave. It is only when the officer would decide to leave first that they would proceed to walk away. One participant explained this as, "You try to walk away from a cop, and they're going to easily say you're trying to resist arrest."

153

<u>De-escalation</u>

Participants expressed concerns around escalating stops. A common theme was to "play by the rules to avoid escalation." Some participants expressed avoidance tactics, such as not going outside on "TNT" — on Tuesdays and Thursdays — when detectives seem to be more present, or walking in a different direction to avoid police contact. Other participants shared ways in which they minimize the potential for escalation like "going with the flow and becoming a chameleon," running away when the officers arrived, or putting their hands up before being asked.

Participants suggested changes to policies and procedures that focused on officers informing civilians of their rights when appropriate during investigative encounters. There were also suggestions for officers to be required to attend de-escalation trainings.

<u>Civilian Complaint Review Board ("CCRB") and Complaints</u>

Many participants expressed concerns about filing complaints inside of their local precinct. They suggested instead that complaints be filed with an entity and/or parties independent of the NYPD and CCRB. There were two reasons for this concern. The first reason was the fear of retaliation and the second was the impression that the CCRB was working on behalf of the NYPD, thereby lacking objectivity. In a response to a question about the CCRB a participant responded, "I ain't gonna call the police on the police." The latter concern was a direct correlate to participants feeling that there is no action taken against officers with complaints filed against them. As such, they expressed the need for a higher level of accountability and transparency in regard to complaints and the final determination of complaints.

Participants also suggested that the complaint process be streamlined and simplified, making it easier for participants to file complaints, thereby minimizing trauma, while receiving proper notification of all complaints. They suggested a simple solution, follow up in the form of a written response (*e.g.*, letter or email) and/or a telephone call.

Community Engagement

Many of the focus group participants expressed a desire to engage in a community feedback process. Participants suggested events such as community forums and conversations with police officers, precinct rating boxes, annual surveys, and other data gathering mechanisms. Some participants also expressed a desire to get to know the officers that work within their communities as well as the importance of officers getting to know the communities that they patrol.

Community Engagement Campaign

Participants expressed a strong desire for community education campaigns. The suggestions were categorized into three areas:

- Community Education Programs for Officers.
- Programs for Officers and the Community.
- Programs for Community Members Only.

The education program for officers focused on the need for officers to have a thorough and accurate understanding of the culture and history of the respective communities that they patrol. Officer and community education campaign suggestions focused on collaborative education programs between the NYPD and community based organizations. Participants expressed a desire for the NYPD to partner with community based organizations in an effort to build an educational campaign. Additionally, community members expressed a strong desire for

community based educational programs focused on providing "know your rights" information. Participants felt that this would empower communities in such a way that aggressive and escalating types of encounters would be minimized. There was a shared sentiment that this would help adults and young people better understand how to engage officers.

Community Evaluation and Input into Training

Training was also a recurrent theme during the focus groups. Participants suggested that many of the constitutional abuses suffered by them were a result of inadequate training of officers by the NYPD. In this regard, "Customer Service" was an overarching training theme.

Participants also felt that abuse of power and consistent disrespect were at the core of police interactions with community members. Additionally, participants expressed the need for officers to receive training to assist them with engaging with special populations such as the mentally ill, homeless individuals, youth, and the LGBTQ community.

Participants also articulated a great level of compassion for officers in terms of job related stress, fear, and trauma. There were several suggestions for therapeutic trainings that could prepare officers to manage stress, fear, and trauma associated with the job. Participants additionally expressed a desire for input into these trainings.

Community Input into Officer Performance Evaluations

Focus group participants expressed an interest in community participation in the evaluation process. Suggestions were centered around community involvement in the evaluation of individual officers and precincts, as well as the inclusion of a "community engagement" metric on annual evaluations. There were also suggestions for community members to complete some level of assessment for officers' work, including but not limited to an oversight committee.

Within the LGBTQ specified groups, participants suggested an oversight committee created and populated with members of the transgender community to rate officers' overall performance.

Community Feedback

Focus group participants suggested the use of web resources and applications as data gathering mechanisms. Participants thought these were good ways to not only report and file complaints but also to provide commendations for deserving officers. Additionally, participants felt that web resources and applications were good mechanisms to allow people to make anonymous reports.

Consent

Participants mentioned that officers regularly did not ask for consent and instead would proceed with a bodily frisk and search while questioning. One participant mentioned in a focus group that they have been frisked and searched by officers while the officers sat in their vehicle. In response to these concerns, participants suggested a simple fix — that officers seek consent. Participants suggested that officers advise a person of his right to not consent to a stop, or to answer questions.

Evaluation

There were several areas of discussion regarding evaluation. Participants suggested both a precinct and individual approach to evaluations. Also suggested was a precinct report card/progress report. Participants thought precinct report boxes would be useful in determining precinct effectiveness and engagement with community members. For individual evaluations, participants suggested the use of an application or an independent review board that included

community members. Their responses were balanced in that they also thought officers should be commended for work well done as well as criticized for unconstitutional policing.

Policing Tactics

Participants shared details of stop encounters where police officers used specific tactics. There were accounts of participants being stopped and held as a form of "inconvenience" or taken to the neighborhood precinct and later being released out of the back door. Participants also shared that they felt officers intentionally used excessive force, especially when an officer felt challenged by the person that was stopped. One example of this is when a participant said that, "Sometimes it feels like if you challenge them, they don't like that; I've been brutalized when they felt I challenged them."

Participants frequently expressed the notion that "cops go looking for trouble," either in the manner of targeting certain individuals, stopping people just to see if they have warrants, or throwing gang signs from their car in an attempt to garner a response. One participant stated, "They've got targets, I'm a target, they have targeted areas where they just go fishing."

In some focus groups, participants stated that officers use certain tactics intentionally to make certain people look like "snitches." Participants felt that this was particularly problematic because as one participant noted, "they're putting my life in jeopardy."

Policy/Procedure

Focus group participants often felt disrespected by officers, a consistent theme throughout all 64 groups. Participants did not limit this feeling of disrespect to stops by officers but also shared that they felt disrespected by officers in encounters separate from stops. Some basic solutions recommended by participants to address the issue of respect was community

158

policing, officer assignments based on the needs of the community, customer service and implicit bias trainings, and providing civilians business cards or something similar with the officer's name, badge number, and precinct at the end of an encounter.

Participants suggested policy/procedural changes for officers to address the way they engage LGBTQ persons. They also suggested changes to how the NYPD audits stops, police hiring standards, engagement of pedestrians during stops to avoid escalation, and protection against retaliation for those filing a complaint.

Supervision

Focus group participants consistently expressed a desire for transparency in the way that officers are supervised, often referencing the need for body-worn cameras. As additional methods of supervision, participants suggested the following:

- Supervisory Training.
- Ensuring Supervisory Accountability.
- Coaching by experienced officers and supervisors and a "trigger system" that will help identify officers who are at risk for mental health stressors.

In addition to the mental health trigger system, participants suggested that supervisors be well trained to identify mental health stressors of their officers. Lastly, participants suggested the creation of a promotion metric that would include professionalism and respect for supervisors to consider.

Trauma Informed Trainings for Police Officers

In some instances, focus group participants were understanding of the stress, fear, and trauma associated with being a police officer. Participants suggested trauma-informed trainings

and other therapeutic trainings and support as a way to manage the stress, fear, and trauma associated with the role of police officer.

## LGBTQ Specific Trainings

LGBTQ focus group participants suggested officer trainings focused on engaging transgender people that are led by transgender people. Assistance from advocacy groups focused on issues relevant to transgender people should be consulted.

## Cultural Awareness/Cultural Competency Trainings

Focus group participants expressed concerns that officers are not culturally competent to serve many of the communities they work within. According to them, this lack of cultural competence leads officers to misunderstand people who live within these communities, often resulting in targeting of community members. Participants suggested cultural competency trainings that would help officers better understand the communities they work in.

## Specialized Trauma Training for Vulnerable Populations

The trauma experienced by participants heavily affected by unconstitutional policing is deep and profound. Many participants expressed experiencing it directly, while others' experiences were vicarious in nature. We also learned during the focus groups that participants would run, even when not engaged in illegal activity, to avoid contact with police. This almost automatic response is often perceived as guilt. Participants articulated that they either feared for their lives, were avoiding the indignity or potential escalation that could result as consequences of the stop, or were fatigued from what they termed "harassment."

Transparency

Focus group participants expressed the need for transparency with respect to NYPD policies and discipline guidelines. Some participants suggested that the Commissioner become more transparent in statements, policies, and training materials; while others expressed the need for transparency in terms of the imposition of discipline. Additionally, participants suggested progressive discipline as a means of holding officers accountable.

General Procedural Suggestions

Many focus group participants expressed that they did not know the names and badge numbers of officers that they have encountered and in some instances officers would not provide this information when requested. As a solution to this problem, participants suggested that all officers provide a business card as a closing gesture at the end of an encounter. According to focus group participants, these cards should provide, at minimum, the officer's name and badge number.

Issues Directly Affecting Homeless Individuals

There were eight focus groups populated with participants who identified as being homeless, six were youth groups and two were adult groups. Participants within these groups expressed that they felt targeted, resulting in frequent encounters with police. Many participants expressed that these encounters were often unavoidable by virtue of their homeless status. As an example, one participant shared how the police would often become frustrated, exclaiming "I just saw you, just picked you up yesterday, why are you back here?" With the participant responding, "Well, I'm homeless, this is the only place I can stay." As stated by a staff person who participated in a focus group and who provides care to homeless people, "[t]here's a

[systemic] issue around homelessness in our city — that it's [disproportionately] impacting people who have no resources to do anything different."

## *Davis* Focus Group Themes

Accountability

Similar to participants in the *Floyd* focus groups, participants from NYCHA developments expressed a concern about a lack of accountability within the NYPD. When asked about accountability, one participant stated, "Police are never going to change unless you change the repercussions." Generally speaking, participants suggested an NYPD cultural change with regard to accountability and an officer accountability sliding scale with progressively more harsh penalties.

Community Engagement

Although many NYCHA participants expressed concern with being heavily policed, they also expressed the desire to partner with the NYPD. Some participants suggested NYPD partnerships with community organizations and more activities involving community members and precinct officers. Some participants were actively engaged in Police Athletic League ("PAL") programming and suggested increased programming similar to PAL. A predominant theme was that community members should know who their officers are, and it was believed that increased community and NYPD collaborations would help in that regard.

Issues Related to Confidential Informants

In many of the focus groups, younger and older participants alike expressed concern with the way the NYPD identifies and cultivates their confidential informants. Younger male participants shared that they were often targeted and harassed by officers in an effort to make them confidential informants. Older participants shared that officers would strong-arm youth into

162

becoming confidential informants. One participant said that he was often harassed by officers and on one occasion he was taken to the precinct when an officer could have given him a ticket instead. This participant stated the following:

> Yeah. That's what they were going to give me [a ticket]. They brung me to two different investigation rooms: the first investigation room, where I said I know my rights, and then they brung me to the detective's room. The detective's room's got pictures of everybody and everything. He said, "You see who you've got beef with this on this wall? They're already telling us what y'all doing. Just give me information, and you'll be home tonight, man. I'll give you the ticket." I said, "Can I get a lawyer?" They said, "Oh, so you know how to play this game?" They brung me downstairs and put me through the system.

It was in this same group that participants shared a concern that the officers in their area take pictures of them with their cellular phones — this is how many of them find themselves on the wall mentioned above.

Participants suggested policy changes that would prohibit officers from harassing and targeting young people for the purpose of making them confidential informants. Additionally, it was suggested that officers should be prohibited from using their electronic devices as a form of intimidation by, for example, taking pictures of young people.

Evaluation and Supervision Reforms

For the NYCHA focus groups the evaluation and supervision questions were combined. Participants suggested some level of community input into the evaluation of individual officers — this input could be in the form of an application or website or an evaluative panel with the following metrics to be included on individual evaluations:

- Procedural metric.
- Respect metric.
- Number of complaints metric.

163

- Performance metric.
- Community involvement/community engagement accolades metric.

Participants also suggested a precinct report card/progress report and precinct boxes. Some participants suggested social media to commend officers and an annual awards ceremony for good officers.

General Procedural Suggestions – Interior and Vertical Patrols

Focus group participants expressed concerns with interior and vertical patrols within NYCHA. Some participants, understanding the need for such patrols, suggested that officers be accompanied by a community member or resident of the development during patrols. Additionally, participants suggested that officers should seek confirmation that the person is a visitor by knocking on the person's door when they are visiting.

Public Safety

NYPD light towers made most participants feel like they were under constant surveillance within their homes. Many of them expressed difficulty sleeping because the lights would shine brightly into their bedrooms. Participants also expressed concern about officers driving on sidewalks within NYCHA developments. Apart from the NYPD, participants felt that the scaffolding present on many properties covered security cameras making it difficult to solve crimes.

Participants suggested the following ideas for policy changes:

- NYPD will use light towers to a limited extent within NYCHA developments.
- Officers will not drive on sidewalks of NYCHA developments.
- Changes in the manner in which vertical patrols are conducted.

And additional areas for consideration:

- NYCHA should immediately remove scaffolding on properties where there is no construction.
- NYCHA will ensure that properties are well lit.
- New York City Department of Transportation will ensure that NYCHA developments have working street lights and install new lights were necessary.
- NYCHA will ensure that installed cameras are working.

Training

Focus group participants expressed a desire for officers to participate in "customer service" type trainings that included a community engagement component. Participants felt that this would equip officers with at least the basic skills to engage community members respectfully. There was a consistent theme of respect, or the lack of it, throughout the housing focus group sessions. Many participants stated that officers did not speak while patrolling their communities. This same lack of engagement was present if the interaction was initiated by the individual instead of the police officer. As a result of this participants provided the following suggestions for community engagement trainings:

- Officers should engage and have conversations with community members before patrolling communities.
- New hires should train within the communities prior to being assigned for patrol. These trainings should be conducted by advocates and community leadership.
- NYPD Leadership/Supervisory trainings. Supervisory and command officers should understand how their management style affects the way officers interact with community members.

Participants also expressed concern that officers interacted with them based on stereotypes. They reasoned that these stereotypes were a result of officers' limited exposure and

engagement with people from diverse backgrounds. As a result, it was suggested that officers be required to participate in cultural awareness and competency trainings.

Trauma-Related Reforms

Participants expressed varied levels of trauma within the focus groups. Some participants discussed past physical encounters with police officers, while others expressed concerns around harassment and being taunted by officers. As a result of these encounters, participants shared some of the ways they attempt to mitigate these traumatic experiences. Many participants shared that they would run when stopped by the police, while others avoided contact by taking alternative routes home.

Participants suggested the following as reform ideas to address issues around trauma:

- NYPD should implement ongoing training to assist NYPD officers and recruits with understanding the depth of trauma associated with historical overuse of SQF and trespass enforcement. Additionally, officers should understand the physical reactions that result from these interactions.
- NYPD should implement trainings for supervisors and command officers and should understand how management styles affect the way officers interact with community members.
- NYPD should implement policy changes around harassment and targeting, including accountability measures for officers found to harass and target people from communities of color.

**Police Focus Groups**

The following are several themes from the three separate police focus groups with NYPD patrol and special units, sergeants and lieutenants, and commanding officers. Below we categorize themes into several areas based on the responses of these officers.

166

Accountability and Discipline

Officers, sergeants and lieutenants, and commanding officers called for improvements to fair and timely discipline and the development of protections for officers exonerated under the CCRB. Police officers pointed to issues with supervision, citing CompStat, Vision Zero, and "activity" expectations as putting pressure on officers to act in an overly aggressive manner. Patrol officers and special unit officers pointed to these pressures as creating and perpetuating the need for the "harassment" of confidential informants and individuals with a criminal record, deemed as "quality touches," and suggested such performance pressures should be eliminated or de-emphasized. Additionally, many patrol officers cited limited and ineffective follow-up by supervisors on SQF policy, documentation, and training and an over-reliance on training as major accountability concerns.

Officers also stressed that policies such as CompStat, Vision Zero, and SQF effectively force them into over policing as a way of both inflating statistics and creating revenue for the City by overzealous summons enforcement. They also said that when these policies lead to wide public discontent, the Department has not owned these policies and as a consequence officers are left to bear the brunt of public resentment and animosity.

NYPD personnel also spoke to a need for greater accountability for civilians who file complaints, suggesting they should be required to submit an affidavit to support their complaint, as any other civil litigant. Officers also raised concerns about the lack of knowledge, inexperience, and background of CCRB investigators who review complaints, and recommended that CCRB hire better trained and more seasoned investigators.

Auditing

During the focus group meetings, NYPD sergeants and lieutenants pointed to a concern that stops were being conducted, but not documented. Many patrol officers pointed to a fear of personal liability as a reason not to document stops. Others were concerned that there was a lack of clarity about the status of SQF as a legal policing tactic following the *Floyd* litigation. Many patrol officers indicated that detectives ("DTs") or plain clothes units accounted for the majority of stops.

Sergeants and lieutenants called for increased narration on UF-250s, command-run audits, improvements to the Integrity Control Officer ("ICO") protocol, and a standardized format for conducting audits of stop reports at the precinct level. All of the groups supported the Body-Worn Camera program, suggesting that it would be helpful for officers in understanding the validity of complaints.

Community Education

Officers also suggested it would be a good idea to implement a community education program. Patrol officers suggested going to schools and making presentations to highlight for civilians the importance of compliance and proper police procedure. Officers also suggested going to schools to share more about the NCO program.

Community Engagement and Policing

Officers, supervisors, and commanding officers highlighted a desire for increased community engagement, citing a need for greater attendance at Community Council meetings, and a desire to go to public spaces like churches, synagogues, and community centers.

Officers also suggested the need for more community centers, after-school programs such as PAL, and the need for greater community investment on the part of the NYPD and other city agencies.

Officers were largely in favor of a community policing model, often citing the need for more NCOs and steady sector officers, and increasing the emphasis on community affairs and problem-solving. The officers also indicated that the NCO program is often hampered because NCOs are more frequently pulled for special assignments such as parades and protests.

Changes to Officer Evaluation

Officers and supervisors suggested several changes to the performance evaluation system, including the following:

- Evaluation of supervisors by subordinates.
- Including attendance on evaluations.
- Including a commendation section for career points.
- Including a metric for communication, empathy, and overall good relations on the performance evaluation.

Additionally, a supervisor suggested the inclusion of activity on evaluation for accountability purposes.

NYPD Structure and Staffing

Officers, sergeants, lieutenants, and command officers all spoke to concerns with the current workforce and division of labor, as well as the breaks in communication between the precinct commands, Borough commands, and 1 Police Plaza. In all of the focus groups, members stated a belief that precinct commands have little power to make the changes necessary in their communities, citing a lack of adequate staffing on patrol and the over-specialization of units.

169

An overall theme was the suggestion that the Department significantly increase the number of civilian staff to cover administrative functions throughout the Department and at the precincts. There was a sense that instead of being on patrol there were too many well-trained police officers doing tasks that could be handled by civilians. Overall, officers called for a more streamlined Department staff structure and the need to centralize key positions to improve communications in and outside of the precinct.

Additional suggestions around staffing included:

- Eliminating or merging the specialized units.
- Utilizing "precision enforcement" and only conducting TAP patrols in response to a complaint.

Training

Officers highlighted a need for more training around the following issues:

- Increased in-service/on-the-job training for improved officer understanding and retention of SQF and trespass enforcement policies.
- More hands-on and scenario-based training.
- Improved field training officer program.
- Re-instruction training for improper UF-250s.
- Training on data integrity.[217]

It should be noted that the Department has implemented many of these suggestions since these focus groups were held in February of 2017.

---

[217]According to a report regarding CompStat Auditing, "Data Integrity" is part of the Data Integrity Unit (DIU) that is responsible for reviewing complaint-reporting data inconsistencies and identifying errors in all mis-classifications. https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/crime_reporting_review_committee_final_report_2013.pdf

**SECTION V: JOINT REMEDIAL PROCESS DESIGN AND IMPLEMENTATION**



### 3. Leadership Meeting Phase

During the Leadership Meeting Phase, the Facilitator received reform ideas from thought leaders at community, advocacy, clergy, and policy organizations (*see* Figure 1). The views shared at these meetings represented the judgement of professionals often based on their direct work with individuals and communities impacted by unconstitutional stop, question, and frisk and trespass enforcement practices.

The Facilitation Team convened a number of discussions with law enforcement related organizations and agencies around the country. The Facilitator hosted conference calls with the Police Executive Research Forum to discuss the Joint Remedial Process design and our initial findings. The Team also met with Laurie Robinson, Co-Chair of the President's Task Force on 21st Century Policing, as well as with Darrel Stephens, Executive Director of the Major Cities Chiefs' Association. We also met with civil rights organizations from around the country.

**Figure 1:** List of Participant Organizations

| ORGANIZATIONS |
|---|
| Brooklyn Defenders |
| Citizens Union |
| Community United for Police Reform ("CPR") |
| Covenant House |
| Fortune Society |
| Legal Aid Society |
| Major Cities Chiefs' Association |
| Micah Group |
| Morris Justice Project |
| National Association for Civilian Oversight of Law Enforcement ("NACOLE") |
| National Police Accountability Project ("NPAP") |
| Open Society Foundations |
| Osborne Association |
| Police Executive Research Forum ("PERF") |
| Police Reform Organizing Project ("PROP") |
| Safe Horizon |
| The Door |
| The President's Task Force on 21st Century Policing |
| Trinity Wall Street |

## Process Development

At the onset of the Leadership Meeting Phase, the Facilitation Team generated a list of previously engaged and newly referred community organizations. Previously engaged organizations were groups that we had interacted with during the Convening and Focus Group Phases of the Joint Remedial Process. Plaintiffs' counsel in the *Floyd*, *Davis*, and *Ligon* cases as well as the NYPD, provided additional referrals and guidance for outreach to organizations. Next, the Facilitation Team developed a strategic outreach plan by sending emails to each organization's executive staff requesting their participation in this Phase. If and when staff confirmed their interest in doing so, an introductory conference call would then be scheduled. During this call the JRP Team would provide the organization's staff members with additional background and context on the JRP and the goals of the Leadership Meeting Phase. If the organization agreed to attend a leadership meeting, they would then be provided with potential scheduling dates. After the meeting date, location, and attendees were confirmed by the organization, an introductory packet was sent to all of the attendees. This packet included a brief overview of the JRP, an abridged list of focus group themes, and an open agenda to assist in guiding the group discussion. Leadership meetings usually lasted two hours. During these meetings, notes were taken and synopses were then developed. This Phase of the process took place between July 2016 and January 2017. A total of 19 leadership meetings took place.

## Summary of Leadership Themes

The repeated themes raised during these meetings included overaggressive policing, targeted policing, a perceived lack of accountability for misconduct at the NYPD, mistrust between communities and the Department, lack of respect by the police, the need to build police-community trust and address residual trauma, and the need for enhanced community

engagement, training, accountability, and transparency. Consistent with the findings of the Liability Opinion, leadership meeting participants reinforced the view that African Americans and Latinos bore the brunt of unconstitutional SQF and trespass enforcement.

Leadership meetings with service provider organizations underscored specific issues confronting vulnerable populations such as homeless youth, victims of domestic violence, parolees, probationers, youth involved in court diversion programs, people receiving drug treatment, and members of the LGBTQ community. What follows are participant thoughts, experiences, and recommendations with regard to community engagement, police-community interactions, training, accountability, oversight, and the monitoring and evaluation of officers.

## Community Engagement

<u>Addressing Harms and Mistrust</u>

Attendees voiced concerns about the harms caused to individuals and communities by overaggressive policing and the NYPD's SQF and trespass enforcement policies. These harms included fear, trauma, and over-criminalization; they also included the trauma caused to police officers by both the pressure to perform under CompStat and the difficulty of policing neighborhoods that resent and feel besieged by the police.

Referring to individual and community harms, one group noted from their research that participants were generally fearful of police and felt a level of harassment and victimization by the police in their communities. This fear was caused by the aggressive nature in which police were interacting with people. A member of this group further stated that people in certain neighborhoods felt that, in general, encounters tended to immediately escalate from an initial approach.

Referring to police reform strategies, an attendee asserted that reforms viewed as an attack on officers were unlikely to be successful. Recognizing that part of the problem was an "us vs. them" mentality, the thought expressed was that until officers understood that they are part of the communities they police, and we reach a point where communities accept them as such, they will be viewed as just an occupying force. Indeed, at each of the meetings held, participants thought that one result of the NYPD's SQF and trespass enforcement policies was that it had caused a lack of trust between community members and police officers. Either expressly or implicitly, it was also recognized that one of the main goals of the reform process is to shape policing in a way that allows these wounds to heal and trust to be restored.

Participants felt that officers often approached members of the community without either courtesy, professionalism, or respect — one attendee went so far as to suggest that the abbreviation "CPR" on police cars stood for "curse, punch, and restrain." There was also a sense of lack of basic courtesies that indicated that the police did not view themselves as part of the community or as public servants. In this regard, attendees mentioned that phones are not answered regularly at the precincts and that upon entering a precinct, police were often unprofessional, dismissive, and demeaning to members of the community.

Several organizations shared their views on the existing harm and mistrust in impacted communities. Issues raised by participants included:

- There exists a systemic cultural barrier between police officers and the community. The community considers the police untrustworthy and the police consider the community to be rivals. Further, the militarization of police officers and their equipment is very intimidating and fosters a sense of mistrust.

- Communities are afraid of the officers in their neighborhoods.

175

- Civilians are carrying emotional scars from past police conduct that are hard to heal.

- Citizens who are abused would prefer to go elsewhere than to the police for help.

- Communities feel afraid to call the police when needed.

- The community does not feel a significant investment coming from the NYPD.

- Community members are scared to speak up because they want to avoid retaliation by the police.

- Surveys commissioned on public perceptions of the NYPD reflected that participants did not feel as if they were protected by the police.

