

# Interior Patrol of Housing Authority Buildings

## Housing Bureau One Day Training
## NYPD Police Academy

Deputy Commissioner, Risk Management Bureau
Jeffrey Schlanger

Chief of Housing Bureau
James A. Secreto

 

Instructors should inform the class that their attention and participation is expected during the class.



# Video of Chief Secreto

Talking points for Secreto video:
His own experience growing up in public housing (community trust)
History of stop and trespass arrests in NYCHA buildings (not about numbers)
New information, help do your job better
Empower cops with more discretion – use your common sense
Good tactics and officer safety



Each instructor should introduce themselves and their background to the class.

Why are we here? Changes were made to the Patrol Guide with regard to interior patrols in NYCHA developments. There have been questions and some confusion from members of the Housing Bureau about what these changes mean when it comes to their enforcement authority. The Department decided that training should be created specifically for Housing Bureau personnel to address these questions and concerns.

If necessary, provide class with some background regarding the "Stop and Frisk" lawsuits and the court-ordered reforms.   The main point you are getting to with this information is that by improving our practices, we are moving towards substantial compliance with the Court orders. The Department cannot achieve substantial compliance without your help.

Background on the 3 class-action lawsuits for instructor only if questions come up:

2008: Floyd v. The City of New York
The plaintiff class alleged that the NYPD's use of Stop, Question and Frisk violated the constitutional rights of the members of the class, African-American and Hispanic individuals. The allegations were that the NYPD violated the plaintiffs' constitutional rights in 2 ways: members of the class were stopped without a legal basis in violation of the Fourth Amendment and they were targeted for stops because of their race in violation of the Fourteenth Amendment.

In 2013, the Court ruled in the Floyd case that the NYPD's extensive use of Stop, Question and Frisk violated the constitutional rights of African-American and Hispanic individuals and appointed a Court Monitor to oversee reforms.

2014: NYC withdrew its appeal of that ruling and agreed to make the ordered reforms.

2010: Davis v. The City of New York

The case challenged the NYPD's practices of unlawful stops, questioning, detaining, and arrests of New York City Housing Authority ("NYCHA") building residents, as well as their visitors—the majority of whom are Black or Hispanic—for criminal trespass without sufficient evidence and due to their race and/or ethnicity in violation of their Fourth and Fourteenth Amendment constitutional rights.

The allegation was that the NYPD violated the Fourth and Fourteenth Amendment rights of the class members due to its alleged policy and practice of stopping, questioning, detaining, and arresting people in residences owned and operated by NYCHA on suspicion of criminal trespass without sufficient legal basis and in a racially discriminatory manner.

2015: NYC settled the case with the plaintiffs. As part of that settlement, the Davis plaintiffs joined the court monitoring of the NYPD.

2012: Ligon v. The City of New York
This case alleged that the NYPD violated the constitutional rights of residents of buildings enrolled in the Trespass Affidavit Program ("TAP"), their visitors, and other individuals likely to be unlawfully stopped, questioned, frisked, searched, summonsed, or arrested on suspicion of trespass in and around TAP buildings.

2013: The Court ruled on one aspect of the Ligon case that dealt with unconstitutional stops outside of TAP buildings in the Bronx. Ligon also became a part of the court monitoring ordered in Floyd.

2017: NYC settled the Ligon case with the plaintiffs.

The judge appointed Peter Zimroth as the Federal Monitor for all three cases. He is responsible for ensuring that we implement reforms required in order to be in substantial compliance with the Court orders.

Court-ordered reforms included revisions to the following:

- Department Policy on Stop and Frisk (now "Investigative Encounters") (**PG 212-11**)
- **Stop Reports** with narratives and expanded supervisor's section replaced the prior "UF 250"
- Department Policy Prohibiting Racial Profiling and Bias-Based Policing (**PG 203-25**)
- Department Policy on Interior Patrol procedures in TAP and NYCHA buildings (**PG 212-59; 212-60**), including the requirement to fill out a **Trespass Crimes Fact Sheet** for every trespass arrest in and around NYCHA and TAP buildings
- **New training** on all of these policies
- **Enhanced supervisory review** of Stop Reports
- Revision to **NYCHA House Rules**



This chart shows the number of stops conducted by NYPD officers from 2003 to 2017– that's the blue. You can see it skyrocketed, peaking in 2011 at nearly 700,000 stops. In 2011 and the years leading up to it, cops were pushed beyond the point they should have been pushed to do stops.

After the Department was sued for its "Stop and Frisk" practices, the number of stops fell off a cliff. There were 11,211 reported stops in 2018.

The red line is the crime rate for the "7 Majors."  What does the class think of that?

Chief Secreto in his message mentioned where we've been with "Stop and Frisk" and where we need to go.

What impact do you think this had on our communities?

These practices also had an impact on police. What impact did this have on you?



Trespass arrests in NYCHA buildings have also decreased steadily the past few years from 2,772 in 2015 to 833 in 2018.

The Department is encouraging officers to use their discretion, including the exercise of restraint when appropriate, and find different ways to correct conditions in their command. What do you think of this change?



**Training Objectives:**
- Conduct all encounters with NYCHA residents and their guests with courtesy and respect and in compliance with the both the United States and the New York State Constitutions, as well as state and federal law.
- NYCHA Rules and Regulations apply to everyone on NYCHA property.  Provide information about NYCHA Rules and Regulations, how they are communicated, where the signs are displayed, and possible sanctions for violations.
- Introduce the revised Patrol Guide 212-60, "Interior Patrol of Housing Authority Buildings" and practical application of the procedure and the relevant law.
- Discuss proper application of PG 212-11 and PG 203-25 in the context of interior patrols of NYCHA buildings.

The law in this area can be complicated.  Officers have a job to do, but at the same time residents of public housing have the right to be left alone in their homes.  This training is meant to help you keep public housing residents safe, including the identification and removal of trespassers, in a manner that respects the rights of residents and their guests.  In the long run, respecting these rights will foster better relationships with the public housing community and help you do your job even better.



What constitutes NYCHA property?

NYCHA housing development grounds include:
- All NYCHA buildings, apartments, manager's offices, maintenance areas, storage rooms, etc.
- All walkways, grounds, parking areas and development driveways located within NYCHA developments.
- Laundry rooms, community centers, childcare centers, senior citizen centers, etc. which operate within NYCHA buildings.



Instructors should use this as an opportunity to further dispel stereotypes of NYCHA residents and talk about their experiences with all different types of people in NYCHA.

Discuss the NCO program and its goals.  NCOs are liaisons between the police and the community.  They spend time familiarizing themselves with the community to better respond to neighborhood-specific crime and other conditions. NCOs attend community meetings with neighborhood leaders, visit schools, follow up on previous incidents, and use creative techniques and adaptive skills to fight crime and contend with other problems in their particular sectors.

Discuss how you can ensure positive interactions.

Use professional language.

Be sharp, neat, and well-spoken.

Look and sound professional.

Improve communication skills and tone of voice.

Do not fall into the trap of considering all interactions to be with the criminal element.

De-escalating a situation helps you stay in control of the interaction.





NYCHA rules and regulations: Who do they apply to?

