# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X
DAVID FLOYD, *et al.*,

            Plaintiffs,

    -against-                               No. 08 Civ. 1034 (AT)

CITY OF NEW YORK, *et al.*,

            Defendants.
-------------------------------------------------------------------- X

**DECLARATION OF COMMUNITIES UNITED FOR POLICE REFORM (CPR) IN**
**SUPPORT OF PLAINTIFFS' MOTION TO MODIFY THE *FLOYD* REMEDIAL**
**ORDER**

I, Carolyn Martinez-Class, pursuant to 28 U.S.C. § 1746 and subject to penalties of perjury, state the following is true and correct:

1. I submit this declaration in support of Plaintiffs' motion to modify the *Floyd* remedial order to ensure more consistent community engagement with the Court and the Court-appointed Monitor and accurate assessments of the NYPD's compliance with the court order. I am not a party to the above-captioned case.

2. I have been the Organizing and Policy Coordinator for Communities United for Police Reform (CPR) since July 2017. Among other responsibilities, I coordinate CPR's policy and legislative efforts, participate in community empowerment work to strengthen community-based infrastructure by supporting know your rights and cop watching efforts, and help to organize various police accountability campaigns.

3. Since July 2017, I have been one of the CPR staff members involved in the *Floyd* reform process. CPR helped to organize community input for the court supervised Joint Remedial Process (JRP), which solicited input from more than 2000 New Yorkers from those communities across the City most impacted by the NYPD's unconstitutional and racially discriminatory stop-and-frisk and trespass enforcement practices. I was personally involved in the JRP in several ways. I communicated regularly with the JRP Facilitator Judge Ariel Belen and represented CPR at meetings with Judge Belen and the NYPD. Further, on behalf of CPR and its members and partners, I provided feedback on Judge Belen's Final Report and recommendations. In July 2018, I supported CPR in filing an amicus brief on the final JRP report where CPR recommended five key reforms to come out of the process.

**About Communities United for Police Reform ("CPR")**

4. CPR, launched in 2012, is a non-partisan, multi-strategy campaign to end abusive and discriminatory policing practices in New York and reduce reliance on policing for community safety.

5. CPR runs coalitions of over 200 national, statewide and local organizations from across New York whose members include community members most impacted by police violence and discriminatory policing, community organizing groups, legal organizations, policy groups, research projects, and others. CPR's coalitions include organizations representing community members from all different walks in life in all five New York City boroughs and include individuals with family members who are police officers. The majority of our member organizations are grassroots organizations whose leadership, constituencies, memberships or clients are based primarily in low-income communities of color, that are most impacted by abusive policing – including youth, LGBTGNC communities, immigrants, people with disabilities, homeless New Yorkers, public housing residents, and others. Members of these communities bear the brunt of the New York Police Department's ("NYPD") unjust stop and frisk practices. This includes organizations that have been leading work on police accountability in Black, Latinx and immigrant communities; organizations representing Lesbian, Gay, Bisexual, Transgender, and Gender Nonconforming communities; homeless New Yorkers; and youth organizations. Notably, young people of color have been documented as those most impacted by the NYPD's stop and frisk practices.

6. In addition, CPR partners with a broad range of additional organizations to advance our effort to create a safer New York City for everyone. Many of our members and partners work on behalf of the communities most unfairly targeted by the NYPD's stop-and-frisk and trespass enforcement practices.

7. CPR's work is largely focused on police accountability, particularly centering the experiences of those directly affected by discriminatory and abusive NYPD policies and practices. Relevant examples include but are not limited to:

   a) In June 2020, after years of sustained organizing & weeks of wide-scale protests CPR led the statewide campaign to pass 3 bills from the Safer NY Act, a package of police accountability bills before the New York State Legislature. This package included the repeal of New York's police secrecy law, 50-a , a law which was used by police departments across the state to shield misconduct information from the public; the Police STAT Act, a law which requires demographic and other reporting on police enforcement activity; and the Special Prosecutor law, which strengthened and codified the Office of the Special Prosecutor – a unit within the Attorney General's Office tasked with leading the criminal investigation of police-involved killings. These pieces of legislation were signed into law by Governor Cuomo.

b) In 2019, CPR was able to effectively advocate for the inclusion of a change to the City Charter as a ballot item in the election. This ballot item expanded CCRB's authority to investigate instances where police officers make false official statements. In spite of significant funds driving a misinformation campaign by NYPD police unions, New Yorkers voted in overwhelming support of the ballot item – it passed with over 70% of the vote.

c) CPR organized a citywide coalition of over 200 community organizations, labor unions, advocacy organizations and others to pass the Right to Know Act in 2017, legislation in the City Council directly relevant to changing NYPD's practices with regards to common street encounters: a local law to mandate NYPD request consent to search an individual unless they have legal basis to engage in said search, a local law that requires the New York Police Department officers provide a business card and the reason for law enforcement activity during certain interactions with the public.

d) CPR has secured other key legislation including: In 2013, CPR secured passage of the Community Safety Act in the City Council, a pair of bills which were directly relevant to increasing NYPD accountability: Intro 1079-2013, a local law to create a clear mechanism for NYPD oversight and increased transparency though establishment of an Inspector General, and Intro 1080-2013, a ban on biased-based profiling; and in 2015 CPR members and partners organized to secure a gubernatorial executive order to establish a special prosecutor for police killings (expanded and codified into law in 2020).

e) CPR members have trained tens of thousands of New Yorkers on their rights during interactions with police and while observing police to increase the safety of community members during police encounters.

