# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

DAVID FLOYD, *et al.*,

                Plaintiffs,

-against-    No. 08 Civ. 1034 (AT)

CITY OF NEW YORK, *et al.*,

                Defendants.
------------------------------------------------------------------ X

------------------------------------------------------------------ X

KELTON DAVIS, *et al.*,

                Plaintiffs,

-against-    No. 10 Civ. 699 (AT)

CITY OF NEW YORK, *et al.*,

                Defendants.
------------------------------------------------------------------ X

## DECLARATION OF LOYDA COLON

    I, Loyda Colon, pursuant to 28 U.S.C. § 1746 and subject to penalties of perjury, state the following is true and correct:

    1.    I submit this declaration in support of Plaintiffs' motion to modify the remedial order. I am not a party to the above-captioned case.

    2.    I am the Executive Director for the Justice Committee ("JC"), a grassroots organization dedicated to building a movement against police violence and systemic racism in New York City.

    3.    I became a JC member in 2006 and soon after became JC's Co-Coordinator. In 2007, I initiated JC's CopWatch program, which helped to form New York City's ("NYC") Cop Watch Alliance. In 2014, I launched the JC's current Families Organizing Program which unites,

organizes, and develops the leadership of NYC families who have lost loved ones to the police. I became a full-time staff member as JC's Co-Director in 2013 and transitioned to become the JC's Executive Director in 2021.

4. I was born in NYC and raised in the housing projects of the Lower East Side. I have been an organizer and activist for over two decades, fighting for freedom for all people, including through struggles for racial justice, rights of LGBTQ+ and gender-nonconforming people, economic justice, and against police and state violence. Prior to coming on staff full-time with the JC, my experience included serving as the first staff member/Interim Campaign Coordinator of Communities United for Police Reform ("CPR"), Coordinator of the Coalition for Community Safety at the Center for Constitutional Rights ("CCR"), Coordinator of the Audre Lorde Project's ("ALP") organizing work against police and state violence, and Coordinator of ALP's first LGBTQ+ youth organizing program.

## About the Justice Committee

5. The JC is a non-partisan, grassroots organization that seeks to end police violence and systemic racism New York and reduce reliance on policing for community safety.

6. The JC was founded in or about the mid-1980s as a part of the National Congress for Puerto Rican Rights ("NCPRR"). It has been an independent entity since 2000, attaining non-profit status in or about 2007. The JC supports, organizes, and develops the leadership abilities of survivors of police violence and families of New Yorkers who have died at the hands of police. Over the years, the JC has supported dozens of families who have lost loved ones to the New York City Police Department ("NYPD") to organize campaigns for justice and accountability for their loved ones' deaths, for example, the mother of Ramarley Graham, whose years of organizing forced former NYPD Officer Richard Haste and former NYPD Sargent Scott Morris out of the

NYPD for killing her son.

7. In order to proactively address police violence as it occurs, in 2007, the JC piloted its first CopWatch team to monitor and document police activity in order to deter abuse. Since that time, JC has operated a CopWatch program that trains and mobilizes New Yorkers to observe and document police officers during investigative street encounters, car stops, arrests, and protests. The JC's CopWatch program is part of its Community Defense Program Area, which activates New Yorkers of color to build community safety in ways that decrease reliance on law enforcement.

8. The JC is a co-founder and Steering Committee member of CPR, which was explicitly named as a stakeholder in the *Floyd* Remedial Order. *See Floyd* ECF No. 372 at 29. Since CPR's launch in 2012, the JC has played a pivotal role in CPR policy campaigns, for example by providing testimony at hearings, participating in protests and press conferences, and lobbying to ensure passage by the New York City Council of the Community Safety Act in 2013 and the Right to Know Act ("RTKA") in 2017 and by organizing families who have lost loved ones to police violence to successfully advocate for Executive Order 147 in 2015 and the passage of special prosecutor legislation and the repeal of New York Civil Rights Law Section 50-a in 2020.

**JC History with *Daniels*, *Floyd*, and *Davis* Litigations**

9. The JC's constituents and members were part of the plaintiff class represented by the *Daniels v. City of New York* litigation. The NCPRR was one of the original named plaintiffs in the *Daniels* litigation.

10. The *Daniels* litigation challenged the NYPD's policy of conducting stop-and-frisks without reasonable suspicion of criminal activity as required by the Fourth Amendment.

