# EXHIBIT 6



666 Broadway, 7th Floor
New York, New York 10012
212-614-6464
ccrjustice.org

March 18, 2019

*Via Electronic Mail*:
Peter Zimroth, Esq.
Arnold & Porter
250 West 55th Street
New York, NY 10019
peter.zimroth@arnoldporter.com

**Re: Compliance Measures for the *Floyd/Davis* Monitorship**

Dear Peter:

On behalf of the *Floyd* and *Davis* Plaintiffs, we write to respond to the proposed compliance metrics circulated by the NYPD on November 30, 2018. While the details of our initial proposed compliance metrics and critiques of the NYPD's proposed metrics are set forth more fully in the attached chart, compliance map, and memorandum from our remedies expert Mike Gennaco, we discuss briefly below five general principles which inform our critiques and proposals and which we believe must guide how substantial compliance is defined and assessed going forward.[1]

### A. Compliance Must Be Measured Through the Experiences of Impacted Communities.

First, any assessment of substantial compliance must formally and meaningfully center the perspectives of those New York City communities that the Court found have been historically targeted and most harmed by the NYPD's unlawful and racially discriminatory stop-and-frisk and trespass enforcement practices. Compliance must be determined using metrics that assess whether the Court-ordered reforms are having their intended impact on the ways that these New Yorkers experience policing because, as the Court itself has recognized, achieving compliance requires a commitment to legitimate and effective outcomes.[2] Direct and formal community stakeholder input is also especially critical given the Court's finding that the City's

---

[1] While Plaintiffs agree it is appropriate to begin discussions with the Monitor and the NYPD about what metrics should be used to assess the NYPD's substantial compliance with the Court-ordered reforms, we think it is extremely premature to actually commence any such compliance assessments at this stage, given that several of the critical Court-ordered reforms (e.g., audits/self-inspections, DAO procedures, RAILS reforms) have not even been fully developed and/or approved by the Court (much less implemented by the NYPD), most of the Court-Appointed Facilitator's recommended JRP reforms are still pending before the Court, and the two Court-ordered pilots have yet to be completed. We also want to emphasize that the proposed metrics in the attached chart and map represent our *initial* proposals, which we will expand upon and likely modify over the course of the parties' and Monitor team's upcoming discussions on compliance metrics.

[2] *See Floyd* Rem. Ord, Dkt # 372, at 29 ("If the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful.").

deliberate indifference to repeated community complaints about suspicionless and racially-motivated stops-and-frisks made it liable for Fourth and Fourteenth Amendment violations, *see Floyd* Liab. Op., Dkt # 373, at 111-13, 178, and the Court's recognition that "no amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety." *Floyd* Rem. Ord, Dkt # 372, at 29. Moreover, community stakeholder input into compliance assessment is routine in other court-ordered police reform efforts, as illustrated by the provisions in recent Department of Justice police pattern-and-practice consent decrees and agreements requiring that data from regularly administered, periodic community surveys be included as part of the monitor's assessments of the subject police department's compliance with the court-ordered reforms and/or improvements in constitutional policing.[3] Accordingly, Plaintiffs have proposed methods for directly incorporating community member perspectives into the Monitor's compliance assessments, including a very promising community survey model from NYCLU and the CUNY Public Science Project, discussed in more detail in the survey report and Powerpoint attached as to this letter.

Relatedly, in order to ensure that community stakeholders have meaningful opportunities to provide formal input on compliance, they must be regularly and fully informed about the substance and progress towards implementation of the various reforms required by the *Floyd*, *Davis*, and *Ligon* orders. However, the only method for informing the public about reform development and implementation currently used by the Monitor team—the filing of the Monitor's status reports on ECF and uploading of them to the Monitor website—cannot accomplish this critical information-sharing task for several reasons. First, the vast majority of people who live in the communities heavily impacted by the NYPD's stop-and-frisk and trespass enforcement practices cannot access Pacer nor have any awareness of the Monitor website's existence, as it has never been publicized.[4] Moreover, the reports themselves are lengthy and technical and thus very difficult if not impossible for people who are not lawyers or policing professionals to fully digest and comprehend. The Monitor team should therefore adopt the

