# EXHIBIT 7

MEMORANDUM

TO: Peter Zimroth, Richard Jerome, and the Monitor Team
FROM: *Floyd* and *Davis* Plaintiffs
DATE: July 22, 2019
RE: Supplemental Submission on Compliance Metrics (Racial Profiling)

      We write to follow up on our May 3, 2019, meeting regarding racial profiling compliance metrics. This supplemental submission addresses: (1) the relevant legal standard after a court finding of intentional racial discrimination; (2) how racial bias compromises police officer decision-making, which is an important consideration at remediation and compliance; and (3) how key qualitative factors must drive compliance metrics in order to sufficiently evaluate efforts to remedy racially-tainted decision-making processes.

      Our discussions on May 3, 2019, and before, about racial profiling and the NYPD's attendant remedial responsibilities, have revealed deep misunderstandings about the NYPD's legal obligations. Plaintiffs have repeatedly emphasized the importance of determining which qualitative factors cause racial disparities in stops and drive a culture of racial profiling at the NYPD. As set forth below, such factors must inform the remedial actions necessary to meet the obligations set out by the Court, the specific compliance measures or *metrics*, and the eventual satisfaction of the legal burden of proof, which lies squarely with the NYPD, that racial discrimination is no longer occurring.

**A.    The Relevant Legal Standard After a Court Finding of Intentional Racial Discrimination**

      The Court found in August 2013 that the NYPD intentionally discriminated on the basis of race, in violation of the Fourteenth Amendment. *See Floyd* Dkt # 373 (Liab Op.) at 181-88. The Court also set forth specific mechanisms, including the Joint Process Reforms, to address the NYPD's discriminatory policies and practices. Because the Court has already found that the NYPD engaged in intentional race discrimination, it is now the NYPD's burden to demonstrate that any racial disparities that persist are not attributable to the policies and practices that the Court found to be intentionally discriminatory.

      The *Floyd* Court articulated this principle, specifying that the monitorship will continue until "*the City can show* by a preponderance of the evidence [] that it has achieved substantial compliance with all of the Immediate and Joint Process Reforms to be approved and so-ordered by the Court in *Floyd*." *Floyd* Dkt # 466 at 1 (emphasis added); *see also Freeman v. Pitts*, 503 U.S. 467, 494 (1992); *Missouri v. Jenkins*, 515 U.S. 70, 150 (1995) (stating, in the school desegregation context, that "[t]he burden of showing that these conditions to finding partial unitary status have been met rests (as one would expect) squarely on the constitutional violator who seeks relief from the existing remedial order"); *Jeff D. v. Otter*, 643 F.3d 278, 285 (9th Cir. 2011) (where state healthcare system had been found to have violated constitutional rights of indigent children with emotional and mental health needs, the "framework" of the plaintiff bearing the burden of proof "was not appropriate for determining whether the Defendants had

1

sufficiently complied with the consent decrees so that they were entitled to have the decrees vacated").

Thus, contrary to the NYPD's comments at the May 3 meeting, where, as here, there has been a judicial finding of unconstitutional government action—in this case "indirect racial profiling"—that led to a particular racial disparity, any further disparity can be presumed to derive from that unconstitutional conduct. *Cf. Keyes v. School Dist. No 1*, 413 U.S. 189, 227 (1973) (determining in the desegregation context that "if, after such detailed and complete public supervision, substantial school segregation still persists, the presumption is strong that the school board, by its acts or omissions, is in some part responsible"); *Vaughns by Vaughns v. Bd. of Educ. of Prince George's Cty.*, 758 F.2d 983, 991 (4th Cir. 1985) ("Because the County's school system had not attained unitary status, it is settled law that plaintiffs were entitled to a presumption that current placement disparities were causally related to prior segregation and that the burden of proving otherwise rested on defendants."); *United States v. Gadsden Cty. Sch. Dist.*, 572 F. 2d 1049, 1050-51 (5th Cir. 1978) (holding that statistical evidence of racial disparities in classroom assignments was sufficient to demonstrate that ability grouping "has caused segregation").

