08 Civ. 1034 (AT)   10 Civ. 0699 (AT)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID FLOYD, *et al.*,

Plaintiffs,

-against-

City of New York, *et al.*,

Defendants.

KELTON DAVIS, *et al.*,

Plaintiffs,

-against-

CITY OF NEW YORK, *et al.*,

Defendants.

**CITY OF NEW YORK'S MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFFS' MOTION TO MODIFY THE *FLOYD* REMEDIAL ORDER AND THE *DAVIS* CONSENT DECREE**

*GEORGIA M. PESTANA*
*Corporation Counsel of the City of New York*
*Attorney for Defendant City of New York*
*100 Church Street*
*New York, New York  10007*

*Of Counsel:*  Angharad Wilson
*Tel:  (212) 356-2572*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...........................................................................................i

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS.............................................................................................3

LEGAL STANDARD ....................................................................................................4

ARGUMENT

     I.     PLAINTIFFS HAVE NOT DEMONSTRATED THAT THE REMEDIAL ORDER SHOULD BE MODIFIED..................................................................................5

          A.    Plaintiffs Have Not Applied the Proper Legal Standard....................................................................6

          B.    Plaintiffs' Proffered Evidence of Racial Bias Within NYPD Does Not Justify Modification of the Remedial Order ...........................................................7

          C.    Contrary to the Community Declarations Submitted by Plaintiffs, There are Numerous Opportunities to Provide Input to NYPD, and Sepcifically to the Monitor on Matters Within his Purview ...........................................................8

          D.    Plaintiffs Have Not Demonstrated a Need to Modify the Monitor's Compliance Metrics......................................11

               1.    Statistical Analysis of Stop Reports is a Reliable, Frequently Used Compliance Metric...........................................................11

               2.    Analysis of Civilian Complaints is a Reasonable Compliance Metric...............................13

               3.    Analysis of NYPD Communications is a Reasonable Compliance Metric...............................13

II.   PLAINTIFFS' PROPOSED REMEDIES ARE
ONEROUS, OVERBROAD AND DO NOT
ADDRESS THE ALLEGED PROBLEMS WITH
THE EXISTING REMEDIAL ORDER ....................................................15

    A.   The Proposed Annual Community Surveys .....................................15

    B.   The Proposed Community Collaborative Board.............................17

        1.   Plaintiffs' Proposed CCB is Substantially
Different From the CCB Proposed in the
JRP Report and in Other Monitorships...................................18

        2.   Plaintiffs' CCB Proposal Would Render
the Confidentiality Order Essentially
Moot.......................................................................................19

    C.   The Proposal for Field Audit/Integrity Testing ..............................20

    D.   The Proposed Procedure for Disciplinary
Proposals.........................................................................................22

CONCLUSION...............................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Baez v. N.Y.C. Hous. Auth.*,
    13cv8916, 2018 U.S. Dist. LEXIS 202477 (S.D.N.Y. Nov. 29, 2018) ...................................6

*Benjamin v. Jacobson*,
    923 F. Supp. 2d 517 (S.D.N.Y. 1996)........................................................................................6

*Calderon v. Wambua*,
    2012 U.S. Dist. LEXIS 46193 (S.D.N.Y. Mar. 28, 2012) .........................................................5

*Chavez v. Ill State Police*,
    251 F.3d 612 (7th Cir. 2001) ................................................................................................12

*City of Cleveland* 15-cv-1046 (N.D. Ohio May 26, 2015) at  5 ...................................................19

*Davis, et al. v. City of New York*,
    959 F. Supp. 2d 324 (S.D.N.Y. 2013)............................................................................ *passim*

*Floyd, et al. v. City of New York*,
    959 F. Supp. 2d 540 (S.D.N.Y. 2013)............................................................................ *passim*

*Floyd, et al. v. City of New York*,
    959 F. Supp. 2d 668 (S.D.N.Y. 2013).........................................................................3, 4, 12

*Horne v. Flores*,
    557 U.S. 433 (2009)................................................................................................................5

*Peightal v. Metropolitan Dade County*,
    815 F. Supp. 1454 (S.D. Fla. 1993) ......................................................................................12

*Philip Morris USA, Inc. v. Otamedia Ltd.*,
    331 F. Supp. 2d 228 (S.D.N.Y. 2004).....................................................................................6

*Rufo v. Inmates of Suffolk Cnty. Jail*,
    502 U.S. 367 (1992)............................................................................................................6, 7

*United States vs. City of Cleveland* 15-cv-1046 (N.D. Ohio May 26, 2015) ................................5.

*United States v. Rioux*,
    97 F.3d 648 (2d Cir. 1996)....................................................................................................12

**Other Authorities**

Fifth Amendment ................................................................................................................12

Fourteenth Amendment ..............................................................................................2, 3, 11, 20

Fed. R. Civ. P. 60(b)(5)..........................................................................................................4

https://ccrjustice.org/sites/default/files/attach/2020/09/Public%20Comment_NYP
    D%20Discipline%20Matrix%20CCR%20%2B%20BLH_FINAL.pdf;
    https://www.changethenypd.org/sites/default/files/cpr_families_organizations
    _letter_on_nypd_discipline_matrix_9-30-2020_final.pdf.......................................10

https://ccrjustice.org/sites/default/files/attach/2020/09/Public%20Comment_NYP
    D%20Discipline%20Matrix%20CCR%20%2B%20BLH_FINAL.pdf;
    https://www.changethenypd.org/sites/default/files/cpr_families_organizations
    _letter_on_nypd_discipline_matrix_9-30-2020_final.pdf;

https://www.nyclu.org/sites/default/files/field_documents/2020109-comments-
    nypddisciplinarymatrix.pdf;

https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/board/20200917_test
    imony_LAS.pdf .....................................................................................................23

https://www.changethenypd.org/campaign/intro-members ...............................................9

https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/disciplinary
    -system-penalty-guidelines-effective-01-15-2021-compete-.pdf ...........................23

https://www1.nyc.gov/site/nypd/about/about-nypd/policy/nypd-disciplinary-
    system-reforms.page .............................................................................................22

https://www1.nyc.gov/site/nypd/about/about-nypd/public-comment.page ....................22

https://www1.nyc.gov/site/nypd/bureaus/patrol/buildtheblock.page.............................11

https://www1.nyc.gov/site/policereform/community-engagement/community-
    engagement.page...................................................................................................10

