**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ X

DAVID FLOYD, *et al.*,

                               Plaintiffs,

-against-                                   No. 08 Civ. 1034 (AT)

CITY OF NEW YORK, *et al.*,

                               Defendants.

------------------------------------------------------------------ X
------------------------------------------------------------------ X

KELTON DAVIS, *et al.*,

                               Plaintiffs,

-against-                                   No. 10 Civ. 699 (AT)

CITY OF NEW YORK, *et al.*,

                               Defendants.

------------------------------------------------------------------ X

## PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO MODIFY THE *FLOYD* REMEDIAL ORDER

Jonathan C. Moore
Luna Droubi
Marc Arena
Rebecca Pattiz
Katherine "Q" Adams
Beldock Levine & Hoffman LLP
99 Park Avenue, Penthouse Suite
New York, NY 10016
212.490.0400

Omar Farah
Samah Sisay
Baher Azmy
The Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
212.614.5475

*Attorneys for Floyd Plaintiffs*

Jin Hee Lee
Raymond Audain
Ashok Chandran
John Cusick
Kevin Jason
Lauren Johnson
NAACP Legal Defense and
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
212.965.2200

Corey Stoughton
Steve Wasserman
Molly Griffard
Jennvine Wong
The Legal Aid Society
199 Water Street
New York, NY 10038
212.577.3300

*Attorneys for Davis Plaintiffs*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 2

I.       PLAINTIFFS APPLY AND SATISFY THE CORRECT LEGAL STANDARD ............. 2

II.      THE MONITORSHIP'S FAILURE TO CONDUCT ONGOING, MEANINGFUL
         COMMUNITY ENGAGEMENT NECESSITATES MODIFICATION OF THE
         REMEDIAL ORDER ............................................................................................ 3

         A.       The Court Should Order the Meaningful Community Engagement that the
                  Monitor has Refused to Conduct ............................................................. 5

         B.       The Monitor Draws a False Distinction Between the Constitutional Issues in the
                  Monitorship and Robust Community Engagement Strategies ................................. 8

III.     THE CCB WILL FACILITATE COMMUNITY ENGAGEMENT AND
         TRANSPARENCY, WHICH ARE ESSENTIAL FOR A CREDIBLE AND
         LEGITIMATE MONITORSHIP .................................................................................. 10

IV.      PUBLIC STATUS CONFERENCES WILL FACILITATE BROAD COMMUNITY
         ENGAGEMENT NECESSARY TO ENSURE THE SUCCESS OF THE *FLOYD-DAVIS*
         COURT-ORDERED REFORMS .................................................................................. 12

V.       COMMUNITY SURVEYS AND FIELD AUDITS ARE NECESSARY AND
         APPROPRIATE MEANS OF ASSESSING THE NYPD'S CONSTITUTIONAL
         COMPLIANCE .................................................................................................... 15

         A.       The Need for Community Surveys to Supplement NYPD Data ........................... 15

         B.       Biannual Field Audits ........................................................................... 20

CONCLUSION ................................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aurelius Capital Master, Ltd. v. Republic of Arg.*, 644 F. App'x. 98, (2d Cir. 2016) ................... 3

*King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 418 F.2d 31 (2d Cir. 1969) ...................... 3

*Philip Morris USA, Inc. v. Otamedia Ltd.*, 331 F. Supp. 2d 228 (S.D.N.Y. 2004) ....................... 3

*Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367 (1992) ............................................................... 3

**Other Authorities**

2020 CCRB semi-annual report at 73, *available at*
    https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2020_semi-
    annual.pdf. ................................................................................................................................. 19

Baltimore Consent Decree, 17-cv-00099-JKB, ECF No. 2-2 ...................................................... 18

CCRB BWC Report (Feb 2020) at 57-59, *available at*
    https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/20200227_BWCRep
    ort.pdf ........................................................................................................................................ 19

Center for Constitutional Rights, *Floyd v. New York* Trial Updates (March 12, 2013), *available
    at* https://ccrjustice.org/floyd-v-new-york-city-trial-updates .................................................... 14

Chicago Consent Decree, 17-cv-06260-RMD, ECF No. 703-1 ................................................... 18

Civil Rights Division, U.S Dep't of Justice, The Civil Rights Division's Pattern and Practice
    Police Reform Work: 1994-Present at 21 (Jan. 2017), *available at*
    https://www.justice.gov/crt/file/922421/download. .................................................................... 9

Cleveland Consent Decree, 15-cv-01046-SO, ECF No. 3-1 ....................................................... 18

Ferguson Consent Decree, 16-cv-00180-CDP, ECF No. 41 ....................................................... 18

Jill Maxwell, Floyd v. City of New York: NYPD's Controversial Stop and Frisk is On Trial, *Mic*
    (May 22, 2013), *available at* https://www.mic.com/articles/43347/floyd-vs-city-of-new-york-
    nypd-s-controversial-stop-and-frisk-is-on-trial ......................................................................... 14

Newark Consent Decree, 16-cv-01731-MCA-MAH, ECF No. 4-1 ........................................... 18

Office of the Attorney General, Memorandum for Heads of Civil Litigating Components United
    States Attorneys 7 (Sept. 13, 2021), *available at*
    https://www.justice.gov/ag/page/file/1432236/download. ........................................................ 16

Review of the Use of Monitors in Civil Settlements and Consent Decrees Involving State and Local Government Entitles (Sept. 13, 2021) at 5, *available at* https://www.justice.gov/ag/page/file/1432236/download...........................................................9

Review of the Use of Monitors in Civil Settlements and Consent Decrees Involving State and Local Government Entitles (Sept. 13, 2021) at 7, *available at* https://www.justice.gov/ag/page/file/1432236/download...........................................................9

Seth Stoughton, *Police Body-Worn Cameras*, 96 North Carolina L. Rev. 13613, 1402-13 (2018) ..........................................................................................................................................19

Transcript of Status Conference before Hon. Catherine D. Perry, U.S.D.J., Jan. 8, 2020, *United States v. City of Ferguson*, 16-Cv-00180 (E.D. Mo.), *available at* https://fergusonmonitor.com/wpcontent/uploads/2020/02/Transcript-of-2020.01.08-A-Status-Conference.pdf ........................................................................................................................15