- Concerns that officers are engaging in racist or otherwise prejudicial practices, and that this is harming communities.

- The dynamic between community and police is deeply adversarial.

### Enhancing Community-Police Interactions

<u>Officer Trauma</u>

It was recognized that police officers are exposed to various forms of vicarious trauma, in addition to any trauma they may experience in the course of their duties. Participants believed that the NYPD needed to have mechanisms in place to assist officers in coping with such trauma and receive training in understanding all aspects of trauma. There was a sense that officers were reluctant to seek counseling because of cultural reasons at the Department that made officers wary of admitting vulnerability. It was further explained that just as implicit biases affect how officers interact with the public, trauma can play an important role.[218]

<u>Youth</u>

---

[218] It was posited that trauma causes hypervigilance and feelings of being threatened during an investigative encounter, which could therefore result in escalation of conflicts.

Further concerns were raised with regard to officer interaction with vulnerable groups. Community leaders felt that officers often use fear and intimidation to get information from vulnerable individuals. With regard to youth, organizations suggested that it was particularly important for the police to approach young people respectfully and receive training on how to do so. Significantly, attendees raised concerns that young people are being stopped on their way to and from school; and that police officers in and near the schools disperse students with commands more appropriate "to cattle," not people.

As reflected in the comments, there was a sense that policing of youth conduct was often unnecessary and unfair and further resulted in unnecessary and unfair entries into "the system." One such example, raised by community groups, is over-policing in subway stations.

Attendees believed that there needed to be youth programs to divert kids from the criminal justice system, and that police should be invested in seeing a community flourish, not in criminalizing youth. It was further discussed, that by engaging in unnecessary SQFs, the Department had created criminal records where not necessary and that one consequence could be deportation based on an individual's immigration status. Recognizing the importance of youth programs as a means to keep young people off the streets and engaged in positive activities, participants advocated for increasing the funding for and the number of available community programs.

In addition to these concerns, community groups raised several specific issues for consideration relating to young minority, LGBTQ, and homeless populations including issues with respect to:

- Over-policing in subways in predominantly poor, underprivileged, minority neighborhoods.[219]

- Arresting people for being homeless and charging them with disorderly conduct or trespassing.[220]

- Targeting people and stopping them before and after going to needle exchange programs.[221]

- Conducting warrant sweeps, predominantly by special units, on the street, in shelters, programs, and clinics.[222]

- Utilizing questionable policing tactics at NYCHA and, in particular, addressed the need for locks on NYCHA doors.

<u>LGBTQ Individuals</u>

Several groups thought that the LGBTQ community was particularly vulnerable. As examples, members of the community are allegedly approached or arrested "just for standing on corners," and transgender individuals are subject to frequent and intentional misgendering.[223] As a result, community groups emphasized that members of the LGBTQ community had a strong sense that they were consistently treated differently and inappropriately by the police.

Community and advocacy groups at several junctures raised concerns that individuals on the street were, and are currently, being arrested for being transgender and officers are claiming

---

[219] Participants raised concerns that transit and precinct officers team up after school and take kids to precincts or issue desk appearance tickets instead of calling the school and confirming identification.

[220] Participants cited, in addition, that there is a lack of services available to those charged in such a manner because the majority of stops occur at night or on weekends. Clients are being screened before being arraigned, put in sealed envelope and only being given to plaintiff's counsel.

[221] Participants felt officers were using the heroin epidemic as an excuse for stop, question, and frisk.

[222] Participants felt these sweeps are not, but should be, subject to scrutiny. Generally, it was presented that warrant searches were being used to justify illegal stops.

[223] "Misgendering" was an often repeated issue. One example was that stop or arrest forms are intentionally recorded with the sex at birth, which is not only disrespectful and hurtful but means that the data on stops are not being accurately recorded.

178

they were loitering and or soliciting prostitution. Attendees claimed that transgender people typically get arrested just for standing on corners, and suggested that loitering laws be carefully scrutinized.[224] Participants suggested that stops depend on factors like how you are dressed, and that for transgender people interactions with officers often escalate from a bad stop to an arrest. Participants brought up several additional issues related to transgender individuals:

- Transgender individuals suffer the worst level of verbal abuse and body language from inmates, civilians, and officers.[225] Participants suggested that police ask individuals what gender pronoun they prefer and whether they prefer a male or female to pat them down.

- Members of the transgender community are often stopped by police officers and prosecuted for loitering with the intent of prostitution. This leads to a phobia in the nature of the stop, wherein individuals feel like they are being targeted because they do not fit the "gender norm."

- Officers use derogatory and condescending language toward LGBTQ individuals and do not respect their personal space.

It was recommended that a program be established where advocates are based inside of the precincts. Those advocates could inform individuals from vulnerable populations about what is going to happen with a case and assess safety concerns. Further, because the advocates would be at the precincts, this would give officers a firsthand look at how to work with these groups, engendering a different perspective that would improve police officer interactions with vulnerable groups.

Building Trust

---

[224] One issue raised was that waiting lists in shelters for transgender individuals leaves them with few options.

[225] It was stated that if someone's identification, such as a driver's license, did not match the individual due to him/her/they being transgender, officers would commonly use the pronoun adequate for the person in the identification picture. For example, "Where are you going Bob?" to a person who now identifies as a female. This, of course, is another example of misgendering.

Engagement clearly means more than education. In this regard, many groups viewed community engagement as a means to build trust between officers and the community. Several groups made specific suggestions for officer engagement with impacted communities. Among these ideas were suggestions for officers to visit churches and community organizations. Participants felt such involvement would help officers become stakeholders in the community. Groups suggested that officers go to the community that they will patrol for the purpose of cultural adaptation; helping them to understand the difference between normal and adversarial interactions in the area. Likewise, many groups believed that police officers should work to become better known by community members. In fact, participants discussed an initiative in which five community officers each choose a youth from the community to build a relationship with him/her. They believed such a process humanizes youth from the community, and officers develop pride in the youth and their development.

Most critically, participants stressed the need for continued and proactive community engagement directed at restoring trust between the citizens and the police. Many emphasized that the public was not fully aware of the mandated reforms or the status thereof.[226] One issue of particular importance was that there was confusion over whether stop and frisk was still legal after settlement in *Floyd*. With this confusion, attendees noted, the approach of an officer is viewed with even greater suspicion and fear. As a result, there was a call for greater community outreach and education; including school based outreach and education on citizen rights. Some thought that information should be disseminated on a precinct level, including at community meetings. Others recommended community surveys to be reviewed, analyzed, and evaluated at

---

[226] Participants stated that precinct-level information is not being disseminated and that there is insufficient information being provided at the community meetings

the community level. It was additionally recommended that feedback mechanisms be developed where citizens can report back to the people policing them.

Additional community education and engagement recommendations included the need to:

- Collaborate with community organizations in the development of public education efforts.

- Educate the community about their rights when engaged or stopped by a police officer.[227]

- Include the Department of Education and the private sector as part of the education process.

- Establish a precinct-level liaison so that there can be shared learning between officers and communities.

- Establish a community-police commission. Such commissions are less threatening to police officers because they do not have the ability to look into allegations of misconduct.

- Increase funding for community programs and efforts toward community engagement.

- Make community outreach/engagement mandatory for every police officer.

- Require the Commissioner to go into communities and listen to stories in a controlled, neutral environment.

- Require commanding officers to meet on a regular basis with people who are critical of them.

- Send police officers to schools and after school programs to engage with youth so that first interactions with police officers are more positive.

- Improve participation by young people by (1) making sure that they are informed about community meetings and (2) holding independent community meetings that cater to youth.[228]

- Improve advertisement of Community Council meetings.[229]

---

[227] A youth participant of a drop in center believed that fear in these interactions can be lowered by providing community members information about their rights. It was stressed that if youth understood their rights better there would be greater calm during police-youth interactions.

[228] Participants explained that even when young people are aware of meetings they are scared to attend and speak about their experiences. Accordingly, CPR recommended independent community meetings scheduled for times when young people could attend; at places young people feel comfortable; that provide multiple ways to have a voice; and that include a youth delegate as the voice of the community.

- Improve the relationship between 1 Police Plaza and the local Community Boards; a representative of each organization should attend the Community Council meetings.

- Establish a clergy advisory council in each precinct that would be able to meet with the commander and discuss issues occurring in the community and any policing practices.

**Inclusive Community Training Concepts**

Participants believed that lasting change would only be possible with cultural change within the NYPD. Consistent with academic scholarship, many participants stressed that cultural changes require buy-in throughout the organization, including leadership, managers, and supervisors. Many thought that training was a means to accomplish that goal. However, as a participant put it, without organizational buy-in, "culture eats training for lunch."

De-escalation

The need for de-escalation training was raised by participants from a number of community groups. Participants felt that officers need to receive training on how to reduce stress in encounters by using less intimidating tactics and interacting more positively. Participants also recognized the need for specialized training to deal with youth, members of the homeless population, people with substance abuse issues, members of the LGBTQ community, and people with mental illnesses. Such training, they asserted, would provide officers with various strategies to employ greater compassion and restraint, which likely would have the effect of making interactions with community members more positive.

Cultural Competence

As noted in the context of community engagement, there was a recognized need for officers to learn more about the communities they serve by becoming more engaged in those

---

[229] It was also suggested that the precincts ensure exact information about the meetings and that the precinct website include updated information.

communities. For instance, it was suggested that officers should receive training specific to the communities they serve.[230] Dovetailing with these ideas, community service organizations that cater to particularly vulnerable groups believed officers should receive field training at these types of organizations — whether through internships, meetings, or otherwise — to learn more about the constituents and the positive ways in which professionals interact with them.[231] Participants from several organizations suggested that the NYPD train officers on how to interact with diverse groups, including vulnerable people and people who have experienced different types of trauma, people with disabilities, and people with mental illnesses.

Insight into Youth Behaviors

Several groups shared specific suggestions for officer training with respect to youth and their behavior. Participants believed that officers were not sufficiently trained to recognize the body language of young people. In addition, there was an overall concern that officers lacked sensitivity when they approached traumatized teens. Participants suggested that officers should be more aware of how they are perceived by teens, they should be more aware of the impact their uniforms has on community members, and, generally speaking, something should be done to change the perception youth have about officers.[232]

---

[230] Participants highlighted the need for the Department and officers to communicate more with the staff of community organizations with the intention of building a relationship that could assist officers with techniques/strategies for how to approach individuals with, for example, mental health issues.

[231] This will allow officers to meet community members experiencing particular difficulties and see how experts interact with them. Officers will then get a sense of what it is like to interact with victims and communities in less threatening and intimidating ways. Based on past experiences with such programs on a small-scale, participants reported that officers and recruits were more likely to be empathetic with community members.

[232] One recommendation was to require empowerment workshops in which youth talk to police officers: Members of the community organizations would first need to make sure that the youths are ready or able to share their stories, and thus it was advised that a small group be tested first and, only if ready, taken to the academy or a neutral space for the empowerment workshop. It was suggested that in this context, police officers could work with youth and play theatrical games.

Participants felt it was imperative that officers learn how to "read" youth, and asserted that trainings should assist officers in cultivating effective trauma response techniques and strategies.[233]

Additional recommendations for training included the need to:

- Increase training on inclusion, diversity, and cultural competence.

- Provide training on implicit bias.

- Link bias training to accountability measures.

- Require recruits to attend a Community Council meeting while in the academy.

- Mandate continued education while in the field after the academy.

- Test for competency.[234]

- Require retraining for current officers.

- Train officers in the law.

- Require prospective officers to have taken a set curriculum of courses.

- Create a task force of community groups to provide input on police training.

**Accountability and Oversight**

<u>Clear Rules and Consequences</u>

Thought leaders discussed the need for clear standards and/or a code of conduct, as well as a system to ensure that officers are held to those standards. They raised the need for meaningful consequences for misconduct. This included increased disciplinary severity for repeated unlawful stops and frisks, and supervisor accountability for individual officers engaging

---

[233] At this point, one participant stated, youth are in survival mode — "police officers are not our friends, they are our enemies."

[234] Citizens Union recommended evaluations after six months.

in pretextual stops. In addition, participants thought that there should be police accountability at the precinct level.

Participants also thought that outside of litigation there was a lack of effective mechanisms for the public to hold the police accountable. Community groups suggested that people need a better way to make complaints about police misconduct because the Civilian Complaint Review Board ("CCRB") and the Office of the NYPD Inspector General are not trusted by community members. Groups suggested that rather than going through the CCRB, community members should be permitted to lodge complaints directly at the precinct. Likewise for public housing residents, there should be a complaint process through NYCHA to ensure that appropriate changes or discipline is imposed on officers who work in public housing.

As reflected in the above comments, while the CCRB is meant to provide an avenue for the public to hold the police accountable, attendees reported community reservations about the CCRB based on several cited issues. For example, participants stated the following concerns: the CCRB has a bad reputation in certain communities; information from the courts and the CCRB is not shared with complainants; there is a lack of independence and transparency at the CCRB; the CCRB does not adequately pursue complaints and that when pressed the CCRB states they are understaffed and the NYPD says the same; and constituents fear that officers would retaliate when a complaint has been filed.

Citizen Union has proposed various reforms to the CCRB in its white papers.[235] In addition, participants said that the community should have input into how the CCRB functions and that the entire process should be public, from the smallest to the most severe violation.

Recommendations included:

● Develop a code of conduct and hold everyone to those standards.

● Ensure meaningful, timely consequences for violations of the patrol guide, policies, and rules.

● Impose discipline on officers who fail to take required trainings.

● Ensure consistent and fair discipline.[236]

● Require accountability to the public at the precinct level.[237]

● Hold officers personally accountable for pretextual stops.

● Ensure officers complete paperwork in each instance in which it is required and address when it is not completed.

● Support officers who intervene when needed and discipline those who do not.

● Appoint a special prosecutor for police misconduct cases.

**Performance Tracking and Evaluation**

Several organizations recognized the need for more robust performance evaluation and early intervention systems. Participants thought it was important that any feedback loop include, among other things, information from the courts regarding suppression and credibility rulings. It

---

[235] *See* Appendix A.

[236] Participants stated that concrete consequences should include loss of pay, loss of vacation days, and demotion, and that command discipline should go on an officer's record.

[237] If officer misconduct is ignored in the precinct, supervisors, managers, and the commanding officer should be penalized.

was also recommended that any tracking system be robust enough to track patterns, from officers working together, to squads and precincts.

In addition to traditional internal mechanisms for supervision, an external monitor and/or independent oversight structures were also recommended. Participants suggested a permanent structure in which civilians from directly impacted communities, support and advocacy organizations, and police reform organizations, develop metrics to review whether the NYPD is in compliance with mandated reforms based on those metrics. Likewise, a member of a police reform organization suggested that there be an early intervention system which is independent of the NYPD and is tasked with monitoring alerts and outcomes. Participants further suggested random audits of the Department to ensure compliance.

Recommendations for NYPD monitoring and evaluation included:

- Develop early intervention systems to detect officers engaging in problematic conduct.

- Create a feedback loop between the courts and the Department. When the court makes a decision in a case, it should get back to the involved officer's supervisor.[238]

- Track patterns, such as officers that are working together and engaging in misconduct and/or being sued, as well as within squads and platoons.

- Develop new performance metrics and measures of evaluating police officers that include a system of dynamic accountability for ranking officers and methods to evaluate them

---

[238] A member of a police reform organization pointed out that the District Attorney had a considerable amount of records about poor policing that do not end up at the Department or in the officer's file. In this regard, it was suggested that a number of declinations of prosecutions should trigger an investigation.

based on deference to the law, procedural justice, de-escalation, and community engagement.[239]

- Develop metrics that address an officer's problem-solving abilities.

- Include community feedback in the evaluation and promotion process.

- Include efforts to engage the community in evaluations of precincts.

- Use neighborhood surveys to assess levels of community safety and satisfaction, and hold local commanders accountable for being responsive to community concerns.

## Open Data and Documentation

Open data and documentation were seen as vital to educating the public and ensuring that the NYPD was accountable to the community. Several groups emphasized the vital role that data plays for studying trends in police behavior. Furthermore, participants stressed the importance of documenting stops. Participants from these groups thought that the NYPD should be required to record Level 1 requests for information and Level 2 encounters and consensual searches. One reason for this was the sense that members of the public did not feel free to leave at Level 1 or Level 2 and/or because intimidation and harassment can occur at Level 1 and Level 2 even if a person has not been officially stopped. Furthermore, such records would permit future study on how and with whom police officers are interacting. And because homeless individuals, youth of color, LGBTQ individuals, and people with substance abuse problems are very frequently the subject of stop, question, and frisk, police should record on the stop form that the individual stopped falls within one of these groups.[240]

---

[239] Participants suggested that officers do not receive credit for doing good things and that performance assessments should not be based only on punitive interactions (such as number of stops). Likewise, participants thought that if an officer's positive conduct was rewarded, other officers would follow suit.

[240] Participants suggested recording this type of demographic information on /in whatever form(s) of documentation the NYPD employs.

Leadership executives highlighted that for oversight functions to be productive, it is critical that all police-citizen encounters be documented. Participants suggested that, in reality, neither police officers nor community members can fully distinguish between Level 1 and Level 2 encounters and Level 3 stops. Further, participants suggested that many Level 1 and Level 2 encounters quickly escalate to Level 3 stops and searches, and to the extent an encounter rises to a Level 3 but is categorized as Level 1 or Level 2, these encounters would be unaccounted for (because only Level 3 stops currently require documentation). Participants also suggested that documenting all encounters would bring to light targeted harassment, which show patterns of officers engaging with people who do not have a criminal record and who are not doing anything illegal.

In addition, some participants posited that under the current criminal procedure law in New York,[241] as applied, there is no discovery process for ascertaining the issues connected with a stop until the beginning of a trial. The absence of such discovery creates challenges to determining a police officer's credibility, and in cases of an unconstitutional stop there is no way for this information to be shared with the court. Because of this lack of information there are no opportunities for defense attorneys to present issues to the court in advance of a trial; and while these issues could be presented at trial, trial only occurs in a small percentage of cases as most cases result in a plea agreement.

Thought leaders provided several additional considerations for documentation and access to data. Community groups recommended that the NYPD:

---

[241] *See* CPL Article 240.

- Record accurate data for encounters and stops for gender and race. With respect to LGBTQ status, permit individuals to self-identify in order to have more accurate statistics.

- Provide "stop" receipts. Receipts can be helpful for ensuring geographical accountability at the precinct level and increasing transparency about Level 1 and 2 encounters.

- Require officers to provide identifying information in the form of a business card with respect to all citizen-police encounters.

- Develop a smartphone application that allows individuals to anonymously report police interactions. It was thought that an application could serve as a platform to track trends, as well as to provide a voice for individuals who have been stopped. Further, it was believed that the app could serve as a basis for partnerships between communities and precincts.

With regard to open data, thought leaders recommended that the NYPD:

- Make the patrol guide, training manuals, and rules governing officer conduct free and accessible to the public.

- Improve the NYPD's website to consolidate and clearly organize information for the public. Make quantitative data dynamic and enable it to be compared and searched with consistent categories and not only in pdf form. Also, ensure that narrative data is well organized.

- Publish stop and frisk data online.

- Make officer disciplinary records public, at least in cases where complaints are substantiated or where there are multiple instances of misconduct by the same officer.[242] Create a searchable record on accountability.

---

[242] The Legal Aid Society has submitted a white paper contending that the City should change the way it interprets Civil Rights Law 50-a to permit disclosure of summaries of misconduct that have been substantiated through investigations by the Internal Affairs Bureau or the CCRB. This white paper can be found in Appendix A.

- Require the CCRB to provide the public with aggregate information about both the police officers and complainants involved in complaints, which include race, ethnicity, age, gender, and for officers, years on the force.

- Require the CCRB to issue a report listing precincts or specialized units with the highest numbers of CCRB complaints, substantiated complaints, and incidents of being named defendants in civil lawsuits alleging police brutality.

- Publish a public report regarding lawsuits and rulings regarding suppression of evidence and findings that officer testimony is not credible.

- Enhance data sharing by requiring the New York City Law Department to issue quarterly reports to the City Council, Comptroller, and CCRB detailing the number and disposition of civil actions filed against the NYPD, and requiring the comptroller to submit information regarding civil legal settlements in all cases to relevant agencies.

- Support the passage of the Right to Know Act: inform individuals subject to a stop or a Level 2 encounter of their right to refuse a consent search.

- Create a permanent structure in which directly impacted communities are able to see that the NYPD has complied with independent oversight. This structure should be comprised of people living in impacted communities, organizations representing impacted communities, and representatives of police reform organizations.

- Require police to turn over stop reports to defense counsel.

**Body-Worn Cameras**

While many groups were in favor of body-worn cameras ("BWCs"), some were skeptical that BWCs would necessarily be effective tools to ensure transparency and accountability. There was also concern that without transparency and accountability, BWCs could be used as a surveillance tool.

Some participants believed that access to BWC footage should be maintained by a third party government oversight agency (perhaps the CCRB or the Office of the Inspector General).

There was also a call for greater community involvement in developing the policies governing the BWC pilot as well as any program that is implemented as a result. This included involving community members, advocates, and policing experts in the evaluation of the program.

Specific recommendations were also made regarding the BWC program, including a clear process for filing complaints, a clear written policy that states the consequences for officers who fail to comply with the BWC policy, establishing a retention policy for video footage, and prohibiting officers from reviewing footage before a written complaint or arrest report has been submitted. Additional suggestions by thought leaders included that the NYPD:

- Require BWCs to be activated at all times.

- Make BWC footage accessible to lawyers and civilians.

- Limit preservation of footage to that which is associated with some degree of misconduct.

- Ensure footage be used for accountability, supervision, and training — *i.e.*, officers can look at the footage of an encounter and see how they did and how they could do better — and not for accusations or as a "gotcha" tool.

- Notify civilians whether cameras are on or off.

- Require District Attorneys to review videos to determine if arrests are done correctly.

- Ensure that, in cases of alleged misconduct, officers are required to give a written and signed statement before being granted access to video footage.

- Maintain videos for a lengthy, but specified time period before purging.

**SECTION V: JOINT REMEDIAL PROCESS DESIGN AND IMPLEMENTATION**



### 4.  Community Forum Phase

The Community Forum Phase of the Joint Remedial Process was established to solicit additional feedback from impacted community members regarding changes to the NYPD's practices of stop, question, and frisk and trespass enforcement. Guided by the Remedies Opinion, the Facilitation Team was charged with conducting a series of "town-hall type meetings" with the mission of providing a broad-based platform for community members to participate and provide suggestions for reform. The aim of the forums was two-pronged — to bring greater awareness to the public about the litigation and the Immediate Reform effort, as well as to solicit additional suggestions concerning the types of remedial measures that the public deemed necessary for meaningful change.

In order to build out the forums, the JRP convened a number of meetings with community-based organizations from the Relationship Building Phase to assemble the

Community Forum Planning Committee ("CFPC"). The mission of the CFPC was to ensure that communities most directly impacted by the NYPD's unconstitutional SQF and trespass enforcement practices were provided an opportunity to share their perspectives on potential reform measures which may be mandated by the Court to bring the NYPD into compliance with the Fourth and Fourteenth Amendments of the U.S. Constitution and New York law. These reforms, however, must be no broader than necessary to bring the NYPD into constitutional compliance.

Forum outreach was direct and intentional, targeting those community members most affected and at-risk of being stopped by police without reasonable suspicion, both in the street and in public housing. Conversations with several stakeholders, including the JRP Advisory Committee, plaintiffs' counsel, community organizations, clergy, and the New York City Law Department, informed the JRP Team's creation of the introductory packet to provide host organizations with a basic structure for program development.

In collaboration with the community anchor organizations, the Facilitation Team successfully conducted a total of 28 forums during the Community Forum Phase, reaching almost 1,800 impacted community members throughout New York City (*see* Figure 1). Of the 28 forums, nine took place in Brooklyn, eight in Manhattan, six in the Bronx, four in Queens, and one in Staten Island. Several overarching themes were extracted around transparency, accountability, evaluation, and police-community relations through a qualitative analysis of forum data and observations.