- All NYCHA tenants
- Any members of the household
- Guests
- Any other person under the tenant's control (babysitter, home health aide, etc.…)
- Non-residents and visitors to NYCHA developments (food delivery people, UPS, FedEx, etc.)

NYCHA developments are private property. The rules apply to anyone who is present on the property!



# The Rules are Communicated in Three Ways:

- **Lease and Highlights**
- **Resident Handbook**
- **Conspicuously Posted Signs**

**Lease and Highlights**: All tenants and authorized household members, **age 18 and older**, are directed to review and sign, and by doing so agree to follow, all NYCHA Rules and Regulations.

**Resident Handbook**: Portions of the Handbook give an abbreviated list of the Rules and Regulations as well as current pet policies.

**Conspicuously Posted Signs**: A sign is conspicuously posted when it identifies who is excluded and what is prohibited, and is posted strategically enough to afford adequate notice of the prohibited conduct, for example posted at the building entrances or elsewhere where the resident has to pass or posted adjacent to an area that has been designated as restricted.

Be mindful that some people, such as Non-English speakers and people with visual impairments, may not be able to read conspicuously posted signs for various reasons.  If you need interpretation or translation services, consult Patrol Guide 212-90.





**Provide handout to class and reference it.**
**See Appendix A for full list**

Observation of a violation of any NYCHA rule, regardless of whether it is also a criminal offense, may, at a minimum, provide an officer with an objective credible reason to approach a person and ask them non-accusatory questions.

What can an officer do when they observe an individual violating a non-criminal NYCHA rule? The officer can, but is not required to, approach that person and ask them if they live in the building, are visiting anyone or have business in the building. They can inform the person that they are violating a House Rule and ask them to stop. If the person is a resident or guest, the officer can fill out a Field Report. They can also continue to observe the individual or engage in non-accusatory conversation to gain additional information.

 

Conspicuously Posted Signs

A sign is **conspicuously posted** when it identifies **who** is excluded and **what** is prohibited and is **posted strategically** enough to afford adequate notice of prohibited conduct. For example, at building entrances or elsewhere a person has to pass or adjacent to an area that has been designated as restricted. Discuss what this means in practical terms. Officers should always make note of the presence, condition, and location of signs when they enter a building, especially when they are conducting an interior patrol. If a sign is missing, damaged or defaced, the officer should complete a Field Report to NYCHA. Remember that, for purposes of trespass arrests, the signs are the most important way that a person is put on notice that only residents, guests, and people with official business are allowed in the building. With regard to restricted areas, the sign informs visitors and residents that only authorized individuals are allowed in those locations. Therefore, the existence and placement of the signs will be critical evidence in any trespass case.

Even though the sign says that people are expected to cooperate with the police and NYCHA management, among others, that is incorrect. They are being **asked** to cooperate with these agencies, but that cooperation is **not required**.



# Residents are **asked** to cooperate with the police, but are **not required** to do so

Trespass on NYCHA Premises

Residents are **asked** to cooperate with inquiries from NYCHA Management, Security Guards, Resident Watch, and the NYPD regarding their presence or conduct in any building or on development grounds. However, residents are **not required** to cooperate with inquiries from the NYPD. Instructors should spend some time discussing what this means. Mere failure to answer questions or cooperate, by themselves, does not give rise to a founded suspicion of criminal activity, reasonable suspicion, or probable cause of trespassing. A person is free to walk away when questioned by the police unless they are stopped based on reasonable suspicion of criminal activity or probable cause.

Are NYCHA residents required to provide proof of residence to the police? No, they are not. Instructors should be prepared to respond to comments from the class, who may be of the opinion that NYCHA residents should be required to show proof of residence to the NYPD upon request, and facilitate a discussion about this. Instructors can remind the class that members of the public are never required to answer questions posed to them by the police and are only required to carry identification when operating a motor vehicle.  These rights do not change because a person lives in or is visiting someone in NYCHA. Consider asking the class to put themselves in the mindset of a NYCHA resident who is asked on a regular basis to show their identification while walking to and from their home.

Ask the class for examples of how they have dealt with this type of situation. Stock example: A person sitting in the stairway who says that they live in the building and that they don't have to provide their ID.



**FIELD REPORT**
PD 313-1511 (1-97)-CSS3

| Housing Authority Development (Name) | Added No. | Pct. of Occ. | Incident | | | |
| | Field Report No. | PSA of Occ. | OCCURRED | Day | Date | Time |
| Place of Occurrence (Bldg., Apt., Walk – Exact Loc.) | ☐ Pick-Up  ☐ Walk-In  ☐ Via Radio | Post No. | REPORTED | | | |

| | REPORTER(S) NAME (Last, First, M.I.) | ADDRESS (No., St, Apt., Borough) | PHONE No. | D.O.B. | RACE | SEX  M  F | TENANT  YES  NO |
|---|---|---|---|---|---|---|---|
| **A** | | | | | | | |
| 1. | | | | | | | |
| 2. | | | | | | | |
| **B** | PERSONS / INVOLVED / WITNESS (Specify Relationship Under Details) | ADDRESS (No., St, Apt., Borough) | PHONE No. | D.O.B. | RACE | SEX  M  F | TENANT  YES  NO |
| 1. | | | | | | | |
| 2. | | | | | | | |

DETAILS   List additional reports prepared with accompanying serial numbers e.g. Aided Report, Accident Report City Involved and notifications made (e.g. Housing Authority Development Manager.)

| Reporting Officer's Rank/Name | Signature | Command | Tax No. | Shield No. |
|---|---|---|---|---|
| Reviewing Supervisor's Rank/Name | Signature | Command | Tax No. | Shield No. |

**DISTRIBUTION: White** — PSA of Occurrence   **Blue** — Housing Authority Development Manager   **Pink** — Reporting Officer

What if there are no conspicuously posted signs?

(Instructors should let the class know that they will be discussing trespass and trespass in a restricted area in more detail later in the lesson.). If there are no conspicuously posted signs, or the signs are not legible because they are defaced or damaged, the officer should inform the person that they are violating a NYCHA House Rule and ask them to stop the behavior. If the person refuses to stop, and they are a resident or a guest, the officer should complete a Field Report. The officer should also complete a Field Report regarding the missing or damaged sign.

What should you do if someone asks you for assistance in evicting a person who is living in their apartment? Unless there is evidence of a crime, you should refer the person to Housing Court.



Why are positive interactions important?

The public trusts (or should trust) us to come into their lives, when conditions require it, to help them. A resident may become an ally and offer information about residents who are committing crimes and/or violating NYCHA rules.  Remember, your interactions with residents are important in the development of these alliances.

Exhibiting Courtesy, Professionalism and Respect during encounters and employing Tactical Communications when interacting with NYCHA residents and their guests will reduce the incidence of CCRB complaints and discipline and make for a better environment for everyone.

Try to build relationships and develop trust with the residents and guests you encounter.  The way you interact with someone, especially young people, can impact all future interactions with the police.  It will impact their attitude about officers generally, and how they feel about having police in their buildings. Remember that you are in people's homes. Treat them with courtesy and respect.  Treat people the way you would want you and your guests to be treated in your home.