8. Members of CPR organizations regularly express the concerns of community members impacted by abusive policing practices in many public arenas and media outlets. For example, members have testified about their discriminatory stop and frisk experiences in front of numerous venues including the New York City Council and the New York State Legislature, at press conferences, at townhall meetings, and in front of former President Obama's 21st Century Policing Task Force. In addition, CPR members have been quoted on policing, police oversight, and police reform in the City of New York in media outlets as diverse as the Associated Press, the New York Times, the New York Daily News, Gotham Gazette, El Diario, the Staten Island Advance, Black Entertainment Television, and Amsterdam News.

9. Historically, CPR's interest in these matters dates back two decades, when, after the 1999 killing of Amadou Diallo by the Street Crimes Unit of the New York Police Department, organizations that would later become founding members of CPR approached the Center for Constitutional Rights ("CCR") to file the lawsuit targeting stop-and-frisk practices (*Daniels v. City of New York*). The information concerning racial disparities in stop-and-frisk obtained through *Daniels* facilitated the filing of *Floyd v. City of New York*. CPR

members are among the named plaintiffs, the main litigating nonprofit legal organizations and key witnesses in Floyd.

10. CPR has worked to ensure directly impacted New Yorkers were able to participate in the *Floyd* legal process. CPR members and partners attended and packed the court every day of the historic nine-week *Floyd* trial. CPR also participated extensively in the JRP. The JRP included 28 community forums, with an estimated 1,777 participants – more than half of these participants' participation was facilitated by CPR members and partners (ECF No. 597 at 7–8.). CPR and CPR members participated consistently throughout the JRP Advisory Committee and process, helping the Facilitator to organize focus groups and recruit participants, and directly organized nine community forums, convening 530 members of directly-impacted communities across the five boroughs. CPR partner organizations organized an additional 6 community forums with an additional 367 participants. Through these activities, CPR endeavored to facilitate direct input in the remedial process from New Yorkers most impacted by stop-and-frisk and trespass enforcement abuses, primarily low-income New Yorkers of color. Since the end of the JRP, CPR and CPR members continue to engage with the *Floyd* remedial process including through filings with the Court.

11. At different times CPR and/or its member organizations have been involved in *Floyd v. City of New York* and have a strong interest in the outcome of stop and frisk reform efforts. CPR is a named stakeholder in the Joint Remedial Process in *Floyd v. City of New York* (ECF No. #372). CPR has submitted multiple filings to the Court for consideration on this matter. The following are just some of the filings we have had accepted by the Court: On August 13th, 2013 the Court granted a March 3rd, 2013 motion for leave to file an *amicus curiae* brief in support of Plaintiffs' remedial proposals in *Floyd* and accepted the brief as filed (ECF No. #377). On May 16th, 2012, the Court granted a request by members and partners of CPR (Bronx Defenders, Brotherhood/Sister Sol, the Justice Committee, Picture the Homeless, and Streetwise and Safe) to submit an *amicus curiae* brief in support of Plaintiffs' motion for class certification (ECF No. # 208). In April 2017, CPR submitted an *amicus curiae* brief to the Court concerning the NYPD's Body-Worn Camera Pilot (ECF No. #547-1). On July 9th, 2018, CPR filed an *amicus curiae* brief in response to the Facilitator's Final Report on the *Floyd* Joint Remedial Process, uplifting impacted community members' priority reforms for the Court – this filing was supported by over 90 organizations (ECF No. #611).

**<u>Support of Plaintiffs' Motion to Modify the Floyd Remedial Order to Ensure More Consistent Community Engagement with The Monitorship And Accurate Assessments of The NYPD's Compliance with The Court Order</u>**

12. In the *Floyd* Remedial Order, Judge Scheindlin framed community input as a 'vital part' of developing a sustainable remedy in this case. While Judge Scheindlin noted an array of stakeholders who should be heard throughout the remedial process, she specifically articulated the importance of centering and elevating the input of those most directly impacted by stop-and-frisk abuses.