3

Additionally, the plaintiffs alleged that officers selectively targeted them on the basis of their race and national origin in violation of the Equal Protection Clause of the Fourteenth Amendment. The plaintiffs sought damages and a judgment declaring that the notorious (now disbanded) NYPD Street Crime Unit's ("SCU") operations were unconstitutional and an order eliminating the SCU or barring it from continuing to make improper stop-and-frisks.

11. The NCPRR, which was led by community organizer Richie Perez, played a major role in initiating the *Daniels* case with CCR, the current co-counsel for the *Floyd* plaintiffs and class members.

12. The JC's constituents and members are also members of the plaintiff class represented by the *Floyd* and *Davis* litigations.

13. The JC has been heavily involved in the *Floyd* litigation and, as members of communities that have borne the brunt of the NYPD's unconstitutional stop-and-frisk practices, its members have a strong interest in the outcome of stop-and-frisk reform efforts.

14. In 2011, the JC filed an amicus brief in support of the *Floyd* plaintiffs' motion for class certification and in support of the injunctive relief sought by plaintiffs. *See Floyd* ECF No. 208.

15. The JC closely monitored and worked to ensure its members were updated on and understood the *Floyd* trial. The JC members—including families who have lost loved ones to police, members of the JC's CopWatch program, and others—packed the court during *Floyd* trial and organized press conferences.

16. After the trial's conclusion, the JC members and staff met with members of the Monitor's team and NYPD representatives on numerous occasions during the early phase of the Immediate Reforms Process ordered by the Court.

**JC History with *Floyd* Joint Remedial Process ("JRP")**

17. The JC, represented by JC member and leader Steve Kohut, was a member of the Advisory Committee for the JRP Facilitator, Judge Ariel Belen. On numerous occasions, Mr. Kohut and other JC members and staff met with Judge Belen's team to provide input on substantive reforms necessary to bring the NYPD's stop-and-frisk practices into compliance with the constitution and how to structure the community input process for the JRP.

18. During the JRP, the JC specifically uplifted the need for the NYPD to document and publicly report aggregate data, including demographic information, on Level 1 and 2 encounters. The JC also highlighted the need for meaningful, timely, and transparent discipline for officers who conduct unconstitutional stops. Both of these reforms emerged as priorities identified by New Yorkers who are directly impacted by NYPD stop-and-frisk abuses in the context of focus groups and other aspects of the JRP's community input process.

19. In spite of the fact that the Facilitator acknowledged the importance of documentation of and reporting on Level 1 and 2 encounters in his final report, *see Floyd* ECF No. 597 at 239 of 312, the Court and Monitor have failed to implement this reform and instead have advanced an "Alternative Plan" that does not address the need for documentation and transparency with respect to racial and other forms of bias in Level 1 and 2 encounters.

20. Throughout the *Floyd* Monitorship, the JC has also focused on the need for discipline reforms that will ensure real accountability for officers who violate the Constitution during stop-and-frisk encounters.

21. During JRP Advisory Committee meetings and other stake-holder meetings, the JC members repeatedly raised these concerns with Judge Belen and his team, yet the Monitor and Court have failed to order meaningful discipline reform to date.

22. The Monitor and Court's unwillingness to order reforms prioritized by community members with direct experience of NYPD stop-and-frisk abuses is representative of the failure in the *Floyd* Remedial Process.

23. Additionally, a confidentiality order requested by the Monitor, supported by the NYPD, and granted by the Court towards the conclusion of the JRP has limited the JC's ability to discuss the JRP process with and received feedback from its members and constituents.

24. Furthermore, the confidentiality order restricted information sharing between Plaintiffs' counsel and the JC, drastically limiting the ability of the JC and its constituents to provide perspective and expertise that the monitorship currently lacks. The order meant that JC organizers could not share back with JC members in any meaningful way how the Parties, the Monitor, and the Court responded to reform ideas that are important to our members and constituents, such as stop receipts, Level 1 and 2 reporting, and making unconstitutional stops an offense resulting in termination. Ultimately, each of these, and many other reform possibilities we raised during the JRP on behalf of our community were opposed by the NYPD and disregarded by the Monitor.

25. The restrictions of the confidentially order have made it virtually impossible to discuss alternatives and strategize with our constituents about how to continue to push for the reforms most important to them. In other words, we have been unable to play the role we are meant to play in this process—to represent the voices of those most impacted by NYPD stop-and-frisk abuses. Furthermore, this on-going lack of transparency contributes to disillusionment with the *Floyd* remedial process, and the broader criminal legal system, and can easily cause community members to lose motivation to engage in efforts to create systemic change.