---

[3] *See, e.g.*, *United States v Town of East Haven*, 12-cv-1652, Dkt# 2-1, ¶ 190(a) (D. Conn. Dec. 21, 2012) (community survey part of monitor's outcome assessment); *United States v. Commonwealth of Puerto Rico*, 12-cv-2039, Dkt# 2-3 ¶ 240(D.P.R. Dec. 21, 2012) (requiring monitor to conduct community surveys to assess police department's "overall compliance with and the effectiveness of" the court-ordered settlement agreement); *United States v. City of Cleveland*, 15-cv-1046, Dkt #7-1, ¶ 361 (N.D. Ohio June 12, 2015) (requiring monitor to conduct biennial community surveys and include analysis of the survey results in outcome assessments of police department's improvements in constitutional policing); *United States v. City of Ferguson*, 16-cv-180, Dkt # 41 ¶¶ 429, 435(a) (E.D. Mo. April 19, 2016) (requiring Monitor to conduct annual community surveys and analyze the results of those surveys as part of outcome assessment to determine whether implementation of consent decree is resulting in constitutional policing); *United States v. City of Newark*, 16-cv-1731, Dkt# 4-1, ¶¶ 22, 175 (D.N.J. April 29, 2016) (requiring monitor to conduct annual community surveys that the monitor "should consider an outcome measure"); *United States v. Baltimore Police Dep't*, 17-cv-0099, Dkt# 2-2 ¶¶ 459(a), 506 (D.Md. Jan. 12, 2017) (including annual community surveys as one of the outcome assessments that the monitor is required to conduct to determine whether police department has shown sustained and continuing improvement in constitutional policing).

[4] Plaintiffs also note that the Monitor website is very difficult for members of directly impacted communities to navigate. Plaintiffs therefore urge the Monitor team to modify website design specifically to facilitate accessibility and public information and understanding for a wide range of educational and language levels by, for example, making website text (if not uploaded reform documents, court orders and monitor reports) available in languages other than English and refraining from the use of policing jargon and legalese whenever possible. Plaintiffs are happy to discuss our website ideas further at a future in-person meeting with the Monitor team.

practice employed by the monitors in Seattle, New Orleans, Ferguson, Newark, and Baltimore of regularly hosting open community forums coinciding with the release of their periodic status reports to the court to summarize, explain, and answer questions about the reports and discuss other monitorship-related issues with interested members of the public. Separate community forums in public housing developments may be advisable given the distinct nature of that particular community.

Similarly, Plaintiffs think it is now more critical than ever that the Court begin, at a minimum, holding regular public status conferences to coincide with the filing of the Monitor's biannual status reports, where members of the public may benefit from listening to the Monitor and parties discuss and respond to the Court's questions about particular issues of concern flagged in the Monitor's reports. This is the practice in *all* of the police monitorships mentioned in this letter, as well as the monitorship in the ongoing federal racial discrimination class action against the New York City Fire Department, *Vulcan Society, et al. v. City of New York*, 07-cv-2067 (E.D.N.Y.).

### B. Compliance Requires Ensuring Reforms Exist *in Practice*, Not Merely on Paper.

Second, as *Floyd* Plaintiffs previously discussed in our December 3, 2015 memorandum on measuring substantial compliance, and as you have reiterated in numerous status reports to the Court, in order for the NYPD to achieve compliance with any of the Court-ordered reforms in *Floyd*, *Davis*, or *Ligon*, it must memorialize those changes in formal, written departmental policies, procedures, training materials, and/or forms, *and* also ensure these changes are implemented and routinized by NYPD personnel *in practice*. *See*, *e.g.*, *Floyd* Dkt ##536 at 3, 576 at 1, 680-1 at 63; *Davis* Dkt ##362 at 3, 386 at 1, 443-1 at 63. Only by demonstrating these changes in practice may the Monitor, the Court, and the public truly measure the legitimacy and success of these reforms. This is precisely the logic of employed by recent Department of Justice police pattern-and-practice consent decrees and court-ordered settlement agreements.[5]

However, for virtually every reform in its proposed compliance plan, the NYPD suggests compliance was or will be achieved once the NYPD has finished revising the relevant Departmental policy documents, written training materials, and/or forms in accordance with the requirements of the Remedial Order and such revisions are approved by the Court. This narrow and formalistic conception of compliance is not only inconsistent with the standards set by DOJ