As long as there continue to be significant racial disparities regarding whom the NYPD stops, how people experience and are treated during stops, and what outcomes result from stops, the NYPD is presumptively not in compliance with the requirements of the United States Constitution and the *Floyd* Remedial Order unless and until the Department itself can show by a preponderance of the evidence that such disparities have ended. Moreover, the racial profiling compliance metrics used by the Monitor must reflect the bedrock legal principle that, when determining whether to vacate a federal court injunction and terminate federal court oversight, the burden of proof lies with the defendant who has been found liable for unconstitutional, discriminatory conduct, not the plaintiff.[1]

---

[1] The fact that the NYPD bears this burden of proof underscores the impropriety of employing the $p<.01$ standard, as suggested by the Monitor, instead of the $p<.05$ standard to assess the statistical significance of racial disparities in the NYPD's SQF data. *See* Plaintiffs' June 7, 2017 Response to the Monitor's 5th Status Report to the Court, Floyd Dkt # 556, at 2-3. The $p<.01$ standard not only imposes a more stringent standard of proof of racial discrimination than the Court itself used at trial, but it privileges the avoidance of so-called "false positive" findings of racial bias over the avoidance of "false negative" findings of racial bias, which directly contravenes the aforementioned presumption that post-liability racial disparities in NYPD SQF activity are evidence of racial discrimination.

**B.     How Racial Bias Compromises Police Decision-Making and Manifests in Discriminatory Law Enforcement Action**

   i. <u>Widely Accepted Social Scientific Research, Including Policing Studies, Demonstrates That Racial Bias Pervades Officer Decision-Making.</u>

In order to fully remedy the constitutional violations at issue, it is imperative for the parties and the Monitor's team to focus explicitly on and understand how racial bias operates in decision-making today, particularly in policing and larger criminal justice context. Numerous studies have documented consistently the transmission of racial bias via social conditioning and the extent to which the racial disparities that pervade the criminal justice system reflect racial biases. *See e.g.,* Radley Balko, *There's overwhelming evidence that the criminal-justice system is racist. Here's the proof*. The Washington Post (Sept. 18, 2018).

This confirms broader, widely-accepted social science research, most prominently by a member of the Monitoring team, documenting the pervasiveness of racial bias and the particular ways in which people are socially conditioned to see Black people as dangerous, suspicious or criminal, and potentially deserving of lesser rights and freedom.  *See e.g.,* Jennifer Eberhardt, *et al., Seeing Black: Race, Crime and Visual Processing,* 87 J. of Personality and Social Psychology 876 (2004); Phillip Goff, Jennifer Eberhardt*, et al., Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences,* 94 J. of Personality and Social Psychology 292 (2008) (citizens' implicit association of Blacks and apes alters judgment in criminal justice contexts and increases endorsement of violence against Black suspects); Aneeta Rattan and Jennifer Eberhardt, *The Role of Social Meaning in Inattentional Blindness: When the Gorillas in Our Midst Do Not Go Unseen,* 46 J. of Experimental Social Psychology 1085 (2010). It is thus no surprise that racial bias has been shown to exist in decision-making throughout the criminal justice system, by virtually every organ of the system. *See e.g.,* Jerry Kang, *et al., Implicit Bias in the Courtroom,* 59 UCLA L. Rev. 1124, 1135 (2011-2012) (racially charged bias exists in every role and stage of court-based practice, particularly in the exercise of discretion and particularly where the actor lacks the awareness to control for the potential for bias); *see also* Ian F. Haney-López, *Institutional Racism: Judicial Conduct and a New Theory of Racial Discrimination*, 109 Yale L.J. at 1808-09 (1999).