Justice, Civil Rights Division, *The Civil Rights Division's Pattern and Practice
    Police Reform Work: 1994- Present* 24 (Jan. 2017),
    https://www.justice.gov/crt/file/922421/dowload............................................12, 13

*New York City Joint Remedial Process: Final Report and Recommendations,
    Floyd,* ECF Docket No. 597 ............................................................................16, 18

New York State Executive Order 203 ..............................................................................10

(Nov. 2020) https://council.nyc.gov/press/wp-
content/uploads/sites/56/2020/11/PDF-FINAL-combined-Clouseau-Report-
public11-5-20-1-1.pdf; https://www.nytimes.com/2021/02/03/nyregion/nypd-
james-kobel-racist-fired.html....................................................................................................8

NYC Police Reform and Initiative Collaborative, Initiative Tracker,
https://www1.nyc.gov/site/policereform/implementation/implementation.page ...................17

RAND Corporation, What is the Impact of Neighborhood Policing in New York
City, https://www.rand.org/well-being/justice-policy/projects/neighborhood-
policing.html .........................................................................................................................17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID FLOYD, *et al.*,<br><br>                              Plaintiffs,<br><br>                  -against-<br><br>CITY OF NEW YORK, *et al*.,<br>                              Defendants. | 08 Civ. 1034 (AT) |
| KELTON DAVIS, *et al.*,<br><br>                              Plaintiffs,<br><br>                  -against-<br><br>CITY OF NEW YORK, *et al.*,<br>                              Defendants. | 10 Civ. 0699 (AT) |

**CITY OF NEW YORK'S MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFFS' MOTION TO MODIFY THE *FLOYD* REMEDIAL ORDER AND THE *DAVIS* CONSENT DECREE**

The City of New York, through its attorney, Georgia Pestana, Corporation Counsel of the City of New York, submits this Memorandum of Law in response to the motion filed by Plaintiffs in the *Floyd* and *Davis* matters requesting modifications to the *Floyd* Remedial Order dated August 12, 2013 and indirectly the *Davis* Settlement dated February 4, 2015.

## PRELIMINARY STATEMENT

In the Monitor's Twelfth Report, the City of New York ("City"), acting through the New York City Police Department ("NYPD") was found to be in substantial or partial compliance with the vast majority of the obligations set forth by the Remedial Order in this matter. In addition to complying with these obligations, NYPD has reduced the overall number of *Terry* stops from a high of over 650,000 in 2011 to just under 10,000 in 2020. At the same time, NYPD has

implemented other major reforms, including adopting a wide-ranging disciplinary matrix and the voluntary assignment of body-worn cameras to all uniformed members of service performing enforcement duties. Although there are still benchmarks that the City must meet to reach full substantial compliance with the *Floyd* Remedial Order, significant strides have been made since the Remedial Order was issued in 2013. Plaintiffs ignore all of this progress in their Motion, and instead propose five ostensibly "modest" changes to the Remedial Order. Far from being simple, these changes would  impose onerous new standards by which substantial compliance should be determined and would require a significant new outlay of City financial resources to implement.

      For the following reasons, Plaintiffs' proposed modifications to the Remedial Order should be denied. First, Plaintiffs have not demonstrated that they are entitled to the relief requested because: (1) neither the allegations regarding selective enforcement of social distancing regulations nor racist online remarks by a former NYPD official are related to the subject matter of the lawsuits at issue; (2) contrary to Plaintiffs' arguments, there has been substantial community input in the Monitorship and to NYPD through other initiatives; and (3) the Monitor's current compliance metrics are reasonable and will accurately measure the City's compliance with the Fourteenth Amendment. Second, Plaintiffs' proposed modifications to Remedial Order are impractical and do not remedy the purported problems with the Monitorship. Specifically, (i) the requested community survey will not be an accurate or fair compliance metric; (ii) a Community Collaborative Board ("CCB") is unnecessary, would only amplify one entity's perspective, and its proposed purpose and duties are different from the one proposed in the Joint Remedial Plan ("JRP") and used by other community boards; (iii) the field audits are untried as compliance metrics and present major logistical challenges; and (iv) another procedure for development and adoption of disciplinary proposals is unnecessary. With respect to Plaintiffs' final request for bi-

annual court conferences be held with the proposed CCB, the Monitor, and the parties, the City takes no position as it relates to court conferences with the Monitor and the parties.

To be clear, the City is committed to ongoing partnerships with the communities served by NYPD, as demonstrated by outreach to communities within and outside of the Monitorship. Moreover, this Monitorship is narrowly tailored in its goals. Plaintiffs' proposals would create significant additional burdens on the City, needlessly extend this Monitorship, and will not cure the deficiencies that Plaintiffs complain exist. As such, they should be denied.

## STATEMENT OF FACTS

In the *Floyd* Liability Opinion issued on August 12, 2013[1] the Court found that the New York City Police Department's stop and frisk practices violated the Fourth and Fourteenth Amendment rights of Black and Latinx New Yorkers. In *Davis*, the Court dealt with the stop and frisk practices as they relate to New York City Housing Authority (NYCHA) buildings.[2] On the same date, the Court issued the Floyd Remedial Order which is the subject of Plaintiffs' current motion.[3]  As part of the *Floyd* Remedial Order, the Court appointed a Monitor to oversee the reform process necessary to correct the issues raised in the Liability Opinion.[4] Broadly, the Monitor's goal would be to "ensure that the [stop and frisk] is carried out in a manner that protects the rights and liberties of all New Yorkers."[5] The Monitor was directed to both have a "distinct function" from other regulatory agencies and to specifically and narrowly focus on the "City's compliance with reforming the NYPD's use of stop and frisk."[6] In turn, the Monitor's duties were