Verbatim Report of Proceedings before the Hon. James L. Robart, United States District Judge, June 30, 2015, *United States v. City of Seattle*, 12-cv-1282 (W.D. Wash.) *available at* http://www.seattlemonitor.com/s/Status-Hearing-Transcript-0630151.pdf.............................15

## **INTRODUCTION**

At the heart of the motion before the Court is the success and legitimacy of this Monitorship, which is the product of historic findings by this Court of decades-long constitutional violations by NYPD officers in Black and Latinx communities in New York City. The reason the Parties are engaged in this Monitorship, and have been for so many years, is to ensure that those who suffered most from the NYPD's unlawful and discriminatory policies and practices will no longer be at risk of further constitutional violations. And yet, as the declarations by community stakeholders demonstrate, for the three years since the Joint Remedial Process ("JRP") concluded, directly impacted communities have been effectively shut out of this Monitorship. The exclusion of their unique and essential perspective and expertise is a sharp departure from proven best practices for federal monitorships around the country.

The Court's Remedial Order, as well as social science and human experience, recognizes that the legitimacy and durability of constitutionally compliant change depends on input and buy-in from those most impacted by policing practices. These authorities all reveal that, as a principle of democratic legitimacy and a pragmatic reality, rights are not mere paper guarantees to be assessed by monitors or statistical experts. Ensuring the protection of those rights requires engaging with the people who are most affected by underlying wrongs and who are invested in changing their interactions with institutions like the police in tangible, meaningful ways.

The Monitor and the City's oppositions misguidedly constrain the scope of the Monitorship's purpose of ensuring the success of this entire litigation and the resulting Remedial Order. Their oppositions disregard the nature of Plaintiffs' requested relief by selectively quoting sources and attempting to narrow Plaintiffs' grounds for modification of the Remedial Order. The oppositions, in effect, elevate mere procedural compliance over a core mandate of the remedial

process—to ensure that Court-ordered reforms are transparent, participatory, and meaningful for those who have been most harmed by the NYPD's unconstitutional practices. As it stands, the monitorship has turned critical stakeholders into mere onlookers on questions that impact their lives directly.

It is especially self-defeating to exclude the perspectives of community stakeholders now, at this critical juncture, when the Monitorship moves forward with assessing the City's compliance with the Court's Remedial Order. Crucially, if the Court is not apprised through the Monitorship of the current experiences and perspectives of New Yorkers who directly experience the NYPD's stop-and-frisk practices on the street and trespass enforcement practices in and around their homes, its assessment of the City's compliance with the Remedial Order will not be fully informed, leading to inaccurate results that will not be credible in the eyes of community stakeholders. Plaintiffs' proposed modifications are essential to honoring the efforts of community stakeholders who played a crucial part in achieving the hard-fought, landmark remedies and to ensuring these remedies are enduring, credible, and legitimate. The Court should take action to address the community's paramount concerns with the Monitorship and its impact on their future, and to ensure a meaningful conclusion to this otherwise historic judicial process.

## **ARGUMENT**

## I.      **PLAINTIFFS APPLY AND SATISFY THE CORRECT LEGAL STANDARD**

Plaintiffs and the Monitor agree that when modification of a decree on injunctive relief is sought by the decree's beneficiary, the well-established standard for modification is whether "'a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes.'" Plaintiffs' Opening Brief at 17, *Floyd* ECF No. 841 (hereinafter "Pls.' Br.") (citing *Philip Morris USA, Inc. v. Otamedia Ltd.*, 331 F. Supp. 2d 228,

244 (S.D.N.Y. 2004) (quoting *King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 418 F.2d 31, 35 (2d Cir. 1969)); *see also* Monitor's Opposition at 8, *Floyd* ECF No. 854 (hereinafter, "Monitor's Opp."). Modification is also appropriate "when enforcement of the decree without modification would be detrimental to the public interest." *Id.* (citing *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 384 (1992) (internal citation omitted)).

The City claims that Plaintiffs provide an "incomplete" description of the proper legal standard. *See* City's Opposition at 6, *Floyd* ECF No. 855 (hereinafter "City's Opp."). But Plaintiffs explained that "[a]n important question in this inquiry is whether the objective of the injunction has been achieved." *See* Pls.' Br. at 17 (citing *Aurelius Capital Master, Ltd. v. Republic of Arg.*, 644 F. App'x. 98, 106 (2d Cir. 2016)). A near-identical standard is set forth in *Rufo*, cited by the City, and states that modification is required when "an injunction has failed to reach its principal objective." *See* 331 F. Supp. 2d at 245-46. In any event, whether the Court applies the *Philip Morris* standard, the *Rufo* standard, or both (as Plaintiffs suggest in their opening brief), modification is proper here. As detailed in Plaintiffs' opening brief and below, the injunction's objective has not been met in this Monitorship.

## II.    THE MONITORSHIP'S FAILURE TO CONDUCT ONGOING, MEANINGFUL COMMUNITY ENGAGEMENT NECESSITATES MODIFICATION OF THE REMEDIAL ORDER

This Court found that, over a period of decades, the NYPD—the largest police department in the country—engaged in a widespread practice of suspicionless stops-and-frisks and a policy of racially discriminatory stops-and-frisks. *See* Liability Opinion, *Floyd* ECF No. 373, ECF pp.183-84 (hereinafter "Liab. Op."). To remedy these entrenched and persistent constitutional violations, the Remedial Order required the NYPD to root out racial bias to prevent further unconstitutional racial profiling. *See* Remedial Order at 17, *Floyd* ECF No. 372 (hereinafter, "Rem. Ord.").

Public perception of racial discrimination by the NYPD is central to the Court's resolution of Plaintiffs' Motion. The Remedial Order recognized that community input and participation in the reform process was "a vital part of a sustainable remedy in this case" and that "if the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful." Rem. Ord. at 29. The Monitor disagrees, arguing that public perception "does not bear directly on the NYPD's compliance with the Fourth and Fourteenth Amendments." Monitor's Opp. at 16. But the Monitor cannot unilaterally ignore this Court's admonition that the success of the reforms it ordered turns on how the public perceives and experiences them. In declarations filed in support of Plaintiffs' Motion, community stakeholders reported that they are unable to access basic, important information about the Monitorship, doubt whether the Monitor seriously considers input from those most affected by the NYPD's stop-and-frisk practices, and do not trust the Monitorship to end the discriminatory policing they have endured. *See* Pls. Br. at 9-11.