**Figure 1.** List of Joint Remedial Process Forums

| Date and Time | Anchor Organization | Attendees |
|---|---|---|
| **Thursday, October 13, 2016**<br>**6:00 PM to 9:00 PM** | **West Harlem**<br>Perfect Peace Ministry | **62** |
| **Saturday, October 15, 2016**<br>**1:00 PM to 4:00 PM** | **West New Brighton**<br>True 2 Life - Cure Violence | **39** |
| **Monday, October 17, 2016**<br>**6:00 PM - 9:00 PM** | **East Harlem**<br>Perfect Peace Ministry | **69** |
| **Thursday, October 20, 2016**<br>**6:30 PM - 8:30 PM** | **Red Hook**<br>Red Hook Initiative | **50** |
| **Wednesday, November 2, 2016**<br>**4:30 PM - 7:00 PM** | **Sunset Park**<br>Atlas DIY | **44** |
| **Thursday, November 3, 2016**<br>**6:00 PM - 8:00 PM** | **Richmond Hill**<br>DRUM | **55** |
| **Wednesday, November 9, 2016**<br>**6:30 PM - 9:30 PM** | **Bedford-Stuyvesant**<br>MXGM | **40** |
| **Saturday, November 12, 2016**<br>**2:00 PM - 4:30 PM** | **West African**<br>Yankasa Mosque | **70** |
| **Monday, November 14, 2016**<br>**5:00 PM - 7:00 PM** | **Black, Latino, & At-Risk**<br>VOCAL-NY | **35** |
| **Tuesday, November 15, 2016**<br>**7:00 PM - 9:00 PM** | **South Bronx**<br>Morris Justice Project | **65** |
| **Wednesday, November 16, 2016**<br>**6:00 PM - 9:00 PM** | **Southeast Bronx**<br>BCCJR | **80** |
| **Thursday, November 17, 2016**<br>**6:00 PM - 9:00 PM** | **Public Housing Residents**<br>FUREE | **25** |
| **Friday, November 18, 2016**<br>**7:30 PM - 9:30 PM** | **South Jamaica**<br>Life Camp | **75** |

| | | |
|---|---|---|
| **Saturday, November 19, 2016**<br>**11:30 AM - 2:00 PM** | **North Bronx**<br>BCCJR | **26** |
| **Monday, November 21, 2016**<br>**6:00 PM - 9:00 PM** | **LGBTQ**<br>The Anti-Violence Project | **130** |
| **Tuesday, November 22, 2016**<br>**5:30 PM - 8:30 PM** | **Latino/a**<br>NMCIR, LatinoJustice | **35** |
| **Wednesday, November 23, 2016**<br>**6:00 PM - 8:00 PM** | **South Bronx**<br>Lead By Example &  Reverse the Trend | **68** |
| **Saturday, November 26, 2016**<br>**2:00 PM - 4:30 PM** | **Jackson Heights**<br>Yankasa Mosque | **40** |
| **Monday, November 28, 2016**<br>**6:00 PM - 8:00 PM** | **East New York**<br>Man Up, Inc. | **99** |
| **Tuesday, November 29, 2016**<br>**6:00 PM - 9:00 PM** | **Bedford-Stuyvesant**<br>Center for NuLeadership | **60** |
| **Wednesday, November 30, 2016**<br>**6:30 PM - 9:30 PM** | **East Flatbush**<br>Flatbush Village | **115** |
| **Thursday, December 1, 2016**<br>**4:00 PM - 7:00 PM** | **Washington Heights**<br>Police Athletic League | **177** |
| **Friday, December 2, 2016**<br>**6:00 PM - 8:00 PM** | **Far Rockaway**<br>Rock Safe Streets | **50** |
| **Saturday, December 3, 2016**<br>**1:00 PM - 4:00 PM** | **Bushwick**<br>El Puente | **67** |
| **Monday, December 5, 2016**<br>**5:00 PM - 7:00 PM** | **Coney Island**<br>Brooklyn Community Services | **16** |
| **Tuesday, December 6, 2016**<br>**5:00 PM - 7:00 PM** | **Youth**<br>MRNY , Urban Youth Collective, etc. | **85** |
| **Thursday, December 8, 2016**<br>**6:00 PM - 8:30 PM** | **Lower East Side**<br>Joint Remedial Process | **14** |
| **Friday, December 16, 2016**<br>**5:00 PM - 7:30 PM** | **Southeast Bronx**<br>Lead by Example & Reverse the Trend | **77** |

## Community Forum Process Development

In June 2016, the Facilitation Team began preparations for the Community Forum Phase of the Joint Remedial Process. As part of the multi-phase design of the JRP, our intention was to gather community input for potential reforms at a broader scale than had been conducted in the focus groups. Our purpose was to develop large public events, providing direct access to impacted community members in order to glean additional reforms and expand upon ideas suggested to us in other phases of the project. As such, the community forums were undertaken not merely as listening exercises, but as opportunities for community members to directly engage with the City and justice system in a candid and constructive way.

In advance of the planning and implementation of the forums, the Facilitation Team undertook several critical steps to ensure that the design and development of forums would be relevant for the target audience. In doing so, we decided that consultation with many of the city officials and grassroots organizations that had assisted us with populating focus groups would be crucial to the perceived legitimacy of the process. In advance of the coordination of such meetings, several preliminary discussions about the forums were held with the Advisory Committee. We collaborated with the Committee, which was comprised of both police and community representatives, to discuss key process considerations and ensure the success of the forums.

In January and February of 2016, two steering meetings were held with the Advisory Committee to discuss the process and design of the Community Forum Phase. In said meetings, we worked to flesh out critical components of a forum for gathering feedback from the community perspective, as well as thoughtful considerations and suggestions from NYPD

representatives. These baseline ideas assisted us in brainstorming the development of forums, including outreach to organizations, neighborhoods, and specialized communities.

These discussions were followed by a series of internal meetings to discuss the goals and objectives necessary to reach a desired end result. Therefore we began by exploring the following five questions:

1. How do we ensure that it is a community process?
2. How can we ensure that we are tailoring forums to the issues of distinct communities?
3. How do we ensure that we get the input we need?
4. How can we foster meaningful dialogue between and among attendees?
5. Should police officers be invited or otherwise involved?

First among these considerations was the formal style of the meetings. It was critical, for the enhancement of public interest and involvement, that the meetings be both engaging and productive, and thus the Facilitation Team placed considerable thought into how the events should take place. Given the historical distrust in many of the communities we were seeking to engage, we understood that the forums could be met with skepticism and apprehension.[243] So then the question became, how do we ensure that communities would feel safe, heard, and that they were contributing to meaningful change?

The proposed answer to these questions was to allow natural leaders in affected communities drive the focus and direction of the forums. Our plan was to consult organizations and advocates about best practices for recruiting and engaging traumatized communities, while also collaborating with the Department to ensure that organizations who would engage and challenge the Department were represented in that sample. Through a purposive design along

---

[243] The apprehension mentioned above had been evidenced by the legacy effects our team encountered with individuals and activists in the focus groups and advisory meetings.

with feedback from the organizations and advocates, we decided to create a model to guide the development of forums that would be led by the community with guidance from the Facilitation Team. Our next process question became, how do we ensure that forums are tailored to the issues of distinct communities? We discussed among stakeholders the option to customize forums through the steering and coordination of anchor organizations.[244] As we wanted to acknowledge the unique concerns of different communities, we decided to conduct diverse forums, which would grant anchor organizations flexibility to develop the engagement strategies most suitable for their respective community. We believed these strategies would be reflective of the varied circumstances of the hosting community, and as such were paramount to the task of ensuring everyone an opportunity to participate.[245]

A primary issue with developing a universal format for community forums is that communities are diverse, with unique issues and concerns. In fact, even how the term community is defined is distinct among different groups.[246] In order to create forums that would resonate with participants and speak directly to their concerns, it was decided that forums should be customized to the unique issues of each group and community. We decided that in order to make these discussions more open and cooperative, it would be best to forgo pre-set questions as used in the Focus Group Phase, and instead develop an open discussion format to broaden the possibilities for suggestions. We created basic parameters to guide organizations in developing forums most befitting the goals of the JRP.

---

[244] "Anchor" was the label used to address and refer to organizations that partnered with the Facilitation Team in the development and hosting of community forums.

[245] *See* Remedies Opinion, 959 F. Supp. 2d at 686.

[246] *See* Section VIII: Process Observations for additional thoughts under *Finding a Common Language for Discourse*.

The next question to address was how to best foster dialogue between and among attendees of the forums. In the Remedies Opinion, the Court appointed a Facilitator to conduct a series of "town hall type meetings." While town halls are a traditional format for community feedback, the Facilitation Team decided that such a format would not be most effective for engaging community members in providing suggestions for change. Instead, we opted for a dialogue based model, leaning toward the use of small group breakout sessions to gather more robust ideas for the Facilitation Team's consideration. These discussions were designed to be confidential, inclusive, and to provide expanded opportunities for feedback.

The most challenging concept to contend with was the question of police involvement. It was at this point that the Team reached a significant fork in the road. Would it be appropriate to attempt to foster dialogue between civilians and police? At the time, it was believed to be in the best interest of the JRP to field such a question with stakeholders from both the community and the Department. The decision to field questions with community groups ultimately lead to the decision to develop a forum planning group.

In March of 2016, the Facilitation Team began the process of collaborating with several community-based organizations to promote and design forums citywide.

**Cultivation and Design of Community Forums**

Beginning in April 2016, the first of a series of planning meetings was convened to formulate strategies for the development of public forums. In collaboration with the Advisory Committee, as well as referrals from the Mayor's Office of Criminal Justice, the Mayor's Office of Community Affairs, the Black, Latino/a, and Asian Caucus of the New York City Council, and Communities United for Police Reform ("CPR"), the planning committee was developed in

an effort to gain stakeholder consensus on the design and implementation of the forums. The key questions for the Community Forum Planning Committee ("CFPC") were; what should the forums look like, who should be there, and what other purposes could or should these events serve? The questions were of great significance for building out what would become a number of events occurring in each of the five boroughs.

Employing Community Expertise

During the CFPC, it was decided that the JRP would collaborate with several organizations to "anchor" community forums. We sought to work with groups that were both critical of and cooperative with the NYPD to ensure a fair and balanced representation of ideas from community members. These organizations would ultimately take the lead in the overall coordination and implementation of forums for each specific community, with the JRP Team providing resources and support. In order to cultivate anchors for the forums, we began coordinated outreach efforts to organizations who had participated in the Convening and Focus Group Phases, as well as through the networks of CPR, the Mayor's Office of Criminal Justice, the Mayor's Office of Community Affairs, and Center for Court Innovation.

As part of the Facilitation Team project management efforts, extensive outreach to grassroots and community-based organizations was conducted. These are organizations that had for many years worked at garnering the trust and confidence of directly impacted community members. Recognizing the essential influence and advocacy of these representative organizations provided the Team a tacit level of confidence that the forums would be planned thoughtfully. It would also ensure that those directly affected by unconstitutional SQF practices and trespass enforcement would be present to participate in the forums.

Setting Basic Standards

In consultation with the CFPC, it was decided that a set of guidelines for the forums would ensure that the public discussions netted constructive input. First among these parameters, was a commitment to neutrality. We believed it was important to maintain a reasonable level of impartiality in the promotion of the forums. As well, each forum was to include facilitated break-out sessions. These sessions were facilitated through the organization or with the assistance of trained facilitators working with the JRP Team. Facilitators were required to develop a written report of small group findings. Ultimately, the organizers of each community forum were asked to provide a record of the event which included the location, date and time, number of attendees, and a copy of the program.

It was very important to the community groups, plaintiffs, and the Facilitation Team alike that these events were culturally responsive, relevant, and community based. Having agreed with the idea of small group breakout sessions, community groups felt it was important that anchors prime the conversation by acknowledging the local history and context of SQF and trespass enforcement for the distinct communities we were to engage.

The agreement was that the forums should provide a brief history and context of historical grassroots organizing efforts to address police reform in New York City that took place before the *Floyd* litigation. As such, the CFPC agreed on the development of an educational segment at forums that would precede small group dialogue. In order to foster a level of consistent discourse, it was decided that the educational segment should include a short video presentation and accompanying infographic. The video and infographic provided a historical overview of the litigation including a framing of the problem, current efforts, and a call to action. After suggestions from participants, it was decided that the video and infographic would be

produced in collaboration with community organizations and the Black, Latino/a, and Asian Caucus of the New York City Council and provided to attendees at each forum.

Areas of Non-Agreement

The CFPC was divided on two key issues: police participation in the forums and uniformity across the forums. During early discussions with community stakeholders, the question of police presence was fraught with controversy. While some community groups were open to the idea or saw the necessity for police involvement, other groups strongly opposed it. Those organizations interested in collaboration would become critical in opening up discussions about how to engage community members with police present.

Rather than challenge any group's positioning on how best to engage its community, it was decided that the best course of action would be to extend police participation as an option. Though we knew police involvement would not be a viable solution for all communities, there was a healthy minority of organizations and activists who not only thought it would be constructive to engage police, but thought it was necessary. The ultimate decision on inclusion would be left to the discretion of the anchor organization.

The Remedies Opinion states that part of the Facilitator's mandate is to gather

> input from those who are most affected by the NYPD's use of stop and frisk . . . . The Facilitator will convene "town hall" type meetings in each of the five boroughs in order to provide a forum in which all stakeholders may be heard. It may be necessary to hold multiple meetings in the larger boroughs in order to ensure that everyone will have an opportunity to participate. The Facilitator will endeavor to prepare an agenda for such meetings, through consultation with the various interested groups prior to the meeting.[247]

---

[247] 959 F. Supp. 2d at 687.

As such, the JRP Team developed an agenda for each community forum in consultation with CPR and other groups interested in hosting such forums. It is true that at the first community forum some youth left because of the overwhelming number of police officers who were present. Following that forum, a request for fewer officers at future forums was made. This request only applied to host organizations that were interested in having police present at their community forums.

In order to facilitate forums involving organizations who did not want police to be present, the Facilitator supported a proposal by plaintiffs' counsel to allow CPR to have the City fund the hiring of a consultant to coordinate what would be termed "Plaintiff Assisted Forums." The Facilitation Team coordinated with the consultant in the implementation of these Plaintiff Assisted Forums sponsored by CPR affiliated organizations, without a police presence.

There were, however, several organizations under the CPR umbrella, whose forums were uniform in nature. The purpose of uniformity, as discussed, was to ensure that a consistent message was captured. Seemingly as a direct retort to the question of police involvement, many of these groups rejected the notion of diverse forums and called for a halt to the forum development process. Considering the time constraints placed upon the JRP by the Court, halting the forum development process was not feasible. As the feedback process was designed to be broad and rich, we were unable to reach consensus on such issues.

As discussed, the Facilitation Team felt it was important that individual anchor organizations have the right to decide whether including the NYPD in their community forums would be right for their community. As also discussed, after a series of negotiations with plaintiffs' counsel in the *Floyd, Davis*, and *Ligon* cases, a mutual agreement was reached that the

forums would be developed along two tracks — one set spearheaded by groups identified by plaintiffs' counsel, known as "Plaintiff Assisted Forums," and the other set coordinated by the Facilitation Team.

## Criteria and Methodology

One of the objectives of the community forums was to create safe spaces for dialogue, where different community stakeholders could engage in problem-solving and sharing ideas. The intention was to gather concrete suggestions for reforms, build partnerships, increase local participation, and support the community in contributing to the content of the Final Report. The intended audience for the forums included directly and indirectly-impacted community members, advocates, clergy, the NYPD, and local leaders. In order to ensure that we received input from impacted community members, we emphasized the development of forums within priority geographic areas. Though we were not beholden to our target areas, it was important that forums were held in neighborhoods representative of the individuals most affected by unconstitutional SQF and trespass enforcement policies.

Neighborhoods were purposively sampled based on multi-modal criteria which included focus group data, areas designated as priorities during earlier Phases of the JRP, and communities that lacked sufficient participation/responses during our Focus Group Phase. In order to select target areas, the Facilitation Team developed a logic model which compared priority precincts from the NYPD's SQF and trespass enforcement data for the *Floyd* and *Davis* cases, which were then prioritized for forums (*see* Figure 2).

In addition to priorities based on NYPD sampling data, the JRP Team fielded additional suggestions for targets in consultation with plaintiffs' counsel. Utilizing their understanding of

areas in which their clients had experienced a number of stops, we garnered three additional

priority areas. In total, the priority matrix highlighted 14 geographic areas for forums — *East*

*Harlem, South Bronx, Southeast Bronx, East Flatbush, East New York, Brownsville, Bedford*

*Stuyvesant, Rockaway Beach, Far Rockaway, South Jamaica, West New Brighton, Lower East*

*Side, Jackson Heights, and Washington Heights*. Of the 14 neighborhoods, nine were labeled as

top priority target areas — *i.e.*, the Team would make the greatest push at developing public

events in these top priority areas.[248]

**Figure 2.** Community Forum Logic
Model

| Precincts {Floyd} | Davis Plan | | Community Forum Locations | | |
|---|---|---|---|---|---|
| | PSAs | Precincts within | Neighborhood | Borough | Cluster |
| 23 | 2 | 73, 75, 77 | East Harlem | Manhattan | 23 PSA 5 NYCHA |
| 40 | | | South Bronx | South Bronx | 40 PSA 7 NYCHA |
| 43 | 3 | 79, 81, 84, 88, 99 | South East Bronx | Bronx | 43, 44 |
| 44 | 5 | 23, 25, 28 | South East Bronx | Bronx | |
| 67 | | | East Flatbush | Brooklyn | 67 |
| 73 | 7 | 40, 42 | East New York | Brooklyn | 73, 75 PSA 2 NYCHA |
| 75 | 8 | 43, 45 | Brownsville | Brooklyn | |
| 79 | | | Bedford Stuyvesant | Brooklyn | 79 |
| 100 | | | Rockaway Beach | Queens | 100,101 |
| 101 | | | Far Rockaway | Queens | |
| 113 | | | South Jamaica | Queens | 113 |
| 120 | | | West New Brighton | Staten Island | 120 |
| | | | Lower East Side* | Manhattan | 7, 5 PSA 4 NYCHA |
| | | | Jackson Heights* | Queens | 114 |
| | | | Washington Heights* | Manhattan | 33,34 |

---

[248] In the early part of the Community Forum Phase it was presumed that there would be a maximum of 10 forums to take place throughout the City. With the massive amount of interest we received from organizations, we expanded the number of forums to fit as many affected neighborhoods as would be needed to get a broad representation of communities.

A multi-layered geographic model of priority precincts was developed in conjunction with the logic model to guide the Team in tracking forums and saturation levels of distinct communities around the City.[249] The graph included layers for the *Davis* and *Floyd* priority precincts as identified during the Focus Group Phase, as well as NYPD Neighborhood Policing precincts where recent Neighborhood Coordination Officer ("NCO") programs had been rolled out (*see* Figure 3). We were interested in determining whether affected communities in NCO precincts were both aware of the NCO program and had a vested interest in collaborating for the forums.

**Figure 3.** Priority Precincts by Stakeholder Group



In order to expand access to affected communities, the Facilitation Team made a concerted effort to prioritize geographical target areas which we had not been able to access, or achieve saturation in, during the Focus Group Phase. These areas were prioritized for the forums, though organizations were not required to conduct forums only in these areas. Over time it became clear that geographic areas could not be the only basis for community forum sampling.

---

[249] *See* Figure 4 for completed composite map.

So in consultation with plaintiffs' counsel, it was agreed that forums should also be developed for specialized populations, based on demographics not necessarily concentrated in a geographic location. These specialized populations included youth, at-risk adults, Indo-Caribbean communities, LGBTQ communities, public housing residents, and the West African Islamic immigrant community.

<u>Community Engagement Strategy</u>

Involving community stakeholders in the development of community forums was a resource intensive process, which required a great deal of planning on the part of the JRP Team. As we knew the cultivation of anchor organizations and participants for the forums was critically significant to the design and outcomes of the forums, we then developed a clear strategy for engaging such affected groups. Utilizing the social capital of community-based organizations, methods were developed to foster participatory decision-making to mobilize communities.

To effectively gather input from community members, several considerations were incorporated for organizations interested in hosting JRP forums. To facilitate community organizations in the process of developing forums, we created an introductory packet containing pertinent materials to provide guidance in planning and budgeting, along with promotional materials.[250]

Critical to the strategy for engaging community members was the cultivation of support staff that were experienced with translating residents' priorities, managing group dynamics and conflict, while also developing authentic relationships. For this reason, we recruited facilitators from the community mediation field who would lead these small group discussions. These

---

[250] *See* Introductory Packet Materials in Appendix F.

facilitators were required to attend an orientation session where they were provided concise guidelines and expectations for engaging community members in a solution-oriented discussion about potential reforms.[251]

Along the Plaintiff Assisted Forum track, a planning consultant assisted the organizations and individuals tapped for involvement within the CPR network. The CPR organizations developed and promoted a digital campaign titled "Our Communities, Our Solutions." This campaign targeted special interest groups and highlighted the history of organizing behind several significant police-related litigations. Forums under this track engaged participants who were primarily from CPR's constituent groups, using predetermined talking points, and a universal engagement design.

Planning and Program Development

We next embarked on the cultivation and design of the plenary sessions and working groups for forums. As the intention of the forums was to define main problems, and suggest actionable steps for the Department, a clear understanding of how each organization was planning to execute forums was necessary. As such, a planning worksheet was developed providing details to the JRP Team as to the steps that organizations were taking to develop forums, as well as any coordinating efforts that would be needed on behalf of the Facilitation Team. Those coordinating efforts included, but were not limited to, basic logistical support, ordering food and materials, and ensuring participant recruitment.

A general discussion of ideas for each forum was reviewed in collaboration with the Facilitation Team to ensure that organizations maintained freedom of design and expression,

---

[251] *See* Facilitation Guide in Appendix F.

while also maintaining the integrity of the process. The simplified document was developed to give the Facilitation Team an idea of what outreach efforts would be needed, as well as to address tools, spokespersons, and other access issues necessary to ensure effective implementation.

All anchor organizations were asked to develop a program template, which included several basic elements for the forums. This template was reviewed by the Facilitator. At each event, the Facilitator provided a brief welcome, which was followed by an educational segment, breakout sessions, a large group share out, and closing remarks by the Facilitator.

Implementation

When forums commenced in October 2016, the JRP Team was present for every event. Over the course of three months, the Team attended meetings providing logistical support, taking observational notes, and completing a debrief of every event. Designed as a reflexive process, the forums were individually refined as overarching limitations and considerations became apparent.

By December 16, 2016, the Facilitation Team, in collaboration with over 20 different anchor organizations, completed the last of 28 forums executed throughout New York City. In collaboration with anchor organizations, the Facilitation Team successfully conducted forums in seven out of the nine top priority geographic neighborhoods, and four out of five mid-priority geographic neighborhoods. At the precinct-level, the forums were implemented in 10 out of 11 top priority precincts and four out of six mid-priority precincts.

**Figure 4**. Community Forum Map



Throughout the five boroughs, nine forums were held in Brooklyn, four in Queens, one in Staten Island, eight in Manhattan, and six in the Bronx. The Facilitation Team conducted a total of eight specialized community forums targeting specific demographic groups which included: youth, at-risk adults in drug treatment, African-American community, Latino community, Indo-Caribbean community, LGBTQ community, public housing residents, and the West African Islamic immigrant community. Of the total number of forums, nine were held in collaboration with CPR, under their "Our Communities, Our Solutions" banner. Additionally, nine forums

were conducted that included the participation of NYPD officers and executives (*see* Figures 5 and 6 for more detail).

**Figure 5**. Plaintiff Assisted Forums

| Date | Organization(s) | Special Interest |
|------|-----------------|------------------|
| 11/03/16 | Desis Rising Up and Moving | Indo-Caribbean Community |
| 11/09/16. | Malcolm X Grassroots Movement | African American Community |
| 11/14/16 | VOCAL-NY | At-Risk Community |
| 11/15/16 | Morris Justice Project | South Bronx Community |
| 11/17/16 | FUREE, NAACP LDF | Public Housing Community |
| 11/29/16 | Center for NuLeadership | Bedford-Stuyvesant Community |
| 12/06/16 | Make the Road NY, Rockaway Youth Task Force, Urban Youth Alliance, Brotherhood-Sister Sol | Youth Community |
| 11/21/16 | The Anti-Violence Project | LGBTQ Community |
| 11/22/16 | NMCIR, LatinoJustice | Latinx Community |

**Figure 6**. Police Participation

| Date | No. of Officers |
|------|-----------------|
| 10/13/16 | 15 |
| 10/15/16 | 7 |
| 10/17/16 | 7 |
| 11/18/16 | 7 |
| 11/23/16 | 7 |
| 11/26/16 | 9 |
| 11/28/16 | 10 |
| 11/30/16 | 10 |
| 12/2/16 | 7 |

**Summary of Relevant Themes**

After extensive review, our analysis of the community forum data sheets and the facilitators' reports highlighted several overarching themes. Community members shared ideas around appropriate encounters, accountability and oversight, transparency, training, community education, and so on.[252] These inputs have been distilled into five thematic areas. As a matter of policy, the themes below include suggestions from the narratives which should be helpful in guiding the Department toward constitutional practices and improved relations with the communities it serves.

---

[252] A compendium of these recommendations is included in the report appendices. *See* Appendix G – Suggested Areas for Reforms by Participants.

Community-Police Relations

While the NYPD has acknowledged that it had embarked upon a failed strategy in the application of its SQF and trespass enforcement policies, it has yet to put forth a solution that addresses the residual trauma that exists in impacted communities across the City. On numerous occasions, the Facilitation Team met with many individuals who had both been directly and indirectly impacted by these controversial enforcement policies. Whether the individuals themselves had personally experienced a stop encounter or not, what was evident was a general sense that community members felt victimized by an institution designed to protect them.[253]

Community forum participants overwhelming agreed that there is crisis in the relationship between NYPD and impacted communities. Citing examples of the trauma and distrust at the forefront of their discussions, impacted community members nonetheless supported the notion of an improved relationship between communities and police. That being said, participants felt that having too many officers who were unfamiliar with their neighborhoods and the people who live there, perpetuates the strained relations between those policed and those who do the policing. Participants suggested that a good way to bridge the gap between community and police, would be to require that officers are embedded within community life in positive ways. While some community members acknowledged their precincts' efforts at engagement, many groups felt the Department and its officers should make greater efforts not only to repair their damaged reputation with impacted communities, but to also practice more responsive policing through fostering partnerships in maintaining public safety.

---

[253] *See also generally* Bellin, *The Inverse Relationship Between the Constitutionality and Effectiveness of New York City "Stop and Frisk,"* 94 B.U. L. Rev. 1495.

Participants agreed that there was a need for both healing and education between the Department and civilians. While community members were open to the idea of a more positive relationship with police, they agreed that there needed to be an earnest gesture from the Department to acknowledge the trauma inflicted upon communities of color, and the provision of resources to begin to repair said trauma. Community members suggested mediation with officers, community meetings and know your rights events, investment in community programs and spaces, and opportunities for police-community problem solving and collaboration as potential ways to begin to repair the trust between both parties.