10 MINUTE BREAK





## PATROL GUIDE

| Section:   Command Operations | | Procedure No:   212-60 | |
|---|---|---|---|
| **INTERIOR PATROL OF HOUSING AUTHORITY BUILDINGS** | | | |
| DATE ISSUED: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
| 10/19/18 | 10/19/18 | | 1 of 6 |

**PURPOSE**   To assist the New York City Housing Authority (NYCHA) in enforcing its rules, limiting criminal activity, providing a safe and secure environment and ensuring the habitability of its residential buildings by performing interior patrols in a manner that respects the rights of Housing Authority residents and guests.

The purpose of conducting interior patrols inside of New York City Housing Authority buildings is to assist NYCHA in enforcing its rules, limiting criminal activity, providing a safe and secure environment, and ensuring the habitability of its residential buildings by performing interior patrols in a manner that respects the rights of Housing Authority residents and guests.

Instructor should ask the class what they think this means, and why it is important to discuss this before going into the details of conducting an interior patrol.

Patrol Guide 212-60 makes clear that:
1. Mere presence in or near a NYCHA building is not a basis to approach someone.
2. Officers have the discretion not to arrest a person they encounter in a restricted area.
3. A Trespass Crimes Fact Sheet must be filled out for all trespass arrests involving a NYCHA building.

Each of the above concepts will be discussed in more detail later in the lesson.



## PATROL GUIDE



| Section:   Command Operations | Procedure No:   212-11 |
|---|---|
| **INVESTIGATIVE ENCOUNTERS: REQUESTS FOR INFORMATION, COMMON LAW RIGHT OF INQUIRY AND LEVEL 3 STOPS** | |

| DATE ISSUED: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 10/19/18 | 10/19/18 | | 1 of 16 |

**PURPOSE**

To describe the types of encounters a uniformed member of the service may initiate with a member of the public during the course of his or her official duties, the level of knowledge required for each type of encounter, the scope of a police officer's authority for each type of encounter, the measures that are permissible to protect uniformed members of the service from injury while engaged in such encounters, and the procedures to be followed by a member of the service during these encounters.

Instructors should ask the class who has attended the Investigative Encounters in-service training at Rodman's Neck.  Remind the class that interior patrols of NYCHA buildings must comply with Patrol Guide 212-11. They are not an exception to the law of investigative encounters. The levels of *DeBour* apply to interactions in NYCHA buildings.



# The **law** in the PG 212-11 isn't new, but **THIS** is:

*Minor or inadvertent mistakes in documentation or isolated cases of erroneous but good-faith stops or frisks by members of the service should ordinarily be addressed through instruction and training. In most instances, instruction and training should be accomplished at the command level. The application of the law in this area can be complicated, and investigative encounters are fluid situations in which one event or observation can alter the level of suspicion or danger. A single erroneous judgment will not generally warrant referral to the Legal Bureau for retraining. However, members of the service who evince a lack of comprehension of the core concepts of the law governing this procedure should be referred to the Legal Bureau.*

Discuss what an officer should do if they make a mistake. For example, the officer discovers at the station house that the person they arrested for trespass lives in the building. The officer should remedy the situation immediately and follow the Patrol Guide procedure for voiding an arrest.

It is important to get the law right since even a single mistake can have a significant impact on a person's life.



An officer must have an objective credible reason to approach a person in a NYCHA building.  This is an encounter, not a stop. An officer can ask non-accusatory questions but cannot treat the person like a suspect.  Thus, an officer cannot seek consent to search an individual. At Level 1, you may not even ask for consent to search.  The individual is always free to leave at Level 1.  At Level 1, if someone runs away, you cannot pursue them.  They are always free to walk or run away.

PG: 212-60: *Mere presence in or near a NYCHA building does not provide a basis to approach and conduct an investigative encounter; nor does it establish reasonable suspicion for a stop.*

Housing officers are not doormen. A doorman may approach and eject someone from a building merely for being present. An officer may not.



# Mere Presence is NOT an Objective Credible Reason

Mere presence in a NYCHA building lobby is not an objective credible reason to approach someone (*People v. Ventura* – 30 Misc. 3d 587).

**EXAMPLES OF OBJECTIVE CREDIBLE REASONS TO APPROACH:**
**(This is a good opportunity for co-teaching and real-life examples of difference between mere presence and OCR)**

1. Defendant unsuccessfully tried to enter a NYCHA building, then waited until someone entered with a key and followed him inside. This means of entry provided an objective credible reason for the officers' Level 1 inquiry as to whether defendant lived in the building. *People v. Carter*, 147 A.D.3d 635.

2. After seeing defendant remain in the vestibule of a public housing building for more than five minutes, with no circumstances explaining his presence, the police possessed an objective, credible reason to ask him whether he lived there or "had business" there. *People v. Donald R.*, 127 A.D.3d 575.

3. Officers had an objective credible reason to approach based on (1) prior criminal trespass history of the building and (2) an effort by the defendant to prevent the police from getting into an elevator with him. *People v. Perez*, 31 N.Y.3d 964.

**EXAMPLE OF MERE PRESENCE:**
Defendant was standing alone in the lobby of a NYCHA building not doing anything in particular. The officer immediately approached him and asked him whether he lived in the building. When defendant replied that he was visiting a friend but did not supply the name or apartment number, he was arrested for trespass. The court found that the officer did NOT have an objective credible reason to approach defendant because mere presence is NOT enough. *People v. Ventura*, 30 Misc.3d 587 (Judge Analisa Torres).

What's the difference between *Donald R.* and *Ventura*? In *Donald R.*, the officer observed the defendant remain there for more than five minutes. That provided an OCR to approach the man.



Observation of a violation of any Housing Authority rule, regardless of whether it is also a criminal offense, may at a minimum, provide an officer with an objective credible reason to approach the person and inquire further.

At Level 1, an officer may ask the three questions in a non-accusatory manner:
- Do you live here?
- Are you visiting someone here (invited guest)?
- Do you have any business in the building?

An officer can also ask for identification in an effort to determine if the individual lives in the building.

***One of the NYCHA House Rules is a prohibition on "lingering."***
*Lingering* occurs when, based on objective facts and circumstances, an individual is observed in a vestibule, lobby, stairwell, hallway or other similar common area of a NYCHA residential building for an unreasonable period of time in light of the area's intended purpose. The primary purpose of these locations is to enable entrance to and exit from the building as well as movement within the building. Activities associated with the primary purpose of such locations are permissible, including but not limited to: standing and talking for a reasonable period of time; waiting for food deliveries, visitors, and transportation; meeting and greeting neighbors and friends; picking up and dropping off children; checking mailboxes; and any similar activity that occurs in the ordinary course of entrance, exit and movement within the building

**Lingering in a common area, without more, is not a criminal offense for which a person may be stopped or arrested.**
An example of lingering is people sitting on the stairs in a stairwell. Since the purpose of the stairs is to allow people to walk from one floor to another, a group of people sitting in the stairwell would be lingering, and subject to a field report.