13. This is particularly critical because the Joint Remedial Process was explicitly designed per the Remedial Order to meaningfully include community input. Unfortunately, the recommendations made during the JRP by communities most impacted by the NYPD's discriminatory and abusive practices have largely been ignored by the Monitor. For example, even though the CPR, its members, and its partners identified as a key priority and advocated for the recommendation that Level 1 and Level 2 encounters be documented and publicly reported on, the Monitor has completely undermined this reform by implementing a much narrower "Alternative Plan." The "Alternative Plan" fails to address the core goals of the Level 1 and Level 2 reporting reform and is instead primarily focused around analyzing videos generated by Body Worn Cameras.

14. Other recommendations from the JRP that were important to CPR have not moved forward. These include transparent, meaningful, and timely discipline for officers, precincts, and commands found to have conducted unconstitutional or abusive stops and/or trespass enforcement; and establishing an independent community board comprised of police accountability groups and organizations that serve, and are led by, members of directly impacted communities, to update and advise the Court during the period of its supervision in this case. The fact that critical reforms, prioritized by communities and included in the Facilitator's Final Report, have been undermined by the NYPD and the City and have not been advanced by the Monitor or the Court represents a failure of the Floyd Remedial Process.

15. While transparent and meaningful discipline was a recurring recommendation put forward during the JRP by directly-impacted New Yorkers in focus groups, town halls and leadership meetings – and while CPR met with members of the Monitor team in August 2018 to discuss what changes need to be made to the NYPD's discipline system – neither CPR nor the public has heard anything from the Monitor team in almost three years about what, if any, discipline reforms will be recommended to the Court. Disappointingly, community input has not been taken seriously throughout this process, and through the course of this case the process has become less transparent.

16. There are numerous additional examples of the shift toward secrecy in this case, including the advancement of multiple confidentiality orders by the Monitor that have limited CPR members' and the public's capacity to meaningfully weigh in on Monitorship developments. This lack of transparency has diminished the capacity for relevant input by organizations like CPR and our members, as well as the plaintiff class; it has also diminished the public trust in the entire remedial process. Only certain documents related to the Monitorship are available for CPR members' review. In order to review the limited documents CPR can see, CPR members have had to take time out of their days to go to Plaintiffs' counsel's office. During these reviews, only certain members are allowed to be present and are restricted from sharing what they see with other CPR members, limiting our organization's capacity to provide robust feedback. Furthermore, Plaintiffs' counsel is also limited in their ability to discuss various changes and proposals in the Monitorship with communities most impacted by these changes. Rather than using input from New Yorkers most impacted by discriminatory and abusive

policing police practices to assess the NYPD's compliance, the Monitor has used the Court-approved confidentiality orders to largely shut the community out of the process.

17. CPR supports Plaintiffs' motion to modify the Floyd remedial order. While all six changes proposed in Plaintiffs' motion are important, CPR would like to emphasize to the Court three  recommendations that we believe are of utmost importance toward increasing transparency and improving community input in the Floyd remedial process. Those recommendations are the following:

a) Community Collaborative Board: The Court should establish a Board consisting of representatives from organizations with a demonstrated record of working on issues related to stop-and-frisk and trespass enforcement practices and working directly with communities most heavily impacted by those practices. This Board should be able to solicit public input concerning reforms stemming from *Floyd,* as well as provide feedback and its own recommendations to the Monitor and the Court on the NYPD's compliance with the Court-ordered reforms. The Board should also have access to all necessary information from the NYPD and Monitor to complete its work and should not be subject to the existing confidentiality orders in *Floyd*.

b) Public status conferences: The Court should hold public status conferences involving the Monitor, parties, the Community Collaborative Board and the public at least twice annually. These conferences would create an opportunity to publicly discuss issues surrounding reforms and NYPD's overall compliance with the remedial order and would allow for the Court to hear directly from impacted New Yorkers concerning their experiences of stop-and-frisk and trespass enforcement.

c) Discipline reforms: One core community priority in *Floyd* is that officers should be meaningfully disciplined when they engage in illegal or otherwise abusive stops, frisks, searches and trespass enforcement actions – especially when these are repeated instances. The Court should ensure that any disciplinary reforms proposed by the Monitor shall be developed in consultation with the Community Collaborative Board. Any proposed disciplinary reforms emerging from *Floyd* should also be subject to a transparent public comment process coordinated by the Monitor prior to being ordered by the Court.

18. More than eight years ago, the *Floyd* trial provided an opportunity for New Yorkers to speak openly about the discriminatory and abusive practices of the NYPD and demand a change. Since then, those voices have been silenced by a Monitorship that lacks transparency and has not engaged meaningfully with the priorities laid forward by the community. The Court and the Monitor have a responsibility to the communities most impacted by abusive NYPD practices and must enact genuine reforms, and assess compliance in a way that accurately reflects the lived experiences of New Yorkers.

19. For all of the reasons provided above and in the interest of justice, CPR supports Plaintiffs' motion to modify the *Floyd* remedial order to ensure more consistent community engagement with the Monitorship and accurate assessments of the NYPD's compliance with the court order.

Dated:        New York, New York

                July 28, 2021

_____
Carolyn Martinez-Class