26. These factors have significantly diminished the JC members' trust in the ability of

the *Floyd* Remedial Process to achieve meaningful reform to end unconstitutional stop-and-frisk practices by NYPD.

### Lack of Transparency Since the Conclusion of the JRP

27. Since the JRP concluded, the monitorship has failed to ensure transparency about the status of Court-ordered reforms.

28. The JC's Advisory Committee representative, Steve Kohut, has received no communication from the Monitor or his team since an email stating that Judge Belen's Final Report would be published on April 30, 2018 was sent on April 5, 2018. JC has only received updates about the monitorship from Plaintiffs' counsel and CPR.

29. Significantly, the JC was not even informed by the Monitor that a website existed for the monitorship.

### Current Experiences of JC Members and Constituents with NYPD Stop-and-Frisk

30. The JC members still report experiencing and witnessing unconstitutional street stops and report an increase in car stops since the conclusion of the *Floyd* trial.

31. During the onset of the COVID-19 pandemic, members and constituents reported being stopped and witnessing stops during social distancing enforcement and feel that social distancing enforcement was used as a pretext for conducting stops.

32. Members and constituents who are approached by NYPD officers often report that they do not feel free to leave regardless of whether there is legal justification for the encounter. These anecdotal experiences align with and add critical lived experience to the Monitor's report that the NYPD is underreporting stops and suggest it may be classifying encounters in which officers have effectively detained their targets as Level 1 and 2 stops. *See Floyd* ECF No. 795-1 at 20-21 of 125.

33. The JC members and constituents report that, even after the enactment of the RTKA, officers often do not give their names, badge numbers, rationale for initiating encounters, or business cards during street encounters, even if they are asked.

34. The JC members and constituents report being stopped, summonsed, and arrested at the protests during 2020.

35. The JC members also report that NYPD officers conduct sweeps through the courtyards of public housing developments.

36. The JC members know first-hand that unconstitutional stops can escalate to fatal outcomes, as in the case of Antonio Williams, *see Williams v. City of New York, et al.,* Index No. 34180/2020E (Bronx Cty. Sup. Ct.), and Eric Garner, who both have family members in the JC.

37. In his reports, the Monitor has failed to acknowledge the dangerousness of stop-and-frisk encounters for individuals like Williams and Garner, and continues to fail to promote reforms that will ensure that NYPD stop-and-frisk practices are constitutional and prevent escalation to the level of violence that the JC's members and constituents have experienced even after advent of the Monitorship.

38. The JC has little confidence in the success of the Monitorship or in the compliance of the NYPD with the Constitution if the Monitor continues to fail to acknowledge ongoing abuses by the NYPD and does not seek and incorporate community input.

**The JC Supports Plaintiffs' Motion to Modify the *Floyd* Remedial Order
to Ensure Consistent Community Engagement with the Monitorship
and Accurate Assessments of the NYPD's Compliance with the Remedial Order**

39. It is the position of the JC that only complete transparency of the Monitorship, including seeking out and incorporating significant community input, will result in successful outcomes in the *Floyd* Remedial Process.

40. In order to ensure transparency and adhere to the Liability and Remedial Orders that the remedial process must hold as particularly important the input of those most directly impacted by stop-and-frisk abuses the Court should order:

    a) The establishment of a Community Board to provide feedback and issue its own assessments and recommendations to the Monitor and the Court on the NYPD's compliance with the Court-ordered reforms. The Community Board should consist primarily of organizations with a history of working on policing issues and should have access to all information necessary in connection with reforms emerging from the *Floyd* remedial process. The Community Board should not be subject to restrictive confidentiality orders and should have direct access to the Court and all information needed to evaluate compliance; and

    b) Public status conferences are held at least twice a year by the Court for the remainder of the Monitorship at which members of the public have the opportunity to receive transparent updates about Court-ordered reforms and provide public comment on the record regarding NYPD compliance; and

    c) The development of discipline reforms with community input, including input from organizations like the JC, which have a long history of involvement in the *Floyd* case and police reform advocacy. These reforms must result in truly deterrent consequences for officers who conduct unconstitutional stops and trespass enforcement.

41. The JC members firmly believe that if we and other representatives of directly impacted communities are not meaningfully consulted and involved in the Monitorship moving forward, the Monitorship will not result in meaningful changes to the NYPD's unconstitutional and racially discriminatory stop-and-frisk and trespass enforcement practices.

[INTENTIONALLY LEFT BLANK]

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 26, 2021  
New York, New York

_____  
Loyda Colon