---

[5] *See. e.g.*, *United States v. City of Seattle*, 12-cv-1282, Dkt # 3-1 ¶ 184 (W.D. Wash. July 27, 2012) ("'Full and effective compliance' with a material requirement of the Settlement Agreement requires that the City and SPD have: (a) incorporated the requirement into policy; (b) trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) *ensured that the requirement is being carried out in practice*.") (emphasis added); *United States v. Commonwealth of Puerto Rico*, *supra* ¶ 241(same); *United States v. City of New Orleans*, 12-cv-1924, Dkt # 159-1 ¶ 447 (E.D. La. January 11, 2013) (same); *United States v. City of Cleveland*, *supra*, ¶ 360 (same); *United States v. City of Ferguson*, *supra* ¶427 (same); *United States v. City of Newark*, *supra* ¶ 173 (same); *United States v. Baltimore Police Dep't*, *supra* ¶ 506 (same). These decrees and agreements also specify that compliance assessments must contain both quantitative and qualitative elements when appropriate, *see e.g. United States v. Seattle*, *supra*; *United States v. Town of East Haven*, *supra* ¶ 189, both of which are included in Plaintiffs' proposed compliance metrics.

and the nation's leading police oversight experts;[6] it contravenes the language of the *Floyd* Remedial Order itself. The Order requires that the Court-ordered Immediate Reforms be "*implemented* when they are approved [by the Court]" and that the Monitor "regularly conduct compliance and progress reviews to assess the extent to which the NYPD has *implemented and complied with* the Immediate and Joint Process Reforms." *See Floyd* Dkt # 372, at 12-13, 14 (emphasis added). This language—and the Court's stated goal of achieving constitutional policing, not constitutional paperwork, *see Floyd* Dkt # 372 at 2— would be meaningless if compliance is achieved at the point when the NYPD's written reform proposals are approved by the Court. Thus, contrary to the NYPD's chart, the Department cannot be in substantial compliance with the Court-ordered stop report reforms, for example, unless and until NYPD officers are consistently documenting all of their *Terry* stops on the new Stop Reports and providing complete and accurate narrative descriptions of the bases for their stops in those reports. Similarly, the NYPD cannot be in substantial compliance with the Court-ordered supervision reforms as long as NYPD sergeants are, in practice, frequently failing to thoroughly review the constitutionality of their subordinate officers' stops, as indicated by the results of recent Stop Report audits. *See Floyd* Dkt# 680-1 at 12-13, *Davis* Dkt# 443-1 at 12-13. This is likewise true with respect consistent documentation of trespass arrests on the new Trespass Crimes Fact Sheet that includes a complete and accurate narrative description of the bases for the initial approach and the ultimate trespass arrest, as well sergeants' review of the constitutionality of those arrests.

### C. Compliance Requires Significant Improvements in Constitutional and Non-Discriminatory Policing.

Third, in addition to NYPD implementation of all Court-ordered reforms in practice, substantial compliance also requires that the NYPD show that it has made significant improvement in constitutional policing since the beginning of the Monitorship, which in this context entails stop-and-frisk and trespass enforcement activity that is much more often supported by the requisite reasonable suspicion or probable cause and is much less racially disparate. The DOJ has articulated this standard of compliance in its recent policing consent decrees, as have court-ordered settlements in police pattern-and-practice suits brought by private civil rights plaintiffs.[7] Moreover, this is entirely consistent with the underlying purpose of the *Floyd* Remedial Order, which is to "end the constitutional violations in the NYPD's stop-and-

---

[6] *See* Police Assessment Resource Center (PARC), *National Guidelines for Police Monitors* 21 (2008)(defining "substantial compliance" as "a formal determination by the court, the parties, or a designated reasonable, objective observer that an Agreement's requirements have been fully adopted as policy, effectively incorporated into training, and *routinely and consistently applied in actual practice for a sustained period of time*") (emphasis added). Plaintiffs note that Deputy Monitor Richard Jerome and NYPD Deputy Commissioner of Risk Management Jeffrey Schlanger were both involved with the working group that developed these National Guidelines.