This racial bias is not limited to self-avowed racists. Even in the absence of any overt racial animus, individuals' perceptions of race are shaped by a long legacy of racial dehumanization and subjugation. Therefore, even if police officers harbor no personal hostility towards a particular racial group, they may nevertheless engage in discriminatory conduct relying on deeply engrained, yet false, racial stereotypes. *See*, *e.g*., Phillip Goff, *et al., The Essence of Innocence: Consequences of Dehumanizing Black Children*, 106 Journal of Personality and Social Psychology 526, 536 (2014) ("[I]mplicit dehumanization of Blacks was a significant predictor of racial disparities in the use of force against children. . . . The more officers implicitly associated Blacks with apes, the more frequently they had used force against Black children relative to children of other races throughout their career."). Indeed, it was NYPD officials' very conscious and explicit reliance on stereotypes of Black criminality when deciding whom to stop-and-frisk which made them liable for violating the Fourteenth Amendment in the *Floyd* case. *See Floyd* Liab Op., Dkt # 373, at 55-58, 82-88. At least one recent study indicates

that individuals not only overestimate their own commitment to egalitarianism, but that people with the *most* racial animus tend to believe most strongly and genuinely that they are unbiased. *See* Keon West and Asia Eaton, *Prejudiced and unaware of it: Evidence for the Dunning-Kruger model in the domains of racism and sexism,* 146 *Personality and Individual Differences* 111, 116 (2019).

>    ii. Training on Policy Reforms Alone Will Not By Itself Effectively Rectify Racial Bias in Decision-Making.

It is, of course, essential for the Department to modify its policies to unequivocally denounce racial bias and make clear the precise parameters of the law, while also implementing training on these policy reforms. However, while training is important to remedy racial bias, all training is not created equal – or even demonstrably helpful – to achieve that goal. In fact, training may create the risk of actually reinforcing bias because once bias is presented as a norm, it gets 'normalized' and people tend to justify bias rather than judging it harshly. *See* Jennifer Eberhardt, BIASED: UNCOVERING THE HIDDEN PREJUDICES THAT SHAPES WHAT WE SEE, THINK, AND DO (2019), 281-82. Trainers, who do not want to alienate their audience, may instead be complicit in rationalizing racism. *Id*.

This phenomenon was specifically cited by the Office of Inspector General for the NYPD in its recent report on biased policing. *See Complaints of Biased Policing in New York City* at 46 ("Instructors . . . engaged in role-playing scenarios that may have unintentionally reinforced negative stereotypes. For example, one instructor was asked by a recruit whether it is permissible to call for back-up before approaching a group of Black people . . . . The instructor responded: 'I hate to say it, [but] biases can help us sometimes to keep us safe.'"). Thus, instead of facilitating self-examination and mitigation of one's own bias, poorly designed and executed training (1) may cultivate an erroneous belief that trainees are bias-free, or (2) may be construed as 'inoculation' from claims of bias by organizations, which then fail to monitor and mitigate bias and address inequity in everyday operations. *Id.* Training alone does not—and cannot—diminish or obviate individual, peer, supervisory, and organizational obligations to actively identify and mitigate bias and address inequity.

Finally, even multiple training sessions may not mitigate racial profiling or racial bias in decision-making if their design, facilitation, or approach is flawed and, most importantly, if the training is not paired with institutional interventions to anticipate and counteract biased conduct. Poorly designed, pedagogically inappropriate diversity training programs often fail to reduce levels of bias, in favor of merely raising awareness of bias. *See* West and Eaton at 112 ("There are certainly teachable strategies that have been empirically shown to cause significant, long-term reductions in bias, such as counter-stereotypic imaging and stereotype replacement. However, these techniques are rarely incorporated into diversity training."). In addition, many programs focus on mitigating the impact of bias without looking to understand and affirmatively counteract one's own individual bias, or centering training around taking specific actions to reduce the possibility that the bias will lead to discriminatory conduct. *Id.* (citing Doyin Atewologun, et al., *Unconscious bias training: An assessment of the evidence for effectiveness*. Equality and Rights Commission (2018)). In order to achieve and maintain substantial

compliance, organizational commitment to counter known bias through specific actions and policies is essential.