---

[1] *Floyd, et al. v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013).
[2] *Davis, et al. v. City of New York*, 959 F. Supp. 2d 324 (S.D.N.Y. 2013).
[3] *Floyd, et al. v. City of New York*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013).
[4] *Id.* at 676.
[5] *Id*. at 671.
[6] *Id*. at 677.

to be "no broader than necessary to end the constitutional violations in the NYPD's stop and frisk practices described in the liability opinion."[7]

Also as part of the Remedial Order, this Court provided for the implementation of a Joint Remedial Process ("JRP"). "At the center of the Joint Remedial Process will be those who are most affected by NYPD's use of stop and frisk."[8] The Joint Remedial Process led to the publication of a 304-page document detailing fourteen recommendations for reform.[9] This Court approved three of those reforms on July 19, 2018, August 8, 2018, and November 20, 2018.[10] From those reforms, the Monitor developed a matrix of 80 tasks that the City must complete in order to be in substantial compliance. NYPD, under the oversight of the Monitor and in coordination with the Plaintiff, has been working towards compliance with those tasks. Indeed, the Monitor has found NYPD to be in substantial compliance with 48 tasks and partial compliance with 16 tasks.[11]

By motion on July 29, 2021, Plaintiffs now move the Court to modify the Remedial Order to add four new provisions, ostensibly because they were recommended by the JRP, in addition to a request for conferences with the Court.[12]  The Monitor opposed those proposals by letter dated September 4, 2021. The City now responds and opposes Plaintiffs' proposals as set forth herein.

## LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 60(b)(5), a party may move for modification of a final judgment if the moving party can demonstrate that there is "a significant change either in factual conditions

---

[7] *Id*.

[8] *Floyd*, 959 F. Supp. 2d at 687.

[9] *Floyd,* ECF Docket No. 662 at 2.

[10] *Floyd,* ECF Docket Nos. 619, 634, and 662.

[11] Monitor's Eleventh Status Report Report, *Floyd*, ECF Docket No. 795-1, at Appendix A.

[12]  Plaintiffs' Memorandum of Law in Support of Their Motion to Modify the *Floyd* Remedial Order, *Floyd* ECF Docket No. 841 ("Pl. Memo. of Law").

or in law' [which] renders continued enforcement 'detrimental to the public interest.'"[13]   A significant change is narrowly defined as either (1) "changed factual conditions [that] make compliance with the decree substantially more onerous;" (2) "a decree proves to be unworkable because of unforeseen obstacles;" or (3) "enforcement of the decree without modification would be detrimental to the public interest."[14] If the moving party demonstrates the first prong, the Court must then consider whether the proposed modification is suitably tailored to the changed circumstances.[15] Additionally, "the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances."[16]

## POINT I

### PLAINTIFFS HAVE NOT DEMONSTRATED THAT <br> THE REMEDIAL ORDER SHOULD BE MODIFIED

This Court should reject Plaintiffs' request to modify the Remedial Order because they have failed to meet their burden of demonstrating that they are entitled to modification. As an initial matter, Plaintiffs do not rely upon the proper standard for their requested relief. Further, the factual allegations asserted to support Plaintiffs' proposed modifications are insufficient regardless of the standard applied. None of the reasons Plaintiffs proffer constitute a change in factual conditions that would make compliance with the Remedial Order more onerous; nor are these unforeseen obstacles that have rendered the Remedial Order unworkable. Finally, Plaintiffs have not

---

[13] *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)).
[14] *Calderon v. Wambua*, 2012 U.S. Dist. LEXIS 46193 at *10 (S.D.N.Y. Mar. 28, 2012).
[15] *Id.*
[16] *Id.*

demonstrated that the enforcement of the Order absent modification will be detrimental to the public interest.[17]

### A. Plaintiffs have not Applied the Proper Legal Standard.

In Plaintiffs' moving papers, they argue that the appropriate legal standard is that "equity countenances the modification of an injunctive decree if 'a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes.'"[18] This legal standard is, at a minimum, incomplete, as the very same opinion also indicates that a beneficiary who requests modification of an injunction in order to enforce it more effectively must demonstrate that the injunction has failed to achieve its principal objective. Plaintiffs have not met this burden.

There has been some dispute in lower courts as to whether the *Rufo* standard also applies to modifications seeking "to impose more <u>stringent</u> obligations on an enjoined party, as opposed to <u>relieving</u> a defendant of its obligations."[19]  In light of the above, the City urges the Court to apply the *Rufo* standard for its review of this issue. However, under either standard, Plaintiffs have failed to demonstrate that they are entitled to modification of the Remedial Order.

In addition, Plaintiffs also note that, since 2010, nearly all consent decrees involving the U.S. Department of Justice have included a provision that there shall be a periodic "comprehensive re-assessment" of the terms of that decree. However, no such provision is included in the *Floyd* Remedial Order, the *Davis* Consent Decree, or in subsequent amendments to the Remedial Order.[20]

---

[17]*Benjamin v. Jacobson*, 923 F. Supp. 2d 517, 521 (S.D.N.Y. 1996).
[18] *Philip Morris USA, Inc. v. Otamedia Ltd.*, 331 F. Supp. 2d 228, 244 (S.D.N.Y. 2004).
[19] *Baez v. N.Y.C. Hous. Auth.*, 13cv8916, 2018 U.S. Dist. LEXIS 202477 at * 10 (S.D.N.Y. Nov. 29, 2018)(emphasis in original).
[20] Pl. Memo. of Law at 18.

Consequently, the Court should use the relevant legal standard for modification – which the City believes in this instance is the *Rufo* standard.

## B. Plaintiffs' Proffered Evidence of Racial Bias Within NYPD Does Not Justify Modification of the Order.

Plaintiffs seek to exploit events of the past year as evidence of the persistence of racial bias within NYPD that "delegitimizes" the Monitorship and justifies changes to the Remedial Order.[21] Specifically, they cite allegations of racial bias in enforcement of emergency orders issued in response to the COVID-19 pandemic and the protests in response to the murder of George Floyd, as well as the revelation of bigoted Internet posts by a former NYPD official as evidence that the Monitorship's legitimacy is threatened.[22]   Putting aside the fact that this purported loss of legitimacy has not been quantified in any way, none of the above claims of racial bias actually relate to the subject matter of the Remedial Order or the Monitorship, and is not evidence that would warrant modification.