These perceptions are justified. Events last year in New York City, including the often-violent policing of racial justice protests against police misconduct and the revelation of blatantly racist internet posts authored by a former NYPD commanding officer of the Equal Employment Opportunity Division, *see id*. at 11-13, demonstrate that racial bias persists in the NYPD. The City's argument that unmistakable evidence of racial bias within the Department is somehow not relevant to whether the NYPD has stopped intentionally discriminating on the basis of race, *see* City's Opp. at 14, should not be taken seriously. Evidence of ongoing, explicit racism within the NYPD supports the inference that continued racial disparities reflect the persistence of the intentional discrimination found by the Court. This evidence contributes to community stakeholders' view that the Monitorship does not and cannot protect their constitutional rights.

A.   **The Court Should Order the Meaningful Community Engagement that the Monitor has Refused to Conduct**

Thus far, community engagement by the Monitorship has been limited to: publishing reports posted on the Monitor and NYPD's websites; filing on the Court's docket; "ask[ing] community stakeholders to arrange calls and meetings with [the Monitor] when they would like to discuss the remedial process" and, vaguely; "[seeking] and maintain[ing] direct connections" with "community stakeholders." Monitor's Opp. at 7. The Monitor also points to the JRP, which ended in 2018, as "the particular channel that the Court provided for direct community input on reforms." Monitor's Opp. at 7. According to the Monitor and the City, these efforts, concluded years ago, obviate the need for additional and sustained community involvement, including the creation of a Community Collaborative Board ("CCB"), s*ee id.* at 7-8; City's Opp. at 8-11, although such a body was a central recommendation from the JRP.

Declarations submitted by community stakeholders, many of whom participated in the JRP, confirm that this Monitorship's attempts at community engagement have been woefully inadequate to ensure the success of the reform process. The Monitor's submission does not seriously engage with the mutually reinforcing declarations describing community alienation from this reform process, and the Monitor submits no record to suggest that any of the steps he has taken have been effective in engaging impacted community members. Nor could he. With few exceptions, the meetings "on multiple occasions with [Communities United for Police Reform ("CPR")]," purported "phone calls and meetings with individual stakeholders," and "direct connections with community stakeholders" ended with the JRP three years ago. Monitor's Opp. at 7; *see e.g.*, Colon Decl. at ¶ 28, Charney Decl. Ex. 3, *Floyd* ECF No. 842-3 (hereinafter "Colon Decl.") ("The [Justice Committee's ("JC")] Advisory Committee representative, Steve Kohut, has received no communication from the Monitor or his team since an email stating that Judge Belen's Final Report

would be published in April 30, 2018 was sent on April 5, 2018."); Cyril Decl. at ¶ 23, Charney Decl. Ex. 2, *Floyd* ECF No. 842-2 (hereinafter "Cyril Decl.") ("I participated in a JRP community forum and focus groups, which were useful as an opportunity to share my experience, but have not been contacted by the Monitor's team since. To my knowledge, no other [Malcolm X Grassroots Movement ("MXGM")] members have been contacted either."); Foster Decl. at ¶ 15, Charney Decl. Ex. 4, *Floyd* ECF No. 842-4 (hereinafter "Foster Decl.") ("Since the end of the *Floyd* Joint Remedial Process, [Make the Road ("MtR")] members have had limited interaction with the Monitorship and the Court and have not felt authentically engaged in our role as a community organization whose members were most affected by the years of unconstitutional policing.").

The Monitor's contention that community stakeholder engagement with the Monitorship should be accomplished exclusively through Plaintiffs' counsel runs contrary to the terms of the Remedial Order, in which the Court specified that these stakeholders must be able to provide input into the reform process independently of Plaintiffs' lawyers. *See* Rem. Ord. at 29 (distinguishing between "members of the communities where stops most often take place" and "the lawyers in this case"). On a practical level, it relieves the Monitorship of its burden to affirmatively engage with the public and instead asks community groups to affirmatively seek avenues for input—for example, engaging their own counsel to "make amicus filings" each time they wish to comment on the Monitor's reform recommendations. Monitor's Opp. at 10. Community stakeholders are not *amici* in these cases, but rather are victims of years of unconstitutional policing by the NYPD. The burden should not rest on community members to repeatedly file motions with the Court to have a direct voice in the Monitorship. This is particularly true when community members have not been meaningfully engaged with and included in this Monitorship for the past three years after devoting significant resources, expertise, and time during the JRP.

Furthermore, as Plaintiffs have realized over the course of the Monitorship, the extraordinarily broad Confidentiality Order in this case severely restricts how much information Plaintiffs' counsel can share with stakeholders about the current status of many of the court-ordered reforms, including information that would not be considered sensitive or confidential except by the terms of the Confidentiality Order itself. These unduly broad constraints make it very difficult—if not impossible—for stakeholders to offer meaningful input on the NYPD's implementation of, and compliance with, many of the court-ordered reforms. *See* Pls.' Br. at 3 n.1. According to the Executive Director for the JC, "the confidentiality order restricted information sharing between Plaintiffs' counsel and the JC, drastically limiting the ability of the JC and its constituents to provide perspective and expertise that the Monitorship currently lacks." *See* Colon Decl. at ¶ 24. If the Monitor seeks to uphold this broad Confidentiality Order, *see* Monitor's Opp. at 12, he cannot also expect Plaintiffs' counsel to meaningfully communicate with community members about the remedial process.