Community members agreed that outreach efforts, including via social media, newspapers, radio, and television are important for them to find meaningful ways to engage. Doing so would give the civilians a greater sense of awareness of not only the changes to the Department, but opportunities for involvement at the local level. Particularly in regard to public housing, residents felt that it was important for officers to have greater communication and rapport with tenants, and to provide opportunities for them to partner in the development of public safety in their neighborhoods.[254]

Protocols for Encounters

Community members also highlighted areas for reform that stem from the most critical element of the *Floyd* Litigation — the *Terry* stop, as well as other police-citizen encounters. An overarching theme of the forums was respect — a word cited very frequently throughout the JRP. For many community members in the forums, negative and/or abusive encounters with officers were paramount to the conversation on police reform. "Officers should stop being so

---

[254] Many public housing residents called for more hiring opportunities and decision making rights for tenants.

aggressive," "Officers should be respectful," and "It's all about the approach," were oft-repeated phrases over the course of the three months in which forums took place.

The expectation of a negative encounter has broad implications for the types of interactions that officers have with community members. Coupled with media coverage of police misconduct, civilians and officers alike are being subjected to both direct and vicarious trauma which has yet to be sufficiently addressed in the field of law enforcement. Negative transactions have parallel outcomes for officers who have become the subject of widespread media and public scrutiny. Such negative portrayals may contribute to a deep resentment and disillusionment with community members, creating an even greater rift between the two groups.[255]

Beyond training and documentation, community members stated that officers should, as a matter of practice, ensure a greater amount of respect and civility in their initial approach, and for the duration of the encounter. Officers should always clearly identify themselves and should ensure that community members understand the reason for the stop and implications for compliance.

Efforts at addressing police reform often highlight the significance of public perception that a police department's practices are fair and unbiased.[256] Research demonstrates that these principles lead to relationships in which the community trusts that officers are honest, unbiased, benevolent, and lawful.[257] Community members also made reference to the assembly of a community commission comprised of a core group of volunteers from diverse disciplines —law,

---

[255] This idea was inferenced from officer statements in the JRP Police Focus Groups.

[256] *See, e.g.*, Tyler, Tom R. "Enhancing Police Legitimacy." The Annals of the American Academy of Political and Social Science 593, no. 1 (2004): 84-99.

[257] *See* President's Task Force on 21st Century Policing. 2015. Final Report of the President's Task Force on 21st Century Policing. Washington, D.C.: Office of Community Oriented Policing Services.

faith leaders, mental health, and so on — that are able to discuss and shape the patterns and practices within the NYPD.

<u>Training and Evaluation</u>

Training emerged as a prominent theme in the community forums. Both community members and officers who participated in the forums stressed the need for improvements to officer training. Many of the training ideas centered on a recurring theme of cultural competence.[258] Sub-themes included cultural sensitivity, customer service, communication, de-escalation, and implicit bias. In the scope of training, community members called for efforts centered on restorative justice and trauma-informed trainings.

Furthermore, many of the community-based organizations involved in the community forums emphasized a desire to be involved in the development and evaluation of training, particularly for special populations.[259] Community organizations stated that members should be engaged in NYPD's assessment of the needs and best practices of impacted communities, as well as the coordination of reports and statistical analyses on policing disparities in affected neighborhoods. Several other suggestions for evaluation included the development of early warning systems, effective feedback loops between New York City agencies, and needs assessments for officer placement within communities of color.

---

[258] "Cultural competence" is loosely defined as the ability to understand and interact with cultures and belief systems that are different from our own. Extensive information on cultural competence exists in the social psychology literature.

[259] The specialized populations in this example included members of LGBTQ, Immigrant, and at-risk communities.

Oversight and Accountability

Throughout the forums, accountability was a frequently cited area for reform. Community members called for meaningful and timely consequences for abusive policing practices, often highlighting the public perception of an obscure, flawed, and arbitrary disciplinary system. Attendees at the forums suggested that the implementation of stricter discipline for officers with repeated violations and greater accountability for the Department overall in addressing rights violations were critical elements of meaningful police reform. Community members also promoted the use of oversight procedures such as body-worn cameras, community oversight boards, and more stringent oversight of anti-crime detective units, as supplements to implementation of departmental change.

Transparency

Last, but certainly one of the most significant suggestions for reform in the forums, was the assurance of NYPD transparency. Throughout New York City, there was a general consensus among participants that the Department should take measures to provide the public with access to NYPD data on stop reports, as well as officer complaints for community oversight and information.

**SECTION VI: JOINT PROCESS REFORM RECOMMENDATIONS**

The Monitorship and Joint Remedial Process came about as the result of decades-long policing policies that resulted in wide scale violations of constitutional rights. Some of the repeated themes raised during the JRP included overaggressive policing, a perceived lack of accountability for misconduct at the NYPD, mistrust between communities and the Department, lack of respect by police officers, the need to build police-community trust, and the need for enhanced community engagement, training, accountability, and transparency.

The Facilitator sees the overarching mission of the Joint Remedial Process as both reporting the many reform proposals that the Facilitation Team heard during our engagement as well as making findings and recommendations for Court-ordered reforms. The Facilitator was charged with working with the parties and other stakeholders to develop, through the Joint Remedial Process, a more thorough set of reforms — the Joint Process Reforms — to supplement, as necessary, the Immediate Reforms. The Joint Process Reforms must be no broader than necessary to bring the NYPD's use of stop and frisk into compliance.

The Facilitator had previously reported the following set of reform recommendations as potential Joint Process Reforms to be agreed upon by the parties. The parties were unable to agree on any Joint Process Reforms, and, as such, the Facilitator now submits the following findings and reform recommendations so that the Court may consider them for additional reform orders. This is a summary of our recommendations for further Court-ordered reforms. We take no position with respect to the process by which the Court decides which of these proposed reforms it will order.

218

It is the understanding of the Facilitation Team that without meaningful accountability and transparency reforms, any attempts at restoring good police-community relations in the most affected communities will be ineffectual. While we credit the efforts of the NYPD, Commissioner O'Neill, and the new Neighborhood Policing program to rebuild relationship and foster community-oriented policing, we must emphasize the critical importance of accountability and transparency reforms which will simultaneously support the Department's mission toward improved police legitimacy, while at the same time being responsive to the concerns of affected civilians. To stress the importance of reforms relating to transparency and accountability we list them first.

## Transparency and Accountability

**1.    Creation of Permanent Structures for Feedback Regarding Officer Conduct – Feedback Loops**

Although the NYPD clearly has begun to change its policies, it is important that the Court order that the Department develop a program for systematically receiving, assessing, and acting on information regarding adverse findings on the conduct of police officers involving illegal stops or illegal trespass enforcements. This information includes: (a) declinations of prosecutions by the District Attorneys in New York City; (b) suppression decisions by courts precluding evidence as a result of unlawful stops and searches; (c) court findings of incredible testimony by police officers; (d) denials of indemnification and/or representation of police officers by the New York City Law Department; and (e) judgments and settlements against police officers in civil cases where, in the opinion of the New York City Law Department, there exists evidence of police malfeasance. The NYPD should develop a formal process to systematically collect such information, and to consider this information, along with substantiated CCRB civilian

complaints, in evaluations of officers, transfer requests, disciplinary processes, and in discretionary promotional decisions.

We note that the NYPD Office of the Inspector General ("OIG") conducted a comprehensive review of data from litigation proceedings, and published its findings in its Annual Report of 2015. In support of the notion of accessing and utilizing information from litigations for the monitoring and improvement of police conduct, the OIG's office stated, as follows:

> The proper collection and analysis of police litigation data has the potential to reduce police misconduct, improve public safety, control costs, identify training opportunities, strengthen public confidence, and advance law enforcement oversight.[260]

The NYPD responded to the Facilitator's Ideas for Discussion regarding the feedback loop. In its response, it asserted with respect to declinations of prosecutions by the District Attorneys' offices in New York City the following:

> There is a system in place for tracking and reviewing declinations of prosecution (DPs) from prosecutors. The Criminal Justice Bureau of the NYPD has five court sections (one in each Borough) which are responsible for collecting the DPs and entering them into the Online Prisoner Arraignment Database ("ZOLPA"). The DP's are classified by category related to the reason why the case was declined. That data is compiled into a report in order to make the data available for future analysis. This data can be sorted by category of DP, or police officer, in order to observe trends and determine whether additional training is needed. In addition, the DP's themselves are ultimately sent to the arresting officer's commanding officer for review and determination whether further action including training is required.

---

[260] *See* New York City Department of Investigation, The Office of the Inspector General for the NYPD (OIG-NYPD), *Using Data from Lawsuits and Legal Claims Involving the NYPD to Improve Policing* (April 2015).

It is recommended that this process for the review of declinations be more robustly structured in a more integrated, systematic manner. The current process as outlined in the quotation above ostensibly creates a "report in order to make the data available for future analysis." There is no specification within this current protocol with regard to whether and how data will be analyzed and what if any corrective actions will be taken. In addition, the NYPD's stated process references a transmittal of declinations to commanding officers for review. It is recommended that a more structured and well-articulated policy be developed for this internal review by commanding officers and immediate supervisors It is further recommended that the policy be expanded to allow for wider analyses of the data to ascertain any patterns of misconduct within units, squads, platoons, commands, and Patrol Boroughs. A higher level of accountability is equally as important, therefore the policy should include accountability measures for commanding officers and immediate supervisors based on the level of misconduct occurring under their supervision.

In order to ensure that declinations of prosecutions are more fully captured and analyzed, it is also recommended that they be formally integrated into the Risk Analytics and Information Liability System ("RAILS") network. This will allow declinations to be reviewed systematically and analyzed by supervisors and officers as a matter of course, fostering greater accountability.

Similarly, the NYPD should create a more discernible and concrete system, in conjunction with the various New York City District Attorneys and the New York City Law Department, to address adverse credibility findings by courts with respect to officer testimony. The NYPD should collaborate with these agencies to create a working group that will develop protocols by which adverse credibility findings are reported to the NYPD. The NYPD should

then set forth a written policy for the evaluation of these reports and any necessary remedial measures including reassignment, retraining, or referral for discipline and investigation.

A written policy with specific protocols also should be developed for the entry into the RAILS network of adverse civil litigation results in section 1983 and tort actions arising from unconstitutional stops and trespass enforcements. A denial of indemnification by the New York City Law Department after consultation with the NYPD is an event that should be entered into RAILS absent extraordinary circumstances. Similarly, a careful analysis should be done with respect to any adverse verdicts or settlements to ensure that a police officer who is engaging in malfeasance or serial misconduct during stops and trespass enforcements is being adequately monitored and supervised. After such an analysis, adverse verdicts or settlements should be considered for entry into the RAILS network.

Finally, we note that the value of this approach may be, as recommended by the Monitor, to identify patterns and practices within commands, precincts, squads, and individual units.

## 2.    <u>Monthly NYPD Discipline Report</u>

It is recommended that the Court order the NYPD to prepare and publish a monthly report — without disclosing personal identifying information — chronicling findings of misconduct and the resultant disciplinary outcomes as they relate to unlawful stops and trespass arrests. This monthly report should include all unlawful stop and trespass arrest incidents that are reported as substantiated by the Civilian Complaint Review Board and referred to the NYPD Department Advocate's Office for disciplinary action. These monthly reports should be disaggregated by geographic and precinct locations, and collated into an Annual Report.

This report should be modeled after the Standard Operating Procedure Annual Report that is created by the NYPD and documents all officer-involved shooting incidents. While these monthly reports should not disclose an officer's identity, they should accurately chronicle the particulars of the incident and the actual discipline that was imposed upon an officer.

This recommendation is consistent with the NYPD's recent decision to publish anonymized summaries of allegations against officers and the disciplinary actions taken in response by the Department. The NYPD's decision to publish this information is consistent with the need for greater transparency and accountability stressed in this Report. The NYPD's effort has received stiff opposition from the Patrolmen's Benevolent Association, which, citing Public Law 50-a, has sued to enjoin the publication of this data and has obtained a temporary restraining order.[261]

### 3.    Disciplinary Recommendations

During the course of the Joint Remedial Process, members of affected communities expressed distrust of both police officers and the NYPD itself. Distrust of the NYPD as an institution is in large part due to the perception that the Department fails to hold officers accountable for misconduct.

These problems must be addressed. Academics, policing experts, and police departments generally agree that a mutual, trusting relationship between the police and community members is critical to effective policing. Likewise, it is recognized that institutional legitimacy encourages compliance with the law and furthers positive community-police interaction, whereas lack of

---

[261] *See* Stephen Rex Brown, "PBA Wins Court Order to Block NYPD from Releasing Police Disciplinary Records," Daily News, Apr. 18, 2018, *available at* http://www.nydailynews.com/new-york/pba-temporarily-block-nypdreleasing-disciplinary-records-article-1.3928178

trust can lead to police-citizen encounters steeped with tension, resulting in ill-advised conduct by both police and citizens during these encounters.

The NYPD should increase transparency around police disciplinary processes while ensuring that those processes are fair. We therefore recommend that the NYPD be ordered to develop and publish progressive disciplinary standards to be used in cases arising from unconstitutional stops and trespass enforcement regarding excessive force, abuse of authority, discourtesy or offensive language, and racial profiling allegations. The development of such standards is consistent with national trends in policing, such as the adoption of the Chicago Police Department Disciplinary Guidelines.[262] A fair disciplinary process is a process "that help[s] address police misconduct while supporting officers who have exercised their discretion appropriately and within the framework of law and policy."[263] While we recognize the Department's tremendous effort to make reforms, provide greater due process for officers, and to rebuild its fractured relationship with impacted communities, we believe it important that the Department develop greater structure and formalization around its discipline process.

Although such a large Department should not be run by exceedingly strict protocols which cast aside the particular facts of a case and the history of an officer's public service, it has become increasingly evident that the Department should consider making revisions to its current discipline paradigm that ensure that disciplinary processes are fair and timely. While the Facilitation Team does not feel it appropriate to dictate the structure or format of such a disciplinary system, we feel it is of critical importance that "a good disciplinary system make

---

[262] Given the administrative law judge's ruling on behalf of the Fraternal Order of Police opposing the disciplinary guidelines in Chicago, we recognize that there are potential issues with collective bargaining. *See* http://www.chicagotribune.com/news/local/breaking/ct-met-chicago-police-discipline-fop-20171114-story.html

[263] Stephens, *Police Discipline: A Case for Change*, at 2.

decisions and impose discipline, where appropriate, in a timely manner," as noted in the Monitor's Seventh Report. These standard disciplinary recommendations should be developed and published to increase public understanding of how officers are disciplined and to ensure external accountability.

### 4. Body-Worn Cameras

The NYPD has, to its great credit, gone well beyond the requirement of the Body-Worn Camera ("BWC") pilot program mandated by the Remedies Opinion by committing to the issuance of BWCs to all patrol officers by the end of 2019. This is a highly commendable initiative by the NYPD and places it at the forefront of national efforts to improve police-community relations.

By implementing this policy, the Department has shown that it takes seriously the need to document and record police-citizen encounters in order to ensure public safety, officer safety, transparency, and accountability, quite apart from the apparent utility of these cameras for law enforcement.

Under the Remedies Opinion, the future of body-worn cameras is a matter to be determined after the one-year pilot has concluded. However, as the NYPD has already committed to the issuance of BWCs to all patrol officers, the question is not whether BWCs will be used in the future but what policies the NYPD will adopt with respect to their use. Because the pilot has not yet concluded, we recommend that there be significant community input into that final design, particularly from organizations and individuals with significant insight and knowledge into such programs, as well as input from police officers who have had significant street-level experience with the use of such cameras.

While it may be premature to comment on the final design of the BWC program before the pilot is concluded, several areas of concern have been raised by stakeholders, including with respect to video access and internal video review. For purposes of this Report, however, we highlight one area for consideration. Under the Draft Operations Order governing the pilot (Draft 16 issued March 22, 2017), officers must activate their BWCs in certain situations, including prior to service calls and "interactions with persons suspected of criminal activity," a reference to *De Bour* Level 2 encounters based on a founded suspicion of criminal activity. But officers are not required to activate BWCs prior to *De Bour* Level 1 encounters — that is, where an officer requests information based on an "objective credible reason . . . which is not necessarily indicative of criminality."[264]

We recommend that that the Court order that the NYPD require its officers to activate BWCs at the inception of Level 1 encounters with civilians. There are several reasons for this.

First, and foremost, our community engagement has shown that civilians overwhelmingly feel that they are not free to leave even during a Level 1 encounter; and we heard repeatedly that many investigative encounters quickly escalate into full blown *Terry* stops. Consequently, it would likely be beneficial for both the NYPD and civilians to have Level 1 encounters recorded by BWCs in order to understand when and how these encounters are actually occurring and in order to maximize compliance with the Immediate Reforms. Furthermore, recording Level 1 encounters will likely serve as a comfort to citizens fearful of interactions with the police, even

---

[264] While the Draft Operations Order does not mandate that officers record Level 1 encounters, the Monitor noted in his April 11, 2017 Memorandum on the Approval of Body-Worn Camera Policies, that some Level 1 encounters will nevertheless be recorded because activation is required during interior patrols of NYCHA and TAP buildings and when responding to radio calls.

at what is deemed to be Level 1, while at the same time increasing the overall transparency of police-citizen encounters, and, potentially, providing a basis for training and accountability.

Second, activating at the initiation of Level 1 encounters would better align the NYPD's practices with the model policies of the International Association of Chiefs of Police ("IACP"), the Police Executive Research Forum ("PERF"), and the American Civil Liberties Union ("ACLU"). While none of these policies reference *De Bour*'s taxonomy, it is clear that many, if not all, Level 1 encounters would be recorded under each: The IACP policy mandates that officers "activate the BWC to record all contacts with citizens in the performance of official duties;" and PERF recommends that officers activate BWCs during "all law enforcement-related encounters." The ACLU states that "an officer [should be required] to activate his or her camera when responding to a call for service *or at the initiation of any other law enforcement or investigative encounter between a police officer and a member of the public.*"

While the NYPD considered each of the above policies when developing the pilot,[265] it ultimately declined to mandate activation of BWCs during Level 1 encounters, leaving it to officer discretion as to when to record at Level 1.[266] Specifically, the NYPD reasoned that because some Level 1 encounters — such as rendering aid to sick a person — may not have an investigative or law enforcement purpose, officers should not be required to record at Level 1. To support this conclusion the NYPD cited, among other things, the NYCLU's concern that the policy should "limit recording to interactions with the public that have an investigative or law

---

[265] *See* New York City Department of Investigation, The Office of the Inspector General for the NYPD (OIG-NYPD), *Body-Worn Cameras in NYC: An Assessment of NYPD's Pilot Program and Recommendations to Promote Accountability* (July 2015).

[266] *See* NYPD Response to Public and officer Input on the Department's Proposed Body-Worn Camera Policy (April 2017).

enforcement purpose" because "community members need to be able to trust that they can speak with officers privately and not have every casual interaction or mere observation by officers be recorded."

We agree that witnesses and crime victims must be protected and feel comfortable in their interaction with the police. Unfortunately, based on the concerns expressed during our community engagement, in the current atmosphere many victims and witnesses already distrust the police to the extent that they are unwilling or reluctant to come forward with information even in the absence of any cameras. Given this legacy, the decision to make the recording of Level 1 encounters discretionary just because some Level 1 encounters will involve a public service function rather than a law enforcement or investigatory purpose cannot be justified. Indeed, if the goal is to restore trust, the NYPD is better served by requiring activation at Level 1, while empowering officers to exercise discretion to turn off the camera when they are recording witnesses, victims, or have other concerns.

Finally, a review of the policies of police departments across the country suggests that many require activation at the equivalent of Level 1 and/or have policies that are more in line with the model policies of IACP, PERF, or the ACLU than is the NYPD policy. One researcher, examining the available policies of the 100 largest cities in the U.S. as of December 2015, found that:

> Recording consensual encounters[267] is an important step toward illuminating a controversial and opaque domain. Given the unregulated and controversial nature of consensual encounters, perhaps what is more remarkable is that nearly half of the

---

[267] Law enforcement or investigative encounters that do not qualify as a stop are sometimes referred to as consensual encounters; consensual because the civilian, having not been detained, is free to leave.

departments with policies coded mandate the recording of consensual encounters. Well over half either provide for discretionary or mandatory recording of such encounters. While a good step forward, wider-spread mandating that consensual encounters be recorded would better serve the goals of increasing trust and transparency that are oft-stated in body camera policies.[268]

Our review of more recent policies indicates that this trend has continued.[269] In Philadelphia, where stop and frisk practices, including racial disparities in the application of those policies, has been litigated, the BWC policy states that "Authorized Body-Worn Cameras will be activated prior to responding to all calls for service and during all law enforcement related encounters and activities involving the general public."[270] In Washington, D.C., activation is required at the initiation of a service call, and in connection with certain listed activities, including "all contacts initiated pursuant to a law enforcement investigation, whether criminal or civil."[271] In Chicago, another city where stop and frisk practices, including racial

---

[268] Mary D. Fan, *Justice Visualized: Courts and the Body Camera Revolution*, 50 U.C. Davis L. Rev. 897, 933-34 (2017); *see also* Mary D. Fan, *Privacy, Public Disclosure, Police Body Cameras: Policy Splits*, 68 Ala. L. Rev. 395, 444, n.220 (2016) (citing Charlotte-Mecklenburg Police Dep't, Directive 400-006 (Apr. 29, 2015) ("While on duty, BWCs shall be turned on and activated to record responses to calls for service and interactions with citizens."); Phila. Police Dep't, Directive 4.21 § 4 (Apr. 20, 2015) ("Body-Worn Cameras shall be activated when responding to all calls for service and during all law enforcement related encounters and activities involving the general public."); Phx. Police Dep't, Operations Order 4.49, at 2 (Apr. 2013) ("The VIEVU PVR-LE2 camera must be activated during all investigative or enforcement contacts.")).

[269] *See, e.g., Spokane Police Dep't, Policy Manual* § 703.4(D)(1)(a) ("Officers shall activate the body camera upon encountering any situation that could be construed as a law enforcement activity. Law enforcement activity may include traffic stops, arrests, searches, interrogations, pursuits and community caretaking functions. For self-initiated law enforcement activity, the officer should activate the camera upon making the decision to contact a citizen for any purpose related to law enforcement activity."), *available at* https://static.spokanecity.org/documents/police/accountability/bodycamera/spd-body-camera-policy.pdf

[270] Phila. Police Dep't, Directive 4.21 § 4.A (1/27/17), *available at* https://www.phillypolice.com/assets/directives/D4.21-BodyWornCameras.pdf

[271] D.C. Metro. Police Dep't, Gen. Order SPT-302.13 § V.A.4.b (3/11/16) (stating that "Members are not required to record non-investigatory contacts (*e.g.*, business checks)"), *available at* https://www.bwcscorecard.org/static/policies/2016-03-11%20Washington%20DC%20-%20BWC%20Policy.pdf

disparities in the application of those policies, has been litigated; activation is required for all law-enforcement-related encounters.[272]

We recognize that one could quibble with whether each of the policies studied by Fan and described above are broad enough to include *all* Level 1 encounters. At a minimum, however, most would include Level 1 encounters that serve a law enforcement purpose, and thus the NYPD's decision to exclude even those Level 1 encounters is inconsistent with these policies. That decision is also inconsistent with the findings in the Liability Opinion, the heightened need for transparency and accountability, and the acute importance of repairing the relationship between the police and the communities that bore the brunt of the NYPD's past unconstitutional practices.[273]

### 5.    Recording Level 1 and Level 2 Encounters

A constant message from the focus groups and community forums was that people in affected communities generally did not feel free to leave a police encounter, even if it was their right to leave. To a civilian in these communities and probably to any average resident of New York City, it does not matter whether an officer believes he is conducting a Level 1 or Level 2 encounter or a Level 3 stop under the *De Bour* paradigm. They feel apprehensive at all levels.

---

[272] *See* Chi. Police Dep't, Special Order S03-14 § II.A (6/9/17), *available at* https://www.bwcscorecard.org/static/policies/2017-06-09%20Chicago%20BWC%20Policy.pdf

[273] *See, e.g.*, D.C. Mun. Regs. tit. 24, § 3900.2 (2016) ("The intent of the BWC is to promote accountability and transparency, foster improved police-community relations, and ensure the safety of both MPD members ... and the public."); Phila. Police Dep't, Directive 4.21, § 1.A.2 (4/20/15) ("Cameras provide additional documentation of police/public encounters and may be an important tool for collecting evidence and maintaining public trust."); S.F. Police Dep't, Department General Order 10.11, at 1 (June 1, 2016) ("The use of Body Worn Cameras (BWC) is an effective tool a law enforcement agency can use to demonstrate its commitment to transparency, ensure the accountability of its members, increase the public's trust in officers, and protect its members from unjustified complaints of misconduct.").

230

These impacted community members consistently expressed a need to quantify these encounters so that appropriate monitoring and supervision of them can occur.

The Facilitation Team does not want to prevent police officers from legitimately engaging civilians in the course of law enforcement by placing upon them the overwhelmingly burdensome task of documenting Level 1 or 2 encounters in the same manner as they are required to document Level 3 stops. Similarly, we do not want to recommend a policy that would interfere with a police officer's ability to assess and respond to an emergency.

Over the course of the Monitorship and the Joint Remedial Process, however, we recognized that technology has evolved to the point where the recording of Level 1 or Level 2 encounters may not be very difficult or time consuming. All patrol officers now have iPhones and all patrol cars are equipped with iPads; and officers are now required to enter their Level 3 stop reports on these devices.

It is recommended, therefore, that the Court order that an application be developed for installation into these communication devices that would allow a police officer to click and enter the approximate age, gender, race, and ethnicity of any person they approach at either Level 1 or Level 2 and then click if the encounter escalates to a Level 3. The location services in these devices can record the time and location of the encounter and there would be no additional paperwork or electronic entries required unless there is a full blown stop in which case a stop report is already mandated.