Ask the class if a person can be arrested just for sitting in a NYCHA stairwell? No, sitting in a stairwell is not a crime. However, the individuals sitting in the stairwell should be asked to leave the stairwell. Context matters.  Exercise common sense and good judgment.  If you see, for example, a young guy simply sitting there momentarily tying his shoes, give him a minute.  He's not the person we should be walking right up to and asking for ID.  And if it is an elderly woman sitting there, perhaps tired, and holding grocery bags, ask her if she needs help.

An example of what would not be considered "lingering" -- neighbors standing in the lobby chatting or checking their mail or waiting for a delivery. One of the functions of a lobby is for neighbors to stop and talk with one another.

PG 212-60: *Upon encountering persons who are violating a Housing Authority rule, take appropriate police action pursuant to P.G. 207-29 ("Field Reports") unless there is a basis for criminal enforcement. Observation of a violation of any Housing Authority rule, regardless of whether it is also a criminal offense, may at a minimum, provide an officer with an objective credible reason to approach the person to inquire further.*

*Do not stop a person in accordance with P.G. 212-11 ("Investigative Encounters…") for a violation of Housing Authority rules unless the rule violation is also a criminal offense. Mere lingering in a common area, without more, is not a criminal offense for which a person may be stopped or arrested.*

**Additional examples of lingering:**
- People sitting in a stairwell
- Standing alone in a residential hallway for more than a brief period of time, not going towards an apartment, elevator, or stairwell
- Sleeping in a hallway or lobby

**Additional examples of not lingering:**
- Standing in a hallway talking with neighbors
- Standing in a hallway waiting for the elevator
- Walking up or down the stairs
- Waiting for a taxi or a food delivery



When encountering persons who may be engaged in criminal trespass based on observed behavior or other credible information, you may approach and ask in a non-threatening and non-accusatory manner:

(1)  If he or she lives in the building
(2)  If he or she is visiting someone in the building
(3)  If he or she has business in the building

The burden of proving that an individual does not have authority to be in the building rests on the police. The individual is not required to answers questions, not even about his or her authority to be in the building.

If the officer suspects the person is not authorized to be in the building, and the officer cannot verify the person's authority to be in the building, the officer may instruct the person that he or she must leave the building, and that a refusal to comply may result in an arrest for trespass.

However, the officer may only arrest the person if there is probable cause to believe that the person committed a trespass. A reasonable investigation is ordinarily necessary to determine whether probable cause exists.

Remember, a person's refusal or inability to produce identification or provide information does not elevate the level of the encounter.

PG 212-60: *Merely passing through a door that has a defective lock or that has been propped open does not, alone, constitute reasonable suspicion of criminal activity.*



An officer must have founded suspicion to ask pointed questions or ask for consent to search someone in a NYCHA building.  However, the officer cannot behave, through words or actions, in a way that would cause a reasonable person to believe that they were not free to leave.

**Examples of Level 2:**
1. An example of founded suspicion is the presence of an individual in a NYCHA lobby that contains shattered blood-stained glass from a broken window (*People v. Pollard*, 2002 N.Y. Misc. LEXIS 1234).
2. Remember the Level 1 example where the officers observed defendant in the vestibule of a public housing building for more than five minutes, with no circumstances explaining his presence (Level 1).  The officers asked defendant whether he lived there or "had business" there. When defendant responded only that he was from Queens, with no indication that he was a resident or the guest of a resident, the police possessed, at the very least, **founded suspicion** of criminality (Level 2), that defendant may have been trespassing. Accordingly, their request that defendant step outside the vestibule so that they could talk to him was justified, and the encounter was not elevated to a seizure (Level 3).  When defendant suddenly reached into his back pocket, the officer grabbed his hand as a protective measure, and found his hand to contain drugs.  *People v. Donald R.*, 127 A.D.3d 575.
3. The police had a founded suspicion that criminal activity was afoot when they observed the defendant, who matched the general description of a robbery suspect in a radio call, in the stairwell of the building where the reported robbery occurred.  *People v. Quinones*, 45 A.D.3d 874. The defendant's attempted flight, combined with the temporal proximity between the reported robbery and the officers' arrival on the scene, gave the police reasonable suspicion to detain the defendant.

**Flight escalates Level 2 to Level 3.  If you have founded suspicion and someone runs, you are now elevated to reasonable suspicion and you can pursue them.**
Are there common situations that come up?  Give a few examples from your experience. Stock example: A person who provides false or inconsistent answers to your questions.



# Consent to Search

## "Can I search your bag?"

## "I can only search your bag if you consent, do you understand?"

At Level 2, you are allowed to ask for consent to search.

Under New York City law, if you ask for consent to search, you must phrase the question so that it elicits a clear yes or no response. If a person says yes, ask if they understand that they can say no.  In other words, consent must be knowing, voluntary, and intelligent. You are also required to record any request for consent to search on your body-worn camera.

Have a brief discussion of discretion here and the ramifications of overuse of consent to search.  Courts will scrutinize searches that resulted from asking for consent to search since the person is waiving their Fourth Amendment right to be free from unreasonable searches.

Just because you can ask for consent to search at Level 2 does not mean that you always should. Use your best judgment and common sense given the circumstances.

# Consent Search Report





If you ask for consent to search at Level 2, you must fill out a Consent Search Report in FORMS. If you ask for consent to search at Level 3, you must fill out the appropriate section of the Stop Report. This documentation is required even if you end up arresting the person.



By now, you are familiar with the pre-printed Business Cards distributed to you by the Department.

Officers are required to identify themselves to an individual who is the subject of law enforcement activity by providing their name, rank, and command.  Officers must also explain the purpose of the interaction in the following circumstances:

All Level 2 encounters
All Level 3 *Terry* stops
All frisks
Any search of person or property, including vehicles
Vehicle checkpoints
Home searches
Investigatory questioning of victims and witnesses to crimes

Additionally, unless the situation results in an arrest or summons, you must offer a Business Card at the end of the encounter. You are not required to offer a Business Card during investigatory questioning of victims and witnesses to crimes, unless you are the assigned detective or a card is requested by the person.





Officers must also provide a Business Card if a person requests an officer's identifying information.

If you run out of pre-printed cards, you must offer to provide the person with the information on a handwritten card.  If you run out of cards altogether, you must offer this information verbally and provide the person sufficient time to write it down.

# Right to Know Act Exceptions







If explaining the purpose of the interaction would impair a criminal investigation, you do not have to do so.

Officers are not required to offer a Business Card to identify themselves if engaged in undercover activities, if exigent circumstances are present (for example, imminent physical injury or destruction of evidence, to name a couple), if it is a security search of someone attempting to enter a building, such as a courthouse, an event, or an MTA facility, or if verifying the identity of a person seeking entry into an area restricted by the Department due to health or safety concerns.

Similarly, the Right to Know Act's requirements for consent searches do not apply if exigent circumstances are present or if it is a security search of someone attempting to enter a building such as a courthouse, an event, or an MTA facility where a person's entrance into the location constitutes implied consent to be searched under an exception to the warrant requirement



**We will now discuss anonymous calls and how you can get to Level 3.**

An anonymous call simply providing a suspect's description and their location only gets you to Level 2. Why is that? Anonymous callers are considered to be less reliable than identified callers. A jealous girlfriend may know where her boyfriend is and what he is wearing, and she might make up the fact about him having a gun in order to get the police to harass him.