[7] *See, e.g.*, *United States v. City of Ferguson*, Dkt #41 ¶ 462 ("Full and effective compliance" means achieving *both* sustained compliance with all material requirements of this Agreement, *and* sustained and continuing improvement in constitutional policing and public trust, as demonstrated pursuant to this Agreement's outcome measures.") (emphasis added); *United States v. City of Newark*, Dkt # 4-1 ¶222 (same); *United States v. Baltimore Police Dep't*, Dkt# 2-2 ¶ 506 (same); *Bailey v. City of Philadelphia*, 10-CV-5952-SD, Dkt # 16 ¶¶ II.D-G, IV.E-F, IV.H., VI.C (E.D. Pa. June 21, 2011) (requiring both implementation of various stop-and-frisk policy, training, supervisory and disciplinary reforms and statistical analysis to assess whether the Department's stop-and-frisk practices are "consistent with constitutional standards").

frisk practices described in the Liability Opinion" and "ensure that the practice [of stop-and-frisk] is carried out in a manner that protects the rights and liberties of all New Yorkers." *See Floyd* Dkt # 372 at 2, 12. The most widely accepted methods for assessing this kind of improvement, which the DOJ decrees and agreements refer to as "Outcome Assessments," generally involve regular, periodic statistical analyses of the subject police department's own data on the law enforcement practice or practices at issue, quantitative *and* qualitative analyses of the effectiveness of court-mandated training, supervision, and disciplinary reforms, and the aforementioned formal and direct incorporation of community stakeholder perspectives.[8] Plaintiffs therefore include several such outcome measures in our proposed compliance metrics.

### D. Compliance Must Be Sustained.

Fourth, the NYPD cannot achieve substantial compliance unless and until it sustains both compliance with all Immediate and JRP reforms and significant improvements in constitutional policing *over an extended period of time*. The Court's July 30, 2014 Order Modifying the Remedial Order requires as much. *Floyd* Dkt # 466 at 2 ("[T]emporary compliance during a period of otherwise sustained non-compliance shall not constitute substantial compliance."). The standard widely used in both the DOJ consent decrees and the agreements in the private plaintiff police pattern-and-practice cases is sustained compliance for at least two-years.[9] This timeframe is also appropriate for the present Monitorship, with the understanding that meaningful failures to maintain compliance resets the two-year clock. Compliance is measured by the increased capacity and propensity of the police to consistently and sustainably operate at a high level of constitutionality and to refrain from racial profiling, and to course-correct as necessary.

### E. Compliance Is Holistic and Involves Interlinked Priorities.

Fifth, Plaintiffs also recognize the inherent dynamic nature of metrics assessing substantial compliance. That is, metrics may be inter-related or complementary with one another, multi-dimensional, and some may be more crucial for assessing compliance and thus entitled to more "weight" than others. While we have meaningfully engaged with the NYPD's chosen chart format, Plaintiffs recommend the use of a compliance "map" or dashboard that can reference the totality and relational aspects of compliance metrics to be considered, as well as provide a deeper dive into compliance and related analysis, in order to present an overview and to highlight key areas where the NYPD's framing was inadequate or inaccurate. We attach our initial version of

---

[8] *See, e.g.*, *United States v. Town of East Haven*, supra, ¶¶ 190(a),(b), (d)-(f); *United States v. City of Ferguson*, supra, ¶¶ 435(a),(c),(d)); *United States v. City of Newark*, supra, ¶¶ 174(a),(d)(e); *United States v. Baltimore Police Dep't*, supra, ¶459(e)-(g), (l)-(n); *Bailey*, supra, ¶¶ IV.D, IV.H; *Melendres v. Arpaio*, 07-cv-2513, Dkt # 606 (Supplemental Perm. Inj.) ¶¶ 136(a)-(c), (f)-(j), 137 (D.Ariz. Oct. 2, 2013).

[9] *See National Guidelines for Police Monitors*, supra, at 95; *United States v. City of Seattle, supra,* ¶ 230; *United States v. Commonwealth of Puerto Rico*, supra, ¶ 299; *United States v. City of New Orleans*, supra, ¶ 491; *United States v. City of Newark*, supra, ¶ 224; *United States v. City of Ferguson*, supra, ¶ 462; *United States v. Baltimore Police Dep't*, supra, ¶ 504(b); *Melendres v. Arpaio*, 07-cv-2513, *supra* ¶ 3 (requiring "full and effective compliance" for no less than three years).

[9] *See National Guidelines for Police Monitors*, supra, at 95; *United States v. City of Seattle, supra,* ¶ 230; *United States v. Commonwealth of Puerto Rico*, supra, ¶ 299; *United States v. City of New Orleans*, supra, ¶ 491; *United States v. City of Newark*, supra, ¶ 224; *United States v. City of Ferguson*, supra, ¶ 462; *United States v. Baltimore Police Dep't*, supra, ¶ 504(b); *Melendres v. Arpaio*, 07-cv-2513, *supra* ¶ 3 (requiring "full and effective compliance" for no less than three years).

such map to this letter and look forward to providing and discussing a more detailed version at the parties' next in-person meeting on compliance metrics.