> iii. <u>The Monitor and NYPD Must Seriously Address the Real-Life Operation of Racial Bias in Police Decision-Making to Fully Mitigate Racial Profiling and Achieve Substantial Compliance.</u>

Although the research studies discussed above are widely known and accepted, the serious concerns they raise have been absent from the parties' discussions about substantial compliance and the NYPD's own racial profiling investigations, which remarkably have never resulted in a substantiated case of racial profiling.[2] If the Court's ruling in *Floyd* and the settlement in *Davis* are to be fully enforced, social science data and analyses must inform the compliance metrics and the ongoing understanding of racial profiling within the NYPD.

What is needed is a serious commitment to invest in a culture change within the NYPD that tackles head-on the important challenge of reversing deeply entrenched racial bias that has, for too long, tainted department priorities and officer discretion. Recent police-public interactions covered in the media and elsewhere illustrate the critical and continuing need for this culture change. For example, the police response to a young Black woman with an infant child, who had been sitting on the floor of HRA while waiting for four hours for childcare vouchers, resulted in the bruising to her infant child and the woman's arrest and detention, raising important concerns about how racial stereotypes may have, at least in part, escalated the police encounter and prevented officers from properly exercising their discretion. *See e.g.,* Ashley Southall and Nikita Stewart, *They Grabbed Her Baby and Arrested Her. Now Jazmine Headley Is Speaking Out,* The N.Y. Times (Dec. 16, 2018); Esha Ray and Reuven Blau, *Defense Lawyers Say NYPD investigating video showing cops yanking baby from woman on the floor*, N.Y. Daily News (Dec. 9, 2018). Similarly, it was reported recently that a Brooklyn homicide investigation by the NYPD conducted widespread DNA swabs and testing of over 360 Black men, information that was also withheld by the police throughout the investigation and prosecution of the case. *See* Graham Rayman, *Lawyers in Vetrano murder trial to challenge prosecutors after anonymous letter says info was withheld from defense*, N.Y. Daily News (Mar. 29, 2019); Jan Ransom and Ashley Southall, *'Race-Biased Dragnet': DNA From 360 Black Men Was Collected to Solve Vetrano Murder,* The N.Y. Times (Mar. 31, 2019). One can reasonably question what level of suspicion, if any, justified the selective enforcement, racial profiling, and targeting of these 360 stops of apparent Black men by the NYPD, and whether hundreds of white men would face indiscriminate stops and DNA swabs without some basis for suspicion beyond race.

---

[2] The New York City Department of Investigation's Office of Inspector General for the NYPD recently released a report highlighting numerous procedural inadequacies and improprieties of these investigations, including recommending several specific qualitative metrics and structural improvements to aid the NYPD in properly investigating biased policing. *See generally,* New York City Dep't of Investigation, *Complaints of Biased Policing in New York City: An Assessment of NYPD's Investigations, Policies, and Training* (Jun. 25, 2019) (available here: https://www1.nyc.gov/site/doi/newsroom/public-reports.page).

All of this may, as the NYPD suggested, implicate broader social problems. Yet, inherent biases inform the decision-making processes that facilitate intentional discrimination. Given the post-judgment posture of this case and the applicable legal standard set forth above, the NYPD has an affirmative legal obligation to acknowledge, locate, and mitigate the underlying causes of the severe racial disparities in its stop-and-frisk and trespass enforcement activity. Despite the legal standard set forth above, our compliance discussions about racial profiling reveal deep misunderstandings of racial profiling, reflexive resistance to racial inferences, and a diminution of the necessity of remediating racial profiling via thorough and credible processes in order to achieve overall substantial compliance. These issues, however, are of the utmost importance in this Monitorship, which has been charged with the responsibility of remedying a race-based law enforcement policy and practice that victimized millions of Black and Latinx New Yorkers for decades.