First, this Court has already held that NYPD's actions in its enforcement of emergency orders last year fell outside the purview of the Monitorship and were irrelevant to the claims adjudicated in the *Floyd* and *Davis* litigation. In motions before this Court in May and June 2020, Plaintiffs argued that NYPD's social distancing and curfew enforcement in response to the COVID-19 pandemic and protests in the wake George Floyd's murder violated the Remedial Order. But this Court disagreed, holding that "[m]uch of the police conduct alleged by Plaintiffs … extends beyond the suspicionless and racially motivated stops and frisks addressed by the Court in *Floyd*."[23] This Court further held that "it is not within this Court's authority to amplify its prior

---

[21]Pl. Memo. of Law at 11.
[22] *Id.*
[23]*Floyd,* ECF Docket No. 790, at 8-9.

rulings to encompass a different set of potentially unconstitutional practices."[24] Although the Court found that "some of the alleged *police conduct* described by Plaintiffs falls squarely within the ambit of *Floyd v. City of New York*,"[25] the Court ultimately determined that "these *claims* do not fall squarely within the scope of the policies and practices adjudicated in this litigation."[26]

Plaintiffs also argue that former Deputy Inspector James Kobel's racist online comments delegitimize the Monitorship and further warrant the Order's modification.[27] But Kobel's behavior did not concern NYPD's stop-question-and-frisk policies, which is the subject of this Monitorship. In any event, NYPD, as well as City Council, thoroughly investigated the matter and terminated Kobel's employment because of the findings made during the investigations, and as part of NYPD's continuing commitment to the elimination of bias in the Department.[28]

In sum, neither of these allegations can properly be characterized as evidence of a change in circumstance in the Monitorship to justify modification, as they are unrelated to the subject matter of the Remedial Order.

### C. Contrary to the Community Declarations Submitted by Plaintiffs, There are Numerous Opportunities to Provide Input to NYPD, and Specifically to the Monitor on Matters Within his Purview.

There is also no merit to Plaintiffs' argument that the Remedial Order should be modified due to inadequate public engagement with NYPD and in the Monitorship because: (1) the allegations made by community groups representing individuals who are members of the *Floyd*

---

[24] *Id.*, at 9.

[25] *Id.*, at 8 (emphasis added).

[26] *Id.*, at 9 (emphasis added).

[27] Pl. Memo of Law at 12.

[28] New York City Council, A Report on NYPD Deputy Inspector James Francis Kobel and "Clouseau," (Nov. 2020) https://council.nyc.gov/press/wp-content/uploads/sites/56/2020/11/PDF-FINAL-combined-Clouseau-Report-public11-5-20-1-1.pdf; https://www.nytimes.com/2021/02/03/nyregion/nypd-james-kobel-racist-fired.html

and *Davis* classes do not demonstrate that there has been a change in circumstance, or that continued enforcement of the Remedial Order would be detrimental to the public interest; and (2) contrary to Plaintiffs' representations, there has been and continues to be public engagement with NYPD and the Monitor.

In support of their arguments, Plaintiffs submit declarations from several community-based organizations, all of which are currently voting members and on the steering committee of Communities United for Police Reform ("CPR"), an umbrella organization for community groups on police reforms, and of which the Center for Constitutional Rights (who is co-counsel in *Floyd*) is also a voting member.[29] These declarations aver in an anecdotal fashion that the organizations' members continue to report unconstitutional *Terry* stops, as well as alleged police misconduct that is outside of the scope of this Monitorship.[30] The declarations also aver that members of these organizations feel excluded by the Monitorship and that they have not received adequate information about occurrences in the Monitorship.[31] Finally, several of the declarations point to a number of recommendations made by the JRP Facilitator that were either not adopted or were modified from the Facilitator's recommendation.[32] These reasons are insufficient to demonstrate that Plaintiffs are entitled to the relief they seek.

First, members of these community groups are individual members of the plaintiff classes in *Floyd* and *Davis*, and, as such, are represented by counsel in this action. Class members can express their views and receive information about the Monitorship through counsel for Plaintiffs.

---

[29] https://www.changethenypd.org/campaign/intro-members.
[30] *See, e.g.*, *Floyd,* ECF Docket No. 842-2, at ¶ 21; ECF Docket No. 842-3 at ¶¶ 30-35, ECF Docket No. 842-4 at ¶ 22.
[31] *See, e.g.*, *Floyd,*  ECF Docket No. 842-2, at ¶¶  23-24, ECF Docket No. 842-3 at ¶¶ 27-29, ECF Docket No. 842-4 at ¶¶ 15-18, 20-21.
[32] *See, e.g.*, *Floyd,* ECF Docket No. 842-1, at ¶13-15, ECF Docket No. 842-3 at ¶¶ 18-22.

Further, in the time period since the JRP, community groups have had direct input on reforms both within and outside of the Monitorship. As one example, Communities United for Police Reform, on behalf of many of its member organizations, including all of the ones who submitted declarations and CCR, submitted public comments on NYPD's proposed Disciplinary Matrix.[33] As another example, the Monitor held meetings with the parties and representatives from CPR, to discuss these community organizations' concerns regarding the Alternative to the Combined Pilot. In addition, policies for which community groups advocated have been considered and compromises by NYPD have been incorporated into existing policies. Indeed, as a result of negotiations over the Alternative to the Combined Pilot, NYPD now mandates that nearly all Level 1 and Level 2 encounters be recorded by Body Worn Camera,  and  some limited documentation by way of categorizations be done for Level 2 stops.[34]

Second, community engagement with NYPD on similar issues as the reforms in these cases exist from other avenues besides the Monitorship. As part of the NYPD Reform and Reinvention Collaborative which was developed in response to New York State Executive Order 203, NYPD hosted several public listening sessions, town halls, and roundtable discussions with a range of stakeholder organizations, including religious leaders, police reform advocates, community-based organizations, individuals from communities most impacted by policing, District Attorneys, and NYPD officers and employees, and many others.[35]  While most of these are not be the same types