The Monitor's misunderstanding of the need for community engagement in the Monitorship is perhaps best exemplified by his reliance on the JRP, which ended in 2018, as "the particular channel that the Court provided for direct community input on reforms." Monitor's Opp. at 7. This reliance misapprehends the role of the JRP in this Monitorship. The work of the JRP—which involved hundreds of community members and the facilitator's staff producing recommendations in the JRP Report that are the source of many of Plaintiffs' proposals, including the CCB—cannot be the end point for community involvement in this remedial process, as the Monitor suggests. Rather, the JRP should be the starting point for the creation of an ongoing and meaningful dialogue with impacted communities to ensure the eradication of the constitutional violations found by this Court. To view the JRP as a temporary moment of this Monitorship—

when community members invested time and resources to produce recommendations that simply could be disregarded without further input—is a disservice to them and raises concerns of tokenism that could jeopardize the legitimacy of the entire Monitorship.

**B.     The Monitor Draws a False Distinction Between the Constitutional Issues in the Monitorship and Robust Community Engagement Strategies**

The Monitor does not contest Plaintiffs' evidence that the Monitorship is an outlier among federal court-mandated police monitorships nationally. When confronted with this fact, the Monitor instead attempts to distinguish *Floyd* and *Davis* from cases resolved by Department of Justice ("DOJ") consent decrees to argue against the creation of the CCB and other proposals for expanding community engagement. *See* Monitor's Opp. at 11. But that distinction is irrelevant. Whether reforms had been agreed to by the City in connection with a consent decree or, as here, ordered by the Court after express findings of liability, has no bearing on the necessity of engaging with the people most affected by the NYPD's unconstitutional stop-and-frisk and trespass enforcement practices. Indeed, accepting the Monitor's position would lead to the untenable conclusion that community engagement is only relevant when a law enforcement agency voluntarily agrees to reform its policies and practices through settlement without an admission of liability, but not in cases where there was an actual finding of a constitutional violation that must be fully remedied. Ultimately, like the DOJ's police reform consent decrees in other jurisdictions, both *Floyd* and *Davis* center on policing practices that have directly impacted millions of New Yorkers over the course of approximately two decades. And, like DOJ consent decrees in Seattle and Cleveland, the *Floyd* Remedial Order and Monitorship encompass reforms to the NYPD's written policies, training, supervision, performance evaluation, and disciplinary systems.

Plaintiffs have established the stark inadequacy of the Monitorship's community engagement efforts when compared with other federal monitorships. *See* Pls.' Br. at 24–29. Since

then, the DOJ has released new best practices for police monitorships that further highlight this inadequacy, noting that "[s]ustained, meaningful engagement with the community is critical to the success of a monitorship" as one of five "core principles" underlying those best practices, emphasizing that monitors should "prioritize stakeholder input" and "*continually* seek the community members' input."[1] The guidelines state that "monitors must go to the places where impacted communities actually live and work to make sure they are reaching a broader swath of people. Monitors must also use modern tools of communication, such as social media, to ensure they're reaching community members whose voices are not as regularly heard."[2] That is precisely what Plaintiffs' motion seeks—and what the Monitor and City adamantly resist. As the DOJ explained in its 2017 Report on more than twenty years of work in federal court monitorships of municipal police departments, the ability to "constructively engage communities and stakeholders in the reform process" is "core" and "critical" to the success of a monitorship.[3] The Monitorship here is unable or unwilling to engage with the community in the way other federal monitors and the DOJ have found necessary, thus warranting intervention from this Court.[4]

More importantly, like the DOJ, this Court has recognized that community trust and remedying the NYPD's constitutional violations go hand in hand—an important, long-ignored element of the Remedial Order. The Monitor seeks to distinguish *Melendres* from *Floyd* and *Davis* by noting that the judgement in that case contained "provisions that aimed '[t]o rebuild public

---

[1] Review of the Use of Monitors in Civil Settlements and Consent Decrees Involving State and Local Government Entitles (Sept. 13, 2021) at 7, *available at* https://www.justice.gov/ag/page/file/1432236/download (emphasis added).

[2] *Id.* at 7–8.

[3] *See* Civil Rights Division, U.S Dep't of Justice, The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present at 21 (Jan. 2017), *available at* https://www.justice.gov/crt/file/922421/download.

[4] DOJ's best practices further state that monitors should have term limits, that their appointments should be reviewed every two to three years and sets a presumptive target for monitorships to achieve their goals within five years. Review of the Use of Monitors in Civil Settlements and Consent Decrees Involving State and Local Government Entitles (Sept. 13, 2021) at 5, *available at* https://www.justice.gov/ag/page/file/1432236/download.

confidence and trust' and 'to improve community relationships.'" Monitor's Opp. at 11 (citing Supplemental Permanent Injunction/Judgment Order at ¶ 107, *Melendres v. Penzone*, No. 07-cv-2513 (D. Ariz. Oct. 2, 2013) ECF No. 606). But the same is true of the Remedial Order in *Floyd*. Indeed, the Court explicitly held and noted in the Remedial Order that the reforms necessary to remedy the NYPD's constitutional violations would not be successful unless the community stakeholders viewed them as legitimate, which could only happen if there was "ongoing communication and negotiation with the community about stop-and-frisk activities." Rem. Ord. at 29–30.[5] The Court also made clear the importance of successfully remedying the NYPD's unconstitutional practices to "prevent another round of protests, litigation, and divisive public conflicts over stop and frisk." *Id.* at 30. Indeed, it is hard to imagine how rebuilding public confidence and improving community relationships could not be essential to the success of the Monitorship after decades of unconstitutional conduct that has created deep distrust within impacted communities. Thus, the distinctions the Monitor seeks to draw between the Remedial Order and the consent decrees described in Plaintiffs' opening brief do not lessen the intrinsic value of community engagement in reforming unlawful police policies and practices.[6]

## III.   THE CCB WILL FACILITATE COMMUNITY ENGAGEMENT AND TRANSPARENCY, WHICH ARE ESSENTIAL FOR A CREDIBLE AND LEGITIMATE MONITORSHIP

Given the inadequate community engagement thus far, it is imperative for the Monitor to partner with a CCB whose proposed member organizations have a demonstrated record of

---

[5] The City argues that the Monitor's loss of legitimacy has not been "quantified," as if that were possible or, in any case, Plaintiffs' burden. *See* City's Opp. at 7. But regardless, Plaintiffs put forth ample evidence of the lack of legitimacy in the declarations from community organizations submitted with their moving papers, and neither the City nor the Monitor proffered their own evidence to rebut the veracity of Plaintiffs' presentation.