We believe that the simple expedient of recording basic data about all encounters by a few clicks on a device would be highly beneficial. To the extent that there is a perception that this requirement would be overly-burdensome for officers trying to canvas for witnesses at a

crime scene, we disagree. The entry of these data points on a pre-programed application could be accomplished in a matter of seconds, either at the time or closely following an investigation of a crime scene. This type of record would help the public, the NYPD, and the Monitor gain a better grasp of the extent and nature of actual police encounters. This information, as with the stop data the NYPD already publishes, should be made publicly available. This data should be published quarterly and annually, disaggregated by demographic and geographic and precinct/command information. It would allow both the NYPD and the public to observe and study trends in policing and enhance transparency and accountability around the current state of SQF policy. There would be actual numbers to consider and analyze.

Under the U.S. Constitution, only *Terry* stops receive scrutiny, and what are known as "consensual encounters" — that is, "the initiation of an encounter by an officer, typically in situations where there is either no articulable basis yet for reasonable suspicion or it is unclear if there is a sufficient basis" — are "unregulated."[274] But in New York, under *De Bour*, Level 1 and Level 2 encounters are supposed to be "regulated." We do not see a basis, at a time where data collection and analysis is the norm in public institutions and private companies alike, for not tracking regulated police-citizen encounters. After all, these are encounters which, if done improperly, are unlawful and have the potential to stymie the restoration of police-community trust and/or create deeper distrust.

Even without a description of why a citizen has been approached, or the nature of the encounter, the number of police-citizen encounters and documentation of who is being engaged by the police is directly relevant to the issues in these lawsuits. In the Liability Opinion, the

---

[274] Fan, *Justice Visualized: Courts and the Body Camera Revolution*, 50 U.C. Davis L. Rev. at 933.

Court found that the plaintiffs had shown both that "the City, through the NYPD, ha[d] a *policy* of indirect racial profiling based on local criminal suspect data" and that "senior officials in the City and at the NYPD have been *deliberately indifferent* to the intentionally discriminatory application of stop and frisk at the managerial and officer levels." 959 F. Supp. 2d at 600. Collecting data on the subjects of Level 1 and Level 2 encounters is essential to understanding, after controlling for crime and other social factors, the extent to which police are initiating encounters on the basis of race. Outside of New York, "[b]ecause the selection of persons for consensual encounters is unregulated[;] the risk of targeting due to hunches based on a person's race, gender, age and socioeconomic background is heightened."[275] In New York, while Level 1 and Level 2 encounters are supposed to be regulated, it is unclear how responsible regulation can occur in practice if data on these police-citizen encounters is not collected. The JRP indicates that despite a reported decrease in the number of Level 3 stops there continues to be a perception of targeting based on race; it is therefore vital to take all necessary steps to determine why this is so.

In its white paper, the Legal Aid Society explains that "Requiring documentation and supervisory review (as in Level 3 stops) will create a record of stops that can be analyzed for patterns and discrepancies." Unlike with Level 3 stops, there is no record of how many Level 1 and Level 2 encounters occur and who the police are choosing to engage. This must be changed

---

[275] Fan, *Justice Visualized: Courts and the Body Camera Revolution*, 50 U.C. Davis L. Rev. at 933 (citing Margaret Raymond, *The Right to Refuse and the Obligation to Comply: Challenging the Gamesmanship Model of Criminal Procedure*, 54 Buff. L. Rev. 1483, 1486 (2007) ("Police are free to initiate a consensual encounter with an individual for any reason or no reason, perhaps based on a whim or a "hunch" that cannot be supported by specific and articulable facts."); Daniel J. Steinbock, *The Wrong Line Between Freedom and Restraint: The Unreality, Obscurity, and Incivility of the Fourth Amendment Consensual Encounter Doctrine*, 38 San Diego L. Rev. 507, 509 (2001) ("Requiring no objective indication of criminality, a consensual encounter can be initiated for no reason or for any reason at all, including the kind of inchoate hunches and suspicions disallowed even for stops, the least intrusive form of seizure.")).

given that the practice likely occurs regularly and unquestionably affects the same communities with which the NYPD has committed to rebuild trust.

    As recognized by the Court, even where the police are required to record stops, that does not mean "that officers . . . prepare a UF-250 for every stop they make." Liability Opinion, 959 F. Supp. 2d at 559. Indeed, as stated by the Monitor in his Seventh Report dated December 13, 2017, "there continues to be an issue of underreporting [Level 3 stops]. Some officers making stops do not file the required stop forms documenting them . . . ." While officers may also underreport Level 1 and Level 2 encounters, requiring reporting on each will provide a more complete picture of police conduct in impacted communities. Significantly, recording Level 1 and Level 2 encounters may act as a bulwark against underreporting of Level 3 stops and will likely help the NYPD and outside groups understand whether there is underreporting. The information also is relevant to officer training, as well as supervision. In sum, as argued by the Legal Aid Society in its white paper: "Although total stops are down, officers may be incentivized to improperly categorize their reasons for the stop in order to justify unconstitutional interactions. Officers may also be genuinely confused about the lawfulness of their interactions. Greater documentation will help clarify this confusion while also increasing accountability."

    We recognize that insofar as the justification for the Level 1 or Level 2 interaction will not be recorded by narrative description, this proposal may have less than optimal utility for conducting a Fourth Amendment analysis of these encounters. But, for the reasons already stated, we believe that requiring a narrative description would be overly burdensome and that recording these encounters in the way here recommended is highly beneficial. Furthermore, under the proposed paradigm, officers will indicate electronically that they have initiated a Level

234

1 or Level 2 encounter, and, if that encounter escalates into a Level 3 stop, there will then also be a record of how many Level 1 or Level 2 encounters so escalate. Because a stop form will be completed at Level 3, there also will be a record of why the officer initially believed there was, for example, a "founded suspicion" of criminality sufficient to approach, but not to detain, and the circumstances under which this founded suspicion became reasonable suspicion.

This information is crucial for a number of purposes. As noted in the context of BWCs, the Monitor has recognized that there is a need to better understand whether officers are confusing Level 1 and Level 2 encounters with Level 3 stops. The Monitor recommended activation of BWCs prior to Level 3 stops in part because it would "allow the NYPD and the monitor to evaluate whether officers are confusing Level 2 encounters with Level 3 stops. Officers may believe that an encounter did not rise to the level of a *Terry* stop when it actually did (that is, when a reasonable person would conclude that he or she had been detained and was not free to go). In that situation, an officer would not have submitted a stop report, under the mistaken belief that the interaction was a Level 2 encounter and not a *Terry* stop."[276] Just as activating BWCs at Level 2 is useful for this purpose, so too is creating a database of Level 1 and Level 2 encounters and reviewing narrative descriptions of Level 3 stops that began at Level 1 or Level 2 in determining whether officers are confusing the *De Bour* levels and/or improperly escalating Level 1 and Level 2 encounters into *Terry* stops. Finally, quantifying the number of Level 1 and Level 2 encounters is necessary to determine whether changes in policy might be necessary to repair distrust between citizens and the police. As recounted elsewhere in this Final Report, there is little dispute that rebuilding trust is necessary. In the context of this

---

[276] Monitor's Memorandum on Approval of Body-Worn Camera Policies (April 11, 2017), at 6-7.

recommendation, we highlight that lack of trust can lead to officer or citizen conduct that results in unnecessary escalation of investigatory encounters into *Terry* stops.

### 6.      Accessing Stop Reports

It is recommended that the Court order the NYPD to create a protocol to expedite the provision of stop reports upon request. Under the current system, as understood by the Facilitation Team, an individual seeking access to their stop report would have to file a FOIL request. While it is completely understandable that the NYPD should carefully review requests for stop reports in the interest of protecting crime victims and its policing strategies, a common complaint that was heard during the JRP is that requesting a stop report through FOIL takes an inordinately long amount of time. It is our understanding that the NYPD is currently engaged within the Immediate Reform Process in developing a protocol for citizens to more easily access their stop reports and body-worn camera footage.

### 7.      Community Engagement

To ensure continued input from affected communities on the impact of Court-ordered reforms and current NYPD policies and practices, it is recommended that (1) the Court order that the NYPD establish a mechanism for regular meetings with those organizations and individuals with whom there has not been such formal and frequent engagement in the past, including youth, special populations such as the LGBTQ community, and critical reform voices; and (2) the Court order the establishment of a "Community Collaborative Board" to provide feedback from affected communities on the Court-ordered reforms as they are being implemented and to make recommendations to the Court and the Monitor during the course of the Monitorship. After summarizing the Department's history of community outreach, as well as the alternative models

236

for community outreach and oversight used outside of New York, we address both of these recommendations below.

Historically, the Department has attempted to engage community members through its Office of Community Affairs. Its efforts have not succeeded, however, in engaging the community members most severely impacted by SQF policies or those who are critical of the Department. It is commendable that the Department has shifted toward more effective community engagement through its Neighborhood Policing Program. In addition, during the Joint Remedial Process, the Department has fostered *ad hoc* contacts between police executives, up to and including the Commissioner, and community groups and leaders from mainly affected communities. These contacts, however positive, have not resulted in the sort of sustained community engagement and input necessary to develop greater trust and confidence in the NYPD on the part of affected communities.

One longstanding effort by the NYPD toward community trust building is the Community Council program managed through the Office of Community Affairs. For instance, there were 86 Community Councils in 2014 according to the NYPD Community Council Guidelines published that year. The Facilitator attended several Community Council meetings in Brooklyn and Staten Island. Although the Facilitator's experience in attending these meetings may not be representative of all Council meetings throughout the City, the NYPD has not contradicted the assessment by the Facilitation Team that Community Council meetings are mainly attended by community residents who, as a general matter, support the Department's policies and tend not to question or criticize those policies.

The Commanding Officers at these meetings were experienced and highly professional police executives who were well liked by the community members in attendance. They had established a rapport with community members and offered ready answers to their questions and concerns. Nonetheless, the issues raised and discussed during these meetings chiefly concerned local policing and safety issues, such as traffic problems, nuisance complaints, and upcoming community events. There was no discussion of the SQF practices of the Department or any other controversial police issues at the Community Council meetings attended by the Facilitator.

A more recent community engagement initiative by NYPD is Build the Block, an extension of the Neighborhood Policing Program. The new Neighborhood Policing Program is a targeted engagement of Neighborhood Coordination Officers (NCOs) within communities participating in the program. The NCOs work daily in specific neighborhoods instead of being deployed to different locations throughout the city. NCOs are responsible for hosting Build the Block safety meetings within their identified neighborhoods. Although commendable, it is too early to assess the efficacy of this initiative.

Community Council meetings, as well as other Office of Community Affairs programs such as forums and street fairs, while well intentioned, planned, and executed, did not address matters such as unconstitutional policing. Absent specific outreach effort by the Department or to community leaders and groups that were critical of NYPD, these programs and meetings are not likely to create the environment for meaningful, structured, and prolonged dialogue between the communities most adversely affected by unconstitutional policing and the NYPD.

During the Joint Remedial Process, community participants recommended different mechanisms for the solicitation of community input into needed reforms and community-based

oversight of the NYPD. As previously discussed in this Report and reflected in the community outreach efforts of other cities like Cincinnati, New Orleans, and Seattle, there is no standard approach.  The community engagement models of these cities are summarized below.

In Cincinnati, the Community-Police Partnering Center at the Urban League of Greater Southwestern Ohio partnered with the police department to discuss problematic policing practices and to review uses of force. The group did not meet regularly, and it did not review department policies or make formal recommendations. Afterwards, the City Manager's Advisory Group (MAG) assumed responsibility for advising the city and police department informally on general police issues of concern to the community. The city manager appoints its members and chairs the advisory group, which meets about three times each year, but does not prepare reports or recommendations.[277]

In New Orleans, the Police-Community Advisory Board ("PCAB") in each of the NOPD's eight districts hold quarterly community meetings, but, do not have decision-making authority over NOPD finances, policies, or practices. Rather, they vet community suggestions, works with NOPD to understand its operations, processes, and challenges, and build consensus on priority items important to the community before submitting recommendations to NOPD for consideration.[278]

Recently, cities under consent decrees have favored greater civil oversight. In Newark, the Newark Police Department was ordered to "[f]und and maintain a civilian a civilian oversight entity for NPD." The goal of the Newark oversight board was to address the "needs and concerns

---

[277] *See* Betsy Graef, *The Seattle Community Police Commission: Lessons Learned and Considerations for Effective Community Involvement*, 14 Seattle J. for Soc. Just. at 43-44.

[278] *See* New Orleans Police Department Police Community Advisory Board (PCAB) (8/9/2016), at 3.

of Newark's residents and increase confidence in the NPD."[279]  After, Newark established a Civil Complaint Review Board with responsibilities including "reviewing internal investigations, monitoring trends in complaints, and reviewing and recommending changes to NPD's policies or procedures."[280]

In Baltimore, a consent decree mandated the creation of a Community Oversight Task Force with adequate funding and with members appointed by the mayor.  Its task is considering whether to restructure Baltimore's current Civilian Review Board (CRB), including whether the CRB should be independent of the police department, whether it should have the authority to recommend discipline, and ensuring that there is sufficient access to relevant information by community members.[281]

One option considered by the Facilitation Team is a commission consisting of appointed community members and police representatives in the mold of Seattle's CPC. Established by consent decree with the Department of Justice, the CPC has, as of 2017, become permanent. The CPC is "mandated to . . . provide ongoing, community-based oversight of SPD and the police accountability system." It is responsible for tracking the adoption of police reform recommendations and reviewing reports issued by the Seattle's monitor.  CPC also holds public meetings, makes biannual progress reports and annual reports to Seattle city officials and community members regarding the "implementation status of these recommendations and the

---

[279] *United States v. City of Newark*, No. 16-1731 (Consent Decree ¶ 13).

[280] Independent Monitor – Fourth Quarterly Report, May 4, 2018, *available at* https://www.newarkpdmonitor.com/wp-content/uploads/2018/05/4QR-FINAL-with-appendices.pdf

[281] *See United States v. Police Department of Baltimore City*, No. 17 Civ. 00099 (Consent Decree ¶ 10).  Additional examples of community entity models are provided in Graef's *The Seattle Community Police Commission: Lessons Learned and Considerations for Effective Community Involvement*, 14 Seattle J. for Soc. Just. 1.

overall performance of SPD and the police accountability system."[282] Unlike New York's CCRB, the CPC does not investigate police misconduct complaints.

While the CPC has been recognized as an important component of Seattle's police reforms, the Facilitator believes that it is premature to recommend the creation of a permanent community police commission in New York City. A number of auditing, oversight, and accountability systems are already in place, including the Office of the NYPD Inspector General/New York City Department of Investigation, the Monitor, the City Council (itself a representative body), the CCRB (itself an all-citizen entity), the Court, as well as the Office of the Mayor and the Office of the Corporation Counsel. Adding another permanent structure would be counterproductive to the extent that it creates confusion as to the roles and responsibilities of the existing structures. The Joint Remedial Process was itself a massive undertaking in soliciting community input on reforms. Furthermore, certain of the Immediate Reforms and many of these Joint Process Reforms are designed to enhance the ability of the public to monitor the NYPD and provide input. While these measures may prove ineffective, we believe that they should be given a chance to succeed before undertaking the complex project of creating a community police commission. Should the need for greater transparency and citizen participation arise, then the institution of a community police commission model should be revisited.[283]

---

[282] FAQs, Seattle Community Police Commission, *available at* https://www.seattle.gov/community-police-commission/faqs#whatdoesthecommunitypolicecommissiondo

[283] Another example is the Chicago Police Board, which dates back to 2004. It is an independent civilian body of nine members who are annually appointed by the mayor with advice and consent of the City Council. The Police Board's primary powers and responsibilities are set forth in the Municipal Code of Chicago, and include deciding disciplinary cases of misconduct, holding monthly public meetings, nominating candidates for the position of Superintendent of Police to the Mayor, and adopting rules and regulations for governance of the Department. *See* https://www.cityofchicago.org/content/dam/city/depts/cpb/supp_info/MCC.pdf *and* https://www.cityofchicago.org/city/en/depts/cpb.html for more details on the Chicago Police Board

Although it is premature to institute a permanent oversight structure, community input remains critical, as recognized both by police[284] and policymakers.[285]  Accordingly, in light of the need for better engagement with communities most adversely affected by unconstitutional policing in New York, and having considered the community engagement models summarized above, the Facilitator recommends two reforms for the Court's consideration.

First, the Court should order the NYPD to meet on a regular basis at the Borough Command level with those individuals and organizations in their communities with whom there has not been such formal and frequent engagement in the past, including youth, special populations such as the LGBTQ community, and critical reform voices. The goal of such meetings would be to provide community members the opportunity to speak directly to the NYPD and receive formal responses to their questions, comments, and proposals. During the course of the Joint Remedial Process, the Facilitation Team spoke with various organizations who could help facilitate outreach to community members. Recommended organizations are listed below:

- Center for NuLeadership

- Make the Road New York

- The Door

---

[284] *See* John G. Reece and Judy Macy, "Citizen Advisory Boards in Contemporary Practice: A Practical Approach in Policing," The Police Chief 82, October 2015, a*vailable at* http://www.policechiefmagazine.org/citizen-advisory-boards-in-contemporary-practice-a-practical-approach-in-policing/

[285] *See* President's Task Force on 21st Century Policing. 2015. Final Report of the President's Task Force on 21st Century Policing. Washington, D.C.: Office of Community Oriented Policing Services ("Law enforcement agencies should establish formal community/citizen advisory committees to assist in developing crime prevention strategies and agency policies as well as provide input on policing issues.  Larger agencies should establish multiple committees to ensure they inform all levels of the organization. The makeup of these committees should reflect the demographics of the community or neighborhood being served").

- Brotherhood-Sister Sol

- Police Athletic League

- The Fortune Society

- BronxConnect

We also had the opportunity to work with organizations that assist especially vulnerable populations such as the homeless, the mentally ill, and the LGBTQ community. In this regard, we recommend the following organizations:

- Picture the Homeless

- The Anti-Violence Project

- The Ali Forney Center

- Exponents

In terms of critical reform voices, we recommend that the NYPD contact Communities United for Police Reform, as well as organizations from the Crisis Management System of the Department of Health and Mental Hygiene. We reference some of them below:

- LIFE Camp, Inc.

- Man Up!, Inc.

- Central Family Life Center

- Save Our Streets

The NYPD should reach out to these individual groups to schedule meetings that would be open to the public. The Borough Commands should be required to create agendas for these meetings in collaboration with the involved community organizations. Additionally, the NYPD should be required to post on its website and social media accounts details of each public

meeting. These details should include the location, time, and proper procedure for having concerns addressed and questions answered.[286] NYPD should provide a proposed timeline for these meetings for the Court's approval.

At these meetings, input about why certain police practices are working or not working for the community and suggestions for new policies and practices or modifications of old ones should be solicited and received. The NYPD would then publish the minutes of the meetings, a summary of the recommendations made at the meetings, and its response to those recommendations to their website.[287] A copy should be provided to the Corporation Counsel, the NYPD Commissioner, the Director of the Mayor's Office for Criminal Justice, the relevant City Council members and committees, and the Community Collaborative Board. While the NYPD would not have to adopt any suggestions, it would have to articulate why it does not believe it appropriate to do so.

The second proposed reform is a Community Collaborative Board (CCB). The CCB would be an advisor to the City, the Court, and the Monitor, but without an express oversight function. We recommend that the CCB be comprised of 10 members appointed by the Court including a part-time Executive Director. These representatives should come from community groups and organizations active in police reform. The membership should reflect the diversity of New York City, not just race and ethnicity but geography as well. It should also address the concerns of NYCHA and TAP residents. The Facilitator recommends representatives of the following organizations:

---

[286] Please see the following link for a posting example:
https://www.cityofchicago.org/city/en/depts/cpb/provdrs/public_meetings.html

[287] *See id.*

- 1 representative each from LIFE Camp, Inc., Save Our Streets, and the Central Family Life Center, who are member organizations of the Crisis Management System of the New York City Department of Health and Mental Hygiene,[288]

- 2 representatives from the leadership of Communities United for Police Reform (CPR)[289]

- 2 housing representatives: 1 from Community Voices Heard as a representative for NYCHA, and 1 for TAP buildings as recommended by *Ligon* plaintiffs' counsel

- 1 representative from the Micah Faith Table of the Interfaith Center of New York[290]

---

[288] The Facilitation Team found the violence interrupters of the Crisis Management System of the New York City Department of Health and Mental Hygiene were well connected to their communities while also maintaining meaningful relationships with the NYPD, both at the precinct and executive levels. These groups work on the ground mediating crises, especially those involving gun violence, in concert with the NYPD. They follow the Cure Violence Model. The Cure Violence Model is an approach to violence prevention from a public health perspective. The prevention model understands violence as a learned behavior that can be prevented using disease control methods. In the United States alone there has been a 73% reduction in shootings and killings as a result of cure violence programs in 20+ cities. In New York specifically, an independent evaluation of the program in Crown Heights, Brooklyn showed a 20% lower rate of shootings, and a year without a shooting or killing in East New York Brooklyn. Additionally, LIFE Camp, Inc.'s Violence Intervention and Prevention System (VIP) has resulted in an 80% reduction in the amount of shootings, with over 550 days of no shootings in their focus area. Over the course of the JRP proceedings, many of these groups hosted focus groups and community forums and were among the leading voices for collaboration with the Department. Crisis Management System members also provided the team with keen insight on the efficacy of NYPD policies and practices based on the input they receive from citizens who are affected by these policies and practices. To learn more about the Crisis Management System visit http://www1.nyc.gov/site/peacenyc/interventions/crisis-management.page.

[289] Communities United for Police Reform ("CPR"), a coalition of over 60 member organizations, is actively engaged in reform efforts of the NYPD. CPR participated in the implementation of the various phases of the JRP. CPR was able to use its expansive network to populate 9 of the 28 forums that took place throughout the City, several of the focus groups, as well participating in the JRP Advisory Committee To learn more about the Communities United for Police Reform campaign and a list of voting member organizations please visit http://changethenypd.org/campaign/intro-members.

[290] During the Convening Phase of the JRP the Facilitation Team met with representatives of the Micah Faith Table of the Interfaith Table of New York. The Micah Table is a coalition of faith leaders from a multitude of religious

- 1 representative from an academic institution who is familiar with the issues outlined in the Remedies Opinion, with experience engaging communities in reform efforts

The Community Collaborative Board will meet quarterly to receive updates from the NYPD with respect to the status of any Court-ordered reforms, and discuss the impact that they are having on affected communities. This Board is not intended to serve as a substitute for or as an overseer of the Monitor. Rather, its goal is to allow representatives who work with the affected communities to offer their input to the Monitor and the Court. The CCB will develop the agenda for these meetings in consultation with the NYPD. The CCB will also publish an annual report with its recommendations for the improved implementation of Court-ordered reforms. Funding resources in the form of stipends for members and a salary for a part-time Executive Director should be provided. After the CCB publishes its annual report, the NYPD should publicly disclose a response to any of the CCB's findings and recommendations. Both the CCB's report and the NYPD's response should be published on the NYPD's website and a copy should be provided to the Corporation Counsel, the NYPD Commissioner, the Director of the Mayor's Office for Criminal Justice, the relevant City Council members and committees, and the Court. The CCB would exist until such time as the Court determines that the NYPD is in "substantial compliance" within the meaning of the Court's July 30, 2014 Order Modifying Remedial Order.

---

affiliations that work collaboratively to end poverty and injustice in New York City. The Facilitation Team met with several member organizations over the course of the Joint Remedial Process, gathering meaningful community insights into the issues of SQF and trespass enforcement. For more information on the Micah Faith Table, please visit http://interfaithcenter.org/welcome-micah-institute/.

During the JRP, community members have asked for a formal mechanism to offer feedback on the Court-ordered reforms during the course of the Monitorship. The Facilitator agrees that such a mechanism, here the CCB, is important. In the absence of the CCB, the facilitation and outreach efforts of the Joint Reform Process will come to an abrupt stop, depriving individuals most affected by these reforms from having their voices heard. As the Court highlighted in the Remedial Opinion, "No amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety."[291]

### Trust, Legitimacy and Police-Community Relations

### 8.     Public Education Campaign

Throughout the Joint Remedial Process, the Facilitation Team has been confronted by a widespread and troubling public misconception that stop, question, and frisk ("SQF") was declared illegal by the Court as opposed to the Court finding that an otherwise legal practice had been unconstitutionally implemented. Concurrently, the Facilitation Team found that police officers may not be properly documenting stops for fear of personal civil liability or administrative discipline. While both findings were true we also heard community members express the desire for public education campaigns.

We identify these two findings as critically detrimental to the NYPD's mission to build community trust, as well as to improve its community policing and precision policing practices. Though it is difficult to discern with complete confidence the source of such misinformation, it is important to address the seemingly systemic lack of information or misinformation which

---

[291] Remedies Opinion, 959 F. Supp. 2d at 686.

continues to drive the divide between officers and the communities they serve. Equally important is the desire for public education campaigns by community members for community members.[292]

Consistent with research on cognition and bias discussing the ways in which "consensus" can transform a rumor into the status of "common knowledge" — including that perceived familiarity of information influences the likelihood that the information is accepted as true[293] — several years of misleading headlines and word of mouth seem to have further entrenched the idea that officers who conduct lawful SQF procedures are illegally harassing civilians. This only reinforces the rift between community and police. Similarly, tabloid news and rumor has fed into the belief by many officers that they will be punished unfairly by the NYPD through unjust discipline and/or be left exposed to frivolous lawsuits if they conduct and document *Terry* stops.

Social science theory purports that a statement is more likely to be deemed true the more often it is repeated. Indeed, studies have shown that attempts to inform people that a given claim is false may inadvertently drive acceptance of said claim.[294] Care must therefore be given to how the NYPD addresses public misinformation about SQF. A reactionary model which neglects to address the issue of SQF directly or endeavors only to dispel the myth of SQF's illegality, serves to further entrench a misguided interpretation of the law, and opens officers up to continued scrutiny and complaint.

---

[292] A recommendation for community members to develop and implement a public education campaign would be ill placed as a recommendation for the NYPD, therefore such a suggestion can be found under areas for policy consideration.