If the person gives you the information face-to-face, it is not considered to be anonymous, whether or not you know their name. This is because you can observe their demeanor and are therefore better able to judge their reliability.

UMOS instructors should add in examples from their experience of how they have handled anonymous calls. Stock example: An anonymous caller states that a woman with brown hair wearing a red jacket is selling drugs in the stairwell between the sixth and seventh floors. You see a woman with brown hair wearing a red jacket standing in the stairwell between the sixth and seventh floors.

# Anonymous Callers




- Try calling back the caller before you arrive on the scene to get a name

- If you can't get a name, did the caller just observe criminality or are there exigent circumstances?

- Whether or not you can speak to the caller, observations that corroborate the alleged criminality will escalate to Level 3

When you are investigating information provided by an anonymous caller, there are a number of ways to get to reasonable suspicion, which allows you to stop the person.  You can verify the identity of the person calling, or verify how that person knows the information they are calling about. What is their basis of knowledge?

For example, if the caller provides information that successfully predicts how the suspect will act: "A man driving a gray BMW, plate ABC123, just ran me off the road. He's headed northbound on the FDR near 42nd Street." If you see a car matching that description heading in that direction, you can stop it even though the information was provided by an anonymous caller.

You can also call the number back to try to get more information, including the person's name.  If you can't get a name, you can try to determine the caller's basis of knowledge.  If the caller confirms that they personally observed criminality (i.e. saw the gun in the suspect's hand) and that this observation just occurred or is presently occurring, this can be enough to get to reasonable suspicion.

One exception to the rule about anonymous callers is exigent circumstances, such as a bomb threat or a caller who states that a person has a gun and is about to shoot someone right now.

Observations that corroborate the alleged crime can also escalate the encounter to Level 3, allowing you to stop the person.  For example, if you see a bulge that could be a weapon or the suspect acts in a manner consistent with being armed.

Additionally, factors that would normally escalate a Level 2 encounter to a Level 3 stop also apply here, such as flight from the police or false or inconsistent statements.



An officer must have reasonable suspicion in order to conduct a *Terry* stop. In order to frisk, you must have reasonable suspicion that the person is armed and dangerous.

PG 212-60: *Do not use a tone or take steps that would create a situation where a reasonable person would not feel free to leave when there is less than reasonable suspicion.*



Take a look at this picture. Do you think this individual would feel free to leave? What level of suspicion do you need to block a person's path? Level 3 reasonable suspicion.

If the individual provides conflicting answers as to their purpose in the building or whether or not they live there, it provides reasonable suspicion to stop them and investigate further (*People v. Wigfall*, 2005 N.Y. Misc. LEXIS 3493).

Examples:

1. What if officers observe a person standing in the lobby staring at the mailboxes for a period of 2 minutes?  The officers have an objective credible reason to approach that person and ask questions. In that real case, the officers approached defendant and asked what he was doing in the building and he said he was just hanging out and did not know anyone who lived there.  When pressed, defendant said that he was there to see a woman named Barbara in Apartment 7B.  When the officers went to the apartment, they learned that no one lived there named Barbara.  Defendant was arrested and searched incident to lawful arrest.  The officers recovered 59 zips of crack-cocaine. *People v. Wigfall*, 2005 NY Misc. LEXIS 3493, aff'd *People v. Wighfall* – 55 A.D.3d 347.  The defendant's inconsistent answers raised this encounter to a Level 3.  When they could not verify whom he was visiting, the officers had probable cause to arrest defendant.  This is an example of how a Level 1 encounter can escalate to another level.

2. Remember the example of the man matching the general description (not a specific description) of a radio run for a robbery in a NYCHA building.  The officers encountered the defendant in the stairwell of the building where the robbery occurred.  The defendant attempted to evade and flee the officers, raising the encounter from founded suspicion to reasonable suspicion.  (*People v. Quinones*, 45 A.D.3d 874).  Assuming this is a verified caller, if the description had been more specific and defendant matched the description, the officers would have had reasonable suspicion upon seeing him.



# Discretion

**Ask the class:  What does discretion mean to you?**

PG 212-60:  *Even if there is probable cause to arrest a person for trespassing, officers **may** exercise their discretion to refrain from arresting that person, and instead instruct that person to leave under appropriate circumstances.*

Discretion is the authority to decide how to resolve situations in different ways.  When we say that you should exercise your discretion, that does not mean that you have to give someone a free pass.  It means that you should take into consideration the totality of the circumstances and **use your common sense** to determine what would be the right and just thing to do in the particular situation.  Common sense is appropriate at all *DeBour levels.*   When we say exercise your discretion, we mean just that, exercise your discretion.

Here are some examples of situations where you might use your discretion, including the possible exercise of restraint, when appropriate:
* Lock on the front door is broken and someone is carrying bags/groceries into the building
* Standing in the lobby in slippers
* Visiting someone who isn't home
* Young person sitting in the stairwell talking on a cell phone
* Kid doing homework in the hallway
* Man standing in the hallway with an open container of beer
* Teenager smoking marijuana in the stairwell
* Kid sitting in the hallway waiting for his mother to come home who had lost his keys several times such that his mother would no longer give him keys (real-life example where 16-year-old was arrested for trespass)

35



# Trespass on NYCHA Premises

## NYS Penal Law Article 140

- Knowingly
- Enter or remain unlawfully
- Building or real property

Definition of Trespass:

PL 140.10:  A person is guilty of criminal trespass in the third degree when he <u>knowingly enters</u> or <u>remains unlawfully</u> in a <u>building</u> or <u>upon real property</u>

(e) where the building is used as a public housing project in violation of conspicuously posted rules or regulations governing entry and use thereof; or

(f) Where a building is used as a public housing project in violation of a personally communicated request to leave the premises from a housing police officer or other person in charge thereof

These are the appropriate charges to use when arresting a person in a NYCHA building for trespass. The New York State Legislature specifically passed them to address the issue of trespassing in NYCHA buildings.



# Authorized Individuals on NYCHA Premises:

- Residents
- Invited Guests
- People with Legitimate Business

Trespassing is prohibited. NYCHA premises are for the use of residents, invited guests, and persons with legitimate business. For the purpose of trespass, residents include individuals residing in the household even if that person is not registered with NYCHA.  A person who lives in a NYCHA apartment, even if they are not registered with NYCHA, is considered a resident and should be treated as such.

Example of a person with legitimate business:  delivery person.



# Reasonable Verification Measures

- Ask to see identification
- Call for assistance
- Check with the apartment resident

At any level, you can ask to see identification, but remember they are not required to provide it.

At <u>Level 1</u>, you can ask to see someone's identification.  Additionally, you can ask the three questions in a non-accusatory manner, if they are related to the reason for your approach:  Do you live here?  Are you visiting anyone? Do you have any business in the building?  If you receive a plausible answer to those three questions, you are still at level 1, and you may not detain the person for further investigation.  An answer is plausible if you cannot articulate a reason to doubt it.