### F. Plaintiffs' Chart and Compliance Map

Finally, Plaintiffs briefly explain how our attached chart and compliance map are structured. In the chart, each reform item that the NYPD is required to comply with is grouped with other related reforms in one of several color-coded broad reform categories (*e.g.,* "Improved Community Trust + Citizen Experience of Policing**,**" **"**Eradicating Institutional Bias, Racial Profiling," and "Maximize Effective Supervision", etc). For each of these required reform items, the chart (i) defines meaningful compliance; (ii) lists and links to the corresponding Task or Recommendation from the NYPD's compliance plan (if it exists) and restates the NYPD's compliance definition for that item; (iii) quotes relevant guidance from the Court and, where applicable, the Facilitator; (iv) lists the key metrics to be used to assess compliance; and (v) offers an assessment of whether substantial compliance has been achieved.

Notably, Plaintiffs' compliance chart and map contain several specific Immediate and JRP reform items that either do not appear at all in the City's compliance plan or are classified therein as mere recommendations with which the NYPD is not required to comply, despite clear indications from prior Court orders and/or Court-Appointed Facilitator that such reforms are expressly Court-mandated and/or are clearly necessary to bring the NYPD's stop-and-frisk and trespass enforcement practices into constitutional compliance. Most significantly, NYPD disregards virtually the entire body of Joint Remedial Process Reforms, including all recommendations and best practices developed by the Facilitator in his Joint Remedial Process Final Report and Recommendations, *Floyd* Dkt. #597, *Davis* Dkt. #399, and instead allege that *participation* in the JRP process satisfies its JRP-related compliance obligations.  This is directly contrary to the spirit and the letter of the remedial framework established by the Court. *See Floyd* Dkt # 372 at 30 ("All parties shall participate in the Joint Remedial Process for a period of six to nine months *to develop proposed remedial measures (the "Joint Process Reforms") that will supplement the Immediate Reforms . . . [and] must be no broader than necessary to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments*.") (emphasis added). Other relevant reform requirements ignored or minimized as mere non-binding "recommendations" by the NYPD's compliance plan include: (i) changes to the QAD Stop Report audits and the command-level Stop Report self-inspections; (ii) changes to officer performance evaluations; (iii) and the offering of NYPD officer business cards to pedestrians during Terry Stops.

The Compliance Map is forward-looking. Plaintiffs acknowledge the revisions to policy, training, and procedures that have already been implemented but do not reference them exhaustively here, in part due to space considerations but mostly because measuring compliance requires measuring sustained compliance in practice and a positive impact in the communities the police serve. Just as liability was demonstrated through the experience of New York residents, compliance must also be measured through this lens.  Plaintiffs offer several mechanisms that, in concert, may facilitate this process. The Compliance Map also sets forth a series of audits, including new procedures, that can accurately and transparently measure improvement and eventual compliance.

6

Plaintiffs would also like to emphasize that our proposed compliance plan is mutually beneficial to both the class members whom we represent, as well as the Department and its members of service. We have a shared interest to develop and implement robust internal Department mechanisms to root out and eliminate the source of racially discriminatory law enforcement practices and outcomes in order to improve and solidify community trust in the NYPD, as well as foster a culture of pride and accountability among its officers.

We look forward to discussing our compliance metrics proposals with the NYPD and your team very soon.

                                                     Sincerely,

                                              \s\Darius Charney
Darius Charney
Jonathan C. Moore
Dominique Day
Luna Droubi
Guadalupe Aguirre
Marc Arena
Nahal Zamani
Ian Head

*On behalf of Floyd Plaintiffs*


\s\ Jin Hee Lee
Jin Hee Lee
Steve Wasserman
Cynthia Conti-Cook
Raymond Audain
Alexis J. Hoag
John Cusick
Aaron Sussman

*On behalf of Davis Plaintiffs*

Encl.


cc:    Richard Jerome (via email)
        David Cooper (via email)
        Jeffrey Schlanger (via email)
        Anne Stone (via email)
        Robert Martinez (via email)

C. Leah Takantzas (via email)
Counsel for Ligon Plaintiffs (via email)