C.   **Key Qualitative Factors Must Inform Assessment of Racial Profiling**

The *Floyd* and *Davis* legal teams acknowledge and appreciate the efforts of the Monitoring team and the NYPD to establish comprehensive reforms and key priorities for substantial compliance in this case, but more must be done. Racial disparity—and our understanding of whether a racial disparity is benign or indicative of ongoing discrimination—must be evaluated in the appropriate context—particularly where, as here, the mandate stems from a court finding of intentional racial discrimination. To that end, <u>it is clear that some investigation and distillation of key qualitative factors must inform the analysis of ongoing racial disparities</u>.

These qualitative factors should include, at a minimum, certain qualitative compliance outcome measures relating to officer performance, use of discretion, and retention of key information relating to mitigating bias. Several of the categories below are not explicit qualitative metrics that can be used to evaluate racial disparity and claims of biased policing but, instead, are necessary processes or analyses that should be conducted regularly to isolate and identify specific qualitative factors relevant to persistent racial disparity and biased policing.

1. <u>Racial Equity Audit</u>. The audit should be used as a means of isolating, identifying, and monitoring key qualitative drivers of racial disparity and racial profiling. Year after year, this is a means to determine important drivers of racial disparity and to measure efforts to diminish racial profiling and biased policing. *See* Goalpost One, *Floyd + Davis Compliance Plan 3-18-19*, at 3.

2. <u>Performance Audits</u>. Outcomes of field-based *Performance Audits* should specifically assess practices relating to racial profiling, including selective enforcement of the law (*who* is getting stopped and who is not getting stopped), outcomes by race (*what* is the result), and what specific practices drive ongoing profiling (*how* bias is perpetuated in this specific context). *See* Goalpost 9, *Floyd + Davis Compliance Plan 3-18-19,* at 6. Performance audits must also embed an ongoing assessment of whether racial profiling investigations as currently operating (IAB never substantiated a case) are adequate, credible, and reliable metrics to measure the NYPD's success at mitigating a culture of racial profiling. *See* Goalpost 10-12, *Floyd + Davis Compliance Plan 3-18-19*, at 7.

3. <u>BWC Data</u>.  Disparate treatment of Black and Latinx people stopped by police may be a source of any racial disparities in the treatment of individuals during the stop (e.g., searches, use of force, and other escalation of the encounter). This may be especially true in the perceptible disparities in respect or formality on the basis of race. Using a massive trove of body-worn camera data in Oakland, Jennifer Eberhardt—a member of the Monitoring team—conducted important research on racial disparities in the amount of respect shown to citizens.  Using an algorithm to analyze a vast amount of historical data, they determined that racial disparities in respect persisted regardless of "explanatory factors" and even in the earliest moments of a police encounter (i.e., before the language or conduct of the person stopped impacted officer conduct). This research should be replicated in New York City, and its outcomes should define key qualitative factors relating to biased policing. *See* Jennifer Eberhardt, *et al., Language from police body camera footage shows racial disparities in officer respect,* 114 PNAS 6521 (Mar. 26, 2017) (officers speak with consistently less respect toward Black community members, even after controlling for officer's race, severity of infraction, and location or outcome of stop).

4. <u>Compstat</u>. The NYPD should conduct a trend analysis from embedding 10 minutes of racial analysis in CompStat and/or the RISK Reviews weekly. *See* Goalpost 5, *Floyd + Davis Compliance Plan 3-18-19*, at 4.

5. <u>Racial Impact Report</u>. Several jurisdictions publish data related to the racial impact of their policing to transparently allow public analysis of this data to drive reform. *See e.g., Oakland Police Department 2016-2018 Racial Impact Report* (available here:   https://cao-94612.s3.amazonaws.com/documents/OPD-Racial-Impact-Report-2016-2018-Final-16Apr19.pdf)*; Strategies for Change* at 55. The NYPD should likewise commit to transparency and public accountability on racial bias issues, and the public scrutiny of these issues will likely help the Department identify and remedy other possible causes of racial profiling.