---

[33]https://ccrjustice.org/sites/default/files/attach/2020/09/Public%20Comment_NYPD%20Discipl
ine%20Matrix%20CCR%20%2B%20BLH_FINAL.pdf;
https://www.changethenypd.org/sites/default/files/cpr_families_organizations_letter_on_nypd_di
scipline_matrix_9-30-2020_final.pdf.
[34] *See*, Court Order, Feb. 12, 2021, *Floyd*, ECF Docket No. 817.
[35]https://www1.nyc.gov/site/policereform/community-engagement/community-
engagement.page.

of groups as the declarants to the instant motion, they offer more diverse contributions on police reforms. NYPD also facilitates community engagement in many other ways, including but not limited to the "Build the Block" program, in which Neighborhood Coordination Officers have quarterly public meetings a to address neighborhood concerns.[36]   Accordingly, in light of the above, the additional channels of community engagement proposed by Plaintiffs are unnecessary.

### D. Plaintiffs have Not Demonstrated a Need to Modify the Monitor's Compliance Metrics.

The Monitor assesses compliance through, *inter alia*: (1) statistical analyses of NYPD Stop Report data; (2) reviews of civilian profiling complaints and complaint data; and (3) reviews of communications from NYPD leadership.[37] Plaintiffs argue that these metrics cannot accurately assess NYPD's compliance with the Fourteenth Amendment and its own racial profiling policies. For the reasons detailed below, they are wrong.

### 1. Statistical Analysis of Stop Reports is a Reliable, Frequently Used Compliance Metric.

Plaintiffs' chief objection to the use of statistical analyses of NYPD Stop Report data is that quarterly audits conducted in 2019 and early 2020 found that a substantial percentage of officers fail to fill out stop reports to document encounters that require them. As Plaintiffs' papers acknowledge, both the Monitor and NYPD have already identified the underreporting of stops as a key issue that NYPD must continue to work on mitigating in order to reliably ensure that NYPD officers' actions are constitutional. To that end, NYPD conducts RISKS Reviews[38] and has undertaken other measures to ensure that required stop reports are completed.

---

[36] https://www1.nyc.gov/site/nypd/bureaus/patrol/buildtheblock.page
[37] Pl. Memo. of Law at 21.
[38] RISKS (Remediation of Identified Situations Key to Success) Reviews is a tool created by NYPD where it conducts biannual meetings between NYPD's Risk Management Bureau and

Plaintiffs also argue that analysis of stop reports is unreliable because incomplete data may mask racial bias in police encounters. This argument, however, presupposes that the stop data used to assess compliance will be incomplete. The final qualitative analysis of the stop data is the second part of the calculus with the first part to be established by the Monitor's finding of compliance with reporting requirements. Indeed, one of the purposes of the Monitor's Alternative Studies  as ordered by the Court on February 12, 2021, is to measure whether officers are under-reporting stops in significant percentages.[39]

Plaintiffs further argue that analysis of stop report data "will never reveal instances of selective enforcement because officers do not document decisions *not* to stop suspicious white persons."[40] While it is plainly true that officers do not document decisions not to stop citizens, such documentation is simply not required to demonstrate a pattern or practice of intentional racial discrimination.[41] Furthermore, the DOJ Civil Rights Division, whose report Plaintiffs cite, also uses similar statistical analyses of stop data to assess substantial compliance in consent decrees.[42]

---

executive officers of each command and at which they discuss the command's compliance with constitutional policing and reporting requirements, as well as supervisory responsibilities.

[39] *See*, Court Order, Feb. 12, 2021, *Floyd*, ECF Docket No. 817.

[40] Pl. Memo. of Law at 22.

[41] *See e.g. United States v. Rioux*, 97 F.3d 648, 659 (2d Cir. 1996) (discussing that a court may employ statistical decision theory to determine if there is racial underrepresentation for purposes of Fifth Amendment equal protection claim); *Peightal v. Metropolitan Dade County*, 815 F. Supp. 1454, 1463 (S.D. Fla. 1993) (holding that to state a *prima facie* case of a Title VII violation, a party may rely on a gross statistical disparity) (citing *Hazelwood School Dist. v. United States*, 433 U.S. 299, 308 (1977)); *Chavez v. Ill State Police*, 251 F.3d 612, 637 (7th Cir. 2001) ("The Supreme Court has long noted the importance of statistical analysis "in cases in which the existence of discrimination is a disputed issue.") (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977)).

[42] U.S. Dep't of Justice, Civil Rights Division, *The Civil Rights Division's Pattern and Practice Police Reform Work: 1994- Present* 24 (Jan. 2017), https://www.justice.gov/crt/file/922421/dowload.

### 2. Analysis of Civilian Complaints is a Reasonable Compliance Metric.

Next, Plaintiffs argue that "relying on civilian profiling complaints to measure the extent of racially discriminatory stop-and-frisk behavior within the NYPD" has inherent limitations.[43] Plaintiffs' selective quote from the *Floyd* liability opinion refers to using civilian racial profiling complaints as "ineffective" with respect to measuring the performance of individual officers, not NYPD as a whole.[44] In fact, the *Floyd* liability opinion discusses civilian complaints in determining liability. Regardless of the outcome of investigations, the aggregate number of racial profiling complaints filed per year is one (but not the only) proxy for how citizens who interact with NYPD members perceive racial bias within the Department. Moreover, assessment of civilian complaints is also one of the metrics that the DOJ uses in assessing substantial compliance in similar cases.[45]

### 3. Analysis of NYPD Communications is a Reasonable Compliance Metric.

Plaintiffs' argument concerning the Monitor's review of communication from NYPD leadership and stop report narratives as a compliance metric similarly fails. Plaintiffs argue that this metric is unreliable because the Monitor will not be able to detect communications from NYPD leadership that encourage targeting of certain racial groups. However, this argument misses several key points. First, if stop report narratives indicate specific reasons that establish reasonable suspicion and do not indicate that individuals were stopped for fitting a vague description that includes generally race, age, and gender, it means that leadership has communicated to the rank-and-file that stops based on generalized factors without more is not permissible. If there is an