[6] The City also misrepresents Plaintiffs' position that the Monitor cannot rely exclusively on NYPD stop data, civilian complaints, and NYPD communications to assess compliance. *See* City's Opp. at 11-13. Plaintiffs do not take the position that the Monitor should not rely on these sources which, as the City points out, are also used by other monitorships. Rather, Plaintiffs maintain that such data is incomplete and insufficient on its own, thus requiring the Monitor to *also* rely on other sources of data including community surveys.

meaningfully engaging directly with impacted communities on stop-and-frisk and trespass enforcement issues in the way the DOJ describes. As explained in the JRP Final Report, CPR and its member organizations were "actively engaged in reform efforts of the NYPD," and "participated in the implementation of the various phases of the JRP." *Floyd* ECF No. 597 at 245 n. 289. CPR used "its expansive network to populate 9 of the 28 forums that took place throughout the City, several of the focus groups, as well as participating in the JRP Advisory Committee." *Id.* But now, these community groups—which were so crucial to the JRP—have been shut out of the remedial phase of this case.[7] Despite the Monitor's passing reference to meetings with CPR on "multiple occasions," Monitor's Opp. 14, CPR has not heard anything from the Monitorship in almost three years about what, if any, discipline reforms will be recommended to the Court. *See* CPR Decl. at ¶ 15, Charney Decl., Ex. 1, *Floyd* ECF No. 842-1 (hereinafter "CPR Decl."). *See also* Cyril Decl. at ¶ 23 (noting that MXGM has not been contacted by the Monitor since participating in JRP focus groups in 2017); Colon Decl. at ¶¶ 28-29 (JC Advisory Committee representative, Steve Kohut, has had no communication from the Monitor or his team since an email sent on April 5, 2018, and was never informed by the Monitor that the Monitorship had a website); Foster Decl. at ¶ 15 (MtR members "have had limited interaction with the monitorship" since the end of the JRP). The CCB would not arbitrarily restrict which stakeholders get information about the Monitorship, as the Monitor claims. *See* Monitor's Opp. at 12. Rather, the CCB would expand the number of stakeholders with this important information and engage the perspectives of community members most affected by stop-and-frisk and trespass enforcement.[8]

---

[7] The City's argument that the proposed CCB "differs substantially" from recommendation in the JRP is immaterial because the CCB was never adopted by the Monitor or ordered by the Court. As explained in Plaintiffs' opening brief, Plaintiffs previously proposed to Judge Belen that the CCB have direct input into discipline reforms in our response to the Final JRP Report. *See* Pls.' Br. 28–29.

[8] The CCB would not, contrary to the Monitor's argument, exclude other stakeholders like district attorneys, police unions and NYPD personnel from participation in the Monitorship. *See* Monitor's Opp. at 12. The Monitor acknowledges his focus groups with NYPD officers and meetings with NYPD executives on a regular basis yet does

The Monitor and the City argue that creation of a CCB—and the resultant increase in community engagement—would impair the remedial process and "essentially moot" the Confidentiality Order in this case. *See* Monitor's Opp. at 11–12; City's Opp. at 25–26. But they make no suggestion that the CCB could not appropriately protect information that is truly confidential, instead premising their argument entirely on an overly broad Confidentiality Order. Indeed, stakeholders like CPR and the various police unions have already been permitted to receive confidential information under the order. Moreover, the experiences of the past three years under the Confidentiality Order show how its broad terms run afoul of this Court's admonition that the order "shall not compromise appropriate transparency," Confidentiality Order at 2, *Floyd* ECF No. 650, undermining the credibility of a Monitorship that is entirely dependent on that transparency.

Finally, abstract concerns about a modest expansion of the groups and people with access to information from the Monitorship cannot justify thwarting the purposes of the Remedial Order or compromising the Monitorship's legitimacy. The Monitor and the City's position ignores the fact that, while ongoing communication with community stakeholders is *required* by the Remedial Order, "confidentiality" is not. *See* Rem. Ord. at 29–30.[9]

## IV. PUBLIC STATUS CONFERENCES WILL FACILITATE BROAD COMMUNITY ENGAGEMENT NECESSARY TO ENSURE THE SUCCESS OF THE *FLOYD-DAVIS* COURT-ORDERED REFORMS

The Monitor's contention that community members can learn everything they need to know about the Monitorship from his reports is directly contradicted by the declarations filed in

---

not have similar focus groups and meetings with impacted members of the public. In addition, any materials and information accessed by the CCB to do its community engagement work, of course, would have to be shared with district attorneys, police unions and other stakeholders.

[9] As the City acknowledges, Plaintiffs have never argued for the wholesale revocation of the Confidentiality Order and that issue is not before the Court at this time. *See* City's Opp. at 19. However, Plaintiffs maintain that the order presents unnecessary and unjustifiable barriers to transparency and community engagement with this remedial process. Plaintiffs are actively engaging with the Monitor and the City about modifying the Confidentiality Order, having sent a letter to the parties on September 17, 2021, setting forth a proposal to strike a better balance between confidentiality and transparency and asking for a meeting to discuss that proposal. *See* Pls.' Br. at 3 n. 1.

support of Plaintiffs' Motion. *See* CPR Decl. at ¶ 16; *see also* Cyril Decl. at ¶ 25; Colon Decl. at ¶¶ 23-25; and Foster Decl. at ¶¶ 14, 17, 20-21, 25. Further, the Monitor's reports have been issued, not six, but nine to eleven months apart, thus failing to provide stakeholders the consistent, timely information about the Monitorship's work required under the Remedial Order. *See* Rem. Ord. at 13 ¶ 7. Many of the Monitor's reports are also so voluminous and technical that community members who lack legal or statistical training or police executive experience often struggle to digest them. Indeed, Plaintiffs' counsel regularly engages experts to assist in understanding the more technical statistical analyses and the sufficiency of the methodology used to assess the data. The Monitor's Twelfth Report was 83 pages in length, not including a 77-page appendix, and required familiarity with such specialized statistics concepts as Poisson regressions, DID estimators, statistical power, standardized mean differences, and robust standard errors.