[293] *See* Schwarz, N., Sanna, L. J., Skurnik, I., & Yoon, C. (2007). "Metacognitive Experiences and the Intricacies of Setting People Straight: Implications for Debiasing and Public Information Campaigns." Advances in Experimental Social Psychology, Volume 39, 127-161, *available at* https://pdfs.semanticscholar.org/41cc/3eeed553e733f7378446ee6205fcea420cac.pdf

[294] *See* Allport, F. H., & Lepkin, M. (1945). "Wartime Rumors of Waste and Special Privilege: Why Some People Believe Them." Journal of Abnormal and Social Psychology, 40, 3-36; McQuail, D. (2000). "McQuail's Mass Communication Theory." Newbury Park, CA: Sage; Rice, R. & Atkin, C. (Eds.) (2001). Public communication campaigns (3rd ed.). Newbury Park, CA: Sage.

It is recommended that the Court order that the NYPD develop a broad-based public education campaign, in consultation with community partners, to correct for these misunderstandings, inform citizens about the rights and obligations of both citizens and police officers during all levels of encounters, and, most importantly, to inform community members about changes to NYPD policing policies. In an effort to ensure that the messages are impactful and long lasting, it is suggested that the Department seek out social psychology experts to assist in developing an effective public education campaign. Social psychology has been at the center of public education and awareness campaigns since the 1950s. These experts study conditions that affect certain behaviors and actions, and are primarily concerned with thoughts, beliefs, and intentions and how they influence interactions between individuals. An example of a policing public education campaign created with the support of a social psychologist is the *Crime Prevention Publicity Campaign* developed by COPS with renowned psychologist Ronald V. Clarke.[295]

It is recommended that the NYPD conduct this campaign through social media, traditional radio and television public service announcement advertising, and through community meetings. It should collaborate with community organizations to help develop this campaign. While the public education campaign would be a citywide undertaking, it is also recommended that community meetings take place in settings where community members have the opportunity to interact with officers. These community meetings can take place in places such as New York City Public Housing ("NYCHA") developments, schools, and drop-in centers in impacted communities.

---

[295] *See* Barthe, E. (2006). *Crime Prevention Campaigns: Problem-Oriented Guides for Police – Response Guides Series No. 5.* Department of Justice, *available at* https://ric-zai-inc.com/Publications/cops-p099-pub.pdf

This campaign would serve at least three purposes. It would serve to correct the misconception that was often encountered during our community engagement that SQF is illegal and no longer allowed. It would help to foster greater trust in those communities that were most affected by the unconstitutional abuse of police authority. It would also reduce the incidence of complaints and lawsuits based on the misconception that SQF is illegal, which would help to alleviate the fear of personal civil liability or administrative discipline on the part of police officers.

### 9.     **Community Surveys**

It is recommended that the Court order that the NYPD implement annual community surveys to be conducted at precinct/PSA levels that track police-community relations broadly, including public perception of police-community relations and of police-civilian street encounters, and to assess the public's experience with Court-ordered reforms. During the length of the Monitorship, the survey should be designed and conducted by an outside entity in collaboration with the NYPD and in consultation with community stakeholders with significant insight on policing issues. The survey process should also be institutionalized beyond the Monitorship, allowing for the ongoing assessment of police practices.

These survey results should factor into the performance evaluations of the senior leadership of the precinct. This recommendation is vital to the effective implementation of the Immediate Reforms and to improving community-police relations. The surveys will ensure that local precinct commanders will be directly responsive to the communities they patrol. It is further recommended that as a complement to the surveys, that a qualitative assessment (*i.e.*, focus groups, in-depth interviews) occurs within those precincts where survey results are

unfavorable. This complementary assessment allows for a comprehensive understanding of the issues present within those communities.

The NYPD's use of the ELUCD group to conduct surveys may be beneficial in this regard. However, we do not know the findings of the survey and, more importantly, it appears to be based upon aggregate citywide data. While such aggregation of data, from across New York City, does serve some purposes, it has little utility when it comes to assessing the quality of community-police relations at a local geographic level.

### 10.    <u>Use of Stop, Question, and Frisk to Develop Youth Informants</u>

The Facilitation Team heard at several community forums and at some focus groups that young people were often stopped and subsequently released in order to coerce them into becoming confidential informants. It was reported that police officers, and, in particular, plainclothes officers, would detain youth on minor violations and bring them to the precinct where they would be photographed and then released if they agreed to become informants. If they refused, they would be processed for minor violations or ridden around in police vehicles in their neighborhood so that an inference could be drawn that they were cooperating with the NYPD as informants. Examples of these experiences were expressed by older focus group participants (examples 1 & 2) and youth participants (examples 3 & 4) during separate focus groups:

> Example 1: "They don't even think they did anything, but just the fact that they be outside, they might know something about another crime. So they scare them, they bring them to the precinct, like, 'You were trespassing. Yo, do you know who was shooting last night? You was out there.' And then, if you're scared enough you'll say, 'Oh, I heard it was [Tashawn] that was shooting,' or something, any name out there. So what they do – they scaring the young guys. You know what I mean? They did something wrong

and they don't want to get in trouble for nothing else, so that way you just make them tell on somebody else, and then that's a whole another thing. They do it all the time."

Example 2: "They muscle the younger guys, tell on somebody else about shooting, drug dealing or whatever, or… and, say, if they found, like, a bag of marijuana on one of the young guys or something like that, and then just use that. It's a cat and mouse game, and [they] put other people in jeopardy by just… And then, pick these guys up, take them in the car and drive them around, so they could be seen in their car, you know. And that will be, 'Are you snitching? But for the cops it's tell us what we want to know. Who was shooting last night? We know you was out there, we've seen you by the store.' And it's like a strong-arm game."

Example 3: "He said, 'You see who you've got beef with this on this wall? They're already telling us what y'all doing. Just give me information, and you'll be home tonight, man. I'll give you the ticket.' I said, 'Can I get a lawyer?' They said, 'Oh, so you know how to play this game?' They brung me downstairs and put me through the system."

Example 4: "'Yo, come on, you all really just doing this for what? I have nothing on me. You all just doing this because you all know me and my hood. I'm out, I'm leaving my hood. Why are you all bothering me?'" They was like, 'Oh, because we know you got this on you. Come on, where is that? Where is that? Can you just give it to us? If you don't got it on you, just give us a name.' I'm like, 'What? Just leave me alone. I don't want nothing to do with you all.' They searched me, they went all through my pockets, they felt on my private parts and all of that. . . ."

Although there is currently a policy in place that is intended to prevent abusive soliciting of young people as informants, the policy is either not being strictly adhered to or there are no enforced accountability measures for such interactions. According to Patrol Guide 212-68, individuals under the age of 18 are to be registered with a parent or guardian present to give written permission; however, this is not what is happening according to many focus group participants. Although this issue, on the surface can be viewed as unrelated to stop, question, and frisk, and trespass enforcement, it is important to note that community members participating in focus groups and forums expressed the "stop" as being the initial contact in the development of

some youth as informants. Essentially, it was reported that stops were used as excuses to engage youth. Therefore, it is recommended that the Court order that the NYPD include a disclaimer in its SQF trainings, at the Academy and in-service, about the Department's policies with respect to the cultivation of confidential informants. It is also recommended that the NYPD create an auditing protocol for the review of youth-involved interactions and measures to address issues related to a violation of the Department's confidential informant policies.

### 11.    <u>Mental Health and Disability Training</u>

It is recommended that the Court order that the NYPD develop SQF training that includes specific units on engaging with people with mental, physical, or developmental disabilities, including different types of scenarios that officers may encounter in serving such individuals. Individuals with mental illness, who have physical disabilities, or who are developmentally disabled are at risk of being subjected to heightened police scrutiny and force based on completely mistaken assumptions.

There are a number of community-based organizations as well as experts in New York City working on issues concerning police treatment of people with disabilities that could serve to help develop these trainings. This training is critical since the behaviors of mentally ill or disabled individual who are being questioned by police officers may be misinterpreted as furtive movements or noncompliance which can then escalate these encounters.

We are not recommending a wholesale revision or a delay of the SQF training, which we acknowledge has been developed with much deliberation and care. We do, however, recommend that the Court order the inclusion of this disability training as a discrete unit within the SQF curriculum.

12.     **LGBTQ-Specific Training and Community Engagement**

The Facilitation Team convened three community forums specific to the LGBTQ community. In addition, there was significant representation of LGBTQ community members at two other community forums. Moreover, the Facilitation Team held focus groups geared toward the LGBTQ community.

A consistent theme that was raised during these sessions was the sense that this community was being targeted by the NYPD for unconstitutional stops often ostensibly for the offense of loitering with the intent to commit prostitution. Furthermore, it was widely reported to us that the police would frequently demean LGBTQ persons during encounters and stops by questioning their preferred gender identification, taunting them, making inappropriate use of gender pronouns, and speaking derisively about their preferred gender identification. During these encounters, officers would use aggressive/derogatory terms and body language as well as condescending tones. Not surprisingly, LGBTQ community members also reported that they are reluctant to report crimes committed against them because they fear further victimization by the police.

These concerns were also documented by the Office of the Inspector General for the NYPD in a report that it issued in November 2017 entitled "Review of NYPD's Implementation of Patrol Guide Procedures Concerning Transgender and Gender Nonconforming People." The report concluded that there were gaps in the Department's implementation and training on Patrol Guide revisions that were issued in 2012. These revisions were intended to address substantially the same issues and concerns encountered during the JRP.

The Office of the Inspector General for the NYPD released its Fourth Annual Report noting the NYPD's responses to the November 2017 report. Of the nine recommendations from the DOI, five were accepted in principle, one was partially accepted, and three were rejected. Below we note the DOI recommendations that were rejected and the NYPD's response:[296]

| | DOI's RECOMMENDATION | NYPD RESPONSE |
|---|---|---|
| 1 | NYPD should create a memo book insert for officers with a summary of the revised LGBTQ protocols. Officers can use this for reference as needed. | NYPD asserts DOI's recommendation is unnecessary, pointing out that NYPD personnel are required to review all Patrol Guide revisions, which are accessible though Department-issued smartphones and tablets. NYPD also states that, as a matter of routine, the Department does not create a memo book insert for all Patrol Guide revisions, as they would become unwieldy. In the future, the Department is planning to transition to electronic memo books. |
| 2 | On a periodic basis, NYPD should make sure that police stations are using updated forms, particularly those documents that are intended to comply with the 2012 revisions. | NYPD states that ongoing compliance checks are not needed because the precincts discussed in DOI's Report now use the updated forms. NYPD further notes that officers were already instructed to use the updated forms, all of which NYPD is endeavoring to make electronically. |

---

[296]Taken directly from the NYPD IG Fourth Annual Report retrieved from http://www1.nyc.gov/assets/doi/reports/pdf/2018/Mar/15_NYPD_IG_Fourth_Annual_Report_w_report%203.29.18.pdf

| 3 | NYPD Internal Affairs Bureau's complaint system should be configured to categorize and track all LGBTQ-related allegations that implicate biased conduct, and not just "profiling." LGBTQ-related allegations involving bias would include violations of the 2012 Patrol Guide revisions and "offensive language." | NYPD asserts IAB is presently capable of tracking profiling complaints, including allegations based on sexual orientation, gender, and gender identity. NYPD has not committed to tracking LGBTQ-related allegations implicating biased conduct that fall outside of "profiling," noting that a category of "LGBTQ-related allegations," beyond profiling, cannot be effectively implemented. |

It is recommended that the Court order there be more training around LGBTQ communities and de-escalation. There should also be further and continued community engagement specific to this community. It is also recommended that the Court order that the Department monitor adherence to the 2012 Patrol Guide Revisions and take steps to ensure implementation. We note below those DOI recommendations that were partially and fully accepted in principle. These recommendations are fully aligned with the JRP recommendation.

| DOI's RECOMMENDATION | NYPD RESPONSE |
|---|---|
| 1 NYPD should provide mandatory in-service training and accompanying resource materials on the 2012 Patrol Guide revisions to all uniformed members through the NYPD-U webinar | NYPD agreed to conduct a refresher course on the 2012 Patrol Guide revisions for members of service via its online platform, NYPD-U. NYPD, however, has not committed to the six-month timeframe recommended by DOI, reporting that |

| | | |
|---|---|---|
| | platform. Training attendance and completion should be tracked to ensure that all member of the police force have received this training. NYPD should conduct this training within the next six months. | the Department will conduct this training by the end of 2018. |
| 2 | Community input should be carefully considered and incorporated as appropriate into the curriculum of officer training on LGBTQ issues. | NYPD reports that historically the Department's LGBTQ- related training has been developed with input from representatives of organizations from the LBGTQ community. These discussions are ongoing. |

### 13.     Implementing the Use of Civil Summonses for Trespass Enforcement by Extending the Criminal Justice Reform Act of 2016.

One of the police practices that the Monitorship and JRP are tasked with addressing is trespass enforcement in and around public housing and buildings enrolled in the Trespass Affidavit Program ("TAP"). During the course of the JRP, some residents of and visitors to public housing and TAP buildings expressed frustration at the volume of arrests for the crime of trespass. At the same time, some visitors and residents were concerned with the presence of intruders in the public spaces inside and outside of their buildings, which residents considered to be an extension of their homes.

The Facilitator recommends that the Court order the NYPD to adopt a new policy which encourages officers to issue a civil summons for trespass, rather than issuing a criminal summons or making an arrest for trespass. In effect, this recommendation calls on the City to extend the Criminal Justice Reform Act of 2016 (the "CJRA") and its accompanying rules and establish a

civil violation for trespass in the administrative code, thus allowing a civil summons to be the primary enforcement tool for trespass in and around NYCHA and TAP buildings.

Separate and apart from the Monitorship and the JRP — and to its great credit — the City enacted the CJRA, which enabled the NYPD to issue summonses with civil penalties for low-level quality-of-life crimes, such as carrying an open container of alcohol, littering, unreasonable noise, or public urination. Prior to the CJRA, the NYPD frequently issued criminal summonses for such offenses, approximately 300,000 in 2015.[297] The Criminal Court dismissed the majority of these low-level violations. For example, from 2003 to 2013, almost two-thirds of these cases were dismissed. *Id.* Nevertheless, because of the criminal character of the summonses, a disposition of guilty resulted in a permanent record. Additionally, if a person missed his or her summons' court date, a judge would issue a warrant for their arrest.

Now, by contrast, these low-level offenses may be treated as civil violations to be adjudicated in the City's Office of Administrative Trials and Hearings ("OATH"). The CJRA did not eliminate criminal penalties for these infractions, but rather, instituted the civil summons as the primary enforcement tool for them. One year after it came into effect, the CJRA has resulted in a 90 percent drop in criminal summonses, while crime continues to decline citywide. *See* CJRA One Year Later, New York City Council, https://council.nyc.gov/the-criminal-justice-reform-act-one-year-later.

As the law stands now, persons arrested or issued a criminal summons for trespass in or around TAP or NYCHA buildings can be charged with a violation of N.Y. Penal Law § 140.05 or § 140.10. Even the least punitive form of trespass, N.Y. Penal Law § 140.05, is categorized as

---

[297] CJRA Fact Sheet, New York City Council, https://council.nyc.gov/legislation/criminal-justice-reform.

a "violation," meaning that it is punishable by a term of imprisonment of up to 15 days, N.Y. Penal Law § 10, and it can result in a permanent record.

Accordingly, it is the Facilitator's recommendation that the Court order the City to extend the CJRA to create a civil trespass violation in the City's administrative code, and to adjudicate these cases in OATH. Such an approach would help address the concerns of some residents and minimize the issuance of arrest warrants and permanent records.

### 14.    Trauma Informed Training – Community Impact

Consistent with the growing number of institutions adopting trauma-informed care and resiliency models nationally, we recommend that the Court order that the NYPD implement a program for training officers on trauma and the implications of trauma for public safety. The NYPD should seek to work with social service practitioners to teach officers more about the debilitating effects of trauma, and its manifestations for both officers and community members. One such model that could be used as an example is the Cambridge Police Department's trauma-informed care training program.[298]

Several different organizations also have resources on trauma-informed care ranging from directly addressing police trauma to techniques for interactions with traumatized individuals.[299] Having an awareness of trauma and its behavioral consequences can provide officers with context on issues of agitation, furtive movement, and even flight, which can be useful cues for officers to dispatch de-escalation techniques during interactions with the public.

---

[298] Accessible at the City of Cambridge website: https://www.cambridgema.gov/news/2016/09/cpdtraumatraining

[299] *See*, *e.g.*, SAMHSA, Philadelphia Police Department, Vera Institute of Justice, and NACOLE.

This recommendation for trauma-informed training will lead to better and more constitutional policing.

## SECTION VII: AREAS FOR POLICY CONSIDERATION

Beyond the 14 Joint Remedial Process recommendations, some suggestions were offered for policy changes that fell beyond the scope of the Joint Remedial Process. These suggestions will be discussed here and labeled "Areas for Policy Consideration."

### 1.    Need for Greater Resources to Accommodate Homeless Youth

After having met with numerous homeless advocacy groups and organizations during the Convening Phase of the JRP, it became clear that there was a lack of resources available to homeless youth in New York City. Officials at Covenant House, an organization that participated in two convening meetings, six focus groups, one leadership meeting, and one community forum, expressed that homeless youth were often turned away as a result of the limited number of short term shelter beds available. Many of the youth who were turned away tended to have more frequent contact with the NYPD simply because they are homeless.

It is commonsensical that youth who are unaccompanied, transient, and sleeping on the street are more likely to come into contact with law enforcement. And for some, if they were without shelter, they are more likely to resort to prostitution and drug dealing as a means to

survive. Beyond the typical risks facing homeless youth, contact with police greatly increases when a young person is homeless and living on the streets.[300]

According to the Coalition for the Homeless, "in recent years, homelessness in New York City has reached the highest levels since the Great Depression," with a continued increase in the number of homeless youth.[301] Runaway and homeless youth in New York City are generally defined as unaccompanied youth. These youth are young people who have run away or were forced to leave their homes and are currently residing in temporary living situations.[302] The 2017 Youth Count Report noted that there were a total of 2,003 unaccompanied youth, up from 1,805 in 2016, and 1,706 in 2015.[303] However, many homeless service providers and advocates would argue that the numbers are much larger, reaching higher than 3,500. It is well noted that the New York City Point in Time ("PIT") count tends to miss large portions of runaway and homeless youth as the count does not include youth who couch-surf or may be engaged in survival sex work.[304]

---

[300] *See* Youth Justice Board Center for Court Innovation, Homeless Not Hopeless: A Report on Homeless Youth and the Justice System in New York City, June, 2017, *available at* http://www.coalitionforthehomeless.org/wp-content/uploads/2018/02/RHY_Testimony_02132018.pdf

[301] New York City Homelessness: The Basic Facts, *available at* http://www.coalitionforthehomeless.org/basic-facts-about-homelessness-new-york-city/

[302] *See* Hofmeister, B., & Routhier, G. (2018, February 13). Testimony of The Legal Aid Society and Coalition for the Homeless. New York City, New York.

[303] These numbers include both sheltered and unsheltered unaccompanied youth for the years 2015-2017, per the youth count report for these years. The youth count report is a report written by the Center for Innovation through Data Intelligence, a research/policy center located in the Office of the Mayor of the City of New York. Each year in an effort to identify areas of service need homeless youth are counted as part of the point-in-time (PIT) count of sheltered and unsheltered homeless adults, families, and youth is conducted. Please visit http://www1.nyc.gov/site/cidi/projects/homeless-youth-count.page for more information about the NYC Youth Count.

[304] *See id.* at 2.

The number of available beds in New York City is well documented. According to the Runaway and Homeless Youth testimony presented to the New York City Council Committee on Youth Services, the Department of Youth and Community Development ("DYCD") has contracted 751 beds to be open through 2019, with another 309 beds for transitional independent living, and 236 beds for crisis.[305] Although the number of funded beds have increased, the beds available for short term crisis placement only increased by 20, speaking to an immediate need for more short term crisis beds.[306]

An increase in the number of short term crisis beds available to homeless youth will not only provide short term housing, but more importantly provide access to services that can help stabilize these young people, decreasing the likelihood that they will engage in risk taking behavior. This suggestion is not intended to be a cure all, but it could definitely be a step in the right direction, creating an opportunity for reducing the rate at which homeless youth are involved in investigative encounters with the NYPD.

## 2.   NYCHA/TAP Responsibility

The following recommendations arise from community input that was received during the *Davis* and *Ligon* portions of the JRP.

A major concern raised by residents of Trespass Affidavit Program ("TAP") buildings and NYCHA developments who participated in our process is the lack of basic security at those facilities. The NYPD's Trespass Affidavit Program, also known as the "Operation Clean Halls" program in the Bronx, allows private property owners to register their buildings with the NYPD

---

[305] *See* http://www.coalitionforthehomeless.org/wpcontent/uploads/2018/02/RHY_Testimony_02132018.pdf
[306] *See id.*

providing the NYPD access to the property to stop, question, search, and, if necessary, arrest individuals who are suspected of trespassing. Landlords are required to sign a document renewing their participation in the program every six months. A similar agreement exist between the NYPD and NYCHA, allowing police officers to conduct vertical patrols throughout public housing developments in search of trespassers and other criminal actors.

In addition to the training and policy recommendations by the Monitor, it is suggested that the NYPD impose a minimal investment in security by building owners as a condition of enrollment in the TAP program. A landlord should be required to install working locks at every entrance within six months of a building's enrollment into TAP. The TAP program is a voluntary program offered by the NYPD in an effort to provide greater safety for TAP residents. Therefore, landlords who are receiving the benefits of this program should be required at a minimum to maintain working locks on their buildings.

This recommendation extends to NYCHA housing developments. Broken locks, intercoms, and doors were reported to be commonplace in NYCHA developments. NYCHA residents repeatedly expressed the view that better building security could significantly reduce the need for the NYPD to heavily patrol the developments.

NYCHA itself attempted to address these security problems by engaging with the Citywide Council of Presidents, the public housing resident leadership, and the NYPD to discuss how to improve security. Ultimately, this collaboration resulted in a Safety and Security Task Force Report that was jointly issued by NYCHA and the Citywide Council of Presidents in 2011.

The Task Force Report listed some basic improvements to building security in a section of the Task Force Report called Access Control Recommendations. It is recommended that NYCHA adhere to its own recommendations which were listed as follows:

> NYCHA has identified the need to secure building entrances as a priority that is essential to improving the security of the developments. To correct the above conditions, NYCHA plans to install "multi-layered" access control, consisting of mechanical door locking hardware, electronic access control and direct call intercoms. This design will provide a higher level of security by eliminating the need for keys (residents will be issued electronic key tags), adding intercoms that do not rely on telephone company infrastructure and providing more durable components to withstand the traffic and reduce the effects of vandalism that building entrances encounter.

### 3.    Interactions Between NYCHA Tenants and the NYPD

Focus group participants from NYCHA housing developments often felt overly surveilled and heavily policed. Participants expressed that the presence of NYPD floodlights and towers often felt like an "occupation by militaristic forces." NYCHA residents in both the focus groups and community forums complained that the floodlights installed throughout many of the developments were unnecessary and highly intrusive. Along with the recommendation that the Task Force improvements to the security of the buildings be ordered, community residents asked that the NYPD be required to remove floodlighting that is harshly illuminating or that NYCHA install and/or maintain conventional street lamps on the sidewalks and inner courtyards of the developments to provide enhanced security in a less intrusive manner.

Additionally, there remains concerns around scaffolding within housing developments. What is being dubbed as "zombie scaffolding" continues to create numerous concerns and

complaints by NYCHA residents.[307] Focus group and community forum participants cited fear of victimization in these scaffolded areas. In addition, many expressed a concern that officers would be limited in their case solving attempts because scaffolding tended to cover cameras.

Lastly, participants from both focus groups and community forums expressed concerns related to police vehicles being driven on sidewalks and recreational areas (*e.g.*, basketball courts, playgrounds, etc.) within housing developments. They urged that the NYPD consider developing a policy that prohibits officers from driving on sidewalks in housing developments, particularly near common spaces, absent exigent circumstances.

### 4.      NYPD Practices at Subway Stations

In the wake of the recent decision by the Manhattan's District Attorney's office to become more discriminant in its prosecution of turnstile jumping, there continues to be a call for a more proactive and less reactive law enforcement approach to this problem. According to a recent report written by the Community Service Society, entitled "*The Crime of Being Short $2.75: Policing Communities of Color at the Turnstile,*" communities of color are disproportionately affected by fare evasion arrests.[308] The Facilitation Team heard at some community forums, leadership meetings, and focus groups that the NYPD positions officers hidden behind turnstiles and gates to apprehend fare beaters. Community members voiced deep frustration at this policy, questioning the intent behind it. People repeatedly urged for a more

---

[307] Zombie scaffolding is a termed used to describe the presence of scaffolding (sometimes for years) without any work being done. NYCHA has received numerous complaints regarding tenants' safety concerns. Some of these concerns were addressed in a notice from NYCHA General Manager, Michael Kelly dated August, 5, 2017, *available at* https://medium.com/@NYCMayorsOffice/addressing-scaffolding-concerns-at-nycha-developments-92b4089bcd31

[308] *See* http://www.cssny.org/news/entry/css-report-details-targeting-of-high-poverty-black-communities-for-fare-eva

commonsense policy of positioning officers in front of turnstiles and gates to act as a deterrent. As in the finding contained within the Community Service Society report, community members voiced deep frustration about how these practices were seemingly focused on subway stations in minority neighborhoods.

The collateral consequences of these practices are far reaching, leading to criminalization of youth and the poor. It is recommended that the NYPD give serious consideration to revisiting these policing practices in the interest of, among other things, mitigating the sense of distrust that members of affected communities have of the Department and improving police-community relations.