At <u>Level 2</u>, when you suspect that someone is trespassing, you have a duty to take reasonable measures to investigate their authority to be in the building.  If you are going to investigate further, be sure to ask what other names they may use or are known by so that when you go to the apartment to check with the resident, you are able to ask the resident about the name they are familiar with. Also ask for the apartment placement in case they don't know or are mistaken about the exact apartment number.  In a trespass situation, if a police officer is conducting a brief investigation to ascertain whether a defendant's explanation is credible, instructing a person to stay with an officer elevates the encounter beyond Level 1.  Remember that, at Level 2, the individual can walk away at any time, and you cannot create a situation (through your words, actions or tone) where a reasonable person would not feel free to leave.  Thus, even though you ask a person to remain in the lobby, he can leave if he chooses to do so.

If you are at <u>Level 3</u>, you can call another unit to detain the person while you check with the resident of the apartment they claim to be visiting.

The New York Court of Appeals provided an important example of the issues surrounding verification in <u>People v. Hill</u>, 93 NY Slip 03405 (2019).  In that case, officers approached a person who entered and exited a NYCHA building several times.  The person explained that he was visiting a person in the building on the 11th floor.  The officers asked for his ID, which he provided.  One officer took his ID up to the 11th floor to verify whether the occupant knew him, while another officer instructed the person to "stand right there" under the watch of two officers.  Although the Court determined that the officers had an objective credible reason for the initial approach, the Court ruled that their subsequent actions (taking

the ID up to a higher floor and/or instructing the person to stay with other officers) elevated the encounter beyond Level 1.

Be mindful that residents may be alarmed or intimidated when a police officer questions them in their homes, especially when an officer goes to their apartment. Thus, when verifying a person's authority to be in the building, take reasonable measures to avoid such intimidation by first using the intercom system to contact the resident, if possible, or permitting the stopped person to call the resident by phone. Consider having them call the resident on speaker phone in order to ensure your safety and theirs.

Individuals may honestly be mistaken as to the specific apartment number or may know only certain individuals, but not others, who reside in an apartment. Officers should take these possibilities into consideration.



The topic of **restricted areas** can be confusing and represents a fairly big change in policy from what many officers have experienced, especially officers who have been with the Housing Bureau for a long time. Instructors should take their time teaching this and be prepared to answer questions. Part of understanding the policy on restricted areas lies in the presence or absence of conspicuously posted signs. So officers conducting an interior patrol need to be aware of the signs. They should consider the following: whether the signs are present and conspicuously posted, whether they have been removed, and whether they have been defaced to such an extent that they are no longer legible.



If there are conspicuously posted signs prohibiting entrance into restricted areas, a member of the service who encounters an individual in a restricted area may arrest that person or may exercise their discretion and instruct the person to leave. Do not allow the person to remain in the restricted area.

If there are no posted signs adjacent to the restricted area, but there are conspicuously posted signs in the lobby, an officer who encounters an individual in the restricted area has probable cause to arrest that person. However, absent extenuating circumstances, officers are strongly encouraged to exercise restraint and inform the person that they are in a restricted area and ask them to leave rather than automatically arresting them.  Officers are also strongly encouraged to exercise similar restraint if the person is a resident of the building, as long as there is no other evidence that the person actually knew that the area is restricted.

# Verification Measures in Restricted Areas



## During pre-arrest investigation, ask the following:
- "How did you get here?"
- "Which door did you use?"
- "You know this is a restricted area, right?"

## If you make an arrest, photograph all signs as they exist at the time of arrest.

When you see someone in a restricted area, consider taking the following verification measures before arresting them. Remember that you have discretion whether or not to arrest even if there are conspicuously posted signs.

Here are some pointed questions you can ask:

**"How did you get here?"**
It is important to know what path they took in order to determine whether they passed a conspicuously posted sign.

**"Which door did you use?"**
It is important to know what door they used in order to determine whether they passed a conspicuously posted sign.

**"You know this is a restricted area, right?"**
If they know that it is a restricted area, then you met the element of "knowingly" and now have probable cause to arrest. However, even if they deny knowing that it is a restricted area, if they passed a conspicuously posted sign, you can attribute knowledge to them. Remember to be mindful that some people, such as Non-English speakers and people with visual impairments, may not be able to read conspicuously posted signs for various reasons and, thus, may not have "knowingly" entered a restricted area.

**If you make an arrest, photograph all signs as they exist at the time of arrest.**
Remember to take a photograph of the sign as it exists at the time you make an arrest because the signage can change or be defaced at any time. Make sure you take pictures of the sign on the door they said they used and the signage in the lobby.



**No Conspicuously Posted Sign or Defaced Sign:**

**Previous Warnings**:  If there are no conspicuously posted signs in the building and the person is a resident or authorized visitor who the officer knows has previously been told to stay out of that type of restricted area, the officer may arrest that individual.

**No Prior Knowledge**:  If the officer has no prior knowledge about the resident or authorized visitor, they should inform that person that the area is restricted and instruct them to leave the area. The officer should complete a Field Report regarding the incident.

**Unauthorized Visitor**:  If the officer encounters an unauthorized visitor in a restricted area without a conspicuously posted sign, the officer should instruct the person to leave the building, and give them an opportunity to do so.

In all of these cases, the officer should complete a Field Report to NYCHA informing them about the missing or defaced signs.



**Refusal to Leave**:  In all cases, if the person refuses to leave the restricted area, after being given an opportunity to do so and told that he would be subject to arrest if he does not, he may be arrested for trespass. The person must be removed from the restricted area.



# Discretion in Restricted Areas

Discretion is the authority to decide how to resolve situations in different ways.

When an officer encounters a person trespassing in a restricted area, even when there are conspicuously posted signs, the officer may exercise discretion given the circumstances and not arrest that person and instead instruct that person to leave the restricted area, or the building, under appropriate circumstances.

If an officer encounters a building resident in a restricted area, such as the roof or roof landing, and there is no other basis to arrest such person, the officer should exercise such discretion and ask the resident to leave the restricted area. While the officer has probable cause to arrest the person, in this instance, if there were conspicuously posted signs, that is not always the best solution to the problem.  The end result that the officer is trying to achieve is getting the person to leave the restricted area. Can that be achieved without resorting to an arrest? Sometimes. Remember, such discretion need not be exercised if the officer knows that the resident had previously been instructed to leave that particular restricted area.

"Use your common sense" – For example, what would you do under the following circumstances?
- People using roof to access adjacent building when elevators are broken
- Resident on the roof watching fireworks
- Resident going to the roof for air
- Resident celebrating their graduation
- Young lady who just took MCAT and went up to get some air
- Young couple on the roof
- College students taking photos on the roof for class project
- Man on the roof smoking a cigarette (with 3 outstanding warrants)
- Person on roof smoking marijuana

Note:  If there is a precinct condition that reasonably limits your discretion, comply with the directive of your C.O.

Note to Instructors:  Please use your own examples from your own experiences.

# PG 212-60:



*A person's refusal or inability to produce identification or provide information does not elevate the level of the encounter.  However, if the individual refuses or is unable to explain his or her presence in the building, the member* **may instruct the person that he or she must leave the building or be subject to arrest for trespass.**

NYPD officers are custodians of NYCHA buildings.  As such, you have the authority to ascertain whether persons are authorized to be in the building and, in certain circumstances, to eject individuals who are suspected of trespassing. Remember, you need at least an objective credible reason to approach a person.  Officers should not eject people without conducting a reasonable investigation as required by PG 212-60.  As a reminder, mere presence is not enough to approach and certainly not enough to eject someone.