6. <u>Outcome and Retention Assessment of Training</u>. Retention and application of training on racial profiling and racial bias in policing (post-tests and follow up tests) must inform the NYPD's analysis of which officers may be at risk for biased policing. *See* Goalpost 7, *Floyd + Davis Compliance Plan 3-18-19,* at 6.

7. <u>Civilian Complaints</u>. Investigation, tracking, and disciplinary actions on civilian complaints of racial profiling are key metrics that may define a credible and authentic commitment to mitigating biased policing.  *See* Goalpost 10-12, *Floyd + Davis Compliance Plan 3-18-19*, at 7. *See also* New York City Dep't of Investigation, *Complaints of Biased Policing in New York City: An Assessment of NYPD's Investigations, Policies, and Training* (Jun. 25, 2019) (available here: https://www1.nyc.gov/site/doi/newsroom/public-reports.page)  (citing numerous concerns, inadequacies, inefficiencies in current NYPD racial profiling investigations).

8. <u>Community Input</u>. Community views on the experience of biased policing may be a valuable source of information to evaluate racial disparities and the real-life effects of the NYPD's efforts to remedy racial profiling. Community surveys offer a concrete assessment of NYPD policy as experienced by New Yorkers and serve as

an equally compelling measure of compliance. *See* Goalpost 17, *Floyd + Davis Compliance Plan 3-18-19,* at 10.

9. <u>Customer Service Audits</u>. Conducting customer service audits routinely after stops would ensure the documentation of individuals' experience, which would be a valuable source of information for compliance analysis. *See Strategies for Change* at 49 (recommending police department works with a researcher who will contact community members recently stopped to 'audit' their experience).

10. <u>Documented Supervisor Interventions</u>. Substantive, systematic, and effective interventions by supervisors is vital to eradicating institutional racial profiling. *See* Goalpost 1, *Floyd + Davis Compliance Plan 3-18-19*, at 20; Goalposts 18-19, at 11; Goalposts 20-21 at 12.

11. <u>Wellness Promotion</u>. Research suggests officers make poorer decisions, misuse or abuse discretion, and may be more susceptible to acting from implicit bias when under stress or particularly tired. This is a clear metric that may mitigate bias and increase retention of policy and training on biased policing. *See e.g.,* Jennifer Eberhardt*, et al., Strategies for Change* at 54.

12. <u>Evaluation of Teams With/out Racial Profiling Complaints</u>. The difference in citizen reporting may also drive an important analysis on factors that may drive or influence profiling. While a key metric people use is that these complaints are more likely in vehicle cases, a broader data set should be analyzed to determine related factors.

13. <u>Mediate Biased Policing Complaints</u>. This includes tracking factors that are relevant to the complainant's claims of racial profiling, which factors were unable to be resolved in order to reach an agreed upon outcome, and which factors were particularly salient or insidious from the community perspective. These tracked factors, in the aggregate and department-wide, should become qualitative factors informing review and analysis of racial disparity and mitigation efforts. *See e.g.,* DOI, *Complaints of Biased Policing in New York City* at 48-50.

These outcome measures are specific, achievable, and important to accurately interpret the overall numbers, despite the reported drop in recorded stops. Importantly, these measures may identify any continuing racial discrimination underlying racial disparities in stops. As more qualitative data is developed, these analyses can inform our understanding of substantial compliance. Notably, this is not an exhaustive list. Additional relevant metrics are set forth in a variety of forums, including the *Strategies for Change* report produced by Dr. Jennifer Eberhardt in her work with the Oakland Police Department.

    We welcome the opportunity to further discuss achieving compliance with respect to the Court's findings of racial discrimination and racial profiling, as these core issues inform all of the other measures for achieving substantial compliance.