---

[43] Pl. Memo. of Law at 22.
[44] *Floyd*, 959 F. Supp. 2d at 617-620.
[45] U.S. Dep't of Justice, Civil Rights Division, *The Civil Rights Division's Pattern and Practice Police Reform Work: 1994- Present* 24 (Jan. 2017), https://www.justice.gov/crt/file/922421/dowload.

increase in legally sufficient stop report narratives, it would also indicate that NYPD leadership is not pressuring officers to achieve results by any means necessary. Furthermore, COMPSTAT crime strategy meetings, chaired by the Chief of Department, and observed by the Monitor, set the agenda for crime reduction efforts city-wide and communications there set the policies for the Department. Additionally, RISKS meetings with command executives, which are also observed by the Monitor, scrutinize the sufficiency of stop encounters and hold commanders accountable for the actions of their subordinates. Unconstitutional directions from within the Department would be evident during these types of meetings.

Plaintiffs' argument also ignores the fact that the Court concluded that intentional racial bias could be inferred from the City's public positions.[46] The Court found that the City's former oft-stated public position that its stop and frisk policy was intended to deter gun possession, along with its statements that young men of color were the primary perpetrators of violent crimes, created the inference that the City had an intentional *de facto* policy or practice of disproportionately targeting young men of color.[47] A lack of such statements, and more importantly affirmative statements correcting those positions, conversely, indicate that the former policies have been abandoned by NYPD.

Plaintiffs have thus failed to demonstrate that they meet the standard for modification of the Remedial Order. Their allegations of persistent racial bias in policing is an attempt to re-litigate a question already decided by this Court, and further, are unrelated to the practices at issue in this Monitorship. Plaintiffs' arguments that modifications to the Remedial Order are necessary because of a lack of community involvement are similarly unavailing. Finally, Plaintiffs have not

---

[46] *Floyd*, 959 F. Supp. 2d at 603-607.

[47] *Id.*

demonstrated that the Remedial Order should be modified to change the Monitor's proposed compliance metrics.

## POINT II

### PLAINTIFFS' PROPOSED REMEDIES ARE ONEROUS, OVERBROAD, AND DO NOT ADDRESS THE ALLEGED PROBLEMS WITH THE EXISTING REMEDIAL ORDER

Plaintiffs' proposed community survey, community collaborative board, field audits, and disciplinary process should be rejected as they are onerous, overbroad, and would not address the alleged problems with the existing Remedial Order.

As an initial matter, the City notes that the JRP solicited community input using 64 focus groups and 28 community forums pursuant to the Remedial Order and incorporated the input obtained into its recommendations, which the Monitor used in developing the compliance matrix. The JRP thus served its purpose of directly soliciting community input. In fact, this Court noted that the JRP was a vehicle for "the parties to participate in a community-input process . . . under the guidance of a facilitator to develop additional reforms."[48] As such, it was not expected that direct community engagement would be as robust under the Monitorship.

#### A. The Proposed Annual Community Surveys.

Plaintiffs' first proposed modification to the Remedial Order is the addition of an annual community survey to assess the public's perception of the constitutionality of police street encounters and trespassing arrests.[49] This survey data would then be used to assess compliance with the Remedial Order. Although Plaintiffs refer to such a recommendation from the JRP,

---

[48] *Floyd,* ECF Docket No. 662, at 1.
[49] Proposed Order Modifying the *Floyd* Remedial Order, *Floyd,* ECF Docket No. 843, at ¶ 1.

Plaintiffs' proposed survey differs from the one discussed in the Final JRP Report, which recommended adoption of an annual survey conducted at the Precinct/PSA level and measuring general community attitudes about policing that would be used to inform and possibly evaluate the performance of precinct leadership.[50]

Plaintiffs' proposed survey also measures the wrong data. Plaintiffs' annual surveys would "assess the public's perception of both whether stops and/or trespass arrests are supported by adequate legal justification and whether stops and/or trespass arrests are occurring in a racially discriminatory manner."[51]  Not only does this proposal involve a complicated legal question for which the average layperson (including the very small minority of survey respondents who were stopped by police or arrested for trespassing in the prior year) has no background, the respondent's individualized answers regarding the overall frequency or racial discrimination of such encounters would be entirely speculative. Such speculation cannot reasonably be a measurement by which the Monitor determines whether the City is in compliance with the Remedial Order. Although Plaintiffs' motion describes several monitorships that include community surveys as compliance metrics, those surveys measure police-community relations more generally – which is data that can be measured by a community survey.[52] Additionally, the Monitorship at issue here is more narrowly tailored than the other monitorships where surveys have been employed.

Further, too much time has passed and too many reforms to NYPD policies have been undertaken to now implement a survey that would accurately reflect community sentiment at the time the Court determined that NYPD had unconstitutional policies or practices in 2013. It would

---

[50] *New York City Joint Remedial Process: Final Report and Recommendations, Floyd,* ECF Docket No. 597, at 258.
[51] *Floyd,* ECF Docket No. 843, at ¶ 1.
[52] *See,* Pl. Memo. of Law at 26.

be unreasonable to require NYPD to demonstrate improvement in the public's perception on the issue of stop and frisk when stops are now a small fraction of what they were in 2013 when the Remedial Order was issued. Because there is no baseline for such a measure, no survey would be able to measure the impact on public perception of the many reforms that have already been implemented.

To the extent that the proposed survey is intended as a means of community engagement, it is not necessary. In addition to the types of public engagement already discussed herein, NYPD currently maintains two different types of surveys related to its performance. The first is a city-wide "customer-service" survey that has been in use since January 2021.[53] The second is a partnership between NYPD and the RAND Corporation to test community-police relations in order to assess the public's perception of NYPD's Neighborhood Policing program. Two rounds of surveys were already conducted and  the analysis is expected to be published later this year.[54]

**B. The Proposed Community Collaborative Board.**

Plaintiffs propose the creation of a community collaborative board ("CCB") to advise and provide community stakeholder input to the Court and Monitor on the NYPD's implementation of the various Court-ordered reforms.[55] This proposal should be rejected for the reasons set forth below.