Any value in the Monitor's reports is further limited by the lack of even minimal steps to tell engaged stakeholders how to access those reports—a responsibility that rests with the Monitorship, not Plaintiffs' counsel.[10] *See, e.g.*, Colon Decl. at ¶ 29 (noting that the JC was not informed that the Monitor had a website). The Monitor offers no evidence to suggest his reports are reaching affected communities.

Even if community stakeholders did know how to access the Monitor's reports and were able to comprehend and digest their contents, the reports only provide the Monitor's perspective on the progress of the reform process. Public status conferences would enhance the legitimacy of the Monitorship by ensuring that the Court, the final decisionmaker on whether the City is in constitutional compliance, hears directly from community stakeholders. The Court would also be

---

[10] Contrary to the Monitor's claim, made without attempting to confirm the veracity of its representation to the Court, Plaintiffs' counsel from the Center for Constitutional Rights regularly posts the Monitor's reports and other case developments to its website. *See* https://ccrjustice.org/ourcases/current-cases/floyd-et-al. But it is not Plaintiffs' counsel's responsibility to inform the public about the work of the Monitorship.

able to question the Monitor and the Parties on reform-related issues on the record—a dialogue that currently does not take place because the Monitor's reports do not seek any such response. Any purported burden of holding regular, biannual status conferences would be outweighed by the utility of these conferences to community stakeholders and the public, as well as to the Court, should it permit a period of public comment. *See* Pls. Br. at 25 n. 34.

The Monitor baselessly speculates that status conferences are unlikely to increase the number of people who engage with the Monitor because they would purportedly be inconveniently scheduled and located, and would not allow members of the public to participate.[11] *See* Monitor's Opp. at 14. This assumption is directly contradicted by the record in this case. *See* CPR Decl. at ¶ 17 (emphasizing public status conferences as "of the utmost importance toward increasing transparency and improving community input in the Floyd remedial process."). At the Spring 2013 trial in *Floyd*—several months before the advent of the Monitorship—hundreds of individuals from communities directly impacted by the NYPD's unconstitutional and discriminatory stop-and-frisk practices, including youth of color, public housing residents, unhoused individuals, members of the LGTBQ community, and more, attended and observed the trial almost every day over two months.[12] That same coalition of stakeholders should have access to information about the Monitorship by attending public status conferences. In addition, contrary to the Monitor's assertion that status conferences "would not be designed for communication with the general public," Monitor's Opp. at 14, this Court is empowered to permit community members most affected by unconstitutional encounters to provide comments to the Court for its consideration.

---

[11] It is strange for the Monitor to take a position on public status conferences when the responsibility for inviting public comment on the vitally important issues in this case rests solely with the Court.

[12] *See* Jill Maxwell, Floyd v. City of New York: NYPD's Controversial Stop and Frisk is On Trial, *Mic* (May 22, 2013), *available at* https://www.mic.com/articles/43347/floyd-vs-city-of-new-york-nypd-s-controversial-stop-and-frisk-is-on-trial; Center for Constitutional Rights, *Floyd v. New York* Trial Updates (March 12, 2013), *available at* https://ccrjustice.org/floyd-v-new-york-city-trial-updates.

As explained in Plaintiffs' opening brief, the Court should schedule regular court conferences to ensure transparency and legitimacy in this important Monitorship. Indeed, the absence of court conferences in the remedial phase of the *Floyd* and *Davis* cases makes this Monitorship an outlier among other major monitorships, like those in Seattle and Ferguson, where regular court proceedings provided important developments with members of the public.[13] Most importantly, the lack of public status conferences has contributed to the feeling among directly-impacted stakeholders that this Monitorship—which purports to benefit them—has no interest in their perspectives or experiences, thereby risking the success and legitimacy of the entire remedial process itself. *See* Foster Decl. at ¶ 16 (MtR "members' impression of the monitorship has been one of a process in which the Monitor makes decisions with the NYPD and then presents those decisions to us, the community, without opportunity for input or shaping solutions. We feel we have been essentially excluded from this process."); Williams Decl. at ¶ 6, Charney Decl. Ex. 5, ECF No. 842-5 ("among New Yorkers of more color, there is a lack of information and clear understanding of the current status of the Floyd monitorship").

## V.  COMMUNITY SURVEYS AND FIELD AUDITS ARE NECESSARY AND APPROPRIATE MEANS OF ASSESSING THE NYPD'S CONSTITUTIONAL COMPLIANCE

### A.  The Need for Community Surveys to Supplement NYPD Data

The Monitor's statement that "[t]he public's perceptions and experiences are important information, but do not bear directly on the NYPD's compliance with the Fourth and Fourteenth

---

[13] *See* Verbatim Report of Proceedings before the Hon. James L. Robart, United States District Judge, June 30, 2015, *United States v. City of Seattle*, 12-cv-1282 (W.D. Wash.) at 5, *available at* http://www.seattlemonitor.com/s/Status-Hearing-Transcript-0630151.pdf; Transcript of Status Conference before Hon. Catherine D. Perry, U.S.D.J., Jan. 8, 2020, *United States v. City of Ferguson*, 16-Cv-00180 (E.D. Mo.), *available at* https://fergusonmonitor.com/wpcontent/uploads/2020/02/Transcript-of-2020.01.08-A-Status-Conference.pdf (providing public comment period at in person status conference); Transcript of Status Conference before Hon. Catherine D. Perry, U.S.D.J., June 4, 2020, *United States v. City of Ferguson*, 16-cv-00180, *available at* https://fergusonmonitor.com/wpcontent/uploads/2020/06/Transcript-of-2020.06.04-Status-Conference.pdf (videoconference with publicly available livestreamed audio and pre-submitted public comments).