### 5. <u>Community Investment</u>

As of 2017, there were 176,066 public housing apartments in 2,462 buildings, in 326 developments throughout the five boroughs; however, there were only 145 community centers and youth programs funded by NYCHA or otherwise.[309] During recent years, community programming for young people living in and around NYCHA developments has taken a sharp decline, with 61 community centers closing. During the *Davis* focus groups, participants were asked "*What role would you like community groups or government agencies to play in supporting a safe neighborhood?*" Most, if not all, participants expressed a desire for more community centers, after school programs, and Police Athletic League programs. Research has long addressed the effect of decreased programming in community centers and after school programs and its correlation to delinquency and/or increased contact with police.

---

[309] *See* https://www1.nyc.gov/assets/nycha/downloads/pdf/factsheet.pdf *and* https://data.cityofnewyork.us/browse?tags=nycha

Policymakers should also seriously consider a large investment in programs that promote crime prevention as part of public safety. The Cure Violence programs associated with the Crisis Management System of the New York City Department of Health and Mental Hygiene have collaborated extensively with the JRP. They have vast experience in successfully mediating gun violence incidents in cooperation with the NYPD. As we indicated earlier, in footnote 288 of the Community Engagement recommendation, "the Facilitation Team found the violence interrupters were well connected to their communities while also maintaining meaningful relationships with the NYPD" The violence interruption programs should be more fully funded and supported by the City of New York. They are reducing shootings by as high as 80% in some of their target areas through intensive, on the ground, mediation efforts. The NYPD should foster even closer relationships with these programs, as they are effective collaborators in reducing gun violence and all of its tragic consequences. The City of New York should seek to expand and provide greater support and resources to these programs.

### 6.      Repeal of Civil Rights Law § 50-A

The Mayor and the State of New York should reevaluate their interpretation of Civil Rights Law § 50-a, which prohibits the Department from sharing information which has historically been open to the public. Many groups agree that the current interpretation of Civil Rights Law § 50-a is overbroad.

Access to public records is presumed under New York's Freedom of Information Law ("FOIL"). However, under New York City's current interpretation of Civil Rights Law § 50-a, access to police disciplinary records is not generally available. This interpretation undervalues public access to information relating to officer accountability for misconduct in the name of officer privacy and safety concerns.

267

Under section 87 of FOIL, "[a]ll records of a public agency are presumptively open to public inspection, without regard to need or purpose of the applicant."[310] As explained in the Legislative declaration to FOIL:

> a free society is maintained when government is responsive and responsible to the public, and when the public is aware of governmental actions. The more open a government is with its citizenry, the greater the understanding and participation of the public in government.
>
> The people's right to know the process of governmental decision making and to review the documents and statistics leading to determinations is basic to our society. Access to such information should not be thwarted by shrouding it with the cloak of secrecy or confidentiality. The legislature therefore declares that government is the public's business and that the public, individually and collectively and represented by a free press, should have access to the records of government in accordance with the provisions of this article.[311]

Notably, under FOIL the presumptive right to public inspection extends to a government employee's disciplinary records.[312] For decades "personnel orders," which among other things, included information regarding disciplinary actions taken with respect to police officers, were publicly posted in the offices of the Deputy Commissioner for Public Information. On May 27, 2016, after the Legal Aid Society filed a FOIL request seeking disciplinary summaries published in the personnel orders dating back to 2011, the City denied Legal Aid's FOIL request and stopped the practice of posting personnel orders. The stated reason was Civil Rights Law § 50-a, which provides that "personnel records [of a police officer] used to evaluate performance toward continued employment or promotion . . . [are] considered confidential . . . ." In this way, Section

---

[310] *Buffalo News, Inc. v. Buffalo Enter. Dev. Corp.*, 84 N.Y.2d 488, 492 (1994).

[311] N.Y. Pub. Off. Law § 84. Under FOIL, an agency "may deny access to records" that "are specifically exempted from disclosure by state . . . statute." *Id.* § 87(a)(2) (emphasis added).

[312] *See Mulgrew v. Board of Educ. of City Sch. Dist. of City of N.Y.*, 31 Misc. 3d 296, 302 (Sup. Ct. N.Y. Co.), *aff'd*, 87 A.D.3d 506 (1st Dep't 2011) (explaining that courts have "repeatedly" ordered the "release of job-performance related information, even negative information such as that involving misconduct").

50-a is invoked by the City to prevent public access to discipline information — even summaries of substantiated misconduct — including information that had been publicly available to journalists for decades.

But nothing in the law compels this result. The City chose to interpret "personnel records" broadly, so that they include summaries of misconduct determinations, and has chosen not to produce the records despite the authority to do so under FOIL. In 2018, however, the NYPD decided to publish anonymized summaries of allegations against officers and the disciplinary actions taken in response by the Department. The NYPD's decision to publish this information is consistent with the need for greater transparency and accountability stressed in this Report and with historical interpretation of Public Law 50-a. The NYPD's effort has received stiff opposition from the Patrolmen's Benevolent Association, which, citing Public Law 50-a, has sued to enjoin the publication of this data and has obtained a temporary restraining order.[313]

Traditionally, section 50-a has been invoked in two contexts — when information is sought by the public or public interest groups under FOIL or in response to subpoenas in civil and criminal proceedings. Not surprisingly, section 50-a has been widely criticized.

New York is one of only three states that grant police officers special confidentiality protections.[314] As explained by New York State's Committee on Open Government, which is charged with overseeing FOIL:

---

[313] *See Patrolmen's Benevolent Society v. De Blasio*, No. 0153231/2018. Earlier in 2018, the PBA sued the City to prevent publication of BWC footage. *See Patrolmen's Benevolent Society v. De Blasio*, No. 0150181/2018.
[314] *See* Robert Lewis, Noah Veltman & Xander Landen, "Is Police Misconduct a Secret in Your State?", WNYC News, Oct. 15, 2015 (hereafter "Lewis, Veltman & Landen 2015"). To be more precise, under New York,

> New York is virtually unique among the states in its refusal to apply the same transparency to police and other uniformed services as applies to all other public employees. Our study of the laws of all fifty states reveals that the great majority treat records pertaining to police officers in exactly the same manner as the treatment of records pertaining to other public employees. No other state provides the unique protection afforded in Civil Rights Law § 50-a.[315]

As a general matter, police disciplinary records are available to the public in Alabama, Arizona, Connecticut, Georgia, Florida, Ohio, Maine, Minnesota, North Dakota, Utah, and Washington, although records of active or unsubstantiated complaints are often not made public. Minnesota law permits public access to "the existence and status of any complaints or charges against the employee, regardless of whether the complaint or charge resulted in a disciplinary action."[316] Information is also available on a more limited basis in Arkansas, Hawaii, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Michigan, New Mexico, Oklahoma, South Carolina, Tennessee, Texas, Vermont, and West Virginia. For instance, the Hawaii statute makes public employee misconduct that results in suspension or discharge.[317]

Even before the City's decision to stop posting personnel orders, the Committee on Open Government had called for the amendment or repeal of Civil Rights Law § 50-a, arguing that "the public needs and deserves transparency surrounding these government officials [*i.e.*, police officers] who exercise vast power over peoples' lives." Following the City's recent refusal to

---

California, and Delaware law, police officer personnel records are deemed confidential. Likewise, in Alaska, Colorado, Washington, D.C., Idaho, Iowa, Kansas, Maryland, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Carolina, Oregon, Pennsylvania, Rhode Island, South Dakota, Virginia, and Wyoming, a public records request for a police officer's disciplinary history is unlikely to be successful. The WNYC report is *available at* https://www.wnyc.org/story/police-misconduct-records/

[315] 2014 Annual Report; *see also* Lewis, Veltman & Landen 2015.

[316] 22 Minn. Stat. Ann. § 13.43 (2016).

[317] *See* 24 Haw. Rev. Stat. Ann. § 92F-14 (2016).

release discipline information, community groups and politicians, including Governor Cuomo, had criticized the law and called for its repeal or reform.

New York's appellate courts have thus far upheld the NYPD's restrictive application of Civil Rights Law § 50-a. In the view of these courts, the answer for proponents of greater transparency can only be found by legislative action or a ruling by the Court of Appeals.[318] While legislation has been introduced, as of the date of this writing, none has passed.

The City has taken the position that Civil Rights Law § 50-a itself bars access to disciplinary records.[319] However, neither legislation nor court victories are needed for the Department to produce the basic information it has always produced, including summaries of misconduct substantiated by investigations conducted by the IAB or the CCRB. No court has required the City to interpret personnel records broadly; indeed, no court has ever held that the City is required to withhold information by Civil Rights Law § 50-a. Furthermore, "[n]othing in the Freedom of Information Law [ ] restricts the right of the agency if it so chooses to grant access to records within any of the statutory exceptions, with or without deletion of identifying

---

[318] *See New York Civil Liberties Union v. N.Y. City Police Dep't*, 148 A.D.3d 642, 642 (1st Dep't 2017) ("We appreciate the various policy arguments made by petitioner and *amici curiae*, and agree that the public has a compelling interest in ensuring that respondents take effective steps to monitor and discipline police officers. Likewise, we recognize that the principles of confidentiality that underlie section 50-a may very well be protected by the redaction of identifying details from the disciplinary decisions sought here. However, as an intermediate appellate court, we cannot overrule the Court of Appeals . . . . The remedy requested by petitioner must come not from this Court, but from the legislature or the Court of Appeals."); *Luongo v. Records Access Officer, Civilian Complaint Review Bd.*, 150 A.D.3d 13, 13 (1st Dep't 2017) ("Petitioner's remedies, under our tripartite system of government, rest with the Legislature as the policy making branch of government, not the courts, which are tasked with interpretation of the laws.").

[319] *See, e.g.*, Greg B. Smith, Kenneth Lovett, Graham Rayman, "De Blasio calls on Albany to nix law that hides NYPD officers' disciplinary records; cop unions protest," New York Daily News, Sept. 1, 2016 (quoting de Blasio as stating, "I believe we should change the state law and make these records public . . . The current state law that we have to honor — that does not allow for transparency").

details."[320] Finally, "FOIL is to be liberally construed and its exemptions narrowly interpreted so that the public is granted maximum access to the records of government."[321]

In short, the City's position that it is compelled to deny access to records may not be supported by the law.[322] While legislation is favored to remove the shield provided by Civil Rights Law §50-a, none is required for the City to restore transparency. The City's restrictive application of section 50-a undercuts transparency and accountability, which in turns threatens the long-term impact of the reforms implemented to remedy the Department's unconstitutional stop-and-frisk practices, not to mention the public's trust of the Department. Civil Rights Law § 50-a and the City's interpretation of it effectively prevents the public from performing its traditional watchdog function and the critical oversight needed once the Monitor's term ends. The New York state legislature should pass legislation remedying this gap in transparency and accountability by repealing Civil Rights Law § 50-a.

### 7.    Cultural Competency Training

Community members in attendance at community forums and those who participated in focus group discussions often expressed concerns around police officers' lack of cultural competence. Cultural competency is loosely defined as the ability to understand and interact with cultures and belief systems that are different from one's own. Community members felt that the

---

[320] *Short v. Bd. of Managers of Nassau Cty. Med. Ctr.*, 57 N.Y.2d 399, 404 (1982).

[321] *Buffalo News, Inc.*, 84 N.Y.2d at 492 (internal quotation marks omitted).

[322] In point of fact, "The NYPD provided the monitor team with the CCRB complaint counts per officer for the length of their careers" in connection with the BWC pilot program. The Monitor has published in part the result of analysis of some of this data, including that "Treatment officers had a total mean of 1.31 CCRB complaints with a range of 0-17 complaints. Control officers had a total mean of 1.54 CCRB complaints with a range of 0-25 complaints. Since career lengths vary . . . , the number of complaints was divided by time of service to estimate each individual officer's CCRB complaint rate per year of service." Sixth Report of the Independent Monitor, The NYPD's Body-Worn Camera Pilot: Research and Evaluation Plan (June 29, 2017).

absence of cultural competency training for police officers combined with any previously held stereotypical notions about these communities often resulted in misinterpretation of behaviors and or otherwise targeting community members. The collateral damage of this void often resulted in severely damaged police-community relations.

As a result of these concerns, participants suggested cultural competency trainings that would help officers better understand the communities that they work within. This training should be an extension of, but not be mistaken for, Fair and Impartial Policing training workshops. As written by Dr. Mitchell Rice in his 2008 primer, "cultural competency is not affirmative action, multiculturalism, diversity training, equal employment opportunity, or political correctness, but instead, it is an integration and transformation of knowledge about groups into specific policies, practices, and attitudes used in appropriate cultural settings to increase the quality of services, thereby producing better outcomes."[323] Such trainings will enable officers to develop a level of cultural awareness that helps them better understand the communities that they work in, thereby exhibiting actions that take into account the cultural context of the encounters. An earlier suggestion by the 1998 Mayor's Taskforce on Police Community Relations suggested such a curriculum. The Taskforce stated that "the Department should create a proactive curriculum which exposes student officers to the diverse and changing nature of the City's communities, that challenges them to become cognizant of and question the feelings, assumptions and perceptions which influence their behavior, and equips them with the

---

[323] Rice, M.F. (2008). *A Primer for Developing a Public Agency Service Ethos of Cultural Competency in Public Services Programming and Public Services Delivery*. Journal of Public Affairs Education and Administration.

necessary tools to effectively serve all communities with courtesy, professionalism and respect."[324]

### 8.    Neighborhood Coordination Officers

During the course of the JRP and specifically in the community forums, we had the pleasure of encountering several Neighborhood Coordinating Officers ("NCO") who were genuinely interested in improving community relations and developing problem solving strategies in their precincts. This model, along with the use of sector officers to engage community members, is long overdue and the NYPD deserves great credit for its implementation.

We recommend that this program be improved. Improved simply means that the quality of such policing extends beyond the few NCO officers assigned and that these officers are not the first to be pulled away for other assignments. There are a limited number of officers currently assigned to this role, and when those assigned officers are regularly pulled away this affects the NCO program as whole. A consistent message from community members was that NCOs were often the first officers pulled away for special events and assignments and that there are simply not enough of them. Many members of impacted communities want expanded opportunities for meaningful interactions with their NCO officers.[325] To be clear, this is not a recommendation for increased funding to improve or expand the NCO program, but instead to improve it within the budgetary bounds already allotted.

---

[324] Task Force on New York City Police/Community Relations: Report to the Mayor, March 1998.

[325] The NYPD has since expanded their NCO program into a leadership philosophy central to their internal reform process. Program expansion is underway, and by the publishing of this report, should be implemented in over 60 commands throughout the City.

## 9.   <u>Community Engagement – Reconciliation</u>

The NYPD should begin to infuse restorative justice efforts into its neighborhood policing strategy. The National Initiative for Building Trust and Justice houses a great number of toolkits and resources on reconciliation for police departments which may prove helpful to the NYPD. Greater emphasis should be put toward this effort through command officer training, Community Council meetings, public education campaigns, and Office of Community Affairs forums and fairs. The NYPD should develop effective techniques and strategies to foster community partnerships, support restorative justice initiatives, and ensure precinct-level accountability for improving public legitimacy. It is important that such efforts come from the top down, and more importantly that such a message is reinforced at every level of operations. While reconciliation is an undertaking which is as broadly defined as it can be far reaching, a strategy of incorporating reconciliation into the NYPD's current programs and trainings has the potential to inculcate systemic change, including with respect to the issue of mistrust.

## 10.  Police Trauma – NYPD Employee Assistance Program

During the Leadership Meeting Phase, community service organizations recommended that the NYPD further develop, augment and support its existing programs that assist officers in coping with trauma. Policing is a high stress, trauma-oriented job, so seeking support should be normalized for police officers.

It was recognized that police officers are exposed to various forms of vicarious trauma by constantly responding to traumatic situations in addition to any trauma they may personally experience in the course of their duties. It was further explained that just as implicit biases affect how officers interact with the public, trauma can play an important role because it causes hypervigilance and feelings of being threatened, which it turn may result in escalation of conflicts.

A critical aspect of addressing the mistrust between civilians and police is addressing the stress, trauma, and at times, disillusionment that officers carry, and take with them into the field. NYPD should ensure that support programs for officers are easily accessible, solution-oriented, and provide officers with strategies to manage trauma in a way that does not diminish their experiences or their competence in the field. It is recommended that the Court order that the NYPD enhance its current officer support functions, and incorporate workshops in collaboration with outside agencies, to assist officers in developing tools to identify and manage their own trauma, and better recognize how it affects their work in the community. The NYPD should also find ways to further encourage officer participation in these programs, as officers may be reluctant to seek counseling because of cultural reasons at the Department that make officers wary of admitting vulnerability.

## 11.     Training for Plainclothes Police Officers

Community participants of focus groups and community forums often cited plainclothes units as the worst offenders of unconstitutional SQF and trespass enforcement. Focus group participants shared experiences of plain clothes officers "rolling up" on them for no apparent reason. These officers were also labeled by community members as "D's". Participants expressed that these officers engaged in regular and frequent stops without justification. They further expressed that plain clothes police often targeted certain individuals for repeated stops. This issue was frequently raised throughout the JRP, with the experience of contact with plainclothes officers described as being fraught with tension, fear, and conflict.

It is our understanding that the SQF and trespass enforcement training for plainclothes units is being developed. We urge that in the interest of promoting safe, respectful, and constitutional interactions with the public, that the SQF and trespass enforcement training for plainclothes units be consistent with the comprehensive curriculum used to train uniformed officers, including the implicit bias and procedural justice elements.

## 12.     Criminal Court Search and Seizure Inquiry at Arraignment

In a city that at one point had over 685,000 stops-and-frisks in a year,[326] it is surprising that there was not a commensurate increase in the number of suppression hearings with police officers called to testify about the bases for these stops. Under the exclusionary rule for Fourth Amendment violations,[327] the Supreme Court determined that suppression of tainted evidence

---

[326] There were 685,724 reported stops-and-frisks in 2011. *See* NEW YORK CIVIL LIBERTIES UNION, *Stop and Frisk Data*, *available at* http://www.nyclu.org/content/stop-and-frisk-data. As noted elsewhere in this Report, officers were not preparing UF-250 for every stop they made, meaning the actual number of stops made in 2011 exceeds 685,724.

[327] *See Weeks v. United States*, 232 U.S. 383 (1914); *Mapp v. Ohio*, 367 U.S. 643, 656 (1961).

was necessary to deter police officers from violating constitutional rights.[328] But suppression hearings in the Criminal Court are few and far between.[329]

While the Supreme Court recognized the limitations of suppression as a means to control police behavior,[330] it nevertheless stated that "[u]nder our decision, courts still retain their traditional responsibility to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires."[331] As Federal Court Judge Jack Weinstein wrote regarding *Terry*, "Active policing of the police by trial courts was noted as serving a 'vital function.'"[332] The idea that courts can promote constitutional policing by conducting suppression hearings is not limited to *Terry*. As then-Chief Justice Burger stated almost fifty years ago, "suppression of evidence in these cases [is] imperative to deter law enforcement authorities from using improper methods to obtain evidence,"[333] and that law enforcement would indeed be deterred if evidence was "suppressed often enough."[334]

---

[328] *See Mapp*, 367 U.S. at 656.

[329] In fact, there is no readily available data kept by any state agency regarding the number of suppression hearings held or the outcomes of those hearings. *See* Steven Zeidman, *Policing the Police: The Role of the Courts and Prosecution*, 32 Fordham Urb. L.J. 315, 321 (2005). The Criminal Court of the City of New York Annual Report lists the number of "pre-trial hearings commenced," but does not delineate the type of pre-trial hearing, whether the hearing was actually completed, and, most important, the outcome. *See* OFFICE OF THE CHIEF CLERK OF THE N.Y. CITY CRIM. CT., CRIMINAL COURT OF THE CITY OF NEW YORK ANNUAL REPORT 2011 6 (Justin Barry ed. 2012), *available at* http://www.courts.state.ny.us/courts/nyc/criminal/AnnualReport2011.pdf

[330] *See Terry*, 392 U.S. at 14-15.

[331] *Id*. at 15. Similarly, prosecutors have a special duty to do justice; a requirement that emphasis procedural validity over obtaining convictions.

[332] Jack B. Weinstein & Mae C. Quinn, Terry, *Race and Judicial Integrity*, 72 St. John's L. Rev. 1323, 1328 (1998) (quoting *Terry*, 392 U.S. at 12).

[333] *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 413 (1971) (Burger, C.J., dissenting).

[334] *Id*. at 415.

In addition, during the Leadership Meeting Phase, we received feedback that under the current criminal procedure law in New York,[335] as applied, there is no discovery process for ascertaining the issues connected with a stop until the beginning of a trial. The practical result is that because most cases result in a plea deal, there is no opportunity to obtain discovery about stops in most cases.

For these reasons, we believe that judges should be encouraged to ask the prosecutor, early in the proceedings, for the factual predicate of the search and seizure in each case they hear. Instead of asking "What's the offer?" or "Is there a disposition?" at the start of each arraignment, judges should ask "What is the basis for the stop and arrest?" This inquiry need not be particularly time-consuming, but would at least allow the Criminal Court to on some level monitor police/citizen interactions on a regular basis. In addition, Criminal Court judges should consider, where appropriate, holding more suppression hearings that would test the validity of stops in light of the unconstitutional policing that resulted in the *Floyd*, *Davis*, and *Ligon* litigations.

---

[335] *See* CPL Article 240; *People v. Rosario*, 9 N.Y.2d 286 (1961).

**SECTION VIII: PROCESS OBSERVATIONS AND LESSONS LEARNED**



**Final Report Phase**

**Community Forum Phase**

Borough wide community forums

**Leadership Meetings**

**Focus Group Phase**

Operationalization of focus group concept and implementation

**Relationship Building & Alliance Development Phase**

Involves small round table meetings with stakeholders intended to lay the

## Introduction

The Joint Remedial Process ("JRP") was an opportunity to better understand the issues and experiences of impacted individuals, based on qualitative feedback from communities affected by the New York City Police Department's ("NYPD") stop, question, and frisk and trespass enforcement policies ("SQF"), and to cultivate meaningful engagement between these communities and the NYPD. Relying on national trends supporting community input in reform efforts, the Facilitation Team sought to design a process which could be used as a model for continued collaboration between police departments and the communities they serve. As such, it became increasingly important that as the process was developed and executed, careful attention was paid to assessing the effectiveness of our methods for possible reproduction.

This section provides a review of the Facilitation Team's observations at each Phase of the JRP, and provides some additional suggestions on how some of these methods could be implemented or revised to accommodate other jurisdictions and cities of varying sizes. We also

share this information in the hope that it might assist organizations and law enforcement agencies seeking to replicate this process. Each section provides a brief summary of the topline issues and ideas that presented themselves during the planning and implementation of the process. These ideas can be used as a guidepost for future discussion and planning.

### Convening Phase

As the initial step in the development of the remedies process it was critical that the Facilitation Team developed a strong base that included individuals and organizations that would be willing to assist in the development and implementation of the JRP. In order to do that, it was important to take a step back and review the goals of the JRP — namely to get meaningful feedback on reforms from impacted community members and to provide a framework for addressing police-community relations in New York City. The convening stage was developed as a means to develop relationships with community organizations and other New York City actors. This in turn created opportunities for these organizations and individuals to actively engage in this community engagement process by, among other things, populating focus groups, co-hosting community forums, participating in leadership meetings, and/or providing white papers. In review, we raise several themes in the development of this Phase and the JRP overall, including:

- Identifying Issues and Outreach
- Figuring Out the Goal
- Issues of Process Design
- Roles and Responsibilities of the Facilitation Team
- Effects of Changes in Political Climate

Identifying Issues and Outreach in the Convening of the JRP

In order to develop a robust process the Facilitation Team needed to better understand the scope of the issues at hand beyond the SQF statistics that have been publicly available. In addition to developing a greater understanding of the scope of the problem, it was important to understand how this process aligns with prior community engagement processes in other jurisdictions. Using the community engagement efforts in Cincinnati, Seattle, and elsewhere as a guide, the Facilitation Team placed seeking several inputs into the structure of the process a priority. Stakeholder groups would be the impetus for this input. It was therefore important that the Facilitation Team identify entities and representatives who were familiar with the SQF and trespass enforcement, either by their mission or their connection to communities impacted by these policies. In consultation with plaintiffs' counsel and the NYPD, a list was generated that included several elected officials and community groups for initial outreach, with the option of expanding outreach as necessary. In order to cultivate these working relationships, the Facilitation Team set up a series of internal meetings to discuss the development of the JRP.

These early meetings helped the Facilitation Team sift through ambiguities and challenges. The following questions, generated during early planning meetings, helped develop a focused process:

- What does a Joint Remedial Process look like?
- Who are the communities most affected?
- How do we define community?
- How do we penetrate these communities?
- How do you conduct outreach?
- How broad or narrow should the outreach be?

Given the mandate of the Joint Remedial Process, it was critical to identify the communities most affected by SQF practices. We determined that the best way to identify these communities was through the use of publicly available SQF and trespass enforcement data.

We further determined the best way to gather robust data from these communities was through multiple phases and varied means of soliciting community input. This would allow the Facilitation Team to gather varied input from a diverse set of perspectives that included both individual and collective voices.

Having had early conversations on the issues from different community groups, the Facilitator thought it important that communities most impacted feel as if their concerns were heard and carefully considered rather than just quantified. With this in mind, the JRP Team developed a streamlined process with a simplified series of phases aimed at gathering a wealth of information, giving community members a space for catharsis, and collective brainstorming, while also providing opportunities for interactions between police officers and community members. This allowed the Facilitation Team to receive direct input from police officers while at the same time fostering better police-community relations.

<u>Figuring Out the Goal of the Process</u>

Contending with the potential for wide and varied input meant that the Facilitation Team would need to navigate a relatively neutral path toward the final recommendations and reforms. This presented two issues, whether inputs should be regarded based solely upon consensus, or whether the goal of the process was to recommend mandated reforms and suggested ideas for

change.[336] Moving forward, it was decided that information from a wider audience would be ideal, rather than to restrict input based upon the development of an arbitrary structure. The Team decided to cast a wide net for information gathering.