[Note to Instructor:  NYPD officers derive their authority as custodians from the merger of the Housing Police and the NYPD (including the Memorandum of Understanding agreed upon by NYCHA and the NYPD), the Penal Law (140.10 (e) and (f)), and case law.]

In most cases, ordering someone to leave a NYCHA building during a Level 1 request for information would be premature and inappropriate unless the situation escalates to a higher level of suspicion.  If you have an objective credible reason to approach an individual, you must conduct a professional, respectful, and non-accusatory inquiry as to whether an individual has authority to be in the building.  If the situation evolves so that you suspect the person is not authorized to be in the building, you have more tools.  Moreover, you are required to make efforts to verify the individual's authority to be in the building, based on the information you are able to obtain, prior to resorting to ejection.  It is the rare Level 1 situation where ejection is the only option.  A refusal to comply with the request to leave the premises may result in an arrest for trespass.

***Example (based on Davis Settlement in Exhibit D):***
Modified version of (d)(i):  Officer is conducting an interior patrol in a NYCHA building that has a recent history of robberies in the building.  The officer runs into a person sitting in the stairwell between the 4th and 5th floors.  The officer approaches the person and explains the concern about safety in the building and asks in a non-accusatory manner whether an individual is a resident of the building, is visiting someone, or has business in the building.  The person claims to live in apartment 7D.  The officers ask the person if he has a key to the apartment or identification.  The person does not have either.  The officer asks the person to accompany him to the apartment.  The person refuses to do so.  The officer radios for assistance and another unit goes to apartment 7D, but nobody is home.  The officer advises the person that he/she

has to go back to his apartment, leave the building, or he/she may be subject to arrest for trespass. The person refuses to do either and informs the officer, "I'm not moving." The officer arrests the person for criminal trespass.

*Why is this action appropriate?*
The fact that the person was sitting in the stairwell gave the officer an objective credible reason to approach. Stairwells are for coming and going. Furthermore, sitting in the stairwell is a violation of NYCHA House Rules. The violation of a NYCHA House Rule, standing alone, would not justify the officer's actions. However, here the lack of a key or ID and the fact that there was no one in Apt. 7D gives the officer a basis for suspecting the person does not belong in the building and thus to tell the person that he has to go back to his apartment or leave the building. Despite this warning, the person refused to exit the building and did not dispel the officer's suspicion of trespass. Under these circumstances, the officer had **Probable Cause** to arrest the person for criminal trespass.

Are there any other actions the officer could have taken?
Could the officer have arrested the person without giving a warning?
Could the officer have arrested without sending the unit to apartment 7D?
Would the situation be different if the person told the officer that he was locked out of his apartment and he is waiting for a family member to come home?

(d)(ii) Same facts as above, except that the person refused to answer the officer's initial questions and instead ignored the officer or told him to buzz off.
What should the officer do then?
What verification measures, if any, should the officer take?
Could the officer tell the person to leave the building? Arrest the person if he did not leave the building?
Could the officer arrest the person without giving the warning?

These questions are fact-specific and cannot be answered in the abstract. Here are just a few examples of factors that might be relevant in deciding whether the officer is at Level 2:

**The civilian's activity:** What was the civilian doing and for how long? Was he just tying his shoes? Was he, for example, on a stairway walking from one floor to another; or was he sitting on the steps? If the latter, for how long was he observed sitting there? Was he with other people? How many? What were they doing? Blocking the stairway? Smoking? Did the person say that they live in the building, or say something that might indicate they live in the building?

**The officer's knowledge:** What did the officer know before the encounter? For example, is the officer someone familiar with the residents of the building, and does he recognize the civilian as someone who lives in the building, or not? Does the officer recognize the person as someone previously arrested? For trespass? For drug offenses? For some other crime? Is the officer aware of complaints about civilians in the hallways or stairways? What was the nature of the complaints? How many? How recent? How closely does the activity or appearance of the civilian encountered match the complaints?
There may be other factors as well that will determine whether the officer is only at Level 1 or instead is at Level 2 and suspects that the person is trespassing.

***Example (from the Davis Settlement in Exhibit D):***
**THE APPROACH – Handling situations without articulable evidence of criminal activity – Level 1**
While on interior patrol, an officer observes a person standing for more than ten minutes in the lobby of a building where robberies have occurred in the lobby and other common areas of the building in the recent past. The officer approaches the person and, in a non-accusatory manner, asks if he lives in the building. The person says, "No, I was visiting my friend John in apartment 3B." **The officer explains that**

**residents are concerned about unauthorized people being in the building and asks the person if he would come with him to 3B. The person says he is waiting for a cab and he would rather not leave the lobby. Although the officer is unable to determine if the person is authorized to be in the building, the officer elects to wait with the man.** Shortly thereafter a cab comes and the man leaves the building. An *Activity Log* entry was made and no further action was needed.

*Why is this action appropriate?*
The officer initially had an objective credible reason to approach the person at the **Request for Information** level.

Were the officer's actions appropriate?
Could the officer have asked the individual to leave the building?
What factors should the officer take into consideration?
What is the officer required to do prior to asking the individual to leave?



# Do you have to give *everyone* the opportunity to leave if you have probable cause to arrest?

You do not have to ask the person to leave if you have probable cause to arrest. You can just arrest the person without issuing a warning.

Example where officer may want to give an opportunity to leave:
Remember the example of the young couple on the roof (if it hasn't been given in the Discretion in Restricted Areas slide, introduce it as an example) – Young couple on the roof, not residents of the building, wanted time alone. You approach them and learn that they do not live in the building, are not visiting anyone, and have no business in the building.  There are conspicuously posted signs prohibiting access to the roof.
What can the officer do?
Does the officer have to give the couple the opportunity to leave?
Can the officer give the couple the opportunity to leave?
Can the officer summarily arrest the couple?
Examples where officer may want to arrest without giving the opportunity to leave:
  • Known gang member who does not live in the building hanging out in the stairwell
  • Person known to cause trouble in the development on the roof
  • Person who is particularly evasive about answering your questions
  • Person urinating/defecating in the elevator or stairwell


10 MINUTE BREAK

49



If you stop a person, you must complete a Stop Report. If you do not arrest the person, you must offer them a Business Card.

The Patrol Guide has been changed to include a requirement that supervisors now review every stop with the officer who conducted it. They must review the basis for the stop and determine if their officers had reasonable suspicion to support the stop, frisk and/or search if conducted. This review is made to assess the legality of the stop itself and of a frisk or search, if either were conducted.

# FORMS





Supervisors have a two-pronged responsibility:

First, they must discuss the stop with the officer during, or at the end, of their tour and, in doing so, review the basis for the stop. This will allow the supervisor to determine if their officers had reasonable suspicion to support the stop and, if conducted, the frisk and/or search.

Second, they must review the Stop Report submitted to them by the officer and ensure that it contains the information and specific details given to them during their discussion with the officer. This is a much more in-depth review than just checking to see if the form is filled out completely.