---

[53] NYC Police Reform and Initiative Collaborative, Initiative Tracker, https://www1.nyc.gov/site/policereform/implementation/implementation.page
[54] RAND Corporation, What is the Impact of Neighborhood Policing in New York City, https://www.rand.org/well-being/justice-policy/projects/neighborhood-policing.html.
[55] Pl. Memo. of Law at 27.

1. **Plaintiffs' Proposed CCB is Substantially Different From the CCB Proposed in the JRP Report and in Other Monitorships.**

Although Plaintiffs credit the JRP, their proposal for a CCB differs substantially from the recommendation in that Report. The Final JRP Report recommended that the CCB "meet quarterly to receive updates from the NYPD with respect to the status of any Court-ordered reforms, and discuss the impact that they are having on affected communities," and publish an annual report with its recommendations for potential improvement in implementation of Court-ordered reforms.[56] The JRP stressed that the proposed CCB "is not intended to serve as a substitute for or as an overseer of the Monitor."[57]

Under Plaintiffs' proposal, the CCB's role would be expanded beyond serving as an intermediary between the community and the Monitor to a role where it wields its own substantial independent power, including in the selection of researchers and methodologies for the proposed new compliance metrics, and the ability to receive whatever documents it deems necessary from the Monitor and NYPD.[58] Of course, given the CCB's expanded mandate, Plaintiffs' CCB proposal contemplates the hiring of an unspecified number of "staff," rather than the part-time executive director recommended in the JRP, the cost of which would be assumed by the City.[59] This expanded mandate would in effect serve as an overseer of the Monitor – which the JRP specifically sought to avoid, as well as suggests a lack of faith in the court's oversight abilities.

---

[56] *New York City Joint Remedial Process: Final Report and Recommendations, Floyd*, ECF Docket No. 597 at 252.
[57] *Id.*
[58] Pl. Memo. of Law at 28.
[59] *Id.*

Further, five out of seven of the members of the CCB would come from CPR or its member organization: two from CPR itself and three from community organizations that served on the JRP Advisory Committee (all of which are member organizations of CPR).[60] This is inconsistent with the JRP proposal (which included academics, faith leaders, and violence disrupters as CCB members) and with the community feedback boards created as part of the monitorships cited in Plaintiffs' brief. For example, Seattle's and Cleveland's Community Police Commissions (CPCs) include members from police associations and not just members of a select group of community organizations.[61] This narrowing of perspectives is particularly troubling considering that CCR is a member organization of CPR and has represented the interests of its members in this Monitorship by, for example, requesting documents on CPR's behalf. To then create a second, essentially oversight role for CPR is unnecessary and clearly against the intent of the Remedial Order.

## 2. Plaintiffs' CCB Proposal Would Render the Confidentiality Order Essentially Moot.

Although Plaintiffs indicated that they would argue the issue of the Confidentiality Order separately,[62] Plaintiffs' proposal that the CCB would "have access to and the ability to publicly share all documents, information and data from the NYPD and Monitor that it needs to complete its work,"[63] would, in essence render the confidentiality order in these cases moot. Hundreds of documents and other materials are protected from public disclosure by the Confidentiality Stipulation to ensure the efficient operation of the monitorship. Plaintiffs' motion and proposed order do not define what the CCB would need to complete its work. Combined with the poorly defined parameters of the CCB's role, as discussed above, it appears that *any* document,

---

[60]*Id.*
[61]City of Seattle, Ordinance 124021 Council Bill 117609 at 4, *United States vs. City of Cleveland* 15-cv-1046 (N.D. Ohio May 26, 2015) at 5.
[62] Pl. Memo. of Law at 3, fn 1.
[63]Proposed Order, at ¶ 3.

information, data or other material shared between NYPD and the Monitor or even Plaintiffs'
counsel, could potentially be subject to this provision, including but not limited to those protected
by privilege. Although the City will reserve further argument on the confidentiality agreement
until such time as it is explicitly before the Court, it should be noted that this aspect of Plaintiffs'
proposal would render cooperation much more difficult and would almost certainly result in more
frequent motion practice. Elimination and/or reduction of the provisions of the existing
confidentiality stipulation are thus not only unnecessary to advancing the goals of the Remedial
Order, it would be detrimental to progress towards substantial compliance.

Furthermore, Plaintiffs' counsel has made several requests to the Monitor to share
documents with Communities United for Police Reform. Upon information and belief, all these
requests were honored – subject of course to the confidentiality stipulation. Indeed, it is completely
unreasonable to now argue that the community groups that are represented by counsel, and who
have provided substantial feedback on reforms in this Monitorship, have been excluded from the
process.

### C. The Proposal for Field Audit/Integrity Testing.

Plaintiffs propose "field audits of NYPD officers' stop-and-frisk and trespass enforcement
activity using integrity testing methods to assess Fourth and Fourteenth Amendment
compliance."[64] As Plaintiffs' brief notes, NYPD currently uses integrity auditing to test and
measure command-level compliance with the Department's courtesy, professionalism, and respect
standard by creating telephone and in-facilities scenarios. By contrast, Plaintiffs propose that an
outside researcher conduct testing of officer-initiated police interactions with the public "by using
trained testers with very similar traits except for race to engage in the same pre-scripted non-violent

---

[64] Pl. Memo. of Law at 29.

'suspicious' behaviors designed to attract police attention."[65] Plaintiffs explain that "the Monitor could feasibly and safely conduct methodologically rigorous field audits of NYPD officer stop-and-frisk and trespass enforcement activity using current and former undercover and internal affairs officers from other law enforcement agencies as testers."[66]

The above-outlined methodology would create numerous difficulties. First, it would be challenging to find other law enforcement agencies who would disregard any safety concerns their members might face if their identities as undercover and/or internal affairs officers were revealed. Second, it is nearly impossible to conduct a field audit that involves a self-initiated stop, which are the stops that are at the heart of the underlying litigation. Between the difficulty of having an officer be the test subject and having the test subject act "suspicious" enough to cause an officer to approach without actually or apparently committing an offense, the rate at which officers stop any citizens is likely to be quite low, if not impossible. Third, there will be questions as to whether the test scenarios reflect typical street encounters in which officers conduct lawful stops and whether the test subjects are typical of the demographic of individuals whose stops are at issue in the litigation.