Amendments" is remarkable in both its disregard for the experiences of community stakeholders and its misguided reliance on NYPD data alone to assess substantial compliance. Monitor's Opp. at 16. In fact, this viewpoint is the very reason Plaintiffs filed this motion and is contradicted by the record in the *Floyd* case and nationwide best practices of police monitorships. In the *Floyd* Liability Opinion, the Court made findings on the constitutionality of several stop-and-frisk encounters under the Fourth and Fourteenth Amendments based in whole or in part on the testimony of persons stopped. *See* Liab. Op. at 114-74. The experiences of individuals involved in encounters are necessary to determine whether continuing violations of the Fourth and Fourteenth Amendments exist, and the proposed community surveys would collect this data on an aggregate basis.

Moreover, this Court has already recognized that "[t]he communities most affected by the NYPD's use of stop-and-frisk have a distinct perspective that is highly relevant to crafting effective reforms. No amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of liberty and safety." Rem. Ord. at 29; *see* Colon Decl. at ¶ 32 ("Members and constituents who are approached by NYPD officers often report that they do not feel free to leave regardless of whether there is legal justification for the encounter."). Community surveys capture this perspective precisely. Indeed, the United States Attorney General acknowledged the vital importance of this information in his September 2021 Memorandum, advising on the use of monitors in civil settlements, noting that federal monitors "must continually seek the community members' input" and "should report on the community's views of a jurisdiction's progress in reaching compliance in their assessments."[14]

---

[14] *See* Office of the Attorney General, Memorandum for Heads of Civil Litigating Components United States Attorneys 7 (Sept. 13, 2021), *available at* https://www.justice.gov/ag/page/file/1432236/download.

The Monitor's arguments against community surveys rely on selective quotes that do not fairly represent the cited source. For example, the Monitor selectively quotes Judge Belen's survey recommendation, which did not just suggest that surveys be used to "track police community relations broadly." Monitor's Opp. at 17. Rather, Judge Belen also advised that surveys be used to track "public perception of police-civilian street encounters, and to assess the public's experience with the court-ordered reforms," both of which go directly to the NYPD's substantial compliance with the Remedial Order. *See* Final JRP Report at 250, *Floyd* ECF No. 597. The Monitor also selectively quotes from Dr. Jennifer Eberhardt's study. In the paragraph immediately following the one cited by the Monitor—noting that community surveys should be used to "help the [Oakland police] department understand its reputation in the community at large"—Dr. Eberhardt's study notes that "[c]ommunity data also show where to look for racial disparities in stops."[15] Given the Monitor's own assessment of the unreliability of NYPD stop data, *see* Monitor's Eleventh Status Report, *Floyd* ECF No. 795-1 at 19–20 ("[a]ny assessment of compliance with the Court's remedial orders will be impossible unless the Department finds ways to ensure that unreported stops are no longer an issue")*,* such insight and guidance from community data are even more essential to ensure that any assessment of substantial compliance is accurate and complete.

The Monitor also claims that surveys in other monitorships were not used to assess compliance with the Fourth and Fourteenth Amendments. *See* Monitor's Opp. at 17. This, again, is inaccurate. The consent decrees in Ferguson, Newark, and Baltimore expressly state that the community surveys are to be used as one of several outcome measures for assessing the monitored police department's progress towards achieving "constitutional policing," which in those consent

---

[15] Jennifer L. Eberhardt, *Strategies for Change: Research Initiatives and Recommendations to Improve Police-Community Relations in Oakland, California* at 50 (Stanford Univ. 2016), *available at* http://www2.oaklandnet.com/%20oakca1/groups/police/documents/webcontent/oak059292.pdf.

decrees—all of which dealt in part with abusive and racially biased pedestrian stops and other policing practices—necessarily meant Fourth and Fourteenth Amendment compliance.[16] All the survey reports from each of the monitorships cited in Plaintiffs' opening brief are not limited to surveying community attitudes about the police, but also include data on community members' actual experiences during pedestrian stops and other police encounters that were the subject of those consent decrees. *See* Pls. Br. at 26 n. 35. As such, whether or not survey data can "accurately reflect community sentiment . . . in 2013" is irrelevant. *See* City's Opp. at 16. The question the surveys seek to address is whether the NYPD is in constitutional compliance.[17]

Though the Monitor describes Plaintiffs' concern with "bias" in the compliance metrics, it is not bias but rather the *incompleteness* of the stop report data—i.e., undocumented stops—that Plaintiffs raised in their opening brief and which represents the ongoing problem with the metrics that would be addressed, to some degree, by community surveys. Tellingly, the Monitor does not mention the incompleteness of stop data in his opposition, even though he acknowledged and discussed it at great length in his recent Thirteenth Status Report.[18]

---

[16] *See* Baltimore Consent Decree, 17-cv-00099-JKB, ECF No. 2-2 at ¶¶ 459, 506 (specifying that, to achieve full compliance, BPD must show sustained and continuing improvement in constitutional policing as demonstrated by the Decree's Outcome Assessments which specifically include an annual community survey); Ferguson Consent Decree, 16-cv-00180-CDP, ECF No. 41 at ¶¶ 429, 430, 434, 435, 462 (same); Newark Consent Decree, 16-cv-01731-MCA-MAH, ECF No. 4-1 at ¶¶ 22-24, 174, 175, 222 (same). *See also* Cleveland Consent Decree, 15-cv-01046-SO, ECF No. 3-1 at ¶¶ 361, 367 ("Analysis of the results of this survey shall be included in the outcome assessments [required by the decree]" used "to measure whether implementing this Agreement has resulted in constitutional policing."); Chicago Consent Decree, 17-cv-06260-RMD, ECF No. 703-1 at ¶¶ 645-48 (same).

[17] The City's brief also suggests that Plaintiffs' proposed survey is not needed because the "NYPD currently maintains two different types of surveys related to its performance," a "customer-service" survey as well as a partnership between NYPD and the RAND corporation. City's Opp. at 17. But neither of these surveys, both maintained by the NYPD, is an adequate substitute for the independent, community-driven survey Plaintiffs propose. The "customer-service" survey to which the City refers appears to provide an opportunity for feedback from people who have requested NYPD assistance or reported criminal activity—not community members who are themselves stopped by police. *See* https://www1.nyc.gov/site/nypd/news/p0922a/nypd-launches-new-text-message-surveys-improve-service-new-yorkers. The RAND-NYPD collaboration, meanwhile, is specifically focused on assessing the perception of the Neighborhood Policing project, which will reveal little about the public's experience with the reforms at issue in this remedial process.