<u>Issues of Process Design</u>

There were several options available for the initial information gathering phase — these included a traditional survey, a participatory action research survey or a focus group process. There are distinct differences between these research methodologies. Due to the magnitude of information gathering the JRP would require, the Team had to contend with how best to move forward with developing the process structure. Initially, the Team considered a survey for gathering such extensive input. The Facilitator initially sought out entities to assist in the development of this survey. After learning more about participatory action surveys, the Team considered a proposal from the City University of New York ("CUNY") for gathering community feedback. The NYPD, however, was not amenable to the use of a participatory action survey approach.[337]

<u>Facilitation Roles & Responsibilities</u>

As a result of our consideration of various methodologies for community engagement and information gathering, the Team developed a better understanding of the role of the Facilitator and Facilitation Team in relation to community groups. Given the unique nature of this process, the Team had to make determinations about the responsibilities of the Facilitator after several

---

[336] These issues were recurring throughout the varying phases of the JRP before resolving in the Final Report all feasible recommendations, and reporting upon those outside of the scope of the JRP.

[337] One of the other issues we found with the survey model was that it lacked a component for the discussion of issues between community members, limited the information we could receive based on response options, and the complexity of information we received which might be helpful for generating additional recommendations.

conflicting discussions with the New York City Law Department, NYPD, plaintiffs' counsel and other stakeholder groups. For example, plaintiffs' counsel and CPR argued that the JRP should function as a community-driven process, instead of as a process supervised by an independent and impartial Court-appointed Facilitator. Clearly, this might affect the outcomes of the information gathering process. This issue was recurring throughout the course of the JRP.

For the purposes of providing community centered guidance, the Facilitator decided to convene an Advisory Committee. Given the Facilitator's position that the JRP serve in some capacity as a healing exercise, the Advisory Committee was convened to create opportunities for community members including the class action plaintiffs, clergy, academic leaders, police union representatives, as well as NYPD and NYCHA, to play a significant role in steering the Joint Remedial Process toward a cooperative end for all parties involved. While the mission of the Advisory Committee was noble, it was problematic in its execution. Representation among the constituent groups was inconsistent. Due to this inconsistency, discussions were often repetitive. Member fatigue soon set in consequently affecting the discussions and attendance. As an alternative, the Team decided to collapse meetings into smaller working groups, invite community-based members to attend All-Parties meetings,[338] and agree to convene fewer, more topic-specific, meetings moving forward (these changes are discussed in further detail in the 'Overarching Observations' section below).

---

[338] All-Parties meetings were usually attended by only plaintiffs' counsel and NYPD executive leadership, but over time and under advisement of plaintiffs' counsel, CPR members of the Advisory Committee were invited to attend which allowed us to collapse the Advisory Committee schedule to an "as-needed" basis.

Changes in Political Climate

One additional process observation in this section was navigating the changes in the political climate since 2014. At the time the JRP was unfolding, several high profile incidents in which allegedly excessive force was used or there was an unjustified shooting by a police officer occurred locally and nationally. The JRP Team was faced with the challenge of navigating the existing tensions in communities not just based upon SQF and trespass enforcement in New York City, but based upon events and news media surrounding similar tensions across the nation. The Facilitation Team sought to develop a local community engagement process which was in many ways related and yet separate and apart from the events that were taking place at that time. The Facilitation Team recognized the importance of addressing allegations of excessive force or unjustified shootings. While it was also understood that investigative encounters are often the antecedent to these types of incidents, the JRP was limited in its jurisdiction to unconstitutional SQF, and trespass enforcement.

Because it was important to the Facilitation Team that community members provide direct and meaningful input into the JRP, it became increasingly important that care be given not to stifle input or displace SQF from the context in which it arose. Instead greater care and attention was placed on meaningful engagement, skillful facilitation of focus groups and community discussions, and conscientious redirection during all of these input sessions to the central jurisdictional issues of SQF and trespass enforcement in New York City.

**Focus Group Phase**

The Focus Group Phase presented the Facilitation Team with its own unique set of opportunities and challenges. Below, we highlight some of the topline concepts which could be useful as a catalyst for continued inquiry and discussion.

286

Focus Group Questions

As covered in the Focus Group Phase section of the Final Report, a list of questions was generated in consultation with plaintiffs' counsel, NYPD executives, and CPR for community feedback. Questions were carefully drafted and negotiated to be as neutral and open ended as possible. This was not without its challenges, however. There were challenges negotiating the types of questions that were asked, and in striking a balance between the stakeholders for input into the development of questions.[339] After using the agreed upon questions during the initial set of focus groups, the focus group facilitator and co-facilitator determined that questions should be revised as need to meeting the nuanced requirements of an individual focus group. While great care was taken to standardize as much as possible, in some groups questions had to be reframed to ensure context and understanding by the participants. The Facilitation Team was able to garner information through the use of questions, ideas, and formats which were as similar as possible, while creating space for the type of group variance which could yield different outcomes in responses. For example, the question "Do you feel safe in your neighborhood?" often yielded disparate responses depending upon the group. Many community members responded in context to their feelings of safety with regard to their neighbors and their community, while the majority responded in regard to police officers. These responses laid the groundwork, at times, for varying sets of probing questions which helped the focus group facilitators to develop more meaningful inferences about the nature of police-community relations in these groups.

---

[339] The Facilitation Team initially developed a series of open-ended questions which were agreed upon by plaintiffs' counsel, but the NYPD hadn't provided input until the focus groups were about to commence. Additionally, questions had to be re-drafted, and the focus group facilitator had to take great care to inform all of the stakeholders about the nature of focus group questions which should not be leading or result in simple yes/no responses.

Focus Group Facilitator and Co-facilitator

Another important observation was in regard to the assigned focus group facilitator and co-facilitator. In line with research and tool kits on hosting focus groups, the Facilitation Team took great care to create a safe and neutral environment for participants. In addition to utilizing community spaces, the focus group facilitator and co-facilitator also took several measures to ensure that community members would feel safe to speak freely. For each forum, the facilitator and co-facilitator dressed in casual attire, the meeting space was organized into a circle, and the co-facilitator observed and took notes outside of the circle so as not to distract participants.

The focus group facilitators also took time to foster relationships with hosting organizations and participants to cultivate a culture of trust among participants. During meetings, the facilitator and focus group facilitator would start with an ice breaking activity which we called "Personal Prose". This activity allowed participants to write details about themselves into a poem which could optionally be shared with the group. As part of making participants feel comfortable, the facilitator and focus group facilitator would participate in sharing their own personal prose with the group. After meetings participants could choose to participate in a small debriefing activity, and were free to ask questions of the Facilitation Team within the context of the focus groups. Some suggestions for focus group facilitators included:

- Cultivating a culture of trust between the organization and Facilitation Team.
- Utilizing ice breaker activities and initiating discussion.
- Engaging in casual conversation before and after group meetings.
- Providing closing debriefs or activities to re-center participants.
- When possible, utilizing facilitators from the same or similar background as participants.

Group Size and Dynamics

Since focus group participants were intentionally selected from a sample of individuals with direct and indirect SQF and trespass enforcement experiences, many participants would become consumed with recounting their own experiences which made it challenging to discuss solutions. During the early phases of the focus group process, the Facilitation Team realized that we would have to limit group size and dynamics in order to preserve the integrity of the discussion. Having smaller, more manageable groups of individuals with similar ages and circumstances made for much more streamlined conversation and greater opportunities for the facilitator to probe, where needed, within the allotted meeting time.

Cutting Through Direct and Vicarious Trauma

One of the clearest and most visceral issues the Facilitation Team was confronted with during the process was the severe apprehension most participants would bring into the focus groups. Many community members did not/could not distinguish the JRP from the NYPD, feared being recorded, or feared retaliation by the NYPD for their participation in such meetings. For this reason and beyond, great care was taken to assure the confidentiality and anonymity of focus group participants so as to relieve their fears of exposure, and create a safe space for continued open and honest discussion among participants. Developing a clear "what happens here, stays here" primer is just one method of relieving the concerns of apprehensive civilians. Other methods utilized included the use of relatable facilitators, building in space for catharsis and group-sharing, and the employment of trust-building and debriefing exercises.

Experience of Trauma and the Inconceivability of Change

Aside from issues of fear and mistrust, the Facilitation Team was often met with a degree of community cynicism toward the possibility of reforms. In what the Team has labeled the "Inconceivability of Change" paradox, community members would often highlight the perceived inevitability that "nothing is going to change," while at the same time highlighting the desire for change. Through continued internal dialogue, the Team came to understand these statements not as a symptom of sheer pessimism but as a result of the traumatic experiences of SQF and trespass enforcement. We found that while community members earnestly wanted change, they also struggled to envision what change would look like. Community members, we perceived, had begun to lose hope that anything could change, let alone that they could have any part in such change.

Part of unpacking this helplessness required that the focus group facilitator utilize the tools of empowerment and imagination to get community members to push past barriers and articulate conceivable solutions. By asking community members to "pretend for a moment," "act as if" or "picture in your ideal world," the focus group facilitator was able to coax community members toward a solution orientation rather than a problem orientation.

Emerging Areas for Reform

Part of conducting an exploratory review or analysis of any kind is the understanding that one may end up discovering concepts that are entirely novel. During the Focus Group Phase participants provided great richness and depth to current paradigms about police reform. More surprising, however, was the community members conceptions of larger social issues, such as teenage homelessness and lack of after-school programming, that were relevant but beyond the scope of the Joint Remedial Process. These ideas were often powerful truths or suggestions

290

which we believed deserved a platform, but which did not fit squarely within the confines of the Remedies Opinion. It was important to the Facilitation Team however not to lose the richness of this information despite our inability to make recommendations concerning these non-jurisdictional issues. That being said, the Facilitation Team felt it important that such information not be neglected on such a basis, but made available to the public for further consideration. The way we chose to navigate the use of this information was by incorporating a code in the analysis for "Extraneous Reform Ideas." This allowed us to capture useful suggestions that could be addressed in the report as "Areas for Further Policy Consideration."

Evaluating Outliers

In every group there is an outlier — an entity that strays far enough from the larger group to be noticeable. The focus groups were no exception. Though relatively few in number, there were instances in which participants had suggestions or made remarks that were far removed, or in direct contrast to the ideas of the larger group. In many cases, the focus group facilitator would give context to outlying statements by asking probing questions. We found that while some participants had similar experiences to other members of the focus group, they held vastly different attitudes and opinions. Understanding how other mitigating factors such as age, race, gender, and sexual orientation might factor in, gave the focus group facilitator context to infer the reasoning behind the participants assertions. Even outlying information was recorded and analyzed. Data was not quantified based on the frequency of assertions. These outlying assertions often provided additional context for the Facilitation Team to consider.

Cultural Competence

It is important to be able to interpret meaning through the use of various accents, slang or cultural euphemisms common in represented communities. At all stages of the focus group

process, cultural competency was an underlying concern for the Facilitation Team. During the Focus Group Phase, the Facilitation Team had to switch transcription companies after reviewing transcripts that inadvertently pulled participants' language out of context, misattributed remarks or misstated participant responses based on the apparent inability on the part of transcriptionists to understand common street vernacular. In groups with LGBTQ individuals, it was similarly of great importance that the focus group facilitators have some basic knowledge of within-group labels and vocabulary. In the Community Forum Phase, it was critical for us to provide language and physical access, as well as access for the deaf and hard of hearing, in order to best fit the needs of the communities in which we conducted our outreach processes. All of these minor shifts allowed us, in some respects, to bridge the gap between the JRP and the community, and gather more meaningful feedback from the individuals who participated in the overall process.

## Leadership Meeting Phase

### Continued Calls for Collaboration

Since leadership meetings were largely held with community organizations and advocates nationally and across the City, the Facilitation Team determined that there are distinctive elements to engagement with this groups that differ from engagement with community stakeholders. As subject matter experts and advocates, many groups were wary of goals and intentions of the Joint Remedial Process. The Facilitation Team tried to assuage this skepticism by providing organizations with an introductory packet which included an abridged list of some of the topics presented to us in the Focus Group Phase and an open agenda for the general format of the meeting. Providing these resources allowed organizational leadership the opportunity to directly address ideas that their organizations worked with most closely. These resources also assisted them in providing detailed feedback to the Team on the subject of reform. As these

organizations are working in these areas on a daily basis, we found that most leadership expressed a strong interest in continued engagement with the outcomes and recommendations of this process. Many times, organization leadership asked for expanded opportunities for information gathering and feedback for the purpose of promoting the organization's continued work in the field.

For our purposes, the Joint Remedial Process Team provided expanded opportunities for input by requesting that organizations provide white papers addressing the concerns of their group.[340] Additionally, we compiled a list of organizations interested in continued collaboration with the NYPD, which we have made open to the public in Appendix G to this report.

### Community Forum Phase

By conducting a review of and reflecting on the forums in debriefing sessions, we were able to identify, in real time, potential threats to the legitimacy of the forums conducted in the JRP. These include:

- "Leveling" & Empowering Marginalized Voices.
- Collaborative Planning and Understanding Process Style.
- Finding a Common Language for Discourse.
- Unpacking and Managing Group Dynamics.

Empowering Marginalized Voices

Throughout the Joint Remedial Process, the Team focused its efforts on seeking out the voices of directly-impacted communities and individuals, and less on institutions. Therefore, the community forums were intentionally developed as a platform to elevate the voices of

---

[340] *See* Appendix A.

community members as subject matter experts. While much of the feedback from these conversations was reflective of a reality of which the average New Yorker may not be aware, for the people that live in these neighborhoods, and are part of these demographic groups, the stories they shared reflect the experiences of certain marginalized communities.

Collaborative Planning and Process Style

One of the key questions in our evaluation of the Community Forum Phase was how could forum development have been made more efficient? Throughout the planning, design, organization, and implementation of the forums it became evident that there exists an inherent tension between community-based and governmental structures. While many grassroots organizations utilize a democratic approach to planning, this was at times difficult to reconcile with the work processes of the JRP. The JRP was conducted pursuant to timelines as directed by the Remedies Opinion. While the Team acknowledges the greater fairness in a democratic process, constraints on the time and resources made it often difficult to achieve consensus around the programming of the forums.

It is however critical to address the ongoing interplay between grassroots organizations and institutional structures. Efficient collaborations require that expectations are clear, representation is apparent, facilitation is effective, and representatives have authority to speak for and make commitments on behalf of their member base.

Finding a Common Language for Discourse

At several junctions of the JRP, semantic fragmentation became an issue between groups. Often the subtle differences in interpretation led to protracted debates about intentions and fueled distrust among groups over similar ideas. One clear example was the varying definitions of

"Community" among the stakeholders. Whether geographic, demographic, broad or more focused, it became clear that it is imperative to develop a common language for discourse between a wide range of interest groups.

There is a need for more collaborative conversations and consensus building on ideas and their meanings. Effective collaboration within a working group requires communication so individual players are prepared to function as a cohesive team. It is critical at every juncture of a project to develop a shared vocabulary with all parties involved.

Unpacking the Dynamics of Small Group Discourse

Yet another set of observations made during the Community Forum Phase was around the adherence to certain social standards in group dynamics. For example, in some groups of women and men, male participants tended to dominate the conversation while female participants provided more passive feedback. In other examples, like with the West African forum, the groups self-selected themselves into all male and all female groups. We found that with these different arrangements there was improved participation, and a noticeable increase in the amount of feedback we received from women.

Similarly, in some groups of youth and adults, youth tended to self-censor and, generally, showed greater deference to the elder members of the group. In groups that were comprised predominantly of peers, discussions were often more open as contrasted with groups that included perceived authority figures. We found this to be especially true in groups with youth and police officers. While many youth present at select forums were willing to engage in earnest dialogue with officers, we did observe a tendency of officers to engage youth more didactically.

In general, we found that while forums that involved police officers worked well to bring community and police together to discuss the fractured relationship between the two, they were somewhat less effective as problem solving activities. In many of the groups, Neighborhood Coordination Officers participated to engage community members in conversations about changes to the Department. We found that in most of these instances the officers present were inclined to answer questions, provide feedback or rationalization for civilian anecdotes, and share information on new programs and policies the Department has undertaken to address previous abuses. As helpful and as well received as these discussions were, the type of pedagogical discourse undertaken by officers in the group had the effect of shifting the dynamics of the conversation from collaborative problem solving to public education.

Managing group dynamics is challenging, particularly when hosting public events. While one cannot predict the quality of the interactions between members in a group setting, a great deal can be learned through observation. Group interactions can be managed in many different ways. For example, the use of small group facilitators helped to manage the conversations in the JRP forums and keep the focus on a collective goal. Other tools that could have been utilized include icebreakers and team building exercises, providing alternative options for feedback or anonymous sharing, setting clear expectations for group members, and creating space for minority (*i.e.*, outranked or outnumbered) voices by leveling the field and giving greater deference to such members.

Unpacking Fear and Mistrust

One of the most significant observations made during the Joint Remedial Process as a whole, has been the patent level of fear and mistrust of police in directly-impacted communities. During the community forums, it was evident that while many community members wanted

better relations with police, and better policing in general, most of the individuals involved in the forum still held a level of apprehension around police involvement. With the assistance of strong community leaders, we were able to convene a series of forums both exclusive and inclusive of officers, but in each set of forums the residual trauma, and relative disillusionment of community members was pronounced. Many community members utilized community forums as cathartic exercises, sharing feelings and experiences they have around policing. At many junctures, facilitators would have to steer the conversation back toward sharing potential solutions, while giving space to community members to unpack their trauma, and highlight issues they observed or experienced in their communities. Other groups self-censored, either providing disproportionate deference to officers, or shying away from discussion all together. In these instances, facilitators attempted to coax community members to share or stay present for discussion.

In instances where police were not included in the forums, based on community objections, fear was a heavily cited argument for the lack of police presence. Many individuals highlighted worries about retaliation as a consequence of police-involvement. The decision to develop two tracks seemed to be the most compelling direction for the JRP process, but other suggestions for addressing this issue in dialogue with community are raised below:

- Priming community members for discourse through a solution-oriented framework
- Preparing officers for engagement through trauma-informed and communication-skills workshops
- Making space for community catharsis
- Utilizing truth and reconciliation methods for dialogue and the full acknowledgement of offenses
- Providing closing decompression exercises for both officers and civilians

While the above suggestions are not comprehensive, we believe they lay a good foundation for successful engagement between groups in future endeavors.

## Overarching Observations in the Joint Remedial Process

<u>Community Distrust of Institutional Players</u>

Likely due to the years of direct and vicarious trauma pervasive in many of the impacted communities, there were often challenges for the Facilitation Team in garnering the trust and respect of community members, as well as leadership. Overall distrust in the police, and the potential for reform, were obstacles to navigating an information gathering process that communities felt was legitimate. Many times the Facilitation Team would have to publicly differentiate itself from the NYPD to maintain its independent and impartial role in developing reform ideas. This distrust is not without warrant.

While there have been significant strides in New York City toward greater transparency, accountability and impact in marginalized communities, it is also fair to say that there is still a long way to go. Part of ushering in a new wave of reform is acknowledging past abuses and their lingering effects, and building in methods to garner trust. Methods used by the Facilitation Team to establish trust included the use of safe and neutral spaces for focus groups, meetings and forums, providing open communication and greater transparency (as much as possible), and fostering an overall culture of respect. Many of these methods were effective, though they could have been applied more liberally. Institutional players should make efforts, as much as possible, to provide more receptive environments for communities to meaningfully engage with projects. Other ideas that could be helpful for entities looking to work with traumatized communities could include the use of team building primers, fair and timely responses to requests for

information, full acknowledgement of missteps, and greater collaboration with stakeholders, including critics, whenever possible.

Community Empowerment and Responsibility

Part and parcel of engaging and collaborating with communities is the basic need for community empowerment. Giving voice to marginalized and directly-impacted communities requires that community members feel as if what they have to say matters. As much as possible, the Facilitation Team sought to give deference to community leaders in driving the JRP toward a successful end. That being said, the Facilitation Team also recognized a need for a more balanced sense of responsibility for community partners. We do not fault community members for not taking a more dynamic role in the promotion of reform, but we raise this point as a call to action. At Focus Groups, Leadership Meetings, and Community Forums alike, community members emphasized the need for both the NYPD and the community itself to make stronger efforts toward change and collaboration. We believe that ensuring that the NYPD uphold its mandate and commitment to change also requires that most impacted communities take on greater responsibility for public safety in their communities, and hold themselves accountable for the preservation and oversight of change.

In making these assertions, the Facilitation Team would like to acknowledge the community organizations and individuals which have been committed to continuing the mission of change from the Cure Violence movement, to the Citizens United for Police Reform, to Citizens Crime Commission and Citizen's Union. For institutions and municipalities committed to reform in New York City we have provided a list of organizations that have enlisted to provide their knowledge, expertise and services for the purposes of perpetuating change in the policing community. This list can be found in Appendix G.

Stakeholder Fatigue

Over the course of the Joint Remedial Process the Facilitation Team observed many of the symptoms of what we have labeled "Stakeholder Fatigue." Individuals and entities that were once enthusiastic and inquisitive, over time became less active and generally less responsive. We understand this to be a natural consequence of the substantial duration of the Joint Remedial Process, while also acknowledging that greater efforts could have been made to maintain strong stakeholder engagement. For example, while very active and engaged in the beginning of the process, over time NYPD become less responsive to requests for timely meetings and information. Similarly, community leaders became less engaged over time. Upon review of the process overall, the Facilitation Team has come up with several suggestions for managing stakeholder engagement over a considerable duration of time.

One tenet we believe is integral to the promotion of ongoing engagement is the generation of value. Social science literature asserts that generally the value or worth that we ascribe to a thing drives our motivation to pursue it.[341] We found that superfluous or didactic meetings will affect fatigue, and instead we suggest that strategic meetings with opportunities for tangible outputs as a result of such meetings will likely be much more effective. Additionally, we found the use of collective agenda setting, the provision of consistent updates, and an emphasis on relevant next steps can likely be useful to prolong engagement.

Understanding Repeated Calls for Change

History and context are fundamental. During the early phases of the JRP it was challenging for the Facilitation Team to navigate some of the effects of the residual trauma and

---

[341] A literature review of principles in psychology, and namely Expectancy-Value theory can speak to this phenomenon more broadly.

mistrust that existed in communities. We found over time that emphasis on police-community relations, for example, would not be sufficient to address the demands of communities which have been attempting police reform for decades. The Facilitation Team was only able to come to a clearer understanding of these points with extensive review of past reform efforts.

Unfortunately, we acknowledge that institutional memory is short, but this point underscores the need for broader attention, review and analysis of repeated calls for change. While the idea may seem obvious, it's important to note that current institutional effort may not be enough. Police departments should take into careful consideration the review past litigation, corrective initiatives and analyze their impact on communities, particularly when those initiatives are relevant to calls for action in the present.

Retooling the Advisory Committee

Advisory committees are collectives of subject matter experts who assist managers in steering the course of projects. Generally speaking, advisory committees provide a wealth of information and resources, and are a beneficial addition to any process. However, in the case of the JRP, the Advisory Committee presented a number of challenges. Committee and participant attendance was imbalanced, meetings were long and at times combative, ideas being discussed were often repetitive and messaging was at times unclear. While Advisory Committees can be a useful tool, we believe it faltered under the JRP for the following reasons:

- Representation of stakeholder groups was inconsistent
- Meetings were often simple updates rather than collective strategy sessions
- Strategic meetings were at times antagonistic due to distinctions in ideological focus
- Topics from external meetings often distracted the focus of the Advisory Committee

Eventually, members of the Advisory Committee were invited to attend All Parties meetings, which helped to ensure that discussions were more clear and productive. Advisory Committee meetings were then pared down to an as-needed basis.

While the Facilitation Team favors the All Parties meeting model for more collaborative reform processes, we provide some plausible ideas for managing a more fruitful and engaged Advisory Committee. We list these ideas below:

- Collective determination of the Advisory Committee's goals and objectives
- Developing protocols, conduct guidelines and a confidentiality regimen that is agreed upon by all members
- Ensuring balanced stakeholder involvement
- Limiting the number of members to better manage group dynamics[342]
- Facilitating discussions based on strategy and deference to expertise
- Developing working groups and tasks for members

---

[342] Literature on group dynamics suggests no more than eight participants. The JRP Advisory Committee was comprised of twice as many members.

302

## SECTION IX: CONCLUSION

The New York City Joint Remedial Process was a landmark collaborative civic engagement process that was not previously ordered or undertaken in a city as large and diverse as New York City.

The Facilitation Team hopes that its recommendations for additional reforms to the NYPD as well as the areas for policy consideration that are documented in this Final Report will be given serious consideration. It was our intention to give voice to those hundreds of thousands of persons living in communities that were widely affected by sustained and wide scale policies and unconstitutional policing.

We note that the NYPD has made great strides in ending these policies and has demonstrated great willingness to continue to do so by engaging in profound revisions to its future policies and training protocols. We also note that it is committed to executing community policing in the form of its Neighborhood Coordinating Officer Program.

These are important and necessary first steps which we applaud. While we are cognizant that the Department has come far, we urge that there are still significant reforms to be made particularly in the areas of transparency and accountability.

We also note and thank the hard work and dedication of the Monitor and his team who have implemented the Immediate Reforms through a carefully designed and executed process. The Monitor attended many of our meetings and we are grateful to him for his valuable input.

I would be greatly remiss if I did not thank the outstanding work of the Facilitation Team. My Deputy Facilitator, Michael Young, Senior Advisor Reinaldo Rivera, Project Manager

Jeanene Barrett, Deputy Project Manager Valerie Paul, Project Attorney Cliff Bloomfield, and Project Assistant Jennifer Dionicio have been indispensable in executing the Joint Remedial Process.