Furthermore, in each of the narrative sections on the Stop Report, the officer must explain in their own words the facts supporting each of the checkbox stop factors they checked off and each of the checkbox frisk and search factors they checked off.  This should be reviewed carefully.



An officer must have probable cause in order to arrest someone.

- Before making an arrest, do a thorough investigation
- Discuss discretion as it relates to trespass arrests
- Quality of arrest v. Quantity of arrests
- Try to remedy a bad situation as quickly as possible – if it is not a good arrest, then void it immediately.



 **TRESPASS CRIMES – FACT SHEET
AND SUPPORTING DEPOSITION**
PD 351-144 (Rev. 03-16)

**NOTE:** This Form Must be Completed by the Officer Who Made the Observations that Led to the Defendant's Arrest.

Defendant's Name: _____     Arrest No.: _____

I, _____, Shield No. _____, a New York City Police Officer/Detective

assigned to the _____ (command), deposes and swears as follows:

On _____ (date), at _____ (time), at _____ (location),

while on patrol inside this dwelling, an apartment building where people reside, I observed the defendant inside this

location as described below.

The Trespass Crimes Fact Sheet must be prepared for all trespass arrests on NYCHA premises.

Have a discussion on how to fill out the TCFS accurately and completely.

Desk officers must ensure that the completed TCFS and Supporting Deposition is included in the arrest package for all arrests in or around any NYCHA building that includes a charge of criminal trespass.

They must review the TCFS for accuracy and completeness and endorse in the appropriate space on the form. They must make a copy of the TCFS for the binder maintained at the desk.

If the TCFS is not accurate and complete, the officer should be instructed to fix the issue, if possible, and resubmit the form. If there was not a sufficient basis for the arrest, the arrest should be voided and the officer reinstructed accordingly, or disciplined, if appropriate.



Have officers fill out a TCFS utilizing the provided fact pattern.  Instructors should look through them and use one or two as examples of good/not so good TCFS.  Instructors should demonstrate the supervisory aspect of going over a TCFS and discuss the issues that supervisors should be aware of.

**TCFS fact pattern (hand out to class)**

At 2000 hours, you and your partner are conducting a directed interior patrol at 735 East 165th St (a NYCHA building). When you enter the building, you observe signs which prohibit trespassing and entry by anyone into restricted areas.  You also observe a young man standing in the lobby staring at mailboxes. You and your partner continue on into the elevator and conduct an interior patrol which concludes several minutes later in the lobby.  The same young man is still standing there staring at the mailboxes. You approach and ask the man if he lives in the building, and he says he is just hanging out and doesn't know anyone who lives here. You ask him if he has any business in the building, and he replies that he is here to see a woman named Barbara in apartment 7B.  This change of story provides you with reasonable suspicion of trespass.  You have another sector respond to stay with the man while you and your partner go to apartment 7B to verify whether the man is an expected visitor. The occupant says no one named Barbara lives in the apartment and no one in the apartment knows the man.  You and your partner arrest the man and, during the search incident to lawful arrest, your partner recovers 59 Ziploc bags containing crack-cocaine from the man's right front pants pocket. (based on People v. Wigfall, 2005 NY Misc. LEXIS 3493)

# Survey Monkey



Survey Monkey HB 1 Day

1) When a sign is missing or defaced you must complete a
   a)  Field Report
   b)  Trespass Crime Fact Sheet
   c)  Stop Report
   d)  Unusual Occurrence Report

2) Which of the following actions may you take with respect to a non-resident you encounter in a restricted area beyond a conspicuously posted sign?
   a)  Order the person to leave
   b)  Arrest the person
   c)  Allow the person to remain there
   d)  a and b

3) A Trespass Crimes Fact Sheet must be filled out:
   a)  When you stop someone in a NYCHA building
   b)  When you arrest someone for trespass in a NYCHA building
   c)  When you ask for consent to search
   d)  Whenever you arrest someone in a NYCHA building

4) Which of the following would not constitute lingering in a NYCHA building?
   a)  Three kids hanging out in the lobby for an hour
   b)  Two people sitting in the stairwell
   c)  A person sleeping in the hallway
   d)  A person waiting in the lobby for a cab

5) How are NYCHA rules communicated to residents?
   a)  Lease
   b)  Resident Handbook
   c)  Conspicuously posted signs
   d)  All of the above



## Resources

- Read PG 212-60
- Training Videos
- Training Sergeants
- Legal Bureau (646) 610-5400
- Risk Management Bureau (718) 610-8500

Appendix A: NYCHA Rules and Regulations

As indicated on posted signs, these activities are prohibited on NYCHA property (lobbies, corridors, stairs, elevators, terraces, balconies, restricted areas and development grounds)

Alcohol consumption and possessing open containers= OATH summons and Field Report
Barbecuing with NYCHA permit +Garden Hose/Fire Extinguisher = No Action
Barbecuing with no Permit+ Garden Hose/Fire Extinguisher= Field Report and Activity Log Entry
Barbecuing with no Permit + NO Garden Hose/Fire Extinguisher= C-Summons and Field Report and Activity Log Entry
Riding bicycles/skateboards/rollerblades= Field Report and Activity Log Entry, may eject non-resident if condition not corrected, C-summons, if appropriate, bike on sidewalk or reckless skateboarding/rollerblading
Creating a disturbance/engaging in dangerous activity= Field Report and Activity Log Entry, may eject non-resident if condition not corrected, C-summons for disorderly conduct, if appropriate
Defacing NYCHA property= Field Report and Activity Log Entry, C-Summons/Arrest for Criminal Mischief (if appropriate, based on dollar amount) or Making Graffiti
Dogs:
- *Failing to curb or pick up solid waste=* Field Report and Activity Log Entry, may eject non-resident, C-Summons Failing to Curb NYS Pub Health Law
- *Unleashed dogs* Field Report and Activity Log Entry= may eject non-resident, C-Summons Possessing unleashed dog NYC Health Code
- *Not registering dog with NYCHA, includes Service Dogs=* Field Report and Activity Log Entry, may eject non-resident
Drug sale, use or possession= C-Summons/Arrest
Entering restricted areas=Can arrest if conspicuously posted sign, can order to leave (and arrest for non-compliance) if no conspicuously posted sign
Lingering in common area of the building= Field Report and Activity Log Entry
Littering:
*Inside of Building* = Field Report and Activity Log Entry
*Outside of Building* =Field Report and Activity Log Entry + OATH Summons
Playing loud music or creating unreasonable noise:
*With sound reproductive device i.e. portable stereo and no NYPD sound permit*= Field Report and Activity Log Entry + C-Summons (A.C. 24-244(a))
*Without sound reproductive device=* Field Report and Activity Log Entry + OATH Summons (Admin Code 24-218)
Smoking in common areas of the building (besides elevator) = Field Report and Activity Log Entry
Smoking in elevator= C-Summons NYC Health code 181-17(a)
Riding or driving unauthorized vehicles on development grounds= Field Report and Activity Log Entry and A or B Summons for Obedience to Traffic Control Devices (only if signs present) and/or Driving on Sidewalk