The logistical difficulties of designing and conducting a methodologically reliable field audit as described by Plaintiffs are likely insurmountable, which is likely why, as far as the City is aware, no monitorship has ever conducted such a field audit to measure stop and frisk activity. Plaintiffs' own motion does not cite any such examples, citing instead a theoretical academic article about how such testing might be accomplished.[67]

---

[65] *Id.* at 29.
[66] *Id.* at 30.
[67] *Id.* at 30, fn 44.

Plaintiffs have proposed these field audits as an alternative to the Monitor's current compliance metric because of the purported unreliability of the Monitor's metrics. However, Plaintiffs' audits do not cure any of the purported issues they raised with respect to the Monitor's metrics and bring a host of other issues. Just like analysis of stop data, field audits will be unable to determine whether any particular stop was motivated by race, so analysis of field audits would also have to rely on statistics in the aggregate. There is also no reason to believe that statistical analysis of the field tests would provide any more reliable data on failure to stop suspicious white individuals than a statistical analysis of the stop reports. Because of the untested nature of field tests as a compliance metric, there will undoubtedly be questions about the reliability of the methodology and an additional question about the responsibility of relying on that untested metric to determine compliance. Instead, the Monitor's proposed metrics are the same as those used by the Court to determine liability in these cases and by the DOJ in stop and frisk cases. Given the above, Plaintiffs' proposal for field auditing should be rejected.

### D. The Proposed Procedure for Disciplinary Proposals.

Plaintiffs further propose that the CCB they envision would have direct input in developing any new NYPD disciplinary proposals and that those proposals would be subject to a public comment period. These proposed procedures are unnecessary and would be ineffective at remedying the claims of inadequate community engagement described in Plaintiffs' motion.

In 2018, NYPD requested that a panel of independent judges and former prosecutors conduct a "top-to-bottom review" of its disciplinary system.[68] On August 31, 2020, as a result of recommendations made by this panel, NYPD publicly posted for 30 days a draft of its Discipline

---

[68]https://www1.nyc.gov/site/nypd/about/about-nypd/policy/nypd-disciplinary-system-reforms.page

Matrix for public comment.[69]  The Discipline Matrix is an overhaul of NYPD's entire discipline process and includes substantiated misconduct that would fall within the purview of the monitorship, i.e. complaints of unconstitutional stop, unconstitutional trespass enforcement, and racial profiling. Counsel for the *Davis* and *Floyd* Plaintiffs separately submitted comments through this process, as did civilians, elected officials, and community groups, including Communities United for Police Reform.[70] Many of those public comments were incorporated into the final document that was made effective on January 15, 2021.[71] The Monitor convened two separate meetings with Plaintiffs' counsel and the City, specifically to discuss the Matrix and for NYPD to provide in-depth explanations on penalties as well as on aggravating and mitigating factors to be considered when assessing those penalties. Thus, Plaintiffs' counsel and community organizations had the opportunity to provide input on this recently disciplinary proposal without the need for court intervention.

Moreover, if the primary reasoning for modifying the Remedial Order is because members of the community feel ignored by the Monitorship, a fundamental question is whether the process Plaintiffs propose will change that perception. In light of the fact that Plaintiffs allege this feeling of exclusion persists notwithstanding the fact that the current NYPD Discipline Matrix had a

---

[69] https://www1.nyc.gov/site/nypd/about/about-nypd/public-comment.page

[70] https://ccrjustice.org/sites/default/files/attach/2020/09/Public%20Comment_NYPD%20Discipline%20Matrix%20CCR%20%2B%20BLH_FINAL.pdf;

https://www.changethenypd.org/sites/default/files/cpr_families_organizations_letter_on_nypd_discipline_matrix_9-30-2020_final.pdf;

https://www.nyclu.org/sites/default/files/field_documents/2020109-comments-nypddisciplinarymatrix.pdf;  https://www.nyclu.org/sites/default/files/field_documents/2020109-comments-nypddisciplinarymatrix.pdf;

https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/board/20200917_testimony_LAS.pdf

[71] New York City Police Department: Disciplinary System Penalty Guidelines, January 15, 2021; https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/disciplinary-system-penalty-guidelines-effective-01-15-2021-compete-.pdf,  at 1.

period for public comment, in which comments were submitted on behalf of individuals as well as member of communities and organizations most affected, and the fact that Monitor met with the parties more than once regarding the latest discipline proposal, it is not clear how Plaintiffs' requested modification would address this problem. The same organizations would have the opportunity to once again submit feedback, but it is not clear how that would be different from the process currently being used. Plaintiffs' proposed procedures for drafting and approving disciplinary reforms should thus be rejected.

## CONCLUSION

In the eight years of this monitorship, the City, working closely with the Monitor and counsel for Plaintiffs, has made significant strides in achieving substantial compliance with the tasks set forth in the Remedial Order. NYPD further continues to engage in reform in and out of the Monitorship and remains committed to working with those communities primarily affected by the former stop and frisk practices to implement effective reforms while responding to community safety concerns.

Plaintiffs have not demonstrated that a modification to the Remedial Order is necessary or appropriate. Moreover, for several of these proposed reforms, these changes are likely to complicate and derail a process that has already been progressing for years, and substantial effort has been expended towards achieving substantial compliance. For the reasons set forth above, Plaintiffs' motion for modification of the Remedial Order should be denied in its entirety.

Date:   New York, New York
         September 14, 2021

**GEORGIA M. PESTANA**
Corporation Counsel of the City of New York
*Attorney for Defendant City of New York*
100 Church Street
New York, New York 10007
(212) 356-2572


By:     *Angharad Wilson /s*

        Angharad Wilson
        Genevieve Nelson
        Nancy Savasta
        Tyler Abboud


cc:     All Class Counsel (By ECF)