[18] *See* Thirteenth Report of the Independent Monitor, *Floyd* ECF No. 853-1 at 4, 19-20, 21-24, 27, 64 (noting that "there is considerable evidence that NYPD officers are not documenting all of their stops of civilians").

Regardless, the Monitor's reviews of NYPD body worn camera ("BWC") videos will not adequately address the problems with either the biased nature or the incompleteness of the stop report data. First, the Monitor notes that he is only reviewing BWC footage for which there is a stop report. *See* Monitor's Opp. at 18. Accordingly, this review does not fill in the gaps for the significant number of stops for which there is no report. Additionally, the Civilian Complaint Review Board's ("CCRB") has noted consistent issues with officers' late activation of BWCs.[19]

Moreover, City University of New York's Institute for State and Local Governance ("ISLG") researchers conducting the upcoming Alternative to the Combined Pilot have acknowledged that their study will not examine encounters in which officers activate their BWCs late or not at all, which could impede and delay the study.[20] This will likely occur given the most recent CCRB semi-annual report, which indicates that, even as of mid-2020, 43% of police-civilian encounters resulting in officer misconduct complaints investigated by the CCRB were not recorded on BWCs.[21] Lastly, even if the ISLG study were not hindered by incomplete BWC footage, BWC video often does not provide an accurate or complete account of police-civilian encounters.[22]

Neither community surveys nor complex data analysis are perfect measures. Both have limitations. Plaintiffs do not ask the Court to decide between stop data and community survey data as measures of substantial compliance. Plaintiffs ask the Court to ensure that *both* sources of information are used and scrutinized.

---

[19] *See* CCRB BWC Report (Feb 2020) at 57-59, *available at*
https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/20200227_BWCReport.pdf

[20] *See* Sampling for Alternative Study to the Combined Pilot, *Floyd* ECF No. 817 at ECF p.16, Study p. 3 n. 7 ("For example, incomplete recordings will not be sent to judges for review. If recordings are often incomplete, then we may need to increase the number of encounters selected to ensure that we reach 1,500 encounters for legal expert review.").

[21] *See* 2020 CCRB semi-annual report at 73, *available at*
https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2020_semi-annual.pdf.

[22] *See* Seth Stoughton, *Police Body-Worn Cameras*, 96 North Carolina L. Rev. 13613, 1402-13 (2018) (noting limitations of BWCs including, *inter alia*, that "[a]n officer's BWC will never capture the details of that officer's behavior—their stance, body language, and specific movements").

B.        **Biannual Field Audits**

In response to Plaintiffs' request for biannual field audits, the Monitor claims that his experts determined that 400 separate audits (each presumably involving multiple NYPD officers and investigative encounters) would have to be conducted every six months to get a representative sample of officers, but offers no basis for this conclusion that either the Court or Plaintiffs can evaluate. *See* Monitor's Opp. at 19. As with community surveys, the Monitor's argument here assumes that Plaintiffs are requesting that field audits be done *in lieu of*, rather than in addition to, stop report data analysis. Both are valuable to the monitoring process. Moreover, as with other issues like BWC recordings and documentation of lower level encounters, the Parties can work together to review how, if at all, the field audits Plaintiffs seek could be tailored to further support the work of the Monitorship: for example, possibly focusing the audits on commands with high numbers of undocumented stops to address the underreporting of stops and commands with racially heterogenous populations to assess selective enforcement. But rather than responding to the proposal in substance, the Monitor instead dismisses it outright with no explanation as to how he determined what would be a representative sample that could be useful to the Court.

## <u>CONCLUSION</u>

This monitorship is at a critical juncture. If significant changes are not made to address the perspectives of those most affected by the NYPD's unconstitutional policies and practices, this Court runs the risk that the efforts over the past seven years of this Monitorship will be for naught. For this reason, the reasons stated above, and those in Plaintiffs' opening brief, Plaintiffs respectfully request that the Court grant their motion to modify the *Floyd* Remedial Order, *Floyd* ECF No. 372, as modified by *Floyd* ECF No. 466, and enter the Proposed Order. Plaintiffs would also request that this Court schedule oral argument on this motion.

20

Dated: October 12, 2021
        New York, New York

                                        Respectfully submitted,

By: _____

    Jonathan C. Moore
    Luna Droubi
    Marc Arena
    Rebecca Pattiz
    Katherine "Q" Adams
    BELDOCK, LEVINE & HOFFMAN,
    LLP
    99 Park Avenue, Penthouse Suite
    New York, NY 10016
    (212) 490-0400
    jmoore@BLHNY.com
    ldroubi@BLHNY.com
    marena@BLHNY.com
    rpattiz@BLHNY.com
    qadams@BLHNY.com

\s\ Omar Farah
    Omar Farah
    Samah Sisay
    Baher Azmy
    CENTER FOR CONSTITUTIONAL
    RIGHTS
    666 Broadway, 7th Floor
    New York, NY 10007
    (212) 614-6464
    ofarah@ccrjustice.org
    ssisay@ccrjustice.org
    bazmy@ccrjustice.org


*Attorneys for Floyd Plaintiffs*

\s\ Jin Hee Lee
    Jin Hee Lee
    Raymond Audain
    Ashok Chandran
    John Cusick
    Kevin Jason
    Lauren Johnson
    NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
    40 Rector Street, 5th Floor
    New York, NY 10006
    (212) 965-2200
    jlee@naacpldf.org
    raudain@naacpldf.org
    achandran@naacpldf.org
    jcusick@naacpldf.org
    kjason@naacpldf.org
    ljohnson@naacpldf.org

\s\ Corey Stoughton
    Corey Stoughton
    Steve Wasserman
    Molly Griffard
    Jennvine Wong
    THE LEGAL AID SOCIETY
    199 Water Street
    New York, NY 10038
    (212) 577-3300
    cstoughton@legal-aid.org
    swasserman@legal-aid.org
    mgriffard@legal-aid.org
    jwong@legal-aid.org

*Attorneys for Davis Plaintiffs*