UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #: _____ | |
| DATE FILED: __09/23/2024__ | |

DAVID FLOYD, *et al.*,

                           Plaintiffs,

-against-

CITY OF NEW YORK,

                           Defendant.

08 Civ. 1034 (AT)

KELTON DAVIS, *et al.*,

                           Plaintiffs,

-against-

CITY OF NEW YORK,

                           Defendant.

10 Civ. 699 (AT)

JAENEAN LIGON, *et al.*,

                           Plaintiffs,

-against-

CITY OF NEW YORK,

                           Defendant.

12 Civ. 2274 (AT)

**ORDER**

ANALISA TORRES, District Judge:

      The Court has received the report dated September 19, 2024, submitted by the Honorable James Yates (the "Report") to Mylan Denerstein, the Monitor. As the Report states, the Court "requested the preparation of an in-depth, critical examination of the efficacy, fairness, and integrity of the City's policies, practices and procedures with respect to police misconduct during stops." Report at 1. The Report finds that although the NYPD expends significant resources "to investigate misconduct claims in general[,] . . . the same cannot be said of disciplinary efforts

regarding compliance with the Fourth and Fourteenth Amendments." *Id.* at 7.  In particular, the

Report concludes:

> Discipline for illegal stops and frisks, even when substantiated by [the Civilian Complaint Review Board], is not pursued with the same vigor and resolve as for other misconduct.  Penalties for wrongdoing involving stops, questions, frisks, or searches of persons . . . even when repeated, are rare.  Investigations and potentially useful data are not shared between agencies or departments as well as could be.  And, various Police Commissioners, over time, have demonstrated an inordinate willingness to excuse illegal stops, frisks, and searches in the name of "good faith" or "lack of mal-intention," relegating Constitutional adherence to a lesser rung of discipline.

*Id.*  The Report provides fifty-one recommendations aimed at addressing the issues it identifies.

*Id.* at 470–79.

The Court invites public comment on the Report, which is attached as Exhibit A.  By

**December 25, 2024**, the parties, the City, and interested members of the public may submit

written comments to the Monitor by visiting https://www.nypdmonitor.org/resources-reports/.

Because submissions will be posted on the public docket, commentors should omit or redact any

sensitive identifying information.

SO ORDERED.

Dated: September 23, 2024
       New York, New York

_____
ANALISA TORRES
United States District Judge

# EXHIBIT A

# REPORT TO THE COURT ON POLICE MISCONDUCT AND DISCIPLINE

**James Yates**
**September 19, 2024**

*Floyd, et al. v. City of New York*

*Ligon, et al. v. City of New York, et al.*

*Davis, et al. v. City of New York, et al.*

## TABLE OF CONTENTS

I.      *EXECUTIVE SUMMARY*..................................................................................*1*

II.     *BACKGROUND*.........................................................................................*7*

III.    *COURT'S DIRECTION*................................................................................*13*

   A.   History of Civilian Oversight in New York City.........................................**19**

   B.   Statutory Framework........................................................................**24**
      i.   Unconsolidated Law § 891, CSL § 75 and NYC Admin. Code § 14-115 .........24

IV.     *INVESTIGATING POLICE MISCONDUCT – A PRELIMINARY*
        *OVERVIEW*.............................................................................................*28*

   A.   What is "Misconduct"?.....................................................................**32**

   B.   Describing Findings.........................................................................**36**
      i.   Split Determinations...................................................................47

   C.   Formal Discipline............................................................................**49**

   D.   Informal Discipline..........................................................................**53**

   E.   Guidance in Lieu of Discipline...........................................................**54**

   F.   Discipline Defined...........................................................................**56**
      i.   Discipline Recommended by CCRB ...............................................59
      ii.  Discipline for SQF Misconduct Examined at the Precinct...................61

   G.   "CD Accepted"...............................................................................**62**

   H.   A-CDs Not Recorded in the Central Personnel Index..........................**65**

   I.   Penalty Imposed for *Floyd* Violations?...............................................**71**

V.      *OVERVIEW OF THE NYPD ORGANIZATION - BACKGROUND*.....................*75*

VI.     *MISCONDUCT INVESTIGATIONS WITHIN NYPD*.....................................*78*

   A.   NYPD Internal Investigations of Civilian Complaints – Preliminary .............**80**

   B.   NYPD Disciplinary System ................................................................**82**

   C.   Complaint Intake at NYPD.................................................................**84**

   D.   Internal Affairs Bureau.....................................................................**88**
      i.   Officer Interviews Within the Department During Investigations...............91

   E.   NYPD Internal Investigations – Categories of Misconduct ....................**94**
      i.    Outside Guidelines Cases..........................................................95
      ii.   Force ....................................................................................97
      iii.  "M" Cases.............................................................................104
      iv.   "C" Cases .............................................................................108

**F.    Bias-Based Policing and Racial Profiling Investigations at NYPD** ................110

   i.    Biased Policing and Profiling Defined ................................................112

   ii.    Comparing Language in Sections of Law to Sections of the NYPD Administrative Guide ...........................................................................115

   iii.    Burden of Proof, Class by Class ........................................................117

   iv.    Consolidating Bias Investigations and Allegations ...........................118

   v.    Discourtesy, Slurs, Offensive Language, and Proof of Bias .............119

   vi.    A Look into Prior Wrongs and Patterns in Bias Cases......................122

**G.    SQF Investigations Within the Department** ......................................124

   i.    Supervisory Review ...........................................................................124

   ii.    Disciplining Supervisors Within a Command ....................................131

   iii.    A Move Away from CCRB Review of Supervisory Failures ..............134

   iv.    Investigations Within a Local Command - Process ...........................134

   v.    Internal NYPD Investigations of Stop and Frisk Misconduct............140

   vi.    Concurrent, Split Investigations - Results Might Not Be Combined ................143

**H.    Adjudication and Processing of Substantiated Complaints within NYPD.....150**

   i.    Department Advocate's Office............................................................150

   ii.    Departmental Investigations - Charges and Specifications Presented by DAO.154

   iii.    Disciplinary Trials .............................................................................155

   iv.    Cases in the Trial Room .....................................................................157

   v.    Stop and Frisk in the Trial Room ......................................................159

   vi.    A Case Study of a Negotiated Plea Reduced by the Police Commissioner .......161

   vii.    Case Study Where the Police Commissioner Raised a Penalty Recommended by DCT (But one day less than that requested by CCRB) ................................163

   viii.    Records in the Trial Room .................................................................168

   ix.    Police Commissioner Review After Trial ..........................................169

   x.    Level C Command Discipline in Lieu of Charges and Specifications..............171

   xi.    Police Commissioner's Duty to Explain Departures from Recommendations ..172

   xii.    Unfettered Discretion of the Police Commissioner............................173

   xiii.    Efforts to Remove the Police Commissioner's Final Authority on Discipline ..174

   xiv.    Previous Efforts to Limit the Authority of the Police Commissioner...............176

   xv.    Deference to the Trial Commissioner's Factual Findings...................181

**VII.    *THE CIVILIAN COMPLAINT REVIEW BOARD*** .................................184

**A.    Board Structure** ..................................................................................184

    i.    Panel Assignment ...................................................................... 186

    ii.   Police Commissioner Designees on All Panels................................. 187

**B.**     **CCRB Budget** ........................................................................... **193**

**C.**     **CCRB ACTIVITY - Generally** ..................................................... **199**

    i.    Processing Complaints at CCRB................................................. 200

**D.**     **CCRB Investigations - Generally** ................................................ **205**

    i.    Split and Concurrent Investigations and Cross-Referrals ................. 206

    ii.   CCRB Staff and Training .......................................................... 208

    iii.  Civilian Interviews ................................................................... 212

    iv.  Officer Interviews at CCRB ....................................................... 212

    v.    Case Study - Force, False Statement, and FADO Investigations Interwoven.... 213

**E.**     **Jurisdiction - Personal** ............................................................... **216**

    i.    Who May be Investigated? .......................................................... 216

    ii.   Who May Complain? ................................................................. 218

**F.**     **Subject Matter Jurisdiction** ....................................................... **222**

    i.    Defining FADO ...................................................................... 229

    ii.   Abuse of Authority Defined for the First Time................................ 232

    iii.  Processing False Statements Under the New Rules in The Administrative
         Guide ................................................................................... 234

    iv.  Use of Force - Display of a Firearm ............................................ 236

    v.    Failure to Supervise - Outside CCRB Jurisdiction? ......................... 239

    vi.  Sexual Misconduct .................................................................. 241

**G.**     **Discourtesy and Offensive Language (Slurs) During a Stop** ............. **242**

**H.**     **Do We Need FADO?** .................................................................. **244**

**I.**     **Timeliness** ................................................................................ **245**

    i.    Case Study:  NDA Due to Statute of Limitations ............................ 249

    ii.   Processing Time ..................................................................... 251

    iii.  Commencement ...................................................................... 253

**J.**     **Subpoenas - Enforcement** .......................................................... **258**

    i.    NYPD Administrative Subpoenas ............................................... 260

**K.**     **NYPD Duty to Cooperate with CCRB Investigations** ..................... **261**

**L.**     **CCRB Access to Employment and Disciplinary History** .................. **266**

    i.    A Case Study Where Access to a Personnel File Would Be of Value to
         CCRB ................................................................................... 268

**M.**    **Access to Files Sealed by CPL 160.50** ....................................................**270**

**N.**    **Access to Sealed or Expunged Substantiated Disciplinary Cases** ..................**277**

**O.**    **Unsubstantiated Findings - the "Sole Basis" Rule** ...............................................**282**

    i.    Two Case Studies - Case History with Little or No Substantiations..................287

**P.**    **CCRB Complaints and Allegations - All FADO** .............................................**289**

    i.    Complaints of Stop, Question, Frisk Misconduct ..............................................291

    ii.    SQF Misconduct by Allegation ...........................................................................291

**Q.**    **CCRB Findings** ..................................................................................................**292**

    i.    UMOS With Substantiated Complaints ...............................................................293

    ii.    CCRB Findings – All FADO Complaints...........................................................294

    iii.    CCRB Findings – All FADO Allegations............................................................296

    iv.    CCRB Findings – Stop/Frisk/Search Complaints ..............................................298

    v.    CCRB Findings – Stop/Frisk/Search Allegations ..............................................299

    vi.    Rate of Substantiation for SQF Allegations by CCRB Panels...........................300

**R.**    **CCRB Recommendations to the Police Commissioner** ..................................**303**

**S.**    **A Larger Perspective - the "Funnel" for Civilian Complaints** ......................**310**

**VIII.**    **NYPD DISPOSITION OF CCRB SUBSTANTIATED MISCONDUCT - FADO 311**

**A.**    **NYPD Disposition of CCRB Substantiated SQF Misconduct** .........................**312**

    i.    Case Study:  A Recommended B-CD for an SOF Violation Reduced to Training by DAO................................................................................................317

**IX.**    **THE ADMINISTRATIVE PROSECUTION UNIT** ................................................**318**

**A.**    **APU - Process** ....................................................................................................**322**

    i.    Amendments to Charges .....................................................................................323

    ii.    Pleas and Final Approval of Pleas by the Police Commissioner .......................325

    iii.    APU Prosecutions - Numbers..............................................................................329

    iv.    Comparing DAO and APU Results in Cases of Formal Prosecution.................331

    v.    Trial Decisions – APU Cases ..............................................................................332

    vi.    Stop and Frisk Misconduct – APU in the Trial Room .......................................332

**B.**    **Provision Two – Retention by the Police Commissioner**...................................**333**

    i.    Memo Exchanges Justifying a Retention to Avoid APU Prosecution ...............336

    ii.    Case Study #1 - Sergeant ███████████ ..............................................338

    iii.    Case Study #2 - PO ███████████: "No Prior Disciplinary History"?.........340

    iv.    Case Study #3 - PO ███████████ - Wrongful Frisk Leads to Repeated "Training".........................................................................................................341

**C.    Charges, Non-APU Cases, Profiling Investigations, and Lawsuits Intertwined**.................................................................................**342**

    i.    An Unusual Case:  Charges, a Trial, and Penalty Days for an Unlawful Stop?.342

**X.    *DISCIPLINARY SYSTEM PENALTY GUIDELINES (MATRIX)*** ......................*348*

**A.    CCRB's Framework for Charges and Specification Cases** .............................**350**

**B.    Disciplinary System Penalty Guidelines** .....................................................**351**

**C.    Explanation of the Guidelines as Adopted January 15, 2021** .........................**354**

**D.    Is the Matrix Consistent with the Court-Approved Patrol Guide?** ...............**358**

**E.    Mitigation and Aggravation**.........................................................................**358**

    i.    Mitigation Factors .............................................................................361

    ii.    Personal History in Mitigation .........................................................361

    iii.    Legal Issues Related to SQF Mitigation............................................362

    iv.    Mistake of Law...................................................................................364

**F.    Concurrent and Consecutive Penalties**.......................................................**369**

**G.    Multiple Allegations – Penalty**....................................................................**371**

**H.    Progressive Discipline, Mitigation, Aggravation** .......................................**374**

**I.    Other Violations in the Matrix** ...................................................................**376**

**J.    Stop/Question/Frisk Under the Disciplinary Guidelines**................................**378**

    i.    Board Recommendation by Allegation – Presumptive, Mitigated or Aggravated .......................................................................................380

    ii.    Board Recommendation - Level of Discipline for Each Allegation .................381

    iii.    SQF Allegations - Board Recommendation..........................................382

    iv.    CCRB Recommendations by Case.....................................................384

    v.    NYPD Response to CCRB Panel Recommendations .......................................386

    vi.    Penalty Disposition of SQF Misconduct by NYPD ...........................................387

    vii.    Consecutive/Concurrent Penalties in the Sample................................389

    viii.    Case Study - A Case Where NYPD Produced a Post-Matrix File ....................390

**XI.    *TRANSPARENCY*** ...................................................................................*390*

**A.    Investigative Files - Public Access** ..............................................................**398**

**B.    Access to CCRB Records Under FOIL** .......................................................**399**

**C.    Published Reports** ......................................................................................**402**

**D.    Explanation of Findings, Variance, Deviation, Departure**............................**402**

    i.    Memos and Correspondence - APU cases (formal discipline): .......................408

    ii.    Memos and Correspondence - DAO/DCT Cases (formal discipline):..............410

iii.   Memos and Correspondence - CCRB FADO Cases Without Charges (Most SQF; Informal Discipline):................................................................410

iv.   Memos and Correspondence When Internally Investigated by IAB, OCD, BIU, and FID .............................................................................................411

v.   Departure Letters Posted by CCRB as of June 2022..........................411

vi.   Departure Letters in SQF Cases ...........................................................413

vii.   Deviation Letters Posted by NYPD.......................................................414

viii.  Deviations From Trial Decisions ..........................................................416

**XII.   FALSE STATEMENTS – RECENT PATROL GUIDE AMENDMENTS AND THE DISCIPLINARY GUIDELINES........................................................418**

  **A.   False Statement - Jurisdiction ..............................................................424**

  **B.   CCRB Examination of Untruthful Statement Allegations.................427**

    i.   False Statements Under the Disciplinary Guidelines .........................428

    ii.   False Statements in SQF Cases Investigated by CCRB .....................430

**XIII.  LAWSUITS AND CIVIL CLAIMS AGAINST OFFICERS...................431**

  **A.   Potential Use of Civil Case Information in Disciplinary Proceedings ...........436**

  **B.   Identifying Civil Claims of Police Misconduct....................................441**

    i.   Posting Individual Officer Liability Online ........................................443

    ii.   Integrated Reporting of Civil Claims and Citizen Complaints ..........445

    iii.   Case Study - Multiple Contemporaneous Actions—The Need for an Accurate Integrated Database ..............................................................446

  **C.   Early Settlement Program:  Pre-Litigation Settlements for Police Misconduct ..............................................................................................447**

  **D.   Qualified Immunity and Indemnification............................................451**

  **E.   Adverse Credibility Determinations ....................................................457**

**XIV.  EXTERNAL OVERSIGHT BY COMPANION AGENCIES .................459**

  **A.   Commission to Combat Police Corruption (CCPC)............................461**

  **B.   New York Police Department Office of the Inspector General ........463**

  **C.   Commission on Human Rights - Bias-based Profiling ........................466**

  **D.   The Law Enforcement Misconduct Investigative Office – Deputy Attorney General ......................................................................................467**

**XV.   RECOMMENDATIONS ...........................................................................470**

**APPENDIX 1:  EXAMINATION OF SQF CASES WHERE A PENALTY WAS IMPOSED ...................................................................................................480**

**APPENDIX 2:  GLOSSARY.............................................................................494**

## I.    EXECUTIVE SUMMARY

**Background**

In 2013, after a lengthy trial, United States District Court Judge Shira Scheindlin found that the New York City Police Department ("NYPD"), violated City residents' Fourth and Fourteenth Amendment rights and that the City did so with deliberate indifference to NYPD officers' "practice of making unconstitutional stops and conducting unconstitutional frisks." In addition, the Court found that the City had a "policy of indirect racial profiling by targeting racially defined groups for stops based on local crime suspect data . . . [that] resulted in the disproportionate and discriminatory stopping of Blacks and Hispanics in violation of the Equal Protection Clause."

In a "Remedies Opinion," a Monitor was appointed by the Court with authority to implement reforms related to training, documentation, supervision and discipline.

Subsequently, the Court (Hon. Analisa Torres, D.J.) requested the preparation of an in-depth, critical examination of the efficacy, fairness, and integrity of the City's policies, practices and procedures with respect to police misconduct during stops. This Report is intended to meet the Court's directive for a study of the NYPD disciplinary process as it relates to Fourth and Fourteenth Amendment compliance in investigative encounters.

**Summary Description of NYPD Discipline**

Any recount of NYPD's disciplinary process will aim at a moving target. Modifications in the disciplinary process utilized by or imposed upon NYPD are in constant flux. In the last five years alone, there has been a blizzard of reforms, outlined in the Report, to New York City and State laws governing discipline, not to mention a variety of changes in rules and regulations within the Department and related agencies, many of which have been, and continue to be, the subject of active litigation and modification.

While it is useful, in the Report, to cite data describing or summarizing disciplinary results at various moments in time and to highlight individual disciplinary cases of note, the main thrust of the Report is not transitory data or individual case studies, but rather, as directed by the Court, a look at policies, practices and procedures.

At the outset, the Report reviews processes within the police department itself. While the Civilian Complaint Review Board ("CCRB") may be the most recognized venue for reviewing claims of police misconduct, the Board handles a small minority of examinations of police conduct. CCRB investigates fewer than 5,000 complaints each year. As many as 50,000 misconduct reviews are performed by other divisions or personnel within the Department. They include the Internal Affairs Bureau ("IAB"), a Force Investigation Division ("FID"), the Office of the Chief of Department ("OCD"), Borough Adjutants, Borough Investigating Units ("BIU") and local Command Officers ("CO"). [Please note: a dictionary of acronyms used throughout the Report is attached as Appendix 2.] Police activity is also scrutinized by a variety of audits conducted by or overseen by the Quality Assurance Division ("QAD"), a unit within the Department, including audits of radio dispatch communications, arrests, and police self-inspection examinations. Separate from the Department's disciplinary process, an Early Intervention Committee ("EIC") reviews officer history when certain signals of potential misconduct are

triggered. Other outside agencies regularly monitor potential misconduct, including the Commission to Combat Police Corruption ("CCPC"), the Office of the Inspector General for the NYPD ("OIG-NYPD"), the NYC Commission on Human Rights ("CCHR") and a state agency, the Attorney General's Law Enforcement Misconduct Investigative Office ("LEMIO"). Finally, thousands of complaints undergo scrutiny by way of claims lodged with the New York City Comptroller's office and lawsuits filed in state and federal court. There is no cognizable attempt to coordinate the various reviews of police misconduct. Without full coordination, cooperation and sharing of information, the mere fact of split or concurrent investigations of any given encounter can lead to confusion or delay.

**Civilian Complaint Review Board**

The CCRB is comprised of fifteen members. Five members are appointed by the City Council; five members are appointed by the Mayor; one member is appointed by the Public Advocate; a Chair is appointed jointly by the Mayor and the City Council Speaker; and three members, with law enforcement experience, are designated by the Police Commissioner. Within CCRB, panels of three of the fifteen members are assembled to review closing reports and recommendations prepared by the investigative staff. Members are assigned to panels on a rotational basis. The Board has adopted a rule, not required by law, that each decisional panel shall have one of the police designees as a member. This leads to police designees hearing a greater volume of cases than other appointees. As an adjustment, more recently, CCRB sends some cases to panels without a police designee, but, if the panel substantiates misconduct, the matter is then sent for a second review attended by a police designee. In essence, misconduct may not be substantiated unless approved by a panel with a police designee. The Report discusses the impact of that decision.

**Disciplinary Recommendations to the Police Commissioner**

Findings of officer misconduct arrive at the Police Commissioner's desk by dint of two highways: a substantiated finding referred from a CCRB panel to the Police Commissioner or one sent after an internal police department investigation. For minor or technical infractions within the Department, local commands/precinct commanders are authorized to impose discipline directly. All other recommendations for discipline are referred to, and left to, the discretion of the Police Commissioner, who may accept or reject a finding and who will then decide whether to impose a penalty, guidance, or neither.

Disciplinary proceedings are either formal or informal. Formal discipline is administered through a trial process where Charges and Specifications are served detailing the allegations of misconduct. A deputy within the Department, sitting as a trial commissioner, receives evidence and makes a recommendation of guilty or not guilty along with a recommendation for a penalty or guidance or neither. The hearing is open to the public and the officer is entitled to representation. There may be several hundred such hearings in a given year. New York State Law requires that the trial commissioner be a deputy of the Police Commissioner if the subject officer faces possible termination. An Appellate Division ruling, barring hearings before an independent administrative hearing officer, has extended that provision of law to require that all trials come before a departmental deputy as the hearing officer, even in the more usual case where termination is not sought by the prosecuting authority.

2

Informal discipline, which is much more common, occurs at the precinct or in the Department outside the trial process, when an officer "accepts" a "command discipline" along with the recommended or negotiated outcome. Absent extraordinary circumstances, stop and frisk misconduct is addressed by informal discipline.

At the conclusion of an investigation or trial, CCRB or a trial commissioner (a departmental deputy), as the case may be, will determine if an allegation is substantiated by a preponderance of the evidence. Investigations and trials are not bound by strict rules of evidence. Hearsay is admissible and may form the basis for a finding. In formal proceedings at Departmental trials a verdict of Guilty or Not Guilty is rendered by the Trial Commissioner along with a recommendation for discipline or guidance if Guilty.

Whether an allegation of misconduct is substantiated by CCRB or found by a Trial Commissioner, the Police Commissioner is not constrained to follow the recommendations and may vary the finding, alter a penalty, or decide upon no disciplinary action (NDA). The variance may be based upon the Commissioner's: (i) disagreement with the factual findings; (ii) a different understanding of the applicable law or rules; (iii) a desire to exercise lenity—imposing a lesser penalty or no penalty; or (iv) any combination thereof. While various provisions of law require an explanation by the Police Commissioner in certain cases of disagreement with the findings of CCRB or a trial commissioner, the explanatory letters are often unclear as to whether the modification is based upon disagreements with factual findings, legal conclusions, or a simple desire to modify a penalty.

The unfettered reach of the Commissioner's authority is a point of frequent public debate.

**Defining "Misconduct" and "Discipline"**

"Misconduct" which can lead to discipline is generally defined by the Department Manual—much, but not all, of which is posted online and publicly available. The Manual incorporates the Patrol Guide and the Administrative Guide, both of which are written by Department staff at the direction of the Police Commissioner without public participation or comment. Large segments of the Department Manual proscribe misconducts which do not focus on job-related interactions with civilians. Rather, they address rules and regulations for on and off-duty conduct, such as dress codes, handling of equipment, domestic disputes or documentation of activities, and so on.

Although the NYC Administrative Code requires publication of the Patrol Guide, many segments of the Patrol Guide relating to discipline were moved in 2021 to the Administrative Guide, only portions of which are posted or publicly available.

CCRB has a mandate to investigate FADO, which is an acronym for authority to investigate complaints of Force, Abuse of Authority, Discourtesy, Offensive Language (commonly referred to as "slurs"). Its jurisdiction was recently broadened to include Untruthful Statements. The term "Abuse of Authority" as defined by CCRB encompasses a wide range of misconduct, not necessarily detailed in the Department Manual. Among other wrongs, "Abuse" includes racial profiling, bias-based policing and sexual harassment.

3

"Discipline" itself is detailed in NYS Civil Service Law and NYC Administrative Code. It includes loss of credit for days or hours of service, termination, suspension, reprimand or disciplinary probation. As an alternative to imposition of penalties, the Police Commissioner or local command may direct guidance, such as training, instructions, monitoring or warnings with admonishment. Guidance is not discipline; it is corrective and remedial.

Command discipline (CD) imposed at the local level by a commanding officer after investigation can consist of an "A-CD," or a "B-CD." The Police Commissioner may also direct imposition of a "C-CD." Command discipline may be accepted by the subject officer, or rejected, in which case formal Charges are served. When ordered by a Commanding Officer or the Police Commissioner, with acceptance by the subject officer, command discipline does not necessarily require an accompanying penalty. Guidance or no action may follow. If a penalty is to be imposed, the maximum available penalty is a loss of up to five penalty days for an A-CD, up to ten penalty days for a B-CD, and up to twenty penalty days for a C-CD. Penalty days may be deducted from accrued vacation time owed the officer or a loss of pay and associated benefits for the prescribed period. Some cases resolve by resignation, not infrequently with the officer retaining pension credits approved by the Police Commissioner.

The Department has published Disciplinary System Penalty Guidelines ("Matrix") outlining presumptive, mitigated, and aggravated penalties for a variety of offenses. CCRB and the Police Commissioner have agreed to follow the Matrix, with the understanding that the Police Commissioner may depart from CCRB recommendations or deviate from the Matrix with a written letter of explanation. Unfortunately, in practice, the letters do not sharply delineate whether a departure or deviation are based upon a different view of the facts, the law, or the appropriate penalty. The letters are, more often than not, perfunctory and conclusory, bereft of details. It is not uncommon for the Police Commissioner to view video evidence and arrive at his own findings, independent of CCRB's determination. Many departures rely upon the Commissioner's conclusion that the officer acted in "good faith" despite no such finding by CCRB.

A significant, and yet unsettled, issue related to the Matrix is the decision whether to impose consecutive or concurrent penalties for multiple acts of misconduct within an encounter. This is important to any measure of discipline for stop/question/frisk misconduct. When several acts, such as an improper stop, frisk, search and use of force are found, separate penalties may aggregate, calling for formal proceedings rather than guidance or command discipline. The ensuing calculation then calls for penalties in a higher range than would be typically imposed in the past. However, a sizeable number of cases where CCRB has recommended formal discipline as a consequence of consecutive calculation are currently "pending," without formal discipline, as negotiation and analysis takes place.

**Discipline for Stop/Frisk Misconduct**

While the Matrix propounds a presumptive three-day penalty for an illegal stop, frisk, or search of person, imposition of that level of discipline is a rarity. Further, the Patrol Guide section on investigative encounters, approved by the Court, permits guidance rather than penalties in "isolated cases of erroneous but good-faith stops or frisks." Over the years, CCRB and the Department have recommended or imposed Training or Instructions routinely for stop/frisk misconduct without limitation or a predicate finding that a bad stop, frisk, or search was indeed an

isolated case of an erroneous, good faith mistake. There are many cases where Training is repeatedly ordered, notwithstanding the fact that the officer had undergone the same training on multiple previous occasions.

There are some cases where penalties for stop/frisk misconduct is ordered, but almost always for an encounter where other misconduct was found as well—commonly excessive force, discourtesy, offensive language, disregard of the Right to Know Act, or failure to file required documentation. In that event, the officer may then receive discipline by way of penalty days for the entirety of the misconduct. Penalties for Fourth Amendment violations alone are the exception.

If CCRB does substantiate stop/frisk misconduct with a recommendation for an A-CD, and if the Police Commissioner agrees with the finding, the Police Commissioner may direct imposition of a penalty or guidance. More commonly, however, the matter is then passed on to the precinct commanding officer to decide upon the discipline or guidance to be imposed. In those cases, imposition of penalty days at the precinct is even more rare.

Also, within the Remedies Opinion, the Court required filing of stop reports when a civilian is temporarily detained or frisked based on reasonable suspicion. Improper or missing stop reports are frequently captured by a variety of audits or inspections. However, stop report failures may not lead to a finding that the stop was illegal unless independently and fully examined, which does not regularly occur. If a bad stop/frisk or search is uncovered at the precinct level, experience shows that discipline is unlikely to follow.

Another problem of note in enforcement of discipline for stop/frisk misconduct is the lack of discipline imposed when supervisors fail to monitor or compel proper activity. Within the precinct, be it sergeants or higher ranked officers, a failure to supervise or tolerance of inappropriate stops, frisks, or searches by officers is a breakdown of significance in achieving constitutional compliance. Yet discipline for such failures is close to non-existent.

**Investigations and Adjudication**

Aside from the Department's reluctance to impose discipline for stop and frisk misconduct, there are other problems and areas of concern.

There will be, on occasion, multiple investigations of the same encounter whereby, for example, the use of force may be examined independently by both the CCRB and the IAB. In those cases, there is no formal requirement that information, interviews, or recommendations be shared or reconciled. Important information, especially with regard to prior disciplinary proceedings and personnel actions within the Department are not shared with CCRB investigators. While cases prosecuted formally by CCRB's Administrative Prosecution Unit (APU) may receive a more detailed, but not complete, set of background materials, that is not true of cases where Charges are not filed, and recommendations are made by the Board without formal prosecution— which includes virtually all stop and frisk violations.

The Department Advocate's Office (DAO) has its own database (Disciplinary Administrative Database System or "DADS"), not available to CCRB. DADS is a complete history of all prior misconduct evaluations for a given officer. Recommendations by CCRB or IAB are reviewed by DAO, which will write a Case Analysis and Recommendation (CAR) report

to the Police Commissioner. That CAR report is not shared with the officer, the complainant, CCRB, or the public, and yet it is essential to an understanding of the final result. Without the CAR report, the Police Commissioner's decision to vary from CCRB may appear inexplicable.

Neither CCRB, Trial Commissioners, nor the Police Commissioner take prior misconduct allegations into account unless the allegations have been substantiated. The Charter itself says that an unsubstantiated allegation may not be the basis for a finding of misconduct by CCRB. While it makes sense to follow the common-law understanding that prior allegations, by themselves, should not be used to infer guilt or predisposition, the rule as broadly applied in matters of police discipline also sweeps aside evidence needed to prove identification, patterns of misconduct, bad faith, schemes, motives, or to demonstrate the falsity of claims of innocent mistake. A large number of cases go unfounded or unsubstantiated based on claims of mistake, good faith error, lack of intent, or due to a failure to identify. Under common evidentiary principles in both State and Federal courts, meaningful evidence of prior wrongs, even when not resulting in a conviction, is permitted to rebut such claims. When CCRB attempted to use that kind of evidence as long as it was not the "sole" basis for substantiation, the rule was stricken by a court. As is often done, the Police Commissioner is free to absolve, citing good faith error, without looking at past evidence to the contrary.

Despite multiple calls in the past to match court filings with disciplinary complaints, there is a want of coordination and consideration of civil claims, either litigated in court or presented to the Comptroller, with disciplinary proceedings in CCRB or before DAO. A large number of cases are settled or reach judgment every year, including allegations of false arrest, malicious prosecution, excessive force, racial profiling, or unconstitutional seizures. The evidence in such cases should be examined and, if appropriate, used in deciding upon proper discipline before the Police Commissioner. Unfortunately, it appears that quite the opposite occurs. Disciplinary complaints are often "closed pending litigation" only to wither on the vine notwithstanding documented evidence of misconduct.

Another frequent and well-founded criticism of the disciplinary process is the length of time it takes to reach final disposition. Finger pointing commonly ensues. Delay may be due to a slew of factors, running from delays in interviews (of both civilian witnesses and officers), difficulty in gathering reports and videos, delays in application of the Matrix or Board review, and time for DAO or the Police Commissioner to finalize a decision, to name a few. Delay negatively impacts officers and the public alike. There is a Statute of Limitations, requiring a final decision within 18 months of commencement of formal proceedings. Until recently, few cases were dismissed due to the statutory limit. Then, in 2022-2023, there were an inordinate number of cases dropped by the Police Commissioner ascribed to an impending statutory deadline. Whether delay was due to the COVID pandemic, restricted access to Body Worn Camera footage, complexity of applying the newly adopted Matrix, or budgetary shortfalls has not been definitively assessed. It could be a combination of such factors. In the end, it is unfortunate that those cases were dropped without further corrective action when they could have proceeded to a finding and mandated guidance such as re-training or instructions, neither of which is barred by the Statute of Limitations.

Currently, CCRB investigators face another roadblock. It is not uncommon for police misconduct to arise in cases where there was an arrest, but the case was "favorably terminated" as

defined by Section 160.50 of the Criminal Procedure Law. The termination by dismissal, acquittal, or declination to prosecute may or may not have been caused by the very police misconduct which is the subject of a civilian complaint. However, as a result of litigation, at this point in time, the records of the arrest are "sealed" and not available to CCRB. The sealing statute was meant to protect the wrongly arrested civilian, not a misbehaving officer. Ironically, the statute, as interpreted by a trial-level court, protects the officer's misconduct, notwithstanding a complaint by the innocent civilian. This issue is on appeal and has yet to be resolved.

## Conclusion

In sum, a significant effort is made, and significant resources are expended, by the NYPD to investigate misconduct claims in general. However, the same cannot be said of disciplinary efforts regarding compliance with the Fourth and Fourteenth Amendments. Discipline for illegal stops and frisks, even when substantiated by CCRB, is not pursued with the same vigor and resolve as for other misconduct. Penalties for wrongdoing involving stops, questions, frisks, or searches of persons ("SQFS") even when repeated, are rare. Investigations and potentially useful data are not shared between agencies or departments as well as could be. And, various Police Commissioners, over time, have demonstrated an inordinate willingness to excuse illegal stops, frisks, and searches in the name of "good faith" or "lack of mal-intention," relegating Constitutional adherence to a lesser rung of discipline. It is with that understanding that the recommendations attached to this Report are offered for consideration as potential avenues for improvement.

## II.    BACKGROUND

On August 12, 2013, following a nine-week trial, United States District Court Judge Shira Scheindlin found that New York City, through the New York City Police Department (NYPD), violated City residents' Fourth and Fourteenth Amendment rights and that the City did so with deliberate indifference to NYPD officers' "practice of making unconstitutional stops and conducting unconstitutional frisks."[1] In addition, the Court found that the City had a "policy of indirect racial profiling by targeting racially defined groups for stops based on local crime suspect data . . . [that] resulted in the disproportionate and discriminatory stopping of [B]lacks and Hispanics in violation of the Equal Protection Clause."[2]

In the time since the trial, the number of stops, as self-reported by police officers in "stop reports,"[3] has dropped from a peak of 685,274 in 2011, to 11,008 in 2018, 13,459 in 2019, 9,544

---

[1] *Floyd v. City of New York*, 959 F. Supp. 2d 540, 562 (S.D.N.Y. 2013) (hereinafter "*Floyd* Liability Opinion"). The plaintiff class, certified by the Court 2012, consists of "[a]ll persons who since January 31, 2005 have been, or in the future will be, subjected to the New York Police Department's policies and/or widespread customs or practices of stopping, or stopping and frisking, persons in the absence of a reasonable, articulable suspicion that criminal activity has taken, is taking, or is about to take place in violation of the Fourth Amendment, including persons stopped or stopped and frisked on the basis of being Black or Latino in violation of the Equal Protection Clause of the Fourteenth Amendment." *Floyd v. City of New York,* 283 F.R.D. 153, 160 (S.D.N.Y. 2012).

[2] *Floyd* Liability Opinion at 562.

[3] NYPD, Department Manual, available at https://www.nyc.gov/site/nypd/about/about-nypd/manual.page. The NYPD Patrol Guide requires an officer to prepare a stop report for "all *Terry* Stops/Level 3 encounters." Patrol Guide

in 2020, and 8,948 in 2021.[4]  The number of reported stops rose dramatically to 15,102 in 2022, and 16971 in 2023.[5]  The question remains whether, and to what extent, the core findings in the Court's decision persist and whether remedies that were ordered by the Court[6] have been implemented.

At the trial, the Court found, for the period between January 2004 and June 2012, that:

- 52% of all stops (out of 4.4 million) were followed by a protective frisk for a weapon, but in 98.5% of those frisks, no weapon was found;

    o By comparison, in 2022, 60% of stops were followed by a protective frisk; in 79% of those frisks no weapon was found.

- 88% of stops resulted in no law enforcement action, i.e., the person stopped was neither issued a summons nor arrested;

    o In 2022, 64.5% of reported stops resulted in no law enforcement action.

- 52% of those stopped were Black, although only 23% of the resident population was Black;

    o In 2022, 59% of those stopped were described as Black, while 24% of the resident population is categorized as Black or African American.

- For the period spanning 2004 through 2009, "[W]hen any law enforcement action was taken following a stop, [B]lacks were 30% more likely to be arrested (as opposed to receiving a summons) than whites, for the same suspected crime."[7]

    o Although not a direct comparison, a recent study done by the Monitor Team found when adjustments were made to account for undocumented stops, it appears that Black subjects were more likely to be frisked relative to White

---

§ 212-11, ¶ 47, available at https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/public-pguide2.pdf. Failure to prepare and file a stop report is treated as a violation of Department rules and regulations and, thus, misconduct.  NYPD "Disciplinary System Penalty Guidelines" at 44.  Temporary detention based on reasonable suspicion that the subject has committed, is committing or is about to commit a felony or Penal Law misdemeanor, falling short of full-custodial seizures based on probable cause, is referred to as a "*Terry* stop," after *Terry v. Ohio*, 392 U.S. 1 (1968).  "Level 3 encounter" refers to the New York state law equivalent of a *Terry* stop.  *See People v. De Bour*, 40 N.Y.2d 210, 223 (1976).  Stop reports are accessible under New York's Freedom of Information Law ("FOIL"), subject to the exceptions provided within N.Y. Pub. Off. Law § 87.  *See Patrolmen's Benevolent Ass'n v. de Blasio*, 171 A.D.3d 636, 638 (2019) (applicable to Body Worn Camera videos). "Within 10 business days of receipt of your request, the NYPD will send out a copy of your stop report or a response indicating that there was no record found or insufficient information to find the stop report."  Police Encounters, https://www.nyc.gov/site/nypd/stats/reports-analysis/stopfrisk.page.

[4] The NYPD's stop, question, and frisk data records are available at https://www1 nyc.gov/site/nypd/stats/reports-analysis/stopfrisk.page.

[5] NYPD, Stop, Question and Frisk Data, at https://www.nyc.gov/site/nypd/stats/reports-analysis/stopfrisk.page.

[6] *See, generally, Floyd v. City of New Yor*k, 959 F. Supp. 2d 668 (S.D.N.Y. 2013) (hereinafter "*Floyd* Remedies Opinion").

[7] *Floyd* Liability Opinion at 560.

subjects in 2021 and 2022, with a difference on the order of eight percentage points.[8]

In conjunction with the Liability Opinion, the Court issued a separate Remedies Opinion which appointed a Monitor with specified authority,[9] and required "immediate reforms" relating to training, documentation, supervision, monitoring and a pilot project for use of body-worn cameras (BWC).[10]  The Court also ordered engagement by all parties in a "Joint Remedial Process" (JRP) guided by a Facilitator.[11]  At the end of the JRP, the Remedies Opinion required the Facilitator to submit to the Court recommendations for "[s]upplemental [r]eforms,"[12] which could be ordered by the Court.

In particular, with regard to disciplinary procedures related to misconduct by officers in civilian encounters, the Court wrote in the Liability Opinion, "when officers were found to have made 'bad' stops, little or no discipline was imposed.  The evidence showed that the NYPD turned a blind eye to its duty to monitor and supervise the constitutionality of the stops and frisks conducted by its officers."[13]  Further, "[d]eficiencies were also shown in the training of officers with respect to stop and frisk and in the disciplining of officers when they were found to have made a bad stop or frisk.  Despite the mounting evidence that many bad stops were made, that officers failed to make adequate records of stops, and that discipline was spotty or non-existent, little has been done to improve the situation."[14]  The Court bemoaned the fact that, "when confronted with evidence of unconstitutional stops, the NYPD routinely denies the accuracy of the evidence, refuses to impose meaningful discipline, and fails to effectively monitor the responsible officers for future misconduct."[15]  The Court went on in the Remedies Opinion to require "Changes to Supervision, Monitoring, and Discipline," declaring:

> An essential aspect of the Joint Process Reforms will be the development of an improved system for monitoring, supervision, and discipline. . . . In light of the complexity of the supervision, monitoring, and disciplinary reforms that will be required to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments, it may be appropriate to incorporate these reforms into the Joint Remedial Process negotiations described below.  However, to the extent that the Monitor can work with the parties to develop reforms that can be

---

[8] *See* Twentieth Report of the Independent Monitor, Racial Disparities in NYPD Stop, Question, and Frisk at 5 and Appendix C. (pending).

[9] *Floyd* Remedies Opinion at 676–78.

[10] *Id*. at 678–86.

[11] *Id*. at 686–88.  Retired Judge Ariel Belen was appointed as Facilitator.

[12] *Id*. at 686.

[13] *Floyd* Liability Opinion at 590.

[14] *Id*. at 561.

[15] *Id*. at 617.

implemented immediately, the Monitor is encouraged to include those reforms in the proposed Immediate Reforms.[16]

The Court's two opinions make it clear that the disciplinary process within the Department needed reform and that reform of the disciplinary process was integral to effectuating compliance with the Fourth and Fourteenth Amendments during police-initiated civilian encounters.  One set of reforms specified in the Remedies Opinion was:

> The Department Advocate's Office [(DAO)[17]] must improve its procedures for imposing discipline in response to the Civilian Complaint Review Board's ('CCRB') findings of substantiated misconduct during stops.  This improvement must include increased deference to credibility determinations by the CCRB, an evidentiary standard that is neutral between the claims of complainants and officers, and no general requirement of corroborating physical evidence.  Finally, the Office of the Chief of Department [(OCD)] must begin tracking and investigating complaints it receives related to racial profiling.[18]

The issue of discipline for police misconduct surrounding the use of stop and frisk was raised regularly during the JRP.

> Members of both the *Floyd* and *Davis* focus groups consistently voiced disappointment that officers were not held accountable for misconduct.  The focus groups also believed supervisors in officers' chains of command should be held accountable for the actions of their staff.  Accountability should include progressive discipline in order to appropriately target disciplinary actions to individual officer behavior over time.[19]

Section 434(a) of the New York City Charter vests final authority for discipline with the Police Commissioner. [20]

> The *Floyd* focus group expressed a need for an independent, third-party entity with which they could file misconduct complaints and which had the authority to take action based on the results of the complaints . . . .  The focus group also felt the

---

[16] *Floyd* Remedies Opinion at 683–84.

[17] The "Department Advocate" (and their deputies) are attorneys designated by the Police Commissioner to prosecute disciplinary proceedings.  *See* 38 RCNY §15-01.  The DAO exercises considerable discretion in reviewing investigations conducted by CCRB, as well as Departmental units such as the Internal Affairs Bureau (IAB), the Force Investigation Division (FID) and Borough/Bureau Investigations Units (BIU).

[18]  *Floyd* Remedies Opinion. at 684.

[19] New York City Joint Remedial Process: Final Report and Recommendations at 117–18, *Floyd v. City of New York*, No. 08-cv-1034 (S.D.N.Y. May 15, 2018), ECF No. 597.  Unless otherwise specified, all ECF numbers herein refer to entries where documents can be located on the docket for *Floyd v. City of New York*, No. 08-cv-1034 (S.D.N.Y.).

[20] "The Commissioner shall have cognizance and control of the government, administration, disposition and discipline of the department, and of the police force of the department."  N.Y. City Charter § 434 (a).

complaint investigation and determination processes should be more transparent, providing regular updates on the status of individual cases.[21]

In its submission to the JRP, Citizens Union had argued,

> [I]n administering justice in cases of alleged police misconduct, too much authority currently resides in the Police Department to prosecute, hear, adjudicate, and decide penalties. Investing so much authority in a single entity to handle essentially four different, major parts of the police disciplinary process—the same entrusted with the right to use force to provide public safety and enforce the law—does not provide for an appropriate level of public oversight or separation of powers in a democratic society.[22]

Current efforts to limit the Police Commissioner's unrestrained authority in disciplinary matters are discussed later. The Facilitator did not adopt that specific recommendation, but noted:

> During all of the community forums, participants stated that there needs to be greater accountability. Participants felt that the current disciplinary system was obscure, flawed and arbitrary, and needed both reform and greater transparency. Community members called for meaningful and timely consequences that escalated for repeat misconduct. Attendees at the forums requested greater accountability at the officer, precinct, and departmental level.[23]

Interviews with leaders of community groups led to the suggestion that:

> [P]eople need a better way to make complaints about police misconduct because the Civilian Complaint Review Board . . . and the Office of the NYPD Inspector General are not trusted by community members. . . . For example, participants stated . . . the CCRB has a bad reputation in certain communities; information from the courts and the CCRB is not shared with complainants; there is a lack of independence and transparency at the CCRB; the CCRB does not adequately pursue complaints and . . . constituents fear that officers would retaliate when a complaint has been filed.[24]

Two important suggestions made during the JRP were that, in addition to loss of pay, vacation days or demotion, "command discipline should go on an officer's record" and "[i]f officer misconduct is ignored in the precinct, supervisors, managers, and the commanding officer should

---

[21] New York City Joint Remedial Process: Final Report and Recommendations at 118, *Floyd*, No. 08-cv-1034 (S.D.N.Y. May 15, 2018).

[22] New York City Joint Remedial Process: Final Report and Recommendations, Appendix A at 44, *Floyd*, No. 08-cv-1034 (S.D.N.Y. May 15, 2018), ECF. No. 598-1.

[23] New York City Joint Remedial Process: Final Report and Recommendations at 224, *Floyd*, No. 08-cv-1034 (S.D.N.Y. May 15, 2018), Doc. No. 598-1 at 119.

[24] *Id*. at 185.

be penalized."[25]    As discussed later in this Report, substantiated stop and frisk misconduct commonly is not entered into important personnel or disciplinary records maintained by NYPD and penalties for failures to supervise are insufficiently disciplined.

As summed up by the Facilitator:

> Throughout the forums, accountability was a frequently cited area for reform. Community members called for meaningful and timely consequences for abusive policing practices, often highlighting the public perception of an obscure, flawed, and arbitrary disciplinary system. Attendees at the forums suggested that the implementation of stricter discipline for officers with repeated violations and greater accountability for the Department overall in addressing rights violations were critical elements of meaningful police reform.[26]

With regard to transparency and accountability, the Facilitator recommended that:

> [T]he Court order the NYPD to prepare and publish a monthly report—without disclosing personal identifying information—chronicling findings of misconduct and the resultant disciplinary outcomes as they relate to unlawful stops and trespass arrests. This monthly report should include all unlawful stop and trespass arrest incidents that are reported as substantiated by the Civilian Complaint Review Board and referred to the NYPD Department Advocate's Office for disciplinary action. These monthly reports should be disaggregated by geographic and precinct locations and collated into an Annual Report. . . .

> This recommendation is consistent with the NYPD's recent decision to publish anonymized summaries of allegations against officers and the disciplinary actions taken in response by the Department. The NYPD's decision to publish this information is consistent with the need for greater transparency and accountability stressed in this Report.[27]

---

[25] *Id.* at 186 nn 236–37. "Command discipline" refers to an informal process for adjudicating misconduct whereby Commanding Officers (COs) in precincts and at the local level are vested with the authority to investigate, determine, and penalize misconduct, e.g., violations of the Patrol Guide. Command discipline or "CDs" carry different levels of potential penalty, discussed later, and can be either an "A-CD," "B-CD," or "C-CD."

[26] *Id.* at 217.

[27] *Id.* at 222–23. In March 2018, NYPD proposed to publish an online Compendium of non-identifiable summaries of the outcomes of disciplinary trials, while omitting information that would tend to identify individual police officers. This proposal falls far short of full transparency but was considered by some to be a helpful step. One year later, in March 2019, Justice Arthur Engoron, New York County Supreme Court, enjoined publication of the Compendium, citing N.Y. Civ. Rights Law § 50-a (hereinafter § 50-a). *See Patrolmen's Benevolent Ass'n. v. de Blasio*, No. 15231/2018, 2019 WL 1224787 (Sup. Ct. N.Y. Cnty. Mar. 11, 2019. Subsequently, with the repeal of §50-a. L. 2020, ch. 96, § 1, effective June 12, 2020, the relief sought in the petition and injunction became moot, and the decision was reversed on November 19, 2020, *see Patrolmen's Benevolent Ass'n v. de Blasio*, 188 A.D.3d 577 (1st Dep't 2020). After that, the Department began to post an "Officer Profile" online at https://nypdonline.org/link/2. In that space, an officer's "Disciplinary History" can be accessed. This posting is extremely limited, however, in that it only lists "formal" charges which have been sustained and where a penalty was imposed by the Police Commissioner. So, for

12

The Facilitator went on to recommend that the NYPD be ordered to:

Develop and publish progressive disciplinary standards to be used in cases arising from unconstitutional stops and trespass enforcement regarding excessive force, abuse of authority, discourtesy or offensive language, and racial profiling allegations.

Consider making revisions to its current discipline paradigm that ensure that disciplinary processes are fair and timely.

Develop and publish disciplinary recommendations to ensure external accountability and public understanding.[28]

In sum, the Liability Opinion, the Remedies Opinion, and the Joint Reform Process highlighted the necessity for re-examination and reform of the Department's disciplinary processes as requisite to any effort to bring the City into compliance with the mandates of the Fourth and Fourteenth Amendments when citizens are stopped, questioned, frisked, and searched in a street encounter. The Department, working with the Monitor and the Plaintiffs, has made advances in the areas of training, written guidelines, audits, documentation, and preventive measures. Discipline, especially for repeat or serious instances of misconduct, is a necessary adjunct to those measures, as is transparency and community involvement. It is this aspect of *Floyd* implementation that this Report will attempt to address.

## III.    COURT'S DIRECTION

Recognizing the need to supplement ongoing efforts by the parties to achieve compliance, and the complexity of the issues surrounding discipline, the Court directed a study and an assessment of the disciplinary process. Specifically, the Court directed:

[T]he preparation of an in-depth, critical examination of the efficacy, fairness, and integrity of the City's policies, practices and procedures with respect to police misconduct during stops, including a granular, step-by-step analysis of (1) police discipline, including disciplinary processes and outcomes, (2) the civilian complaint process (both at the CCRB and the NYPD), and (3) the prosecution and adjudication of such complaints. The report shall address the issues of accountability, transparency, speed, and due process for officers and other participants, and it shall provide both a quantitative and qualitative analysis, including a detailed narrative of cases which exemplify the manner in which the CCRB and NYPD have addressed police misconduct during stops and discipline . . . Following the report's critical assessment of existing policies, practices and procedures, the report shall set forth, in detail, recommendations as

---

example, cases that were "filed," reversed, resulted in Command Discipline, or cases in which the penalty was reduced to guidance such as training are not listed despite substantiation by CCRB or recommended substantiation by IAB.

[28] New York City Joint Remedial Process: Final Report and Recommendations at 224, *Floyd*, No. 08-cv-1034 (S.D.N.Y. May 15, 2018)

to the specific ways in which such policies, practices, and procedures can be improved, in order to promote constitutional policing.[29]

The NYPD disciplinary process is rapidly changing on an almost daily basis. This Report will attempt to describe a moving target, which has undergone significant changes since the Court's opinions in *Floyd*, mostly in the last three years. For that reason, statistics and even case studies referred to in this Report that might be as little as one or two years old should be viewed with caution. Adoption and implementation of the NYPD Disciplinary System Penalty Guidelines (sometimes referred to as the "Matrix")[30] after 2021 may alter some outcomes. There is a partial analysis of post-Matrix data in this Report as well.[31] At the same time, core problems —in particular dealing with lack of accountability, community participation, recognition of the seriousness of stop, question, frisk ("SQF") violations, transparency and issues surrounding profiling and discrimination—remain.[32]

It is an understatement to say that police misconduct has become a central topic in today's public discourse. Litigation, legislative changes, and regulatory adjustments regarding reporting, investigating, and adjudicating misconduct abound. Each has a substantial impact on the manner by which misconduct is addressed. Some recent changes of significance, many of which are described in this Report, include:

- Changes in NY state law governing disclosure of personnel and disciplinary records;[33]
- Changes in NY state law governing when, during a street encounter, a person may be arrested or, in the alternative, must be given an appearance ticket for minor offenses;[34]
- Changes in NY state Law creating an investigative unit within the Attorney General's Office to examine and report upon police misconduct;[35]
- Changes in NY state law requiring public descriptive reporting of use of force incidents;[36]

---

[29] Correspondence from Judge Analisa Torres to Peter Zimroth (May 30, 2018).

[30] Throughout, the NYPD Disciplinary System Penalty Guidelines may be referred to as either the "Guidelines" or the "Matrix." Available at https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/nypd-disciplinary-penalty-guidelines-effective-2-15-2022-final.pdf.

[31] Context around any particular action by the Police Commissioner is best understood by review of DAO's Case Analysis and Recommendation (CAR) report. Unfortunately, the Department asserted privilege and CAR reports were not available for this Report.

[32] Some reports cited herein enumerate stop/question/frisk conduct and will be referred to as "SQF." Some reports include, as well, "search of person." For this Report, the term SQF will include searches of persons as well as stop, question, and frisk conduct.

[33] L. 2020, ch. 96, § 1, effective June 12, 2020 (repealing N.Y. Civ. Rights Law § 50-a and amending N.Y. Pub. Off. Law § 87).

[34] L. 2019, ch. 59, effective January 1, 2020 (amending Article 150 of the New York Criminal Procedure Law).

[35] L. 2020, ch. 104, effective April 1, 2021.

[36] L. 2019, ch. 55, effective July 11, 2019 (adding N.Y. Exec. Law § 837-t).

- Changes in NY state law creating a "Right to Record Law Enforcement Related Activities;"[37]
- Changes in NYC local law creating a private right of action for search, seizure and use of force misconduct, and barring "good faith" and "qualified immunity" as defenses in such civil actions;[38]
- Changes in NYC local law regarding the definition of "bias-based policing;"[39]
- Changes in NYC local law requiring public reports on use of summonses and desk appearance tickets;[40]
- Changes in NYC local law requiring public reporting on use of force incidents and use of force encounters;[41]
- Changes in NYC local law requiring public reporting of "officer deployment," which requires public posting, by precinct, of statistics regarding substantiated misconduct;[42]
- Changes in NYC local law requiring assessment of adverse credibility determinations and civil lawsuits arising from police misconduct, along with a public posting of lawsuits pending against the City, and a report to the City Council Speaker;[43]
- Changes in NYC local laws limiting arrests and returns to Criminal Court for quality-of-life and other low-level offenses;[44]
- Changes in NYC local law directing use of civil summonses returnable to the Office of Administrative Trials and Hearings (OATH) in lieu of returns to Criminal Court for quality of life offenses, along with a public report;[45]
- Changes in NYC local law requiring officers to identify themselves during certain citizen encounters;[46]
- Changes in NYC local law requiring disaggregated information, by precinct of requests for consent to search and whether the subject was with limited English proficiency;[47]

---

[37] L. 2020, ch. 100, effective July 14, 2020 (adding N.Y. Civ. Rights Law § 79-p).

[38] Local Law 48 (2021) (adding a new chapter 8 to Title 8 of the NYC Admin. Code).

[39] Local Law No. 71 (2013) (amending NYC Admin. Code § 14-151).

[40] Local Law No. 69 (2016) (adding NYC Admin. Code § 14-156); Local Law No. 68 (2016) (adding NYC Admin. Code § 14-157).

[41] Local Law No. 85 (2016) (adding NYC Admin. Code § 14-158); Local Law No. 86 (2016) (adding NYC Admin. Code § 14-159).

[42] Local Law No. 88 (2016) (adding NYC Admin. Code §14-160). Full implementation of this law was delayed, prior to the repeal of N.Y. Civ. Rights Law § 50-a, by a restraining order issued in *Patrolmen's Benevolent Ass'n. v. de Blasio*, No. 153231/2018 (Sup. Ct. N.Y. Cnty.). On appeal the order was reversed, and the petition dismissed as moot in light of the repeal of § 50-a. Since then, NYPD has posted reports covering the years 2016–2020. The "Deployment Report" lists, in one total number, the number of officers who have crossed certain disciplinary thresholds. Without a breakdown by category and identification of officers, the list is, for all practical purposes, of little use. With the repeal of §50-a, the law needs to be, and should be, amended to include a broader array of misconduct findings.

[43] Local Law No. 166 (2017) (adding NYC Admin. Code § 7-114 and N.Y. City Charter §808).

[44] Local Law No. 71 (2016), part of the Criminal Justice Reform Act (CJRA).

[45] Local Law No. 73 (2016), part of CJRA; *see also* N.Y. City Charter § 1049.

[46] Local Law No. 54 (2018) (adding NYC Admin. Code § 14-174 (Right to Know Law)).

[47] Local Law No. 20 (2024) (amending NYC Admin. Code § 14-173.

- Changes in NYC local law, the "How Many Stops Act," requiring a public quarterly report of the reasons and basis for all "investigative encounters" including Level 1, Level 2, and Level 3 encounters, along with: a description of the apparent race/ethnicity, gender, and age of the member of the public involved; whether force was used; whether a summons or arrest ensued; and whether a Level 3 encounter began as a Level 1 or Level 2 encounter.[48]
- A series of amendments to the City Charter, adopted by referendum on November 5, 2019,[49] strengthening and expanding the powers of the CCRB, including that:

  o CCRB may now investigate matters within the Board's jurisdiction, without the necessity of waiting for a complaint;
  o CCRB may now investigate and make findings regarding false statements made by a subject officer during a CCRB investigation;
  o CCRB may now enforce subpoenas for materials and witnesses necessary for an investigation;
  o Requiring the Police Commissioner to explain in detail when he intends to impose a penalty at variance from that recommended by CCRB;
  o Altering the composition of the Board to increase, proportionately, representation by members independent of the Mayor and Police Commissioner;
  o Guaranteeing and strengthening the budget of CCRB;

- An amendment to the City Charter and the Administrative Code directing CCRB to replace NYPD in investigations of bias-based policing;[50]
- Changes in NYC local law regarding when an officer may seek consent to search an individual and requiring reports of such searches;[51]
- Changes in NYC local law requiring the Police Commissioner to publish a disciplinary penalty grid along with an annual report on results, as well as:[52]

  o Promulgation and adoption of a Disciplinary Guidelines matrix by NYPD;
  o Implementation of a new Memorandum of Understanding (MOU) between NYPD and CCRB agreeing to adhere to the matrix;

- Changes in NYC local law requiring establishment of an Early Intervention System (EIS) with specified parameters;[53]

---

[48] Local Law No. 43 (2024) (adding NYC Admin. Code § 14-196).

[49] Local Law No. 215 (2019) (enacting Charter Amendments approved in a November 2019 referendum).

[50] Local Law No. 47 (2021).

[51] Local Law No. 56 (2018) (adding NYC Admin. Code §14-173).

[52] Local Law No. 69 (2020) (adding NYC Admin. Code §14-186).

[53] Local Law No. 68 (2020) (adding NYC Admin. Code §14-190).

- Changes in NYC local law requiring officers, while on duty and in uniform, to display shield numbers or face civil liability;[54]
- Changes in NYC local law prohibiting police interference with videotaping police activity;[55]
- CCRB Rule changes,[56] approved by the Appellate Division following litigation,[57] expanding CCRB's investigative capacity:

  o Permitting witnesses, who are not victims, of police misconduct to file a complaint;
  o Permitting "non-witnesses," i.e., citizens without personal knowledge of an event to bring a complaint;
  o Authorizing investigation of complaints after the expiration of the 18-month statute of limitations period designated in N.Y. Civ. Serv. Law §75-4;
  o Permitting review panels which do not include a Police Commissioner designee in certain situations;
  o Permitting CCRB to note misconduct outside CCRB's jurisdictional parameters of "Force, Abuse, Discourtesy and Offensive Language" (otherwise known as FADO)[58] and the evidence to support those allegation(s);

But rejecting other changes in CCRB Rules:

- Consideration of prior unsubstantiated complaints is prohibited;
- The Administrative Prosecution Unit (APU) of CCRB may not ask a panel to reconsider or add Charges after it has made its recommendation and findings to the Police Commissioner;
- Expanded authority to investigate sexual harassment complaints required compliance with the rule-making requirements of the City Administrative Procedure Act,[59] and was thereby restricted pending such compliance;[60]

---

[54] Local Law No. 70 (2020) (adding NYC Admin. Code §14-187).

[55] Local Law No. 67 (2020) (adding NYC Admin. Code §14-189).

[56] Rules of the Civilian Complaint Review Board, RCNY, tit. 38-A.

[57] *See Lynch v. NYC Civilian Complaint Rev. Bd.*, 183 A.D.3d 512 (1st Dep't 2020).

[58] "The board shall have the power to receive, investigate, hear, make findings and recommend action upon complaints by members of the public . . . against members of the police department that allege misconduct involving excessive use of **force**, **abuse** of authority. . . , **discourtesy**, or use of **offensive language**, including, but not limited to, slurs relating to race, ethnicity, religion, gender, sexual orientation and disability." N.Y. City Charter § 440(c)(1).

[59] *See id.* at § 1043.

[60] The proper rule-making authority ultimately took place, and "sexual misconduct" was included in the definition of "Abuse of Authority" in 38-A RCNY § 1-01 effective March 26, 2021. The sexual misconduct rules were subsequently approved by the Appellate Division. *Matter of Lynch v. NYC CCRB*, 206 A.D.3d 558 (1st Dep't 2022).

- Case law developments making it more difficult for CCRB to get, and for IAB to access, full records of illegal arrests of witnesses to misconduct, which were dismissed by a court and sealed pursuant to N.Y. Crim. Proc. Law § 160.50;[61]
- Significant limitations in the definition of, and the penalty to be imposed for, false official statements, written and adopted by the Police Commissioner the day after CCRB became empowered to investigate such statements;[62]
- Changes in procedures to be followed by the Department when investigating a bias complaint.[63]

In addition, in 2020, municipalities throughout New York, including the City, were directed by former Governor Andrew Cuomo to "develop a plan to improve . . . deployments, strategies, policies, procedures, and practices, for the purposes of addressing the particular needs of the communities served by such police agency and promote community engagement to foster trust, fairness, and legitimacy, and to address any racial bias and disproportionate policing of communities of color."[64]

The City responded with a Plan which, among other things, recognized the importance of, and need for, reforms in the disciplinary process. After collaborative review, "[t]here was near-universal support for building on the success of the CCRB and strengthening and clarifying its role in the disciplinary process."[65]  The City's Plan concluded that:

"The disciplinary system should be based on five values:

1.    Holding officers accountable for misconduct and harm to the public;
2.    Keeping a record and recognizing disciplinary actions as vital sources of information about an officer, supervisors, and the department as a whole;
3.    Identifying patterns and problems related to policies, training, supervision, and institutional performance rather than mere individual misconduct;
4.    Building public trust and community cohesion through timely decision making; and

---

[61] *See R.C. v. City of New York*, 100 N.Y.S.3d 824 (Sup. Ct. N.Y. Cnty. 2019). The parties are currently (as of October 24, 2022) engaged in negotiations concerning implementation of a permanent injunction. Plaintiffs have proposed a "plan" which would permit record access for records which are "De-identified" and used for "purposes of assessing the lawfulness of officer conduct or investigating officer misconduct." *R.C. v. City of New York*, Index No. 153739/2018, NY County Supreme Court, NYSCEF Doc. No. 261 (Oct. 20, 2022). The "plan" has not yet been adopted. The proposal, while referencing access by NYPD, does not mention access or use of the information by CCRB. Legislation has been introduced in the NYS Assembly to grant access to sealed records by CCRB. NY Assembly Bill 370/ 2023. On appeal, the Appellate Division, First Department, remitted the matter to the lower court for "detailed fact-finding" and cautioned that it was not necessary to de-identify information of arrestees. However, access by CCRB, as opposed to IAB, was not ordered. *R.C. v. City of New York*, 213 NYS 3d 19 (1st Dep't June 4, 2024).

[62] Patrol Guide § 203-08, amended effective April 1, 2020, moved to Admin. Guide § 304-10 in 2021.

[63] IAB Guide 620-58. Notably, IAB Guide 620-58 has been approved by the Court. *See* Memo Endorsement, *Floyd*, No. 08-cv-1034 (S.D.N.Y. Jan. 3, 2019), ECF No. 677. Whether and how this will be implemented with the subsequent assignment of profiling allegations to CCRB remains to be seen. IAB will still have cases to investigate.

[64] Exec. Order No. 203 (June 12, 2020).

[65] NYC Police Reform and Reinvention Collaborative Draft Plan at 8, adopted by the City Council on Mar. 25, 2021, Intro. Res. 1584/2021.

5.      Holding the Police Commissioner accountable for the conduct of those whose [sic] serve in the department."[66]

Adherence to the aspirational goals cited in the Plan will be important going forward. However, as a backdrop to any survey in the future or any description of current policies and practices utilized to investigate and discipline Stop/Frisk misconduct, a preliminary review of the statutes regulating wrongful actions by officers is necessary.

## A.      History of Civilian Oversight in New York City

Under Section 434(a) of the New York City Charter, the Police Commissioner has unbridled final say in disciplinary matters.  Civilian oversight of police misconduct is limited to precatory entreaty.  Reform proposals to enhance external review and resistance to those reforms are in constant and continued contention.  To understand the restraints placed upon citizen review of misconduct investigations, it is necessary to begin with a look at the history and evolution of efforts to open police discipline to public and external review.

While the CCRB is the City's most recognizable avenue for resolution of civilian complaints regarding police misconduct, it exists within a complex framework of state and city laws, and city regulations that both support and check its efforts—reflecting a balance of political reality, due process protections for police officers, procedural justice for citizen complainants and transparency in policing.  The CCRB was created in response to repeated calls for civilian oversight of police misconduct.  However, the CCRB has always been limited in what conduct it may investigate, how the investigations are to be conducted, the reach of information available to its investigators and, most importantly, the consequences that may follow findings of misconduct or recommendations for discipline.

By the terms of the New York City Charter, the CCRB is an independent agency responsible for receiving complaints from members of the public against NYPD officers.  As the Charter declares:

It is in the interest of the people of the city of New York and the New York City police department that the investigation of complaints concerning misconduct by officers of the department towards members of the public be complete, thorough and impartial.  These inquiries must be conducted fairly and independently, and in a manner in which the public and the police department have confidence.  An independent civilian complaint review board is hereby established as a body comprised solely of members of the public with the authority to investigate allegations of police misconduct as provided in this section.[67]

The movement to provide independent citizen oversight of police misconduct originated nearly 100 years ago with the creation of a Committee on Constitutional Rights by the Los Angeles Bar

---

[66] *Id.* at 13–14.

[67] N.Y. City Charter, ch. 18-A, § 440(a).

Association in 1928.[68]  The reform movement grew and, today, there are more than one hundred oversight agencies throughout the United States.

The first version of the CCRB was established in 1953.[69]  By the CCRB's own account, it was originally formed after a coalition of 18 organizations—the *Permanent Coordination Committee on Police and Minority Groups*—lobbied to take action against police misconduct, specifically against racial minorities.[70]  The NYPD responded by forming its own internal review board.  In its early form, civilians would file complaints against officers at the Department.  An Investigating Board consisting of three Deputy Police Commissioners, assisted by a staff of police department employees, would respond.[71]  This format endured for more than eleven years.

Following street protests in Harlem and Bedford-Stuyvesant in the summer of 1964, the call for a more independent civilian review board became a part of everyday political discourse in New York City leading into the mayoral election campaign of 1965.  Candidate John Lindsay supported reform, promising that "he would seek a board dominated by civilians appointed by the Mayor."  During the campaign, as later recounted by Justice Francis Murphy, Jr., in an opinion reviewing challenges to the Board's powers, "[t]he effectiveness of the civilian complaint procedure . . . [became] the subject of numerous studies by Bar associations, vigorous editorials in newspapers, feature articles in periodicals, critical examinations in legal journals, lengthy discussions on radio and television, as well as street corner debate."[72]

Justice Murphy provides a useful summary of the opposing positions as follows:

The arguments espoused by those who favor at least partial non-police participation on a Review Board are, in brief: that various groups, most particularly minority groups, distrust a police-oriented board, on the ground that its members will be inner directed and overly protective towards their cohorts— "the me[n] on the beat"; that it should be emphasized, once and for all, that the police are the servants of the people; that policemen who properly perform their duties have nothing to fear; that unfounded charges against the police would be exposed; and that a civilian controlled review board will serve to lessen strained community relations.

On the other hand, various individuals and groups, led by law enforcement officials, argue that membership on review boards should be limited to Police Department personnel for the following reasons; police morale will be adversely affected if the board is composed of civilians; a degree of expertise and familiarity with police

---

[68] *See* Samuel Walker, Police Accountability: The Role of Citizen Oversight (2001) see Wadsworth Professionalism in Policing Series available at https://www.amazon.com/Police-Accountability-Oversight-Wadsworth-Professionalism/dp/0534581587?ie=UTF8&s=books&qid=1277046556&sr=1-1.

[69] CCRB, History, available at https://www1.nyc.gov/site/ccrb/about/history.page (last visited Apr. 13, 2022) [hereinafter *CCRB History*].

[70] *Id.*

[71] CCRB, New York City Civilian Complaint Review Board Status Report January – December 2001 5–6 (May 2002), available at http://www.nyc.gov/html/ccrb/downloads/pdf/ccrbann2001.pdf [hereinafter 2001 Status Report].

[72] *Cassese v. Lindsay*, 272 N.Y.S.2d 324, 327 (Sup. Ct. N.Y. Cnty. 1966) (Murphy, Jr., J).

problems is required of those serving on a review board; the existence of a board dominated by civilians may deter an officer from exercising the necessary and proper authority at a critical moment for fear that his actions may not only be subject to criticism, but that he may be exposed to unwarranted civilian complaints; and, because the Police Department is a para-military organization, discipline should remain entirely within the domain of Police Department personnel.[73]

Once elected, Mayor John Lindsay appointed former federal judge Lawrence Walsh to investigate the operations of the police department generally.[74]  In his final report, Judge Walsh advocated for civil representation on the Board "in order to instill public confidence that investigations of civilian complaints would be handled fairly."[75]  And following the report, Mayor Lindsay formed a search committee, chaired by former U.S. Attorney General Herbert Brownell, to find civilians to serve on the Board.[76]

In May 1966, Police Commissioner Howard R. Leary, by administrative order,[77] established a seven-person review board, which included four civilians recommended by the Mayor to the Police Commissioner and three members of the Department named directly by the Police Commissioner.  However, this effort met with strong opposition from police unions.[78]  Declaratory judgment and a permanent injunction were sought barring implementation of the Order on the ground that only employees of the Department could investigate civilian complaints, citing the New York City Charter[79] and New York State Unconsolidated Law.[80]  The union petition was dismissed on the grounds that the administrative order had been promulgated by the Police Commissioner himself, who retained ultimate disciplinary decision-making power and, therefore, the review board was merely advisory to the Police Commissioner.[81]

When the court challenge failed, the unions successfully petitioned to amend the City Charter by a public initiative,[82] which was approved in November 1966.  The approved amendment

---

[73] *Id.* at 327–28.

[74] *CCRB History*, *supra* note 66.

[75] *Id.*

[76] *Id.*

[77] NYPD, General Order 14 (May 17, 1966).

[78] *See Cassese*, 272 N.Y.S.2d at 328.

[79] N.Y. City Charter § 434(b).

[80] McKinney's Unconsol. Laws of N.Y. ch. 834, § 891 (1940).

[81] *Cassese*, 272 N.Y.S.2d at 334–36.

[82] This public initiative is occasionally—and incorrectly—cited as a "referendum."  *See Caruso v. City of New York*, 517 N.Y.S.2d 897, 898 n.1 (Sup. Ct. N.Y. Cnty. 1987) (explaining the distinction), aff'd 143 A.D.2d 601 (1st Dep't 1988), aff'd 74 N.Y.2d 854 (1989).

added a new Section 440 to Chapter 18 of the New York City Charter that required all members of the Review Board be employees of the Department and explicitly barred civilian oversight.[83]

Twenty years later, in 1986, the New York City Council amended the Charter by Local Law to, once again, permit a "mixed board" structure with private citizens serving alongside non-uniformed police officers.[84]  The CCRB was increased to twelve members—with the Mayor and City Council appointing six private citizens (one from each borough and one at large) and the Police Commissioner appointing the other six members.  At this point, the Board remained a unit housed within the NYPD.[85]  The Department supported the Board by assigning personnel to a Civilian Complaint Investigative Bureau ("CCIB").  By 1991, sixty-one investigators, employed by NYPD, conducted most of the investigations—twenty-eight of whom were civilians and thirty-three of whom were uniformed members.[86]  The Board's jurisdiction was limited, at that time, to Force, Abuse of Authority, Discourtesy and Offensive Language (FADO) issues. [87]

The 1986 amendment came by way of a City Council sponsored local law.  The power of the City Council to amend a provision of the Charter (section 440) that had previously been approved by initiative, was unsuccessfully challenged by the Police Benevolent Association of the City of New York (PBA).[88]

In 1993, once again after extensive debate and public comment,[89] Mayor David Dinkins and the City Council amended the City Charter to create an independent police oversight agency

---

[83] Local Law No. 40 (1966) ("[C]ivilian complaints against members of the police department of the city of New York shall be investigated and dealt with fully and fairly by the appropriate official regularly charged with the governance and discipline of the police department without interference by any person or group of persons not regularly in police service. . . . Neither the mayor, the commissioner, nor any other administrator or officer of the city of New York shall have power to authorize any person, agency, board or group to receive, to investigate, to hear, or to require or recommend action upon, civil complaints against members of the police department as provided in this section.").

[84] Local Law No. 13-A (1986) (amending Chapter 18, Section 440 of the N.Y. City Charter).

[85] *Id.*

[86] Report of the Legal Division of the NYC Council to Intro. No. 549 of 1992, p.4.

[87] As noted above, FADO is an acronym for Force, Abuse of Authority, Discourtesy and Offensive Language.  CCRB jurisdiction, until 2020, was limited by N.Y. City Charter § 440(c)(1) to civilian complaints that fell into these four categories.  In 2020, the Charter was amended to permit investigation by CCRB of false statements made by officers in the course of a CCRB investigation.  Beginning in 2022 CCRB is further directed to investigate racial profiling complaints, a form of Abuse of Authority of which CCRB had abnegated responsibility to investigate in the past.  "FADO," as a result of expanded authority to investigate untruthful statements, may be found listed as "FADOU" or "FADO-U" in later CCRB reports.  Throughout this Report, for convenience, the term FADO will be used to include FADOU allegations arising after 2022.

[88] *See Caruso v. New York*, 136 Misc. 2d 892, 893 n.1 (distinguishing local law amendments from initiatives and referenda).

[89] Six NYPD officers were arrested in Suffolk County in 1992 for selling cocaine. "New York City Officers Charged with Running L.I. Cocaine Ring," NY Times (May 8, 1992), p.1.  Mayor David Dinkins, shortly thereafter, created the Mollen Commission and proposed a civilian oversight agency.  Union response was a rally with an estimated 10,000 off-duty officers marching on City Hall in protest. McKinley Jr., James C. "Officers Rally and Dinkins is Their Target," NY Times (Sept. 17, 1992).

with an all-civilian membership.[90]    As acknowledged last year in the draft plan for reform submitted to the Governor by New York City, "[a] true CCRB had been an idea for decades before Mayor David Dinkins made it a reality in 1993.  The David Dinkins Plan is the single largest expansion and strengthening of the CCRB since it was established."[91]    The new Board was authorized to hire and employ civilian investigators to replace the 156 civilian and uniformed employees of NYPD previously assigned to review civilian complaints.[92]    These changes were prompted, in part, by increased public support for civilian oversight of the police, which arose out of the response by some officers to protesters demonstrating against a 1:00 a.m.  curfew in Tompkins Square Park in 1988.[93]  According to a CCRB report, video footage at the time "showed police officers striking people with nightsticks, kicking people who were on the ground, and covering their shields to hide their identity."  The CCRB's report on the incident concluded that "[f]orce was used for its own sake."[94]    Among other changes made in 1993, the CCRB's was granted the power to issue subpoenas and recommend discipline in cases the Board was able to substantiate.[95]

The 1993 version of Section 440, supplemented by a Memorandum of Understanding (MOU),[96] remained in place without substantial modification until 2019.  In 2018 the City Council, by Local Law created a Charter Revision Commission.[97]  After hearings and public meetings, the Commission proposed five substantive revisions to Section 440, discussed *infra*, placed on the November 3, 2019, ballot.  The ballot question was approved, and the Charter amendments are now law.[98]

In brief, and as discussed later, the 2019 changes:

- Altered the composition of the Board by permitting direct appointment of Members by the City Council;
- Added an appointee of the Public Advocate to the Board
- Guaranteed a budget based on the size of the police force; and
- Required the Police Commissioner to explain departures from CCRB recommendations.

---

[90] Local Law No. 1 (1993) (repealing NY City Chapter 18, Section 440 and creating a new Chapter 18-A, Section 440)].

[91] NYC Police Reform and Reinvention Collaborative Draft Plan at 14, at 14 (Mar. 5, 2021).

[92] Report of the Committee on Public Safety, New York City Legislative Annual, Dec. 17, 1992.  The Police Commissioner was to assign NYPD personnel to assist the CCRB.  This NYPD assistance would come from the Civilian Complaint Investigative Bureau, which assigned 129 investigators to the CCRB.

[93] *See CCRB History*, *supra* note 3.

[94] *Id*.

[95] *Id.*

[96] *See* Memorandum of Understanding Between the Civilian Complaint Review Board (CCRB) and the Police Department (NYPD) of the City of New York Concerning the Processing of Substantiated Complaints, April 2, 2012, available at https://www1 nyc.gov/assets/ccrb/downloads/pdf/about_pdf/apu_mou.pdf.

[97] Local Law No. 91 (2018).

[98] Local Law No. 215 (2019).

- Authorized investigations by CCRB into false statements made by an officer who is the subject of a complaint in relation to the Board's resolution of the complaint.

Proposed, but not included in the Charter proposition drafted by the Commission, was a shift of final authority over discipline from the Police Commissioner to the CCRB.

Discussed later in this Report were two Charter amendments adopted subsequently by Local Law rather than initiative or referendum. Section 440 was amended in 2021 to specify that complaints of bias-based policing and racial profiling fall within CCRB's abuse of authority jurisdiction.[99] The section was amended again in 2022 to implement a CCRB request to give the Board the capacity to initiate an investigation prior to the filing of a civilian complaint.[100]

### B. Statutory Framework

New York State legislation sets broad parameters for law enforcement oversight and discipline, which is otherwise left to each locality.[101] It provides due process protections for police officers, prescribes a statute of limitations for investigating and disciplining police misconduct, and regulates the types of records and information that can be disclosed during and after an investigation.

### i. Unconsolidated Law § 891, CSL § 75 and NYC Admin. Code § 14-115

New York State's Unconsolidated Law § 891, enacted in 1940, provides generic due process protections for police officers throughout the State.[102] The law states that a police officer cannot be removed from his or her position "except for incompetency or misconduct," which must be demonstrated by a hearing, upon due notice and charges.[103] Any hearing against an officer pursuant to this law is to be "held by the officer or body having the power to remove the person charged with incompetency or misconduct" or, in the alternative, "by a deputy or other employee of such officer or body designated in writing."[104] Police officers have a right to be represented by counsel and may seek judicial review, in accordance with Article 78 of the Civil Practice Law and Rules of any disciplinary action imposed.[105]

Civil Service Law § 75, enacted in 1958,[106] also establishes baseline procedural rules for disciplinary action, but it differs from § 891 in several important respects. For one, it attaches due process requirements before imposition of "any disciplinary penalty provided in . . . section [75],"

---

[99] Local Law No. 47 (2021).

[100] Local Law No. 24 (2022).

[101] A recent reform creates an oversight unit within the Attorney General's Office as well. *See* N.Y. Exec. Law § 75 (2020).

[102] McKinney's Unconsol. Laws of N.Y. ch. 834, § 891 (1940).

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] L 1958, ch. 790.

24

not just termination.[107]  Disciplinary penalties specified in that section are: reprimand, a fine not to exceed one hundred dollars (deducted from wages), suspension without pay, demotion in grade or title, or dismissal.[108]

Under Civil Service Law § 75, any "potential subject of disciplinary action" has a right to union representation, which may include counsel.[109]  The subject must receive advance notice in writing and be afforded a reasonable period of time to obtain representation.  The subject must be furnished a copy of the charges preferred and allotted at least eight days before being required to answer.  A hearing must be held "by the officer or body having the power to remove the person against whom such charges are preferred, or by a deputy or other person designated by such officer or body in writing for that purpose."[110]  At the hearing, the subject, with counsel or union representative, has the right to summon witnesses.  The burden of proof is upon the entity alleging misconduct.  Technical rules of evidence need not be followed; the case may rest on hearsay.  At the conclusion of the hearing, the recommendations of the hearing officer are referred to the Police Commissioner for review and decision.  These rights must be afforded whenever the officer faces one of the listed disciplinary actions.

In 1990, subdivision 3-a was added to Section 75, delegating broader powers to the Police Commissioner with respect to punishment, but not procedure.  The amendment, applicable only to NYPD, authorizes the Police Commissioner to punish an officer guilty of charges "pursuant to the provisions of section 14-115 . . . of the administrative code of the city of New York."[111]

New York City Admin.  Code § 14-115(a)[112] assigns the Police Commissioner:

[The] power, in his or her discretion, on conviction by the commissioner . . . of a member of the force of any . . . neglect of duty, violation of rules, or neglect or disobedience of orders . . . or immoral conduct or conduct unbecoming an officer, or any breach of discipline, to punish the offending party by reprimand, forfeiting and withholding pay for a specified time, suspension, without pay during such suspension, or by dismissal from the force[.]

It further provides that officers,

[S]hall be fined, reprimanded, removed, suspended or dismissed from the force only on written charges made or preferred against them, after such charges have been examined, heard and investigated by the commissioner or one of his or her deputies upon such reasonable notice to the member or members charged, and in

---

[107] N.Y. Civ. Serv. Law § 75(1) (emphasis added).

[108] *Id.* § 75(3).

[109] *Id.* § 75(2).

[110] *Id.*§ 75(2).

[111] L. 1990, ch. 753.

[112] LL 907/1985.

such manner or procedure, practice, examination and investigation as such commissioner may, by rules and regulations, from time to time prescribe.[113]

While the three statutes overlap to some extent, there are inconsistencies in language (discussed later) which, from time to time, raise issues regarding procedure and scope of coverage. The three statutes do not use precisely the same language in defining the range of disciplinary action permitted and to whom the procedural protections are afforded.[114]

### (1)    NY City Charter § 434 and the Taylor Law - Collective Bargaining

NY City Charter § 434 (a) provides that the Police "[C]ommissioner shall have cognizance and control of the government, administration, disposition and discipline of the department, and of the police force of the department."   The Administrative Code says that the Police Commissioner "shall have the power, in his or her discretion . . . to punish [an] offending party."[115] An issue arises whether that power can or should be the subject of collective bargaining with the police unions.[116]   The "Taylor Law"[117] requires public employers to negotiate with certified employee organizations over, *inter alia*, "the terms and conditions of employment of the public employees."[118]   Throughout recent years, some or all of the collective bargaining agreements between the City and one or more unions have expired only to be revived after prolonged negotiations.   In the interim, the "Triborough Amendment" requires the employer to honor the expired agreement until a new agreement is negotiated.[119]

In 2003, an expired collective bargaining agreement with the PBA[120] had contained provisions: (1) requiring expungement of some disciplinary records; (2) prescribing certain rights regarding the timing of charges and trials and reimbursement of pay under certain conditions; (3) setting guidelines for interrogations of subject members; (4) granting a delay for consultation with a lawyer before questioning; and (5) providing for independent hearings.[121]

---

[113] Admin. Code § 14-115(b).

[114] *See, e.g.*, discussion *infra* regarding demotion and multiple penalties.

[115] NYC Admin. Code § 14-115(a).

[116] Herein, reference to "unions" generally means collectively: Police Benevolent Association of the City of New York, Inc.; Sergeants Benevolent Association; Lieutenants Benevolent Association; Captains Endowment Association; and Detectives' Endowment Association.

[117] N.Y. Civ. Serv. Law §§ 201, et seq.

[118] *Id.* § 204(2).

[119] *Id.* § 209-a(1)(e).  An agreement executed for the 2010-2012 term was revived in 2016 and extended to 2018. That agreement had expired and continued in effect under the Triborough Amendment.

[120] Police Benevolent Association of the City of New York.  From 1892 until a name change in 2019 the PBA was known as the Patrolmen's Benevolent Association.

[121] *See Patrolmen's Benevolent Ass'n of City of N.Y. v. N.Y. State Pub. Emps. Rels. Bs.*, 6 N.Y.3d 563, 570 (2006). Ironically, and perhaps inconsistently, in 2003 when the City sought to outsource disciplinary hearings to an independent agency, the Office of Administrative Hearings and Trials (OATH), the PBA sued successfully to bar

During negotiations for renewal of the expired contracts, the City took the position that the listed provisions were not to be continued since the Police Commissioner's authority was not properly a matter subject to mandatory collective bargaining under the Taylor Law. The matter reached the New York Court of Appeals, which held that the declared legislative policy in the Charter and the Code "favoring the authority of [the Police Commissioner] over the police" was a "strong one."[122]  Accordingly, "the public interest in preserving official authority over the police remains powerful. . . . The issue is whether these enactments express a policy so important that the policy favoring collective bargaining should give way, and we conclude that they do."[123]  The Court of Appeals held that "police discipline may not be a subject of collective bargaining under the Taylor Law when the Legislature has expressly committed disciplinary authority over a police department to local officials."[124]

The current Agreement, in continued effect by virtue of the Triborough Amendment, stipulates those grievances "shall not include disciplinary matters."[125]  In the same vein, in recent federal litigation balancing the Department's statutory Freedom of Information Law (FOIL) responsibilities with contract obligations, when unions asserted an agreement to bar disclosure of disciplinary records, the Second Circuit ruled that "the NYPD cannot bargain away its disclosure obligations" under FOIL.[126]

There is a discussion, below, of attempts, past and present, to create mechanisms for adjudication of disciplinary matters by bodies independent of the Police Commissioner, including the Office of Administrative Trials and Hearings or the CCRB.  While this may be done by amendment of local law, state law, or regulation (in the case of SQF misconduct where termination is not a consequence of a finding of misconduct), any such effort might require collective bargaining.  The Court of Appeals has made it clear that discipline in New York City is not subject to collective bargaining due to the continuation of grandfathered laws which pre-dated the Taylor Law. An amendment of state or local law, not being grandfathered, will open the matter to bargaining absent a new restriction in state law.  Recently, Rochester police organizations have successfully challenged efforts to create an independent review panel in that city with the power to control a final decision. The Appellate Division, Fourth Department, setting aside the provision, held that shifts in disciplinary proceedings, post-Taylor Law, fall within the general provision in

---

consideration of discipline by a body outside of the Department. *Matter of Lynch v. Giuliani* ("Giuliani"), 301 A.D.2d 351, 359 (1st Dep't 2003).

[122] *Id.* at 575–76.

[123] *Id.* at 576.  A secondary issue in the case was whether the city provisions had been supplanted by N.Y. Civ. Serv. Law § 75, but the Court pointed to a grandfathering provision in § 76(4), which preserved the City provisions that had been derived from earlier state statutes (L 1897, ch. 378; L 1873, ch. 335), thus permitting them to survive.

[124] *Patrolmen's Benevolent Ass'n of City of N.Y.*, 6 N.Y.3d at 570.

[125]  Patrolmen's Benevolent Association 2010-2012 Agreement, (CBA), art. XXI, § 1(a)(2), 1 year extension signed by Patrick Lynch, President PBA and Police Commissioner William Bratton, February 10, 2016. https://www.nyc.gov/assets/olr/downloads/pdf/collectivebargaining/cbu79-police-patrolmens-benevolent-association-080106-to-073110.pdf.  On April 5, 2023, a new agreement was announced (only the third time in 30 years that an agreement was reached).  It was ratified on April 24, 2023. The new contract is retroactive to 2017 and expires in 2025.  The general terms of the predecessor agreement were continued. (Section two, Memorandum of Understanding Between the City of NY and the PBA.)

[126] *Uniformed Fire Officers Ass'n v. De Blasio*, 846 F. App'x 25, 30 (2d Cir. 2021).

that law that "terms and conditions" of employment are subject to collective bargaining.  That decision was affirmed in November 2023 by the Court of Appeals.[127]

The Collective Bargaining Agreement also creates a "joint subcommittee" tasked with developing procedures to ensure that "[a]ll disciplinary charges shall be brought in a timely fashion pursuant to the current departmental regulations . . . [and] Departmental trials shall be held as promptly as possible, utilizing additional hearing personnel."[128]  In response to inquiry about whether and when the subcommittee currently meets, the Monitor was advised that the First Deputy Commissioner "oversees the internal disciplinary procedures of all Police Department Employees" and "[i]n that capacity he meets with union representatives from time to time to discuss inter-alia issues of the timeliness of the disciplinary process."  The response continues that, "[t]hese meetings have satisfied the Department's/City obligation under the contractual provision."[129]

## IV.    INVESTIGATING POLICE MISCONDUCT – A PRELIMINARY OVERVIEW

In order to escape the mantle of "deliberate indifference" placed upon it by the Court, NYPD will need to demonstrate that it is actively identifying, noting, and responding to unconstitutional stop, question and frisk (SQF) activity and biased policing.  That should include fair-minded investigation of misconduct complaints and discipline when needed.  At present, there are multiple ways in which misconduct is identified and addressed.  There is no unitary systematized method for tracking misconduct or invoking responsive measures.  Instead, an assortment of official bodies, described below, receive complaints and report—invariably by way of recommendation—to the Police Commissioner who may then be required to respond but is not required to act as recommended.  While various investigations, databases and responses co-exist and some data may be interchanged, each system is independent of the other.  Complete sharing of information between agencies is not required in any of the authorizing statutes or regulations.

In addition to the CCRB and the Department itself, there are at least four entities, state and local—internal and external to the Department—which are charged with investigating police misconduct.[130]  In some cases, there are jurisdictional overlaps.  Some entities are limited to generic recommendations without suggesting individualized disciplinary responses.  Other investigating entities are authorized to make findings and comment on discipline, which may have consequences for the Member of Service (MOS) involved if the Police Commissioner concurs.  In the end, absent

---

[127] *Matter of Rochester Police Locust Club, Inc. v. City of Rochester*, 196 A.D.3d 74 (4th Dep't 2021), aff'd 2023 NY LEXIS 1901 (Nov. 20, 2023).  (Taylor law prohibition on bargaining matters of discipline is only applicable to grandfathered restrictions, pre-existing enactment of the Taylor law.)

[128] CBA, Article XVI, § 9, *supra*.

[129] Letter from Jeff Schlanger, former Deputy Commissioner, Risk Management Bureau to the Monitor Team (Jan. 22, 2021).

[130] The New York City Inspector General for the NYPD (OIG-NYPD), the Commission on Human Rights in New York City (CCHR), the Citizens Commission to Combat Police Corruption (CCPC), and the Law Enforcement Misconduct Investigative Office (LEMIO) within the New York State Office of the Attorney General.  This does not include the work of prosecutorial agencies pursuing criminal liability.

a criminal conviction or civil liability assessed against an officer, the final word on misconduct and all disciplinary recommendations rests with the Police Commissioner alone.[131]

The Police Commissioner is appointed by the Mayor and holds office for a term of five years. The Police Commissioner may be removed from office by either the Mayor or the Governor, if in the judgment of either, the "public interest shall so require[.]"[132] There have been thirteen different Commissioner terms—and eleven different individual Commissioners—in the last forty years.[133]

Not only does the Police Commissioner have complete discretion in deciding upon a penalty, but it is also the City's legal posture that "no law mandates how or when [the Commissioner] must impose discipline."[134] Recommendations for discipline by CCRB may be adopted or modified by the Police Commissioner, or may result in No Disciplinary Action (NDA).[135] This Report will attempt to walk the reader through the maze of decision-making which may flow from allegations of misconduct.

Misconduct comes to the attention of the Department in multiple ways. Some complaints are lodged directly with the Department. The most visible outside entity is the Civilian Complaint Review Board (CCRB).[136] Aside from CCRB, three other municipal agencies receive complaints: The Commission on Human Rights (CHR); The Commission to Combat Police Corruption (CCPC),[137] and the Office of the Inspector General for the NYPD (OIG-NYPD).[138]

---

[131] N.Y. City Charter, ch. 18, § 434(a) ("The Commissioner shall have cognizance and control of the government, administration, disposition and discipline of the department, and of the police force of the department.") Of course, various prosecutorial agencies may pursue issues of criminal liability. Their work is outside the scope of this Report.

[132] *Id.* §431(b).

[133] Benjamin Ward (1984-1989); Richard Condon (1989-1990); Lee Brown (1990-1992); Raymond Kelly (1992-1994); William Bratton (1994-1996); Howard Safir (1996-2000); Bernard Kerik (2000-2001); Raymond Kelly (2002-2013); William Bratton (2014-2016); James P. O'Neil (2016-2019); Dermot Shea (2020-2021); Keechant Sewell (2022-2023); Edward A. Caban (Present, Commencing July 1, 2023).

[134] Respondent's Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Petition at 5, *Carr v. de Blasio*, 101332/2019 (Sup. Ct. N.Y. Cnty. July 10, 2020), NYSCEF No. 13. Petitioners had sought a summary judicial inquiry, pursuant to NYC Charter § 1109, into the stop and arrest of Eric Garner, claiming a need for transparency beyond that available under FOIL. The petition did not seek to compel any particular disciplinary outcome. The Court ruled that, "[a] failure to conduct . . . an investigation" in the case before the Court "would constitute a neglect of duty." *Carr v. de Blasio*, 70 Misc. 3d 737 (Sup.Ct. NY Cty. 2020), aff'd 197 A.D.3d 124 (1st Dep't 2021).

[135] Of 498 closed cases, in 2016 through 2019, where an allegation of Stop/Frisk/Question misconduct was substantiated after investigation by CCRB, 39 had a final decision by the Police Commissioner of "NDA." This does not include another 26 cases which were "administratively closed" for a variety of reasons. NYPD "Final Federal Monitor – SQFSTA – 2023 Q1, Q2."

[136] N.Y. City Charter, ch. 18-A, § 440.

[137] Exec. Order No. 18 (Feb. 27, 1995) (signed by Mayor Rudolph W. Giuliani).

[138] N.Y. City Charter, ch. 34, § 808.

Beginning April 1, 2021, a Law Enforcement Misconduct Investigative Office run by a New York State deputy attorney general is to receive and investigate complaints of corruption, abuse, excessive force, and fraud, and to make recommendations thereupon.[139]

Each of the four municipal agencies will be described below. Each agency may review individual complaints, but they have distinct and circumscribed roles. In the end, CCRB is the only outside agency that may prosecute and recommend individualized discipline for a particular officer.

In addition to the four city and state entities, the Department learns of officer misconduct through:

- Civilian complaints to the Department, processed within NYPD through the Internal Affairs Bureau (IAB), and reviewed by the Office of the Chief of Department (OCD), and/or the Department Advocate's Office (DAO);[140]
- Force Investigations by the Force Investigation Division (FID) of force incidents usually triggered by a Threat, Resistance, Injury Report (TRI), which members are required to file;[141]
- Reports by fellow police officers to the appropriate local command or IAB;[142]
- Observation, monitoring, and corrective action by supervisors within a squad, precinct, or command, which may or may not result in "Command Discipline."[143]
- Audits within the NYPD through the Department's Quality Assurance Division (QAD), such as stop report audits, RAND audits,[144] and Police-Initiated Enforcement (PIE) audits;[145]
- Lawsuits brought in federal or state court;

---

[139] L 2020, ch. 104. In one of her first public actions, the Attorney General issued a "Preliminary Report on the New York City Police Department's Response to Demonstrations Following the Death of George Floyd" in which it found a pattern or practice of excessive force and false arrests by officers. *See* New York State Office of the Attorney General, Preliminary Report on the New York City Police Department's Response to Demonstrations Following the Death of George Floyd (July 2020), available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.

[140] Patrol Guide §§ 207-30, 31.

[141] Patrol Guide § 221.-03.

[142] Patrol Guide § 207-21 ("All members of the service have an absolute duty to report any corruption or other misconduct, or allegation of corruption or other misconduct, of which they become aware.")

[143] *See generally* Patrol Guide § 202, *et seq.*

[144] RAND audits are reviews of radio dispatches (ICADS – "Improved Computer Aided Dispatch System"), following an encounter, screened for use of certain key words ("stopped" "holding" "under" "warrant check," etc.), to ascertain if a *Terry* Stop has occurred and has been properly reported.

[145] PIE audits are reviews by Departmental auditors of the paperwork when a self-initiated enforcement action (i.e., not in response to a call or directive) has resulted in an arrest. Under an Audit Plan approved by the Court, *see* Memo Endorsement, *Floyd*, 959 F. Supp. 2d 540 (No. 08-cv-1034), ECF No. 791, there will be a review of one encounter (where an arrest occurred) per week in each of 133 commands, yielding a total of 6916 encounters reviewed. In addition, RAND and QAD reviews will yield data on roughly 7,980 additional encounters. Integrity Control Officers within each precinct review the audit response for corrective action.

- Claims filed and settled with the City Comptroller prior to commencement of a lawsuit;[146]
- Alerts by court decisions or by prosecutors' advice when illegal activity or testimony thought not to be credible triggers an adverse credibility referral to the Department.

Although lawsuits and civil claims may expose misconduct, court judgments and settlements—even where personal liability is assessed—do not necessarily lead to disciplinary proceedings against an officer. If the claimant does not file a complaint with IAB or CCRB, it would be unusual for a disciplinary investigation to be commenced solely on account of a civil claim—even one with merit. To the contrary, pending court proceedings will sometimes cause a halt to an ongoing disciplinary investigation. As will be demonstrated later in this Report, where the history of complaints against a sample of officers is catalogued, it is not uncommon for officers to have legal proceedings pending in court for one set of misconduct claims, while other unrelated allegations of misconduct against the officer are simultaneously being investigated at CCRB or IAB. The extent to which the Law Department (handling litigation) and DAO (handling disciplinary proceedings) interact, harmonize, or seek to consolidate multiple complaints or lawsuits is unknown. Case histories tend to indicate that pending litigation can result in a settlement or administrative closure of parallel disciplinary proceedings. Failure to pursue misconduct by internal or CCRB investigation tends to inure to the benefit of an officer facing a lawsuit, since a misconduct finding might otherwise jeopardize the officer's right to indemnification or representation by the City and, as well, might imperil a defense of qualified immunity asserted by the City.

Overall, there are three principal tranches by which disciplinary proceedings may be commenced and Departmental discipline imposed:

- (1) CCRB may substantiate a civilian complaint and recommend formal or informal discipline to the Police Commissioner by way of referral through DAO or by prosecution before a Deputy Commissioner for Trials ("DCT");
- (2) Departmental investigative entities (IAB, BIU, FID, or OCD) may investigate and recommend formal or informal discipline to DAO or to a Commanding Officer;
- (3) Local Commanding Officers or Executive Officers ("XO"s) may pursue matters within their command based upon recommendation of an Integrity Control Officer ("ICO"), a supervising officer, or an audit.

Not all misconduct involving public interaction is subject to investigation by CCRB. The Board has a limited and circumscribed role in addressing misconduct. For one, prior to 2022,

---

[146] N.Y. City Charter, ch. 5, § 93(i). In FY 2019 there were 5,848 tort claims against NYPD, which include civil rights violations. Tort claims settled at the pre-litigation stage for $220.1 million. There were 2,315 "police action" claims settled in court for $95.2 million. Police action claims result from alleged improper police action, such as false arrest or imprisonment, excessive force or assault, or failure to provide police protection. Separately, civil rights claims for wrongful convictions, which may or may not include police misconduct, settled for $30.9 million. Office of the New York City Comptroller, Claims Report: Fiscal Year 2019 (June 2020), available at https://comptroller.nyc.gov/wp-content/uploads/documents/Claims-Report-FY-2019.pdf. In FY 2022 the "payout" for cases commenced in state and federal court against NYPD rose to $208,702,000. Mayor's Management Report, FY 2022, at 61.

CCRB needed a civilian complaint.[147]  Without a civilian complaint, wrongful police action falling within the CCRB's jurisdiction (Force, Abuse of Authority, Discourtesy and Offensive Language – FADO), including an illegal stop or frisk, would go unexamined unless the Department or CCRB investigated the FADO violation on their own initiative without a complaint.  Use of Force is tracked and assessed independently by NYPD and discipline may follow without a civilian complaint.  Stops are audited, but disciplinary proceedings, or even investigations, for stop and frisk misbehavior absent a civilian complainant are very rare.

CCRB has subject matter jurisdictional limitations and personal jurisdictional limitations which are discussed in more detail later.  These limitations often result in separate investigations for the same encounter, with CCRB looking at one aspect of a complaint (e.g., a FADO allegation), while the Department will weigh another.  A common example of CCRB's jurisdictional limitation, for purposes of this Report, is the dichotomy between complaints regarding stop and frisk misbehavior, which CCRB does investigate, and an officer's failure to file a stop report for the encounter, failure to activate a body worn camera,[148] or a wrongful traffic stop, all of which may be outside CCRB's jurisdiction.

This Report will address NYPD investigations before examining the more limited role CCRB may play when it receives a citizen complaint.  But before walking through the advantages and disadvantages of each tranche as a mechanism for identifying SQF misconduct and invoking discipline, an explanation of what is meant by "misconduct" and "discipline," along with a brief description of the difference between "formal discipline" and "informal discipline," is in order.

### A.    What is "Misconduct"?

The term "misconduct" covers a broad range of prohibited behavior.  Officers may act inappropriately in dealing with the public, be it through direct violation of *Floyd*'s mandate or in other ways including corruption, discourtesy, wrongful use of force, improper or retaliatory arrests, offensive language (slurs), improper search or seizure of a vehicle, property, or premises, false testimony, sexual harassment, theft, interference with recordings, destruction of recordings—to name a few.  But not all allegations of misconduct derive from interactions with the public.  A vast number of investigations are for lack of compliance with NYPD rules, relating to missed assignments, wrongful use of Departmental property, improper dress, failure to complete necessary reports, and the like.  Additionally, officers commonly face discipline for off-duty personal misbehavior involving, for example, driving while impaired, drug or alcohol abuse, and domestic disputes.

In the end, the contours of what can be pursued as misconduct are not outlined with precision but are shaped by reference to a North Star—the Department Manual which includes the

---

[147] The Charter was amended, effective January 20, 2022, to permit initiation of investigations by the Board.  NYC Charter § 440, LL 24/2022.  Unfortunately, this is confined to some extent because, on June 8, 2023, CCRB and NYPD included a clause in a "Data Sharing Agreement" which limits pursuit of a bias-based or racial profiling investigation, "If the Complainant is uncooperative or otherwise does not wish to pursue the allegation, the CCRB will not make a request for Data. . . ."  Article II, para. B.

[148] CCRB proposed an amendment to its Rules permitting review of improper use of body worn cameras.  (Proposed 38-A § 1-01 at https://rules.cityofnewyork.us/wp-content/uploads/2022/06/CCRB-Rules-FINAL-5-31-22-with-Certifications.pdf.)  The amendment was adopted, effective Oct. 22, 2022.

Patrol Guide and the Administrative Guide.[149]  These Guides generally spell out the rules officers must follow.[150]  The rules contained in the Guides are not drafted externally; they are written and amended by the Police Commissioner at the Commissioner's sole discretion.[151]

The origins of the Patrol Guide lay in "Rules and Regulations for Constables" adopted by Mayor De Witt Clinton in 1812, some thirty-three years before the NYPD as we know it was formed.  But it was not until January 2017 that the Patrol Guide was readily available to the public. NYC Admin. Code § 14-164 required, for the first time, that the Guide be published on the Department's website.[152]  The Patrol Guide is constantly evolving.  Section 14-164 requires monthly updates to be posted for public access as well.

Commencing June 2021, the Police Commissioner moved large sections of the Patrol Guide (all of Sections 203 and 204 dealing with common misconduct issues) from the Patrol Guide to a separate document known as the Administrative Guide.[153]  Thus far, transfer from the Patrol Guide to the Administrative Guide has not resulted in many substantive changes.[154]  However, unlike the Patrol Guide, the entirety of the Administrative Guide need not be made public and is not required by local law to be published.  On August 4, 2021, portions, but not all, of the

---

[149] The Court has ordered or approved a few provisions pertaining to the issues in *Floyd*.  Any such changes would require Court approval prior to amendment or revision.  Salient provisions of the Patrol Guide were stripped and moved to the NYPD Administrative Guide in July 2021.  The Patrol Guide and the Administrative Guide, together, are now denominated the "Department Manual."  Misconduct allegations, in NYPD's Disciplinary Guidelines refers to violations of the Department Manual.  The Manual may be found at https://www1 nyc.gov/site/nypd/about/about-nypd/manual.page.  Misconduct also includes criminal conduct, such as violations of NYS Penal Law, an analogous statute of another state, or federal law.  NYPD "Disciplinary System Penalty Guidelines" n.36, at 18.  Depending upon the salient date, this Report will occasionally cite a Patrol Guide section which was subsequently moved to the Administrative Guide.  For convenience, a conversion table is appended to this Report, correlating old sections with new sections.

[150] *See* NYPD Disciplinary System Penalty Guidelines, at 45: "Department rules and regulations are codified in the Patrol Guide, Administrative Guide, Detective Guide, DAS Bulletins, Finest Messages, Reference Guides and other publications available to members on the Department's electronic portal under the "Directives & Manuals" section." (citing https://portal nypd.org/pages/DirectivesAndManuals.aspx).  Unfortunately, other than the Patrol Guide and some sections of the Administrative Guide, these are not publicly available, making it difficult to know whether some rules or regulations have been violated and, if so, how.

[151] As an example, a recent notable re-write by the Police Commissioner is in the definition of "Making False Statements," Patrol Guide § 203-08.  (Now Admin. Guide § 304-10.)  The Department had, for decades, promised to punish intentionally false official statements with presumptive termination, which, in practice, rarely occurred.  After years of criticism by the Commission to Combat Police Corruption for lack of enforcement and in the Department's handling of false statement allegations, Section 440(3) of the City Charter was amended, over objection by the Department, to permit some false statement investigations by CCRB.  On the day that the amendment took effect, March 31, 2020, the Patrol Guide was amended, allowing the Police Commissioner greater flexibility in disciplining findings of false or misleading statements by codifying exceptions to a finding of a false official statement.  It will be worth watching to see how closely CCRB follows the Police Commissioner's formulation.

[152] Local Law No. 129 (2016), effective Jan. 29, 2017.

[153] A spreadsheet documenting the re-numbering or re-naming of sections is appended to this Report.

[154] The prohibition on Biased-Based Policing has added new sections in conformance with Federal Law, discussed later.  Also, Patrol Guide § 203-10(7) previously placed an outright ban on "[s]oliciting, collecting, or receiving money for any political fund, club, association, society, or committee."  With the move to the Administrative Guide, such political activity is acceptable if "approved by Internal Affairs Bureau."  Admin. Guide § 304-06(16).

33

Administrative Guide were posted online.[155]  Whether the shift will have impact on public access or ease of amendment remains to be seen.  The change was made without advance public notice and the rationale for the shift has not been publicly explained.  A concern would be if it becomes more difficult for complainants to identify, or for CCRB to allege, misconduct with specificity.  Will it be more difficult, after findings are made, for reviewers to understand or to account for cases which are unfounded or exonerated?[156]  Included in the removed sections are regulations prohibiting an array of public-contact misconduct, from bias-based policing and making false statements, to refusals to identify oneself or to comply with the Right to Know Act.[157]

The move to the Administrative Guide followed shortly after the Department and the City were required, by Executive Order, to submit a plan going forward for improvement of police practices following the murder of George Floyd.[158]  A draft plan was prepared March 5, 2021 and, with some modifications adopted by the City Council on March 25, 2021.[159]  The Draft Plan promised that NYPD and CCRB would "[e]stablish the Patrol Guide Review Committee," which would "allow for reform by identifying policies and practices outlined in the Patrol Guide that need to be changed."[160]  This, if adopted, would have accomplished three reforms: (1) it would constrain the Police Commissioner's unilateral power to define misconduct; (2) it would lend transparency and community involvement to the portions of the Guide; and (3) it would synchronize definitions employed by CCRB and NYPD.  The final plan adopted 20 days later, omitted the recommendation.  Nonetheless, moving large sections of the Patrol Guide to the Administrative Guide insulates, for now, the Police Commissioner's exclusive authority to define misconduct from the City Council proposal.

CCRB generally abides by, and applies, the Commissioner's definitions in the Patrol Guide and Administrative Guide (referred to collectively as the "Department Manual") when drawing charges and specifying allegations of misconduct.  However, CCRB is not necessarily confined to the express elements of an offense as written in the Manual.[161]  CCRB can, by regulation, if necessary, adjust its own finding as to what constitutes a FADO violation.  This is especially true

---

[155] NYPD, Department Manual, available at https://www1.nyc.gov/site/nypd/about/about-nypd/manual.page.

[156] One prominent example is the omission of Admin. Guide § 322-11, referenced later in this report.  While that section defines disciplinary outcomes, it is not publicly available.

[157] *See, e.g.*, Local Law No. 54 (2018) (adding NYC Admin. Code § 14-174 ("Identification of police officers")) and Local Law No. 56 (2018) (adding NYC Admin. Code § 14-173 ("Guidance regarding consent searches")).

[158] Exec. Order No. 203 (June 12, 2020).  The emergency executive order, issued during the COVID pandemic, was discontinued by the Legislature in April 2021.

[159] *See* NYC Police Reform and Reinvention Collaborative Draft Plan (Mar. 5, 2021), available at https://www1.nyc.gov/assets/home/downloads/pdf/reports/2021/Final-Policing-Report.pdf, adopted by the N.Y. City Council, Intro. Res. 1584/2021 (Mar. 25. 2021).

[160] *Id*. at 15.

[161] Tension between CCRB's finding that a FADO violation has occurred and the Police Commissioner's decision on whether a Patrol Guide violation will be acknowledged, can, and does, arise.  The contours of misconduct in the areas of false testimony, sexual harassment, and racial profiling—all discussed later—are particular areas of potential disagreement.

in the definition of "Abuse of Authority," which is malleable.[162]  There is a lengthier discussion of the scope of Abuse findings later in this Report.

Neither "Discourtesy" nor "Offensive Language" are sharply defined in the Patrol Guide or the Administrative Guide.  Findings by CCRB of Discourtesy will usually refer either to Patrol Guide § 200-02, which states that one of the "Values" of the Department is to "render [their] services with courtesy and civility" or Patrol Guide § 203-09 (now Admin. Guide § 304-11), which states that a "Purpose" of the section is to "ensure uniformed members of the service interact with members of the public in a professional manner."  "Offensive Language" (commonly referred to as a "Slur") is captured by a general prohibition against "[u]sing discourteous or disrespectful remarks regarding another person's age, ethnicity, race, religion, gender, gender identity/expression, sexual orientation, or disability" in the Administrative Guide.[163]  CCRB is left with a range of discretion in finding discourtesy or offensive language violations.  There is no guarantee, however, that the Police Commissioner will agree with the findings.  In the end, notwithstanding a finding by CCRB, the Police Commissioner decides whether to discipline a member for a remark that CCRB deemed offensive, or a gesture found by CCRB to be discourteous.  The Police Commissioner may simply disagree with the finding and then deny imposition of discipline.[164]

There is considerable flexibility for the Police Commissioner to find misconduct in the interstices of the Patrol Guide.  Patrol Guide § 203-10 (5)[165] prohibits "[e]ngaging in conduct prejudicial to good order, efficiency or discipline of the Department."  This open-ended canon is often used in conjunction with, or as an alternative to, other well-defined rule violations when the evidence may not clearly prove a violation of the better-defined rule.[166]  In the words of the Department, "[t]his is a catch-all.  A lot of conduct is considered prejudicial to the good order and

---

[162] *See, e.g.*, *Lynch v. NYC Civilian Complaint Rev. Bd.*, 206 A.D.3d 558 (1st Dep't 2022) (allowing the Board to add sexual harassment as misconduct under abuse of authority*)*; *DiGiacomo v. NYC Civilian Complaint Rev. Bd.*, 214 A.D.3d 531, 532 (1st Dep't 2023) ("CCRB had a rational basis for defining abuse of authority to include NYPD members' 'refusals to provide identifying information. . .'").

[163] Admin Guide § 304-06(2), formerly Patrol Guide § 203-10.  When the provision was moved from the Patrol Guide to the Administrative Guide, "age" was added.  Neither Guide speaks to gestures, but gestures can form the basis of a finding by CCRB.

[164] In a recently filed Departure Letter, the Police Commissioner disagreed with a CCRB finding that a "sexually suggestive remark [should] be penalized as an offensive language statement" in a case where an officer, standing "mere inches" from the complainant, stated, "Do you want to kiss me?"  The Police Commissioner decided that the officer did not intend to make any reference to the individual's sexual orientation when he made the statement."  The findings were reduced to discourtesy, citing a Board recommendation "that the penalty itself should be mitigated due to the novelty and complexity of the policy regarding offensive language statements."  Police Commissioner's Penalty Departure, Detective ██████████, August 25, 2022. https://www.nyc.gov/assets/ccrb/downloads/pdf/complaints/complaint-outcomes/redacted-departure-letters/██████████_RedactedDepartureLetter.pdf.

[165] Now Admin. Guide § 304-06(1).

[166] *See* Commission to Combat Police Corruption, Sixteenth Annual Report of the Commission at 86 (Oct. 2014), available at https://www1 nyc.gov/assets/ccpc/downloads/pdf/Sixteen-Annual.pdf.  ("The 'conduct prejudicial' section is often used when misconduct falls short of 'making false official statements' as defined" in the Patrol Guide.)

efficiency of the Department.  Some of this conduct is corruption, other is misconduct, and other is administrative violation."[167]

## B.    Describing Findings

Whether conducted internally at NYPD or independently at CCRB, investigations can conclude with a finding for each allegation.  After a finding, penalty recommendations by CCRB are made for each substantiated allegation while NYPD has assessed one penalty for an entire case.[168]    An "**allegation**" is one distinct violation of a provision of the Patrol Guide or Administrative Guide for one act of improper conduct by one officer.  Often, there are multiple allegations within a complaint against an officer.  A "**complaint**" usually includes all the allegations arising from one encounter and investigated by one entity.  (One encounter may result in two complaints being pursued separately in CCRB and in NYPD for jurisdictional reasons.)  Within one entity with jurisdiction (CCRB or NYPD), if there are multiple complainants (victims, witnesses, or supervisors) arising from one encounter or incident, the allegations are usually kept together in one complaint.  A "**case**" refers to the investigation and disposition of one individual officer's conduct within a complaint.  There will be several "cases" within a complaint when there are multiple officers charged in connection with one incident.

Generally speaking, findings are denominated by NYPD as either: **Substantiated**, **Unsubstantiated**, **Unfounded**, or **Exonerated**.    In 2022, CCRB proposed to replace "Unsubstantiated" with "Unable to Determine" and to replace "Exonerated" with "Within guidelines."  The new terminology for CCRB case dispositions took effect October 22, 2022.[169]  There are supplemental outcomes under both CCRB Rules and NYPD guidelines beyond these categories.

There are slight variations in the formulations used for each of the principal dispositions, which can lead to confusion as to the significance of a particular finding.  The definitions and the differences in nomenclature often require a judgment call that is not easy to make.  Differences in the definition of "unsubstantiated," "exonerated," or "unfounded," while subtle, will have consequences in how they are noted and kept in personnel files, whether sealing or expungement will follow, and in the available files for consideration in investigations that may arise anew at a later time.[170]

---

[167] Risk Management Bureau, Federal Monitor Team Request Form (Apr. 16, 2020), on file with the Monitor Team.

[168] With the adoption of a "grid" or "matrix," NYPD has begun to assign a penalty for each substantiated allegation, but "[i]f the same underlying act(s) of misconduct support multiple definitions of proscribed conduct or support alternative theories of prosecution, then a single penalty will be applied."  NYPD, Disciplinary System Penalty Guidelines at 12 (Jan. 15, 2021).  Penalties for a given case may be the aggregated sum of penalties for individual allegations.  "Both the NYPD and CCRB determine a finding for each allegation and penalties are based on the totality of substantiated allegations."  City 09.01.23 Feedback to Yates Discipline Report, Item 30.

[169] The dispositions analyzed in this Report occurred prior to October 22, 2022.  Accordingly, earlier terminology is used throughout the discussion of those dispositions.

[170] Police Benevolent Association of the City of New York ('PBA'), Sergeants Benevolent Association ("SBA"), Lieutenants Benevolent Association ("LBA") Collective Bargaining Agreements ("CBAs"), art. XVL, § 7(c) requires removal of unfounded and exonerated findings in the Central Personnel Index (CPI), but not of unsubstantiated

CCRB Rules, prior to October 22, 2022, provided for nineteen different possible dispositions,[171] the majority of which explain the outcome of an investigation that may have been side-tracked before completion—Complainant Unavailable, Complainant Uncooperative, and Officer Unidentified are a few examples.   As to the principal findings after a completed investigation, the CCRB Rules[172] gave the following definitions:

- **Substantiated**:  There was a preponderance of evidence that the acts alleged occurred and constituted misconduct.
- **Unsubstantiated**:  There was insufficient evidence to establish whether or not there was an act of misconduct.
- **Unfounded**:  There was a preponderance of the evidence that the acts alleged did not occur.
- **Exonerated**:  There was a preponderance of the evidence that the acts alleged occurred but did not constitute misconduct.
- **Other Misconduct Noted** (**OMN**):  Evidence of misconduct is indicated, but the allegation falls outside of CCRB's FADO jurisdiction and is being referred to NYPD for investigation or disposition.

Until recently on its website,[173] CCRB described the outcomes slightly differently, as:

- **Substantiated**:  means there is sufficient credible evidence to believe that the subject officer committed the alleged act without legal justification.
- **Unsubstantiated**:  means the available evidence is insufficient to determine whether the officer did or did not commit misconduct.
- **Unfounded**:  means there is sufficient credible evidence to believe that the subject officer did not commit the alleged act.
- **Exonerated**:  means the subject officer was found to have committed the act alleged, but the officer's actions were determined to be lawful.

---

findings. [U]pon written request to the Chief of Personnel by the individual employee, remove from the Personnel Folder investigative reports which upon completion of the investigation are classified 'exonerated' and/or 'unfounded.'" *Uniformed Fire Officers Ass'n v. de Blasio*, No. 20-cv-05441 (S.D.N.Y. Sept. 4, 2020), ECF No. 226 at 16.

[171] Prior to 2022, there were nineteen defined "Case Dispositions" including: complaint withdrawn, complainant unavailable, victim unavailable, complainant uncooperative, victim uncooperative, victim unidentified, officer unidentified, referral to another agency, lack of jurisdiction, mediated agreement, failed mediation when complainant fails to participate, officer no longer with NYPD, and administrative closure when an agency, not a member of the public, refers a case but CCRB is unable to proceed.  38-A RCNY § 1-33.  Much of the data in this Report applies to cases decided under this formulation.  As discussed below, the Rules were amended, September 22, 2022.  As of that amendment, there were fifteen case dispositions.  The most significant changes were: (1) "Unsubstantiated" became "Unable to Determine"; and "Exonerated" became "Within NYPD Guidelines."  *Id.*

[172] *Id.*

[173] CCRB, Case Outcomes, available at https://www1 nyc.gov/site/ccrb/investigations/case-outcomes.page (last accessed Apr. 18, 2022).  These are the same definitions of "unfounded" and "exonerated" advanced by Corporation Counsel in a recent federal court filing.  *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss at 11, *Uniformed Fire Officers Ass'n v. De Blasio*, No. 20-cv-05441 (S.D.N.Y. Sept. 4, 2020), ECF No. 220, n.3 at 5.

As of October 22, 2022, CCRB has amended Section 1-33 ("Case Dispositions"):[174]

- **Unable to Determine** replaces Unsubstantiated.
- **Within NYPD Guidelines** replaces Exonerated.

The Detectives' Endowment Association and the Lieutenant's Benevolent Association (representing more than 7000 members) have objected to the change in nomenclature. They contend that the change "would unnecessarily create confusion . . . to the detriment of officers and the public." They ask that the reason for lack of substantiation (withdrawal, non-cooperation, failure of proof) should be itemized and that the term "exonerated" is needed as "the clearest indication that [the officer] did nothing wrong."[175]

Similarly, the PBA and the Sergeants Benevolent Association (on behalf of 30,000 members) predict that inconsistencies in terminology used by CCRB with those traditionally used by NYPD and other agencies, such as District Attorneys and the courts will be confusing, make compliance with confidentiality, disclosure, and evidentiary rules more difficult and "promote the serious risk of improper disclosure." [176]

In pending litigation against the revised definitions by CCRB, the NYC PBA has argued that:

> CCRB's changes to the long-standing case disposition categories are arbitrary and capricious for numerous reasons, including because they: (i) create inconsistency with the NYPD and other bodies that use and rely on the same disposition categories; (ii) create obvious prejudice to officers by labeling them with seemingly blameworthy disposition terms even when they have not been found to have committed any wrong doing; and (iii) impair the accuracy and completeness of CCRB data necessary to hold CCRB accountable.[177]

The PBA contends that "CCRB's new disposition . . . 'unable to determine' – is inaccurate and unfairly carries a stigma for the subject officer. It suggests that the investigation was somehow

---

[174] CCRB, Implementation of Charter Changes and Other Amendments, available at https://rules.cityofnewyork.us/rule/implementation-of-charter-changes-and-other-amendments/. Along with changes to the definition of "unsubstantiated" and "exonerated," the Board also proposes to combine "complainant unavailable," "alleged victim unavailable," "alleged victim unidentified," "alleged victim uncooperative," and "complainant uncooperative" into one category—"unable to investigate." This reduces the list of outcomes from 19 to 15.

[175] Letter, Karasyk & Moschella to Heather Cook, Assistant General Counsel, CCRB (July 11, 2022), at 5.

[176] Letter, Patrick J. Lynch and Vincent J. Vallelong to Heather Cook (July 11, 2022), at 15.

[177] *NYC PBA v. City of New York*, Index No. 150441/2023, Doc. No. 22 at 19. (Sup. Ct. N.Y. Cnty, 2023). The court denied much of the petition on January 2, 2024, but did reinstate categories previously listed in Rule 1-33(e)(6), including "Complainant Unavailable," "Alleged Victim Unavailable," "Complainant Uncooperative," "Alleged Victim Uncooperative," and "Alleged Victim Unidentified." NYSCEF DOC. No. 71.

incomplete, rather than projecting the fact that no misconduct was proven after full presentation of evidence."[178]

A vast number of CCRB cases are "truncated." As discussed later, the number can be anywhere from 50 to 70% of CCRB case closings. The new definition, "unable to determine," creates an overlap between cases that are fully investigated but wanting in persuasion and those cases where the record was not fully developed for lack of a witness.

By comparison to CCRB, NYPD uses the following "standardized terminology . . . when preparing reports concerning internal investigations":[179]

- **Substantiated**: Accused employee has committed ALL of the alleged acts of misconduct.
- **Partially Substantiated**: Employee has committed PART of alleged act(s) of misconduct. (This describes a case outcome, not an allegation determination.)
- **Unsubstantiated**: Insufficient evidence to clearly prove OR disprove allegations made.
- **Unfounded**: Act(s) complained of DID NOT OCCUR or were NOT COMMITTED BY MEMBERS OF THIS DEPARTMENT.
- **Exonerated**: Subject employee(s) clearly NOT INVOLVED in ANY MISCONDUCT. Incident occurred but was lawful and proper.
- **Misconduct Noted**: Act(s) of misconduct OTHER THAN those alleged complaints [sic] were committed by the concerned employee. (This classification can be used with any of the aforementioned dispositions as a case outcome.)

In addition, NYPD will close cases with categories not utilized by CCRB, including:

- **Information and Intelligence**: Although the evidence did not substantiate a misconduct allegation, the matter is referred back to the officer's command for tracking purposes. This classification may be used as well for **Minor Procedural Violations** (MPV) which did not rise to the level of misconduct.

IAB uses still another set[180] when investigating discriminatory activity:

- **Substantiated**: Credible evidence exists that the accused MOS committed the alleged act of misconduct, and such credible evidence outweighs the evidence that the accused MOS did not commit the alleged misconduct.
- **Unsubstantiated**: There is insufficient credible evidence to prove or disprove the allegation.

---

[178] *NYC PBA v. City of New York*, Index No. 150441/2023, Doc. No. 22 at 22. (Sup. Ct. N.Y. Cnty, 2023).

[179] NYPD Admin. Guide § 322-11 (effective June 23, 2020). Unfortunately, IAB Guide 620-58 (dealing with profiling investigations) uses yet another set of definitions. Adding to the mystery, Administrative Guide § 322-11 is not available to the public online.

[180] IAB Guide 620-58.

- **Unfounded**: Credible evidence exists that the alleged act of misconduct did not occur or that the accused MOS did not commit the alleged act of misconduct and such credible evidence outweighs the evidence that the accused MOS did commit the alleged misconduct.
- **Exonerated**: Credible evidence exists that the alleged conduct occurred, but it was lawful and proper.

The inconsistencies in definitions, at first blush, appear minor. They are not. With the lack of uniformity, cases can fall into different slots not because of the evidence or lack of evidence, but merely due to ambiguity in interpretation.[181] As a simple matter of logic and fairness to officers, complainants, and the public, it would seem that one set of definitions should be uniformly and consistently applied. As put by the PBA in recent litigation, "[I]t is vital that . . . disposition categories be fair, accurate, and consistent across agencies."[182] As one example, the Charter prohibits use of an "unsubstantiated" complaint as a basis for a CCRB recommendation.[183] The PBA fears, with some justification, that renaming an "unsubstantiated" case as an 'unable to determine" case may become a vehicle for bypassing the Charter's prohibition.[184]

Fundamentally, as in any adjudicatory process, the definitions require understanding the difference between findings of fact and conclusions of law.[185] Findings of fact can be based upon a weighing and balancing of all the evidence—extrinsic, testimonial (including assessments of credibility), and inferences that may be drawn from the totality of the accepted facts. Conclusions of law require a determination of whether the facts, once found, constitute a violation of the Constitution, other laws, or the Patrol Guide and the Administrative Guide.

NYPD's rules regarding adjudication in the Trial Rooms recognize this principle.[186] In outlining the procedure at the end of a trial for hearing officers' reports to the Police

---

[181] In another context, discovery in criminal proceedings, a court refused to be bound by CCRB denominations due to the lack of a uniform standard. *People v. Taveras* (Bx Crim. Ct. Feb. 10, 2023), NYLJ p.17, col 3 ("Unless specifically restricted by statute, city and state agencies are free to modify their administrative regulations, altering applicable definitions and standards so long as such modifications do not run afoul of the law. Unlike defined standards of proof in formal criminal and civil law proceedings, there is no universal standard which governs the administrative proceedings or internal investigations of different city, county and state law enforcement or ombudsman agencies. Thus, an unsubstantiated finding in Albany County might be an exonerated finding in New York City and vice versa. The CCRB may use the term unsubstantiated today but, later, may substitute that term for another. Limiting discovery to categories which are not governed by standards that are universal across New York State and/or are subject to change when the individual agency deems appropriate could result in potentially arbitrary rulings."). Subsequently, upon application by the People to re-argue the invalidation of a certificate of compliance, the decision was vacated on other grounds. *People v. Taveras*, CR-004492-22BX, NYLJ p.17, col. 1 (Apr. 14, 2023). Nonetheless, the Court's observations regarding a lack of uniformity in definitions remains undisturbed.

[182] *NYC PBA v. City of New York*, Index No. 150441/2023, Doc. No. 22 at 25 (Sup. Ct. NY Cty, 2023).

[183] NYC Charter § 440(c)(1).

[184] *NYC PBA v. City of New York*, Index No. 150441/2023, Doc. No. 22 at 25 (Sup. Ct. NY Cty, 2023).

[185] *See generally*, *e.g.*, *Rochester Lantern Co. v. Stiles & Parker Press Co.*, 135 N.Y. 209 (1892); *People v. Brown*, 33 N.Y.3d 983 (2019) (requiring a finding of fact before deciding a question of law in the context of CPL 440 proceedings).

[186] *See* 38 RCNY § 15-06. Rules of the Police Department: Adjudications.

Commissioner, the Rules provide, "[t]he Draft Report and Recommendation shall consist of a summary and analysis of the testimony, recommended findings of fact and conclusions of law, and recommendations for the disposition of the Charges and Specifications."[187]  However, the CCRB Rules do not specifically ask a panel to do the same.  There, an investigator writes up a summary of the facts and the panel makes a "finding" for each allegation.  If deference is to be given to factual determinations, as required by the Remedies Opinion, it would be cleaner for panels to follow the practice used by Trial Commissioners, i.e., to specifically make findings of fact and, separately, state conclusions of law.  At that point, it would be appropriate for DAO and the Police Commissioner to give deference to the findings of fact, which is the practice, generally speaking, for hearings by administrative judges and panels.[188]

On occasion, reviewers will mistakenly intermix the term "credibility" with "factual findings."  "Credibility" is an assessment of the believability of an individual witness or the witness' statements.  Assessing credibility of a witness or a statement does not end the inquiry. That assessment is a component within a factual finding.  The ultimate conclusion should be based on a weighing of all the credited "evidence"—the totality of circumstances—beyond a mere assessment of the credibility of a single witness.  Factual findings should include credited testimony, but also may include other evidence such as videos, documents, and reasonable inferences.  In the absence of extrinsic evidence, a finding by the factfinder may be based upon credited testimony without extrinsic evidence but is not limited to credited testimony when other evidence is available.[189]  A finding should not be based, even in part, on discredited testimony.

Unfortunately, in the various definitions:

- The terms "misconduct" and "acts" are used interchangeably when there is an important distinction between a finding that an "act" occurred as opposed to a finding that "misconduct" occurred (and thus drawing a legal conclusion as to whether the act was a violation).
- The CCRB online definition of "unsubstantiated" (endorsed by Corporation Counsel in federal court[190]) speaks of the insufficiency of "available" evidence, while the definition in the CCRB Rules, prior to the proposed amendments, and in the NYPD Administrative Guide do not.
- The Administrative Guide, 322-11, states that a case is unsubstantiated when there is insufficient evidence to "clearly prove or disprove" allegations.
- A misidentification of an offending officer could result in exoneration under the NYPD definitions but only a finding of unfounded in CCRB's formulation.
- CCRB will categorize a case as unfounded when there is "sufficient credible evidence to believe the subject officer did not commit the alleged act" under one formulation but

---

[187] *Id.* § 15-06(a)(2).

[188] *See, e.g.*, *Berenhaus v. Ward*, 70 N.Y.2d 436, 443-45 (1987).

[189] See discussion of fact-finding and deference to CCRB in the analysis of Departure Letters, below.

[190] Defendants' Memorandum of Law in Support of Their Motion to Dismiss at 5,11, *Uniformed Fire Officers Ass'n v. de Blasio*, No. 20-cv-05441 (S.D.N.Y. Sept. 4, 2020), ECF No. 220.  *See also* https://www.courtlistener.com/recap/gov.uscourts.nysd.540297/gov.uscourts.nysd.540297.220.0_1.pdf.

would require "a preponderance of the evidence that the acts alleged did not occur" under another.

The three definitions of "unsubstantiated" or "unable to determine" listed above differ slightly. Does an unsubstantiated result mean that: (1) there was insufficient proof that an act of misconduct occurred at all; (2) there was proven misconduct but insufficient evidence that the subject officer is the malefactor; or (3) there was some evidence that the officer engaged in misconduct, but it was not proven by a preponderance of the evidence?[191]

In reviewing various exchanges between CCRB and DAO, it is not uncommon to find an assertion that "misconduct was not proven" when the meaning of the assertion is unclear. As pointed out by the Union plaintiffs in recent litigation, "technical terms such as 'unsubstantiated' and 'unfounded,' as defined by the City, do not provide the public with meaningful context for assessing the truth or falsity of allegations."[192]

The distinction between "unsubstantiated," "unfounded," and "exonerated," is important. The Collective Bargaining Agreement with the various police unions requires removal of unfounded and exonerated, but not unsubstantiated, cases from an officer's personnel file."[193] In court, unsubstantiated cases may be used for cross-examination, while unfounded and exonerated cases may not.[194]

The definitions used by NYPD in AG 322-11 when compared to definitions used by CCRB pose a significant risk of confusion. Drawing a distinction between "Substantiated" and "Partially Substantiated" depending upon whether ALL allegations are proven makes statistical comparisons difficult and has the potential to mask misconduct when entities outside the Department seek to learn of substantiated cases. Similarly, requiring evidence to "clearly prove" an allegation, as described in the "Unsubstantiated" definition, skews findings against substantiation by a preponderance of the evidence. Finally, the definition of "Exonerated" rightly lists findings where

---

[191] After years of litigation, the U.S. Department of Justice and the Yonkers Police Department came to an agreement regarding police encounters and disciplinary measures on November 14, 2016. The Agreement can be accessed at https://www.justice.gov/crt/case-document/file/923196/download. Incorporated in the agreement at 15, paragraph 81, are the following definitions: "Unfounded," where the investigation determines, by a preponderance of the evidence, that the alleged act did not occur; "Substantiated," where the investigation determines, by a preponderance of the evidence, that an accused person committed all or part of the alleged acts of misconduct; "Unsubstantiated," where the investigation determines by a preponderance of the evidence, that there is insufficient information to prove or disprove the allegations; and "Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged act did occur but was justified, legal and did not violate Yonkers Police Department policies, procedures, or Training.

[192] Response and Reply Brief for Plaintiffs-Appellants-Cross-Appellees at 48, *Uniformed Fire Officers Ass'n v. De Blasio*, No. 20-2789 (2d Cir. Nov. 19, 2020), ECF No. 357.

[193] Specifically, Article XVI, Section 7(c) of the CBA requires, that "upon written request to the Chief of Personnel by the individual employee, remove from the Personal Folder . . . reports . . . which are classified 'exonerated' and/or 'unfounded.'" There is no provision for removing cases which are closed as "unsubstantiated." *Uniformed Fire Officers Ass'n v. de Blasio*, No. 20-cv-05441 (S.D.N.Y. Sept. 4, 2020), ECF No. 226 at 16.

[194] Unsubstantiated cases provide a good faith basis for further inquiry. *See, e.g.*, *People v. Randolph*, 132 N.Y.S.3d 726 (Sup. Ct. Suffolk Cnty. 2020); *People v. Porter*, 142 N.Y.S.3d 703 (Crim. Ct. Bronx Cnty. 2020); *People v. McKinney*, 145 N.Y.S.3d 328 (Sup. Ct. Kings Cnty. 2021).

the "Incident occurred, but was lawful and proper" but then adds cases where the subject was "clearly not involved in any misconduct" which invites exoneration based upon a balancing of the evidence as opposed to a simple declaration that the conduct was lawful.

As to the lack of clarity in current practice, take three common scenarios:

Assume complainant C alleges an act of misconduct by officer O—a frisk by O done without reasonable suspicion that C was "armed and dangerous."[195]  Assume officer O denies the allegation.  Testimony is in conflict.

- **Construct (a):  (Weight of the evidence**):  It could be that O's identity is not in dispute. It could be that there is some evidence of a frisk by O, but the evidence is not sufficient (by a preponderance) to substantiate that the act (the frisk) occurred.  At the same time, there is no evidence that C was armed or dangerous, so a frisk, if it did occur, would have been improper.
- **Construct b**:  (**Identity**):  It could be that an act of misconduct (a frisk without cause) is demonstrated, but O's identity is not proven.
- **Construct c**:  (**Question of Law**):  It could be that undisputed evidence shows that O frisked C, but NYPD and CCRB disagree about the propriety of the frisk.  (e.g., CCRB finds that O did not have sufficient suspicion that C was armed and dangerous, while DAO, accepting the factual findings, determines that the facts did provide reasonable suspicion for a frisk.)

Construct (a)

In situation (a), CCRB, by its definitions, might determine, on balance, after listening to competing versions of the event, that there is insufficient evidence to determine if the officer committed the act of frisking.  In other words, the act if done would have been improper, but, on balance, the commission of the act was not proved.  CCRB, by its rules, should say the case is unsubstantiated or list it as "unable to determine" since the disposition is the product of a weighing and balancing of competing evidence in a case where some evidence supports either conclusion.

However, in situation (a), NYPD or IAB might argue that the act complained of (the frisk) was not proved to have occurred and thus the finding should be unfounded.  The credible evidence did not demonstrate that C was frisked.  In the language of IAB Guide 620-58: "Credible evidence exists that the alleged act of misconduct did not occur" (O's denial) and "such credible evidence outweighs the evidence that the accused MOS did commit the alleged misconduct."  This confuses a finding that an act occurred or did not occur with a finding that misconduct occurred or did not occur.  If the only evidence is the testimony of O and C, is it necessary that NYPD or IAB find C to be completely unworthy of belief, and give no credit to C, to say the matter is unfounded?  Or is it sufficient that NYPD or IAB believe O over C?

A knotty example of this dilemma (the choice between "unsubstantiated" and "unfounded" arises with frequency in profiling and bias-based policing cases.  C complains of an action (a gesture, a slur, words, or deeds) and O denies the action.  In the earlier years of profiling

---

[195] Patrol Guide § 212-11 ("Definitions").

investigations by IAB or BIU, more cases were unfounded than unsubstantiated. That has shifted more recently with the number of unsubstantiated profiling complaints exceeding those that were unfounded. The reason for the shift in recent years, which is sizeable, is unclear. For 2017-2019, 1,912 bias claims were unfounded, while 1,193 were unsubstantiated. By comparison, for 2020-2023, 496 were unfounded, while 537 were unsubstantiated.[196]

Did an "unfounded" finding in almost 2,500 profiling cases mean that there was no credible evidence that the acts (slur, words, gesture) occurred? Or did it mean that the evidence that the act did not occur outweighed some evidence that it did occur? Without a clear expression of the basis for the finding, it is difficult to ascertain why a profiling complaint went unfounded instead of unsubstantiated, unless the claimant was entirely unbelievable or there was clear extrinsic evidence that the alleged acts never occurred.

Construct (b)

Similarly, in scenario (b) (a failure to identify the officer), "unsubstantiated," "unfounded," or "exonerated" are all plausible findings under the various definitions. In its Rules, CCRB proposes to carry a separate case disposition—"Officer Unidentified."[197] An unsubstantiated finding should indicate that there is some evidence of misconduct by the subject officer, but not by a preponderance of the evidence. Under the NYPD definition of "unfounded" the lack of evidence of identity could lead to a finding of unfounded. Record evidence supporting a finding of misidentification or lack of identification could, under NYPD guidelines, lead to a finding of unfounded, but in the eyes of the Department also lead to a finding of exonerated if the evidence was clear that officer O was not the officer who conducted the improper frisk. Again, the rules are not clear.

"Unfounded" in this case should be reserved only for cases where the factfinder concludes that the acts alleged did not occur, regardless of whether an officer could have been identified and without a determination that the alleged facts if they had been proven would have constituted misconduct. But if the determination that the conduct did not occur requires a balancing or weighing of competing evidence, then the case should be unsubstantiated, not unfounded. A paradigmatic parallel might be to look at the difference between criminal cases which are overturned on appeal for legal insufficiency as opposed to reversal of a decision which is against the weight of the evidence. If there is no credible evidence to support the charge, the charge is unfounded. If there is credible evidence of misconduct but, on balance, the weight of the evidence is against the allegation, then the charge is unsubstantiated.[198]

---

[196] Internal Affairs Bureau, Assessment and Analysis Unit, Profiling Case Analysis Report, June 30, 2023. No profiling allegation against a uniformed officer has been upheld by DAO as "substantiated." As of October 22, 2022, profiling allegations are sent to CCRB for investigation.

[197] 38-A RCNY § 1-33 (11).

[198] *See*, e.g., N.Y. Crim. Proc. Law § 70.10(1). Legally sufficient evidence of a charge occurs when "competent evidence which, if accepted as true, would establish every element of an offense." *Id.* In the context of a misconduct allegation, if the sworn testimony of a victim/witness establishes misconduct, a case cannot be "unfounded." It might be that counter evidence outweighs or balances against the claimed violation, in which case the matter is "unsubstantiated" not "unfounded."

Here, the distinction between the terms "acts" and "misconduct" is important. "Misconduct" is a mixed finding of fact and law. "Unfounded" should be reserved for findings of fact where the officer did not engage in the conduct (the "acts") alleged, regardless of whether it was proper or improper.

On its website, CCRB propounds an example of an Unfounded case. It describes a situation where the complainant alleged that an officer wrongfully threatened him. The officer and three neutral witnesses contradicted the complainant, saying the threat was never made. In that case "Unfounded" was an appropriate outcome since it is evident that the unsupported allegation was clearly rejected.[199]

<u>Construct (c)</u>

Finally, in scenario (c), to eliminate confusion between "unfounded" and "exonerated," "exonerated" should be reserved for cases where the Police Commissioner accepts the findings of fact but determines that the actions were lawful. The distinction is meaningful because "exonerated" becomes a guidepost for future actions by other officers and a signal to the community of conduct the Police Commissioner deems to be permissible notwithstanding CCRB's condemnation. An exoneration will be used as a precedent for how officers are to conduct themselves going forward. Exoneration is a declaration of the status of the law. In the SQF area, "exoneration" is especially consequential. An exoneration by the Police Commissioner denotes approval of the officer's actions and becomes guidance for other officers as to permissible behavior. Here, tension between a reading of the Patrol Guide and an understanding of the law may arise. CCRB is not necessarily confined, under the Charter, to the Patrol Guide when judging Abuse of Authority, but when Charges and Specifications are drawn, APU does adhere to provisions of the Guide. In order to convict, APU must demonstrate to a Deputy Trial Commissioner that a provision of the Patrol Guide or Administrative Guide was violated. A Trial Commissioner will not accept CCRB's interpretation of the law or claim of "abuse" if it is counter to the Department's understanding of the law.

It is not uncommon, in a case where there are mixed findings of fact and law, to see CCRB and DAO disagree about the outcome and the applicable state of the law. In 2018, IAB exonerated fourteen profiling complaints. It is difficult to comprehend exactly what was implied by those findings. Did NYPD accept all the allegations by the complainant but decide that the acts did not transgress the law? Or was exoneration dispensed in a case of misidentification? Or did they determine the alleged actions did not occur, in which case the finding should have been "unfounded." Remember that the IAB Guide 620-58 exonerates when "[c]redible evidence exists that the alleged conduct occurred, but it was lawful and proper."

In its "Case Profiles" posted on the CCRB website, the Board gives as an example of an exonerated case a situation where a woman complained that an officer used unnecessary force when he removed her from a bank by putting her in a "full Nelson."[200] CCRB reviewed the video footage and found that the officer did not use a "full Nelson," but had used only minimal and necessary force. This is an unfortunate exemplar since the outcome was based on a factual finding

---

[199] https://www.nyc.gov/site/ccrb/investigations/investigation-unfounded.page.

[200] https://www.nyc.gov/site/ccrb/investigations/investigation-exonerated.page.  (Last accessed Jan. 11, 2023).

contrary to the civilian claim. It was a mixed finding of fact and law, not a legal exoneration of undisputed fact. Since the video and witnesses clearly contradicted the complainant's assertion, "Unfounded" would have been a more appropriate outcome.

As to invocation of "exoneration," in SQF cases, NYPD will apply *Terry* and *DeBour*, as the Police Commissioner understands the law, but the Department does not always agree with CCRB's reading of the law. In that regard, the Police Commissioner, looking to DCT (for formal cases) and DAO (for informal cases), is the final arbiter—without appeal.

Further adding to the confusion, when cases are decided informally without Charges, on occasion, CCRB may substantiate an allegation, only to have DAO ask for reconsideration and request exoneration. If CCRB denies the request, it is not uncommon for the Police Commissioner to agree with DAO, not by "exonerating," but by ending the case with "NDA"—No Disciplinary Action. Disposition by "NDA" is ambiguous. It cannot be known if "NDA" means the Police Commissioner believed the case should have been unsubstantiated, unfounded, or exonerated, or if the Police Commissioner agreed the case should have been substantiated, but that discipline should not be imposed. Without more, it cannot be known if there was a disagreement on the facts, credibility assessments, inferences, conclusions, or a reading of the law.[201]

When the Police Commissioner decides that he will not discipline an officer against whom the CCRB had recommended discipline other than Charges, it may be listed as "DUP" (Department Unable to Prosecute). This can result from a variety of decisions, including the Police Commissioner's exercise of discretion even when he agrees with the findings of fact and conclusions of law. It is not a clear determination that the conduct was excused as lawful and proper.

As one example, in 2022, CCRB had recommended formal Charges be brought against Officer ███████. The Board substantiated six allegations of misconduct, including a frisk and multiple unlawful threats. The Police Commissioner retained the case, under Provision Two — discussed later—and declared that "no disciplinary action" would be taken. In CCRB's view the officer's actions were unwarranted and an abuse of authority.[202] In the Police Commissioner's view, after looking at Body-Worn Camera footage, the "conduct was aimed at ensuring the safety of everyone on the scene." From this exchange it cannot be known if there was a rejection of factual findings by the Police Commissioner or if the Police Commissioner felt that the officer's conduct was lawful in the given situation.

In another recent case, CCRB had substantiated findings against Detective ███████ of an unlawful stop, frisk, and failure to comply with the Right to Know Law. CCRB had recommended a command discipline for each act of misconduct. Detective ███████ had an apartment under surveillance wherein a shooting suspect was thought to be. ███████ stopped and frisked another individual, not the suspect, as he left the apartment. In the eyes of the Board, there was no reason to suspect or frisk the complainant, i.e., no "individualized suspicion." However,

---

[201] Later in this Report, the Police Commissioner's obligation to explain departures from CCRB recommendations is discussed. As discussed, a review of departure letters will show that they rarely, if ever, explain a difference of opinion in interpretation of the law.

[202] Provision six letter, DADS No. ███████, on file with the Monitor.

the Police Commissioner concluded that the actions were "reasonable and appropriate." No disciplinary action was imposed. From the exchange it might appear that the Police Commissioner exonerated the Detective. Impliedly, the Police Commissioner has determined that a stop and frisk of any person exiting an apartment where an arrest warrant for a "shooter" is about to be executed may be stopped and frisked despite a want of individualized suspicion. Without further explication, it is hard to know if the determination was based upon a view of the facts or upon a differing understanding of the law of investigative encounters.[203]

In cases of formal discipline, after trial, a Trial Commissioner's finding is either "guilty" or "not guilty," rather than Substantiated, Unsubstantiated, Exonerated, or Unfounded. A guilty verdict in a CCRB case may be reversed, not by a declaration of exoneration, but by the Police Commissioner's declaration that the subject officer is "Not Guilty." The complainant, the officer, and the public are then left to speculate whether there was a failure of proof or whether the Police Commissioner condoned the actions of the officer.

### i.    Split Determinations

Because some encounters may be separately and independently investigated by distinct investigating units (commonly force, false testimony, profiling), inconsistent findings by various investigators are inevitable. Differing results may, on occasion, be simply a matter of differing views of the facts or the law. But, unless terminology is coordinated, some number of outcomes will be in conflict merely because of a lack of uniformity in nomenclature.

Take as an example, Officer A sees two men drinking from a bottle wrapped in a paper bag. One civilian is Black, the other is White. The officer approaches both men and says, "Wait a second, before you go anywhere, what's in that bag? Beer?" The men stop, turn around, and the officer determines that the bottle contains beer. The officer issues a criminal court summons[204] to the Black civilian only, who then files a complaint with CCRB, alleging that he was stopped with insufficient cause and that he, not his White companion, was selectively given a ticket as proof of bias-based policing and racial profiling.[205] CCRB might substantiate the stop-misconduct allegation, deciding that the initial approach was an unlawful Level 3 detention.[206] The profiling complaint is split off (prior to 2022) and passed from CCRB to IAB or BIU without investigation by CCRB. BIU's assessment is that the officer had probable cause to approach, ask the question, and issue the summons; therefore, BIU might conclude that the "officer's decision to initiate enforcement action" was not "motivated even in part by [the] person's . . . race [or] color,"[207] but was fully justified by the observed level of suspicion, notwithstanding CCRB's decision.[208]

---

[203] Departure Letter, Sept. 15, 2022, DADS No. ███████.

[204] NYC Admin. Code § 10-125 (open container law).

[205] Patrol Guide § 203-25 (Now Admin. Guide § 304.17); NYC Admin. Code § 14-151.

[206] *Terry* stops for Administrative Code violations, such as NYC Admin. Code § 10-125 (open container law), are not lawful. N.Y. Crim. Proc. Law § 140.50.

[207] Patrol Guide § 203.25.

[208] *Floyd* Liability Opinion at 666-67 ("The City and the NYPD's highest officials also continue to endorse the unsupportable position that racial profiling cannot exist provided that a stop is based on reasonable suspicion. This

Beginning in 2022 CCRB will have the capacity to investigate the profiling complaint, but, as with force investigations or false statement investigations, the Department may continue to conduct its own investigation separately. In such cases, the Department may on occasion concur with CCRB's findings, but if history is a teacher there will be times when independent investigations arrive at conflicting results.

  With adoption of a disciplinary grid or matrix, if it continues to be used by both CCRB and NYPD, which seems essential, it is imperative that the two agencies adopt a uniform and clearly defined set of terms, with both agencies using the preponderance of the evidence standard. Title 38-A, RCNY § 1-33, Admin. Guide 322-11 and IAB Guide 620-58 should be amended to use identical terminology. The proposed Rule changes by CCRB, may well, as argued by the Unions, add to confusion. "Unable to Determine" may not be viewed by the Department as a precise equivalent to its own "Unsubstantiated." Without a complainant, NYPD might be justified in calling the case unfounded, while CCRB places the matter within the ambit of unsubstantiated. As well, in the not uncommon situation where multiple officers are present but proof of the identity of an officer who searched, frisked, or committed the alleged wrongful act is insufficient, may be disposed by CCRB with "Officer Unidentified" while NYPD may choose to consider the case "Unfounded", or the officer named to have been "Exonerated."

  The cleanest definitions would be:

- **Substantiated**: Viewing all the evidence for and against the allegation, the evidence supporting the allegation of misconduct outweighs the evidence against the allegation.[209]
- **Unsubstantiated**: Viewing all the evidence for and against the allegation, the evidence supporting the allegation of misconduct does not outweigh the evidence against the allegation.

---

position is fundamentally inconsistent with the law of equal protection and represents a particularly disconcerting manifestation of indifference. . .. A police department that has a practice of targeting[B]lacks and Hispanics for pedestrian stops cannot defend itself by showing that all the stopped pedestrians were displaying suspicious behavior. Indeed, the targeting of certain races within the universe of suspicious individuals is especially insidious . . . . The Equal Protection Clause's prohibition on selective enforcement means that suspicious [B]lacks and Hispanics may not be treated differently by the police than equally suspicious whites.")."

[209] This is a mixed finding of fact and law, indicating the factual findings on balance support substantiation and the credited facts constitute misconduct.

- **Unfounded**: Viewing all the evidence, it is clearly[210] demonstrated that the officer did not perform the acts or engage in the conduct[211] attributed to the officer, either because the acts did not happen or because of misidentification.[212]
- **Exonerated**:  Viewing all the evidence it is demonstrated that the subject officer engaged in the alleged conduct, but the officer's actions were lawful and proper.[213]

### C.    Formal Discipline

Officer misconduct may be addressed formally or informally.  The hearings and procedural rights accorded N.Y.  by Civil Service Law § 75 and NYC Admin.  Code § 14-115 are part of the "formal disciplinary process."[214]  The formal process commences with service of Charges and Specifications and may conclude with a negotiated plea, a trial, or a determination by the Police Commissioner that Charges will not be pursued.  A penalty may not be imposed without Charges, Specifications, and an administrative trial, unless the subject officer agrees to accept a proposed penalty through an informal process.

When formal discipline is pursued, Charges and Specifications may be prosecuted either by the Department Advocates Office (DAO) or by the Administrative Prosecution Unit of CCRB (APU-CCRB).  After investigation, if misconduct is substantiated, DAO or APU-CCRB will present Charges to a Deputy Commissioner for Trials, or, in the alternative, negotiate a plea to a lesser penalty, recommend guidance (training or instructions) in place of a penalty, or agree to no discipline at all ("NDA"—no disciplinary action).

Penalties available to the Police Commissioner after a substantiated finding, a verdict, or upon a negotiated settlement, include:

- **Penalty days**.  This can take the form of suspension without pay for a period of up to thirty days for an offense.  An officer loses associated benefits (pension credit, vacation

---

[210] It is fair to require "clear evidence" because "unfounded" should be reserved for cases where the factfinder had reason, beyond a mere balancing of evidence or witness credibility, to conclude that the acts alleged (not the misconduct) did not occur.

[211] Here, the word **"conduct"** is used—meaning the acts attributed to the officer, not "**misconduct**"—which is a mixed finding of fact and law.  "Unfounded" should be reserved for cases where it is clear that the officer did not engage in the conduct alleged, regardless of whether it was proper or improper.

[212] *See*, *Floyd* Liability Opinion at 107, n 383. ("An officer is 'exonerated' if she committed the alleged acts, but the acts "were determined to be lawful and proper,' and an allegation is 'unfounded' if there is sufficient evidence that the officer did not commit the alleged act.")

[213] IAB Guide 620-58 ("Processing and Investigating Complaints of Profiling and Bias-Based Policing") uses "[c]redible evidence exists that the alleged conduct occurred, but it was lawful and proper." Introduction of the word "credible" at this point confuses factual findings with questions of law.  It would be better to use the CCRB definition posted online prior to October 2022 at CCRB, Case Outcomes, available at https://www1 nyc.gov/site/ccrb/investigations/case-outcomes.page (last accessed Apr. 18, 2022).  "The subject officer was found to have committed the act alleged, but the officer's actions were determined to be lawful."  Unfortunately, with its revision of Rule 38-A RCNY 1-33 (e), replacing "exonerated" with "within NYPD Guidelines," CCRB's language now declares that an action is within guidelines when there was a preponderance of the evidence that the acts alleged occurred but did not constitute misconduct." *Id.*

[214] Patrol Guide § 206-06.

accrual, sick leave accrual) during suspension. The Police Commissioner may suspend the officer without pay pending a disciplinary hearing and determination of the charges.[215] The Civil Service Law § 75(3-a) limits the suspension to a period not to exceed thirty days.[216] If penalty days are assessed after adjudication, pay and benefits lost during suspension may be applied, going forward, to the assessed penalty.

- **Time deduction**. A lesser suspension or deduction, where the officer loses credit (pay and associated benefits) for some number of hours worked.

- **Vacation days**. An officer, depending on length of service accrues vacation time as a credit during the working year.[217] That accumulated credit may be reduced as a penalty. Officers who do not use their vacation time in the current year may accrue up to three days per year to use as terminal paid leave when retiring after twenty years of service or upon disability. An officer may "carry over a maximum of three weeks' vacation into following year."[218] An assessed penalty day will reduce available vacation time permitted in the current year, the following year, or to be deducted from the end-of-service accrual.

- **Fine**. An amount not to exceed one hundred dollars per offense deducted from salary.[219]

- **Dismissal**.[220]

---

[215] NYC Admin. Code § 14-123.

[216] *Bullock v. Kelly*, 847 N.Y.S.2d 384 (Sup. Ct. Kings Cty. 2007) (finding, where an officer was incarcerated and unavailable for duty pending a criminal trial for a period in excess of thirty days—and the disciplinary proceedings were delayed pending the criminal proceedings—upon a later not-guilty determination that the officer was entitled to salary from the point in time the thirty-day suspension had expired, despite the fact that he was incarcerated and unavailable for assignment during that period of time).

[217] Members of the Service accrue one and two-thirds days of vacation time for each month of service, *i.e.*, twenty days per year, in their first five years on the job. After that, they earn two and a quarter days per month, or 27 days per year. Patrol Guide § 203-19.

[218] *Id.*

[219] It is unclear if a fine is available to the Police Commissioner unless objection is waived as part of a settlement. There are conflicting provisions in the law. New York Civil Service Law § 75(3) authorizes a fine "not to exceed one hundred dollars." However, New York Civil Service Law § 75(3-a) limits NYPD penalties to those listed in NYC Admin. Code sections 14-115 and 14-123. Section 14-115(a) enumerates the Police Commissioner's disciplinary options but does not include a fine. It permits "forfeiting and withholding pay." In a review of sanctions imposed over the last five years, no instance of the imposition of a fine other than a suspension without pay, loss of credit for time worked, or loss of accrued vacation days was found. *See, e.g.*, *Cepeda v. Koehler*, 159 A.D.2d 290 (1st Dep't 1990) (where hearing examiner recommended thirty-day suspension without pay for a Department of Correction (DOC) officer, but DOC Commissioner imposed forfeiture of fifteen days and a $1,500 fine, penalty vacated as illegal disposition without waiver).

[220] Dismissal or Termination is rarely imposed by the Police Commissioner for civilian complaints brought by CCRB—the ███████ case being the exception in the last five years. More commonly, "forced separation" is employed. When faced with termination, the officer elects to resign or retire, depending on length of service and eligibility for retirement. If the officer has received permission from the Police Commissioner, he or she is allowed to retain some or all post-employment benefits, including pension. *See* NYC Admin. Code § 14-126. When an officer is separated from the Department during the pendency of an investigation, the case is "filed," which preserves the charges in the event he re-applies or is restored to service. Other dismissals may occur automatically, by operation of law, outside the disciplinary process, upon conviction of certain crimes that violate the Oath of Office, including Perjury, Bribery, Sex Abuse, Offering a False Instrument for Filing, Falsifying Business Records, among others. *See* N.Y. Pub. Off. Law § 30(1)(e). There were eleven dismissals in 2018, but none, other than ████████, were for

- **Dismissal Probation**. The officer is dismissed, but dismissal is stayed for a period not to exceed one year while the officer is placed on probation and monitored. The officer may be terminated at any time without further proceedings or necessity to adjudicate new misconduct.[221] At the conclusion of the year, the officer is either dismissed or restored to service.[222]
- **Reprimand.** A written or verbal admonishment by a supervisor which may be documented in the officer's personnel file. An informal warning or admonishment, not kept in a personnel file, is not a reprimand.[223]

Other sanctions, ancillary to discipline, include:

- **Demotion** of a probationary supervisor or an officer, who has received a discretionary promotion.[224]

---

"Misconduct Involving Public Interaction." *See* NYPD, Discipline in the NYPD 2018 at 10, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/discipline/discipline-in-the-nypd-2018.pdf. There were ten dismissals in 2019, but none were for "Misconduct Involving Public Interaction." NYPD, Discipline in the NYPD 2019 at 10, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/discipline/discipline-in-the-nypd-2019a.pdf.

[221] NYC Admin. Code § 14-115(d).

[222] There are three types of probation: (1) **Entry Level Probation**—for the first two years of employment, a newly-hired MOS can be summarily terminated without formal proceedings; (2) **Promotion Probation**—upon a promotion in rank, the officer must complete a probationary period before he or she is "tenured" in the greater rank; (3) **Dismissal Probation**—occurs following a finding of misconduct or negotiation regarding a misconduct allegation. Throughout this report "disciplinary probation" refers only to Dismissal Probation. NYPD, Disciplinary System Penalty Guidelines at 13 (Jan. 15, 2021).

[223] Warnings may be verbal or written and filed with the officer's papers. AG-§318-01. For purposes of this Report, a warning or admonishment that (i) is not recorded in a permanent personnel file as a discipline, and (ii) is not the product of formal disciplinary process or waiver, is not a statutory "reprimand" and is not a penalty. Civil Service Law § 75, which defines discipline, does not equate warnings or admonishment with reprimand. *See Hoffman v. Village of Sidney*, 235 A.D.2d 698, 699–700 (3d Dep't 1997) ("[A] 'Letter of Reprimand' placed in [an officer's] personnel file was nothing more than a critical admonition and not so formal as to trigger the hearing requirement of Civil Service Law § 75 . . . [and] clearly 'falls far short of the sort of formal reprimand contemplated by the statute.'") (quoting *Holt v. Bd. of Educ.*, 52 N.Y.2d 625,633 (1981)). *See also Matter of Soriano v. Elia*, 155 A.D.3d 14996 (3d Dep't 2017). In 2019, of 339 officers formally charged with misconduct, none received a Reprimand as the final penalty. NYPD, Discipline in the NYPD 2019 at 10, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/discipline/discipline-in-the-nypd-2019a.pdf. In 2016, three officers received a Letter of Reprimand for illegal entry into a residence. ███████, ██████ and ████████. A Reprimand was recommended by DCT after trial for an illegal apartment entry for three officers in 2020, but the Police Commissioner reversed the finding of guilty and found all three officers to be not guilty. ██████████. In another case, after finding a Lieutenant guilty of excessive force in 2019, the trial commissioner recommended a Reprimand, but again the Police Commissioner reversed the finding and declared the Lieutenant to be Not Guilty. In its quarterly report, August 2023, APU described three cases, one for an improper frisk, where a plea, approved by the DCT, to a reprimand were all set-aside by the Police Commissioner who determined that Training was an appropriate penalty.

[224] Demotion of a tenured officer may be a negotiated alternative, but it is not one of the disciplinary penalties set forth in Section 14-115 of the Administrative Code and is not available to the Police Commissioner as a disciplinary penalty unless objection is waived in a negotiated settlement. *See Wein v. City of New York*, 56 N.Y.2d 758 (1982). Civil Service Law § 75(3), on its face, does authorize "demotion in grade or title" as a disciplinary penalty but the Administrative Code does not. Normally, the State statute would prevail. However, the Administrative Code section

- **Restitution** in cases where the officer improperly received compensation.  Restitution of the over-payment is made to the NYC Commissioner of Finance.  Restitution is independent of formal discipline.
- **Revocation of Permission** to engage in outside employment for up thirty days **IF** the violation was related to outside employment.[225]
- **Restriction on out-of-command assignments** for a fixed period not to exceed five such assignments.[226]
- **Forced Retirement**.  As an alternative to discipline and in lieu of dismissal, "forced separation" is commonly employed.  When faced with termination, the officer elects to resign or retire, depending on length of service and eligibility for retirement.  If the officer has received permission from the Police Commissioner, he or she is allowed to retain some or all post-employment benefits, including pension.[227]  When an officer is separated from the Department during the pendency of an investigation, the case is "filed" which preserves the charges in the event he re-applies or is restored to service.[228]
- **Automatic Dismissal Without a Disciplinary Proceeding**.  Dismissal may occur automatically, by operation of law, outside the disciplinary process, upon conviction of certain crimes which violate the Oath of Office, including Perjury, Bribery, Sex Abuse, Offering a False Instrument for Filing, Falsifying Business Records, among others.[229]

---

preceded enactment of § 75(3) and is grandfathered by the terms of Civil Service Law § 76(4).  *See Bailey v. Susquehanna Valley Cent. School Bd. of Educ.*, 276 A.D.2d 963 (2d Dep't 2000).  In 1990, Civil Service Law § 75(3-a) was enacted.  L 1990, ch. 753.  The 1990 amendment made it clear that the Administrative Code list of available sanctions does not include demotion controls.  It seems likely that, if challenged, the Code's limitation (excluding demotion of a tenured officer) would prevail.

[225] Patrol Guide § 206-07 (now Admin. Guide § 318-05).

[226] *Id.*  Out-of-command assignments are lucrative in that officers receive pay and credit beyond the normal work-week assignment.

[227] NYC Admin. Code § 14-126.

[228] NYPD reports that 136 officers elected "forced separations" when charged with misconduct for CY 2018–2020.  NYPD, 2020 Discipline Report at 9, available at https://www1 nyc.gov/assets/nypd/downloads/pdf/analysis_and_pla nning/discipline/discipline-in-the-nypd-2020.pdf.  Five of those were officers who, facing an allegation of an illegal stop/question/frisk amongst other charges, retired and had their cases "administratively filed."  Beginning in 2018, in theory, those officers who resigned "in connection with allegations of misconduct" are to be listed in a public "decertification" list whereby future employers, including law enforcement agencies, would be aware of the misconduct cause for retirement.  *See* N.Y. Exec. Law § 845; 9 NYCRR § 6056.2; NYS Division of Criminal Justice Services, Police and Peace Officer Decertification, available at https://www.criminaljustice.ny.gov/Officer_Decertifi cation.htm.  A recent (Nov. 17. 2021) search of that database did not include any of the officers who separated while facing SQF misconduct charges.  It is unclear why NYPD did not post their names with DCJS.  Absent listing, they could be rehired by other agencies without knowledge of the SQF misconduct allegation. *See also* Arno Pedram and Luca Powell, *NY Regulations Allow Cops Stripped of Training Credentials to be Rehired*, The Intercept, available at https://theintercept.com/2021/07/08/new-york-police-decertification/.

[229] *See* N.Y. Pub. Off. Law §30(1)(e).  There were eleven such dismissals in 2018.  None, other than ███████, were for "Misconduct Involving Public Interaction."  NYPD, Discipline in the NYPD 2018 at , available at https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/discipline/discipline-in-the-nypd-2018.pdf.  There were ten dismissals in 2019.  None were for "Misconduct Involving Public Interaction."  NYPD, Discipline in the NYPD 2019 at 10, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_pla nning/discipline/discipline-in-the-nypd-2019a.pdf.

Throughout this Report, as in most NYPD and CCRB reports, a chart may simply say that "x days" were imposed as a penalty. When so indicated, the days deducted could be penalty days, lost accrued vacation time, or days on suspension which were applied to the penalty imposed.

### D.    Informal Discipline

Regardless of how a matter was investigated, or which entity investigated, for many thousands of complaints of misconduct each year, informal measures are used in place of formal proceedings. The lion's share of discipline administered by the Department is through Command Discipline (CD), which is defined as "non-judicial discipline that can be issued by a commanding/executive officer for any minor violation . . . in order to correct" deficiencies and maintain discipline within the command.[230] The Department can eschew formal discipline and offer a Command Discipline to the subject officer. The officer may then decide to accept a penalty or even accept a CD without penalty and waive formalities.

When first instituted, Command Discipline was described as "an administrative procedure designed to allow commanding officers to handle the less serious violation without resorting to the filing of formal charges and a trial." [231] Commissioner Bratton described it as one way of "practicing community policing on the cops."[232] Prior to 1995, DAO would handle minor infractions. Beginning on October 13, 1995, Commanding Officers were given expanded authority to handle a range of misconduct at the local level and the Command Discipline system was instituted.

With time, Command Discipline has become the predominant form of proceeding, invoked for almost every kind of misbehavior. It can follow substantiation of a misconduct allegation after an investigation by CCRB, DAO, IAB, FID, OCD, BIU,[233] or even an investigation initiated at the precinct level by local supervisors. Commanding/Executive Officers are authorized to impose informal discipline directly for misconduct observed within the precinct.[234]

Command Disciplines (CDs) fall into three categories: Schedule A (A-CD), Schedule B (B-CD) or Schedule C (C-CD).[235] CDs, if punished, may be punishable by forfeiture of penalty

---

[230] Admin. Guide § 318-01.

[231] Police Commissioner William Bratton began the informal process on October 13, 1995. *See* First Annual Report, Citizens Commission to Combat Corruption (CCCC) at 99 (Mar. 25, 1996).

[232] Baker, Bratton Tries a Community Policing Approach, on the New York Police, N.Y. Times (Sept. 20, 2015).

[233] Departmental internal investigating entities, discussed later, include: "IAB" (the Internal Affairs Bureau); "FID" (the Force Investigation Division); "OCD" (the Office of the Chief of Department); "BIU" (Borough Inspections Unit).

[234] Admin. Guide § 318-02 (formerly Patrol Guide § 206-02).

[235] C-CDs can carry a penalty up to twenty penalty days. C-CDs are rare and are not an available penalty to local commanders. Admin. Guide § 318-01 (formerly Patrol Guide § 206-03). No C-CDs have been proposed by COs or approved by DAO in recent years.

days or hours.  For an A-CD, the subject officer may be assessed up to five vacation or penalty days.  B-CDs permits a forfeiture of up to ten days.[236]

Investigations when conducted at the Command level are, absent exigent circumstances, required to be completed within sixty days of "issuance" (presumably the date a Supervisor's Complaint Report (PD468-123) is filed with the Commanding/Executive Officer).[237] Thereafter, within five working days of the adjudication, the ICO must enter required data in the Citywide Command Discipline System, which entries must be finalized by the CO/XO within the next five days.  The Citywide Command Discipline System is merely a statistical compilation and is not useful for identification of findings against a particular officer.

After investigation, the Police Commissioner may pass along a substantiated finding of misconduct by CCRB or one of the Departmental investigating units to the local Command with direction to impose Command Discipline.  Unless specifically directed by the Police Commissioner, there is no requirement that any penalty be imposed.  The decision is left to the Commanding Officer (CO).  The CO may impose a penalty or direct that the officer receive guidance in the form of Training, Instructions, or a warning.  The CO may also decide to take no further action.

### E.    Guidance in Lieu of Discipline

Very often, findings of misconduct, especially for SQF misconduct, result in guidance, such as "Training," "Instructions," "Warnings/admonition," or CRAFT entries,[238] without imposition of an official penalty.  Guidance by itself is not a penalty.

Remedial actions falling within guidance include:

- **Monitoring**: This may entail increased supervision, change of assignment, limitation on promotion or specialized assignments, restrictions on hours worked or permission to engage in off-duty employment.[239]

---

[236] Patrol Guide § 206-04.  The Patrol Guide also authorizes "[r]evocation of permission to engage in outside employment for a fixed period of time, not to exceed thirty days, if the violation is related to outside employment" and restrictions on up to five out-of-command *assignments.*

[237] Admin. Guide § 318-02.  *But see Covino v. Kane*, 273 A.D.2d 380 (2d Dep't 2000) (Violation of union contract provision requiring a disciplinary decision be made with sixty days held harmless as contract did not provide for recourse.)

[238] Cop's Rapid Assessment Feedback Tool (CRAFT).  Formerly, precincts kept a "minor violation" log as a paper local record in the precinct.  The minor violations log was a logbook kept at each command that recorded minor procedural violations of Department rules by members of the service.  The information in these logs was not tracked centrally, it did not become part of a member's personnel record, and there were no penalties or additional consequences for being listed in the log.  The NYPD has replaced the minor violations log with a CRAFT Supervisor's Comment Form.  CRAFT entries can be either positive or negative.  CRAFT entries are not considered discipline by the Department.

[239] Monitoring comes at three levels.  Level 1 and Level 2 are not disciplinary. They are part of supervision and management.  Monitoring may or may not follow as an additional consequence of a misconduct determination or as part of any other performance review, but it is not a penalty dependent upon a finding of misconduct. Level 1 and Level 2 last 12 months and 18 months respectively and can include mentoring, counseling, or restrictions on

- **Instructions**:  Which may be given by the Legal Bureau or within the Command by a supervisor or Training Sergeant.  Instructions are meant to be tailored to the particular behavior leading to the need for remediation or guidance.[240]
- **Training**:  Which may be given at the NYPD Police Academy or by the Legal Bureau.  Training may be accomplished by attending classes or observing a video[241] and frequently consists of re-visiting a course previously given to the officer.  There are specialized courses in SQF and in Tactical Communication—learning how to respectfully speak to civilians.
- **Warning/Admonishment**:  Verbal or written communication to the officer, usually within the command, which is not entered in the Central Personnel Index (CPI) or permanent personnel file.

Many, if not most, of the substantiated SQF or stop report failure cases provide for guidance in the form of "Training" or "Instructions."  Training may occur by direct interaction with one of the lawyers in the Legal Bureau or the Professional Standards Bureau or merely a requirement that the officer attend a Police Academy class.  The Police Academy class often is the same class that officers were required to attend prior to the infraction.  They repeat the course.  The requirement may also be met by viewing an instructional video (which may or may not have been seen by the subject previously).

It is not uncommon for an officer to be directed to undergo "Training" more than once after multiple findings of misconduct.

> "Records of training are kept and maintained in several decentralized locations, depending upon the type of training imposed. Training imposed as a result of formal discipline is maintained in DADS.  Training which results from informal discipline is often recorded at a precinct level, in a personnel folder, and in the CRAFT system. Training performed from the Training Unit, in accordance with tactics and other directives, is generally reflected in an officer's CPR."[242]

---

assignments.  Level 3 accompanies dismissal probation and can be considered discipline, but it also may be based upon negative performance, without a finding of misconduct.

[240] "With the adoption of the NYPD Disciplinary Matrix on March 15, 2021, the CCRB no longer issues Instructions as a Board Discipline Recommendation."   CCRB Monthly Statistical Report, January 2023 at 25, https://www.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2023/01112023_monthlystats.pdf. Notwithstanding, the Police Commissioner, DAO, and local Commanders may continue to do so.

[241] When an officer is directed to take "Training" upon substantiation of misconduct, that may be completed by viewing a video instead of personally attending a class.  The Disciplinary System Penalty Guidelines provide that "training will be delivered . . . in a suitable venue," which can include delivery by the Training Sergeant in the precinct, at the Legal Bureau, the Police Academy, or at the Professional Standards Bureau (formerly the Risk Management Bureau).   NYPD, Disciplinary   System   Penalty   Guidelines   at   3,   available   at https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/disciplinary-system-penalty-guidelines-effective-01-15-2021-compete-.pdf.

[242] December 22, 2023 "DAO Responses to Federal Monitor Inquiry – FM 68-2023."

In 2017, 48 of 102 SQF misconduct cases substantiated by CCRB were sent for Training. In 2018, 27 of 88 substantiated SQF misconduct cases were sent for Training. In 2019, 39 of 96 substantiated SQF misconduct cases were sent for Training.

Command Level Instructions, referred to as "Instructions," is given at the command, usually by a training sergeant assigned in each command. If the instruction was directed by DAO, a communication is sent from DAO to the CO of the command regarding the issue to be covered. However, DAO does not advise the CO under what circumstances, or how, to give the instruction. DAO sends a communication regarding the subject of instruction but receives no specific information on what follows.[243] The CO signs an endorsement on the original directive merely indicating that "Instructions" were given, without further specification.

The CCRB tells Board members that instruction is "less formal,"[244] and has stated that panels "usually recommend this type of discipline where the [officer] has committed a technical violation of the law or Patrol Guide, but the Panel understands the reasoning behind the [officer's] actions."[245]  Despite the fact that a Fourth Amendment violation is not, and should not be considered, a "technical violation of the law," in 2017-2019, the Board recommended instructions in 25 cases of SQF misconduct. The Police Commissioner imposed instructions in 10 of those cases. The remainder were either disposed of by No Disciplinary Action (NDA) or by training.

## F.    Discipline Defined

The preceding paragraphs use the term "penalty" in place of "discipline" at various points. Throughout this Report there will be many statistical measures and tables describing whether and at what level discipline was imposed for officer misconduct. In quantifying whether "discipline" was imposed, this Report will adopt the statutory definitions of discipline in the Civil Service Law § 75 and in Administrative Code § 14-115 (deducted time credit, suspension, termination, formal reprimand).[246] "Guidance" such as "Training," "Instructions," or "Warnings," without a penalty carries little or no adverse consequence or career stigma for the officer.[247] When no adverse consequence, punishment, or penalty described in the statute follows a misconduct finding, it invites misunderstanding to say that "discipline was imposed."[248] Acceptance by the Department

---

[243] *See* September 18, 2019, response to Monitor inquiry of DAO.

[244] CCRB 101, included in a "Board Packet" provided new members, at 37 ("Disciplinary Recommendations").

[245] CCRB, Memorandum Accompanying August 8, 2018, Public Presentation of CCRB's Disciplinary Framework, at 4, available at https://www nyc.gov/assets/ccrb/downloads/pdf/about_pdf/board/20180808_disciplinaryframework_ memo.pdf.

[246] *Lynch v. Civilian Complaint Rev. Bd.*, 183 A.D.3d 512, 515 (1st Dep't 2020) (stating that Instructions and Training are "short of removal and disciplinary proceedings" and do not implicate Section 75).

[247] The Department, in its online explanation of penalties, lists Reprimand, Penalty Days, Dismissal Probation, and Dismissal or Forced Separation, citing formal re-training, non-punitive counseling, or monitoring programs not as penalties, but as "Additional Sanctions." NYPD, Discipline in the NYPD 2019 at 7, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/discipline/discipline-in-the-nypd-2019a.pdf.

[248] CCRB annual and bi-annual reports, *see* CCRB, Reports, available at https://www1.nyc.gov/site/ccrb/policy/

of a finding of misconduct by CCRB, standing alone, may signify no more than that the Department acknowledged the finding and then ordered some "corrective action," caution, or guidance in place of a penalty.[249]  In the words of the Department, an officer receives training "in order to assist him in addressing future similar incidents," not as a disciplinary penalty.[250]

In describing whether an officer was disciplined for improper behavior, this Report does not count an officer as having been "disciplined" if the case was resolved without one of the penalties listed in the statute as a discipline.[251]

The Department, when responding to public inquiries for disciplinary history, recognizes the distinction between guidance and discipline and takes pains to omit cases where no penalty was imposed: guidance outcomes are not listed as part of the "disciplinary history" of officers. The Department's online posting of "Officer Profiles" under "Disciplinary History" will not post a case where the officer only received guidance, even when the guidance was the end result of a formal proceeding.   When CCRB substantiates a case and recommends Charges and Specifications, if the final outcome, before or after trial, is Training, the NYPD officer profile does not post the event because it is not, in the eyes of the Department, part of the officer's disciplinary history.

---

reports.page, will commonly say "discipline was imposed" after a case was sent to the Police Commissioner, when in fact Training, Instructions or warnings were the only action directed by the Police Commissioner.  For example, when the Police Commissioner decides to block a CCRB-APU prosecution (Provision Two - retention, discussed later), CCRB will frequently report that the case was "retained with discipline" when, in fact, only guidance, without penalty, followed.

[249] In a parallel proceeding, *Nunez v. City of New York*, No. 11-cv-5845 (S.D.N.Y.), regarding misconduct by staff of the NYC Department of Correction, the federal monitor is careful to use the term "corrective action" when discussing Training, counseling, modification of assignment and even suspension.  *See, e.g.*, Eleventh Report of the *Nunez* Independent Monitor at 75, *Nunez*, No. 11-cv-5845 (S.D.N.Y. May 11, 2021), ECF No. 368.  In other major cities, where Guidelines have been adopted or court-ordered, Training, Instructions, and Warnings are corrective, non-disciplinary, actions.  *See, e.g.*, Los Angeles Police Department Admin. Order No. 15 (Sept 15, 2016); *United State v. City of Cleveland,* No. 15-cv-1046 (N.D. Ohio, Jan 10, 2018); Denver Police Department Discipline Handbook: Conduct Principles and Disciplinary Guidelines (May 3, 2018).

[250] *See, e.g.*, "Police Commissioner's Penalty Departure" letter, CCRB #           , January 8, 2020.

[251] This very distinction was made in *Lynch*, 183 A.D.3d at 512.  In considering whether the Statute of Limitations contained in Civil Service Law § 75(4), which bars late disciplinary proceedings, barred untimely imposition of Instructions or Training, the majority ruled that Instructions and Training fall short of discipline and Section 75 was inapplicable.  *Lynch*, 183 A.D.3d at 515.  The majority (3-1) rejected the argument made by the lone dissenting justice that "behavior correction or Training" would still constitute discipline and the Department's argument that the mere presence of a complaint on record would "unduly stigmatize" an officer and impact future promotions and transfers.  *Id.* at 520-21. See also CCRB Memorandum Accompanying August 8, 2018, Public Presentation of CCRB's Disciplinary Framework, at 5. ("Formalized Training and Command Level Instructions are not considered formal discipline by the NYPD and can be imposed even after the statute of limitations has run on a case.")

If guidance is the only disposition after a finding of misconduct, that action is not recorded in the officer's Central Personnel Index (CPI).[252] This omission is consequential because the CPI is reviewed for decisions regarding assignment, promotion, or transfer.[253]

Since guidance does not qualify as discipline, it can be imposed even after the statute of limitations has run on a case.[254] The statutory limitation applies only to discipline, not to guidance, including training, instructions, or admonitions.

In criminal court proceedings, when a report of prior discipline for misconduct is produced for use as potential *Giglio* material, the Department provides the prosecutor and court with a modified copy of the CPI which does not include findings resulting in guidance.[255] The response has repeatedly been deemed inadequate by courts which have found that "records underlying substantiated and unsubstantiated disciplinary allegations of misconduct" are required to be disclosed by statute. [256]

The NYC Charter also distinguishes guidance from discipline in its text. Section 441 of the Charter, mandates that a finding by the Board of acts of bias be detailed in a "written statement

---

[252] An accepted B-CD with guidance which came through CCRB will be entered in the CPI. But guidance, without a B-CD, is not included.

[253] AG § 329-09.

[254] *Id.*

[255] *See Giglio v. United States*, 405 U.S. 150 (1972). The adequacy of a limited response in the face of a discovery demand under the Criminal Procedure Law is a topic working its way through New York criminal courts. *See, e.g.*, *People v. Perez*, 144 N.Y.S.3d 332(Crim. Ct. Bronx Cnty. Apr. 8, 2021). "Although decisional law on this issue is still unsettled, and the Court acknowledges very little appellate authority on the issue, this Court stands by its prior findings that all underlying documents relating to substantiated police misconduct allegations, and accompanying disciplinary records must be disclosed . . . as well as unsubstantiated misconduct allegations . . . and not just a summary of misconduct allegations.*" People v. Sarcone*, 79 Misc 3d 1222A, 2023 NY Misc LEXIS  3370 (Bx. Crim. Ct. July 6, 2023) (internal citations omitted). AG 329-09 provides, "Information contained in the Central Personnel Index is highly personal and confidential. . . . Information will be disseminated on a need-to-know basis and authorized personnel will not utilize the Index for mass checks. In no cases will any information be divulged relative to a current investigation." at p2.

[256] CPL 245.20 (1)(k)(1v). *People v. Darren*, 2022 NY Misc. LEXIS 2156 (NY Cnty. Crim. Ct. 2022). ("Indeed, this court has rejected them [listing arguments against disclosure of NYPD disciplinary records] on several occasions (*see People v. Soto*, 72 Misc 3d 1153, 152 N.Y.S.3d 274 [Crim. Ct., NY Cnty. 2021]; *People v. Williams*, 72 Misc 3d 1214[A], 150 N.Y.S.3d 234 [Crim. Ct., NY Cnty. 2021]). Other judges in this courthouse have likewise rejected the same arguments, holding that CPL 245.20 (1)(k)(iv) requires disclosure of records underlying substantiated and unsubstantiated disciplinary allegations of misconduct before a valid COC [certificate of compliance] can be filed (*see People v. Edwards*, 74 Misc 3d 433, 160 N.Y.S.3d 532 [Crim. Ct., NY Cnty. 2021]; *People v. Barralaga*, 73 Misc 3d 510, 153 N.Y.S.3d 808 [Crim. Ct., NY Cnty. 2021]; *People v. Kelly*, 71 Misc 3d 1202[A], 142 N.Y.S.3d 788 [Crim. Ct., NY Cnty. 2021]); *People v. Ahmed Mohammed*, CR-026662-21NY [Crim. Ct., NY Cnty., Apr. 28, 2022]; *People v. Abdul Salaam*, CR-019124-21NY [Crim. Ct., NY Cnty., Apr. 19, 2022]; *People v. Eric Morton*, CR-003860-21NY [Crim. Ct., NY Cnty., Aug. 25, 2021]). Courts of other jurisdictions have handed down the same ruling (*People v. Perez*, 71 Misc 3d 1214[A], 144 N.Y.S.3d 332 [Crim. Ct., Bronx Cnty. 2021]; *People v. Herrera*, 71 Misc 3d 1205[A], 142 N.Y.S.3d 791[Dist. Ct., Nassau Cnty. 2021]; *People v. Cooper*, 71 Misc 3d 559, 143 N.Y.S.3d 805 [Cnty. Ct., Erie Cnty. 2021]; *People v. McKinney*, 71 Misc 3d 1221[A], 145 N.Y.S.3d 328 [Crim. Ct., Kings Cnty. 2021]; *People v. Porter*, 71 Misc 3d 187, 142 N.Y.S.3d 703 [Crim. Ct., Bronx Cnty. 2020]; *People v. Randolph*, 69 Misc 3d 770, 132 N.Y.S.3d 726 [Sup. Ct., Suffolk Cnty. 2020]; *People v. Rosario*, 70 Misc 3d 753, 139 N.Y.S.3d 498 [Cnty. Ct., Albany Cnty. 2020])."

of final determination" which must include "recommendations of the board for remedial action, including Training, discipline, where consistent with section 75 of the civil service law, or both."[257] By the language of the Charter, Training is a "remedial action," distinct from section 75 discipline.

That is not to say that training or other forms of guidance are always inappropriate resolutions where SQF misconduct is alleged. In fact, the United State Department of Justice encourages training as an **adjunct** to discipline, but not as a **substitute** for discipline. DOJ distinguishes remedial measures from discipline and recommends guidance simply upon an allegation, not proof, of misconduct:

> Regardless of whether a misconduct allegation is substantiated and regardless of whether discipline is ordered, the agency should **additionally** consider whether to require Training, counseling, or other remedial non-disciplinary measure for officers who are the subject of a misconduct investigation[]. Where the substantiated misconduct involves excessive force, false arrest, improper search or seizure, discriminatory policing, or discriminatory behavior in the workplace, discipline typically should be accompanied by appropriate remedial non-disciplinary measures.[258]

In the area of SQF violations, guidance may be appropriate and a proper outcome for, in the words of Patrol Guide, "isolated cases of erroneous but good-faith stops or frisks,"[259] but it should not be confused with "discipline."

### i.    Discipline Recommended by CCRB

The distinction between discipline and guidance is important because CCRB frequently recommends guidance in lieu of discipline after a substantiated FADO finding. In turn, the Police Commissioner reduces to guidance a significant number of the cases where CCRB has recommended discipline. If CCRB recommends guidance and DAO agrees, a form will be sent to the CO indicating what Instructions or Training should be imposed. When completed, an endorsement is sent to DAO simply indicating completion. This information does not go into any centralized personnel folder unless specific Training was directed by the Police Commissioner.

For the years 2017 to 2019, CCRB substantiated FADO misconduct allegations against 1,217 officers.[260] CCRB recommended Command Discipline or charges for 689 of the officers and recommended Training or Instructions in 528 of those cases. The Police Commissioner then imposed Command Discipline, not necessarily statutory discipline, for only 259[261] and pursued

---

[257] N.Y. City Charter § 441(d)(2)(iii) (added by Local Law 47 of 2021).

[258] US Department of Justice, Principles for Promoting Police Integrity: Examples of Promising Police Practices and Policies at 9 (Jan. 2001), available at https://www.ojp.gov/pdffiles1/ojp/186189.pdf. (Emphasis supplied.)

[259] Patrol Guide § 212-11.

[260] CCRB, Annual Report 2019 at 43, available at https://www1 nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annu al_bi-annual/2019CCRB_AnnualReport.pdf.

[261] As discussed later, many if not most of the CDs were "accepted" without imposition of any penalty.

charges for fourteen officers.[262]  The Police Commissioner ordered Training, Instructions, or no discipline for the remaining 944 officers (77.6%).

In sum, CCRB recommended discipline for 56.6% of its substantiated complaints but the Police Commissioner imposed a CD or accepted charges for fewer than 22.4% of CCRB's substantiated complaints.  Even then, as explained in the following section, the fact that a CD was accepted or charges were filed in the 22.4% of the substantiated cases, does not mean that any penalty was actually imposed for those officers.  Reports by CCRB or NYPD that "discipline was imposed" when nothing more was done than to direct "Training," "Instructions," or "warnings" lends to inflated "concurrence" estimates.  It is not uncommon for CCRB to recommend CD with Training and find the case resolved with "Training" alone.  That result cannot accurately be portrayed as "concurrence" and will need to be explained in a departure letter.[263]

Separating guidance from penalties is especially critical in assessing the level of discipline applied to stop and frisk misconduct.  As with all FADO cases, CCRB frequently recommends guidance rather than discipline for SQF misconduct.  For the years 2017 to 2019, CCRB recommended no more than "Instructions" or "Training" in 82 of 286 cases where it had substantiated an allegation of an illegal stop, question, frisk, or search.  Thereafter, the Police Commissioner reduced the penalty recommendations in most of the remaining cases.  In the end, just 27 of 266 officers (10.0%)[264] were penalized by forfeiture of penalty days after CCRB had substantiated an illegal stop, question, frisk, or search.[265]  The Police Commissioner directed "Instructions" or "Training" for 135 cases.  No penalty was imposed in those 135 cases.  The remaining 104 substantiated SQF cases were disposed of or diverted in other ways, short of imposition of a penalty.[266]

The low rate of discipline for SQF misconduct (27 of 266) should be viewed in the broader context of an equally low rate of substantiation.  At the end of the process, the percentage of civilian complaints alleging illegal SQF behavior that results in the imposition of a penalty is minimal.  The disciplinary "funnel" is extraordinarily narrow.

In the first place, for a multitude of reasons, including truncation, mediation, pending litigation, and failure to identify the responsible officer, not all complaints of SQF misconduct are fully investigated.  From 2017 to 2019 there were 2,592 complaints to CCRB containing an allegation of an improper stop, question, frisk, or search of person.  Some complaints contained

---

[262] The fact that Charges and Specifications were "pursued" for fourteen officers does not mean that they were found guilty or that discipline was imposed.  There was "Disciplinary Action" in 28% of the cases where charges were pursued by APU and closed in 2019.  The rest were "Not adjudicated" or "No Disciplinary Action."

[263] NYC Charter § 440 (7)(d)(3).

[264] There were 286 cases with substantiated findings of SQF misconduct by CCRB sent to DAO in years the 2017 to 2019.  Of those, 266 were closed as of the matrix supplied by NYPD.  Federal Monitor – SQFSTA Report as of 12-31-2021.

[265] Sixteen cases were "closed administratively," which could mean retirement, resignation, or simply a decision by the Police Commissioner not to pursue the matter for a variety of reasons.  Although numbers are incomplete for 2022, of 254 stop/question/frisk substantiated misconduct findings by CCRB referred to the Department for discipline, 86 have been finalized and only 5 officers received discipline in the form of penalty days.

[266] Federal Monitor - SQFSTA Report supplied by DAO to the Monitor.

multiple allegations.[267]  There were 2,176 allegations evaluated to conclusion by CCRB from 2017 to 2019.[268]  Of those, 559 allegations were substantiated by a panel.  The rest went unfounded, unsubstantiated, or exonerated.[269]

Putting the numbers for Stop, Frisk, Question, and Search of Person together, 2,592 SQF complaints to CCRB led to 2,176 evaluations of allegations of SQF misconduct, which led to 559 substantiated allegations against officers, which ended with forfeiture of penalty days for 27 officers—a penalty for less than 1% of civilian complaints.

The years 2017 to 2019 were cited because many later cases substantiated by CCRB in 2020 and 2021 were not yet resolved by the Department.  But for the three-year period, 2019 through 2021, of 183 closed and finalized cases where there was a substantiated SQF allegation within a complaint, only 18 officers received a penalty of lost vacation or credited days.[270]  In the few cases where a penalty was imposed, there were likely other factors, beyond SQF misconduct, which contributed to a rare outcome—discipline for Fourth Amendment violations.

### ii.    Discipline for SQF Misconduct Examined at the Precinct

Without a civilian complaint and examination by CCRB, for SQF violations uncovered in the precinct guidance rather than discipline is also the norm.  Improper SQF encounters may be noticed by a supervisor at the precinct or uncovered in an audit of stop reports.  During an audit, the precinct may become aware of an illegal stop, question, frisk, or search as it screens for failures to file a stop report.  The failure to file a stop report is subject to separate discipline within the Department as a misconduct case (an "M" case).

In cases where a stop report failure is identified, the underlying SQF violation would not fall within CCRB's Abuse of Authority jurisdiction without a civilian complaint.  SQF misconduct identified in the precinct is not forwarded to CCRB for investigation.  The local CO then is responsible to decide whether the illegal stop, frisk, or search should be disciplined.  Of 86 reported failures to file a stop report, some with identified SQF misconduct, uncovered by QAD audits spanning the period from 4Q2016 to 1Q2020, 62 received a CRAFT report, 29 received

---

[267] An encounter described in a complaint may involve several officers, several citizens, and multiple improper actions.  For example, a wrongful stop, question, frisk, and search by one officer against one civilian, would contain four allegations of misconduct.

[268] Because of the way CCRB reports findings, sometimes listing allegations and sometimes listing complaints, it is not possible to convert the 2,176 allegations (which were fully investigated) to an identifiable number of complaints (out of 2,592) that contained an SQF allegation that was fully investigated.

[269] CCRB 2019 Annual Report, at 46

[270] Subsequent to the drafting of this Report, a matrix submitted by DAO included stop/frisk substantiations up to September 30, 2022.  Of 46 cases where CCRB substantiated an SQF violation, 25 had been finalized by the Police Commissioner who imposed penalty days on only two of the officers (███████ and █████) whose cases are discussed later in the report.  Due to the Covid pandemic, the interview and investigation process was impaired considerably in 2020-21.  In 2022, as of the report date, 254 cases with a substantiated SQF violation were sent to DAO from CCRB. In 86 cases, the matter was closed with five of the 86 receiving a penalty of lost vacation days (two officers lost three days each and the officers lost one day each.  Final Federal Monitor - S Q F S T A Report as of 09-30-2022 (1).

Instruction/Training, 10 accepted a Command Discipline without penalty, and 11 received NDA.[271] No penalty days were assessed by the local command for stop and frisk report failures.

The question that follows is whether an identified stop report failure is merely a documentation failure or is an indicator of an illegal stop and, if so, whether, along with the finding of a stop report failure, illegal stops are identified and disciplined in the precinct, absent a civilian complaint to, and substantiation by, CCRB. According to the Department, in 2018 and 2019, 181 cases of "Improper Preparation of Stop Report" were identified through a combination of inspections by QAD, Command, and CCRB referrals. Twenty-two of the 181 were further classified by commands as "Improper Stop/Frisk/Search."[272] None of the report failures uncovered by QAD or local commands and classified as "Improper Stop/Frisk/Search" received penalty days as discipline.

With the information made available to the Monitor Team, it appears that SQF misconduct, absent a CCRB investigation, even if identified in the precinct, is not penalized by loss of vacation days.

### G.    "CD Accepted"

As noted above, an officer can "accept" Command Discipline, waive the filing of Charges and Specifications and forego a trial. A "CD accepted" concludes a proceeding and can be imposed with or without a penalty. If the final outcome of a misconduct investigation is an "A-CD accepted," without further penalty, it should not be considered discipline. This occurs with regularity for stop and frisk misconduct.[273]

After investigation, when a CCRB panel substantiates an allegation, it does not recommend a specific penalty. If a CCRB panel believes that a penalty rather than guidance is needed, it will simply recommend an A-CD, a B-CD, or Charges and Specifications, depending on what penalty the panel believes should be available to the Police Commissioner (up to five penalty days, up to ten penalty days, or more).[274] This leaves the choice of penalty to the Police Commissioner.[275] In turn, the Police Commissioner may fix a penalty or send the command discipline (an A-CD or a B-CD) to the command, in which case, the Commanding Officer determines whether and what

---

[271] NYPD Spreadsheet: "QAD stop report failures," (Dec. 8. 2020), on file with the Monitor Team.

[272] NYPD Spreadsheet: "2-25-2019 Final Spreadsheet Without Color," last modified Apr. 5, 2020.

[273] "Disciplinary memoranda and evaluations are adverse employment actions only if they affect ultimate employment decisions such as promotions, wages or termination." *Knight v. City of New York*, 303 F. Supp. 2d 485, 497 (S.D.N.Y. 2004) (alteration method) (quoting *Regis v. Metropolitan Jewish Geriatric Ctr.*, 2000 WL 264336, at *8 (E.D.N.Y. Jan. 11, 2000)).

[274] C-CDs (with a potential penalty of twenty days) are the exclusive province of the Police Commissioner. If a CCRB panel believes a penalty greater than the ten days available in a B-CD should be imposed, it will not recommend a C-CD. Instead, it asks APU to file Charges and Specifications. NYPD, Disciplinary System Penalty Guidelines at 13 (Jan. 15, 2021).

[275] As discussed later, when calculating "progressive discipline" for Guidelines purposes, CCRB has asserted that it will presume a penalty of five days was imposed when an A-CD was accepted, despite the reality that this almost never occurs.

penalty should be imposed.  In either case, the end result can be that no disciplinary penalty is imposed.  In both cases, "CD accepted" has no disciplinary consequence if it carries no penalty.[276]

In many instances, "Command Discipline" (CD) is accepted, but does not carry an accompanying penalty and will not be considered discipline in this Report unless a penalty as described in § 14-115 accompanies the determination.  Mere acceptance of an A-CD without a penalty (even if the result is Training, Instructions or a warning and admonishment) and without entry into a centralized personnel record such as the CPI is not discipline.  A formal, written, reprimand citing a CD and recorded in the CPI is a penalty. If DAO assesses a penalty by way of lost time or credit, it notifies the Leave Integrity Management System.  Otherwise, there is no permanent record other than DAO's own internal database (DADS), which is not available outside of DAO.

A disciplinary history may be looked at when promotions are under consideration.[277] However, "[h]aving a disciplinary history cannot, standing alone, disqualify a candidate for promotion."[278]

Until 2022, Patrol Guide § 206-04 authorized, in addition to loss of vacation days or accrued time, revocation of permission to engage in outside employment, but only if the misconduct was related to the outside employment.  As well, a Commanding Officer was authorized to restrict up to five overtime assignments.  The Patrol Guide went on to authorize other actions which were not included as "penalties."  They included: (1) warning and admonishing verbally; (2) warning and admonishing in writing with "a copy to be filed with the papers";[279] and (3) changing assignments. These actions were not penalties linked to an adjudication or acceptance of discipline.

More recently, with disciplinary matters being moved from the Patrol Guide to the Administrative Guide, Admin. Guide § 318-01 has been amended[280] to move the authorization to change assignment, limit outside employment and restrict some overtime under a category labeled "Penalties for Schedule A."

Command discipline can result from a wide range of misconduct—from minor to more serious.  Patrol Guide § 206-03 listed offenses from illegal parking to neglect of care of firearms or failure to submit reports in a timely manner.  With an amendment to the Administrative Guide

---

[276] *Cf. Wohlrab v. Miles*, 82 A.D.2d 836 (2d Dep't 1981) (where a police Lieutenant in Newburgh was adjudicated guilty of nine charges of misconduct, but no further penalty was imposed, the Court held the statute did not permit judicial review of the findings, which is limited to cases where the officer believes "himself aggrieved by a penalty or punishment of demotion in or dismissal from the service, or suspension without pay, or fine, imposed pursuant to the provisions of section seventy-five" (internal quotation marks omitted)).  Unless so aggrieved, the Civil Service Law does not recognize the adjudication as a cognizable injury capable of judicial review.

[277] The Career Advancement Review Board (CARB) is convened to determine whether members who have disciplinary issues in their careers possess the character and judgment necessary to become a supervisor. Admin. Guide § 329-15. *Longe v. City of New York*, 802 F. App'x 635 (2d Cir. 2020).

[278] *Thompson v. City of New York,* 50 Misc. 3d 1202 (A) at *13 (Sup.Ct. N.Y. Cnty. 2015).

[279] "Papers" is not defined, but presumably it is the written hardcopy kept at the precinct.  Admin. Guide § 320.

[280] Effective February 16, 2022.

in February 2022, the list of misconduct was eliminated, and Commanding Officers were directed to refer to the Disciplinary System Penalty Guidelines (the Matrix) for offenses punishable by command discipline. The listing identifies the same thirty-five violations that had been written into Patrol Guide § 206. Unlike other misconduct in the Guidelines, there is no reference to a presumptive penalty.

While the Payroll Management System will be advised if there is a forfeiture of time or days, misconduct assessed within the command is not noted in any central repository for disciplinary records. Patrol Guide § 206-02[281] required the ICO to enter all relevant information regarding command disciplines into the Citywide Command Discipline System—a statistical compilation, not useful for examining an individual officer's disciplinary history. If Command Discipline is issued at the Command Level without coming through DAO, then DAO would not have a record of the CD. The exception would be if the B-CD or recommendation for a C-CD was presented to DAO, i.e., disciplinary matters other than Schedule A command disciplines, where conferral or approval by DAO is required.[282]

For a significant number of cases where CCRB substantiated SQF misconduct, "CD accepted" is the final disposition with no discipline attached. Only a small fraction of SQF cases, where a CD is accepted, carry a penalty.[283] Looking at closed SQF cases:[284]

- In 2017, of 101 substantiated CCRB cases which included SQF misconduct, 22 cases resulted in a final disposition of "CD accepted." Only one of those cases carried forfeiture of a penalty day; three carried a time deduction of two to four hours.[285]
- In 2018, of 82 substantiated SQF cases, 15 cases resulted in a designation "CD accepted." Two of those cases carried a penalty of days forfeited, two cases had time deducted.[286]
- In 2019, of 96 substantiated SQF cases, 33 cases resulted in a designation "CD accepted." Two of those cases resulted in forfeiture of one penalty day for each, three cases had hours deducted.[287]

---

[281] Now Admin. Guide § 318-02.

[282] Admin. Guide §§ 318-02, 03.

[283] This practice may be impacted, but not eliminated, in the future to some extent, by application of the newly adopted disciplinary matrix, discussed later. For example, in 2022 of the first 131 closed cases with a substantiated SQF violation, 30 cases resulted in a "CD accepted"—14 of the 30 resulted in loss of one or more penalty days and five of the cases resulted in a loss of credit for one or more hours. Eleven of the 30 cases ended in a "CD accepted" without penalty. (NYPD Final Federal Monitor – SQFSTA Q1, Q2, as of Sept. 28, 2023 provided to the Monitor.)

[284] Final Federal Monitor – SQFSTA -2023 Q1 Q2 final copy.

[285] The one A-CD carried a forfeiture of one penalty day. Time deducted for three cases was two, two, and four hours respectively. SQFSTA matrix

[286] One A-CD carried a one-day, the other a five-day, penalty (the officer was found to have given false testimony); two cases had four and five hours deducted, respectively.

[287] Each of the two cases ended with one penalty day assessed; three cases had time deducted of one, one, and four hours respectively.

Further analysis of the above is more revealing. Not one case could be found where an A-CD was "accepted" in that three-year period and where a penalty was imposed for illegal SQF behavior alone. Here, an explanation is in order.

Along with stop and frisk misconduct, if CCRB substantiates other FADO misconduct such as wrongful force, discourtesy, slurs, strip searches, threatened firearm use, or vehicle searches, for example, in the same complaint with the SQF misconduct, a common result will be to roll all substantiated allegations together into one disposition—"CD accepted."[288] From 2017 to 2019, if one analyzes the above 69 cases where a CD was "accepted," 47 included other substantiated misconduct allegations in addition to an improper stop, question, frisk, or search. They ranged from force to illegal arrests, etc. Included in that 47 were all five cases (in the three-year period) which received a penalty of a day(s) forfeited.

In sum, for 2017-2019, putting the "guidance" and "CD accepted" numbers together for wrongful SQF behavior:

- Guidance instead of discipline was imposed in 135 of 266 closed cases.[289]
- "CD accepted" was the final outcome for another 69 of 266 closed cases.
- Only five cases where a CD was accepted resulted in penalty days being assessed and in all five of those cases, the penalty covered other wrongful behavior in addition to an illegal stop or frisk in the complaint.
- Eight cases where a CD was accepted ended with an aggregate total of 23 hours of credited time being forfeited.

## H.    A-CDs Not Recorded in the Central Personnel Index

Of the 69 SQF cases where a CD was accepted between 2017 and 2019, 55 were for an A-CD. Seven of the 55 A-CDs carried a penalty.[290] For those seven cases, it can be said discipline was imposed. But, aside from the loss of a few days or hours of accrued vacation or credited time, what was the long-term consequence? Does the subject officer face any after-effect beyond a relatively minor loss of a few accrued vacation hours or days? Is there a permanent record of misconduct, especially SQF misconduct, which can be seen by future investigators? By superiors making personnel decisions? By the public?

The Central Personnel Index, or CPI, is used whenever a background inquiry is made, including promotion and transfer requests. When CCRB substantiates misconduct, if an A-CD is

---

[288] FADO misconduct could range from excessive force to discourtesy to slurs or any other conduct within FADO. The disposition by the Police Commissioner is unitary; one disposition for the entire complaint.

[289] Guidance and CD accepted account for 204 of the 266 closed cases. The majority of the remaining cases ended without discipline as well for a variety of reasons (administratively closed, NDA, Not Guilty verdicts, retirement, etc.). Only twenty-two of the 266 (not already counted in the "CD accepted column") received penalty day punishment. (Twenty-seven cases in all received penalty days. Five overlapped in the "CD accepted" column.) (Federal Monitor – SQFSTA Report as of 12-31-2021.) Those cases will be explained in detail later in this Report. None of them are cases where penalty days were forfeited in response to an SQF allegation alone. Each has a storied history.

[290] In 2017 and 2018, three officers lost a total of seven days and four officers lost a total of nine hours. In 2019, no officer receiving an A-CD was penalized with a loss of time or vacation day.

"accepted," no entry is made in the CPI. This is true even if DAO, the Police Commissioner, and the subject officer all agree that CCRB's finding of misconduct was correct and the civilian was unlawfully stopped, frisked, or searched. No CPI entry is made regardless of whether penalty days or hours are assessed. A-CDs which were the result of an IAB or Borough Investigation are entered in the CPI. But A-CDs investigated at the precinct or by CCRB are not. The accepted A-CD is an entry which may be written and kept in a limited set of local command files, but not in a centralized personnel file.[291] Further, localized records, where entry of the A-CD is made, are expunged after one year.[292]

Early on in CCRB's lifetime, CCRB substantiated a case against PO ███████████. The Police Commissioner decided against formal discipline. Officer ███████ sued to have CCRB's record expunged. The Appellate Division, First Department, rejected the petition declaring:

> [T]his is a matter within the discretion of the Police Commissioner. The determination as to whether a substantiated CCRB complaint should be expunged or retained, and if retained, whether it should be utilized in personnel decisions, are policy matters entailing the exercise of the Police Commissioner's discretion.[293]

In a recent data request to the Department by the Monitor, the inquiry was for the final disposition of 45 accepted A-CDs for SQF misconduct from 2017 through 2019 where previous responses had left the disposition column blank. The response as to 37 of the 45 was that the information was unavailable because the case had been "Purged." Of the remaining eight, four were left blank, three received W&A,[294] one received a penalty of two hours deducted. In all, information as to a final decision was available for only four of the 45 A-CDs. If the information is unavailable to the police liaison and to the Monitor team, then one would have to assume that it is not available to any of the entities passing judgment on future misconduct findings, such as CCRB, APU, IAB, OCD, Deputy Trial Commissioners, prosecutors obliged to meet Giglio[295] responsibilities, and reviewing courts. Each will be told that the officer has "no disciplinary record." If a record is "purged" and unavailable for notice or review, it carries no significance as a record of discipline.

CCRB keeps its own records of past A-CDs that were substantiated. CCRB has an internal database, the Complaint Tracking System (CTS), which is available to IAB investigators. The CTS will not record the final penalty imposed, if one was imposed. The CTS will not contain

---

[291] A record is made at the precinct and entry is made in the Citywide Command Discipline System, which is merely a statistical compilation, not a personnel record. Patrol Guide § 206-02.

[292] Admin. Guide § 318-12 (formerly Patrol Guide § 206-14). Since A-CDs are assessed for a number of the more serious SQF violations, the Monitor Team asked the Department about the need for expungement. The response was, "[e]xpungement is an important part of this process since it fulfils the goals of a disciplinary system which include rehabilitation and education and strikes the right balance with respect to proportionality and fairness." Email from Deputy Commissioner for Risk Management Matthew Pontillo the to Monitor Team (Mar. 18, 2021).

[293] ███████ v. Civilian Complaint Rev. Bd., 30 A.D.3d 201, 202 (1st Dep't 2006).

[294] Warning and Admonition, commonly called "warnings."

[295] Giglio v. United States, 405 U.S. 150 (1972).

records of other (non-CCRB) NYPD investigations, even if related to the substantiated misconduct, such as Stop Report Failures or independent investigations by NYPD.

> While the CCRB receives notification of the final category of discipline, the Agency does not receive specifics on the penalty that the Police Commissioner ultimately imposes.  For instance, the NYPD reports to the CCRB whether an officer was given a Command Discipline A, but not the number of vacation days forfeited.  Similarly, the Agency is made aware of the fact that Training was given to an officer, but not the exact Training module.[296]

When an officer's disciplinary history is examined by a CCRB investigator for prior or related misconduct, or by a CCRB panel contemplating a penalty recommendation, a slimmed-down version of the CPI, a Summary Employment History (SEH), is provided to CCRB.  The SEH will not include NYPD investigations with misconduct findings that merely resulted in guidance, an "accepted A-CD," or even an A-CD where a penalty was imposed.[297]  NYPD takes the position that CCRB need not know of, or consider, prior Departmental A-CDs because they are used "to empower commanders and address low-level issues through non-judicial means . . . [and] 'A' CDs are not relevant to CCRB cases with regard to content or penalty."[298]

> Within the precinct, the Commanding Officer may have on file a "Supervisor's Complaint Report" (PD 468-123).  This record is kept within a "personal folder," which is a written folder (11" x 14") kept at the precinct and not filed digitally or centrally maintained.[299]

If a case began with the Police Commissioner's acceptance of substantiated Charges and Specifications recommended by CCRB, but subsequently the Police Commissioner imposes an A-CD as the final disposition, the CPI will continue to reflect the disposition of the action by the Police Commissioner.  Nonetheless, public reports by NYPD, in its online profile,[300] will still claim no disciplinary history.

DAO keeps its own records in a database, known as DADS,[301] but that is kept by the attorney advocates for internal use by DAO and is not accessible outside of DAO.  DAO also has the ability to request the CD history from the officer's current command.  Other entities, such as NYPD Trial Commissioners, are not informed of misconduct findings ending in an A-CD.  This

---

[296] CCRB, Annual Report 2019 at 46 n.37, available at https://www1 nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2019CCRB_AnnualReport.pdf.

[297] "The CCRB is provided with the Summary of Employment information which contains: Pedigree information, Current Command, Arrest history, medals, Discipline History of Closed Charges and Specification and B-CDs/C-CDs.  It does not contain A-CDs, cases that were dismissed, or those currently pending."  December 22, 2023 "DAO Responses to Federal Monitor Inquiry – FM 68-22023."

[298] Email from Deputy Commissioner for Risk Management Matthew Pontillo to the Monitor Team (Mar. 18, 2021).

[299] Admin. Guide § 320-03.

[300] NYPD Officer Profile available at https://nypdonline.org/link/2.

[301] Disciplinary Administrative Database System.

would seem to incentivize officers to accept an A-CD after a CCRB substantiation, even with a minor time deduction, since it will have little or no effect on their record or career.

CCRB substantiations are discounted, when compared to the treatment afforded internal IAB or OCD investigations ending with the same level of discipline. A CCRB substantiated SQF violation ending in an A-CD is not accorded the same level of notation in personnel records as other A-CDs for technical infractions found by IAB or OCD. Since, as a practical matter, A-CDs for SQF only come through CCRB, the net effect is to minimize disciplinary history for SQF misconduct. At the same time, the City has also maintained that A-CDs in general are "technical violations" not to be included in disciplinary histories available to the public.[302] In the end, the CPI records technical violations referred by IAB for minor rules violations but omits stop and frisk A-CDs coming from CCRB.

B-CDs recommended by CCRB and sustained by the Police Commissioner are entered into the CPI system. However, officers may apply to have the record sealed on the third anniversary of the disposition if the member has not accrued any new B-CDs or Charges in the interim. If the officer has new misconduct findings resulting a B-CD or Charges and Specifications, sealing is delayed until the officer has gone three years from their disposition. An officer may accrue one or more subsequent A-CDs during the three-year waiting period, but that will not delay or forestall sealing.[303] As demonstrated, a significant number of SQF violations receive an A-CD. Nonetheless, the Patrol Guide will permit sealing of a B-CD even if the officer has accrued one or more subsequent SQF A-CDs during the three-year waiting period. Once sealed, the B-CD misconduct finding is "suppressed . . . whenever background inquiry is made." The record is only available to IAB for "statistical evaluations and internal investigations."[304] The B-CD record is not available to CCRB or Trial Commissioners for use in a new investigation.[305]

B-CDs for SQF misbehavior are infrequent. Only fourteen cases of 286 closed SQF cases in the years 2017 to 2019 resulted in a B-CD.[306] Six of those fourteen B-CDs received a penalty. Eight were accepted without further penalty. It might be argued by some that an accepted B-CD reflects discipline since the fact is noted in the CPI even without imposition of a penalty. But the fact that the record may be sealed after three years tends to undercut that argument.

In more serious cases where formal charges are pursued, Trial Commissioners contemplating a penalty recommendation after a guilty verdict or during plea negotiations are denied a full disciplinary history. Often, when a case is presented to a DCT Trial Commissioner, DAO will assert that there is "no prior disciplinary history," unless there is a history of formal discipline. Many DCT decisions are now available online. They are replete with writeups by trial commissioners justifying a plea or recommendation to a lesser penalty than one sought by CCRB-APU on the ground that the officer has "no prior disciplinary history" notwithstanding numerous

---

[302] *Uniformed Fire Officers Ass'n v. de Blasio*, 846 F. App'x 25, 33 (2d Cir. 2021).

[303] Admin. Guide § 318-12 (formerly Patrol Guide § 206-14).

[304] *Id.*

[305] If the B-CD was adjudicated by CCRB, they will have their own record of the CCRB proceedings.

[306] In 2022, as of Sept. 30, 2022, of 254 SQF substantiations by CCRB, the Board recommended a B-CD in 37 cases, but the Police Commissioner imposed a B-CD in only four of the cases.

command disciplines that may have preceded the case. A history of NYPD command discipline, with or without penalties, and prior "guidance" are simply not considered. Again, since SQF violations standing alone seldom, if ever, receive formal discipline, current practice undermines a Trial Commissioner's ability to take prior SQF misconduct into proper account.[307]

In public documents, the Department does not report a case as "disciplined" unless Charges were preferred, and a penalty was imposed. Command Discipline findings by CCRB are not listed. After the repeal of Civil Rights Law § 50-a, there were frequent calls for a public listing of the disciplinary history of officers. In its "Collaborative Plan" submitted to the Governor, the City Council and the Mayor promised that the City will "[h]old police officers accountable for misconduct through internal NYPD disciplinary decisions that are transparent, consistent, and fair," which included "[k]eeping a record and recognizing disciplinary actions as vital sources of information about an officer, supervisors, and the department as a whole" and promising "[t]ransparency [so] both [the] NYPD and community know what discipline to expect."[308]

Unfortunately, the Disciplinary History posted in an Officer's Profile[309] removes all guidance and all command disciplines, even where penalty days were imposed. Only Charges, formally pursued and resulting in a penalty are listed. In serious cases, if Charges and Specifications were pursued and substantiated but if the ultimate disposition by the Police Commissioner was "Training," the Officer Profile entry for Disciplinary History will remain blank with a report that, "[t]his officer does not have any applicable entries."[310] There will be no mention of the fact that Charges were preferred and reduced to Training. An officer can have a long record of many substantiations and even discipline, but only formal discipline through Charges and imposition of a penalty is posted.

In litigation following the repeal of Civil Rights Law § 50-a, the City has taken the position that A-CDs, even when substantiated, are merely "technical infractions" that should be redacted from FOIL responses for requests to see "law enforcement disciplinary records."[311] At the moment, the issue remains unresolved. The Department at some future point may separate some A-CDs from others for purposes of FOIL disclosure. If the Department continues to deny FOIL requests for all A-CD findings on the ground that they are "technical infractions," a court will need to decide if they properly fall within an exemption in the Public Officers Law to FOIL release of "disciplinary records."[312]

---

[307] In theory, Trial Commissioners will now utilize the Disciplinary System Penalty Guidelines. If they do so, they are to consider progressive discipline for offenders who repeat a similar offense. This should require production by DAO of more fulsome records for their review. It is unclear if DAO has committed to such production.

[308] NYC Police Reform and Reinvention Collaborative Draft Plan at 13–14 (Mar. 5, 2021), available at https://www1.nyc.gov/assets/home/downloads/pdf/reports/2021/Final-Policing-Report.pdf, adopted by the N.Y. City Council, Intro. Res. 1584/2021 (Mar. 25, 2021).

[309] *See* NYPD, Officer Profile, available at https://nypdonline.org/link/2.

[310] *See, e.g.*, officer profiles for Officers ███████, ███████, and ███████.

[311] *Uniformed Fire Officers Ass'n v. de Blasio*, 846 F. App'x 25, 33 (2d Cir. 2021) (quoting N.Y. Pub. Off. Law § 89(2-c)).

[312] *Id.*

Public Officers Law § 89(2-c) permits NYPD, as a matter of discretion, to withhold from FOIL applications, a record of a "Technical infraction." Public Officers Law § 86(6) defines a "Technical infraction" as:

> [A]minor rule violation by a person employed by a law enforcement agency as defined in this section as a police officer, peace officer, or firefighter or firefighter/paramedic, solely related to the enforcement of administrative departmental rules that (a) do not involve interactions with members of the public, (b) are not of public concern, and (c) are not otherwise connected to such person's investigative, enforcement, training, supervision, or reporting responsibilities.

Substantiated stop and frisk misconduct clearly does not fall within this exception and should be available upon FOIL request. Regardless of the outcome of the litigation on the issue of FOIL access, one thing seems certain: it is difficult to reconcile the City's argument that A-CDs are technical infractions unworthy of being included in FOIL responses to request for disciplinary records while, at the same time, asserting that an "A-CD accepted" without penalty constitutes "discipline."

CCRB maintains its own records of past CCRB actions, so it will be aware of the Board's own prior misconduct recommendations for an A-CD and whether the Police Commissioner approved or disapproved the A-CD. Up until now, CCRB was not advised of the specific penalty imposed by the Department after substantiation and recommendation of an A-CD. CCRB would only be told that the A-CD was accepted or rejected. If the misconduct is repeated, CCRB's knowledge of a prior penalty, or lack thereof, is limited. Without knowledge of prior disciplinary results, progressive discipline for repeat offenders cannot be realized.[313]

This last concern may be in the process of being addressed to some extent. The 2020 amendments to the City Charter now require the Police Commissioner to provide the "level of discipline and any penalty imposed, in all cases in which the board submitted a finding or recommendation to the Police Commissioner with respect to a matter within its jurisdiction pursuant to [Section 440 of the Charter]."[314] The stated plan "going forward" is for penalties to be noted in an NYPD closing memo.[315] If accomplished, this will provide CCRB investigators and panels with the disposition of allegations substantiated by CCRB. Much depends upon how NYPD interprets the mandate to note a "penalty." Will NYPD tell CCRB the precise penalty (or lack of penalty) set by the CO? That has not been the practice heretofore.

The Collaborative Plan declares that "NYPD will make public 'deviation letters' that set out the Police Commissioner's specific rationale for exercising [her] discretion to deviate from the

---

[313] CCRB has indicated informally that the Board may presume that a penalty was imposed, but that is an assumption on CCRB's part—an assumption that is not statistically defensible.

[314] N.Y. City Charter § 440(d)(3).

[315] Email from Deputy Division Chief, Tort, NYC Law Dep't, Nancy B. Savasta to the Monitor Team (Mar. 15, 2021)

guidelines set by the new disciplinary matrix."[316]  Will they specify the suggested and final penalties imposed?

Depending on the terms of implementation of the new Charter mandate, there is a potential for important informational gaps to persist:

- If a case is sent to the CO for final disposition without direction from the Police Commissioner, will the CO's disposition be reported back to CCRB?  Currently, when a case is sent to the CO without specific mandate by the Police Commissioner, the final penalty or non-penalty by the CO, kept at the precinct, is not logged in a central database and is not easily retrieved without individualized manual effort.  Proceeding to recommend penalties for misconduct without knowledge of previous final dispositions runs counter to the notion of "progressive discipline."[317]

- Outcomes of associated allegations within a complaint which were investigated by the Department are not reported to CCRB.  Many SQF complaints have additional allegations of wrongdoing in the same encounter or investigation.  Many of those, (non-FADO and force) are sent to the Department for investigation.  For example, if allegations of false testimony[318] or profiling[319] or failure to file a stop report were included in an SQF complaint, the results of related Departmental investigations of those matters would not be reported to CCRB.

Going beyond an analysis of consequences when an A-CD is "accepted," the question to be answered is whether the Police Commissioner actually imposes a penalty for CCRB-substantiated stop and frisk allegations.

## I.    Penalty Imposed for *Floyd* Violations?

*Floyd* concerns and the term "SQF misconduct" as used throughout this Report are not, in every case, coextensive.[320]  A police encounter, along with an improper Stop, Question, Frisk, or Search may also encompass allegations of racial profiling, wrongful use of force, retaliation,

---

[316] NYC Police Reform and Reinvention Collaborative, Initiative Tracker, available at https://www1 nyc.gov/assets/policereform/downloads/PUBLIC-NYPD-Reform-EO203-Tracker-3-29-22.pdf.

[317] Aside from the need to know for purposes of progressive discipline, knowledge of other complaints is useful in detecting patterns and examining motive.  Two of the cases examined later in this report included misconduct claims of retaliation, where earlier encounters with the same civilian(s) gave insight to later misconduct. (Generally speaking, an officer receives qualified immunity from § 1983 liability if probable cause supports an arrest even one made with a retaliatory motive.  Whether §1983 immunity should insulate an officer from internal discipline is an open question. *Reichle v. Howards*, 566 US 658 [2012]).

[318] The 2020 Charter amendments permit CCRB to investigate the "truthfulness of any material official statement . . . made during the course of and in relation to the board's resolution of [a FADO] complaint."  N.Y. City Charter § 440(c)(1).  This leaves out false statements made in court, to district attorneys, to grand juries, in court, and in paperwork.  Experience shows that a false or misleading statement made in one context is often repeated in other settings.  Nothing in the Charter precludes concurrent investigations of false or misleading statement.

[319] A 2021 amendment to the Charter directs CCRB to accept profiling complaints.  That provision became effective January 20, 2022.

[320] In data analysis, throughout this Report, "SQF" refers to Stop, Question, Frisk, and also includes Search of Person.

intentional failure to file a stop report, refusal to identify or display shield, discourtesy, slurs and offensive language, strip searches, sexual harassment, interference with recording, related vehicle searches, seizure of property, destruction or copying of cellphone content, failure to activate a body-worn camera (BWC), improper requests to search, failure to supervise, etc. Many, if not all, of these offenses, may be associated with a questionable *Terry* stop.

Some of these violations fall within CCRB FADO jurisdiction and will be investigated along with the stop or frisk by CCRB. Some do not fall within CCRB FADO jurisdiction and may, or may not, be investigated concurrently by the Department. For CCRB investigations, it is not uncommon to have some allegations within a complaint or encounter substantiated while others are not. Complaints which include an allegation of an illegal stop, frisk, or search of a person that was not substantiated will not be reflected in a statistical Matrix provided by the Department and cited here when assessing SQF discipline, even though one or more of the other related allegations were upheld.

Take as an example a case where an officer stops and questions a civilian in a discourteous manner. CCRB may unsubstantiate the stop and question allegations because evidence of "reasonable suspicion," or the lack thereof, was equivocal. At the same time, CCRB may substantiate the claim of discourtesy and that discourtesy finding may be penalized. That case will not be included in any measure of discipline for SQF misconduct even though the misconduct punished occurred during a stop encounter. To that extent, cited numbers of misconduct and discipline for complaints associated with stop encounters may be under-inclusive. On the other hand, the statistics provided by NYPD and CCRB will usually include cases where one penalty was imposed for multiple allegations. Thus, for example, a file may say "15 vacation days" was imposed as a penalty after an officer illegally stopped, punched, and strip-searched a civilian. In such a case, it cannot fairly be said that a penalty of "15 days" forfeited was the penalty for an illegal stop. As a measure of penalties imposed for improper stops, such a report risks being over-inclusive.

As of a recent SQFSTA matrix provided to the Monitor team, in the years 2019 to 2021, CCRB substantiated 210 cases against an officer where a wrongful stop/question/frisk/search allegation was included within the complaint.[321]

The Police Commissioner has made a final decision in 186 of the 210 referrals. The rest were still open and pending. A number of the closed cases involve multiple allegations of other serious misbehavior including strip searches, uses of force, slurs, or similar wrongdoing. Many of the cases substantiated by CCRB also include aggravating circumstances in the investigation or processing of the complaint itself, i.e., false testimony, deactivated cameras, missing paperwork— logs, memos and stop reports—which were ancillary to and outside the scope of CCRB's investigation.

---

[321] Final Federal Monitor – SQFSTA Q1, Q2, as of Sept. 28, 2023, provided to the Monitor. The number of complaints, not cases, is less than 210, since one wrongful complaint, describing an improper encounter, may include allegations against multiple officers.

A penalty of lost days was imposed by the Police Commissioner in 22 of the 186 cases.[322] It is worth looking at those cases in depth to see if any officer is penalized for *Floyd* violations alone or if cases where a deduction of credited days did occur are the result of confluent circumstances beyond a Fourth Amendment violation.[323]

Last year the Police Commissioner agreed to abide by the Disciplinary Guidelines Matrix.[324] In that document, the "presumptive" penalty for each allegation of an improper stop, frisk, or search is three penalty days, absent aggravating circumstances, mitigating circumstances, or invocation of progressive discipline. As of this writing, there is insufficient documentation or data to fully assess the application of the Disciplinary Guidelines to stop and frisk misconduct.[325] Nonetheless, we can look at final outcomes. It is useful to match discipline recently imposed for each SQF allegation substantiated between 2019 to 2021 with the outcome of three penalty days that is the presumptive penalty for SQF misconduct going forward.

- The Police Commissioner has imposed no penalty in 157 of the 186 closed cases.[326]
- 7 of the 186 closed cases were penalized with a deduction of credited time in the range of one to four credited hours.

---

[322] Subsequent to the writing of this Report, in January 2023, an updated SQFSTA matrix was provided, dated Sept. 30, 2022. The Appendix reflects updated numbers. Unfortunately, underlying communications between CCRB and DAO, necessary to a full understanding of the numbers and the basis for dispositions was not made available. At the time the Appendix was written, 182 of the 210 CCRB substantiated SQF cases had been closed. Of the 182, penalty days were imposed in 19 cases. They are discussed in an Appendix.

[323] The Appendix analyzes a number of those cases.

[324] "On February 4, 2021, the NYPD and Civilian Complaint Review Board signed a memorandum of understanding to strengthen the disciplinary matrix and ensure greater transparency around the disciplinary process. Specifically, this MOU: confirms that the NYPD and CCRB will use the matrix as a framework to guide penalties for officer misconduct; requires the NYPD and CCRB to describe, in writing, the basis for any departures from the matrix and make such document publicly available; reiterates the Police Commissioner's obligation to notify the CCRB when it intends to impose a penalty that is less than CCRB's recommendation and make that determination publicly available; and ensures CCRB's access to officer employment history for any substantiated allegations. "Reforms to the NYPD Disciplinary System," available at https://www.nyc.gov/site/nypd/about/about-nypd/policy/nypd-disciplinary-system-reforms.page.

[325] The City has resisted production of Case Assessment Reports (CAR) by DAO or other correspondence between DAO and CCRB, which are necessary to a full understanding as to why a recommendation by CCRB was downgraded. Letter, Nancy Savasta Deputy Chief to the Monitor, February 10, 2022. The same issue is currently being litigated before J. Colleen McMahon in the Southern District. *In re: New York City Policing During Summer 2020 Demonstrations*, 1:20-cv-8924 (S.D.N.Y), Doc No. 831 (Jan. 28, 2023). The claim that CAR memos are protected by attorney-work product or deliberative process memos and therefore not available to the Court is dubious. *See discussion*, Memorandum Order, Dkt. No. 271. More recently, in March 2022, the Department provided a spreadsheet with the outcomes of thirty-eight cases decided under the Disciplinary System Penalty Guidelines, again, without accompanying Departmental memos that had been requested. Those outcomes are discussed *infra*. CCRB has recently begun to post "Departure Letters" (described *infra*) which describe cases where the Police Commissioner has elected to impose a lower level of discipline than requested by CCRB, available at https://www1.nyc.gov/site/ccrb/complaints/complaint-outcomes.page (visited June 8, 2022). Twelve of the 111 cases included in that list included a finding of an improper stop, frisk or search of person. One case (PO ▮▮▮▮▮▮▮▮) resulted in a one-day penalty. The remainder went with no discipline (NDA), training, or an A-CD accepted without penalty.

[326] As previously explained, "Penalty" means a loss of credited time, days, suspension, dismissal, or formal reprimand, as discussed earlier "discipline" is described in Article 14 of the Administrative Code.

- 22 of the 186 closed cases were penalized with a loss of credit for one or more vacation days.

    o Within that number, 18 of the 186 closed cases received the "presumptive penalty" of three or more penalty days.

From another point of view, one might look at complaints rather than cases. How many incidents or encounters where a civilian complained of a bad stop, frisk, or search (along with other misconduct) and where CCRB substantiated SQF misconduct by one or more of the participating officers resulted in imposition of discipline for any of the officers named in the complaint?

- 16 of 149 closed complaints (encounters) where CCRB had substantiated an SQF violation, resulted in imposition of a penalty days for one or more of the officers.

    o Within that number, 13 of 149 closed complaints (encounters), resulted in imposition of the presumptive three or more penalty days for any one of the officers.[327]

- 5 closed complaints resulted in a time deduction of a 1 to 4 hours.
- The next question to be asked, in the cases where an officer was penalized by loss of one or more vacation days, is whether the penalty was for stop and frisk misbehavior or whether the penalty covered a cluster of discerned misbehavior?

"Pure" cases where SQF misconduct received a penalty absent false testimony, wrongful arrest, strip search, use of force, or missing paperwork are extremely rare. Even in those rare cases, typically, there were other aggravating circumstances such as a history of discipline, a likely pattern, multiple lawsuits, or an internal disciplinary history distinct from CCRB investigations. It is not unusual to see cases where an officer has multiple pending CCRB complaints or lawsuits at the same time, resolved with only one of the complaints receiving a penalty.

Without an in-depth analysis of each case where a penalty was imposed, it cannot be claimed that a penalty was imposed solely for a *Floyd* violation. For example, an illegal stop which receives a penalty must be examined for other allegations, other complaints, other IAB investigations, or other lawsuits pending at the time of the disposition. As well, discipline for one case cannot be looked at in a silo, isolated from other pending cases.[328] Otherwise, it would be misleading to say that SQF misconduct was penalized without acknowledging the full spectrum of

---

[327] Even then, one of the four complaints was the product of a downward departure by the Police Commissioner from a recommended B-CD to an A-CD. In another case, where CCRB recommended charges, the Police Commissioner allowed a negotiated plea, of five penalty days (the equivalent of an A-CD) to avoid a formal disciplinary proceeding.

[328] A recent submission by CCRB (March 2022) of recommendations made since inception of the Disciplinary Penalty Guidelines System (Matrix, discussed below), indicates that CCRB may make note of "[t]he adverse result of a criminal, administrative or civil proceeding related to the underlying conduct" as a potential aggravating factor when recommending a penalty.

misconduct issues presented and resolved.  It is here that CAR memos[329] would be useful since DAO puts cases together where there are multiple concurrent investigations for the same encounter or multiple misconduct claims pending contemporaneously.  DAO also has exclusive access to a complete disciplinary history.  CAR memos present a full picture to the Police Commissioner before they make a final decision.

It is a worthwhile exercise to examine more closely the twenty unusual cases,[330] over the last three-year period, 2019-2021, where penalty days were imposed in order to discern whether the Police Commissioner has, in fact, disciplined any officers for Fourth Amendment violations. The Appendix contains a description, using available data, of a number of cases where a penalty was imposed and also a stop/frisk/search allegation may have been substantiated by CCRB.[331]  It would be misleading, for example, to cite a case where excessive force or a false statement was substantiated in conjunction with a wrongful stop to say that penalty days were assessed for the stop.  Any true assessment would look at all the charges and allegations pending at the time of the allegation and at the time of disposition, including non-CCRB cases such as force, false statement or profiling, prior case dispositions, civil actions pending and prior to the disposition, and probationary periods that overlapped the allegation or disposition.  This would require CCRB investigative reports, IAB investigative reports, CAR[332] memos, and an analysis of complaints filed in court.  The writeups in the Appendix attempts this analysis in a number of cases but access to all the necessary information was, in some cases, not produced.

## V.    Overview of the NYPD Organization - Background

Established in 1845, the NYPD is one of the oldest and largest municipal police forces in the United States.  Heading the Department is Police Commissioner Edward A. Caban. He was appointed to a five-year term by Mayor Eric Adams in July 2023.

NYPD employs approximately 35,000 uniformed officers and 19,000 civilian employees.[333]  The NYPD is principally divided into twenty-three bureaus and major offices that perform enforcement, investigative, and administrative functions.[334]  The largest bureau is the Patrol Services Bureau, which oversees the majority of uniformed officers on patrol and is headed

---

[329] The City has asked that the Report not include references to two CAR memos which were produced.

[330] Out of 111 closed cases.  Fed. Monitor SQFSTA Report as of 09-30-2022.

[331] In the Court's correspondence commissioning this Report there was a directive to include a "detailed narrative of cases which exemplify the manner in which the CCRB and NYPD have addressed police misconduct during stops and discipline." Correspondence from Judge Analisa Torres to Peter Zimroth (May 30, 2018).

[332] Case Analysis and Recommendation made by DAO to the Police Commissioner.

[333] NYPD, About NYPD, available at https://www1.nyc.gov/site/nypd/about/about-nypd/about-nypd-landing.page. Members of the Service (MOS) include uniformed and approximately 19,000 civilian employees.  Uniformed Members of the Service (UMOS) are the roughly 35,000 sworn police officers.

[334] NYPD, Bureaus, available at https://www1 nyc.gov/site/nypd/bureaus/bureaus.page.

by the Chief of Patrol.[335]  It is divided into eight borough commands,[336] which are further divided into seventy-one police precincts.[337]  A typical police precinct covers an area with approximately 70,000 to 150,000 residents.  There are nine Public Housing Police Service Areas (PSAs), which overlap forty of the precincts.

Relevant to a discussion of discipline, other NYPD offices include the Office of the Chief of Department ("OCD"), which oversees all Members of the Service ("MOS"), the Internal Affairs Bureau ("IAB"), which is tasked with investigating police misconduct, the Professional Standards Bureau (formerly labeled the Risk Management Bureau - "RMB"), which tracks police performance, and the Trials Bureau, which is also referred to as the Office of the Deputy Commissioner of Trials ("DCT").[338]  The Trial Bureau is primarily responsible for conducting disciplinary trials of NYPD employees when formal discipline is sought.  The Force Investigation Division ("FID"), established in 2015, investigates all firearms discharges and deaths in police custody, and reports directly to the First Deputy Commissioner.[339]  The Department Advocate ("DAO") acts as principal prosecutor for matters of misconduct, which is distinct role from that of the Deputy Commissioner for Legal Affairs.

Reporting to the Commissioner are several other key department officials, including First Deputy Commissioner Tania Kinsella, a number of Deputy Commissioners,[340] Chief of Department Jeffrey B. Maddrey, and the various bureau chiefs.[341]  Michael Gerber is Deputy Commissioner for Legal Affairs.

As a backdrop to the Department's discipline process, a look at overall activity of the Department is helpful.  In 2018, there were, on average, 36,784 uniformed members of service.[342]  They responded to 6.1 million calls for service.  There were 246,781 arrests.[343]  In that same year, there were:

---

[335] NYPD, Patrol, available at https://www1.nyc.gov/site/nypd/bureaus/patrol/patrol-landing.page.

[336] These include Manhattan North, Manhattan South, The Bronx, Brooklyn North, Brooklyn South, Queens North, Queens South, and Staten Island.  NYPD, Detectives, available at https://www1 nyc.gov/site/nypd/bureaus/investiga tive/detectives.page.

[337] NYPD, Patrol, available at https://www1.nyc.gov/site/nypd/bureaus/patrol/patrol-landing.page.

[338] *Id.*

[339] NYPD, New NYPD Use of Force Guidelines Announced, available at http://nypdnews.com/2015/10/new-nypd-use-of-force-guidelines-announced/;  NYPD, Use of Force Report 2017, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/use-of-force/use-of-force-2017.pdf.

[340] Deputy Commissioners are appointed by the Police Commissioner, *see* N.Y. City Charter § 432, and include Deputy Commissioners for Internal Affairs, Legal Matters, Trials, and Department Advocate, among others.

[341] NYPD, Leadership, available at https://www1 nyc.gov/site/nypd/about/leadership/leadership-landing.page.

[342] For many of the statistics cited, 2018 was chosen since the records are the most complete, facilitating comparisons. In FY 2023 there were 33,797 uniform personnel and 15,117 civilian personnel.

[343] NYPD, Use of Force Report at 13-14, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/use-of-force/use-of-force-2018.pdf.  Of those arrests, 96,394 were for seven major index crimes (Murder, Rape, Robbery, Felony Assault, Burglary, Grand Larceny, and Grand Larceny Auto).  *See also* RMB Crime, Arrest, Summons, Stop Reports Matrix (Mar. 2020), on file with the Monitor Team.  Arrests dropped dramatically, to 214,617 in 2019.

- 56,657 Desk Appearance Tickets[344] issued;
- 89,910 Criminal Court Summonses[345] written;
- 54,413 Civil summonses, sending respondent to OATH for minor infractions.[346]

As of the beginning of 2021, the composition of the uniformed force, broken down by rank and ethnicity is as follows[347]:

| Rank | White | Black | Hispanic | Asian | Other | Total |
|---|---|---|---|---|---|---|
| Chief | 8 | 4 | 2 | 0 | 0 | 14 |
| Asst/Dep Chief | 61 | 11 | 7 | 1 | 0 | 80 |
| Inspector | 94 | 15 | 15 | 2 | 0 | 126 |
| Dep. Inspector | 122 | 17 | 21 | 5 | 0 | 165 |
| Captain | 204 | 35 | 56 | 42 | 0 | 337 |
| Lieutenant | 895 | 210 | 336 | 141 | 1 | 1,583 |
| Sergeants | 2,227 | 622 | 1,093 | 382 | 3 | 4,327 |
| Detectives | 2,539 | 774 | 1,326 | 221 | 5 | 4,865 |
| Police officers | 9,872 | 3,571 | 7,272 | 2,345 | 16 | 23,076 |
| Total | 16,022 | 5,259 | 10,128 | 3,139 | 25 | 34,573 |

| Rank | White | Black | Hispanic | Asian | Other | Total |
|---|---|---|---|---|---|---|
| Chief | 57.1% | 28.6% | 14.3% | 0.0% | 0.0% | 100.0% |
| Asst/Dep Chief | 76.3% | 13.8% | 8.8% | 1.3% | 0.0% | 100.0% |
| Inspector | 74.6% | 11.9% | 11.9% | 1.6% | 0.0% | 100.0% |
| Dep. Inspector | 73.9% | 10.3% | 12.7% | 3.0% | 0.0% | 100.0% |
| Captain | 60.5% | 10.4% | 16.6% | 12.5% | 0.0% | 100.0% |
| Lieutenant | 56.5% | 13.3% | 21.2% | 8.9% | 0.1% | 100.0% |
| Sergeants | 51.5% | 14.4% | 25.3% | 8.8% | 0.1% | 100.0% |
| Detectives | 52.2% | 15.9% | 27.3% | 4.5% | 0.1% | 100.0% |

---

[344] *See* N.Y. Crim Proc. Law § 150.10; RMB Crime, Arrest, Summons, Stop Reports Matrix (Mar. 2020), on file with the Monitor Team. Desk Appearance Tickets or "DATs" involve removing the civilian to the precinct, running a background check (including fingerprinting if authorized by Criminal Procedure Law Article 160) and releasing for return to court at a later date.

[345] *See* N.Y. Crim. Proc. Law § 130.10. This number does not include parking or vehicle traffic summonses. Criminal Court Summonses are handed to the civilian at the scene and require a return to Criminal Court at a later date, without fingerprinting. Some confusion in terminology may arise, since under Criminal Procedure Law Article 130 summonses are, by definition, court-ordered. However, in New York City, NYPD officers are authorized to write a "C summons" without a court order.

[346] *Id*. Not included in this number are 1,069,708 vehicle "moving summonses" and 386,704 "parking summonses." RMB Crime, Arrest, Summons, Stop Reports Matrix (Mar. 2020), on file with the Monitor.

[347] NYC Police Reform and Reinvention Collaborative Draft Plan at 163–64 (Mar. 5, 2021), available at https://www1.nyc.gov/assets/home/downloads/pdf/reports/2021/Final-Policing-Report.pdf, adopted by the N.Y. City Council, Intro. Res. 1584/2021 (Mar. 25, 2021).

| | | | | | | |
|---|---|---|---|---|---|---|
| Police officers | 42.8% | 15.5% | 31.5% | 10.2% | 0.1% | 100.0% |
| Total | 46.3% | 15.2% | 29.3% | 9.1% | 0.1% | 100.0% |

Formal Discipline (Charges and Specifications filed) by race and ethnicity of the subject officer, Uniformed Members of the Service, 2020:

| 2020 | N | % of those charged |
|---|---|---|
| White | 173 | 35.4% |
| Black | 117 | 23.9% |
| Hispanic | 159 | 32.5% |
| Asian | 40 | 8.2% |

## VI.     MISCONDUCT INVESTIGATIONS WITHIN NYPD

The NYPD Patrol Guide and the Administrative Guide contain the basic rules and procedures that police officers must follow in carrying out their official duties.[348]  In addition, the Internal Affairs Bureau Guide sets forth procedures for the intake, classification, and investigation of complaints against members of the NYPD.[349]

If one totals the number of arrests, *Terry* stops, summonses and DATs,[350] there are nearly two million police-citizen enforcement encounters per year in New York City, and another one million moving violation tickets written.  Fewer than 5,000 complaints are accepted for review by CCRB.  The overwhelming majority of police-citizen encounters, whether properly or improperly performed, unfold without CCRB review or citizen oversight.  Unless a civilian complains to CCRB or some other monitoring agency, or files a civil legal claim, and excluding the rare case where the officer's conduct is fully litigated in a criminal proceeding, evaluations of police compliance with the law are entirely dependent on the Department's own internal mechanisms for detecting, investigating, and describing the propriety of officer interactions with the public.[351]

---

[348] *See, e.g.*, Patrol Guide § 203-06 (Now Admin. Guide § 304-06) (listing numerous rules governing police conduct); § 203-08 (Now Admin. Guide § 304-10) (prohibiting officers from intentionally making false statements); § 203-09 (describing rules around public contact); § 203-10 (Now Admin. Guide § 304-06) (outlining twenty-four prohibited activities for uniformed officers).  Effective June 2021 the entirety of section 203 was removed and placed in the Administrative Guide.  Some portions of the Administrative Guide are publicly available online.  NYC Admin. Code § 14-164 requires online publication of the patrol guide, but not the Admin. Guide.

[349] *See, e.g.*, NYPD, Internal Affairs Bureau Guide 620-58, Processing and Investigating Complaints of Profiling and Bias-Based Policing Control.  The IAB Guide is not posted on the Departmental website, but a copy can be accessed on the NYPD Monitor website under "Policies."  https://www.nypdmonitor.org/resources-reports/, last accessed September 23, 2023.

[350] Desk Appearance Tickets (Article 150 of the Criminal Procedure Law).

[351] The Inspector General for NYPD and the Commission to Combat Police Corruption (CCPC) will, on a regular basis, review the work done by the Department when it investigates, but they are neither mandated nor equipped to conduct their own field investigations.

Independent of the role played by CCRB, NYPD's willingness to audit, monitor, supervise and, when appropriate, impose discipline for misconduct is essential to constitutional compliance.

Given the *Floyd* Court's finding of deliberate indifference over the years prior to the trial, a necessary focus becomes the manner and transparency by which the Department examines SQF behavior and actively screens for misconduct.  Whether the Department has improved compliance with the Fourth and Fourteenth Amendments in recent years requires an evaluation beyond an analysis of civilian complaints to CCRB alone.  It cannot be assumed that all stops are constitutionally valid absent a civilian complaint to CCRB.  Looking at NYPD's disposition of CCRB substantiated complaints says little about overall stop and frisk activity or misconduct.  Waiting for a complaint to be made by a civilian, substantiated by CCRB, approved by DAO, and ending in a disciplinary decision by the Police Commissioner, is an ineffective method of assuring that discipline is imposed, when needed, for SQF misconduct.

Aside from litigation, illegal stop and frisk behavior may only be uncovered in one of three ways: by civilian complaint, supervisory review, or audit.  The extent of compliance with the Constitution and the *Floyd* ruling is uncertain given the unknown number of unreported and unreviewed stops that may occur each year.  Complaints to CCRB and internal NYPD reviews are indicators to some extent.  It is a simple matter to look at CCRB substantiations of SQF misconduct and then measure whether discipline is appropriately applied when a civilian has successfully complained.  But complaints to CCRB and CCRB substantiations are just the tip of the iceberg in trying to assess all police-stop activity and whether discipline for misconduct is properly accorded.  There are many and varied reasons why a civilian would fail or refuse to file a CCRB complaint (intimidation, lack of information, lack of ready access or means, pending criminal charges, pending civil complaints, attorney advice, to name a few) that have nothing to do with the legality of a stop or the level of misconduct.  The level of misconduct reported through CCRB tells us only a small part of the story about the overall amount or level of misconduct.  Without community surveys from which to draw inferences, it is difficult to conclude whether a small or a large percentage of civilians who believe they have been wronged during a police encounter actually follow through with a complaint to CCRB.

On average, about 60,000 complaints of police misconduct are received or logged each year by NYPD and CCRB combined.[352]  Each agency reviews the complaint at intake and assigns them for investigation or refers them to other agencies for want of appropriate jurisdiction.  One might presuppose that CCRB receives the bulk of the complaints, but that would be incorrect.  On average, CCRB receives about 10,000 complaints a year.  Once screened, less than one-half of the complaints coming to CCRB remain there for processing.  Many fall outside CCRB's jurisdiction.  If so, they are referred out by CCRB's Case Management Unit to other agencies, including NYPD.

The Department, through IAB, logs about 50,000 complaints annually.[353]  Complaints logged by IAB may come from civilians, other agencies, CCRB, or by way of internal reporting.

---

[352] Due to cross-referrals, from NYPD to CCRB and vice-versa, there is some degree of overlap in these two sets of numbers.

[353] In reviewing this Report, the Department asserted that the average (overlapping COVID) had more recently (2020-2022) dropped to an average of 30,000 complaints, but it has not provided a citation or reference in support of that number.  Item 115, City 09.01.23 Feedback to Yates Discipline Report.

As with CCRB, around one-half of the complaints are screened out for reasons discussed below, or because they represent multiple entries for one event.  In the end, somewhere between 20,000 to 30,000 complaints are investigated within the Department.

## A.    NYPD Internal Investigations of Civilian Complaints – Preliminary

One might think that most complaints to IAB originate from internal or inter-agency referrals, while civilians would complain first to CCRB before going to NYPD.  But the reality is, in 2018, 52% of the complaints received by IAB came from civilians who reported the incident directly to the Department, at the precinct or elsewhere.  Fewer than one-third (30%) of complaints received by NYPD originate within the Department by way of audits, supervisory review, internal investigations, and complaints by other officers.[354]

In 2018 alone there were 51,106 complaints logged by IAB.  In 2019, another 46,192 complaints were received by IAB.[355]  Once logged with IAB, an investigation may be conducted by IAB or referred out for investigation to other bureaus or other units within the Department.  As with CCRB, not all NYPD-logged complaints lead to an NYPD investigation; many are referred away to external agencies for jurisdictional reasons.  In 2018, IAB referred 2,326 of the complaints it received to CCRB and referred another 3,790 to other governmental agencies.

Many complaints are duplicative and will lead to just one investigation.  There might, for example, be multiple complainants regarding one encounter.  After consolidation, screening, and out-bound referrals, of the 51,106 complaints, IAB created 36,701 cases for investigation[356] and conducted 29,873 investigations in 2018.  Of 46,192 complaints in 2019, NYPD created 34,028 cases for investigation and conducted 23,878 investigations.  For a sense of proportion, this is five to six times as many investigations as are done by CCRB and as much as twenty times the number of full investigations conducted by CCRB.[357]

Investigations do not necessarily fall cleanly into one bucket or the other.  An incident may involve a FADO complaint but also include allegations of non-FADO misconduct.  The IAB case both NYPD and CCRB will parse the allegations and conduct parallel investigations.  Also, some matters overlap and may result in concurrent investigations.  A complaint of excessive force will be investigated by both CCRB and NYPD contemporaneously.[358]  A corruption investigation may include wrongful actions that fall within FADO, generating two investigations.[359]  A wrongful stop

---

[354] CCPC, Nineteenth Annual Report of the Commission at 17 (Dec. 2019), available at https://www1.nyc.gov/assets/ccpc/downloads/pdf/Annual-Nineteen-Report.pdf.

[355] Email from Sgt. Xochilt Chantel, NYPD RMB, Inspector General Coordination Unit, to the Monitor Team (Aug. 13, 2020).

[356] Item 118, City 09.01.23 Feedback to Yates Discipline Report.

[357] A large number of CCRB complaints are truncated or mediated and therefore are not processed for investigation.

[358] Excessive force may be investigated by a CO, IAB or FID depending on the level of force used.

[359] For example, a citizen may complain of an illegal search and complain that money in his wallet was wrongfully kept by the officer.

and frisk complaint may also contain allegations of racial profiling or a failure to file a required stop report, in which case the matter may be split for investigation by both CCRB and NYPD.

One of the consequences of shared investigative authority between NYPD and CCRB is the large number of cases referred in a two-way exchange from one agency to the other before full investigation.

- Of the 2,951 complaints that IAB passed to CCRB in 2018, 2,088 were retained and handled by CCRB as within its jurisdiction.
- Meanwhile in that same year, CCRB received directly, and then referred out, 5,689 complaints to NYPD (4,802 to OCD and 887 to IAB).

Each agency (CCRB and NYPD) will also send complaints out to other agencies, depending upon the nature of the complaint and the identity of the subject. This can include referrals to Homeland Security, Department of Justice, or Postal Police and range as far as the San Diego Police Department.

- In 2018, 2,584 complaints were sent **by CCRB** to governmental agencies other than NYPD.[360]
- In 2018, 3,790 complaints were sent **by NYPD** to governmental agencies other than CCRB.[361]

By way of comparison to the investigative workload of NYPD, after subtracting cases that are truncated or sent to mediation, IAB averages a little over 1,300 full investigations per year as measured against approximately 24,000 internal NYPD investigations.[362]

CCRB does not have open access to NYPD's databases, so a CCRB investigator working on a case does not know, unless advised by the IAB liaison, if an encounter that is the subject of a CCRB complaint is also the subject of an NYPD investigation. By contrast, Integrity Control Officers (ICO) throughout the Department have access to CCRB's Complaint Tracking System

---

[360] CCRB, Annual Report 2018, available at https://www1 nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2018CCRB_AnnualReport.pdf.

[361] Email from Sgt. Xochilt Chantel, NYPD RMB, Inspector General Coordination Unit, to the Monitor Team (Aug. 13, 2020). The most frequent recipients were DOJ and assorted Inspector Generals for various NYS agencies.

[362] In 2017, CCRB closed 1,348 cases after full investigation. In 2018, that number was 1,208. CCRB Annual Report, 2018. A direct comparison is not possible for a variety of reasons: (1) NYPD misconduct jurisdiction is much broader than FADO and may include internal personnel matters or any other violation of the Patrol Guide, which runs 2,101 pages in length (available online at https://www1.nyc.gov/site/nypd/about/about-nypd/patrol-guide.page); (2) although internal investigations may, and often do lead to discipline, a limited number are based on civilian encounters; and (3) a large number of CCRB cases end in efforts at mediation or are truncated—cut short for a variety of reasons discussed below. In 2018, 58% of CCRB case resolutions were by truncation and 12% were by mediation or attempted mediation.

(CTS), a database that organizes and holds together all the evidence in a complaint being investigated by CCRB.[363]

## B.    NYPD Disciplinary System

The International Association of Chiefs of Police and the Department of Justice have worked together to identify four principles for an effective complaint process:

- Comprehensive:  All complaints are investigated, regardless of their source;
- Accessible:  Civilians should have easy access to the complaint process;
- Fair and Thorough:  Investigations must be in accordance with high standards; and
- Transparent:  The complainant should be kept apprised of the status of complaints and the community is to be kept apprised through summary reports.[364]

As has been observed in other reports,[365] NYPD's current system for disciplining officers, outlined in a labyrinthine set of administrative codes and regulations as well as internal NYPD documents, is notoriously complex and opaque.  The following section outlines and discusses the current processes used by the NYPD to investigate misconduct and to discipline members.

Investigations conducted by IAB, OCD, BIU (Borough/Bureau Investigation Units) or FID (Force Investigation Division) are all tracked through a variety of databases, not one integrated database.[366]  All complaints received in the first instance at the Department are sent initially to IAB, which assigns the complaint an IAB log number.  After logging, depending on the nature of the complaint and the identity of the subject of the complaint, the matter may be kept at IAB, sent to another unit in the NYPD, such as BIU[367] or the local Command, or sent to CCRB.  Commonly, a case will be "split" when the complaint contains multiple allegations, e.g., "[t]he officer punched

---

[363] CCRB Response to Supplemental Question Number Six (June 3, 2018).  ICOs are lieutenants assigned to each precinct and borough command.  They keep track of investigations within their command.

[364] CCPC, Sixteenth Annual Report of the Commission at 8 (Oct. 2014), available at https://www1.nyc.gov/assets/ccpc/downloads/pdf/Sixteen-Annual.pdf (citing Int'l Ass'n of Chiefs of Police, Protecting Civil Rights:  A Leadership Guide for State, Local, and Tribal Law Enforcement at 86-89).

[365] Mary Jo White et al., The Report of the Independent Panel on the Disciplinary System of the New York City Police Department at 7 (2019), available at https://www.independentpanelreportnypd net/assets/report.pdf (hereinafter, "Independent Panel Report").

[366] ICMT, ICMS, CPI, and DADS, described *infra*.  ICMS is the internal case management system used by NYPD to track investigations, including those referred to CCRB.  ICMT includes IAB investigations internal to the Department, such as corruption ("C") cases which is only available to IAB.  FID conducts their cases utilizing another system, the Enterprise Case Management System ("ECMS") with case findings only being entered into ICMT when completed. Item 125, City 09.02.23 Feedback to Yates Discipline Report.

[367] "Borough and Bureau Investigation Units usually investigate cases that range from landlord-tenant disputes and domestic violence complaints, when there is no serious physical injury, to allegations that officers have stolen property, when that property does not consist of money, credit or debit cards, or valuable jewelry."  CCPC, Fourteenth Annual Report of the Commission at 11 n.21 (Feb. 2012), available at https://www1.nyc.gov/assets/ccpc/downloads/pdf/14th_annual_report.pdf.

me and took the money I had in my pocket."[368]  If a complaint is received by IAB that contains allegations of misconduct falling both within and outside CCRB jurisdiction, IAB will separate the allegations.  In the example given here, the excessive force complaint might be sent to CCRB and concurrently investigated by IAB, which will also investigate the stolen property claim.  Once IAB splits a case, IAB does not track the investigation at CCRB and does not "pair back" the IAB investigation with the CCRB investigation.  Compounding the problem, the Force Investigation Division (FID) keeps a separate database, not shared with IAB.[369]  Parallel investigations may occur.  This is most common when the case has received media attention or the victim suffered serious physical injury.[370]  If both investigations result, independently, in a substantiation, then the Department Advocate's Office (DAO) will be advised, but the investigations themselves are not coordinated.

On occasion, the Administrative Prosecution Unit of CCRB (APU) and IAB will both investigate the same event.  At that point, CCRB may elect to "Administratively Close" the civilian complaint and defer to DAO/IAB handling of the case even though CCRB had jurisdiction.

A number of investigations are conducted and result in discipline or guidance at the command and precinct level.  The command and precinct investigations are not systematically captured or reported in any centralized database, so it is difficult to know how many misconduct investigations are instituted or how they are resolved.  The only way to accurately measure discipline for misconduct would be to scour the records kept at each local command or kept by the command's Integrity Control Officer (ICO).[371]  Complicating the availability of this information is the fact that, by the terms of the Patrol Guide, many of those records are sealed or destroyed not long after they are created.[372]  In the end, all final dispositions of disciplinary complaints or investigations, whether commenced by civilian complaint or otherwise, are made within the Department by the Police Commissioner or his designees and shrouded in confidentiality or buried by a failure to encompass them all in one centralized, integrated, database.

---

[368] In an earlier study, the CCPC observed, "[u]sually, parallel investigations occur when there is a complaint of a serious physical injury during an interaction with the NYPD, or when the case has received media attention."  CCPC, Seventeenth Annual Report of the Commission at 99 (Nov. 2015), available at https://www1.nyc.gov/assets/ccpc/downloads/pdf/Seventeenth-Annual.pdf.  With false testimony added to CCRB's portfolio, there undoubtedly will be parallel investigations in that area.

[369] Memo from Erin Pilnyak, Risk Management Bureau, NYPD, to the Monitor Team (Sept. 9. 2020).

[370] CCPC, Seventeenth Annual Report of the Commission at 99 (Nov. 2015), available at https://www1.nyc.gov/assets/ccpc/downloads/pdf/Seventeenth-Annual.pdf.

[371] An ICO is assigned to each police precinct and holds the rank of Lieutenant.  The position was created in 1973 after the Knapp Commission Report on Police Corruption.  The primary responsibility of the ICO is to develop and maintain an Integrity Control Program within the Command.  "The concept underlying their creation [was to] act as the 'eyes and ears' of the Department at the precinct level."  CCPC, Second Annual Report of the Commission, at 12 (Oct. 1997), available at https://www1.nyc.gov/assets/ccpc/downloads/pdf/Second-Annual-Report-of-the-Commission.pdf.  In connection with that function, ICOs are to "[p]rovide advice to commanding officers/unit commanders concerning appropriate penalties for violations of Department regulations."  Patrol Guide § 202-15 (10). In response to criticisms that ICOs were overburdened with administrative responsibilities, the Patrol Guide now specifies that ICOs are not to be assigned any duties, other than those listed in the Patrol Guide, by command.

[372] Sealing and destruction of Command Discipline records is discussed later in this Report.

### C.     Complaint Intake at NYPD

A complaint against a police officer can be initiated either by a civilian complainant or by a fellow officer or supervisor. The NYPD may also review an officer's conduct based on its own internal audits, monitoring, and reporting.

A civilian complaint against a police officer can be lodged at any patrol precinct, Housing Bureau Police Service Area, transit district, traffic unit, or any other NYPD office.[373] Civilians can also submit complaints by mail, email, and telephone.[374] Complaints against officers can also be submitted directly to the Internal Affairs Bureau or the Civilian Complaint Review Board. Once a complaint is lodged, a dizzying traffic circle of assignment and re-assignment follows. Complaints eventually end up with either CCRB, IAB, OCD, BIU, FID or local commands. Getting there may be a journey.

All complaints coming to the Department, regardless of the originating source, receive an IAB identifying number and are reviewed by IAB's Assessment Intake Unit for assignment to an investigative unit. FADO complaints are logged by IAB but sent to CCRB. Corruption complaints ("C"), some force complaints ("FI"), and the most serious misconduct complaints stay with IAB. Other misconduct cases ("M") are considered less serious and are usually sent to the Borough or Bureau Investigation Units (BIU).

Approximately one half of the complaints received by the Department are classified as "Outside Guidelines" (OG). OG cases involve an allegation of a violation of a Departmental rule or guideline. It is a classification reserved for lesser offenses. Common intra-Departmental OG complaints include Misuse of a Parking Plaque, Damage to Police Property, and Improper Parking of a Department Vehicle. Common civilian complaints in the OG category are disputed traffic or parking summonses or a failure to take or make a report when requested by a civilian. They can be passed on from IAB to OCD. The Investigation Review Section of OCD will send less serious complaints to the local command to be addressed through the Command Discipline process. All investigations have a target date for completion within ninety days.[375]

Complaints received by NYPD involving excessive force, abuse of authority, discourtesy, or offensive language (FADO) and made by a civilian, are assigned a CCRB serial number and, according to the Patrol Guide, referred immediately by telephone to the CCRB's Intake Unit,[376] which is open to receive complaints twenty-four hours a day.[377] Complaints against uniformed members containing allegations of other acts of misconduct, such as failure to properly perform duty, are also referred to the CCRB, and assigned a Chief of Department serial number as well.[378]

---

[373] Patrol Guide § 207-27, 28.

[374] *Id.*

[375] Admin. Guide § 318-17.

[376] Although the Patrol Guide requires the receiving officer to immediately refer the complaint to the CCRB, in practice it can take up to a week for the receiving officer to do so.

[377] Patrol Guide § 207-27, 28.

[378] *Id.*

Complaints of corruption or other misconduct outside the CCRB's jurisdiction are referred to the IAB.

Upon receiving a civilian complaint in person, usually at the precinct, the NYPD officer must interview the complainant and provide him or her with a Civilian Complaint Report,[379] which the complainant prepares in his or her own handwriting and signs.[380]  This is then converted to a typed copy prepared by the desk officer or other officer receiving the complaint and signed by the complainant.  The complainant is given a copy to take with him or her.  As well, for recordkeeping purposes, the officer prepares a "Statistical Summary Sheet."[381]  The officer is to note the physical condition of the complainant and whether the complainant appears under the influence of drugs or alcohol or otherwise in a state that could bear on his or her credibility.[382]  The officer is also required to notify an Investigating Supervisor[383] if doubt exists as to the identity of the service member against whom the complaint is lodged.[384]  A Reviewing Supervisor[385] then reviews the Civilian Complaint Report and forwards the report to the Commanding Officer, who then distributes it to either (i) the IAB's CCRB Liaison if the complaint is within the CCRB's jurisdiction,[386] or (ii) the Investigation Review Section of the Office of the Chief of Department if it is a non-FADO complaint.[387]

If the referral is being passed on to CCRB, the officer is to obtain a CCRB serial number.  Otherwise, the process calls for assignment of a Chief of Department serial number and an IAB log number.

The receiving member or investigating supervisor is to gather relevant Activity Logs (PD112-145), Command Log entries, ICAD Event Information, Roll Call, etc., and forward them to the IAB-CCRB Liaison Unit.  If the complaint falls within OCD jurisdiction, then the documents are forwarded to the Investigation Review Section of OCD.

At point of intake, decisions regarding referral and classification may call for an exercise of discretion.  The Patrol Guide lists as examples some matters that are sent to CCRB but should also receive an OCD serial number since the matter might end up in either bailiwick.  An example

---

[379] Known as a PD 313-154.  A failure to do this, if reported to CCRB, can form the basis for an Abuse of Authority finding by CCRB.  This, of course, is contingent upon the civilian having the persistence to report the entire episode to CCRB.  In 2019 there were 223 allegations of "Refusal to process a civilian complaint" made to CCRB, which could include a refusal to receive a complaint of officer misconduct.

[380] Patrol Guide § 207-31 (Now Patrol Guide § 207-28).

[381] PD313-154B.

[382] Patrol Guide § 207-28.

[383] A Platoon Commander, Special Operations Lieutenant, or the Integrity Control Officer.

[384] Patrol Guide § 207-28.  When asked by the Monitor Team if a complainant would learn the name of a subject officer who had not identified himself, DAO responded, "[t]his question is best answered by CCRB."  Letter from DAO to Monitor Team (Sept. 3, 2019).

[385] *Id*. ("The reviewer must be at least one rank higher than the member receiving the Civilian Complaint Report.").

[386] Department records, however, are not forwarded directly to the CCRB.  *See* Patrol Guide § 207-28.

[387] Patrol Guide §207-28.

would be "fail[ing] to properly perform [a] duty, unwarranted traffic summons, etc."[388]  The examples given, depending on the surrounding circumstances, could go either way.  A failure to provide medical treatment is clearly a FADO matter for CCRB.  A failure to perform some minor function called for by the rules might also be an OG matter.  Similarly, a simple complaint about a traffic summons is not normally considered to be within CCRB jurisdiction.  But a retaliatory summons following an illegal stop is clearly an abuse within FADO.  The decision to send the case to one place or the other before full investigation will be consequential since disputed summonses at NYPD rarely result in findings of misconduct, while wrongful threats to summons or arrest, or retaliatory summonses, receive a full investigation at CCRB.[389]

A large segment of IAB's intake is of complaints first made to CCRB and then passed on to NYPD.  In 2019, CCRB referred 6,102 complaints to NYPD that were logged by IAB, which then assessed each complaint by a "preliminary investigation . . . [that] may include calling the complainant [and] searching databases."[390]  After screening, 5,220 of the referred cases[391] containing 10,757 allegations were processed by IAB.  The referral may have been a "complete referral" of the entire complaint or a "split referral," whereby CCRB retained FADO allegations within the complaint for further investigation.  Most of the cases referred by CCRB to NYPD are for minor violations.  In 2019, 37 of the cases contained a "C-Corruption" allegation.  And, closing the circle, 50 cases were sent from CCRB to IAB for alleged retaliation by an officer after the complainant filed a complaint with CCRB.[392]

Not all the cases received at IAB intake from CCRB stay with IAB.  In 2019, 17 of the cases were "FI-Force Investigations" and were picked up by FID.  In addition, 271 of the cases were classified as "M-Misconduct," which were sent out to one of the Borough/Bureau commands.  And 4,229 cases were classified as "OG-Outside Guidelines"[393] which were passed on to OCD.

CCRB can also send minor cases directly to OCD.  IAB takes these complaints direct from the CCRB complaint tracking system and then electronically assigns them to the responsible unit.  In 2018, for example, CCRB sent 1,486 cases to OCD where there was a "summons or arrest dispute."  And another 977 complaints against an officer for improperly filling out or refusal to prepare an accident or criminal complaint reports were passed on to OCD.

---

[388] Patrol Guide § 207-28.

[389] Looking at allegations fully investigated by CCRB in 2019, there were 48 threat of summons allegations (five were substantiated); 557 threat of arrest allegations (29 were substantiated) and 14 retaliatory summons allegations (13 were substantiated).  Executive Director's Monthly Report, January 2020 at 47, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2020/20200108_monthlystats.pdf.

[390] Internal Affairs Bureau:  Assessment and Analysis Unit Report, on file with the Monitor Team.

[391] A "case" is a complaint against an identified officer.

[392] Retaliatory arrest or summons of a civilian is investigated by CCRB as a potential abuse of authority.  The CCRB investigative manual lists action by a civilian which, if the cause for enforcement action, might be the basis for an investigation of possible retaliation.  This includes "the use of an obscenity, a challenge to the officer's authority, a request to obtain the officer's name or shield number, or a threat to file a complaint."  CCRB Investigative Manual at 323.  Retaliation for filing a CCRB complaint is not considered a FADO action and, instead, is sent to IAB.

[393] The remainder were either referred out to another agency or filed for further information without investigation.

86

Regardless of which entity first received a civilian complaint, if the complaint alleges a FADO violation, but the subject of the complaint is a civilian member of the service, including traffic enforcement agents and school safety agents, then the matter is sent to IAB for assignment to the appropriate body, not to CCRB. CCRB does not investigate complaints against non-uniformed members.

NYC Charter § 440(c)(1) empowers CCRB to investigate complaints against "members of the police department." However, in its Rules, CCRB has limited its acceptance of complaints to those made against "**uniformed** members" of the NYPD and will not investigate complaints against other Members of the Service.[394] In 2018, CCRB demurred and referred 419 complaints to NYPD where the complaint was by a civilian against a civilian member of the Department.

Under the Patrol Guide, there is no requirement that the complainant be notified which office is responsible for investigating her or his complaint. Normally, if an NYPD investigator can contact the complainant, the complainant is told that they will get the "overall disposition" of a case after it is closed. "Overall disposition" merely tells the complainant whether the complaint was substantiated by IAB or not. They will not know if a penalty was imposed or not. They will not be told which allegations were substantiated and which ones were not.

The Patrol Guide mandates that uniformed members of the NYPD report misconduct committed by a fellow officer—whether on or off duty—including corruption, excessive use of force, or perjury.[395] Such complaints can be made either by calling the IAB's Command Center or submitting a written report to the Chief of Internal Affairs.

If a Member of Service submits a civilian complaint to CCRB against another officer (presumably while the complaining officer was off duty), the matter stays within the Department and is referred to the Commanding Officer of the Investigation Review Section of OCD for disposition. CCRB merely records the information without investigation even if the misconduct falls within FADO. So, for example, an officer who witnesses, or is the victim of, an illegal stop or frisk, whether once or repeatedly, would not alert CCRB. Aside from OCD, the officer could, theoretically, complain to the CO where the offense occurred for investigation within that precinct. There are no reports of SQF investigations commenced in this manner and ending with discipline in the data supplied to the Monitor. The Monitor team was advised that an individualized query to precincts would be required to learn if that information exists.[396]

---

[394] *Compare* N.Y. City Charter § 440(c)(1) *with* 38-A RCNY §1-02 (a). There are approximately 36,000 uniformed officers and another 19,000 civilian employees who are Members of the Service or members of the police department. (With vacancies and retirements, the number of uniformed officers dropped to 33,797 in FY23 and the number of civilian personnel fell to 15,117. Mayor's Management Report, September 2023, at 62. Title 38-A RCNY § 1-02(a) narrows this to "uniformed members" of the NYPD, which eliminates investigation of "members of the service— Traffic Enforcement Agents and their supervisors; School Safety Agents and their supervisors; Police Cadets, and School Crossing Guards, who are all, arguably, "members of the police department." *See* Admin. Guide § 322-11.

[395] *See* Patrol Guide § 207-21 ("All members of the service have an absolute duty to report any corruption or other misconduct, or allegation of corruption or other misconduct, of which they become aware.").

[396] Patrol Guide § 207-28. One exception is the case where a MOS is the victim of a discriminatory slur by another officer. In that case, the complaint is registered with CCRB, but then forwarded to the Equal Employment Opportunity

###   D.        Internal Affairs Bureau

IAB reports directly to the Police Commissioner[397] and is responsible for investigating allegations of corruption, certain force complaints, and non-FADO misconduct lodged against NYPD officers.[398]  IAB can receive complaints in-person at its 24-hour command center, as well as by email, mail, and telephone, including by means of a non-recorded anonymous tip-line.[399] Complaints relating to officers that are submitted at another NYPD location or through 911 and 311 can also be referred to IAB if the complaint falls within IAB's jurisdiction.  "All corruption and misconduct allegations received by the Department by mail, e-mail, or in-person are reported to IAB's Command Center and similarly assigned a log number."[400]

The IAB is divided into twenty-three investigative groups.  Some groups are assigned geographically.  Some are specialized and handle select categories of investigations.[401]  IAB employs an investigative staff of approximately 350 sergeants and detectives charged with reviewing complaints, interviewing witnesses, gathering evidence, and assessing allegations of misconduct.[402]  In all, in the Mayor's proposed budget FY 2023, there are 625 full time employees at IAB with a budget of $71.9 million.[403]  One advantage IAB has over CCRB is the availability of various investigative tools to carry out its mission, including surveillance, undercover officers, drug tests, and confidential informants.[404]

Each morning, the IAB Assessment Committee meets to classify allegations received in the preceding 24 hours.  An initial callout team may interview and then transfer the case to an appropriate group.

On June 17, 2020, Mayor de Blasio announced certain standards for IAB.  The standards required IAB "to complete its full investigation IAB immediate decisions about the disciplinary

---

Division of NYPD for investigation.  A bias complaint may also be filed directly with the City Commission on Human Rights ("CCHR").  NYC Admin. Code § 8-109.

[397] NYPD. Use of Force Report 2017 at 8, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/use-of-force/use-of-force-2017.pdf.

[398] IAB will investigate FADO misconduct when connected to other investigations such as corruption.  IAB can investigate FADO misconduct on its own initiative when there is no civilian complaint.  If IAB recommends discipline after an investigation, the recommendation is reviewed by DAO, which has the option to accept or modify the disciplinary action.

[399] NYPD, *Internal Affairs,* available at https://www1.nyc.gov/site/nypd/bureaus/investigative/internal-affairs.page.

[400] CCPC Eighteenth Annual Report of the Commission, at 163 (Aug. 2017), available at https://www1.nyc.gov/assets/ccpc/downloads/pdf/18th-Annual-Report.pdf.

[401] Examples of internal groups formed in the past include police impersonation, integrity testing, surveillance, financial investigations, court monitoring, and computer crimes.

[402] Independent Panel Report at 9.

[403] NYC Departmental Estimates FY 23, at 730, available at https://www1 nyc.gov/assets/omb/downloads/pdf/de2-22.pdf.

[404] NYPD. Discipline in the NYPD:  2016-2017 at 2, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/discipline/discipline-in-the-nypd-2016-2017.pdf.

process within two weeks or less." Under the reform, the Department must make available information in all cases, such as the officers' names, charges, hearing dates, and resolutions. The Department has not, thus far, amended its Guides to conform with the former Mayor's directive. Today, the investigative period for DAO prosecuted cases averages over seven months.[405]

The categories of findings recorded by IAB at the conclusion of an investigation are slightly different from findings made by CCRB (discussed *infra*). After an investigation is concluded, IAB designates each complaint as "substantiated," "partially substantiated," "unsubstantiated," unfounded," or "exonerated."[406] A sixth category, "information/intelligence only" ("I&I"), is used to, among other things, record complaints that are referred to other agencies, outside the NYPD, or to describe complaints that are considered so clearly not credible that no investigation is undertaken.[407] It can also be used to characterize allegations which the investigators deem to be vague or possessing "no investigative qualities" and then recorded for possible future reference.[408]

IAB does not make penalty recommendations. If IAB substantiates a case, it may recommend either Charges and Specifications or Command Discipline to DAO. The IAB investigator presents the case to the assigned DAO attorney. DAO then determines what charge(s) will be written up and what level of discipline, if any, will be sought. IAB/BIU/FID merely investigate the case and determine whether to substantiate. DAO determines discipline.

When IAB investigates a matter, for example a Force or Corruption case, they have access to the CPI, which lists earlier complaints previously substantiated by CCRB, but the CPI only contains cases where DAO or IAB Police Commissioner agreed to a B-CD or filing of Charges. They do not have access to previous substantiations within the Department which have been sealed pursuant to either Patrol Guide §§ 206-14 or 206-15 (discussed elsewhere in this Report).[409] IAB or FID may look at prior Force complaints investigated within the Department which are kept within the CPI. BIU, when investigating a profiling allegation,[410] may look at prior unsubstantiated (but not unfounded or exonerated) profiling allegations, including a look into the prior investigative file.[411] When OCD is investigating an OG matter, it may look at a prior file as well.

---

[405] CCPC, Nineteenth Annual Report of the Commission at 49 (Dec. 2019), available at https://www1 nyc.gov/assets/ccpc/downloads/pdf/Annual-Nineteen-Report.pdf.

[406] *See* Admin. Guide § 322-11.

[407] *See* Independent Panel Report at 9 n.18.

[408] CCPC. First Annual Report of the Commission at 27 (Apr. 1996), available at https://www1 nyc.gov/assets/ccpc/downloads/pdf/First-Report-of-the-Commission.pdf.

[409] Now Admin. Guide § 318-12.

[410] The Charter change authorizing CCRB to investigate profiling complaints does not preclude an investigation by IAB/BIU. For one, CCRB is limited to investigation of civilian complaints, while NYPD may become aware of profiling for which there is no civilian complaint. In addition, it is not unlikely that a profiling complaint substantiated by CCRB will undergo a second investigation or a concurrent review by IAB. This is true of force complaints and, given the seriousness of a profiling complaint is likely to occur with profiling complaints. The question was twice (orally) put to representatives of the Law Department without a response.

[411] IAB Guide 620-58 (Processing and Investigating Complaints of Profiling and Bias-Based Policing) at paragraph 11 instructs the investigator to "[r]eview subject officer's CPI, including prior civilian complaints, as well as lawsuits

When a Commanding Officer, or the CO's designee, is investigating a matter, the CPI is available (subject to sealing), but no other case history.  Only DAO, which keeps its own record database (DADS), has full access to all prior complaints (whether substantiated or not), but DADS does not include prior Command Disciplines which originated and were resolved within the precinct.  And while DAO may reconcile investigations and adjust disciplinary recommendations, it does not investigate matters; it merely reviews recommendations from CCRB, BIU, IAB, OCD and, as well, makes further recommendations to the Police Commissioner, which may come from DCT, FID, or the Force Bureau.

DAO control over IAB investigative results was criticized in a recent report by the Commission to Combat Police Corruption (CCPC).  They cited cases where misconduct findings by IAB were dismissed.  The Commission recommended:

> The Department should explore creating a separate disposition category for those cases in which IAB (or any other investigative unit) believes that there is sufficient evidence to bring a charge but no charge is brought and no discipline is administered such as "Referred but not charged" or "Unsubstantiated due to declination by DAO."  This disposition could be used when DAO declines to pursue discipline because it disagrees with the investigators' assessment that sufficient evidence exists.  Such a category would alert future investigators who review the officer's background that although the disposition was ultimately not substantiated, investigators believed there was merit to the allegation.  This information might prompt investigators probing later allegations against the same officer to take the later allegations more seriously.  It might also cause them to re-examine the earlier allegations in greater depth when reviewing the background of the subject officer as the earlier allegations would have more credence than they ordinarily would be given to prior allegations closed as "Unsubstantiated."[412]

For lesser infractions, listed in Patrol Guide § 206-03[413] and Administrative Guide 304-06, including such items such as "Unnecessary conversation," "Improper uniform," etc., command discipline or guidance can be administered by the Investigations Unit within IAB and consultation with DAO is not required.

DAO may also pass a substantiated finding by IAB/BIU/FID on to the CO in the precinct and recommend that Command Discipline be imposed.  Once IAB or BIU make a finding after investigation, the CO may not change that finding without conferral with the investigating entity.  The Patrol Guide merely requires "conferral," not "approval."  On the other hand, if disciplinary

---

filed against him or her, and prior performance evaluations with an eye towards identifying patterns of bias/misconduct on the part of the subject officer."  It is unclear whether this would require a look into prior unsubstantiated complaints.

[412]  CCPC, Nineteenth Annual Report of the Commission at 127 (Dec. 2019), available at https://www1.nyc.gov/assets/ccpc/downloads/pdf/Annual-Nineteen-Report.pdf.

[413]  Now AG § 318-02.

action was recommended to the CO by DAO, that may not be changed without approval by the Deputy Commissioner Department Advocate.[414]

### i.    Officer Interviews Within the Department During Investigations

For more serious investigations, an IAB or BIU investigator may question an officer who is the subject of, or a witness to, the matter under inquiry by invoking Patrol Guide § 206-13[415] (now Administrative Guide 318-11, "Interrogation of Members of the Service"), that prescribes detailed procedural requirements.  Prior to any questioning, the interrogating officer must permit the service member to obtain and confer with counsel.  The interrogation is recorded, and the DAO must provide the officer with a copy of a tape of the interrogation.[416]

Command disciplinary procedures will not customarily require time to obtain counsel as the interview is informal.  The Patrol Guide permits time to obtain counsel for "serious" violations,[417] presumably where formal proceedings are contemplated.  Representatives of department line organizations (unions) are present during the interrogation, although they do not, in all instances, represent the officer.

If the officer is a potential subject of a disciplinary proceeding, the officer is provided, in advance of the interview, a description of the nature of any accusation, information concerning the allegation, and the identity of witnesses or complainants.  An officer may be suspended and terminated upon refusal to answer questions in an office interview.  The officer is also given a tape recording of the interrogation within five to twenty days depending on the status of the investigation and before any subsequent CCRB interview.

The officer's interview is considered confidential under Patrol Guide § 206-13 (now AG § 318-11).  Questions and answers are not released or revealed outside of the Department without approval of the Deputy Commissioner – Legal Matters.  This position was sustained in court in reliance upon former Civil Rights Law § 50-a on the claim that it was a personnel record.[418]  The viability of continued confidentiality can, and probably will, be challenged going forward.  Beyond a claim of "unwarranted invasion of privacy," or "interference with law enforcement investigations," the utility of secrecy in this regard may become diminished for several reasons.

The officer's statements cannot be used against him or her in a subsequent criminal proceeding.[419]  Since the immunity is based upon Fifth Amendment protections and not any explicit statutory provision, the immunity that follows is "use plus fruits" and not "transactional."[420]

---

[414] Patrol Guide § 206-02.  (Now Admin. Guide § 318-01).

[415] Now Admin. Guide § 304-10.

[416] *Id.*

[417] After the assault on Abner Louima, in 1997 there was pressure to eliminate the "48-hour" rule which had been part of the union contract. Finally, in 2002 after litigation, the automatic rule was eliminated.

[418] *Gonzalez v. United States*, 2013 US Dist. LEXIS 75091, 2013 WL 2350434 (S.D.N.Y. May 23, 2013) (Cott, Magistrate J.).

[419] *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967).

[420] *Caruso v. CCRB*, 158 Misc. 2d 909 (N.Y. Cty. Sup. Ct. 1993).

During CCRB investigations, the officer has time to review the civilian statements before being questioned. By contrast, the civilian witnesses do not have the right to see the officer's statements.

As with IAB interviews:

[A]ll members of the Department who are questioned by the CCRB [are] to cooperate in the CCRB investigation, to report all pertinent information to the CCRB, and to answer all questions posed by a CCRB investigator or board member fully and truthfully. Where a member of the Police Department refuses to answer a question in a CCRB investigation, the CCRB investigator or Board member shall inform the Police Department, and a designated supervisory officer the Police Department shall advise the officer that the refusal to answer questions in a CCRB investigation will result in immediate suspension and the preparation of disciplinary charges, and the supervisory officer shall then direct the officer to answer the questions posed.[421]

In the view of Corporation Counsel, "It is irrelevant that the new CCRB has no express statutory authority to grant immunity. Where a public employee is compelled to testify about his or her job over a claim of privilege against self-incrimination, use immunity 'attaches automatically by operation of law,' and flows directly from the Constitution."[422]   In other circumstances, "[t]o prevent the privilege from shielding information not properly within its scope . . . a witness who desires the protection of the privilege . . . must claim it at the time he relies on it" and "a witness must assert the privilege to subsequently benefit from it."[423]   However, in the case of an IAB interrogation, since there is a "threat to withdraw . . . public employment . . . the privilege . . . need not be affirmatively asserted."[424]   Presumably this also applies to CCRB interviews.[425]

While statements made by the officer during a disciplinary interview may not be used against him in a criminal proceeding, the question arises as to whether an IAB interview or a CCRB interview may be available in a subsequent civil suit. Federal courts in the Districts of New York routinely permit discovery of CCRB investigations in cases involving the NYPD.[426] That would necessarily include statements made by the subject officer in the course of the investigations.

---

[421] Opinion No. 4-93, 1993 NYC Corp Counsel LEXIS 14.

[422] *Id.* (internal citations omitted).

[423] *Salina v. Texas*, 570 U.S. 178, 183, 186 (2013) (sometimes referred to as "immunity by invocation").

[424] Corp. Counsel Opinion No. 4-93.

[425] Compare CPL 190.50 which grants automatic immunity, without invocation, to witnesses in the Grand Jury.

[426] *Heller v. City of New York*, 06 CV 2842 (NG), 2008 WL 2944663 (E.D.N.Y. July 31, 2008); *1 Move v. City of New York*, No. 05 CV 3180, 2005 U.S. Dist. LEXIS 42902, at *1-2 (E.D.N.Y. July 13, 2006); *Bradley v. City of New York*, No. 04 CV 8411, 2005 WL 2508253, at *1-2 (S.D.N.Y. Oct. 3, 2005); *Fountain v. City of New York*, No. 03 CV 4526, 03 CV 4915, 03 CV 7790, 03 CV 8445, 03 CV 9188, 03 CV 9191, 04 CV 665, 04 CV 1145, 04 CV 1371, 04 CV 2713, 2004 WL 941242, at *3 (S.D.N.Y. May 3, 2004) (citing *King v. Conde*, 121 F.R.D. 180, 188 (E.D.N.Y. 1988)).

Any concern for the future personal liability of officers following an interview was discounted by U.S. District Court Judge Jack Weinstein:

> An officer's financial responsibility for civil rights claims is likely to be slight (because he is relatively judgment proof or indemnified by his employer), whereas he (or his friends) may face termination or prosecution in internal affairs investigations. In sum, disclosure to civil rights litigants is probably a minute influence on officers' candor. *See Kelly*, *supra*, 114 F.R.D. at 665 ("the possibility of disclosure to a civil litigant probably adds almost nothing to the pressure to dissemble that officers already would feel; those who are going to lie are going to do so regardless of whether there is some chance of disclosure to a citizen complainant.").[427]

The confidentiality limitation placed on officer interviews has been extended in a fashion, to CCRB, which can become a hindrance to CCRB investigations.

> The CCRB requests entire case files from concurrent IAB investigations, which includes transcripts and audio recordings of the interviews. The NYPD refuses to release these documents until it has concluded its investigation. Often, the CCRB has concluded its investigation prior to the NYPD closing and/or providing this information.[428]

In effect, this can mean that the officer and his representative can review prior statements made to IAB when being interviewed by CCRB investigators, but the CCRB investigator may have to conduct the interview without access to a prior statement made to IAB. While this situation would seem to be awkward in the ordinary course, now, with the added responsibility to investigate false statements, denying access to CCRB of a prior interview will become more problematic. It is awkward, if not untenable, to ask a CCRB panel to determine if a sworn statement is false without providing access to the panel of sworn statements covering the same matter made in a departmental interview.

The quality of IAB interviews has also been a subject of repeated criticism and concern by outside reviewers.[429] In the words of the Commission:

> Especially in the context of official Department interviews, questioning at times appeared perfunctory, with insufficient efforts made to obtain the details of what actually occurred. While the Commission does not advocate unnecessarily prolonging interviews, questioning that only seeks to obtain a denial, or that yields answers that are vague or can be interpreted multiple ways, or that does not challenge statements that seem incredible could result in failure to uncover

---

[427] *King*, 121 F.R.D at 193 (E.D.N.Y. 1988) (quoting *Kelly v. City of San Jose*, 114 F.R.D. 653, 655 (ND Cal. 1987). This was written before the City put restrictions upon qualified immunity for police misconduct. (*See discussion infra*.) Nonetheless, indemnification provisions still obtain.

[428] Letter to Monitor Team, September 3, 2019, Matthew Kadushin, General Counsel, CCRB.

[429] CCPC Nineteenth Annual Report, *supra* note 354 at 29 (citing 12 previous studies and reports lodging the same criticism).

evidence of serious misconduct that would have been revealed through more competent and persistent questioning. Also, this type of seemingly pro forma questioning may send a message to the subject officer and the delegate present with that officer that IAB places no credence in the allegations or does not view the allegations as sufficiently serious to merit any genuine inquiry. In addition, the Commission noted interview techniques that violated best practices for obtaining the most reliable information. These included interviewing witnesses together, using close-ended questions, using witnesses as interpreters, ceding control of the interview to the subject officer's representatives, and failing to describe non-verbal responses and exhibits for the recording.[430]

This is a phenomenon observed and corroborated by the Monitor. Two of note were interviews conducted by BIU investigators in connection with profiling allegations against an officer who was the subject of eight separate profiling investigations (all of which were unfounded or unsubstantiated). The interviews were criticized for their brevity, with one lasting just nine minutes,[431] and another was criticized for taking place six months after the incident and five months after the complainant had been interviewed.[432]

### E.    NYPD Internal Investigations – Categories of Misconduct

IAB oversees some of the non-FADO complaints against NYPD officers, but not all. IAB investigations are typically classified into one of four categories depending on the nature of the allegations.[433]

- **Corruption ("C")** cases involve allegations of corruption or serious misconduct. They are retained for investigation by IAB.
- **Misconduct ("M")** cases may be handled by IAB or investigative personnel within the Borough/Bureau Investigative Units. M cases commonly involve non-appearance in court, missing property, off-duty incidents, misuse of time, disputed stop of a vehicle.[434] From 2015 through the beginning of 2022, allegations of racial profiling and bias-based policing were also classified as M cases and investigated by Borough/Bureau Investigative Units (BIU).
- **Outside Guidelines ("OG")** cases involve allegations of minor infractions or violations of Department regulations that fall outside Patrol Guide prohibitions involving public contact. They are often referred to command-level investigators as a result.[435]

---

[430] *Id*. at 30.

[431] PO ███████████, IAB ███████.

[432] ███████████.

[433] IAB may also conduct Self-Initiated (SI) cases and Programmatic Review (PR) cases.

[434] NYPD distinguishes vehicle stops (M cases) from street stops (CCRB abuse of authority). A complaint of a wrongful vehicle traffic stop is not sent to CCRB, unless there is also a claim of an illegal frisk or search.

[435] NYC Dep't of Investigation, Addressing Inefficiencies in NYPD's Handling of Complaints: An Investigation of the "Outside Guidelines" Complaint Process at 1 (Feb. 2017), available at https://www1.nyc.gov/assets/oignypd/do

- **Force Investigations ("FI")** may also be logged by IAB and then, depending on the "Force Incident Level" be investigated by local command, BIU, IAB, or FID.

### i.    Outside Guidelines Cases

OG cases, whether raised by civilian complaint or otherwise, are typically referred to the Investigation Review Section ("IRS") of the Office of the Chief of Department ("OCD").[436]  OG cases commonly involve issues such as: disputed arrest, disputed summons, failing to take police action, failing to respond in a timely manner, incomplete or inaccurate reports, or an inaccurate property clerk invoice.  OG cases account for approximately 50% of civilian complaints filed each year.[437]  In 2018, 25,662 cases were investigated.  In 2019, 20,923 OG cases were closed.  (It is uncertain how many were still under review at the time of this Report.[438])  Reported dispositions were as follows:

| OG - OUTSIDE GUIDELINES DISPOSITIONS | 2018 | 2019 |
|---|---|---|
| EXONERATED | 6,052 | 5,188 |
| UNFOUNDED | 2,960 | 2,564 |
| I&I | 1,140 | 1,069 |
| I&I / MINOR PROCEDURAL VIOLATION | 10 | 7 |
| MINOR PROCEDURAL VIOLATION | 4 | 7 |
| SUBSTANTIATED / MINOR PROCEDURAL VIOLATION | 63 | 30 |
| PARTIALLY SUBSTANTIATED | 654 | 623 |
| PARTIALLY SUBSTANTIATED / MINOR PROCEDURAL VIOLATION | 42 | 24 |
| UNFOUNDED / MINOR PROCEDURAL VIOLATION | 13 | 5 |
| SUBSTANTIATED | 4,061 | 3,127 |
| UNSUBSTANTIATED / MINOR PROCEDURAL VIOLATION | 28 | 8 |
| UNSUBSTANTIATED | 10,607 | 8,256 |
| EXONERATED / MINOR PROCEDURAL VIOLATION | 28 | 15 |
| Grand Total | 25,662 | 20,923 |

---

wnloads/pdf/Reports/OGReport.pdf.  Other common case classifications include Self-Initiated ("SI") cases and Programmatic Review ("PR") cases.  In SI cases, IAB initiates an investigation based upon information that it developed, while in PR cases, IAB revisits a closed investigation to determine if further inquiry is needed.

[436]  CCPC, Eighteenth Annual Report of the Commission at 163 (Aug. 2017), available at https://www1.nyc.gov/assets/ccpc/downloads/pdf/18th-Annual-Report.pdf.  More recently, the procedure was altered such that OG cases are sent directly to an investigating unit and the IRS "monitors [the] cases to ensure they are closed in a timely manner."  Item 154, City 09.01.23 Feedback to Yates Discipline Report.

[437]  NYC Dep't of Investigation, Addressing Inefficiencies in NYPD's Handling of Complaints:  An Investigation of the "Outside Guidelines" Complaint Process at 1 (Feb. 2017), available at https://www1.nyc.gov/assets/oignypd/downloads/pdf/Reports/OGReport.pdf.

[438]  IAB, OG Discipline Matrix (July 27, 2020), on file with the Monitor Team.  "Partially substantiated" signifies that at least one allegation among several was substantiated.

In more serious cases, IAB may retain an OG case for investigation. In 2018, IAB investigated 328 OG cases and substantiated 38 of them. In 2019, IAB investigated 252 OG cases and substantiated 59 of them.

The OG processing system is elaborate. The complaint usually gets passed from IAB to OCD-IRS, which then forwards it to the appropriate command (Patrol Services Bureau, Housing or Transit Bureau).[439] Within the Patrol Services Bureau, which fields the majority of OG complaints, the Office of the Chief of Patrol's Investigation and Evaluation Unit receives the complaint and, in turn, forwards it to one of the eight Patrol Borough Commands. The Patrol Borough Command assigns the case to a supervisor in the precinct. There, an Operations Lieutenant passes the complaint to a precinct supervisor, usually a sergeant for investigation. Once the supervisor reaches a conclusion, the case is reviewed by a superior officer in the precinct, forwarded to the Patrol Borough, and passed back to the Patrol Services Bureau. Investigating officers at the Command level are directed to contact the civilian complainants, if there is one, within five days and to conclude the investigation within ninety days. If the complaint originated with a civilian, the investigator is to complete, and return to IRS, a "Disposition and Penalty Report for Civilian Complaints Investigated by NYPD."[440] IRS may conduct a final review and enter the information on a Disposition and Penalty Form for Outside Guidelines into a computerized case management tracking system, called the ICMT.

In February 2017, the NYPD Office of Inspector General (NYPD-OIG[441]) issued a report entitled "Addressing Inefficiencies in NYPD's Handling of Complaints: An Investigation of the 'Outside Guidelines' Complaint Process" and concluded that there are "certain inefficiencies, inconsistencies, and outdated technology that is incompatible with other NYPD systems."[442] By letter dated May 8, 2017, the Police Commissioner responded to the Inspector General's report. The Commissioner noted that the NYPD "had focused on most, if not all, of the issues raised by" the Inspector General before it issued its report and stated that "[b]ecause most of the [Inspector General's] present recommendations are consistent with the NYPD's previously contemplated plans for improvement, the NYPD concurs with nearly all of them."[443]

Aside from the cumbersome system for complaint/case flow—passing through successive units for assessment and review—the heart of the criticism by the OIG was with an inefficient case tracking mechanism and the failure to give complainants access to information on the status of complaints. According to OIG as of April 2021, the problems had not been completely addressed. It noted that the switchover from a manual entry system for data collection and reporting to implementation of ICMT was incomplete, there was no web-based procedure to communicate the

---

[439] Admin. Guide § 318-01.

[440] Known as PD468-152.

[441] Throughout this Report, "NYPD OIG" may, from time to time be referred to in shorthand, for convenience, simply as "OIG."

[442] NYC Dep't of Investigation, Addressing Inefficiencies in NYPD's Handling of Complaints: An Investigation of the "Outside Guidelines" Complaint Process at 1 (Feb. 2017), available at https://www1.nyc.gov/assets/oignypd/downloads/pdf/Reports/OGReport.pdf.

[443] Letter from Police Commissioner to Mayor Bill de Blasio, et al., (May 8, 2017), available at https://www1.nyc.gov/assets/doi/oignypd/response/NYPD_Response_OG_Report.pdf.

status of complaints to complainants and the Department is merely "considering" publishing quarterly reports with the number of cases received, investigated, and closed annually.[444]

### ii. Force

Section 221-01 of the Patrol Guide sets forth the NYPD's use of force guidelines.[445] Under the guidelines, force may be used when it is reasonable to ensure the safety of a member of the service or a third person, to place a person in custody, or to prevent escape from custody. The use of force must be reasonable under the circumstances; any unreasonable use of force is deemed "excessive" and in violation of NYPD policy.[446] An officer's failure to intervene to prevent the use of excessive force, report the use of excessive force, or request timely medical treatment for a victim of excessive force is considered "serious misconduct" that may result in discipline, including dismissal.[447]

The NYPD's use-of-force guidelines recognize four levels of force.

- **Level 1** involves physical force (hand strikes, foot strikes, forcible take-downs, wrestling), or the use of a "less lethal" device such as pepper spray or a mesh restraining blanket. It also includes discharge or use of a conducted electrical weapon ("CEW") when limited to probe mode. It includes cases where there is physical injury to the subject or officer.
- **Level 2** involves the intentional use of an object, like a baton, a canine bite, or the use of a CEW in stun mode.[448] Here, as well, where there is substantial physical injury (loss of tooth/teeth, application of stitches/staples, unconsciousness, hospital treatment) involved or a claim of excessive use of force, the case is processed as a Level 2.[449]

---

[444] OIG-NYPD, Seventh Annual Report at 44 (Apr. 2021), available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/OIGNYPDAnnualRpt_4012021.pdf.

[445] In enacting the budget for FY 2020, New York State mandated that all law enforcement agencies in the state have a use-of-force policy, with mandatory reporting requirements, for all use-of-force incidents. *Governor Cuomo Announces Highlights of FY 2020 Budget* (Apr. 1, 2019), Executive Law 837-t., available at https://www.budget.ny.gov/pubs/press/2019/pr-enactfy20 html. NYPD's first employment of a Use of Force policy was in 2016 and, as discussed below, has since been updated and revised.

[446] Patrol Guide § 221-01. Excessive Use of Force is defined as "[u]se of force deemed by the investigating supervisor as greater than that which a reasonable officer, in the same situation, would use under the circumstances that existed and were known to the MOS at the time force was used." *Id.*

[447] *Id.*

[448] In drive stun mode a probe can incapacitate a muscle mass and therefore the individual. This is used to coerce compliance by the infliction of localized pain. Item 161, City 09.01.23 Feedback to Yates Discipline Report.

[449] "In June 2017, after evaluation of the revised use of force policies, substantive modifications were made. The most notable change is the Level 2 use of force designation for any allegation/suspicion of excessive force or the commission of a prohibited action (e.g., use of a chokehold) even if there is no injury to a subject." NYPD, Use of Force Report 2017 at 1, available at https://www1 nyc.gov/assets/nypd/downloads/pdf/use-of-force/use-of-force-2017.pdf.

- **Level 3** is defined as the use of physical force that is readily capable of causing, or causes, serious physical injury (hospital admission required), or alleged use of a chokehold.[450]
- **Level 4** includes the discharge of a firearm and any case where a civilian dies or is likely to die just before or while in police custody, or during apprehension.

Typically, around 95% of force incidents are categorized as Level 1. In 2019 (before implementation of Level 4), 94.4% of force incidents were categorized as Level 1. Level 2 accounted for 3.9% and the remaining 1.7% were classified as Level 3. Depending on the method of deployment use, of Conducted Electrical Weapons (CEW or Tasers) can be classified as a Level 1 or 2. For the most part, they are classified as Level 1 and account for 15% of police use of force incidents (1,271 of 8,595 in 2019).

In 2019, tasers were used nine times during the course of a stop that did not result in an arrest or involve an Emotionally Disturbed Person.[451] They were used 621 time to affect an arrest and 380 times in situation involving an Emotionally Disturbed Persons.

**Reporting and Investigating Use of Force**

In June 2016, the Threat, Resistance, or Injury Incident Report (TRI) was introduced to centralize force reporting. The member of service must complete Part A of a TRI Worksheet for every "reportable" use of force.[452] Reportable incidents cover a wide range, from hand strikes, use of restraints, and police canine bits, to use of tasers, firearm discharge, and more. Actions that are not reportable include ordering or guiding a person to the ground or use of handcuffs. If more than one officer was involved, each must separately prepare the form. If there is more than one subject of the force, a TRI form is filed for each subject. Upon notice, the immediate supervisor is then responsible for a preliminary assessment and to categorize the level of force for the purpose of determining which investigating authority will pursue the matter.

If a member of the service becomes aware of the use of excessive force, that member is required to report the incident to the IAB Command Center. Absent a civilian complaint, the

---

[450] Patrol Guide § 221-03 defines a chokehold as "any pressure to the throat, carotid artery or windpipe, which may prevent or hinder breathing, or reduce intake of air or blood flow." NYC Admin. Code § 10-181 prohibits restraint in the course of an arrest that restricts the flow of air or blood by compressing the windpipe, carotid arteries, or diaphragm. A violation is a class A misdemeanor. The crime of Aggravated Strangulation (N.Y. Penal Law § 121.13-a), a class C felony, was enacted in 2020 (L .2020, ch. 94). It punishes obstruction of breathing or blood circulation, or use of a chokehold or similar restraint that applies pressure to the throat or windpipe of a person in a manner that may hinder breathing or reduce intake of air, which cause serious physical injury or death. A conviction of either crime will lead to presumptive termination under the Guidelines. A chokehold where no injury resulted will receive a presumptive penalty of twenty penalty days. On June 22, 2021, a state court struck the entire Administrative Code provision on the grounds that the phrase "compresses the diaphragm" is unconstitutionally vague. *Police Benevolent Ass'n of the City of New York v. City of New York*, 2021 WL 2555799 (Sup. Ct., N.Y. Cnty. June 22. 2021) (Love. J.). That decision was reversed, and the Administrative Code provision was upheld on May 19, 2022. (205 A.D.3d 552 [1st Dep't], *aff'd* 40 N.Y.3d 417 (2023)).

[451] NYPD, Use of Force Report 2019 at 46, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/use-of-force/use-of-force-2019-2020-11-03.pdf.

[452] Patrol Guide § 221-03.

incident will not be reported to CCRB. Regardless of the level of force used, the Patrol Guide requires documentation of the incident allowing the Department to analyze incidents where members of the service have used force, have had force used against them, and/or when subjects have actively resisted custody. The investigative procedures to be followed depend upon ongoing assessments of the seriousness of the injuries and amount of force involved. In all cases where use of force is applied, the member of service must obtain medical attention for any person injured and notify his or her immediate supervisor regarding the type of force used, the reason force was used, and any injury to any person involved. If the officer's immediate supervisor was involved in the incident, notice should be provided to a supervisor of the same rank or higher within the command who was not involved.

If Level 1 conduct (physical force or injury) was involved, the immediate supervisor will question the subject regarding possible injuries, document any such injuries, and will be responsible to ensure that timely medical attention is provided. The supervisor interviews any witnesses and questions the member of service involved regarding the basis for applying force and the type of force used. After speaking with the relevant parties, the supervisor must then determine whether the use of force was within NYPD guidelines or whether further investigation is required.[453] The supervisor completes Part B of the TRI form, which is filed with the desk sergeant.

If a Level 2 use of force (substantial physical injury or excessive use of force) is suspected, the Patrol Bureau Command and the Internal Affairs Bureau are notified. Level 2 investigations will stay with the local command at a rank above the immediate supervisor (the Commanding Officer, the Executive Officer or the Duty Captain), unless superseded by IAB or the Force Investigation Division ("FID").[454] The local command may utilize the Patrol Bureau Investigation Units. The investigator prepares an "Investigating Supervisor's Assessment Report," (PD370-154A) ("ISAR"), which goes to the First Deputy Commissioner, the Chief of Department, IAB, Legal Matters and RMB. IAB has the option of taking over the investigation in their discretion.

If a Level 3 use of force (use of deadly force or serious physical injury which is not life-threatening) is reported, IAB conducts the investigation, unless FID supersedes.

If a Level 4 use of force (firearm discharge, death, serious physical injury likely to result in a death) is reported, FID will investigate. In addition, FID may assume control of any level investigation at the direction of the First Deputy Commissioner.

In determining whether use of force is reasonable, officers are told to consider a number of factors, including the nature and severity of the crime, any actions taken by the subject of police action, and the immediacy of the perceived threat or harm to the subject, members of the service, and/or any bystanders.[455] The Patrol Guide requires "de-escalation techniques when appropriate and consistent with personal safety."[456]

---

[453] *Id*.

[454] While IAB reports directly to the Police Commissioner, FID, DAO and RMB report to the First Deputy.

[455] Patrol Guide § 221-01.

[456] Patrol Guide § 221-02.

Within 48 to 72 hours after receiving notice of a triggering event within its jurisdiction, the FID must circulate a preliminary report to senior NYPD executives, followed by a preliminary presentation to the Police Commissioner and the First Deputy within two weeks.[457]  Thereafter, monthly reports are provided to the First Deputy.

Finally, the Use of Force Review Board, chaired by the First Deputy, reviews all cases where IAB or FID were the lead investigators.  The Use of Force Review Board may review any alleged violation of the use of force guidelines.  It is empowered to find that, under exigent or exceptional circumstances, the use of prohibited force was justified and within guidelines.  The subject of any disciplinary action or civilian complaint related to use of force may submit a request for a review of the circumstances to the Board, which then may make a final determination of whether the force used was reasonable under the circumstances and within applicable guidelines.

**Reported Use of Force in Stop and Frisk Encounters**

In the context of *Floyd* concerns:  How often is force used in the course of a *Terry* stop?  How often was a civilian **forcibly** stopped or frisked without probable cause to arrest?  How often is there a force misconduct complaint after a stop?  Given the separate strands of investigative authority, between CCRB, IAB, FID, local Command, and the Force Review Board, this is not an easy set of questions to answer.

Statistics garnered from filed stop reports at the online Stop, Question and Frisk Database and statistics from TRI Reports at the online Use of Force ("UOF") Reports give different answers.  If one looks at the stop report filings, force was used in 2,645 stops in 2018 and in 3,162 stops in 2019.  Yet if one looks at the TRI/Use of Force Reports, under the category "suspicious person/condition stop," force was only used 56 times in 2018 and 90 times in 2019.  Obviously, the criteria for data entry in the two data sets do not match.  Some of the mismatch is understandable.  For example, handcuffing is listed as physical force in stop reports, but it is not a reportable TRI/Use of Force event.  Similarly, drawing or pointing a firearm is listed in stop reports, but not in TRI reports.[458]  The reports and statistics are handled separately and apparently not coordinated.  These two items alone, however, do not account for the vast discrepancy.  The dissonance makes it difficult to reconcile or draw firm conclusions from the two sets of reports.  In any event, it appears that force is used commonly in stops and frisks and that the use of force in most of those cases are not reflected in TRI/Use of Force reports, which would otherwise have led to a separate investigation by a supervisor, a command executive, IAB, or FID under the use of force guidelines.

Consider the following:

---

[457] Independent Panel Report at 9; Patrol Guide § 221-04.

[458] In 2019, a firearm was drawn or pointed, according to filed Stop Reports, 586 times out of 13,459 stops (4.5%).  In 420 of the 586 instances, there was no arrest.  These cases would not be reported in TRI/Use of Force Reports. NYPD, Stop, Question and Frisk Data, 2019, available at https://www1.nyc.gov/site/nypd/stats/reports-analysis/stopfrisk.page.

In **2018** out of **11,009** stop reports filed:

- 3,115    Stops led to an arrest (28.2%)
- 7,894    Stops did not lead to an arrest (71.7%)
- 2,630    Force used in stops (23.9%)

  - 788    Force was used in the stop, followed by an arrest
  - **1,842  Force was used during stop but no arrest (16.7% of all stops)**

    - 1,280        Push, shove, handcuff
    - 337          A firearm was drawn or pointed
    - 242          Physical force (other)
    - 85           A restraint was used
    - 12           CEW used

- 6,519    Frisks as part of a stop (59.2%)

  - 4,638  Frisk did not lead to arrest
  - **1,302  Force was used with frisk but no arrest (11.8% of all stops)**


In **2023** out of **16,971** stop reports filed:

- 4,900    Stops led to an arrest (28.9%)
- 12,071   Stops did not lead to an arrest (71.1%)
- 3,793    Force used in stops (22.3%)

  - 1,905  Force was used in the stop, followed by an arrest
  - **1,888  Force was used during stop but no arrest (11.2% of all stops)**

    - 1,503        Push, shove, handcuff
    - 332          A firearm was drawn or pointed
    - 100          Physical force (other)
    - 295          A restraint was used
    - 30           CEW used

- 10,924   Frisks as part of a stop (64.4%)

  - 8,411  Frisk did not lead to arrest
  - **1,259  Force was used with frisk but no arrest (7.4% of all stops)**

Force commonly is used in executing stops and frisks that do not lead to an arrest. Ultimately, an important question is whether use of force correlates with unlawful stops and/or unlawful frisks. If one credits the stop reports, force is used in roughly 23% of all reported stops. Force is used 11% to 16 % of the time when a person is stopped, but not arrested. Force was used in 7% to 12% of stops with frisks where the civilian was not arrested. The Department's list of stop reports[459] tells us how many stops or frisks were accompanied by force and how many of those concluded with or without an arrest. But there is no attempt to match that data with misconduct complaints.

Correlation, if demonstrated, between wrongful stops and frisks and excessive force needs, as well, to take into account profiling complaints. As recently remarked by CCRB's Director of the Racial Profiling/Bias-Based Policing Unit, "the legislative history leading to CCRB's creation . . . reveals that concerns over discrimination – particularly allegations regarding the use of excessive force by NYPD officers against Black and Latino community members – greatly influenced the creation of the agency."[460]

In sum, it is clear that force is used in a number of cases where a civilian is stopped or stopped and frisked but there is no ensuing arrest. How many of those forcible stops and forcible frisks were proper and how many were improper? Since the Department's listing of stop reports[461] is not correlated with CCRB's Complaint Tracking System, this potentially useful analysis is not available.

Because CCRB and IAB/FID separately investigate force incidents, it is difficult to track and trace the efficacy of use of force investigations overall. Sometimes both CCRB and NYPD will conduct overlapping or sequential investigations. Sometimes one will investigate while the other does not. No effort is made to coordinate investigations, data, or discipline for parallel use of force investigations.

Recently, U.S. District Court Judge Raymond Dearie criticized gaps that follow from separate investigations when force and related misconduct allegations are split up. Looking at cases investigated within NYPD, he found: "Most complaints are referred to another department for further investigation, but IAB receives no information about how, or whether, those departments conduct investigations and the results of the investigations."[462] And looking at referrals to CCRB, he found that "[p]ertinent information from an [IAB] investigation is not shared

---

[459] *See* NYPD, Stop, Question and Frisk Data, available at https://www1 nyc.gov/site/nypd/stats/reports-analysis/stopfrisk.page.

[460] Memorandum, Darius Charney, "Changing CCRB's Rules to Incorporate CCRB's New Jurisdiction under Local Law 47," July 8, 2022, at 3 (citing N.Y. City Dep't of Investigation, Office of the Inspector General for the NYPD, *Biased Policing Complaints in New York City: An Assessment of NYPD's Investigations, Policies, and Training*, at 39 n.45 (June 2019) (citing N.Y.C. CCRB: Hearing on Intro. No. 549 Before the Comm. On Public Safety, N.Y. City Council 52–53, 435 (1992))), available at https://www1 nyc.gov/assets/doi/reports/pdf/2019/Jun/19BiasRpt_62619.pdf.

[461] *See* NYPD, Stop, Question and Frisk Data, available at https://www1 nyc.gov/site/nypd/stats/reports-analysis/stopfrisk.page.

[462] *Jenkins v. City of New York*, 388 F. Supp. 3d 179, 190 (E.D.N.Y. 2019) (Dearie. J.).

with other departments [e.g., CCRB] conducting additional investigation."[463]  Based on this and other findings in the case before him, he concluded, "persistent inadequacies in the CCRB and IAB investigations demonstrate that City officials simply did not care what a thorough investigation would reveal [and] were indeed indifferent to whether or not excessive force was used."[464]

This remains problematic in the context of Stop and Frisk compliance.  Precinct commanders, or IAB, or FID may investigate a force complaint.  Along with the force complaint, IAB may investigate a FADO allegation if there is no civilian complaint.  CCRB may investigate the same force complaint if there is a citizen complaint.  Along with an NYPD force investigation, CCRB may investigate use of force as part of a FADO allegation.  As Judge Dearie pointed out, the investigations are not coordinated.

It would be desirous to be able to match stop reports, TRI reports, IAB Force investigations, and CCRB Force investigations with one another.  Correlating *Terry* stops with Use of Force Reports, and then analyzing the outcomes if the encounter was investigated, whether upon a civilian complaint or otherwise, would go a long way to understanding the extent to which the Department complies or fails to comply with *Floyd*.  To do this, any use of force by officers during a stop or frisk should be scrutinized and consistently catalogued in a way that is understandable.  At this time, there is no data set that coordinates reports, investigations, and discipline for use of force, when applied to stops and frisks.[465]

As to outcomes for misconduct investigations of use of force, a comparison of the effort by NYPD and CCRB shows the following:[466]

**2018**[467]

NYPD reports

- 7,879 force incidents reported on TRI forms where an officer used force
- 5,035 during arrest (out of 246,779 total arrests)
- 37 IAB improper use of force cases; four substantiated

---

[463] *Id.* at 191.

[464] *Id.* (alteration in original) (internal quotation marks omitted).

[465] An added difficulty in reviewing stop investigations with other Departmental investigations is tallying by "allegations" vs. "complaints" vs. "cases" vs. "incidents" in various reports, which makes comparisons tedious if not impossible.  Further, summaries in reports which compare complaints received to dispositions is always imprecise because they are moving targets, i.e., complaints received in one year are usually resolved in a later year.

[466] The data received from IAB listed "cases" while the data available from CCRB listed "allegations," so the comparison is indicative but not precise.

[467] NYPD Discipline Investigations 2018-2019 Matrix – received (July 25, 2020), on file with the Monitor. "Partially Substantiated" indicates that allegations other than wrongful use of force within the complaint were substantiated.

CCRB Reports

- 1,767 excessive force complaints received
- 1,747 excessive force complaints investigated
- 3,651 excessive force allegations received
- 1,226 excessive force allegations fully investigated/closed
- 73 excessive force allegations substantiated:
    - 13 officers guilty or partly guilty[468]
- Five cases where both an SQF and a use of force allegation was substantiated

**2019**[469]

NYPD Reports[470]

- 8,595    incidents reported on TRI forms in which an officer used force
- 5,062    force during arrest (out of 214,615 total arrests)
- 30    IAB improper use of force cases; one substantiated

CCRB Reports

- 1,982 excessive force complaints received
- 1,970 excessive force complaints investigated
- 4,205 excessive force allegations received
- 1,433 excessive force allegations fully investigated/closed
- 98 excessive force allegations substantiated
    - 17 officers guilty or partly guilty[471]
- 10 cases where both an SQF and a use of force allegation were substantiated

### iii.    "M" Cases

IAB refers most M ("Misconduct") cases to investigative units at Bureau or Borough commands (BIU) which pass the results on to the Office of the Chief of Department. The Investigation Units are separate from the precincts. They are generally staffed by detectives, sergeants, and lieutenants. They report their findings to a Unit Commander and the Commanding Officer for the Patrol Bureau. There are 35 Borough/Bureau Investigation Units.

---

[468] NYPD, Discipline in the NYPD - 2018, at 10, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/discipline/discipline-in-the-nypd-2018.pdf. There were seventeen sustained force complaints. Thirteen were by CCRB and four were by IAB.

[469] *See* NYPD, Use of Force Report 2019, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/use-of-force/use-of-force-2019.pdf.

[470] There were 10,270 TRI reports filed, but 1,675 showed no use of force by an officer.

[471] NYPD, Discipline in the NYPD -2019, available at https://www1 nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/discipline/discipline-in-the-nypd-2019a.pdf. Eighteen were reported overall, but one was IAB-substantiated.

Cases sent from CCRB containing an allegation of profiling along with a corruption allegation were kept in and investigated by IAB and are not "split."[472]  On the other hand, if a case contains an excessive force allegation or a rule violation (OG) along with a profiling allegation, the IAB Assessment and Analysis Unit will split the case.[473]  Prior to 2022, the profiling allegation went to BIU.  The OG allegation may be sent to OCD and passed on to the local command.  The force allegation may be sent to the local command, IAB, or the Force Investigation Division depending on the level of force employed.

Racial profiling complaints filed by a citizen moved in 2022 from NYPD to CCRB due to an amendment to Section 440 of the City Charter.[474]  CCRB promulgated regulations implementing the change effective September 22, 2022.[475]  Presumably, nothing bars IAB from investigating discriminatory policing in the absence of a citizen complaint.

In addition, NYPD, in conjunction with the Monitor team, developed Internal Affairs Bureau Guide 620-58, which delineates guidelines for investigation of complaints related to Racial Profiling and Bias-Based Policing.[476]  The Court in *Floyd* approved the process outlined.[477]  Since the City of New York is the Defendant in that action, the shift of profiling investigations from NYPD to CCRB does not vitiate the need for both City agencies to follow the protocol, at a minimum.  Going forward, whether a profiling complaint is investigated by CCRB, NYPD, or both, the procedures in §620-58 should be followed.

A referral of an "M" case to IAB or OCD may or may not be related to a parallel CCRB FADO case.

In 2018, CCRB referred 911 complaints to IAB and 4,798 complaints to OCD.  Of cases referred to IAB, 23.7% (216/911) were related to a CCRB case.  Of cases referred to OCD, 20.7% (995/4,798) were related to a CCRB case.

By category of complaint, referrals to IAB and OCD by CCRB were as follows:

---

[472] NYC Dep't of Investigation, Addressing Inefficiencies in NYPD's Handling of Complaints:  An Investigation of the "Outside Guidelines" Complaint Process at 5 n.3 (Feb. 2017), available at https://www1 nyc.gov/assets/oignypd/ downloads/pdf/Reports/OGReport.pdf.  With the direction to CCRB, in the amended Charter, to investigate profiling cases, it remains unclear if IAB will independently investigate bias allegations or review findings by CCRB.

[473] The Department contends that the term "split investigation" is a "misnomer" since it sends part of a complaint to CCRB but "Whether CCRB decides to investigate is not within our jurisdiction."  Nonetheless, when IAB determines that a complaint contains both FADO and non-FADO allegations, IAB logs will contain a "standard disclaimer" that "CCRB will investigate the FADO allegations against uniformed members of the service contained in this log."  Letter from Jeff Schlanger, former Deputy Commissioner, Risk Management Bureau to the Monitor Team (Jan. 7, 2021). The complaint is split.

[474] Local Law No. 47 (2021) (effective 270 days from Apr. 25, 2021).

[475] *See generally*, 38 RCNY 1-01, *et seq.*

[476] Procedure 620-58, eff. Aug. 7, 2018.

[477] Doc. No. 802 (Dec. 3, 2020).

| 2018<br>CCRB REFERRAL TO IAB | Related to a<br>CCRB case | Not related to<br>a CCRB case | TOTAL |
|---|---|---|---|
| Force with severe injury/ related CCRB case | 1 | 0 | 1 |
| Cavity search | 5 | 2 | 7 |
| Complaint not against Member of Service | 1 | 0 | 1 |
| Complaint by MOS against MOS | 1 | 17 | 18 |
| Complaint against NYPD civilian | 1 | 0 | 1 |
| Criminal Prosecution allegation against MOS | 15 | 55 | 70 |
| False Official Statement | 8 | 0 | 8 |
| Impersonation of MOS | 2 | 25 | 27 |
| Improper/ refusal to file accident or complaint | 1 | 5 | 6 |
| No FADO allegation | 2 | 60 | 62 |
| Off-duty/unrelated to authority | 2 | 75 | 77 |
| Ongoing harassment by MOS | 52 | 201 | 253 |
| Other | 11 | 49 | 60 |
| Past Statute of Limitations | 1 | 55 | 56 |
| Profiling | 28 | 56 | 84 |
| Retaliation for filing CCRB complaint | 13 | 17 | 30 |
| Sexual Misconduct | 35 | 23 | 58 |
| Dispute over summons or arrest | 1 | 1 | 2 |
| Unreturned property | 36 | 54 | 90 |
| **TOTAL REFERRED TO IAB** | **216** | **695** | **911** |
| **CCRB REFERRED TO OCD -2018** | | | |
| Complaint against non-MOS | 0 | 4 | 4 |
| Complaint by MOS against MOS | 0 | 1 | 1 |
| Complaint against NYPD civilian | 1 | 418 | 419 |
| Improper/ refusal to file accident or complaint.      918 | 59 | 977 | |
| No FADO allegation | 35 | 1,769 | 1,804 |
| Off-duty/unrelated to authority | 0 | 3 | 3 |
| Ongoing harassment by MOS | 0 | 2 | 2 |
| Other | 8 | 26 | 34 |
| Sexual Misconduct | 0 | 1 | 1 |
| Dispute over summons or arrest | 16 | 1,470 | 1,486 |
| Unreturned property | 17 | 50 | 67 |
| **TOTAL REFERRED TO OCD - 2018** | **995** | **3,803** | **4,798** |

Importantly, in the SQF context, M cases (whether investigated by IAB, BIU, or OCD) include stop report failures, other failures to properly report (activity logs, memo books, strip search reports, etc.), and improper use of body-worn cameras (BWC). A substantial number of potential M violations are noticed during the course of an SQF investigation by CCRB. This is especially true for SQF investigations where profiling complaints, BWC failures, and stop report failures first become evident in a CCRB inquiry. CCRB refers the potential violations to NYPD for investigation as "OMN" cases. "OMN" is CCRB's notation for "Other Misconduct Noted."

OMN cases, usually M cases, are separated from the FADO investigation and forwarded to IAB for follow-up.[478]

In **2018**, Other Misconduct Noted allegations referred by CCRB in the course of investigating a FADO complaint were as follows:

| | |
|---|---|
| Failure to prepare a memo book entry | 293 |
| Failure to produce stop report | 57 |
| False official statement | 8 |
| Improper use of body-worn camera | 6 |
| Other Misconduct | 62 |

In **2019,** of 1,540 fully investigated FADO complaints by CCRB, 610 included an OMN referral. Of these, 271 OMN referrals were made for memo book failures, and 55 were for stop report failures.

The biggest change in OMN referrals came after patrol officers were outfitted with body-worn cameras (BWC). An officer's failure to activate as required is referred from CCRB to IAB as an OMN "M" case. In 2018, there were only six such referrals. With expanded camera employment, that number jumped to 132 BWC referrals in 2019. In 2020 and 2021, CCRB referred 444 instances of improper use of a BWC.[479]

CCRB has adopted a Rules change regarding BWCs. The Board now includes "improper use of body worn cameras" within the definition of "Abuse of Authority."[480] Once implemented, the panels would no longer be required to refer BWC violations to the Department but would be free to evaluate the allegation at CCRB.[481] In January 2023, the NYC PBA initiated an Article 78 proceeding seeking to prohibit CCRB's inclusion of BWC violations as an abuse of authority.[482]

Most "M" cases are investigated by BIU. CCPC, after study of the range of cases sent from IAB to BIU, observed, "[b]orough and bureau investigation units usually investigate cases that range from landlord-tenant disputes and domestic violence complaints, when there is no serious physical injury, to allegations that officers have stolen property, when that property does not consist of money, credit or debit cards, or valuable jewelry."[483] In borough-based cases, if investigated by units other than IAB, when an investigation has concluded, the Duty Captain is responsible for submitting a detailed report to the IAB with the disposition of all allegations and

---

[478] Prior to the Charter amendments in 2020, CCRB includes False Statement referrals in its OMN listings. They were categorized as "C" cases and kept by IAB for investigation.

[479] Policy Memorandum, CCRB (July 6, 2022), available at https://www.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/board/2022/memo/07062022_BWC_Justification_Memo.pdf.

[480] 38-A Rules of the City of NY § 1-01, effective Sept. 22, 2022.

[481] https://rules.cityofnewyork.us/rule/implementation-of-charter-changes-and-other-amendments/.

[482] *NYC PBA v. CCRB*, Index No. 150441/2023 (Sup. Ct. NY Cty.). That portion of the petition was denied on January 3, 2024. NYSCEF Doc. No. 71.

[483] CCPC, Fourteenth Annual Report of the Commission at 11 n.21 (Feb. 2012), available at https://www1.nyc.gov/assets/ccpc/downloads/pdf/14th_annual_report.pdf.

recommendations for further investigation, if warranted.  The Duty Captain may also recommend that the IAB close the investigation.[484]

In 2018, there were 3,148 closed "M" investigations.  In 2019 there were 2,102 closed M investigations.[485]  Some were investigated by IAB and the results were passed on to DAO and the Police Commissioner.  Some were investigated by BIU and the results were passed on to the Chief of Department.

For 2018 M cases:

- IAB substantiated 28 of 181 M cases.  (15.5%)
  - IAB "partially substantiated" 38 cases.[486]
- BIU substantiated 859 of 2,967 M cases (28.9%).
  - BIU "partially substantiated" 406 cases.

For 2019 as of July 25, 2020, M case dispositions were:

- IAB substantiated 41 of 211 M cases.  (19.4%)
  - IAB partially substantiated 51 cases.
- BIU substantiated 583 of 1,891 M cases (30.8%).
  - BIU "partially substantiated" 267 cases.

### iv.    "C" Cases

If a police officer receives a complaint of corruption about himself or herself, he or she must request that a supervisor respond to the scene.  Once the supervising officer responds, he or she must interview the complainant and confer with the IAB's Command Center before interviewing the subject police officer.[487]  C cases investigated by IAB can include false testimony, theft, improper involvement in businesses or enterprises that are in conflict with assignments, or potentially criminal behavior.

As noted, the Patrol Guide sets forth a process for officers to report corruption and other misconduct, including excessive force and perjury.[488]  A member who has observed or become aware of such violations must contact the IAB's Command Center by telephone or fax.  Members are also permitted to lodge such reports anonymously by writing to the Chief of Internal Affairs.[489]  The reporting officer will receive a confidential identification number from the command center investigator, the receipt of which satisfies the officer's reporting responsibility.

---

[484] Patrol Guide § 202-08.

[485] NYPD Discipline Investigations Matrix, (July 25, 2020), on file with the Monitor team.

[486] NYPD Discipline Investigations Matrix, (July 25, 2020), on file with the Monitor team.  "Partially substantiated" can mean that some, but not all, allegations of misconduct were substantiated.

[487] Patrol Guide § 207-21.

[488] Id.

[489] Id.

Failure to report allegations of known or perceived corruption or misconduct itself constitutes an offense of serious misconduct and can be charged as such when uncovered. Moreover, any attempt to cover up acts of corruption are referred to the prosecutor's office with jurisdiction over the matter.[490]

In the past, false official statement referrals (for statements made while being interviewed by CCRB investigators) were treated as "C" cases when received by IAB from CCRB.[491]  There were 22 such referrals between 2018 and 2019.  In 2016, IAB began to report the disposition of False Official Statement cases (OMNs) back to CCRB (not the penalty, merely the finding).  In 2018, eight such cases were decided by the Department.  Only one was substantiated.  In 2019, IAB resolved eight of the sixteen False Official Statement cases sent by CCRB.  None were substantiated.  Going forward, false statements made by a subject officer to a CCRB investigator can be investigated by CCRB.  (The Charter change is discussed later).  It seems likely that IAB will continue to, and should, investigate falsity as well.  While the Charter limits CCRB investigations of untruthful statements made in the course of an investigation, it is possible, if not likely, that an officer who made a false statement to a CCRB investigator also made a conforming statement about the event, in writing or orally, within the precinct, to a prosecutor, to a grand jury, to a court, or to an IAB investigator.  It makes little sense to cabin the investigation to CCRB alone.

In 2018, there were 611 Corruption, or "C," cases investigated by IAB.  46 of the C cases were substantiated.  145 were "partially substantiated," which means that misconduct other than corruption was sustained.  231 of the 611 investigations resulted in findings of Exonerated, Unfounded, Unsubstantiated and I&I.  Another 185 resulted in a finding of a Minor Procedural Violation.[492]

In 2019, 475 "C" cases were closed.  58 of them were substantiated and 132 were partially substantiated.  151 resulted in findings of exonerated, unfounded, unsubstantiated and I&I. Another 127 resulted in a finding of a "Minor Procedural Violation.

With 2021 amendments to its Rules, expanding FADO jurisdiction by a revised definition of "Abuse of Authority" (discussed later in this Report), there is a possibility that CCRB may begin to examine corruption cases within the rubric that an officer was "misusing police powers."[493]  In the past, as argued by the PBA in opposition to the Rule change, CCRB did not investigate

---

[490] *Id.*

[491] With the 2019 Charter amendments, the Board has the power to investigate "the truthfulness of any material official statement made by a member of the police department who is the subject of a complaint received or initiated by the board, if such statement was made during the course of and in relation to the board's resolution of such complaint." Going forward, CCRB may investigate false statements made to the CCRB investigator, but that does not prevent CCRB from referring false statement investigations to IAB where the statements were made elsewhere.  The 2022 proposed Rules changes define "Abuse of Authority" to include "intentionally untruthful testimony and written statements made against members of the public in the performance of official police functions. . . ."  This is broader than the language in the Charter, but arguably falls properly within abuse of authority and would permit CCRB to investigate misstatements in reports, filings, and court proceedings.

[492] Misconduct was not found but Command is notified of an MPV which results in a CRAFT entry only.

[493] 38-A RCNY Chapter 1, Subchapter A:  Definitions.

corruption cases since criminal acts were thought to be outside CCRB's jurisdiction.[494]  However, the Appellate Division, First Department recently rejected that argument, holding, "Contrary to petitioners' contention, the governing statute does not prohibit the CCRB from investigating matters that may touch upon criminal conduct.  While the CCRB had a prior practice of referring such matters to the Police Department's Internal Affairs Bureau, that prior practice does not render the CCRB's current interpretation arbitrary, especially where CCRB has set forth a rational basis for changing its approach."[495]

## F.    Bias-Based Policing and Racial Profiling Investigations at NYPD

Prior to 2016, allegations of racial profiling made to CCRB were not investigated by either CCRB or IAB.[496]  Following a meeting with the Monitor in 2016, CCRB and IAB personnel agreed that, going forward, CCRB would notify IAB upon receipt of a profiling complaint.  Absent unusual circumstances, those complaints are classified as "M" cases and passed on to a Borough/Bureau Investigating Unit (BIU) for investigation.[497]  The results have not engendered confidence in the review process.  As of July 2021, out of 5,174 complaints filed against Members of the Service over a seven-year period, only four allegations were substantiated by IAB or BIU (two allegations against uniformed members and one against a school safety agent).  However, in those cases, the misconduct occurred off-duty and was unconnected to any enforcement action.  As such, neither charges nor a complaint for profiling or bias-based policing were drawn by DAO.  No officer has been charged with bias-based policing or profiling in connection with an enforcement action.

The Charter was amended in April 2021, authorizing CCRB to include racial profiling and bias-based policing within its abuse of authority jurisdiction, commencing January 2022.[498]  Because CCRB needs a civilian complaint to act, some profiling investigations will still be kept at NYPD rather than CCRB, despite the change.  As of July 8, 2021, of 5,174 profiling complaints logged in the past, 323 were listed as coming from Members of the Service.  The matrix is not specific, so it is possible that some of these complaints were civilian complaints made to a Member of the Service and then passed along by officers rather than originating from sources other than a

---

[494] Plaintiffs-Petitioners' Memorandum of Law (I) in Reply and in Further Support of Their Verified Petition, *Lynch v. NYC CCRB*, NY Cnty. Sup. Ct., Index No. 154653/2021, Doc No. 77 at 8-9 (Aug. 6, 2021).

[495] *Lynch v. NYC CCRB*, 206 A.D.3d 558 (1st Dep't 2022).

[496] Second Report Of The Independent Monitor at 59 (Feb. 16, 2016), https://www.nypdmonitor.org/wp-content/uploads/2016/02/2016-02-16FloydvCityofNY-MonitorsSecondStatusReport.pdf.

[497] As explained in a report by OIG-NYPD, "[a]lthough biased policing allegations, standing alone, are classified as 'M,' if the complaint includes other allegations that IAB classifies as 'Corruption' (represented by the 'C' classification) (i.e., acts of corruption, criminal activity, or serious misconduct), then the entire case is categorized as 'C.'  NYPD categorizes all internal investigations according to the most serious allegation in the case.  In these instances, IAB would investigate the biased policing allegation because IAB investigates all 'C' cases.  Prior to January 2015, biased policing allegations were classified as 'Outside Guidelines'" (OG) cases, which are considered less serious than either 'M' or 'C' classified allegations.  OG cases go through the Investigative Review Section of the Office of the Chief of Department to determine where the allegations should be sent for investigation, but they are sent to the subject officer's precinct."  OIG-NYPD, Complaints of Biased Policing in New York City:  An Assessment of NYPD's Investigations, Policies, and Training , at 10 n.14 (June 2019), https://www1.nyc.gov/assets/doi/reports/pdf/2019/Jun/19BiasRpt_62619.pdf.

[498] N.Y.C. Charter § 440(c) (eff. January 20, 2022).

civilian complaint.  If the complaints originated with a civilian compliant from Members of the Service, they will continue to be investigated by IAB or BIU, not CCRB.[499]

It might be that IAB or BIU will open concurrent investigations for profiling complaints, as the Department does in some use of force cases.  It may be the Department will independently investigate a profiling case, but only after a substantiated case is referred to the Department by CCRB.[500]

In addition, 571 of the 5,174 profiling complaints were made against non-uniformed Members of the Service.  By its rules, not the Charter, CCRB declines to investigate cases against non-uniformed members.  Profiling complaints against non-uniformed members will still need to be investigated by IAB or BIU if CCRB continues its policy of not investigating non-uniformed members.

Working with the Plaintiffs and the Monitor team, NYPD has written a careful protocol (IAB Guide 620-58), approved by the Court, detailing how NYPD should conduct profiling investigations.  Going forward, CCRB will need to adopt, under a similar process, guidelines or protocols for the cases they do accept.

Biased policing remains a serious concern today, as it did in 2013 when the decision in *Floyd* was rendered.[501]  A recent study submitted to the Court by the Monitor found that "racial disparities in frisk, search, summons, arrest, use of force, and the recovery of a weapon or other contraband diminished" during the 2013-2019 study period.[502]  The report did note, however:

> The number of Black and Hispanic people subjected to stop encounters dropped significantly between 2013 and 2019, though the overall share of stops by race and ethnicity remained largely unchanged.  The lack of change in the racial distribution of stops during this time period, even with an overall reduction in stops, reflects the fact that the number of stops of Whites and other groups was substantially lower than Hispanics and Blacks.  In 2013, for example, the total number of reported stops of Black and Hispanic subjects was 5.0 and 2.6 times larger than that of reported

---

[499] In a 2019 report, OIG-NYPD urged that the Patrol Guide should explicitly require officers to report observed instance of biased policing.  The Department responded that PG § 207-21 already requires officers to report "[c]riminal activity or other misconduct of any kind including the use of excessive force or perjury" to IAB (PG § 207-21) and that was sufficient.  OIG asserted that it would "continue to monitor the issue."  OIG-NYPD, Annual Report 2020: Annual Report 2020:    Office of the Inspector General for the NYPD at 9 (Apr. 2020), https://www1.nyc.gov/assets/doi/reports/pdf/2020/OIGNYPD_SixthAnnualReportFinal_4.9.2020.pdf.

[500] CCRB recently acquired jurisdiction in false statement cases as well.  The same possibility of concurrent or consecutive investigations arises for those cases.  In all, nothing prevents the Department from investigating a force, profiling, or false statement case independent of a CCRB investigation.

[501] "Biased policing, whether perceived or actual, is a matter of significant public concern.  Communities affected by certain policing practices report high levels of distrust of the police, as the remedial process of *Floyd v. City of New York* has documented."    OIG-NYPD, Annual Report 2020, *supra* note 500 at 8, https://www1.nyc.gov/assets/doi/reports/pdf/2020/OIGNYPD_SixthAnnualReportFinal_4.9.2020.pdf.

[502] Thirteenth Report of the Independent Monitor, Racial Disparities in NYPD Stop Question, and Frisk Practices: An Analysis of 2013 to 2019 Stop Reports at 2-3 (Sept. 1, 2021), https://www.nypdmonitor.org/wp-content/uploads/2021/09/13th-Report filed_.pdf.

stops of White subjects.  In 2019, reported stops of Black and Hispanic subjects were 6.6 and 3.2 time larger than the total number of stops of White subjects.[503]

### i.    Biased Policing and Profiling Defined

Bias in policing is prohibited by Administrative Code § 14-151 and by NYPD's Administrative Guide 304-17.[504]  The former, Administrative Code § 14-151, declares, "[e]very member of the police department or other law enforcement officer shall be prohibited from engaging in bias-based profiling."[505] The Code creates a private right of action which may be brought in court or by a complaint filed with the Commission on Human Rights.

The bill creating § 14-151[506] was vetoed by then Mayor Bloomberg on the ground that it "would unleash an avalanche of lawsuits against police officers."[507]  The Mayor continued, in his disapproval message:  "From the police officer's perspective . . . every officer acting on a description that includes some characteristic of a possible perpetrator would have to think about whether taking action will result in a lawsuit."[508]  Nonetheless, the City Council persisted and § 14-151 was enacted by a veto override on August 22, 2013.

Subsequently, § 14-151 was challenged in two separate court proceedings.  One, commenced by Mayor Bloomberg at the end of his third term, in September 2013, was withdrawn by Mayor de Blasio a few months into his first term in April 2014.  The other was brought by the Police Benevolent Association and the Sergeants Benevolent Association and continued to conclusion.[509]  Important to the litigation was the meaning of the phrase "the determinative factor" as one of the required elements of proof of bias in Administrative Code § 14-151.

During the drafting of the law, NYPD requested that the phrase "the determinative factor" be incorporated.  According to the Department, in applying Fourth Amendment analysis, demographic factors, such as race, could and should be considered in deciding whether to initiate law enforcement action if, for example, it is a physical characteristic as part of a description of a

---

[503] *Id.*

[504] Formerly Patrol Guide § 203-25.  Effective 6/2/21, Patrol Guide § 203-25 was re-numbered as Administrative Guide § 304-17.  It was also amended to include, "[T]he Department complies with Federal civil rights laws" including "Title VI of the Civil Rights Act of 1964, which prohibits discrimination based on race, color, or national origin (including language)" and "Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination based on disability."

[505] Here, the prohibition in the NYC Administrative Code is read to bar discrimination by all Members of the Service.  Despite CCRB's self-imposed limitation of investigations to uniformed members, the section applies to all members as reflected by Administrative Guide § 302-17, which applies 14-151 to all members of the service.

[506] LL 71/2013.

[507] Mayor's Veto Message, M-1184-2013 (July 23, 2013).

[508] *Id.*

[509] *PBA of the City of New York, Inc. v. City of New York*, 2014 N.Y. Slip Op. 31570 (U), *aff'd* 142 A.D.3d 53 (1st Dep't June 23, 2016).

suspect. It would only be unlawful to stop an individual if the deciding factor for doing so was that the person stopped matched the race of the person described.[510]

The Department's language was adopted when Administrative Code § 14-151 was enacted. The Code prohibits "intentional bias-based profiling" and reads:

> [A]n act of a member of the force of the police department or other law enforcement officer that relies on actual or perceived race, national origin, color, creed, age, immigration or citizenship status, gender, sexual orientation, disability, or housing status as **the determinative factor** in initiating law enforcement action against an individual, rather than an individual's behavior or other information or circumstances that links a person or persons to suspected unlawful activity.[511]

Nonetheless, in its legal challenge to the provision, the PBA argued that the Criminal Procedure Law empowers officers to stop a person upon reasonable suspicion. Therefore, they argued, a local law could not prohibit a stop when an officer has reasonable suspicion. The exception would be where race was the "sole" basis for the action. If no other factor supported enforcement action, there would be no authority for the stop under the CPL because race alone does not provide reasonable suspicion. However, the PBA argued, because state law authorized a stop based on race along with other factors combining to give reasonable suspicion, the local law conflicted with general law (the CPL) and was therefore void.

The Appellate Division rejected the challenge to the local law. It held that there is a difference between "**the** determinative factor" (the language in § 14-151) and **a** determinative factor as posited by the PBA. If race was **a** determinative factor, a stop is authorized under the CPL. If race was **the** determinative factor, it is barred under the criminal law. The court held that the Administrative Code was not in conflict with the CPL because the Code required proof that race was **the** determinative factor. For those purposes, the CPL and the NYC Administrative Code are in sync.

The Appellate Division ruled the CPL and Administrative Code did not conflict for the additional reason that they address two distinctly different areas of the law. The CPL proscribes Fourth Amendment incursions. There, the findings in criminal court are based on objective criteria and the totality of the circumstances. On the other hand, Administrative Code § 14-151 addresses Fourteenth Amendment concerns. In that area, subjective intent of the officer comes into play in deciding if the actions are discriminatory. Under Equal Protection analysis, it would be discriminatory if, subjectively speaking, race was a motivating factor but not the only factor. According to the Court, the distinction is that, for criminal procedure purposes, "a police stop that is motivated by discrimination or pretext may still be upheld if it is otherwise supported by reasonable suspicion" but might still be discriminatory under civil law.[512]

---

[510] NYPD Finest Message, Nov. 21, 2013.

[511] N.Y.C. Admin. Code § 14-151(a)(1) (emphasis added).

[512] *PBA*, 142 A.D.3d at 66.

113

The Court added that selective enforcement is barred by the Equal Protection Clause. "[T]he Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment."[513] Under § 14-151, a claim of "bias-based profiling" against an individual officer must be founded upon proof that the officer: (1) relied upon actual or perceived membership in a protected class; (2) as the determinative factor in initiating a law enforcement action against an individual; (3) rather than the individual's behavior or other information or circumstances that linked the individual to suspected unlawful activity; and (4) the officer engaged in bias-based profiling intentionally.

When one analyzes the combined elements of proof required by § 14-151, a case against an officer is quite difficult to prove. Mere disparate treatment or impact is not enough. Cases claiming selective enforcement or pattern and practice alone would also fail under § 14-151 if the officer had sufficient Fourth Amendment grounds for the stop, frisk, search or arrest. During investigations, if there is proof that bias was a determinative factor in an enforcement action, that proof can be, and usually is, countered by evidence that the action was otherwise legally justified and cause for enforcement. Take the prototypical case of a summons for an open container violation. If the officer had reason to believe the civilian had alcohol in an open container, a bias claim under § 14-151 fails absent further proof that the action was taken with the intention of discriminating, even if the officer gave a ticket to a protected class member while ignoring contemporaneous violations by others. If, however, intentional bias is proven in the enforcement action, an abuse of authority based on a Fourteenth Amendment violation may still be pursued.

Fourth Amendment analysis is measured by looking at the surrounding circumstances objectively. Equal Protection analysis, and profiling investigations, look at the subjective motivation of the officer. A recent decision by the Appellate Division, Third Department, may upend the bifurcated analysis between equal protection investigations and Fourth Amendment scrutiny. In *People v. Jones*,[514] the court held that the state constitution, Article 1, sec. 12, does not preclude a challenge to a traffic stop on racial profiling grounds even where the officer had probable cause to believe the motorist had violated the Vehicle and Traffic Law. In that case, the defendant was observed to have made a turn without proper signaling. The observation was made by officers following the car during a narcotics surveillance operation. The Appellate Division acknowledged that federal and state precedent held that neither the Fourth Amendment nor the state constitution would justify suppression on a claim that the asserted justification is pretextual, i.e., the primary motivation of the officer was bias rather than enforcement of the VTL.[515] But the Court held that suppression is an available remedy in a criminal case when "assessed objectively

---

[513] *Id.* at 67. This is consistent with Judge Scheindlin's statement in 2013 in the *Floyd* Liability Opinion that the City "continue[s] to endorse the unsupportable position that racial profiling cannot exist provided the stop is based on reasonable suspicion. This position is fundamentally inconsistent with the law of equal protection and represents a particularly disconcerting manifestation of indifference." 959 F. Supp. 2d at 665-67.

[514] *People v. Jones*, 210 A.D.3d 150 (3d Dep't 2022).

[515] *Whren v. United States*, 517 US 806 (1996); *People v. Robinson*, 97 N.Y.2d 341 (2001). *But compare,* The Appellate Division, First Department has decided that suppression in a criminal trial is not an available remedy for discriminatory enforcement. *People v. Dula*, 198 A.D.3d 463 (2021).

with reference to the facts and circumstances of the encounter" the "traffic stop was premised on racial profiling."

Suppression of evidence in a criminal case is a serious matter to be applied with caution. Nonetheless, the Appellate Division is willing to consider suppression when traffic laws are selectively enforced. The Police Commissioner has considerable latitude in governing police conduct as she writes the Departmental Manual. He could, if he chose, follow the lead of the Appellate Division and sanction bias by looking at both the subjective motivation of the officer (current practice) and the objective facts surrounding the conduct, i.e., condemning discrimination in selective stops even where reasonable suspicion might otherwise justify a particular stop.

### ii.    Comparing Language in Sections of Law to Sections of the NYPD Administrative Guide

The NYPD Administrative Guide adopts a two-tier approach to bias and profiling complaints, distinguishing "Bias-Based Policing" from "Racial Profiling," and prohibiting both. The definition of **bias-based policing** in the NYPD Guide tracks the stringent language in the Administrative Code. On the other hand, the bar against **racial profiling** in Administrative Guide § 304-17(3) adopts a broader standard.

Paragraph 5 of NYPD Administrative Guide § 304-17 repeats the Administrative Code language barring an officer from intentionally engaging in **Bias-Based Policing** (also interchangeably called Bias-Based Profiling in the Administrative Guide):

> The Administrative Code and Department policy prohibit . . . officers from intentionally engaging in bias-based profiling, which is defined as 'an act of a member . . . .that relies on actual or perceived race, national origin, color, creed, age, immigration or citizenship status, gender, sexual orientation, disability, or housing status as **the** determinative factor in initiating law enforcement action against an individual, rather than an individual's behavior or other information or circumstances that links a person or persons to suspected unlawful activity.[516]

"Bias-based profiling" under this section of the Guide and under the Administrative Code broadly protects against enforcement on the basis of national origin, gender, disability, sexual orientation, immigration or citizenship status and housing status.

Separately, **Racial Profiling** is barred by paragraph 3 of Administrative Guide § 304-17:

> Race, color, ethnicity, or national origin may not be used as **a** motivating factor for initiating police enforcement action. When an officer's decision to initiate enforcement actions against a person is motivated **even in part** by a person's actual or perceived race, color, ethnicity or national origin, that enforcement action violates Department policy unless the officer's decision is based on a specific and

---

[516] Admin. Guide § 304-17(5) (emphasis added).

reliable suspect description that includes not just race, age, and gender, but other identifying characteristics or information.[517]

"Racial profiling" under the Patrol Guide enforces the Fourteenth Amendment and applies to acts based on race, color, ethnicity and national origin.  It does not include profiling based on disability, sexual orientation, immigration status, citizenship status, or housing status.

To its credit, the Department has opted to go beyond the Administrative Code and seeks to protect Fourteenth Amendment interests even when an enforcement action might satisfy the Fourth Amendment.  It bans profiling of persons with protected status when racial considerations are **a motivating factor "even in part**."[518]

Specifically, with regard to SQF activity, the Administrative Guide continues this more expansive approach and warns that:

> Individuals may not be targeted for any enforcement action, including stops, because they are members of a racial or ethnic group that appears more frequently in local crime suspect data.  Race, color, ethnicity, or national origin may only be considered when the stop is based on a specific and reliable suspect description that includes not just race, gender, and age, but other identifying characteristics or information.[519]

This is repeated in Patrol Guide 212-11 ("Investigative Encounters").  "In addition, a person may not be stopped merely because he or she matches a generalized description of a crime suspect, such as an 18-25 year old male of a particular race."[520]  Such a stop would implicate both the Fourth and Fourteenth Amendments.

On May 31, 2022, CCRB publicly posted a series of amendments to its Rules.  The amendments were approved and adopted by the Board on September 14, 2022.  There, the Board defines "Racial Profiling" to mean "a law enforcement action initiated by a member of the Police Department against a civilian that is motivated**, at least in part,** by the civilian's actual or perceived race, color, ethnicity or national origin, unless the decision to initiate the law enforcement action is based on a specific and reliable description of a suspect in a recently reported crime or series of crimes that includes not just race, age, and gender, but other identifying characteristics or information." [521]

---

[517] Admin. Guide § 304-17(3) (emphasis added).

[518] The language was developed with the help of and the advice of the Monitor Team.  The Court, in the Floyd Liability Opinion, found:  "To establish discriminatory intent, plaintiffs must show that those responsible for profiling did so 'at least in part because of, not merely in spite of, its adverse effects upon the profiled racial groups.  Plaintiffs are not required to prove that race was the sole, predominant, or determinative factor in a police enforcement action."  959 F. Supp. 2d at 662.

[519] Admin. Guide § 304-17(4).

[520] Patrol Guide § 212-11.

[521]     https://rules.cityofnewyork.us/rule/implementation-of-charter-changes-and-other-amendments/     (emphasis supplied).

It is unclear why the Board chose to alter the language, previously approved by the Court in *Floyd*, by substituting "at least in part" for the language in the Patrol Guide—"even in part"—or if the substitution carries any consequence for enforcement.[522]

Finally, the NYPD Disciplinary System Penalty Guidelines defines an abuse of discretion to include an "enforcement action such as an arrest or summons for which there is a lawful basis, however, but for the officer's improper motive, enforcement action would not have been taken."[523] Does the use of a "but for" analysis here require proof that bias was "the determinative factor" or that the arrest was motivated in part by bias?  Time will tell whether this provision is invoked when investigating allegations of selective enforcement.

### iii.    Burden of Proof, Class by Class

The scope of coverage for different groups of civilians varies under different provisions of the Charter, the Administrative Code and the NYPD Administrative Guide.

- **Racial Profiling**, under § 304-17, paragraph 3 of the Administrative Guide, the narrowest of coverage, protects against discriminatory enforcement based on actual or perceived race, color, ethnicity, or national origin.
- **"Act of bias"** under § 441 of the Charter covers acts based on race, ethnicity, religion, gender, sexual orientation or disability.
- **"Bias-based Policing (or Profiling)"** under Administrative Code § 14-151 and paragraph 5 of Administrative Guide § 304-17 uses the broadest definition, looking at bias based on actual or perceived race, national origin, color, creed, age, immigration or citizenship status, gender, sexual orientation, disability, or housing status.

The last, the broader definition in the Administrative Code and Administrative Guide § 304-17(5), requires proof that class identification was the determinative factor in a police decision to act.  For the more limited class, defined by Administrative Guide § 304-17(3), and in particular with regard to stop and frisk actions, proof is sufficient if enforcement was motivated even in part by class identification.

Of 5,077 discrimination allegations[524] logged by IAB as of March 31, 2021, 3,392 (66.8%) alleged bias based on race, color, ethnicity or national origin—the groups covered by § 304-17(3). The remaining complaints—1685 (33.2%)—were claims of discrimination based on the other groups itemized in the Administrative Code—age, immigration or citizen status, gender, sexual orientation, disability, and housing status.[525]

---

[522] "At least in part. . ." is language used in the *Floyd* Liability Opinion. 959 F. Supp. 2d at 662

[523] NYPD Disciplinary System Penalty Guidelines at 27 (Feb. 15, 2022), https://www.nyc.gov/site/nypd/about/about-nypd/policy/nypd-discipline-matrix.page.

[524] 3,336 cases.  Item 167, City 09.01.23 Feedback to Yates Report.

[525] Internal Affairs Bureau Assessment and Analysis Unit, Profiling Case Analysis Report, updated as of Mar. 31, 2021.

### iv.    Consolidating Bias Investigations and Allegations

It is particularly fitting that profiling cases in the future will be considered by CCRB in conjunction with SQF complaints.[526]   After reviewing a number of profiling investigations, Plaintiffs' counsel expressed dissatisfaction with the adequacy of NYPD handling of bias complaints:

> IAB investigators sidestepped clear inference of racial profiling or selective enforcement in certain stops.  Their investigations frequently ignore how the choice to make stops may reflect racial profiling and how race factors into whom officers deem suspicious—an issue that lies at the heart of the *Floyd* liability opinion.[527]

Without revisiting the files viewed by Plaintiffs, the point made is a good one:  Complaints of SQF misconduct and profiling should be examined as one inextricable whole.  Commencing in 2022, the two halves of the *Floyd* opinion (detailing both Fourth and Fourteenth Amendment concerns) are properly conjoined for the first time.

Any investigation of an SQF-profiling complaint requires determining both whether the officer had discriminatory intent and whether the officer had reasonable suspicion.  The bias decision should not be artificially isolated from the suspicion issue being decided.  It is difficult enough to decipher whether profiling was intentional (under paragraph 5) or what motivated an officer (under paragraph 3), but the difficulty is unduly compounded when the judgment is made in a silo, stripped of an evaluation of the surrounding circumstances that led to the encounter.  In an IAB investigation, IAB Guide § 620-58 specifically directs that "[t]he officer should articulate in their own words, the specific circumstances that provided the basis for their actions or inactions."  This is proper and necessary.  The problem in the past, however, was that IAB's determination of "the basis" for the officer's actions was made separately from CCRB's resolution of the reasonable suspicion issue.  Ultimately, it is too easy for an NYPD investigator to dismiss a profiling complaint because that investigator believed the subject officer had reasonable cause to engage the complainant without the full benefit of the companion CCRB investigation.

In 2016, there were 34 SQF allegations, involving 14 subject officers, that had a racial profiling allegation spun off to IAB and which were fully investigated and closed by a vote of a CCRB panel.  CCRB substantiated 14 of the SQF allegations, against seven of the officers.  The remainder were unsubstantiated or exonerated.  In 2017 to 2018, there were 41 SQF allegations, involving 20 subject officers, that were fully investigated and closed by CCRB panels and where a racial profiling allegation was spun-off to IAB for the same complaint.[528]   21 SQF allegations were unsubstantiated and 20 SQF allegations ended with exoneration.  None of the 41 SQF

---

[526] The Charter directs CCRB to investigate both bias-based policing and racial profiling. N.Y.C. Charter § 440(c)(1).

[527] Letter to the Monitor, Re:  Review of IAB Investigative Files, (Apr. 17, 2020).

[528] There were 126 SQF allegations in CCRB with a spin-off racial profiling allegation sent to IAB. 85 of the SQF allegations did not close with a finding on the merits by CCRB either because they were truncated, closed for pending litigation, mediated, the officer was unidentified, or the complainant was uncooperative.  While CCRB mediates a substantial number of the SQF complaints with a racial profiling allegation, NYPD does not mediate profiling complaints that it receives.

118

allegations were substantiated by CCRB.  In none of these cases was the profiling investigation substantiated by the NYPD.

It is difficult to know if, in the future, consolidation of allegations into a single investigation will or will not lead to a higher rate of substantiation.

### v.    Discourtesy, Slurs, Offensive Language, and Proof of Bias

If a complaint alleges that an officer used a racial slur but does not allege any additional bias-based enforcement, that allegation is investigated by CCRB as "offensive language." Offensive language complaints made to NYPD are sent to CCRB.  If a racial slur is alleged in connection with other race-based law enforcement conduct, the complaint was investigated by the NYPD as a racial profiling investigation (until CCRB begins conducting profiling investigations).

What happens if a profiling complaint also contains a racial slur allegation?  In the past, the allegations were split.[529]  In the future, CCRB can also investigate bias complaints made by a civilian along with the slur allegation.  However, NYPD may continue to investigate profiling complaints while CCRB will continue to investigate the offensive language complaint.

Nothing prevents NYPD from independently examining both the slur and the bias allegations at any point in time.  In cases where there is no civilian complainant, NYPD may be the only available body authorized to investigate.  So, for example, going forward, when CCRB is unable to pursue a profiling complaint for want of cooperation by a civilian complainant, if there is evidence of bias, it would seem appropriate for IAB/BIU to complete the investigation notwithstanding CCRB's abstention.

Even though CCRB and the Department distinguish discourtesy from offensive language, neither the Patrol Guide nor the Administrative Guide define discourtesy.  Subdivision one of Patrol Guide § 203-10 (now Administrative Guide § 304-06) prohibits "[e]ngaging in conduct prejudicial to good order, efficiency, or discipline."  This subdivision has been cited by CCRB investigators when substantiating a finding of discourtesy.

Administrative Guide § 304-06 prohibits "[u]sing discourteous or disrespectful remarks regarding another person's age, ethnicity, race, religion, gender, gender identity/expression, sexual orientation, or disability."  This apparently is used when an offensive language (slur) allegation is adjudged.[530]

The Disciplinary System Penalty Guidelines define and distinguish discourtesy and offensive language, with the latter carrying a much heavier presumptive penalty—five penalty days vs. 20 penalty days.[531]  The Guidelines define Discourtesy to include "foul language, acting

---

[529] Although NYPD sent the slur allegation to CCRB, while keeping the profiling investigation, in practice IAB/BIU would investigate the slur as well.

[530] Note that housing status, immigration status, or citizenship—categories protected by the Administrative Code— are not listed as a basis for an offensive language claim under Administrative Guide § 304-06.

[531] Disciplinary System Penalty Guidelines at 26. https://www1 nyc.gov/assets/nypd/downloads/pdf/public_informat ion/nypd-disciplinary-penalty-guidelines-effective-2-15-2022-final.pdf.

in a rude or unprofessional manner (such as demeanor or tone), and flashing rude or offensive gestures that is unjustified or unwarranted with no legitimate law enforcement purpose."[532] Offensive language is defined as "more serious conduct than discourtesy and includes slurs based on membership in a protected class such as race, religion, ethnicity, gender, gender identity, sexual orientation, age or disability."[533]

The Guidelines also added a new category, prohibiting "Hate Speech" which is "[s]peech or other form of expression that is intended to intimidate, attack, or threaten/incite violence against a person or group on the basis of national origin, ethnicity, color, religion, gender, gender identity, sexual orientation, disability or other protected class."[534] This offense carries a presumption of termination. The Guidelines state, "Hate Speech is more egregious than 'Offensive Language' and may not be language that merely offends or insults an individual or is considered rude, distasteful or offensive but rather shocks the conscience."[535]

In 2019 the Office of the Inspector General for the NYPD (OIG-NYPD) examined the files in 888 profiling cases, none of which had been substantiated. It recommended that CCRB investigate profiling complaints under its "abuse of authority" jurisdiction.[536] In defending its failure to substantiate profiling complaints, the Department argued, "[e]ven the best investigative protocols, and the NYPD believes that it has the best protocols in place, cannot go inside an officer's mind to glean, and prove by a preponderance of the evidence, intent or motivation."[537]

OIG-NYPD acknowledged that "biased policing complaints are often difficult to substantiate because of the need to prove discriminatory intent" and that "CCRB may need additional data and records from NYPD—and on an expedited basis—to complete such investigations in the required time frame."[538]

The report also focused on the decision to split profiling complaints from complaints of offensive language (slurs). It recommended that "offensive or derogatory language associated with an individual's actual or perceived protected status, such as an officer's use of racial slurs [should be] classified, investigated, and adjudicated as biased policing."[539]

---

[532] NYPD Disciplinary System Penalty Guidelines, *supra* note 30 at 25.

[533] *Id.*

[534] *Id.* at 47.

[535] *Id.*

[536] OIG-NYPD, Complaints of Biased Policing in New York City: An Assessment of NYPD's Investigations, Policies, and Training, *supra* note 498 at 40-42, 56, https://www1.nyc.gov/assets/doi/oignypd/response/FinalResponse_to_IG_v2_81619.pdf.

[537] NYPD Final Response to Complaints of Biased Policing in New York City at 7-8, (Aug. 16, 2019). https://www1.nyc.gov/assets/doi/oignypd/response/FinalResponse_to_IG_v2_81619.pdf.

[538] OIG-NYPD, Complaints of Biased Policing in New York City: An Assessment of NYPD's Investigations, Policies, and Training, *supra* note 498 at 42.

[539] *Id.* at 52.

120

As well, the OIG June 2019 report observed, "NYPD's early intervention and performance monitoring systems do not monitor biased policing allegations . . . with the same depth and diligence that NYPD brings to tracking excessive force claims involving NYPD personnel."[540]

There ensued a dialogue between OIG-NYPD and NYPD about the feasibility and legality of counting slurs as a biased policing matter.[541]  Without repeating the interchange in full, in essence the Department argued:

- Establishing use of a slur does not require proof of intent, but showing profiling does. Combining them might make proving slurs more difficult by imposing a "higher standard."[542]
- The "statutory scheme of division of cases between the NYPD and the CCRB does not currently allow for the NYPD to investigate such allegations of misconduct."[543]
- Biased policing under the Code requires more than a biased "act" such as uttering a slur.  It requires a biased enforcement "action" such as a stop or arrest.[544]
- RMB has, through its monitoring and intervention programs "undertaken a non-disciplinary review of complaints alleging both protected-class profiling and offensive language, which could be indicative of an officer who can benefit from additional Training irrespective of the disciplinary outcome of the . . . case." [545]

OIG-NYPD responded[546] by asserting:

- Nothing requires NYPD to engraft an intent element in defining slurs as misconduct. The fear of a "higher standard" of proof for slurs is misplaced.
- The statutory division does not prevent NYPD from conducting concurrent investigations as it does in cases of excessive force.
- A slur issued in the course of police enforcement is an "action" that meets the statutory standard.[547]

Notably, the dialogue has focused entirely upon the strict language of the Administrative Code and the Charter without taking into account the Department's ability to set a higher standard of conduct for officers than the minimum required by law.  Local laws establish a floor, not a ceiling.  The Police Commissioner is free to prohibit biased policing proactively.  If the elements of proof required by the Administrative Code are too difficult, if not impossible, to meet, the Police

---

[540] *Id.* at 3.

[541] *See generally id.*; NYPD, Final Response to Complaints of Biased Policing in New York City.

[542] *Id.* at 8.

[543] *Id.* at 13.

[544] *Id.* at 12.

[545] *Id.* at 4.

[546] OIG-NYPD, Annual Report 2020, *supra* note 500 at 3, 9.

[547] In *People v. Jones*, 210 A.D.3d at 156, the Appellate Division, wrote that "most relevant" to objective assessments of profiling was a "consideration of the officers' actions and comments during the encounter."  In the *Jones* case, the requirement was satisfied by evidence of a "highly concerning racist statement" made by the officer.

Commissioner can alter the Administrative Guide to effectuate the goal in a manner above the minimum required by the Administrative Code with robust enforcement against biased policing. As was demonstrated earlier, nothing prevents the Police Commissioner from adopting OIG's recommendation in defining misconduct under the Police Guide or the Administrative Guide as independent grounds for enforcing anti-discriminatory measures and in authorizing concurrent investigations by CCRB and IAB.  The distinction between "acts" or "actions" and "words" or "slurs" is an artificial construct which the Police Commissioner has complete authority to dismantle.  Now that CCRB has jurisdiction to investigate these matters, the Department and CCRB should work together to overcome inappropriate hurdles in proving bias where it exists.

### vi.    A Look into Prior Wrongs and Patterns in Bias Cases

Following a February 2021 hearing on racism, bias, and hate speech in the NYPD, the City Council determined there was a "need for performance of a comprehensive public integrity investigation to identify any instances of previous professional misconduct by an NYPD employee who has been found to have engaged in an act exhibiting racism or bias or in hate speech."[548]  The goal was to review in a comprehensive way, harassment, discourtesy, slurs and profiling in an officer's past.  The Council Committee found that "neither the IAB nor the CCPC has yet taken the initiative to proactively investigate past professional conduct by any NYPD employees found to have engaged in racist, biased, or hate speech."[549]

On April 25, 2021, the City Council added a new section 441 to the City Charter.[550]  Its provisions did not take effect until 270 days thereafter, on January 20, 2022.  By its terms, the NYPD, the Commission on Human Rights (CCHR), and the Department of Investigation (OIG-NYPD) are required to advise CCRB of any final determination, in the last five years, by CCHR that an officer engaged in an act of bias.

Charter section 441 defines an **"Act of Bias"** as:

[A]n act stemming from a specific incident:

(i) that is **motivated by or based on animus**[551] against any person on the basis of race, ethnicity, religion, gender, sexual orientation or disability, and

---

[548] City Council Committee Report of the Committee on Civil and Human Rights, Intro. No. 2212-A, at 9 (Mar. 25, 2021), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4770945&GUID=B5D55B19-D0FD-440C-999F-1708BF09F374&Options=ID%7cText%7c&Search=2021%2f047.

[549] Id. at 10.

[550] Local Law 47 of 2021, https://legistar.council nyc.gov/LegislationDetail.aspx?ID=4770945&GUID=B5D55B19-D0FD-440C-999F-1708BF09F374&Options=ID%7cText%7c&Search=2021%2f047.  The Mayor took no action upon the bill, presented to him on March 25, 2021  Id.  As such, it became law without approval 30 days later. N.Y.C. Charter § 37.

[551] "Animus" is introduced for the first time, without further definition.

(ii) that the board is empowered to investigate pursuant to paragraph 1 of subdivision c of section 440.[552]

In essence, the section proposes two reforms long sought by advocates: (1) it takes slurs and discourtesies into account when looking at biased behavior, rather than concentrating solely on particular acts of bias in enforcement; (2) it looks at history for patterns.

The former directly addresses an argument made by NYPD in its August 16, 2019, response to the OIG report on biased policing. An "act of bias" is distinguished in its definition from "enforcement actions" required by Administrative Code § 14-151. A slur is an act of bias, whether one considers it a biased enforcement action or not.

Under the new Charter provision, CCRB will also define a new term, a "**severe act of bias,**" thereby separating "acts of bias" from "severe acts of bias." CCRB may conduct its own investigation of past acts of bias and must conduct the investigation if there was an earlier finding of a severe act of bias. This review is to be conducted for past findings by any "covered entity" which includes not only CCHR, but also DOI, NYPD, any court, or any other officer or body designated by the Board.

Effective October 22, 2022, CCRB has adopted new regulations with a definition of a "severe act of bias" as:

"an act of bias by a member of the Police Department that (i) causes death, physical injury, or serious psychological or economic injury to the victim(s) of the act, (ii) subjects the victim(s) of the act to demeaning, degrading, or humiliating treatment, or (iii) involves criminal conduct, sexual misconduct, threat of violence, or conduct that otherwise shocks the conscience."

On January 12, 2023, the PBA filed an Article 78 proceeding to enjoin and declare as illegally overbroad the definition of a "severe act of bias." It argues that the word "severe" requires a high standard before the label attaches since it triggers significant consequences. In this case, the petition alleges that "it is difficult to conceive of any alleged act of bias that CCRB could not claim is 'demeaning, degrading, or humiliating' to the alleged victim." As such, the agency has failed to adequately distinguish severe acts of bias from other acts of bias.[553]

CCRB can examine off-duty acts of bias if the conduct could have: (i) resulted in discipline; (ii) could have had a disruptive effect on the mission of the Department; and (iii) the Department's interest in preventing disruption outweighed the member's speech interest. In either case, the Board may make a recommendation "for remedial action, including training, discipline, where

---

[552] This subparagraph introduces potential confusion since it remains unclear if a civilian complaint is necessary and whether non-uniformed members of the service were meant to be included.

[553] *NYC PBA v. City of New York*, Index No. 150441/2023, Doc. No. 22 at 25, 2024 NY Misc LEXIS 14 (Sup. Ct. NY Cty, 2023). The court agreed, on January 3, 2024, that CCRB's definition of "severe act of bias" needed further detail and barred "past professional conduct investigations" until the definition was further clarified. NYSCEF Doc. No. 71. A Notice of Appeal was filed by the PBA on February 9, 2024.

consistent with section 75 of the civil service law, or both."[554]  The Police Commissioner is to report back on the level of discipline and any penalty imposed, with a detailed explanation" if he varies from the Board's recommendation.[555]

Because, for all practical purposes, neither CCHR nor NYPD have made any findings of bias against a uniformed police officer,[556] the impact of the Charter's new mandate to look back is uncertain.  Is the Charter provision asking CCRB to look for patterns of past behavior in a new inquiry or to re-open prior unresolved cases?  In any event, going forward, the new section 441, working in combination with CCRB's expanded authority, empowers CCRB to:

1.    Investigate racial profiling complaints;
2.    Combine those investigations with allegations of offensive language, discourtesy and even stop and frisk misconduct;
3.    Keep a record of past allegations and open them to review as new complaints come in; and
4.    Look for patterns.

### G.    SQF Investigations Within the Department

#### i.    Supervisory Review

In the absence of a civilian complaint, a supervisor who becomes aware of an improper stop, question, frisk, a failure to comply with the Court-ordered provisions of Patrol Guide § 212-11, or a violation or any related offenses that might otherwise be investigated by CCRB if there were a civilian complaint, can file a "Supervisor's Complaint Report/Command Discipline Election Report" with the Commanding Officer or Executive Officer for "corrective action."[557]

As observed by CCPC:

Supervisors have the important duty to guide their subordinates and take action to prevent or correct mistakes and misconduct.  The failure to do so can not only lead to inadvertent misconduct by subordinates but can actually encourage misconduct if the subordinates observe that there are no negative consequences.  When the supervisor is the person engaging in misconduct, the supervisor models that behavior for colleagues, and sends a message that such transgressions, and perhaps others, will be tolerated.  Because of the possible far-reaching impact, these types of cases merit significant penalties.[558]

---

[554] N.Y.C. Charter § 441(d)(2).

[555] Id. § 441(d)(4).

[556] The Monitor team was recently advised, at a meeting with CCRB personnel on April 3, 2023, that there are 111 profiling investigations underway by CCRB.

[557] Patrol Guide § 206-01 (Now AG § 318-02); PD468-123.

[558] CCPC, Nineteenth Annual Report at 99 (Dec. 2019), https://www1 nyc.gov/assets/ccpc/downloads/pdf/Annual-Nineteen-Report.pdf.

At trial in *Floyd*, the City asserted that NYPD was able to identify and prevent unconstitutional stops, in part, because sergeants "routinely witness stops made by officers."[559] However, the Court concluded that this was not an "effective means for monitoring the constitutionality of stops . . . [because] sergeants do not effectively monitor the constitutionality of stops even when they are present."[560]

The Court lamented, "when officers were found to have made 'bad' stops, little or no discipline was imposed.  The evidence showed that the NYPD turned a blind eye to its duty to monitor and supervise the constitutionality of the stops and frisks conducted by its officers."[561]  The Court found, "[d]eficiencies . . . with respect to stop and frisk and in the disciplining of officers when they were found to have made a bad stop or frisk.  Despite the mounting evidence that many bad stops were made, that officers failed to make adequate records of stops, and that discipline was spotty or non-existent, little has been done to improve the situation."[562]

To date, this problem has been addressed in part by improved stop reporting, supervisory reviews and audits.  While sergeants are correcting stop reports and, on occasion, providing instructions for stops they find to be improper, there is no evidence that sergeants, or any other supervisory authority within the Department, impose discipline for wrongful stops or frisks unless brought to the Police Commissioner's attention by CCRB or, on rare occasion, following an audit.  The *Floyd* Court's observation that "discipline was spotty or non-existent" for SQF misconduct continues today.  Absent a CCRB complaint or capture by audit, there is little evidence that supervisors within a command are reporting and referring SQF misconduct for investigation or discipline.  Mandatory audits, (QAD, RAND, or PIE), are useful tools for identifying failures to comply with PG § 212-11[563] or the Court's orders.  But the question remains whether discipline ensues when SQF misconduct is identified, not by CCRB, but internally within a command, whether by supervisors, by audit or otherwise.  Are commanding officers, ICOs, or supervisors identifying and disciplining improper stops and frisks?  Without a civilian complaint, does the Department self-police misconduct and does it invoke discipline when it discovers officers have engaged in unconstitutional behavior, including repeated SQF misconduct?  From records produced by NYPD thus far, it would seem not.

The Department, with the participation of the Monitor, has established certain procedures for supervisory review and assessment of street-encounter activity, regardless of whether there was a civilian complaint.  "As required by the court orders, Patrol Guide Section 212-11 provides for a more robust supervision of officers with regard to their stop and frisk activity."[564]  This is a

---

[559] *Floyd* Liability Opinion, 959 F. Supp. 2d at 610.

[560] *Id.* at 610-11.

[561] *Id.* at 590.

[562] *Id*. at 561.

[563] Procedure Patrol Guide § 212-11.  This is a detailed, 16-page directive, which has been developed with oversight by the Court.

[564] Seventh Report of the Independent Monitor, December 13, 2017, at 11.

separate process from audits conducted after the fact by QAD. As explained in the Monitor's Fourth Report, the supervisory review includes an assessment of SQF compliance:[565]

> The new Patrol Guide section 212-11 governing stops and frisks requires supervisors to respond to the scene of stops when feasible, discuss the circumstances of the stop with the officer making the stop before the end of the officer's tour, and review the officer's stop report form and activity log. The supervisor must determine whether the stop was based on reasonable suspicion of a felony or Penal Law misdemeanor; if a frisk was conducted, whether the frisk was supported by reasonable suspicion that the person was armed and dangerous; if a search was conducted, whether it was reasonable; and if force was used, whether the use of force was reasonable. The supervisor must direct the officer to make corrections to the stop report form if it is inaccurate or incomplete, and, if appropriate, instruct the officer or refer the officer for additional training or other remedial action, including, if appropriate, disciplinary action.

Similarly, the Collaborative Plan recently adopted by the City promises that "The NYPD will require supervisors to proactively monitor discretionary officer activity for indications of bias-based policing and take corrective measures immediately."[566] The Monitor team has not been advised of any steps taken, thus far, to implement that portion of the Collaborative Plan.

Self-examination by the Department of improper SQF activity is dependent upon: (a) on-the-scene supervision, which can occur if a supervisor is on scene or notified of the encounter; (b) review of stop reports and associated BWC footage, which is possible only if the officer has filed a stop report; and (c) audits, including ICAD, PIE and BWC reviews, which may catch some SQF activity that was not, but should have been, reported.[567] "The underreporting of stops has been acknowledged by the Department and by officers and supervisors in focus groups conducted by the Monitor, and explicitly identified in NYPD audits."[568]

While helpful, none of these "screens" can fully capture the many occasions when an officer stops, questions, or frisks a civilian. If the officer does not file a report; a witness does not file a complaint; a supervisor does not appear at or review the stop; or an audit does not uncover the failure to report, the encounter will go unmonitored and escape review. The number of times this may occur could be large and is important to any assessment of NYPD compliance with the *Floyd* orders. The parties acknowledge the need to identify unreviewed stops and continue to work with the Monitor.

As noted by the Monitor in the Thirteenth Report submitted to the Court:

---

[565] Fourth Report of the Independent Monitor, November 18, 2016, at 18.

[566] NYC Police Reform and Reinvention Collaborative Plan, Adopted by the City Council Mar. 25, 2021, at 12.

[567] At the time of this writing, at the direction of the Court, the Monitor is conducting research studies of BWC videos that will, during the period of the study, identify some unreported stops. The purpose of the pilot, however, is informational, not disciplinary.

[568] Eleventh Report of the Independent Monitor at 13 (Oct. 28, 2020), https://www.nypdmonitor.org/wp-content/uploads/2020/11/11th-Report-Submission-2.pdf.

There is substantial evidence suggesting that many NYPD officers do not submit reports documenting all of their stops of civilians in years 2016 to 2019. These undocumented stops may undermine the reliability of statistical analyses to identify racially disparate stop report patterns and practices in NYC.[569]

The Report aptly summed up the problem as follows:

It is important for the NYPD to strengthen its efforts to ensure that officers document all of their stops. Without complete stop data, it will not be possible to conduct valid and reliable statistical analyses that can appraise whether the NYPD is in substantial compliance with the Court's remedial order.[570]

If a supervisor is notified of and responds to a contemporaneous encounter, the primary responsibility for ensuring that a stop, frisk, or search is proper rests with the supervisor.[571] The NYPD catalogues that information in its stop reports. For the third quarter of 2020, supervisors were "on the scene" in 1,132 of 1,519 reported stops.[572] After the encounter, if a stop report is written (either at the scene or at the end of the tour), that stop report, describing the circumstances, is reviewed by a supervisor, and may be audited.[573]

As found in the Eleventh Monitor Report, supervisors reviewed 12,958 stops and found 66 failed to articulate reasonable suspicion for the stop.[574] They reviewed 7,290 reports of a frisk and found 60 failed to offer a sufficient basis for the frisk.[575] Supervisors reviewed 4,721 reported searches and found 64 of the reports lacked sufficient basis for the search.[576] Concededly, it is difficult to determine whether the fault lay solely in the articulation in the reports or in the underlying stop and frisk itself. Some could be a simple failure to report accurately and completely; some may be the product of illegal stops and frisks.

A stop report that does not sufficiently articulate the reasonable suspicion for an otherwise legal stop or frisk can and should be corrected by revising the report. However, if a supervisor determines that the stop, frisk or search itself was improper, the encounter should be investigated and the officer subject to discipline if appropriate, not merely "corrected" by revising the report after the fact. The supervisor has a responsibility to correct behavior, not just the stop report. By either guidance or discipline, the supervising officer and the Department have a duty to address

---

[569] Thirteenth Report of the Independent Monitor, *supra* note 503 at 4.

[570] *Id*. at 63.

[571] Patrol Guide § 212-11.

[572] "3Q 2020 Floyd SQF redacted" matrix, on file with the Monitor. In 11 of the 1,132 cases, the supervisor reported that there was not sufficient basis for the stop. In none of the 11 cases was there "follow-up disciplinary action" reported.

[573] More than 7,000 stop reports are audited by QAD each year. Eleventh Report of the Independent Monitor, *supra* note 569 at 79.

[574] *Id.* at 48.

[575] *Id.*

[576] *Id.* Precinct supervisors are less likely to find flaws in the Stop Reports than outside auditors. Upon review by QAD of a large sample of Reports approved by supervisors, QAD found about 20% to be insufficient. *Id.* at 80.

the underlying misconduct. Whether findings of "insufficient basis" in the reports are investigated beyond a simple review of the stop report itself is unknown. One thing is clear: Not one of the 2019 stop reports found wanting by supervisors resulted in discipline being imposed for an illegal stop, frisk, or search, although a number received guidance in the form of training, instruction, or both.[577] Supervisors have a duty to investigate and address Fourth and Fourteenth Amendment violations, not simply to "paper over" them. If that is being done, assuming discipline is appropriate in some number of cases, it is not reflected by the statistics.

In 2019, QAD looked at more than half of the stop reports which were filed—7,475 of 13,459. QAD found 6,050 of those sufficiently justified the stop. Similarly, 3,233 of 3,434 frisk reports were found to be sufficient and 2,312 of 2,473 search reports were sufficient.[578] That means, according to QAD, officers did not articulate a sufficient basis for 1,415 stops, 201 frisks, and 161 searches. Again, what is not known is how many of those were actually illegal stops, frisks, or searches and how many were legally conducted encounters which were poorly described in the stop reports. Although some guidance or negative CRAFT entries may have been instituted at the command as a result of a QAD audit, NYPD does not conduct a misconduct investigation by IAB, OCD, or DAO based on a QAD audit. Without further investigation or more explicit description of the stop or stop report deficiency by supervisors, improper stops and frisks may well go unreviewed unless reported to CCRB.[579] A report that does not support the stop, frisk, or search does not trigger a disciplinary investigation into the legality of the underlying encounter by one of the other Departmental units charged with that responsibility. At the very least, the CO should be required to write a report analyzing the legality of the encounter and explaining whether a precinct investigation, reference to another investigating unit, or even discipline, is appropriate, and if not, why not.

Similar to QAD audits, NYPD's RAND audits look for failures to prepare a stop report. In 2019, RAND sampling identified 74 cases where, based on the radio communications and further investigation, a *Terry* stop occurred and a stop report should have been filed. In 21 of those cases, no report was filed. In the 21 cases where a RAND audit uncovered a wrongful failure to report, only one case resulted in imposition of a command discipline.[580]

---

[577] Thirteenth Report of the Independent Monitor, Racial Disparities in NYPD Stop Question, and Frisk Practices: An Analysis of 2013 to 2019 Stop Reports at 2-3 (Sept. 1, 2021), https://www.nypdmonitor.org/wpcontent/uploads/2021/09/13th-Report filed.pdf.

[578] *Id*. at 79. Unlike the numbers for CCRB allegations, prior to 2020, QAD only looked at the sufficiency of a basis for a frisk or search if the stop appears to be justified. Therefore, the number of frisks and searches which appear to be questionably supported do not overlap with number of stops reported to be questionable. If a stop was done without cause and a frisk was later done without reasonable suspicion, only the illegal stop would be reflected by these numbers. One can safely assume that some numbers of the frisks were illegal, but not accounted for in this tabulation.

[579] With the introduction of Neighborhood Safety Teams, testing the validity of street encounters will become increasingly important. Self-examination and careful supervision are vitally important to this effort.

[580] *Id*. at 83-84.

Finally, by way of PIE audits, in 2019, QAD auditors reviewed some 461 arrests to determine whether a stop preceded the arrest and if it was properly documented. The PIE audits found that 142 arrests required the filing of a stop report, but only 70 (roughly 50%) were filed.[581]

In sum, for 2019, internal reviews and audits within the Department found stops which were not properly explained or justified in 190 cases reviewed by supervisors, 1,777 considered by QAD, 21 uncovered by RAND audits, and 72 discovered by PIE audits. The total missing or defective stop reports in one year is significant. It may be that some of the failures were simply a paper error, and the underlying stop and frisk was completely lawful. But it is improbable that all of the deficient or missing reports were mere reporting errors and that every one of the encounters was otherwise lawful and justified. In any event, there is little record of discipline being invoked as a consequence of an illegal stop, question or frisk uncovered by the audits or self-inspection.

Included in the various reviews and audits are two kinds of stop report failures. In some instances, a report was filed but failed to specify reasonable suspicion. In other cases, no report was filed when it should have been. The former category could be either a mere articulation failure or could have exposed the fact that reasonable suspicion was not articulated because the officer did not have, objectively speaking, just cause to stop and frisk. The distinction is important and can be discerned with a reasonable follow-up by supervisors.

There is a disturbingly high percentage of substantiated findings by CCRB for SQF misconduct when the encounter was not documented by a stop report. Where no stop report was filed, and articulation is not the issue, there appears to be a greater likelihood that a constitutional violation occurred. An improper stop or search and a concomitant failure to report the incident by the same officer may well be correlated. For comparison's sake, consider what happens when CCRB uncovers a failure to report. Unlike command audits and reviews, CCRB will continue to fully investigate the encounter in the SQF complaint while forwarding the report failure back to the Department. Since stop report failures are split off from FADO investigations, one can determine how many times CCRB investigated and substantiated an SQF complaint after it had alleged that a stop report should have been filed. From 2013 to 2018, CCRB referred 384 OMN[582] cases to the Department where an officer made a stop but did not file a report. As of 2019, we know the outcome of the CCRB investigation in 327 of those cases.[583] In 192 of the 327 closed cases (59%), CCRB substantiated SQF misconduct.[584] Notably, although many investigations are

---

[581] *Id.* at 85-86.

[582] "Other Misconduct Noted."

[583] OMN Spreadsheet (failure to complete stop report), First Quarter 2019, on file with the Monitor team.

[584] Typically, when a CCRB substantiated FADO is sent to DAO, the accompanying OMN (Stop Report Failure) is left with DAO, rather than being fully investigated by IAB, OCD or BIU, to resolve. Oddly, in 12 of the 192 SQF substantiations, NYPD "exonerated" or "unfounded" the stop report failure, but in each case, nonetheless, DAO required "Instructions" or "Training" for the Stop Report failure. It is difficult to understand how a stop, question, frisk violation can be substantiated by CCRB and confirmed by DAO, while the Department claims that the allegation of a missing stop report is exonerated or unfounded—unless the report was discovered after the referral from CCRB. But in that case, why would DAO order Instructions or Training for the OMN? It could be that the report was initially misfiled. The alternative might be that the stop/frisk was illegal but the stop report fully and accurately described illegal actions by the officer. The matter was not pursued further.

pending or still ongoing, this is a much higher rate of substantiation[585] than, for example, the overall 12% rate of substantiation of SQF allegations at CCRB in 2019.[586]  Pure and simple, in CCRB's experience, there is a much higher incidence of unlawful behavior when a stop, which is the subject of a complaint, is made but not reported than when misconduct is alleged, and a report is filed. When a report is not filed, but should have been filed according to CCRB, the substantiation rate for SQF complaints on average over the last five years is closer to 50%.

More recently, with a number of investigations still in progress, in 2022, of 118 cases referred to NYPD by CCRB for failure to file a stop report, 44 of the cases also resulted in a substantiated finding of a wrongful stop or frisk (37%).[587]  Again, this is a much higher rate of substantiated SQF misconduct than for cases where a report was filed.

Whether there is a discernible correlation between a failure to file a stop report and misconduct would require further analysis.  But at this point, it is worth noting that, for CCRB, a failure to file a stop report, when SQF misconduct is alleged, is a potential indicator of misconduct beyond a mere failure to document.[588]

QAD or precinct commands do identify some SQF misconduct that was not reported to CCRB during reviews or audits for stop report failures.  How often does that happen?  And what discipline, if any, is imposed?

For the two-year period 2018-2019, there were 15 cases that the Department identified as "Improper Stop/Frisk/Search" encounters identified by audits or local command reviews and the Department issued command discipline.[589]  Theoretically, these should have led to some internal response, be it discipline, guidance, or at a minimum a description of the misconduct even though they were not the product of a CCRB referral or citizen complaint.

Eight of the cases of "Improper Stop/Frisk/Search" were discovered by QAD.  Of those eight cases, three resulted in an A-CD.  Two of the A-CDs received W/A (warning and

---

[585] This percentage could well be artificially low, since the cases that take longer to resolve are presumably more complex or delayed for good reason.

[586]  Data provided by NYPD thus far does not permit a pure comparison, since CCRB does not single out for report the SQF substantiation rate for cases where a stop report was properly filed.  The 12% number is for all SQF investigations.  The 12% rate is inflated by including the non-report cases.  Given the high rate of SQF misconduct in stop report failure cases, if one were to subtract them from the overall substantiation rate, and simply look at cases where a stop report was available, the CCRB substantiation rate would fall to an even lower rate than combined total rate of 12 % for SQF allegations.

[587] 3Q 2022 CCRB OMN Fail to Complete Stop Report, supplied by NYPD and on file with the Monitor.  Notably, this statistic does not screen for other failures to document such as a missing activity report, which may expand the number of CCRB misconduct findings.

[588] After analysis of the application the Disciplinary Matrix by the Commission to Combat Police Corruption, the observation was made that, "We thought the presumptive penalties for failing to complete reports should be higher in some cases, but we viewed those penalties as sufficient where multiple charges were brought, and where the penalty for failure to file reposts was imposed consecutively.  Commission Report to the Office of the First Deputy Mayor, August 2021, at 6. https://www.nyc.gov/assets/ccpc/downloads/pdf/Report-on-Matrix-Penalties-for-Failure-to-Take-Police-Action-October-2021.pdf.

[589] "Stop Report Failure Discipline 2-25-20" matrix provided by RMB, on file with the Monitor team.

admonishment). One A-CD ended with a penalty (two hours). The remaining five cases received "Instructions" only.

Seven cases of "Improper Stop/Frisk/Search" were identified by the precinct command during the same period. Two received A-CDs. Both officers were given warnings. The remaining five cases, where no A-CD was ordered, ended with two warnings, two CRAFT and one instruction.

In sum, only one case in the two-year period resulted in imposition of a penalty for an illegal stop/frisk/search where officers within the Department, not CCRB, examined the misconduct. The penalty was a loss of two hours of credited time.[590] While audits and supervisory review do help to identify some illegal stop activity, without a civilian complaint, Departmental investigations do not lead to disciplinary action. Absent a civilian complaint, investigations and disciplinary action for unconstitutional stops and frisks within the command remain just as Judge Scheindlin described them to be—"spotty" or "nonexistent."[591]

Beyond "correcting" a deficient or missing stop report, the validity of the encounter must be examined carefully, and discipline should be considered. The Court has previously accepted language in the Patrol Guide that "isolated" and "erroneous" but "good faith" SQF misconduct may be dealt with by guidance rather than discipline.[592] The fact that reported discipline is practically non-existent for the many cases where a stop or frisk occurred but was not reported or described accurately is troubling. The purpose of the stop report requirement is not to have reports corrected or completed. No one seeks an empty "paper chase." Rather, stop reports are required to ensure Fourth and Fourteenth Amendment compliance.

Whether it be an isolated or a repeated wrongful act, officers are not penalized at the precinct level for illegal stops or frisks. Reserving discipline for cases where a civilian has complained to CCRB confines effective discipline to a small universe of misconduct. If patrol officers know that audits or supervisory reviews do not lead to discipline for Fourth and Fourteenth Amendment violations, and if they know that the majority of CCRB complaints, although unwelcome, lead to little more than training, instructions, or "CD accepted" without penalty, then they certainly know that the chance of discipline for constitutional violations overall is minimal.

### ii. Disciplining Supervisors Within a Command

If investigations and disciplinary responses within the precinct or at IAB for SQF misconduct are thought to be inadequate, the next question is: Are supervisors held accountable for SQF misconduct by officers they supervise within their command?

---

[590] *Id.*

[591] *Floyd* Liability Opinion, 959 F. Supp. 2d at 561.

[592] Patrol Guide § 212-11.

In the two-year period 2018 to 2019, there were 510 instances noted where, according to departmental audits and reviews, supervisors "Failed to Detect/Identify Unconstitutional Stops/Frisks/Searches" while reviewing stop reports.[593]

- Nine of the supervisors received an A-CD in 2018. Three accepted an A-CD with no other consequence. Six officers in the Ninth Precinct were reported to have been assessed a time deduction totaling 24 hours. (It is unclear from the report if that penalty was for other included misconduct—which seems likely since no other officers in the two-year period received discipline for SQF supervisory failures.)
- No supervisor received command discipline for the failure in 2019.
- 121 of the supervisors were given CRAFT notices, without penalty.
- The remaining 380 supervisory failures resulted in Training, re-Training, or Instructions—all without discipline.

When CCRB suspects that a superior officer is directly or indirectly responsible for a junior officer's SQF misconduct, one of two things may follow. If the Board finds that the supervisor authorized or directly participated in the misconduct, it will substantiate an abuse of authority claim. If the Board believes the superior officer did not participate, but passively failed to properly supervise the encounter, it will refer an OMN allegation to NYPD. The distinction is subtle and subject to arbitrary conclusions. A supervisor on the scene should be held accountable for SQF misconduct by officers under command. In a similar situation, Patrol Guide § 221-01 (governing force incidents) emphasizes that "[f]ailure to intervene in the use of excessive force . . . is serious misconduct . . . that will result in Department discipline . . . " and "[i]f a member of the service becomes aware of the use of excessive force . . . the member must report such misconduct" to IAB (emphasis in the original). Placing a similar affirmative responsibility to manage Fourth and Fourteenth Amendment misconduct on a supervising officer at the scene of an encounter makes eminent good sense. Unfortunately, experience has shown that charges of a "failure to supervise" SQF misconduct, once sent from CCRB to the Department, carry little or no consequence.

In the three-year period 2016 to 2018, a total of ten supervisors were so charged or referred. Because NYPD imposes and reports penalties based on all the proven allegations in a complaint or encounter, and because the failure to supervise complaints were coupled with other misconduct allegations against the supervisor, such as discourtesy or false statement or strip searches, it is difficult to ascertain if any penalty was imposed upon a superior officer for improper SQF supervision of a subordinate during a street encounter, or if discipline ensued for personal misconduct beyond a failure to supervise a stop encounter. In the ten cases reported by CCRB:[594]

- Four officers (three Sergeants and one Lieutenant) were found by CCRB to have actively authorized or supervised SQF misconduct beyond passive failure to prevent.
- A Lieutenant retired before he was served with charges.[595]

---

[593] 2-25-2020 command audit stop reports, on file with the Monitor.

[594] CCRB Fail to Supervise SQFT matrix, on file with the Monitor.

[595] Lt. ███████.

- One Sergeant (since promoted to Lieutenant)[596] improperly searched and questioned an individual and authorized an improper frisk. CCRB recommended a B-CD, but the Police Commissioner imposed Instructions without discipline.
- Another Sergeant (since promoted to Lieutenant)[597] was charged with supervising the search of two individuals. He was charged with conducting an unlawful frisk and two unlawful searches. Before trial, he negotiated a plea with APU of 10 penalty days. The Police Commissioner reduced the penalty to 4 days.
- A Sergeant authorized an improper stop and was given Instructions.
- Six officers were referred to NYPD for a passive OMN-Failure to Supervise improper SQF conduct by officers under their command.[598]
- Three allegations were dismissed by the Police Commissioner with "NDA." This included a Lieutenant, a Sergeant, and a Deputy Inspector.
- Two were only found to have failed to prepare or supervise preparation of a stop report. Allegations of failing to supervise SQF misconduct were not substantiated by the Department.
- One Sergeant was given an NDA by the Police Commissioner for failure to supervise and for discourtesy but was given Training for his illegal search of a vehicle.[599]

In one example during that time period, a Sergeant[600] and another officer stopped a vehicle for an "obscured rear license tag." The officer wrongfully frisked three occupants in the Sergeant's presence. The patrol officer also interfered with a cellphone recording and allegedly spoke discourteously. That patrol officer was charged and negotiated a plea with APU of ten days forfeited. Charges were not brought against the Sergeant. However, his case was referred to the Department as an OMN-failure to supervise. The Sergeant has a history of eight complaints brought to CCRB, mostly for wrongful force, slurs, and discourtesy. None have been substantiated, although one of the cases, involving a wrongful tasering, led to a $30,000 judgment against the Department in the Eastern District of New York. The Department investigators exonerated the Sergeant of the failure to supervise charge.

In sum, for the three-year period (2016-2018) only one supervising officer received discipline for a failure to supervise or for authorizing wrongful SQF actions by officers under their supervision.[601] Not one superior officer was found by departmental investigators to have failed to supervise SQF misconduct by junior officers in the superior officer's presence when the OMN was

---

[596] Lt. ■■■■■■■■.

[597] Lieutenant ■■■■■■■■ is assigned to IAB. In this case, DAO had asked for reconsideration and exoneration. DAO contended that there was insufficient evidence that ■■■ supervised the frisks and searches.

[598] On February 10, 2021, the Rules of CCRB were amended. CCRB, Notice of Adoption (Feb. 10, 2021), https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/CCRB_Final%20Proposed%20Rules%20and%20Law%20Dept%20Certification_02042021.pdf. Included therein was a change to 38-A RCNY 1-44, citing "a superior officer's failure to supervise" as "outside" CCRB's jurisdiction. *Id.* at 13. No distinction was made between active or passive supervision.

[599] Sgt. ■■■■■■■■.

[600] Sgt. ■■■■■■■■.

[601] There may have been discipline or guidance for the six officers in the Ninth Precinct discussed above. But again, without a data response from the Department there is no reason to assume such.

referred to them by CCRB. Two superior officers who were found by CCRB to have directly participated by authorizing or supervising SQF misconduct received "Instructions." One officer who pled to supervising an improper search and frisk of two individuals had his agreed-upon penalty reduced.[602]

### iii.    A Move Away from CCRB Review of Supervisory Failures

A recent amendment to the CCRB Rules that excludes "failure to supervise" from CCRB jurisdiction is highly unfortunate.[603] The amendment is discussed later in detail, under "Subject Matter Jurisdiction." At this point it is worth mentioning that, in 2021, CCRB wrote into its rules, for the first time, that a failure to supervise is not within its jurisdiction. In light of the statistics cited herein, CCRB's decision to abdicate responsibility is worrisome. The *Floyd* court, in the Remedies Opinion, highlighted the need for "meaningful supervisory oversight of the officer's decision to conduct the stop . . ." [604] Excluding that area from CCRB review seems to be a step backward from the City's attempts to comply.

As noted by CCPC in their Eighteenth Annual Report:[605]

Supervisors are responsible not only for their own actions, but also for the actions of their subordinates, as they directly impact their subordinates' performance and behavior. A supervisor's failures can lead to subordinates making mistakes that can lead to discipline and affect their careers. A supervisor's unwillingness to take corrective action or to conform his own conduct to Department standards can also cause subordinates to emulate bad behavior, believing it to be appropriate. Accordingly, failures of supervisors to discharge their responsibilities should receive significant penalties, especially when these failures result in subordinates' avoidable misconduct.

### iv.    Investigations Within a Local Command - Process

Section 206-01[606] of the Patrol Guide requires supervisors who observe misconduct to report it.[607] Supervisors prepare a Supervisor's Complaint Report/Command Discipline Election

---

[602] There is one case where a "supervising Sergeant" personally conducted two illegal stops and an illegal search of a teenager's backpack. At the same time, a fellow officer under his supervision "slammed" a teenager to the ground and the "stomped" him. In that case, Sgt. ████████ was charged, went to trial, and received ten penalty days. In part, the penalty applied was due to a prior record of three separate disciplinary matters resulting in 45 penalty days and, in addition three separately substantiated CCRB cases where no penalty was dispensed. Sgt. ████ was subsequently promoted to Lieutenant.

[603] 38-A § 1-44, effective Sept. 22, 2022. CCRB, Notice of Adoption, *supra* note 599 at 13 (citing "a superior officer's failure to supervise" as "outside" CCRB's jurisdiction).

[604] *Floyd*, Index No. 08-cv-1034, Doc. No. 372 at 19.

[605] CCPC, Eighteenth Annual Report, *supra* note 606 at 95.

[606] Now AG § 318-02.

[607] Administrative Guide § 304-06, formerly Patrol Guide § 203-06, forth a list of prohibited conduct while officers are on duty, which includes consuming alcohol, gambling, and using any electronic or digital device such as a personal gaming device or a personal digital assistant.

Report, which is submitted to the Commanding Officer ("CO").[608]  The CO or the Executive Officer ("XO") within the command is then authorized, for less serious misconduct, to impose informal discipline or guidance.[609]

The complaint, prior to adjudication, is entered in the local Command Discipline Log,[610] but is not forwarded outside the precinct.  Then, following notification to the officer and, if requested by the officer, a representative of any line organization representing the officer, the CO must give the member an opportunity to make a statement in rebuttal and conduct any necessary further investigation.  The interview is intended to be an informal, non-adversarial occasion and no minutes are recorded.  The subject officer must be given a copy of the Supervisor's Complaint Report/Command Discipline Election Report.[611]

Prior to February 2022, the Patrol Guide specified which violations may be addressed through Command Discipline by the CO.  The offenses were enumerated in Section 206-03 of the Patrol Guide.  There were 36 listed "A" violations and eight listed "B" violations.  They range from truly minor to some relatively more serious infractions.  For example, failure to sign a return roll call, "unnecessary conversation" and "improper uniform" are among listed A violations, along with obvious neglect of care of firearms and loss of a summons book.[612]  Parking a car illegally, whether Departmental or private, is listed as a Schedule A offense.  Theoretically, deficiencies in filing or preparing a stop report might be included under "Omitted entries in Department records, forms or reports" or under "Failure to submit reports in a timely manner."

The "B" violations included failure to safeguard a prisoner," "loss of Department property," and "failure to give name and shield number to person requesting," i.e., a "Right to Know Act" offense.[613]

On February 16, 2022, the lists itemizing A-CDs and B-CDs for which a local precinct commanding/executive officer is permitted to impose a penalty were moved to Administrative Guide § 318-01 and the Disciplinary System Penalty Guidelines.  The list for "Misconduct Adjudicated by level A Command Discipline" is now entirely contained in the Disciplinary Guidelines and mirrors the list formerly in the Patrol Guide.  The level B-CD violations are listed in both AG § 318-01 and is repeated in the Disciplinary Guidelines.

SQF violations were not listed in Patrol Guide § 206-02.  Command Discipline is available to precinct Commanding Officers for SQF violations and violations of Patrol Guide § 212-11 (Investigative Encounters) without requiring a finding by CCRB.  If a local commanding officer becomes aware of improper stop and frisk behavior, the CO has the option to discipline the offender.  Nothing in the Departmental Manual precludes investigation of SQF misconduct by a CO or an XO.  To the contrary, Patrol Guide § 212-11 requires Integrity Control Officers (ICO) to

---

[608] Patrol Guide § 206-01.  Now AG-§ 318-02.

[609] Administrative Guide § 318-02, formerly Patrol Guide § 206-02.

[610] PD 568-102.

[611] Admin. Guide § 318-02.

[612] Patrol Guide § 206-03.

[613] Patrol Guide § 203-09; N.Y.C. Admin. Code § 14-174 (Identification of police officers).

"take appropriate remedial action if warranted, including discipline, if appropriate." And COs are to "Identify training needs and necessary remedial or disciplinary actions required."

Section 206-02 declared that a CO "may initiate command discipline" for the listed offenses.[614] The replacement section, § 318-02, "Violation Subject to Command Discipline," states that a CO can issue an A-CD for minor violations listed in the Guidelines.[615] Neither § 206-02 nor § 318-01 specify stop and frisk violations as part of the responsibility of a CO. The absence of reference to SQF misconduct, rightly or wrongly, lends itself to a negative implication that COs are not authorized to assess an A-CD or a B-CD for conduct not enumerated, such as SQF misconduct.

There was a catch-all provision in the Guidelines, which had been in § 206-02, allowing an A-CD for "[a]ny other minor violation that, in the opinion of the commanding/executive officer is appropriate for Schedule A command discipline procedure."[616] The question remains: If a supervising officer within the command observes an illegal stop or frisk, but there is no civilian complaint made to CCRB, may the CO order an A-CD or a B-CD? While the language is ambiguous, this is a hypothetical question since no cases could be found where, absent a CCRB finding or capture by audit, a precinct commander proactively imposed an A-CD, a B-CD, or any other penalty for an illegal SQF encounter.

At the conclusion of a precinct investigation, the commanding officer prepares a report in which any findings are indicated and whether the allegations are substantiated.[617] If there is sufficient evidence of an offense listed in Admin. Guide § 318-02 , the findings and a proposed penalty are presented to the accused officer in an interview which is "informal and non-adversarial."[618] A representative of the union ("line organization") may be present if the officer so requests. The officer may accept or decline the findings. If the member declines the findings, then DAO is notified, and Charges and Specifications can be prepared. At that point, the proceedings become "formal," and discipline may not be imposed absent a trial before a Deputy Commissioner of Trials (DCT), or as part of a negotiation and settlement.

There are exceptional cases where consultation with the DAO is required prior to adjudication and command disciplinary action. If the alleged misconduct involves the loss of or failure to safeguard a firearm, DAO must be consulted.[619] Or if the accused member has two or more prior command disciplines within the last six months, Patrol Guide § 206-03 required the CO to confer with the patrol borough/bureau adjutant to determine if Charges and Specifications

---

[614] Emphasis added.

[615] Discipline is available for an abuse of authority finding by CCRB and that includes Fourth and Fourteenth Amendment violations listed in the Disciplinary System Guidelines Matrix. However, the question raised here is whether COs are instructed to impose Command Discipline within the precinct upon observing an SQF violation. The Guidelines do not list SQF misconduct, under "Violations of Department Rules and Regulations" (offenses for which command discipline may be imposed).

[616] Patrol Guide § 206-03(35) (emphasis in original).

[617] Admin. Guide § 318-02.

[618] *Id.*

[619] Formerly Patrol Guide § 206-03, now AG § 318-02.

should be drawn. It is hard to confirm whether this proviso is honored since A-CD records are kept locally. No member has faced Charges and Specifications under this provision for a minor violation based solely upon a record of two or more prior command disciplines within a six (or even twelve) month period.[620] Further, "DAO does not currently have a way to track this specific subset of cases," rendering any attempt to monitor compliance ineffective.[621] The Court has ordered Early Intervention review for members who accrue multiple CCRB complaints within a short time period, but there is no review, disciplinary or otherwise, for officers who accrue multiple precinct complaints.[622]

Upon receiving notice of a Supervisor's Complaint, the CO is to direct the ICO to investigate the subject's prior twelve-month disciplinary history and to attach it to the report.[623] A disciplinary history, no matter how extraordinary or serious, which is more than twelve months old is not a requisite component of the evaluation for discipline within the command. In any event, a search for records after one year would often prove futile since Patrol Guide § 206-02 (now AG § 318-02) requires the command to:

> Remove and destroy records and dispositions of convictions listed under Schedule "A" on the anniversary date of each entry, provided the member has no subsequent disciplinary violation. Additionally, remove and destroy all unsubstantiated command disciplines from the Command Discipline Log on the anniversary date of entry.

The requirement to "remove and destroy" records apparently applies to all A-CDs in the officer's record available to the CO, XO or ICO. Not only are all records of A-CD command-investigated misconduct destroyed, but records of A-CDs substantiated by CCRB, IAB, BIU, DAO, and Trial Commissioners are expunged from the command history. Similarly, prior investigations within the command of misconduct not substantiated are expunged. Expungement after just one year has two unfortunate consequences: (a) relevant prior substantiated misconduct is unavailable when considering appropriate disciplinary measures; and (b) any meaningful attempt within the Department to ferret out patterns of misconduct by an individual officer or squad is significantly hampered.

---

[620] The Discipline System Penalty Guidelines will, in the future, permit aggregation of substantiated command disciplines under consideration within one complaint to arrive at a determination that Charges and Specifications should be filed. This is different from a decision to elevate a command discipline to Charges based upon two or more prior command disciplines. See also the discussion of progressive discipline under the Guidelines, *infra*.

[621] Letter, March 5, 2021, Dep. Commissioner Schlanger to Monitor Team.

[622] As of December 31, 2019, 9,499 of 36,602 officers (26%) had three or more CCRB complaints lodged against them. However, only 217 officers had three or more CCRB substantiated complaints. CCRB, Annual Report 2019 at 28, https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2019CCRB_AnnualReport.pdf.

[623] Patrol Guide § 206-02. Now AG § 318-02.

Patrol Guide § 206-14[624] also calls for "sealing" of records of B-CDs after three years.[625]

Later in this Report, there is a discussion regarding the recently adopted Disciplinary System Penalty Guidelines (referred to as "Matrix" or "Guidelines" throughout this Report).[626] The Guidelines are to be utilized by Commanding Officers when imposing discipline at the command level. The Guidelines consider prior disciplinary history as an aggravating factor which may elevate a penalty, apply progressive discipline for repeated misconduct, and look for patterns of misbehavior. The Guidelines consider prior disciplinary events where the subject officer received a penalty of five days or less if imposed in the last three years, and cases where the officer received five to ten penalty days over the past five years. However, the Department has indicated that it will continue to expunge records of A-CDs after one year and seal B-CDs after three years. If that information is unavailable, it will prove an obstacle to application of the Guidelines within the precinct or command going forward.

The Matrix also purports to consider as an aggravating factor "[c]onduct demonstrating a pattern of behavior that indicates an inability to adhere to Department rules and standards."[627] It would seem to be inherently difficult to look for patterns of a history of non-compliance with rules and standards if Command Discipline records are expunged shortly after discipline is imposed.

As noted above, once an investigation is concluded, the CO presents the findings and penalty recommendations to the subject officer. The subject officer can then either accept the findings and proposed penalty, accept the findings but appeal the proposed penalty to a Command Discipline Review Panel assembled by the CO, or decline to accept the findings and proposed penalty, in which case the matter is referred to DAO for formal proceedings commenced by the filing of Charges and Specifications.[628]

If the subject officer accepts the findings and proposed penalty, the Command Discipline Election Report is updated with the disposition and filed in Command. The information is stored manually and kept in the local precinct. If there are Schedule B violations, then the Report must also be filed in the subject officer's personnel folder and forwarded to the DAO.[629] It is DAO's responsibility to enter information regarding a Schedule B violation that has been forwarded to it in the member's Central Personnel Index (CPI).

If the subject officer accepts the findings but contests the proposed penalty, then the matter goes before a Command Discipline Review Panel, whose decision is final and not subject to review. The Command Discipline Review Panel can approve, reduce, or increase the proposed

---

[624] AG § 318-12 as of Feb. 16, 2022.

[625] CCRB will have its own records but will not be advised of A-CDs or B-CDs adjudicated internally. *See* discussion, *infra*, regarding disciplinary history. Trial Commissioners, similarly, are only advised of formal disciplinary history. See Below.

[626] NYPD, Disciplinary System Penalty Guidelines.

[627] *Id*. at 10.

[628] Admin. Guide § 318-02.

[629] *Id.*

penalty up to double the CO's proposed penalty.  Absent exigent circumstances, this process must be completed within sixty days of the date of issuance.[630]

If the subject officer rejects the findings and penalty, the CO updates the Supervisor's Complaint Report/Command Discipline Election Report and confers with the DAO, after which the DAO prepares Charges and Specifications.[631]  As part of this process, the CO provides written documents, files, investigative reports, and other additional information supporting the basis for the charges.  At that point, any further disciplinary decisions are left to DAO and the Police Commissioner after a trial or a plea.[632]

In one case,[633] an officer (PO ███████████) and his partner were each offered a penalty of five vacation days after an investigation.  ████████'s partner had wrongfully arrested the complainant for a parking violation.  Both officers used force to effectuate the arrest, which was excessive at the inception since the arrest was unauthorized.  The partner accepted the offered CD and the penalty.  ██████ declined the finding and went to a Departmental trial.  After trial, the penalty imposed by the Police Commissioner was ten vacation days.[634]  The Court of Appeals rejected ██████'s challenge to the doubled penalty, noting ██████ "should have anticipated the possibility of a harsher penalty in opting for an administrative trial.  Given the *quid pro quo* of the bargaining process, . . . it is . . . to be anticipated that sentences handed out after trial may be more severe than those proposed in connection with a plea."[635]

In cases sent to the CO after an investigation by another body (CCRB, IAB, etc.), DAO may direct a penalty.  The CO may not modify the findings or recommended penalty without consulting with DAO.  Once the PC directs a penalty, the decision is final.  If a specific penalty is not directed by DAO or the PC, the CO has discretion to select among available penalties, reduce the penalty to mere guidance, including a verbal warning, or even take no further action.  DAO may leave the question of discipline as "open" for A-CDs and B-CDs.  DAO directs a penalty in a minority of cases.  The more usual practice is to refer a matter to the precinct or local CO's discretion.[636]

If a substantiated command discipline violation is sent directly to the CO by IAB or another investigative unit, the local CO administers the penalty.[637]  The subject officer can, again, either

---

[630] *Id.*

[631] *Id.*

[632] Patrol Guide § 206-05.

[633] ██████████████████

[634] The Police Commissioner also, as an added sanction, forfeited ██████'s police department law school scholarship.  AG § 318-02 warns officers that a Command Discipline Review Panel has an option to double the proffered penalty.  Here, apparently, the Police Commissioner doubled the five-day penalty that the CO had offered ██.

[635] ██ 96 N.Y.2d at 40.

[636] In a study of the two-year period 2014-2016, CCPC looked at 32 disciplinary cases sent from DAO to command. In three of those cases the Police Commissioner directed a penalty.  The remainder were left to the discretion of the CO. CCPC, Eighteenth Annual Report, *supra* note 606 at 62.

[637] Patrol Guide § 206-02.

accept the findings and proposed penalty; accept the findings but appeal the proposed penalty to the Command Discipline Review panel; or reject the findings and proposed penalty and have the matter resolved through charges and specifications. If the officer elects to appeal the penalty, the "Next Higher Command" above the CO assembles the review panel. There are no specific requirements in the Guide about who is to sit in the panel.[638] Notably, the CO is not required to investigate the matter and can neither change the stated findings without the approval of the investigating authority nor change the recommended disciplinary action, if there is one, without the approval of the Deputy Commissioner, Department Advocate.[639]

In reviewing the last five years' SQF cases, only one case was found where an officer refused a command discipline and went to trial instead. The officer[640] had a history of 13 CCRB complaints. CCRB substantiated complaints and recommended Charges and Specifications in four of the cases.[641] For the first two cases, charges were reduced to A-CDs with no other penalty. The third case went to trial on charges of an unlawful Stop, Frisk and Vehicle Search. He was found not guilty. In the fourth case, in 2016, CCRB substantiated allegations of an illegal Stop and Arrest. CCRB recommended a B-CD. DAO asked for reconsideration and that he receive Training instead of command discipline. CCRB declined the requested reconsideration. The officer refused to accept the B-CD and demanded formal proceedings. He went to trial and was found guilty. The Trial Commissioner recommended a penalty of five penalty days. The Police Commissioner declined to reduce the penalty and ordered that he forfeit ten days—the equivalent of the B-CD he was originally offered.

## v.    Internal NYPD Investigations of Stop and Frisk Misconduct

An open question is whether IAB, BIU, OCD, or any entity within the Department above the precinct level, conducts investigations for SQF misconduct that may lead to discipline. If there is a civilian complaint, it goes to CCRB and discipline may follow. But SQF violations that do not trigger a civilian complaint are not sent to CCRB. If the Department becomes aware of repeated stop and frisk violations by an officer, or within a squad or command, are enforcement actions taken?

For comparison, force investigations automatically follow the filing of a TRI. The Department will investigate force incidents on its own initiative. It does not wait for a citizen complaint. The Department has admirably demonstrated a heightened sensitivity to "use of force

---

[638] Admin. Guide § 302.

[639] Admin. Guide § 318-02.

[640] PO ███████ is no longer with the force. Also, more recently (Dec. 16, 2021), PO ███████ declined an A-CD for a substantiated improper search and was served with Charges and Specifications. The case is open and pending. According to the CCRB closing report, PO ██████ received a call from FedEx that packages for delivery to a CBD store potentially contained THC. The officer opened the packages at the precinct. After a field test, the store owner was arrested. Prosecution was declined. CCRB substantiated the search allegation since no warrant had been obtained.

[641] The DCT writeup for the case described ██████ as an "Eighteen-year officer with no disciplinary record." ███

incidents" and the need for careful review of those incidents in recent years.[642]  On the other hand, IAB, BIU, or OCD do not independently monitor or investigate street encounters for stop, frisk, or search misconduct.

A bad stop or frisk may incidentally show up during a force, corruption, or "M" investigation already underway.  When the use of force is investigated, how thoroughly is the propriety of a stop or search in the same encounter investigated?  Departmental investigative units do not commence misconduct proceedings for SQF violations standing alone.  The Borough Commands and the Departmental hierarchy review audits and CCRB recommendations, but there is no centralized effort at the Departmental or Borough levels to investigate stop and frisk misconduct or to administer discipline for stop and frisk violations.  SQF reviews are left to local audits and relegated to precinct discretion.  That is not to say that every stop and frisk should be the subject of a full investigation.  But lifting serious or repeated stop and frisk misconduct out of the realm of precinct and informal discipline would send a valuable message to patrol officers in general.

IAB can be proactive.  IAB conducts Programmatic Review (PR) investigations when it feels a closed investigation may require further inquiry.  Those investigations tend to focus on corruption.  Active review by IAB, if focused on SQF misconduct in a particularly troubled precinct, might be of value and go a long way toward preventing systemic misbehavior within a command.

Outside of audit notices to the precinct, there is no evidence that IAB or any other centralized investigating body within NYPD proactively pursues disciplinary investigations for incidents of stop and frisk misconduct, repeated SQF violations, or patterns of SQF misbehavior.[643]  Invariably, the Department waits for a civilian complaint to CCRB before it considers discipline for illegal SQF activity.  As discussed earlier, discipline for SQF misconduct at the precinct level is very rare and, even then, DAO, IAB and OCD do not gather or maintain records of precinct-initiated disciplinary actions.

One place the Department could start would be an investigation in cases where a stop took place, there was no arrest, but force was used.  The use of force is routinely investigated.  Why not thoroughly investigate the stop itself?  For Level 1 force, the local command looks at the use of force.  Shouldn't the command be told to evaluate and report upon the entire encounter in cases where a constitutional question is at issue along with the force inquiry?  Similarly, when IAB is

---

[642] Examples include reorganization of force investigations, use of FID, creation of TRI reporting, use of force reports to NYS, to name a few.

[643] RISK reviews were terminated in 2023.  For several years prior, RISKS reviews were held semi-annually for each precinct, but RISKS reviews were not used for disciplinary investigations. Administrative Guide § 318-01 lays out a procedure for complaints not involving corruption or force.  If the complaint did not fall under the purview of FADO, it went to the OCD Investigation Review Section (IRS), which passes it on to the local Commanding Officer or BIU responsible for the allegation.  The Guide calls for an interview of the officer and witnesses within five days and the filing of a Disposition Report (PD 468-152) within ninety days.  Since these allegations do not involve force, racial profiling or SQF misconduct, and have been abandoned by the Department, this Report did not attempt an assessment of compliance with the stated goals.  As of 2024, the Department is in the process of testing a new program, Compliance Stat, which may capture levels of SQF misconduct in highlighted precincts.  This program is a non-disciplinary review and will not be analyzed in this Report.

investigating a use of force incident, if there was no arrest, shouldn't IAB assess the propriety of the entire encounter?[644]

As indicated earlier, 3,162 of 13,459 stop reports filed in 2019 recorded the use of force during the stop.[645]  If customary procedure was properly followed,[646] a TRI report and a force investigation within the Department would flow from many of the 3,162 force incidents.  As a starting point, it would be appropriate to consider whether a thorough SQF investigation should be conducted by IAB as well.  It would seem that use of force against a civilian during a *Terry* stop or frisk where the civilian was not arrested, summonsed, or otherwise engaged in criminal activity should receive a careful review and careful documentation.[647]  Given the overlap with CCRB jurisdiction, it could be that some of the stops or frisks were investigated by CCRB.  As a measure of Fourth Amendment compliance, it would be useful to know how many cases where force was employed by the officer were examined for SQF misconduct by CCRB, how many by IAB, and how many went without investigation.

There were 863 SQF complaints to CCRB in 2019.  There were 1,982 excessive use of force complaints to CCRB in 2019.  There is no data on the intersection, i.e., how many SQF complaints to CCRB were accompanied by a use of force investigation by either CCRB or IAB.[648]  Some of the SQF/Force complaints, examined by CCRB, might have overlapped with a concurrent force investigation by IAB, the CO, or FID.  However, there is no effort to correlate SQF complaints at CCRB with force investigations at the Department.  Also, if a stop or frisk occurred, force was used, no arrest was made, and no complaint went to CCRB, what investigation of the propriety of the stop ensued, if any, as part of the force investigation conducted by the Department?

Some FADO allegations are investigated by IAB.  IAB investigates corruption and force incidents and when an abuse, discourtesy, or offensive language violation surfaces along with the corruption or use of force report, IAB will investigate that matter as well, even in the absence of a civilian complaint.  If there is a civilian complaint, IAB will split the case and send the FADO allegations to CCRB while continuing to investigate force, C cases, and M cases.

Questions remain:  What happens to SQF investigations if and when conducted by IAB as an adjunct to another investigation such as force or corruption?  Are they treated seriously and is wrongdoing, if present, substantiated by IAB?  Is discipline applied?  Are FADO and SQF violations reviewed and appropriately disciplined when there is no complaint to CCRB but

---

[644] While reviewing a draft of this Report, the Department responded that, "ICMS and ICMT systems contain Disputed Stop allegations.  If during the course of the investigation there is reason to believe that the stop was improper, or it is alleged by the complainant the stop was improper, the allegation would be added and investigated."  Item 180, City 09.01.23 Feedback to Yates Discipline Report.  The Department has been asked to give statistics or an example of a case where IAB substantiated a force complaint and, at the same time, disciplined an officer for an illegal stop arising out of the same encounter independent of any CCRB complaint or investigation.

[645] 372 drawn or pointed firearm + 2421 physical force + 342 use of force (other).

[646] Patrol Guide § 221-03.

[647] CPL § 140.50 permits a stop only where the subject is suspected of a felony or misdemeanor defined in the penal law.  This does not include lesser petty offenses or summons able Administrative Code violations.

[648] While that number is unknown, it should be noted that of 96 complaints with a substantiated SQF violation in 2019, nine also substantiated a wrongful use of force.

discovered within the Department by IAB?  Without access to the IAB files in those cases, these questions remain unanswered at this time.

### vi.    Concurrent, Split Investigations - Results Might Not Be Combined

If a complaint contains a corruption or profiling allegation along with a FADO allegation, a duplicate "spin off" log is created, and the FADO complaint is sent to CCRB.  When this is done, IAB removes the C or M level allegations (except for profiling) in the notice to CCRB.[649]  In that case, nonetheless, most FADO allegations may be investigated concurrently by CCRB while the C or M case will be investigated by the NYPD.[650]  When there is a "force incident" NYPD will investigate it whether there is a civilian complaint or not.  If a civilian does initiate a force complaint, that may be investigated concurrently, by both CCRB and IAB.

Once the allegations in a complaint are split up, with some staying in NYPD and some going to CCRB, IAB does not track the investigation at CCRB and does not "pair back" the IAB investigation with the CCRB investigation.[651]  If both investigations independently result in a substantiation, then the Department Advocate's Office (DAO) will be advised, but the investigations themselves are not coordinated.

There are some efforts, discussed later,[652] to share information between CCRB investigators and NYPD investigators, but there is a gap between sharing some information and coordinating parallel ongoing investigations.[653]

Putting aside access to information, there is a preliminary question:  Are concurrent investigations reconciled?  It would seem, as a matter of common sense, that even if allegations within a complaint are being investigated in separate, independent venues, and even when there is a reluctance to allow "open-file" sharing of interviews and other information, that CCRB and NYPD should, at least, keep each other current on the status and outcome of investigations as well as coordinating interviews.

However,

"The NYPD does not provide the CCRB with disposition or results of concurrent investigations.  The exception to this rule is for False Official Statements which the CCRB has referred to the NYPD which result from the CCRB's investigation.  In the past, this has been an issue which, in part, led the CCRB to pursue investigations into sexual misconduct allegations.  The NYPD refused, and continues to refuse, to

---

[649] IAB Assessment and Analysis Unit, "Response to agenda topics for upcoming meeting with Federal Monitor" (Nov. 17, 2018).

[650] In the CCPC study cited *supra* note 636, some FADO cases were spun off to CCRB and some stayed with IAB.

[651] Memo response to Monitor inquiry, Erin Pilnyak, Risk Management Bureau, NYPD (Sept. 9, 2020).

[652] See discussion of the Matrix-MOU, *infra*.

[653] See, for example, the MOU between CCRB and NYPD, regarding BWC access, signed November 21, 2019, discussed *infra*. *See also* MOU Concerning the NYPD Discipline Matrix, signed Feb. 4, 2021, discussed *infra*.

provide the CCRB with any information regarding sexual misconduct allegations against MOS referred by the CCRB."[654]

The dichotomy is best explained in a 2021 report by the Citizens Union:

> Pursuant to the New York City Charter, the CCRB has the power to "compel the attendance of witnesses and require the production of such records and other materials as are necessary for the investigate on of matters within its jurisdiction." In practice however, the NYPD withholds significant, relevant information form the CCRB or produces it after substantial delays and often with redactions. The NYPD does not provide the CCRB with the complete disciplinary records of police officers who are the subject of complaints—clearly relevant information with respect to credibility as well as the CCRB's recommendation regarding an appropriate penalty. . . . The NYPD justifies its failure to provide the CCRB with prompt access to documents and other relevant material based on a myriad of claims of privilege and privacy concerns, some based on statutes designed to protect innocent civilians, not police officers accused of misconduct. It is easy to get lost in the competing legal arguments involved. Our conversations with various interested parties, both inside and outside city government, as well as a review of the relevant laws, convince us that for the most part the NYPD's arguments against sharing materials with the CCRB do not appear to be well-supported. The basic point is the City currently runs two parallel systems for disciplining police officers. One is run by the NYPD through its Internal Affairs Bureau and has access to all relevant information the possession of the Department the other is run by the CCRB and has access only to the material that the NYPD decides to turn over. This situation is intolerable.[655]

It is unclear if information flows in the other direction when investigations are split. Do NYPD investigating units track concurrent CCRB investigations? The Monitor team asked if IAB, BIU, or any other NYPD investigating unit (e.g., FID) learns of a FADO disposition made by CCRB in cases where CCRB has referred an OMN case such as a profiling, false statement, failure to complete a stop report or even force matter arising from the same encounter. DAO, the unit charged with reviewing multiple substantiations arising from an encounter, directed the Monitor

---

[654] Matthew Kadushin, General Counsel, June 3, 2019, letter. After the letter was written, and after a court-imposed delay, CCRB has resumed investigation of sexual misconduct complaints by civilians against officers. *Matter of Lynch v. NY City Civilian Complaint Review Bd.*, 206 A.D.3d 558 (2022). In its review of a draft of this Report, the Department noted that, for sexual misconduct cases referred to NYPD by CCRB, in the past, there was a "duty to redact information in order to safeguard the privacy rights of victims from being handed over to an independent non-governmental agency." (Item 180, City 09.01.23 Feedback to Yates Discipline Report). It is true that Civil Rights Law § 50-b exempts disclosure to the public, under FOIL, of a police report which "tends to identify such a victim" unless or until consented to by the victim or ordered by a court for "good cause." Since the quoted matter in the Kadushin letter speaks to cases referred, in the first instance, by CCRB to NYPD, it can be assumed in most such cases the victim at first complained to CCRB and consent of the victim to receive records would have been obtained by CCRB. In any event, going forward, now that CCRB investigates the matter in any case where the victim complains of sexual misconduct by an officer to CCRB, it would seem paradoxical for the Department to resist access to police reports surrounding the encounter in the name of protecting the identity of the victim.

[655] Citizens Union Agenda for Police Reform, "CCRB Access to NYPD Materials" at 12 (Mar. 2021).

team to ask the question of "IAB/Investigations."[656]  Accordingly, the question was put to IAB if it was true that "the Department does not track the case for outcome unless it comes back to DAO as substantiated by CCRB?"[657]  IAB's response was,

> Cases referred by CCRB to DAO for charges are not paired back up with the original Log #.  This is because the Log # is an IAB tracking number and the interaction between CCRB and DAO has nothing to do with IAB.  DAO only contacts IAB because of a different rule that a log # must accompany Charges & Specifications.  CCRB is not mandated to report their investigations to IAB, and thus there may not have been any logs prior to the request for a log # for charges . . . .  Once something is "spun off" to CCRB, it is up to that agency to determine what they do with it.  IAB does not track this.[658]

The unfortunate reality is that multiple entities can, and often do, investigate the same encounter without sharing information or outcomes.  Turf wars and secrecy are not uncommon in bureaucracies, so this is not surprising.  What is of concern is the fact that officers, witnesses, and victims may be interviewed, and records gathered, without commonality or coordination of the interviews and of the evidence before a judgment is made by the investigating entities.  In the end, substantiated cases do come to DAO or the Police Commissioner, but that does not dispel the likelihood of inconsistencies, confusion, misunderstanding, or conflict in the process.

As just an example of the imbalance of information, take the case of Lt. ████████.  If one were to look at his posted disciplinary history in the "Officer Profile" website.[659] it would appear that Lt. ██████ has no disciplinary history.[660]  If one looks at the CCRB history posted online,[661] it would appear that he has had 16 complaints investigated by CCRB with only two substantiations for which he received "Instructions" and "Training," respectively.  Not available online, but known to CCRB, are another 12 current complaints that are "pending."  CCRB does not post "open" cases on its website.

What is not shared with the CCRB is that Lt. ██████ has been the subject of another 31 internal investigations, including three "C" cases, 11 M cases (3 profiling), 12 OG cases, and 5 FI cases.  In 2020-2021 alone, he has been the subject of nine internal investigations with allegations of ranging from improper force to profiling to illegal searches.  Some of those undoubtedly overlap

---

[656] DAO Response letter on file with Monitor Team (July 10, 2019).

[657] *Id.*

[658] Memo response to Monitor inquiry, Erin Plinyak, Risk Management Bureau, NYPD (Sept. 9, 2020).

[659] NYPD Online, Officer Profile, https://nypdonline.org/link/2.

[660] Indeed, Lt. ██████' profile reflects a number of recognition and awards for meritorious and excellent police duty while failing to disclose the complete list of complaints against him.  A more recent review of his online profile, accessed on April 9, 2023, shows an update with eleven cases entered.  Nonetheless, a comparison of CCRB's posting with the NYPD posting shows the latter to be confusing and, to a large extent, misleading.  The CCRB posting lists 32 complaints, to CCRB (which do not include IAB investigations within the Department). Fourteen of the 32 complaints were substantiated by CCRB.  There were 35 allegations of SQFS misconduct investigated by CCRB, eight of which were substantiated.  The NYPD profile lists two B-CD "recommendations" without reference to the 12 substantiated allegations that were dismissed by the Police Commissioner.

[661] CCRB, NYPD Member of Service Histories, https://www1 nyc.gov/site/ccrb/policy/MOS-records.page.

with CCRB's investigations, but there is no guarantee, without a civilian complainant, that CCRB is even aware of the allegations or investigation which are kept within the Department. At the time of this writing, he has a pending CCRB complaint claiming improper force, improper pointing of a gun, property damage and discourtesy. To the extent that the full record of his prior investigations remains unknown to CCRB investigators, CCRB panels, and Trial Commissioners, any meaningful consideration of discipline is substantially impaired if not futile

In the past (and continuing until the Charter change allowed CCRB to investigate profiling), discourtesy and offensive language complaints have been split off from racial profiling or bias-based policing complaints against the same officer. CCRB kept the discourtesy and slur allegations while sending the bias complaint to IAB, and vice-versa.[662] To the extent that discourtesy or offensive language findings were substantiated by CCRB, while profiling allegations in the same encounter were not substantiated by NYPD, the outcome is understandably difficult for complainants to accept.[663]

In the coming year, the Charter change, authorizing CCRB investigations into profiling allegations will help to combine some cases before one body.[664] Offensive language and discourtesy complaints can be indicators of profiling, biased policing, or selective enforcement. As discussed later, inquiry into bias-based policing will best be served when allegations of slurs, discourtesy, excessive force, and SQF misconduct are combined and investigated with external scrutiny, i.e., by CCRB.

Over the five-year period, 2014-2018, 52.5% of all CCRB complaints were brought by Black individuals, who comprise 25.5% of the city population. White individuals brought 14.4% of complaints while comprising 33.3 % of the population. Hispanic individuals brought 25.4% of the complaints, while comprising 28.6 % of the city population. There may be numerous explanations for these numbers, but putting aside any argument over whether the statistics prove or do not prove unlawful disparity in enforcement or misconduct, separating allegations within one complaint, ending with substantiation by one investigative body and non-substantiation by

---

[662] Seventh Annual Report of the OIG-NYPD at 14-15 (Apr. 2021), available at https://www1 nyc.gov/assets/doi/ reports/pdf/2020/OIGNYPDAnnualRpt_4012021.pdf. The OIG-NYPD has argued that a racial slur is an act of bias and, therefore, separating slur investigations from bias investigations is unjustified; an officer who utters a racial slur during an official encounter has committed an act of bias. On the other hand, NYPD takes the position that NYC Admin. Code § 14-151 requires a bias-based "enforcement action." To NYPD, uttering a racial slur is an act, not an action. Ac § 14-151 condemns "an **act** of a member of the force . . . that relies on . . . race [etc.] . . . as the determinative factor in initiating law **enforcement action**. . ." NYPD's interpretation separates the biased "act" of the member (the slur) from the "enforcement action" (the stop, frisk or arrest) of the officer and, according to the Department, the law requires proof, not that a biased act occurred, but that the enforcement action itself was bias-based. Under either interpretation, a slur would seem to be material evidence in a selective enforcement investigation—which hopefully will be taken into consideration when CCRB assumes oversight of profiling claims.

[663] In 2016 to 2018, CCRB referred 44 cases with profiling allegations where there was a contemporaneous SQF investigation by CCRB. None of the profiling allegations were substantiated.

[664] Local Law 47 of 2021 took effect on January 20, 2022. From 2016-2020, 1,348 of 5,077 profiling complaints handled by IAB came from CCRB referrals. With the change, since CCRB needs a civilian complaint, it is unclear how many profiling investigations will be sent from NYPD to CCRB and whether some will be kept at IAB. CCRB is only authorized to investigate upon a civilian complaint. As of July 8, 2021, of 5,174 logged profiling complaints 323 were listed as coming from Members of the Service. The matrix is unclear, so it could be they were civilian complaints passed along rather than originating from fellow officers.

another opens the Department to community skepticism. Inconsistent findings will always be viewed with suspicion. This may continue to be true in any case where there are parallel investigations, be it force, false statements, or even bias to the extent that IAB may continue to investigate those allegations in tandem with CCRB.[665]

Theoretically, if a case is substantiated by either IAB or CCRB, the matter will end up with DAO. Multiple substantiations from different sources could be considered as one before a recommendation is made to the Police Commissioner or a final determination is made. DAO admits that it has asked for reconsideration of some CCRB cases before they have received a closing report from an NYPD unit that may be investigating the same incident.[666] After asking, or not asking, for reconsideration DAO will try, "if practicable," to send both sets of substantiated findings to the Police Commissioner at the same time, "however it does not happen in all cases."[667]

Unanswered is what happens if the results of an IAB or FID investigation and a CCRB investigation do not match or are in direct conflict. A substantiation by CCRB without substantiation by IAB of related allegations regarding the same encounter would be of concern. Of equal concern is the possibility that CCRB does not substantiate allegations in a complaint while IAB does. In the latter example, neither DAO nor the Police Commissioner would have reviewed CCRB's investigation. In cases where the results seem inconsistent, a better practice would be to present the Commissioner with all the investigative materials to contextualize the entire incident.

**False Statement Referrals and Investigations**

The lack of coordination between CCRB and NYPD is troubling in SQF investigations. In many SQF investigations, the outcome may well depend upon the officer's statement and credibility. Where CCRB has reason to believe the officer lied, but IAB disagrees, without sharing information and coming to a mutual resolution about the alleged falsity, a reasoned outcome to the SQF allegation is awkward if not difficult. How does the Police Commissioner balance a claim by CCRB that the officer may have lied about an illegal stop or frisk with a finding by IAB that the officer did not lie? CCRB's doubts about the credibility of the officer will be reflected in its assessment of the FADO complaint. Where CCRB substantiates SQF misconduct and takes the serious step of referring an allegation of a false statement to IAB, it is worth cataloguing not only

---

[665] Given the penalty (presumptive termination) associated with false official statements (intentionally lying under oath about a material matter to CCRB, Patrol Guide § 203-08), CCRB has been sparing in its referrals to IAB about false testimony referrals. From 2016 to 2018, only 47 such referrals were made. Matrix response by CCRB to Monitor Team, June 3, 2019. From 2013 to 2017, CCRB sent a total of 139 false statement cases to IAB. CCRB was able to track 81 of those cases, sent between 2010 and 2018 and found that only two of 81 false statement referrals from CCRB were substantiated by IAB. 2019 Charter Commission, Preliminary Staff Report at 22 (Apr. 2019), https://static1.squarespace.com/static/5bfc4cecfcf7fde7d3719c06/t/5cc20da7085229f4fcd80ffc/1556221355492/Preliminary+Staff+Report.pdf. With the recently acquired power to investigate false statements, in 2022, 97 allegations of false (52), misleading (44) or inaccurate (1) statements were substantiated. Not one officer prosecuted by APU was terminated. CCRB Executive Director's Monthly Report, January 2023 at 21, https://www.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2023/01112023_monthlystats.pdf.

[666] The reconsideration process, described in 38-A RCNY 1-36, has fallen into disuse in recent times.

[667] DAO response to Monitor inquiry (July 10, 2019).

what happened to the false statement referral, but also what happened to the SQF finding in that same complaint.

Going forward, with CCRB's examination of untruthful statements made to a CCRB investigator as authorized by the 2019 referendum, this may well continue to be a problem if IAB and CCRB conduct parallel investigations which are not reconciled.

There were just 15 complaints in years 2017 to 2020 where CCRB substantiated an SQF allegation while making a false statement referral to IAB.[668] There were 20 officers alleged to have made a false statement in those 15 investigations. Since a finding of a false statement during a CCRB investigation carries a presumptive penalty of termination, referral to IAB is a serious matter, undertaken sparingly by CCRB. A referral means more than that CCRB did not credit the officer's testimony. A referral means CCRB has reason to believe the officer intentionally lied about the stop encounter or sought to mislead while under oath.

How many times did CCRB substantiate an SQF allegation while, simultaneously, IAB found that the officer lied about the encounter in the CCRB interview? For 2017 to 2020, only one CCRB-substantiated SQF complaint coincided with an IAB substantiation of the false statement referral.[669] There were 19 cases where CCRB substantiated SQF misconduct, referred a false statement investigation to IAB, but IAB failed to substantiate the false statement referral.

Of the 19 false statement referrals where falsity was not substantiated by IAB, CCRB recommended Charges for five officers, command discipline for 12 officers, and training for two officers for the substantiated SQF misconduct.[670] In the end, the Police Commissioner imposed penalties (forfeited days or hours) upon five of the 19 officers.[671]

Reconciling false statement findings with credibility assessments in SQF cases is critical. If a complainant describes an improper stop or frisk and the officer denies the factual allegations,

---

[668] RMB 910-2020 dated August 24, 2020, Matrix on file with the Monitor. As with profiling investigations, a recent Charter change has now authorized CCRB to keep and investigate false statements made in the course of a CCRB investigation. Simultaneously with the Charter change, the Police Commissioner amended the Patrol Guide definitions of false statements in a manner inconsistent with the many recommendations of the CCPC, which had called for more rigorous pursuit of false statements. Patrol Guide § 203-08 (amended Apr. 1, 2020).

[669] CCRB substantiated allegations of an illegal frisk and search of person against PO ███████████. A false statement allegation and a strip search allegation were referred to IAB. IAB concluded that the strip search was improper, and that ████ made false and/or inaccurate and misleading statements twice—once to CCRB and once in a Departmental interview. ████ received five penalty days for the CCRB allegations and a 30-day penalty with dismissal probation for the IAB findings (it is unclear if two sanctions ran concurrently). Along with ████, in the same complaint, it was determined that Sergeant ████████████ "made misleading/inaccurate statements during a CCRB interview," "wrongfully authorized the strip search of a prisoner," and failed to document the matter in several respects as required. He was given 30 penalty days and dismissal probation. Shortly thereafter, in June 2021, ████ was promoted to Lieutenant.

[670] In 2020, CCRB was given authority to substantiate false statements made in the course of a CCRB investigation. Since then, CCRB has charged three officers (Sgt. ██████████████, PO ███████████, and PO ███████████) with making an untruthful statement at the same time as substantiating an SQF violation. All three cases are pending and open as of February 2023.

[671] No officer received penalty days for an SQF violation alone. Each officer who received discipline had other abuse or force allegations associated with the encounter.

then much will depend on the credibility of the officer's denial. Now that CCRB has authority to investigate false statements made in the course of a CCRB interview, there will be some, but not complete, coordination of the findings. A false statement made to CCRB may be consistent with, or inconsistent with, statements made at a Departmental interview, in filed reports, and in statements made to a District Attorney, a Grand Jury, or in court. It is likely that DAO or IAB will be asked to re-assess a finding by CCRB that a false statement was made. Presumably, IAB will separately interview the officer, look at all the documents and affidavits that were filed, and look at grand jury and courtroom testimony, among other things to match up the officer's statements to CCRB with other sources. Unless those materials are equally available to CCRB, inconsistent conclusions about the SQF allegations are likely to persist. This ties directly into the Court's concern about deference to credibility determinations made by CCRB in stop and frisk cases.

IAB investigatory files in false statement cases are not shared with CCRB. CCRB and DAO cannot come to agreement about the weight of the evidence and the credibility of an officer when a false statement or bias referral is independently investigated by IAB without a shared file or results. If the officer lies to, or misleads, CCRB, neither DAO nor CCRB is in a position to dismiss or unsubstantiate a complaint based on his or her word. The investigation and determination of the falsity allegation is inextricably intertwined with acceptance or rejection of explanations offered in defense of the stop and frisk allegations.

Of the 20 substantiated SQF cases accompanied by a CCRB-false statement referral (discussed above), DAO requested reconsideration by CCRB in eight cases while the false statement investigation by IAB was still open. In five of the eight cases, DAO asked CCRB to reconsider and unsubstantiate the case. In each of the eight cases, CCRB refused the reconsideration request. Nonetheless, DAO and CCRB are working at irreconcilably conflicting purposes when CCRB concludes that misconduct occurred and the officer lied while, at the same time, DAO ask CCRB to unsubstantiate its finding that misconduct occurred. After CCRB declined to unsubstantiate upon reconsideration, the Police Commissioner dismissed the SQF case with an NDA in four of the cases and ordered Training in the fifth case. All eight reconsideration cases ended with a lesser penalty than requested by CCRB. In the end, the Police Commissioner discounted CCRB's fact finding.

As the Court pointed out in *Floyd*, CCRB credibility assessments are an integral part of any SQF determination. Because very few allegations of false denials, lies, or misleading statements made to CCRB are substantiated by IAB,[672] the likelihood that CCRB may find a stop or frisk to have been improper over an officer's testimony to the contrary, and that the finding may then be in conflict with an IAB evaluation of the officer's credibility, is of concern. Rather than lending increased deference to CCRB determinations, as ordered by the Court, contrary findings made by NYPD without coordination with CCRB unfairly devalues CCRB's assessment. If CCRB finds that the officer lied but IAB does not agree with that conclusion, the inconsistency should not, by itself, be used to call into question CCRB's finding for the SQF allegations.

With the Charter change, CCRB's expanded authority to investigate a false statement made to their investigators during the course of an investigation will alleviate, but not resolve the conflict. Questions outside the SQF investigation concerning false or missing paperwork, efforts

---

[672] CCPC, Nineteenth Annual Report, *supra* note 636, at 23.

to mislead or impede an NYPD investigation, bias, selective enforcement, or false statements to district attorneys or a court, will all elude examination by CCRB for want of jurisdiction as the stop or frisk complaint is evaluated. Any complete investigation of an alleged false statement made to CCRB will necessarily require a look at statements made in police reports, filings with district attorneys, grand jury and court testimony (if such occurred), and interviews with IAB. Confining the inquiry to testimony at CCRB without more cannot lead to an adequate determination.[673]

## H.    Adjudication and Processing of Substantiated Complaints within NYPD

### i.    Department Advocate's Office

The Department Advocate's Office (DAO) is an internal NYPD office staffed by 22 attorney advocates and one managing attorney, along with a number of uniformed and civilian personnel.[674] Five of the attorneys are assigned to review CCRB recommendations.[675] It is responsible for evaluating substantiated allegations of serious misconduct, prosecuting them as necessary, and recommending disciplinary measures to the Police Commissioner.[676] DAO receives for review all cases investigated and substantiated by CCRB and receives a copy of the case report for all cases that are investigated by other units within the Department if the recommended penalty is Command Discipline B or Charges and Specifications.

The Independent Panel wrote that the DAO was "significantly understaffed." As of the Panel's report (December 2018), DAO had 1,162 open cases with only ten attorneys. The problem, according to the Panel was "exacerbated in recent years by the failure to fill vacancies and make new hires."[677] They called for an addition of "at least 10 new attorneys." In response to a Monitor inquiry, the Monitor was advised that, at that time, there were 138 open DAO CCRB cases which were assigned to five attorneys. Assuming both responses are accurate, it appears that DAO, at that time, was handling 1,024 non-CCRB (FID, IAB, OCD, DCT, and Command cases). In other words, only about 12% of the disciplinary cases reviewed by DAO and, presumably, the Police Commissioner, come from substantiated civilian complaints made to CCRB.

NYPD responded to the Independent Panel by acknowledging that a staffing shortage caused unwarranted delay. As of 2021, seven additional attorneys were hired, and a promise was

---

[673] Subsequent to this Report, under its new-found authority, CCRB substantiated 52 of 62 investigated allegations of "False Official Statement" and substantiated 44 of 45 investigated allegations of "Misleading Official Statement." Executive Director's Monthly Report, January 2023 at 21, https://www nyc.gov/assets/ccrb/downloads/pdf/policy_p df/monthly_stats/2023/01112023_monthlystats.pdf.

[674] As of August 2018, the DAO is staffed by 65 people, including 37 civilians and 28 officers. *See* DAO Organizational Chart.

[675] Letter, Deputy Commissioner Jeffrey Schlanger to Monitor Team (Dec. 3, 2018).

[676] Discipline in the NYPD, at 3, https://www.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/discipline/ discipline-in-the-nypd-2019a.pdf; CCRB, Semi-Annual Report (Jan. – June 2018) at 37, https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/20181221_Semi-Annual%20Report.pdf.

[677] Hon. Mary Jo White, The Report of the Independent Panel on the Disciplinary System of the New York City Police Department at 4 (Jan. 2019). at 37.

made to add six more to that count.[678]  When IAB investigates a case, DAO is contacted and a conferral with a DAO attorney is scheduled to review the case file.  The DAO attorney will have more background information about the subject officer than the investigator.

DAO maintains its own DADS database which records all disciplinary actions, whether substantiated or not.  DADS also retains a history of command disciplines after they have been expunged or sealed in other databases.  DAO also looks at the evaluation history of the officer.[679]

There is one instance when DAO will seal records within its own DADS database.  If an officer has been found "not guilty" of all allegations in a complaint and the verdict was dismissed because a violation did not occur or there was a case of mistaken identification—in essence a Trial Commissioner's equivalent of an "unfounded" finding.  In such a case, an application may be made to the Police Commissioner, whose decision to seal the record is discretionary.[680]  If the Police Commissioner orders the records to be sealed, it may not be referred to in future.

When recommending action or disposition to the Police Commissioner, the "DAO may obtain if available any command level investigations or investigations done by IAB or Investigative Units related to the same incident" and "an officer's CPI, CORD report (Commanding Officer's Recommended Discipline) and officer's evaluation history."[681]  The CORD report,[682] signed by the officer's local Commanding Officer, contains a recommendation regarding potential discipline, based on a review by the CO of annual evaluations, CCRB history, PEPR (Performance Evaluations), the precinct's CD log and Minor Violation Log.[683]  It also contains a narrative description of the of the CO's "overall impression of . . . demeanor, work performance, professionalism and career potential."  It contains a rating, between 1 to 10 of the officer's "overall performance."

If SQF misconduct is identified by a supervisor, through audit or otherwise, and a command discipline, guidance, or CRAFT is issued, DAO may obtain that information upon request, but the information would not be shared with CCRB, even in the case of repeated SQF violations.[684] If SQF misconduct is substantiated by CCRB and an A-CD is recommended and

---

[678] "De Blasio Pledges to Speed Up Discipline Against Accused Cops After Years of Logjams," The City (Aug. 25, 2021), https://www.thecity.nyc/2021/8/24/22640485/de-blasio-pledges-to-speed-up-discipline-against-accused-cops-after-years-of-logjams?mc_cid=9b304ec81c&mc_eid=dde979a67a.

[679] There is one instance when DAO will seal records within its own DADS database.  If an officer has been found "not guilty" of all allegations in a complaint and the verdict was dismissed because a violation did not occur or there was a case of mistaken identification—in essence a Trial Commissioner's equivalent of an "unfounded" finding.  In such a case, an application may be made to the Police Commissioner, whose decision to seal the record is discretionary. Patrol Guide § 206-15.  If the Police Commissioner orders the records to be sealed, it may not be referred to in future personnel decisions, but may be "utilized for informational purposes as necessary."  *Id.*

[680] Patrol Guide § 206-15.

[681] Letter, Jeffrey Schlanger, Deputy Commissioner, Risk Management Bureau to the Monitor, December 3, 2018.

[682] PD 468-153.

[683] Replaced by CRAFT Report.

[684] NYPD's position is that CRAFT is not part of the disciplinary process and, for instance, would not be considered in imposing "progressive discipline" under the new disciplinary guidelines.  CRAFT is folded into positive or negative performance evaluations.

accepted, but the CO imposes guidance, the information is not noted on the CPI or the SOEH provided to CCRB in the event of a new complaint.

In sum, DAO is in a position to make decisions armed with a wealth of information not available to CCRB, APU, IAB, OCD, or Trial Commissioners. DAO has information it does not share in several important interchanges: (a) When DAO asks CCRB to reconsider a matter; (b) when DAO exchanges correspondence on whether APU can go forward on a case or it will be "retained"; (c) when DAO explains a downward departure in a recommended penalty; or (d) when DAO rejects an IAB finding or recommendation.

The information known only to DAO may be mitigating and justify a decision to reduce a recommended penalty. The information may be pejorative and justify elevating a recommended penalty. A case-by-case analysis would be needed to weigh whether the withheld information should have been shared. But one thing is certain: The dialogue is one-sided.

Better access to a complete personnel record of a subject officer would seem to be essential to APU's pursuit of Charges and Specifications. CCRB commented on this imbalance more than six years ago in one of its public reports:

> Presently the APU does not have access to the NYPD's Disciplinary Administrative Database System (DADS) and as a result we must rely on DAO for many administrative tasks related to prosecuting a case. Allowing the APU limited DADS access would enable us to process and resolve cases more expeditiously, in the same way that the NYPD's operations are enhanced by having limited access to the CCRB's Complaint Tracking System (CTS). This benefits both the respondent who is eager to resolve his case and the complainant who seeks closure regarding the incident. The expeditious resolution of cases will increase public confidence in the disciplinary system by demonstrating that civilian complaints are taken seriously by the Police Department. Finally, Allowing the APU limited access to DADS shifts part of the administrative burden of processing APU cases from DAO to the CCRB. . . .

> At present time the APU does not have access to respondents' Central Personnel Index (CPI). Instead, DAO prepares a Word document for the APU titled "Summary of Employment History" (SEH) which includes some but not all of the respondent's relevant disciplinary history. For example, the SEH contains only the respondent's most recent evaluation even though DCT considers the respondent's last three evaluations when making a penalty recommendation.

> The lack of complete information regarding respondents' disciplinary history impedes the penalty recommendation and plea negotiation process. The APU is working without a complete picture of the respondents' background, making it difficult to recommend an appropriate penalty or negotiate a fair plea agreement.

We, therefore, request that the APU be provided with the same version of the CPI provided to DAO attorneys.[685]

If DAO concludes that Command Discipline is warranted, it can send a letter to IAB describing the misconduct and directing a penalty. IAB is responsible to ensure the CO complies.[686] At this stage, DAO may direct discretionary or "open" discipline, which gives the commanding officer discretion to deviate from DAO's recommendation. If, however, DAO recommends non-discretionary discipline, the commanding officers may deviate from DAO's recommendation only after consulting with DAO.[687]

In cases involving more serious misconduct, DAO will prepare administrative charges known as Charges and Specifications, the adjudication of which is handled in the first instance by the Department of Trials. Charges and Specifications must include "a brief statement of disciplinary matters to be adjudicated," which must set forth the alleged misconduct, and the date, time, and place of occurrence.[688]

If IAB substantiates a serious misconduct allegation, it will present its case to DAO and request that Charges and Specifications be drawn. If DAO decides not to proceed because there is insufficient evidence, the disposition is changed from substantiated to unsubstantiated. In its analysis of IAB-DAO procedures, CCPC has urged that the matter should be recorded as "unsubstantiated-DAO declined discipline" in those circumstances. "This would alert future investigators who review the officer's background that although the disposition was ultimately unsubstantiated due to DAO's belief that it lacked sufficient evidence to bring charges, IAB determined based on its investigation that the subject officer committed the misconduct."[689]

The recently adopted Disciplinary System Penalty Guidelines empowers DAO to "direct that a disciplinary matter be adjudicated through CD [Command Discipline] in lieu of Charges and Specifications when appropriate."[690] This authority will be of significance in SQF cases since, as demonstrated later when Guidelines recommendations for SQF misconduct is discussed, multiple stop and frisk findings can lead to a CCRB recommendation for Charges. A number of such recommendations are still in the pipeline and are subject to DAO approval.

If the DAO approves Charges and Specifications, the commanding officer reviews the specifications for accuracy and serves them upon the subject officer. A copy is also sent to the subject officer's attorney within two weeks.[691] Depending on the method of service used, the

---

[685] CCRB, Status Report for the CCRB's Administrative Prosecution Unit: First Quarter of 2014 at 4-5 (Apr. 29, 2014), https://www1 nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/apu-2014q1.pdf. The new Matrix-MOU, discussed *infra*, promises more information sharing.

[686] The Police Commissioner must approve imposition of a B-CD or higher.

[687] Patrol Guide § 206-02.

[688] 38 RCNY § 15-03.

[689] CCPC, Nineteenth Annual Report, *supra* note 636, at 27.

[690] Disciplinary System Penalty Guidelines at 52, https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/nypd-disciplinary-penalty-guidelines-effective-2-15-2022-final.pdf.

[691] Patrol Guide §§ 206-05, 206-06. As of Feb. 16, 2022, AG §§ 318-04, 318-05.

subject officer has between eight and thirteen days to respond to the allegations.[692]  The respondent officer must sign and return the original Charges and Specifications.  Unless the Charges and Specifications are resolved through a settlement with the subject officer, the commanding officer and the DAO then schedule a Departmental trial.[693]  If the officer accepts a settlement through a guilty plea, the proposed settlement is sent to the First Deputy Commissioner and then the Commissioner for final approval.[694]

### ii.    Departmental Investigations - Charges and Specifications Presented by DAO

On average, NYPD investigative units handle ten times the number of investigations completed by CCRB.  Those investigations may occasionally lead to Charges and Specifications filed, not by the CCRB, but by DAO itself.

DAO may take over the prosecution of a case initiated by the CCRB's Administrative Prosecution Unit (APU), but that is rare.  Rather, most cases prosecuted by DAO were brought by IAB, FID, Borough Investigation Units and OCD.  Some of those cases may have been initiated by a citizen complaint and kept within the Department.  For example, a force complaint or a corruption complaint may have first been drawn to the attention of IAB by a citizen complaint.  Those complaints may be investigated by local command, IAB or FID.  Theoretically, profiling complaints, if one were to be substantiated by BIU or IAB, could be prosecuted by DAO as well.[695]

Charges and Specifications specify the "activity or conduct at issue, along with date, time and place of occurrence."[696]  They include a statement of the behavior or incident which is the subject of the action.  "Additionally, the Charges and Specifications shall identify the contract provision, law, policy, regulation or rule that was allegedly violated."[697]  If the allegations are the product of an internal investigation, DAO draws up the charges.  If the allegations are the product of a CCRB recommendation, APU drafts the charges and submits them to DAO for review.  Unless the Police Commissioner directs otherwise or CCRB requests DAO substitution, APU will then be responsible for the prosecution before a Trial Commissioner.[698]

Once the DAO approves the Charges and Specifications, the commanding officer reviews them for accuracy and serves them upon the subject officer.  A copy is also sent to the subject officer's attorney within two weeks.[699]  Depending on the method of service used, the subject

---

[692] 38 RCNY § 15-03.

[693] Patrol Guide §§ 206-05, 206-06.

[694] Independent Panel, *supra* note 365, at 11.

[695] From 2014 through March 2021, 5,077 profiling complaints have been referred to NYPD.  Not one has been substantiated against a uniformed officer.  Commencing January 2022, profiling cases are investigated by CCRB if based on a citizen complaint.  This does not eliminate the theoretical prosecution of a profiling complaint by DAO.

[696] 38 RCNY 15-01.

[697] *Id*.

[698]  38-A RCNY 1-42.

[699] Patrol Guide §§ 206-05, 206-06.

officer has between eight and thirteen days to respond to the allegations.[700]  The respondent officer must sign and return the original Charges and Specifications.   Unless the Charges and Specifications are resolved through a settlement with the subject officer, the commanding officer and the DAO then schedule a Department trial.[701]  If the officer accepts a settlement through a guilty plea, the proposed settlement is sent to the First Deputy Commissioner and then the Commissioner for final approval.[702]

### iii.    Disciplinary Trials

If an officer elects to proceed to trial, a disciplinary trial takes place in an NYPD trial room at One Police Plaza and is presided over by the Deputy Commissioner of Trials ("DCT") or one of three Assistant Deputy Commissioners.[703]  This is true irrespective of whether DAO or APU is prosecuting the case.  Basic rules governing the proceedings can be found at 38 RCNY § 15-01 et seq.  The same rules apply to uniform and non-uniform members of the service.  Trials are open to the public and, as of March 2019, trial calendars are posted publicly on the NYPD's website one month before the trials are scheduled to take place.[704]  The trial calendar lists the date, time, and location of the trial, as well as the name and rank of the respondent officer.  Unfortunately, the Charges and Specifications of which the officer is accused are omitted.[705]  Unless an attendee is personally familiar with the Member or history of the matter, keeping track of the proceedings is not easy for a casual observer.

Proceedings before the DCT are similar to, though less formal than, ordinary civil bench trials.   The parties may take discovery beforehand, including a request that the DCT issue subpoenas, and they may call witnesses and present evidence.[706]  The trial is not governed by rules of civil procedure or evidence.  The DCT is free to apply principles of civil practice or rules of evidence but is not required to do so.  Hearsay is admissible, and it may form the sole basis for findings of fact.[707]  However, Trial Commissioners take the view that "hearsay declarations are insufficient to support findings of guilt in cases that pose close questions of credibility.[708]  The

---

[700] 38 RCNY § 15-03.

[701] Patrol Guide §§ 206-05, 206-06.

[702] Independent Panel, *supra* note 365, at 11.

[703] NYPD, Trials, https://www1.nyc.gov/site/nypd/bureaus/administrative/trials.page.

[704] *Id.*  The trial calendar lists the date, time, and location of the trial, as well as the name and rank of the respondent officer; the Charges and Specifications of which the officer is accused are omitted.  On the other hand, CCRB also posts the trial calendar.  Its version is even less useful since it lists the trial date, the precinct and the top allegation, but doesn't list the officer's name.  https://www1 nyc.gov/site/ccrb/prosecution/apu-trials.page.

[705] Update:  More recently, the Department has begun to post a Disciplinary Trial Calendar which categorizes the allegations by "Case Type," such as "physical alteration" of "violated EEO policy," etc., without listing the allegations or Charges.  https://www.nyc.gov/site/nypd/bureaus/administrative/trials.page.

[706] Rules of the City of New York Civilian Complaint Review Board (38-A RCNY) §§ 15-03–15-04.

[707] *Id.*

[708] Trial Memorandum, Sergeant ███████████████████████████████████████████████ .
Other agencies permit hearsay to form the sole basis for a finding of fact.  *See* N.Y.C. Charter § 1046(c)(1); 38 RCNY § 15-04 (e); Gray v. Adduci, 73 N.Y.2d 741, 742 (1988); Dep't of Correction v. Jackson, OATH Index No. 134/04 at

APU will continue with a trial if there is sufficient alternate evidence even where the complainant is absent. DAO has a different policy and will only proceed if the complainant or necessary witnesses are available. Until recently, DAO would move to dismiss a case if the complainant does not cooperate.[709]

The hearing is transcribed. After the hearing is concluded, the DCT will review the testimony and evidence presented and prepare a Draft Report and Recommendation.[710] The Draft Report and Recommendation provides a summary and analysis of the evidence, and recommends findings of fact and conclusions of law, as well as an ultimate disposition.[711] The parties are then provided with an opportunity to review and comment on the Draft Report and Recommendation by submitting written comments to the DCT, which is commonly referred to as a "Fogel" letter.[712]

Upon receiving the parties' comments, the DCT prepares a final Report and Recommendation and forwards it to the Police Commissioner along with a transcript of the proceedings, all exhibits received in evidence, and any comments submitted by the parties in response to the Draft Report and Recommendation.[713] Unlike findings made by a CCRB panel, the DCT renders a verdict of Guilty or Not Guilty for each allegation. The DCT can submit a penalty recommendation permitted by the Administrative Code and the Civil Service Law. In the alternative, the parties may submit an agreed upon penalty recommendation to DCT outside the scope of the statutes.[714]

Notwithstanding that the trial is open to the public, the transcript, record,[715] preliminary findings, and the *Fogel* response are still considered confidential personnel records by NYPD and are not available to the complainant or the public, even in redacted or anonymized form.[716] Given that the testimony and arguments were made in a public forum and given the repeal of CSL § 50-a, keeping the transcript from public view seems anomalous. Under the Public Officers Law, the transcript should be available by a FOIL request, if not made public automatically. Because the proceedings are open to the public, a claim that a transcript (or recording) of the event is an unwarranted invasion of privacy is questionable, unless some portion of the proceedings had been

---

4-5 (May 5, 2004); Police Dep't v. Ayala, OATH Index No. 401/88 (Aug. 11, 1989), aff'd sub nom., 170 A.D.2d 235 (1st Dep't 1991).

[709] The Department has asserted that "DAO rarely moves to dismiss a case in recent year [sic] with a non-cooperative complainant," Item 185 City 09.01.23 Feedback to Yates Discipline Report, but has not cited any case where this occurred. A quick survey of published trial decisions did uncover a recent case, PO ███████████, where an illegal search of a car was sanctioned, notwithstanding the non-appearance of the victim. https://nypdonline.org/link/1016.

[710] 38 RCNY § 15-06.

[711] 38 RCNY § 15-06.

[712] Rules of the City of New York Civilian Complaint Review Board (38-A RCNY) § 1-46.

[713] *Fogel v. Bd. of Educ.*, 48 A.D.2d 925 (2d Dep't 1975) (Petitioner should have been afforded an opportunity to read and respond to findings and recommendation prior to adjudication); *see also* 38 RCNY § 15-06; 38-A RCNY § 1-46 (a).

[714] 38 RCNY §15-07.

[715] *Buzzfeed, Inc v. Deputy Comm'r of Trials*, No. 155278/2018, 2019 NY Misc. Lexis 3338 (NY Cty. Sup. Ct.).

[716] *New York Civil Liberties Union v. NYC Police Dep't*, 32 N.Y.3d 556, 571 (2018). A union representative may publish the officer's *Fogel* response, but the Department does not.

ruled to be confidential by the DCT at the time of the trial. Even in that case, a later assertion of a need to continue confidentiality would need to be made and supported by the information access officer for NYPD.[717] Given the City's current litigation posture, NYPD does not release records of pending matters, those records might not be available for public inspection.

To counter this, to some extent, CCRB has modified its Quarterly Reports, which are online. The description of APU prosecuted cases in the Trial Room that have been finalized are described, with a short recitation of the facts and a listing of the CCRB complaint number along with the name of the subject officer.[718] The APU reports are posted anywhere from six to eighteen months after the decision.

In addition, the Department has recently begun to post trial decisions in a Library which is available online.[719] This new listing is quite useful and more current, with postings running just months after the decision.

The Police Commissioner may suspend the officer without pay pending the hearing and determination of the charges.[720] Notwithstanding the open-ended language of the Administrative Code, Civil Service Law §75(3-a) limits the suspension to a period not to exceed thirty days.[721]

### iv.    Cases in the Trial Room[722]

Most cases brought to the Trial Room for formal discipline are prosecuted by DAO. As of December 31, 2020, there were 1,034 active cases with formal charges. 920 of those cases were handled by DAO while 114 were APU cases. Matters prosecuted by DAO typically depend upon the word and work of fellow officers (IAB, BIU, or FID), as opposed to CCRB matters which are heavily reliant on civilian testimony. As well, CCRB is frequently in the position of trying a matter based on hearsay when civilian witnesses fail to appear. It follows that a higher percentage of DAO cases are pled rather than tried since the outcome might appear foregone. Ten to fifteen

---

[717] "Requests for records pursuant to the N.Y. Public Officers law sections 87 and 89, referred to as the Freedom of Information Law (FOIL), must be in writing and must contain a description of the records that is sufficiently detailed to enable a search to be conducted." https://www1.nyc.gov/site/nypd/bureaus/administrative/document-production-foil-requests.page.

[718] *See generally* CCRB, Report on the Administrative Prosecution Unit ("APU"): First, Second, Third, and Fourth Quarters of 2020 (May 28, 2021), https://www1.nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/05282021_APU2020.pdf.

[719] NYPD Online, Trial Decisions Library, https://nypdonline.org/link/1016.

[720] Admin. Code § 14-123.

[721] *Matter of Bullock v. Kelly*, 847 N.Y.S.2d 384 (N.Y. Cty. Sup. Ct. 2007) (Even where the officer was incarcerated and unavailable for duty pending a criminal trial, and the disciplinary proceedings were delayed pending the criminal proceedings, upon a not guilty determination he was entitled to salary after the thirty-day suspension expired.).

[722] Precise numbers for activity in the Trial Room are difficult, if not impossible, to report since CCRB-APU quarterly reports and NYPD annual Discipline Reports do not use the same parameters. Trials commenced in one year may show up in statistics for a later year. NYPD records do not separate APU cases from cases prosecuted by DAO. There is no apparent attempt to harmonize the alternate sets of reports. The numbers gleaned here are summaries after combing through multiple reports from both agencies. While the totals may not be precise, they are generally an accurate reflection of case-flow through DCT.

percent of DAO cases go to trial, while more than one-half of the cases prosecuted by CCRB go to trial.[723]

From the third quarter 2016 through 2020, CCRB brought 310 cases to the Trial Room. 193 (62%) went to trial, of which 82 (42%) resulted in a guilty or partial guilty verdict. The Police Commissioner reversed or reduced the penalty in 19 of the 82 guilty/verdict cases (23%)[724]

At the same time, 117 of the 310 CCRB cases pled guilty. After CCRB and DCT negotiate and approve a plea, it is presented to the Police Commissioner for final approval. A negotiated plea is no guarantee of discipline and can be disregarded by the Police Commissioner. The Police Commissioner vacated or reduced the approved plea in 41 of the 117 plea bargains (35%) approved by DCT. In 2020 (an admittedly atypical year due to Covid), the Police Commissioner allowed one out of six pleas to stand while reducing the rest.[725]

Taking 2019 as a typical year, there were 339 officers who faced formal charges by DAO and APU combined.[726] In all, 66 trials and mitigation hearings were held.

**DAO in the Trial Room - 2019**:

- 288 cases resolved the Trial Room by DAO.
- 38 Trials (34 Guilty; 4 Not Guilty).[727]
- 13 officers pled guilty but also had a mitigation hearing in the trial room.[728]
- 279 officers were disciplined (245 by plea).
- 9 were dismissed.[729]
- 176 forfeited penalty days.
- 94 were placed on dismissal probation and lost penalty days.
- 17 officers separated from the Department.

---

[723] Discipline in the NYPD (reports from 2018 to 2021) at https://www.nyc.gov/site/nypd/stats/reports-analysis/discipline.page.

[724] CCRB, Report on the Administrative Prosecution Unit ("APU"): First, Second, Third, and Fourth Quarters of 2020 (May 28, 2021), https://www1 nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/05282021_APU2020.pdf.

[725] *Id.*

[726] Discipline in the NYPD, at 8, https://www.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/discipline/discipline-in-the-nypd-2019a.pdf. The online report does not always separate APU prosecutions from DAO prosecutions. Accordingly, parsing out APU and DAO prosecutions and discerning the outcome for each category may not be precise.

[727] "Guilty" includes partial guilty verdicts where at least one charge was sustained. "Not Guilty" means all specified charges are dismissed.

[728] At a mitigation hearing the officer pleads guilty to the charges and presents evidence in mitigation regarding the penalty to be submitted to the Police Commissioner. This may be countered by the prosecution. Typically, unlike the trial phase of the proceedings, mitigation hearings (as with the penalty phase following a trial) are closed to the public.

[729] The discipline report lists these cases as dismissals, which presumably do not include forced separations.

**APU in the Trial Room - 2019:**

- 51 cases resolved in the Trial Room by APU.
- 28 Trials (15 Guilty; 13 Not Guilty).
- 10 officers negotiated a plea with APU.
- 25 officers were disciplined.
- 1 was dismissed (███████).
- 24 forfeited penalty days ranging from 1 to 30 days.

Typically, cases DAO considers serious enough to warrant Charges involve conduct within the station house or while off-duty. DAO prosecutions for misconduct during a citizen encounter are the exception, not the rule. In 2019, 288 cases were formally prosecuted by DAO, out of a total of 339 cases presented to DCT.[730] Only 23 of all 339 cases formally finalized in 2019 were for "Misconduct Involving Public Interaction."[731] Another 26 of the 339 cases alleged wrongful "Use of Force." Most of those were based on a CCRB substantiation and not brought by DAO. The bulk of formal disciplinary cases brought by DAO were for Departmental Rule Violations (189 total, of which 187 pled guilty). The remaining 101 cases formally prosecuted were for an assortment of personal misbehavior such as off-duty Domestic Incidents, Narcotics Related charges, Official False Statements, DWI, Sexual Misconduct, and Criminal Conduct. With the exception of a substantiated force complaint, it is unusual for DAO, rather than CCRB, to bring formal charges against an officer for a street encounter involving a citizen victim.

A total of 35 officers were disciplined in the Trial Room for misconduct in the categories of excessive force or public interaction misconduct. DAO was responsible for ten of those cases and APU was responsible for 25 of those cases. Thirty-two of the disciplined officers forfeited penalty days. Two (including ███████) were dismissed. One was placed on Dismissal Probation.

### v.    Stop and Frisk in the Trial Room

It is difficult to measure discipline imposed for stop/frisk misconduct handled by APU since Charges and Specifications are rarely filed for stop and frisk misconduct standing alone. SQF allegations are wrapped up in other misconduct allegations such as excessive force or untruthful statements. This became increasingly true in the last three years, as CCRB's Framework[732] and, subsequently, the Department's Guidelines recommend Charges and Specifications for other types of misconduct, but not for an illegal stop, question, frisk, or search. In 2020, CCRB recommended formal discipline in only three of 68 complaints that included a

---

[730] 51 cases were prosecuted by APU before a Trial Commissioner. "Discipline in the NYPD 2019" at 8. https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/discipline/discipline-in-the-nypd-2019a.pdf. Each prosecution against an officer is denominated a "case." A complaint may encompass several cases if more than one officer is accused.

[731] *Id*. at 10. Since CCRB-APU handled 51 cases, it is unclear why all 51 were not "public interaction" cases. The discrepancy lies in the separate reporting and classification by CCRB and NYPD. "Public Interaction" cases, in the NYPD classification system is "any misconduct by an on-duty UMOS that occurred when he or she had contact with a civilian, including during law enforcement activities or any other dealings with the public."

[732] An attempt by CCRB to standardize recommendations for formal discipline was adopted in 2018 and is discussed *infra* as a precursor to the later adoption of the Disciplinary System Penalty Guidelines.

159

substantiated SQF violation. Those allegations were combined with accompanying charges of force, strip search, or retaliatory arrest. As of December 31, 2022, two of the three cases had closed. [733]

In 2014, CCRB recommended formal discipline (Charges) for 102 of 179 cases (57 %), which included a substantiated SQF violation.

In 2015, CCRB recommended formal discipline (Charges) for 48 of 269 cases (18%), which included a substantiated SQF violation.

Looking at cases from 2016 to 2022, which included a substantiated SQF allegation along with other allegations:[734]

2016

- CCRB recommended Charges and Specifications in 23 out of 212 cases (11%), which included a substantiated SQF allegation.
- There were two trials with guilty verdicts—both included allegations of improper strip search—both received ten days.
- There were 11 negotiated pleas—all for ten penalty days or less.[735]
- The remainder were either closed administratively or without discipline.

2017

- CCRB recommended Charges and Specifications in 17 of 102 cases (17%) that included a substantiated SQF allegation.
- There were seven trials ending in five guilty verdicts—all received ten penalty days or less, with the exception of one case carrying an allegation of a chokehold, receiving 15 penalty days.
- There were six negotiated pleas—all of whom received ten penalty days or less with one exception.[736]
- The remainder were either closed administratively or without discipline.

2018

- CCRB recommended Charges and Specifications in 15 of 88 cases (17%) that included a substantiated SQF allegation.

---

[733] One officer, Lt. ███████ has a CCRB history of 28 complaints, 13 of which have been substantiated. As of July 2022, he had four open sets of Charges against him—all awaiting APU decision. It is reported that he has filed retirement papers, avoiding discipline for 29 allegations brought by CCRB. He is said to have a "dozen lawsuits" filed against him resulting in over $1.5 million in settlements. ████████████████████████████████
████████████████████████████

[734] The following tables are based on NYPD – Federal Monitor – SQFSTA reports provided to the Monitor by NYPD.

[735] There was one exceptional case, PO ████, explained later, where the officer received 17 penalty days.

[736] Sgt. █████████ was alleged to have wrongfully tasered two suspects, one of whom was handcuffed at the time.

- There were nine trials ending in seven guilty verdicts—all received ten penalty days or less with the exception of one case where the verdict was 15 days for illegal force with an added three penalty days for the illegal stop.
- There were two negotiated pleas—for four days and five days respectively.

## 2019

- CCRB recommended Charges and Specifications in 13 of 96 cases (14%) that included a substantiated SQF allegation.
- Only eight of those cases have closed. There were two trials (one resulting in a not guilty verdict and the other resulting in imposition of 20 penalty days after a guilty verdict), three negotiated pleas for five, 18, and 25 penalty days respectively, one case administratively closed upon retirement of the officer, and two cases retained by the Police Commissioner without discipline.

## 2020

- CCRB recommended Charges and Specifications in three of 68 cases (4%) which included a substantiated SQF allegation.
- Two of the cases resulted in a negotiated plea with penalty days.[737] The third case remains unresolved, four years after the complaint. That officer, PO ████████, has a history of seven complaints—six of which include allegations of unlawful stop or frisk behavior.

## 2021

- CCRB recommended Charges and Specifications in 27 of 46 cases (under the Matrix). As of 12/31/2022, only ten had been resolved. Nine of the ten were closed without penalty. One resulted in a negotiated plea of 18 penalty days.

## 2022

- CCRB recommended Charges and Specifications (under the Matrix) in 92 of 254 cases. As of 12/31/2022, 21 cases were administratively closed without finding due to the Department's assertion that the cases were received too late to be resolved due to an impending Statute of Limitations deadline. One case received a negotiated disposition of Training. The remainder are still open.

### vi.    A Case Study of a Negotiated Plea Reduced by the Police Commissioner

As indicated, the Police Commissioner reduces the penalty or sets aside the plea in more than one-third of the cases where CCRB previously negotiated a disposition with the subject officer. The following is a typical example of an instance where this occurred in a stop and frisk matter.

---

[737] One of the two officers is Lt. ████. *See supra* note 734.

As background, the following is the description offered by CCRB in its Quarterly Report:[738]

In March 2017 at approximately 1:30 p.m. in Staten Island, the Victims, two Black males in their early twenties, were standing in front of a building alongside other individuals. PO ██████████ and his partner, a fellow officer, pulled up in their vehicle and approached the Victim stating, "I see you rolling up. I can see the weed through the car." PO ████ and his partner frisked the outside of one of the Victim's clothing and searched the inside of the other Victim's hooded sweatshirt. PO ████ stated that he conducted the search to recover a suspected marijuana cigarette and did not recover any marijuana cigarettes from either Victim. The searches and frisks were captured on cellphone video.

The Board substantiated three (3) total allegations: three (3) Abuse of Authority allegations against PO ████ for searching and frisking Victim 1 and searching Victim 2. PO ████ pleaded guilty and agreed to accept eight (8) days' vacation forfeiture. Commissioner Shea set aside the negotiated plea and instead imposed four (4) days' vacation forfeiture, stating that in reaching the penalty he considered the cases cited by the CCRB and PO ████ history with the Department.

Officer ████ has a CCRB history of eight complaints. They almost all include an allegation of illegal stop and frisk or closely related activity, ranging from strip searches to vehicle searches to slurs to use of force. Two of the complaints arose after the described incident, but while the matter was pending. Only one other case had been substantiated and, in that case, PO ████ received no discipline, he was sent to Training. At least two of the complaints were dropped for failure of witnesses to cooperate. Also, around the same time (April 11, 2018) PO ████ was separately accused in a civil suit filed in the U.S. District Court for the Eastern District of New York of falsely arresting and illegally searching a 31-year-old Black construction worker and City University of New York student. It was alleged that he stopped the victim's vehicle for failing to signal as he pulled out of a parking area. According to the complaint the victim's car was searched and his pants were pulled down in public view on the street. He also complained of intentional distress as he was strip-searched again in the precinct before a female officer. A charge of marijuana possession was later dismissed. The case settled for $7,500.

Without an attempt to assess the merits of any of the seven other complaints or the lawsuit, the more pertinent question is whether the Police Commissioner was aware of, and took into account, the array of similar sounding (and almost contemporaneous) complaints when he made the decision to reduce the negotiated penalty.

---

[738] CCRB, Report on the Administrative Prosecution Unit ("APU"): First, Second, Third, and Fourth Quarters of 2020, *supra*, at 19-20.

### vii. Case Study Where the Police Commissioner Raised a Penalty Recommended by DCT (But one day less than that requested by CCRB)

It is an extremely rare case (no other could be found) where the Police Commissioner enhanced a penalty recommended by a Trial Commissioner for stop and frisk misconduct. For that reason, the background in the one case where that did occur is worth exploring.

In February 2018, Sgt. ████████████ and PO ████████, in plainclothes, saw two civilians in conversation reaching toward their waistbands. They suspected a drug sale was in progress. One of the victims testified that they were merely having a conversation about belts. As found by the Trial Judge, neither individual was seen holding money, drugs, or any object in their hands. There was no touching of the hands. The officers did not see any bulges or outlines that would lead them to suspect there was a weapon. Nonetheless, each officer stopped and frisked the two civilians, including allegedly grabbing and pulling in the groin area of one of the two victims.

Upon a finding of guilty to allegations of improper stop and frisk for each, the APU prosecutor asked that Sgt. ████████ forfeit eight days and Officer ██████ forfeit seven days. Instead DCT recommended a three-day forfeiture for each officer. The ADCT wrote that "neither Respondent has a disciplinary record." The ADCT also found that

> [T]he misconduct in this case was due to Respondents' misunderstanding of the applicable legal principles associated with a stop and frisk, rather than an intentional disregard of the rights of the two individuals in this encounter. Both Respondents came across as conscientious in the performance of their duties. The police action taken here was born [sic] out of a genuine desire to improve the living conditions in a high-crime area where much community concern had been expressed.[739]

On February 21, 2021, the Police Commissioner disapproved the DCT recommendation and imposed an eight-day penalty upon Sgt. ████████ and a six-day penalty upon Officer ████.

It is worth looking into the background that foreshadowed this unusual action by the Police Commissioner.

At the time of the Police Commissioner's decision, Sgt. ████████ has ten CCRB complaints in his history and Officer ████ had 13 CCRB complaints. They had been named as defendants in 18 civil lawsuits. The fact that these forty-one civilian complaints and lawsuits for the most part complain of SQF and related force misconduct should not be disregarded.[740] Especially noteworthy is the fact that five of the complaints were for encounters when the two officers were teamed together.

---

[739] Report and Recommendation, In the Matter of the Charges and Specifications Against Sergeant ████████████████████████████

[740] The list below is of only 34 events because some lawsuits and complaints were against both, essentially doubling up and listed here just once.

In fact, Sgt. ▮▮▮▮ was charged, in 2017, with a wrongful failure to supervise the same Officer ▮▮ when ▮▮ conducted an illegal frisk. The substantiated charge against ▮▮▮ received no penalty. The failure to supervise by ▮▮▮▮ ended with "Instructions" and no discipline. Given the repeated pattern of alleged misconduct as they were on patrol together, a kind description of the outcome here would be to say that there was a missed opportunity.

Some complaints were substantiated. Others were not.[741] Some complaints went unsubstantiated because of a failure by a complainant to continue to cooperate. Some complaints were adjudicated on the merits—ending either with or without substantiation. It is also recognized that some lawsuits are settled without full exploration. It is not fair to assume personal responsibility in every case where there is a settlement—especially if there are multiple defendants. Nor is it fair to disregard a substantial settlement or a disproportionate number of settlements merely because they did not go to trial.

The purpose of this catalog is to demonstrate the background that was known or might have been known by the Police Commissioner as he assessed the personal history of the subject officers and invites question of the ADCT's declaration that neither officer had a disciplinary history. ADCTs are told of merit awards and performance ratings, which are often used to justify reduced sanctions and passed on to the Police Commissioner. Are the ADCT or Police Commissioner also told of a history or pattern of complaints and filings which did not end in formal discipline or judgment? When Trial Commissioners mitigate sanctions based on a positive history of merit and performance, and then report that to the Police Commissioner, should more be said? It would be helpful to know how much of the following history was presented to the Police Commissioner when he imposed discipline on February 22, 2021.

A timeline paints a better picture of a pattern that could have been recognized much earlier. Since the two officers acted as a team on more than one occasion, and their history is interwoven, the two timelines are merged in this compilation. Events where allegations were substantiated or litigation closed with a settlement or judgment are highlighted. Dates listed are the date of the incident when available, otherwise the date a complaint was lodged is noted.

This list is not complete because records are unavailable. While they are available to DAO, they are not part of the DCT decision. Not included in this listing are Departmental disciplines that were not charged formally or did not originate with CCRB. Command Disciplines, IAB investigations, BIU investigations, and OCD investigations are omitted, even when substantiated. There may also be claims that were settled with the Comptroller without commencement of a lawsuit. This is not uncommon for stop and frisk violations which are compromised at lesser amounts. Further inquiry of IAB and the Law Department would be needed to flush out those cases if they exist.[742]

---

[741] The following list does not itemize every allegation levelled against the officers. For brevity's sake, only one relevant allegation is listed for each complaint even if there were multiple allegations within the complaint that were resolved.

[742] According to an article published in the NY Daily News, April 8, 2024, there were 3219 claims against NYPD which were settled by the Comptroller between January 1, 2022 and March 11, 2024 for a total of $82.7 million. $9.2 million of that was for claims settling for $10,000 or less. "NYC paid $83 million in claims against the NYPD in

**Date of Incident if Known or**
**Date of Filing if Incident Date Unknown**

- 2/12/06
  - CCRB complaint against PO #1 █████████ force, pepper spray, stop, question - complainant uncooperative.
- 5/15/11
  - CCRB complaint against PO #2 ██████ (search unsubstantiated).
- 4/22/12
  - **Federal lawsuit against PO #1 ███████████ settled for $50,000 - false arrest/force.**
- 10/17/12
  - CCRB complaint against PO #1 █████████ for stop/frisk/force/strip search - complainant uncooperative.
- 1/29/13
  - **Lawsuit commenced against PO #1 █████████, et al., settled for $300,000 - false arrest/malicious prosecution.**[743]
- 3/4/13
  - CCRB complaint against PO #2 ████████ (force unsubstantiated).
- 3/22/13
  - **Federal lawsuit against PO #1 █████████ for frisk and retaliatory arrest. $20,000 settlement - stop/frisk/search.**
- 8/1/13
  - **CCRB complaint against PO #2 ████████ for Frisk/Question substantiated, Received Instructions and No Disciplinary Action (DUP).**
- 8/9/13
  - CCRB force complaint against PO #2 ████████ complainant unavailable. [744]
- 8/9/13
  - **Federal lawsuit against PO #2 ████████ settles for $50,001 - force.**
- 11/3/13
  - Lawsuit against PO #2 ██████, still open -false arrest/force - Court ordered PO #1 █████████ to be deposed as a witness - unclear if complaint will contain allegations against PO #1 █████████.
- 11/13/13
  - CCRB force complaint against PO #2 ████████ - victim uncooperative.
- 5/2/14
  - CCRB complaint against PO # 1 ████████████ threaten arrest unsubstantiated.

---

under-the-radar settlements." https://www.nydailynews.com/2024/04/08/nyc-paid-83-million-in-claims-against-the-nypd-in-under-the-radar-settlements/.

[743] Based on Law Department posting. https://www.nyc.gov/site/law/public-resources/nyc-administrative-code-7-114.page. Not available on NYSCEF.

[744] "[N]o complainant" means a complaint was filed, but the complainant was no longer available or cooperative.

- 5/8/14
  - **CCRB complaint against <u>BOTH</u>, vehicle search, substantiated.  CCRB recommended a B-CD for BOTH, the Police Commissioner dropped PO #2** ▮ **to an A-CD with no discipline.  PO #1** ▮ **received no discipline, DUP.**
- 8/16/14
  - CCRB complaint against PO #2 ▮ - frisk/search unsubstantiated.
- 12/6/14
  - CCRB complaint against <u>BOTH</u> - stop, wrongfully pointed gun, threaten arrest - exonerated.
- 12/17/14
  - Lawsuit against PO #1 ▮ settled for $32,500 - False arrest.
- 9/15/15
  - CCRB stop/force/search complaint against PO #2 ▮ complainant uncooperative.
- 2/25/16
  - **Lawsuit against PO #2** ▮ **settled for $50,000 (not in NYSCEF, but Law Department posting shows assault/malicious prosecution and false arrest).**
- 4/25/16
  - **Lawsuit against PO #2** ▮ **settled for $35,000 - force/false arrest/assault.**
- 6/8/16
  - **Lawsuit against PO #1** ▮ **settled for $22,500 - false arrest/strip search.**
- 6/15/16
  - CCRB complaint against PO #1 ▮ - refusal to process civilian complaint – unfounded.
- 7/31/16
  - **CCRB frisk complaint against <u>BOTH</u> substantiated against PO #2** ▮ **- A-CD accepted, with no discipline.  Unsubstantiated against PO #1** ▮.
- 12/23/16
  - **Lawsuit against PO #2** ▮ **settled for $35,000 - false arrest/force.**
- 1/25/17
  - **Lawsuit against PO #2** ▮ **settled for $27,500 - false arrest/strip search.**
- 2/17/17
  - CCRB force complaint against <u>BOTH</u> unsubstantiated.
- 2/24/17
  - Lawsuit against PO #2 ▮ - force/false arrest (open).
- 3/8/17
  - Lawsuit against PO #2 ▮ - false arrest/strip search (open).
- 8/16/17
  - Lawsuit against PO #2 ▮ - force/false arrest/gunpoint (open).

166

- 11/23/17
  - **Lawsuit against PO #2 ███████ settled for $15,000. False arrest/seizure (open).**
- 2/23/18
  - **CCRB, THIS CASE, AGAINST <u>BOTH</u> stop/frisk substantiated.**
- 8/18/18
  - **CCRB complaint alleging chokehold against PO #2 ██████ - CLOSED PENDING LITIGATION - no further action following settlement on 4/3/2020.**
- 8/18/18    (Related to the above CCRB complaint which was closed).
  - **Lawsuit PO #2 ████ - kneeled on neck of victim while on the ground. Settled for $50,000.**
- 8/28/19
  - **Federal Lawsuit against PO #1 ████████ settled for $55,658 while the Stop/Frisk case was before the Police Commissioner - assault, wrongful detention - finalized 4/6/21.**

Especially troubling is the ADCT representation to the Police Commissioner that, "the misconduct in this case was due to Respondents' misunderstanding of the applicable legal principles associated with stop and frisk, rather than an intentional disregard of the rights of the two individuals in this encounter.   Both Respondents came across as conscientious in the performance of their duties." It is impossible to reconcile that finding with the records in this case. Aside from the disciplinary histories, PO #1 Sgt. ████ had already attended six training classes involving SQF activity and PO #2 Detective ███ had attended ten training classes in the same area.  At some point, "misunderstandings" should not continue to be written off as such.[745]

As discussed later, the Department places heavy reliance on findings of "good faith" or "unintentional misunderstanding" of the law in mitigating discipline.  Patrol Guide § 212-11 speaks to lesser penalties for isolated, good faith, erroneous stop and frisk misconduct. Unfortunately, no record is kept of how many cases go without discipline in reliance upon that provision.  Training is frequently ordered for SQF misconduct without a specific finding of lack of intent or good faith.  Based on the sheer number of cases that have gone below the "presumptive" three-day penalty that is now mandated by the Guidelines, it would appear that almost all SQF violations were deemed "good faith" errors.  Under the new Guidelines, a finding that Training should be recommended because there was an explicit factual determination that the misconduct was isolated, erroneous, and in good faith, should be documented in CCRB's recommendation of mitigation.

Sgt. PO #1 ██████ was promoted to Sgt. Detective Squad in the Office of the Chief of Department on February 5, 2021—around the same time the case was resolved (the Police Commissioner set the final discipline in this case on February 22, 2021).  The only disciplinary history listed in the online "Officer Profile" is the one 2018 finding of guilt for the illegal stop and frisk.

---

[745] Further confounding this case study is the fact that the NYPD continued to recognize Sgt. ████ and Detective ██ for meritorious and excellent police duty through November 1, 2017.  *See* https://nypdonline.org/link/2.

Officer #2 ▮▮▮ was promoted to Detective on July 30, 2021.  The only disciplinary history listed in the online "Officer Profile" is the one finding of guilt for an illegal stop and frisk. Officer #2 ▮▮▮ has a CCRB history of 13 complaints, four of which were substantiated. Five allegations of SQF misconduct have been substantiated and a chokehold complaint went unresolved as it was "closed – pending litigation."

### viii.    Records in the Trial Room

Depending upon the outcome, the record of the proceedings may be sealed or expunged. There is a contract provision with the unions that "upon written request to the Chief of Personnel by the individual employee [the Department will] remove from the Personal Folder investigative reports which, upon completion of the investigation, are classified "exonerated" and/or "Unfounded.""[746] The Agreement also provides that Schedule A violations "heard in the Trial Room" where the disposition is "other than 'guilty'" may be expunged after 2 years upon petition to the Police Commissioner.[747]   A review is conducted by a board composed of the Deputy Commissioner- Trials, Department Advocate, and the Chief of Personnel, or their designees.  The Board makes a recommendation to the Police Commissioner.  The employee concerned will be notified of the final decision of the Police Commissioner by the Deputy Commissioner-Trials.

Similarly, Section 7(c) of the Police Sergeants', Lieutenants', and Captains' Collective Bargaining Agreement, states the NYPD "will upon written request to the Chief of Personnel remove from the Personal Folder investigative reports which, upon completion of the investigation are classified 'exonerated' and/or 'unfounded.'"

PG § 206-15 (replaced by AG § 318-01) says that a "not guilty" after a Departmental trial may be sealed upon application to the Police Commissioner.  The Commanding Officer of DAO is to make a recommendation based upon the member's service record, the nature of the charges and "other relevant factors."  In addition, the DAO "shall ensure" sealing if the charges were dismissed because a violation did not occur or were based on mistaken identification.  It is unclear if the caveat that a "violation did not occur" applies to all unfounded and exonerated cases.  It should not, if properly understood, apply to allegations which were unsubstantiated.  Once sealed, unlike the provisions in PG § 206-14, not only are the records sealed in the CPI, but they are to be sealed in DAO's DADS system as well and deleted from any records kept in command.  Once sealed, the matter may not be referred to when the member is being considered for promotion, transfer, or detail assignment.  However, DAO may review the file "for informational purposes as

---

[746] CBA, art XVI, § 7 available at *UFO, et al., v. de Blasio*, 20 Civ 5441, Dkt. No. 220 at 21 (S.D.N.Y. Sept. 4, 2020). For simplicity, unless noted otherwise "CBA" will refer collectively to the entire group of Collective Bargaining Agreements. "Where an employee has been charged with a 'Schedule A' violation as listed in Patrol Guide 118-2 [*sic*] and such case is heard in the Trial Room and disposition of the charge at trial or on review or appeal therefrom is other than 'guilty,' the employee concerned may, after 2 years from such disposition, petition the Police Commissioner for a review for the purpose of expunging the record of the case. Such review will be conducted by a board composed of the Deputy Commissioner - Trials, Department Advocate, and the Chief of Personnel, or their designees. The Board will make a recommendation to the Police Commissioner. The employee concerned will be notified of the final decision of the Police Commissioner by the Deputy Commissioner - Trials."

[747] It is the City's position that discretionary removal from the officer's personnel file "does not create an entitlement to remove the investigative reports or the actual complaint and allegation from [NYPD's or CCRB's] own records in toto, much less from the public domain." *UFO*, Dkt. No. 220 at 21.

necessary."  If the file is available for "informational purposes," then not much is accomplished with regard to the DADS file, since DAO does not include previous not guilty determinations in its reports to CCRB, Trial Commissioners, or the Police Commissioner.

### ix.    Police Commissioner Review After Trial

In cases where formal discipline is pursued, after trial and before the trial record is delivered to the Police Commissioner, the trial record is first reviewed by a supervisor and two officers in the First Deputy Commissioner's Office.  The file, including the First Deputy Commissioner's own penalty recommendation, is then delivered to the Police Commissioner's Office, where it is reviewed again by officers on the Police Commissioner's staff.  These officers prepare a case analysis for presentation to the Commissioner's Executive Officer and Chief of Staff, who each make their own independent penalty recommendations.  These recommendations, along with those of DAO, the DCT, the CCRB (as appropriate), and the First Deputy Commissioner, are then presented to the Police Commissioner for his final review.[748]

The Police Commissioner may approve or modify the recommended findings and the penalty, if any.[749]  If the Commissioner approves the findings and penalty, the Commissioner stamps the Report and Recommendation as "Approved" and signs it, along with a separate "Disposition of Charges" form that identifies each charge and its disposition, as well as the disciplinary penalty.  These documents—the approved Report and Recommendation and the Disposition of Charges form—are provided to the charged officer and the officer's attorney.  The records are considered by the NYPD whenever officers are considered for promotions, transfers, or assignments, as well as in determining the penalty in any subsequent disciplinary matter under consideration by the Police Commissioner.[750]

At a committee meeting attended by representatives from the First Deputy Commissioner's Office, DAO, and the Professional Standards Bureau (formerly the Risk Management Bureau - "RMB"), as well as a rotating three-star chief, the Police Commissioner makes a final determination as to whether imposing discipline and a penalty are warranted.[751]  By law, the Police Commissioner has complete authority and discretion over discipline within the NYPD.[752]  The penalty imposed is required to take into account the officer's employment history and the nature of the proven misconduct.[753]  The written final determination is then served on the officer and the DAO.[754]  For CCRB cases, the final determination is also forwarded to the CCRB, which then

---

[748] Independent Panel, *supra*, at 14.

[749] 38 RCNY § 15-08(a).

[750] As explained in other parts of this Report, some or most of the records are not made available to CCRB panels or Deputy Trial Commissioners.

[751] Independent Panel, *supra*, at 14; 38 RCNY § 15-08.

[752] N.Y.C. Admin. Code § 14-115; N.Y. City Charter § 434.

[753] 38 RCNY § 15-07.

[754] 38 RCNY § 15-08.

communicates the disposition to the complainant by letter. The letter merely provides the finding, i.e., substantiated, exonerated, unsubstantiated, or unfounded without further detail.

Given the unstructured nature of the decision-making process, there have been "frequently voiced allegations of favoritism in the NYPD's disciplinary process. . . ."[755] This was especially true in claims of "white-shirt immunity" with lesser penalties for high-ranking officials.[756] The Independent Panel's investigation wrote that there was "possible inappropriate influence . . . [in] that certain decision makers may be susceptible to pressures, which could adversely affect the integrity of the disciplinary process."[757] The Panel went on to say,

> As is true of any multi-step, complex decision-making process, the Department's disciplinary system is susceptible to improper influences or inequities, including in making decisions not to report misconduct at all. And, during the course of its review, the Panel was made aware of certain fact patterns that suggest that, on occasion, officers failed to report incidents and impeded or otherwise interfered with ongoing investigation, including by "pulling rank" or exploiting their relationships with influential members in the Department.[758]

They "found that the Department Advocate is particularly vulnerable to internal and external influences."[759] The Panel made two recommendations: (1) there should be guidelines to ensure "that the disciplinary process is free from inappropriate influence and what factors members should consider before participating in internal and external functions and events;" and (2) the Department should implement a recusal policy.[760]

In partial satisfaction of the request, the Department adopted Interim Order No. 11 of 2020,[761] which contained "guidelines to members of the service regarding recusal from involvement in disciplinary proceedings or investigations when there is an actual or perceived conflict of interest based on a personal or familial relationship with a subject."[762] Additionally, the Administrative Guide now prohibits "[d]iscussing substance of a pending case *ex parte*. . . ." It is unclear if the Order resolved the problem cited in the Panel's report since it applies to DAO "during

---

[755] Independent Panel, *supra*, at 6. *See, e.g.* Graham Rayman & Thomas Tracy, NYPD chief used rank to dodge penalty, fueling criticism that brass rarely held accountable, Daily News (Mar. 13, 2018), https://www.nydailynews.com/new-york/nypd-chief-rank-dodge-penalty-park-fight-article-1.3872978.

[756] After implementation of the Matrix, the Police Commissioner posted 184 Departure Letters where recommendations by CCRB for discipline were reduced or dismissed. As of Apr. 7, 2023, of 184 downward departures, dismissed cases included 1 Deputy Chief, 1 Inspector, 3 Deputy Inspectors, 2 Captains, 17 Lieutenants, and 22 Sergeants. posted letters at https://www.nyc.gov/site/ccrb/complaints/redacted-departure-letter.page.

[757] *Id.*

[758] Independent Panel, *supra*, at 31.

[759] *Id.* at 6.

[760] *Id.* at 50.

[761] Issued January 24, 2020, the Order amended Administrative Guide § 318 and Patrol Guide § 203-06. Both added sections were moved to Administrative Guide § 304-06, July 2021.

[762] NYPD Public Score Card -DCPI 10-13-2020.

the pre-charge stage."[763]  One cannot assume the Order prohibits the Department Advocate from *ex parte* communications with attorneys and representatives at later stages, after charges have been filed.  A more carefully crafted prohibition may be needed.  On the one hand, conversations with attorneys and representatives are a necessary part of any prosecution effort.  On the other hand, *ex parte* conversations with the Department Advocate were the very kind of questionable conduct condemned by the Panel.  A distinction should be drawn between discussions that are part of the process and are noted on the record versus casual off-the-record conversations.  Towards that end, the Panel recommended,

> The guidelines should further require proper documentation of all such informal communications.  Creating a record and maintaining logs of such communications are critical to ensuring accountability and, at the very least, internal transparency about those who have access to key decision makers within the Department.  Such logs should be made available for internal audit and inspection by the OIG-NYPD.[764]

Neither the Interim Order nor the Department Manual requires logs or documentation of *ex parte* conversations.  The newly adopted Disciplinary Guidelines provide,

> An individual member of the service's status as a supervisor will generally be viewed as an aggravating factor, particularly for on-duty misconduct, which may warrant a penalty higher than the presumptive penalty for the particular violation.  Supervisors are expected to lead by example and they are responsible for holding their subordinates accountable.  The Department has higher expectations for supervisors, including their ability to exercise sound judgment and to be more deliberate in their actions than subordinate members.[765]

There are not enough cases yet to evaluate whether that promise has been met.

### x.    Level C Command Discipline in Lieu of Charges and Specifications

The Disciplinary Guidelines provide that "[t]he Department Advocate may direct that a disciplinary matter be adjudicated through CD in lieu of Charges and Specifications when appropriate."[766]  It might be that this provision was meant to apply only to C-CD cases brought to DAO by NYPD investigations and not to extend to CCRB recommendations.  However, there is nothing in the Matrix that clearly exempts APU charges from DAO diversion.  Under the new Guidelines System, CCRB may add the penalties for several offenses and arrive at a conclusion that somewhere between a 10 and a 20-day penalty is required by the Guidelines.  At that point,

---

[763] Admin. Guide § 304-06.

[764] Independent Panel, *supra*, at 50.

[765] NYPD Disciplinary System Penalty Guidelines at 10, eff. Jan. 15, 2021, at 10. https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/disciplinary-system-penalty-guidelines-effective-01-15-2021-compete-.pdf.

[766] NYPD Disciplinary System Penalty Guidelines, *supra*, at 50.

CCRB will recommend Charges. The Guidelines would appear to permit a plea to such a penalty without a trial. The Matrix goes on to say that

> A C-CD may be utilized in lieu of Charges and Specifications by the Deputy Commissioner, Department Advocate for situations in which there are no significant aggravating factors or additional misconduct. The Deputy Commissioner, Department Advocate will evaluate each case on its merits and consider all relevant factors when making a determination to issue a C-CD including consultation with the member's Commanding Officer. Prior disciplinary history, including the same or similar acts of misconduct, contemporaneous pending unrelated disciplinary matters and any significant aggravating factors may make the issuance of a C-CD inappropriate. At the direction of the Deputy Commissioner, Department Advocate, the assigned member from the Department Advocate's Office will prepare the C-CD and forward it to the Commanding Officer of the appropriate adjudicating borough or equivalent command with a memorandum identifying the significant facts related to the misconduct, the appropriate penalty range as well as the presumptive penalty. In accordance with Patrol Guide procedures 206-04 and 206-05, the Borough Adjutant (or equivalent) will adjudicate the C-CD promptly, adhering to the guidance/direction provided by the Department Advocate.[767]

There is no required minimum penalty that flows from imposition of a C-CD, the maximum penalty is 20 vacation days. In 2020, there were two cases resolved by imposition of a Schedule C Command Discipline; neither were SQF cases.

### xi. Police Commissioner's Duty to Explain Departures from Recommendations

Under Section 440 of the Charter, in CCRB cases only, if the Police Commissioner departs upward or downward from the recommendation made by the DCT or CCRB, he must prepare a variance memorandum explaining the basis for deviating from their recommendations. A more detailed explanation is required if the Police Commissioner imposes a penalty or level of discipline that is lower than that recommended by the Board or DCT.[768]

---

[767] *Id*. at 52.

[768] NYC Charter §I 440 (b)(7)(d)(3). " In any case substantiated by the board in which the police commissioner intends to impose or has imposed a different penalty or level of discipline than that recommended by the board or by the deputy commissioner responsible for making disciplinary recommendations, the police commissioner shall provide such written report, with notice to the subject officer, no later than 45 days after the imposition of such discipline or in such shorter time frame as may be required pursuant to an agreement between the police commissioner and the board. Such report shall include a detailed explanation of the reasons for deviating from the board's recommendation or the recommendation of the deputy commissioner responsible for making disciplinary recommendations and, in cases in which the police commissioner intends to impose or has imposed a penalty or level of discipline that is lower than that recommended by the board or such deputy commissioner, shall also include an explanation of how the final disciplinary outcome was determined, including each factor the police commissioner considered in making his or her decision."

The obligation to report outcomes and to explain departures was part of the Charter referendum approved by the voters in November 2019.  In essence, any departure in the penalty or level of discipline from that recommended by CCRB or a DCT needs a written explanation giving the reasons for deviating.  Further, if the penalty or level of discipline is lower than that recommended, a more detailed explanation of "how the final disciplinary outcome was determined, including each factor the Police Commissioner considered in making his or her decision" must be provided.  This Charter amendment could be of significant benefit in understanding SQF outcomes.  Discipline in substantiated SQF cases is commonly reduced from CCRB's recommendation.  Previously, downward departure letters were only supplied in formal disciplinary cases prosecuted by APU.[769]  No explanation was given in the majority of SQF cases where command discipline or guidance were recommended by CCRB and not pursued formally. The Charter now requires an explanation in all cases, which should include all SQF substantiations regardless of the level of discipline sought.  This would, or should, include cases where CCRB recommended an A-CD or B-CD or even guidance.

Aside from the Charter, there are obligations or promises to report under the 2012 APU-MOU, the Disciplinary Guidelines, and a Penalty Matrix-MOU signed in 2021 designed to implement use of the Disciplinary Guidelines.[770]  The varying, and sometimes conflicting, requirements are discussed later in this Report.

### xii.    Unfettered Discretion of the Police Commissioner

Although the Commissioner's discretion is referred to as "unfettered,"[771] there are some limitations to the power.  Administrative Code § 14-115 enumerates and limits the available penalties the Commissioner may impose:

> The commissioner shall have power, in his or her discretion, on conviction by the commissioner, or by any court or officer of competent jurisdiction, of a member of the force of any criminal offense, or neglect of duty, violation of rules, or neglect or disobedience of orders, or absence without leave, or any conduct injurious to the public peace or welfare, or immoral conduct or conduct unbecoming an officer, or any breach of discipline, to punish the offending party by reprimand, forfeiting and withholding pay for a specified time, suspension, without pay during such suspension, or by dismissal from the force; but no more than thirty days' salary shall be forfeited or deducted for any offense.

---

[769] Previously, downward departure letters were required in limited cases by 38-A RCNY § 15-18 and by a MOU entered into in 2012 for trial cases prosecuted by the APU-CCRB.

[770] Matrix-MOU (Feb. 4, 2021), https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/nypd-ccrb-discipline-matrix-mou-final.pdf.

[771] *See* Independent Panel, *supra*, at 28 ("The Panel is concerned, however, that the Commissioner's unfettered discretion gives rise to the perception, whether justified or not, of bias or inconsistency, which undermines the confidence of the public and other constituencies in the integrity, fairness, and robustness of the NYPD's disciplinary system."); *id.* at 48 ("The exercise of unfettered discretion has the potential to result in inconsistent outcomes, favoritism, and excessive leniency.")

Further, the Commissioner's determination may be challenged in an Article 78 proceeding, which reviews whether the decision was arbitrary and capricious, not supported by substantial evidence, or the penalty or discipline imposed was an abuse of discretion.[772]

### xiii.    Efforts to Remove the Police Commissioner's Final Authority on Discipline

A recurring theme throughout the history of civilian oversight has been an effort by some to give final authority to an outside, independent, body in assessing civilian complaints of police misconduct.  The effort is as alive today as it has been in the past.  In its submission to the JRP, Citizens Union argued,

> Concurrently, the City and the State should explore ways through legislation or other means that would allow CCRB complaint hearings to go through OATH, or an alternative independent body, to create a needed level of independence and impartiality.  One possible approach would be to enact legislation specifying that hearing officers be appointed for fixed terms, removable only for cause.  At present, the hearing officers are a deputy commissioner and assistant commissioners who serve at the pleasure of the Commissioner. . . .

> [I]n administering justice in cases of alleged police misconduct, too much authority currently resides in the Police Department to prosecute, hear, adjudicate, and decide penalties.  Investing so much authority in a single entity to handle essentially four different, major parts of the police disciplinary process – the same entrusted with the right to use force to provide public safety and enforce the law – does not provide for an appropriate level of public oversight or separation of powers in a democratic society.[773]

A recent report by the National Organization of Black Law Enforcement Executives concurs.  They wrote:

> Citizen review and oversight is a necessary component in reimagining public safety and creating accountability on the part of law enforcement.  In order to address the power disparity between police who are tasked to protect and serve the community and the community members themselves, the community must be empowered through civilian awareness, visibility, and engagement.  Accountability on the part of law enforcement requires the creation of an environment that is inhospitable to officers who are not following the rules, both internally and externally.  Internally, police departments need to identify officers who are not following the rules and subject them to disciplinary action.  Equally important though, citizens should weigh in on review and oversight of law enforcement agencies, because ultimately, citizens are the most affected by their actions. . . .  Citizen oversight of law

---

[772] *Montella v. Bratton*, 93 N.Y.2d 424 (1999) (NYPD disciplinary proceedings are governed by NYC Admin. Code § 14-116 which confines review to an Article 78 proceeding.)  *See also Batista v. Kelly*, 16 A.D.3d 182 (1st Dep't 2005) ("[S]ubstantial deference is due to the police commissioner's disciplinary determinations.")

[773] Appendix, JRP Final Report, Case No. 8-cv-1034-AT, Dkt. No. 598-1 at 44.

enforcement should be available in the form of a separate body that is given a meaningful seat at the table, with the power to weigh in on all aspects of enforcement. . . .  To provide meaningful review, citizens must have access to all relevant information and evidence and need the power to subpoena records and testimony. . . .  Consistent with review of use of force and misconduct, citizens should weigh in on disciplinary actions, and be empowered to advance discipline, including when it can result in suspension or dismissal of officers.[774]

On March 25, 2021, the New York City Council adopted Resolution 1538-A/2021.  The Resolution cited reports that the concurrence rate[775] for formal discipline, i.e., serious cases where Charges and Specifications are pursued by CCRB, was only 32 percent.  Seeking greater deference to CCRB determinations, the Council's Resolution sent a Home Rule Message[776] to Albany, requesting legislative adoption of S5252/A6012, a bill pending in the State Legislature.[777]  The bill amends Sections 434 and 440 of the NYC Charter and Section 14-115 of the Administrative Code. It removes discretion from the Police Commissioner in misconduct cases brought following civilian complaint.  CCRB's FADO jurisdiction would remain, but CCRB would send cases where command discipline or Charges and Specifications have been substantiated by a panel to an independent hearing officer appointed by the Executive Director of CCRB for final adjudication.

The Interplay with two state statutes may be read to limit this effort in New York City.[778] While the bill amends Local Laws (the NYC Charter and the Administrative Code), it does not amend State Law—either Unconsolidated Law 891 or Civil Service Law § 75.  For clarity's sake, if the sponsor's desire is to assign discipline to a body other than the Police Commissioner, it might be provident to make clear, legislatively, that § 891 and § 75 do not control.  As well, if the sponsor's desire is to do such without collective bargaining, the Taylor Law[779] may need amendment.[780]

---

[774] National Organization of Black Law Enforcement Executives (NOBLE), Report of the Reimagining Public Safety Task Force at 22-23 (2020), https://www.cga.ct.gov/jud/tfs/20200116_Police%20Transparency%20and%20Account ability%20Task%20Force/Related%20Materials/Report%20of%20the%20NOBLE%20Reimagining%20Public%20 Safety%20Task%20Force.pdf https://noblenational.org/about-us/.

[775] The rate at which the Police Commissioner follows CCRB's recommendation for discipline.

[776] N.Y. Municipal Home Rule Law § 40. A Home Rule Message is needed when a locality asks the State Legislature to amend or deviate from State law in a way that would affect that municipality but not the entire State.

[777] Subsequent to the drafting of this Report, the proposal was encompassed in A.376/S.2108 of the 2023-24 legislative session. The bill remains in committee and would require a new home rule message.

[778] CSL § 75; Unconsolidated Law § 891; Admin. Code § 14-115.

[779] CSL § 201.

[780] *See Matter of Rochester Police Locust Club, Inc. v. City of Rochester*, 231 N.E.3d 1001, 208 N.Y.S.3d 94 (Nov. 20, 2023). The Taylor Law, Civil Service Law § 201, L. 1967, ch 392, (requiring bargaining of terms and conditions of employment) was held, in a 4-3 opinion, to include discipline when local laws are amended subsequent to the enactment of Civil Service Law §74, et seq. in 1958. In 2022, the Legislature amended the Taylor Law to specifically denominate "discipline" as part of "terms and conditions of employment" for firefighters. *See* Civil Service Law § 201(4)(b), L.2022, ch 674 §3, effective March 1, 2023. Police organizations were not included in that amendment, but, nonetheless, the ruling in *Rochester* may well be held to require bargaining absent specific textual inclusion in the Taylor Law

Special Local Laws (applying solely to an identified local government) require enactment in the State Legislature if in conflict with general laws. In this case, the Council asks the Legislature to amend NYC law in a way that bypasses general laws, without amending the general laws that would apply elsewhere.[781]

> As expected, the CCRB supports the legislation,

> Providing the CCRB with final disciplinary authority would lead to greater police accountability and ensure New Yorkers have a disciplinary process that—from start to finish—is totally independent from the police department. . . . Communities across this country are searching for ways to improve community-police relations and achieve more accountability in their police departments. New York can step up and be a leader on this issue and show the rest of the nation that empowered civilian oversight [is] possible.[782]

On the other hand, the Police Commissioner has argued that,

> As the final arbiter in matters of discipline, a Police Commissioner's role is similar to a trial judge in imposing penalties . . . . This command structure enables the Police Commissioner to effect change in the department and ensures consistency and efficiency in all of the department's operations. This becomes essential in flexibly responding to events—such as crime upticks or national security issues—in real time. It would be hard to imagine a system for rapid discipline by an outside body—in effect, weakening what is a longstanding, paramilitary style justice system affording the Police Department wide latitude for rapid accountability and for real time operational maneuverability in times of public need.[783]

Given the importance of this topic to compliance with *Floyd*, a brief diversion into the history and failure of attempts to remove adjudicatory authority from the Police Commissioner in New York City is helpful.

### xiv. Previous Efforts to Limit the Authority of the Police Commissioner

In July 2000, the New York City Commission to Combat Corruption published a Report, "The New York City Police Department's Prosecution of Disciplinary Cases," which analyzed the

---

[781] The Resolution passed on a voice vote without a roll call. A Home Rule Message requires either the concurrence of the Mayor or approval by two-thirds of the Council without the Mayor. The Amendment would need to be passed by the State Legislature, since an amendment to local laws would open the discipline to collective bargaining. *Matter of Rochester Police Locust Club, Inc. v. City of Rochester*, 2023 NY LEXIS 1901 (2023). Even then, without an amendment to Civil Service Law § 75, a potential conflict with the Taylor Law (discussed above) would ensue.

[782] CCRB, Press Release: After Council Resolution Passes, CCRB Chair Reiterates Need for Final Disciplinary Authority (Mar. 25, 2021), https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/news/press-releases/2021/PR_FinalAuthorityRes_03252021.pdf.

[783] N, NYPD Vision for Fair and Effective Discipline (Nov. 10, 2020), https://www1.nyc.gov/site/nypd/news/pr1110/nypd-vision-fair-effective-discipline.

effectiveness of the Department's processing of civilian complaints.[784]  The Commission found an inordinate delay in civilian-initiated prosecutions, which it attributed to delayed transfer of information from CCRB to NYPD when DAO took over the prosecution of a case after CCRB recommended Charges and Specifications.[785]  The Commission proposed that CCRB be allowed to handle cases without transfer, while leaving the ultimate decision with the Police Commissioner.[786]

In response, in July 2001, the Department and CCRB entered into a Memorandum of Understanding permitting prosecutions directly by CCRB.[787]  The implementing Rules change (38 RCNY 15-12) provided that lower-level disciplinary actions would be decided by the Board with recommendations passed on to the Police Commissioner.  In more serious cases, calling for potential termination or suspension, beginning July 25, 2001, Charges and Specifications would be filed by CCRB.  If a hearing, rather than a negotiated settlement, was necessitated, that would be conducted by the New York City Office of Administrative Trials and Hearings ("OATH").  The Administrative Law Judge at OATH, after the hearing, would issue a report with proposed findings of fact and a recommended decision to the Police Commissioner.

OATH was established within the City Charter in 1988 as part of a New York City Charter Revision Commission ballot proposal creating the City Administrative Procedure Act.[788]  Administrative Law Judges within OATH are authorized to "conduct adjudicatory hearings for all agencies of the city unless otherwise provided for by executive order, rule, law or pursuant to collective bargaining agreements."[789]  OATH is "an independent body that can be a resource to agencies in conducting their adjudications, while at the same time establishing an independent structure outside of the agency to provide an unbiased assessment of the matters to be adjudicated."[790]

OATH hearings separate the investigator/prosecutor from the adjudicating officer—a common staple of any fair-hearing procedure.  Secondly, the hearing officers are trained independent arbiters.  OATH Administrative Law Judges are outside the chain of command; difficult decisions can be made without fear or favor.  Administrative Law Judges are not hired, selected, fired or punished for their independent judgments; and, as is demonstrated by the existing practice utilized for correction officers, decisions are made openly and publicly, with written decisions explaining outcomes and providing guidance for future proceedings.  Decisions are posted on a website with full disclosure, naming the parties and detailing the facts and

---

[784] *See* Commission to Combat Police Corruption, The New York City Police Department's Prosecution of Disciplinary Cases (July 2001), https://www1.nyc.gov/assets/ccpc/downloads/pdf/The-NYPD-s-Prosecution-of-Disciplinary-Cases-July-2000.pdf [hereinafter CCPC Report].

[785] *Id.* at 6-13.

[786] *Id.* at 93.

[787] *See* Section II.C, *supra* (discussing the framework of the MOU).

[788] At its inception, OATH was created by Mayoral Executive Order No. 32 of 1979. It was included in the Charter nine years later.

[789] Chapter 45-A, N.Y.C. Charter § 1048.

[790] *Matter of Victor v. N.Y.C. Off. of Trials & Hr'gs*, Ind. No. 100890/15 (N.Y. Cty. Super. Ct. 2018) (quoting NY City Charter Revision Commission, Final Report at 117 (Sept. 4, 2003)).

recommended findings.  If needed, OATH officers have discretion to redact items to protect particular items of information needing privacy.[791]

OATH disciplinary hearings are the rule, not the exception for all other City employees, including other uniformed services.  Firefighters and City correction officers facing discipline, suspension and termination, currently have their cases heard before OATH.  There are 11,600 correction officers.  Their trials are public.  The results are published and posted online with the name of the officer included.[792]  OATH postings list both substantiated allegations and those that are not substantiated.[793]

Today, issues surrounding the propriety of a police stop are, on occasion, heard before an OATH officer, however these are in the context of *Krimstock* hearings (seeking return of seized property), not discipline.[794]  Isolated misconduct matters dealing with employee relations charged against a police officer, not prosecuted by APU and not leading to possible termination, can also be resolved before OATH Administrative Law Judges.  When the Law Enforcement Bureau of the NYC Commission on Human Rights ("CCHR") brings a complaint against individual police officers, it is heard in the Office of Administrative Trials and Hearings when there is an LEB finding of probable cause.  The parties are publicly identified by title and name in the Commission's published decisions.[795]  Thus far, CCHR has not brought an action before OATH against any individual officer or group of officers for misconduct other than internal employment or violations of the public accommodations section of the Charter.  CCHR also has the authority to investigate claims of bias-based profiling, independent of CCRB or NYPD actions that may be pursued.[796]  Presumably those claims could be resolved at a public OATH proceeding if needed.[797]

The 2001 MOU and the Rules, allowing APU prosecutions and hearings before OATH Administrative Law Judges, were successfully challenged by the PBA.  The Appellate Division, First Department, held that OATH was barred from hearing the matters because New York State Unconsolidated Law § 891 provides that removal hearings for police officers must be held by the

---

[791] 48 RCNY § 1-49(d); *see Dep't of Correction v. Johnson*, 2019 NY OATH LEXIS 362 (2019); *Victor v. N.Y.C. Off. of Trials & Hr'gs*, 174 A.D.3d 455 (1st Dept 2019).

[792] A recent application to extend the confidentiality blanket of Civil Rights Law § 50-a, prior to its repeal, to the proceedings, was rejected on the grounds that it was untimely.  *Victor,* 174 A.D.3d 455.

[793] The Correction Officers Benevolent Association (COBA) had joined as Plaintiffs in federal litigation brought by the PBA, asking that unsubstantiated and pending claims, prior to substantiation, be withheld from the public.  *UFO*, Dkt. No. 197 (S.D.N.Y. Aug. 21, 2020).  COBA's application for a preliminary injunction as to Correction Officers was denied. The case in its entirety was voluntarily dismissed with prejudice on April 13, 2021.

[794] *Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002); *see, e.g. Police Dep't v. Neofytides*, 2014 NY OATH LEXIS 146 (2014).

[795] *See, e.g. In re Comm'n on Human Rights ex rel. Carter v. NYC Police Dep't*, OATH Index No. 0019/15, 2018 NY OATH LEXIS 330 (2018) (dismissing a claim of retaliatory denial of overtime by a supervisor, a Sergeant).

[796] Admin. Code § 14-151(d)(1)(ii) specifically authorizes CCHR to investigate and pursue a complaint alleging bias-based profiling against "any law enforcement officer who has engaged, is engaging, or continues to engage in bias-based profiling."

[797] In *Jaggi v. NYC Police Department*, OATH Index No. 1498/03 (2004) a Traffic Enforcement Agent successfully alleged religious discrimination - again on an employment issue - before an OATH administrative judge.

Commissioner or a "deputy or *other* employee" of the Department.[798]  The Court interpreted the use of the word "other" to require that any *deputy* appointed by the Police Commissioner to hear disciplinary hearings must also be an *employee* of the Department.[799]  OATH judges are independent agents.[800]  They can be deputized but cannot be "employees" of the agency for which they provide hearings. Although the statute permitted the Police Commissioner to assign hearings to deputies, the Appellate Division ruled that the Police Commissioner was not allowed to "deputize" OATH judges for the purpose of conducting a hearing, even if the end result was only advisory.  The Court ruled that, under § 891, only employees of the Department could conduct termination hearings.

The court in *Giuliani* went further than requested by the Plaintiff unions.[801]  Today, all formal disciplinary hearings are held by deputies within the Department and not OATH.  After concluding that removal hearings must be chaired by employees, the panel, unfortunately, extended its holding beyond removal hearings covered by the statute to all disciplinary proceedings.

Unlike Section 891, both Civil Service § 75 and NYC Administrative Code §14-115 apply to all disciplinary hearings.  They are not limited to hearings where termination is sought.  Neither section requires that hearing officers in disciplinary cases must be employees of their department.  Section 75 specifically authorizes deputization or outside designation.  After the hearing, the recommendation is referred back to the employer "for review and decision."[802]  It is for that very reason that, consistent with Section 75, firefighters and correction officers have their disciplinary hearings first heard by OATH appointees.

The *Giuliani* panel conceded that Section 891, "by its terms, applies only to charges that may result in an officer's removal from service."[803]  Nonetheless, it concluded that Section 891 and Administrative Code §14-115 should be "construed together as forming part of the same

---

[798] *Matter of Lynch v. Giuliani* ("Giuliani"), 301 A.D.2d 351, 359 (1st Dep't 2003).

[799] A good example of the ambiguity (and potential for alternate construction) with which the use of the word "other" may be interpreted in a similar situation is the discussion by both the majority and the concurrence in *Heien v. North Carolina*, 574 U.S. 54, 67-68, 69 (2014). There, the state motor vehicle code required a stop lamp and all **other** rear lamps to be in good working order. The question was:  If all rear lamps are required to be in working order, does the law then require all stop lamps to be in working order? Or does just one stop lamp have to be in working order if there are more than one stop lamp? The semantic debate was whether the phrase "stop lamp and other rear lamps" meant that all "stop lamps" were, therefore, "rear lamps." Similarly, in *Giuliani*, the question was whether "deputy or other employee" means that all "deputies" are "employees." The various justices in *Heien* conceded that the word "other" permitted dual conflicting interpretations, either including all stop lamps as also being rear lamps, or not. The Court acknowledged that either interpretation was reasonable.

[800] *See, e.g., Dep't of Correction v. Royster*, OATH Index No. 156/20 (2020).

[801] Respondent – Cross Appellants (OATH) only appealed "from that portion of the judgment granting the petition to the extent of '(i) declaring that § 891 of McKinney's Unconsolidated Laws prohibits respondent Office of Administrative Trials and Hearings hearing prosecutions that may result in recommendations for termination against police officers serving in the competitive class of service and (ii) barring said respondent from hearing such cases.'" *Id*. at 356.

[802] Civil Service § 75.

[803] *Giuliani*. 301 A.D.2d at 359-60.

179

subject matter" (while ignoring Civil Service Law § 75). The court extended its reading of Section 891 to "enjoin OATH from holding **any** hearings based on complaints filed with the CCRB, whether or not removal is a possible outcome of the hearing."[804]

The court's expanded reading of Section 891 directly affects attempts to enforce *Floyd*'*s* holding in stop and frisk cases. SQF allegations, standing alone,[805] are not typically considered "serious" enough to warrant termination and do not result in removal, or even suspension.[806] SQF violations, even when substantiated, are not sent to a hearing officer for formal disciplinary proceedings. They are dealt with informally through Command Discipline or guidance. From 2016 through 2020, there were 44 closed cases containing a substantiated SQF allegation (along with other charges such as force) where CCRB recommended Charges and Specifications (a necessary predicate to termination).[807] None resulted in a Police Commissioner order of termination or suspension. As a consequence of *Giuliani*, SQF misconduct proceedings cannot be heard, in public, before a neutral and independent body such as OATH notwithstanding the Department's practice of discounting SQF violations to the point that termination is not an available outcome in cases of SQF misconduct.[808]

Overall, removal or termination proceedings are rare and constitute a small fraction of the 4,500 investigations conducted by CCRB each year. In the three-year period, 2017-2019, 130 APU cases went to a final hearing and recommendation in a trial before a trial commissioner.[809] One case, ███████, resulted in termination. The Appellate Division's extended mandate is a classic example of the "tail wagging the dog." The procedures for the exceptional case of termination controlled the choice of hearing site for all formal discipline.

To be clear, while adjudication before a neutral and independent body may be salutary and a desirable legislative goal from the perspective of the public, it is not a necessary requirement of due process for the officers who are charged.

---

[804] *Id.* (emphasis added).

[805] *See* discussion *supra* indicating that no case could be found where an SQF allegation standing alone resulted in termination or suspension. As well, the grid or matrix recently adopted by CCRB does not recommend charges for SQF allegations.

[806] The disciplinary matrix or "grid" used by CCRB does not suggest Charges and Specifications for SQF violations. NYPD's "Disciplinary System Penalty Guidelines," provide "Presumptive Penalties for Abuse of Authority." The guidelines for SQF misconduct presume Training or command discipline with possible imposition of "penalty days," i.e. accrued vacation days or credit for suspension days, up to a level B-CD. This would permit a loss up to 10 days, but only for intentional or bad faith conduct, otherwise the penalty is 3 days or less. Termination is not listed as a potential outcome.

[807] SQFST matrix supplied by the Department to the Monitor.

[808] See discussion, *infra*, of the Disciplinary Matrix and of CCRB's Guidelines - both of which do not provide for termination for SQF misconduct absent extraordinary circumstances. Since the *Floyd* decision, no uniformed officer has been terminated for an improper stop, question or frisk alone.

[809] Executive Director's Monthly Reports for January 2018, 2019, and 2020 compiled. CCRB calculates an APU "case" as the proceeding against each individual officer. Accordingly, APU "case" counts and CCRB reports on "complaints" may not match.

The New York Court of Appeals has ruled that,

> [D]ue process requires only notice and some opportunity to respond . . . due process could be satisfied by a pretermination showing that 'there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.' This . . . demands no more than that the employees be given an explanation of the charges against them and an opportunity to present their side of the story either in writing or in person.[810]

As a matter of federal constitutional law, it is an open question whether due process also requires an impartial decision-maker at a pre-termination hearing, i.e., a hearing and recommendation to the Police Commissioner who makes the final decision. It is argued that the availability of Article 78 review post-termination is sufficient to protect any due process rights. The Second Circuit, in 2001, held that a pre-termination hearing for a police officer does not require a neutral adjudicator as long as full due process is available in a post-termination hearing.[811] On the other hand, given the limited scope of review permitted in an Article 78 proceeding,[812] and in light of subsequent Supreme Court holdings, a later panel of the Second Circuit, in an unpublished decision, questioned the continued viability of the earlier opinion.[813]

### xv.  Deference to the Trial Commissioner's Factual Findings

The Court of Appeals has held that the Police Commissioner may not arbitrarily disregard a Trial Commissioner's findings of fact. Although the Police Commissioner is not bound by the findings of a trial commissioner, "it is not proper for an administrative agency to base a decision of an adjudicatory nature, where there is a right to a hearing, upon evidence or information outside the record."[814] This is true with regard to the finding of guilty or not guilty but is not the case when assessing a penalty. "After a civil service employee has been found guilty of misconduct the public employer may consider material included in the employee's employment record in determining an appropriate sanction; however, the employee must first be given notice of the data to be considered and an opportunity to submit a written response relative to such information."[815]

In one case, a Trial Commissioner exonerated an officer, a Lieutenant, of a charge of soliciting and advising another officer to make a false statement during an investigation. The Police Commissioner overrode the determination, finding the officer guilty. The charges rested entirely on the uncorroborated testimony of an alleged accomplice. In an Article 78 proceeding,

---

[810] *Prue v. Hunt,* 78 N.Y.2d 364, 369 (1991) (Internal citations omitted).

[811] *Locurto v. Safir*, 264 F.3d 154, 174 (2d Cir. 2001).

[812] An Article 78 proceeding is limited to three questions: (1) Is the decision arbitrary and capricious? (2) Is the finding unsupported by substantial evidence? or (3) Does the penalty shock the conscience?

[813] *Rothenberg v. Daus*, 2015 US Dist. LEXIS 39764. 2015 WL 1408655 (S.D.N.Y. Mar. 27, 2015) (Stein, J.), quoting 481 F App'x 667 (2012). *But see Green v. Dep't of Educ. of N.Y.*, 16 F. 4th 1070 (2d Cir. 2021).

[814] *Simpson v. Wolansky*, 38 N.Y.2d 391, 393 (1975) (applying CSL §75 to a case where the commissioner reversed a hearing officer's determination "on matters not appearing in the record"); a*ccord Matter of Farrell v. Dowling*, 90 A.D.2d 849 (2d Dep't 1982); *Matter of Spetalieri v. Quick*, 96 A.D.2d 611 (3d Dep't 1983).

[815] *Bigelow v. Bd. of Trustees*, 63 N.Y.2d 470, 472 (1984).

the Lieutenant argued that the hearing officer's credibility determination should be final and binding upon the Police Commissioner. In restoring the not guilty finding, the Court acknowledged that a hearing officer's report "is not conclusive against being overruled by the . . . Commissioner" but it is "entitled to weight in determining the existence of substantial evidence particularly to the extent that material facts in any case depend on the determination of credibility of witnesses as shown by their demeanor or conduct at the hearing."[816]

In a later case, an officer argued that a guilty finding should be overturned for want of accomplice testimony corroboration, as in *Kelly*. In denying the appeal, the Court wrote that there is no fixed requirement of accomplice corroboration in police discipline trials.[817] The lack of corroboration in *Kelly* was "one reason among several" for reversal. The Court reiterated that, in finding the Respondent guilty, "the Hearing Officer's evaluation of the witnesses' credibility was entitled to great weight" because the Hearing Officer is "able to perceive the inflections, the pauses, the glances and gestures—all the nuances of speech and manner that combine to form an impression of either candor or deception."[818] But, here, the Trial Commissioner had found Petitioner guilty and the Police Commissioner's reliance on that finding was based upon substantial evidence.[819]

Even though the outcomes differed, the common thread that ran through both cases was that some level of deference should be accorded the factfinder, the Trial Commissioner, by the Police Commissioner whose "review is confined to a lifeless record."[820] The hearing officer's factual finding cannot be unreasonably ignored.

Similar arguments might be made with regard to CCRB findings. Factual findings by a panel should not be disregarded.[821] Panels have the benefit of tape recordings, documentary evidence, videos, and full interviews. On the other hand, CCRB panels are not presented with live

---

[816] *Kelly v. Murphy*, 20 N.Y.2d 205, 209-10 (1967) (internal citation omitted).

[817] *Berenhaus v. Ward*, 70 N.Y.2d 436, 445 (1987).

[818] *Id.* at 443, 445.

[819] Substantial evidence has been defined as "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact. *Id.* at 443.

[820] *Id.*

[821] Generally, the rule for review of factual findings by an administrative body was best stated in a dissenting opinion by Justice Friedman, vindicated by a reversal on appeal, "if we can discover somewhere within the record 'a rational basis . . . for the findings of fact supporting the agency's decision, the agency's determination must be confirmed. Further, an administrative agency's determinations concerning the credibility of witnesses who have testified before it at an evidentiary hearing are 'largely unreviewable by the courts.' In sum, '[w]here there is a conflict in the testimony produced . . . [and] where reasonable [people] might differ as to whether the testimony of one witness should be accepted or the testimony of another be rejected, where from the evidence either of two conflicting inferences may be drawn, the duty of weighing the evidence and making the choice rests solely upon the [administrative agency]. The courts may not weigh the evidence or reject the choice made by [such agency] where the evidence is conflicting and room for choice exists." *Rodriguez-Rivera v. Kelly*, 3 A.D.3d 379, 384 (1st Dep't 2004) (Friedman, J., dissenting), *rev'd* 2 N.Y.3d 776 (2004) ("We agree with the dissenter below that the majority improperly substituted its credibility determinations for those of the Police Commissioner" which had confirmed the findings of the Trial Commissioner).

testimony and examination of the witnesses. They rely heavily on the presentation and recommendations of the investigator, making direct comparison to Departmental Trials difficult.

CCRB has begun to post departure letters it receives from the Police Commissioner when the Commissioner imposes a lesser penalty or level of discipline than that recommended by CCRB when it substantiates a complaint.[822] As of March 2023, there were 181 Departures described in cases decided in 2022. Although the letters are required to explain in detail the reasons for the Police Commissioner's rejection of CCRB's recommendation, they are brief and opaque. Nonetheless, an attempt to categorize the reasons given for departure (or deviation) may be classified into groupings.

A review of the most recent 100 letters (as of April 1, 2023) shows the following:

- In 81 of the 100 cases, CCRB recommended a B-CD
    - In 58 of the 81, the Police Commissioner dismissed the case with NDA.[823]
    - 14 of the 81 cases were reduced from B-CD to A-CD.
    - 9 of the 81 cases were reduced from B-CD to Training.

- In 19 of the 100 cases, CCRB recommended an A-CD.
    - In 18 cases, the Police Commissioner dismissed the case with NDA. The remaining case was reduced from an A-CD to Training only.

More interesting, in the context of discussions around the Police Commissioner's acceptance, rejection, or deference for factual determinations by CCRB, are the reasons offered for departure or deviation.[824]

- 43 of the 100 departures/deviations appear to have been a result of a rejection of the factual findings of the CCRB panel.
- 18 of the 100 departures/deviations were based upon the Police Commissioner's conclusion that the officer acted "in good faith" or "without intent" to commit misconduct.
- 39 of the 100 departures were based upon the Police Commissioner's reading of the law and guides in determining that the conduct did not violate such.

---

[822] At https://www.nyc.gov/site/ccrb/complaints/redacted-departure-letter.page. Departures (a penalty other than that recommended by CCRB) and Deviations (a penalty other than one called for by the Disciplinary Matrix) are combined in the postings. The differing requirements under the law and MOUs is discussed later in this report.

[823] Any case resulting in NDA is a deviation from the Matrix.

[824] The departure letters rarely delineate the cause with precision. The statistical breakdown here is this reviewers best interpretation of letters which are frequently ambiguous.

## VII.    The Civilian Complaint Review Board

### A.    Board Structure

The composition, powers, and duties of the current CCRB are delineated by Section 440 of the City Charter.[825]  That section underwent significant changes by way of a Referendum in November 2019.[826]  One important change was in the Board composition.

From 1993 to 2020, the Mayor appointed 13 Board members to head the CCRB.  Five members were directly appointed by the Mayor.  He would appoint one as Chair.  Eight were appointed by the Mayor after "designation" – the City Council designated five members - one from each borough - and the Police Commissioner designated three.

As noted in the Preliminary Staff Report to the 2019 Charter Revision Commission, "[t]he Mayor does not have to accept a particular person designated by the Council or the Police Commissioner; the Mayor may reject (and has in the past rejected) proposed designees and may require the designation of someone else who would be mutually agreeable to the designator and the Mayor."[827]

Effective March 31, 2020, the CCRB was expanded from 13 to 15 members with the addition of one direct appointee by the Public Advocate and a Chair, to be jointly appointed by the Mayor and the City Council Speaker.  The five members previously appointed by the Mayor upon designation of the City Council are now appointed directly by the City Council.  In sum, the balance shifted.  He no longer has control of all 15 slots.  Of the 15 members on the Board, the Mayor now has five direct appointments and three upon designation of the Police Commissioner.

All members must be residents of the City and the Board must "reflect the diversity of the city's population."[828]  Members may not hold any other public office of employment.  Other than the Police Commissioner's designees, no member may have had experience as a law enforcement professional or be a former employee of NYPD.  The Police Commissioner's designees are required to have experience as law enforcement professionals.[829]

Board members receive compensation on a per-session basis.[830]  In the event that one of the Board seats becomes vacant, a successor is designated by the same authority (City Council,

---

[825] *See generally* 18-A NY City Charter § 440 ("Civilian Complaint Review Board").

[826] Local Law No. 215 (2019).

[827] Charter 2019 NYC, Preliminary Staff Report (Apr. 2019), at 16, accessed at https://static1.squarespace.com/static /5bfc4cecfcf7fde7d3719c06/t/5cbe86c2e4966bc917c36e0f/1555990215645/PreliminaryStaffReport2019.pdf.

[828] § 440 (b)(1).

[829] § 440(b) (2). "For the purposes of . . . section [440] experience as a law enforcement professional shall include experience as a police officer, criminal investigator, special agent, or a managerial or supervisory employee who exercised substantial policy discretion on law enforcement matters, in a federal, state, or local law enforcement agency, other than experience as an attorney in a prosecutorial agency."

[830] CCRB, *The Board*, https://www1 nyc.gov/site/ccrb/about/the-board.page (last visited May 30, 2019).  Board Members are paid a stipend at a rate of $315 for every six-hour session of time spent on CCRB related work or activities. Compensated time includes time spent reviewing and analyzing files, panel meetings and board meetings.

Police Commissioner, Mayor or Public Advocate) that chose the former occupant of the seat, and the successor serves the remainder of the former occupant's term.[831]

Direct appointment by the Council and the Public Advocate, bypass the need for Mayoral approval and concurrence. This is a significant step toward establishing the Board's independence. As part of the testimony before the Charter Commission, Brian Corr, President of the National Association for Civilian Oversight of Law Enforcement, representing 70 Civilian Oversight agencies across the United States, pointed out that "it is very important . . . to] exercise oversight effectively you need entities that also report to the Mayor, the City Council and can balance out that power. . . ."[832]

It is a welcome addition to the Board's composition that the Public Advocate now has a direct appointment. In the past, the Office of the Public Advocate has demonstrated a strong interest in assuring that CCRB and NYPD properly address civilian complaints of police misconduct.

In 1997, Advocate Mark Green asked to review two years' worth of substantiated CCRB case files to "ascertain whether the NYPD's failure to prosecute and/or impose discipline against misbehaving officers is indicative of systemic problems in the response to complaints."[833] NYPD objected, citing Charter § 24 (j), claiming that review of misconduct complaints was not an authorized power of the Public Advocate. The Court disagreed, writing "[t]hat one third to one half of CCRB 'substantiated' complaints resulted in no discipline is a legitimate area for study by [the Public Advocate] to determine why such a result ensued,"[834] an analysis with which the Appellate Division agreed and described as "cogent."[835]

Subsequently, the Public Advocate published a 147-page report[836] analyzing 664 substantiated cases and finding that 75 percent of the officers disciplined received insignificant penalties which he characterized as a "slap on the wrist."[837]

---

[831] N.Y. CITY CHARTER, ch. 18-A, § 440(b)(4) (2019).

[832] P.63, March 7, 2019, Transcript of the Minutes of the Charter Revision Commission 2019.

[833] *Green v. Safir*, 174 Misc. 2d 400, 401 (Sup. Ct. N.Y. Cty 1997).

[834] *Id.* at 401.

[835] *Green v. Safir*, 255 A.D.2d 107 (1st Dep't 1998). As pointed out by the City in its 09.01.23 Feedback to Yates Discipline Report, Item 186, "Supreme Court ruled in favor of [Green] stating (1) Public Advocate serves a watchdog function, (2) police misconduct is and has always been an area of concern for the government, (3) the Public Advocate was looking for patterns, not resolve individual cases (something the Public Advocate cannot do), (4) stated that lack of disciplinary action in the proportion that exists was a legitimate area of study, (5) noted that Civil Rights Law §50-a (4) provides an exception to its general rule of police officer record privacy for government agencies in furtherance of their official duties."

[836] Mark Green, Investigation of the New York City. Police Department's Response to Civilian Complaints of Police Misconduct, New York: Office of the New York City Public Advocate and the Accountability Project, 1999. Repeated attempts to obtain a copy of this report from the office of the Public Advocate and Richard Aborn, who is said to have participated in the draft, have failed. The description comes from the NY Times article cited *infra*.

[837] W. Rashbaum, "More Police Officers Being Punished but Not More Severely," NY Times (July 28, 2000), Section B, Page 1.

More recently, Letitia James, then Public Advocate, sued unsuccessfully to obtain Grand Jury records in the case examining the death of Eric Garner and the involvement of Officer ███████. There, the Appellate Division Second Department denied the application[838] on the grounds that the office of Public Advocate, which reviews complaints against city agencies, lacked the capacity to oversee either District Attorney offices or the Courts and, as such, had no legitimate reason to obtain the testimony in the criminal proceeding.

### i.    Panel Assignment

After their appointments, all Board members attend orientation and receive training from the General Counsel's Office on the CCRB's processes, terminology, and disciplinary framework.

The full Board does not sit and review every case. The Charter provides that the Board shall create rules and may establish panels to review a given complaint, and states that a panel should contain no less than three Board Members, and no panel may consist exclusively of one group of appointees (i.e., a panel cannot be entirely composed of three appointees of the Mayor, designees of the Police Commissioner, or appointees of the City Council).

The CCRB Chair or Executive Director generally assigns cases that have been fully investigated to panels for review.[839] Panels are determined by the CCRB's Case Management Unit ("CMU"). The CMU collects the Board members' availability and then sets a six-month schedule of panel-meeting dates.[840] Board members are assigned to panels on a rotating basis, with the CMU adjusting panel composition as necessary to accommodate individual members' schedules.[841]

Panel members meet, generally via online video conference, to discuss and register final votes on each case. These meetings are not taped or transcribed. A CCRB attorney is present to answer any legal questions and provide legal advice, but she may not recommend how the panel should dispose of any case. Before reaching a conclusion, the panel may ask questions of the investigator who handled the case. The panel can also return the case to the Investigations Unit for further investigation, or conduct its own additional fact-finding, including interviews.[842] A panel operates by majority rule, meaning a panel can determine the outcome of any allegation by a two-to-one vote. Panel votes are confidential.[843]

---

[838] *Matter of James v. Donovan*, 130 A.D.3d 1032 (2d Dep't 2015).

[839] CCRB RULES, at § 1-31(a).

[840] CCRB, Procedures and Standards for CCRB Board Panels.

[841] *Id.*

[842] CCRB RULES, at § 1-32(b).

[843] Plaintiffs assert that "panel votes are subject to FOIL, now that Section 50-a has been repealed." Item 224, 09.29.23 Plaintiffs Feedback on Draft Discipline Report. Plaintiffs recommend that findings be made by staff without requiring a vote by a panel of Board members. On the other hand, the Communities United for Police Reform ("CPR"), "strongly disagree" with that recommendation. July 12, 2024 "Recommendations for Draft Floyd Discipline Report by Hon. James A. Yates."

When asked if, in the past, panel members have personally participated in an interview, the CCRB response was:

> Despite the fact that CCRB Rules authorize personal interviews of witnesses by Board Members, historically, the Board has not personally interviewed witnesses. Board panels do utilize the Further Investigation process whereby Members submit questions to the investigator which can include another interview. If a CCRB panel disagrees with the investigator's finding, the Case Management Unit sends a memo to the investigator, to which the investigator may respond. In 2018-2019, 18 cases were sent back for Further Investigation.[844]

CCRB convenes two to four panels each month, and each panel is assigned approximately 50 cases for review. As a result, "most Board members review 50 cases a month, though there are times when some will review as many as 100 cases." In discussions with the Monitor team, some Board members have expressed concerns about the number of cases they must review each month.[845]

Panels are assembled and members are asked to review 45 to 50 cases in a meeting, which is usually scheduled three weeks after the documents are sent to the members. The panels do not physically convene in one setting. Rather, members log into the system where they view audio files, video recordings, and a closing report along with relevant documents. They officially conference by Video Conferencing.

In theory, a panel could send a case to the full board for review. Any one member of a panel may ask for full board review. Any member of the board outside the reviewing panel can ask the Chair to pull a case for review by the full board.[846] The Chair, on its own initiative, may ask for full board review. During panel review, a Request for full Board review can be made by a panel member or any other member of the Board. Full Board review is also possible if the majority of the three members on a panel cannot agree on a disposition. The CCRB Rules provide that in certain circumstances, cases can be assigned to the full fifteen-member Board.[847] The full Board reviews about one to three cases per year. Between 2016 and 2018, the full Board voted on a total of 7 closed cases.

### ii.    Police Commissioner Designees on All Panels

With two additional members, following the Charter amendments, the Board now has an opportunity to address one of its rules governing rotation of assignments and, in particular, whether

---

[844] Matthew Kadushian, General Counsel, CCRB, June 3, 2019, letter.

[845] Interviews (Aug. 17, 2018).

[846] *See* CCRB RULES, *supra* note 332, at § 1-32(c) ("[U]pon request of a member of the panel, or upon the direction of the Chair at the request of any member of the Board, the Case will be referred to the Full Board for its consideration.").

[847] *See* CCRB RULES, *supra* note 332, at § 1-31(a) (providing that fully investigated cases may be assigned "to the Full Board for review"); *see also* INVESTIGATIVE MANUAL, *supra* note 392, at 23 (noting that the full board "initially reviews all completed cases in which the police conduct allegedly resulted in an individual's death and may opt to decide the case itself rather than refer it to a board panel").

it is necessary to have a NYPD designee on every panel. The requirement that one member be a NYPD designee is not in the Charter or the Administrative Code. It was, however, promulgated as a Rule of the CCRB.[848]

In 2018, the rule was amended to permit designation of a panel by the Chair, in rare instances, to decide a case without requiring that at least one member be a NYPD designee. This is limited to instances where it is necessary to avoid interference or unreasonable delay in the Board's operations. The amendment was unsuccessfully challenged by the PBA, with a claim that "this prejudices the interests of Police Officers for no rational reason."[849] The Supreme Court disagreed, holding that "[t]he revision is rational, because, if there is an emergency situation, the CCRB needs to proceed rapidly."[850] The Appellate Division affirmed on this point. It held that "the Charter only requires that the panels be formed with members from two of the categories" and PBA's "contention that the rule will tend to prejudice police officers because Police Commissioner designees are fewer in number and therefore less likely to be available for a given panel is speculative."[851] Since there is no statutory basis for the police-designee rule in the first place, it seems unnecessary for the Court or the Board to rely on necessity as justification for its elimination. The rule can be dropped entirely and replaced by one grounded in the principles of fairness and the need for true civilian oversight.

A mathematical consequence of the Board's Rule mandating inclusion of a police designee on every panel is the disproportionate quantity of cases heard by police appointees. The Board assigns cases on a rotational basis.[852] But a police designee is always one of the three "in the room."

It is difficult to be precise about relative workload of each board member, in part because of turnover within the Board. In the years 2016 to 2018, there were twenty different board members sitting on the thirteen-member Board. During that period, the three police designees voted on 4,409 cases – an average of 1,469 cases for each police-designee during those years.[853] The five Mayoral appointees voted in 3,805 cases – an average of 761 decisions for each Mayoral appointee. The five Council designees voted on 4,041 cases – for an average of 808 cases for each designee.

There might be sound reasons for the statistical imbalance in the number of cases heard by various members. For example, turnover, illness, and unfilled vacancies within the Board might be reflected in lower numbers of decisions by certain board members. Deference to the burden of other duties assigned to the Chair that might limit her availability. But the inescapable fact is that,

---

[848] Rule 38A RCNY 1-31[b].

[849] *Lynch v. New York City Civilian Complaint Review Board*, 98 N.Y.S 3d 695 (Sup. Ct. N.Y. Cty. 2019) 2019, *aff'd* in part, 183 A.D.3d 512 [1st Dept 2020]). The decision addressed challenges to twelve separate rule changes by CCRB. The. Appellate Division affirmed in part and reversed in part.

[850] *Id.*

[851] *Lynch, supra*, note 850, at 516.

[852] 38-A RCNY 1-31(b).

[853] One police designee participated in 653 investigations in 2016 alone.

as a result of the Board's decision to include a law enforcement official in every panel, the police designees decide a far greater number of cases than other appointees.[854]

The choice to apportion membership with its current makeup (five mayoral, five council, one joint, one public advocate, and three law enforcement) was a political choice, which is not the object of this analysis. One can agree or disagree with the political "balance" set out in the Charter (not the Rules), but it is a political compromise made by the Council that is accepted for sake of analysis. As noted in the earlier discussion about oversight and independence, there are and have been serious differences of opinion about the makeup of an oversight board. But, for the moment that issue was settled by the voters in 2019 and the ultimate compromise set by the Charter and is not the point of this discussion.

Rather, the point being made here is that the Charter makes all members equal, but the Rules alter that by giving some members the opportunity to weigh in on a greater number of overall dispositions. Some members have a more frequent say on dispositions and, consequentially, a heavier imprint on precedent and norms. They have a greater voice. This was not a choice made by elected officials or the voters.

As to the merits of the Rule, not the Charter, arguments can be made on either side of the issue. It can be said that the resulting statistical imbalance has a beneficial or a detrimental influence on outcomes. Without statistical analysis, or even anecdotal evidence, any assumptions are just that, theoretical assumptions.

Civil Rights advocates and reform groups might argue that the weighted system undermines independent civilian oversight envisioned for the Board. Historically, reform groups fought to exclude law enforcement representatives entirely. Assigning three votes out of fifteen to Departmental appointees was a choice by the voters they must accept. But the Rule, giving them more say, is not.

On the other hand, an argument can be made that law enforcement experience lends context and validity to the Board's decisions. Without that inclusion, decisions would be challenged as insufficiently grounded in reality. One can say that inclusion leads greater to public and officer acceptance.

Beyond the direct impact on each individually decided case, the Rule also has a consequential bearing on trends and norms, and ultimately policies. The Disciplinary Guidelines, in a section headed "Effect of precedent" explain that precedent was "taken into account" in their formation and that "situations may arise that are not included in or adequately addressed by the Guidelines. If so, a penalty evaluation will be made based upon the facts and circumstances of the present caseload considering relevant, recent or analogous cases. If the grid or future values to be inserted in the grid are based on precedent, then precedent sets the norm and expectations. "Precedent" as used in this context is not the kind of precedent one thinks of when looking at U.S. Supreme Court jurisprudence which is based upon text, legislative intent, deductive reasoning, and

---

[854] Based on the numbers cited in the study period referenced in this section (2016-2018) - before the Charter change - it appears that police designees decided almost twice as many cases as the Mayoral appointees and about 80% more cases than Council appointees.

common law evolution. "Precedent" in the context of a disciplinary guideline or grid is merely an algorithm urging an outcome based on past disciplines with similar characteristics. It is merely a statistical aggregation of past votes. The result of Rule 1-31 is that each police designee has had and will have a disproportionate weighted vote in CCRB's decision-making process overall and in setting presumptive penalties under the guidelines.

A breakdown of decisions made by each designee is not available to the Monitor. Pertinent to this Report, it is clear that a police designee voted on every SQF complaint brought by a citizen, but how individual votes were cast is unknown. It would be unfair to assume, without evidence, that background plays a role.

In January 2016, Police Commissioner William Bratton asked the Board to disclose to the Department (but not to the complainants or the public) how panel members voted in each case.[855] This would have been useful in measuring the impact of designee participation in panel assignments. There was opposition, both within and outside the Board, to disclosure for fear of retribution or intimidation. It is possible that the Board might assert confidentiality on grounds that the record constitutes pre-decisional intra-agency materials under the Public Officers Law,[856] but at this time, CCRB Rules do not specifically provide for confidentiality. The Bratton proposal was not adopted.

Following the addition of two panel members by the 2019 referendum, Rule 1-31 (Assignment of Cases) underwent revision in 2021. But when Rule 1-31 was amended, an opportunity to balance the proportion of cases heard by police representatives was squandered and, if anything, the imbalance was increased. The rule mandated that "each panel will consist of at least one member designated by the City Council, at least one designated by the Police Commissioner, and at least one designated by the Mayor." Adjustments needed to be made to include the Public Advocate's appointee and the Chair in the rotation. Effective March 26, 2021, 38-A RCNY 1-31(c) was added to provide:

> (c) Due to the special characteristics of their respective offices and appointments, the Public Advocate Appointee and the Chair may participate on a panel as either a Mayoral Appointee or a City Council Appointee.

This change gave the Board the flexibility to permit the two added members to join a panel in either capacity. That means a panel with a police representative and a Council representative could be joined by one of the two new members, and just as well, a panel with a police representative and a Mayoral representative could be supplemented by one of the two new members. In effect, these additions, or rather substitutes, would patch a hole when needed, but would displace non-law enforcement members only.

Ironically, by adding the two new members to the "non-police" bucket but maintaining the rule that a police representative must be present in every panel, the mathematical imbalance

---

[855] Susan Watts, NYPD Wants Civilian Complaint Review Board to Show How its Members Vote on Police Cases, Daily News, January 5, 2016, available at https://www.nydailynews.com/new-york/ccrb-asked-show-votes-police-cases-article-1.2485480.

[856] Public Officers Law § 87(2)(g).

between appearances by police and non-police representatives will be even greater. Each Council representative and the Mayoral representative will be called upon less frequently to participate – each of them will vote on a smaller share of the overall caseload. The police representatives will have a vote in every decision and their proportionate share of all votes will be increased.[857]

Indirectly, the impact of law enforcement votes was raised in litigation. In *Buchanan v. City of New York*,[858] an employee of CCRB claimed she was wrongly fired in retaliation for engaging in protected speech. She had prepared a memo, directed to the Chair of the Board and the Executive Director, detailing a pattern of "flips" where Board members overturned case dispositions by CCRB investigators. In the main, the flips she described were cases where the investigator had requested substantiation of misconduct allegations, but panel members voted against substantiation.[859] According to reports, the police designees "flipped" at a much higher rate than other Board members. Two police representatives were said to flip 43% and 55% of recommendations while "Five [other] members had rates between 0.6% and 8%. Among them: former CCRB Chair Fred Davie . . . flipped 4.5% of substantiated allegations, the analysis said."[860] In a July 2020 memorandum, according to the federal complaints, one employee argued that "whether some complainants saw justice for misconduct was very likely related to which Board Members were assigned to their panels rather than the merits of their complaints."[861] The verity of the memo was not reached in the litigation. District Court Judge Sidney Stein granted portions of a motion to dismiss but denied a motion to dismiss as against the Executive Director.[862] The case was subsequently settled without a public posting of the terms of the settlement or a copy of the "flip" memo in the electronic filings.[863]

If the flip memorandum was correct, the law enforcement representatives play a significant role in misconduct claims that are not substantiated. Without knowing more, it cannot be said

---

[857] In reviewing a draft of this Report, CCRB explained that it currently has adopted a different practice, not explained in the Rules. Apparently, it can send a case to a preliminary screening panel without a Police Commissioner representative. It the matter is not substantiated; the vote becomes a panel recommendation. If one of the members disagrees and wishes to substantiate an allegation, then it needs to go to an appellate panel with a Police Commissioner representative for a decision. If anything, this exacerbates the problem . . . requiring a double vote before a case may be substantiated and exalting police designees into membership in an appellate panel. Item 243, City 09.01.23 Feedback to Yates Discipline Report.

[858] 21-cv-0660 (S.D.N.Y.) (Stein, J.). The case was settled on November 1, 2022 (ECF Doc. No. 93) without disclosure of the terms of the settlement.

[859] Overall, including the law enforcement representatives, panels overturned 585 allegations of police misconduct where investigators had recommended substantiation from January 2014 to May 2020 for a flip rate of 11.4 percent. (The Board substantiated 5127 allegations of misconduct during that period.) Not all flips were to unsubstantiate. There were 180 allegations where panels substantiated out of 39,000 allegations where investigators had recommended against substantiation.

[860] Yoav Gonen, NYPD Oversight Board Overturned Hundreds of Its Own Police Misconduct Findings, The City, May 4, 2021, at https://www.thecity nyc/2021/5/4/22419968/nypd-oversight-board-ccrb-overturned-cop-misconduct-findings?mc_cid=23f76d78e0&mc_eid=dde979a67a. (Quoting a former investigator with CCRB as saying, "The vast majority of the flips soften outcomes.").

[861] Complaint, paragraph 34, *Buchanan v. City of New York*, 21-cv-0660 (S.D.N.Y.), Doc No. 1.

[862] *Buchanan v. City of New York*, 21-cv-0660 (S.D.N.Y.), Doc No. 30.

[863] Order of Dismissal, Buchanan, Doc No. 61, and Stipulation of Voluntary Dismissal, Doc No 93 (Nov. 10, 2022).

whether any particular vote was a good vote or a bad vote.[864]  That is not the question.  Rather, the question is why the Board gives the Police Commissioner's designee's vote more weight against a claim that the Rule slows down the process by overloading a few members with a disproportionate share of decisions.  It had been argued that a "law enforcement perspective on each panel was essential, and more important than a delay in deciding a case."[865]  While that may be true in some cases requiring expertise, there are other factors that would argue for "fresh" eyes in SQF cases.  At the outset, few if any SQF cases, standing alone, are prosecuted by APU at trial.  Most SQF cases are resolved with a panel vote, followed by DAO requests for reconsideration or by DAO recommendations to the Police Commissioner, and the Commissioner has the sole and final power to decide whether misconduct occurred.  In the area of SQF cases, which have been a source of friction between the community and the police, the need for unvarnished community input in weighing discourtesy, selective enforcement or bias is to be valued.  While the technical aspects of stop and frisk law can be daunting,[866] there is nothing inherently beyond the capabilities of civilian Board Members to identify inappropriate or abusive SQF behavior.  The Patrol Guide section on Investigative Encounters, as written with the Court's direction, is equally comprehensible to citizen Board Members as to those with law enforcement background.  And, while there may be argument for the need for police experience and insight in making judgments about use of force, which is debatable, there is nothing to indicate that police representatives on the panel understand the constitutionality of an SQF encounter better than other appointees.[867]  More to the point, there is not a dearth of police insight in the disciplinary process. The Police Commissioner and his employees are fully experienced in such matters and all decisions are reviewed by them with final decision by the Police Commissioner.  At the same time, the Police Commissioner needs to hear the reactions of a citizen panel to a disputed stop encounter before he renders final judgment.[868]

---

[864] In an audit published by the New York State Comptroller, it was reported that "less than 2% of fully investigated allegations were flipped by the Board."  Although "the panel is required to document the rationale for their dissent" the report went on to write that "our analysis of the supporting documentation indicates that explanations are not always sufficiently descriptive for the investigator to understand the reasoning behind the flip, which could improve future investigations."  It concluded, "Not only would it help to ensure consistency across entities, but it would also promote transparency in decision making." (Office of the New York State Comptroller, Division of State Government Accountability, "New York City Civilian Complaint Review Board – Complaint Processing" Report 2020-N-9 at 13. October 2022).

[865] *Lynch v. N.Y.C. CCRB*, No. 152235/2018 (N.Y. Sup. Ct.), Memorandum of Law in Support (Mar. 13, 2018) (NYSCEF No. 3).

[866] See, *People v. De Bour*, 40 N.Y.2d 210 (1976) and its progeny.

[867] Each Board member has an impressive history in legal studies or public administration.  *See* Meet the Board, available at https://www1.nyc.gov/site/ccrb/about/board/members.page.  Fred Davie was replaced by Arva Rice as Chair of the Board in February 2022.

[868] In a review of a draft of this Report, the City response complained that the Report was "strongly implying that the NYPD should be removed entirely from the oversight group."  Item 254, City 09.01.23 Feedback to Yates Discipline Report).  This clearly misapprehends the entire discussion. For one thing, the NYPD cannot be "removed" since the NYPD designates former law enforcement personnel but is not a participant in the first place. More importantly, an observation that certain designees get to vote in a disproportionate number of cases, not as a result of language in the Charter or the Administrative Code, but merely as a matter of choice by CCRB, does not imply in any way that NYPD should be removed entirely.

## B.    CCRB Budget[869]

An oft-repeated lament regarding CCRB's capacity to receive and thoroughly investigate complaints is that it suffers from budgetary limitations.  In 2018, CCRB complained to the Charter Revision Commission of "historical underfunding" compared to other peer agencies.  The Charter Commission noted, for example, that San Francisco's Department of Police Accountability is guaranteed, by city Charter, one line investigator for every 150 sworn members of the police department – a ratio of 0.67 percent.  NYPD in FY 2020 had a budgeted uniform officer headcount of 36,113.  If the same ratio were applied in New York, the CCRB would have 242 line-investigators.  In 2017, San Francisco's Accountability Office had a budget equal to 1.23 percent of the San Francisco Police Department.  If that were true in New York, CCRB's budget would be roughly $67 million.  Oakland, Chicago and Miami also have budgets that are linked to the size or allocation of the police forces they oversee.  Chicago's Civilian Office of Police Accountability has a budget of nearly $17.5 million used to investigate complaints lodged against 15,000 officers.

As outlined in 2018 CCRB's request, prior to the Charter change, for an established budget line:

> Currently, the CCRB's budget is approximately 0.27 percent of the NYPD's total budget.  After intra-city (i.e. required) spending for items such as occupancy, internet service, and telephone lines, the Agency has less than one million dollars in available funds to support its investigations, prosecutions, and employees, generally.  On a per head basis, that amounts to less than $2,000 per person each year.  Such limited resources make it unnecessarily difficult for Agency staff to effectively investigate a police department with a budget of more than 5.6 billion dollars and some 35,000 uniformed officers.  As a point of comparison, the Inspector General for the NYPD ("OIG-NYPD"), housed within the Department of Investigation ("DOI"), had an Other than Personal Services ("OTPS") budget of nearly $17,000 per head for fiscal year 2018, and the DOI as a whole had an OTPS allocation of almost $35,000 per person in the same period.  Similarly, the City Commission on Human Rights had an OTPS allocation of more than $3.7 million

---

[869] NB: The budgetary process is in constant and rapid flux, with planned expenditures, proposed expenditures, adopted plans, a Program to Eliminate the Gap ("PEG") and emergency adjustments. It would be a Sisyphean task to attempt to stay current as the Report is written. Numbers provided here are more to the point of proportion rather than precision. Under the Charter, the most relevant number is the budgeted Full Time Equivalent ("FTE") number of employees in CCRB compared with the budgeted Uniform Officer Headcount for NYPD, which is to be .0065 absent emergency declarations by the Mayor.  As an update to some of the numbers which follow, the police budgeted uniform headcount planned for FY 2024 is 35,001(Report to the Committee on Finance and the Committee on Public Safety on the Fiscal 2024 Executive Plan, May 18, 2023 https://council.nyc.gov/budget/wp-content/uploads/sites/54/2023/05/NYPD.pdf). The CCRB FY 2024 $22.4 million budget allows for a headcount of 237, which is 9 above the Charter mandated FTE count of 228. However, with 31 vacancies, which cannot be filled during the pendency of a Mayoral mandated freeze, CCRB is operating with 22 fewer employees than mandated by the Charter. (Report on the Fiscal 2024 Preliminary Plan, Committee on Public Safety, NYC Council. https://council.nyc.gov/budget/wp-content/uploads/sites/54/2023/03/CCRB.pdf).  The most recent budget agreement between the Mayor and the City Council, as of July 2024, included an appropriation of $25,442,983 (an increase of $2,110,968 above that proposed by the Mayor), with a baseline FTE of 259. https://www.nyc.gov/site/omb/publications/finplan06-24-cc.page.

for an authorized headcount of 156 in fiscal year 2018, compared with the CCRB's allocation of $3.5 million for 187 authorized heads.[870]

Police oversight in New York is a massive undertaking. In 2017, the CCRB received over 10,500 complaints, 4,487 of which were in its investigative jurisdiction. CCRB requires additional funding for a number of essential initiatives to support these investigations. For instance, it is absolutely critical for the Agency to upgrade to its systems, hardware, Training, security, and operations, some of which are more than twenty years old. The CCRB's case tracking system dates back to the early 1990's and continues to run on outmoded and often redundant technologies—this system simply cannot keep up with the pace of the Agency's investigations or the digital storage demands that continue to grow as the NYPD equips every officer with a body-worn camera. With the Right To Know Act taking effect in October 2018, officers for the first time will be required to hand out business cards during all Level 2 and Level 3 stops. The card will include the number for 311 and a notation that civilians may call the number if they wish to comment on their interaction with the officers. Many of those calls will be routed to the CCRB, and the Agency will need to increase its intake staff, investigators, and resources in order to effectively manage the inevitable increase in complaints.[871]

A focus of that testimony was the budgeted allocation for Other Than Personal Services ("OTPS"). The Charter Commission's response was to require a fixed ratio of staff to the size of the police department. No change was made to accommodate OTPS demands. That is, the Charter as amended now guarantees a budget for salaries and employees, but still leaves CCRB strapped for funds to pay for equipment and computer services.

The adopted Charter amendment requires an appropriation each year, beginning in fiscal year 2021, in an amount sufficient to fund a "full-time equivalency" (FTE) rate equal to 0.65 percent of the number of uniform budgeted headcount of the Police Department. This ratio looks exclusively at the number of personnel in each agency and, in effect, requires that the City budget appropriate enough money so that the number of employees at CCRB should be .0065 of the number of uniform police in the same budget. It does not look at source of funds. It does not look at hardware, technology costs, rental, equipment or other OTPS. It does not look at relative salaries or overall budget,[872] remembering that the average cost of a uniformed officer (including benefits) is higher than the average cost of a CCRB employee.

---

[870] That number has been reduced to 136 as of April 2024 according to Item No. 946 of the City's line comments to the second draft of this Report.

[871] Fred Davie, Chair, CCRB to New York City Charter Revision Commission, May 23, 2018.

[872] For perspective, the overall operating budget for NYPD in recent years has been: (FY 2020 = $6.086 billion [spent]) (FY2021 = $5,565 billion [budgeted]) ((FY 2022 = $5,587 billion). Budgeted OTPS (FY 2021 - $607 million) (FY 2022 = $450 million). Not included in this number are items in other budget lines for police-related expenditures such as capital costs, litigation, council member discretionary precinct funds, etc., which can almost double the allotment. Additionally, the NYPD regularly exceeds its budget. In FY 20, NYPD spent $6.1 billion when allotted $5.5 billion.

The Charter allows some flexibility:

> [T]he appropriations available to pay for the personal services expenses of the civilian complaint review board may be less than the minimum appropriations required . . . provided that, prior to adoption of the budget . . . the mayor determines that such reduction is fiscally necessary and that such reduction is part of a plan to decrease overall appropriations or is due to unforeseen financial circumstances, and the mayor sets forth the basis for such determinations in writing to the council and the civilian complaint review board at the time of submission or adoption, as applicable, of any budget or budget modification containing such reduction.[873]

In the Spring of 2020, former Mayor de Blasio had proposed, with his Executive Budget proposal for FY 2021, a 7 percent reduction as part of an overall reduction due to the fiscal impact of the pandemic. But with passage of federal economic relief in the CARES Act, that reduction was no longer necessary. Accordingly, a modification letter was not required.

There are roughly 35,000 uniform officers with the NYPD. To be more precise, the budgeted uniform headcount over the past few years has been:[874]

| FY 2016 | - | 34,483 |
| FY 2017 | - | 35,780 |
| FY 2018 | - | 35,822 |
| FY 2019 | - | 36,461 |
| FY 2020 | - | 35,910 [875] |
| FY 2021 | - | 35,007 |
| FY 2022 | - | 35,030 |

If the Charter is followed, that would mean CCRB should receive sufficient Personal Service funding for approximately 228 FTE in the current fiscal year.[876]

The allocated budget for Personal Services for CCRB[877] over the past five years (in thousands of dollars) with an authorized headcount of full-time equivalent employees, was:

---

[873] LL 215/2019.

[874] Finance Division, NY City Council, *Report to the Committees on Finance and Public Safety on the Fiscal 2022 Executive Budget for the New York Police Department*, May 11, 2021, available at https://council.nyc.gov/budget/wp-content/uploads/sites/54/2021/05/NYPD.pdf. (This does not include roughly 19,000 Members of the Service [MOS] who may be officers or other civilian employees but are not uniform police. There are approximately 5,300 School Safety Agents who are not uniformed officers.)

[875] The Department went over budget projections, the actual number was 36,178.

[876] 0.0065 x 35,007 = approximately 228.

[877] NY City Independent Budget Office, Fiscal History: CCRB, (last accessed Apr. 16, 2022), available at https://ibo.nyc ny.us/RevenueSpending/ccrb.html; https://council nyc.gov/budget/wp-content/uploads/sites/54/2020/03/054-ccrb.pdf.

| | | |
|---|---|---|
| FY 2016 | $15,077 | 180 FTE |
| FY 2017 | 15,174 | 166 FTE |
| FY 2018 | 16,403[878] | 173 FTE |
| FY 2019 | 18,459 | 168 FTE |
| FY 2020 | 19,330 | 212 FTE |
| FY 2021[879] | 18,973[880] | 203 FTE  -  original COVID plan |
| FY 2021 | 19.700 | 228 FTE  -  updated COVID plan[881] |
| FY 2022[882] | 19,626 | 262 FTE[883] |

The numbers above are the amounts budgeted and expected to be spent. The Adopted 2022 Financial Plan for the City[884] called for 269 FTE by June 30, 2022. In the end, CCRB did not fill all the positions and accommodated a hiring freeze. CCRB estimates that it spent $18.95 million.

In January 2022, Mayor Adams proposed an across the board cut of 3 percent in agency budgets, which applies to CCRB as well. That is not a finalized number for FY 2023 as negotiations with the City Council are in progress.

The Mayor had proposed to spend, in FY 2023, $3.2 million for Administration, plus $3.1 million for the APU, and $10.6 million for investigations/mediation for a total of $16.9 million. In addition, the newly created "[b]iased [sic] Based Policing Investigations Unit would receive $2.8 million, for a grand total of $19.7 million." The plan is to fund 252 positions. This does not include an additional $5.2 million for OTPS, which is separate and apart from the Charter staffing requirement.

The Mayor's proposed FY 2023 budget for the NYPD[885] was $5.66 billion with a Personal Services appropriation to fill 50,863 positions, which includes uniformed and non-uniformed

---

[878] Increase reflects implementation of a Feb. 24, 2016 stipulation and settlement with the union for investigators, DC 37 Local 1113, regarding promotion to Level II.

[879] Adjusted, COVID 19.

[880] For a variety of reasons, some related to the COVID pandemic and some related to other personnel issues, the actual expenditure for FY 2021 was only $16,346,000.

[881] Frederick Davie, *Preliminary Mayor's Management Report FY 21*, Civilian Complaint Review Board, accessed on April 18, 2022, available at https://www1.nyc.gov/assets/operations/downloads/pdf/pmmr2021/ccrb.pdf (updated after passage of federal pandemic relief).

[882] Adopted Budget July 2021. OTPS budget was increased from FY 2021 = $4.77 million to FY 2022 = $5.15 million.

[883] "The City of New York Adopted Budget Fiscal Year 2022," at 69e, available at https://www1.nyc.gov/assets/omb/downloads/pdf/erc6-21.pdf. For comparison, the Department of Investigation has a budget allocation providing for 365 FTE.

[884] The Financial Plan of the City of New York, Fiscal Years 2021-2025, available at https://www1.nyc.gov/assets/omb/downloads/pdf/adopt21-stafflevels.pdf.

[885] This includes $4.3 million to fund a Gun Violence Suppression Unit of 60 uniformed officers.

members.  The Mayor proposes to maintain a uniformed headcount of 35,030.[886]  Under the Charter, this would call for 228 FTE positions at CCRB.  (.0065 x 35,030).[887]

The latest proposed Executive Budget (FY 2024) offers CCRB $18,932,463 in personal services, providing for 259 FTE, and another $ 4,412,763 in other than personal services.

The City Council, in its response to the Mayor's budget proposal, has observed, "CCRB has encountered roadblocks to reaching their full capacity as a result of a hiring freeze and an inadequate Personal Services budget, and as of March [2022], was not in compliance with the Charter headcount requirement."[888]  The Council called for an additional $2 million to allow hiring for vacant positions.

After negotiations with the City Council, the adopted financial plan for FY 2023 allocated $5.59 billion to the police department and $23.5 million to CCRB.[889]  In September 2022, the Mayor directed an additional 3% cut in spending for CCRB, but not for NYPD.  This action was repeated with another 3% directed cut in November.[890]

Despite aspirational budgeting, the actual headcount at the end of January 2021 was 185 positions (Investigations and Mediation had 119 personnel + Executive and Administrative program area had 52 personnel + APU had 14 personnel).  This in part was due to a hiring freeze during the pandemic and delays by the Office of Management and Budget in approving new hires. "As a result of not being able to fill vacant positions, the City is currently [March 16, 2021] out of compliance with the Charter."[891]

The most significant changes in personnel were in the APU and in the number of investigative staff.  In 2018, there were 24 employees in APU.  That dropped in 2021 to as low as

---

[886] The Financial Plan of the City of New York, Fiscal Years 2022-2026, available. https://www1.nyc.gov/assets/omb/downloads/pdf/feb22-stafflevels.pdf.

[887] The Mayor's proposed budget, submitted Jan. 5, 2023, appropriates $23.5 million to CCRB with allowance for 259 FTE.  236 of those positions are city-funded. https://data.cityofnewyork.us/City-Government/Full-Time-and-FTE-Headcount-including-Covered-Orga/84ax-hg3y. The personal service allocation for IAB is $74.3 million allowing for 625 full-time employees. Risk Management Bureau is allotted $18.9 million for 42 FTE. The Departmental Advocate appropriation is for $6.1 million, allowing for 71 employees. The total operating budget appropriation for NYPD is $5.7 billion. (Not including capital expenditures.) There are 34,158 uniformed officers currently active, with a budgeted headcount of 36,201 uniformed officers. https://data.cityofnewyork.us/City-Government/Full-Time-and-FTE-Headcount-including-Covered-Orga/84ax-hg3y/ and https://www nyc.gov/site/ccrb/policy/data-transparency-initiative-mos.page.

[888] Response to the Fiscal 2023 Preliminary Budget and Fiscal 2022 Preliminary Mayor's Management Report, at 37. https://council.nyc.gov/budget/wp-content/uploads/sites/54/2022/04/Fiscal-2023-Preliminary-Budget-Response-.pdf.

[889] https://www1 nyc.gov/assets/omb/downloads/pdf/exec22-fp.pdf.

[890] Jesse O'Neil & Bernadette Hogan, *Eric Adams orders city to leave jobs vacant after migrant crisis, union bill*, NY Post (Nov. 22, 2022), at https://nypost.com/2022/11/22/nyc-orders-third-round-of-budget-cuts-this-year/.

[891] Finance Division of The Council of the City of New York, *The New York City Council's Response to The Fiscal 2023 Preliminary Budget and Fiscal 2022 Preliminary Mayor's Management Report*, April 1, 2022, available at https://council.nyc.gov/budget/wp-content/uploads/sites/54/2022/04/Fiscal-2023-Preliminary-Budget-Response-.pdf.

11. As of March 2023, the number of positions in APU were back up to 22.[892]  On the other side of the coin, the number of investigators (including Intake & Evidence Collection), NYPD Relations increased from 110 to 133.  In March 2023, the number of positions in the "Investigations and Mediations" unit was at 144.

The number of investigators listed includes supervisors, intake personnel, mediation coordinators and investigator managers.  There were 86-line investigators in the Investigations Division (Levels I, II, III).  The attrition rate is high, between 11 percent to 31 percent in recent years (Supplemental Question Number 2 – Staffing and Hiring).  Level I investigators have a starting salary of $39,370.  After one year of experience, they are eligible to become Level II investigators with a salary of $54,147.[893]

For the sake of perspective, with the understanding that approximately 4,500 complaints are fully investigated in any given year by approximately 100 investigators, a rough estimate of caseload per investigator would be in the range of 50 cases per year.

There are, as with any agency, budgetary factors and needs which are unique, one-shots or peculiar to the agency.  So, for example, one problem for CCRB is that approximately $2.5 million of its budget is transferred to other city agencies for things like rent, phone services and other technical services.  In all, almost $3.5 million of its budget is for other-than-personnel services.  As well, within its budget are extraordinary one-time, non-personnel service costs such as computer and video build-ups associated with the increased use of body worn cameras and surveillance videos.[894]

An Article 78 proceeding was commenced on Jan 28, 2020, by the Police Benevolent Association ("PBA") contending that the budget provisions in the Charter amendments are illegal under state law because they deprive the Council of its appropriation authority.  The petition contended, as well, that the entire set of Charter amendments approved in the November 2019 referendum were null and void since they are all part of one integrated amendment and vote.  The petition was dismissed on October 31, 2020, for want of standing.  The PBA has filed a notice of appeal.[895]

As a result of budget cuts, CCRB has decided to limit its review of a number of authorized matters.  The following announcement has been posted on its website:

On September 9, 2023, the Office of Management and Budget ("OMB") announced citywide budget cuts. As a result, the CCRB will lack the resources to fully investigate

---

[892] Report on the Fiscal 2024 Preliminary Plan and the Fiscal 2023 Mayor's Management Report for the CCRB, Chair of the Committee on Public Safety, NYC Council. https://council.nyc.gov/budget/wp-content/uploads/sites/54/2023/03/CCRB.pdf.

[893] Supplemental Question Number 2 – Staffing and Hiring.

[894] Requested needs include:  $150,000/year for expanded computer storage, $1.45 million for case-tracking platform, and added needs for a call-recording system, sexual misconduct investigators, language access facilitation, etc.

[895] *Lynch v. City of New York*, (Sup. Ct., N.Y. Cnty.) (Edmead, J.S.C.) Index No. 150957/2020., Doc. No 39 (Oct. 15, 2020), 2020 NY Misc LEXIS 10123.

certain cases within its jurisdiction. After careful consideration, effective January 1, 2024, the CCRB suspended investigating:

- Failure to provide officers' business cards pursuant to the Right to Know Act ("RTKA") with no other allegations:
- Refusal to provide name or shield number with no other allegations;
- Discourteous words or actions with no other allegations;
- Threats with no action with no other allegations;
- Refusal to process a civilian complaint with no other allegations;
- Property seizures with no other allegations;
- Forcible removal to hospital with no other allegations;
- Untruthful statements with no other allegations;
- Any complaint that has only the above referenced allegations.

The CCRB will resume investigating these cases as soon as the city allocates sufficient funding to do so.[896]

## C.    CCRB ACTIVITY - Generally

Complaints, when first made, are reviewed by CCRB's intake unit.  CCRB receives complaints from the public through multiple channels.  The Intake Unit receives complaints, logs them into the CCRB's computerized Complaint Tracking System ("CTS"), and forwards any that will be investigated by the CCRB to one of sixteen Investigative Squads.[897]

Less than one-half of them are accepted or, in CCRB's jargon, "received," since many fall outside its jurisdiction or do not properly complain of police misconduct by a uniformed officer. In FY 2020, CCRB received 4,597 complaints compared to 5,236 in FY 2019 and 4,392 in FY 2018.[898]  These numbers are down from a high of 7,660 complaints in 2009.[899]  The CCRB gets complaints in four ways:  civilians may:  (1) call CCRB; (2) complain in person at a CCRB office; (3) send an online complaint form or written letter; or (4) complain to the NYPD or another city agency and be referred to the CCRB.[900]  (As discussed later, the Charter was amended in 2022[901] to permit CCRB to initiate investigation on its own without a field complaint.)  About half of the

---

[896] https://www.nyc.gov/site/ccrb/complaints/file-a-complaint/ccrb-jurisdiction.page. Last visited July 13, 2024.

[897] *See* CCRB, Response to Federal Monitor's Request Number Six, at 12 (document compilation that is the second enclosure in the CCRB's first response, dated July 17, 2018, to the Federal Monitor's request for CCRB documents; on file with author); CCRB INVESTIGATIVE MANUAL, *supra* note 392, at 5-6; CCRB, Intake Training at 25 (PowerPoint presentation that is the fourth enclosure in the CCRB's third response, dated Oct. 1, 2018, to the Federal Monitor's request for CCRB documents; on file with author) (hereinafter "Intake Training").

[898] Mayor's Management Report for FY 2021 at https://www1.nyc.gov/site/operations/performance/mmr.page.

[899] *Data Transparency Initiative—Complaints*, CCRB, https://www1.nyc.gov/site/ccrb/policy/data-transparency-initiative-complaints.page (last visited May 8, 2019).  *See also* https://www.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2009_annual-appendix.pdf.

[900] INVESTIGATIVE MANUAL, *supra* note 392, at 4-5; *see also File a Complaint*, CCRB, https://www1.nyc.gov/site/ccrb/complaints/file-complaint.page (last visited May 5, 2019).

[901] Local Law 24 of 2022.

complaints CCRB handles are filed directly with the CCRB, and most of those complaints are reported by phone or through the CCRB website.[902]  The other half of the complaints start at the NYPD, where civilians generally complain to the IAB by phone or at the precinct.[903]

### i.    Processing Complaints at CCRB

Many complaints to CCRB are not "received" or kept at CCRB, meaning, they are screened out at intake as not being a matter which CCRB can investigate because the alleged misconduct does not fall within FADO jurisdiction or because the alleged offender was not a uniformed police officer subject to CCRB's review.

On average there are about 10,000 complaints filed with CCRB's intake unit each calendar year, with the pandemic year of 2020 being predictably lower.  CCRB retains fewer than one-half:

|        | Filings | Retained CCRB | Sent to: OCD | IAB   | Other[904] |
|--------|---------|---------------|--------------|-------|------------|
| 2016   | 10,524  | 4,285         | 5,172        | 883   | 184        |
| 2017   | 10,580  | 4,486         | 4,849        | 1,017 | 238        |
| 2018   | 10,693  | 4,744         | 4,813        | 902   | 234        |
| 2019   | 11,020  | 4,964         | 5,055        | 834   | 167        |
| 2020   | 8,414   | 3,872         | 3,698        | 663   | 181        |
| Total: | 51,231  | 22,351        | 23,587       | 4,299 | 1,004      |

The bulk of complaints to CCRB are made initially by phone contact - roughly 65% each year, with the on-line website accounting for much of the remainder.[905]  The Intake Unit will attempt to schedule an initial interview with the complainant for each complaint that is filed in a way other than in-person communication.[906]  Intake Unit personnel are provided with training

---

[902] In 2017, 42% of the 2,269 complaints filed directly with the CCRB were reported in a phone conversation, 27.1% were reported through the CCRB's website, 22.3% were reported through the automated call processing system, and 6% were reported in-person at the CCRB.  2017 STATISTICAL APPENDIX, at 20 tbl. 7A.  Meanwhile, 91% of the 2,084 complaints filed with the NYPD that ended up with the CCRB were reported in a phone conversation, 5.1% were reported in person, and 2.9% were reported over the internet.  *Id.* at 21 tbl. 7B.

[903] *Id.*

[904] "Other" would include referrals to other law enforcement agencies or relevant governmental bodies.

[905] Undoubtedly due to the pandemic, there was a steep rise in on-line filings in 2020 from an average of 25% to 42% of filings that year. CCRB Annual Report -2022, at 9. https://www.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2022_Annual_Report.pdf.  More recently, there were 3393 complaints received in 2021 and 3698 complaints received in 2022. The number may be on the rise. In the first ten months of 2023 alone, there were 4756 complaints received.

[906] INVESTIGATIVE MANUAL, *supra* note 392, at 6-7, Intake Training. In Item 200 of the City review of a draft of this Report, the "Feedback Comment" was that it "Cannot find or access this source." (City 09.01.23 Feedback to Yates Discipline Report).  The Plaintiff Notes on City's Feedback, responded, "Agree that the entire Investigative Manual (which is subject to FOIL, and which plaintiffs have certain sections of) should be published on the monitor's website in conjunction with report publication."

materials that cover, among other things, how to process new complaints and enter details about them into a Complaint Tracking System ("CTS"), and how to talk to a complainant to get an effective narrative of her allegations.[907]  For "walk-in" complaints made in person at CCRB offices, an Investigative Squad on intake duty handles the intake responsibilities, including the initial interview with the complainant.[908]

Relevant to stop and frisk issues, how many times was a complaint filed in connection with an encounter that led to an arrest or summons or something less, such as questioning or temporary detention? One might hypothesize that the bulk of complaints would be a citizen reaction to an arrest or ticket, whether valid or not.  But that is not the case.  On average, more than one-half of the complaints received are in cases where no arrest was made and no summons was issued (57 percent in 2019 and 63 percent in 2020).  According to CCRB, about 10 percent to 12 percent of the complaints (603 in 2019, 370 in 2020) arise from a street encounter where the complainant was suspected of crime, but it is hard to discern from the statistics in that report if a stop report was filed in any or all of those cases.  Upon investigation, if a stop is alleged, CCRB will request a copy of the stop report, and if none is produced in a case where a stop is believed to have occurred, an OMN referral will be generated.[909]  While CCRB compiles an aggregate number of stop complaints made and NYPD aggregates the number of stop reports filed, neither CCRB nor NYPD attempt to correlate statistics by matching stop reports for an officer, a squad or a command with complaints.  NYPD keeps track of the number of CCRB complaints by officer or command, but they are not matched to the number of stops made.  Knowing what percent of reported stops by an active officer or in a busy precinct result in a complaint brought to CCRB might prove useful as a performance gauge.[910]

Although they might arguably fall within FADO, CCRB will generally refer complaints of abuse to the OCD when they allege that "an officer failed to make an arrest or issue a summons, failed to take appropriate action, or improperly prepared reports," or "when a civilian complains that he/she was not guilty of the offense or crime for which he/she was summonsed or arrested."[911]  CCRB will keep a complaint aimed at a summons or arrest as an abuse of authority if the facts

---

[907] *See generally* Intake Training, *supra* note 898.  The CCRB's Training Unit is discussed in further detail below in Part II.C.  The Director of Intake maintains a separate queue of cases deemed "sensitive" that are not handled through the regular intake process.  INVESTIGATIVE MANUAL, *supra* note 392, at 6.  Such cases involve, for example, officer-involved shootings, deaths in custody, cases involving public figures or in which there has been media coverage of an officer's conduct, or where a video appears on social media with a "significant number of views."  *Id.* at 15.  Such cases are assigned to senior investigators (as discussed below in Part II.A.).

[908] INVESTIGATIVE MANUAL, *supra* note 392, at 4-5.

[909] Until 2022, the term "OMN" was used for non-FADO referrals to NYPD by CCRB where other misconduct was noted.  The PBA complained on the grounds that, without investigation, it was improper to imply that misconduct had been found.  The courts agreed, *Lynch v. CCRB*, Index No. 154653/2021, Doc No. 88, that the referral was only for "possible" misconduct, and the term used thereafter is "OPMN" indicating Other Possible Misconduct.  Since some references in this Report are to items generated before 2022 and some are later, any reference herein to OMN may, in the future be read as OPMN.

[910] Although not correlative, it is worth noting that only 4,500 of 13,500 stops reported in 2019 resulted in an arrest or issuance of a summons.

[911] INVESTIGATIVE MANUAL, *supra* note 392, at 4-5. (Providing several illustrative examples, and noting that "[g]enerally, the CCRB *chooses not to exercise its jurisdiction* over such allegations" (emphasis added)).

suggest that the summons was issued or arrest made in retaliation for the complainant's response,[912] the officer refused to process a complaint, or there was attendant misconduct claimed that falls within FADO.[913]

If a referral to another agency is made, the Case Management Unit notifies the complainant of the referral,[914] and complainants whose complaints are referred to other agencies are mailed a tracking number.[915]  Once a determination is made at intake to retain a case, CCRB is required to notify the Department "of the actions complained of within a reasonable period of time after receipt of the complaint."[916]

Complaints that fall within the "sole jurisdiction of another agency" must be referred to that agency.[917]  Where the allegations in a complaint fall partly within the CCRB's jurisdiction and partly within the sole jurisdiction of another agency, CCRB's Chair (in consultation with the Executive Director) has discretion to refer the entire complaint to the other agency to be investigated by that agency.[918]

It is common for CCRB to refer some allegations in a complaint to other agencies while retaining others.[919]  In 2017, the CCRB conducted split investigations for 142 (3 percent) of the cases referred to the OCD and 222 (22 percent) of cases referred to the IAB.[920]

The most common OMN cases referred by CCRB to NYPD are: (1) failure to prepare an Activity Log; (2) failure to produce stop and frisk report; (3) failure to prepare a memo book entry; and (4) failure to document strip search.[921]

---

[912] *Id.*, Administrative Guide 304-17 (7) prohibits such actions.

[913] *Id.*  The manual provides a few examples of complainant behavior that could prompt retaliation by an officer and result in CCRB investigation: "the use of an obscenity, a challenge to the officer's authority, a request to obtain the officer's name or shield number, or a threat to file a complaint."  *Id.*  Proposed Rule changes for CCRB would include sexual harassment, if the cause for police action, as an Abuse of Authority within its jurisdiction.

[914] Heather Cooks, Senior Counsel, CCRB, CCRB:  The Life of a Case, at "Initial Case Screening" (on file with author).  The CMU is a group of eight employees (as of July 2018) who perform various administrative functions for the CCRB, including facilitating Board review of cases.  CCRB, Response to Federal Monitor's Request Number Six, at 13 (document compilation that is the first enclosure in the CCRB's first response, dated July 17, 2018, to the Federal Monitor's request for CCRB documents; on file with author).

[915] https://wwww nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2017_annual.pdf.

[916] 38-A RCNY § 1-17.

[917] 38-A RCNY § 1-15.  Per this rule, the CCRB refers complaints against civilian employees of the NYPD to the OCD or the IAB.

[918] 38-A RCNY § 1-15 (b).

[919] *See* INVESTIGATIVE MANUAL, *supra* note 392, at 10-11 (IAB), 11-12 (OCD).

[920] CCRB, Responses to Federal Monitor's Supplemental Questions, at 1 ¶ a (CCRB's response, dated June 3, 2019, to the Federal Monitor's additional request for CCRB documents; on file with author).

[921] Prior to 2022, the common referrals were profiling, untruthful statements, and improper use of body worn cameras.  Subsequently, CCRB has acquired jurisdiction over profiling and untruthful statements by dint of Charter amendments and has voted to review improper use of body worn cameras as well.

Prior to 2022, CCRB referred a comparatively smaller number of profiling cases to IAB. Between 2016 and 2018, CCRB received a total of 143 profiling complaints. It was CCRB's policy to "capture" that information "only if the complainant or alleged victim voluntarily expresses this belief."[922]

In the years 2016-2018, there were very few false official statement referrals (49) and virtually no BWC referrals, since cameras were not in use.[923] In that time period, the majority of OMN referrals were failure to document an encounter, which could include missing entries in activity logs, memo book entries, stop reports, consent forms and strip search reporting. There were 1,435 allegations/OMN referrals to NYPD. Six-hundred-thirty-eight of those referrals were for a complaint where CCRB also substantiated FADO misconduct within the same complaint. Of 760 cases where there was an OMN referral, 284 were part of a substantiated FADO complaint.

By either calculation (complaints or allegations), somewhere between 38 to 45 percent of the time when CCRB notes a documentation failure, CCRB determined that a FADO violation occurred as well. This is an exceptionally high concurrence rate, given that the overall substantiation rates by CCRB in recent years is generally in the 25 percent range.[924] A fair conclusion to be drawn is that there is a higher rate of misconduct which can be associated with events where there was also a failure to document. Put another way, a failure to document in a stop report, memo book, or strip-search report may be an indicator of misconduct.

For OMN cases, if no FADO allegations are substantiated, CCRB will close the case as it refers the matter to IAB. At that point, CCRB will send the entire investigative file to IAB. For false statement referrals, assuming the matter is not kept under the recent Charter amendments, CCRB will send supporting documentation to IAB, but not the entire case file.

CCRB has observed that it has "better success conducting full investigations when the case is filed directly with CCRB" rather than with the NYPD.[925] CCRB's 2017 Annual Report indicates that in referred cases, CCRB sometimes has difficulty making initial contact with the complainant or victim, who may not have been informed of the referral to the CCRB by the referring agency.[926] Cases coming from the IAB more often result in truncated (and hence uncompleted) CCRB investigations.

---

[922] Appendix - CCRB Complaint Data at 52, https://www1 nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2018_annual-appendix.pdf.

[923] *Id.*

[924] https://www.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2022_Annual_Report.pdf. From 2010 to 2019, CCRB panels substantiated 2933 complaints out of 17,325 decisions—a 16.9% substantiation rated. More recently, the substantiation rate in 2019 had increased to 24% (370 of 1540 fully investigated complaints) and 30 % (293 of 981 fully investigated complaints) in 2020. The 2020 numbers are probably skewed due to the reduced number of complaints that could be fully examined during the Covid pandemic.

[925] CCRB, Responses to Federal Monitor's Supplemental Questions, at 3 ¶ b (document that is the tenth enclosure in the CCRB's third response, dated Oct. 1, 2018, to the Federal Monitor's request for CCRB documents; on file with author); *see also* January-December 2017 Report, at 9-10.

[926] January-December 2017 Report, at 9-10.

In 2017, the truncation rate was 69 percent for cases filed with IAB and sent to CCRB; 44 percent for cases filed directly with CCRB; and 52 percent for cases filed elsewhere.[927]

In 2018, the number of truncations for cases coming through IAB was 73 percent.[928]  This compares to an overall truncation rate within CCRB of 60.9 percent for that same year.  In 2018, of 4,759 complaint closures at CCRB, 2,899 were truncated, mostly due to pending litigation or complainant reluctance of one kind or another.

More currently, albeit in a pandemic year, 2020, of 3,307 closed CCRB complaints, 2,187 were closed due to truncation.  1,711 were truncated because a complaint was withdrawn, the witness was uncooperative or unavailable.  351 of the truncated complaints were "closed pending litigation."[929]  Effective October 22, 2022, the Board redefined its dispositional outcomes: "Unable to Determine" replaced "Unsubstantiated."[930]  As such, a number of cases in which the complainant was uncooperative will now be categorized as "Unable to Determine" rather than "Unsubstantiated."  This will probably have the effect, in 2023 and going forward, of lowering the number of cases that are listed as "truncated," where such cases previously fell.  The NYPD has not changed its categorizations of dispositions.  The change is currently being challenged in court by the PBA.[931]

CCRB has indicated that "[t]here are some instances where IAB refers a case after significant delays and some occasions, including for notable incidents garnering media attention, where IAB did not refer a case when it should have.  IAB often does not inform civilians that their cases are being referred to the CCRB if the complaint contains allegations falling with the CCRB's jurisdiction."[932]

Without further survey data, it is difficult to know why cases truncate at a higher rate when the victim first goes to NYPD instead of directly to CCRB.  One could speculate that it derives from witness fatigue, a reduced awareness of available recourse, treatment and response at first contact, delay in attempts to establish a connection, or a number of other reasons.  But for whatever reason, fall-off when cases are handed-off, is a problem that needs a coordinated response.

---

[927] *Id.* at 23.

[928] NYC Civilian Complaint Review Board, James Blake Fellow Report 2020, at 5, available https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/CCRB_BlakeFellow_Report.pdf.

[929] Pending Litigation is a truncation category added in August 2017. It indicates that the complaint was truncated due to the complainant/alleged victim's attorney.  *See* CCRB, Executive Director's Monthly Report, January 2021, at 28, available                                                                                                                    at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2021/20210111_monthlystats.pdf.

[930] 38-A RCNY § 1-33 (e)(2).

[931] *Police Benevolent Association v. N.Y.C. Civilian Complaint Review Board*, Index No. 150441/2023 (Sup.Ct. NY Cnty. 2023).

[932] CCRB, Responses to Federal Monitor's Supplemental Questions, at 3 ¶ b, *supra* note 926.

### D.        CCRB Investigations - Generally

The Intake Unit consisted of six investigators in 2018.[933]  That number has increased to eight.[934] As noted above, the Intake Unit will attempt to schedule an initial interview with the complainant for each complaint that is filed in a way other than in-person communication.  For "walk-in" complaints made in person at CCRB offices, an Investigative Squad on intake duty handles the intake responsibilities, including the initial interview with the complainant.[935]

After preliminary screening, the Intake Unit forwards matters that are retained to one of sixteen investigative squads.[936]  Roughly 65% of the staff at CCRB are assigned to the Investigations, Intake & Evidence Collection, NYPD Relations and Evidence Collection Units.[937]

The investigative squad assigned to a complaint, along with staff known as the field team, use various methods to locate and collect evidence to investigate that complaint.  The Rules of the CCRB enumerate specific methods that investigators may use, including requests for information or documents; interviews with the complainant, alleged victim, subject officer and/or witnesses; and field visits to examine the site of the alleged misconduct and collect evidence from the scene.[938]

If the Intake Unit determines that CCRB lacks either subject matter jurisdiction or personal jurisdiction, it will forward the complaint to the Case Management Unit which sends it on to the appropriate agency, if there is one.  The two most common destinations for complaints referred-out by CCRB are NYPD's Internal Affairs Bureau (IAB) and the Office of the Chief of Department ("OCD").  IAB investigates all claims of potential criminal activity, including corruption and perjury, by NYPD officers or civilian employees.[939]  Until recently, CCRB referred complaints to the IAB when they involve allegations of corruption, perjury, and off-duty criminal conduct.[940]

---

[933] CCRB, Response to Federal Monitor's Request Number Six, at 12 (document compilation that is the first enclosure in the CCRB's first response, dated July 17, 2018, to the Federal Monitor's request for CCRB documents; on file with author).

[934] Item 300, City 09.01.23 Feedback to Yates Discipline Report.

[935] INVESTIGATIVE MANUAL, *supra* note 392, at 4-5.

[936] *See* CCRB, Response to Federal Monitor's Request Number Six, at 12 (document compilation that is the second enclosure in the CCRB's first response, dated July 17, 2018, to the Federal Monitor's request for CCRB documents; on file with author); INVESTIGATIVE MANUAL, *supra* note 392, at 5-6; CCRB, Intake Training at 25 (PowerPoint presentation that is the fourth enclosure in the CCRB's third response, dated Oct. 1, 2018, to the Federal Monitor's request for CCRB documents; on file with author) [hereinafter Intake Training].

[937] NYPD Relations Unit works with the IAB Liaison to obtain Departmental records and access to officers.

[938] CCRB RULES § 1-23; *see also* Heather Cook, Senior Counsel, CCRB, CCRB:  The Life of a Case, at "Role of the Field Team" (on file with author).  "Within one business day of being assigned the complaint, the investigator must attempt to arrange to interview the complainant (and/or victim) by contacting the complainant by telephone and e-mail." INVESTIGATIVE MANUAL, *supra* note 392, at 21.  NYPD officers must agree to requests by CCRB investigators for interviews, whether they are the subjects of investigation or witnesses to investigated incidents.  *See* N.Y. CITY CHARTER, ch. 18-A, § 440(d)(2) (2019) ("The police commissioner shall ensure that officers and employees of the police department appear before and respond to inquiries of the board and its civilian investigators in connection with the investigation of complaints submitted pursuant to this section . . . .")

[939] PATROL GUIDE 207-21.

[940] CCRB Rules

Allegations of retaliation for filing CCRB complaints are referred to IAB but allegations that an officer refused to accept or refer a complaint to CCRB are not. If an on-duty officer files a complaint against another officer, CCRB will refer the entire case to IAB.

CCRB refers complaints to the OCD when they do not contain FADO allegations and do not come within the IAB's responsibility.[941] In addition, the CCRB will generally refer complaints of abuse of authority to the OCD when they allege that "an officer failed to make an arrest or issue a summons, failed to take appropriate action, or improperly prepared reports," or "when a civilian complains that he/she was not guilty of the offense or crime for which he/she was summonsed or arrested."[942] The CCRB will, however, keep a complaint aimed at a summons or arrest as an abuse of authority if the facts suggest that the summons was issued or arrest made in retaliation for the complainant's behavior or there was attendant misconduct claimed that falls within FADO.[943]

### i.    Split and Concurrent Investigations and Cross-Referrals

A consequence of CCRB's circumscribed jurisdiction is a practice, sometimes confusing, of cross-referrals, split investigations and concurrent investigations. Complaints are cross-referred when one entity, either NYPD or CCRB, receives a complaint but, rather than investigating the matter, sends it to the other. Split investigations occur when one complaint contains allegations that fall within FADO and allegations that fall outside FADO. In such a case, CCRB will, in most cases, investigate the FADO allegation(s) while NYPD will receive the remaining allegations. Concurrent investigations occur when both agencies investigate the same allegation - commonly in force investigations. With the Charter change authorizing investigations of false statements, overlap in that arena is likely to occur as well – particularly when an officer has given a questionable statement to CCRB and to another entity (NYPD, Courts, prosecutors) about the same subject matter.[944]

Adding to potential confusion is the fact that IAB will examine and close a FADO complaint in many instances when there are other associated allegations within the complaint that fell within IAB jurisdiction – usually, but not always, excessive force. In FFY 2017-2018, 205 of 803 allegations of misconduct closed by IAB were FADO allegations.[945]

---

[941] *Id.* at 11.

[942] *Id.* (providing several illustrative examples, and noting that "[g]enerally, the CCRB *chooses not to exercise its jurisdiction* over such allegations" (emphasis added)).

[943] *Id.* The manual provides a few examples of complainant behavior that could prompt retaliation by an officer and result in CCRB investigation: "the use of an obscenity, a challenge to the officer's authority, a request to obtain the officer's name or shield number, or a threat to file a complaint." *Id.* Proposed Rule changes for CCRB would include sexual harassment, if the cause for police action, as an Abuse of Authority within its jurisdiction.

[944] "The NYPD's Internal Affairs Bureau can, in theory, initiate its own investigations into alleged misconduct based on media reports, although no evidence was offered that IAB has in fact done this in response to media reports over the last decade concerning racially biased and/or constitutionally unjustified stops and frisks."

[945] CCPC Nineteenth Annual Report, at 22, available at https://www1.nyc.gov/assets/ccpc/downloads/pdf/Annual-Nineteen-Report.pdf. CCPC analysis was done on a fiscal year, rather than a calendar year basis. CCPC evaluated 830 cases involving 2,707 allegations during FFY 2017 and 2018.

In 2017, the CCRB conducted split investigations for 142 (3%) of the cases referred to the OCD and 222 (22%) of cases referred to the IAB.[946]

There is no organized effort to harmonize multiple investigations that may arise from one encounter; CCRB and NYPD not only act independently, they commonly proceed without coordination of the two separate ongoing investigations. Referrals can lead to concurrent investigations run by both CCRB and NYPD. As described by CCRB counsel,

> While force is the most common type of allegation that is investigated by both the NYPD and the CCRB, there are numerous incidents that both the NYPD and CCRB investigate, although each investigation may focus on different aspects of the incident. . . . The NYPD will open concurrent investigations into portions of an incident being investigated by the CCRB that are outside of the CCRB's jurisdictions – such as corruption – or IAB will at times pursue investigations into non-FADO aspects of a case referred by the CCRB. The CCRB is not always notified of these investigations. Additionally, there are allegations within IAB's sole jurisdiction that arise out of concurrent investigations into FADO allegations that IAB pursues, but that the CCRB did not refer to them. . . . At times, the CCRB may receive complaints that fall partially within the jurisdiction of the CCRB and partially within of another agency or the NYPD. Often these cases will only require that "spin-off" case be referred to the external agency with jurisdiction in some cases, the case may be better served by referring the entirety of the investigation to another agency . . . In these instances, the Executive Director, in consultation with the Board Chair, will make the final determination about whether to pursue an investigation, but the Agency reserves all rights to investigate FADO's in any complaint.[947]

CCRB employs three different "levels" of investigators: Levels I, II, and III.[948] Level I investigators are considered entry-level, and can be promoted to Level II after one year of successful employment.[949] The CCRB experiences varying levels of turnover in the investigator ranks, with a 30.9 percent rate of attrition in 2016 and a 10.9 percent rate in 2017.[950] Level II and III investigators are considered "experienced."[951] Supervisors within each squad assign the squad's cases to particular investigators based on a number of factors; the only rule about assigning cases

---

[946] CCRB, Responses to Federal Monitor's Supplemental Questions, at 1, June 3, 2019, on file with the Monitor Team.

[947] Matthew Kadushin, General Counsel, CCRB, June 3, 2019, letter to Monitor Team.

[948] CCRB, Responses to Federal Monitor's Supplemental Questions, at 1 (document that is the tenth enclosure in the CCRB's third response, dated Oct. 1, 2018, to the Federal Monitor's request for CCRB documents; on file with author).

[949] Id.

[950] Id.

[951] Id.

to particular investigators is that "sensitive" cases must be assigned to a Level II or III Investigator.[952]

### ii.        CCRB Staff and Training[953]

Although improving the quality and efficiency of investigations has been a priority of the CCRB in recent years,[954] measuring quality is difficult.  Several metrics of quality discussed here include the qualifications and performance standards for investigators, the supervision and Training they receive, the agency's specific quality control measures, and the NYPD's evaluation of CCRB dispositions in substantiated cases.

The qualifications for entry-level (Level I) investigators include a B.A. degree from an accredited college or university, a 3.0 GPA or higher, relevant coursework "preferably in criminal justice or a related field," and strong analytical writing, oral communication, and time-management skills.[955]  At the start of investigators' employment, and after any promotion, they are given job expectations called "Tasks and Standards."  There are expectations for each of several areas of job performance, including "adher[ing] to current investigative practices," "interview[ing] civilian and police witnesses," "rigorously prepar[ing] impartial reports that accurately document any and all evidence obtained," and "obtain[ing] all relevant evidence . . . and employ[ing] other investigatory methods as required by agency rules and procedures."[956]  Specific expectations for Level I investigators include:

- "Maintains an unbiased outlook through all facets of the investigation and makes well-reasoned decisions."
- "Takes all reasonable investigative actions to locate and contact involved civilians and understands the agency's contact attempt requirements."
- "Understands what questions need to be asked of interviewees and utilizes proper techniques to extract the detailed, relevant information required for investigations, including the use of diagrams or maps to aid in understanding what occurred."
- "Drafts transcriptions of witness statements and interviews that accurately summarize the relevant information obtained in a chronological narrative and clearly delineates . . . the basis of the witness' knowledge of information . . . ."

---

[952] CCRB, Response to Federal Monitor's Requests Number 7 and 8, at 4 (document that is the ninth enclosure in the CCRB's third response, dated Oct. 1, 2018, to the Federal Monitor's request for CCRB documents; on file with author).

[953] NB:  The section "CCRB Staff and Training" is outdated.  It was accurate when first drafted in 2018-2019, but, as the City rightly points out, there have been revisions.  However, neither the City nor CCRB have suggested any amendments or provided any new information in this regard.  Plaintiffs have pointed out that they do not object to streamlining this discussion to avoid unnecessary delay in the release of the Report.  The discussion is left within the Report to describe past practice and can be updated when necessary information is supplied to the Monitor.

[954] *See  e.g.*  CCRB,  2014  ANNUAL  REPORT  1  (May  2015),  available  at http://www.nyc.gov/html/ccrb/downloads/pdf/Annual%20Report%202014-Rev4Final.pdf.

[955] CCRB, Investigator Level I Job Description, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/ccrb_investigator_jobposting.pdf.

[956] CCRB, Tasks and Standard Sheet, provided to Monitor Oct. 18, 2018.

- "Demonstrates an understanding of Patrol Guide procedures, NYPD Training materials, and legal standards to objectively reach recommendations based on the preponderance of the evidence standard."
- "Understands what NYPD documentary and video evidence are required for incidents under investigation and, within 24 hours of the initial assignment of a case, follows the appropriate protocol to request such evidence from IAB, DOA, and any other applicable NYPD command."[957]

Level I investigators are evaluated against these expectations six months into the job and again after one year to determine whether they qualify for promotion to Level II. Investigators are generally evaluated each year thereafter and are generally eligible for promotion to Level III after two years of employment.[958] The CCRB has also defined criteria for promotion; among other things, investigators must receive certain performance-evaluation scores for "interview skills," "written work," "gathering documentary evidence," "gather[ing] other evidence" and "case management and organization."[959]

CCRB uses its more experienced staff to promote the quality of its investigations. For example, sensitive cases are only assigned to experienced investigators, and SQF cases are "often" assigned to experienced investigators because they "often require proficiency in search and seizure law."[960] Further, experienced investigators supervise the work of less experienced investigators. For example, the squad leader gives initial instructions to the investigator to whom she assigns a complaint and then reviews the case file that the investigator develops in working on that complaint, including the case plan (which sets out the investigative steps that the investigator intends to take) and the ultimate report that goes to the Board.[961] The squad leader tracks data about how well investigators are doing, known as key performance indicators ("KPI"), in the Complaint Tracking System. In addition, the CCRB provides all investigators with legal guidance for certain kinds of cases. An investigator must consult an agency attorney about applicable law before interviewing officers in sensitive cases and cases involving searches of persons, vehicles or premises, entry onto premises (absent a search warrant), and strip searches.[962]

---

[957] Id.

[958] CCRB, Response to Federal Monitor's Supplemental Question Number Four (document that is the thirteenth enclosure in the CCRB's third response, dated October 1, 2018, to the Federal Monitor's request for CCRB documents; on file with author).

[959] Memorandum from Jonathan A. Darche, Executive Director, CCRB, to Investigative Staff, CCRB (July 30, 2018) (on file with author).

[960] CCRB, Response to Federal Monitor's Requests Number 7 and 8, at 4 (document that is the ninth enclosure in the CCRB's third response, dated October 1, 2018, to the Federal Monitor's request for CCRB documents; on file with author). CCRB has explained in discussions with the Monitor team that some SQF cases are assigned to Level I investigators.

[961] Id. at 7.

[962] Id. at 7.

In addition to supervision from experienced investigators, new investigators also receive intensive orientation training when they start.[963]  The CCRB has provided the Monitor with copies of several presentations used to train investigators, particularly those that teach them to investigate allegations relating to improper SQF and search practices.  Topics include the use of documentary evidence to assess search and seizure allegations, techniques for effectively interviewing civilians and officers in search and seizure cases, and the law related to street encounters, entries onto premises, and vehicular stops and searches.[964]  These detailed presentations cover both the substantive rules surrounding proper searches and seizures as well as practical investigative guidance, such as specific questions investigators should ask and consider.

As described in 2018, in addition to overseeing the initial training for Level I investigators, CCRB's Training Unit—made up of a Director and two Deputies—is also responsible for providing investigators with ongoing training and professional-development programs.[965]  In 2018, for instance, a law professor gave investigators a supplemental course on Fourth Amendment search and seizure and use of force doctrines, including the law of cell phone searches. Investigative Managers received a two-day training on coaching strategies to enhance their supervision skills; and staff from the Perception Institute conducted implicit bias Training for all staff, incorporating CCRB-specific case studies.[966]

The Training Unit assesses needs for additional Training and implements programs, in part, in consultation with the CCRB's Director of Quality Assurance and Improvement ("DQAQI").[967] Measuring and improving the quality of investigations is a central focus of the DQAQI's role. Among other things, the DQAQI: (a) provides data to the Deputy Chief of Investigations on the state of the overall docket, delayed cases and KPIs for each investigative squad; (b) reviews random samples of cases in their final stages, as well as reports and accompanying files in sensitive cases before they go to the Board; (c) updates and maintains the Investigations Manual and interim operating procedures, and develops new policies and efficiency improvements, in consultation with the Deputy Chief and Co-Chiefs of Investigations; (d) reviews decisions to "truncate" or close cases without full investigation (for example, because the complainant is unavailable or

---

[963] CCRB, Responses to Federal Monitor's Supplemental Questions, at 5 (document that is the tenth enclosure in the CCRB's third response, dated October 1, 2018, to the Federal Monitor's request for CCRB documents; on file with author).

[964] *E.g.*, Suzanne D. O'Hare, Deputy Chief Prosecutor, CCRB, Search & Seizure Law:  Street Encounters (on file with author); Suzanne D. O'Hare, Deputy Chief Prosecutor, CCRB, Search and Seizure Law:  Entries (on file with author); Suzanne D. O'Hare, Deputy Chief Prosecutor, CCRB, Vehicle Stop & Search Law (on file with author); Laura Kastner, Investigative Manager, CCRB & Greg Finch, Investigator, CCRB, Documents Related to Search and Seizure Cases (on file with author).

[965] *See e.g.*, CCRB, Response to Federal Monitor's Request Number One, at 4 (document compilation that is the first enclosure in the CCRB's first response, dated July 17, 2018, to the Federal Monitor's request for CCRB documents; on file with author); CCRB, SEMI-ANNUAL REPORT:  JANUARY-JUNE 2018, at 72, https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/20181221_Semi-Annual%20Report.pdf [hereinafter JANUARY-JUNE 2018 REPORT].

[966] JANUARY-JUNE 2018 REPORT, *supra* note 966 at 72.

[967] CCRB, Response to Federal Monitor's Supplemental Question Number Nine, at 1 (document that is the fifteenth enclosure in the CCRB's third response, dated October 1, 2018, to the Federal Monitor's request for CCRB documents; on file with author).

uncooperative) and tracks truncation statistics; and (e) in coordination with the Director of NYPD Relations, monitors evidence collection efforts between the CCRB and NYPD.[968]

Finally, each fall, the NYPD invites all investigators hired by CCRB since the previous fall to the Police Academy so that the investigators can learn about how MOS are trained. The NYPD presentations to CCRB investigators are simulations of the trainings that MOS receive. (Board members do not attend these presentations, nor do they receive any Training from the NYPD). The syllabus of presentations that NYPD Police Academy trainers conduct for CCRB investigators typically includes:

- Police Academy Orientation
- Department Structure
- Less Than Lethal Weapons
- Stop, Question and Frisk/Body Cameras
- Fundamentals of Defense Tactics
- Police Academy Orientation
- Recruit Curriculum Overview
- Narcotics Operations
- Arrest Warrants And I-cards
- Scenario Based Training

Some other recent examples of presentations that the NYPD has conducted for CCRB staff include:

- A Use of Force presentation was done in August 2016, after the NYPD changed its use of force policy.
- Several years ago, after the initial *Floyd* decision, the Risk Management Bureau came to speak to the CCRB about the decision.
- Early in 2019, an attorney from General Counsel's Office, the Deputy Director of Training, and two Investigative Unit members observed the CIT Training that the Department gives to officers.
- Members of the CCRB' s Policy Unit attended NYPD Executives Taser Training in May 2018.
- Periodically, the Emergency Services Unit (ESU) comes to the CCRB to present on ESU's work.
- The Internal Affairs Bureau conducts an annual full-day presentation at the CCRB outlining IAB's work.
- The impact of NYPD's training on the perceptions of the CCRB investigators as they conduct fact-finding exercises to evaluate pending cases is unknown.

---

[968] *Id.*

### iii.    Civilian Interviews

The Charter specifies that, "No finding or recommendation shall be based solely upon a unsworn complaint or statement. . . ."[969]  As part of an overall revision of its rules "to accelerate investigations" among other things, CCRB adopted twelve or more rules changes in 2018.[970]  One amendment was to permit a witness to be interviewed and make a statement first and then be sworn or asked to verify the statement after the interview.[971]  This, in contrast to interviews of officers who are advised of their rights, assured of use immunity, then sworn-in at the beginning of the interview.  The "post-verification" rule, as argued by CCRB, was written "to avoid the possibility of discouraging that witness [a civilian] from testifying," and as the lower court found, when the rules were challenged by the PBA, "[t]he CCRB's concerns of intimidation and underreporting are legitimate and provide a rational basis for the differences in swearing requirements between civilian witnesses and officers."[972]

### iv.    Officer Interviews at CCRB

When a CCRB investigator wishes to interview an officer, notice is given to the Supervisory/Ranking Officer concerned who directs the officer to answer questions.  A subject officer is given two business days' notice prior to the interview to obtain and consult with counsel.  The officer is advised that all questions must be "answered fully and truthfully," that "refusal to cooperate . . . will result in immediate suspension and preparation of disciplinary charges," and that "answers given in an interview or proceeding may not be used against the member in a later criminal action."[973]  False or misleading statements are subject to discipline as provided by Administrative Guide 304-10.

Patrol Guide section 206-13 (now AG section 318-11) explains the procedures to be followed when an officer is the subject or witness in an official investigation.  The officer is given time to confer with counsel (who may be accompanied by a union representative).  Prior to the interview, the officer is advised of the nature of any accusation, the identities of witnesses and complainants, and information concerning all allegations.  The interview is recorded; there are no "off the record" interchanges.  If charges are brought against the officer, a copy of the transcript or recording is given to the officer within 20 days of commencement.

---

[969] NYC Charter § 440 (c)(1).

[970] Notice of Adoption, City Record, Jan. 2, 2018, eff. Feb. 1, 2018.

[971] 38-A RCNY 1-24(d).

[972] *Lynch v. CCRB,* 64 Misc. 3d 315, 329 (Sup. Ct. N.Y. Cty.), *aff'd,* 183 A.D.3d 512 (2020)

[973] Patrol Guide § 211-14. Police officers who refused to sign waivers of immunity from prosecution could not be summarily dismissed under Article I § 6 of the New York Constitution and § 1123 of the New York City Charter, but those provisions must be read together with this section and would be construed to afford police officers a hearing and an opportunity to explain. *Gardner v. Murphy*, 46 Misc. 2d 728, 260 N.Y.S.2d 739, 1965 N.Y. Misc. LEXIS 1780 (N.Y. Sup. Ct. 1965), *rev'd, Koutnik v. Murphy*, 25 A.D.2d 197, 268 N.Y.S.2d 265, 1966 N.Y. App. Div. LEXIS 4654 (N.Y. App. Div. 1st Dep't 1966).

The time it takes to bring an officer in for an interview is a significant cause of delay in completing investigations. In 2019, it took 21 days on average to have a full interview with a complainant. It took 98 days on average for an officer to be interviewed.[974]

If there are multiple allegations, CCRB and NYPD investigators act completely independently once the matter is "split" or "spun-off." Only "[i]n cases where there is a concurrent force investigation by NYPD [and CCRB does] the investigative entity maintains contact with CCRB." In the case of concurrent investigations, "[a]s a matter of course, with the exception of profiling investigations, IAB does not provide its disposition without CCRB requesting them. IAB does not share dispositions of corruption cases or other non-FADO categories . . . [except False Official Statement cases]. IAB will not provide any case materials or additional information beyond the disposition. . . . If the CCRB generates an OMN for a False Official Statement, IAB will provide the disposition to this allegation without being requested. IAB will not provide any case materials or any additional information beyond the disposition. . . . IAB will provide CCRB with GO-15 recordings (audio of IAB's interview with the MOS) when requested, but these are provided solely so that the officer may avail himself/herself of their Patrol Guide right to review previous statements prior to testifying with the CCRB. The CCRB is rarely provided with audio of officers' statements to IAB regarding concurrent incidents."[975]

### v.    Case Study - Force, False Statement, and FADO Investigations Interwoven

Overlapping jurisdictions by IAB and CCRB can easily weave a tangled web. Multiple investigations might take place in separate venues. Interviews may be repeated at disconnected locations. Information is not shared. Conclusions can vary. And, most of all, resolution is prolonged.

Rather than speak hypothetically, consider as a case study following the investigation of a brief encounter that occurred in the Bronx in 2017, on the Saturday before Thanksgiving, at a residence for people who had difficulty finding permanent housing as they aged out of foster care, suffered from mental illness, or presented other care issues.[976]

Six officers responded to calls of an assault or fight in progress in the lobby and on the fifth floor. When they arrived at the location, they were directed to the fifth floor by a building security officer. Some officers went to the fifth floor, and some went to the sixth floor. As three officers rode an elevator to the fifth floor, complainant "C," a resident but not a suspect, hurled several insults at the officers. (C had joined another person in calling for the police to come to the facility but vocally objected to their walking through the facility unaccompanied.) The exact nature of the verbal exchange is in dispute. C says he was asking "who are you looking for?" and was told by PO #1 ████████ "mind your business." Further words were exchanged. The officers exited the elevator and, according to PO ████, C said "you all are a fucking bunch of keystone cops." At

---

[974] CCRB Annual Report 2019 at 30.

[975] Matthew Kadushin, General Counsel CCRB, June 2, 2019, letter to the Monitor Team.

[976] Generally, CCRB NYPD Officer History can be found at https://www.nyc.gov/site/ccrb/policy/MOS-records.page. Description of events in this case study derives from investigative reports provided by CCRB and NYPD. For copies of any such reports, inquiry should be directed to the relevant agencies.

this point, PO #1 ███ also claims C said, "I'm going to fuck you up, I'm going to get you," although that particular statement is in sharp dispute and was not substantiated by any of the investigations.  In any event, PO #1 ███ said, "I've had enough" and returned to the elevator where a struggle ensued.  According to the IAB report and based on video surveillance, PO #1 ███ applied an apparent chokehold for eight seconds and punched C with a closed fist, followed by two other officers who entered the fray.  After 10 to 13 seconds, a fourth officer, PO #2 ███, who was outside the elevator, aimed a Taser at C and pulled the trigger several times, apparently without effect.  (It was speculated by IAB that it was either a "missed probe" or "the wires [were] broken.")  C was brought to Lincoln Hospital for treatment, which is standard protocol after a tasering.  Although PO ███ brought C there as an Emotionally Disturbed Person Case ("EDP"), that was deemed to be an improper classification.  C was diagnosed with Impulse Disorder.

Investigations and proceedings that followed included a CCRB FADO case, an IAB force investigation, an IAB false statement investigation, an interview at the Comptroller's office,[977] a civil lawsuit in Bronx Supreme Court and a trial before a DCT.

The first complaint went to CCRB which substantiated allegations of unlawful Stop, Use of Force (chokehold) and Use of Force (punch) against PO #1 ███ and Use of Force (Taser) against PO #2 ███.  On July 27, 2018, CCRB recommended that Charges and Specifications be served on POs #1 ███ and #2 ███.

While the matter was pending before the panel, on April 5, 2018, a CCRB investigator also referred the matter to the IAB Command Center as a "spin-off."  A Level 2 Force Investigation was opened.

CCRB also referred a False Statement case to NYPD against PO #3 ███ who witnessed the event and claimed that it began when C put his face within two centimeters of PO #1 ███, which was refuted by a video recording.  IAB conducted separate investigations of POs #1 ███, #2 ███, and #3 ███.

PO #1 ███

At the time of the incident, PO #1 ███ had two previous substantiated CCRB complaints.  One was for physical use of force which resulted, after trial, in forfeiture of 40 penalty days and dismissal probation.  Allegedly he had punched a handcuffed prisoner in the face.  The other was for an unlawful Stop and retaliatory summons, for which CCRB recommended a B-CD but which was reduced by the Police Commissioner to an A-CD with no apparent penalty.  While the Charges were pending in this case, he incurred another substantiated complaint for Discourtesy for which he received no penalty, only "Instructions."

PO #1 ███ was the subject of six IAB Force Investigations.  Other than the earlier CCRB matter, which resulted in a trial, the other matters were all filed away for Information/Intelligence ("I&I") without discipline.

---

[977] As authorized by GML § 50-h.

PO #1 ███ has been named in five civil lawsuits. Four of them are unrelated to the CCRB complaints. One lawsuit, still pending, was filed by complainant C for the November 2017 incident. Four of the lawsuits were pending at the time of this incident. One, commenced in 2016, settled for a $20,000 award against the City in 2019.

The IAB investigation was extensive and thorough. Seven Patrol Guide § 206-13 interviews were conducted. During the investigation, an IAB Intelligence Agent reported that "PO #1 ███ is described as a loudmouth and likes to sound like a tough guy in order to gain compliance on patrol." Another agent stated, "there is a rumor in the command that PO #1 ███ likes to tell lies on an on-going basis." The investigators conferred with the Bronx District Attorney who declined jurisdiction, the Comptroller's office which confirmed a claim had been filed, and the CCRB investigator assigned to the case who shared her file.

The IAB investigation was closed on April 4, 2019, one year after it had been sent to IAB. The chokehold and punch allegations were referred back to CCRB for investigation and closed by IAB for I&I. CCRB lists the case as "Previously adjudicated, with discipline." DAO lists the case as "Administratively Closed."[978]

PO #2 ███

PO #2 ███ was investigated by IAB in regard to the use of the taser. She has no previous substantiated CCRB complaints. She had been on Level 3 Dismissal Probation for unrelated activity. Part of the investigation was a review to see if she had properly reported the incident on a TRI form and whether she had improperly classified C as an EDP. Both matters were closed for I&I. IAB recommended Exoneration on the allegation of CEW/Taser misuse. That finding was made on January 31, 2019. Nonetheless, the use of the Taser was referred back to CCRB for prosecution of the Charges on April 4, 2019.

A DCT trial was held on January 4, 2020, on the Taser charge. On March 13, 2020, an Assistant DCT recommended that she be found Not Guilty. That recommendation was approved by the Police Commissioner on April 15, 2020.

PO #3 ███

CCRB referred to IAB seven allegations of False Statements against PO #3 ███ based on his CCRB interviews as a witness. In essence, CCRB alleged that he lied when he testified: (1) C initiated the incident by getting within two centimeters of PO #1's ███ face; (2) C was known to the police; and (3) the security guard directed them to the fifth and sixth floors. IAB determined that all three statements, while not accurate, were qualified statements of uncertainty and, while inaccurate, were not made to deceive or mislead. His case was closed as unfounded.

---

[978] The most current SQFSTA spreadsheet provided by the Department, (Final Federal Monitor – SQFSTA – 2023 Q, Q2) lists the case as closed administratively. The CCRB online website lists the penalty as 1-year dismissal probation. It is unclear how or when the decision to place him on probation occurred.

### E.    Jurisdiction - Personal

There has been a dramatic set of changes in the landscape for CCRB in the last two years. As a result of recent amendments in the Charter, the Administrative Code, and the Rules, bias-based policing, sexual misconduct, and false statements made to CCRB are now investigated by CCRB.   Other closely related items, such as failure to document enforcement actions, false reporting in other venues, such as complaint or arrest reports or court testimony, making misleading or inaccurate statements that impede an outside investigation may remain outside CCRB jurisdiction.[979]  Use of Force incidents, remain in a hybrid status, since a minority of them lead to a citizen complaint to CCRB but undergo NYPD investigation nonetheless.[980]

### i.    Who May be Investigated?

CCRB's jurisdiction under the Charter runs to "complaints by members of the public or complaints initiated by the board against **members of the police department**. . . ."[981]  However, CCRB Rules define the Board's jurisdiction as limited to "complaints by members of the public against *uniformed* members" of the NYPD.[982]

This narrows the range of CCRB's authority considerably.  By definition, "Members of the Service" ("MOS") include **all** personnel of the Department, which includes Uniformed Members of the Service and civilian Members of the Service.[983]  The sub-group "Uniformed Members of the Service" ("UMOS") are "police officers, detectives and supervisory officers authorized to wear the police uniform, who are defined as police officers under Section 1.20 of the Criminal Procedure Law."   Civilian members of the service are "Members of the Service not authorized to wear a police uniform," which include:  Traffic Enforcement Agents and their supervisors; School Safety

---

[979] CCRB asserts that, by its rules, it "investigates false/misleading/inaccurate statements against a civilian in other venues."  (Item 351, City 09.01.23 Feedback to Yates Discipline Report.). It is unclear if this is only in connection with a pending FADO complaint already under investigation for an untruthful statement made to a CCRB investigator, or if CCRB will actively pursue a false statement case wholly unrelated to, and independent of, a complaint or an ongoing investigation. Subparagraph 440 (c)(i) of the New York City Charter provides: "The board  shall  also have the power to investigate, hear, make findings and recommend action regarding  the truthfulness  of any material official statement made by a member of the  police department  who  is  the  subject  of  a  complaint  received  or initiated  by the board, if such statement was made during the course of and  in relation to  the  board's resolution of such complaint."  However, CCRB Rule 38-A RCNY 1-01 includes within the definition of Abuse of Authority, "intentionally untruthful testimony and written statements made against members of the public in the performance of official police functions."

[980] In 2018, there were 6,344 use of force incidents where force was used by members of the service (MOS), and which were investigated within the Department.  There were only 1,767 force complaints by civilians to CCRB. CCRB substantiated 73 excessive force allegations.  See NYPD, 2018 Use of Force Report, at 36, 40, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/use-of-force/use-of-force-2018.pdf.   While it is common for CCRB and IAB to have separate, concurrent, investigations of lower level force complaints, as a matter of practice, CCRB defers to FID in the investigation of those in the category of "readily capable of causing death or serious physical injury."

[981] NY City Charter, ch 18-A, §440 (c)(1) (emphasis added).  The Board was granted the additional power to initiate complaints effective January 20, 2022.  LL 24/2022.

[982] 38-A RCNY § 1-02 (emphasis supplied).

[983] NYPD Administrative Guide 322-11, effective June 23, 2020.

Agents and their supervisors; Police Cadets, and School Crossing Guards.[984]  By its own Rules, CCRB has limited itself to investigation of misconduct complaints against uniformed members only and does not investigate misconduct by non-uniformed members of the service.

The budgeted headcount for uniform members in FY 2021 was around 36,000 officers. There are approximately 19,000 other employees of the NYPD who are members of the service and whose conduct does not fall within CCRB jurisdiction (there are many other civilian employees of the Department who are not members of the service and thus have little interaction with the public).  Under Mayor de Blasio, there were ongoing discussions and plans on whether and when to remove over 5,300 School Safety Agents in the School Safety Division from NYPD control.  Mayor Adams had let the number drop to the point that there were only 3,900 agents in February 2023.  In November 2023, as part of an overall budget reduction, the Mayor announced that he was cancelling an expected class of 200 new agents.  There were fewer than 200 uniformed MOS assigned to work in schools along with School Security Agents in the Division.  The MOU between the Department of Education and NYPD was modified and renewed on June 20, 2019. In 2019, there were 182 FADO complaints and eight racial profiling complaints filed against School Safety Agents.  Former Mayor de Blasio announced plans for School Safety Officers to be moved from NYPD to the Department of Education by the end of fiscal year 2022.  With the change in administration, that plan appears to be on hold.  The Mayor's budget plan for FY 2023 leaves the Division in place, but with a baseline reduction of 560 officers.

A recent study by the New York State Office of the Attorney General commented upon this and recommended that CCRB assume broader authority:

> The CCRB's jurisdiction must also be expanded, both in terms of what complaints it is authorized to hear and what portions of the City's workforce it is authorized to hear them against.  For instance, CCRB currently does not have the authority to investigate misconduct complaints against NYPD's 19,000 non-uniformed employees, such as School Safety Agents and Traffic Enforcement Agents, City Peace Officers working for City entities like the Department of Homeless Services, and volunteer auxiliary police.  Many of these workers interact directly and regularly with the public—including vulnerable populations—and complaints against them should get a full and thorough hearing.[985]

Notwithstanding the statement that "CCRB currently does not have the authority" to expand its reach, it would appear that the limited engagement is self-imposed and not a consequence of language in the Charter.  Citizen complaints against non-uniformed members of the service are investigated by the Department itself.

---

[984] Administrative Guide 322-11.

[985] NYS Attorney General, Preliminary Report on the New York City Police Department's Response to Demonstrations Following the Death of George Floyd, at 41, available at https://ag ny.gov/sites/default/files/2020-nypd-report.pdf.

### ii.    Who May Complain?

Another bone of contention, the subject of repeated litigation brought by the PBA, is whether a sworn complaint by a civilian victim of police misconduct is a necessary predicate to commencement of an investigation by CCRB.  Until 2022, Section 440 of the Charter gave the Board the power to investigate "complaints by members of the public against members of the police department."  This opened the question of whether misconduct could be investigated absent the involvement of a "victim" or a "witness" to an encounter.  In 2022, after years of litigation and revisions to the Rules, the matter, for the most part, was settled. The Charter was amended to permit investigations "initiated by the Board."  At the same time, the Board amended its Rules, providing that, "The Board may delegate its power to initiate complaints to the Civilian Complaint Review Board's Chair, Executive Director, General Counsel, or Board member panel. . . ."[986]

Prior to the recent Charter amendment, the Board had subdivided the manner by which an investigation could be commenced into three categories.  38-A RCNY 1-11 had three subdivisions:

- Sec. 1-11(a) permitted any individual having personal knowledge of misconduct gained through firsthand observation or experience, and as well permitted a parent, legal guardian or legal representative to initiate a complaint;
- Sec. 1-11(b) (the "Non-Witness Rule") permitted initiation upon a complaint by a "Reporting Non-Witness, after consideration of the nature and/or severity of the alleged misconduct, the practicability of conducting a full investigation and the numbers of complaints received by the Board regarding the incident;
- Sec. 1-11(c) (the "Sua Sponte Rule") authorized investigations initiated by the Board without a sworn complaint by a "member of the public." The Rule provided: "The Board has the power to review incidents involving members of the New York City Police Department and investigate Cases arising therefrom within the Board's jurisdiction under the New York City Charter."

The PBA challenged the Rules claiming they went beyond the authority granted CCRB by the Charter.  The objection to Rule 1-11 (a) was that it went beyond witnesses with personal knowledge, allowing complaints by representatives.

Petitioners objected to, and denominated Rule 1-11(b) as the "YouTube Rule" because, they interpreted the Rule as permitting complaint by "a viewer on YouTube [who] watches an incident and then makes a complaint of misconduct to the CCRB [when t]hat person has no firsthand experience, and no knowledge whether the video is embellished or fabricated."  The lower court agreed, striking the YouTube clause on the "possibility of a mass influx of complaints based on unreliable information."[987]

The PBA also challenged the Sua Sponte Rule claiming that it allowed the CCRB to "investigate" potential misconduct without a "complaint by [a] member of the public," in violation of the City Charter.  The Rule was defended on the basis that it only allowed the CCRB

---

[986] 38-A RCNY § 1-14, eff. Oct. 22, 2022.

[987] *Lynch v. N.Y. City Civilian Complaint Review Bd.,* 64 Misc. 3d 315 (Sup. Ct. NY Cnty. 2020).

to "review" incidents that had not been complained about; it did not allow the CCRB to "investigate" those incidents toward the end of disciplining a subject officer.

In sum, the PBA claimed that all three rules were "likely to cause more harm than good."[988]

The lower Court agreed, finding that the rules created "a serious likelihood" that the CCRB would receive and investigate "complaints based upon unreliable information," and that "[t]he Rule would allow respondents to expand its Charter to solicit complaints actively, rather than 'investigating upon complaint.'"[989]

The City did not appeal the lower court's striking of the Sua Sponte Rule, and the Appellate Division was not asked to address the issue. Accordingly, the Rules were amended and 38-A RCNY 1-11 (c), the Sua Sponte Rule, was deleted effective March 26, 2021.[990]

A live example of the importance of flexibility in the witness rules is a case reviewed by the Monitor team. There, three police officers approached a group of children playing in a park telling them that "they had received a call about someone in the park with a gun." Two of the children, an 11-year-old boy and a 13-year-old girl began to flee. The subject officer followed them, at which point they ran to an apartment building. The officer chased them, unholstering and pointing his gun at the girl. CCRB determined that there was insufficient basis for the attempted stop and brandishing of the weapon. The scene was witnessed by an adult who filed a complaint. The complainant described himself as the girl's "godfather." He was neither a parent/guardian nor a victim of the threatening gesture. CCRB recommended Charges and Specifications, without a sworn complaint by the girl. DAO asked for reconsideration, claiming that the complainant's status was "insufficient to satisfy the sworn complaint or statement requirement." Since "the CCRB does not have a verified, sworn statement from [the girl] . . . this matter should not have been substantiated."[991] The Police Commissioner retained the case[992] and ordered "Training" in place of a disciplinary hearing.

Another notable example of the need for flexibility is the proceeding against PO █████ █████. The subject officer filed a motion to dismiss on the grounds that the complaint triggering the investigation was not made by an eyewitness to the event. The DCT ruled that the intake call provided CCRB with a rational basis to move forward with the investigation.

On appeal, the First Department reversed the decisions regarding both the "witness rule" (1-11[a]) and the "non-witness rule" (1-11[b]), finding that:

> 38-A RCNY 1-11(a), as amended, permits any individual having personal
> knowledge of alleged misconduct by a member of NYPD to file a complaint.

---

[988] *Id.* at 332.

[989] *Id* at 331.

[990] Councilmember Adrienne Adams introduced legislation authorizing investigations of "complaints initiated by the board" (Intro 2440-2021), Nov. 10, 2021, which was enacted as a Charter amendment, LL 024/2022 in February 2022.

[991] PO █████, CCRB # █████, at 3, April 7, 2018.

[992] Provision two of the 2012 APU-MOU.

"Personal knowledge" is defined as knowledge "gained through firsthand observation or experience" (38-A RCNY 1-01). This rule is within the CCRB's statutory authority and is rationally rooted in the New York City Charter's directive that the CCRB receive complaints from "members of the public" (NY City Charter § 440[a]).

38-A RCNY 1-11(b), as amended, gives the CCRB discretion to investigate complaints filed by "Reporting Non-Witnesses," i.e., persons "without personal knowledge" of the alleged misconduct (38-A RCNY 1-01). This rule is rationally related to the purpose of the establishment of the CCRB, i.e., that the investigation of complaints of police misconduct "is in the interest of the people of the city of New York and the New York city police department" (NY City Charter § 440[a]).

There is no basis for Supreme Court's speculation that 38-A RCNY 1-11(a) and (b), as amended, would result in "a mass influx of complaints based on unreliable information." Rule 1-11(b) provides a non-inclusive list of the factors to be considered in determining whether to investigate a complaint by a non-witness, among which are "the nature and/or severity of the alleged misconduct, . . . the practicability of conducting a full investigation . . . and the numbers of complaints received by the Board regarding the incident." Thus, the CCRB would serve as its own gatekeeper for the investigation of non-witness complaints.

….

Moreover, the broad nature of much of the CCRB's FADO jurisdiction, which, as indicated, includes complaints of discourtesy and use of offensive language (NY City Charter § 440[c][1]), naturally suggests that complaints may be filed by members of the public at whom the misconduct is not directed. Indeed, it is easy to imagine a scenario in which a witness to discourtesy or offensive language might wish to file a complaint while the object of the discourtesy or offensive language might not.[993]

Even after the appellate approval of 11(a) and 11(b) there were still calls for reinstatement of the Sua Sponte Rule. The rationale, as best articulated by Citizens Union of the City of New York, in a plea to the Charter Revision Commission of 2019, had been,

to permit CCRB to initiate an investigation into reported or known incidents of police misconduct within its jurisdiction in the absence of a complaint. Such authority would track the authority of the Police Department's Internal Affairs Bureau. With this authority, the CCRB would no longer be forced to remain on the sidelines when there is a notorious or sensitive incident that has become the focus of community and police concern.[994]

---

[993] 183 A.D.3d at 514.

[994] Citizens Union of the City of New York: Testimony to the New York City Charter Revision Commission 2019 (Mar. 7, 2019).

In the context of SQF investigations, the point made by Citizens Union is especially apt. Awaiting a complaint by a civilian before wrongful stop and frisk behavior can be independently examined is not the most effective way to address the problem. While improper SQF behavior contributes to community resentment, unwillingness to pursue a CCRB complaint by the victim is understandable. The relatively low number of CCRB complaints of illegal stops (862 in 2018) may be an indicator of improved policing, or it might readily be ascribed to a number of other factors: (i) unless force or some egregious behavior, such as a strip search or an illegal arrest, accompanies the charge, civilians may not think a report to CCRB is "worth the effort"; (b) the majority of persons stopped are young, Black or Hispanic males who, for a variety of reasons, may view official avenues of redress with skepticism;[995] (c) a reluctance, by many, even if innocent of any criminality, to voluntarily undergo examination and submit sworn testimony, explaining circumstances where they were suspected by an officer of engaging in criminal activity is understandable; (d) a given percentage of subjects of SQF enforcement activity have a criminal complaint pending as a consequence of the stop; an inordinately high number of those criminal complaints, especially for lesser offenses, end up with declined prosecutions or dismissal but, nonetheless the fact of a pending prosecution in another setting acts to discourage full participation in the CCRB process.[996]  Even when a FADO complaint is filed, only a minority are fully investigated (1,408 of 4,759 in 2018).[997]  The rest are truncated or mediated. Truncations most commonly occur when a complainant withdraws or fails to participate, for a variety of reasons including pending litigation. Absent authority for CCRB to proactively pursue SQF misconduct without a participating complainant, there is no external, independent locus to identify and prosecute improper stop and frisk behavior. The only alternative is to fall back and rely upon the Department to self-inspect. With the Monitor's assistance, the Department has stepped up efforts to screen, self-inspect and audit, but is Departmental self-examination the equivalent of external independent scrutiny? Given the court's finding of a history of deliberate indifference to SQF misconduct in the past, that question must be asked going forward. Can self-inspection suffice or should some independent entity, such as CCRB or DOI, be authorized to proactively monitor Fourth and Fourteenth Amendment compliance?

In the end, an agreement was reached to overcome the legal challenges to the Sua Sponte Rule and to permit reinstatement of CCRB's authority to commence an investigation prior to

---

[995] In 2018, 12,244 of 13,459 (91%) of persons listed in stop reports as suspects were non-white. 12,179 were male (90%). 8,262 were under 30 years of age (61%). These numbers are for reported stops. There is reason to believe that the percentage of minorities are even higher if unreported stops are included. *See* Twelfth Report of the Independent Monitor: The Deployment of Body Worn Cameras on NYPD Officers at 74 (Nov. 30, 2020). 76% of CCRB complaints are made by Black or Hispanic victims. *See* CCRB Annual Report 2018, at 20.

[996] Even when a complaint is filed and accepted by CCRB, only a minority undergo full examination. In 2018, only 1408 of 4759 complaint closures at CCRB were fully investigated. 2899 were truncated, mostly due to pending litigation or complainant reluctance of one kind or another. In 2020, of 3307 closed CCRB cases, 2187 were closed due to truncation. 1709 of those were truncated because a complaint was withdrawn, the witness was uncooperative or unavailable. 351 of the truncated cases were "closed pending litigation. Pending Litigation is a truncation category added in August 2017. It indicates that the complaint was truncated due to the complainant/alleged victim's attorney, CCRB, Executive Director's Monthly Report, January 2021, at 28, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2021/20210111_monthlystats.pdf.

[997] CCRB, James Blake Fellow Report 2020 at 9. In 2021, 612 of 2677 (23%) of case closures were by way of full investigation. In 2022, 2343 of 3909 (60%) case closures were by way of full investigation. CCRB Annual Report 2022 at 25.

receipt of a complaint. In its presentation of planned reforms to the Governor, in 2021, the City committed to amending the law to "increase CCRB's authority so it can initiate investigations on its own."[998] On January 9, 2022, the Charter was amended. Section 440 of the Charter now permits the Board to initiate complaints on its own.[999]

As a practical matter the initial deletion of the Sua Sponte Rule was mitigated by the appellate approval of the "YouTube" clause.[1000] Just about any concerned citizen, whether a personal witness to the event or not, can file a complaint under the "non-witness" or "YouTube" rule. Along that line, employees in the investigations division of CCRB were advised, "[i]n the event that you read a tweet that is not linked to the CCRB's Twitter feed, take a screenshot or copy the tweet's language & handle and email that info to [supervisors]." In those cases, the "potential complainant" is to be encouraged to use one of CCRB's official channels.[1001]

Subsequently, Local Law 24 of 2022, amended the Charter to explicitly authorize investigations of "complaints initiated by the board. . . ."[1002]

Simultaneous with the Charter amendment taking effect (October 22, 2022), CCRB adopted Rule 1-14, which authorizes delegation by the Board of the power to initiate complaints, without a civilian complainant, to the Chair, Executive Director, General Counsel, or a Board member of a panel. This has triggered another lawsuit, an Article 78 proceeding brought by the PBA, complaining that the delegation from a full board to individuals is unauthorized.[1003] The matter is currently pending.

## F.    Subject Matter Jurisdiction

Under earlier Charter provisions,[1004] CCRB was permitted to investigate four kinds of misconduct: (1) excessive use of force; (2) abuse of authority; (3) discourtesy; and (4) use of offensive language (FADO).[1005] Following amendment to the Charter, adopted by referendum in

---

[998] NYC Police Reform and Reinvention Collaborative Plan, March 25, 2021, at 15, available at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4890502&GUID=2CB9D744-6371-434F-8331-4A923FF529AB&Options=&Search=.

[999] Local Law 024 of 2022.

[1000] § 1-11 (b).

[1001] Memo, Response Procedures for Twitter posts re potential complaints, Chiefs of Investigation to the Investigation Division, October 26, 2017.

[1002] LL 24/ 2022, Charter § 440(c)(1) became law when returned by Mayor de Blasio unsigned.

[1003] *NYC PBA v. City of New York*, Index No. 150441/2023, Doc. No. 1 (Sup. Ct. NY Cnty., 2023) (""The Charter does not grant the Board authority to "delegate" the new power to initiate complaints.") Doc. No. 66 at 24.

[1004] 1993 to 2019.

[1005] NY CITY CHARTER, ch. 18-A, § 440(c)(1) (2019).

November 2019, the Board's jurisdiction was expanded to include investigations into whether a subject officer had given a false statement in the course of a CCRB investigation.[1006]

By contrast, NYPD's Internal Affairs Bureau ("IAB") had, in the past, the exclusive ability to investigate allegations that NYPD officers engaged in corruption, perjury, and off-duty criminal conduct. IAB has concurrent jurisdiction with CCRB in cases alleging excessive use of force. More serious allegations of excessive use of force may also be investigated by the Force Investigation Division under the auspices of the First Deputy Commissioner.[1007] As noted earlier, with a revised definition of "abuse of authority" in its Rules, there is a possibility that CCRB may begin to investigate corruption cases and false statements made outside a CCRB investigation.

When a complaint contains allegations that are outside FADO, but also contains allegations falling within FADO, the complaint may be split. An example might be when an officer conducts an illegal frisk while drunk on duty. CCRB would evaluate the Stop complaint and refer the allegation regarding intoxicants.

If a complaint contains allegations that fall exclusively to NYPD, but also contains a FADO allegation and there is joint jurisdiction, the Chair, in consultation with the Executive Director, is authorized to send the entire complaint to NYPD. An example might be a complaint alleging a wrongful taking of property by force. Theoretically, CCRB could investigate the force allegation

---

[1006] "The board shall also have the power to investigate, hear, make findings and recommend action regarding the truthfulness of any material official statement made by a member of the police department who is the subject of a complaint received by the board, if such statement was made during the course of and in relation to the board's resolution of such complaint." City Charter § 440(c)(1).

Currently and hopefully as a temporary measure, CCRB has suspended investigation of a number of matters within its jurisdiction for want of sufficient resources. As stated on its website:

"On September 9, 2023, the Office of Management and Budget (OMB) announced citywide budget cuts. As a result, the CCRB will lack the resources to fully investigate certain cases within its jurisdiction. After careful consideration, effective January 1, 2024, the CCRB suspended investigating:

- Failure to provide officers' business cards pursuant to the Right to Know Act (RTKA) with no other allegations;
- Refusal to provide name or shield number with no other allegations;
- Discourteous words or actions with no other allegations;
- Threats with no action with no other allegations;
- Refusal to process a civilian complaint with no other allegations;
- Property seizures with no other allegations;
- Forcible removal to hospital with no other allegations;
- Untruthful statements with no other allegations;
- Any complaint that has only the above referenced allegations.

The CCRB will resume investigating these cases as soon as the city allocates sufficient funding to do so." *See* "CCRB Jurisdiction" at https://www.nyc.gov/site/ccrb/complaints/file-a-complaint/ccrb-jurisdiction.page, last visited on April 8, 2024.

[1007] Patrol Guide 221-01, et seq. Beginning in 2015, more serious force cases are handled by the Force Investigation Division ("FID") and the Force Investigation Bureau ("FIB"). *See* "CCRB Jurisdiction".

separately while splitting off the theft charge, but it has the discretion to send the entire complaint to IAB.[1008]

Arguably, in the past, the "Abuse of Authority" component of FADO could have been read to include bias-based policing and racial profiling and could have been handled by CCRB. However, CCRB chose not to investigate those cases and, instead, referred them to IAB as "M" cases. The decision by CCRB to send racial profiling complaints to NYPD, even when associated with other FADO allegations, is not typical of civilian oversight entities.[1009] As noted by the Office of the Inspector General for the NYPD, the fact that CCRB "does not investigate complaints of biased policing made against officers . . . makes CCRB an outlier among the independent police review agencies that primarily handle complaints of police misconduct in the largest U.S. police departments."[1010] This sentiment was seconded in a recent study by the New York State Attorney General, who also concluded that CCRB's jurisdiction should be explicitly expanded to include investigating allegations of biased policing and racial profiling.

Following those observations, in 2021, the Charter was amended to authorize CCRB to receive and investigate profiling cases, beginning in 2022, by including those allegations in the definition of Abuse.[1011]

## Other Possible Misconduct Noted (OMN)[1012]

There are other violations, such as an officer's failure to complete a stop report, or other necessary documentation such as an activity log, in-house rules violations, and off-duty misconduct, that may remain beyond the CCRB's jurisdiction and must be referred to the NYPD as OMN's.

In 2018, the Board revised CCRB rules with twelve amendments.[1013] One of the changes affected the way cases of misconduct are sent from CCRB to NYPD for allegations outside CCRB subject matter jurisdiction and falling in the category described as "Other Misconduct Noted" ("OMN"). The new rule provided that non-FADO misconduct "will be noted in case disposition

---

[1008] 38-A RCNY  1-15(b).

[1009] *See* OIG-NYPD Sixth Annual Report at 8, online at https://www1.nyc.gov/assets/doi/reports/pdf/2020/OIGNYPD_SixthAnnualReportFinal_4.9.2020.pdf.

[1010] OIG-NYPD Sixth Annual Report at 8, online at https://www1 nyc.gov/assets/doi/reports/pdf/2020/OIGNYPD_SixthAnnualReportFinal_4.9.2020.pdf.

[1011] Local Law 47 of 2021, amending Charter § 440 (c)(1), Effective January 20, 2022. ("The board shall have the power to receive, investigate, hear, make findings and recommend action upon complaints by members of the public against members of the police department that allege misconduct involving excessive use of force, abuse of authority **including bias-based policing and racial profiling**, discourtesy, or use of offensive language, including but not limited to, slurs relating to race, ethnicity, religion, gender, sexual orientation and disability.") (emphasis added).

[1012] CCRB Rules were amended, effective October 22, 2022, to re-designate "Other Misconduct Noted" ("OMN") as "Other Possible Misconduct Noted" ("OPM"). (38-A RCNY § 1-44). Throughout this Report, citation to "OMN," if the disposition occurred after October 2022, should be read as "OPMN."

[1013] The Revised Rules were adopted on October 11, 2017, published in the City Record on January 2, 2018, and went into effect on February 1, 2018.

by categories describing the possible misconduct and the evidence of such misconduct." [1014] The referral would be described as, "Other Misconduct Noted:  The Board found evidence during its investigation that an officer committed misconduct not traditionally investigated by the Board, but about which the Police Department should be aware." [1015]

In 2018 there were 430 OMN allegations referred to NYPD from CCRB.  356 of them were for document failures (stop report, memo book, activity log, strip search).  The remainder ranged from failure to supervise to unreturned property, etc.  In 143 of OMN referrals, there was a FADO substantiated allegation by CCRB as well.  In 287 of the OMN referrals, there was not a substantiated FADO allegation.[1016] When DAO reviews a substantiated FADO allegation from CCRB, it may or may not seek an independent investigation of the OMN referred allegation.  More often than not, DAO will simply combine the allegations without seeking an independent investigation by IAB, BIU or OCD.

If APU becomes aware of possible misconduct outside of FADO during the course of a prosecution, it will refer the matter directly to the Department.[1017] The 2018 revision permitted note of the referral.

The PBA objected to the 2018 revision of the OMN rule, claiming that in cases of misconduct other than FADO, CCRB is without jurisdiction or authority: (1) to investigate; or (2) to collect evidence; or (3) to forward evidence to the Department; or (4) to note misconduct in CCRB records.  The PBA argued that the new Rule would "allow non-FADO conduct to appear in CCRB proceedings . . . [and] taint those reports and appear in the permanent record of that officer.  The challenge was rebuffed by the lower court on the grounds that "[d]ocumentation affords clarity to both the NYPD and CCRB." [1018] On appeal, the Appellate Division upheld the rule change.  The First Department panel held that the rule was merely "designed to make a record of the existence of possible non-FADO misconduct . . . [which is] 'noted' as 'possible misconduct' with a listing of evidence of such misconduct and thus entails neither a finding nor a determination made by CCRB."[1019]

The "Other Misconduct" Rule contained within Subchapter E of the Rules of the CCRB, applies only to APU prosecutions of Charges and Specifications.[1020]  Until amended in October, 2022, the rule specifically provided "[i]f **during the course of a Prosecution** the Civilian

---

[1014] Revised Rule 38-A NYCRR §1-44. Subsequent to appellate approval in *Lynch v. CCRB*, 183 A.D.3d 517 (2020), the PBA revised its objection because the word "possible" was not written into Rule 1-33 (e)(15). A lower court ruled, on November 16, 2021, that "non-FADO misconduct" should be noted as "**possible** misconduct" to clarify that there was no finding or determination by CCRB. *Lynch v. CCRB*, Sup. Ct. NY Cnty., Index No. 154653/2021 (emphasis added). That decision was affirmed on July 11, 2022. *Lynch v. CCRB*, Index No. 154653/2021, Doc No. 88.

[1015] 38-A RCNY 1-34.-(15).

[1016] Appendix, CCRB Complaint Data 2018.

[1017] 38-A RCNY 1-44; Paragraph 7 of the APU-MOU.

[1018] *Lynch v. N.Y. City CCRB*, 98 N.Y.S.3d 695(Sup. Ct. N.Y. Cnty. 2019) (Crane, J.). ("*Lynch*")

[1019] *Lynch v. N.Y. City CCRB*, 183 A.D.3d 512, 517 (1st Dep't 2020).

[1020] Other Possible Misconduct Noted is also listed as a possible case disposition, presumably for all matters. 38-A RCNY § 1-33(11).

225

Complaint Review Board becomes aware of possible misconduct falling outside its jurisdiction, such as the making of a false statement by an officer, the Board shall not itself prosecute such possible misconduct but shall instead immediately refer such possible misconduct to the Police Department."[1021]  The Rule is part of the MOU between the Department and CCRB on April 12, 2012, which mandates that CCRB amend its Rules to implement the MOU.  The rules were amended in 2022, but the MOU has not been amended.

Until an earlier Rules amendment, in January 2022, implementing Charter amendments, bias-based policing and racial profiling allegations were examples of matters which would be split off from investigation of a stop and frisk complaint and referred to NYPD.  However, they were not sent to the full panel first and no reference of profiling was made by the panel.  Instead, an immediate spin-off referral was made to IAB without detailing evidence or naming the subject officers.[1022]

Several observations need to be made about Rule 1-44 in practice.  The *Lynch* decision in the Appellate Division,[1023] when approving the modification, made no note of the distinction between APU and non-APU cases, nor was it raised in the course of the litigation.  In current practice, evidence is compiled, noted and forwarded to the Department in all CCRB investigations – not just APU prosecutions.  Panels vote to refer a an OMN allegation in non-APU cases.  It is not unusual to see a stop and frisk investigation which includes a referral regarding stop reports or activity log entries which are missing.  Since Rule 1-44 does not apply to non-FADO cases, this apparently derives from Rule 1-33 (15) which permits the Board to find "that an officer committed misconduct not traditionally investigated by the Board" in all cases.

In sum, if other misconduct is discovered during the course of an investigation, the matter will be referred to the Department and will not be prosecuted.  If the matter is discovered before APU prosecution, the matter will be presented to, and voted upon, by the Board panel.  If the matter is discovered after referral to APU and in the course of a prosecution, the matter will be referred directly by APU, without presentation. When APU attorneys prepare a case for trial, they are privy to more departmental information than they might obtain in the normal course of less 'serious' misconduct.  Personnel records which are not automatically shared with CCRB investigators are made available to APU.  They might include, for example, IAB interviews of officers, the CPI, Command Disciplines, prior IAB, OCD, FID investigations, or the fact that the officer is on disciplinary probation.  It is more likely that APU prosecutors will uncover other misconduct than that which may be discovered during the normal course of a CCRB investigation of minor misconduct.

The MOU and the Rules provide that, when an investigation is spun off or referred to NYPD, the agencies may coordinate investigations, or the Department may enlist the assistance of

---

[1021] *Id.* (emphasis added).

[1022] Memo, Re:  Profiled Contact, Olas Carayannis, Director of Quality Assurance and Improvement, CCRB, to the Investigations Division, March 28, 2018.

[1023] *Lynch*, 183 A.D.3d 512.

CCRB in its portion of the investigation. In response to inquiry, the CCRB has indicated that it is not aware of any case where this has occurred.

In the case of "Other Misconduct Noted," the CCRB generally does not send the matter immediately, as specified in the MOU, but rather notes it for the Department when the case is closed. IAB then receives a disc with the entire CCRB case file. Prior to the recent Charter amendments, in the case of false statement referrals, the matter would be referred to IAB at an earlier stage, before closure. In that case, CCRB would send supporting documentation, but not the case file. Included in the material forwarded to IAB is the CCRB interview of the officer. This is a one-way street: in cases of concurrent or split investigations, the NYPD may not forward its P.G. 206-13 (officer interview) to CCRB absent approval by the deputy commissioner for legal affairs, which is rarely given.[1024]

In the case of OMN spinoffs, CCRB's subject matter jurisdictional limitations may result in incomplete examination of misconduct related to one complaint. An obvious question is "What becomes of the misconduct allegation which is spun-off or referred back to the Department?" A misconduct allegation left standing alone—if there is no substantiation of the FADO allegation by CCRB—is referred to one of the investigating units for disposition—IAB, BIU or OCD as the case may be.[1025] If there is a substantiated FADO allegation, DAO may keep the connected OMN case, and the matter is then resolved within DAO or with the Police Commissioner, based upon the entire complaint.[1026] This can become a matter of significance in the case of SQF allegations, where closely related allegations, such as the failure to prepare or produce a memo book, activity log or stop report is integral to any investigation of SQF misconduct. An intentional failure to file a stop report or to make an entry in an activity log, or a deliberately false description of the stop in a report, might be evidence of the officer's level of misconduct or intent during an unlawful stop, frisk or search, and should be considered.

Split jurisdiction may have consequences going forward with adoption of the new Disciplinary System Penalty Guidelines. Under the Guidelines, the presumptive penalty for an illegal stop is three penalty days. The Guidelines also presume a penalty of one day for negligent failure to record an event with a BWC. Further, if the failure to record was of an "Underlying Incident [which] is the Subject of an Investigation" the presumptive penalty is three days forfeited. The Guidelines list "failure to report incident or make a required activity log entry" as an aggravating factor. Separately, the failure to prepare a required report or to document an

---

[1024] PG § 206-13 was moved to AG § 318-11 as of Feb. 16, 2022

[1025] In a CAR memo (Case Analysis and Recommendation) ██████████████████████████████████████████████████████████████████████████ ███████████████████████ The Department has asserted privilege (attorney-client and deliberative process) as to requests for CAR memos, which are of the essence in trying to understand the underlying facts relied upon by the Police Commissioner in making a final decision. The deliberative process privilege does not apply to "purely factual material." *Nat'l Cong. for Puerto Rican Rts.*, 194 F.R.D. 88, 93 (S.D.N.Y. 2000).

[1026] The Monitor has been advised that, commencing in 2022, all stop report failures referred by CCRB to the Department after an SQF complaint has been substantiated will be investigated by IAB. However, the question remains: will the separate investigations (CCRB and IAB) be coordinated and will the report failure be independently disciplined?

investigative encounter carries a presumptive penalty of five days with a mitigated penalty of three days. [1027]

This raises a few questions. Assuming CCRB has a stop complaint under investigation and a camera was not activated as required, or required documents were not prepared, will the OMN referral for BWC misconduct[1028] or stop report failure go to DAO? IAB? OCD? Or the precinct? Will that depend upon whether CCRB substantiates the stop complaint? In the past, DAO did not send stop report failures out for investigation if the SQF complaint was substantiated. That is no longer the case. Will the presumptive penalty for a BWC failure, or a stop report failure, depend upon whether CCRB substantiates the stop complaint? Is, in the words of the Matrix, the "underlying incident . . . the subject of an investigation" when CCRB unsubstantiates the stop complaint? Without coordination with CCRB, how will NYPD or CCRB know what penalty is appropriate for the BWC or stop report failures? An SQF violation may be noted by CCRB with a recommendation for a given penalty. At the same time, a stop report failure may be referred to NYPD for investigation. The important question is whether the two investigations will be reconciled and, if so, will each allegation, if substantiated, receive independent assessment under the disciplinary matrix?

While CCRB posts disciplinary results of its investigations online[1029] and the Department posts a limited number of disciplinary outcomes on its "officer profile" pages,[1030] stop report failures, along with other OPMN referrals sent to the local command are not available for public inspection. In other words, there is no way to know the outcome of OPMN investigations and whether or what discipline was imposed.

For example, in one case, CCRB had recommended a B-CD for an illegal search and referred over to NYPD the failure to make entries in the officer's Activity Log. The Police Commissioner departed by reducing the search to an A-CD, and then wrote that the A-CD "will include the failure to make proper Activity Log entries."[1031] If the usual protocol was followed, DAO did not send the log failure out for independent investigation but merely accepted the OMN referral and folded it into the potential discipline for the bad search. Without more, based upon the departure letter, it appears that the documentation failure was neither investigated nor independently subjected to discipline.

---

[1027] The Department has proposed revisions to the discipline matrix which would reduce the mitigated penalty for failure to prepare a required report, i.e., activity logs and memo books, to training. The comment submission period ended June 18, 2023. The revision has not been adopted as of December 1, 2023.

[1028] Rule changes adopted effective October 22, 2022, would permit BWC violations to be investigated by CCRB as an abuse of authority. On January 12, 2023, the NYC PBA filed a lawsuit seeking to bar investigation of BWC violations by CCRB. *PBA of the City of NY v. NY City CCRB.*, Index No. 150441/2023 (Sup. Ct. N.Y. Cnty.). The Department joined the union in arguing that BWC non-compliance should not be investigated by CCRB as an abuse of authority. Doc. No. 22 at 7.

[1029] https://www.nyc.gov/site/ccrb/policy/MOS-records.page.

[1030] https://nypdonline.org/link/2, reserved for outcomes of formal discipline, discussed below.

[1031] Police Commissioner's Penalty Departure, PO ███████████, (now Sgt. ██████ as of May 17, 2022), CCRB # ███████, February. 6, 2020. PO ██████ has had ten CCRB complaints investigated with three substantiated.

In the above-cited case, under the Guidelines, does CCRB investigate and make a finding regarding the activity log? Is it an aggravating circumstance? It's outside CCRB's jurisdiction. If CCRB refers the OMN to NYPD, how can CCRB consider this as an aggravating factor without investigation? If DAO rolls the activity log failure into consideration of the substantiated search, how will DAO know whether this failure is an aggravating factor or a separate offense without independent investigation? Without investigation by CCRB or one of the investigating units at NYPD, how can this assessment fairly be made? An illegal search of a person carries a presumptive penalty of 3 days and a mitigated "penalty" of Training, but BWC and Stop Report failures should be investigated, evaluated, and taken into consideration, either as an aggravating circumstance or added penalty, or both. The question is "How and where will that be done?"

The point here is to examine problems that surface when artificial boundaries are placed on CCRB jurisdiction as penalties are assigned in a Guidelines regime. How can CCRB's circumscribed jurisdiction be reconciled with Guideline penalties that are divided between two investigating entities? With particular reference to SQF misconduct, the question is asked to highlight the difficulty that may arise when misconduct related to an encounter, such as report failures, BWC failures,[1032] are removed from CCRB scrutiny.

With increased usage of body-worn cameras, the possibility that misconduct will be captured even in the absence of a civilian complaint to CCRB increases as well. The BWC-MOU, signed in November 2019, granted access in a contained viewing room to CCRB investigators when responding to a complaint. While looking at the videos, if the investigator "recognizes or believes that he or she has observed potential misconduct . . . unrelated to the incident under investigation by the CCRB, the investigator shall refer the incident to the NYPD's Internal Affairs Bureau . . . [and] not commence an investigation into the unrelated incident."[1033] It is unclear if CCRB will note the referral in "case dispositions by categories describing the possible misconduct and the evidence of misconduct" under OMN referral rule.[1034] However, the BWC MOU goes on to provide that "The NYPD IAB Liaison will inform the CCRB of the actions, including dispositions, it has taken in response to any such referral," which is a break from the customary practice of other OMN referrals. Unfortunately, according to CCRB, notwithstanding the MOU, the plan for review was not implemented.[1035]

### i.    Defining FADO

It is relatively clear what misconduct comes within the force, discourtesy, and offensive-language categories of CCRB jurisdiction.

---

[1032] Subsequent to this draft Report, on October 22, 2022, 38-A RCNY § 1-01 was amended to permit CCRB to investigate improper use of body worn cameras as an abuse of authority.

[1033] BWC-MOU paragraph 7(a).

[1034] 38A RCNY 1-44

[1035] Item 393, City 09.01.23 Feedback to Yates Discipline Report. ("This never materialized, there is no viewing room. The CCRB still only receives the BWC that NYPD deems relevant to our requests.").

**FORCE**

The Patrol Guide defines "Excessive Force" as "Use-of-force deemed by the investigating supervisor as greater than that which a reasonable officer, in the same situation, would use under the circumstances that existed and were known to the member of the service at the time force was used."[1036]

The Disciplinary System Penalty Guidelines is more specific, sub-categorizing levels of force:[1037]

Deadly Physical Force – Physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury (e.g. the use of a deadly weapon, such as discharging a firearm, against a person).

Non-Deadly Force – Force not readily capable of causing death or other serious physical injury (e.g., physical force such as employing a takedown technique, and using hand strikes or foot strikes against a person).

Less Lethal Force/Device – The application of a significant intermediate use of force option including Oleoresin Capsicum ("O.C.") spray, conducted electrical weapon ("CEW") or impact weapon against a person.

**DISCOURTESY AND OFFENSIVE LANGUAGE**

The Charter merely authorizes investigation of "discourtesy, or use of offensive language including, but not limited to, slurs relating to race, ethnicity, religion, gender, sexual orientation and disability" without further definition.[1038]    The Departmental Manual prohibits "Using discourteous or disrespectful remarks regarding another person's age, ethnicity, race, religion, gender, gender identity/expression, sexual orientation, or disability" without more specificity.[1039] The Disciplinary System Penalty Guidelines goes further, even including examples:[1040]

Discourtesy – Discourtesy may include foul language, acting in a rude or unprofessional manner (such as demeanor or tone), and flashing rude or offensive gestures that is unjustified or unwarranted with no legitimate law enforcement purpose.

Example: an officer holding up his middle finger to an individual recording the officer on a cell phone camera, with no legitimate law enforcement purpose.

---

[1036] Patrol Guide § 221-01.

[1037] https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/nypd-disciplinary-penalty-guidelines-effective-2-15-2022-final.pdf, at 21.

[1038] N.Y. City Charter § 440 (c)(1).

[1039] Administrative Guide § 304-06(2).

[1040] NYPD Disciplinary System Penalty Guidelines at 26, https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/nypd-disciplinary-penalty-guidelines-effective-2-15-2022-final.pdf.

Offensive Language – Offensive language is more serious conduct than discourtesy and includes slurs based on membership in a protected class such as race, religion, ethnicity, gender, gender identity, sexual orientation, age or disability. Offensive language is distinguished from "Hate Speech" (see below).

Example: an officer is aware that a transgender female identifies as a woman, yet the officer referred to the complainant as "he," not the complainant's preferred gender pronoun while speaking to her.

## ABUSE OF AUTHORITY

It is less clear what misconduct comes within the abuse of authority category. The term "Abuse of Authority" is not defined by the Charter. As such, it can potentially cover a wide spectrum of misconduct. The Board has flexibility in deciding, as a matter of policy, what misconduct constitutes an abuse of authority.[1041] Until 2021, the term went undefined. While the Departmental Manual explains the obligations and duties of officers and the corresponding misconduct for which they are accountable, it does not define "abuse." The Disciplinary Guidelines have 30 categories of penalties for Abuse of Authority, but it does not claim to be exhaustive or exclusive. The Board is not necessarily bound by the Patrol Guide. "Abuse" is left to reasonable interpretation by the Board. It can, within its delegated authority, reach to include some items under the umbrella of FADO which are not explicitly banned by the Patrol Guide, or some items banned by the Patrol Guide which the Police Commissioner may not believe are within CCRB jurisdiction.

CCRB, in a list of allegations received by type, identifies 49 categories of misconduct as abuse of authority.[1042] Generally, they include wrongful entry, seizures, threats, interference with recordings, and refusal or failure to perform required duties during a civilian encounter. As pertinent to this Report, included in this category are street encounters involving wrongful stops, questioning, frisks, searches, and an officer's refusal to identify or non-compliance with the requirements of the Right to Know Act.[1043] Arguably, the entirety of Patrol Guide § 212-11 (Investigative Encounters) should fall within the purview of Abuse of Authority and, as such, fall within CCRB's jurisdiction.

Whether an act of misconduct properly falls within CCRB's "Abuse" jurisdiction is not always clear. One example where the Police Commissioner and CCRB disagreed over jurisdiction is of a complainant who was pursued by an off-duty Sergeant, in a seeming moment of road-rage,

---

[1041] *Lynch v. CCRB*, 206 A.D.3d 558 (1st Dep't), Index No.154653/21, Appeal No. 16202, Case No. 2021-04687 (July 10, 2022) ("Given the CCRB's expertise in studying and investigating police disciplinary matters, we defer to its interpretation of the term 'abuse of authority' unless that definition is irrational, unreasonable or inconsistent with the governing statute.").

[1042] CCRB Semi-Annual Report 2021 at 23, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy _pdf/annual_bi-annual/2020_semi-annual.pdf (one category is "other").

[1043] NYC Admin. Code § 14-174, eff. October 19, 2018. 38-A RCNY §1-01, as amended October 22, 2022, specifies that "refusals to provide identifying information" is an abuse of authority, but there is no specific reference to all provisions of the Right to Know Act such as offering a business card or explaining the reason for a stop. Failure to comply with the Right to Know Act, in its entirety, would appear to constitute an abuse of authority as well. *DiGiacomo v. N.Y. City Civilian Complaint Review Bd.*, 212 A.D.3d 551 (1st Dep't 2023).

in his personal car.[1044]  This was done without proper cause for a stop.  The complainant charged that the Sergeant threw bottles at him during a wild chase.  The complainant pulled over and stopped next to an RMP that was unconnected to the chase.  An independent witness said the Sergeant appeared to be a drunk driver, driving in an erratic manner and swerving from side to side.  The Sergeant left his private car and detained the driver.  He then issued an improper summons for Reckless Driving.[1045]  CCRB substantiated an abuse claim for "conducting a vehicle pursuit of a vehicle without sufficient legal authority."  The Police Commissioner closed the case administratively and took no disciplinary action, having determined that CCRB did not have jurisdiction in that case.[1046]

Prior to the 2019 Charter referendum, the City Charter made no reference to false statements or false documentation made by an officer in the course of processing a case or during a misconduct investigation.  Such arguably could have been considered an abuse of authority and could potentially have been investigated by CCRB in conjunction with a complaint under investigation.[1047]  "When police officers provide testimony or make official written statements against civilians 'in the performance of official police functions,' they are plainly exercising their authority as police officers, and when they intentionally falsify such testimony or statements, they clearly abuse that authority."[1048]  This may have been accomplished by amendment to the definition of "Abuse of Authority" discussed below.

### ii.    Abuse of Authority Defined for the First Time

In February 2021, the Board defined "Abuse of Authority" in its regulations for the first time, 38-A RCNY § 1-01 was adopted to read:

> **Abuse of Authority**.  The term 'Abuse of Authority' refers to misusing police powers.  This conduct includes but is not limited to, improper searches, entries, seizures, property damage, refusal to provide identifying information, and intentionally untruthful testimony and written statements made against members of the public in the performance of official police functions.

---

[1044] Discussed in greater detail in the CCRB, Report on the Administrative Prosecution Unit – Third Quarter 2016-Fourth Quarter 2017, at 7, available at https://www1 nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/apu_2016q3-2017q4.pdf.

[1045] VTL § 1212.

[1046] Vehicle stops accounted for 6% of the allegations received by CCRB in the 2021 semi-annual report.  *See also Torres v. Madrid*, 141 S. Ct. 989 (2021), (force used in an attempt to restrain, objectively measured, is a seizure under the Fourth Amendment).  The Disciplinary Guidelines lists Improper/Wrongful - Stop of a Vehicle" under the Misconduct category of Abuse.

[1047] See, *Lynch v. NYC CCRB*, Index No. 154653/2021, Memorandum of Law in Support of Defendants-Respondents' Verified Answer to The Petition and in Support of Defendants-Respondents' Cross-Motion to Dismiss at 11, citing Memorandum from CCRB's General Counsel, January 2021 ("false official statements "harms civilians, betrays the public trust, and directly implicates CCRB's abuse of authority jurisdiction. . . .'")

[1048] *Id*. at 22.

The new definition drew not one, but three lawsuits.[1049] The petitioners complained procedurally of the rule-making process and substantively of the definition's breadth. The Petitions, in the aggregate, asserted:[1050]

- Inclusion of the term "misusing police powers" at the core of the definition of Abuse wrongfully expands CCRB's authority beyond the language of the Charter and historically observed boundaries.
- "Abuse" requires malicious intent, whereas "misuse" would encompass incorrect actions without intent.
- The Rule expands false statement jurisdiction beyond the Charter in that it would allow investigation of perjury, false written statements, falsifying business records, tampering with public records and offering a false instrument for filing - all of which are Penal Law offenses falling within the province of District Attorneys. Criminal acts are outside CCRB's jurisdiction.
- The Rule wrongly allows investigations of false statements by officers other than those who are the subject of an investigation - the language of the Charter.
- The Rule was adopted in violation of the Open Meetings Law and without allowing a proper comment period.

The City responded to the arguments concerning "Abuse of Authority" by pointing out:

- "Misusing police powers" and "abuse of authority" are close enough in definition and practice to fall within the general rule that a regulatory body is entitled to deference when it defines terms legislatively assigned to it.
- False statements, when they harm a civilian complainant, always were an abuse of authority within CCRB's jurisdiction. The Charter amendment merely took away the need for a complainant when the false statement was made to a CCRB investigator, since the civilian complainant, in the past, could not complain of an interview of which he was unaware. As a supporting memo by CCRB claims, "This area is ripe for independent oversight."[1051]

On November 16, 2021, the lower court ruled that CCRB's interpretation of its abuse of authority jurisdiction is entitled to great weight and judicial deference. Petitioners appealed and on June 28, 2022, the Appellate Division, First Department affirmed the lower court and approved the amended definition of Abuse of Authority, finding that the "making of false statements against civilians" is an abuse and is "consistent with the plain language of the governing statute."[1052]

---

[1049] *Lynch* v. *NYC CCRB*, Index No. 154653/2021 (N.Y. Cty. Sup. Ct.) (NYC PBA); *DiGiacomo* v. *NYC CCRB*, Index No. 154779/2021 (N.Y. Cty. Sup. Ct.) (Det. Endowment Assn.); *Turco* v. *NYC CCRB*, Unassigned (N.Y. Cty. Sup. Ct.) (Sgts Ben. Assn). The three matters were re-assigned and joined on June 29, 2021.

[1050] The petitions allege a number of other wrongs with the Rules, some of which are repeats of the prior, 2018, litigation. The discussion here is limited to a few material complaints by the unions.

[1051] Memorandum, to CCRB from General Counsel's Office (Jan. 8, 2021), available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/board/2021/01132021_memo_propo sedrules.pdf.

[1052] *Lynch v. N.Y. City Civilian Complaint Review Bd.*, 206 A.D.3d 558 (1ˢᵗ Dep't 2022).

Untruthful statements by police officers are clear misuses of their police powers and constitute an abuse of authority.[1053]

Armed with court decisions deferring to its definition, CCRB again expanded its definition, effective October 22, 2022, to read:

> Abuse of Authority. The term "Abuse of Authority" refers to misusing police powers. This conduct includes, but is not limited to, bias-based policing and racial profiling, improper use of body worn cameras, improper searches, entries, seizures, property damage, refusals to provide identifying information, intentionally untruthful testimony and written statements made against members of the public in the performance of official police functions, and sexual misconduct.[1054]

### iii.    Processing False Statements Under the New Rules in The Administrative Guide

When the Charter amendment regarding false statements became law, an amendment to Rule 1-44 and the APU-MOU became necessary since both explicitly directed APU to "immediately" refer such "possible misconduct" (false statements) to the Department because it fell "outside" CCRB's jurisdiction.  The Rule was amended in 2022.[1055]  The APU-MOU has not yet been amended. Within the new definition of Abuse of Authority, the Board has acted to include false reports or statements made not only in a CCRB interview, but at any time when it harms a civilian or a civil right.[1056]  Under the new Rule, CCRB can investigate and sustain an abuse allegation where the officer is claimed to have filed false paperwork (such as a stop report, arrest report or complaint) or lied during a court proceeding or an IAB investigation.  The misconduct need not have been made to a CCRB investigator.

Aside from the question of jurisdiction, i.e., was the statement made outside a CCRB investigation, handling of false statement allegations will need to be ironed out between CCRB and NYPD.  As discussed later, the Police Commissioner recently amended Patrol Guide 203-08,[1057] over the objection of CCPC, to sub-divide untruthful writings and statements by officers – distinguishing between False Statement, Misleading Statements, Inaccurate Statements and Impeding an Investigation.  Additionally, the proposed Disciplinary Guidelines further define Denials, Retractions, Omissions, Inaccurate Statements and Mistakes.

For example, the City, in its review of a draft of this Report, objected to a reference to "missing reports" as possible inclusion within an untruthful statement determination by CCRB.  It

---

[1053] *Lynch*, *supra* NYSCEF Doc No. 80.

[1054] 38-A RCNY §1-01, adding profiling and sexual misconduct investigations as discussed below.

[1055] Section amended City Record Sept. 22, 2022, § 1, eff. Oct. 22, 2022.

[1056] Failure to file a report (memo book, activity log, stop report, consent to search report, strip search documentation, etc.) are not reviewed by CCRB as "Acts of omission are not included in the CCRB's false statement allegations." (Item 402, City 09.01.23 Feedback to Yates Discipline Report). This seems odd since an intentional omission about a material item can support a false statement claim. *See, e.g., Kastis v. Alvarado*, 2019 US Dist. LEXIS 115731 (E.D. Cal., 2019).  Similarly, a failure to file a stop report is a violation of PG § 212-11.

[1057] Now AG § 304-10.

noted that "Acts of omission are not included in the CCRB's false statement allegations." [1058] Plaintiffs responded that, "CCRB still investigates missing memo book entries, etc. as OMNs but they are not included in the "false statement" jurisdiction that was granted." (Presumably referring to section 440 of the Charter.)[1059]  However, within the Disciplinary System Penalty Guidelines,[1060] "Omissions" are included as possible misconduct within the definition of "Misleading" if the "omitted fact(s) [are] material [and] intentional."  Is an intentional, material, omission in a stop report an untruthful statement which can be substantiated as an Abuse of Authority or a False Statement by CCRB?

In cases where substantiated Charges and Specifications are being prosecuted, the MOU outlining the powers of the Administrative Prosecution Unit ("APU"), states that false statement investigations fall outside FADO jurisdiction.  The MOU dictates that the CCRB should refer false statements and any other misconduct which falls outside FADO "immediately" to the Department for investigation.[1061]

Most SQF cases do not result in Charges and Specifications and are not prosecuted by the APU.[1062]  Since the MOU provision applies only to Charges prosecuted by APU, nothing prevents examination by CCRB of false statements in non-APU cases, i.e., most SQF cases.  A false statement made in a report, to a fellow officer, or to a District Attorney, if made to justify a stop or frisk can be read as an abuse of authority.  However, the language in the APU-MOU that false statements fell "outside FADO jurisdiction" had been read: (1) to bar review of all false statements, whether made to a CCRB investigator, in a report, or to a District Attorney; and (2) to prevent examination in non-APU cases even though the memorandum only applies to APU cases.

The 2019 Charter Amendment, effective March 31, 2020, partially addresses the issue.  But by its language, it is limited to statements made to CCRB alone.[1063]  In 2019-2020, prior to the Charter Amendment, CCRB sent 26 cases to IAB as OMN referrals.  In the first full year of its expanded authority (3rd Quarter 2020 through 2nd Quarter 2021), CCRB referred five substantiated allegations of an Untruthful Statement to the Department.  There were also 66 findings of an

---

[1058] Item 402, .09.01.23 Feedback to Yates Discipline Report.

[1059] Item 402, .09.29.23 Law Department Discipline Excel with headers and plaintiff comments--updated 10.24.23.

[1060] NYPD Disciplinary System Penalty Guidelines (Feb. 15, 2022), at 31.

[1061] CCRB & NYPD, Memorandum of Understanding Between the Civilian Complaint Review Board and the Police Department of the City of New York Concerning the Processing of Substantiated Complaints ¶ 7, April. 2, 2012, available at https://www1 nyc.gov/assets/ccrb/downloads/pdf/about_pdf/apu_mou.pdf  ("If during the course of its prosecution of a substantiated civilian complaint CCRB becomes aware of possible misconduct falling outside its FADO jurisdiction, such as the making of a false statement, which is alleged to have been committed by the subject officer, CCRB shall immediately refer the allegation of other misconduct to NYPD for investigation and shall not itself undertake the prosecution of such allegation.").

[1062] A review of SQF cases substantiated by CCRB for the 18-month period from January 2018 to June 30, 2019, shows that panels recommended Charges and Specifications for 27 of 176 cases.  None of those cases resulted in a trial by prosecuted by APU.

[1063] City Charter § 440 (c)(1). The Board may make recommendations "regarding the truthfulness of any material official statement made by a member of the police department who is the subject of a complaint received by the board, if such statement was made during the course of and in relation to the board's resolution of such complaint." The Board began to investigate untruthful statements made to CCRB after July 18, 2020. Annual Report 2020 at 17.

Impeding Investigation allegation, but they were for officer refusals to be interviewed during the COVID-19 pandemic, and they were "closed administratively after an agreement was reached with the NYPD and police unions under which the officers agreed to be interviewed."[1064]

As noted earlier when discussing split investigations, the officer's interview by IAB is not generally made available to CCRB. This is unfortunate in light of the Court's expressed concern in the *Floyd* liability opinion that NYPD tended to reject SQF complaints by over-reliance upon the officer's account. At the same time, in its remedy opinion, the Court ordered increased deference to credibility determinations made by CCRB. When CCRB evaluates statements made in a CCRB interview and IAB separately investigates false statements made outside the context of a CCRB interview, the result may well be a "split" determination with inconsistent assessments of credibility. The CCRB may discredit an officer's account and substantiate a claim of an illegal stop or search. At the same, the NYPD might examine the officer's account and may decide to unsubstantiate a false statement allegation. The DAO and the Police Commissioner are then presented with the CCRB's finding that the SQF encounter was illegal or abusive based in part on an assessment against the officer's credibility and that the officer's explanation was false. Simultaneously, the IAB may have looked at the officer's statement or statements made elsewhere (police reports, district attorney interviews, court testimony) and decided to credit the officer's account as true or not incredible.

### iv.    Use of Force - Display of a Firearm

CCRB does not entirely align its force allegations with the four-tier system used by IAB. CCRB subcategorizes force complaints into 18 groupings, from "gun pointed" to "restricted breathing."[1065]

It is unclear where "display" or "brandishing" of a firearm when the gun is not aimed at the complainant falls. CCRB and NYPD do not always see eye-to-eye. CCRB may consider the unnecessary brandishing of a weapon to be a use of force violation.[1066] If a questionable stop is made with a drawn firearm, does this constitute an improper use of force in the eyes of the Department? Use of Force reports by the Department do not include cases where a gun is pointed or drawn, since the Patrol Guide does not require the filing of a TRI unless the firearm is discharged (Level 4) or used as a hard object against a civilian (Level 2).[1067]

From 2013 through 2017, there were 1,202 allegations accepted by CCRB of cases where, according to the complaint, a gun was improperly pointed, out of a total of 19,687 use of force

---

[1064] CCRB Annual Report at 35, available at. https://www1 nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2020_Annual.pdf.

[1065] *See e.g.*, CCRB, Executive Director's Monthly Report, January 2020 at 42.

[1066] CCRB will consider "gun drawn" as a potential abuse of authority. Item 407, City 09.01.23 Feedback to Yates Discipline Report. On the other hand, NYPD only lists such as an abuse if there is a wrongful "threat of force." NYPD Disciplinary System Penalty Guidelines, at 28.

[1067] NYPD, Use of Force, available at https://www1.nyc.gov/site/nypd/stats/reports-analysis/use-of-force.page.

allegations (6.2 percent).[1068]  New York State recently directed each locality to report incidents of police use of force for statewide compilation and publication.[1069]  Under that law, brandishing a weapon constitutes a reportable use of force.  Division of Criminal Justice Services regulations, promulgated to implement section 837-t, define brandishing to be when officers "point a firearm at a person or persons."[1070]  Nonetheless, "NYPD only reported to the state incidents where a firearm was used or discharged" in the first report, unlike other police organizations throughout the State.[1071]

Patrol Guide section 221-01 outlines permissible uses of force.  The section prohibits an unjustified cocking of a firearm.  The Discipline Guidelines also cautions that "[d]rawing a firearm prematurely or unnecessarily limits a uniformed member's options. . . .  The decision to display or draw a firearm should be based on an articulable belief that the potential for serious physical injury is present."  Threatening to use a firearm, in and of itself, may constitute a "threat of force" which, if unwarranted, is an Abuse of Authority and punishable under the Disciplinary System Guidelines.[1072]

In one case before a Trial Commissioner, an officer who verbally threatened to shoot the complainant with his gun displayed at a "ready position: 45 to 50 degrees toward the ground" was found not guilty of wrongful use of force, but guilty of threatening a use of force without sufficient cause.[1073]

In another case,[1074] an officer chased an 11-year-old boy and a 13-year-old girl who were playing basketball in a park.  The officer was acting on an anonymous call of a man with a gun in the park with a vague description.  CCRB determined that the description was insufficient to justify an attempt to stop the two children and sought Charges and Specifications against the officer for illegal stops and improper use of force.  DAO acknowledged that: "While in pursuit, PO ███ pointed his firearm at both [children]."  DAO asked CCRB to withdraw the Charges and exonerate the officer, in part on the grounds that, "[t]he Department does not consider the act of an officer

---

[1068] CCRB, 2017 Annual Report Statistical Appendix at 14, available at https://www1 nyc.gov/assets/ccrb/download s/pdf/policy_pdf/annual_bi-annual/2017_annual-appendix.pdf, 14.

[1069] Executive Law S 837-t.

[1070] 9 NYCRR Part 6058; see also NYS Division of Criminal Justice Services, Use of Force:  Questions and Answers, available at https://www.criminaljustice ny.gov/crimnet/ojsa/crimereporting/Use%20of%20Force%20-%20Question%20and%20Answers.pdf.

[1071] NYS Division of Criminal Justice Services, Use of Force Incidents Report, , July 2021, at 13, available at https://www.criminaljustice.ny.gov/crimnet/ojsa/use-of-force-incidents-final-report.pdf.

[1072] See NYPD Disciplinary System Penalty Guidelines, January 15, 2021, at 18-22, available at https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/disciplinary-system-penalty-guidelines-effective-01-15-2021-compete-.pdf.

[1073] PO ███████████, Case No. █████████, available at https://oip nypdonline.org/files/████████████ ███ .pdf.

[1074] PO ███████, Reconsideration Request, CCRB # ████████, April 7, 2018.



merely pointing his firearm to be a Use of Force." CCRB declined the request. The Police Commissioner took the case away from CCRB,[1075] and ordered training for the officer.

In its quarterly Report APU noted:

CCRB has strong objection to the DAO's assertion that the pointing of a firearm is not a Use of Force. In fact, the Department has held officers accountable for improperly using force by pointing their firearms at civilians in the past. The actions of the Respondent in pointing his gun at two (2) children created a dangerous situation that could have resulted in death or serious physical injuries to the children involved and the surrounding members of the public. The Respondent did not have reasonable suspicion that either minor was armed or dangerous and should have not pointed his weapon. Pointing a gun without police necessity is in direct violation of the guidelines set forth in the NYPD's Patrol Guide. NYPD Patrol Guide Section 221-01 states that "the decision to display or draw a firearm should be based on an articulable belief that the potential for serious physical injury is present.[1076]

In a review of SQF cases substantiated by CCRB in the last five years, there are nine known cases where CCRB found an improper Use of Force based upon pointing of a firearm and one where the victim was struck with a firearm. The Police Commissioner rejected CCRB's disciplinary recommendation in eight of the nine cases, and imposed discipline in none of them.[1077] In one case reported by APU,[1078] the Police Commissioner reversed a Trial Commissioner's finding of guilty when an officer stopped and frisked four men at gunpoint because they were videotaping an encounter with others.[1079]

---

[1075] Provision two of the Memorandum of Understanding Between the Civilian Complaint Review Board and the Police Department of the City of New York Concerning the Processing of Substantiated Complaints (hereinafter "APU-MOU") authorizes the Police Commissioner to remove a case from CCRB-APU prosecution "in the case of an officer with no disciplinary history or prior substantiated complaints" if the interests of justice would not be served by prosecution. Unless CCRB is given access to internal investigations by IAB, BIU, or commands, it cannot verify that the officer had "no disciplinary history" when a case is retained.

[1076] Report of the Administrative Prosecution Unit ("APU") Second Quarter of 2018, March 12, 2019, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/20190312_APU_2Q18.pdf . Although CCRB cites the case as one which was "Retained with Discipline," and notwithstanding that APU filed Charges and Specifications, the officer's Disciplinary History online indicates that he "does not have any applicable entries." See Disciplinary History, available at https://nypdonline.org/link/2.

[1077] Police Officers ████████████████████████████████, and ████████. There is one case (Captain ██████████████), from 2015, where an officer wrongfully stopped, pointed his firearm at, and ordered to the ground, two individuals. A 30-day penalty was imposed.

[1078] CCRB, Report on the Administrative Prosecution Unit First Quarter 2016 at 2, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/apu_2016q1.pdf.

[1079] More recently, a Trial Commissioner agreed with CCRB-APU that drawing a weapon inappropriately, even when in the "SUL position" i.e., drawn but pointed down, constituted a violation of PG 221-01 and recommended a 10-day penalty. The Police Commissioner approved the penalty. PC████████ CCRB #████████ (Dec. 15, 2023), https://www.nyc.gov/assets/ccrb/downloads/pdf/APU-Documents████████-APU-Final-Documents.pdf.

238

### v.    Failure to Supervise - Outside CCRB Jurisdiction?

Prior to the 2019 Charter change, CCRB Rule 1-44 declared that false statements fell outside CCRB jurisdiction and should be referred to the Department.  After the Charter authorization, an amendment to Rule 1-44 could have been a simple deletion of the reference to false statements.  Unfortunately, the Rule was also amended to add a new exclusion, "a superior officer's failure to supervise."  This arbitrarily carves out failures to supervise as "outside CCRB's jurisdiction" and strips CCRB of the power to review serious misconduct.[1080]  There is no reason why a failure to supervise during a street encounter should not be considered an abuse of authority.

Earlier in this Report, the distinction between active and passive supervisory failures, which were made on an *ad hoc* basis by NYPD and CCRB, was noted.  In fact, that is a distinction without a difference.  A supervisor in a squad car or on street patrol who is physically present during, and aware of, egregious SQF misconduct has abused his authority even if he did not participate personally.  In that situation, the supervisor is not some passive, remote, observer distanced in time and space.

But even if one accepts the distinction between active and passive failure, total exclusion of both from CCRB's ambit, as appears from the language in amended Rule 1-44, is a particular affront and peril to stop and frisk compliance for several reasons.  To understand this, it is necessary to go back to the origins of *Floyd* and the Monitorship.

The liability opinion in *Floyd* highlighted the importance of, and failures of, supervisors in preventing abuse and indifference:

- "Much evidence was introduced regarding inadequate monitoring and supervision of unconstitutional stops."[1081]
- "A municipality may incur *Monell* liability based upon deliberate indifference through its Training and supervision practices."[1082]
- "Even NYPD commanders and supervisors have acknowledged that UF-250s do not provide enough information to determine whether reasonable suspicion existed for a stop."[1083]
- "The evidence showed that the NYPD turned a blind eye to its duty to monitor and supervise the constitutionality of the stops and frisks conducted by its officers."[1084]
- "More importantly, the evidence showed that sergeants do not effectively monitor the constitutionality of stops even when they are present."[1085]

---

[1080] For supervisors and peer officers the Patrol Guide considers, "Failure to intervene in the use of excessive force . . . is serious misconduct."  Patrol Guide § 221-01.

[1081] *Floyd* Liability opinion at 561.

[1082] *Id.*; *see also Monell v. NY City Dept of Social Services*, 436 U.S. 658 (1978).

[1083] *Id.* at 578.

[1084] *Id.* at 590.

[1085] *Id.* at 611.

The remedies opinion stated:

- "The Monitor's initial responsibility will be to develop, based on consultation with the parties, a set of reform of the NYPD's policies, Training, **supervision**, monitoring and discipline regarding stop and frisk."[1086]
- Reforms are needed for "direct supervision" and "indirect supervision" which would cover both on-the-scene supervision and *post hoc* reviews.[1087]

The substitution and placement in Rule 1-44 of language stripping CCRB of authority to look at supervisory failures is antithetical to the *Floyd* rulings in two ways.  First, the carve-out is broader than prior practice and would appear to cover both active and passive supervisory failures.  It may be, going forward, that CCRB will be permitted to investigate cases where the supervisor physically participated in the misconduct, but it would appear by the language of 1-44 that a CCRB investigator or panel member cannot examine a direct, improper, order by a supervisor ("Go toss that guy.")[1088]  In any event, a supervisor who is present and condones misconduct should be identified as one who has abused his authority.

Second, replacing the language of the false statement exception with a failure-to-supervise exception, backfilling the same space in the Rules that was deleted, will, once again, cause "immediate" referrals with no examination and no notation by the panel that a referral was made.  Unlike other referrals where the panel notes OMNs and cites evidence, supervisory failures will not be documented by CCRB.[1089]  If the Rule follows previous practice, there will not be vote by a panel, there will not be a notation by CCRB, and there will not be a detailing of the evidence passed on to NYPD by CCRB.  [1090]

After trial, Judge Scheindlin flatly rejected the City's defense that supervisors, left to their own devices, are an effective guardrail against misconduct.  She called for changes in the way they supervise and for oversight of their actions on the street.  Throwing the inquiry back to the

---

[1086] Remedies Opinion at 12 (emphasis added).

[1087] *Id.* at 23.

[1088] CCRB asserts, in its response to a draft of this Report that it investigates allegations against supervising officers "if they actively participate in the misconduct by words or deeds." ( Item 416, City 09.01.23 Feedback to Yates Discipline Report). If so, it would appear that the language in § 1-44 is overbroad and should be amended.

[1089] CCRB asserts, in its response to a draft of this Report, that panels send failure to supervise allegations to NYPD as OPMNs.

[1090] NYPD has, in recent years, adopted a policy of reporting back to CCRB the outcome of a profiling referral sent to IAB.  Since none were substantiated, the report back would not be especially informative. At a minimum, going forward, IAB should report the outcome of referrals in failure to supervise cases. A good example might be the investigation into CCRB complaint #████.  There, during a protest on ████ 2020, PO ████ was found to have struck a reporter with his baton and to have been untruthful during the investigation.  The reporter was wrongfully arrested and given a summons. PO ██ was on the scene with a supervising officer, Lt. ████ who was alleged to have been present and spoken discourteously (cursed) at the reporter at the same time.  Based on a video with "no . . . ambiguity" the CCRB investigator recommended that Lt. ████ be charged with discourtesy. The panel unsubstantiated the discourtesy allegation against Lt. ████ but referred an OMN allegation of failure to supervise against him. It is unknown what ensued within the Department with that referral, but Lt. ████ was separately found to have wrongfully used force, himself, on the same day.

Department and stripping CCRB of the ability to scrutinize supervisory behavior is a step back from reform of stop and frisk activity.

### vi.    Sexual Misconduct

In February 2018, the Board, by Resolution[1091] voted, as a matter of policy, to prosecute allegations of sexual misconduct, including sexually motivated street stops and traffic stops as an abuse of authority.  The PBA challenged the move claiming it was, in effect, a Rule change not a policy change, that would require public notice and comment under the City Administrative Procedure Act (CAPA).[1092]    The PBA also argued that the policy exceeded Charter FADO jurisdiction.  Their claim was that sexual misconduct or harassment of a civilian is not an abuse of authority.  The lower Court upheld the Board's determination, deciding that a mere policy change did not require CAPA compliance.  The Court also ruled, giving deference to the agency's reading of the Charter, that it was within the Board's regulatory powers to include sexual misconduct in the definition of abuse of authority.[1093]

The CAPA segment of the decision was reversed on appeal, with the Appellate Division holding that the change in practice was a "sweeping policy change . . . amount[ing] to the adoption of a new 'rule.'"[1094]  CCRB did not appeal that decision.[1095]

Notably, the Appellate Division did not hold that sexual misconduct cannot be included in the definition of abuse of authority.  Without reaching the merits of that issue, it held the Resolution to be a nullity on procedural grounds.  The holding was that CCRB "did not follow the public vetting process required by CAPA."[1096]  CCRB in February 2021 adopted the necessary Rule change and sexual misconduct may now be investigated.[1097]

The current Rule[1098] provides:

**Sexual Misconduct**.  The term "Sexual Misconduct" encompasses misconduct of a sexual nature alleged by a civilian against a member of the Police Department.  It includes, but is not limited to, the following examples of misconduct:  verbal sexual harassment;  sexual harassment using physical gestures;  sexual humiliation; sexually motivated police actions such as stops, summonses, searches, or arrests; sexual or romantic propositions;  and any intentional bodily contact of a sexual

---

[1091] CCRB, Board Resolution, Feb. 14, 2018, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/20181402_boardmtg_sexualmisconduct_resolution.pdf.

[1092] City Charter § 1041 (5).

[1093] *Lynch v. New York City CCRB*, 64 Misc. 3d 315 (Sup. Ct. N.Y. Cnty. 2019).

[1094] 183 A.D.3d 512 (1st Dep't 2020).

[1095] *Lynch*, NYSCEF #152235/2018.

[1096] *Lynch*, at 319.

[1097] Miscellaneous Rule Amendments, 2020 RG 068, effective March 26, 2021.

[1098] 38-A RCNY 1-01

nature, including but not limited to, inappropriate touching, sexual assault, rape, and on-duty sexual activity.

**Sexual Humiliation**.  The term "Sexual Humiliation" refers to incidents in which an officer gratuitously shames or degrades a civilian in relation to their sexual organs or sexual behavior.

The Sexual Misconduct rule is confined to allegations by "a civilian against a member of the Police Department."[1099]  Presumably that is limited to misconduct by Uniformed Members of the Service and would not include other Members of the Service.[1100]  Since complaints between Departmental employees are not typically processed by CCRB, one can also assume that "civilian" in this context means someone other than Members of the Service and is not limited to someone who is not a Uniformed Member.[1101]  In sum, a complaint by any employee of NYPD, including civilian Members of the Service, would be investigated by IAB, and a complaint by a civilian, not an employee of the Department, against a Member of the Service other than a Uniformed Member of the Service would stay with IAB as well.

The PBA had re-instituted litigation claiming, again, procedural defects and re-asserting that sexual misconduct or harassment of a civilian is not an abuse of authority.[1102]  The petition was denied and the new Rule was approved by the Appellate Division, First Department, on July 11, 2022.[1103]  Even outside the adopted Rule change, and irrespective of the outcome of the litigation, there are aspects of the sexual misconduct investigations that could and should be pursued as an Abuse of Authority or other misconduct falling within FADO.

## G.    Discourtesy and Offensive Language (Slurs) During a Stop

The Charter authorizes investigations of "discourtesy, or use of offensive language, including but not limited to slurs relating to . . . gender [and] sexual orientation."[1104]  It would seem

---

[1099] *Id.*

[1100] Patrol Guide § 207-28. "Complaints made against civilian members of the service . . . will be directed to the Internal Affairs Bureau for screening . . . ." One exception is the case where a MOS is the victim of a discriminatory slur by another officer. In that case, the complaint is registered with CCRB, but then forwarded to the Equal Employment Opportunity Division of NYPD for investigation. A bias complaint may also be filed with CCHR.

[1101] Patrol Guide § 207-28. "A member of the service may prefer a civilian complaint against another member of the service. Investigation of such complaint will be conducted by the commanding officer(s) assigned by the Commanding Officer, Investigation Review Section, Office of the Chief of Department. Whenever a member of the service is a victim of disparaging remarks relative to his/her ethnicity, race, religion, gender, or sexual orientation, made by another member of the service, he/she may register a complaint with the Civilian Complaint Review Board. The Civilian Complaint Review Board will record the complaint and forward a summary of the allegation to the Equal Employment Opportunity Division for Investigation."

[1102] *Lynch v. NYC CCRB*, Index No. 154653/2021 (N.Y. Cty Sup. Ct) (petition dismissed in part and granted in part.)

[1103] *Matter of Lynch v. NY City Civilian Complaint Review Bd.*, 206 A.D.3d 558 (2022).

[1104] The Charter authorizes investigations of "discourtesy, or use offensive language including, but not limited to, slurs relating to race, ethnicity, religion, gender, sexual orientation and disability." § 440 (c)(1). Currently the Board separately identifies: Discourtesy Allegations (Word, Action, Gesture, Demeanor/tone, Other) and Offensive Language Allegations (Race, Gender, Ethnicity, Other, Religion, Sexual orientation, Physical disability, Gender Identity).

that "sexual humiliation" as defined could be investigated as a discourtesy or offensive language allegation. However, given the history of litigation on the issue, it is probably prudent for CCRB to list sexual humiliation under the broader ambit of abuse of authority as well.

How this will be handled by the proposed Disciplinary Guidelines remains to be seen. The Matrix lists two kinds of sexual misconduct. The first category is for sexual propositions and unwanted verbal sexual advances. The second category is for a "sexually motivated enforcement action" as well as sexual touching and sexual solicitation. Both carry a range between 30 penalty days with probation up to termination.

Can the narrower definitions in the Guidelines be used to circumscribe CCRB's use of a wider definition? Will we see determinations by the Police Commissioner reducing or dismissing CCRB findings on the grounds that the facts do not support the Guidelines' parameters?

Noteworthy is the fact that the misconduct is included in the portion of the grid reserved for abuse of authority, discourtesy, and offensive language. The placement in this portion of the matrix would seem to indicate that NYPD accepts CCRB's position that sexual misconduct directed at a civilian is within FADO's jurisdiction as a form of Abuse of Authority.

The CCRB Rule is broader than the sexual propositions, sexually motivated enforcement and wrongful contact covered by the NYPD's Discipline Guidelines. Sexual Humiliation under the Rule is not explicitly referenced in the Guidelines. On the other hand, with the Guidelines, Discourtesy carries a presumptive penalty of five days and Offensive Language carries a presumptive penalty of 20 penalty days.[1105] Will the Department leave Sexual Humiliation as a subset of Abuse of Authority? Or consider a remark that "gratuitously shames or degrades a civilian in relation to their sexual organs or sexual behavior" as Discourtesy or Offensive Language?

Offensive language (slurs), Discourtesy, Profiling and Sexual Misconduct are allegations which would seem to overlap or, at a minimum, coincide. Of interest is what happens to those allegations and, of even more interest, is there an overlap with substantiated SQF misconduct?

For the years 2017-2019 CCRB:

- Received 3,832 complaints of Discourtesy
- Received 5,461 allegations of Discourtesy
- Fully investigated 2,089 allegations of Discourtesy
- Substantiated 313 (15%) allegations of Discourtesy

For the years 2017-2019 CCRB fully investigated 466 allegations of Offensive Language. 48 (10.3 percent) were substantiated.

---

[1105] Within the proposed NYPD Disciplinary Matrix at 22, defines Discourtesy as "foul language, acting in a rude or unprofessional manner (such as demeanor or tone), and flashing rude or offensive gestures." FN 42 declares that "Offensive language is more serious conduct than discourtesy and includes slurs based on membership in a protected class such as race, religion, ethnicity, gender, gender identity, sexual orientation, age, or disability."

Of interest is the number of cases where CCRB substantiates an SQF violation and, at the same time, substantiates either a discourtesy or slur allegation.

2017    -    Out of 102 cases with a substantiated SQF allegation
- Seven also had a substantiated Discourtesy allegation
- One also had a substantiated slur (offensive language) allegation

2018    -    Out of 88 cases with a substantiated SQF allegation
- Five also had a substantiated Discourtesy allegation
- No slur allegations substantiated

2019    -    Out of 96 cases with a substantiated SQF allegation
- Seven also had a substantiated Discourtesy allegation
- One racial slur allegation[1106]

2020    -    Out of 68 cases with a substantiated SQF allegation
- Five also had a substantiated Discourtesy allegation
- No slur allegations substantiated

## H.    Do We Need FADO?

It is worth asking whether or why any jurisdictional limits are required when a citizen complains of improper police conduct by an on-duty officer. Other than political considerations, why do the Charter, or MOUs, or Rules, even attempt to limit oversight of public misconduct? If a civilian complains of misconduct by an officer that injures the civilian while the officer was "on the job," why place any offenses out of CCRB's power to review? Understandably, some matters, particularly corruption complaints, can be better handled by District Attorneys, Special Prosecutors or even IAB. That should not preclude civilian oversight and disciplinary responses, notwithstanding the PBA claim in litigation that "CCRB does not have jurisdiction over criminal matters."[1107] Some investigations require undercover operations, informants, or cooperating witnesses and should be conducted by other agencies. But, as with Force Investigations, there is no reason why protocols and agreements to defer investigations could not be drafted to accommodate those concerns. The ███████ cases are a good example of the need for CCRB action when other venues have failed. Corruption investigations are probably best left to IAB, but they are relatively small in number and could easily be excluded.[1108] Personnel matters and Rules violations, such as chronic absences, domestic violence, misuse of property, intra-agency conflicts, failure to take police action, and improper summonses, are easily excluded as matters of internal control. But it is difficult to understand why civilian complaints and encounters involving false filings outside of CCRB interviews, which abuse authority or harm a civilian, intentional report or camera misconduct when done to cover or misrepresent a civilian encounter, etc., are out of

---

[1106] The officer retired and the case was administratively closed.

[1107] Plaintiffs-Petitioners' Memorandum of Law, *Lynch v. CCRB*, Index No. 154653, Doc. No. 68 at 10, citing one line (arguably out of context) from *Lynch v. CCRB*, 183 A.D.2d 512,515 (1st Dep't 2020). See also the declaration by the Appellate Division, First Department, that "Contrary to petitioners' contention, the governing statute does not prohibit the CCRB from investigating matters that may touch upon criminal conduct." Index No 154653, Doc No. 88.

[1108] IAB substantiated 58 corruption cases in 2019. False statement cases are included in that count as a "C" case.

CCRB's reach.[1109]  A recent study by staff at CCRB of 16 metropolitan forces with oversight agencies found that twelve had no limits.[1110]

## I.    Timeliness

CCRB's ability to investigate a complaint is limited if the complaint is delayed or if the investigation is prolonged.  There are two deadlines.  The first deadline is a discretionary one, set by CCRB rules.[1111] CCRB will not automatically investigate a complaint that is filed more than one year after the incident.  If filed late, the Chair in consultation with the Executive Director decides whether to investigate the complaint based on the nature and/or severity of the alleged misconduct, the availability of evidence and/or witnesses, the ability to identify officers and civilians involved, the reason for the late filing, and the number of complaints received regarding the incident, as well as the practicability of conducting a full investigation.[1112]

The second constraint is mandatory.  Civil Service Law § 75(4) prescribes an 18-month statute of limitations (SOL).  After 18 months, the officer may only be disciplined if the misconduct constitutes a crime.[1113]  The subject officer need not be convicted, or even charged, with a crime. It is sufficient to avoid the statute if the conduct could constitute a crime if proved.[1114]  The extension permitted by this provision has been, at least on one occasion, broadly interpreted.  In that case, an officer used false pretenses to trick the owner of a broken-down vehicle into giving him title.[1115]  Although not criminally charged, the officer was disciplined after expiration of the statute of limitations on the ground that he could have been charged with official misconduct under the penal law.[1116]  Theoretically, the definition of official misconduct is so broad that the exception could swallow the rule.

The most well-known example of the invocation of the "crime" exception is the case against ███████████.  He was charged with an assault and chokehold in connection with the

---

[1109] In review of a draft of this Report, CCRB asserted "They are not, we plead these allegations." Item 883, City 09.01.23 Feedback to Yates Discipline.  CCRB may investigate the totality of untruthful statements when uncovered as part of a FADOU investigation, but CCRB does not, independently investigate adverse credibility or false statement allegations brought against officers in the normal course of criminal prosecutions, civil litigation, or false filings.

[1110] Detroit, Cincinnati, Long Beach CA, San Diego, Springfield MA, Syracuse NY, Pittsburgh, Providence RI, Berkeley, Chicago, San Francisco, Washington DC, Atlanta, Albuquerque, Miami.  June 2019 Board Meeting Presentation.

[1111] 38-A RCNY 1-15(b).

[1112] 38-A RCNY 1-15(c).

[1113] N.Y. Civ. Serv. Law § 75(4) (McKinney 2018) ("Notwithstanding any other provision of law, no removal or disciplinary proceeding shall be commenced more than eighteen months after the occurrence of the alleged incompetency or misconduct complained of and described in the charges . . . provided, however, that such limitations shall not apply where the alleged incompetency or misconduct complained of and described in the charges would, if proved in a court of appropriate jurisdiction, constitute a crime.").

[1114] *Rea v. City of Kingston*, 110 A.D.3d 1227 (3rd Dep't 2013).

[1115] *Mieles v. Safir*, 272 A.D.2d 199 (1st Dep't 2000).

[1116] Penal Law § 195.00 (1) ("A public servant is guilty of official misconduct when, with intent to obtain a benefit or deprive another person of a benefit: 1.  He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized . . .")

death of Eric Garner, which occurred on July 17, 2014. In December 2014, a Richmond County grand jury declined to indict him and the District Attorney Dan Donovan refused to file a criminal court complaint. It was not until four years after the incident, July 18, 2018, that CCRB filed Charges and Specifications. On May 9, 2019, the DCT issued a decision denying a motion to dismiss. The tribunal ruled that the proceeding was timely if APU were able to prove, by a preponderance of the evidence, each element of a charged crime as well as a violation of the Patrol Guide. The Charges and Specifications cited both the Patrol Guide § 221-01,02 (use of chokehold and excessive force) and two provisions of the Penal Law: a misdemeanor (Assault in the Third Degree, Recklessly Causing Physical Injury, PL 120.00 [2]); and a class C felony (Strangulation in the First Degree, intentional chokehold causing serious physical injury, PL 121.13).

After trial, the Trial Commissioner found ███████ guilty of the first charge upon being satisfied that the elements of the misdemeanor assault were proven at the hearing by a preponderance of the evidence. It went on to find him guilty of the Patrol Guide violation. At the same time, the DCT found CCRB failed to prove intentional strangulation as defined in the Penal Law and, accordingly, dismissed the second charge as untimely before reaching the merits of the Patrol Guide violation.[1117] The ruling was upheld by the Appellate Division on March 25, 2021.[1118]

Another, more recent, case of note was an investigation in connection with the shooting death of Kawaski Trawick. The Bronx District Attorney had concluded that criminal charges would not be filed against the officers involved in the encounter, but publicly stated that the "use of deadly physical force was not justified." CCRB recommended that one officer face Charges. The Police Commissioner declined, stating that CCRB had missed the SOL. CCRB countered that the delay was due to slow production of material, including BWC footage, to the Board. The Department was of the opinion that the statutory extension applicable to criminal behavior was not available because the District Attorney had decided against prosecution.[1119]

The statutory clock starts to run at completion of the misconduct. Thus, in the case of a continuing crime, such as concealing evidence or impeding an investigation, the 18-month clock is tolled until "all relevant alleged acts were completed. . . ."[1120]

---

[1117] CCRB exonerated ███████ on an allegation of improper threat of summons and unsubstantiated an allegation of discourtesy. Presumably those allegations were untimely as well.

[1118] ███████ *v. O'Neill*, 192 A.D.3d 598 (1st Dep't 2021). The procedural approach of DCT was unusual. The Trial Commissioner required proof at trial of a set of facts (the Penal Law) divorced from, and in addition to, proof of misconduct. In effect, there were two simultaneous trials occurring before her. The hearing officer could have simply ruled (or separately taken evidence) on the statutory issue: whether the "misconduct complained of and described in the charges would, if proved in a court of appropriate jurisdiction, constitute a crime." The court of appropriate jurisdiction would be the Richmond County Criminal Court. The hearing officer could have ruled on that hypothetical point (either on the papers or after a hearing) and left the ruling for appeal, without conducting two trials within one.

[1119] "Above the law: The shameful end of the Trawick investigation." NY Daily News, Opinion Page, April 16, 2024, https://www.nydailynews.com/2024/04/16/above-the-law-the-shameful-end-of-the-trawick-investigation/?oref=csny_firstread_nl.

[1120] *Matter of Rea v. City of Kingston*, 110 A.D.3d 1227, 1230 (3d Dep't 2013).

Finally, officers may be estopped from asserting the Statute of Limitations when their own acts of wrongdoing or fraud prevented timely commencement.[1121]  This can include mere concealment by failing to respond to a prosecutor's inquiry.[1122]

At one time, the Department had pursued a legislative proposal to amend CSL § 75 to extend the Statute of Limitations for the discipline of non-criminal misconduct from 18 months to 3 years.  The proposal was supported by CCPC,[1123] but apparently never gained traction and has not appeared as an agenda item for NYPD in more recent years.

Lastly, 38-A RCNY 1-15(a), as amended in 2018, authorizes the Chair to investigate complaints of misconduct filed after the expirations of the SOL.  That is because the Rule, according to the appellate court in *Lynch*, "merely authorizes the CCRB to *investigate* a complaint. It does not authorize the commencement of any removal or disciplinary proceedings. . . ."[1124] After investigation, CCRB can "make findings and recommend action" which are not necessarily limited to a disciplinary proceeding against an officer.

Previous to the COVID pandemic, not many cases were actually dismissed due to the SOL. In 2018-2019 only four cases were dismissed for that reason.[1125]  CCRB reports 13 cases in which the SOL had expired in Non-Charges cases from 2016 to 2020.[1126]  There are cases where discipline is reduced, pled out, charges are not filed or officers separate from the Department, while filing charges without adjudication, if the SOL dismissal date is near.[1127]

However, there was a surge of cases dismissed due to the expiration of time in 2022.  This apparently was the result of a confluence of factors.

- The COVID pandemic prevented in-person interviews of witnesses and officers. As a result, there was an inordinate number of cases that were delayed as alternative, video, arrangements were sought.
- Implementation of the Disciplinary Guidelines System has required in depth analysis and application of the Guidelines, along with explanations, which has impacted the process for final decision making.

---

[1121] *Hetelkides v. Ford Motor Co.*, 299 A.D.2d 868 (4th Dep't 2002).

[1122] *Matter of Steyer*, 70 N.Y.2d 990 (1988).

[1123] CCPC, *Second* Annual Report of the Commission, October 1997 at 10, available at https://www1.nyc.gov/assets/ccpc/downloads/pdf/Second-Annual-Report-of-the-Commission.pdf.

[1124] *Lynch v. CCRB*, 183 A.D.3d 512, 515 (1st Dep't 2020).

[1125] NYPD SQFSTA Matrix (as of Dec. 31, 2021).

[1126] CCRB Annual Report -2020 at 42, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2020_Annual.pdf.

[1127] Officers facing disciplinary charges sometimes "separate" from the Department through termination (rare), resignation, retirement, or termination by operation of law (i.e., they are convicted of certain crimes which automatically terminate employment as a public officer.  (NY Public Officer's Law § 301).  Retirement may be full retirement after 20 years of service or a reduced benefit for vested service below 20 years.

In a recent analysis by the Legal Aid Society, 346 complaints in 2022 were dismissed due to want of timeliness. 45 of the dismissed cases contained a substantiated SQF allegation. This seems to be a result of delayed findings by CCRB coupled with the Police Commissioner's decision to let the SOL expire for many cases where the findings were presented to the Police Commissioner in the final weeks or months of the allotted time.[1128]

Although some of the delay and cause for dismissal can be attributed to the pandemic, it should be kept in mind that the Governor's Executive Order 202.8 extended the time permitted under the Civil Service Law by tolling the statute for 228 days. This raises the question of whether the extraordinarily high number of dismissals were due to a "one-time" event (the pandemic) or to other systemic failures, such as application of the Matrix or arrival of a new Police Commissioner.

In the end, the SOL has impact on case resolutions as they are delayed, truncated or closed pending litigation, and then result in avoidance of meaningful discipline merely because the clock has run out.[1129]

In a response to a recent data request for the status of cases with a substantiated SQF allegation in 2021, of 46 cases listed in the matrix supplied by the Department, seven of 46 cases were listed as "closed administratively" by reason of "Short SOL."[1130] There may or may not be more cases similarly affected since 21 of the cases were still open at the time of the submission, March 15, 2022.[1131] During the period of time from January 2022 through October 2023, the Department closed as "Short SOL" 937 of the 2380 (39.4%) of the APU cases it received from CCRB. 191 of those cases contained a substantiated SQF allegation.[1132]

Delay may be caused by any number of factors, some to accommodate witnesses and officers, some to process and investigate the case within CCRB and some to preparation for trial or evaluation by DAO and the Police Commissioner. No attempt was made in this Report to weigh the various causes of delay.[1133] In 2021, CCRB reported that the median age of a case on its open docket is between five to seven months from date of incident, with 239 of 2,089 cases that are 15 months or more beyond the date of the incident.[1134] An audit of timeliness by CCRB conducted by

---

[1128] Letter, The Legal Aid Society to Mayor Eric Adams (Mar. 15, 2023). On file with the Monitor.

[1129] *See, e.g.*, Sgt. ██████████ who faced Charges for an unlawful frisk, along with allegations of improper force, whose "penalty" was reduced to loss of 3 vacation days rather than a trial due to an impending closing date.

[1130] SQF received DAO 2021 matrix (on file with Monitor Team).

[1131] For a period of time, during the pandemic, it was alleged that substantial delays were caused by officers' refusal to appear when called by CCRB. To the extent that this may be true, equitable estoppel would justify extending the termination date. *In re Steyer*, 70 N.Y.2d 990 (1988).

[1132] FM-68 2023 DAO Responses to Federal Monitor Inquiry.

[1133] In response to a draft of this Report, the Department pointed to "the comparative ineffectiveness of APU as compared to DAO" and "the issue of long CCRB investigative time frames." The response went on to assert that, "The Department initially informed the CCRB that it would need 120 days to process its recommendations and impose discipline. This timeframe was relaxed to 30 days after assurances that the CCRB backlog was a temporary one . . ." (Item 440, City 09.01.23 Feedback to Yates Discipline Report.)

[1134] CCRB, Executive Director's Monthly Report, January 2021, at 39, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2021/20210111_monthlystats.pdf.

the NYS Comptroller, even taking COVID delays into account concluded that "CCRB does not complete investigations in a timely manner and does not have performance measures in place to effectively monitor lengthy investigations."[1135]

### i.    Case Study:  NDA Due to Statute of Limitations

The Statute of Limitations does come into play when there is a confluence of litigation, a witness who has counsel with a desire to wait, and a decision to close an investigation pending litigation.  The following history may be unusual as to the particular facts of the case, but more to the point is not exceptional as the histories of the officers unfold.

Sgt. #1 ███████,[1136] along with Officers #2 ████████ and #3 ████████ were on duty in the Bronx on August 5, 2016. According to a complaint filed in Bronx Supreme Court and interviews with the officers, they stopped two individuals on suspicion of an open container violation.  An individual, JL began to record the incident.  JL was well known to officers in the precinct as a member of "Cop Watch Patrol." He records and posts police encounters.  He was wearing "Cop Watch Patrol Unit clothing" and displaying his affiliation with the organization.  The ensuing saga is too extended to repeat, but in essence, JL claims he was wrongly arrested, falsely charged, and held for 23 hours, the District Attorney declined prosecution, he was re-arrested and given a DAT, and his recording equipment was confiscated, with some of it returned later but with recordings deleted.

A brief timeline is as follows:

- Incident on 8/5/16 with a Statute of Limitations cutoff date of 2/5/18.
- JL brought a complaint to the Department on 8/16/16.
- JL was given a DAT, but the criminal case was dismissed on 1/12/17.
- JL commenced a civil lawsuit on 5/11/17.
- Sgt. #1 ███ and PO #2 ███ interviewed by IAB on 11/14/17.[1137]
- CCRB recommended command discipline (B-CD) for all three officers on 2/20/18.[1138]

---

[1135] Office of the NYS Comptroller, Division of State Government Accountability, New York City Civilian Complaint Review Board, Complaint Processing, Report 2020-N-9 (Oct. 2022).  "While CCRB officials attributed long investigation times in part to NYPD's delays in providing information or access to members of service, we identified weaknesses in CCRB's oversight of timeliness of investigations and monitoring of delays that could jeopardize its ability to hold officers accountable for misconduct."  At 1.

[1136] Sgt. #1 ███ was promoted to Lieutenant on June 10, 2021. The fact of promotion in this case and other example contained herein is listed in light of current litigation pending, a class action regarding NYPD's response to BLM protests, before J. Colleen McMahon.  (*In re: New York City Policing During Sumer 2020 Demonstrations*, 1:20-cv-8924 [SDNY], Doc No. 798 (Dec. 27, 2022).  There, plaintiffs have advanced a "fail upward" theory - claiming "numerous instances" where NYPD is alleged to have ignored CCRB disciplinary recommendations only to have "ultimately rewarded with career benefits" the "worst kind of abusers."  Without opining one way or the other on the validity of the theory presently before J. McMahon, note is taken, and the course of the litigation should be tracked.

[1137] JL filed a false statement complaint against PO #2 ███ and PO #1 ███.  The allegations were unsubstantiated.

[1138] It is unclear why the CCRB investigation was delayed for the entire 18 months.  Litigation was commenced five months after the CCRB complaint was made, which may have contributed to the delay.

- The Police Commissioner dismissed the cases (administratively closed due to SOL) on 3/16/2018.[1139]
- The lawsuit closed with a $860,000 settlement on 2/27/19.

As interesting as the details of the encounter might be, and as stunning as the size of the award may be, the purpose of referencing the case here is not to recount the incident itself, but to work through the procedural history of disciplinary actions and litigation that are on display in the case of the three officers over a brief three-year interval in their careers.

During the period in question, between the time of the incident and final settlement of the lawsuit against the three officers, 2016 through 2019, each officer was the subject of numerous CCRB complaints and other civil lawsuits.

**Officer #3** ███████████ :

- Six separate CCRB complaints alleging, among other things, illegal stops, use of force, and discourtesy.  Two were unsubstantiated, two were truncated due to litigation, another (this case) was administratively closed for SOL, and one illegal stop was substantiated, ending in an A-CD without penalty.  The one substantiated case was for an encounter only nine days after this case and, in that case, he was charged again with acting with Sgt. #1 ███ .
- Six separate lawsuits (only one, this case, coincided with the distinctly separate CCRB investigations listed above).  Four of the lawsuits resulted in settlements in the amounts of $28,000, $85,000, $170,000 and $860,000.  The other two lawsuits appear to be open - one of which he is named with ████ for a second time.

**Officer #2** ███████████ :

- Has eight separate CCRB complaints (only two during the period in question) alleging force, stops, discourtesy, and retaliatory summons.  Four of the cases were truncated, one was NDA, one ended in exoneration, one unsubstantiated, and this case which was administratively closed.
- Seven separate lawsuits (only one, this case, overlapped with the CCRB complaints above) resulting in settlements of $142,750, $860,000, $35,000, and $3500, with the others still open—one of which he is named with PO #3 ████ again.

**Lieutenant #1** ███████████ :

- Three older CCRB complaints, two of which were substantiated.  But during the one-year period of August 2015 to August 2016 he accrued four separate CCRB complaints alleging illegal stops, frisk, discourtesy, or excessive force.  Only one of the four recent cases ended in substantiation (nine days after this case and acting again with PO #3 ████ ) where he received an A-CD with two hours penalty for an illegal stop and seizure of a cell phone.

---

[1139] ████ Closing1.pdf at 12.

- Four separate lawsuits, three of which settled for $860,000, $60,000 and $52,500. The fourth lawsuit names both #1 ███ and #2 ███ and the complainant is, allegedly, a tetraplegic.

In all, in a relatively short three-year period coinciding with the pending charges and litigation in this case, it is remarkable to note that the three officers, frequently working together and occasionally charged together, compiled an aggregate 12 CCRB complaints (not counting older cases) and 15 lawsuits.[1140]  The majority of the lawsuits (10) have settled with substantial awards.  Only one complaint ended with discipline (two hours forfeited) for the Sergeant, who was subsequently promoted to Lieutenant.

Sadly, as demonstrated further by a series of case studies laid out later in this Report, the sheer number of contemporaneous lawsuits and open CCRB cases is not highly unusual.  At this point in the Report it is worth thinking about a case which was delayed during pending litigation and ended up without discipline by invocation of the SOL.  Given the records of repeated truncations and failure to substantiate, at the very least it is regrettable that the allegations were never resolved but allowed to languish without a clear finding—notwithstanding the $860,000 award.

## ii.    Processing Time

With or without the statute of limitations, the time it takes CCRB and the Department to resolve complaints is a constant concern.  Officers are harmed by delay in that an open case can impede promotions and transfers.  For civilians, the truncation rate is very high and much of that may be attributable to delay as well.

The pandemic dramatically impacted CCRB's ability to investigate and close a case in a timely fashion.  Video interviews needed to be conducted and a number of witnesses, including officers, were unwilling to participate in video interviews.  The average time it took to have the first interview with a complainant in fully investigated cases nearly doubled (from 71 to 141 days) between 2018 and 2020.  As such, 2020 is an outlier in metrics surrounding timeliness.  As well, even before the pandemic, delays in access to video footage, especially Body Worn Camera (BWC) footage were a serious problem until a BWC-MOU was agreed upon.  In November 2019 an agreement was reached allowing CCRB investigators to search BWC databases in a secure search facility and in the presence of NYPD personnel.  The space has not yet been used due to pandemic restrictions.

The average age on the docket for a case rose from 101 days (FY 2018) to 109 days (FY 2019) to 142 days (FY 2020).[1141]

---

[1140] As noted, one filing was a suit against both ███ and ███ , another filing was a suit against ███ and ███ .

[1141] CCRB, Mayor's Management Report, FY 2021, available at https://www1 nyc.gov/assets/operations/downloads/pdf/pmmr2021/ccrb.pdf.

The average time to complete a full investigation rose from 190 days (FY 2018) to 249 days (FY 2019) to 290 days (FY 2020).  (Approximately 30 percent of cases which are closed are closed following a full investigation.)

The average time to complete an investigation which ended with a substantiated allegation is even longer and rose from 208 days (FY 2018) to 269 days (FY 2019) to 326 days (FY 2020).

The average time to complete a full investigation for substantiated cases jumped to 564 days in 2021 and 553 days in 2022.  This reached a peak in the first half of 2022 with delays extending to 615 days. More recently, the first half of 2023, the number of days to complete a full investigation of a substantiated case was reduced to 445 days.

One obvious cause for delay is the time between incident and first report to CCRB.  One half of CCRB's complaints come by referral.  The time it takes to pass a complaint from precinct to IAB to CCRB can be significant.  CCRB argues that the interval is critical, and delay contributes to difficulties in contacting witness.  They assert it is the cause of a higher level of truncations for cases initiated at the precinct as opposed to those made directly with CCRB.

Before an officer may be interviewed, the officer has a right to consult with a local representative of a line organization, who may be present at any interviews.  The representative can be an attorney.  CCRB Rules in this respect are quite detailed.  38-A RCNY 1-24 lays out the procedure, which won't be repeated here.  In essence the subject is given time to confer with counsel.  The subject can be accompanied by two representatives including counsel.  The interviewer is to accommodate the officer with a reasonable time and date for the interview.  Prior to the interview the officer is advised of the nature of the complaint and information concerning all allegations, and the identity of witnesses and Complainants. . . ."[1142]

In 2018, the average time to first civilian interview was 19 days and the first officer interview took place on average, 75 days after the complaint was received.[1143]  In 2022, the average days to first civilian interview was only 16 days, but it took 256 days on average to interview the subject police officer.[1144]

In the case of a recommendation for a CD, where charges are not sought, the clock is not stopped until the Department serves the CD, specifying which allegations were substantiated along with the penalty recommendation.  Even then, the clock continues to run while the officer, after consultation with an advisor, contemplates whether to accept the CD.  If the officer declines the CD,[1145] i.e., the officer wishes to contest the findings, then Charges and Specifications are drafted

---

[1142] 38-A RCNY 1-24(f).

[1143] CCRB Annual Report 2018 at 23, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2018CCRB_AnnualReport.pdf.

[1144] CCRB Annual Report – 2022, available at https://www nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2022_Annual_Report.pdf.

[1145] Patrol Guide 318-02 (19).  An officer may refuse to accept a CD finding and request formal charges.

and served on the officer.[1146]  Again, the clock continues to run until the charges are drafted and the officer is served.

If CCRB recommends Training or Instructions, or DAO reduces a CD recommendation from a penalty to Training or Instructions, the result is not considered "discipline" for purposes of Section 75 and the Statute of Limitations becomes irrelevant.

### iii.    Commencement

For formal discipline, the Statute of Limitations "clock" begins to run at the time of the occurrence of the alleged misconduct and is "stopped" at commencement.  After a panel has approved Charges, the APU unit will draft the Specifications and forward them to NYPD to serve the officer.  A proceeding "commences" at time of service[1147] of the Charges and Specifications.[1148]

Prosecutions by APU take more time than prosecutions brought by DAO.  A common cause for delay is the time it takes NYPD to serve charges upon the officer after DAO has received them from APU.  The delay from investigation to panel recommendation to NYPD actually serving the officer can be of legal consequence.  Cases become imperiled or weakened by the approaching deadline for prosecution.

CCRB and NYPD have adopted a practice, not necessarily required by law, whereby the entire length of the time that CCRB investigates, a panel reviews and considers a complaint, and until NYPD serves notice with fully drafted specifications, is considered "pre-commencement." CSL § 75 does not define "commencement." The usual practice in other contexts is to stop the clock upon receiving notice even without full explication of the basis for the action, with the understanding that amendments or more detail will be provided later.  [1149]

Even after a full investigation and recommendation for formal discipline by CCRB, a not insignificant series of events are set in motion before service and commencement.

A DAO attorney will thoroughly review the CCRB file. All available records will be reviewed, including but not limited to: Body Worn Camera footage from responding and involved officers, relevant surveillance captures, cell phone records and recordings, 911 calls, and witness statements. . . . The DAO will make a

---

[1146] If the Stature of Limitations cutoff is near, NYPD will draw up Charges and Specifications in readiness for a possible declination.  (Phone conversation with Jonathon Darche, Executive Director, CCRB August 7, 2020).

[1147] *Mikoleski v. Bratton*, 249 A.D.2d 83, 84 (1st Dep't 1998).

[1148] N.Y. Civ. Serv. Law § 75(4) (McKinney 2018) ("Notwithstanding any other provision of law, no removal or disciplinary proceeding shall be commenced more than eighteen months after the occurrence of the alleged incompetency or misconduct complained of and described in the charges . . . provided, however, that such limitations shall not apply where the alleged incompetency or misconduct complained of and described in the charges would, if proved in a court of appropriate jurisdiction, constitute a crime.").

[1149] See, e.g., in civil actions, CPLR § 203 provides a "[m]ethod of computing periods of limitation generally." An action is commenced when the claim is interposed, basically by a serving the officer with notice of the nature of the action and a summons which can be amended.  While not exactly parallel, the Administrative Code, or even the Rules of the CCRB could be drafted to "stop the clock," when needed, by serving the officer with notice of the complaint and general nature of the allegations, which could be detailed later by amendment when specifications were drawn.

recommendation as to whether to concur with the findings of the CCRB, or to depart. Where they concur, DAO will serve charges. Where there is a recommendation to depart, the case will be then reviewed by the First Deputy Commissioner and the Police Commissioner. If the First Deputy Commissioner and Police Commissioner agree with the departure recommendation, a departure letter will be issued. If they disagree DAO will serve charges.[1150]

As indicated earlier, in the Court's Remedial Opinion, there was a requirement in SQF cases that NYPD provide increased deference to CCRB credibility determinations. To the extent that DAO's intercession includes independent assessments of credibility and a review of evidence not in the record considered by or available to CCRB, the exhaustive evaluation process invites findings other than that of CCRB.

Until the officer is served with formal charges and specifications, the clock is still running. This practice is unwieldy. The clock could be stopped at an earlier point with a simple service of notice of CCRB's findings and recommendation. The usual need for a statute of limitations is that delay in notice can impair an ability to prepare a defense. If the officer has participated in an interview before CCRB, that is no longer an issue. It is true that delay may also unfairly impact career opportunities for an officer, which is why every effort should be made to resolve accusations as promptly as feasible. But unless there is undue delay by APU or DAO causing harm to the officer's career path, an officer who is aware of the allegations at the outset is in a position to defend.

In the case of a recommendation for an informal command discipline, where charges are not sought, again, the clock is not stopped until the Department serves the CD, specifying which allegations were substantiated along with the penalty recommendation. Even then, the clock continues to run while the officer, after consultation with an advisor, contemplates whether to accept the CD. If the officer declines the CD, i.e. the officer wishes to contest the findings, then Charges and Specifications are drafted and served on the officer.[1151]

Absent exigent circumstances, the Patrol Guide requires service of charges to be done "expeditiously" defined as "within six weeks after receipt" by DAO.[1152] During the three-year period, 2018 to 2020, CCRB substantiated and sent 162 cases to NYPD with a recommendation of Charges and Specifications and a request to serve the officer with the charges. According to CCRB, after Charges and Specifications were submitted by APU, the Department averaged 120 days (not six weeks) to serve the officer and "stop the clock."[1153] There is no indication that a

---

[1150] December 22, 2023 "DAO Responses to Federal Monitor Inquiry – FM 68-2023."

[1151] If the Stature of Limitations cutoff is near, NYPD will draw up Charges and Specifications in readiness for a possible declination. (Phone conversation with Jonathon Darche, Executive Director, CCRB August 7, 2020).

[1152] Patrol Guide 206-06. (Now AG § 318-04). The section, by its terms, is aimed at procedures for acting upon internal investigations, but DAO asserts that this is "a target time to serve charges regardless of the source of request." December 22, 2023 "DAO Responses to Federal Monitor Inquiry – FM 68-2023."

[1153] Report on the Administrative Prosecution Unit ("APU") First Quarter 2019 (Feb. 7, 2020), at 6, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/20200207_APU_1Q19.pdf .

substantial number of cases were lost to the Statute of Limitations on account of delayed service by NYPD, but the approaching deadline can be a factor in the final disposition.[1154]

In 2018 the Department took an average of 104 days to serve Charges and Specifications on 54 Respondents.[1155]

In 2019 the Department took an average of 88 days to serve Charges and Specifications on 59 Respondents.

In 2020 the Department took an average of 85 days to serve Charges and Specifications on 50 Respondents.[1156]

Service delay as a contributing factor to processing time for CCRB has been a source of concern. A study by CCPC of 1,395 disciplinary cases adjudicated between October 2014 and August 2016 found the average delay from day of incident to service and filing of charges was 256 days for DAO and 458 days for APU. For cases that went to trial, DAO on average took 339 days before serving charges, measured from day of incident to date of service, and APU took 455 days. For cases that ended with a plea, DAO on average took 232 from date of incident to filing of charges, while APU took 474 days.[1157] In sum, prosecutions, and especially pleas, by APU take considerably longer from day of incident to service and formal accusation.

A recently concluded study of timeliness [of cases where Charges and Specifications were filed] by the NYC Commission to Combat Police Corruption concluded, "[i]n a typical DAO case [not derived from CCRB], disciplinary proceedings are completed at least one and a half to two years after the misconduct occurred."[1158]

CCPC's review of a large sample of closed disciplinary cases (513), spanning October 2016 through September 2018, found that the average "Investigative Period" was 8.18 months and

---

[1154] One study of 120 closed use of force investigations by the OIG-NYPD found that five of them had been dismissed where the Statute of Limitations expired before discipline could be imposed. NYC Department of Investigation, Office of the Inspector General for the NYPD, *Police Use of Force in New York City*, October 1, 2015, at 45, available at https://www1.nyc.gov/assets/oignypd/downloads/pdf/oig_nypd_use_of_force_report_-_oct_1_2015.pdf.

[1155] Report on the Administrative Prosecution Unit ("APU"), May 2021 at 26, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/05282021_APU2020.pdf.

[1156] In a recent response to a recent request for update (FM 68-2023 DAO, December 22, 2023, "Responses to Federal Monitor Inquiry"), DAO asserts that the average time for service was reduced to 32 days for 2022 and 25 days for 2023. In part this was due to the large number of cases where a decision was made to not serve charges at all for a variety of reasons, including Short SOL, Departures, and MOS resigning/retiring.

[1157] CCPC, Eighteenth Annual Report of the Commission, August 2017, available at https://www1.nyc.gov/assets/ccpc/downloads/pdf/18th-Annual-Report.pdf. The bulk of the delay for DAO can be attributed to the average length of investigation by IAB. It is not possible to make a one-to-one comparison, given the nature of the reports, but CCPC found that the average investigation length in those years ranged from 10 to 13 months. CCPC Nineteenth Annual Report of the Commission, at 18, available at https://www1.nyc.gov/assets/ccpc/downloads/pdf/18th-Annual-Report.pdf.

[1158] CCPC Nineteenth Annual Report, *supra* note 354, at 48.

the average "Adjudication Period" was 14.36 months for an overall processing period of 22.94 months.

363 of the 513 cases sampled were prosecuted by DAO.  For those cases, the average Investigative Period was 7.37 months.  The average Adjudication Period was 12.31 months.  The overall processing period was 20.11 months.

150 of the 513 cases sampled were prosecuted by APU-CCRB.  For those cases, the average Investigative Period was 10.1 months.  The average Adjudication Period was 19.27 months.  The overall processing period was 29.8 months.

Differences in timeliness between CCRB and DAO could be ascribed to a number of factors:  (i) the time it takes to present a case to a Board panel and await a panel decision; (ii) CCRB cases require cooperation and scheduling for civilian witnesses, whereas most DAO prosecutions are for internal police rules violations which can be presented without civilian interviews and attendance; (iii) delays at CCRB for investigation, which may be a function of caseload, investigator experience or delayed access to necessary information being held by NYPD, such as videos or BWC evidence; (iv) the nature of FADO prosecutions, which can include a variety of ambiguous or subtle determinations as measured against the clarity of a rules' violations prosecuted by DAO; (v) subject officer willingness to accede to command orders to appear for interviews and to command decisions rather than conceding to a civilian complaint before a civilian panel; (vi) subject officers may appreciate the reality that a plea offer from DAO is less likely to be undercut by the Police Commissioner, while realizing that an appeal to the Police Commissioner following an APU negotiation may be more fruitful, giving them a second bite at the apple;[1159] (vii) the reconsideration process;[1160] (viii) delay in serving Charges and Specifications while the Department conducts a secondary review of CCRB's determinations; and (ix) many other plausible explanations which are not contemplated by this list

Finally, DAO may intervene before service of Charges to ask the panel to reconsider its finding.  Reports by the Independent Panel and CCPC have concluded that reconsiderations add to delay.  Is the delay worth it?  For stop and frisk cases, reconsideration requests by DAO are rarely successful.  In SQF cases overall, in years 2017-2019, DAO requested reconsideration in 40 cases.  Reconsideration was denied or there was no change by CCRB in all but five.  In 12 of the 40 cases DAO requested reconsideration where the Board had substantiated Charges.  Only one was granted.[1161]  In that one case, DAO asked that charges be reduced to no discipline – Training.  The panel, upon reconsideration, reduced the level of discipline to a B-CD.  Nonetheless, the Police

---

[1159] In 2018-2020, the Police Commissioner reduced or set aside 18 out of 43 pleas which had been agreed to by the officer, APU and DCT.  CCRB Annual and Semi-Annual Reports.

[1160] CCRB attributed the lengthy delays in 2016 to "an increase in the number of cases where the Department requested reconsideration. . . ."  CCRB, Report on the Administrative Prosecution Unit, Second and Third Quarters 2019, at 10, available                                                                                                                                        at https://www1 nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/20200605_APU_2Q-3Q19.pdf.

[1161] CCRB # ███████, Det. ██████.

Commissioner went on to impose Training.  Since 2020, the reconsideration process has rarely been used and has not been used by the NYPD for SQF cases.[1162]

Processing delay is a serious concern for all involved – officers, victims, and the public at large.  Whether it's budget, access to information, witness reluctance or simple bureaucratic indifference, the problem with timeliness is recognized by the Department and CCRB as a priority,[1163] but success seems elusive.  In 2017, 88 percent of CCRB's docket were cases that were less than five months old.  That dropped to 76 percent in 2018 and dropped further to 68 percent in 2019 and 2020.[1164]

As a snapshot of causes of delay, in December 2020, the APU looked at its open docket of 98 pending cases and found the following.[1165]

| | |
|---|---|
| Awaiting filing of charges | 4 |
| Charges filed, awaiting service by NYPD | 9 |
| Charges served, awaiting personnel info | 62 |
| Charges served, awaiting conference | 2 |
| On calendar for appearance | 3 |
| Off calendar, appearance pending | 6 |
| Trial scheduled, not commenced | 2 |
| Trial commenced | 2 |
| Plea agreed, paperwork pending | 3 |

As can be seen, by far the largest number of cases awaiting action are those where personal history information needs to be delivered to APU attorneys by NYPD for them to proceed.  In particular, to prepare for trial, APU prosecutors need CORD reports,[1166] SEH reports,[1167] and DCS reports.[1168] According to the Guidelines Matrix MOU, APU prosecutors can obtain employment history by emailing a request to the Department.

---

[1162] In response to a draft of this Report, the Department asserts that there are "between 2-3 cases in the last 12 months or so."  Item 460, City 09.01.23 Feedback to Yates Discipline Report.  *See also* Final Federal Monitor – SQFSTA – 2023 Q1, Q2 on file with Monitor.

[1163] "Improve the quality and timeliness of investigations" is listed as the number 1 goal by CCRB in its FY 2021 Mayor's Management Report.

[1164] CCRB Executive Director's Monthly Reports for December 2017, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2017/20171213_monthlystats.pdf, et seq.

[1165] CCRB, Executive Director's Monthly Report, January 2021, *supra* note 930, at 49.

[1166] Commanding Officers Report on Members facing discipline.

[1167] Summary of Employment History (a redacted version of the CPI).

[1168] A Disciplinary Cover Sheet.

At that time (December 2020) there were another 14 cases where a plea had been proposed or a verdict rendered and the parties were awaiting a decision by the Police Commissioner as to how they could proceed.[1169]

## J.    Subpoenas - Enforcement

One of the necessary reforms included in the 1993 creation of an independent civilian board was the power to "compel the attendance of witnesses and require the production of such records and other materials as necessary for the investigation of complaints pursuant to [Section 440 of the Charter]." The power was further implemented by Rules of the Board which provided that "subpoenas ad testificandum [testimony] and duces tecum [documents] may be issued and served. Such subpoenas are enforceable pursuant to relevant provisions of Article 23 of the New York Civil Practice Law and Rules."[1170]  The subpoena power granted by the Charter and described in the Rules applies to third parties and is distinct from the Police Commissioner's separate duty to provide assistance and to "cooperate fully with investigations by the Board, and to provide to the board upon request records and other materials which are necessary for [investigations] . . . ."[1171]

If the recipient of a subpoena fails to comply, a court order, pursuant to CPLR 2308, is required to enforce the subpoena.  A Richmond County Supreme Court Justice ruled in 2019 that the Charter did not give the Board the "capacity to sue" to enforce a subpoena.[1172]  The Court reasoned that the Board could not commence an action in a court proceeding without specific authority by the Charter.  In other words, CCRB investigators could subpoena third parties, but if the recipient resisted, CCRB could not go to court independently to enforce the subpoena without the intervention of the City Law Department.

Another lower court, in an application by CCRB for a declaratory judgment granting access to GML section 50-h transcripts held by the City Comptroller,[1173] ruled that CCRB did have capacity to sue for declaratory or injunctive relief.[1174]

Generally, a prerequisite to filing any civil lawsuit against NYPD is submission of a "notice of claim" to the NYC Comptroller.[1175]    Under General Municipal Law Section 50-h, the Comptroller's Office conducts a sworn interview of any claimant.[1176]  That interview, in many cases, is pertinent to CCRB's investigation—a sworn statement describing the alleged misconduct.

---

[1169] CCRB, Executive Director's Monthly Report, January 2021, *supra* note 930, at 48.

[1170] 38-A RCNY § 1-23(d).

[1171] NY Charter § 440(d)(1).

[1172] *CCRB v. Office of the District Attorney*, 63 Misc. 3d 530 (Sup. Ct. Richmond Cty. 2019) (Garnett, JSC).

[1173] *CCRB v. Office of the Comptroller*, 2015 N.Y. Misc. LEXIS 4917 (Sup. Ct. N.Y. Cty. 2015) (Mendez, JSC).

[1174] The issue here, in practice, was delay and cost more than availability, since, according to a verified petition signed by the Assistant Deputy Executive Director of CCRB, the Comptroller's Office has never opposed an application by CCRB to obtain the transcripts. Petitioner's Memorandum in Support, Index No. 452358/2015, NYSCEF Doc. No. 1, ¶ 25.

[1175] N.Y. Gen. Mun. Law §§ 50-e, 50-j to 50-k (McKinney 2013).

[1176] *See id.* § 50-h(1).

However, section 50-h (3) states that, "[t]he transcript of the record of an examination shall not be subject to or available for public inspection, except upon court order upon good cause shown, but shall be furnished to the claimant or his attorney upon request."

In seeking direct access to section 50-h transcripts, CCRB argued that, as a sister public agency to the Comptroller, the Board did not need to apply to a court, on notice to the parties, with a demonstration of individualized "good cause" in order to inspect the transcripts when relevant.[1177] The court denied the application, reasoning that CCRB "although an agency, consists of members of the public" and as such, the Board could only obtain records from the Comptroller in a judicial proceeding under the same limited rules of access applicable to any other member of the public.[1178] The court found that the CCRB must follow the requirement in section 50-h that a transcript will not be made available for "public inspection."[1179]    Accordingly, the court held that the Comptroller's Office cannot provide 50-h transcripts to CCRB without a court order or complainant consent.[1180]

With regard to subpoenas for documents, the Court pointed out that the statutory provisions "do not specifically identify records from other agencies or departments related to the complainant" and, further, "[t]he relevant provisions of the NYC Charter and Rules of the City of New York allow petitioner to obtain records from the Police Department as part of its investigation and prosecution." But the court went on to observe that, while the Rules permit "the Attorneys for the parties, 'the right to subpoena witnesses,' it is silent as to transcripts.'"[1181]

The Board, in the eyes of the court, was advisory to NYPD and could request the Department's assistance in obtaining documents,[1182] but could not independently compel attendance or production without a good cause demonstration linked to the particular transcript sought.

Obviously, CCRB will need, from time to time, records held by third parties, including City agencies, that are not within the custody or control of NYPD.  They should be able to compel production without enlisting the aid of Corporation Counsel or NYPD.

In sum, there were two barriers raised to CCRB's power to compel production of necessary documents.  One court questioned CCRB's ability, or capacity, to go to court to compel compliance

---

[1177] The Law Department has access to 50-h transcripts. It is unclear if, in the course of preparing a case, the Corporation Counsel shares the transcripts with IAB investigators.

[1178] (Explaining that the Charter and CCRB Rules authorize the CCRB to require the NYPD to produce documents, "but do not specifically identify records from other agencies or departments related to the complainant"—including the Comptroller's Office—as within the CCRB's subpoena power).

[1179] *CCRB v. Office of the Comptroller*, 2015 N.Y. Misc. LEXIS 4917, at *2, *4 (Sup. Ct. N.Y. Cty. 2015) ("The transcript of the record of an examination shall not be subject to or available for public inspection, except upon court order upon good cause shown, but shall be furnished to the claimant or his attorney upon request" (quoting N.Y. GEN. MUN. LAW § 50-h(3)).

[1180] *Id.* at 4.

[1181] *Id.* at 5.

[1182] NYC Admin. Code § 14-137(a) (authorizing NYPD subpoenas).

and another court asserted that CCRB had no more standing than a private citizen to seek documentary evidence from governmental entities other than NYPD.

The recent amendments to the Charter may have cured the problems created by the lower courts' rulings. The Charter was amended to provide that "[t]he board may request the corporation counsel to institute proceedings in a court of appropriate jurisdiction to enforce the subpoena power exercised pursuant to this section, and the board itself may, subject to chapter 17 of the charter, institute such proceedings."[1183] In general, subpoenas necessary to an investigation may now be issued as administrative subpoenas, and, if denied, enforced by way of court proceedings, under CPLR Article 23.[1184] Importantly, going forward, the Board need not await Corporation Counsel approval and need not limit its range to NYPD records.

In addition, before amendment, the Charter required a majority vote of the full Board to approve issuance of a subpoena.[1185] In the month of April 2018 alone, CCRB issued 179 subpoenas.[1186] Convening a quorum and obtaining a vote of the full Board for every subpoena is impractical.

Effective March 31, 2020, the Charter was amended to permit delegation of subpoena power to the Executive Director. Paragraph (c)(3) of section 440 of the Charter now provides, "[t]he board may, subject to any conditions it deems appropriate, delegate to and revoke from its executive director . . . subpoena authority and authority to institute proceedings."

### i.  NYPD Administrative Subpoenas

The clarifying language in the Charter should promote CCRB's ability to issue non-judicial subpoenas. This may prove useful in eliminating wasted time and unnecessary motion practice. While "administrative" subpoenas issued by NYPD under authority of NYC Admin. Code section 14-137 have drawn criticism for abuse and overuse,[1187] the problem in the past was that NYPD

---

[1183] NY City Charter § 440(c)(3).

[1184] However, it may be that GML § 50-h transcripts, if not made available by the Comptroller, will continue to require an application to a court and a showing of good cause or complainant's consent, but for the moment CCRB should have the same access as any other City agency. *CCRB v. Office of the Comptroller*, 52 Misc. 3d 226, 227 (Sup. Ct. N.Y. Cnty. 2016) (d'Auguste, JSC).

[1185] Letter, Fred Davie, Chair, CCRB to NYC Charter Revision Commission, May 23, 2018.

[1186] CCRB RULES, *supra* note 840, at § 1-23(d) ("Upon a majority vote of the members of the Full Board, subpoenas ad testificandum and duces tecum may be issued and served."); N.Y. CITY CHARTER, ch. 18-A, § 440(c)(3) (2019) ("The board, by majority vote of its members, may compel the attendance of witnesses and require the production of such records and other materials as are necessary for the investigation of complaints submitted").

[1187] *See* Ali Winston, NYPD Expands Use of Controversial Subpoenas to Criminal Cases, The Appeal, August 25, 2020, available at https://theappeal.org/nypd-controversial-subpoenas; *see also* Thomas Tracy, NYPD Subpoenaed Phone Records of NYC Reporter in Effort to find Department Leaks: Attorney, NY Daily News, July 17, 2020, available at https://www.nydailynews.com/new-york/nyc-crime/ny-nypd-subpoenas-phone-records-of-reporter-to-find-leaks-20200717-mg6hhuqv55flbc4ihgg24w3sye-story html.

The NYC Admin. Code § 14-137(a) provides that the Commissioner may "compel obedience" to subpoenas. The same language was missing in Charter § 440. A recent article in the NY Post (Nov. 14, 2020, at 2, "Subpoena 'scare tactics' by NYPD") complained that the Department has "used the subpoena 217,872 times since 2010 without

used administrative subpoenas for criminal investigations, thereby wrongly circumventing the Criminal Procedure Law.[1188]  The same abusive practice should not arise with use of subpoena power by CCRB.  Just as NYPD may continue to obtain administrative subpoenas in aid of a disciplinary proceeding after application to the Deputy Commissioner of Trials and upon a showing of need, balanced by a consideration of resources and the complexity of the case,[1189] CCRB will have the power to enforce subpoena compliance, limited to items needed for an investigation upon a complaint in disciplinary proceedings only.

### K.     NYPD Duty to Cooperate with CCRB Investigations

CCRB's ability to investigate a citizen complaint is dependent upon the full cooperation of NYPD personnel and complete access to relevant files.  There has been a history of criticism by CCRB personnel concerning difficulties in obtaining complete access to requested information.

The Charter provides,

> It shall be the duty of the police department to provide such assistance as the board may reasonably request, to cooperate fully with investigations by the board, and to provide to the board upon request records and other materials which are necessary for investigations undertaken pursuant to this section, except such records or materials that cannot be disclosed by law.[1190]

All requests run through the NYPD IAB liaison unit.  CCRB investigators cannot receive information directly from the precinct or other investigative units.[1191]  Typical CCRB requests from the NYPD include, among other things, arrest reports, radio-dispatch communications, command logs, officers' memo books, stop reports, BWC and video footage, 911 reports, and investigative

---

oversight from the courts." The article contended that "NYPD has quietly used [subpoenas] to intimidate phone companies, banks, Internet service providers and social media giants into handing over . . . personal information . . . even when cases are not criminal in nature."

[1188] *People v. Ayodele*, 2012 NY Misc LEXIS 6651 (Sup. Ct. Queens County 2012), *rev'd* on other grounds, 116 A.D.3d 706 (2d Dep't 2014) ("[T]he commissioner's subpoena powers are limited to administrative issues that directly affect the Police Department and cannot extend to those given the District Attorney.") (citations omitted).

[1189] *Irizarry v. NYPD*, 260 A.D.2d 269 (1st Dep't 1999); 38 RCNY 15-03(f)(2). 38 RCNY § 15-03(f)(2).

[1190] NY City Charter § 440(d)(1).

[1191] Patrol Guide 207-31 (Now PG § 207-28) ("Any request for Department records made by representatives of the Civilian Complaint Review Board will be referred to the Internal Affairs Bureau, Civilian Complaint Review Board Liaison, for necessary attention. Department records will not be forwarded direct to the Civilian Complaint Review Board.").

records from the IAB and the FID.[1192]  IAB personnel can also assist in identifying subject officers when the complainant is unable to identify the officers in the complaint.[1193]

The NYPD has limited the materials that the CCRB may obtain through Patrol Guide § 211-14 which lists a number of records that are not released to CCRB investigators:

- Records concerning a case that has been sealed pursuant to Criminal Procedure Law 160.50.
- Records of sex crimes per Civil Rights Law 50-b.
- Psychiatric records (without patient consent).
- Alcohol counseling records (without patient consent).
- Medical records (without patient consent).
- Administrative Guide § 318-11, "Interrogation of Members of the Service" interviews without permission.  Of Deputy Commissioner – Legal Matters).
- Personnel records of police officers as per Civil Rights Law 50-a; and
- Juvenile records as per Family Court Act 381.3.

It was reported to the Monitor team that since May 2018, the NYPD disclosure of their files has become more restrictive than the Patrol Guide provisions, with the NYPD declining to provide additional categories of records (for example, Domain Awareness System ("DAS") snapshots, which reflect the data officers are aware of at the time of stops) and redacting additional content within records (for example, redacting threat resistance injury reports entirely, and redacting everything but complainants' arrest stamps in command logs).[1194]

When a complaint is first made to NYPD and logged by IAB, if the complaint or some of the allegations are cross-referred to CCRB, certain preliminary information will be sent to CCRB. This includes event information such as a typed 911 or radio run information, the Automated Roll Call System roster (to help identify officers at the encounter), Threat, Resistance, and Injury (TRI) reports, and Complaint Reports (UF-61's) which are made upon an arrest.  Any other documents need to be specifically requested through the IAB Liaison Unit.

CCRB states that it requests the entire case file, video, and audio evidence when it is aware of a concurrent investigation with IAB.  However, IAB typically will not provide any materials until its case has concluded, with the exception of video evidence, which it periodically shares if specifically requested.  IAB will provide the DAO with GO-15 recordings (audio of IAB's interview with the MOS) when requested, but these are provided solely so that the officer may avail himself/herself of their Patrol Guide right to review previous statements prior to testifying

---

[1192] *See, e.g.*, Heather Cook, Senior Counsel, CCRB, CCRB 101 Presentation, at Rqst 6, page 29, *in* CCRB, Response to Federal Monitor's Request Number Six (document compilation that is the first enclosure in the CCRB's first response, dated July 17, 2018, to the Federal Monitor's request for CCRB documents; on file with author).

[1193] *See* INVESTIGATIVE MANUAL, *supra* note 392 at 212 (explaining that "[i]n certain cases, the Chief of Investigation will also act as a liaison between the CCRB and IAB commanders to expedite requests for New York City Police Department records"); *id.* at 61 (explaining that "the IAB Liaison Unit" will sometimes help investigators obtain the identity of officers).

[1194] Interview with J. Christopher Duerr, Chief of Investigations, CCRB [Based on "NYPD refusal to share with CCRB.pdf" file]

with the CCRB. The CCRB is rarely provided with audio of officers' statements to IAB regarding concurrent incidents. As a matter of course, IAB does not provide its dispositions without the CCRB requesting them. IAB does not share dispositions of corruption cases or other non-FADO categories. If a concurrent Force Investigation is underway, CCRB will be denied access to TRI reports. If the CCRB generates an OMN for a False Official Statement, IAB will provide the disposition to this allegation without being requested. IAB will not provide any case materials or any additional information beyond the disposition.

A recent example of concurrent investigations leading to conflicting results is the case of PO ███████. There, CCRB substantiated two force allegations and one allegation for an untruthful statement against the officer. The closing report indicated that the officer approached a civilian who was recording police actions during a protest demonstration. According to CCRB, ████ hit a photographer in the thigh with a baton and then pushed a cameraman away with the same baton. When asked about the incident in the CCRB interview, he denied using his baton "at all that evening."[1195]

The Police Commissioner rejected the findings of CCRB. Based upon "a thorough review of this incident . . . conducted independently by the Department" and upon her "being shown the video evidence" the Police Commissioner dismissed the recommended B-CD with an NDA/DUP.[1196] Apparently a force investigation by IAB conflicted with the facts found by CCRB when it substantiated the force and rejected the testimony of the officer. When given the choice, the Police Commissioner accepted IAB's findings and rejected those of CCRB.

The Domain Awareness System, which officers can access while on patrol, contains a wealth of background information. It is a useful tool in stop and frisk situations especially. It includes information about warrants, arrests, arrest reports (UF-61). which detail arrest events, AIDED cards, I-Cards, etc. CCRB investigators have complained that beginning in 2018, the IAB Liaison shut off access to DAS snapshots (a "lightened" version of DAS), which had been made available in the past. The claim was that AIDED reports might contain medical information which could be protected by HIPAA (Health Insurance Portability and Accountability Act) – even though the police department is not a HIPPA provider and, therefore, is not covered by HIPAA.

Beginning in 2018, under the claim of CPL 160.50 (sealed cases) and Family Court Act 381.3 (Juvenile Records) compliance, the Department redacted identifying information in documents which had been sealed or which might become sealed. This included:

- UF61 (arrest reports) describing the reasons for an arrest – which had not yet been sealed because the case was still open;
- Warrants for arrested persons on the same theory;
- Command Logs;

---

[1195] CCRB closing report, Case # ███████.

[1196] Police Commissioner Departure Letter, CCRB Case # ███████. In response to a draft of this Report, the Department pointed to the fact that "████ corrected his account" after being shown the video evidence. (Item 483 City 09.01.23 Feedback to Yates Discipline Report.) This supports the observation that a secondary factfinding proceeding by NYPD followed the proceedings conducted by CCRB.

- Prisoner Pen Holding Rosters – on the theory that other witnesses to abuse in the holding pen might have sealed arrests;
- Threat Resistance Injury Reports (TRI) which are filed when there is a "use of force";
- All documents where FID was conducting a simultaneous investigation;
- Search Warrant Applications.

As well, IAB began editing and redacting BWC footage if there was a possibility of a sealed arrest or a juvenile arrest.

As noted above, CCRB investigators are not permitted to obtain records directly from the precinct or command in which the civilian encounter occurred. Nor do they have ready access to central files or databases within NYPD. All document requests are filtered through the IAB/CCRB liaison.[1197] In interviews by the Monitor team with CCRB staff, the point was made that, on not infrequent occasion, a request for information by a CCRB investigator is met with a demand to identify the specific complaint being investigated and to particularize the need for the file.[1198]

This last demand, the need to specify a complaint with particularization of the relevance of a file to the complaint is an unnecessary hindrance to full investigations. Anyone familiar with investigations, or inquiries of any kind, knows that being asked to particularize the need for a specific research file in advance of seeing the file tends to hamper and artificially confine the investigation. It is only when an investigator has an ability to scan a file that linkages, connections, and corroborating evidence can be discovered. Asking an investigator to particularize the value of evidence before the investigator has seen the evidence puts the cart before the horse.

In his May 23, 2018, letter to the City Charter Commission, former Chair Fred Davie asked for broader authority to investigate. He wrote,

> Currently, the Charter limits the NYPD's duty to cooperate with CCRB inquiries to records and materials which are necessary to investigations. With a similar goal to that of codification of the APU, better defining the NYPD's duty to cooperate would enable the established cooperation between the agencies to continue, regardless of leadership changes at either agency.

> In the Agency's suggested language emendations to the Charter, this goal is achieved by adding an additional line to § (d)1 that specifies that NYPD's duty to cooperate with CCRB requests for information extends to situations necessary for the CCRB to satisfy its Charter-mandated duties and responsibilities.

Prior to Charter revision in 2020, the Charter provided,

> It shall be the duty of the police department to provide such assistance as the board may reasonably request, to cooperate fully with investigations by the board, and to provide to the board upon request records and other materials which are necessary

---

[1197] Patrol Guide § 211-14. Request are made by PD 149-164 to the IAB Management Resources Section. Copies of any pertinent records, not originals, may be obtained.

[1198] Monitor Team Interviews with CCRB staff, July 24, 2018, and September 17, 2019.

for the investigation of complaints submitted pursuant to this section except such records or materials that cannot be disclosed by law.[1199]

At Chair Davies' request, that provision was amended as follows,

It shall be the duty of the police department to provide such assistance as the board may reasonably request, to cooperate fully with investigations by the board, and to provide to the board upon request records and other materials which are necessary for investigations undertaken pursuant to this section except such records or materials that cannot be disclosed by law.[1200]

Following the Charter change, CCRB amended its rules, effective March 26, 2021, to conform:

The Board may obtain records and other material from the Police Department which are necessary for investigations undertaken by the Board, except such records and material that cannot be disclosed by law. In the event that requests for records or other evidence are not complied with, investigators may request that the Board issue a subpoena duces tecum or a subpoena ad testificandum.[1201]

It could be argued that these amendments to the Charter and the Rules are purely technical, designed merely to accommodate CCRB's expanded jurisdiction allowing for investigations of false statements. However, given the backdrop, it is more likely that the change, although minor in appearance, is designed to address failures (real or perceived) of NYPD to cooperate. The need to associate a request with a particular complaint can no longer be justified by allusion to the Charter or the Rules.

It is worth noting that the Charter and the Rules, if narrowly construed by NYPD liaison officials, can place an artificial limit on cooperation by the Department. They speak to an obligation for NYPD to produce materials "which are **necessary** for investigations. . . ."[1202] According to investigative staff at CCRB, this seemingly innocuous caution, on occasion, becomes a barrier to access and cause for denial or delay in obtaining material from the Department when the liaison officer questions the need for records sought by a CCRB investigator. The Charter does not authorize IAB to decide for CCRB whether an item is necessary to CCRB. By comparison, the Executive Order for the CCPC requires the Police Commissioner to "ensure and mandate the full cooperation of all members of the Police Department with the Commission. . . ." And "that interference with or obstruction of the Commission's functions shall constitute cause for removal from office or other employment, or for other appropriate penalty."[1203] Similarly, the Department of Investigation is awarded "full cooperation" in investigations, without limitation. Any attempt

---

[1199] NY City Charter § 440(d)(1). (Until Mar. 31, 2020).

[1200] *Id*. Effective Mar. 31, 2020. (New matter underlined. Deleted matter bracketed.)

[1201] 38-A RCNY § 1-23(e).

[1202] Charter § 440(d)(1), 38-A RCNY § 1-23. (Emphasis added).

[1203] Executive Order No. 18, at § 3(a) (1995).

265

to "prevent, interfere with, obstruct, or otherwise hinder any study or investigation . . . shall constitute cause for suspension or removal from office or employment."[1204]

The Charter language was broadened to require cooperation in all investigations without reference to, or disclosure of, a particular complaint. CCRB now should receive cooperation and have access to materials pertinent to its full review of FADO misconduct, without necessity of proving materiality to any single specified complaint. By dint of the Charter amendment, it would seem that CCRB is no longer confined to examination of one complaint at a time or one officer's conduct in a particular encounter but should receive materials connected to any FADO investigation which began with a complaint by a member of the public but leads to review of a broader problem. So, for example, if a civilian complained of an illegal stop or search against a named officer, but the investigation revealed that the misconduct was one of a series of wrongful actions by the named officer and others in his command or those supervising the named officer, the new language would clearly authorize an investigation by CCRB with the power to request necessary materials and records. The investigation once "undertaken" upon a civilian complaint should be permitted to reach a logical conclusion for the entire investigation.

## L.    CCRB Access to Employment and Disciplinary History

Traditionally, CCRB investigators would not receive the full employment or disciplinary history of an officer in the course of an ordinary investigation. If a panel voted to substantiate charges and formal discipline, the APU would receive the Summary of Employment History (SEH) of the officer which included any prior substantiated Charges, Dismissal Probations, and B-CDs.[1205] Performance evaluations, lawsuits, pending charges and performance monitoring would not be included. In the vast majority of CCRB investigations which are not handled by APU, including almost all SQF inquiries, the SEH was not provided to the investigator. CCRB penalty recommendations would rely solely on CCRB's own, limited, record of prior substantiated FADO complaints and formal discipline resulting in a penalty.

In testimony before the Charter Revision Commission,[1206] the Executive Director complained,

"The Charter currently requires that the NYPD cooperate with CCRB investigations but lacks any specific language requiring the Department to cooperate with prosecutions or the Agency's operational capabilities. As a result, the CCRB lacks access to items like subject officers' NYPD disciplinary histories or the specific penalties given to officers in non-APU cases, both of which would help the Board to make more informed decisions on disciplinary recommendations

---

[1204] NY City Charter § 1128.

[1205] Email, Dep. Commissioner Matthew Pontillo to Monitor Team, Mar. 18, 2021. C-CDs could also be included but, as a practical matter, they are so rare as to be not worth listing.

[1206] 2019 Charter Revision Commission Public Forum Presentation of Jonathan Darche, March 7, 2019, at pp. 1–2, 6 https://static1.squarespace.com/static/5bfc4cecfcf7fde7d3719c06/t/5c9b8941085229a1975c8f21/1553697097110/Meeting_Testimony_3_7_19.pdf.

and provide more transparent aggregate disciplinary data to the public creating the ability for CCRB policy reports to provide more contest to the reported data."

This testimony was apparently aimed at shortcomings in access to information in APU cases because CCRB never asked to see personnel history or the SEH in non-APU cases. Neither the Rules, the Charter, nor the APU-MOU distinguished access to background information between APU and non-APU cases. Limited access was accomplished by mutual, unwritten, agreement. This was unfortunate given that a history of prior OMN, M, C, OG and even FADO A-CDs[1207] could and should be useful in evaluating all cases, including SQF misconduct. Knowledge of a complete disciplinary history would seem to be essential to CCRB discipline recommendations as well as any meaningful dialogue regarding a reconsideration request in SQF cases.[1208]

Historically, even in cases where Charges and Specifications were brought by APU, there were still inadequacies in access to a complete history. As described in CCRB's APU quarterly report,

> Presently the APU does not have access to the NYPD's Disciplinary Administrative Database System (DADS) and as a result we must rely on DAO for many administrative tasks related to prosecuting a case.

And,

> At present time the APU does not have access to respondents' Central Personnel Index (CPI). Instead, DAO prepares a Word document for the APU titled 'Summary of Employment History' (SEH) which includes some but not all of the respondent's relevant disciplinary history. For example, the SEH contains only the respondent's most recent evaluation even though DCT considers the respondent's last three evaluations when making a penalty recommendation.[1209]

The recently adopted Discipline Matrix-MOU promises that the necessary background will be shared with CCRB. As discussed later in this Report, adjustments are being worked through. At present, after substantiation, if Charges and Specifications are drawn, the APU can request a

---

[1207] A substantial number of FADO allegations are investigated within the Department and without CCRB involvement. For example, in a July 2023 report, the Citizens Commission to Combat Police Corruption, in a study of the workings of IAB, reviewed 46 randomly-selected IAB investigations that were closed in 2021. Within those 46 cases were 111 FADO allegations investigated by IAB. (Twenty-First Annual Report, NYC Commission to Combat Police Corruption, at 11, available at https://www.nyc.gov/assets/ccpc/downloads/pdf/2021-Annual-Report-with-Executive-Order.pdf.)

[1208] In response to a draft of this Report, the City responded, "The SEH is now requested by investigators whenever a case is closed with at least one substantiated allegation. It is provided to the board during case deliberations so the panel members can make an appropriate penalty recommendation consistent with the Matrix." (Item 491, City 09.01.23 Feedback to Yates Discipline Report.). As discussed later in this Report, there are times when disclosure of non-CCRB discipline would be useful during the course of an investigation and before a substantiated allegation is being reviewed for penalty assessment.

[1209] APU 1q2014, at 4, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/apu-2014q1.pdf.

copy of the CORD, SEH, and a Disciplinary Cover Sheet (DCS) containing a list of prior formal disciplinary actions.

i.      **A Case Study Where Access to a Personnel File Would Be of Value to CCRB**

As has been noted at various points in this Report, it is common for CCRB to recommend Training for SQF misconduct or for the Police Commissioner to reduce a penalty to Training after an SQF finding by CCRB with a more severe recommendation.  For example, in 2019 the Police Commissioner imposed Training as the "discipline" after a substantiated SQF finding by CCRB in 39 of 96 cases.  In 24 of those 39 cases, CCRB had recommended Training and the Police Commissioner agreed.  In another 15 cases, CCRB recommended something other than training but the Police Commissioner imposed Training nonetheless.[1210]  If CCRB had had access to an unredacted CPI and PEPR report, CCRB (and outside observers) would have been able to look at the prior history of Training to see whether Training made sense in each case.

Take as a relatively benign example the case of Sergeant ███████. Sergeant ██ has been with the Department for eight years. He was promoted to Sergeant in October 2019.  During his time with the Department, he has been the subject of nine CCRB complaints.  Two were substantiated - an unlawful frisk in 2016 and an unlawful questioning in 2019.  (His promotion to Sergeant was three months after a Stop/Question/Frisk/Search complaint was filed.) In both substantiated cases, CCRB recommended, and the Police Commissioner accepted, a disposition of Training.

What was to be gained by ordering Training for a second time? If CCRB had had access to Sergeant ██'s complete personnel file, they would have known that the sergeant has attended approximately 120 Training sessions in his eight-year career.  Six of the training sessions were for "Investigative Encounters."  One such session was in January 2020, shortly after the 2019 finding. Another was in 2016, shortly after the 2016 finding.  Both sessions, as listed in his Officer Profile, were simply a viewing of the same video:  "Terry Stops and Reasonable Suspicion."[1211]  Would CCRB have recommended nothing more than a second viewing of the same video for a second offense if it had known? Was the second "discipline" nothing more than another one in a series of 120 Training sessions he was required to take in the normal course, as if he had never committed an SQF offense at all?

Was the panel's decision to simply repeat the same Training class made with all the information that it should have had?  Aside from his extensive "Training" history, there are a number of other factors which might have been of value to CCRB if the panel had full access to relevant information in NYPD's personnel files, including his internal NYPD disciplinary history and his history as a subject officer in multiple lawsuits.

In the time period 2017-2019, Sergeant ██ was the subject of eight internal investigations at NYPD.  They included allegations of excessive force, profiling, failure to provide medical care,

---

[1210] Federal Monitor SQFSTA report provided by NYPD.

[1211] The video had the same title.  While it is possible that the video was updated in the interval between screenings, there is no indication of such in the Officer Profile.

stops, searches, and use of a taser. Some were substantiated, some were partially substantiated, some were unsubstantiated, and some ended in exoneration.

Also, partially referenced in the personnel file, but not available to CCRB when it recommended Training for illegal questioning in 2019, was the fact that Sergeant ███ was named in six civil lawsuits. Three were settled for amounts of $75,000, $15,000 and $10,000. Another was settled for an undisclosed amount and two are still open. Three of the lawsuits arose out of incidents occurring in 2018-2019, around the time of his second substantiated CCRB misconduct finding and promotion.

The point of this recitation—looking at the Sergeant's history of attending many, many, Training classes, being the subject of internal investigations not known to CCRB and being named in multiple lawsuits—is merely to question CCRB's limited access to a complete file when a panel makes a recommendation after a non-APU SQF misconduct finding. It is non-sensical that CCRB is denied a full and complete picture when recommending discipline. A rote imposition of "Training" without deeper analysis looks foolish and sends the wrong message to officers and the public alike.

Complaints about problems with access to information is not limited to investigative staff. Unavailability of the full disciplinary history of officers was raised at a recent public CCRB meeting by a Board Member, who complained that lack of access to NYPD disciplinary history interferes with panel decision-making.[1212]

With the adoption of the Disciplinary Guidelines, the Department and CCRB entered into a new, supplementary MOU (Matrix-MOU).[1213] Given the Guidelines' promise of progressive discipline and assessments of aggravating and mitigating circumstances, an understanding of an officer's complete disciplinary history is needed if CCRB is to apply the matrix as promised. Accordingly, the Matrix-MOU promises access to an officer's employment history in all cases. Regarding non-APU cases, the Matrix-MOU specifies that CCRB's penalty recommendations shall take into account "the NYPD employment history and any other relevant information."[1214]

Under the MOU, CCRB must wait until after a panel has substantiated a complaint before it may ask for the employment history. At that point, an email request is sent to NYPD and the Department strives to reply within 20 business days. In a change from past practice, the Department agrees not to refuse or delay disclosure on the ground that it is conducting a concurrent or parallel investigation. At this point in time, it is too early to know if the MOU provision is intended to obviate the Patrol Guide restrictions on access to meaningful employment histories.

The Matrix-MOU specifically prohibits CCRB from disclosing "any NYPD employment history to any person, organization or agency without first notifying the NYPD's Legal Bureau"

---

[1212] Board Member Erica Bond, CCRB public meeting (Dec. 9, 2020).

[1213] Memorandum Of Understanding Between The New York City Police Department And The New York City Civilian Complaint Review Board Concerning The NYPD Discipline Matrix (Feb. 4, 2021), https://www1.nyc.gov/site/nypd/about/about-nypd/mous-nyc-rules.page. The matrix MOU supplements the earlier APU-MOU. "Nothing [in the matrix MOU] intends to replace or supersede [the] previous MOU . . . ." N 1, at 3.

[1214] *Id.* ¶ 3.

in order to provide "an opportunity to assert any applicable legal exemptions."[1215]  With the repeal of Civil Rights Law § 50-a, it is unclear if this limitation is confined to Public Officer's Law §§ 86 (6-9), which exempts certain law enforcement records from FOIL as a matter of personal privacy.  It may well be that NYPD will continue to deny access to all the items previously withheld under PG § 211-14.[1216]

The interplay between the non-disclosure clause in the Matrix-MOU, barring public disclosure or redaction of personal items, and paragraph 6 of the Matrix-MOU requiring public availability of departures from the Guidelines may lead to some confusion in the future.  If a departure finds aggravating or mitigating factors based on information not disclosed, public skepticism is likely to ensue.

### M.    Access to Files Sealed by CPL 160.50

Patrol Guide § 211-14 provides that records concerning a case that has been sealed pursuant to Criminal Procedure Law 160.50 may not be released to the CCRB.[1217]  CCRB's ability to investigate officer misconduct is significantly hampered when it is denied access to police files in cases where the police mistakenly or wrongfully arrested a person whose case was subsequently dismissed or voided.[1218]

It is widely recognized that a vast number of arrests result in dismissal or, in the words of CPL § 160.50, the accused receives a "favorable termination."[1219]  In such cases, Section 160.50 requires that all records maintained of the arrest be sealed.  Recently, in *R.C. v. City of New York*,[1220]

---

[1215] *Id.* at 11.

[1216] Records concerning a case that has been sealed pursuant to Criminal Procedure Law 160.50, Records of sex crimes per Civil Rights Law 50-b.

Psychiatric records (without patient consent).

Alcohol counseling records (without patient consent).

Medical records (without patient consent).

P.G. 206-13, "Interrogation of Members of the Service" interviews (without permission. Of Deputy Commissioner – Legal Matters).

Personnel records of police officers as per Public Officers Law § 86.

Juvenile records as per Family Court Act 381.3.

[1217] The Patrol Guide only references CPL 160.50, but presumably the same holds true for §§ 160.55 and 160.58.

[1218] The self-evident need for disclosure in investigation of potential police misconduct was the very reason that this Court authorized NYPD to share sealed records with the Monitor Team in its examinations.  *Floyd*, 1:08-cv-1034 ECF Doc No. 559 (July 17, 2017).

[1219] Discovery in the *R.C.* case showed that the Domain Awareness System (DAS) installed on phones with Microsoft K, contain 6,908,699 sealed arrest reports of 3,576,113 individuals as of Nov. 20, 2019.  "The NYPD Can See Millions of Arrest Records That Were Supposed to be Sealed," Huff Post (July 27, 2020), available at https://www.huffpost.com/entry/nypd-police-sealed-records_n_5f1add79c5b6296fbf417b71?ncid=newsltushpmgnews.

[1220] *R.C. v. City of New York*, 64 Misc. 3d 368 (Sup. Ct. N.Y. Cty, 2019).

a class action against NYPD was brought seeking to prevent NYPD's practice of maintaining and accessing sealed records for investigation of criminal activity.

In the normal course, aside from records kept at the precinct of arrest, entries of sealed events will be kept on a central digitized report that compiles various documents into one easily accessible and readable document, an ENTITY - EXTENDED REPORT in the Domain Awareness System. It combines ICADs prepared at the precinct, complaint reports, and interviews by the Criminal Justice Agency ("CJA")[1221] which makes bail recommendations to the courts, etc. Despite a sealing order, the listings will continue to make available arrest dates, the NYSID number assigned, the location of the arrest, the "Top Charge," the complaint number, a recitation of the facts in the complaint, the home address given, the arrestee's phone number, and a summary of the personal information given in the CJA interview.

In *R.C. v. City of New York*, it was alleged that "in the three-year period between 2014 and 2016, the NYPD collected and catalogued information from records of over 400,000 arrests that are required to be sealed under Section 160.50 alone."[1222] It was further alleged that "more than 330,000 of those arrests were of Black and Latino people."[1223] Many, if not most of these records involved misdemeanor or lesser charges which did not result in a conviction if not outright exoneration. In response, the Department argued that the statute permitted internal use of its own records; it was claimed that the statute's sole prohibition was against disclosure to third parties. In denying the City's motion to dismiss, Judge Alexander Tisch rejected that argument and held that the complaint's allegation against "NYPD's own use of sealed arrest information . . . sufficiently alleges a statutory violation . . . ."[1224] On September 27, 2021, Judge Lyle Frank granted a motion for a preliminary injunction ordering that "NYPD personnel may not access sealed arrest information without a court order" and that there must be a "cessation of use of sealed records for investigatory purpose unless an unsealing order has been obtained from a Court of competent jurisdiction or an exception to the sealing statutes applies."[1225] The Respondents had until April 1, 2022 to comply with the Order.[1226] Since then, the parties are negotiating "a plan to comply with this order . . . ." And filing of a Note of Issue was delayed to July 15, 2022.[1227]

---

[1221] Notwithstanding an assertion of the *Miranda* right to remain silent or a request to see an attorney, arrestees are required to answer personal questions put by a CJA interviewer before counsel is assigned if they want the agency to make a bail/release recommendation to the court. A refusal to answer personal questions can be cause for a prosecutor to recommend or a court to order confinement without bail.

[1222] *R.C.*, Index 153739/2018, NYSCEF Doc. No. 2, at 2.

[1223] *Id.* at 5.

[1224] *R.C.* at 379.

[1225] *R.C.*, Index 153739/2018, NYSCEF Doc No. 200, at 4.

[1226] NYSCEF Doc. No. 208

[1227] NYSCEF Doc. No. 210.

Plaintiffs in *R.C.* have indicated, by way of letter-memorandum to the court that they are amenable to use of de-identified sealed records by DAO, IAB, and CCRB. There is difficulty in describing de-identified records and in assessing their utility.[1228]

Further exacerbating difficulties that CCRB has in obtaining information necessary to an investigation, the Department of Law has taken the position in R.C. that NYPD should be permitted to look at sealed records when making disciplinary decisions, but at the same time, opposes availability of sealed records to CCRB.[1229] The trial court issued an order implementing a Preliminary Injunction Order which adopted the plan proposed by plaintiffs.

On June 6, 2024, the Appellate Division reversed and vacated the preliminary injunction. The Court held that the decision was premature and overbroad.[1230] On remand, the Appellate Court required a "detailed fact-finding" with relief to be confined to remedying violations of the sealing statutes.

In particular, the Appellate Division found the requirement that files be "de-identified" (redacting identifying information of arrestees) prior to use in disciplinary proceedings was not necessary. "Plaintiffs sought an order prohibiting the NYPD from providing its personnel with access to sealed arrest information for law enforcement purpose." The relief granted in the injunction went beyond. The lower court "lacked the authority to order a plan that addresses what other purposes the sealed records can be used for, such as . . . accessing sealed records to address officer misconduct."

Not discussed in the opinion is the question of CCRB access to the same records. It would be an unfortunate outcome of the litigation if access were limited to the Department without disclosure to CCRB.

CCRB has reported that when investigating complaints of police misconduct, it frequently encounters significant obstacles in obtaining necessary information in the possession of NYPD that is otherwise sealed. This makes necessary reviews of BWC videos doubly difficult since IAB must first review the videos to mask or redact images of witnesses in cases where witnesses to, or participants in, an encounter were arrested but subsequently had their case dismissed or prosecution was declined. Section 160.50 does permit a complainant to sign a waiver permitting CCRB access to sealed materials in NYPD's possession, but in the many cases where persons other than the complainant had their records sealed or may in the future have them sealed, obtaining waivers is not easily accomplished. As noted in CCRB's recent report on BWC usage in investigations,[1231] "[w]hile the CCRB hopes that the BWC MOU and its adoption of verbal and written waiver/consent procedures will largely alleviate issues associated with obtaining BWC footage related to sealed cases, investigating these cases without the improved level of review

---

[1228] NYSCEF Doc. No. 214 (May 20, 2022), at 7.

[1229] Letter/Correspondence to Judge. NYSCEF Doc. No. 273 at 3.

[1230] *R.C. v. City of New York*, 2024 N.Y. App. Div. LEXIS 3062 (1st Dep't 2024).

[1231] "Strengthening Accountability: The Impact of the NYPD's Body-Worn Camera Program on CCRB Investigations," Feb. 2020, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/20 200227_BWCReport.pdf.

provided by BWC footage would be a disservice to both the complainants and officers involved."[1232]

The purpose of Section 160.50 was not to prohibit an examination of misconduct by an officer after a wrongful arrest. Rather, "the Legislature's objective in enacting CPL §160.50 . . . was to ensure that the protections provided be consistent with the presumption of innocence, which simply means that no individual should suffer adverse consequences merely on the basis of an accusation, unless the charges were ultimately sustained in a court of law . . . . Indeed, the over-all scheme of the enactments demonstrates that the legislative objective was to remove any stigma."[1233] When the NYPD denies access to sealed records in a CCRB investigation of misconduct by an officer, the Department is not protecting the innocent civilian, who in many cases, ironically, may be the victim, complainant, or witness to police misconduct. The Department is not preventing "stigmatization" of the civilian and is not preserving the witness' presumption of innocence.

The Patrol Guide directive in PG 211-14 to IAB to withhold information turned the civilian's right to sealing into a shield against investigation of the officer of the violations which may have led to the civilian's voided arrest or prosecution. Arrests that are voided and dismissed are the very cases where the officer's conduct should undergo heightened scrutiny. Protecting the officer who makes a bad arrest was not the intent of the Legislature in enacting CPL 160.50 or of the plaintiffs who sought to protect the presumption of innocence in *R.C. v. City of New York*.

The Court of Appeals has recognized exceptions to CPL §160.50 in the case of attorney disciplinary proceedings,[1234] and in the case of judicial disciplinary proceedings.[1235] In both cases, the Court recognized that the statute was not "absolute." Access might be granted to preserve "inherent authority over records and disciplinary powers." More importantly, access was granted in *Matter of Dondi* and *Matter of NYS Commission on Judicial Conduct v. Rubenstein* despite the fact that the subject of the investigation objected to use of the sealed materials against himself because he had received a favorable termination in a criminal case. Here, in CCRB investigations of the officer, not the arrestee, the facts are inapposite. The wrongfully arrested civilian is not suing to cloak the matter and the statute is not invoked to protect the civilian against future misuse or adverse consequences. Where the civilian who received the favorable termination is not connected to the subject of the investigation, the rationale for going beyond the literal language of the statute to allow use in a disciplinary proceeding is even stronger than that in *Dondi* and *Rubenstein*.

In a case where unsealing was sought by the NY State Police to investigate a disciplinary matter involving a Trooper, the Appellate Division, Third Department wrote,

> There is no question that County Court had inherent authority to unseal the criminal
> records upon a showing that the material was essential to petitioner's investigation

---

[1232] *Id.* at 11.

[1233] *People v. Patterson*, 78 N.Y.2d 711, 716 (1991).

[1234] *Matter of Dondi*, 63 N.Y.2d 331 (1984).

[1235] *Matter of NYS Commission on Judicial Conduct v. Rubenstein*, 23 N.Y.3d 570 (2014).

and prosecution of the disciplinary charges against respondent.  Nonetheless, such authority "should be exercised rarely and only in extraordinary circumstances. Notably, such discretionary power may not be invoked in the absence of a compelling demonstration, by affirmation, that without an unsealing of criminal records, the ends of protecting the public through investigation and possible discipline of [a police officer] cannot be accomplished."[1236]

In that case, the court held that there was an insufficient demonstration of need supported only by "conclusory allegations."  However, in dicta, the court opined that evidence material to the investigation could be unsealed if necessary witnesses were unavailable.

The statute does not create a broad, substantive, privacy right to be enforced in the abstract.[1237]  Generally, by enacting CPL §160.50, the Legislature sought to afford "protection to the accused in pursuit of employment, education, professional licensing and insurance opportunities."[1238]  Thus, NYPD should not vicariously assert a privacy interest on behalf of a citizen witness to protect the misconduct of a third person.  To its credit, NYPD made this very argument before Judge Tisch, but lost.

To be sure, the statute creates a permissible private right of action to guard against the "**risk** of public disclosure."[1239]  But CCRB and IAB investigations are internal personnel actions which prevent public disclosure.[1240]  NYPD and CCRB can ensure that the record of any criminal proceeding that was favorably terminated will be sealed or redacted against any public disclosure beyond that needed internally for investigation of a complaint.  CCRB currently redacts identifying information of witnesses and victims in its public reports and can continue to do so.

The only exception should be in the rare case where the officer who is the subject of the misconduct investigation is also the same person who was criminally charged and subsequently acquitted.  In that case, the Department is not entitled to unseal the criminal court record.[1241]  That is because, in that instance, the Department is acting as a public employer and not as an investigatory body and the statute's purpose, to protect against adverse employment consequences, is fulfilled by sealing.  This is not the case when the sealed record is of an arrest of someone other than an officer facing a misconduct charge.

As argued by the City in *R.C. v. City of NY,*

[W]hen a police officer is investigated for performing an improper arrest, the police officer is not the individual who was intended to be protected by §160.50, and there

---

[1236] *NY State Police v. Charles Q,* 192 A.D.2d 142, 145 (3d Dep't 1993), *aff'd* on other grounds, 85 N.Y.2d 571 (1995) (internal citations and quotation marks omitted.)

[1237] *People v. Patterson,* 78 N.Y.2d 711 (1991).

[1238] *Grandal v. City of NY,* 966 F. Supp. 197 (S.D.N.Y. 1997, J. Scheindlin) (internal citation omitted).

[1239] *Lino v. City of New York,* 101 A.D.3d 552 (1st Dep't 2012) (emphasis in the original).

[1240] *Hughes, Hubbard & Reed v. CCRB,* 171 A.D.3d 1064 (2d Dep't 2019); *People v. Chimborazo,* CR-007578-23BX (Crim. Ct. Bx. Cnty. Oct. 17, 2023).

[1241] *NYS Police v. Charles Q,* 85 N.Y.2d 571 (1995).

is virtually zero chance that the individual who is intended to be protected by the statute – the arrested member of the public who has not been convicted – will be stigmatized by the police department investigating the arresting officer's conduct.[1242]

Unfortunately, the Court in *R.C. v. City of NY* rejected the City's argument by reference to *Lino* (a case where arrestees with favorable terminations faced a risk of stigma) and *Charles Q.* (a case where the officer sought to protect himself from stigma and adverse consequences following an acquittal).[1243]  The Court extended the reasoning in those cases to disciplinary inquiries into police misconduct, where stigma of, or adverse consequences to, the wrongfully accused civilian is not an issue.  The Court invoked the "clear language" of the statute, while, in fact the statute does not directly address this situation, as reason to avoid looking at the statute's history and purpose – to protect against adverse consequences which might be visited upon an arrestee.[1244]  The purpose of the sealing statute is to preserve anonymity for the wrongfully accused defendant, not to shroud the officer's misconduct in darkness.

Ironically, if not perversely, the extension by the court in *R.C. v. City of NY* of sealing provisions to protect the arresting officer's misconduct went even beyond the relief sought by the Plaintiffs.  In response to the City's motion to dismiss on the grounds that internal use of sealed matters was necessary for disciplinary investigations, Plaintiff's argued,

> [M]ost of Defendants' hypotheticals [citing a need for use in disciplinary proceedings] concern the use of sealed records in the context of public safety or internal officer discipline matters that have nothing to do with the use of sealed records in the course of routine investigations at issue here.  The issue on this motion is the internal use and disclosure of sealed records, which results in the stigmatization and further scrutiny of individuals whose records should be sealed.[1245]

The City has appealed the ruling in *R.C. v. City of NY*, and while the case continues, Patrol Guide 211-14 remains in place.[1246]  The Court denied a Motion to Dismiss made by the City.  The Court also enjoined the City to the extent the "the defendants [are] to abide by the sealing statutes as such statutes have been interpreted through relevant case law."[1247]  It is unclear whether NYPD continues to utilize CPL 160.50 material in internal disciplinary investigations.

When asked in a recent court filing, the City has sought to distinguish "official records and papers," which are sealed under the statute[1248] from "information" which may be derived from

---

[1242] 64 Misc. 3d 368 (Sup. Ct. N.Y. County, 2019) (NYSCEF Index No. 153739/2018, Doc. No. 38 at 16).

[1243] *R.C. v. City of New York*, 64 Misc. 3d 368, 375–76 (Sup. Ct. N.Y. County, 2019).

[1244] *Id.* at 375.

[1245] Index No. 153739/2018, NYSCEF Doc. No. 41 at 28.

[1246] Index No. 153739/2018, NYSCEF Doc. No. 294.

[1247] *Id.* Doc. No. 200 (Sept. 27, 2021).

[1248] CPL 160.50 (1)(c).

independent of the records.[1249]  It is difficult to understand a position which would permit reading, copying, using, and distributing information about a favorably terminated prosecution when the statute calls for sealing of all the records regarding the arrest and prosecution.

More recently, the City proposed a "Preliminary Injunction Compliance Plan."[1250]  The Plan limits use of sealed records "for investigatory purposes."  Access will be available for "non-investigatory functions, such as internal oversight and police officer accountability."[1251]  Under this Plan, if approved by the Court, IAB will have access to sealed records when the investigation does not "involve suspicion of criminal activity."[1252]  IAB should, under the Plan, be able to fully investigate misconduct allegations notwithstanding CPL 160.50.

Plaintiffs expressed concern that overlap may occur when a supervising officer uses records for "oversight and accountability" but then continues to have the records available for criminal investigations. [1253]  Plaintiff have agreed to a directive that the Department "will limit access to sealed records solely to personnel whose assignments have a statutory exception under the law or require access to perform non-investigatory functions."[1254]

Along that line, Plaintiffs have agreed to allow "De-Identified Sealed Records" for "police oversight and accountability purposes."  Those are records "from which the name, date of birth, address, NYSID, and any other unique identifiers that can be used to connect the records to an individual are removed.  The final implementation plan should define the personnel who will be given such access. . . ."[1255]

In the interim, the Court has approved issuance of a "Finest Message" to be sent to all officers by the Deputy Commissioner, Legal Matters advising them that "sealed records may not be used for investigatory purposes" without a court order.[1256]

An important omission in the proposed resolution is access by CCRB and the APU.  As of this writing it is unknown if CCRB or APU will have similar access for misconduct investigations.[1257]

Some IAB investigations look into misconduct along with criminal activity.  How cases of potential mixed purpose will be handled is an open question.  Importantly, however, if CCRB and NYPD are to have a meaningful exchange of disciplinary recommendations and a mutual

---

[1249] *R.C. v. City of NY*, NYSCEF Doc. No. 187 at 11.

[1250] NYSCEF Doc. No. 215 (May 20, 2022).

[1251] *Id*. at 8.

[1252] *Id*. at 9.

[1253] Letter/Correspondence to Judge, Doc No. 214 (May 20, 2022).

[1254] Plaintiffs' Proposed Edits to Defendants' FINEST MESSAGE Proposal, Draft 5.9.2022, NYSCEF Doc. No. 217.

[1255] Plaintiffs' Modifications to Defendants' Proposed Plan, Exhibit A, NYSCEF Doc. No. 2115 (May 20, 2022).

[1256] Decision + Order on Motion, Doc. No. 233 (July 27, 2022).

[1257] Neither Corporation Counsel nor CCRB have responded to inquiries about the impact of the court's order upon access to records by CCRB.

understanding of misconduct allegations, they both should have equal access to information needed for that purpose.  To the extent that IAB or DAO continue to look at information derived from events where the record was sealed by § 160.50, that same information should be available to CCRB.

It may be that a compromise will be accepted and implemented.  It may also follow that the statute itself will be modified.  In the "Collaborative Plan" submitted by the City to the Governor declared that the City "supports a State law change that would broaden access to sealed records for specified entities, including CCRB, charged with investigating police misconduct, especially biased-policing investigations."[1258]  As of June 12, 2023, a proposed order is under consideration by the parties and the Court that permits access to "De-identified" records (personal address, social security, etc.) "for the purposes of assessing the lawfulness of officer conduct or investigating officer misconduct."  The order does not mention access by CCRB. [1259]

**Update**:  On June 6, 2024, the Appellate Division reversed and vacated the preliminary injunction.  *R.C. v. City of New York*, 2024 N.Y. App. Div. LEXIS 3062 (1st Dep't 2024).  The Court held that the decision was premature and overbroad.  On remand, the Appellate Court required a "detailed fact-finding" with relief to be confined to remedying violations of the sealing statutes.

In particular, the Appellate Court found the requirement that files be "de-identified" (redacting identifying information of arrestees) prior to use in disciplinary proceedings was not necessary.  "Plaintiffs sought an order prohibiting the NYPD from providing its personnel with access to sealed arrest information for law enforcement purpose."  The relief granted in the injunction went beyond.  The lower court "lacked the authority to order a plan that addresses what other purposes the sealed records can be used for, such as . . . accessing sealed records to address officer misconduct."

Not discussed in the opinion is the question of CCRB access to the same records. It would be an unfortunate outcome of the litigation if access were limited to the Department without disclosure to CCRB.

### N.    Access to Sealed or Expunged Substantiated Disciplinary Cases

The Patrol Guide sets forth a process by which disciplinary charges against an officer may be sealed or expunged from the member's CPI, the DAO's Disciplinary Record System database, the Command Discipline Log and the Citywide Command Discipline System.[1260]  The records, once sealed or expunged, are not available to CCRB panels or APU, as well as to Departmental personnel, including Trial Commissioners.

Disciplinary history is reviewed in several settings and in each setting, there is no good reason for blindfolding substantiated misconduct.  For example, the Command Discipline Log is

---

[1258] NYC Police Reform and Reinvention Collaborative Plan at 8. Adopted by the City Council Mar. 25, 2021, Intro. Res. 1584/2021.  *See* Assembly Bill 370, Senate Bill 6267, awaiting a home rule message from the City.

[1259] Doc. No. 306.

[1260] Patrol Guide §§ 206-02, 206-14, 206-15.  Now Administrative Guide § 318-02.

examined as part of the performance evaluation process.[1261] In the event of a new allegation of misconduct, the CO is required to "consider" the subject officer's disciplinary history over the previous 12 months.[1262]

Schedule A command discipline records are automatically removed from an officer's personnel files and destroyed on the first anniversary date if the officer has no subsequent disciplinary record within that year.[1263] Otherwise, destruction is delayed until the officer has completed a full year without a "subsequent disciplinary violation." The Guide is not clear as to what qualifies as a subsequent disciplinary violation. If formal discipline is intended, then expungement will be automatic unless Charges are brought for a new offense in the year following the A-CD.[1264]

Schedule B command discipline may be sealed in the officer's CPI. To do so, the member must prepare a formal request to the commanding officer on the third anniversary from the date the command discipline was issued. The commanding officer is required to expunge the disciplinary record from the member's command folder, endorse the original request, and forward it to the Human Capital Division, so long as there have been no additional violations. If there have been additional Schedule B disciplines or Charges and Specifications, the member can resubmit a request three years after the disposition of the most recent disciplinary violation.[1265]

Any M or C cases which result in a final disposition of exoneration or unfounded are also sealed in the member's CPI; however, such records remain available to IAB, the Legal Bureau, and the Employee Assistance Unit for limited purposes.[1266] For example, the records can be used for statistical evaluations and internal investigations.[1267] The Patrol Guide does not specify what records are kept of unsubstantiated profiling allegations.

Once records of substantiated B-CD offenses or unfounded/exonerated M or C cases have been sealed, the information is "suppressed" whenever background inquiry is made, including promotion and transfer requests.[1268]

When an officer has had Charges and Specifications lodged against him or her which resulted in a "Not Guilty" determination, the member can prepare a request to seal the charges no sooner than two years following a final decision by the Police Commissioner after trial. The

---

[1261] Patrol Guide § 205-48; AG § 329-09.

[1262] Patrol Guide § 206-02.

[1263] Patrol Guide § 206-02.

[1264] *Id*. The Guide also directs removal and destruction of all unsubstantiated command disciplines from the Command Discipline Log kept at the precinct by the Commanding Officer and the Integrity Control Officer, but not until the anniversary date. The record of a precinct investigation by the ICO or CO in a logbook, but not a digital database, is kept at the precinct and destroyed after one year.

[1265] Patrol Guide § 206-14. Now Administrative Guide § 318.12.

[1266] *Id*.

[1267] *Id*.

[1268] *Id*.

commanding officer then reviews the request and makes a sealing recommendation to the Police Commissioner. The Deputy Commissioner and DAO also review the request and make their own recommendations as to sealing. If the Police Commissioner approves the sealing request, he forwards it to the commanding officer and DAO.[1269]

After approval, Charges are sealed in the CPI, the DAO Disciplinary Record System database, and "any other folder/files where disciplinary charges are maintained." As well, the disciplinary record is "deleted" from folders and files maintained in command.[1270] Once a record is sealed it may not be referred to when a member is being promoted, transferred or being considered for a detail assignment, but DAO may keep copies for "informational purposes as necessary."

While Charges which resulted in a "Not Guilty" determination generally require the Police Commissioner's approval prior to sealing, the Patrol Guide requires DAO to prepare a dismissal memorandum which will ensure that sealing will occur if the dismissal occurred because: (a) a violation did not occur; or (b) the charges were based on mistaken identification.[1271]

The question arises as to what consequence or record is kept in a case where the CCRB has substantiated an allegation of misconduct, but the Police Commissioner determines that no disciplinary action should be taken. CCRB retains the record as substantiated by the Board with a notation regarding subsequent action by the Department. The practice was challenged in 2006 by an officer who sought a court order directing CCRB to expunge certain findings in its records. CCRB had substantiated two complaints against the officer: excessive force and abuse of authority. The Police Commissioner ordered no disciplinary action for the excessive force complaint but ordered Training for the abuse complaint. The Appellate Division denied the request to expunge CCRB's records. It held that "this is a matter within the discretion of the Police Commissioner. The determination as to whether a substantiated CCRB complaint should be expunged or retained, and if retained, whether it should be utilized in personnel decisions, are policy matters entailing the exercise of the Police Commissioner's discretion."[1272]

Whether records are sealed or expunged and whether done automatically or in the Police Commissioner's discretion, the records should still be available to CCRB and should, in the discretion of CCRB, be taken into consideration by CCRB panels when appropriate. This is especially true for substantiated wrongdoing. Substantiated A-CDs, B-CDs and Charges as recent as one to three years old can play a significant role in penalty recommendations now that the Department has agreed to the concept of progressive discipline in applying the Disciplinary Guidelines. Aside from penalty assessments, there is no question that prior findings may play a significant role in deciding whether to substantiate an allegation. One can argue, as discussed

---

[1269] Patrol Guide § 206-15. Now Administrative Guide § 318.12.

[1270] *Id.*

[1271] *Id*.

[1272] *Matter of* ████ *v. CCRB*, 30 A.D.3d 201 (1st Dep't 2006). Discussion at 12 City Law 104, available at https://advance.lexis.com/document/teaserdocument/?pdmfid=1000516&crid=1f2d81eb-725c-445e-824a-ce577cac1008&pddocfullpath=%2Fshared%2Fdocument%2Fanalytical-materials%2Furn%3AcontentItem%3A4M9G-WVY0-00CV-400T-00000-00&pdcomponentid=156233&ecomp=rzhdk&earg=sr0&prid=2236e23c-c51a-4eed-a7a0-aea82ae88f80.

below, whether unsubstantiated misconduct should be considered even when pertinent and material. Due process plays a role in deciding whether unfounded or exonerated allegations should be looked at when a new charge arises, but it is hard to understand why the same principle should apply to prior substantiated misconduct.

Recently the Monitor team put to the Department the proposition that,

"The CCRB should obtain a complete record of any prior disciplinary actions by the Department including disciplinary probation, whether or not the prior investigation came through CCRB. This may include PEPR, CRAFT or CORD reports as well. This should include prior discipline which came through Command, FID, DAO, BIU, IAB, DCT or OCD."

The response was,

"[A]bsolutely not. It's not relevant to their determination, runs counter to the goals of discipline, management of a command, established policy, collective bargaining and due process. For the more serious or non-technical 206-03 violations, these generally go through DAO. If there are specific examples, I'm happy to discuss.

"Section 8 of the collective bargaining agreements applies to sealing certain schedule "A" CD incidents. This is still being litigated in the UFOA case and there is pending action re the TRO. The city has taken the position that such "A" CDs for technical violations, as that term is defined in the Public Officers' Law, should not be disclosed but that others (CCRB FADOs) could be published."[1273]

There are a few problems with this response:

- Prior misconduct is of value in many cases where motive, intent, mistake, identity or participation in an overall scheme or plan is at issue. The Disciplinary Guidelines look at good faith, mistake, lack of intent, not only in assessing guilt but also in mitigating penalties. If CCRB is to apply the Matrix, it must have a complete record of prior misconduct.
- Prior misconduct is of value in weighing credibility. As observed by Judge Scheindlin, many cases come down to a swearing contest between the officer and the complainant. Prior misconduct of any kind tends to show that the officer is willing to put his interests ahead of his duties, and more so if the prior misconduct tended to show that the officer was untruthful, misleading, lacking in candor, or outright lying, in previous interviews. The Guidelines mitigate cases where the officer is forthcoming. This cannot be assessed without a full record of prior explanations or excuses for similar misconduct, which, if successful, tend to be repeated.
- Respectfully, but contrary to the response, the "goals of discipline" are not advanced by covering up prior proven misconduct. Even more so if one subscribes to the promise of progressive discipline as the Department intends.

---

[1273] Email exchange, Monitor Team and Matthew Pontillo, Assistant Chief and Commanding Officer, Office of the First Deputy Commissioner (Mar. 18, 2021).

- Section 8 of the collective bargaining agreement says nothing about CCRB use of prior substantiated misconduct or of sealing substantiated cases. It applies only to cases which were not substantiated and provides,

  > Where an employee has been charged with a "Schedule A" violation . . . and such case is heard in the Trial Room and disposition of the charge at trial or on review or appeal therefrom is other than "guilty", the employee concerned may, after 2 years from such disposition, petition the Police Commissioner for a review for the purpose of expunging the record of the case.[1274]

- The City's litigation posture in *UFOA* has nothing to do with CCRB access to records of prior misconduct. That case revolves around public access through FOIL under the Public Officers Law. The Public Officers Law permits the Department to withhold from FOIL demands by the public for minor technical infractions in a disciplinary history. It says nothing about disclosure to CCRB or CCRB's use of the information. In any event, since A-CD is a common disposition for SQF misconduct, it is critical that FADO findings (not derived from CCRB investigations) and OMN findings such as stop report failures and BWC infractions, be fully disclosed to CCRB.
- The City advised the Court in *UFOA* that the CBA did not prevent the use of sealed information in future investigations. "It is the City's position that discretionary removal from the officer's personnel file [under the CBA] does not create an entitlement to remove the investigative reports or the actual complaint and allegation from [NYPD's or CCRB's] own records in toto, much less from the public domain."[1275]
- The letter response cites a contract provision which expunges findings "other than guilty." That has nothing to do with sealing or expungement of substantiated A-CD's.

In a closely parallel, but not identical situation, former Commissioner Shea wrote an Op-Ed piece in the New York Daily News complaining about sealing of records.[1276] He contended that records of acquittals or dismissals lodged against innocent civilians should be available for use by detectives as they investigate a new case. He argued that sealed, "records could become completely invisible to police. We wouldn't even be able to know they exist. We would be meeting 'the perpetual first offender' because NYPD's own records . . . will not show up in our systems."[1277]

Even though the Police Commissioner was talking only about cases where arrestees were found not guilty, nonetheless he saw the value in looking at records of prior dismissals. Here, the

---

[1274] Collective Bargaining Agreement, Art XVI, § 7, available at *UFO v. de Blasio*, 20 Civ. 5441 (S.D.N.Y. Sept. 4, 2020), ECF Doc. No. 220, at 21.

[1275] *UFO v. de Blasio*, 20 Civ. 5441 (S.D.N.Y. Sept. 4, 2020), ECF Doc. No. 220, at 21.

[1276] Writing in reference to the *R.C.* case.

[1277] Dermot Shea, "Don't Put Blindfolds on NYPD's Cops," NY Daily News (Sept. 27, 2021), available at https://www.nydailynews.com/opinion/ny-oped-making-cops-work-blindfolded-20210927-oh4zbh3wtfeadalaf4475iwdii-story.html.

281

case against sealing, and the need to lift the blindfold, is more compelling, since the records that become "invisible" under the Patrol Guide are records of substantiated misconduct.

The recently adopted Disciplinary Guidelines promise progressive discipline when an officer has a history of misconduct. Histories will be used to elevate penalties dependent upon the seriousness of the prior substantiated misconduct and the length of intervening time. Some prior events will be considered in perpetuity. Remembering that a large number of FADO investigations are accomplished by IAB or BIU, all FADO findings within the Department should be made available to CCRB in calculating discipline for any new FADO finding by the Board. Also, if a prior finding of excessive force, profiling, false statements, intentional refusal to take a complaint or file a report, failure to supervise, or any of a myriad of substantiated misconduct related to FADO, was previously found by IAB or BIU, that is necessary information for CCRB since each of those findings of wrongful public interaction are material to CCRB's understanding of a new citizen complaint.

### O.    Unsubstantiated Findings - the "Sole Basis" Rule

The Charter directs, "nor shall prior unsubstantiated, unfounded or withdrawn complaints **be the basis** for any . . . finding or recommendation."[1278] A good argument could be made that the language in the Charter may be overbroad in that prior complaints, especially unsubstantiated cases where evidence is equivocal, should not be disregarded.

Far and away the most common finding by CCRB is that an allegation was "unsubstantiated." A review of all findings by CCRB from 2010 through 2019 found that 8,775 of 17,325 (50.6%) complaints went unsubstantiated.[1279]

The substantiation rate for Stop, Question, Frisk, and Search of Person allegations is very low. From 2014 through 2019, of 5,581 SQF allegations that were fully investigated, i.e., not withdrawn, truncated, or mediated, only 1,424 (25.5%) were substantiated. 2,062 (36.9%) went unfounded or exonerated. In 2,095 of the 5,581 (37.5%) the available evidence was mixed and ended up being unsubstantiated.

The Charter language is broad and includes in its sweep cases which are "withdrawn" along with unsubstantiated cases. "Withdrawn" includes truncations and mediations. How many prior complaints are excluded from consideration by the Charter when a new complaint is filed? If all cases, other than those that are substantiated are deemed to be beyond consideration by CCRB, we have the following for the three-year period 2017 to 2019:

A sum of 12,878 FADO complaints were "closed:"[1280]

---

[1278] Charter 440(c)(1) (emphasis added).

[1279] David Cruz, *Why the Majority of NYPD Misconduct Complaints End up 'Unsubstantiated*, THE GOTHAMIST (Aug. 18, 2020). *See also* CCRB 2018 Statistical Appendix, indicating that from 2014–2018, 93% of 23,079 closed complaints went without substantiation. This includes cases that were "unfounded," "withdrawn," "closed pending litigation," of not fully investigated.

[1280] The number here is of complaints, not allegations.

- 1,827 unsubstantiated
- 309 unfounded
- 796 exonerated
- 623 mediated
- 684 attempt mediation
- 7,475 truncations
- 310 officer unidentified

Of the total of 12,878 cases, 12,024 were closed without substantiation, which, if the Charter is mechanically applied, cannot be "the basis" for any new findings.

This would imply that 93% of past FADO complaints which, after screening, sufficiently allege wrongdoing by a uniformed officer to justify retention by CCRB, cannot be taken into account or considered in the future whenever a new complaint is brought against the same officer. Some of those cases might well contain useful information, leads, or warnings about precinct problems or patterns of misconduct - either individually or within a squad. Turning a blind eye to the past is illogical and contrary to investigations conducted in any other context, whether it be in civil proceedings, administrative proceedings, criminal proceedings, or even in internal organizational handling of complaints.

If an officer has a lengthy history of force, threat or retaliation cases that are truncated, is it wise to ignore that history when a new charge of threat or retaliation is levelled? If an officer avoids discipline on multiple cases upon a claim of good faith mistake of law, should that history be considered or re-examined if, upon a new charge, he again claims a similar "mistake?" If an officer, time and again, is excused for seizing the wrong person by mistake, does there come a point in time when one can question his claim of good faith mistaken identification? How many times may a similar mistake be made without questioning the sincerity of the claim? If several officers have a history of unsubstantiated complaints where they had been joined as subjects, should their history of concerted action be considered even if not substantiated? Cases have been cited in this Report where the same two officers have been accused of similar misconduct on more than one occasion when acting together. Should that be considered if the joint conduct is alleged to repeat itself? It is not uncommon for an officer, during an inquiry, to say he did not see or was unaware of the actions of a fellow officer at the time. That is reasonable and plausible, but does it remain so as an excuse if ventured repeatedly?

For the moment, putting aside exonerations, truncations and unfounded cases, a necessary question to be asked is, "Should a series of unsubstantiated complaints against an officer be disregarded in all circumstances?" Remembering that an unsubstantiation often means there was evidence linking the officer to misconduct, but that the evidence is equivocal or short of convincing, is the evidence in every such case meaningless when weighing a new charge against the same officer? Or when considering his disciplinary history, his credibility, or an asserted defense? Is there a good faith basis for opening the file?[1281]

---

[1281] Unsubstantiated findings must be disclosed in criminal proceedings for use as impeachment, *Giglio* or *Molineux* material. *See People v. Alvia*, 2022 NY Misc. LEXIS 3212 (Bx. Crim. Ct. Aug. 1, 2022) ("This Court and many

In 2018, the Board sensibly amended Rule 1-33(a) to permit a look into prior cases by adding the words "sole" to the existing regulation that had been patterned after the Charter.

> (a) Pursuant to Chapter 18-A § 440(c)(1) of the New York City Charter, no finding or recommendation shall be based solely upon an unsworn complaint or statement, nor shall prior unsubstantiated, unfounded or withdrawn complains be the **sole** basis for any such finding or recommendation."

The intent was to look at a prior case "if it has special relevance, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[1282]  Obviously a history of allegations, in and of itself, is insufficient to justify a new finding - and the regulation acknowledged that self-evident truth.

CCRB's approach in drafting the new Rule was ham-handed in that it sought to deal with unsubstantiated, unfounded, and withdrawn complaints as one grouping, without acknowledging that each category might require an individualized and more discerning approach.  Simply inserting the word "sole" into a regulation that otherwise parroted the Charter, left the amendment wide open to claims of unsupported alteration of the Charter and potential abuse, which is exactly what the PBA presented in a court challenge.[1283]

The NYCLU, in an *amicus* filing, joined the PBA in objecting to the amendment,

> This is an area ripe for nuanced treatment, depending on the circumstances presented.  For example, prior uncontested parts of unsubstantiated or unfounded complaints could properly be considered in a current investigation without undermining the rights of the accused.  Similarly, the fact of prior false statements by a police officer in an unfounded case could be considered in evaluating the same officers' testimony in an open case. . . . By amending this rule with a single word, the CCRB has elided important distinctions between the three dispositions that it governs, as well as the very different consideration that should apply to different types of information drawn from past complaints.  This broad-bus approach risks violating officers' right to due process.  This Court should construe Rule § 1-33 more narrowly in order to avoid this Constitutional concern.[1284]

---

others have explained that the statute's [Article 240 of the CPL] command includes 'unsubstantiated' allegations – a technical term that simply means no factual determination was made.") (citing, e.g., *People v. Spaulding*, 75 Misc. 3d 1219[A], 2022 NY Slip Op 50544[U] at *2 [Crim. Ct. Bronx County 2022] [Licitra, J.]; *People v. Martinez*, 168 N.Y.S.3d 679, 75 Misc. 3d 1212[A], 2022 NY Slip Op 50476[U] [Crim. Ct., NY County 2022] [Rosenthal, J.]; *People v. Edwards*, 74 Misc. 3d 433, 160 N.Y.S.3d 532 [Crim. Ct., NY County 2021] [Weiner, J.]; *People v. Barralaga*, 73 Misc. 3d 510, 153 N.Y.S.3d 808 [Crim. Ct., NY County 2021] [McDonnell, J.]; *People v. Kelly*, 71 Misc. 3d 1202[A], 142 N.Y.S.3d 788, 2021 NY Slip Op 50264[U] [Crim. Ct., NY County 2021] [Gaffey, J .]; *People v. Perez*, 71 Misc. 3d 1214[A], 144 N.Y.S.3d 332, 2021 NY Slip Op 50374[U] [Crim. Ct., Bronx County 2021] [Johnson, J.]).)

[1282] *Lynch v. CCRB*, Memorandum of Law, Index 152235/2018, NYSCEF Doc. No. 58, at 25.

[1283] *Lynch*, *supra*.

[1284] *Lynch v. New York City Civilian Complaint Rv. Bd.*, Index 152235/2018, NYSCEF Doc. No. 68, at 26 (Aug. 2, 2018).

The lower court bypassed the invitation to narrowly construe the language, merely cherry-picking one portion of NYCLU's objection.  The court struck the amendment in its entirety on the grounds that it "puts officers' due process rights at risk" and "lacks the necessary detail to protect a Police Officers' due process rights."  Unfortunately, the Appellate Division agreed, but then took the argument one step further, finding the Charter contained a "directive that prior unsubstantiated complaints play no role in subsequent findings."[1285]  That clearly overstates the breadth of the Charter prohibition.

While the language in the appellate decision will be read by some to bar any future attempts to refine the language in the proposed regulation, absent amendment to the Charter, the issue is important enough that it should not continue unaddressed.  NYCLU's invitation to re-draft the revision with "nuanced treatment" should be accepted.

A string of similar unsubstantiated cases which demonstrate a pattern, a misapplication of the law, or prejudicial behavior can be useful in investigating misconduct.  It may also be used to help identify an officer.  For one, CCRB could attempt to distinguish unsubstantiated cases from those that are unfounded or exonerated.

As found by federal District Court Judge Raymond Dearie,

The inadequacy of the investigations in this case is particularly relevant given the evidence [the Defendant] proffered showing that the NYPD routinely treats complaints that have not been substantiated as though the officer has been exonerated from any wrongdoing . . . a reasonable jury could find that a monitoring and disciplinary system that disregards any complaint or series of similar complaints because they are unsubstantiated does not demonstrate a 'meaningful attempt on the part of [the City] to . . . forestall further incidents,' and it may reasonably be inferred that such a system encourages similar excesses.[1286]

The well-known evidentiary rules in *People v. Molineux*,[1287] and FRE 404 should apply with equal force in disciplinary proceedings.  Motive, intent, scheme or plan, identity, opportunity, absence of mistake are all issues which commonly arise in disciplinary investigations.  When the issue is advanced, a close look at related allegations in the past deserve consideration.

In addition, prior misconduct that speaks to credibility or candor of a witness, needs to be taken into account in weighing current testimony when, as often happens in SQF cases, the matter comes down to one witness' word against another.  At training sessions with investigators, the Monitor team was advised that NYPD looks at prior misconduct of the complainant and looks at

---

[1285] *Lynch*, 18 A.D.3d 512, 517 (1st Dep't 2020).

[1286] *Jenkins v. City of NY*, 388 F. Supp. 3d 179, 193 (E.D.N.Y. 2019) (internal citation omitted).

[1287] 168 N.Y. 264 (1901).

whether the witness has a history of multiple claims against the police.[1288]  Why should a civilian's past be considered while an officer's past is ignored?[1289]

In a recent decision, *People v. Rouse*,[1290] the Court of Appeals reversed a conviction where the trial court had limited inquiry into prior matters in which the testifying police officers' credibility had been assailed.  The trial court had acknowledged the well-known rule that prior bad acts may be used to question credibility when they demonstrate an untruthful bent or a willingness to place advancement of self-interest ahead of principle or of the interests of society.  However, the lower court had denied use of prior negative assessments, claiming there was no "good faith basis" to use the negative priors, absent a formal charge or proof that the officer had previously been "administratively sanctioned," i.e., a substantiated charge by NYPD.  The Court of Appeals held that this was an abuse of discretion as a matter of law.  Instead of a prior administrative substantiation, all that was necessary to allow consideration of the prior misconduct in weighing credibility was "some reasonable basis" to support the inference.[1291]  The same rule should apply here as well.

In the context of SQF investigations, repeated and similar unsubstantiated allegations of misbehavior should be looked at in assessing respondents' defenses of "good faith" or "lack of intent" or "mistake" or "objective reasonableness."[1292]  It would defy logic for the Department to apply those principles to excuse or mitigate charges in its Disciplinary Guidelines, as it declares it will, without taking multiple prior misconduct allegations into account.  How many times can a person make the same good faith mistake?

As discussed later, the recently adopted Disciplinary System Penalty Guidelines (Matrix) mitigates penalties if the officer has had a "limited or lack of knowledge, training and experience . . . that is germane to the incident."  A history of complaints, interviews, litigation, and unsubstantiated investigations in cases of similar allegations or a pattern of misconduct should be just as relevant.

Examination of a series of related unsubstantiated cases would also be useful in identifying a wider pattern of misbehavior in a squad or precinct, including failures to supervise adequately.

---

[1288] IAB and BIU pull up the DAS report on victims which contains an entire history of prior police contacts including sealed events.

[1289] During litigation in *Mullins v. City of New York*, 634 F. Supp. 2d 373, n.56 (2009), the Court was advised that false statement allegations, while still open but not yet substantiated, may be considered by supervisors in the Department when the subject officer seeks a favorable transfer or promotion.

[1290] 34 N.Y.3d 269 (2019).

[1291] Unsubstantiated cases provide a good faith basis for further inquiry.  *People v. Randolph*, 69 Misc. 3d 770 (Suffolk Cty. Ct. 2020); *People v. Porter*, 71 Misc 3d 187 (Crim. Ct. Bx. Cty. 2020); *People v. McKinney*, 2021 NY Misc. LEXIS 2581 (Kings Cty. Crim. Ct. 2021).

[1292] *See, e.g.*, *People v. Rouse*, 34 N.Y.3d 269 (2019), permitting a good faith basis inquiry of law enforcement witnesses even where the officer was not administratively sanctioned.  *See also People v. Molineux*, 168 N.Y. 264 (1901) and FRE 404(b) which permits use of prior acts to prove: motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

In evaluating violations of Fourth and Fourteenth Amendment rights, the Department cannot turn a blind eye to misconduct claims merely because, on balance, they were unsubstantiated.

### i.    Two Case Studies - Case History with Little or No Substantiations

The following two case histories are just two out of many similar case studies. They are listed here to demonstrate the importance of recognizing patterns and problems in deciding the merits and the penalties in invoking disciplinary responses. This is not to be confused with "presumption of innocence" and our venerable requirement of "innocent unless or until proven guilty" in court. It is simply a common-sense look at lengthy histories which should be considered. As CCRB proposed in its amended regulation, the prior allegations cannot be the "sole basis" for a finding but could and should be considered under the "totality of the circumstances."

Deputy Inspector ████

On May 3, 2016, the commanding officer of the 60th Precinct, Deputy Inspector ████ ████, was on a vacation day. Nonetheless, while in an unmarked car and out of uniform, he pulled over a car with Pennsylvania license plates for an unsignaled left turn. He unlawfully frisked and searched the complainant, claiming that there were robberies in the area with drivers from out of state. No documents were submitted to support this assertion. CCRB substantiated the wrongful frisk and search and recommended a B-CD. CCRB was unable to substantiate claims of discourtesy, offensive language and refusal to identify, although the investigator did recognize a "clear pattern of discourteous and profane language."

DAO asked for reconsideration and recommended unsubstantiation, which CCRB declined. The Police Commissioner, in turn, set aside the substantiated misconduct and ordered "NDA."

DI ████ has a history of 26 CCRB complaints and 84 allegations. Some of the allegations ended by exoneration or an unfounded finding. 43 allegations were unsubstantiated and another 16 were withdrawn, either because a complainant was unavailable or the matter was closed pending litigation.

In all, four separate complaints (with eight allegations) ended with a substantiated finding. CCRB recommended discipline for all eight allegations. The Police Commissioner refused. In seven of the substantiated allegations, he ordered "NDA." He did order an A-CD for one substantiated allegation (retaliatory summons), but no penalty was imposed.

At the same time, DI ████ was named as a defendant in nine lawsuits. Six of the nine ended in settlements in the amounts of $165,000, $7,500, $7,500, $30,000, $9,000, and $25,000. The other three are still open. During the course of these events, he was promoted from Captain to Deputy Inspector in 2015 and then to Inspector in 2018.[1293]

---

[1293] ████████████████

Ten of the complaints against DI ███ alleged wrongful use of force, including a chokehold in one case. Discourtesy and slurs appeared with frequency in many of the CCRB complaints and lawsuits.

Remarkably, 11 of the CCRB complaints and four of the civil lawsuits all derived from incidents occurring in just 2016-2017. The CCRB investigator suggested there was a clear pattern of discourteous and profane language, but no pattern was investigated or found.

In sum, DI ███ retired completely without discipline or repercussion. The prospect that cases were decided with blindfolds, disallowing a formidable history from consideration when weighing close, unsubstantiated, cases or without being taken into account when pondering penalty, is sad commentary on a system that looks at cases one complaint at a time without context. As summed up by District Court Judge Dearie in a case where he rejected a plea by the City to disregard an officer's history in which "the overwhelming percentage of complaints [against the officer] were found to be unsubstantiated," citing "NYPD's flawed supervisory and disciplinary system," he wrote

> It suggests that unsubstantiated means exonerated and that the number of complaints, no matter how many, has no probative force and is of no concern. . . . Given the evidence before the Court, a reasonable factfinder could conclude that in [the officer's] case, the City chose not to conduct an investigation or meaningfully monitor his performance but instead chose to disregard a problem officer and invite his continued abuse.[1294]

PO ███

At the end of a career where he accrued 19 complaints filed at CCRB with 55 allegations of misconduct and no discipline imposed, when a complaint was finally substantiated on the 19th complaint (for an illegal stop, retaliatory arrest, and discourtesy), Officer ███████ retired and the case was "filed," again without discipline. His history is not particularly unusual but is cited here merely to give another example of repeated allegations which should have invited a more comprehensive analysis rather than viewing each incident in his past in isolation and ignoring cases that were unsubstantiated or withdrawn.

In November 2016, in the one case in his history that led to Charges and Specifications, Officer ███ and another officer (PO ███) approached a complainant who was sitting in a parked truck. They asked what he was doing in the area. He was frisked and searched. PO ███ searched the inside of the car and found a knife on the floor. The complainant was arrested for possession of a gravity knife. PO ███ claimed to have field tested the knife, but the video does not support that claim. The knife was not a gravity knife. No stop report was filed. Allegations of wrongful stop, vehicle search, improper arrest and discourtesy were substantiated against PO ███. ███ claimed he may have been doing administrative work that day, again, which was subsequently determined to be a false statement. Allegations of wrongful stop, frisk and search of

---

[1294] *Jenkins, supra* at 193.

person were substantiated against PO ███ as well. The board recommended Charges and Specifications for both officers.

The case was subject of a civil lawsuit, which resulted in a $17,500 settlement.

Complaints against PO ███ included nine excessive force allegations (including wrongful use of a baton, another with an unidentified "inanimate object"), refusal to obtain medical treatment, 24 allegations of illegal stops, frisks and searches, and seven complaints of discourtesy or slurs.

In 2015, CCRB did substantiate a stop complaint, but the Police Commissioner elected to DUP-NDA the case, in effect negating any recommendation for discipline.

Until the final charge in his career, some of the earlier allegations (6) ended with exoneration. The rest were unsubstantiated, unfounded or withdrawn. In addition to complaints investigated by CCRB, PO ███ failed to file a stop reports or to note encounters in his memo book. He was charged with that particular oversight at least six times.

The CCRB investigator, in the writeup of the most recent case, nonetheless wrote that there was "no pattern applicable" to his most recent misconduct. There is no mention in the report of whether the investigator reviewed all the prior complaints and came to the conclusion based upon that review. If it was not conducted, it should have been.

Separately, seven lawsuits were filed against PO ███ for wrongful police action, four of which settled for $7,500, $35,000, $52,500 and $17,500, while the others remain open.

## P. CCRB Complaints and Allegations - All FADO

For the period 2017–2019, of 31,907 complaints that were screened at intake, 14,092 were retained for action by CCRB. The majority of the complaints that were retained did not result in a finding by the Board.[1295] Most complaints were diverted as a result of truncation, mediation,[1296] or an inability to identify the officers involved. In the end, over the three-year period, 3,786 of complaints (29.4% of all retained cases) were fully investigated by CCRB and voted upon by a panel, resulting in a finding for or against a complaint against an identified officer.[1297]

---

[1295] Generally, when dealing with aggregate numbers, this Report will use statistics in the 2017 to 2019 range. Updating to include 2020 would skew any analysis due to the pandemic, social isolation, and singular changes in police activity, reporting by civilians, and processing by CCRB. As well, police interactions with Black Lives Matters protesters resulted in an influx of complaints which, for a variety of reasons, were not disposed of by CCRB. There were 8,414 complaints filed in 2020 with CCRB, of which CCRB retained 3,872.

[1296] Mediation numbers include "Mediation attempted" which designates that the officer and civilian agreed to mediate, but the civilian failed to appear and does not request that the case continue. CCRB Semi-Annual Report 2019, at 31, accessed at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2019_semi-annual.pdf.

[1297] Throughout this Report there is reliance upon data from 2017 to 2019. This is the product of several factors: delay and lag time in closing cases sufficient to capture a full set of data; the pandemic; delay in obtaining reports or data from official sources, to name a few. In response to a draft of this Report, CCRB points out, rightly, that much of the

In that three-year period, 2017-2019, 23.1 percent of FADO allegations were for excessive force.[1298]  Another 63.1 percent of the allegations were for abuse of authority.[1299]  Overall SQF misconduct (which falls within the abuse category) constitutes only about 13.7 percent of all allegations considered by CCRB.[1300]

A complaint will often carry multiple allegations.  More than one civilian-victim/witness may have been aggrieved during the encounter.  Several separate acts of misconduct during the encounter by the officer(s) may have been alleged - all of which are combined within one complaint.  CCRB usually categorizes a complaint by what it considers to be the most serious allegation within a complaint.  Another way to measure civilian complaints is to look at the number of and types of allegations made rather than complaints made.  There are, on average, over three allegations of misconduct in each complaint.

|  | **2017** | **2018** | **2019** | **3-year total** |  |
|---|---|---|---|---|---|
| **COMPLAINTS** |  |  |  |  |  |
| All Complaints to CCRB | 10,579 | 10,660 | 10,668 | 31,907 |  |
| Complaints Kept at CCRB | 4,486 | 4,645 | 4,961 | 14,092 |  |

| **TYPE OF COMPLAINTS KEPT AT CCRB** |  |  |  |  | **%** |
|---|---|---|---|---|---|
| Force | 3,421 | 3,795 | 4,205 | 11,421 | 23.1% |
| Abuse | 8,751 | 10,431 | 12,031 | 31,213 | 63.1% |
| Discourtesy | 2,033 | 1,844 | 1,584 | 5,461 | 11.0% |
| Off. Lang. | 462 | 416 | 371 | 1,249 | 2.5% |

Within the 14,092 complaints retained by CCRB, in the same three-year period, there were 49,244 **allegations** of FADO misconduct.

| Allegation Type | 2017 | 2018 | 2019 | 3-year Total |  |
|---|---|---|---|---|---|
| Force | 3,421 | 3,795 | 4,205 | 11,421 | (23.2%) |
| Abuse | 8,751 | 10,531 | 12,031 | 31,113 | (63.2%) |
| Discourtesy | 2,033 | 1,844 | 1,584 | 5,461 | (11.1%) |
| Offensive Lang. | 462 | 416 | 371 | 1,249 | (2.5%) |
| **TOTAL ALLEGATIONS** | 14,667 | 16,586 | 18,191 | 49,244[1301] |  |

---

data on CCRB's substantiation rates were "pre-BWC."  The availability of video evidence undoubtedly has substantially impacted its substantiation rate.  A true assessment of those numbers would necessarily entail another study – which is beyond the scope of this Report. (Item 520, City 09.02.23 Feedback to Yates Discipline Report.)

[1298] Defined in Patrol Guide § 221-01 (Force Guidelines).

[1299] Until 2021, abuse of authority went undefined, but CCRB listed 45 categories of misconduct as abuse of authority. CCRB Semi-Annual Report 2019 at 22.  38-A RCNY § 1-01 now defines Abuse of Authority.

[1300] In 2022, 528 complaints received contained a SQFS allegation (CCRB Annual Report – 2022 at 19) out of a total of 3,724 complaints (CCRB Monthly Statistical Report – January 2023, at 8).  This is 14.2 %.

[1301] In 2020, the pandemic year, there were 2,813 force allegations + 7,114 abuse allegations + 1,078 discourtesy allegations.

Within the 14,092 complaints and 49,244 allegations of FADO misconduct, how many are for stop and frisk misbehavior?

### i.     Complaints of Stop, Question, Frisk Misconduct

Over time, the number of reported stops has decreased.  Whether this is an accurate measure of stop activity, merely a drop in reports, or some combination of the two is an open question.  During the period of the Monitorship:[1302]

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| Reported Stops | 45,788 | 22,565 | 12,404 | 11,629 | 11,008 | 13,459 |
| SQF Complaints | 1,003 | 886 | 869 | 890 | 839 | 863 |
| % of Stops[1303] | 2.2% | 3.9% | 7.0 % | 7.7% | 7.6% | 6.4% |

In recent years, the percentage of stops which led to a civilian complaint has leveled off in the seven percent range,[1304] but that percentage is significantly higher than the percent of stops leading to a civilian complaint in earlier years.  The number of stop complaints as a percentage of the number of reported stops is not, in and of itself, a reliable measure of lawful or unlawful stops behavior.  The two may not correlate for a number of reasons.

### ii.     SQF Misconduct by Allegation

Another way to look at SQF complaints retained by CCRB is to look at the allegations within the complaints.  How many complaints retained by CCRB after screening at intake contained an allegation of a wrongful stop, question, frisk or search of person?  Again, looking at 2017-2019:

| Allegation | 2017 | 2018 | 2019 | 3-year Total | % |
|---|---|---|---|---|---|
| Stop | 851 | 855 | 902 | 2,608 | 38.6% |
| Question | 207 | 280 | 310 | 797 | 11.8% |
| Frisk | 497 | 466 | 491 | 1,454 | 21.5% |
| Search Person | 659 | 614 | 620 | 1,893 | 28.0% |
| **TOTAL** | 2,214 | 2,215 | 2,323 | 6,752 | |

---

[1302] Reported stops in 2020 dropped to 9544 and SQF complaints in 2020 dropped to 696, but given the many issues associated with reports in the pandemic COVID year the numbers may be an aberration.

[1303] This percentage does not assume that the complaints were for reported stops.  Many complaints are for encounters that were not reported.  See Stop Report Failure discussion below.

[1304] In 2020, there were 696 SQF complaints out of 9,544 reported stops (7.3%).  In 2022, there were 15102 reported stops (NYPD Stop, Question and Frisk Data, available at https://www.nyc.gov/site/nypd/stats/reports-analysis/stopfrisk.page) with only 528 complaints received containing a stop, question, frisk, or search of person allegation. (CCRB Annual Report 2022, at 19).  This is 3.5 % of reported stops.

The "total" line in the table requires closer analysis; the allegations should not simply be added together with the assumption that there were 6,752 police-civilian encounters in that time period that were the subject of an investigation by CCRB. There is overlap in the numbers. For example, some complaints may allege all four actions (stop, question, frisk, search of person) and be listed in each line of a column.

It is interesting that there were many more allegations of an illegal search than allegations of illegal questioning or frisks. Were those searches not preceded by a question or a frisk? Some may have been preceded by a frisk but the complainant only complained of the search. In those cases, depending on the complaint, an investigation by CCRB into a stop and search could, but may not, look into the propriety of the question or frisk as well

### Q.    CCRB Findings

For 2017–2019, only 3,786 of the 14,092 FADO complaints retained by CCRB reached the point of a finding by a CCRB panel. The rest were truncated, mediation was attempted or completed, or withdrawn for other reasons. The first table below measures findings and outcomes by "complaint." In addition to looking at complaint numbers, one can look at individual allegations of misconduct within a complaint, or one can look at the number of cases (each complaint against an officer is handled as a separate "case").[1305]

CCRB forwards a discipline recommendation to DAO for each substantiated allegation. Until implementation of the Disciplinary Guidelines, the Police Commissioner had imposed one penalty for an entire case, regardless of the number of allegations substantiated by CCRB. If there was a separate finding in a related case by IAB or one of the other internal investigation units (BIU or FID), the Police Commissioner assessed one penalty for that case.[1306] In some cases, the Police Commissioner would close a CCRB case, usually after a substantiated finding, and combine it with the penalty assessed in the internal Departmental investigation. This has been modified to some extent by adoption of the Disciplinary Matrix as established by the Police Commissioner in 2021, which provides,

> "Separate presumptive penalties, adjusted for relevant aggravating and mitigating factors, are applied to each substantiated act of misconduct for which there has been a finding or acceptance of guilt. These presumptive penalties are then aggregated to address each distinct act of misconduct."[1307]

---

[1305] When Charges and Specifications are voted by a panel, the case is passed to the Administrative Prosecution Unit (APU) of CCRB for potential trial before a trial commissioner within the Department (discussed later in this Report). APU treats each officer as a separate "case" for statistical purposes. *See* CCRB Semi-Annual Report 2019 at 47, available at https://www1 nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2019_semi-annual.pdf.

[1306] DAO or the Police Commissioner will commonly combine two open parallel investigations by administratively closing one or assessing one penalty for the IAB and CCRB findings. This is particularly true in false statement cases substantiated by IAB where CCRB has a related finding.

[1307] Disciplinary Guidelines at 12.

Comparing reports and statistics of outcomes at CCRB with those of NYPD can be deceptive since they report complaint outcomes differently when a complaint contains a mix of findings among a cluster of allegations.  CCRB reports complaint outcomes as follows:

- A complaint is "substantiated" if any one allegation within the complaint is substantiated.  (This differs from IAB, which declares a case to be "partially substantiated" of only one or some of the allegations are substantiated, but not all of them.)[1308]
- Now that CCRB has revised its description of case dispositions, comparison is impossible since it no longer matches with NYPD's description of outcomes.[1309]
- A complaint is exonerated if all the allegations made against identified officers are exonerated.[1310]
- A complaint is unfounded if there are no substantiated or unsubstantiated allegations and there is at least one unfounded allegation.[1311]
- A complaint is unsubstantiated if there are no substantiated allegations and there is at least one unsubstantiated allegation.[1312]

For this reason, it is useful to look at both complaint processing and allegation processing when attempting to assess outcomes at CCRB and NYPD.  Allegation outcomes alone do not paint a complete picture.

### i.    UMOS With Substantiated Complaints[1313]

Also, since multiple officers may be involved in one incident, the number of officers found to have engaged in wrongdoing (i.e., substantiated cases) is greater than the number of substantiated complaints.[1314]  Of all complaints received, CCRB substantiates allegations against a relatively small number of the approximately 35,000 uniformed officers.  Looking at substantiated cases (not complaints) we have the following numbers:

---

[1308] Commission to Combat Police Corruption ("CCPC") 18th Annual Report, at 18.

[1309] Compare CCRB "case dispositions" 38-A RCNY § 1-33, amended effective October 22, 2022, with NYPD Admin. Guide § 322-11 (effective June 23, 2020).

[1310] *Id.* at 19.

[1311] *Id.* at 19.

[1312] CCRB James Blake Fellow Report, 2020, at 7, available at https://www1 nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/CCRB_BlakeFellow_Report.pdf.

[1313] UMOS are "Uniformed Members of the Service," AG 322-11, as opposed to "Members of the Police Department," NY City Charter § 440(c)(1).  More than one officer may be charged in one complaint.

[1314] The number of officers listed for 2017 and 2018 comes from the CCRB 2018 Annual Report at 34. The 2019 number comes from CCRB Executive Director's Monthly Report (Jan. 2020), at 24, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2020/20200909_monthlystats.pdf.
Slightly different numbers appear in the Statistical Appendix at 113, wherein the UMOS number is 374 for 2017 and 340 for 2018.    Appendix - CCRB Complaint Data (2018), at 113, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2018_annual-appendix.pdf.

| **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
|------|------|------|------|------|------|
| 467 | 773 | 515 | 355 | 326 | 536 |

As of December 31, 2020, 21,186 active uniformed members had been the subject, at one time in their history, of at least one CCRB complaint. That is 61.2% of 34,588 active members. 13,592 (39.2%) had been the subject of two or more complaints.

Eighty-nine percent of officers (30,674) officers have had zero **substantiated** complaints against them. Only 804 (2.3 %) have two or more substantiated complaints in their history.[1315] There is no available data on how many officers have been the subject of a SQF complaint, which would be worth obtaining.[1316]

The numbers support an argument not only for rigorous progressive discipline, but for consideration of relevant and material evidence of repeated behavior even where allegations are not substantiated. (See discussion above on the "sole basis" rule.) A small proportion of officers have repeat violations. Disciplinary efforts should concentrate on them. The majority of officers in the Department are unfairly tarnished by the wrongful conduct of the few. In other contexts, for example crime prevention, an accepted strategy is to concentrate on repeat offenders, whether convicted previously or not.[1317] So too, here, misconduct could best be addressed by focusing attention on the 6,388 officers (18.4%) of officers who have been the subject of more than three complaints or the 804 officers who have been the subject of more than one substantiated complaint. Early intervention and risk management is one avenue, but the knowledge that an investigation will be thorough, a substantiation will not be lightly disregarded, and that discipline is certain for repeat subjects is important as well. Later in this Report a few examples of multiple officers with seven or more prior complaints, all going without discipline, will be examined.

###    ii.    CCRB Findings – All FADO Complaints[1318]

| | **2017** | **2018** | **2019** | **3 YR TOTAL** | **% OF FINDINGS** |
|---|---|---|---|---|---|
| **FADO FINDINGS** | | | | | |
| Substantiated | 258 | 226 | 370 | 854 | 22.6% |
| Unsubstantiated | 653 | 578 | 596 | 1827 | 48.3% |
| Unfounded | 87 | 92 | 130 | 309 | 8.2% |

---

[1315] CCRB Annual Report 2018 at 22.

[1316] Once CCRB begins to investigate profiling complaints, a dataset on outcomes in that area would become important. As of now, even without any substantiated profiling cases, there is a listing by IAB of MOS who have been the subject of three or more profiling cases. As of April 17, 2021, there were 74 officers who had been named in three or more profiling complaints. Two had been named seven times.

[1317] *See, e.g.*, Police Commissioner's comment that "[w]e are not helping these kids by putting them back on the street," referring to accused teens who have long rap sheets (available at https://pix11.com/news/local-news/nypd-commissioner-bail-change-rikers-teen-shootings-school-safety-officers/).

[1318] The rate of substantiation in 2020 rose to 30% (293 of 981) but the many issues surrounding police action and CCRB investigation in the pandemic year make the numbers a possible aberration. This is the substantiation rate for fully investigated complaints and not all complaints.

|                                    |       |       |       |        |                      |
| ---------------------------------- | ----- | ----- | ----- | ------ | -------------------- |
| Exonerated                         | 240   | 218   | 338   | 796    | 21.0%                |
| **TOTAL FINDINGS**[1319]           | 1,238 | 1,114 | 1,434 | 3,786  | 100%                 |
|                                    |       |       |       |        |                      |
| **OTHER COMPLAINT CLOSURES**       |       |       |       |        | **% OF ALL CLOSURES** |
| Off.  Unidentified                 | 110   | 94    | 106   | 310    | 2.4%                 |
| Mediated                           | 204   | 232   | 187   | 623    | 4.8%                 |
| Attempt Mediation                  | 213   | 231   | 240   | 684    | 5.3%                 |
| Truncations/Other[1320]            | 2,286 | 2,334 | 2,855 | 7,475  | 58.0%                |
| **TOTAL CLOSED W/O FINDINGS**      | 2,813 | 2,891 | 3,388 | 9,092  |                      |
|                                    |       |       |       |        |                      |
| **TOTAL CLOSURES**[1321]           | 4,051 | 4,005 | 4,822 | 12,878 |                      |

Comparing findings in an earlier three-year period (2014-2016):

| **COMPLAINTS FADO FINDINGS** | **2014** | **2015** | **2016** | **3-YR TOTAL** | **%** |
| ---------------------------- | -------- | -------- | -------- | -------------- | ----- |
| Substant.                    | 313      | 519      | 342      | 1,174          | 22.7% |
| Unsub.                       | 1,024    | 1,050    | 678      | 2,752          | 53.1% |
| Unfounded                    | 147      | 150      | 139      | 436            | 8.4%  |
| Exonerated                   | 265      | 296      | 257      | 818            | 15.8% |
|                              |          |          |          |                |       |
| **Total Findings**           | 1,749    | 2,015    | 1,416    | 5,180          |       |

Although the raw numbers vary over time, the rate of findings in each 3-year period measured by category are roughly equivalent.  However, there is a five percent drop in unsubstantiated cases in the later period.  There is a five percent increase in exonerations in the

---

[1319]  Unlike tables in the Annual Reports filed by CCRB, this Report does not include "Officer Unidentified" in the "findings" category.  A recent article in the Gothamist (https://gothamist.com/news/why-the-majority-of-nypd-misconduct-complaints-end-up-unsubstantiated) looked at 17,325 complaints decided by CCRB from 2010 to 2019 and found that 8,775 were unsubstantiated, 1.525 were unfounded, 2.939 were exonerated, 1.153 were officer unidentified and only 2.933 (16.9%) were substantiated. During that same period 49% of filed cases were truncated.

[1320] Includes "Complaint withdrawn," "victim/witness unavailable," "victim/witness uncooperative," "closed pending litigation." As previously noted, CCRB has re-defined categories of case dispositions, making it impossible to compare numbers in this table with more current dispositions. *See, e.g.*, Executive Director's Monthly Report for August 2023, available at https://www.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2023/08092023-monthlystats.pdf.

[1321] Total retained (14,092) and total closed (12,878) are not equal—all cases retained for investigation in a given year are not necessarily resolved or closed in that same calendar year.

same period. Does this mean that some number of cases which were ambiguous and went unsubstantiated are now more likely to result in exonerations? Without further statistical analysis, a reliable conclusion cannot be drawn from this comparison. It could be that increased availability of video evidence, from BWC, witness cell phones, and video surveillance cameras, has an impact here, but that would require further careful analysis. In more recent years, CCRB has been able to receive BWC footage in as much as 50% of all cases.[1322] CCRB has begun to measure and report upon "The Impact of BWC and Other Video Evidence."[1323]

### Substantiated Complaint Findings All-FADO Year by Year

| Year | Number of Complaints Substantiated | Rate of Substantiation |
|------|-----------------------------------|------------------------|
| 2014 | 313 of 1,749 | 17.9% |
| 2015 | 519 of 2,015 | 25.8% |
| 2016 | 342 of 1,416 | 24.2% |
| 2017 | 258 of 1,238 | 20.8% |
| 2018 | 226 of 1,114 | 20.3% |
| 2019 | 370 of 1,434 | 25.8 % |

Again, the range, from a low of 17.9 percent to a high of 25.8 percent, without deeper analysis is not significant enough to draw any firm conclusions.

### iii.    CCRB Findings – All FADO Allegations

Below is a table grouping complaints into allegations to get a closer look at CCRB dispositions:

### CCRB PANEL FINDINGS ON INDIVIDUAL ALLEGATIONS - 2017-2019

| | 2017 | 2018 | 2019 | 3 Year Total | 3-year % |
|---|---|---|---|---|---|
| **FADO** | | | | | |
| Substantiated | 655 | 545 | 872 | 2,072 | 12.6% |
| Unsubstantiated | 2,383 | 2,190 | 2,379 | 6,952 | 42.2% |
| Unfounded | 477 | 463 | 627 | 1,567 | 9.5% |
| Exonerated | 1,721 | 1,716 | 2,463 | 5,900 | 35.8% |
| **TOTAL** | **5,236** | **4,914** | **6,341** | **16,491** | |
| | | | | | |
| **FORCE** | | | | | |
| Substantiated | 83 | 73 | 98 | 254 | 7.0% |
| Unsubstantiated | 449 | 408 | 430 | 1,287 | 35.4% |
| Unfounded | 213 | 168 | 209 | 590 | 16.2% |
| Exonerated | 518 | 429 | 561 | 1,508 | 41.4% |
| **TOTAL FORCE** | **1,263** | **1,078** | **1,298** | **3,639** | |

---

[1322] CCRB Annual Report 2022, at 3.

[1323] *Id.* at 51.

**ABUSE**

| | | | | | |
|---|---|---|---|---|---|
| Substantiated | 489 | 394 | 574 | 1,457 | 14.1% |
| Unsubstantiated | 1,226 | 1,264 | 1,476 | 3,966 | 38.5% |
| Unfounded | 158 | 183 | 280 | 621 | 6.0% |
| Exonerated | 1,173 | 1,263 | 1,817 | 4,253 | 41.3% |
| **TOTAL ABUSE** | **3,046** | **3,104** | **4,147** | **10,297** | |

**DISCOURTESY**

| | | | | | |
|---|---|---|---|---|---|
| Substantiated | 69 | 69 | 175 | 313 | 15.0% |
| Unsubstantiated | 585 | 424 | 379 | 1,388 | 66.4% |
| Unfounded | 73 | 74 | 104 | 251 | 12.0% |
| Exonerated | 30 | 24 | 83 | 137 | 6.6% |
| **TOTAL DISCOURTESY** | **757** | **591** | **741** | **2,089** | |

**OFFENSIVE LANG**.

| | | | | | |
|---|---|---|---|---|---|
| Substantiated | 14 | 9 | 25 | 48 | 10.3% |
| Unsubstantiated | 123 | 94 | 94 | 311 | 66.7% |
| Unfounded | 33 | 38 | 34 | 105 | 22.5% |
| Exonerated | 0 | 0 | 2 | 2 | 0.4% |
| **TOTAL OFF. LANG.** | **170** | **141** | **155** | **466** | |

The substantiation rate for FADO allegations retained by CCRB, overall, for the three-year period, 2017-2019, is 12.6 percent. Force allegations have the lowest substantiation rate, 7.0 percent. Some force complaints are handled concurrently with NYPD investigative units. Some are passed off from NYPD to CCRB and some are handled by NYPD without CCRB investigations.

**Rate of Substantiation for all FADO Findings by CCRB Panels – Allegations 2014-2019**

| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
|---|---|---|---|---|---|---|
| **Substant'd** | 720 | 1267 | 855 | 655 | 545 | 872 |
| **Unsubst'd** | 3,303 | 3,819 | 2,687 | 2,383 | 21,90 | 2,379 |
| **Unfounded** | 600 | 786 | 628 | 477 | 463 | 627 |
| **Exonerated** | 1703 | 2038 | 1862 | 1721 | 1716 | 2,463 |
| **Total** | 6,326 | 7,910 | 6,032 | 5236 | 4,914 | 6,341 |

| **Rate %** | | | | | | |
|---|---|---|---|---|---|---|
| **Substant'd** | 11.4% | 16.0% | 14.2% | 12.5% | 11.1% | 13.8% |
| **Unsubst'd** | 52.2% | 48.3% | 44.5% | 45.5% | 44.6% | 37.5% |
| **Unfounded** | 9.5% | 9.9% | 10.4% | 9.1% | 9.4% | 9.9% |
| **Exonerated** | 26.9% | 25.8% | 30.9% | 32.9% | 34.9% | 38.8% |

Overall, the substantiation rate for FADO allegations was relatively stable.  The most noticeable trend was the decrease in unsubstantiations and a corresponding increase in exonerations.  One explanation, going forward and offered by CCRB, is the increased availability of video evidence.

Video evidence, which may lend clarity to contrasting claims, would logically explain a shift from unsubstantiated (where the evidence is not conclusive enough to support a clear finding) to one of the other fact-based outcomes (where the evidence, after viewing a video, is conclusive enough to resolve factual conflicts between substantiated and unfounded).

More current numbers, reflecting in part availability of video evidence are:

| | **2021** | **2022** |
|---|---|---|
| **Substantiated** | 24.6% | 24.0% |
| **Unsubstantiated** | 30.1% | 27.2% |
| **Unfounded** | 11.8% | 14.0% |
| **Exonerated** | 32.7% | 34.8% |

Over the last eight years, the most dramatic shift is in the rate of substantiations – rising from the low teens to the mid-twenties.  This is reflected in a corresponding drop in unsubstantiations from about 50% to 27%.  As well, there is an increase in exonerations, over time, rising from mid-twenties to upper thirties.  A number of factors could be involved here.  Video availability certainly helps, but anyone who has looked at BWC evidence becomes painfully aware that the shots are discontinuous, spotty, and inconsistent – all through no fault of the officers. It's merely a by-product of fast moving action shots taken from the point of view of multiple officers.  As well, BWC activation may be subject to variables.  Finally, the change in definitions of outcomes makes it unwise to compare dispositions over the most recent years.  "Within guidelines" is not the same as "Exonerated," and "Unable to Determine" includes dispositions which may not have been denominated "Unsubstantiate" in earlier years.

### iv.    CCRB Findings – Stop/Frisk/Search Complaints

The number and percentage of complaints involving a stop, question, frisk, and/or search of person where a panel substantiates at least one SQF misconduct allegation has dropped significantly in recent years.

| **COMPL. SQF** | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| **SUBST'D** | 179 | 268 | 212 | 102 | 88 | 96 |
| **PERCENT** | 17.8% | 30.2% | 24.4% | 11.5% | 10.5% | 11.1% |

v.    **CCRB Findings – Stop/Frisk/Search Allegations**

Allegations of SQF misconduct adjudicated by CCRB have remained relatively constant over the last six years - ranging roughly between 700 and 1,300, despite a drop in reported stops by 75 percent.

| **SQF** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
|---|---|---|---|---|---|---|
| **Stops** | 45,788 | 22,565 | 12,404 | 11,629 | 11,008 | 13,459 |
| **Allegations Adjudicated** | 1,099 | 1,311 | 995 | 693 | 693 | 790 |

But, as with complaints, fewer allegations of stop and frisk misbehavior are substantiated in the three years 2017-2019 than in the three-year period 2014-2016.

### CCRB PANEL FINDINGS OF STOP, QUESTION, FRISK, SEARCH OF PERSON ALLEGATIONS

| ALLEGATION | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 6 year Total | 2014-2016 | 2017-2019 |
|---|---|---|---|---|---|---|---|---|---|
| **STOP** | | | | | | | | | |
| Substantiated | 99 | 131 | 146 | 63 | 39 | 50 | 528 | 28.3% | 18.8% |
| Unsub. | 168 | 149 | 65 | 65 | 81 | 74 | 602 | 28.8% | 27.3% |
| Unfounded | 4 | 2 | 7 | 3 | 6 | 9 | 31 | 1.0% | 2.2% |
| Exonerated | 135 | 216 | 205 | 156 | 129 | 132 | 973 | 41.9% | 51.7% |
| **TOTAL STOP** | 406 | 498 | 423 | 287 | 255 | 265 | **2,134** | | |
| **FRISK** | | | | | | | | | |
| Substantiated | 91 | 148 | 102 | 69 | 59 | 43 | 512 | 38.9% | 30.6% |
| Unsub. | 126 | 120 | 72 | 62 | 80 | 73 | 533 | 36.3% | 38.5% |
| Unfounded | 3 | 7 | 2 | 3 | 7 | 11 | 33 | 1.4% | 3.8% |
| Exonerated | 64 | 77 | 64 | 67 | 55 | 96 | 423 | 23.4% | 39.1% |
| **TOTAL FRISK** | 284 | 352 | 240 | 134 | 201 | 223 | **1,434** | | |
| **QUESTION** | | | | | | | | | |
| Substantiated | 13 | 19 | 19 | 9 | 6 | 11 | 77 | 19.0% | 12.0% |
| Unsub. | 24 | 36 | 24 | 26 | 25 | 33 | 168 | 31.3% | 38.7% |
| Unfounded | 2 | 2 | 1 | 0 | 4 | 2 | 11 | 1.9% | 2.5% |
| Exonerated | 34 | 57 | 37 | 32 | 16 | 53 | 229 | 47.8% | 46.5% |
| **TOTAL QUESTION** | 73 | 114 | 81 | 67 | 51 | 99 | **485** | | |

299

| SEARCH | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Substantiated | 57 | 86 | 59 | 42 | 36 | 27 | 307 | 21.6% | 12.0% |
| Unsub. | 237 | 200 | 61 | 101 | 101 | 92 | 792 | 53.3% | 38.7% |
| Unfounded | 7 | 8 | 5 | 3 | 5 | 4 | 32 | 2.1% | 2.8% |
| Exonerated | 35 | 53 | 126 | 59 | 44 | 80 | 397 | 22.9% | 46.5% |
| **TOTAL SEARCH** | 336 | 347 | 251 | 205 | 186 | 203 | **1,528** | | |
| | | | | | | | | | |
| **TOTAL SUBST'D** | 260 | 384 | 326 | 183 | 140 | 131 | 1,424 | 28.5% | 20.9% |
| **TOTAL SQF ALLEGATION FINDINGS** | 1,099 | 1,311 | 995 | 693 | 693 | 790 | 5,581 | | |

### vi. Rate of Substantiation for SQF Allegations by CCRB Panels

We see from earlier tables that Abuse of Authority allegations overall are substantiated at a 14.1 percent rate for the three-year period, 2017-2019. Stop, Question, Frisk, Search of Person (SQF) allegations for the same three-year period are substantiated at a 20.9 percent rate (454/2,176). CCRB's substantiation rate for stop and frisk allegations has dropped in recent years. The earlier three-year period (2014-2016) is compared to the succeeding three-year period (2017-2019) in the above table to look for trends in the rate of substantiation for stop and frisk allegations over time. For the three-year period 2014-2016, the SQF rate of substantiation was 28.5 percent (970/3,405). For the three-year period 2017-2019, the SQF rate of substantiation was 20.9 percent. If one looks at 2019 alone, the overall substantiation rate for SQF findings has dropped further and dramatically to 16.5 percent. (131/790).

Again, explanations for the fall-off in substantiations are theoretical. It could be that more people are complaining about stops but more officers are complying with SQF law and rules. That would explain the increase in exonerations. On the other hand, substantiation fall-off could be a symptom of a change in Board philosophy or membership. It could be any of a variety of other factors, but, nonetheless, the trend is noticeable. In particular, comparing 2014-2016 to 2017-2019, the rate of substantiation for stop allegations has dropped from 28.3 percent to 18.8 percent.

### (1) Fewer SQF Substantiations, More Exonerations - Why?

As with all FADO findings, a trend in SQF investigations toward more exonerations is evident. In 2014-2016, 32.4 percent (1,103/3,405) of SQF allegations were exonerated. In 2017-2019, 41.0 percent (919/2,243) of SQF allegations were exonerated. Looking at stop allegations alone, in 2014-2016, 41.9 percent (556/1,327) of stop allegations were exonerated. In 2017-2019, 51.7 percent (417/807) of stop allegations were exonerated.

As discussed above, when looking at all-SQF trends (again comparing 2014-2016 to 2017-2019), one might theorize that a decrease in the rate of substantiation (28.3% to 18.8%) might be offset by an increase in unsubstantiated allegations as the balance of persuasive evidence shifted.

In theory the drop in substantiations could arise from uncertainty in the evidence which would be reflected in an increase in unsubstantiations. But the rate of unsubstantiations held constant. The rate of unsubstantiation for all SQF cases went from 37.7 percent (12,82/3,405) in 2014-2016 to 36.2 percent (813/2,243) in 2017-2019. For stop allegations alone, the rate of unsubstantiation was 28.8 percent (382/1327) and in 2017-2019 the unsubstantiation rate was 27.2 percent (220/807).

Over the six-year period (2014-2019), the rate of unsubstantiations for stops and for SQF allegations is relatively constant, while there is an increase in exonerations and a decrease in substantiations. However, year to year, as the table below shows, in the three years from 2017-2019, the unsubstantiation rate and the exoneration rate have both levelled off and remain fairly stable while the substantiation rate dropped.

In 2019 there was a significant increase in BWC availability, for that reason, an increase in substantiations, rather than a decrease, might have been expected, but did not occur. If anything, substantiations decreased as BWC footage in CCRB investigations rose from zero in 2017, to 11 percent of the cases in 2018, to 36 percent in 2019.

Including video from other sources (surveillance, cellphones), the number of investigations where video footage was available rose from 33 percent in 2017 to 43 percent in 2018 to 57 percent of the fully investigated cases in 2019.

What impact did this have on SQF misconduct investigations? Comparing panel findings for SQF allegations year-to-year from 2017 to 2018 to 2019 as video footage was increasingly available:

| ALLEGATION | 2017 | 2018 | 2019 | 2017 % | 2018 % | 2019 % |
|------------|------|------|------|--------|--------|--------|
| **STOP** | | | | | | |
| Substantiated | 63 | 39 | 50 | 22.0% | 15.3% | 18.9% |
| Unsub. | 65 | 81 | 74 | 22.6% | 31.8% | 27.9% |
| Unfounded | 3 | 6 | 9 | 1.0% | 2.4% | 3.4% |
| Exonerated | 156 | 129 | 132 | 54.4% | 50.6% | 49.8% |
| **TOTAL STOP** | 287 | 255 | 265 | | | |
| | | | | | | |
| **FRISK** | | | | | | |
| Substantiated | 69 | 59 | 43 | 34.3% | 29.4% | 19.3% |
| Unsub. | 62 | 80 | 73 | 30.8% | 59.7% | 32.7% |
| Unfounded | 3 | 7 | 11 | 1.4% | 3.5% | 4.9% |
| Exonerated | 67 | 55 | 96 | 33.3% | 27.4% | 43.0% |
| **TOTAL FRISK** | 201 | 201 | 223 | | | |
| | | | | | | |
| **QUESTION** | | | | | | |
| Substantiated | 9 | 6 | 11 | 13.4% | 11.8% | 11.1% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Unsub. | 26 | 25 | 33 | 38.8% | 49.0% | 33.3% |
| Unfounded | 0 | 4 | 2 | 0.0% | 7.8% | 2.0% |
| Exonerated | 32 | 16 | 53 | 47.8% | 31.4% | 53.5% |
| **TOTAL QUEST.** | 67 | 51 | 99 | | | |
| | | | | | | |
| **SEARCH** | | | | | | |
| Substantiated | 42 | 36 | 27 | 20.5% | 19.4% | 13.3% |
| Unsub. | 101 | 101 | 92 | 49.3% | 54.3% | 45.3% |
| Unfounded | 3 | 5 | 4 | 1.5% | 2.7% | 2.0% |
| Exonerated | 59 | 44 | 80 | 28.8% | 23.7% | 39.4% |
| **TOTAL SEARCH** | 205 | 186 | 203 | | | |
| | | | | | | |
| **ALL SQF** | | | | | | |
| Substantiation Rate | | | | 26.4% | 20.2% | 16.6% |
| Unsub Rate | | | | 36.7% | 41.3% | 34.4% |
| Unfounded Rate | | | | 1.3% | 3.8% | 3.3% |
| Exoneration Rate | | | | 45.3% | 35.2% | 45.7% |

While there are no dramatic shifts in rates overall with increased use of video from 2017 to 2019, some numbers are worth noting:

- SQF substantiations overall dropped from 26.4 percent to 16.6 percent.
- Substantiation of frisk allegations dropped from 34.3 percent to 19.3 percent.
- Substantiation of search of person allegations dropped from 20.5 percent to 13.3 percent.
- Exoneration of search of person allegations rose from 28.8 percent to 39.4 percent.
- The SQF Unfounded rate increased over those three years, from 1.3 percent to 3.3 percent.

CCRB writes in its Annual Reports that for other misconduct allegations the availability of videos leads to greater substantiation. (Although Force substantiations remained relatively stable going from 5.7 percent to 5.9 percent to 6.8 percent.) Perhaps no hard correlation, up or down, can be drawn directly from video availability to outcomes. It could be simply a matter of engaging in the "*post hoc ergo propter hoc*" fallacy, without taking other causes into account.

In any event, a trend toward fewer substantiations and more unsubstantiations or exonerations in SQF cases is a matter of import which needs further watching or exploration.

With reference to the earlier discussion in this Report, regarding designation of the various kinds of findings (substantiated, unsubstantiated, etc.), the very high number of exonerations compared to the very low number of unfounded cases is worth reflection. Could it be that in 45 percent of the cases the officer engaged in the conduct alleged but, despite the claim of abuse, the conduct was proper, while in only 2 percent of the cases the evidence shows the officer never engaged in the conduct at all?

302

Does this mean that evaluators exonerate officers not only on the law ("the officer did it, but it was proper"), but also based on the facts ("the officer didn't do it")?

Exonerations have precedential value. One of the aims of a disciplinary system is to establish norms and to plant guardrails for future conduct. An exoneration tells the officer, and others who learn of the result, that actions which led to a complaint were proper and can be repeated. If a substantial number of the exonerations listed above were cases where the officer in fact did what was alleged, but the Police Commissioner believes what the officer did was entirely proper, then that is a teaching moment which tells us it may be repeated.

For that reason, in the SQF area it is important that bad stops, frisks or searches not be exonerated when the Fourth or Fourteenth Amendment are violated but the officer, for example, acted in good faith or the officer was inexperienced, and the law was complex.

### R.    CCRB Recommendations to the Police Commissioner

At the close of a CCRB investigation, the investigator prepares a closing report and a "CCRB Investigative Recommendation," which is reviewed by a Squad Leader. The recommendation includes a "Case Summary," and histories of both the subject officer and the civilian complainant. The history of the officer is that of prior CCRB dispositions. The history of the civilian will include a report on civil claims made, attempts at mediation, and prior arrests and convictions of the complainant. A factual summary will accompany each allegation. The closing report by the investigator will include summaries of interview notes, activity logs, and other relevant documents.

After a CCRB panel makes a decision, the Case Management Unit generates a "disposition letter" which is sent to the complainant, the victim, and the subject officer informing them of the Board's findings.[1324] The CMU also sends the Police Commissioner a memorandum detailing the Board's findings.[1325] Pursuant to a Memorandum of Understanding, signed February 4, 2021, CCRB has agreed to share with NYPD an analysis describing with particularity the basis for the recommended penalty, any aggravating and/or mitigating factors applied and a description of how those factors were applied.[1326]

A disposition letter to a complainant briefly itemizes the allegations and the Board's findings. It will also list the CCRB's disciplinary recommendation to the Police Commissioner.

Any witness who testified is sent a letter merely advising that the matter is closed.

If an allegation is substantiated, the complainant or victim is reminded that the CCRB's authority is limited to investigating instances of police misconduct, and it is up to the Police

---

[1324] INVESTIGATIVE MANUAL, at 21.

[1325] *See* Heather Cooks, Senior Counsel, CCRB, CCRB: The Life of a Case, at "Closing the Case" (on file with author).

[1326] Matrix MOU, I (2).

Commissioner, who receives a copy of the CCRB's findings, to determine what disciplinary action is ultimately taken against the officer.[1327]

After investigation and review of the investigator's recommendation, the panel will "recommend action" upon substantiated complaints.[1328]  In the past, that recommended action, was only of the category of discipline or guidance recommendation, i.e., A-CD, B-CD, Charges and Specifications, Training, Instructions, or Warnings.[1329]  With adoption of the Disciplinary Guidelines and the accompanying Matrix-MOU, CCRB recommendations will require a written analysis "describing with particularity the basis for the recommended penalty."  However, recommendations for each allegation will remain the same, i.e., each substantiated allegation will receive a recommendation for guidance, command discipline (either A-CD or B-CD), or Charges and Specifications.  CCRB will continue its practice of not recommending a specific penalty (hours forfeited, penalty days assessed, reprimand or disciplinary probation), which will remain under the purview of the DAO and the Police Commissioner.  Prior to the issuance of the Disciplinary Guidelines, CCRB would not aggregate separate findings of SQF allegations (e.g., three substantiations, with each prompting a command discipline recommendation) to recommend Charges.  The Police Commissioner could aggregate command discipline recommendations and approve the filing of Charges.  Under the Disciplinary Guidelines recently put in place, CCRB has begun to "add up" allegations and recommend Charges where, in the past, multiple SQF allegations would only lead to informal discipline recommendations.  It is unknown at this time whether the Police Commissioner will accept or decline to follow these recommendations.[1330]

Without further specificity by CCRB, DAO or a Commanding Officer have considerable latitude in disposing of command discipline recommendations.  The distinction between an A-CD and a B-CD is meaningful if there is an associated penalty imposed by DAO or a CO; otherwise, the recommendation by CCRB alone carries little direct consequence.  As longtime Board Member John Siegal succinctly put it, "I will tell you, the difference between Command Discipline B and A is a complete mystery to me."[1331]

---

[1327] *E.g.*, Letter from Jonathan Darche, Acting Executive Director, CCRB (Jan. 20, 2017); Letter from Mina Q. Malik, Executive Director, CCRB (Feb. 11, 2016) (on file with author).

[1328] NY City Charter § 440(c)(1).

[1329] *E.g.*, Letter from Jonathan Darche, Acting Executive Director, CCRB (Jan. 20, 2017); Letter from Mina Q. Malik, Executive Director, CCRB (Feb. 11, 2016) (on file with author).

[1330] "Prior to the CCRB's adoption of the NYPD's Disciplinary Matrix on Mar. 15, 2021, the Board Discipline Recommendation for each officer was determined by the most severe disposition of the allegation(s) substantiated against the officer, with the order of severity as follows: 1. Charges 2. Command Discipline B 3. Command Discipline A 4. Formalized Training 5. Instructions.

Following the adoption of the NYPD Disciplinary [sic] Matrix on Mar. 15, 2021, the Board Discipline Recommendation for each officer is determined by the sum of the Matrix penalty days associated with the allegation(s) substantiated against the officer as follows: 1. Charges (penalty days >= 11) 2. Command Discipline B (6 <= penalty days <= 10) 3. Command Discipline A (1 <= penalty days <= 5) 4. Formalized Training (0 < penalty days < 1).  CCRB Monthly Statistical Report, January 2023, at 25, available at https://www.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2023/01112023_monthlystats.pdf.

[1331] CCRB Board Minutes, August 8, 2018, at 45:6-8.

If the Police Commissioner concurs with a CCRB finding, Command Discipline may be followed by a penalty, i.e., loss or forfeiture of vacation days or accrued time, with discretion left to the Department. As noted earlier the Report, when Command Discipline is imposed, more often than not the penalty decision is sent to the local Commanding Officer (CO) without explicit direction from the Police Commissioner or DAO. An A-CD, if the recommendation is endorsed by the Department, permits loss up to five days of accrued vacation time or penalty days. A B-CD is capped at ten penalty days.[1332] The CO may, but is not required to, impose any of those penalties.

Prior to implementation of the Matrix there had been a significant shift in the recommendations by CCRB away from Charges and toward guidance. The following charts look at "cases," i.e., recommended action for each officer with a substantiated allegation, not complaints.

### ALL-FADO CCRB Recommended Discipline/Guidance

|  | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|---|---|---|
| **Charges** | 254 | 190 | 59 | 38 | 71 | 82 | 35 |
| **B-CD** | 112[1333] | 334 | 96 | 58 | 60 | 90 | 53 |
| **A-CD** |  |  | 125 | 120 | 68 | 100 | 97 |
| **Training** | 15 | 230 | 203 | 79 | 57 | 128 | 106 |
| **Instructions** | 82 | 15 | 29 | 60 | 70 | 134 | 152 |
| **Total Cases** | 463 | 769 | 512 | 355 | 326 | 534 | 443 |

Taking the same numbers, by percentage of recommendations overall:

|  | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|---|---|---|
| **Charges** | 54.9% | 24.7% | 11.5% | 10.7% | 21.8% | 15.4% | 7.9% |
| **B-CD** | 24.2% | 43.4% | 18.8% | 16.3% | 18.4% | 16.9% | 12.0% |
| **A-CD** |  |  | 24.4% | 33.8% | 20.9% | 18.7% | 21.9% |
| **Training** | 3.2% | 29.9% | 39.6% | 22.3% | 17.5% | 24.0% | 23.9% |
| **Instruct.** | 17.7% | 2.0% | 5.7% | 16.9% | 21.5% | 25.1% | 34.3% |

---

[1332] Patrol Guide § 206-04.

[1333] In earlier reports by CCRB, no distinction was made between recommendations for A-CD or B-CD. The number here is for the two recommendations combined.

305

Over time, by the end of 2020, we had arrived at a point where 58 percent of recommendations for substantiated FADO misconduct were for guidance rather than discipline and another 22 percent resulted in A-CD, which seldom result in discipline.[1334]

## CCRB RECOMMENDATIONS AFTER ADOPTION OF THE MATRIX

### Formal Discipline - Charges

Implementation of the Disciplinary Matrix has impacted the recommendations made by CCRB and upon the level of discipline recommended. More current numbers are:

|  | **2021** | **2022** |
|---|---|---|
| **Charges** | 48.0% | 33.2% |
| **B-CD** | 16.7% | 23.7% |
| **A-CD** | 27.0% | 35.6% |
| **Training** | 6.6% | 7.5% |
| **Instructions** | 1.7% | 0.0% |

Since 2021, more cases have ended with a recommendation by CCRB for Charges and Specifications than before. In 2022, out of 1607 recommendations, 534 (33%) were for Charges and Specifications.[1335] This undoubtedly derives from the fact that matrix penalties for each separate substantiated allegation are added consecutively (unless deemed to warrant concurrency) to arrive at a total of recommended penalty days. If that number exceeds 10, the CCRB recommendation is for Charges and formal discipline.

Primarily, the recent increase in recommendations for formal discipline is due to findings of wrongful force, slurs, or untruthful statements. Very few Abuse of Authority allegations (which includes SQF misconduct) call for or receive a recommendation for formal discipline. In 2022, only 128 Abuse of Authority allegations of 3028 substantiated FADOU allegations (4.2%), received a CCRB recommendation that Charges and Specifications be drawn. 151 Force allegations, 75 slur allegations and 96 untruthful statement allegations account for the bulk of Charges.[1336]

After referral by CCRB, whether the increase in recommendation for Charges and Specifications will alter final outcomes and decisions by the Police Commissioner has yet to be determined.

An increase in cases referred for Charges by APU, does not translate automatically into prosecution by APU, trial at DCT, or discipline by the Police Commissioner. Either as a consequence of departures and deviations from the Matrix by the Police Commissioner,

---

[1334] This Report concludes that A-CD recommendations are rarely "discipline" because a very small minority of those cases carry any penalty. See "Discipline Defined" discussion earlier.

[1335] CCRB Annual Report 2022, Figure 28: Board Recommendations for Officers with Substantiated Allegations.

[1336] CCRB Annual Report 2022, Figure 29: Board Disciplinary Recommendations by Substantiated Allegations.

administrative closures, retention, NDA/DUP, SOL, or other dispositions, the vast majority of cases where CCRB recommends Charges and Specifications do not receive discipline.

In 2022, APU only closed 21 cases where discipline was imposed. Five of those cases ended with a trial/guilty verdict and imposition of penalty days. Twenty cases ended with a plea where penalty days were imposed. Only seven of those cases resulted in the imposition of ten or more penalty days. One case resulted in a plea and suspension.[1337] In sum, for closed cases by APU in 2022, seven cases received a penalty of ten or more days, and one case received a suspension.

While it is true that CCRB, in 2022, recommended Charges in 534 cases and only 7 received a penalty of more than 10 days, those numbers cannot be matched exactly. They don't entirely overlap. Cases charged in 2022 are not necessarily finalized in 2022. Some dispositions reported in 2022 were for cases charged in earlier years.

Even so, most referred cases do not reach the point of closure by verdict or plea (29 in 2022)[1338]—they are diverted without discipline for one reason or another. For example, in 2022 the Police Commissioner administratively dismissed 343 cases, claiming there was insufficient time for the Department to decide upon a final disposition because the referral was approaching the Statute of Limitations deadline.[1339]

Nonetheless, of 74 closures of APU cases by trial, plea, retention or "other," in 2022 seven cases received a penalty of 10 or more days.[1340]

## CCRB RECOMMENDATIONS (INFORMAL) WITH THE MATRIX

More recently, implementation of the Disciplinary Matrix has impacted CCRB's informal (non-Charges) recommendations as well. Of 1,608 case recommendations against officers in 2022, (excluding Charges discussed above) there were:[1341]

- 381 (24%) recommendations for B-CD
- 572 (36%) recommendations for A-CD
- 120 (7%) recommendations for Guidance

The dramatic elevation in recommendations in the two-year period from 2020 to 2022 is most likely attributable to the Matrix. In particular, notice that Guidance dropped from 58% of

---

[1337] CCRB Annual Report 2022, Figure 34: Case Outcomes.

[1338] *Id.*

[1339] *Id.*, Figure 32. CCRB did not report on how many of the 343 cases closed for SOL reasons were cases where the Board had recommended Charges and Specifications.

[1340] This does not include the one suspension, which is a serious penalty. It also does not include 5 cases where APU reported that some number of days were imposed, without reporting the actual penalty imposed.

[1341] CCRB Annual Report 2022, Figure 28.

the recommendations to 7% in that two year period, while recommendations for command discipline or charges rose concomitantly.[1342]

Once again, it is difficult to match the CCRB recommendations in 2022 with the NYPD outcomes in 2022, since they do not overlap.  There were only 52 B-CDs meted out by the Police Commissioner for CCRB referred cases in 2022.  There were only 207 A-CDs imposed by the Police Commissioner for CCRB cases.  Since some of those dispositions were for cases referred in 2020 or 2021, and given that there were far fewer referrals in those years, the percentage of referrals receiving a given penalty cannot be measured by these raw numbers.  Internally, however, the penalty assessed by the Police Commissioner in 2022 upon issuance of a B-CD or A-CD by the Police Commissioner can be measured. It appears that 48 of the 52 B-CD dispositions finalized received penalty days as part of the discipline. It appears that 42 of the 207 A-CD dispositions received penalty days as part of the discipline imposed. Another 165 A-CDs received as a final disposition do not report an assessment of penalty days.[1343]  Since A-CDs referred from CCRB are commonly sent to the precinct for action or are "accepted" by DAO without penalty, it should not be assumed, absent accurate follow-up and reporting by NYPD, that many or any of the 165 A-CDs in this category received discipline.

CCRB only recommends an A-CD when the Matrix calls for 1 to 5 penalty days.[1344]  It seems that an A-CD which ends with the officer receiving guidance or an A-CD accepted, without a loss of vacation days from the Police Commissioner or the precinct commander is a case where the NYPD has "imposed a penalty or level of discipline that is lower than that recommended by the board . . ." as described in the Section 440 (d)(1) of the Charter.  If so, a written explanation of how the final disciplinary outcome was determined, including each factor the Police Commissioner considered in making his or her decision" is required.  Under current practice, when the Board recommends and A-CD, but NYPD imposes training for the A-CD or accepts the A-CD without penalty, it appears that departure letters are not written because the level of discipline (A-CD) is the same. While this may be an expedient way of reconciling CCRB's recommendation of 1-5 penalty days with NYPD's avoidance of a penalty day assessment, the apparent dissonance might, in the future lead to litigation over whether there is compliance with the Charter.  Simply put, CCRB only recommends an A-CD when it is recommending a penalty of 1 to 5 vacation days, and NYPD often imposes no penalty.

### SQF - CCRB Recommended Discipline/Guidance

The charts below examines whether there is a parallel drift in regard to disciplinary recommendations by CCRB for substantiated SQF complaints:

| SQF | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| **Charges** | 102 | 48 | 23 | 19 | 15 | 13 | 3 |

---

[1342] Along with an elevation in level of penalties recommended, it should be noted that CCRB quadrupled the number of cases it decided and referred to NYPD in previous periods.  (2018 = 326) (2019 = 534) (2020 = 443) (2021 = 348) for an average of 413 per year vs. (2022 = 1607).  CCRB Annual Report 2022, Figure 28.

[1343] CCRB Annual Report 2022, Figure 30.

[1344] CCRB Annual Report 2022, at 34.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **B-CD** | 51 | 74 | 44 | 16 | 27 | 37 | 12 |
| **A-CD** | 4 | 65 | 72 | 41 | 15 | 16 | 17 |
| **Training** | 1 | 26 | 69 | 22 | 14 | 24 | 18 |
| **Instructions** | 20 | 59 | 4 | 4 | 15 | 6 | 8 |
| **TOTAL** | **178** | **272** | **212** | **102** | **86** | **96** | **58** |

| **SQF** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|---|---|---|
| **Charges** | 57.3% | 17.6% | 10.8% | 18.6% | 17.4% | 13.5% | 5.2% |
| **B-CD** | 28.7% | 27.2% | 20.8% | 15.7% | 31.4% | 38.5% | 20.7% |
| **A-CD** | 2.2% | 23.9% | 34.0% | 40.2% | 17.4% | 16.7% | 29.3% |
| **Training** | 0.6% | 9.6% | 32.5% | 21.6% | 16.3% | 25.0% | 31.0% |
| **Instructions** | 11.2% | 21.7% | 1.9% | 3.9% | 17.4% | 6.3% | 13.8% |

There was an unmistakable trend toward less severe CCRB recommendations for stop and frisk misbehavior through 2020.

Separating discipline from guidance, in how many SQF substantiated misconduct cases did CCRB recommend discipline? As discussed earlier, an "A-CD accepted" without penalty is not discipline. During 2014-2020, there were 220 SQF cases where CCRB recommended an A-CD. Of those, a total of eight cases resulted in the loss of one or more penalty days.[1345] The rest received no penalty and were not disciplined. Thus, it is clear that the anticipated and highly probable outcome when an A-CD is recommended by CCRB for SQF misconduct is a limited record entry within the Department, with no penalty attached. It may be that CCRB intended that discipline with a penalty flow from an A-CD recommendation. But since time has shown that penalties do not flow from their A-CD recommendations, it is difficult to claim that the result was unexpected.

Once again, it appears that the Matrix has an impact upon CCRB penalty recommendations to the Police Commissioner for SQF substantiations.

| | **2021** | **2022** |
|---|---|---|
| **Charges** | 57.5% | 43.6% |
| **B-CD** | 10.6% | 28.0% |
| **A-CD** | 25.5% | 26.1% |
| **Training** | 6.4% | 2.4% |
| **Instructions** | 0.0% | 0.0% |

Looking at cases which included a substantiated stop/frisk/search finding among the allegations within a complaint, it appears that, in 2022, 92 of 254 substantiated cases were sent

---

[1345] Numbers of officers forfeiting a penalty day after CCRB recommended an A-CD: (2014 = 0) (2015 = 0) (2016 = 3) (2017 = 1) (2018 = 2) 2019 = 0) (2020 = 2). Final Federal – SQFSTA – 2023 Q1, Q2 provided by NYPD to the Monitor.

from CCRB with a Charges and Specifications recommendation. As of the latest matrix[1346] sent to the Monitor, 27 of the 92 cases had closed.  Only two of the 27 closed SQF cases where charges had been recommended resulted in imposition of penalty days – one was reduced to an A-CD with 3 days imposed and the other ended as a B-CD with a 10-day penalty.[1347]

Later in this Report there is further discussion of what happens to recommendations made by CCRB once they are forwarded to the Police Commissioner.  But at this point, it is worth noting the "funnel" within CCRB -- that is, the series of filters that combine to screen cases from the point of civilian complaint to recommendation for discipline to the Police Commissioner.

### S.    A Larger Perspective - the "Funnel" for Civilian Complaints

Putting aside yearly fluctuations and simply reviewing at the process overall, statistically, what happens from the time a civilian is concerned and energized enough to file a complaint against police conduct to the time CCRB recommends discipline in the form of some penalty, large or small, to the Police Commissioner?

On average, over 10,000 complaints arrive at CCRB's doorstep each year.  CCRB opens the door for approximately 4,500, screening out the rest for a variety of jurisdictional reasons.  Some are weeded out for reasons of personal jurisdiction, and thus cannot be counted as complaints of "police" misconduct—the complaint is against others than UMOS.  But many are complaints against police officers that are weeded out due to CCRB's subject matter jurisdictional limits.  Of the remaining 4,500, approximately 1,100 to 1,500 are "fully investigated" and presented to panels for consideration.   Of those, about 25 percent (approximately 350 complaints related to approximately 450 officers), contain an allegation which is substantiated.  Finally, in the last three years, discipline is recommended by CCRB to the Police Commissioner in about 130 cases per year.  About one-half (related to approximately 65 officers) face formal discipline, the other half are recommendations for informal discipline.

The following graphic does not represent any particular year but is an approximated summary of years 2017-2019 for the purpose of demonstrating a sense of case-flow through the CCRB "filter."[1348]

---

[1346] Final Federal Monitor – SQFSTA – 2023 Q1, Q2 final copy.

[1347] Final Federal – SQFSTA – 2023 Q1, Q2 provided by NYPD to the Monitor.

[1348] The discussion here approximates case flow from year to year. For more precise numbers, 2019 can serve as a typical example. In that year, CCRB received 10,084 citizen complaints.  After initial screening CCRB accepted for potential investigation 4,961 FADO complaints.  In that same year, it fully investigated 1,540 of the complaints.  Only 370 of the complaints were substantiated.  Of the 370, the Board recommended formal discipline (Charges and Specifications) for only 55.  The Board recommended informal discipline or guidance for the remaining 315 substantiated cases.



As demonstrated by tables above, a similar "funnel" can be found for SQF complaints. In recent years, on average almost 900 SQF complaints are received each year. Approximately 100 of them have one or more SQF allegations substantiated. Roughly 40 or so are recommended for discipline (Charges or B-CD).[1349]

## VIII.    NYPD Disposition of CCRB Substantiated Misconduct - FADO

After a CCRB panel makes a finding and recommendation it is forwarded to DAO. Here, two roads diverge. If the panel recommendation is for informal action—command discipline or guidance—then an attorney in the Department Advocate's office will review it and either request reconsideration from CCRB or forward the CCRB report along with a "DAO Recommendation and Analysis" (known as a CAR memo) to the Police Commissioner. It is not uncommon for DAO's analysis to differ from CCRB's recommendation whether or not reconsideration was proposed.

If the panel recommends Charges and Specifications with formal discipline, the CCRB's APU will draw up specifications for DAO to review. In the end, both roads converge at the Police Commissioner's desk with Charges being the road less traveled.

The interplay between CCRB and DAO often focuses on the "concurrence rate," i.e., how often the Police Commissioner accepts CCRB's disciplinary recommendation.

While the focus of this Report is on SQF conduct and not upon force allegations, concurrence rates are a matter of sensitivity and import for the public. For comparison purposes, note a 2020 study by the New York State Office of the Attorney General which concluded,

> Over the five-year period between 2014 and 2018 (the last year for which full data is available), CCRB received more than 55,000 complaints from the public, including nearly 20,000 individual misconduct allegations for excessive force. The

---

[1349] The reference here is limited to Charges and B-CDs because so few A-CDs can be expected to end with a penalty.

CCRB fully investigated and substantiated more than 4,000 individual allegations of misconduct, and recommended discipline for nearly 2,500 officers, including recommending more than 600 officers be suspended or terminated. Yet, not once in those five years did the NYPD Commissioner fire an officer following CCRB's recommendation. In only eight cases over those five years did the NYPD Commissioner determine that the next most serious penalty—a suspension of longer than one month and/or dismissal probation—was merited. Even suspensions of more than ten days only happened a handful of times a year, on average.[1350]

For the three-year period 2017-2019, looking at all substantiated FADO cases, CCRB recommended a command discipline 496 times (208 B-CD and 288 A-CD).[1351] The Police Commissioner imposed command discipline 262 times, or 52.8 percent of the time. For the remaining 234 cases (47%), guidance or no discipline resulted.

Even then, within the 262 cases where the Police Commissioner pursued command discipline, it cannot be said that discipline was imposed at the level recommended by CCRB or, indeed, that any penalty at all was imposed. An unknown number of the cases were resolved simply as "A-CD accepted," without penalty or even a notation in the CPI. Additionally, an unknown number of those cases were reduced from a B-CD recommendation to an A-CD as a final disposition. In 208 of the 496 cases, CCRB recommended a B-CD. The tables in the CCRB's 2020 Annual Report do not record how many of those B-CDs were reduced to an A-CD.[1352] We know, for comparison, that of 27 recommended B-CD's by CCRB in SQF cases, only three were maintained as B-CDs. The rest were reduced to an A-CD or otherwise disposed of. Although we may not assume a similar 90% downward departure for all 208 B-CD recommendations by CCRB, whatever number of cases where a B-CD was reduced to an A-CD, it should not be counted as a concurrence.

## A.    NYPD Disposition of CCRB Substantiated SQF Misconduct

Once CCRB adjudicates a complaint with a substantiated SQF allegation, it is forwarded to DAO for review and possible recommendation to the Police Commissioner. The Monitor team is provided with a matrix that lists complaints containing one or more substantiated allegations of Stop, Question, Frisk, Search, Trespass Arrest (SQFSTA) misconduct. Disciplinary recommendations by CCRB and dispositions by the Police Commissioner are detailed within the matrix. If penalty days or hours are assessed, they also are detailed in the matrix.

---

[1350] New York State Office of the Attorney General, "Preliminary Report on the New York City Police Department's Response to Demonstrations Following the Death of George Floyd," at 41 (July 2020), available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf (internal citations deleted).

[1351] Disposition of formal Charges is discussed later in this Report. The focus here is on informal discipline since Charges for SQF misconduct is rare.

[1352] Figure 36 in the 2020 Annual Report shows a "Discipline Difference" of 296 cases in that period, but this total combines multiple downward departures and is not a measure of how many B-CDs were reduced to A-CDs.

The SQFSTA matrix is useful to a point in gauging discipline and penalties proposed and imposed for stop and frisk misbehavior.  However, it cannot be relied upon completely as a measure of discipline for SQF misconduct for a variety of reasons.

Penalties, heretofore, have been imposed by the Police Commissioner on a "case" basis and not on an "allegation" basis; thus, it can be deceiving to look at a penalty for a case which contains a substantiated SQF allegation and assume that the penalty imposed in the case was solely for SQF misconduct.  If, for example, an officer stops a victim illegally and strikes the civilian wrongfully with a baton and then lies about the incident in an interview, a stringent penalty displayed in the matrix for the case would likely be due to the force violation more so than from the illegal stop.  It would be reasonable for the penalties to be combined.  If an officer has two or three cases pending at the same time, a stiff penalty may reflect a combination of factors beyond the isolated SQF misconduct.  These are problems which, going forward, may resolve themselves because the Disciplinary Guidelines promise an assessed penalty for each substantiated allegation within a complaint.  If penalty assessments are explained for each allegation substantiated, understanding discipline for SQF misconduct going forward may become simpler.  But for now, summary descriptions of penalties imposed for SQF misbehavior need to be read with an eye towards multiple substantiated allegations as well as investigations stemming from both CCRB and in the Department, which are resolved contemporaneously.

The Inspector General for NYPD (OIG-NYPD) had recommended that penalties should be assessed separately for substantiated allegations.  That may become the practice with adoption of the Disciplinary Guidelines, but how well that will be followed is yet undetermined.  At this moment, NYPD has under review proposed modifications to the Matrix which, if adopted, would significantly expand the number of allegations which would be deemed to run concurrently if substantiated.[1353]  In a 2015 review of disciplinary practices in connection with use of force, the OIG-NYPD wrote:

> It is currently impossible for OIG-NYPD to determine how much an officer is punished when there are multiple allegations against the officer.  For example, in one case . . . an officer faced one count for punching a complainant, four counts for unlawful stops, and one count for an unlawful arrest.  The officer . . . received a penalty of 30 vacation days.  In the case file . . . it is impossible to determine how many days were levied specifically for the punch . . . failing to make clear the weight of a particular instance of misconduct . . . actively hampers the ability of officers to understand the cost breakdown of particular instance of misconduct. . . . OIG-NYPD therefore believes that . . . each allegation should have its specific penalty set forth in NYPD documents so that every individual instance of misconduct can be measured.[1354]

---

[1353] "Policies," NYPD, available at https://www.nyc.gov/site/nypd/about/about-nypd/public-comment.page (last viewed Sept. 17, 2024).

[1354] *Police Use of Force in New York City*, NYC Department of Investigation, Office of the Inspector General for the NYPD, October 1, 2015, at 54, available at https://www1.nyc.gov/assets/oignypd/downloads/pdf/oig_nypd_use_of_force_report_-_oct_1_2015.pdf.  On November 14, 2016, the United States Department of Justice, Civil Rights Division, U.S. Attorney's Office, SDNY, the City of Yonkers and the Yonkers Police Department (YPD) entered into

At the time, the Department rejected OIG's suggestion, claiming that,

> The Department examines the totality of the actions of each Officer in a given situation to determine the appropriate penalty. Other factors also weigh into the assessment of a penalty, including but not limited to the Officer's prior disciplinary history, prior evaluations and CCRB history.[1355]

With that caveat, the following chart demonstrates the dispositions for SQF complaints decided by the Police Commissioner in years 2016-2019. The complaints, in many cases were brought the year or two prior. Allowing for investigation and disposition in CCRB followed by negotiation with DAO and determination by the Police Commissioner, there is typically a considerable lag between incident and final disposition.

The chart shows the recommended penalty by CCRB with an arrow indicating the final outcome for closed cases. For example, "B > A w/penalty" represents a recommended B-CD by CCRB that ended with an "A-CD accepted" and a penalty (hours or days forfeited) was imposed. "B > A no penalty" indicates that the officer "accepted" an A-CD and no penalty was imposed. This would include cases where CCRB recommended a B-CD, the officer accepted an A-CD with or without "Training" or "Instructions." In most cases, when an A-CD is accepted, there is neither a penalty nor guidance. "B > Guidance" means the CCRB recommended a B-CD and the Police Commissioner decided against command discipline of any kind, merely directing Instructions or Training be given.

"Admin filed" covers a variety of outcomes, none of which involved imposition of discipline. It could be the case was dropped ("Discipline - Unable to Prosecute," "DUP") for administrative reasons including a problem with the statute of limitations. It can also include cases where the officer decided to resign or retire, with benefits, prior to final disposition. On occasion, in non-SQF cases, a retirement may be "forced" but even then, the officer retires with any accrued benefits.[1356] "NG" is not guilty, and "NDA" is No Disciplinary Action.[1357] "CS" is Charges and Specification. "Guidance" combines "Instructions" and "Training." "No disposition" are mostly APU decisions which are pending.

---

an Agreement, requiring that YPD adopt a misconduct-investigation policy with a separate investigative finding for each allegation. There is no specific reference to penalty assessments. *See* Yonkers Police Department – Agreement – November 11, 2016, available at https://www.justice.gov/crt/case-document/file/923196/download.

[1355] Letter from New York City Police Department to Mayor Bill de Blasio, Speaker Melissa Mark-Viverito, Commissioner Mark G. Peters, and Inspector General Phil Eure December 30, 2015, at 25, available at https://www1.nyc.gov/assets/doi/oignypd/response/NYPD-response-to-use-of-force-report-dec-2015.pdf.

[1356] "NG" is not guilty. "Guidance" combines "Instructions" and "Training." "No disposition" is mostly accounted for by APU decisions still pending.

[1357] A not guilty disposition could be based upon a finding by the Trial Commissioner or upon a determination by the Police Commissioner.

**SQFSTA**

**CCRB Recommendation > Ultimate Police Commissioner Decision**

|  | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
|---|---|---|---|---|---|---|
| CS > CS w/penalty | 50 | 29 | 12 | 12 | 9 | 1 |
| CS > CD no penalty | 5 | 0 | 1 | 0 | 1 | 2 |
| CS > Guidance | 26 | 4 | 5 | 1 | 1 | 0 |
| CS > NDA or NG | 19 | 10 | 1 | 1 | 2 | 0 |
| CS > Admin filed | 2 | 6 | 4 | 4 | 2 | 1 |
| CS > No Disposition |  |  |  |  |  | 9 |
|  |  |  |  |  |  |  |
| B > B | 5 | 16 | 6 | 2 | 3 | 10 |
| B > A w/penalty | 1 | 1 | 5 | 1 | 3 | 0 |
| B > A no penalty | 11 | 23 | 21 | 3 | 7 | 11 |
| B > Guidance | 24 | 27 | 11 | 7 | 11 | 10 |
| B > NDA or NG | 6 | 6 | 3 | 1 | 4 | 3 |
| B > Admin filed | 4 | 2 | 2 | 3 | 1 | 2 |
| B > No Disposition |  |  |  |  |  | 1 |
|  |  |  |  |  |  |  |
| A > A w/penalty | 0 | 6 | 5 | 3 | 0 | 0 |
| A > A no penalty | 1 | 32 | 21 | 15 | 3 | 8 |
| A > Guidance | 2 | 26 | 29 | 20 | 6 | 4 |
| A > NDA or NG | 2 | 3 | 13 | 2 | 1 | 1 |
| A > Admin filed | 0 | 1 | 2 | 1 | 5 | 2 |
| A > No Disposition |  |  |  |  |  | 1 |
| Guidance > Guidance | 19 | 71 | 65 | 23 | 26 | 28 |
| Guidance > NDA | 2 | 2 | 7 | 3 | 3 | 2 |
| Guidance> Admin filed | 0 | 1 | 1 | 0 | 0 | 0 |
| Guidance > No disposition |  |  |  |  |  |  |
| **TOTAL** | **179** | **266** | **214** | **102** | **88** | **96** |

315

A few observations can be made from the chart. First, there is a significant drop in the number of substantiated SQF cases sent to the Police Commissioner, even accounting for the nine cases from 2019 that remained open. Earlier charts in this Report showed the number of SQF complaints retained for investigation by CCRB had remained steady, hovering in the 850 to 900 range each year from 2015 forward. However, after processing at CCRB, substantiated SQF cases sent to the Police Commissioner decreased noticeably after 2016.

Prior to adoption of the Disciplinary Guidelines, the level of discipline recommended by CCRB following a finding of SQF misconduct had decreased significantly. In 2014, CCRB recommended Charges and Specifications for 57 percent (102 of 179) of the cases with an SQF substantiated finding. In 2019, CCRB recommended Charges and Specifications for three percent (3 of 96) of the cases with an SQF substantiated finding. In 2020, of 60 closed cases, CCRB had not recommended Charges for any of the SQF substantiated complaints

Later in this Report, the "Framework" adopted by CCRB and the Discipline Guidelines are discussed. Both grids recommend against formal discipline for a single substantiated stop/question/frisk misconduct complaint.

The new Discipline Guidelines do give CCRB the discretion to combine multiple SQF violations to arrive at an aggregate score resulting in Charges being recommended. A finding of "aggravated circumstances" may allow for a recommendation of Charges under the Matrix as well. When utilizing the Matrix, CCRB assigns a penalty day value to each substantiated allegation – deciding whether to mitigate, aggravate, depart, or apply the presumptive penalty. The penalties for a case are added up to arrive at a sum. At that point if the sum is:

- less than 1 day: Training is recommended
- from 1-5 days: an A-CD is recommended
- from 6-10 days: a B-CD is recommended
- 11 or more days: Charges and Specifications are recommended.[1358]

This may explain a rise in 2021 recommendations for formal discipline. In quite a turnabout, in 2021, CCRB recommended Charges for 25 percent (27 of 107) of substantiated SQF cases. None of these cases have proceeded to trial or plea. Two have been closed due to resignation or retirement. It remains to be seen what impact the Guidelines will have on the ultimate disposition in those cases, including whether formal disciplinary proceedings will actually follow. The Monitor team has not reviewed open files in CCRB cases, so analysis or an explanation cannot proceed at this time.

The few cases where CCRB had recommended Charges after 2018 and prior to utilization of the Matrix often included other misconduct such as use of force, a strip search, a denial of necessary medical treatment or intentional entry into premises.[1359] In 2020, the last full year in

---

[1358] CCRB Annual Report 2022, at 34.

[1359] There is one case, ▮▮▮▮▮▮▮▮▮▮▮▮, where a complaint was filed alleging, along with an illegal stop, two wrongful use of force actions along with discourtesy and an illegal search. CCRB only substantiated the stop allegation, but recommended Charges. PO ▮▮▮▮ had 15 CCRB complaints with 19 allegations of illegal Stop, Frisk,

which Charges were recommended prior to the Matrix, of 13 cases where formal discipline was recommended, seven involved incidents where force was used, a gun was drawn, or a strip search ensued. One case has resulted in a negotiated plea for five penalty days forfeited.[1360]

Imposition of a penalty (deducted days or hours) by the Police Commissioner even in cases where CCRB recommends discipline is rare. In conversations with the Executive Director of CCRB, the Monitor team was advised that CCRB, when applying the Guidelines, assumes that officers accepting an A-CD or B-CD will forfeit some penalty days (up to 5 and 10 respectively) upon acceptance of the CD. But records show that no more than 6 out of 53 officers, where CCRB recommended command discipline, received any penalty in 2019. (three forfeited a few days, three forfeited a few hours). The rest received "guidance," a "warning," or nothing at all.

Even if one considers a B-CD mark entered into the CPI to be a "penalty," whether or not time or days are forfeited, CCRB recommended a B-CD for stop and frisk misconduct 82 times in the years 2017-2019.[1361] A B-CD was upheld by the Police Commissioner in only 14 of those 82—the rest were downgraded. It may be said that SQF B-CD recommendations have a concurrence rate of 17.1 percent if one counts an accepted B-CD as a concurrence when no penalty is imposed, simply because B-CDs are entered into the CPI.

As noted earlier, CCRB frequently recommends guidance in lieu of discipline. But for the years 2017-2019, CCRB recommended command discipline or Charges in 201 of 487 substantiated SQF cases. In other words, in roughly 50 percent of the SQF decided cases, the Police Commissioner was presented CCRB findings with a request to impose discipline by way of penalty days or hours for an A-CD, a B-CD or allowing formal discipline to proceed. The Police Commissioner imposed discipline (either a forfeit of days or hours, or entry of a B-CD in the CPI even without loss of time) in just 41 of those cases (8.4%). The remaining 446 substantiated SQF findings went without a permanent record in the personnel file and without penalty.

### i.    Case Study:  A Recommended B-CD for an SOF Violation Reduced to Training by DAO

Numerically, the most common final outcome for a B-CD recommendation by CCRB on a stop and frisk case is for the Police Commissioner to decline command discipline and to impose Training. The following case is more representative than atypical.

Detective #1 ██████████ and Lieutenant #2 ████████████

As determined by CCRB, on May 6, 2018, PO #1 ████████, an officer with five years' experience on the force, improperly stopped and frisked the complainant who had an "undefined bulge" in his pocket. The bulge was a cellphone. CCRB recommended a B-CD. A

---

Question, or Search of Person (SQFS) misconduct, four of which were substantiated. The case went to trial and ████ was found Not Guilty.

[1360] Sgt. ██████████, whose case is discussed more fully elsewhere in this Report.

[1361] CCRB recommended a B-CD 82 times, but six are still open.

reconsideration request by DAO for Training was declined. Nonetheless, the Police Commissioner imposed Training as the only discipline.

The complainant swore that three officers jumped out of an unmarked car. One, Officer ████, grabbed him by the neck and arm, while another "checked" his body and pockets. They then got back in the car and drove away. Allegations of slurs and refusal to identify were not substantiated.

Officer #1's ████ stop report described a "bulge in his front hoodie pocket that appeared to be a weapon." When the officer yelled, "Stop!" the complainant continued walking saying, "I don't have to stop for you," which, according to the officer, caused him "to fear for his safety as well as the safety of others,"

Sgt. #2 ████, the supervising officer, "approved" the stop report as "Accurate and Complete," writing that it provided a "Sufficient Basis" for both the stop and the frisk. However, DAO, by its assessment found the stop report did not provide sufficient reasons to justify the stop or the frisk. Sgt. #2 ████ (now Lieutenant ████) was the subject of another incident occurring thirteen days later. That case and his background are discussed extensively in the Appendix.

CCRB recommended a B-CD for Officer #1 ████. On November 11, 2018, DAO requested Training by way of reconsideration. DAO asserted that PO #1 ████ had no prior formal disciplinary history and that there was no pattern of similar misconduct in his background. CCRB denied the request, by a vote of 2-1, on April 24, 2019.

Officer #1 ████ was the subject of five total complaints involving improper citizen encounters. Four of the five involved allegations of excessive force, one with a gun drawn and another leading to litigation. The complaints are all of recent activity. Three were lodged in 2018 alone, just prior to DAO's recommendation of a reduced penalty and its assertion that there was no pattern of misconduct. They may have been resolved separately prior to the reconsideration request, but there is no indication of such in the paperwork, so it would be speculative to offer an explanation.

It is questionable how much value flowed from the Police Commissioner's decision to impose Training in lieu of discipline. Officer #1 ████ has attended 260 Training classes in his career, seven of which in "Investigative Encounters." All of those were taken before the Police Commissioner's decision in this case. ████ has not attended a class in investigative encounters subsequently, despite the Police Commissioner's mandate. Since this case, he has received two new excessive force complaints and been promoted to Detective.

## IX.    THE ADMINISTRATIVE PROSECUTION UNIT

There is a bifurcated system for prosecution of cases through formal discipline. CCRB panels may recommend that formal discipline ensue after a substantiated finding of misconduct. As well, IAB, OCD of BIU may recommend to DAO that formal discipline be imposed after their own investigations. Generally speaking, DAO will prosecute cases brought by NYPD units and CCRB's APU will advance FADO cases recommended by CCRB panels. In either event, prosecutions commence with service and filing of Charges and Specifications. If the Police

Commissioner permits a case to go forward, it may be resolved by trial or plea before a Deputy Trial Commissioner.

Following the 2003 decision in *Giuliani*, forbidding an independent trial forum for discipline, there were persistent efforts by reformers to push for prosecution of civilian complaints by investigators independent of the Department.  For one thing, Unconsolidated Law § 891 makes no mention of who may conduct an investigation or prosecution; its prohibition is limited solely to the question of who may preside at a hearing.  The decision in *Giuliani*, barring independent trial or hearing officers, did not strip away CCRB's ability to investigate or prosecute a disciplinary matter.

Nevertheless, after the decision, DAO re-assumed the role of prosecuting disciplinary hearings it had held before the CCPC 2000 report.  From 2007 to 2011, CCRB substantiated about 200 cases a year, recommending Charges and Specifications for 140 of them.[1362]  During those years, DAO would then assume the case and decide whether to prosecute.  DAO had a history of reluctance to prosecute case presented by CCRB.  "In the 18 months prior to the APU's existence, the Department hadn't held a single trial for any CCRB case for which the Board had recommended Charges and Specifications."[1363]

Beginning in 2010, a pilot program was instigated, with a CCRB attorney acting as a lead prosecutor.  An Administrative Prosecutions Unit was permitted, in cases substantiated by CCRB, to prosecute "a small portion of the misconduct cases that went to administrative trial at the police department."[1364]  The pilot project, funded by the City Council, was given permanent status and funding in November 2011.  According to CCRB: "This was the first time that a civilian oversight agency in the United States had been given prosecutorial power."[1365]  The pilot was deemed to be a success.

> During the pilot program one of the benefits that emerged was the ability of the CCRB to get cooperation and trial testimony from victims and civilian witnesses who felt more comfortable with an employee of the independent agency with whom they had an established relationship, rather than police department lawyers.  Another advantage held by CCRB attorneys is their familiarity with the intricacies of the agency's investigative process and their ability to give trial judges insight into the nature of these investigations.  This can affect how judges weigh particular evidence and arguments, increasing the likelihood of a guilty finding.[1366]

---

[1362] CCRB MOU Announcement, "The CCRB Announces Historic Agreement with the NYPD for Expanded Prosecutorial Authority" (Mar. 28, 2012), available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/CCRB_AP U_announcement.pdf.

[1363] Fred Davie, Chair, "Changes to Chapter 18-A of the New York City Charter," May 23, 2018.

[1364] *Id.*

[1365] Status Report For the CCRB's Administrative Prosecution Unit First Quarter of 2014 at 1.  (Available here: https://www1.nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/apu-2014q1.pdf).

[1366] CCRB MOU Announcement, "The CCRB Announces Historic Agreement with the NYPD for Expanded Prosecutorial Authority" March 28, 2012, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/CCRB_AP U_announcement.pdf.

Today, in the main, APU handles the cases where FADO allegations are substantiated and the CCRB recommends Charges and Specifications.[1367]  There are exceptions, however, when a case will be handled by DAO instead, in particular when a case is "retained" by the Police Commissioner, force cases and SQF allegations that are subsumed within a force investigation.

On April 2, 2012, a Memorandum of Understanding (MOU) was signed between the Police Commissioner and the Chair of CCRB.[1368]  The APU-MOU permits the APU to "undertake the administrative prosecution of all civilian complaints against NYPD uniformed officers which have been substantiated by CCRB and in which CCRB has recommended that Charges and Specifications be preferred [after the effective date[1369]]."[1370]  DAO continues to prosecute charges drawn within the Department after investigation by IAB or other internal entities.  The APU-MOU lays out many of the procedural aspects of prosecutions by CCRB.  The MOU required adoption and amendment of the "respective chapters of the Rules of the City of New York . . . to implement this MOU."[1371]  Accordingly, a new Subchapter E of Title 38-A of the Rules of the CCRB, was adopted which replaced the previous Subchapter E.

In 2013, the APU was comprised of 12 APU lawyers, all of whom were former local or federal prosecutors; there was also an investigative staff of four investigators with CCRB investigative experience.[1372]  Currently the APU consists of a Chief Prosecutor, two Deputy Chief Prosecutors, ten prosecutors, four trial preparation assistants and an administrative assistant.[1373]

To place the APU-MOU and the Rules in context, at the end of a prosecution and trial or settlement, the final decision still resides and remains with the Police Commissioner.[1374]  The Police Commissioner may set aside a finding and can modify any penalty.  The MOU acknowledges this in paragraph 8:  "The Police Commissioner shall retain in all respects the authority and discretion to make final disciplinary determinations."[1375]  All trial decisions and negotiated pleas are subject to approval by the Police Commissioner.[1376]

---

[1367] In 2022, CCRB began to handle cases in which it recommended command discipline, but the officer refused to accept a CD offered by DAO.  (Item 575, City 09.01.23 Feedback to Yates Discipline Report.)

[1368] *Memorandum of Understanding Between the Civilian Complaint Review Board (CCRB) and the Police Department NYPD of the City of New York Concerning the Processing of Substantiated Complaints* (Apr. 2, 2012), hereinafter "MOU," available at https://www.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/apu_mou.pdf.

[1369] April 11, 2013.

[1370] MOU ¶ 1.

[1371] MOU ¶ 27.

[1372] Status Report For the CCRB's Administrative Prosecution Unit First Quarter of 2014 at 1–2, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/apu-2014q1.pdf.

[1373] Item 580, City 09.01.23 Feedback to Yates Discipline Report.

[1374] NY City Charter § 434, NYC Admin. Code § 14-115.

[1375] MOU ¶ 8.

[1376] *Id.* ¶ 21.

When they were first adopted in 2012, the APU-MOU and Subchapter E of the Rules[1377] largely contained consistent language.  There are three observations worth noting.

First, the MOU and Subchapter E are only applicable to prosecutions of Charges and Specifications by way of a formal disciplinary process.  Unless the Disciplinary Guidelines alter the landscape, the APU-MOU is generally inapplicable to SQF allegations for which Charges and Specifications are not recommended.[1378]

Second, the Rules were amended significantly in 2018, whereas the MOU was not at the time and has not been amended since.  Inconsistencies between the amended Rules and MOU will persist until the MOU is re-drafted.[1379]

Finally, recent amendments to the Charter and state law will require further amendments to the Rules and the MOU, as there are changes regarding jurisdiction, confidentiality, and access to information which are not reflected in the Rules or the MOU.  The MOU is outdated and in need of revision.

The APU-MOU is not mandated by law.  It is a voluntary accord of potentially limited duration.  Provision 29 of the MOU recognizes that "[e]ither party hereto may terminate this MOU upon written notice."[1380]  38-A RCNY § 1-02 concedes that "[]the jurisdiction of the Board includes the prosecution of certain substantiated civilian complaints pursuant to a Memorandum of Understanding (MOU) executed by the Board and the Police Department on April 2, 2012 (as from time to time amended) during the period that such MOU is in effect."[1381]

---

[1377] Title 38-A of the Rules of the Civilian Complaint Review Board.

[1378] *See, e.g.*, CCRB's "Disciplinary Framework" which does not call for charges based upon an SQF violation.  In a review of this report by representatives of Communities United for Police Reform (CPR), The Justice Committee & CPR, and VOCAL-NY & CPR (hereinafter jointly referred to as "CPR"), dated July 12, 2024, the recommendation was made that "formal charges and discipline be pursued for any officer for the 2nd improper stop, and first if aggravated."  This would mean that CCRB would be required to recommend Charges and Specifications, that APU would draft specifications, that NYPD would formally serve the officer, and that the matter would be presented to a Trial Commissioner.  It seems unlikely that a requirement that Charges and Specifications be served and filed for SQF cases would result in greater discipline, since the final disposition still rests with the Police Commissioner, guided by the Disciplinary Guidelines Matrix.  A move to requisite formality would lend some transparency to the process in cases which actually went to trial, since trials are public.  However, it is doubtful that some or any cases would actually proceed to trial for SQF violations (absent concomitant aggravating misbehavior such as demonstrated bias, false statements, or wrongful use of force).  The probable outcome would be a disposition negotiated between APU, DAO, and the subject officers.  Absent a change in the Disciplinary Guidelines or a dramatic change in practice by CCRB and the Department, there is little reason to believe that negotiated settlements would be any different if service of Charges and commencement of formal proceedings were added as a prerequisite to substantiation.  At the same time, formality in the process would be expensive, burdensome to APU, Trial Commissioners and NYPD, delay commencement of proceedings, and extend the time between complaint and final disposition.

[1379] See, for example, handling of OPMN and exclusion of authority to review supervisory failures, both discussed earlier, and revisions to the Rules permitting amendments to CCRB panel recommendations for Charges.

[1380] MOU ¶ 29.

[1381] 38-A RCNY § 1-02.

During the review process conducted by the New York City Charter Revision Commission, the CCRB requested "Codification of the APU."[1382]  In support of that proposal, Chair Davie wrote:

> Amending the City Charter to codify the APU will ensure that the effective administrative prosecution procedures developed by the CCRB and the NYPD over the past few years continue, regardless of leadership changes at either agency.  Such action by the Charter Revision Commission will further demonstrate the City's commitment to providing fairness and safety to the public by ensuring that there is an independent, proven, and secure process for holding NYPD officers accountable for misconduct.

In the Preliminary Staff Report to the Charter Commission, staff noted that codification was supported by Citizens Union, the NYCLU and Communities United for Police Reform.[1383]  Neither the Staff Report nor the Final Report[1384] adopted the proposal for codification.  The Commission concluded that, while "the 2012 MOU is terminable at will by either the NYPD or the CCRB, the Commission has no reason to believe this agreement will be terminated."[1385]

In the end, the APU-MOU was not codified.  CCRB's ability to prosecute cases formally is left to the discretion of the Police Commissioner, who may terminate the MOU at will.

## A.    APU - Process

In order to formally commence a prosecution, Charges and Specifications are drafted by CCRB and then served upon the subject officer by NYPD, at DAO's direction, on behalf of CCRB.  Charges and Specifications include,

> [A] brief statement of the disciplinary matters to be adjudicated, including the activity, behavior or incident which is the subject of the disciplinary action and, where appropriate, the date, time and place of occurrence.  Additionally, the Charges and Specifications shall identify the contract provision, law, policy, regulation or rule that was allegedly violated.[1386]

After the CCRB notifies the Police Commissioner and DAO of its recommendation, the Department Advocate makes an initial determination regarding whether an "expedited prosecution" is necessary "for example, where the subject officer has filed for vested or service retirement or is scheduled for imminent promotion."[1387]

---

[1382] Fred Davie, Chair, "Changes to Chapter 18-A of the New York City Charter," May 23, 2018.

[1383] Charter 2019 NYC, Preliminary Staff Report, April 2019, at 17.

[1384] Final Report of the 2019 New York City Charter Revision Commission, August 2, 2019.

[1385] *Id.* at 53.

[1386] 38 RCNY § 15-03(a).

[1387] MOU ¶ 14.

If CCRB determines that it cannot conclude the prosecution in time, it can ask DAO to undertake the prosecution.[1388] While this is rare to non-existent, it is more common for a case to be resolved through administrative filings associated with retirement.[1389]

Once the officer has been served, the APU requests from NYPD the documents necessary to determine whether and how the officer should be disciplined.[1390] Among other things, the NYPD provides a summary of the officer's NYPD disciplinary record and a report from the officer's commanding officer detailing the officer's performance evaluations.[1391] The DAO is responsible for ensuring that the relevant personnel at the NYPD cooperate with the CCRB throughout this process.[1392] If, during the course of discovering information for the prosecution, the APU learns that a case might fall outside the CCRB's jurisdiction or require a deadline that the APU cannot meet, it will dismiss the charges against the officer and either refer the case to the entity that has power to review the officer's actions, or request that the NYPD discipline the officer.[1393]

APU may request that an officer be placed upon modified assignment or suspended, either with pay or without pay. The determination is made by the Police Commissioner.[1394] A suspension without pay may not exceed 30 days.[1395]

### i.    Amendments to Charges

Prior to trial, APU attorneys may engage in plea discussions with the officer and the officer's representatives. APU takes longer to resolve a case by plea than by trial. In other settings, pleas usually are employed to expedite resolution. DAO time-to-disposition is almost halved by plea agreements. It takes APU, on average, 242 days longer to resolve a case by plea than it takes for DAO to negotiate a plea.

---

[1388] *Id.*

[1389] 116 officers "separated" from the Department in 2018-2020 when faced with disciplinary charges. (Discipline in the NYPD- 2020, available at https://www1.nyc.gov/site/nypd/stats/reports-analysis/discipline.page.)  29 of those were officers facing discipline recommended by CCRB. (CCRB Monthly Statistical Reports, January 2019, 2020, and 2021, available at https://www1.nyc.gov/site/ccrb/policy/monthly-statistical-reports.page.)  Five of those were cases which included a substantiated SQF misconduct allegation among other allegations in the complaint. (SQFSTA Matrix 2021). Other than ▮▮▮▮▮▮, no officer prosecuted by APU has been terminated. The DCJS online Decertification List shows only three officers in all as having been Removed for Cause pursuant to a Hearing Held Under Civil Service Law § 75 since 2016, available at https://www.criminaljustice.ny.gov/Officer_Decertification.ht m. They were Officers ▮▮▮▮, ▮▮▮▮, and ▮▮▮▮. None of those officers were terminated as a result of a substantiated CCRB allegation. Det. ▮▮▮ is listed in the Appendix for a case where CCRB recommended Command Discipline for a bad frisk, but the Police Commissioner decided on NDA for the frisk.

[1390] *Id.* at "Calendaring the Case."

[1391] CCRB, Procedures and Standards for CCRB Board Panels, *supra* note 841, at 4.

[1392] CCRB RULES, *supra* note 840, at § 1-45(f) (2018).

[1393] *See* CCRB RULES, *supra* note 840, at §§ 1-43, 1-44 (2018); *see also* JONATHAN DARCHE, REPORT ON THE ADMINISTRATIVE PROSECUTION UNIT SECOND QUARTER OF 2018, at 5 (2019).

[1394] Patrol Guide § 206-08.

[1395] New York Consolidated Laws, Civil Service Law § 75 (3).

One explanation for the lengthy plea discussions in APU cases may be that DAO has more flexibility in reviewing or amending specifications during the course of negotiations. Plea discussions occur after the panel has voted. During the course of those discussions, new evidence may be discovered, either in aggravation or mitigation after the initial drafting of the charges. The Rules of the Police Department, but not the MOU, explicitly allow that "Charges and Specifications may be amended upon notice to all parties."[1396] This makes practical sense for all concerned. For this reason, APU sought comparable authority to amend Charges and Specifications. CCRB amended its Rules[1397] in 2018 to parallel the Department's Rules. This would have allowed CCRB's Chief Prosecutor or Executive Director to ask the panel to add allegations, or to reconsider previously unsubstantiated allegations upon written notice to the parties.[1398]

Before the 2018 amendment to the Rules could take effect, the Appellate Division, First Department struck the provision, declaring,

> Among other things, the CCRB can recommend to the Police Commissioner that charges and specifications be brought and the Police Commissioner can accept or reject this recommendation. The MOU provides a mechanism for delegating to the APU prosecution of CCRB-recommended charges and specifications accepted by the Commissioner. Amended charges and specifications, being in effect, new charges, would have to be submitted to the Commissioner as recommendations. This is a limitation imposed by the Charter. Since neither the CCRB nor the NYPD has the power to override the Charter, the two agencies' MOU cannot do so either.

The mistaken assumption underlying the Appellate Division's decision was that amendments to a panel's list of charges would unlawfully circumvent approval by the Police Commissioner. DAO attorneys ask panels to reconsider their decisions before proceeding. It is unclear why APU prosecutors, deputized to stand in the shoes of DAO prosecutors, could not do the same. In any event the Police Commissioner still holds the same power to retain a case even after amendment, and to accept, reject or modify any finding by a Trial Commissioner or any proffered plea. The MOU and the Rules are clear that:

> In all instances the Police Commissioner may accept, reject, or modify the recommendation presented, or may ask CCRB for additional investigative or background information in its possession. He may also request further investigation or development of the record in the case to enable him to make a final disciplinary determination. If CCRB's recommendation is rejected or modified, CCRB will then be responsible for taking any appropriate follow-up action, such as proceeding with prosecution of the subject officer, engaging in additional investigation, or further developing the record in the case.[1399]

---

[1396] 38 RCNY § 15-03(a).

[1397] 38-A RCNY 1-42(h).

[1398] 38-A RCNY § 1-42(h).

[1399] MOU ¶ 20; *see also* 38 RCNY § 15-17; 38-A RCNY § 1-46(c).

And "[t]he Police Commissioner retains in all respects the authority and discretion to make final disciplinary determinations."[1400]

CCRB has not appealed the court's ruling on this issue.  The most recent proposed set of amendments to Title 38-A delete paragraph 1-42(h) in its entirety, thereby eliminating the authorization for the APU prosecutor to seek amendments from a panel after commencement of the proceedings.[1401]

### ii.    Pleas and Final Approval of Pleas by the Police Commissioner

After the officer is served with notice of the Charges and Specifications, proof of service is returned to the APU.  At that point, APU requests the Summary of Employment History (a redacted portion of the CPI for that officer) and a CORD report (Commanding Officer's Review), which will list prior A-CDs within the last 12 months along with the most recent Employment Evaluation and Departmental Recognition of medals.[1402]  During preparation of this Report, the following proposition was put to RMB by the Monitor Team:

> The CCRB should obtain a complete record of any prior disciplinary actions by the Department, including disciplinary probation, whether or not the prior investigation came through CCRB.  This may include PEPR, CRAFT or CORD reports as well. This should include prior discipline which came through Command, FID, DAO, BIU, IAB, DCT or OCD.[1403]

The response from RMB was:

> [A]bsolutely not.  It's not relevant to their determination, runs counter to the goals of discipline, management of a command, established policy, collective bargaining and due process.  For the more serious or non-technical 206-03 violations, these generally go through DAO.[1404]

APU does not have access to the full CPI for the officer.[1405]  The disciplinary history does not include A-CDs that are more than one-year old; they are removed and expunged from precinct

---

[1400] 38-A RCNY § 1-45(a).

[1401] Miscellaneous Rule Amendments, CCRB-4, certified November 5, 2020.  Rules proposal available for public comment on December 9, 2020, available at https://www1 nyc.gov/assets/ccrb/downloads/pdf/about_pdf/CCRB%20 Proposed%20Rules_11092020.pdf.

[1402] PD 468-153.  The Commanding Officer describes a subject officer's assignments and rates the officer's overall performance.

[1403] Matthew Pontillo, RMB, February 26, 2021, correspondence.

[1404] *Id.*

[1405] On February 26. 2021, in response to inquiry by the Monitor team concerning APU access to background information, RMB wrote: "The 'Summary of Employment' document that the NYPD provides to CCRB contains all of the information that they have asked for.  It includes C&S, Sch. "C" and "B" CDs, and Dismissal Probation and includes all of the information considered by the NYPD when evaluating a case.  Schedule "A" CDs for command-level violations are not considered nor should they be. The list of 36 violations enumerated in PG 206-03 identifies technical and administrative violations and delegates the authority to the commanding officer to address those issues

records.  A history of B-CDs may be available, although they are subject to discretionary sealing after three years.  Unsubstantiated, unfounded, or exonerated cases will not be included.  Pending complaints which have not been resolved are not disclosed.  This full history would be necessary for APU's assessment of the appropriate plea to propose.  A complete personnel history, listing all Training and all prior investigations, would also be desirable.

The Matrix-MOU, signed February 4, 2021, requires the CCRB investigator to "email a NYPD employment history request form" after CCRB has substantiated a complaint against the officer.  That background information is not, according to the MOU, available during the investigation.[1406]  Absent exceptional circumstances, NYPD has twenty days to respond to the request.[1407]  NYPD may redact information that is not available under FOIL and CCRB may not disclose the employment or disciplinary history provided.[1408]

Typically, the APU attorney will schedule an initial conference with the subject officer and the officer's attorney.  A plea offer is made and, if accepted, forwarded to the Office of the Deputy Commissioner of Trials.  If no plea is taken, the case is calendared by DCT for trial.  The proposed plea agreement, if approved by the Trial Commissioner will be held in abeyance and sent to the First Deputy Commissioner and the Police Commissioner for approval.

Under the Matrix-MOU, if there is a plea, APU is to present a written analysis "describing with particularity the basis for the recommended penalty, any aggravating and or mitigating factors applied and a description of how those factors were applied."[1409]

Under the 2018 Rules amendments, APU can negotiate a plea and hold off on final agreement until the Police Commissioner has a chance to accept, reject or modify the proposed plea.[1410]  Prior to the Rule change, the parties would enter into an agreement and, on occasion, find the agreement subject to subsequent modification by the Commissioner.  Under the revised Rule, by accepting the agreement, the Commissioner approves or modifies the discipline to be imposed prior to the entry of the plea.[1411]

---

locally and manage their command.  The whole point here is to empower commanders and address low-level issues through non-judicial means.  Expungement is an important part of this process since it fulfils the goals of a disciplinary system which include rehabilitation and education and strikes the right balance with respect to proportionality and fairness. These sch. "A" CDs are not relevant to CCRB cases with regard to content or penalty. CCRB already knows the outcome of their own cases related to their FADO jurisdiction including CDs.  Until now, CCRB has not asked for the penalty imposed by the PC – only the method of imposing the penalty (i.e., "A" CD, "B" CD, etc.)."

[1406] Matrix-MOU, § V, ¶ 10.

[1407] *Id.* ¶ 12.

[1408] *Id.* ¶ 11.

[1409]  Matrix-MOU, Sec. III, ¶ 4.

[1410]  38-A RCNY § 1-46(d).

[1411]  In *Lynch v. New York City Civilian Complaint Rev. Bd.*, 64 Misc. 3d 315, 334 (N.Y. Sup. Ct. 2019), the court found that the revised Rule still gives the Commissioner final say in any proposed plea, as the Rule still explicitly states that "the Police Commissioner will be informed of any proposed plea, and it will be *held in abeyance until approved by the Police Commissioner*."  (Emphasis in original).

The PBA opposed this, arguing that holding a plea "in abeyance" would deprive the Police Commissioner of the right to make a final determination. They denominated the amendment as the "Undermine Plea Authority Rule." The lower court rejected this argument, concluding that "the Commissioner still has the final say."[1412]  The Rule also provides:

> In all Prosecution in which the Police Commissioner rejects a negotiated plea, the CCRB will be responsible for implementing the Police Commissioner's decision, including further negotiating the Prosecution in a manner consistent with the Police Commissioner's determination or proceeding with the prosecution.

> The PBA did not appeal the ruling and Revised Rule 1-46(d) remains in effect.

Plea discussions after charges are filed often result in modification or reduction of the charges voted upon by the CCRB panel. An analysis conducted during Commissioner O'Neill's term in office (2nd Quarter of 2016 through 3rd Quarter of 2019) listed 152 pleas in cases prosecuted by APU. Of 152 pleas presented to the Commissioner, 103 were approved and 49 were closed at a discipline level below APU's recommendation.[1413]  The most common discipline imposed in plea agreements was forfeiture of vacation days.[1414]

After the decisions in *Lynch v. CCRB*, pleas are agreed to, approved by the DCT, but held in abeyance subject to the Police Commissioner's approval. The Police Commissioner is free to continue the frequent practice of disapproval of a plea, requiring the parties to accept a change or re-negotiate. It seems counter-productive if the Police Commissioner were to downgrade a negotiated plea that are within the Disciplinary Guidelines except under exceptional circumstances. If officers know they will get two bites at the apple they can readily forestall a public trial and full examination by trial, and then work out a plea with the Police Commissioner. Under the Disciplinary Matrix, however, the Police Commissioner is required to write a detailed explanation for departure from the recommended penalty. This assumes that the Deputy Commissioner for Trials has approved and recommended the plea agreement. The Charter requires the Police Commissioner to write a report which:

> [S]hall include a detailed explanation of the reasons for deviating from the board's recommendation or the recommendation of the deputy commissioner responsible for making disciplinary recommendations and, in cases in which the police commissioner intends to impose or has imposed a penalty or level of discipline that is lower than that recommended by the board or such deputy commissioner, shall also include an explanation

---

[1412] *Id.*

[1413] CCRB, Report on the *Administrative Prosecution Unit ("APU")*: Second and Third Quarters of 2019 at 10, available at https://www1 nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/20200605_APU_2Q-3Q19.pdf.

[1414] *See, e.g.*, JONATHAN DARCHE, REPORT ON THE ADMINISTRATIVE PROSECUTION UNIT FIRST QUARTER OF 2018, at 5 (2019); JONATHAN DARCHE, REPORT ON THE ADMINISTRATIVE PROSECUTION UNIT FIRST QUARTER OF 2018, at 6–8 (2018); JONATHAN DARCHE, REPORT ON THE ADMINISTRATIVE PROSECUTION UNIT THIRD QUARTER OF 2016 – FOURTH QUARTER OF 2017, at 8–15 (2018); *see also* Heather Cooks, Senior Counsel, CCRB, CCRB: The Life of a Case, at "APU Plea Offers" (on file with author).

of how the final disciplinary outcome was determined, including each factor the police commissioner considered in making his or her decision.[1415]

The quarterly reports by APU to the Police Commissioner provide brief descriptions of departures from APU recommendations. More recently, following the repeal of Civil Rights Law § 50-a, the quarterly reports provide links to CCRB's closing report, prepared by a CCRB investigator which describes the allegations and recommends a disposition, but not a penalty. They are very helpful in understanding the process and the outcome. But the reports are heavily redacted such that a complete understanding of the case can be difficult when there are multiple officers or civilians involved.

It is not uncommon for the Police Commissioner to set aside plea agreements to dismiss the charges or reduce the penalty. In the first half of 2023 alone, 26 pleas were presented to the Police Commissioner after negotiations between the officer and APU and after approval by the deputy trial commissioner, the Police Commissioner disapproved 13 of those pleas, either dismissing the charges or imposing no penalty.[1416]

Although not fully representative of the entire class, the reports do add context to the process. In one case, for example, a Black male and a Hispanic male were stopped by five officers in plainclothes and unmarked vehicles.[1417] They were found to have frisked and searched the men without cause. The Respondent, who was on the scene and supervised the misconduct, had accepted a plea with a forfeiture of ten penalty days. The Police Commissioner set aside the negotiated plea and imposed four days forfeiture because it was "more consistent with penalties previously imposed for similar misconduct."[1418]

Another case of a plea which was downgraded involved an Anti-Crime officer who frisked and searched two individuals. He refused to identify himself, ultimately pushing his shield toward the face of one and, when questioned, falsely denied the frisks and searches.[1419] No stop report was filed. Video evidence substantiated the complaints. Charges of wrongful frisks and searches and discourtesy were part of a plea agreement for twenty-five days forfeited for one of the complaints and twelve vacation days for the other. The Commissioner called the pleas excessive. One was renegotiated to ten days and the Police Commissioner reduced the penalty to five days for the other. This case is an example of the need to keep charges together instead of splitting off the false testimony allegation and stop report failures; there is no indication as to how referrals for the failure to file stop reports were resolved.[1420] Without exploration of the truthfulness of the officer's testimony or consideration of the missing paperwork, a narrow examination of the frisks and searches in isolation, without considering the rest of evidence, would not do justice to the inquiry.

---

[1415] N.Y. City Charter § 440(d)(3).

[1416] CCRB, Report on the Administrative Prosecution Unit ("APU"): First and Second Quarters of 2023.

[1417] CCRB, Report on the Administrative Prosecution Unit ("APU"): Second and Third Quarters of 2019, at 10.

[1418] *Id.* at 10-11.

[1419] *Id.* at 11.

[1420] *Id.*

But for the video evidence, this matter may well have resulted in a simple contest of credibility without a satisfactory resolution.

### iii.    APU Prosecutions - Numbers

CCRB panels substantiate charges and recommend formal proceedings when the panel believes the officer should receive a more serious penalty than an A-CD or B-CD.  While a Schedule C-CD is a discipline level available to the Police Commissioner, allowing imposition of 20 penalty days, the Board cannot recommend that level of discipline.[1421]

The panel does not draw up the specifications itself.  Instead, when a panel recommends Charges and Specifications, the Case Management Unit notifies APU attorneys, who prepare the specifications, submit them to the panel for review and approval, and then forward them to DAO, usually within four weeks.[1422]  At that point, upon review, a case may be sent back for reconsideration, retained by the Department, or permitted to proceed once the Department serves the papers upon the subject officer.

Since 2013, the APU has closed more than 400 cases, tried more than 250 members of the NYPD, and taken pleas from more than 180 members of the NYPD.[1423]  Board recommendations calling for filing of Charges and Specifications have fluctuated wildly over the past six years.  With the adoption of the Disciplinary Framework ("Framework")" by CCRB in 2018, Charges and Specifications for SQF violations were discouraged.  The Framework has been replaced by the Disciplinary Matrix ("Matrix") and the numbers may stabilize.  It could be that the variations in the number of cases for which CCRB seeks formal discipline are based on external factors rather than inconsistency in value judgments made by the panels.  If so, the Matrix will not level the number or the percentage of cases for which a prosecution and trial are sought.

Formal proceedings commenced by CCRB for all FADO, not just SQF, misconduct, are small in number.  Of the many citizen complaints to CCRB, only a handful are punished through formal proceedings.  By the time complaints are screened, investigated, adjudicated, and decided by the Police Commissioner, the number of cases resulting in discipline is narrowed considerably.

After substantiating FADO misconduct, panels have recommended formal discipline (Charges and Specifications) as little as 8% of the time and as much as 55% of the time over the from 2014-2020.[1424]  Year by year, the number of cases where CCRB called for charges were:

---

[1421] Patrol Guide § 206-05 ("[O]nly the Department Advocate's Office can direct issuance of a Schedule "C" command discipline.").

[1422] CCRB, APU Prosecutions and Provision Two of the MOU (CCRB's Second Response to the Federal Monitor's Request for CCRB Documents, encl. 12 (Aug. 23, 2018); on file with author).

[1423] *The Administrative Prosecution Unit (APU)*, CCRB (last visited Nov. 3, 2021), available at https://www1.nyc.gov/site/ccrb/prosecution/administrative-prosecution-unit-apu.page.

[1424] After adoption of the Disciplinary System Penalty Guidelines, the number of cases with recommendation for Charges and Specifications has increased significantly.  Since almost none of those cases have resulted in a disposition, it is too early to know if they will be tried, retained, reduced, or pled.

- 2014:     254 of 463     =     55% of substantiated cases
- 2015:     190 of 769     =     25%
- 2016:     59 of 513     =     12%
- 2017:     38 of 355     =     11%
- 2018:     73 of 326     =     22%
- 2019:     82 of 536     =     15%
- 2020:     35 of 443     =     8%

"Complaints" and "Cases" are distinct measures of activity. A complaint may implicate more than one officer. The two measures roughly correspond. So, for example, in 2018, the Board recommended Charges in 46 of 226 (20%) of substantiated complaints. In 2019 panels sought charges in 55 of 370 (14%) of substantiated complaints.[1425] Both numbers are almost identical to the percentage of cases recommended for Charges.

In the three fiscal years from 2018-2020, looking at cases, there have been 81 trials and 56 plea bargains.[1426]

- Fy 2018:   43 trials and 33 pleas
- Fy 2019:   19 trials and 16 pleas
- Fy 2020:   39 trials and 7 pleas

Matching statistics of filings with dispositions, given the varying reporting mechanisms used by NYPD and CCRB and the considerable time-lag between the two events is difficult. The following chart breaks down APU final results in the Trial Room.

**APU Results - Calendar Year (Cases)**

|  | **2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|
| **Trials** | 67 | 12 | 28 | 21 |
| Guilty Verdict | 28 | 9 | 15 | 11 |
|     PC Reversed to Not Guilty | 4 | 1 | 1 | 3 |
| Not Guilty Verdict | 39 | 3 | 13 | 10 |
| Plea With Discipline Approved | 18 | 19 | 10 | 5 |
| Plea Disapproved/No Discipline | 6 | 1 | 0 | 0 |

---

[1425] Executive Director's Monthly Report – January 2020 (Statistics for December 2019) at 22, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2020/20200108_monthlystats.pdf.

[1426] CCRB, Preliminary Mayor's Management Report at 71, available at https://www1.nyc.gov/assets/operations/downloads/pdf/pmmr2021/ccrb.pdf.

There is also a time-lag between verdict/plea in the trial room and final decision on a penalty by the Police Commissioner.  For those same years, penalty decisions by the Police Commissioner were:

| Penalty | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Penalty Imposed | 51 | 29 | 25 | 16 |
| No Discipline/Penalty Imposed[1427] | 57 | 12 | 18 | 20 |

From the earlier tables, we know that CCRB panels voted to recommend Charges and Specifications in 226 cases for the four calendar years 2017-2020.  Some number of those have not yet been resolved.  But of 228 cases prosecuted by APU which did reach final disposition during those four years, 121 ended with discipline being imposed and 107, for one reason or another, went without discipline.[1428]

In further analyzing the 121 APU guilty/plea cases over that four-year period in which a penalty was imposed:

- 1 was terminated (█████████)
- 3 were suspended or lost more than 30 days credited time
- 4 forfeited between 21 to 30 days credited time
- 28 forfeited between 11 to 20 days credit
- 5 received a penalty of between 1 to 10 forfeited penalty days.

### iv.    Comparing DAO and APU Results in Cases of Formal Prosecution

Section VI.H.iv of this report discussed prosecution by DAO.  A significant number of those cases are disciplined and there are a cognizable number of dismissals, suspensions, and forfeiture of credited time.  By contrast, complaints by civilians substantiated by CCRB and proven in the Trial Room, are less likely to result in conviction or comparable penalties.

For example, looking at 2019, CCRB-APU had 15 guilty verdicts and 10 pleas out of 51 closures in the Trial Room, for a 50% conviction rate.  Of these 25, one officer was terminated (████████), one officer received a loss of more than 30 penalty days, and 23 officers received a penalty of fewer forfeited days.

In that same year, DAO had 322 guilty verdicts or pleas out of 339 who were charged, for a 98% conviction rate.  While many of those cases were for misconduct unrelated to public complaints, such as DWI or drug use, assorted Rules Violations, Mishandling of Firearms, or Domestic Violence, there were 16 officers charged with use of excessive force and 18 officers charged with Misconduct Involving Public Interaction.  All 34 of those officers were found guilty or pled guilty.  All 322 of the officers who pled or were found guilty were penalized with dismissal

---

[1427] This includes cases that did not proceed to discipline for whatever reason, including cases where the Police Commissioner reduced a proffered penalty to guidance or command discipline without penalty as the final disposition. It does not include Not Guilty verdicts.

[1428] Because of the natural time lag between a panel vote and final disposition, the two totals do not match.

(10), forced separation (17), loss of credited days with dismissal probation (94), or forfeiture of penalty days (201).[1429]

### v.    Trial Decisions – APU Cases

Recently, the Department has begun to post a "Trial Decisions Library" online.[1430]  From that, a reviewer can read the trial recommendations by DCT hearing officers at the conclusion of a trial or, occasionally, upon acceptance of a plea.  There is a considerable lag between the time of trial and the time that a decision is posted.  Nonetheless a review of the decision list provides an indication of CCRB-APU activity, outside the quarterly reports filed by CCRB.

Of the most recent 107 cases described in the "Library" covering a period from November 2019 to August 2021, thirty-five were prosecuted by APU.  The rest were DAO prosecutions.  Eleven of the 35 CCRB cases resulted in Not Guilty verdicts by the Trial Commissioner.  Another three had a Guilty finding reversed by the Police Commissioner, who disagreed with the verdict.

Of the remaining 21 cases, where an APU guilty verdict was sustained by the Police Commissioner, the only complaint regarding a street encounter with a stop and frisk allegation unaccompanied by other misconduct, was the case of ███████████████████████, described earlier in this Report.  Even in that case, there was an allegation that ████ "grabbed and pulled" the "groin area" of the complainant, an aggravating factor which may have been resolved internally by the Department since contact with the groin is separated from strip searches, with the former being investigated by IAB and the latter investigated by CCRB.

In litigation prior to the repeal of Civil Rights Law § 50-a,[1431] the Department had prevailed when it argued that minutes of the proceedings, Fogel letters, and the preliminary recommendation of a Trial Commissioner are all confidential personnel records.[1432]  While the DCT now publishes the final decision and recommendation of a Trial Commissioner, the minutes of the proceedings, recommendations by DAO to the Police Commissioner, and Fogel letters are still not publicly available.[1433]

### vi.    Stop and Frisk Misconduct – APU in the Trial Room

Any analysis of the level of discipline imposed for violations of *Floyd* begins with recognition that formal disciplinary proceedings with penalties for stop and frisk violations are the exception, not the rule.  Recall the "funnel" of penalties for SQF misconduct for the years 2017-2019, wherein 286 complaints containing a CCRB substantiated stop, question, frisk or search of

---

[1429] NYPD 2020 Discipline Report at 7, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/discipline/discipline-in-the-nypd-2020.pdf.  Technically speaking, forced separation is not a discipline. NYPD is not permitted to force a retirement, but it is common to negotiate a settlement (either before or after a finding of guilty) of voluntary separation.

[1430] Trial Decision Library, available at https://nypdonline.org/link/1016.

[1431] L. 2020, ch 96, § 1 (eff. June 12, 2020).

[1432] *N.Y. C.L. Union v. New York City Police Dep't*, 32 N.Y.3d 556, 564 (2018).

[1433] *Fogel v. Bd. of Ed. of City of N.Y.*, 48 A.D.2d 925, 925 (1975).  Fogel letters can be filed in DAO prosecutions and in APU prosecutions. 38 RCNY § 15-06 and 38-A RCNY § 1-46 (a).

person (SQF) violation were sent to the Police Commissioner. Of the 286, CCRB recommended formal proceedings (Charges and Specifications) in 35 cases. (None were for SQF misconduct alone; *i.e.*, there were associated other charges.) In the end, 21 of those cases ended with penalty days forfeited. When penalty days are assessed, the penalty more often than not is in a range between 1 to 10 accrued vacation days. Of the 286 SQF misconduct cases in that time period, only 3 ended with a penalty in excess of 10 days forfeited.[1434] Remembering the Appellate Division's overly expansive reading of Unconsolidated Law § 891 in the *Giuliani* case, to require that all disciplinary adjudications be kept in-house despite the fact that the plain language of the statute only requires such for termination cases, it is worth noting that none of the SQF related cases in the trial room ended in termination or suspension.

### B.    Provision Two – Retention by the Police Commissioner

Although the MOU and the Rules provide that the APU is to undertake administrative prosecution of civilian complaints against officers that the CCRB has found to be substantiated and for which it has recommended Charges and Specifications, the MOU also allows the Police Commissioner to intervene and remove the case from the APU. The cases where the Police Commissioner denies APU the ability to prosecute are commonly known as "Provision Two" cases, a reference to paragraph 2 of the APU-MOU. The MOU and the Rules authorize the Police Commissioner to order APU to "refrain" from prosecuting a case in "limited circumstances where the Police Commissioner determines that [CCRB's] prosecution of the Charges would be detrimental to the Police Department's disciplinary process." By agreement, this power would be invoked only in cases where "there are parallel or related criminal investigations, or when, in the case of an officer with no disciplinary history or prior substantiated CCRB complaints, based on such officer's record and disciplinary history the interests of justice would not be served."[1435]

Under Provision Two, the Police Commissioner is to write a "detailed explanation" of the decision to retain a case along with "a statement detailing what discipline if any the Police Commissioner would pursue."[1436] CCRB then has five business days to object to the decision in writing, at which point the Police Commissioner then can respond in writing and, if he persists in removal, CCRB must "refrain from further prosecution."[1437] Again, the denial must be "made in writing and shall include a detailed response to CCRB's rebuttal."[1438] In sum, the decision to retain a case, if opposed by CCRB, requires an exchange of three explanatory writings: two "detailed explanations" by the Police Commissioner and one "rebuttal" by CCRB.

---

[1434] The surrounding circumstances, which caused heftier penalties, for the three cases—PO ████████ (15 days), Sgt. ████████ (30 days), and PO ████████ (18 days)—were exceptional. They are discussed individually in detail later in this Report.

[1435] MOU 2; *see also* 38-A RCNY § 1-42(b).

[1436] MOU 2-5; *see also* 38-A RCNY § 1-42(b) through (e).

[1437] *Id.*

[1438] *Id.*

In years 2018-2020, the Police Commissioner retained 17 of 142 cases (12%) where CCRB had voted that Charges and Specifications to be drawn.[1439]  This is a six-fold increase from the previous three-year cycle where Provision Two was used sparingly.  In the years 2015-2017, the Police Commissioner retained only 11 of 544 cases (2%) where CCRB had recommended Charges.[1440]

The fluctuation in demands for retention corresponds with the temporary use of "Reconsiderations" in its place.  Under CCRB Rules (38-A RCNY § 1-36) the Department Advocate may request reconsideration of a panel's findings or recommendation.  The process commenced in practice in 2015 and was frequently utilized at first.  In 2016, there were 74 reconsideration requests of 212 substantiated SQF cases alone.  As described by CCRB in 2016, "[i]t is the Agency's theory that the reason the Department ceased retaining cases is due to the implementation of the reconsideration policy[.]"[1441]  Apparently, with little success in gaining modifications upon requested reconsiderations, DAO has for the most part abandoned the process, preferring instead to go directly to the Police Commissioner for reduction of a CCRB finding and recommendation, or retention, bypassing further dialogue with the panels.  Of 610 substantiated cases sent to DAO after 2015, including some force cases as well as SQF cases, there were 112 requests for reconsideration, of which 97 were declined.  Reconsideration was granted with a change in finding in only four cases and a reduction in recommended discipline in 11 more cases.  In 2018, DAO requested reconsideration of 18 of the 76 closed SQF cases.  All of the reconsideration requests were for a lower penalty than that recommended by CCRB, or for no penalty at all.  In 16 of the reconsideration cases, DAO asked that CCRB replace a disciplinary recommendation with no discipline:  either exoneration, unsubstantiation or Training.  CCRB denied all requests.  In 2019 there were only four requests, and none were successful.  In 2020 and 2021 there were no requests for reconsideration in SQF cases.  Currently, the reconsideration process for SQF cases is defunct.  Reconsideration requests by DAO in other FADO cases dropped from 152 in 2017 to 14 in 2020.[1442]

Alternatively, DAO has had considerable success in gaining modifications of CCRB recommendations by direct recommendation to the Police Commissioner.  Of the 97 cases where DAO requested reconsideration and CCRB declined, the Police Commissioner ended the matter by a downward departure in finding or penalty in 67 cases.[1443] As long as the Police Commissioner grants a downward departure after a CCRB declination, there is no practical reason for DAO to

---

[1439]    Executive Director's Monthly Report January 2018 (Statistics for December 2017) at 30, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2018/20180110_monthlystats.pdf.

[1440] As a consequence of a number of external factors, not the least of which was the impact of the Covid pandemic on case processing, numbers for 2021-2022 are probably not reflective of trends regarding retention of formal prosecutions.  However, in the first two quarters of 2023, the Police Commissioner retained 6 of 45 ( 13.3%) such cases. (A much larger number were administratively closed due to retirements or due to impending statute of limitations cutoffs.) APU Quarterly Reports–Q1,Q2 2023.

[1441] Report on the Administrative Prosecution Unit - Fourth Quarter 2015, at 3 (May 6, 2016).

[1442] CCRB 2020 Annual Report at 55, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2020_Annual.pdf. Of 152 requests in 2017, 14 resulted in a modification by CCRB.  Of 14 requests in 2020, three resulted in a modification by CCRB.  *Id.*

[1443] Federal Monitor SQFSTA reports provided to the Monitor by NYPD.

engage in the process with CCRB. In a way, that is disappointing given the process opened the door for a dialogue and mutual understanding of findings and recommendations.

It may be, in many cases, the Police Commissioner's decision to reduce a CCRB recommendation, when based upon information provided by DAO, is justified and explicable. Unfortunately, memos written to the Police Commissioner by DAO (Case Analysis and Recommendation – "CAR" memos) are secret under a claim of privilege. This leaves the public and reviewers without a full explanation of the rationale for bypassing CCRB's recommendation.

In any event, with the demise of the reconsideration process, it is fair to assume that there will be more retention demands. It is too early to predict at this time, but with adoption of the Disciplinary Guidelines, theoretically, more SQF cases will result in a recommendation for Charges as multiple allegations are aggregated, so more retention cases are likely.[1444]

If CCRB substantiates a case and recommends Charges and Specifications but the Police Commissioner exercises his discretion to retain the case, the removal may, and often does, result in no discipline (NDA). After retention, the Police Commissioner is free to direct DAO to proceed with the prosecution, to dismiss, or mandate an alternative disposition. If the case does not result in discipline, a record of the event will remain in DADS and in CCRB's files. The CPI will reflect the Charges and the outcome, but there will be no entry in the officer's "Disciplinary History" in the online "Officer Profile" posted by the Department.

CCRB reports Provision Two cases as either "retained with discipline" or "retained without discipline." CCRB reports a case as retained with discipline when Training, Instructions, or A-CDs without penalty are the result. Accordingly, CCRB reports of discipline are much more extensive than the numbers included in this Report. For 2016-2020 CCRB reported that the Police Commissioner retained 32 cases with discipline and 10 cases without discipline. However, a minority of the 32 cases "retained with discipline" received any penalty. Most received Training or an A-CD with no penalty.

As a typical example, PO ██████████ unlawfully frisked a "Black male in his early twenties [who] was sitting on a stoop . . . smoking[.]"[1445] The Police Commissioner retained the case and directed Training instead of discipline for the officer.[1446] CCRB describes the case as "retained with discipline." Officer ████████ "disciplinary history" as listed in the online profile maintained by NYPD lists no events.

---

[1444] See, e.g. CCRB # █████████, Sgt ██████████ and PO █████████. CCRB found they had wrongfully stopped five people. With no other charges, the presumptive penalty of three days was applied to each stop and aggregated, resulting in a request for formal discipline. The matter has not been calendared in the trial room as of this writing.

[1445] Report on the Administrative Prosecution Unit ("APU") First, Second, Third, and Fourth Quarters of 2020 at 21, available at https://www1 nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/05282021_APU2020.pdf).

[1446] Officer ████ has attended 187 Training classes, including seven on investigative encounters and stop/frisk.

Similarly, Det. ███████████ had an arrest warrant for a person that was seven years old.[1447]  Without current reason to think the suspect was at a residence, he showed the warrant to an occupant who denied knowing the warrant subject but submitted to a search upon display of the warrant.  He searched the house.  CCRB substantiated Charges, determining that there was no true "consent" to the search.  The Police Commissioner retained the case and ordered Training.  He did so on an assertion that no misconduct occurred.[1448]  Surely the Police Commissioner can order more training for any officer, even one who has done nothing wrong.  But when the Police Commissioner decides that no misconduct occurred, it is paradoxical to say that discipline was ordered.  In any event, CCRB describes the outcome as retained with discipline.  Detective ███████'s online "Officer Profile" under "Disciplinary History" states that "[t]his officer does not have any applicable entries."[1449]

A review of 28 cases retained in years 2016-2020 shows that penalty days were assessed in only four cases.[1450]  Each of those "penalty" cases involved either force, a chokehold, or multiple incidents and allegations separately prosecuted by the Department which were "wrapped up" by combination.[1451]  Two cases were administratively closed when the officer separated from the Department.  Nine of the retained cases ended with Training.  Five of the cases ended with an "NDA" meaning that no disciplinary action was taken.[1452]  Four of the cases ended with an A-CD which was accepted without penalty.  All but the first four of the retained cases not only avoided discipline, but also avoided, according to the disciplinary history in the Department's online profile, a record of formal Charges having been sustained by the Police Commissioner.  In other words, while CCRB or NYPD may note the proceedings, there is no disciplinary history for the officer in the Department's posted public record.[1453]

### i.    Memo Exchanges Justifying a Retention to Avoid APU Prosecution

Despite the fact that the Rules and the MOU call for detailed explanations justifying removal from APU prosecution, a review of the letter exchange between the Police Commissioner and CCRB in 18 of these cases leads to the unfortunate conclusion that the correspondence from NYPD is far from the detailed writing contemplated by the APU-MOU.  A form letter without analysis or content is the more usual response from the Police Commissioner's office.

---

[1447] Report on the Administrative Prosecution Unit ("APU") First, Second, Third, and Fourth Quarters of 2020, at 22, available at https://www1 nyc.gov/assets/ccrb/downloads/pdf/prosecution_pdf/apu_quarterly_reports/05282021_APU2020.pdf.

[1448] *Id.*

[1449] NYPD Online, "Officer Profile," available at https://nypdonline.org/link/2.

[1450] Two cases were retained with Training, while receiving penalty days assessed in separate departmental investigations.  Two officers, ███████ and ████████████, separated from the Department when charged.

[1451] This is an incomplete listing of outcomes in later years because some matters may still be open and unresolved.

[1452] These cases are also written up as "DUP" Department Unable to Prosecute.

[1453] In theory, the two officers who left the Department, █████ and ███████, should be named in NYS Division of Criminal Justice Services decertification index.   Executive Law § 845, 9 NYCRR 6056.2, available at https://www.criminaljustice.ny.gov/Officer_Decertification htm.

For those who hoped for a meaningful exchange in the demand by the Police Commissioner to remove a case from APU prosecution, a disheartening example would be the following exchange in the case of Officer ███████.

Officer ███████ was charged with violating Patrol Guide rules limiting the use of Tasers. He was found to have pointed and threatened the use of a taser at a student in a school setting while the student was already rear-cuffed. He was also charged with pointing and threatening use of the taser at a group of other students. The Police Commissioner's initial explanation for reducing Charges to NDA was the following:

> The Police Commissioner has reviewed the Civilian Complaint Review Board's recommendation for Charges/Specifications in connection with CCRB Case No. ███████ as it pertains to P.O. ███████. Having analyzed the facts and circumstances of this matter, the Police Commissioner has determined that to pursue Charges/Specifications would be detrimental to the Police Department's disciplinary process.
>
> P.O. ███████ has no disciplinary history and no prior substantiated CCRB complaints. Therefore, as provided for within the Memorandum of Understanding between the Civilian Complaint Review Board and the Police Department, based on the interests of justice, the Police Commissioner intends to retain the current matter within the Police Department and take No Disciplinary Action against P.O. ███████.

While the form letter repeats the language of the MOU in conclusory terms, it says nothing about the reasons for blocking CCRB prosecution in the instant case. Nor does it explain why the Police Commissioner was imposing no discipline at all.

CCRB wrote in reply that Tasers, according to the Patrol Guide, should only be used against persons who are actively resisting or exhibiting active aggression. In this case the video footage shows the victim was merely attempting to de-escalate a situation. The response CCRB received was:

> The Police Commissioner has reviewed your letter . . . and considered the issues you raised concerning the CCRB case involving P.O. ███████. Notwithstanding the arguments expressed in your response letter, the Police Commissioner maintains that it would be detrimental to the Police Department's disciplinary process to allow the Civilian Complaint Review Board to pursue Charges/Specifications against P.O. ███████.
>
> Therefore, the Police Commissioner affirms his decision to exercise Provision 2 of the Memorandum of Understanding and to take No Disciplinary Action against P.O. ███████ regarding the allegations substantiated by the Civilian Complaint Review Board.

It should be noted that P.O. ███████ had six complaints filed against him from 2014 to 2019. While this case was the only one substantiated, the cluster of similar complaints in a five-year time span is troubling. One was for Discourtesy, but the remaining five were for excessive

force. All but one of them, including a Chokehold complaint, preceded the Police Commissioner's declaration that the officer has no disciplinary history.

The APU-MOU restricts retention to cases where the officer has no disciplinary history and prosecution would be detrimental to the disciplinary process. Other than a simple rote repetition of those two standard clauses, neither of the Police Commissioner's writings comes close to a "detailed explanation" for no discipline in this case. The failure to meet the expectations of the MOU is more than a contract failure; it undermines the objective of creating an understanding between civilians, CCRB, the Department and officers on the force as to why CCRB's findings were disregarded.[1454]

In sum, 15 cases were resolved with no formal discipline, and it remains unknown whether any penalty was actually imposed in the other cases. It can be fairly said that the decision to retain a case is, in most instances, likely to remove the case from any disciplinary penalty without the benefit of an NYPD investigation or trial.[1455]

The Police Commissioner's expansive reading of Provision Two manifests itself in several ways: (1) an overly liberal view of "no disciplinary history"; (2) a disregard for adverse civil litigation or repeated complaints indicating a pattern of abuse;[1456] and (3) an unfortunate downgrading of SQF violations. Invocation of Provision Two is somewhat puzzling and unnecessary, since in the final analysis discipline after a DCT hearing or plea is still left to the Police Commissioner's unfettered discretion. It seems pointless to pre-judge a matter, by cutting off a prosecution before all the facts are known and a recommendation has been made, when the Police Commissioner, in the end, controls the final decision and the record of the proceedings.

Many of the retained cases were quite serious. One involved an officer who struck a civilian 11 times with a baton while he was on the ground. Another involved the unnecessary threatening of a group of students in school with a taser. A third case involved brandishing of a firearm on a subway while seizing a subject for a minor subway infraction as he was seated next to other passengers.[1457] In another case, the officer intentionally deprived an epileptic of his medication, resulting in a seizure.

The following are three case studies which may be useful in understanding the retention process:

   ii.  **Case Study #1 - Sergeant** ██████████████

On September 11, 2015, a person (the "victim") was removed by police from a subway train for passing between cars. As he was being held at the platform by one officer, according to

---

[1454] Departure letters may be sent to CCRB, but as explained within this Report, they are cursory at best.

[1455] In CCRB's quarterly reports to the Police Commissioner, a number of cases are listed as "retained with discipline," without further elaboration. In fact, almost all of the cases listed as "retained with discipline" were cases where guidance, in the form of Instructions or Training were the ultimate disposition.

[1456] ████████████, described earlier, is a useful case study for this purpose.

[1457] As explained earlier, unless the firearm is cocked, aimed at the complainant, or there is a spoken threat of use, the Department does not consider brandishing of a firearm as a use of force.

a reporting witness, an Assistant District Attorney ("ADA"), Officer ████ [1458] approached and punched the victim several times in the stomach and chest. ████ claimed he was doing so because the victim was "flailing his arms," but the ADA witness stated that the victim was "not trying to resist, not fighting, trying to escape or behaving in any aggressive or resistant manner toward the officers."

Four months later, on January 7, 2016, CCRB substantiated a finding of excessive force and recommended Charges. DAO did not serve the Charges on ████, but instead, on August 10, 2016, asked for "reconsideration." CCRB accepted the request even though the request was well beyond the 30-day limit for reconsideration requests. [1459] In its request DAO agreed with the factual findings but asked that Charges be dropped and ████ be sent for training in "Use of Force" without discipline. DAO emphasized that the officer had no prior formal disciplinary history. [1460] (His two prior CCRB investigations were also for excessive use of force, but both were abandoned and left unresolved when the complainants failed to cooperate further with the investigations.)

On October 25, 2016, the CCRB panel declined to modify its recommendation, arguing that "the complainant was not threatening to assault the officer for behaving in any aggressive manner" and that "Training is not the appropriate recommended penalty[.]"

The case lingered for another five months without further action by DAO. On March 2, 2017, the Police Commissioner wrote that Charges "would be detrimental to the Police Department's disciplinary process . . . and "based on the interests of justice . . .[he] intends to retain the current matter . . . and to provide P.O. ████ with formalized Training . . . as an effective means of addressing the allegations[.]"

On March 7, 2017, CCRB objected, writing that to "dismiss these charges undermines those powers [of APU prosecutions] and circumvents the CCRB's disciplinary process granted by our Memorandum of Understanding." The letter of intent to retain "fails to establish a sufficient basis for retaining this matter." Further, "Dismissing Charges and Specifications and circumventing the CCRB adjudicatory process is inappropriate and it weakens the public's trust in the disciplinary process and the Department as a whole . . . [which] regrettably calls into question the legitimacy of the process and the validity of holding members of service accountable for acts of police misconduct. . . . and defies public policy."

On March 9, 2017, the Police Commissioner responded that "[n]otwithstanding the arguments expressed in the response letter, the Police Commissioner maintains that it would be detrimental to the Police Department's disciplinary process to allow the CCRB to pursue Charges/Specifications against P.O. ████."

Ironically, the Police Commissioner also cited the fact that the 18-month statute of limitations would run out in two days, on March 11, 2017. Only six months of the delay were

---

[1458] On August 30, 2019, PO ████ was promoted to Sergeant.

[1459] 38-A RCNY § 1-36(b) allows reconsideration of late requests for "good cause."

[1460] As of this writing, Sgt. ████'s online Officer Profile shows no disciplinary history.

caused by CCRB's investigation and subsequent review of DAO's reconsideration request. The remaining 12 months were the result of DAO's failure or refusal to serve the Charges on the officer as requested.

Training was ordered. Officer ███████ attended 84 Training classes in the interval between the Police Commissioner's direction to take a Training class in Use of Force and October 23, 2019, when he, for the first time, attended a Training class entitled "Force Policy Update Video." None of the intervening classes were in Use of Force.

### iii.     Case Study #2 - PO ███████████ : "No Prior Disciplinary History"?

The APU-MOU provides that retention be used to avoid APU prosecutions only in cases where "there are parallel or related criminal investigations, or when, in the case of an officer with no disciplinary history or substantiated CCRB complaints, based on such officer's record and disciplinary history the interests of justice would not be served."

One of the cases provided the Monitor Team involved an officer[1461] found by CCRB to have wrongfully used excessive force in March of 2015. In August of 2016, the Police Commissioner retained the case and imposed no discipline. CCRB objected on the grounds that the officer had a prior disciplinary history. At that time, the officer had been the subject of 23 prior CCRB complaints.[1462] In addition, by 2016, the same officer had been a named defendant in two federal civil rights actions. One of the cases, pending at the time, ended with a $341,000 judgment. (In all, the officer has been named in three separate federal civil rights lawsuits. One suit, alleging illegal entry and search, was filed in 2010, ending in a $9,000 settlement in 2012. A third case, filed in 2018, ended in a $45,000 judgment.)

The Police Commissioner asserted that the officer had no prior substantiated CCRB complaints and, therefore, no disciplinary history as far as CCRB and the APU-MOU were concerned. When CCRB pointed out to the Commissioner that the officer did, in fact, have another complaint that had recently closed with a substantiation by CCRB,[1463] the response was that "it is the Police Commissioner's position that a substantiation of the earlier allegation that post-dates the matter at hand cannot be considered as a prior substantiated CCRB complaint within the meaning of Provision Two of the MOU."[1464] Apparently, the Department's narrow view of the MOU and the Rules was that the phrase "no disciplinary history or prior substantiated CCRB complaints" should be read to mean "no complaints substantiated by CCRB prior to commission

---

[1461] PO ███████████ .

[1462] New York Civil Liberties Union, "NYPD Misconduct Complaint Database," available at https://www.nyclu.org/en/campaigns/nypd-misconduct-database.

[1463] At the time the Police Commissioner pulled the case, CCRB had substantiated an unrelated abuse case for an illegal frisk in 2014. It apparently was the Commissioner's position that an illegal frisk in 2014, substantiated in 2015, could not be considered as a bar to a 2016 retention because the 2015 decision to substantiate occurred two months after the illegal force misconduct in the instant case.

[1464] Aug. 31, 2016 Letter to Ms. Mina Malik, ED CCRB, from Cecil A. Wade, Deputy Chief, Commanding Officer, Police Commissioner's Office.

of the misconduct charged in the instant case," in effect erasing all meaning from the phrase "no disciplinary history."

This approach—discounting prior substantiated misconduct if the prior adjudication was not finalized at the time of the later incident—is probably borrowed from the Penal Law, which defines a second felony offender, for purposes of mandatory sentencing enhancement, as one who was sentenced for a felony prior to the commission of the more current offense.[1465]  While that particular rule of lenity may make sense in the criminal court, it is inappropriate in a disciplinary structure for police misconduct.  If a person has a prior substantiated allegation at the time the Police Commissioner is considering an appropriate sanction for a second offense, ignoring the prior substantiation is contrary to one of the stated goals in the City's Collaborative plan: "Identifying patterns and problems related to policies, Training, supervision, and institutional performance rather than mere individual misconduct."[1466]

CCRB does not have full access to the prior disciplinary history of an officer.  Command disciplines and IAB/FID/BIU/OCD histories are not shared at the point that the Police Commissioner decides to retain a case.  The fact that an officer might be on disciplinary probation is not shared unless the case is handled by APU and Charges have been filed.  CCRB does not have access to prior substantiations that may have been sealed.  As long as CCRB is forced to rely solely on its own record of substantiations at CCRB, the promise of no NYPD retentions for officers with a prior disciplinary history is empty.

### iv.    Case Study #3 - PO ▮▮▮▮▮▮▮ - Wrongful Frisk Leads to Repeated "Training"

In July 2018, Officer ▮▮▮▮▮▮▮, along with three other officers, approached two individuals sitting on a stoop in the Bronx.  Both individuals were frisked without cause, one by Officer ▮▮▮▮.  At the time of the encounter, Officer ▮▮▮▮ had been with the force for five years.  A video surveillance camera captured the event.  CCRB recommended Charges and Specifications.  ▮▮▮▮ currently has a record of thirteen CCRB complaints.  The allegations range from SQF misconduct to excessive force, to sexual misconduct and slurs, among others.[1467] Ten of the complaints preceded the 2018 encounter, although none had been substantiated.  A later complaint of an illegal stop, filed in 2019, was substantiated and resulted in training.  Officer ▮▮▮▮ had previously attended five classes in Investigative Encounters.

Officer ▮▮▮▮ was a named defendant in three civil lawsuits alleging false arrest and wrongful assault/battery.  All three were settled, in amounts of $77,500, $80,000, and $109,000, respectively.

The Police Commissioner concurred with the finding that the frisk was illegal.  Over CCRB objection, the Police Commissioner retained the matter, directing that PO ▮▮▮▮ receive an A-

---

[1465] New York Consolidated Laws, Penal Law § 70.06.

[1466] NYC Police Reform and Reinvention Collaborative Plan at 8.  Adopted by the City Council Mar. 25, 2021, Intro. Res. 1584/2021.

[1467] CCRB has investigated ten force allegations, seven SQF/search allegations, and six discourtesy/slur allegations, among others, made against this officer. Officer ▮▮▮▮ was promoted to Detective on February 9, 2022.

CD without penalty, but with an opportunity to be trained in the area of investigative encounters—
for a sixth time.

### C.    Charges, Non-APU Cases, Profiling Investigations, and Lawsuits Intertwined

The APU-MOU provides that a case may be retained either because a parallel criminal
investigation is underway or in the interest of the Department when the officer has no prior
disciplinary history.  In 28 SQF and force cases reviewed for this Report where the Police
Commissioner retained a case, none were retained due to a pending criminal investigation.  There
were three cases where the officer was the subject of multiple investigations both by CCRB and
IAB.  In those three cases, it may have made sense for the charges to be combined for a global
settlement or decision.  As well, when Charges are recommended, but multiple or concurrent
investigations are "in the air," it is not unusual for matters to be resolved collectively.  As will
discussed later, the interplay between civil litigation and disciplinary proceedings may eventuate
in cases being closed before final adjudication.  Cases are not necessarily decided in independent
silos without regard to pending investigations or litigation in alternate forums.

The following is a case study in the inter-relationship between CCRB, IAB, and civil
matters that overlapped and undoubtedly impacted each other.

### i.    An Unusual Case:  Charges, a Trial, and Penalty Days for an Unlawful Stop?

Two case histories involving Officer #1 ███████████, one describing an incident in 2017
and the other of an incident in 2019, follow for several reasons.  Both encounters involve an
unlawful stop followed by wrongful punches to the face of a civilian by PO #1 ██████.  Although
separate incidents, to some extent, the processing of the cases overlap and intertwine.

One of the two case histories seems at first blush to be unusual because the two officers
accompanying PO #1 ██████ appear to have been penalized with three lost vacation days despite
the fact that the only substantiated allegations against them were for an unlawful stop.  However,
these officers also faced allegations of an unlawful chokehold, an unlawful frisk, an unlawful
search, and failures to prepare stop reports.  But the only substantiated allegations against PO #2
████████████ and PO #3 ████████████████ were the stop allegations.  Because the two officers faced
formal disciplinary proceedings and forfeited penalty days for a single stop allegation standing
alone, a deeper dive into the case is worth exploring.

As it turns out, their wagons were hitched to fellow officers in the 75th Precinct.  Five
officers in that precinct had a cluster of accusations of misconduct in interactions with civilians in
a concentrated time period.  At times, they acted together, and at other times, they acted
independently.  It is non-sensical to review one isolated illegal stop without also considering the
many filed complaints and claims for similar wrongdoing in a short time span.

In the four-year period from September 1, 2016, to August 18, 2020, the five officers were
the subject of forty investigations by CCRB, IAB/BIU, or pending lawsuits.  In some cases, they
were alleged to have acted together.  In others, the lawsuits were the cause of dropped disciplinary
investigations into the same conduct.  Two encounters led to recommendations for Charges and

Specifications by CCRB.  One went to trial and the other was administratively removed (without a retention letter) by NYPD and settled informally.

Collectively, they had 26 complaints brought to CCRB, with 15 of them alleging wrongful force, while the remainder were largely for SQF misconduct and discourtesy.  There were four profiling investigations and seven lawsuits for police misconduct, four of which have already settled for substantial sums.  Aside from the two investigations described below where CCRB recommended Charges, only three allegations have been substantiated and none led to discipline.  Nonetheless, one cannot review the following histories without recognizing that the Department and the precinct should do more than consider just one officer's case in isolation

**Charges:  PO #1 ███████ - First Use of Force Substantiation**

On Sept 27, 2017, the complainant (CW) was walking home from his job as a security guard.  Police Officer #1 ████████, PO #2 █████████, and PO #3 █████████, in plainclothes and an unmarked car, made a U-turn, approached CW and "surrounded" him.  He was asked, "What's going on, what are you doing, where are you going?"  CW started to reach into his pocket to show identification.  According to CW, he was grabbed.  He "feared for his life" and ran for one minute, then stopped and sank to his knees.  Sgt. #1 █████ caught up to CW and punched him three times in the face.  Officer #3 ████ rear-cuffed him.  They took his ID back to their car.  After determining that he was not armed, according to CW, he was told he could go as long as didn't "say the 75th Precinct or the police did this to me." His eye was swollen and bruised.

The officers claim they saw "bulges inside one of his pants pockets."  The officers swore that the approach at first was cordial, but CW refused to take his hands out of his pockets, shoved them, then ran before they "collided" and he was brought to the ground and PO #3 ████ handcuffed him.  He had marijuana in his pocket.  After weighing the evidence, the Trial Commissioner concluded that the initial stop by all three officers was illegal, that Sgt. #1 █████ did punch CW in the eye after a brief chase, but that Officers #2 ████ and #3 ████ were not present when that occurred.

APU recommended three forfeited penalty days for PO #2 ████, seven days for PO #3 █████, and 18 days for PO #1 █████ (15 days for the force allegation plus 3 days for the illegal stop).  To CCRB's credit, the closing report acknowledged that prior allegations against PO #1 █████ "reflect a pattern applicable in this case."  The report cited two prior force allegation and one prior stop allegation, none of which had been substantiated.  The 18-day recommendation was adopted.  As to PO #2 ████ and #3 ████, the Trial Commissioner concluded that "recent precedent shows that, for an unlawful stop alone, respondent typically forfeit three days" reducing the time assessed to #3 █████ from seven to three days and recommending three days for #2 █████ as well.  On November 21, 2019, Police Commissioner O'Neill approved the recommended penalties.  By the time the Police Commissioner accepted the 18-day penalty for PO #1 █████, he had already been charged anew with another and similar Use of Force violation, once again punching a suspect without cause.  It is not certain, but probable, that the Police Commissioner knew of the later Charges at the time he concurred with the Trial Commissioner's recommendation.

343

**Second PO #1 ▮▮▮ Use of Force Substantiation**

Four months before the Police Commissioner's July 31, 2019, decision on the above force substantiation, PO #1 ▮▮▮ was alleged to have wrongfully punched another citizen in a questionable stop and frisk encounter. CW2 was in front of a local deli. According to the civil complaint, PO #1 ▮▮▮, PO #4 ▮▮▮, and several other officers ordered him to stop and put his hands up. PO #1 ▮▮▮ punched him several times, and PO #4 ▮▮▮ tackled and allegedly placed him in a chokehold.

As found by CCRB, PO #5 ▮▮▮ exited a police vehicle and reached toward CW2's torso. CW2 backed up and told the officer not to touch him. PO #5 ▮▮▮ and PO #4 ▮▮▮ then grabbed him. PO #4 ▮▮▮ pulled CW2's waistband out and reached into his shorts, and a struggle followed. PO #1 ▮▮▮ jumped in and punched CW2. After CW2 was subdued, PO #1 ▮▮▮ punched him in the face again. He was arrested for Disorderly Conduct, Obstructing Governmental Administration, and possession of a weapon.[1468] He was given an Adjournment in Contemplation of Dismissal, and the case against CW2 was later dismissed by the Court.[1469]

Subsequently a complaint was filed with CCRB, the IAB, and in court. The incident was video-recorded by a bystander, and the officers allegedly attempted to interfere with that recording. CCRB unsubstantiated the claim that PO #4 ▮▮▮ placed CW2 in a chokehold. CCRB substantiated a wrongful stop claim against both PO #4 ▮▮▮ and PO #5 ▮▮▮, a wrongful strip search claim against PO #4 ▮▮▮, and force and discourtesy claims against PO #1 ▮▮▮. Applying the Disciplinary Guidelines, CCRB recommended the following:

| Officer | Misconduct Allegation | CCRB Recommendation |
|---|---|---|
| PO #5 ▮▮▮ | 1 stop | A-CD |
| PO #4 ▮▮▮ | 1 stop<br>1 strip search | Charges |
| PO #1 ▮▮▮ | 2 discourtesy<br>1 force (second punch) | A-CD for each<br>B-CD |

Collectively, under the Disciplinary Guidelines, PO #1 ▮▮▮ three CCRB substantiated allegations in this case, aggregated, called for Charges to be filed. However, because IAB separately investigated the force (punch) allegation against PO #1 ▮▮▮, Charges were not filed by APU.

---

[1468] A search of his pocket after the arrest revealed a knife. The weapons charge was dismissed.

[1469] The NYPD Office of the Deputy Commissioner's Legal Bureau Bulletin Vol. 47, No. 2 (Feb. 2017) explains the circumstances under which a person may be charged with disorderly conduct, in regard to defining "public inconvenience, annoyance or alarm." It states that the public harm standard is not met unless and until the exchange in question extends beyond that between the person involved and an officer and becomes "a potential or immediate public concern," making clear that a verbal or gestural dispute between an officer and a civilian is not sufficient for an arrest for disorderly conduct in the absence of civilian bystanders who are becoming agitated or whom the subject intends to agitate by his actions.

CCRB generated a spin-off referral to IAB for the claim that PO #4 ███████ touched CW2's genitals during the strip search.[1470] Discipline for PO #4 ██████ for the strip search was combined with the IAB investigation regarding the wrongful touching of CW2's genitals.[1471]

No aggravating or mitigating circumstances were found or cited by CCRB for any of the three officers. At this point in time, the Charges recommended for PO #4 ██████ have not been served. Instead, they were diverted by DAO as "Closed: previously adjudicated."[1472] As a consequence of a parallel investigation by IAB, both PO #5 ████████ and #4 ███████ went without penalty for FADO misconduct; they were warned and admonished. Charges and Specifications were recommended for PO #1 ██████, who received, instead, a B-CD and seven penalty days.

**Disciplinary History for PO #1 ██████, #4 ██████, #5 ████████, #3 ██████ and #2 ██████**

PO #1 ██████ has been with the Department for eight years. Fifteen CCRB complaints have been filed against him, including the substantiated cases described above and a third substantiated wrongful stop in 2020 for which he received an A-CD without further penalty. Included in his CCRB history are eight separate complaints for wrongful use of force. His other substantiated case was for discourtesy, for which he received an A-CD without discipline as well. Yet another force complaint against him was "closed pending litigation," but it is unclear to which incident this complaint refers.

Three lawsuits were filed against PO #1 ██████, all alleging wrongful use of force. The suits have settled for $25,000, $28,500 and $75,000, respectively. The most recent settlement ($75,000) arose out of the CCRB substantiated incident with #5 ██████ and #4 ██████, which is awaiting final disposition by the Police Commissioner.

PO #4 ██████ has been with the Department for six years. Six CCRB complaints have been lodged against him, two of which have been substantiated. In the first case he was given Instructions for a refusal to identify. The second substantiated complaint is the one described above.

PO #5 ███████ has been with the Department for five years. He has four prior CCRB complaints in his history, two of which were substantiated. A lawsuit complaining of excessive force is pending against him in the EDNY arising from an August 2018 incident. A use of force and discourtesy complaint against him was closed pending litigation. It is unclear if the pending litigation deferral refers to the pending 2018 EDNY case or if there is yet another case filed against him.

PO #2 ██████ has been a police officer for eight years. Six CCRB complaints have been filed against him, with one substantiation. Complaints in the past include three claims of excessive

---

[1470] IAB # ████████.

[1471] CCRB investigates strip searches as possible FADO misconduct. IAB investigates wrongful touching of genitalia. PO #4 ██████ received no penalty for the CCRB substantiation. NYPD's online posting of disciplinary history shows no "applicable entry" for the portion of the encounter investigated by IAB.

[1472] RMB response, "Data Request. New and Outstanding Discipline.nypd.11/1/21" matrix (Nov. 1, 2021).

force, including use of a chokehold, illegal frisks and a profiling charge which went unsubstantiated. In October 2017, he settled a case alleging an illegal seizure and arrest for $20,000.

PO #3 ███ has been on the Force for nine years. He was promoted to Detective in June 2021. Beyond the illegal stop cited above, his record includes only two other CCRB complaints, both for excessive force. Both cases were dropped for want of a cooperating witness.

It is worth noting the pattern of similar complaints against these five officers in the 75th precinct over a brief four-year period. The list below includes just the complaints lodged against these officers from 2016 to 2020, omitting any complaints outside of this date range, such as four earlier CCRB cases against PO #1 ███.[1473]



- 9/1/16: **PO #2**███: Force, Chokehold
  - CCRB - unsubstantiated
- 9/13/16: **PO #2**███: Profiling
  - CCRB - unsubstantiated
- 1/3/17: **PO #2**███: Vehicle Stop, Refusal to Identify
  - CCRB - no c/w[1474]
- 7/15/17: **PO #3**███: Force
  - CCRB - no c/w
- 9/1/17: **PO #4**███: Profiling
  - IAB/BIU - unsubstantiated
- 9/7/17: **PO #1**███: Force
  - Lawsuit EDNY - settled $25,000
- 9/21/17: **PO #1**███: Stop, Refusal to Identify
  - CCRB - no c/w
- 9/27/17: **PO #1**███: Stop, Force
  - Charges: APU trial - 18 penalty days
  - **PO # 2**███: Stop
  - Charges: APU trial - 3 penalty days
  - **PO # 3**███: Stop
  - Charges: APU trial - 3 penalty days
- 10/18/17: **PO #2**███: False arrest
  - Lawsuit Kings Cnty. Sup. Ct. settled $20,000
- 4/2/18: **PO #1**███: False arrest 14-year old girl witness
  - Lawsuit EDNY - settled $28,500
- 5/11/18: **PO #4**███: Vehicle Stop
  - CCRB - no c/w
- 7/31/18: **PO #4**███: Threaten arrest
  - CCRB - no c/w

---

[1473] The date of the incident is listed for CCRB complaints and lawsuits, unless the matter was settled, in which case the date of the settlement is used.

[1474] "No c/w" indicates that a victim or necessary witness failed to cooperate, was unavailable, or withdrew a complaint.

- 8/5/18:    **PO #4** ██████ :  Illegal entry, search, false arrest
  - Lawsuit EDNY open
- 8/15/18:   **PO #5** ████████ :  Lawsuit, Force, False Arrest
  - Lawsuit open
- 8/31/18:   **PO #2** ██████ :  Frisk, Question
  - CCRB - Frisk exonerated
  - CCRB - Question unsubstantiated
- 10/28/18:  **PO #4** ██████ :  Stop, RTKA
  - CCRB - RTKA substantiated Instructions[1475]
  - CCRB - Stop exonerated
- 11/18/18:  **PO #1** ██████ :  Profiling
  - IAB/BIU - unfounded
- 1/5/19:    **PO #4** ██████ :  Vehicle Stop
  - CCRB - unsubstantiated
- 2/27/19:   **PO #1** ██████ :  Force
  - CCRB - closed pending litigation
- 4/6/19:    **PO #1** ██████ :  Stop
  - CCRB - unsubstantiated
- 5/11/19:   **PO #4** ██████ :  RTKA, Question
  - CCRB - exonerated
- 7/20/19:   **PO #1** ██████ :  12 allegations:  (4 Force, Frisk, 5 discourtesy)
  - None substantiated except:
  - CCRB: 1 Discourtesy substantiated = A-CD with no penalty

  **PO #2** ██████ :  2 Force, 1 Discourtesy
  - CCRB - unsubstantiated 1 Force, Discourtesy
  - CCRB - exonerate 1 Force
- 7/31/19:   **PO #1** ██████ :  4 Force + 2 Discourtesy Allegations
  - CCRB - substantiated 1 force + 2 discourtesy
  - CCRB recommended a B-CD.  Under the Guidelines, Charges should have been drawn.
  - Police Commissioner has not acted upon the B-CD recommendation.

  **PO #4** ██████ :  Force, Chokehold unsubstantiated,
  - CCRB - Stop/Strip Search substantiated

  **PO #5** ████████ :
  - Stop substantiated = B-CD > reduced to an A-CD with warning/admonishment
- 8/10/19:   **PO #1** ██████ :  Force
  - CCRB - no c/w

  **PO #2** ██████ :  Force
  - CCRB - no c/w
- 9/11/19:   **PO #3** ██████ :  Force
  - CCRB - no c/w

---

[1475] "RTKA" indicates a failure to offer a business card or identify under the Right to Know Act, NYC Admin. Code §14-174.



- 10/15/19: **PO #5** ███████ : Stop, Frisk, Search
    - o    CCRB - unsubstantiated
    - o    CCRB - RTKA failure substantiated
        - ▪    CCRB recommended A-CD
        - ▪    Police Commissioner departed to NDA.
- 1/24/20: **PO #1** ██████ : Force
    - o    CCRB - no c/w
- 2/13/20: **PO #1** ██████ : Vehicle stop, vehicle search
    - o    CCRB - no c/w
- 2/13/20: **PO #1** ██████ : Profiling
    - o    IAB - unsubstantiated
    - **PO #5** ███████ : Vehicle stop
    - o    CCRB - no c/w
    - **PO #5** ████████ : Profiling
    - o    IAB/BIU - unfounded
- 4/28/20: **PO #5** ████████ : Force, Discourtesy
    - o    CCRB - Closed pending litigation (8/15/18 incident)
- 8/18/20: PO #1 ██████ & PO #4 ███████ :
    - o    Lawsuit (Kings Cnty. Sup. Ct.) arising from 7/31/19 incident, settled $75,000
- 10/17/20: **PO #1** ██████ : stop, RTKA - both substantiated - A-CD

Curiously, while the 2017 CCRB closing report identified a pattern of wrongful stops and use of force, the 2019 CCRB closing report asserts that "PO [#1] ███████ 's CCRB history does not show a pattern pertinent to this investigation." From 2014 to 2020, ten civilians have complained to CCRB alleging PO #1 ███████ 's wrongful use of force, and he has been named in three lawsuits alleging some sort of police misconduct. While it is true that only two force allegations have been substantiated, none of the rest ended with exoneration or unfounded findings. A lengthy history of multiple cases that were dropped because a complainant was not available after the complaint was filed or CCRB investigations that are "closed pending litigation" is by no means a clear record and should not be taken to indicate that such an officer has not demonstrated a "pattern pertinent to this investigation."

## X.    DISCIPLINARY SYSTEM PENALTY GUIDELINES (Matrix)

A comprehensive disciplinary matrix "lists all of the various offenses for which a police officer may be disciplined and then lists potential punishments for each offense, taking into consideration the police officer's past disciplinary record."[1476] A matrix has benefits for both the community and officers. For the community, a matrix promotes transparency in the disciplinary process and reduces the perception that outcomes are arbitrary. Academic research suggests that "[a]dministering fair and consistent discipline is an important aspect of organizational justice and

---

[1476] Udi Ofer, *Getting it Right:  Building Effective Civilian Review Boards to Oversee Police*, 46 Seton Hall L. Rev. 1033, 1047 n.49 (2016).

citizenship . . . [which works to] reduce real or perceived workplace inequity and discrimination."[1477]

Several other large police departments have adopted a disciplinary matrix, either on their own or spurred by litigation. Cleveland has guidelines as part of a consent decree with the Department of Justice.[1478] Denver has voluntarily adopted a Discipline Handbook with a matrix dividing misconduct into six categories and assigning penalties to each.[1479] The Los Angeles Police Department has adopted guidelines by Administrative Order.[1480] San Diego has a "Misconduct Related Discipline Matrix."[1481]

During the Joint Remedial Process, the Facilitator noted that multiple participants asked for discipline guidelines to be drafted and that progressive discipline be imposed as a means of holding officers accountable.[1482] The facilitator was more specific, calling for an enumeration of ranges of penalties, taking into account degrees of justification, and mitigating and aggravating factors.[1483]

At first, the Department did not support the concept.[1484] It responded,

[P]ublished discipline guidelines (i.e., a discipline 'matrix') are not the proper way to ensure the equitable imposition of discipline as each case is fact-specific and discipline relies on the consideration of a number of mitigating or aggravating factors. Similar matrices in other jurisdictions have faced strong legal opposition for violating collective bargaining laws and denying officers their due process rights. Furthermore, the New York City Charter and Administrative Code gives the Police Commissioner exclusive statutory authority over discipline. To create a presumptive standard of discipline would divest him of the authority to make decisions in each case based on the totality of the circumstances and eliminate his ability to exercise discretion.[1485]

---

[1477] *See, e.g.*, Jon Shane, *Police Employee Disciplinary Matrix: An Emerging Concept*, 15(1) Police Quarterly 62, 64 (2012)

[1478] *United State v. City of Cleveland,* No 15-cv-1046 (N.D. Ohio Jan. 10, 2018). The matrix separates discipline from corrective actions and forbids substituting corrective actions in place of discipline. Instruction and Training are "Non-Disciplinary Actions."

[1479] Denver Police Department Discipline Handbook: Conduct Principles and Disciplinary Guidelines 16-17 (May 3, 2018).

[1480] LAPD Administrative Order No. 15 (Sept. 15, 2016).

[1481] SDPD Misconduct Related Discipline Matrix, available at https://www.sandiego.gov/sites/default/files/misconductrelateddisciplinematrix.pdf.

[1482] See, e.g., JRP at 24, 161, 224, ECF Doc. No. 597 (May 15, 2018). .

[1483] *Id*. at 65.

[1484] Subsequently the Department has embraced the concept of Guidelines.

[1485] The Way Forward - The NYPD's Response to the Joint Remedial Process Report, ECF Doc. No. 603, at 9 (June 8, 2018).

Almost simultaneous with the JRP, CCRB began a pilot program to test a "Disciplinary Framework."  The Board said that the Framework was "in response to Board member concerns about having no formal guidelines."  A review of past recommendations showed wide-ranging variations in CCRB recommendations following substantiation:[1486]

### A.    CCRB's Framework for Charges and Specification Cases

In 2018, CCRB began a pilot program to test a "Disciplinary Framework." The Board said that the Framework was "in response to Board member concerns about having no formal guidelines" for determining what cases should be recommended for Charges and Specifications. A review of past recommendations showed wide-ranging variations in CCRB recommendations following substantiation:[1487]



The Board tested the Framework in July 2018 and seven months later adopted the plan. The Framework consisted of three tiers of analysis:  First, the panel would look at: (1) "Allegation Type;" then (2) "MOS History;" and finally (3) "Case Totality."[1488]  The main focus of CCRB's

---

[1486] A Framework for Discipline Recommendations:  August 2018 Board Meeting, available at https://www1 nyc.go v/assets/ccrb/downloads/pdf/about_pdf/board/20180808_disciplineframework_presentation.pdf.    The presentation did not define the category "No Recommendations."

[1487] *Id.*  The presentation did not define the category "No Recommendations."

[1488] Memorandum Accompanying August 8, 2018 Public Presentation of CCRB's Disciplinary Framework, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/board/20180808_disciplinaryframework_memo.pdf.

Framework was to standardize the dividing line between formal and informal discipline, *i.e.*, when should a panel recommend Charges and Specifications.

In assessing Allegation Type, the Framework identified Chokeholds, Strip Searches, Warrantless Entries, Slurs, Force with Serious Injury and Sexual Misconduct as cases for which charges would be the presumptive recommendation. If the case was not in one of those categories, the "next level of analysis" is MOS History. There, CCRB would look at rank, years of service, Command and prior CCRB allegations of misconduct (e.g., the member had previously been substantiated for similar misconduct) to assess whether or not the case should be recommended for charges. The final factor, Case Totality, would look to "egregious" cases to enhance a recommended punishment, but could also be used to reduce a recommendation.

The Framework had little applicability to SQF misconduct. Since illegal stops, frisks, and searches were not considered serious enough to be included in the "Allegation Type" category, and such complaints would only result in charges under the Framework if factors reviewed under MOS History or Case Totality elevated the discipline recommendation.

## B.     Disciplinary System Penalty Guidelines

On July 15, 2020, seven weeks after the death of George Floyd, Mayor de Blasio signed into law Administrative Code § 14-186, which required a disciplinary matrix to be adopted and posted for the NYPD.[1489] The Department was given six months to develop and publicize the new guidelines. Commencing in January 2022, an annual report is to be posted on the NYPD website listing the "number and percentage of instances" when the Police Commissioner deviated from the matrix.

The Department has posted two tables: one for 2021 and one for 2022. Unfortunately, the posting lists "cases" and "respondents" without further explanation. Presumably, in a departure from customary and past practices, "cases" seems to apply to investigations and "respondents" seems to list individual determinations by officer, or what has hitherto been denominated as a "case." In any event, the tables are as follows:[1490]

In 2021 there were 6 of 431 cases with a deviation, which meant there were 7 of 488 deviations for officers under investigation. In 2022 there were 4 of 417 cases with a deviation, which meant there were 5 of 491 deviations for officers under investigation.

"Deviations" are to be distinguished from "Departures." The former refers to cases where the Police Commissioner went outside the range of penalty permitted by the Matrix. "Departure" refers to a case where the Police Commissioner has imposed a different level of discipline (usually a downward departure) from that recommended by CCRB. As of October 10, 2023, CCRB has posted 206 departure letters received in 2020-2021, but that is not a true measure of the number of

---

[1489] Local Law 69 of 2020.

[1490] Available at https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/cy-2021-disciplinary-matrix-deviations-by-the-police-commissioner.pdf.

cases where a departure may have occurred since there is a time lag between the timing of a departure and the posting of a letter from the Police Commissioner on the website.

The "internal disciplinary matrix" is to set forth mitigating and aggravating circumstances, or any other factors considered by the commissioner to be relevant.

On August 30, 2020, a first draft of a Matrix was published for comment. CCRB held a public hearing on September 9, 2020, eliciting comments on the first draft.[1491] Common themes of criticism were:

- **Inappropriate Legal Standards**: Community members objected to the use of an "objectively reasonable mistake of fact or law" standard to avoid penalties, since that standard is regularly associated with qualified immunity. In the area of SQF, it was argued, this measure would wrongly conflate civil liability protections with misconduct assessments for Fourth Amendment violations. (This theme is of extreme importance in SQF hearings, since "good faith" mistakes in law and facts are commonly used to justify or mitigate wrongful stops.)
- **Force Analysis:** The draft weighted misconduct by the consequent injury to the complainant. Critics contended that discipline should be based upon the wrongful act of the subject officer and not graded on the extent of injury.
- **Aggravating/Mitigating Factors**: Members of the public objected that the factors were too vague and subjective. In particular, they argued that merely being truthful when interviewed or having no prior disciplinary history should not be grounds for mitigation from a presumptive penalty. Rather, the presumptive penalty should be for applied to truthful first offenders.
- **Compliance with BWC Requirements**: It was argued that presumptive penalties for BWC failures should receive stiffer penalties than proposed and that the lenient penalties in the proposed Matrix would fail to generate meaningful compliance with the BWC program.

The CCRB listed other issues which, in the judgment of the Board, would need to be resolved or were in need of "clarification."

- CCRB will need a "complete employment history" to fully evaluate aggravating and mitigating factors.
- Reasons for why the proposed Matrix discipline for excessive force should not lead to presumptive termination.
- Detailed explanation for when "justification" in the use of force would avoid discipline.
- Better recognition of violations of the Right to Know Act and use of "consent" for searches.
- Availability of deviations should be constrained.
- "Training" as a penalty should be detailed and specific.

---

[1491] Sept. 9, 2020, CCRB Letter to Police Commissioner Shea, available at https://www1 nyc.gov/assets/ccrb/downloads/pdf/about_pdf/NYPDMatrix_Response_Testimony_09302020.pdf.

- Clearer specification for when penalties for multiple substantiated allegations will run concurrently or consecutively.

In addition to comments collected by CCRB, the Department received 439 relevant comments during the comment period—August 31, 2020, to October 5, 2020. The Department summarized the comments as follows:[1492]

- Too much discretion rests with the Police Commissioner.
- The Guidelines are too confusing and include too many legal principles.
- The aggravating and mitigating factors are too subjective, too vague, contain too many loopholes, perpetuate stereotypes, and can be used to justify any outcome.
- Penalties are not severe enough generally or otherwise incongruous (*e.g.*, termination for marihuana use or petit larceny but not for excessive force).
- Penalties are too severe and will discourage cops from doing their job/cause them to retire.
- Termination should be the presumptive penalty for any use of excessive force (including failing to intervene/report/obtain medical aid) or any prohibited use of force in the Patrol Guide
- Penalties for excessive use of force should be based upon the nature of the misconduct and not the manner in which the act is carried out and/or the outcome. Consideration of outcomes (*e.g.*, nature of force used, injury sustained, etc.) should be deferred to the application of aggravating and mitigating factors.
- Termination should be the presumptive penalty for any violation of law (*e.g.*, DWI, failure to offer a business card under the Right to Know Act, Fourth Amendment violation, etc.)
- The Guidelines are too detailed with respect to distinctions between bad acts.
- The Guidelines are not detailed enough, all violations of the Right to Know Act and specific acts of force (*e.g.*, CEW use) should be listed.
- Forfeiting vacation time should not be a penalty. Suspension without pay should be the penalty unless termination applies.
- The penalties for body-worn camera policy violations are too low.

The PBA opposed the entire concept. As one news outlet reported, "Police union head says new NYPD disciplinary guidelines, which would standardize punishments for misconduct, have 'nothing to do with fairness.'"[1493]

Shortly thereafter, the draft was revised and a set of "Disciplinary System Penalty Guidelines" were put into effect on January 15, 2021.[1494] The Department listed 20 changes from

---

[1492] Available at https://www1 nyc.gov/site/nypd/about/about-nypd/policy/response-to-public-comments.page.

[1493] John Annese & Graham Rayman, *Police union head says new NYPD disciplinary guidelines, which would standardize punishments for misconduct, have 'nothing to do with fairness,'* N.Y. Daily News (Aug. 31, 2020), available at https://www.nydailynews.com/new-york/nyc-crime/ny-nypd-disciplinary-cases-police-union-20200831-5nrongs73jd45fzfsu2q3lqdz4-story html.

[1494] Available at https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/disciplinary-system-penalty-guidelines-effective-01-15-2021-compete-.pdf.

the first draft that were made in response to public comments.  Without enumerating all, some significant changes were made:[1495]

- Detailing a system for calculating progressive discipline, *i.e.*, added available penalties for repeated misconduct.
- Eliminating consideration of an officer's lack of prior disciplinary history as a mitigating factor.
- Eliminating use of the term "objectively reasonable mistake of fact or law" in measuring Stop and Frisk misconduct.
- Clarifying that deviations from presumptive penalties or departures from the Guidelines will be explained, listing factors that were considered.

Finally, in recognition that "recent precedent" regarding penalties for FADO had been too low, the Department increased presumptive penalties for FADO violations "to ensure that penalties for public contact offenses are commensurate with the penalties for internal rule violations." However, it noted that the "increased" penalties were "particularly in the areas of use of excessive force."[1496]

Immediately after publication of the revised Guidelines, CCRB, by resolution, committed to utilizing the Discipline Matrix beginning February 1, 2021 "on a trial basis, for a period of one year, as the non-binding framework for its discipline recommendations in all CCRB cases."  On February 4, 2021, a Matrix-MOU was signed by Rev. Fred Davie, CCRB Chair; and Police Commissioner Dermot Shea, implementing an agreement for CCRB to abide by the new Matrix.

## C.    Explanation of the Guidelines as Adopted January 15, 2021

The Guidelines are contained within a 54-page document.[1497]  The general design is to fold all punishable misconduct into ten broadly defined sections:

- Conduct Constituting a Crime[1498]
- Excessive Force (F)
- Abuse, Discourtesy, Offensive Language (ADO)[1499]

---

[1495] *Id.*

[1496] *Id.*

[1497] Disciplinary System Penalty Guidelines, available at https://www1 nyc.gov/site/nypd/about/about-nypd/public-comment.page.

[1498] Public Officers Law § 30 requires automatic termination upon conviction of a number of crimes related to holding of office.  As such, the Matrix provides for termination as a presumptive penalty.  Forced Separation is allowed, if mitigated, for theft-related convictions and in cases where no conviction has occurred, but where the Police Commissioner finds that the officer engaged in criminal conduct nonetheless, *e.g.*, ██████.  Article V, Section 7 of the NYS Constitution permits forfeiture of vested pension rights when a public officer is convicted of a felony related to his office.  However, that provision, adopted in 2018, does not apply to NYPD officers beyond the Police Commissioner.  Consequently, unlike most other public officers in the State, neither termination nor forced separation carries an automatic threat to pension rights for almost all NYPD officers.

[1499] Hereinafter, when referring to the Guidelines, the Report will use "ADO," as used in the Guidelines to distinguish the Abuse of Authority section of the Guidelines from the Use of Force section of the Guidelines.

- False, Misleading and Inaccurate Statements
- Domestic Violence
- Intoxication-Related Misconduct
- Firearm-Related Incidents
- Controlled Substances
- Departmental Rules and Regulations Which are Subject to Formal Discipline[1500]
- Off-Duty Misconduct

Within each section there is a list of acts of misconduct falling within the broader category. Most relevant to *Floyd*, the Abuse of Authority column contains 28 subsections describing misconduct with an associated range of penalties. Pertinent to SQF, among the 28 are:[1501]

- Stop of a Person
- Frisk of a Person
- Search/Seizure of a Person
- Strip Search
- Enforcement Action with Abuse of Authority or Discretion
- Failure to Process a Civilian Complaint
- Retaliatory Action for Making a Complaint
- Failure/Refusal to Identify (name or shield)
- RTKA Failure/Refusal
- Failure to Comply with Consent to Search Requirements
- Interference with Recording
- Deleting Recording
- Discourtesy
- Offensive Language (slur)

Local Law 69 requires a semi-annual review of the Guidelines. Some adjustments have been made in the interim. For example, a change made recently corrected for the absence of any reference to unconstitutional questioning in the Matrix, by adding a box for "Improper/Wrongful Stop and Question or Question of a Person." Illegal questioning will carry the same penalty as an illegal stop or an illegal stop with questioning. There will not be a separate penalty assessment if an illegal stop also includes illegal questioning; it will be considered one act of misconduct.[1502]

---

[1500] While Charges and Specifications may be pursued for items in this category, the determination is left to the DAO. For example, BWC misconduct is included in this category, but the presumptive penalties range from training to three penalty days.

[1501] Disciplinary System Penalty Guidelines at 25-6. For the sake of brevity, the titles used here are shortened versions of the description of misconduct contained within the Matrix. All 28 are not listed.

[1502] "Proposed Revisions to NYPD Disciplinary System Penalty Guidelines" at 4, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/nypd-discipline-guidelines-proposed-revisions-public-comments-2021-11-05.pdf. In the only case involving unconstitutional questioning that was provided to the Monitor since the adoption of the Matrix, an officer was found to have stopped and questioned the complainant without cause while his partner frisked, searched, handcuffed, threatened arrest, and detained him for ten minutes. The officer, PO ███████, had eight previous complaints filed with CCRB, including allegations of

For each offense listed there are three columns. There is a "Presumptive Penalty," a "Mitigated Penalty," and an "Aggravated Penalty." The presumptive penalty for an illegal stop or frisk is three penalty days. If this, in fact, were imposed, and it would apply to first offenders as promised, it would be an increase in accountability for SQF misbehavior. The mitigated penalty for SQF allegations is Training.

The following is an abridged listing of Matrix penalties for misconduct of importance to *Floyd* contained in the "ADO" section:

| **Misconduct** | **Mitigated Penalty** | **Presumptive Penalty** | **Aggravated Penalty** |
|---|---|---|---|
| Stop of Person | Training | 3 Penalty Days | 15 Penalty Days |
| Frisk of Person | Training | 3 Penalty Days | 15 Penalty Days |
| Search/Seizure of Person | Training | 3 Penalty Days | 15 Penalty Days |
| Strip Search (Procedural) | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Strip Search (unauthorized/unwarranted) | 20 Penalty Days | 20 Suspension Days +Dismissal Probation | Termination |
| Wrongful Enforcement Abusive/Unauthorized | 10 Penalty Days | 20 Penalty Days | Termination |
| Failure to Process a Civilian Complaint | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Retaliatory Action for Making a Civilian Complaint | 20 Penalty Days | 30 Penalty Days | 40 Penalty Days |
| Failure/Refusal to Identify Shield or Name | Training | 3 Penalty Days | 5 Penalty Days |
| Failure/Refusal RTKA[1503] Business Card | Training | 3 Penalty Days | 5 Penalty Days |
| Failure - Consent to Search under RTKA | Training | 3 Penalty Days | 5 Penalty Days |
| Deletion of Information from Recording Device | 20 Penalty Days | 30 Penalty Days + Dismissal Probation | Termination |

---

improper use of pepper spray, force, gun drawn, and discourtesy. None had been substantiated. The Police Commissioner wrote a Departure Letter (see discussion below) explaining that he would impose discipline of an A-CD and forfeiture of three days. The Departure Letter claimed that CCRB had recommended a B-CD. This was because CCRB had recommended an A-CD for separate allegations: the stop and the question. If a presumptive penalty of three days each was applied, the aggregate recommendation would be a B-CD with a penalty of six days. The Police Commissioner departed by consolidating the accusations and imposing a three-day penalty for an A-CD. The Department viewed the stop and question as part of the same act and thus only justifying one three-day penalty.

[1503] Right to Know Act.

| Interfere with Recording/Device | 10 Penalty Days | 20 Penalty Days | 30 Penalty Days |
|---|---|---|---|
| Discourtesy | 1 Penalty Day | 5 Penalty Days | 10 Penalty Days |
| Offensive Language (Slur) | 10 Penalty Days | 20 Penalty Days | Termination |

In theory, the ranges are based on precedent. The ranges permitted by mitigation and aggravation are so broad in most columns that it is hard to argue with that assertion. But one significant problem with basing penalty ranges on precedent is that in the past, multiple allegations in one complaint would be consolidated, with one penalty or guidance or NDA imposed for the entire complaint. In contrast, the plan for the Matrix is that each substantiated allegation will be assigned a penalty within the grid unless deviation is called for and explained. For example, in the past if a wrongful frisk was accompanied by a punch and the officer received a 15-day penalty, it is not possible to isolate the penalty ascribed to the frisk. As such, ascertaining "precedent" becomes a murky.

The Matrix consists of a set of value judgments that the Police Commissioner is entitled to make, regardless of precedent. On the surface, one could still ask why simple Discourtesy (without Offensive Language) rates a harsher set of penalties than an illegal frisk. Similarly, why is interference with a recording treated at an order of magnitude with more seriousness than unconstitutional invasions? The litany of potential questions is limitless, and one must assume wrinkles will be ironed out over time.

An indicator of the value the Guidelines attach to Fourth Amendment compliance is the level of available penalties for SQF-related misconduct in comparison to all other offenses. Of approximately 166 listed acts of on-duty misconduct in the Guidelines, the lowest range of penalties[1504] are reserved for stop/frisk/search related violations. The only violations with lower penalties are wrongful "removal to a medical facility without consent or public health need" and unintentional or negligent violations of rules regarding body-worn camera deployment. All other listed violations have a higher presumptive penalty and/or a higher aggravated penalty. The only offenses which may be mitigated to Training are the 11 related to stop/frisk/search, unintentional BWC violations, or Right to Know Act violations.[1505] Items such as Misuse of Computer, Email or Mobile Digital Devices, Using Department Letterhead of Non-Official Purpose, and Failing to Utilize a Holster, are just a few examples of offenses that carry a higher minimum penalty and/or a higher presumptive or aggravated penalty than offenses related to search and seizure.[1506]

---

[1504] As used here, "range of penalties" includes a look at the entire range from mitigation to aggravation.

[1505] Portions of the RTKA are incorporated by Court order in Patrol Guide § 212-11. Neither Los Angeles nor Denver allow training for Detention-related violations, even when mitigated. Both draw a distinction between disciplinary measures and corrective actions, such as training.

[1506] For comparison, "Detaining a person without legal justification" in the Los Angeles matrix requires discipline by way of an official reprimand or 1 to 5 penalty days at a minimum for first offenders, 11 to 15 days for second offenders and termination for a third offense. http://lapd-assets.lapdonline.org/assets/pdf/AO_15.pdf.

### D.    Is the Matrix Consistent with the Court-Approved Patrol Guide?

At least one matter is of immediate concern given the Court's prior rulings in *Floyd*.  Patrol Guide § 212.11 provides:

> Minor or inadvertent mistakes in documentation or isolated cases of erroneous but good-faith stops or frisks by members of the service should ordinarily be addressed through instruction and training.  In most instances, instruction and Training should be accomplished at the command level.  The application of the law in this area can be complicated, and investigative encounters are fluid situations in which one event or observation can alter the level of suspicion or danger.  A single erroneous judgment will not generally warrant referral to the Legal Bureau for retraining.  However, members of the service who evince a lack of comprehension of the core concepts of the law governing this procedure should be referred to the Legal Bureau.[1507]

In the past, dispositions of Training and Instructions were regularly meted out without explanation or evidence that the misconduct was isolated, erroneous, or done in good faith.  The Matrix permits a mitigated penalty of Training.  The important question to be answered is whether guidance rather than discipline will be imposed by finding mitigation in a manner which is broader than the Court-approved Patrol Guide.  Will training rather than penalty days be invoked for a large number of cases, as in the past, where there is no finding that the unconstitutional behavior was isolated, erroneous, and in good faith as specified by the Court-approved policy?

Thus far, NYPD has posted in its "Deviation Letter Library"[1508] some explanations for imposing lesser discipline than allowed in the Matrix for a wide variety of misconduct, *i.e.*, guidance or discipline below an allowable mitigated penalty.[1509]  Only ten encounters are explained.[1510]  One of the letters—that of PO ███████—is presented below as a case study.  Just as with the penalty departure letters criticized by the Independent Panel, the Deviation letters are conclusory.  They present, in abbreviated terms, the Police Commissioner's view of the facts—without discussing prior disciplinary history, the factual findings of CCRB, the factors used in deviating from the Matrix, and/or precedent upon which the decision was made.

### E.    Mitigation and Aggravation

A critical aspect of the Matrix is the deployment of mitigating and aggravating factors.  If either set of factors is routinely used to avoid a presumptive penalty, then the "presumption" carries little meaning.  The Matrix offers "Factors" to be considered in departure from the presumption in

---

[1507] *Floyd*, No. 08-cv-1034, Doc. No. 527 (Mar. 25, 2016).

[1508] Available at https://nypdonline.org/link/1035 (last visited Apr. 14, 2022).

[1509] Departure Letters, sent to CCRB when the Police Commissioner imposes a penalty below that recommended by CCRB, discussed below, are posted at https://www.nyc.gov/site/ccrb/complaints/redacted-departure-letter.page.

[1510] One case is posted, that of Sgt. ███████, is posted without an accompanying letter. *See* CCRB's History of Active NYPD Officers as of Dec. 19, 2021, available at https://www1.nyc.gov/site/ccrb/policy/MOS-records.page. There were no allegations substantiated by CCRB against Sgt. ██████.  The remaining six postings, two with multiple officers, describe deviations in a total of four complaints.

358

two places.  One set is applicable to the entire grid, and a second set is added for each section within the Matrix.  For example, the Matrix has a generalized listing of 14 "Potential Mitigating Factors" and 18 "Potential Aggravating Factors" that may be used in any case being reviewed by CCRB and the Police Commissioner.  After that, for the Abuse, Discourtesy, and Offensive Language section (ADO), the Matrix sets out 7 "Additional Potential Mitigating Factors" and 13 "Additional Potential Aggravating Factors."

Since training is the allowable "Mitigated Penalty" for all wrongful SQF behavior in the ADO section,[1511] the Police Commissioner has freedom to remain within the Guidelines without imposing discipline for SQF misconduct.  Training is available at all times for these offenses—not just for isolated errors as described in the Patrol Guide—upon a finding of mitigating factors, which is broadly defined.

There is no rule of thumb by which the amount or degree of departure is to be calculated.  Any Factor in the list of twenty-one may be cause for reduction of a penalty from presumptive to the minimum.  If the presumed penalty for a bad frisk is three days, that implies that an A-CD will be the level of discipline.  By finding mitigation, the Police Commissioner can impose training without a command discipline, thereby reducing both the penalty (three days) and the level of discipline (A-CD). [1512]

Nor is there any formula by which mitigating and aggravating factors are to be calculated or balanced against each other.  If the matter implicates a "complex" legal analysis (a mitigating factor) but resulted in "significant interference" with the complainant (an aggravating factor), how are the competing factors to be weighed?  That is left to the Police Commissioner without requiring further explication of how he or she resolved the conflict.

The Matrix-MOU requires CCRB to "put in writing . . . any aggravated and or mitigating factors applied and a description of how those factors were applied ."[1513]  This is a one-sided agreement.  The Police Commissioner is not required to do the same in the ordinary case.  He need not put in writing the factors he considered as long as he "accepts" CCRB's recommendation.  This can, and probably will, lead to the same uninformative reports and low level of discipline for SQF cases as has occurred in the past.  For example, CCRB may recommend an A-CD for a bad frisk, which carries a presumed penalty of three forfeited days.  But the Police Commissioner may then dispose of the case with an "A-CD accepted" but impose no further penalty or guidance.  CCRB

---

[1511] Stops, Frisks, Vehicle Stops, Search of Person, Search of Property, Seizure of Person, Seizure of Property, "Incidental" Search of Premises, Failure or Refusal to Identify, Failure or Refusal to Comply with RTKA including Consent to Search, and wrongful Removal to a Medical Facility without Consent or Public Health.

[1512] The NYC Charter requires a "detailed explanation" from the Police Commissioner whenever he imposes a "penalty **OR** level of discipline" other than that recommended by CCRB. §440(d)(3) (emphasis supplied).

[1513] Matrix-MOU at 3, ¶¶ 2, 3.  There are a variety of requirements for documentation of variances from recommendations or the Matrix, all discussed below.

is not advised that the presumed three-day penalty was not imposed. Both sides will then claim that the Police Commissioner "concurred" with CCRB's recommendation.[1514]

In such a case, any aggravating or mitigating factors found by CCRB will remain in private correspondence with the Police Commissioner since CCRB's explanation of factors considered in its recommendation is not public. The Police Commissioner need not explain to CCRB, the complainant, or the public why no penalty was imposed since the Police Commissioner is not required, in a case of concurrence, to explain anything.

If the Police Commissioner decides to impose a lower penalty or lower level of discipline than that recommended by CCRB, the PC is required by the Charter to advise CCRB within 45 days after discipline has been reduced. In that writing, the Commissioner is to explain how the outcome was determined and the reasons for doing so, along with an explanation of each factor the Police Commissioner considered.[1515] Logically, the writing required by the Charter, if followed, would acknowledge whatever aggravating and mitigating factors were considered by the CCRB and list the factors the Police Commissioner accepted or rejected. As things stand, however, there is no guarantee that this will occur, since the Charter does not reference the Matrix and does not require analysis of the aggravating and mitigating factors recommended by CCRB.

The Charter also does not require the letter to be published when the Commissioner departs from CCRB's recommendation. The Police Commissioner has committed, in the Disciplinary Matrix, to "notify the CCRB . . . pursuant to the process specified in the 2012 [APU] MOU between the NYPD and the CCRB and to make the written determination publicly available."[1516] But the Commissioner's commitment is limited, as the APU-MOU only calls for an explanation in APU cases.[1517] Accordingly, the Matrix-MOU, when read together with the APU-MOU, does not necessarily require a public explanation in non-APU cases or SQF violations. As this new process takes shape, it will be of particular interest to the *Floyd* litigation to see if the Police Commissioner provides a detailed explanation in public of aggravating and mitigating factors considered or rejected when the Police Commissioner imposes a level of discipline or penalty lower than that recommended by CCRB in non-APU cases.[1518]

---

[1514] Panels do not recommend a specific number of penalty days. If a case is prosecuted by APU, the APU attorney may negotiate a plea for a specific number of days or hours. If a DCT Trial Commissioner finds a subject officer guilty, the APU attorney who prosecuted the case may recommend a specific penalty as well.

[1515] NYC Charter § 440 d)(3).

[1516] Matrix-MOU ¶ 8.

[1517] Even for APU cases, the language in the Matrix-MOU is ambiguous. It promises the "written determination" will be publicly available. The Police Commissioner can fulfill that obligation by merely posting the final disposition without the "detailed explanation" of the reasons for departure being posted.

[1518] CCRB has begun to post departure letters it receives online. *See* https://www.nyc.gov/site/ccrb/complaints/redac ted-departure-letter.page. The Police Commissioner at first began to post deviation letters (where the penalty imposed by the Police Commissioner is outside the range authorized by the Matrix). Deviation Letter Library, available at https://oip nypdonline.org/view/1009///%7B%22hideMobileMenu%22:true%7D/true/true. There are only 14 deviation letters posted over the period from June 2021 to June 2023. Many departures are also deviations. It appears that a deviation letter is not written, even if the penalty is outside the guidelines, if a departure letter is written and sent to CCRB.

### i.    Mitigation Factors

Looking broadly at the 21 Mitigating Factors the Police Commissioner may use in SQF cases, they fall into three general categories:  Personal, Legal, and Factual.

- "Personal" mitigating factors are those where the Police Commissioner excuses or mitigates based on the personnel record of the subject officer.
- "Legal" issues are those where CCRB and the Police Commissioner agree on the facts but disagree over whether the actions constitute a violation of the applicable law or rule.
- "Factual" issues are those where the Police Commissioner makes his own findings of fact which may or may not agree with those made by CCRB.

### ii.    Personal History in Mitigation

As mentioned throughout this Report, CCRB's access to officers' personnel histories is extremely limited, despite the fact that the Matrix-MOU requires CCRB to "take into account . . . the NYPD employment history and any other relevant information."[1519]  If CCRB had all the information available to it that is available to IAB, DAO, or the Police Commissioner, it would know of all internal misconduct allegations as well as the performance record of the subject officer. As just some examples discussed earlier, DAO has the ability to look at prior investigations by IAB, OCD, BIU, and local Command investigations, whether substantiated or not.  DAO can find out whether or not discipline had been meted out in the precinct for command discipline matters or as a consequence of stop/frisk audits.   DAO or the Police Commissioner will know of performance ratings, and can see the CPI, CORD reports, PPR, PERF reports, pending litigation, precinct conditions, probation, interventions, litigation, etc.

In contrast, CCRB investigators and panels do not get the full disciplinary or personnel history of an officer.  During the investigation phase they rely upon their own limited internal history.  If there is a request for reconsideration (which are becoming nearly non-existent), DAO will share some history of substantiated formal discipline.[1520]  When Charges and Specifications have been decided, DAO traditionally handed a Summary of Employment History (SEH) to the APU prosecutor.  Again, this is a limited report that does not contain all the information available to DAO.  APU is not advised of command discipline penalties or unsubstantiated cases even if they involved allegations of false statements, racial profiling or corruption.

---

[1519] Matrix-MOU ¶¶ 3-4.

[1520] In response to an inquiry put to RMB and IAB, dated April 16, 2020, the Monitor Team was advised that "DAO looks at the complete disciplinary history when considering a penalty recommendation, including A-CD history and history of dismissal probation . . . During the course of an investigation, CCRB does not get any other information besides the CCRB history. Once they substantiate a case, if we ask for reconsideration, the reconsideration memo will include all disciplinary history, including Dismissal probation. If it is an APU case and APU is prosecuting, APU will be made aware of the Dismissal Probation and the disciplinary history."  The disciplinary history referred to here is for formal discipline and substantiated (non-CCRB) A-CDs in the CPI.

The Matrix-MOU provides that the CCRB panel will be given access to a subject's "Employment History" only if a CCRB investigator has first completed the investigation and recommends that an allegation be substantiated.  In this context,

> "[E]mployment history" refers to a document which was previously supplied by the NYPD to the CCRB in cases where CCRB's Administrative Prosecution Unit handled the prosecution of substantiated allegations resulting in Charges and Specifications.[1521]

In other words, under the new Matrix-MOU, CCRB will continue to receive the same information as it had in the past for APU cases, which was delayed and limited.  Upon substantiation, CCRB may send an e-mail request to the Department for the available SEH.  NYPD then has twenty business days to respond.  At this time, with the Matrix, APU can request CORD reports and a Disciplinary Cover Sheet (DCS).

The MOU provides that CCRB is prohibited from disclosing any of the employment history or disciplinary records it receives from NYPD without first notifying the NYPD Legal Bureau. NYPD reserves the right to withhold or redact information under applicable FOIL limitations, discussed above.  Given the City's posture in *UFO v. de Blasio*, A-CDs, even when substantiated, are "technical violations" which are not discoverable under FOIL.[1522]

The Matrix reduces or mitigates penalties in several instances based upon the background of the officer.  CCRB and the Police Commissioner are to consider:[1523]

- The reasonably limited or lack of knowledge, training, and experience of the MOS that is germane to the incident;
- Positive employment history including any notable accomplishments, Departmental recognition, and positive public recognition;
- The potential for rehabilitation; and
- Particular to abuse of authority findings, "Potential for training to correct/rehabilitate behavior."[1524]

Each of these may only be fairly considered if CCRB has full and complete access to the personnel record of the officer at the outset of an investigation.

### iii.    Legal Issues Related to SQF Mitigation

Under the Matrix, mitigation may rest upon factors such as:

- Complexity of legal analysis as applied to the facts

---

[1521] Matrix-MOU, Section V n.5

[1522] CCRB has its own records of its own determinations which it is free to disclose under FOIL.

[1523] Guidelines at 9, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/nypd-disciplinary-penalty-guidelines-effective-2-15-2022-final.pdf.

[1524] Guidelines at 30.

- The area of law or policy implicated in the matter is novel or complex

In Patrol Guide § 212-11 (investigative encounters), the Court has previously recognized that "[t]he application of the law in this area can be complicated, and investigative encounters are fluid situations in which one event or observation can alter the level of suspicion or danger." In effect, any and every stop encounter can be said to require complex legal or policy analysis. The danger here is that the mitigating factor of legal/policy complexity applies so commonly to SQF encounters that, unless monitored and regulated, it can be cited in almost every SQF investigation. The mere fact that a DAO attorney may view the facts or the law as difficult will present itself in almost every contested stop and will, if left unmonitored, inevitably undercut the presumptive penalty for stop and frisk misconduct.

It is a different matter altogether if the Police Commissioner and a CCRB panel have a disagreement about the application of the law to a certain set of facts. The Police Commissioner has the prerogative to issue no disciplinary action (NDA) with respect to a CCRB finding if she believes the conduct was lawful and he explains his legal reasoning. However, when the Police Commissioner upholds the finding and agrees that the officer did violate the Fourth or Fourteenth Amendment, using the "complexity" of stop and frisk law as a reason to send (and re-send) officers to training instead of imposing discipline risks severe erosion of any presumed penalty.

Similarly, the Matrix calls for mitigation for:

- The state of mind of the MOS, including absence of intent. (Applies to all misconduct adjudications);[1525] and
- Good faith and the absence of an intent to violate procedural or legal standards. (This "Factor" is specifically inserted in the ADO section and applies to stop/frisk/search misconduct.)[1526]

In discussions with the Monitor Team, representatives of NYPD have asserted that they will use an objective reasonableness standard, rather than a subjective one. But despite that stated intention, in practice, if adjudicators are told to look for absence of intent and to take into account good faith along with the complexity of the law of stop and frisk, then cases can be unfound or exonerated where an officer acted without reasonable suspicion or probable cause but did so in "good faith." The result is indistinguishable from a lenient, subjective standard.

There is the distinct probability, based on the frequency with which the Police Commissioner has excused prior misconduct upon a finding of "good faith" (see case studies in the Appendix), that absence of demonstrated bad intent will be overutilize.

Even in extreme cases of bad searches where evidence of wrongful intent may be available, caution must be exercised to guard against a shift in the burden of proof. Respondents in CCRB hearings frequently claim that their behavior was well-intentioned without further evidence than the claim itself. That is an affirmative defense put forward by the officer for which he or she or she should carry the burden of persuasion. The burden should not be placed upon CCRB to

---

[1525] *Id.* at 9.

[1526] *Id.* at 30.

disprove a claimed lack of mental culpability. Once a constitutional violation is demonstrated, the burden should be on the Respondent and should not be on CCRB, APU, or DAO to prove bad intent or to disprove lack of good intention.

### iv.    Mistake of Law

Abuse of authority and SQF misconduct may be mitigated under the Guidelines upon an absence of intent to violate legal or procedural standards. The Guidelines also reference the "complexity" of the law as cause for mitigation.

Mistake of law should not be used as an excuse when the officer knew all the relevant facts, the law is clear, but the officer did not understand the law. Officers should be accountable to know the law in disciplinary proceedings.

In New York Penal Law, "[a] person is not relieved of criminal liability for conduct because he engages in such conduct under a mistaken belief that it does not, as a matter of law, constitute an offense" unless the belief is founded upon an administrative order, a judicial decision, or an official interpretation made by a responsible official.[1527]

"Good faith mistake of fact," "good faith mistake of law," "totality of circumstances," and "objective reasonableness" are all catch-phrases which New York's highest court has been reluctant to apply in criminal prosecutions and which the City Council has rejected in civil litigation.[1528] As questionable as their application might be in such cases, there is even less reason to extend those theories to excuse bad stops and searches in disciplinary proceedings where evidence will not be excluded. The goals in internal disciplinary proceedings are standard setting, education, correcting inappropriate behavior, deterring future misconduct, responding to community concerns, and encouraging proper policing.[1529]

There are two criminal law cases where mistakes of law were invoked to avoid suppression of evidence: *Heien v. North Carolina* in the United States Supreme Court and *People v. Guthrie* in the New York Court of Appeals.[1530] Both cases involved a situation where the law itself was unclear; neither case forgave an officer for failing to understand or follow settled law. In *Heien*, the statutory rule governing the need for an additional working rear light on a car was so poorly worded that it divided the courts. Until the highest court settled the issue, it was impossible for an officer to know what the law required. Suppression of evidence by retroactively applying the latest interpretation made no sense. Accordingly, the United States Supreme Court denied suppression. In *Guthrie*, an officer stopped the defendant who unequivocally ran a stop sign. Further research by the defense attorney uncovered the fact that the stop sign was not properly listed in a registry.

---

[1527] N.Y. Penal Law § 15.20(2).

[1528] *People v. Bigelow*, 66 N.Y.2d 398 (1985) (rejecting as a matter of state constitutional law the "white heart, empty head" defense permitted by *United State v. Leon*, 468 U.S. 897 (1984), and *People v. Johnson*, 66 N.Y.2d 398 (1985) (rejecting the "totality" approach for warrantless stops and searches based on a need for "predictability and precision" and for "the protection of the individual rights of our citizens" as a matter of State Constitutional Law)). *See also* NYC Admin. Code § 8-807.

[1529] "Goals of the Disciplinary System," Disciplinary System Penalty Guidelines at 3.

[1530] *Heien v. North Carolina*, 574 U.S. 54 (2014); *People v. Guthrie*, 25 N.Y.3d 130 (2015).

The Court, once again recognizing the practical impossibility of an officer on the street knowing about the defect in registration, denied suppression.

Both cases forgave facially proper police behavior where the law was, practically speaking, unknowable. Neither court would forgive an officer's failure to recognize settled law as an excuse merely because the law is "complex." Yet that is exactly what might be derived from the current Matrix mitigation for misconduct factors. "Complexity" and "absence of intent" are factors which all too easily can be used to excuse constitutional violations. Excusing an officer's mistake of law removes an incentive to learn the law. As best cautioned by Associate Judge Rivera recently in the Court of Appeals, "[W]hy incentivize mistaken, unlawful stops?"[1531] In the Judge's words, such a rule "encourages illegal stops." She concluded by declaring,

> If we are going to adopt a per se rule, we should choose one that minimizes illegal stops by requiring suppression in every case where the officer acts without authority under the law. That would further public safety by incentivizing officers to know the laws that they are obligated to enforce and ensure that motorists who comply with the rules of the road do not have to fear being pulled over for no good reason.[1532]

While forgiving tolerance for misconduct may be understood when considering personal civil liability of the officer (see the discussion, *infra*, of qualified immunity) or in the case of a criminal prosecution where vital evidence may be suppressed, the Supreme Court has never engrafted the doctrine of good faith mistakes of law onto departmental disciplinary proceedings That line of thinking would erase years of careful demarcation of the boundaries of lawful search and seizure, watering down the very rights the *Floyd* opinion sought to protect. An officer's misapprehension of the law should not be grounds for avoiding discipline merely because other, reasonable, officers could have made the same mistake. The Police Commissioner's personal assessment of the reasonableness of a stop/search/frisk in question cannot replace court decisions. As a matter of law and policy, mistakes of law which officers (as opposed to courts) believe are "objectively reasonable" should have no place in misconduct findings. A bad stop or frisk cannot be exonerated or unfounded merely because a reasonable officer (as opposed to a court) might have read the law to permit the stop or frisk. "Reasonableness," either subjective or objective, should not be used to authorize or condone Fourth and Fourteenth Amendment violations by complete dismissal of the complaint

An officer's objectively reasonable misapplication of the law may be used in mitigation of penalty, but not liability. This Court, recognizing the distinction at an earlier juncture, approved language in the Patrol Guide that "isolated cases of erroneous but good-faith stops or frisks . . . should ordinarily be addressed through instruction and Training."[1533] That provision, if properly

---

[1531] *People v. Pena*, 36 N.Y.3d 978, 998 (2020) (Rivera, J., dissenting). *Pena* was a plurality opinion with no majority opinion on the question of whether the New York Constitution excused a good faith mistake of law in a case where, again, the Vehicle and Traffic Law was ambiguous in its requirements.

[1532] *Id.*

[1533] *See generally* NYPD Patrol Guide, *Investigative Encounters: Requests for Information, Common Law Right of Inquiry and Level 3 Stops*, Proc. No. 212-11 (eff. Oct. 15, 2016), available at http://www.nyc.gov/html/nypd/downloads/pdf/analysis_and_planning/212-11.pdf.

followed and limited to a small class of cases for first offenders, mitigates but does not excuse misconduct. Nor is it justification for the Police Commissioner to avoid proceedings by retention or by termination with an NDA. The record needs to be clear that a violation occurred and punishment was reduced but not excused.

Unfortunately, under current practice, it is impossible to tell if the Guide's tolerance of isolated, erroneous, good faith mistakes by mitigated punishment is used appropriately or if the exception has swallowed the rule. SQF misconduct commonly goes unpunished, but is that due to a finding that the violation was isolated, erroneous and in good faith? Invocation of the clemency rule is neither litigated nor documented. For that reason, a history of guidance in lieu of discipline in past cases cannot be known if the "isolated, erroneous, good faith" exception was abused. It may be that the Department may cite to PG § 212-11 when explaining departures as the disciplinary guidelines are developed.

Unless closely watched, the new Disciplinary Guideline System creates wide portals for improper NDAs and wrongful exonerations. In the section prescribing penalties for SQF misconduct, the guidelines list "Complexity of Legal Analysis as Applied to the Facts." This is just another way of saying that an officer's mistake of law will be considered. Similarly, the Guidelines say that "[g]ood faith demonstrated by the member of service and the absence of intent to violate procedural or legal standards" is also an "Additional Potential Mitigating Factor"— another escape valve to condone Fourth and Fourteenth Amendment strictures. As the Guidelines are applied over time it should be necessary, as a matter of compliance in *Floyd*, to see if these factors are used to mitigate, which is permitted, or used to excuse, which is not.

When the Police Commissioner reduces or dismisses a penalty recommendation or a level of discipline below that recommended by CCRB, or determines that the matter should go NDA/DUP, a departure or deviation letter should be written. (See discussion below.) From June 2021 until June 2022, the Department posted 12 deviation letters and then discontinued the practice. Deviations from the Guidelines are now often explained in departure letters. As of October 2023, CCRB has posted 206 departure letters.[1534]

A review of the departure letters, written since 2020 shows that, typically, penalty recommendations or misconduct findings by CCRB are rejected by the Police Commissioner for one or more of the following reasons. Either the Police Commissioner: (a) has arrived at a different view of the facts; (b) has a different view of the law; or (c) excuses the misconduct, notwithstanding a substantiated violation, on the grounds that the subject officer acted in "good faith" or with "good intent." The letters are rarely specific enough to quickly categorize which of the three reasons has been applied, and sometimes the explanation for the downward departure appears to be a blend or mix of one or more of the three factors. Without the full, unredacted, closing reports from CCRB or the CAR memo from DAO, the cause for departure is not clear.

---

[1534] NYPD Departure Letters, available at https://www.nyc.gov/site/ccrb/complaints/redacted-departure-letter.page.

Of the 183 departure letters, written between January 8, 2020, to May 2, 2023:[1535]

- Where a B-CD was recommended by CCRB for 133 of the officers:
    - 81 received an NDA/DUP
    - 24 received training
    - 28 received an A-CD with 13 receiving to 1, 2, or 3 penalty days
- Where an A-CD was recommended by CCRB for 35 of the officers:
    - 27 received an NDA/DUP
    - 8 received training or instructions
- Training or instructions were recommended for 16 of the officers:
    - All 16 received NDA/DUP

More interesting is the reason offered in the Departure letters for the 185 reductions or dismissals. An attempt to precisely decipher or categorize the basis for departure is an impossible task since the letters themselves are not sufficiently detailed to permit that kind of analysis. An attempt has been made herein to read each letter and categorize, to the best of this writer's ability, the basic cause for departure. Understandably, some if not many departures are based upon a combination of multiple factors. Distinguishing between disagreements on the law; disagreements on the facts; application of lenity for "good faith"; or a mere disagreement with the Matrix as applied by CCRB cannot easily be discerned from the letters themselves. However, a reading of the departure letters, in the opinion of the writer, leads to the following conclusions:

- 64 were dismissed or reduced on the basis of a renewed finding of facts by the Police Commissioner.
- 36 were dismissed or reduced on the basis of a declaration of "good faith" or "lack of intent."
- 70 were dismissed or reduced because the Police Commissioner disagreed on the law as to whether misconduct occurred.
- 13 were reduced where the Police Commissioner disagreed with the penalty.

In the *Floyd* Liability Opinion, Judge Scheindlin observed, "[W]hen confronted with evidence of unconstitutional stops, the NYPD routinely denies the accuracy of the evidence, refuses to impose meaningful discipline, and fails to effectively monitor the responsible officers for future misconduct."[1536] The Judge continued, "Rather than accepting the CCRB's findings, the DAO conducts its own review of the materials that the CCRB's three-member panel has just reviewed." In particular, the Judge noted that NYPD has a policy of rejecting CCRB findings when the findings rest upon uncorroborated testimony of a civilian, despite the fact that CCRB had weighed the evidence in making its own determination. There was no "deference" to CCRB's factfinding process. She concluded that "DAO's evidentiary theory [rejecting CCRB's acceptance of uncorroborated civilian testimony as insufficient] seriously undermines the NYPD's ability to

---

[1535] Starting with the first letter posted, PO ████████, CCRB Case # ████████, and through to that of PO ████████, CCRB Case # ████████, as posted sequentially. Available at https://www.nyc.gov/site/ccrb/complaints/redacted-departure-letter.page.

[1536] *Floyd* Liability Opinion at 105.

367

hold officers accountable for unconstitutional stops or frisks."[1537]  In the *Floyd* Remedies Opinion, Judge Scheindlin concluded that "[t]he Department Advocate's Office must improve its procedures for imposing discipline in response to the Civilian Complaint Review Board's . . . findings of substantiated misconduct during stops. This improvement must include increased deference to credibility determinations by the CCRB, an evidentiary standard that is neutral between the claims of complainants and officers, and no general requirement of corroborating physical evidence."[1538]  The clear import of the Liability Opinion and the Remedies Opinion, read together, is that findings of fact by CCRB should not be disregarded absent good cause. Independent civilian review is in place for a reason.

Frequent disregard for CCRB determinations simply because the Police Commissioner, without the benefit of hearing testimony, elects to arrive at a different factual finding or because the Police Commissioner believes the officer acted in good faith, or acted with good intent, continues the very flawed process that underpinned the holding in *Floyd*.

This should be distinguished from disagreements pertaining to controlling law.  No one would quarrel with the fact that the Police Commissioner, under the current form of the Charter, is the judge of the law.[1539]  As such, the Commissioner's exoneration of a complaint on the ground that CCRB's findings of fact, once accepted, do not demonstrate a violation of law or guides, if explained, is understandable.

However, dismissal of a complaint because the Police Commissioner chooses to disregard CCRB's investigation and factual findings, without cause, reverts the disciplinary process to the very form Judge Scheindlin found wanting.  Even worse, excusing established misconduct, such as a stop or frisk without objective reasonable suspicion, merely because the Police Commissioner declares that the officer meant well or acted in good faith, is in clear defiance of the opinions in *Floyd*.  A citizenry plagued with Fourth Amendment violations, as found in the Liability Opinion, is not made whole when told that the officer did not mean to act illegally.

The irony here, when the "good faith" rubric is applied, is not only that an illegal encounter is condoned. Aggravating the problem is that declarations of "good faith" or "lack of wrongful intent" or claims of "innocent mistakes" are never fairly litigated.  They are declared by the Police Commissioner without full examination or opportunity to object.  Under the sole-basis rule, discussed above, misconduct may be excused repeatedly on grounds of mistake or good faith without consideration that the same "mistake" or claim of good faith has previously been invoked in defense on one or more prior occasions.[1540]

---

[1537] *Id.* at 107-08.

[1538] *Floyd* Remedies Opinion at 24.

[1539] NYC Charter § 434.  (Assuming adherence to the Constitution and, in particular, the Fourth and Fourteenth Amendments.)

[1540] As previously discussed, Patrol Guide § 212-11 permits reduction in the penalty level in "isolated cases of erroneous but good-faith stops or frisks."  Application of this exception is neither documented nor catalogued.

### F.    Concurrent and Consecutive Penalties

In a break from past practice, the Matrix promises that separate presumptive penalties will be applied to each substantiated act of misconduct.[1541]   The stated intention, when imposing penalties for multiple allegations contained in one complaint, is to disaggregate the discipline imposed into separate penalties for "each distinct act of misconduct."  If this is followed to the letter, many complaints which led to informal discipline in the past would instead result in prosecution and formal discipline.

CCRB recommends Charges for any case where the aggregated penalties total more than ten penalty days.  This does not necessarily mean that formal discipline will follow, but it could.  Take, for example, the recent case of PO ▮▮▮▮▮, an officer with no prior CCRB history who has been with the Department for eight years.[1542]  CCRB substantiated a complaint wherein five individuals were stopped illegally.  Given the presumptive penalty of three days for each stop, the aggregated presumptive penalty would be 15 days.  CCRB panels do not recommend a set number of days, the Matrix notwithstanding.   Instead, CCRB recommended Charges and Specifications for a Member of the Service whose aggregated penalty, if imposed, would calculate to an amount above the ten-day penalty allowed for a B-CD.  Thus, CCRB has recommended Charges in this case because the aggregated total presumptive penalty is 15 days.  The Charges were served upon the officer without a request to retain under Provision Two.  If this case were to go forward to trial, the result would be unique.  An APU prosecution and formal discipline for an officer without a history and with Stop allegations only has not, after the CCRB Framework, gone to trial.[1543]  It is unlikely that this will occur in the case of Officer ▮▮, but since the entire process under the Matrix is new, the outcome at this point is uncertain.[1544]

This will be a common dilemma in SQF adjudications.  A stop is often followed by a frisk, and then a search.  In such cases, there could easily be three substantiated allegations.  Will the penalties for each violation be consecutive, or will they be aggregated in one concurrent penalty?  Discussions with the Deputy Commissioner of Risk Management suggested that the penalties would be separate and concurrent, but the Matrix language is unclear on this point.  There also could be improper force in conducting the frisk, or the stop was made for discriminatory reasons.  Would the forceful frisk be considered one act of misconduct or two?  Would the profiled stop be

---

[1541] "Calculation of Penalties," Disciplinary System Penalty Guidelines at 12-13.

[1542] Subsequent to sharing this draft of the Report with the parties, PO ▮▮▮ had a new substantiated complaint with allegations of discourtesy and a racial slur.  As of September 2023, both complaints (with a total of seven substantiated allegations) remained unresolved, notwithstanding recommendations for Charges and Specifications by CCRB for both complaints.

[1543] Subsequent to the encounter described (CCRB Complaint # ▮▮▮▮▮), PO ▮▮▮ faced a new complaint (#▮▮▮▮) alleging an illegal Frisk, Discourtesy and Racial Slur.  The frisk allegation was exonerated but the other two allegations were substantiated.  Again, CCRB recommended Charges and Specifications.  All seven allegations remain open ("APU Decision Pending") as of September 12, 2023. https://www.nyc.gov/site/ccrb/policy/MOS-records.page.

[1544] Subsequent to the draft Report, as of July 16, 2024, two other complaints were lodged against Officer ▮▮.  Allegations of Discourtesy and Slur, occurring during a stop, were substantiated.  Further allegations of RTKA violations were avoided as part of CCRB's decision to drop investigations due to budget limitations.  The five improper stops were combined and Officer ▮▮ forfeited three vacation days.

one act or two?  Is the entire episode one course of conduct?  At this point in time, not enough cases have been processed under the Matrix to provide answers to these questions.

In particular, Patrol Guide § 212-11 outlines a series of requirements in the course of an investigative encounter.  These include:  offering a business card, offering identification, documenting a request for consent to search, filing Stop Reports, activating BWCs, and explaining a reason for an encounter, among others.  Some are investigated by CCRB while others are not.  Will an officer who fails to abide by multiple measures during an encounter face individualized assessments for each failure to comply?  Will multiple investigations by separate bodies be reconciled?  Will failures to comply lead to multiple allegations or will they be treated as aggravating factors?  If individually substantiated, will the penalties for multiple allegations be consecutive or concurrent?

A recent example provided to the Monitor Team involved an officer[1545] who "wore a sweatshirt bearing discourteous and offensive words and images during an encounter with five teenagers."  The Board recommended that the ten counts of discourtesy and slur all run concurrently.  In the same encounter, a Deputy Inspector at the scene wrongfully refused to explain the reason for the encounter, which is a violation of the Right to Know Act.  The Board recommended that those five counts run concurrently as well.[1546]  In each case, one act affected five people, so it seems appropriate for the penalties to run concurrently.

Some of the SQF requirements listed in P.G. § 212-11 (such as report failures and BWC failures) are not contained in the Abuse, Discourtesy, Offensive Language section of the Matrix since they are not investigated by CCRB.  Instead, they are listed under "Violations of Department Rules and Regulations."  That section, however, is headlined as violations "Adjudicated by Charges and Specifications."[1547]  This seems odd, since report failures and BWC failures, by themselves, are practically never addressed by formal discipline. There is a footnote (Matrix n.80) that states,

> The misconduct specified here may or may not rise to the level of Charges and Specifications as determined by the Department Advocate based upon all of the facts and circumstances surrounding the incident.  In such cases, the violations may be addressed as aggravating factors related to other acts of misconduct or may be addressed at the command level if there are no associated acts of misconduct being adjudicated through Charges and Specifications.[1548]

Since the bulk of SQF findings by CCRB which are accompanied by stop report failures will not end up in the Trial Room, one can assume that these M cases associated with SQF substantiations will be rolled into DAO's handling of CCRB's recommendation as an added

---

[1545] PO ██████████ .

[1546] DI ██████████ .

[1547] Matrix at 43.

[1548] *Id.* at 45 n.80.

aggravating factor without separate investigation.  It will be important to observe in the future how this type of situation is handled.

The Department has assured the Monitor team that a stop report failure will carry a presumptive five-day penalty, not treated simply as an aggravating factor for an improper stop.[1549] But in cases where the aggregate presumptive penalty is greater than ten days, footnote 80 seems to contradict that assertion.  The choice of whether to pursue Charges appears to be left to the discretion of DAO.  Since CCRB does not investigate report and BWC failures, how will CCRB's assessment of whether a failure justifies aggravation be reconciled with DAO's calculation?  One thing that seems certain is that such failures will not receive separate adjudication and result in the imposition of penalties consecutive to CCRB's recommended penalties.[1550]

## G.     Multiple Allegations – Penalty

There are also open questions regarding when the Police Commissioner may impose multiple penalties for a finding of misconduct arising from one complaint.

Civil Service Law § 75(3) lists available penalties in the disjunctive.[1551]  Courts have held that the Civil Service Law "provides a **choice** of penalties."[1552]  Penalties under the Civil Service Law are to be imposed in the alternative, meaning that more than one penalty may not be imposed for a single finding of misconduct.  This rule has been applied even in cases where there are multiple specifications (allegations) substantiated within one finding.[1553]  How this is to be applied in the case of multiple allegations substantiated within one complaint for an NYPD officer under the Administrative Code and the recently adopted Guidelines[1554] may yet become an issue.

Civil Service Law § 75(3-a),[1555] applicable solely to NYPD officers, provides that the Police Commissioner may punish police officers pursuant to the provisions of § 14-115 of the Administrative Code of the City of New York.  That Code section (14-115(a)) repeats the same

---

[1549] NYPD Response to Monitor Questions re Matrix (Dec. 21, 2020). Whether this will apply as well to failures to comply with the "How Many Stops Act" (NYC Admin. Code 14-196, LL 2024/43, passed by veto override January 30, 2024) remains to be seen.

[1550] Distinguish this situation from one where a RTKA violation is adjudicated by CCRB.  If both an SQF and RTKA violation are substantiated, it is possible that they will be treated as separate offenses with consecutive penalties. Similarly, if CCRB's proposed Rule changes (May 31, 2022) are adopted, BWC violations should be investigated and aggregated by CCRB, rather than separately handled by DAO.

[1551] "[P]unishment may consist of a reprimand, a fine not to exceed one hundred dollars to be deducted from the salary or wages of such officer or employee, suspension without pay for a period not exceeding two months, demotion in grade and title, **or** dismissal from the service." CSL § 75(3) (emphasis added).

[1552] *Sinnott v. Finnerty*, 113 A.D.2d 836 (2d Dep't 1985) (emphasis added) (prohibiting simultaneous imposition of a suspension and reprimand); *see also Matter of Brabham v. Weinstein*, 89 A.D.2d 566 (2d Dep't 1982); *Matteson v. Oswego*, 186 A.D.2d 1017 (4th Dep't 1992).

[1553] *Matter of Brabham v. Weinstein*, 89 A.D.2d 566 (2d Dep't 1982).

[1554] NYPD, Disciplinary System Penalty Guidelines (Feb. 15, 2022), available at https://www1.nyc.gov/site/nypd/about/about-nypd/policy/nypd-discipline-matrix.page.

[1555] Added by L. 1990, Ch. 753.

disjunctive listing of available penalties as its predecessor, Civil Service Law § 75(3).[1556]  Thus far, there is no definitive court ruling embracing the prohibition against multiple penalties under the Administrative Code.  However, prior to the addition of subdivision 3-a in 1990, there were two Appellate Division rulings barring multiple punishments of NYPD officers under Civil Service Law § 75(3).[1557]  It is logical to conclude that, by repeating the same language when discipline for NYPD officers was separately restated in the amendment, the legislature did not intend to alter that precedent.

On the other hand, imposition of a combined sentence of forfeiture of 30 vacation days coupled with placement on dismissal probation has been upheld.[1558]  That can be explained by reference to the statute, which does not list dismissal probation as one of the punishments in the disjunctive series.

Consonant with that interpretation, until now, the Police Commissioner has imposed one penalty for all the substantiated allegations contained within a complaint.  Past practice fell comfortably within the statute since, regardless of the number of allegations sustained, only one penalty was imposed.

With the new Guidelines, the Department intends to impose "separate presumptive penalties" for "each substantiated **act of misconduct**."  The Guidelines explains that "presumptive penalties are then aggregated to address each distinct act of misconduct."[1559]  It is unclear, but probable, that "act of misconduct" as used in the Guidelines is intended to refer to "allegation."[1560]  It may well be that a finding that aggregates X number of penalty days for allegation number one and Y number of penalty days for allegation number two, assuming the allegations are separate and distinct acts of misconduct, is permitted by statute as merely constituting one choice of alternative available punishments.

However, limiting that principle, the new Guidelines state if "the same underlying act(s) of misconduct support multiple definitions of proscribed conduct or support alternative theories of prosecution, then a single penalty will be applied."[1561]  This would probably be required in any event.  Separate from the language of the Civil Service Law or the Administrative Code, there is

---

[1556] The Police Commissioner may "punish the offending party by reprimand, forfeiting and withholding pay for a specified time, suspension, without pay during such suspension, **or** by dismissal from the force." (emphasis added).

[1557] See cases cited *supra* note 1550.

[1558] *Quinn v. Kerik,* 305 A.D.2d 68 (1st Dep't 2003).

[1559] Guidelines at 13.

[1560] In one recent case, PO ███████ was found to have improperly frisked two civilians.  CCRB recommended a B-CD with a presumptive penalty of six days—three days for each improper frisk.  In a recommendation (CAR Report) to the Police Commissioner, DAO argued that an A-CD was appropriate and that the penalties should run concurrently because the frisks "took place immediately after each other during the same incident."  The Police Commissioner kept the B-CD but imposed a penalty of three hours.

[1561] *Id.*

372

case law supportive of a fundamental fairness argument that multiple punishments for the same "identical conduct" should be barred.[1562]

The fundamental question yet to be determined is whether the Police Commissioner will, or can, impose multiple punishments when multiple findings of misconduct for separate allegations are made for one encounter, complaint, or case. It is difficult to know if single or multiple penalties can or will be applied for a single act of misconduct, a single complaint, a single encounter, or for each allegation.[1563] If a single penalty is calculated by aggregating identified penalties for separate allegations, the argument can be made that just one penalty was imposed. The counter-argument, certain to be made by officers or their representatives, is that multiple penalties in the aggregate are, nonetheless, still multiple punishments.

More uncertain in application is the Matrix declaration that where "separate charges result from the same **underlying course of conduct**, a single penalty will be applied."[1564] A course of conduct is undefined and potentially sweeping. The example given in the Guidelines is a case where an intoxicated driver is unfit for duty. There, driving under the influence and being unfit for duty apply to the same single act. The concern is whether "underlying course of conduct" will be read more expansively to cover several distinct but related acts.

This question is particularly relevant to SQF investigations. Will an illegal stop, question, frisk, and search result in one penalty or multiple penalties? If each allegation or physical act is considered separately, will penalties be aggregated or consolidated? Will they be imposed consecutively or concurrently?

In response to inquiry, the Monitor team was orally advised that for a single encounter that involves an improper stop and an improper frisk and/or search, each would be reviewed individually (because they are separate acts), and each would receive a separate penalty. The team was also told that the presumption would be that the penalties would be consecutive and not imposed concurrently. Presumably this means an illegal stop and frisk are not to be considered as part of one underlying course of conduct. Since the Guidelines do not state this clearly in written form, close scrutiny of penalties going forward is necessary.

In one of the few cases where the issue has been discussed since adoption of the Guidelines,[1565] DAO recommended that a substantiated stop against two individuals be considered one act and, accordingly, recommended a reduced penalty (but see the PO ███ case discussed in the Section above).

Further, what if an illegal stop is performed with discourtesy or a slur is used? Is discourtesy during an improper stop "one underlying act of misconduct" or part of one "underlying course of conduct"? Or neither? Are the discourtesy and the slur one act of misconduct?

---

[1562] *Savello v. Frank*, 48 A.D.2d 699 (2d Dep't 1975); *Donofrio v. Spinnato*, 144 A.D.2d 672 (2d Dep't 1988).

[1563] One action may violate separate requirements of the Patrol Guide, leading to multiple allegations or findings of misconduct. For instance, tackling a civilian without reasonable suspicion may support an excessive force finding as well as an improper stop finding.

[1564] Guidelines at 13 (emphasis added).

[1565] PO ███████.

Importantly, if a racial slur is used and that is part of the proof of an act of bias in a profiling case, how are they to be treated? Suppose an officer approaches two victims and wrongfully stops them with one command. What then?

In each of the above hypotheticals, open questions include: (1) Will there be separate penalties? (2) Will they be aggregated or consolidated? (3) Will the Administrative Code permit multiple penalties (either by aggregation or by separate imposition)?

## H.    Progressive Discipline, Mitigation, Aggravation

Progressive discipline is a goal cited in the Joint Remedial Process report and sought by many reformers.[1566] The Guidelines declare "Progressive Discipline" may be imposed, and the Matrix permits, but does not mandate, enhanced penalties in certain cases based upon a member's prior disciplinary history.

The rules for application of progressive discipline and consideration of prior disciplinary history are complex. When does a lack of prior history constitute a mitigating factor? When does a history of misconduct constitute an aggravating factor? When do rules requiring application of progressive discipline kick in? And how do they intersect with the potential finding of aggravation or mitigation?

**Mitigation**. The Guidelines provide that, "[a] presumptive penalty is the assumed penalty generally deemed appropriate **for the first instance of a specific proscribed act**."[1567] There is no mention of whether a good prior disciplinary record may be considered in mitigation as a basis to depart downward from a presumptive penalty.

The files examined by the Monitor team are replete, however, with ameliorated penalties based upon a lack of disciplinary history. As one example of many which could be found, on June 7, 2021, the Police Commissioner signed a Deviation letter in which he wrote that the officer's "lack of prior substantiated CCRB complaints[] is an additional mitigating factor in this case."[1568] In another case in the Trial Room, on October 14, 2021, the Police Commissioner approved a Trial Commissioner's recommendation, where the DCT wrote that the subject had "no prior disciplinary history" so "the Disciplinary Guidelines counsels a mitigated penalty in this matter."

Of particular interest is the frequent reference by the Police Commissioner when departing downward to a "lack of prior substantiated CCRB complaints." A prior history of Departmental violations or proven misconduct in the trial room should prevent mitigation based solely on want of CCRB substantiations.

**Aggravation**.[1569] While a disciplinary history for misconduct is not listed as one of the specific thirty-one factors itemized that may be used to raise a presumptive penalty in Abuse,

---

[1566] JRP at 241.

[1567] Guidelines at 8 (emphasis added).

[1568] Deviation Letter Library, CCRB Case No. ▮▮▮▮, regarding Detective ▮▮▮▮, available at https://oip.nypdonline.org/files/▮▮▮▮.pdf.

[1569] Guidelines at 11.

Discourtesy, Offensive Language cases,[1570] the Matrix does state in general that prior disciplinary history may "potentially" serve as an aggravating factor.[1571]  There is no specific definition of "prior disciplinary history" for purposes of aggravating a presumptive penalty.  It is unclear whether CCRB, in non-formal cases, will have access to NYPD substantiated investigations in addition to its own prior substantiated CCRB complaints.

**Progressive Discipline.**  The Matrix adopts a complex set of rules in advancing the laudable goal of progressive discipline.  The entire set of rules is detailed on pages 11 and 12 of the Disciplinary Guidelines and will not be repeated here.  The basic proposition is that a specified number of penalty days will be added to the calculated penalty under the Matrix based upon disciplinary history up to the point where, in the upper range, dismissal probation or termination may result.

Thus, some cases will result in a "penalty increase" of one to three days, another may require an increase of five to ten days, etc.  There are, however, a number of limitations on the imposition of progressive discipline.

- **Time Limitations**:  The prior substantiation must have been within either three, five, or ten years of the current offense, depending on the severity of the prior offense.[1572]  The clock commences on the date the Police Commissioner approved imposition of the final penalty for the prior act of misconduct.[1573]
- In some cases, an officer may have been charged on multiple occasions with similar or serious violations.  If they are committed during the pendency of adjudication, they will not be eligible for "progressive discipline."  Experience shows that a final decision by the Police Commissioner often occurs years after the misconduct.  If new wrongs are committed after a finding by CCRB or a Trial Commissioner, discipline should be enhanced, notwithstanding the fact that the Police Commissioner had not yet made a final determination.
- The Matrix provides that time limitations do not apply to prior disciplinary history establishing patterns of misconduct.[1574]  Unfortunately, "prior disciplinary history" is limited to CCRB substantiated cases and formal discipline prosecuted by DAO.  Patterns of misconduct are to be found in a broader reach than defined by the Matrix.
- **Narrowing of Eligibility**:  The Matrix does not enhance a penalty for a history of misconduct unless the prior misconduct falls into one of two narrow boxes:

---

[1570] There are 18 factors which apply to all cases and an additional 13 which may be used in an ADO case.

[1571] Disciplinary System Penalty Guidelines at 11.

[1572] There is an exception for offenders who faced termination or forced separation but escaped the penalty by way of previous mitigation.

[1573] Disciplinary System Penalty Guidelines at 11.

[1574] Guidelines at 12.

- The prior wrong had to be the "same misconduct" as the current substantiated allegation.[1575]  For example, an officer who was found to have wrongfully stopped and tasered a complainant can illegally frisk another civilian on a later occasion and not be eligible for progressive discipline because the two offenses are not the same misconduct.

- The presumptive Guidelines penalty for the new substantiated allegation must be equal to or greater than the presumptive penalty for any previously substantiated allegation.[1576]  Progressive discipline is reserved for offenders who progressively offend.  This rule creates an unnecessary obstacle to progressive discipline for actors who engage in repeated acts of similar but not identical misconduct.

    - For example, if an officer wrongfully stops a complainant in 2021, and the officer is also found to have acted with discourtesy or used a slur, regardless of the penalty then imposed (whether mitigated, presumptive, or aggravated), if the officer later frisks another person unlawfully in 2022, he or she will not receive progressive discipline because the presumptive frisk penalty (three days) is less than the presumptive penalties for discourtesy (five days) or slurs (20 days).

- **Foundation**:  If the above rules for progressive discipline are met, the Guidelines permits an increase in the penalty days, without regard to the presumptive penalty for the previous offense.  So, for example, an officer who is found to have made an illegal stop in 2021 may well have received training for the first offense.  If, in 2022, he or she illegally frisks another complainant, he or she is eligible to receive between one to three days sanction for the second offense, notwithstanding that the presumptive penalty for a wrongful frisk by a first offender is three days.

The Guidelines do not guarantee CCRB access to prior IAB, FID, or BIU investigations. Repeated force, profiling, false statement, stop report failures, failures to supervise, etc., are not available to CCRB unless Charges were prosecuted and formal discipline ensued.  As such, it is uncertain how CCRB is to calculate recommendations for "progressive discipline" without being permitted to take such instances of misconduct into account.

## I.     Other Violations in the Matrix

There are two other swaths of listed offenses in the Disciplinary Guidelines beyond the ten broad categories listed above.  One is for Equal Employment Opportunity Violations which are consigned to the Deputy Commissioner of Equity and Inclusion.[1577]  The other, of significance to SQF enforcement, is Misconduct Adjudicated by Command Discipline.[1578]  A-CDs or B-CDs

---

[1575] By contrast, the LAPD guidelines provide that an offense is a repeat offense if "of the same general nature as the previous misconduct." The offenses need not be identical. LAPD Administrative Order 15 at 2, available at http://lapd-assets.lapdonline.org/assets/pdf/AO_15.pdf.

[1576] Again, for CCRB, this will be limited to prior CCRB substantiations.

[1577] Disciplinary System Penalty Guidelines at 50.

[1578] *Id*. at 52-53.

permit the commander of the relevant unit to set the penalty within the previously established ranges for each under the Patrol Guide. (From no penalty up to five penalty days for an A-CD, and from no penalty up to ten penalty days for a B-CD.)

According to the Disciplinary Guidelines, commanding officers, when imposing discipline for A-CDs and B-CDs are to "impose penalties that are consistent with the presumptive penalties described herein, while considering relevant aggravating and mitigating factors." No presumptive penalties are listed in this category. The list in the Matrix largely replicates the offenses that were covered in the list of Command Discipline offenses that could be handled at the precinct level included in Patrol Guide § 206-03.[1579] Many of the offenses so listed are minor or technical, such as failure to maintain a neat and clean professional appearance or illegal parking of a vehicle.

An important question to be resolved is whether SQF misconduct substantiated by CCRB and passed from DAO to the precinct will, in fact, receive the presumptive penalty and will compliance be monitored by DAO after the matter is sent to the precinct.

In the past, if CCRB recommended an A-CD, and, if that was accepted by DAO and the officer, precinct commanders did not impose any penalty absent a directive from the Police Commissioner, which was rare. Going forward, will CCRB continue to substantiate a bad stop/frisk/search and recommend an A-CD with an expectation that a presumptive three-day penalty will be imposed only to find that, in the vast majority of cases, no discipline will be imposed?

The list of "Misconduct Adjudicated by Command Discipline" also includes "Omitted Activity Log entries" and "Omitted entries in Department records, forms or reports."[1580] In other words, when a precinct supervisor discovers, through audit or otherwise, that a stop report is missing or omits necessary entries, the matter is left to the CO's discretion without report to DAO or the Police Commissioner and without a presumptive penalty.

While some M cases such as "Fail to Document an Investigative Encounter" and "Fail to Prepare a Required Report" are also listed separately in the "Rules and Regulations" swath within the Matrix, presumably that penalty box is reserved for cases where CCRB has made an OMN referral in connection with its own FADO investigation or one of the central NYPD investigating offices (IAB or BIU) has undertaken the matter. Beyond simple auditing, there is no requirement that precinct commanders work through DAO, Borough Commanders, or the Police Commissioner when finding stop report failures.

In theory, under the advisory language in the Matrix, a Commanding Officer, upon discovering a report failure, is to impose penalties that are "consistent with the presumptive penalty" ascribed for M case referrals. Within the Matrix, under the section "Violations of Department Rules and Regulations," the presumptive penalty for a report failure is forfeiture of five days with a mitigation/aggravation range from three days to ten days. However, that swath is reserved for violations "Adjudicated by Charges and Specifications." DAO would then decide on the penalty –theoretically somewhere between three to ten forfeited days. Absent a formal

---

[1579] Now AG § 318-01

[1580] *Id.*

proceeding, as a matter of precedent, there are no cases where a Commanding Officer imposed five days, or even three days, solely for a missing stop report. So, until proven otherwise, it is safe to assume that Stop Report failures, unless referred by CCRB and prosecuted by DAO, will continue to go without discipline, the Matrix notwithstanding.

## J.    Stop/Question/Frisk Under the Disciplinary Guidelines

Shortly after publication of the revised Guidelines, CCRB, by resolution, committed to utilizing the Discipline Matrix beginning February 1, 2021 "on a trial basis, for a period of one year, as the non-binding framework for its discipline recommendations in all CCRB cases."[1581] On February 4, 2021, a Matrix-MOU was signed by Rev. Fred Davie, CCRB chair, and Police Commissioner Dermot Shea, implementing an agreement to abide by the new Matrix.

It is too early to measure the impact of the Disciplinary Penalty Guideline System upon discipline for stop and frisk misconduct. The Matrix was adopted in January 2021 and implemented June 2021. As of the report made available to the Monitor in March 2022, there were 39 complaints where CCRB has substantiated an SQF allegation since the Guidelines were adopted. Within those complaints, there were 91 cases (officers) with substantiated allegations, and there are 224 substantiated allegations in all.[1582]

Because the new system aggregates presumptive penalties for multiple allegations within a case, there are some stop and frisk allegations where CCRB recommended the presumptive penalty (an A-CD) for a substantiated allegation, but when multiple allegations were combined, the overall case recommendation was elevated to a B-CD or Charges and Specifications. For example, an illegal stop and an illegal frisk by an officer with no prior disciplinary history could draw a presumptive six-day penalty (three days each for the stop and the frisk). This would be a break from past practices, but only if the Police Commissioner allows the CCRB recommendations to be aggregated consecutively and to proceed at the elevated level

Under the new system, the Board recommends a guideline penalty for each individual substantiated allegation. For each, it decides whether the penalty should be presumptive, aggravated, or mitigated.

The Board then combines the allegation recommendations to arrive at an overall Board recommendation for the entire case (i.e., for each officer).[1583] Further, the Board may recommend that some misconduct findings run concurrently, and some may run consecutively, which will then affect the combined Board disciplinary recommendation for the officer.

The current Matrix, as it applies to SQFS misconduct, reads as follows:

---

[1581] CCRB Annual Report 2021 at 4.

[1582] "Follow-up Detail" matrix on file with Monitor Team, submitted Mar. 25, 2022.

[1583] Some officers may have multiple "cases" open at the same time. Each complaint against that officer will constitute a new case.

| MISCONDUCT | MITIGATED PENALTY | PRESUMPTIVE PENALTY | AGGRAVATED PENALTY |
|---|---|---|---|
| Stop and Question or Improper Question of a Person | Training | 3 Penalty Days | 15 Penalty Days |
| Frisk of Person | Training | 3 Penalty Days | 15 Penalty Days |
| Search/Seizure of Person/Property | Training | 3 Penalty Days | 15 Penalty Days |

At this point in time, as of October 10, 2023, since the Department has not come to a final disposition in the 30 of the 91 cases made available to the Monitor, a complete analysis of the results focuses more heavily upon CCRB's application of the Matrix with less that can be said about the Police Commissioner's adherence to the Matrix or CCRB's recommendations, beyond the fact that recommendations for Charges and Specifications quite frequently remain open and pending for an inordinate length of time.  To best understand the results, one needs to look at:  (a) CCRB recommendations for substantiated allegations; (b) CCRB disciplinary recommendations for each officer within a complaint; and (c) the disposition of a complaint.[1584]

### A PRELIMINARY ANALYSIS OF SQF OUTCOMES WITH THE MATRIX

To assess the impact of the newly adopted Matrix upon SQF discipline, the Monitor team asked for closing reports, CAR reports, and final dispositions for all cases in which an SQF allegation had been substantiated by CCRB after implementation of the Matrix in June 2021.[1585] There were a series of requests by the Monitor, ranging from August 31, 2021 through December 6, 2021.  Requests were for correspondence between CCRB and the Department, which would include CCRB closing reports, Police Commissioner memos, and CAR reports.

Closing reports for 91 cases (within 39 complaints containing 224 substantiated allegations) were supplied in February and March of 2022 with follow-up data sent in June.[1586]  Twenty-four of the

---

[1584] In a review of this report by representatives of Communities United for Police Reform (CPR), The Justice Committee & CPR, and VOCAL-NY & CPR (hereinafter jointly referred to as "CPR"), dated July 12, 2024, recommended stiffer sanctions in the Matrix, as follows:

| MISCONDUCT | MITIGATED PENALTY | PRESUMPTIVE PENALTY | AGGRAVATED PENALTY |
|---|---|---|---|
| 1st improper stop, frisk or search | Training | Training + 15 Penalty Days | Training + 15 Penalty Days |
| 2nd improper stop, frisk or search | 5 Penalty Days | 15 Penalty Days | Termination |
| 3rd improper stop, frisk or search | Termination | Termination | Termination |

[1585] The City Department of Law has objected to production of CAR memos, claiming deliberative process and work-product privileges. Letter, Nancy Savasta, Deputy Chief NYC Law Department (Feb. 10, 2022).

[1586] The list of cases analyzed can be found in spreadsheet, "Follow-up Detail," sent to the Monitor on June 30, 2023. "NYPD Disciplinary Administrative Database System, CCRB Substantiated Stop/Question/Frisk/Search or Trespass Arrest Allegations Closed from 2022 to YTD 3/31/23."

complaints were made to CCRB in 2019.  Thirteen of the complaints originated in 2020.  Two of the complaints were commenced in 2021. At the time of the analysis, as of March 7, 2022, 38 of the 91 cases had closed.  This gives an early, but probably premature, look at the manner by which the Disciplinary Guidelines will be utilized.  Despite the 18-month interval between the time the records were produced and the time of final analysis in this Report (October 10, 2023), final action by the Police Commissioner has not been taken in 31 of the 91 cases.

### i.      Board Recommendation by Allegation – Presumptive, Mitigated or Aggravated

The Board recommended the **presumptive penalty** for 177 of the 224 substantiated allegations.

- Of the 177 substantiated allegations with a presumptive penalty recommendation:

    o Seventeen arose from one complaint where two officers detained a group of teenagers.  An allegation was substantiated for one act of detention, one slur, and one act of discourtesy that affected multiple teenagers.  The Board recommended that all substantiated allegations in the two cases run concurrently.
    o In another case where two officers detained five teenagers, the Board did not recommend concurrent penalties for the ten findings; the allegations were aggregated to arrive at an elevated penalty recommendation for each officer.

The Board found **aggravating circumstance**s for 17 of the 224 allegations.

- The 17 allegations with aggravating circumstances were confined to seven of the 39 complaints.
- Within those seven complaints, the Board found allegations with aggravating factors for 10 of the 91 officers.

    o Aggravating factors utilized ranged from lack of candor, supervisory position, intentional or deliberate actions, pendency of a related legal proceeding, or use of force.

- For nine of the ten officers, where aggravating circumstances were found, the Board went on to recommend that Charges and Specifications be drawn. As of October 10, 2023, not one of the recommendations has been observed. All nine cases were either reduced, dismissed, or remain open.

    o In one case where aggravating circumstances were found (the officer was charged with discourtesy), the Board had elevated a presumptive A-CD to a B-CD, not Charges.  The Police Commissioner rejected the B-CD recommendation and the case ended with NDA-DUP.
    o One of the ten officers separated from the Department before Charges were served.
    o In one case the Police Commissioner reduced Charges to Training.

- o   In one case the Police Commissioner rejected Charges with NDA-DUP.
- o   In one case Charges were reduced to an A-CD with 1 penalty day.
- o   In one case Charges were reduced to Training.
- o   The remaining cases where aggravating circumstances were found remain open with a decision still pending.

The Board found **mitigating circumstances** for 30 of the 224 substantiated allegations.

- In 19 of the 30 allegations that were mitigated, the explanation offered was the "totality of circumstances." This does not bode well for implementation of the Guidelines. Remembering that the Matrix-MOU requires CCRB to describe "with particularity the basis for . . . any aggravating and or mitigating factors applied and a description of how those factors were applied," a mere reference to "totality of circumstances" provides no detail. The Guidelines list 14 aggravating factors and 19 mitigating factors. Not one of those individual factors is "totality of circumstances." Rather, the Guidelines lists each factor with specificity, which may then be considered by reviewing the totality of circumstances. Citing to the totality of circumstances does not explain the basis for mitigation.

### ii.    Board Recommendation - Level of Discipline for Each Allegation

The Board **recommended Charges** for 30 of the 224 allegations. The majority of the allegations for which the Board recommended Charges were misconduct other than stop, question, frisk or search. They were for use of force, untruthful statements, slurs, etc.

- Sixteen of the 30 allegations called for Charges as a presumptive penalty due to the nature of the allegation. This would not include SQF misbehavior.
- Twelve of the allegations where the Board recommended Charges would not have called for Charges presumptively, but the Board did so upon a finding of aggravating circumstances. Five of these were for SQF misbehavior. (See discussion below.)
- In two cases, the Board recommended a mitigated penalty but still recommended Charges. This arose in a complaint where two officers[1587] wrongly used force by way of a deadly weapon (a gun) and a dangerous instrument (a vehicle). Although there was no injury to the complainant, a presumptive penalty would have been termination while a mitigated penalty would be Charges with 30-days and dismissal probation. The Board called for the mitigated penalty.

The Board **recommended a B-CD** for 36 of the 224 allegations. Thirty-three of the B-CD recommendations were the presumptive penalty for the allegation found. None were for a stop, question, frisk, or search of person.

- The three other allegation recommendations of a B-CD, which were elevated from the presumptive A-CD, were instances where the Board found aggravating circumstances. Each was for Discourtesy.

---

[1587] Lt. ███████ and PO ███████████ .

o One case was that of Lt. ███████, who has two open and separate post-matrix complaints with five substantiated allegations pending. Lt. ███ has 17 CCRB complaints against him, six of which have been substantiated. In one of the pending cases, where he was found to have illegally stopped/searched a vehicle and violated the RTKA; the Board recommended three A-CDs, which aggregated to a B-CD recommendation to the Police Commissioner. In the other pending case against ███, the recommendation for Discourtesy was elevated from an A-CD to a B-CD by CCRB due to the totality of circumstances. Lt. ███ has been sued in the vehicle case and that lawsuit is pending in Kings County Supreme Court. The Police Commissioner has not yet finalized a disposition for the two open cases against Lt. ███.

The Board **recommended an A-CD** for 134 of the 224 allegations.

- For 128 of the A-CD recommendations, the Board recommended the presumptive level of discipline.
- For four of the A-CD recommendations, the Board found mitigating circumstances.
- For two of the A-CD recommendations, the Board found aggravating circumstances.
- In one case (PO ██████████████), the Board recommended that six penalties for discourtesy (each is an A-CD) run concurrently. Officer ███ was found to be wearing a sweatshirt with "DILLIGAF" and a "Punisher" logo, which are said to be worn by antigovernment militia and white supremacist groups as he participated in the stop of a group of teenagers. The Board recommended that penalties for the A-CDs run concurrently.

### iii. SQF Allegations - Board Recommendation

Within the 39 complaints produced, there were 107 substantiated allegations for stop, question, frisk, or search of person misconduct.

- 43 stops
- 4 questions[1588]
- 26 frisks
- 34 searches of person

Of the 43 substantiated **Stop** allegations, the Board recommended:

- A presumptive disposition (A-CD, 3 penalty days) for 31 of the allegations
- Mitigation (Training) for nine of the allegations
- Aggravated disposition (Charges) for three of the allegations

---

[1588] An allegation for an illegal question does not receive a separate penalty if there is a stop allegation substantiated for the same complaint. Here, two of the four alleged illegal questioning incidents were in an encounter with an illegal stop.

o Two were aggravated for lack of candor.
o One was aggravated due to a related civil suit and supervisory responsibility.

Of the **four Question** allegations, the Board recommended:

- A presumptive disposition (A-CD, 3 penalty days) for each

  o There will not be a separate penalty for two of the four officers (POs ████ ████████ and ████████████) with a substantiated question allegation since the Guidelines combine a stop and a question allegation as one allegation.[1589]

Of the **26 Frisk allegations**, the Board recommended:

- A presumptive disposition (A-CD, 3 penalty days) for 24 of the allegations
- Mitigation (Training) for one allegation (PO ████████████)
- Aggravated disposition (Charges) for one allegation (Sgt. ████████████)

Of the **34 Search of Person** allegations the Board recommended:

- A presumptive disposition (A-CD, 3 penalty days) for 26 of the allegations
- Mitigation (Training) for 7 of the allegations
- Aggravated (Charges) for one allegation (Sgt. ████████████)

**In all**, for the 107 substantiated stop/question/frisk/search of person (SQF) allegations:

- The Board recommended the presumptive penalty (A-CD with 3-day penalty) for 84 of the allegations.
- The Board mitigated the finding and recommended Training for 17 of the allegations.
- The Board found aggravating factors and recommended Charges for five of the allegations.
- Three of the five officers faced Charges for stop and frisk misbehavior which was elevated from a presumptive A-CD (three penalty days) to Charges due to aggravating circumstances. The three officers were:

  o Lt. ████████████ was in a patrol car with Detective ████████████ (retired) when the complainant "flipped a bird" at the car. The complainant was stopped, frisked, taken to the stationhouse, searched and charged with Disorderly Conduct (which charge was dismissed). When asked about the incident, Lt. ████████ allegedly gave a false statement. The incident was video recorded by a companion. Along with the stop allegation, Lt. ████████ was charged with the stop, making a misleading statement, and



---

[1589] PO ████████ and PO ████████.

conducting a retaliatory arrest. The Charges are pending and unresolved at this time.[1590]

- o  Sgt. ██████████ was with three other officers in an unmarked car in October 2019, when he stopped and frisked the complainant without proper cause. Other officer(s), unidentified, were alleged to have used excessive force in the encounter. Sgt. ██████'s history was discussed earlier in this Report. Sgt. ██████ had Charges pending from an earlier incident, in May 2019. Both incidents, along with a 2018 CCRB complaint and a lawsuit from a fourth incident were each charged along with another officer, ██████ ██████. CCRB cited the pending lawsuit as an aggravating factor. The Police Commissioner has not yet made a decision regarding both open sets of Charges against ██████.

- o  PO ██████████ is alleged to have given an untruthful statement about an incident where he wrongfully stopped, spoke discourteously and used force (baton) against a reporter observing a protest. CCRB, based upon aggravating circumstances, recommended Charges. Along with ██████, Lt. ██████████ is alleged to have failed to supervise and is charged, separately, with wrongful use of force on the same day. Cases against both ██████ and ██████ are open and pending.

### iv.   CCRB Recommendations by Case

The Board arrives at a final disciplinary recommendation for a B-CD or Charges with formal discipline in three ways: (1) some allegations presumptively call for Charges or a B-CD (force, slurs, untruthful statement); (2) some allegations presumptively call for an A-CD, but Charges or a B-CD flow as a consequence of aggravating factors; and (3) some less serious allegations may be aggregated, elevating a final Board discipline recommendation from an A-CD to a B-CD or Charges.

In any of the above three scenarios, where the final penalty recommendation exceeds ten days (absent a recommendation for concurrent sentences or mitigation), the Board's final disciplinary recommendation is for Charges and Specifications.

- • The Board recommended that 37 of the 91 officers **be served with Charges and Specifications** to face formal discipline:

  - o  Eight of the 37 officers had one or more substantiated allegations which presumptively called for Charges.
  - o  Eight of the 37 officers had an allegation that did not presumptively call for Charges, but a recommendation for Charges was based upon aggravating factors.

---

[1590] On February 20, 2024, Police Commissioner Caban approved a plea before a Trial Commissioner. Lt. ██████ accepted: (1) a mitigated penalty for an untruthful statement—20 days; (2) a mitigated penalty for a retaliatory arrest—10 days; and (3) a concurrent presumptive penalty for a bad stop—3 days. Available at https://www.nyc.gov/assets/ccrb/downloads/pdf/APU-Documents/██████████-APU-Final-Documents.pdf.

- o 21 of the 37 officers did not have an allegation recommendation of Charges, but when lesser findings were aggregated, the final Board recommendation for the case was that Charges be served and filed.

- The Board recommended that 17 of the 91 officers **receive a B-CD**.

  - o For 11 of the 17 officers, a B-CD was recommended by the Board, although no allegation, separately considered, was higher than a presumptive A-CD. By aggregating two or more presumptive A-CD offenses the Board elevated the overall recommendation from an A-CD to a B-CD.

    - ▪ An example is the case of PO ███████████, who was found to have illegally searched a bag and to have failed to provide a business card when requested. In that case, the complainant had gone to the precinct to file a domestic violence complaint. The detective, instead, questioned her about drug activity by her companion and herself. The detective said he would not take the complaint unless he could search her bag.[1591] The search and business card (RTKA) violations each called for a presumptive A-CD (three penalty days each). Combined, the Board recommendation was for a B-CD (six penalty days).

  - o For five of the 17 officers, a B-CD was the presumptive recommendation for the allegation substantiated (threat of force or wrongful threat of arrest).
  - o For one officer (PO ██████████), the Board elevated a presumptive A-CD for Discourtesy to a B-CD due to an aggravating factor ("time for deliberate reflection").
  - o The Board recommended that 27 of the 91 officers **receive an A-CD.**
  - o For 23 of the officers an A-CD was the presumptive level of discipline. The presumptive penalty would be three days.
  - o Four of the officers were found to have committed multiple offenses (stop or search) with an A-CD presumption, which could have elevated the recommendation to a B-CD, but the Board mitigated findings either because of a potential for training or under the totality of circumstances. In all four cases CCRB recommended an A-CD with Training.

- The Board recommended that ten of the 91 officers **receive Training** without a command discipline.

  - o Four of the officers had conducted an improper search of person.
  - o Six of the officers were cited for refusal to provide shield number (RTKA).

---

[1591] The Board also referred Other Misconduct Noted to the Department for a failure to provide her with a consent to search form.

### v.     NYPD Response to CCRB Panel Recommendations

**Dispositions as of October 10, 2023**

Of the 91 cases produced for examination in March 2022 in response to a data request to NYPD for SQF cases substantiated by CCRB after implementation of the Matrix, 31 have not yet closed. They are cases listed as "decision pending," despite the fact that they all originated in the period 2019 to 2021. In 37 of the 91 cases, CCRB recommended Charges and Specifications. Twenty-four of the open cases are instances where CCRB recommended Charges and Specifications, but a decision is still "pending." Another six are cases where CCRB recommended a B-CD, but a decision is still pending. Lastly, in one case CCRB recommended Training, but the matter is listed as "decision pending.[1592]

**Of the 91 cases, the Board recommended Charges in 37 instances**:

- Four cases ended with NDA.
- Two cases were reduced to training.
- Two cases were reduced to a B-CD, with one receiving seven penalty days and the other a two-hour time deduction.[1593]
- Three cases were reduced to an A-CD, receiving one day, three days and a warning/ admonishment respectively.[1594]
- One case was retained with training being ordered.
- Two cases ended with officers retiring or going on terminal leave.
- Twenty-three cases are open, with a decision pending.

**Of the 91 cases, the Board recommended a B-CD in 17 instances:**

- Six cases ended with NDA.
- Two cases ended with a B-CD, one receiving no penalty and the other retiring after being assessed a ten-day penalty
- Three were reduced to an A-CD, with one receiving a three-day penalty and the other two receiving no penalty.
- Six cases remain open, with a decision pending.

**Of the 91 cases, the Board recommended an A-CD in 27 instances**:

- Ten cases ended with NDA.
- Thirteen cases ended with an A-CD. Two received a one-day penalty, the others received no penalty.

---

[1592] NYPD Member of Service Histories, available at https://www.nyc.gov/site/ccrb/policy/MOS-records.page.

[1593] Lt. ██████ had been charged with wrongful use of force (gun pointed), two wrongful frisks, two wrongful search of person, two wrongful stops, and discourtesy.

[1594] PO ██████ was discussed earlier in this Report. In that case, notwithstanding the CCRB recommendation for Charges based in part upon a substantiated improper strip search, the Department resolved the case without prosecution by APU. IAB separately investigated the incident, due to a fellow officer having punched the victim repeatedly in the face. PO ████ was permitted to accept an A-CD with a Warning and Admonishment.

- Four cases were reduced to training.

**Of the 91 cases, the Board recommended Training in 10 instances:**

- Eight cases ended in NDA.
- One case ended in Training.
- One case is listed as decision pending.

**In sum**, as of October 10, 2023, of the 91 post-Matrix case files provided to the Monitor:

- Of 37 cases where CCRB recommended Charges, the Police Commissioner:

  o Twelve ended with a reduced level of penalty of 12.
  o One officer found guilty, receiving 18 penalty days.
  o Two officers left the Department
  o Twenty-three cases are still open/pending.

- Of 17 cases where CCRB recommended a B-CD, the Police Commissioner:

  o Two ended with a B-CD. (One of the two received penalty days.)
  o Nine ended with reduced the level of penalty and no discipline.
  o Six cases are still open/pending.

- Of 27 cases where CCRB recommended an A-CD, the Police Commissioner:

  o Twelve ended with a reduced level of penalty, no discipline.
  o Two ended with an A-CD. (One of the two received penalty days).

- Of the ten cases where CCRB recommended Training, the Police Commissioner:

  o Ten ended NDA.
  o One received Training.
  o One case is still open/pending.

### vi.    Penalty Disposition of SQF Misconduct by NYPD

The sample provided the Monitor was of 91 cases where a substantiated SQF allegation was included within the findings by CCRB for complaints lodged between 2019 and 2021. More often than not, a substantiated SQF allegation is only one of several other acts of misconduct within the same encounter. But, in the sample provided, 14 of the 91 cases were matters where the only substantiated allegations were for SQF allegations. As of October 10, 2023, eight of those 14 cases had a final disposition. Six cases still have a decision pending without resolution.

The presumptive penalty under the Matrix for a substantiated stop, frisk, or search of person is for three penalty days. In the sample provided, CCRB recommended the presumptive penalty of three days for the allegations within 11 of the 14 SQF/only cases. CCRB recommended mitigation for two of the cases based on "lack of experience," and that the law in the case was "complex." Accordingly, CCRB recommended Training for those two cases.

In one case, CCRB found aggravating circumstances, which would call for charges and carried a 15-day penalty, for a frisk conducted by a supervisor with wrongful intent.

In four cases, CCRB recommended Charges and Specifications, not due to aggravating circumstances but because multiple SQF allegations aggregated to a consecutive penalty in excess of ten days. However, even if the decision were made by the Police Commissioner to run those findings concurrently rather than aggregating them consecutively, the presumptive penalty in each of those cases would still be at least three vacation days.

If the Matrix is followed and if CCRB recommendations are respected, at least 12 of the 14 cases should have ended at a minimum with an A-CD with three or more penalty days, regardless of whether the penalties run consecutively or concurrently and even if the Police Commissioner denied a finding of aggravated circumstances.

If the Police Commissioner were to find mitigating circumstances for any or all of those 12 cases, reducing the case from an A-CD to training, that would still be a departure from the penalty recommended by CCRB.[1595]

Remember that the Police Commissioner is to explain a departure in detail when he departs from either the level of penalty recommended by CCRB OR the penalty recommended by CCRB. The question is, how many of the SQF cases received the level of penalty (an A-CD, B-CD, or Charges, as the case may be) recommended by CCRB?  And how many cases received the presumptive or proscribed penalty (three or ten days as the case may be)?  How many cases were departures from CCRB and how many were deviations from the Matrix?

- For the two cases with a mitigation recommendation by CCRB:

  - In one case the training recommendation was administratively closed with an NDA for SOL.
  - In the other case, the training recommendation is still open.

- For the one case with an aggravated circumstance finding, a decision is pending and the case is still open.
- For the nine cases which have closed where an A-CD and the presumptive penalty for the SQF allegations (even if the overall case recommendation was for a B-CD or Charges due to aggregation) was recommended:

  - One case ended with an A-CD but no penalty imposed.
  - Three cases ended with NDA.
  - One case ended with training as the final disposition.
  - Four cases still have a final decision pending.

---

[1595] If the case is simply reduced to Training upon the Police Commissioner's finding of mitigation, there is no question that the result is a departure. If the case is finalized as an A-CD with Training, although the level of discipline remained as an A-CD, the penalty reduction from a presumptive three-day penalty to Training requires explanation under the Charter provisions.

**In sum**, within the sampled 91 cases with substantiated SQF allegations, without other accompanying non-SQF substantiations, no officer has received penalty days for an A-CD recommended by the Board and no officer has received the presumptive three-day penalty for SQF misconduct. [1596]

Even for cases where an SQF substantiation is included along with other substantiated allegations, imposition of penalty days is in the minority. Disallowing the 30 cases which have yet to be decided,[1597] of the remaining 61 finished cases where there is an SQF substantiated finding within the case, only ten cases ended with imposition of penalty days. Another 13 cases resulted in an A-CD disposition without notation that penalty days were imposed.[1598] The remaining 38 finished cases went without discipline of any kind.

For those who expected that a substantiated SQF allegation, absent mitigating circumstances, would lead to a three-day penalty, the expectation has not been realized.

As well, mitigation of an SQF allegation does not lead to Training as outlined in the Matrix. Of the 224 substantiated allegations within the 91 cases, 17 were SQF allegations where the Board found mitigation. Those 17 mitigated SQF allegations were found in the case of nine officers. Two of the nine officers received Training. Five of the nine received an NDA. Two received an A-CD without penalty or Training. One case remains open after a Training recommendation by CCRB.

### vii.    Consecutive/Concurrent Penalties in the Sample

Another aspect of the Guidelines that could have a potential impact upon discipline for SQF violation is the decision to aggregate the penalty for multiple bad stops or frisks. The true measure of the efficacy of the new system will be how DAO and the Police Commissioner ultimately dispose of cases where CCRB has recommended a B-CD for SQF misconduct or Charges as a result of multiple SQF violations being combined consecutively. In the past, the majority of SQF cases received training or an A-CD without penalty. But, for example, if an illegal stop and frisk are elevated to a B-CD with a presumptive six-day penalty (three days each for the stop and the frisk), the Guidelines will have altered SQF discipline significantly.

---

[1596] One officer, PO ▓▓▓▓▓▓▓▓, whose case is described later in this Report, received a presumptive three-day penalty for stopping two individuals. CCRB had recommended an A-CD for each stop which might have called for six forfeited days. But since the two were treated concurrently, the presumptive three-day penalty was imposed.

[1597] As of October 10, 2023, looking at CCRB – NYPD Member of Service Histories, available at https://www.nyc.gov/site/ccrb/policy/MOS-records.page.

[1598] As described earlier in this Report, it is common for an SQF case to end with the notation "A-CD accepted," which typically goes without penalty days and as discussed above, for a variety of reasons, is not discipline. As well, it is not uncommon for an A-CD finding by CCRB to be referred to the local command for decision as to penalty. There is no guarantee, or follow-up, to ensure that the local precinct commander imposes penalty days upon receiving the case.

The Department has proposed amendments to the Matrix which are under consideration.[1599] Thus far, the amendments have not been finalized. The proposal would mandate concurrence when separate acts of misconduct "are related to each other by fact, scheme or pattern."

In the sample provided to the Monitor, there were eight SQF cases where two presumptive three-day penalties were aggregated by CCRB to combine into a B-CD recommendation by the Board. As of October 2023, one case is open and three received NDA. Four cases closed as B-CDs. The penalty imposed in those four cases were, respectively: (1) time deduction of three hours; (2) two cases receiving three penalty days; and (3) one case receiving a penalty of ten days, coupled with retirement. From this limited number of cases, it is too early to draw any clear conclusions regarding potential aggregation of consecutive penalties for SQF misconduct.

### viii.    Case Study - A Case Where NYPD Produced a Post-Matrix File

<u>PO ▮▮▮▮▮▮▮▮▮ - CCRB prosecution resolved by IAB investigation</u>



On July 31, 2019, the victim (AS) and two others were in front of a deli at about 10:25 p.m. when PO ▮▮▮▮ and two officers in plainclothes arrived in an unmarked car. One of the officers was found to have punched AS, as he was taken to the ground by all three officers and handcuffed. CCRB substantiated a stop and strip search allegation against PO ▮▮▮▮▮▮ and recommended an A-CD for the stop along with Charges for the strip search. The Guidelines call for a presumptive 20-day penalty along with Dismissal Probation for the strip search. ▮▮▮▮▮ has a history of six CCRB complaints with only one previous RTKA violation having been substantiated. He received "instructions" for the previous substantiation.

Before Charges were filed, the matter was taken up internally within the Department. An investigation determined that ▮▮▮▮ "effected the arrest of [AS] without reasonable cause" in violation of the Patrol Guide. In addition, he failed to properly document the event in his activity log, failed to prepare a stop report, improperly conducted a frisk without reasonable suspicion, and conducted a wrongful search of "the interior portions of [AS]'s clothing. The determination was an A-CD with "warning and admonishing in writing," which was accepted.

The CCRB proposal to file Charges was Administratively Closed.

As indicated above, and in at least three cases (including the ▮▮▮▮ case), where CCRB had recommended Charges and Specifications by employment of the Disciplinary Guidelines, the case was separately resolved by an internal NYPD investigation, without APU prosecution and without application of Provision Two of the APU-MOU. How this was accomplished needs to be examined in detail.

## XI.    TRANSPARENCY

Few things are as important to the establishment of a fair, consistent, and understandable disciplinary system as transparency. Public trust and accountability, of course, demands visibility into actions taken by the Department. But the need for transparency goes further. Rumors of

---

[1599] NYPD Policies, available at https://www.nyc.gov/site/nypd/about/about-nypd/public-comment.page.

favoritism or suspicions that misbehavior is condoned or even encouraged fester in darkness. Indeed, the only viable way for the Department to lift the label of "deliberate indifference" to constitutional violations placed upon it by the Court is by openly producing proof of its successes and failures as it strives for reform. Lastly, often overlooked, is the importance of discernible discipline as a teaching tool for officers in the Department. If discipline is quietly applied or avoided for one officer and kept as a "dirty secret," other officers within the precinct, command, borough, or Department as a whole remain ignorant of the Department's efforts to corral misbehavior and are consigned to baseless speculation about what is punishable and how discipline is imposed.

Transparency does not work if it is half-hearted. Transparency includes open discussion of the factual basis for decisions, whether substantiated or not, and explanation of the rules that applied. We are all familiar with the quotation "Sunlight is said to be the best of disinfectants." But Justice Brandeis followed that famous aphorism with the statement, "Electric light [is] the most efficient policemen."[1600]

From 1972 to 2016 NYPD would routinely post personnel orders, including disciplinary actions, in the office of the Deputy Commissioner for Public Information. In May of that year, the Department ceased posting the cases and began to refuse FOIL requests for information about disciplinary actions.

The blanket denial of access to those records led to calls for reform. After a review of practices in NYPD, the "Independent Panel" observed that "Lack of transparency was one of the most frequent complaints that the Panel heard about the Department's disciplinary process."[1601]

As part of the Joint Remedial Process, Judge Belen argued, "The Mayor and the State of New York should reevaluate their interpretation of Civil Rights Law § 50-a, which prohibits the Department from sharing information which has historically been open to the public. Many groups agree that the current interpretation of Civil Rights Law § 50-a is overbroad."[1602]

At the time, a pending lawsuit brought by the NYCLU sought copies of all final opinions in substantiated cases issued in the Trial Room along with the final formal discipline imposed. The petition was denied on the grounds that the documents were "personnel records" protected by CRL § 50-a.[1603] Petitioners agreed that the decisions were personnel records but argued that the Department and the Court had the discretion to release redacted versions, if needed to guard against "unwarranted invasions of privacy."[1604] The Court of Appeals denied the petition in a sweeping

---

[1600] Louis D. Brandeis, *Other People's Money and How the Bankers Use It*, at 92 (1914).

[1601] Hon. Mary Jo White, The Report of the Independent Panel on the Disciplinary System of the New York City Police Department at 4 (Jan. 2019).

[1602] JRP 267.

[1603] *NYCLU v. NYPD*, 102436/2012 (Sup. Ct. N.Y. Cnty.) (Hagler, J.), *aff'd* 148 A.D.3d 642 (1st Dep't 2017).

[1604] POL § 87.

opinion.[1605]  The Court held that police personnel records could not be disclosed and that redaction was insufficient.

Ordinarily, agencies have discretion, subject to court review, to decide whether disclosure of a record constitutes an "unwarranted invasion of privacy" under Public Officer Law (POL) § 87(2)(b).  Even then, the agency still has the right to publish the information if, on balance, the public interest would be served.  In *NYCLU*, the Court ruled that CCRB did not have the same discretion for records deemed confidential by § 50-a, which was governed by a different sub-paragraph, POL § 87(2)(a).  That particular sub-paragraph did not permit discretionary disclosure for items "specifically exempted from disclosure by state or federal statute."

Partially in reaction to that *NYCLU* decision and in response to the numerous calls for police reform following the death of Eric Garner and George Floyd, the Legislature repealed § 50-a[1606]  Along with the Repeal of § 50-a, the Legislature deleted the reference to the section in POL § 87(2)(a).

In place of § 50-a, the Legislature directed that law enforcement disciplinary records are available by use of the Freedom of Information Law (FOIL).[1607]  Within that statute it created a two-tier system for access to law enforcement records.  Some records must be disclosed in their entirety, while others must be redacted.

"Law enforcement disciplinary records" are generally available and include the misconduct allegations; the name of the officer; transcripts of proceedings including exhibits, and dispositions; and any final opinion or memorandum supporting the outcome, including the factual findings and analysis.

Certain records must be redacted.  They are itemized in paragraph 2-b of § 89 of the Public Officers Law.[1608]  They include distinctly personal information such as medical histories,[1609] home addresses and phone numbers, private financial records, and participation in employee assistance programs, etc.  The statute calls for redaction of the personal information only—not wholesale withholding of files which may contain some redacted information.

Law enforcement disciplinary records, since they are not itemized as exceptions in paragraph 2-b, must be disclosed without redaction unless the agency determines, on a case-by-case basis, to redact because disclosure with identifying details would constitute an unwarranted invasion of personal privacy.[1610] Some records are "specifically exempted from disclosure by state

---

[1605] *NYCLU v. NYPD*, 32 N.Y.3d 556 (2018).

[1606] L 2020, ch 96, eff. June 12, 2020.

[1607] POL § 86 *et seq.*

[1608] POL § 89(2-b).

[1609] Redaction is not required for medical histories when obtained during, and are relevant to, a misconduct investigation. In the past, CCRB would have difficulty obtaining necessary medical records of an officer from NYPD unless the officer consented.  HIPAA does not preclude this because NYPD is not a "health care provider."

[1610] "[B]lanket exemption for particular types of documents are disfavored." *NYCLU v. City of Schenectady*, 306 A.D.2d 784,785 (3d Dep't 2003) (citing *Matter of Gould v. NYPD*, 89 N.Y.2d 267, 275 (1996) (rev'd on other

or federal statute."[1611]  A list of others may be withheld, but only upon a showing that disclosure would jeopardize certain protected rights, such as depriving a person of a right to a fair trial or identifying a confidential source.[1612]

But, in cases where the agency determines that release would constitute an unwarranted invasion of privacy, the solution is not to withhold the entire record, but instead to delete "identifying details."[1613]  This is a matter of discretion for the Department.  The statue suggests specific items which would generally be so protected such as "employment, medical or credit histories," and "information of a personal nature reported in confidence to an agency and not relevant to the ordinary work of such agency."[1614]

The decision to redact on privacy grounds, if not itemized in paragraph 2-b, goes through a two-step process.  First the agency needs to decide whether a particular item's disclosure would constitute an unwarranted invasion of privacy.[1615]  Even then, however, the agency is still permitted discretion to disclose, notwithstanding the privacy interests asserted.[1616]

The classification of a record as one which would constitute an unwarranted invasion of privacy is generally left to agency discretion.  The committee on public access to records may promulgate guidelines regarding deletion of identifying details or withholding records, but in the absence of such guidelines, the agency is left to determine the boundaries.  However, "all records of a public agency are presumptively open to public inspection and copying unless otherwise specifically exempted." Further, "[e]xemptions are to be narrowly construed to provide maximum access, and the agency seeking to prevent disclosure carries the burden of demonstrating that the requested material falls squarely within a FOIL exemption by articulating a particularized and specific justification for denying access."[1617]

---

grounds). Agencies also have discretion to deny access to records or portions of records that, if disclosed, would impair contract negotiations, expose trade secrets, interfere with law enforcement investigations, identify a confidential source in a criminal investigation, and certain inter-agency and intra-agency communications. POL § 87(2).

[1611] POL § 87(2)(a).

[1612] POL § 87(2)(e)(i)-(iv).

[1613] POL § 89(2)(c)(i).

[1614] POL § 89(2)(b)(iv).

[1615] The Court of Appeals, in condemning a "runaround" which must end in an application to see force reports, declared, "The City is reminded that government records are "presumptively open," and statutory exemptions are "narrowly construed," and the City must articulate a "particularized and specific justification for non-disclosure." *Matter of NYCLU v. City of Schenectady*, 2 N.Y.3d 657 (2004*); Matter of Harbatkin v. NYC Dep't of Records & Infor. Servs*., 19 NY 3d 373 (2012)

[1616] POL § 87(2)(a): "Each agency **shall**, in accordance with its published rules make available for public inspection and copying all records except such agency **may** deny access to records or portion there of that: . . .if disclosed would constitute an unwarranted invasion of personal privacy. . ." (emphasis added). *See also Matter of Capital Newspapers Div. of Hearst Corp. v. Burns*, 67 N.Y.2d 562, 567 (1986) ("[W]hile an agency is permitted to restrict access to those records falling with the statutory exemptions, the language of the exemption provision contains permissive rather than mandatory language, and it is within the agency's discretion to disclose such records . . . if it so chooses.").

[1617] *Id*. at 566.

One month after the repeal of § 50-a, Corporation Counsel for the City of Syracuse asked for guidance from the Committee on Open Government (COG) on whether pending or unsubstantiated complaints could be withheld on grounds of privacy.

The public debate on the bill in both the Senate and the Assembly had made it clear that pending and unsubstantiated allegations remained available for inspection and amendments to bar their disclosure were rejected by the Legislature. However, discretionary redaction of "identifying details" still rested, as before, with the agency where privacy so demanded.

Previously, before the repeal of § 50-a, in advisory opinions regarding disciplinary records of city employees generally, the Committee on Open Government had permitted redaction of identifying details in cases where "charges of misconduct have not yet been determined or did not result in disciplinary action." It also noted that a finding of "unwarranted invasion of privacy" was not without guardrails and wrote that a finding is achieved by balancing the privacy interest at stake against the public interest in disclosure. In particular, redaction is permitted when the information is "of a personal nature" and release "would result in economic or personal hardship to the subject party and such information is not relevant to the work or the agency requesting or maintaining it."[1618]

The Committee also cautioned that redaction of a portions of a record is not the same as complete exemption of a record. Privacy could not be broadly asserted to justify withholding entire records.

> In our opinion, if the City is able to prevent disclosure of records which would constitute an unwarranted invasion of personal privacy through the redaction of identifying details, it has an obligation to redact those details and disclose the remainder of the records (unless another ground for denial can be asserted).[1619]

An advisory opinion authored by staff on July 27, 2020, in response to the question from Syracuse Corporation Counsel about the effect of the repeal on law enforcement records, stated:

> Accordingly, it is our opinion, in the absence of judicial precedent or legislative direction, that the law does not require a law enforcement agency to disclose 'unsubstantiated and unfounded complaints against an officer' where such agency determines that disclosure of the complaint would constitute an unwarranted invasion of personal privacy, but also does not require an agency to withhold such a record. Rather, as with all of the FOIL exemptions except § 87(2)(a), which no longer applies to this situation since the repeal of § 50-a, an agency may, but not must, withhold as exempt a record meeting the criteria for such exemption. In light of the repeal of § 50-a, a request for disciplinary records relating to a police officer must be reviewed in the same manner as a request for disciplinary records of any other public employee. As such, based on our prior analyses of the disclosure

---

[1618] Committee on Open Government, FOIL AO 19771 (May 7, 2020), available at https://docs.dos ny.gov/coog/ftex t/f19771 html.

[1619] Committee on Open Government, FOIL AO 19805 (Apr. 30, 2021), available at https://docs.dos.ny.gov/coog/fte xt/f19805.pdf.

requirements relating to disciplinary records of government employees generally, when allegations or charges of misconduct have not yet been determined or did not result in disciplinary action, the records relating to such allegations may in our view be withheld where the agency determines that disclosure would result in an unwarranted invasion of personal privacy. In addition, to the extent that charges are dismissed, or allegations are found to be without merit, we believe that those records also may be withheld based on considerations of privacy.[1620]

In reliance upon that opinion, the City of Syracuse denied a FOIL request seeking disciplinary records related to complaints not yet substantiated. It did so categorically instead of looking at each individual complaint or case. A Supreme Court Justice in Onondaga County subsequently agreed with the City of Syracuse and even went so far as to add additional bases for denial of disclosure. The court ruled that unsubstantiated and open cases warranted privacy.[1621] In addition, the court speculated that open claims might be protected on the grounds that release would interfere with law enforcement investigations and were also protected as inter- and intra-agency documents.[1622]

On November 10, 2022, the Appellate Division, Fourth Department reversed the decision in *City of Syracuse*, holding that unsubstantiated and open cases could not be categorically exempted from FOIL. It did permit the Syracuse Police Department to withhold or redact individualized records upon a showing of a particularized and specific justification showing an unwarranted invasion of personal privacy under Public Officers Law § 89(2)(c)(i).[1623]

In New York City, The New York Post sought disciplinary records of 144 officers from NYPD. At first, the Department objected, not on the grounds of privacy, but on a claim that the request was unduly burdensome. In that case, after a two-and-one-half-year delay, a scheduled release was ordered, citing *City of Syracuse* as binding authority.[1624]

Another court in New York City directed the release of IAB records in two cases, but permitted redaction of personal information, presumably not including the identity of the officers involved.[1625]

The Herkimer Police Department has also denied access to unsubstantiated or open cases, but with an additional wrinkle. The Herkimer authorities decided that the repeal of § 50-a was not

---

[1620] Committee on Open Government (July 27, 2020), available on file in *Uniformed Fire Officers Ass'n. v. de Blasio*, 20-cv-05441, Dkt. 30-1 (S.D.N.Y. July 28, 2020), Doc. No. 30-1. Robert Freeman, the long-term head of the Committee, had been forced to leave office just a few months before enactment of the provisions. The request went to Shoshanah Bewlay, who took office on March 19, 2020.

[1621] *NYCLU v. City of Syracuse*, 72 Misc. 3d 458 (Sup. Ct. Onondaga Cnty. 2021), *on appeal* NYSCEF CA 21-00796.

[1622] *Id.* (citing POL §§ 87(2)(e), (g)).

[1623] *Matter of NYCLU v. City of Syracuse*, 210 A.D.3d 1401 (4th Dep't 2022).

[1624] *NYP Holdings, Inc. v. NYPD*, 77 Misc. 3d 1211 (A), Index No. 159132/2021 (Sup. Ct. N.Y. Cnty. Dec. 6, 2022), *aff'd*, 220 A.D.3d 487 (1st Dep't 2023).

[1625] *Rickner Pllc v. City of NY*, 2022 N.Y. Misc. LEXIS 2233, Index No. 157876/2021 (Sup. Ct. N.Y. Cnty. May 25, 2022).

retroactive. Accordingly, they refuse to disclose records created prior to July 20, 2020. Gannett Newspapers has filed a petition to reverse this determination. The case is pending in Herkimer Supreme Court.[1626]

Holding to the contrary, the Appellate Division, First Department, recently ruled that the repeal of Civil Rights Law § 50-a applies retroactively.[1627]

In a petition filed against the City of Schenectady, another lower court has rejected the blanket assertion of privacy for unsubstantiated cases, writing:

> [R]egardless whether unsubstantiated or unfounded or exonerated or dismissed, or regardless of whether not yet fully determined, or regardless of whether founded but without discipline imposed, the respondents herein cannot determine to deny the sought disclosure. A finding that [the police officer's] personnel record, or any portion thereof, be withheld or redacted on the basis that its release would constitute an unwarranted invasion of personal privacy, cannot be realized by petitioners, as to do so would render the legislature's repeal of [§ 50-a] utterly meaningless simply by the respondents theorizing that the record (or any portion thereof) is, in their opinion, 'private.' Given that an easy ability to render the new statutory scheme meaningless could not possibly have been [ ] intended by the legislature, this Court is constrained to deny the petition and complaint in their entirety.[1628]

As well, the claim of non-retroactivity has been rejected by a court in Orange County on the grounds that the repeal was remedial in nature and, as such, is to be applied retroactively.[1629]

On the other hand, a Justice in Monroe County has recently held that the statute is not remedial in nature and therefore not to be applied retroactively.[1630]

In New York City, litigation was commenced in United States District Court for the, Southern District of New York, by a consortium of public unions seeking to bar disclosure of open and unsubstantiated claims. They cited Due Process[1631] and bargaining contract obligations, as

---

[1626] *Gannett Co. v. Herkimer Police Dep't*, Index No. EF2021-108916 (filed Nov. 22, 2021); *accord, People v. Francis*, 2022 NY Misc. LEXIS 510 (Sup. Ct. Monroe Cnty. 2022). *But see Puig v. City of Middletown*, 71 Misc. 3d 1098 (Sup. Ct. Orange Cnty. 2021) (repeal was remedial and therefore retroactive).

[1627] *NYP Holdings, Inc. v. NYPD*, __A.D.3d__(1st Dep't Oct. 12, 2023), Index No.159132/21, Case No. 2023-00242.

[1628] *Schenectady Patrolmen's Benevolent Ass'n v. City of Schenectady*, 2020 N.Y. Slip Op. 34346(U) (Sup. Ct. Schenectady Cnty Dec. 29, 2020.

[1629] *Matter of Puig v. City of Middletown*, No. 000498-2021, 2021 N.Y. Misc. LEXIS 1713, at *16 (Sup. Ct. Orange Cnty. Apr. 7, 2021)

[1630] *Matter of Abbatoy v. Bater*, 178 N.Y.S. 3d 412, Index No. E2021009176 (Sup. Ct. Monroe Cnty. Nov. 17, 2022). A notice of appeal has been filed (Dec. 16, 2022).

[1631] Under a claim of "Stigma-plus" injury.

well as claimed a generic unwarranted invasion of privacy.[1632] On August 21, 2020, Plaintiffs' motion for a preliminary injunction was granted it in part, to extent that:

> The NYPD and CCRB may not disclose records of Schedule A command discipline violations for cases heard in the trial room, for which the ultimate disposition of the charge at trial, or on review or appeal, is other than guilty, which records have been, are currently, or could be in the future the subject of a request to expunge the record of the case pursuant to Section 8, for those officers covered by the PBA, the SBA, and the LBA, collective bargaining agreements.[1633]

On appeal, to the Second Circuit, the Unions' blanket objection to the release of open or unsubstantiated complaints was denied. In particular, as to claims that the City had, in the past, considered unsubstantiated claims to be barred by privacy concerns, the Court decided that the "practice, if it ever existed, appears to have ended no later than 2017."[1634] However, the court ruled that the City may, upon a particularized finding of an unwarranted invasion of privacy, redact records. The Unions had argued that publication of certain disciplinary records without individualized review is arbitrary and capricious. The Court noted that "the City appears to still recognize those specific FOIL exemptions that are designed to protect against unwarranted invasions of personal privacy or endangering a person's safety."[1635] In light of the ruling in *City of Syracuse*, above, it would be ironic, if not patently inconsistent with arguments made to the Court of Appeals, if the City were now to follow the lead of Syracuse and adopt a general bar to disclosure of unsubstantiated cases—the very position the unions sought and the City opposed in court with assurances that there would be individualized review of privacy claims.

In fact, the Appellate Division, First Department, followed that very line of reasoning on February 16, 2023, in a decision requiring the New York City Department of Correction "to disclose the requested records [unsubstantiated complaints or allegations], subject to redactions with specific justification under Public Officers Law § 87(2)."[1636] Although not specifically addressed in the appellate opinion, the lower court had overruled an objection to retroactive application. The First Department affirmed the lower court decision in its entirety.

One issue of particular importance to stop and frisk litigation that was left open by the Appeals Court was whether "technical infractions" are available upon a FOIL request. POL § 87(2-c) permits, but does not require, redaction of technical infractions in a disciplinary history. A technical infraction is defined as:

> a minor rule violation by a person employed by a law enforcement agency . . . solely related to the enforcement of administrative departmental rules that (a) do not involve interactions with members of the public, (b) are not of public concern, and

---

[1632] *Uniformed Fire Officers Ass'n v. de Blasio*, Index No. 20-cv-05441, ECF Doc No 197 (S.D.N.Y.) (Failla, J.).

[1633] *Id.*, ECF Doc No 16 at 23 (Aug. 21, 2020).

[1634] *Uniformed Fire Officers Ass'n v. de Blasio*, 846 F. App'x 25 (2d Cir. 2021).

[1635] *Id.* at 32.

[1636] *NYCLU v. NYC Dep't of Corrs.*, 213 A.D.3d 530 (1st Dep't 2023).

(c) are not otherwise connected to such person's investigative, enforcement, Training, supervision, or reporting responsibilities.[1637]

At first, the Department, took the position that Command Discipline, especially A-CDs, were "technical infractions" and that the City would not disclose cases where informal discipline was utilized. This, of course, would bury almost every SQF case. If followed, this would hide not only open cases and unsubstantiated cases but, beyond that, would bury substantiated stop and frisk misconduct from public review. The Court appreciated that this particular objection to disclosure rested upon an unresolved interpretation of the Public Officers Law. It remanded the issue to the lower court, writing, "If [intervenors] can show that 'Schedule A' violations include anything other than '[t]echnical infractions[s]' as defined by New York law, it may move the District Court for appropriate relief."[1638]

Upon remand, the question regarding disclosure of substantiated A-CDs was not settled since the action was voluntarily discontinued. The parties, in a letter submitted by Corporation Counsel prior to a stipulation of dismissal, promised to "continue internal discussions regarding modification language and potentially collaborate with [Communities United for Police Reform][1639] to draft mutually agreeable language to propose to the Court for its consideration.[1640] Three weeks later, a stipulation of dismissal was filed, but it contained no language resolving the issue of disclosure of A-CDs.[1641]

Settlement of this issue is of meaningful consequence for transparency in stop and frisk cases. If one follows the clear language in the statute, it would seem there is no issue to be resolved. The statute plainly exempts enforcement actions that involve interactions with members of the public. By definition, FADO complaints brought to CCRB involve interactions with the public. SQF findings are not "technical infractions" under FOIL.

Nonetheless, as of this writing it appears the parties have not yet drafted "mutually agreeable language" to resolve the issue. In practice, CCRB had posted complaints and dispositions online, including A-CDs and unsubstantiated allegations. More recently CCRB has altered its reporting and no longer posts unsubstantiated cases. As well, it does not post open cases.[1642] The NYPD purports to list its disciplinary histories, but the online profile is extremely limited. It only lists substantiated formal charges, which is less than the tip of an iceberg.

## A.    Investigative Files - Public Access

If unsubstantiated and open cases are ruled to be inaccessible under FOIL as argued in the *Syracuse* and *Herkimer* cases, either on grounds of privacy or retroactivity, a secondary question is whether all of the material in the files of disciplinary investigations remain inaccessible. The

---

[1637] POL § 86(9).

[1638] *Uniformed Fire Officers Ass'n*, 846 F. App'x at 33 (internal citations omitted).

[1639] CPR had intervened to strike the lower court's preliminary injunction barring disclosure of A-CD's.

[1640] *UFO v. de Blasio*, 20-cv-5441, ECF Doc No 258 (Mar. 22, 2021).

[1641] *Id.*, Doc. No. 261 (Apr. 13, 2021).

[1642] *See* MOS Records, available at https://www.nyc.gov/site/ccrb/policy/MOS-records.page.

new FOIL provisions only apply to records "created in furtherance of a law enforcement disciplinary proceeding" which is defined to be after "the commencement of any investigation and any subsequent hearing or disciplinary action conducted by a law enforcement agency."[1643]  For other records, the usual and customary rules for FOIL access apply.  That would include a large portion of the records held by CCRB.

In a case that preceded the repeal of § 50-a, the Appellate Division, First Department, affirmed an opinion granting access to BWC footage without regard to the pendency or prospect of a disciplinary proceeding.[1644]  The court held that BWC footage is "is more akin to arrest or stop reports, and not records primarily generated for disciplinary and promotional purposes.  To hold otherwise would defeat the purpose of the body-worn camera program to promote increased transparency and public accountability."[1645]

Most of the documents contained in the typical CCRB-SQF investigation are merely a compilation of ancillary documents, comparable to BWC footage.  Activity logs, stop reports, TRI-force reports, consent to search reports, strip-search reports, memo book entries, etc. are not compiled as personnel records.  They were not created in furtherance of nor during a CCRB investigation.  As such, they are not "law enforcement disciplinary records" under POL § 86. Instead, they are ordinary "factual information" documents and therefore discoverable under FOIL as decided by the New York Court of Appeals in *Gould v. NYPD*.[1646] This includes activity logs and any other document prepared or kept by the Department as a normal part of documenting police action.  This creates an interesting tension between the customary handling of FOIL exemptions for personal privacy where the Department has discretion and may disclose the items even after a finding of a privacy interest, and the newer language in POL § 89 where the Department must redact items if a privacy interest is found.  While "law enforcement disciplinary records" must be redacted to guard against an unwarranted invasion privacy, other records used in a disciplinary investigation, including stop reports and memo books, need not be redacted even in unsubstantiated cases.  The holding in *Gould* preceded the repeal of § 50-a, so retroactivity is not an issue in the case of ordinary reports; they continue to be accessible as before, but now their inclusion in a personnel file is no longer cause for withholding them.

## B.    Access to CCRB Records Under FOIL

CCRB is not a law enforcement agency.[1647] It is an independent agency and not under the control of NYPD.  In the past, NYPD would stress the point in refusing to give certain personnel records to CCRB, citing § 50-a.  The Civil Rights Law, prior to repeal, had an exception to § 50-a, providing that the section did "not apply to any agency of government which requires the records described . . . in the furtherance of their official functions."[1648] If CCRB were considered to be an

---

[1643] POL § 86.

[1644] *Matter of Patrolmen's Benevolent Ass'n of N.Y.C v. de Blasio*, 171 A.D.3d 636 (1st Dep't 2019), *appeal dismissed*, 35 N.Y.3d 979 (2020).

[1645] *Id*. at 639.

[1646] *Gould v. NYPD*, 89 N.Y.2d 267 (1996).

[1647] *See* POL § 86(8).

[1648] CRL § 50(4), repealed.

agency of government it should have had full access to personnel records and disciplinary histories within NYPD, which it did not. NYPD restricted access to § 50-a personnel records to CCRB on the grounds that CCRB was not a governmental agency under § 50(4) but was comprised of civilians.

Despite the fact that CCRB is not a law enforcement agency and not automatically entitled to police personnel records under previous law, the Appellate Division, Second Department, ruled in *Hughes, Hubbard & Reed v. CCRB* in 2019 that CCRB was prohibited from disclosing its own records, not just NYPD records, under § 50-a because they were personnel records in the "control of a police agency" and "they are used to evaluate performance" of officers.[1649] The ruling, to be kind, was internally inconsistent. A civilian complaint to an independent agency does not become a police personnel record merely because some percentage of them may eventually be passed on to the Department. Similarly, a report written by a CCRB investigator is not a police record because some of the reports may be passed on to the police for the Department's potential use. Even police records which were not personnel records (force reports, memo books, etc.) before they were shared with CCRB do not assume the cloak of personnel record when sent to CCRB merely because they are shared with CCRB and might possibly be referenced in a report to NYPD.

Finally, it was inherently contradictory to say that CCRB is not a government agency performing an official function under former § 50(4), (thus denying access to personnel records) while at the same time maintaining that records generated by CCRB are police personnel records under the control of the Department because CCRB is part of the Department.

§ 50-a only applied to "personnel records used to evaluate performance toward continued employment or promotion, **under the control of any police agency**." (emphasis added). In order to find that all records created or maintained by CCRB, an independent agency, were Police Department records, the Court in *Hughes* had to stretch the boundaries of precedent. In an earlier opinion, *Matters of Prisoners' Legal Services (PLS) v. New York State Department of Correctional Services*,[1650] the Court of Appeals faced a situation where two offices in the same correctional facility maintained records that were used for employee evaluations. One office maintained employment records. Another office held files with grievances lodged against the officers by inmates. Both were used for promotion and assignments. The Court found that both sets of records, maintained in the facility and in the custody and control of the agency, were personnel records even though kept in separate offices in the same building.

The Court in *Hughes* extended the *PLS* holding to find that the records of CCRB, an independent agency, with records independently created by CCRB, were also under the control of the Police Department as well because some CCRB records were passed on to DAO after an investigation. For the *Hughes* court the simple fact that CCRB records may be used by NYPD for employment purposes was enough to make them personnel records protected by § 50-a. By that logic, if a New York Times article put in an officer's file and used to evaluate the officer, not only does that article becomes confidential, but the New York Times would also be prohibited from re-publishing it.

---

[1649] *Matter of Hughes, Hubbard & Reed v. Civilian Complaint Review Bd.*, 171 A.D.3d 1064 (2d Dep't 2019).

[1650] 73 N.Y.2d 26 (1988).

In any event, no matter how strained the opinion in *Hughes* may have been, it is past history because § 50-a is gone. However, the question will arise anew in the language of POL § 89. That section took away NYPD's ability to disclose some records of a personal nature. It also permitted NYPD to refuse disclosure of other records where a privacy exception was successfully asserted or on the grounds of interference with criminal investigations, or as intra-agency/inter-agency communications.

So, for example, does the new law mean that CCRB investigative files and dispositions are to be governed by whatever policy NYPD may adopt with regard to unsubstantiated and open cases? Will the mandated withholding of private disciplinary records be extended to CCRB despite the fact that CCRB is not a law enforcement agency? Will NYPD attempt or have the right to impose its view of the privacy provisions of FOIL upon CCRB? A good argument can be made, now that CCRB is freed of the yoke of the ruling in *Hughes*, that the new sections of the Public Officers Law do not apply to CCRB. It should be free to disclose any or all of its own records under the older provisions of FOIL—which leaves discretion to the holding agency. It is unclear at this time which policy will prevail.[1651]

The recently adopted Matrix-MOU contains a proviso that NYPD employment histories provided to CCRB are subject to the redactions required by the Public Officers Laws.[1652] It further provides that CCRB shall not disclose any NYPD employment history without first notifying NYPD's Legal Bureau, giving NYPD an opportunity to assert any applicable legal exemptions. CCRB needs to be cautious about entering into any agreement that may narrow disclosure beyond that required by FOIL. As the Second Circuit wrote when discussing the contract between the unions and NYPD, "disclosure obligations" cannot be bargained away.[1653]

In any event, the "employment history" which is delivered to CCRB under the Matrix-MOU "refers to a document which was previously supplied by the NYPD to the CCRB in cases where CCRB's Administrative Prosecution Unit handled the prosecution of substantiated allegations resulting in charges and specifications."[1654] This clause is apparently limited to the Summary Employment History (SEH) which, in the past, did not contain CORD reports, or disciplinary histories from IAB, DAO, BIU, or local commands.[1655] In the typical SQF case where Charges and Specifications are not filed, the panel did not receive even a limited employment history. But the current Matrix-MOU does not confine records available to CCRB investigators solely to APU cases, which may mean that more information will be available in SQF

---

[1651] A Supreme Court Justice in Albany County recently wrote that, notwithstanding a privacy interest, an "agency may within its exercise of discretion release such records." *Munger v. Hochul*, 2022 N.Y. Misc. LEXIS 8031, Index No. 907274-21 (Sup. Ct. Albany Cnty. Nov. 23, 2022).

[1652] Memorandum of Understanding Between NYPD and CCRB concerning the NYPD Discipline Matrix at 11 (Feb. 24, 2021) (hereinafter "Matrix-MOU").

[1653] *Uniformed Fire Officers Ass'n v. de Blasio*, 846 F. App'x 25, 31 (2d Cir. 2021).

[1654] Matrix-MOU at 5 n.5.

[1655] The Matrix-MOU also provides that NYPD will not refuse to disclose or delay disclosure of an officer's employment history on the ground that it is conducting a concurrent or parallel investigation.

investigations not leading to formal discipline.[1656]  The new MOU also does not say anything about CCRB's ability to make an independent determination in response to a FOIL request for CCRB records.

A lawsuit demanding redacted copies of CCRB closing reports was recently settled in the applicant's favor.[1657] but the extent and scope of the redactions not yet undetermined.

### C.    Published Reports

On March 27, 2018, the Department announced that it would publish summaries of Disciplinary records with the names of the officers redacted in a "Trial Decision Compendium." The PBA successfully sued to enjoin the publication, citing § 50-a.[1658]  With the repeal of § 50-a, the basis for the petition became moot and the order was reversed.[1659]

Since then, the Department has posted an online a "Trial Decisions Library" which has the written opinion of the Trial Commissioner in cases that went to trial or where there was a plea to Charges.[1660]  The approval/disapproval letter of the Police Commissioner is attached, and the charged officers are identified by name.  This is a useful resource for the 35 to 50 cases that are written up each year, but it is not very useful for the vast majority of disciplinary matters, including most SQF cases, that are not included in the writeups.

### D.    Explanation of Findings, Variance, Deviation, Departure

Recent Charter amendments, along with MOUs and adopted Rules, require certain memo exchanges between CCRB and the Department as explanations for decisions pertaining to disciplinary findings and recommendations.  In addition, the parties have agreed to explain the decision to adhere to or deviate from the Guidelines Matrix.  As outlined below, some of these "explanations" are publicly available.

One of the Charter amendments approved in November 2019 requires the Police Commissioner to report to CCRB, in writing, on any action she takes with regard to any substantiated case submitted by CCRB.  She is directed to specify the "level of discipline and any penalty imposed, in all cases."[1661] Notwithstanding the clear mandatory language of the Charter, CCRB reports, "While the CCRB receives notification of the final category of discipline, the Agency does not receive specifics on the penalty that the Police Commissioner ultimately

---

[1656] Employment histories may not necessarily be sought in every case.  The Matrix-MOU only promises to deliver the employment history within 20 business days after a specific written request is made to the Department by the CCRB investigator.  Matrix-MOU ¶¶ 9-12.

[1657] *Teufel v. Civilian Complaint Review Bd.*, Index No. 157001/2021 (Sup. Ct. N.Y. Cnty. Dec. 27, 2021).

[1658] *Patrolmen's Benevolent Ass'n of N.Y.C. v. de Blasio*, 153231/2018 (Sup. Ct. N.Y. Cnty. Mar. 11, 2019) (Engoron, J.).

[1659] *Patrolmen's Benevolent Ass'n of N.Y.C. v. de Blasio*, 2020 N.Y. Slip Op. 6866 (1st Dep't Nov. 19, 2020).

[1660] Available at https://nypdonline.org/link/1016.

[1661] NYC Charter 440(d)(3).

imposes."[1662]  As explained earlier, in most substantiated SQF cases, informal discipline or guidance is imposed by the Police Commissioner.  If read literally and followed, the Police Commissioner will need to follow up on cases sent to the precinct for action, *i.e.*, most command disciplines, to find out what action if any the local commanding officer has taken, and then explain his findings to the CCRB.  The Charter does not require that the notice must be publicly available.  While CCRB does list online[1663] the penalties imposed for substantiated cases where they are so advised, the records are only available if the name of the subject officer is known.  CCRB does publish semi-annual reports, annual reports, and monthly statistical reports, but while levels of discipline are reported, penalties are not.  Thus, there is no easily accessible way for the public to look at penalties imposed overall during a particular time-block.

Knowing the precise penalty imposed would be useful in gauging the "concurrence rate" between CCRB and NYPD.  Statistics provided heretofore were imprecise.  For example, if CCRB recommended an A-CD, but the discipline was "accepted" without penalty, it would be generous to describe the result as one of "concurrence" without further explanation.  Even with that, the Charter Commission Staff noted that only 45 to 54 percent of non-APU cases resulted in discipline at a level suggested by CCRB in the 12 months preceding the Charter report.  In cases where formal discipline was recommended, the fall-off was even greater.  Only 26 to 37 percent of cases in that time period were formally prosecuted after a recommendation of Charges by CCRB.[1664]

Prior to 2019, the Police Commissioner did not explain variances from a CCRB recommendation, with two exceptions:  (1) pursuant to the APU-MOU, the Police Commissioner voluntarily agreed to give advance notice when he or she divested APU of authority to prosecute formal discipline (under Provision Two of the APU-MOU, discussed earlier); and (2) in cases prosecuted by APU in the Trial Room where the Police Commissioner imposed discipline that was of a "lower level" that that recommended by CCRB or the Trial Commissioner.

The explanations were judged to be wanting by the Independent Panel.  The "change of penalty" letters sent to DAO when there was a variance from a Trial Commissioner's finding or penalty were cited by the Panel as "conclusory" and "boilerplate," often advancing little more than the "totality of the issues and circumstances" or that the officer "did not act in bad faith."  The Panel wrote that "the conclusory format of the letters contributes to a perception that disciplinary decisions are arbitrary" and that it "undermines [s] the confidence of the public and other constituencies in the integrity, fairness, and robustness of the NYPD's disciplinary system."  Despite the fact that "variance memoranda prepared by the Police Commissioner's Office in CCRB cases typically include greater detail," the Panel concluded that "CCRB, DAO, and DCT trial judges, all of whom base their penalty recommendations on precedent, would benefit from a better understanding of the Commissioner's rationale."[1665]

[1662] Available at https://www.nyc.gov/site/ccrb/complaints/redacted-departure-letter.page.

[1663] Available at https://www1.nyc.gov/site/ccrb/policy/MOS-records.page.

[1664] Preliminary Staff Report, Charter Commission at 17 (Apr. 2019).

[1665] Independent Panel at 25-28.

Picking up on that point, the Staff of the Charter Commission recommended a more detailed explanation in all cases, not just APU cases.

At this point in time, a duty or commitment to explain variances in disciplinary actions from CCRB' recommendation, a Trial Commissioner's recommendation, or the Disciplinary Guidelines, are contained in: (1) the Charter; (2) the APU-MOU; (3) the Matrix-MOU; and (4) the Guidelines Matrix itself. In addition, the Administrative Code requires an annual online public posting online of statistics regarding the number and percentage of instances in which the Commissioner deviated from the Guidelines.[1666]

The mandates and agreements create multiple, seemingly inconsistent and/or overlapping, requirements or obligations to document or to explain. They vary in: (a) content, (b) timing, (c) whether an exchange of documents may obtain prior to imposition, and (d) who receives the information. It is unclear, at this time, how any of these inconsistencies will be reconciled. The list of reports includes the following:

1. **The 2012 APU-MOU**[1667] requires advance notice in an APU case when "the Police Commissioner intends to impose discipline that is of a lower level than that recommended by CCRB or by an NYPD Trial Commissioner." The notice is to include "a detailed explanation of the reasons for deviating from CCRB's recommendation including but not limited to each factor the Police Commissioner considered in making his decision." The written notification goes to CCRB and the subject officer ten business days prior to imposition of discipline, with an opportunity for both to respond. Notice or explanation to the DCT is not required. The clause only requires notice where the "level of discipline," not the penalty, is affected. So, for instance, a decision to replace Charges with Command Discipline would be noted, but a decision to reduce the number of penalty days recommended by the DCT or in a plea bargain with CCRB does not require prior explanation under the 2012 MOU. The provision applies only to formal disciplinary matters and, as such, is rarely applicable to SQF misconduct.[1668] Oddly, the "or" in the notice paragraph has been read in the conjunctive, so notice and an explanation under the APU-MOU is not given to CCRB when the Police Commissioner approves a verdict or penalty recommendation by the DCT, even where the DCT recommended a lesser discipline than that sought by CCRB. If the two recommendations (CCRB and DCT) are different, but the Police Commissioner has

---

[1666] NYC Admin. Code § 14-186(d): "[B]y each January 30 . . . the department shall post . . . the number and percentage of instances within the preceding calendar year in which the commissioner imposed a discipline penalty that is different from the disciplinary matrix penalty." In the two year period from June 2021 through June 2023, a total of 14 deviations have been posted. https://nypdonline.org/link/1035.

[1667] Memorandum of Understanding Between the CCRB and the NYPD of the City of New York Concerning the Processing of Substantiated Complaints (APU-MOU) ¶ 6, available at https://www1 nyc.gov/assets/nypd/downloads/pdf/public_information/ccrb_nypd_mou_prosecution_of_substantiated_civilian_complaints_130402.pdf.

[1668] The language of 38 RCNY § 15-18, which incorporates paragraph 6 of the APU-MOU, does not limit itself to formal charges. It applies to "any case substantiated by CCRB," which would seem to require an explanation in SQF cases that are not formally charged. Notwithstanding such, the explanations are only supplied in cases prosecuted by APU. Conversation with Robert Martinez, Risk Management Bureau (July 16, 2019).

gone below both recommendations, the MOU calls for explanation of deviation from CCRB's recommendation, not the DCT recommendation, but in practice the deviation from both was noted. The explanation is considered confidential and is sent to CCRB but not shared with the complainant nor made public.

2.    **The Rules of CCRB** require the same notice and permit the same response in APU cases where the Police Commissioner intends to impose a lower level of discipline than that recommended by CCRB or the Trial Commissioner. But the CCRB Rules modify the APU-MOU slightly by specifying that the Police Commissioner give reasons for lowering the level of discipline from the Trial Commissioner's recommendation as well as from that of CCRB, which may not be the same.[1669] In practice, one letter is written.[1670]

3.    **Provision Two**: The 2012 APU-MOU and the Rules of CCRB[1671] allow the Police Commissioner to "retain" cases being prosecuted by APU, which are  known as "Provision Two" or "Paragraph Two" cases.[1672] The Commissioner can direct CCRB to refrain from prosecution in such cases, but the Commissioner is to invoke this paragraph only when pursuit of Charges by APU would be "detrimental to the Department's disciplinary process." In those cases, the Police Commissioner is to give a "detailed explanation" for the request and a statement detailing the discipline the Police Commissioner will pursue, if any, as an alternative. Within five days of receipt, CCRB can reject the request by a statement rebutting the Police Commissioner's notice. Five business days after receiving CCRB's rejection, the Police Commissioner can respond, rebutting CCRB's rejection in a detail. The Police Commissioner's determination is final. Again, the correspondence in Provision Two cases is considered confidential and is not shared with the complainant nor available to the public.

4.    **The City Charter** as amended in 2019 (effective 2020)[1673] now requires the Police Commissioner to report to the Board in writing "on any action taken, including the level of discipline and any penalty imposed" whenever the CCRB has submitted a

---

[1669] Rules of the Civilian Complaint Review Board, 38-A RCNY § 1-45. The recommendations of CCRB and the Trial Commissioner may, and often do, differ. Although the CCRB Rules require the Police Commissioner to explain deviations from both the CCRB recommendation and the Trial Commissioner's recommendation, this does not result in two writings:  only one explanation is written. In cases prosecuted by DAO, the Police Commissioner does not provide an explanation to DAO or the Trial Commissioner. Rules of the Police Department, 38 RCNY Chapter 15, "Adjudications." In all cases, regardless of whether prosecuted by APU or DAO, and regardless of the level of intended discipline, the parties may submit a Fogel letter commenting on the recommendation of the Trial Commissioner before final consideration by the Police Commissioner. *See Matter of Fogel v. Bd. of Educ. of City of N.Y.,* 48 A.D.2d 925 (2d Dep't 1975).

[1670] This is, theoretically, more detailed than the "conclusory" or "boilerplate" change of penalty letters written to DAO of which the Independent Panel complained. Independent Panel at 25-28.

[1671] 38-A RCNY § 1-42(b); APU MOU ¶ 2, available at https://www.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/ apu_mou.pdf.

[1672] APU MOU ¶ 2, available at https://www.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/apu_mou.pdf.

[1673] LL 2019/215 by referendum amending Chapter 18-A, Section 440 of the N.Y. City Charter, eff. Mar. 31, 2020.

finding or recommendation to the Commissioner. Theoretically, the final level of discipline and specific penalty imposed will be reported to CCRB. If followed to the letter, this means that CCRB will learn, for the first time, how many days or hours were forfeited after the CO was advised of a CD. In practice, as cited above in the NYPD Departure Letters page of CCRB's website, this does not occur.[1674] Unlike the APU-MOU, this requires notice in all cases, including non-APU cases, which should encompass SQF misconduct.

a.    If the level of discipline **or** the penalty is less than recommended by either CCRB **OR** DCT, than an additional explanation "of how the final disciplinary outcome was determined, including each factor the Police Commissioner considered in making his or her decision" is required.[1675]

b.    But the Board does not recommend a specific penalty;[1676] it only recommends a level of discipline (Guidance, Command Discipline A or B, or Charges). With adoption of the Guidelines, the Board may also recommend the "presumptive" sanction, the "mitigated sanction," or the "aggravated sanction," but it will not recommend a specified number of hours or days. This presents an open question: If, for example, the presumptive penalty for improper use of a Taser is 20 days and the Board so finds, is an imposed penalty of 10 days or 25 days a "deviation" that requires explanation?

c.    The Charter further requires an additional explanation of "how the disciplinary outcome was determined, including each factor the Police Commissioner considered" in cases where the penalty is lower than that recommended by "the board" or "deputy commissioner." Will the explanation be offered when the Board has not recommended a penalty, but APU has? Unlike Board recommendations, it is common for APU to recommend a specific number of penalty days. Will the detailed explanation be offered when in the Trial Room, the Police Commissioner agrees with the ADCT, but not with the APU attorney?

d.    Also, the Charter permits delay of the explanation until 45 days after the imposition of discipline. Unlike APU cases, there will not be an opportunity in advance of imposition to object.[1677] The charter is silent as to access by the complainant or the public. If past is prologue, the correspondence here might also be kept from the complainant and the public—although with the repeal of CRL § 50-a and given the fact that the report is created well after the case has closed, there would seem to be little legal support for continued secrecy. It is unlikely that the public, when voting for the Charter change

---

[1674] Available at https://www.nyc.gov/site/ccrb/complaints/redacted-departure-letter.page.

[1675] City Charter 18-A § 440(d)(3).

[1676] After a trial or as part of a plea-bargain, APU will recommend a specific penalty to the DCT.

[1677] *Id.*

and promised explanations for deviations from recommendations were aware that the explanations might remain secret.[1678]

5.  **The Disciplinary System Penalty Guidelines or "Matrix"** promises that the Police Commissioner will prepare a memorandum documenting factors that were considered in making his final "disciplinary decision" in all cases—not just formal disciplinary proceedings—describing any deviation from a recommendation by DAO, Trial Commissioner, or CCRB—all of which may be different.[1679]  Although the Guidelines promise an explanation for deviations from the "presumptive penalty,"[1680] this promise is probably meant to be limited to dispositions entirely outside the Guidelines, which is all that is required by the Matrix-MOU.  In other words, it is not foreseen that the Police Commissioner will write and publish a detailed explanation (a deviation letter) in every case where she applies mitigating or aggravating factors but stays within the Guidelines.

   a.  The Matrix narrative does not distinguish its promised memorandum from the 2012 APU-MOU explanation or the Charter-mandated explanation described above, so the following questions remain:

      1.  When will the memorandum explaining the decision be prepared and sent to CCRB?
      2.  Will the "final decision" memos be the same as an explanation of a deviation?
      3.  Will the final decision memo be available to the complainant and the public?
      4.  Will it document factors in all cases, including when there is no departure or deviation.  if the Police Commissioner merely accepts a recommendation?
      5.  Will the promised "disciplinary decision" include both the level of discipline and the final penalty?

6.  **2021 Matrix-MOU**.  Section IV of the Matrix-MOU promises that both the CCRB and the Police Commissioner will abide by the guidelines contained therein and:

   a.  The Matrix-MOU requires CCRB to describe with particularity the basis for a recommended penalty in all cases, including a description of how aggravating and/or mitigating factors were applied.  This applies to plea negotiations as well.[1681]

---

[1678] It appears deviation letters in a few cases have begun to be posted online in response to the Matrix-MOU.  The range of letters to be posted has yet to be determined.

[1679] NYPD Disciplinary System Penalty Guidelines, eff. January 15, 2021, at 6.  Adopted pursuant to NYC Admin. Code § 14-186.

[1680] Guidelines at 8 ("That penalty determination, including the rationale for any deviation from the presumptive penalty and/or the recommendation of either a trial judge or CCRB, is memorialized in a memorandum, as part of the final adjudication of the case.").

[1681] Matrix-MOU at 5.

    b.   Under the Matrix-MOU, where CCRB recommends a departure from the Matrix, the basis for the departure will be in writing. The writing will be "publicly available" subject to potential redaction if required.

    c.   Under the Matrix-MOU, where the Police Commissioner intends to depart from the Matrix, she will set forth in writing the basis for the departure, including aggravating and mitigating factors considered, which will be publicly available subject to redaction.

Under the Matrix-MOU, where the Police Commissioner intends to impose discipline or penalty within the guidelines, but lower than recommended by CCRB, she will follow the procedure outlined in the 2012 MOU, and make the determination publicly available, subject to redaction. The determination may be made based on recommendations from the Trial Commissioner or DAO. Their recommendations will be publicly available, again, subject to redaction.

Crucial to the above is a fundamental question: What is meant by a variance in "penalty?" Since CCRB does not recommend specific penalty days, how are we to know if there has been either a departure or a deviation? (Although CCRB and NYPD are not consistent in their use of the terms "departure" and "deviation," the former usually refers to a variance between a CCRB recommendation and the Police Commissioner's disposition; the latter usually refers to a disposition that is not within the Guidelines.)

For example, if CCRB recommends an A-CD for a bad frisk, using the Guidelines' presumptive penalty because it found no finding aggravating or mitigating circumstances, and the officer accepts the A-CD without forfeiting any penalty days, or the Police Commissioner imposes an A-CD with Training, is that a different "penalty" than one recommended by CCRB which requires an explanation? If CCRB recommends an A-CD and the Police Commissioner, applying progressive discipline, imposes a six-day penalty instead of the presumptive five-day penalty, is that a different penalty than the one recommended by CCRB?

As a result of the multiple and inconsistent requirements for "explanations," knowing whether a written explanation is due and who will be able to see it is a daunting task. Putting the various disclosure requirements together, a decision flow chart, with the basis for the mandate in parentheses, would look like the following:

### i.       Memos and Correspondence - APU cases (formal discipline):

- CCRB describes in writing the basis for a recommended penalty, along with a description of aggravating and mitigating factors applied.[1682] This is sent to DAO prior to NYPD action but is <u>not</u> publicly available.
- If APU enters into a proposed plea agreement, the basis for the plea is in writing and is <u>not</u> publicly available. It is provided to the officer prior to approval/disapproval by Police Commissioner.[1683]

---

[1682] Matrix-MOU, available at https://www1.nyc.gov/assets/home/downloads/pdf/office-of-the-mayor/2021/Disciplinary-Matrix-MOU.pdf.

[1683] *Id.*

- If CCRB's recommendation is outside the Guidelines (limited to extraordinary circumstances), the basis for the determination must be in writing and <u>will be</u> publicly available. Provided prior to NYPD action.[1684]
- If DAO requests reconsideration (rare in recent years) there is a written request from DAO to CCRB and a response from CCRB prior to service of Charges and Specifications. These documents are <u>not</u> publicly available.[1685]
- If the Police Commissioner determines (limited to extraordinary circumstances) to deviate from the Guidelines (whether or not it is in agreement with CCRB's recommendation), she will put the basis in writing in a departure letter. This <u>will be</u> publicly available. No time limit is given for this departure letter.[1686]
- If the Police Commissioner intends to impose a level of discipline or penalty of discipline other than that recommended by CCRB (regardless of whether it is within the Guidelines), she must explain the reasons for deviating from the Board within 45 days after imposition of the discipline. This is <u>not</u> publicly available.[1687]
- If the Police Commissioner intends to impose a level of discipline or penalty lower than that recommended by CCRB (regardless of whether it is within the Guidelines), she must also explain how the outcome was determined including each factor considered. This is provided to the CCRB within 45 days after imposition and is <u>not</u> publicly available.[1688]

  - <u>BUT</u>: Under the APU-MOU, if the Police Commissioner intends to impose "discipline that is of a lower level" than that recommended by CCRB <u>or</u> the Trial Commissioner, the Police Commissioner must "notify" CCRB and the Respondent ten days prior to imposition with a detailed explanation of the reasons for deviating. CCRB and the Respondent have five days to respond, followed by the Police Commissioner's final determination. This correspondence is <u>not</u> publicly available.[1689]

- In "limited instances" where the officer has no disciplinary history and the Police Commissioner wishes to withdraw the case from APU prosecution in the "interests of justice" (either permitting DAO to take over the prosecution or diverting from formal discipline entirely), the Police Commissioner writes a detailed explanation, CCRB may offer a statement in rebuttal, and the Police Commissioner may deny CCRB's request with a "detailed response."[1690] The entire exchange takes place prior to removal and is <u>not</u> publicly available.

---

[1684] *Id.*

[1685] 38-A RCNY § 1-36.

[1686] Matrix-MOU, available at https://www1.nyc.gov/assets/home/downloads/pdf/office-of-the-mayor/2021/Disciplinary-Matrix-MOU.pdf. When an item is designated as publicly available, the Department and CCRB reserve the right to redact or withhold information where "permitted by applicable local, state, or federal laws." *Id.* at 4.

[1687] N.Y. City Charter § 440(d)(3).

[1688] *Id.*

[1689] APU-MOU, Provision Six, available at https://www.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/apu_mou.pdf.

[1690] *Id.*, Provision Two.

- In all cases, CCRB must be notified of the "level of discipline and penalty imposed" at the close of the case. The NYPD notification letter is <u>not</u> publicly available, but notice from CCRB is provided to the complainant and will be posted on the CCRB MOS discipline website. Despite the Charter mandate that CCRB be informed of the level of discipline <u>and</u> the penalty imposed, the Department has heretofore disregarded the mandate.[1691]

### ii.    Memos and Correspondence - DAO/DCT Cases (formal discipline):

- The Trial Commissioner prepares a written decision, applying the Guidelines, with findings as to each allegation and a recommended penalty within the Guidelines. The Trial is public, but the decision before review by the Police Commissioner is <u>not</u> publicly available.
- The Police Commissioner will either approve or disapprove the recommendation. If she disagrees with a Trial Commissioner's penalty recommendation, she will write a cursory "change of penalty" letter. No time limit is provided.
- The final decision is posted online in a "Trial Decisions Library" with the approval/disapproval letter. Earlier exchanges (Trial Commissioner's recommendation and Fogel letters) are <u>not</u> publicly available.

### iii.    Memos and Correspondence - CCRB FADO Cases Without Charges (Most SQF; Informal Discipline):

- CCRB describes in writing the basis for a recommended penalty, along with a description of aggravating and mitigating factors applied. This is <u>not</u> publicly available. Provided to NYPD prior to NYPD action. (Matrix-MOU).
- If CCRB's recommendation is outside the Guidelines (limited to extraordinary circumstances), the basis for the determination is in writing and <u>will be</u> publicly available. Provided to NYPD prior to action; provided to public after final NYPD decision. (Matrix-MOU).
- If DAO requests reconsideration (rare in recent years), DAO sends a written request from CCRB and provides a response prior to service of Charges and Specifications. These documents are <u>not</u> publicly available. (38-A RCNY 1-33).
- If the Police Commissioner determines (limited to extraordinary circumstances) to deviate from the Guidelines (whether or not it is in agreement with CCRB's recommendation), she will put the basis in writing in a deviation letter. This <u>will be</u> publicly available. No time limit is provided. (Matrix-MOU).
- If the Police Commissioner intends to impose a level of discipline or penalty of discipline other than that recommended by CCRB (regardless of whether it is within the Guidelines), she must explain the reasons for departing from the Board's recommendation. This is <u>not</u> publicly available and is provided 45 days after imposition of the discipline. (Charter).

---

[1691] "The Agency does not receive specifics on the penalty that the Police Commissioner ultimately imposes." CCRB Annual Report 2020 at 42, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2020_semi-annual.pdf.

- If the Police Commissioner intends to impose a level of discipline or penalty lower than that recommended by CCRB (regardless of whether it is within the Guidelines),  she must also explain how the outcome was determined including each factor considered. This is <u>not</u> publicly available and is provided 45 days after imposition.  (Charter)

- In all cases, CCRB must be notified of the "level of discipline and penalty imposed" at the close of the case.  (Charter).  The notification letter is <u>not</u> publicly available, but notice from CCRB is provided to the complainant and will be posted on the CCRB MOS discipline website.  Despite the Charter mandate that CCRB be informed of the level of discipline <u>and</u> the penalty imposed, the Department has, heretofore, disregarded the mandate.  "The Agency does not receive specifics on the penalty that the Police Commissioner ultimately imposes."[1692]

### iv.    Memos and Correspondence When Internally Investigated by IAB, OCD, BIU, and FID

- For all but FID (Force) allegations, the findings and recommendations are presented to DAO, which can modify the recommendation to the Police Commissioner.  The correspondence is <u>not</u> publicly available.

- FID findings and recommendations are presented to the First Deputy Commissioner. The report is <u>not</u> publicly available.

### v.    Departure Letters Posted by CCRB as of June 2022.

In 2020, the Police Commissioner acted on 494 non-APU recommendations from CCRB. The Police Commissioner ordered command discipline for 118 of the 494 officers, or 23.8% of the time.  According to CCRB's 2020 Annual Report, there was a "Discipline Difference"[1693] in 81 cases and "No Discipline" in another 24 cases.  One might expect, therefore, based on CCRB's assessment in that report that somewhere in the vicinity of 105 departure letters will need to be written for cases disposed of in 2020 alone.

As of June 12, 2022, a total of 118 cases are detailed in explanatory departure letters covering misconduct occurring during a period from 2018 to 2021.[1694]  The posting is not yet complete.  Departures out-pace postings, but more letters are posted as time goes on.  Of the first 118 cases where a departure letter was posted by CCRB, if presumptive penalties under the Guidelines were imposed, penalty days would have been forfeited in 100 of the 118 cases.  Instead, it appears the Police Commissioner ordered penalty days in two of the cases and discharged 63 of the cases with NDA (no disciplinary action).  Thirty-one cases were reduced to training or

---

[1692] *Id.*

[1693] "Discipline Difference" is not defined (*id.* at 47), so a prediction of how many departure letters need to be written is imprecise.

[1694] There is some overlap between the first 47 departures contained in the Appendix to CCRB's Semi-Annual 2020 Report, available at https://www1 nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2020_semi-annual.pdf, and CCRB's posting of departure letters under "Complaint Outcomes," available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2020_semi-annual.pdf.    The combined total covers 119 cases.

instructions.    Broken down by CCRB recommendation with final Police Commissioner determination, the 118 cases were resolved as follows:

- **Charges** were sought by CCRB in four cases.  (Each involved force):

    o  The Police Commissioner imposed an A-CD without penalty in one case and NDA for the remaining three cases, including one false statement finding.

- **B-CD** was sought by CCRB in 69 cases:

    o  The Police Commissioner imposed no discipline (NDA) in 31 of the 69 cases
    o  The Police Commissioner reduced the B-CD to training or instructions in 21 of the 69 cases.
    o  The Police Commissioner allowed the subject to accept an A-CD with no penalty in 15 of the 69 cases.
    o  The Police Commissioner "concurred" in the recommended level of discipline (B-CD) in two cases.  It is unclear what penalty, if any, was imposed.

- **A-CD** was sought by CCRB in 25 cases:

    o  The Police Commissioner imposed an A-CD in two cases.
    o  The Police Commissioner reduced the A-CD to guidance (training or instructions) in seven of the cases.
    o  The Police Commissioner reduced the A-CD to NDA in 16 of the cases.

    o  There were two cases where CCRB recommended consecutive A-CD's for RTKA violations, which would have combined to a B-CD level of penalty, but the Police Commissioner ruled that the violations should be dealt with concurrently—reducing the discipline level to an A-CD in both cases.

- **Instructions or training** were sought by CCRB in 18 cases:

    o  The Police Commissioner reduced guidance to NDA in 15 of the 18 cases
    o  The Police Commissioner imposed instruction twice and training once.

There were another 58 downward departures where CCRB did not receive an explanation, mostly because CCRB had recommended Training and the Police Commissioner ordered that Instructions be given instead.  In the eyes of CCRB, this is a downward departure, but in the eyes of DAO this is not a downward departure and, thus, no letter is written.[1695]

The Charter requires an explanation of any departure from the "penalty or level of discipline" recommended by CCRB.  The Matrix-MOU requires an explanation when the Police

---

[1695] CCRB Semi-Annual Report 2020 at 53. *But compare* Disciplinary Guidelines for failure to activate a BWC, at 43, where the presumptive penalty is Training, but a mitigated penalty is Instructions.  NYPD's Guidelines seem to support CCRB's argument that Instructions is a lesser penalty than Training.

Commissioner "intends to impose discipline or penalty . . . lower than that recommended by the CCRB."

The first published draft of the Guidelines contained a provision making Training the presumptive penalty and Instructions a lesser penalty which becomes available upon a finding of mitigating circumstances.[1696] Thus, NYPD's Matrix would have recognized instructions as a lesser penalty than training. The amended and current version of the Guidelines eliminated instructions as a mitigated penalty and replaced it with "N/A" (not available) . . . conforming to the Department's current view. This Report takes the position that neither Training nor Instructions are a "penalty or level of discipline." As such, a reduction by the Police Commissioner from training to instructions does not implicate a penalty of disciplinary reduction and would not require a departure letter.

### vi. Departure Letters in SQF Cases

The Department has provided the Monitor Team with a copy of two Departure Letters written in SQF cases.

One letter provided was for PO ▆▆▆▆▆▆, whose case is discussed earlier in this Report. In sum, PO ▆▆▆ had two allegations substantiated by CCRB—one for an illegal stop and another for improper questioning. The Board recommended a presumptive sentence for each. If run consecutively, the penalty would be six days (three days for each allegation). The Police Commissioner wrote that ▆▆▆ acted in "good faith," and therefore an A-CD with a 3-day penalty would be imposed. Subsequent to this determination, the Department, in a revision of the Guidelines, declared that an illegal stop and question would be combined and treated as one allegation, with a penalty of three days.

The departure memo also noted "a lack of substantiated CCRB history" but did not mention:

- A DADS case where PO ▆▆▆ was penalized 40 days and placed on Dismissal Probation and ordered to pay a $500 fine for prior "Traffic Violations Bureau-related misconduct."
- A prior B-CD with a five day penalty for improper handling of equipment
- A prior A-CD for Unprepared (No Activity Log) in court.
- There were three prior OMN referrals from CCRB, but no information as to disposition was available.

The second departure letter provided was for Sergeant ▆▆▆. The complainant was a passenger in a car that was stopped by other officers. Sergeant ▆▆ came upon the scene shortly after the stop was made and after the vehicle in which the complainant was riding was searched improperly by other officers. When the driver resisted a call to exit the vehicle, Sergeant ▆▆ improperly threatened him with arrest. At that point, the complainant, had a seizure. As the complainant was placed in an ambulance, Sergeant ▆▆ directed the other officers to search the complainant's bag before putting it in the ambulance with him. CCRB recommended a mitigated

---

[1696] Improper activation of a BWC, NYPD, Disciplinary System Penalty Guidelines at 43 (Jan. 15, 2021).

penalty of Training for the improper direction to search the bag, given good faith and the totality of the circumstances. CCRB recommended a B-CD for the threat of arrest without finding mitigating or aggravating circumstances. The presumptive penalty for an improper threat of enforcement activity is a 5-day penalty, the equivalent of an A-CD.[1697] Nonetheless, CCRB recommended a B-CD for that allegation. The Police Commissioner "departed" by imposing an A-CD. While the A-CD is a departure from CCRB's recommendation, it was within the Guidelines, given the presumptive 5-day penalty. More importantly, at this time, it is unclear if any penalty, other than an A-CD accepted without penalty days, was actually imposed in this case.

The departure letter chiefly is of interest not for the result but for the rationale provided by the Commissioner. The search was excused because the search was "undertaken to ensure the safety of the ambulance crew." Both CCRB and the Police Commissioner found mitigation for the direction to search the bag of the passenger on that basis. The Police Commissioner (not CCRB) mitigated the threat to arrest the driver because an MTA parking placard was found in the car during the subsequent illegal search by other officers, which led to a summons being issued against the driver of the car. According to the Police Commissioner, "the contraband for which he [the driver] was arrested had already been discovered and that information would likely have been provided to Sergeant ███ closely in time to when he made the threat to arrest." However, a review by DAO had found, ███████████

███████████████████████████████
███████████████████████████████[1698]

### vii.    Deviation Letters Posted by NYPD

At this point in time, the Police Commissioner has begun to post "Deviation Letters,"[1699] although their significance is mostly hypothetical, since the posted letters apply to cases decided by CCRB prior to June 2021 before CCRB began to use the Guidelines. With one exception, the Police Commissioner merely announced that he concurred with CCRB's recommendation in cases where CCRB's recommendation would have been below the Guidelines if CCRB had used the Guidelines. (In the one other case, CCRB recommended an A-CD. and the Police Commissioner ordered training.)

- PO ███████: CCRB substantiated a Discourtesy allegation. This was PO ███ second investigation for Discourtesy, the first of which went unsubstantiated. The Matrix calls for a presumptive five-day penalty and permits mitigation to one day. CCRB recommended Instructions. and the Police Commissioner agreed.
- PO ███████: Charges were filed for a substantiated chokehold, for which the Matrix requires termination or separation. CCRB recommended a ten-day penalty. and the Police Commissioner agreed.

---

[1697] The Guidelines detail an improper threat of enforcement activity without specifying a threat to arrest. An improper threat to arrest is prohibited by Administrative Guide § 304-06. In its CAR memo, DAO presumed that a threat of arrest fell within a threat of enforcement activity. **Note: The City has asserted a claim of privilege with regard to the two CAR memos which have been produced and asks that they not be referenced in this Report.**

[1698] Case Analysis and Recommendation Memorandum.

[1699] https://nypdonline.org/link/1035.

- PO ⬛⬛⬛⬛: Charges were filed for an improper vehicle search and retaliatory summons. ⬛⬛ pled guilty, and CCRB recommended a two-day penalty. The Matrix presumes a twenty-day penalty for an improper enforcement action and a three-day penalty for the illegal search. The Police Commissioner concurred with CCRB's recommendation of two days because the vehicle search was "minimal." ⬛⬛ has had seven CCRB complaints with 23 allegations, mostly of force or stop/frisk misbehavior. Only one other complaint was substantiated —an improper frisk for which he received training.

- PO ⬛⬛⬛⬛: CCRB substantiated an improper refusal to process a civilian complaint. The Matrix presumes a ten-day penalty but permits mitigation to a five-day penalty. CCRB recommended an A-CD and training because of the officer's relative inexperience. The Police Commissioner imposed training.[1700]

- Sergeant ⬛⬛⬛⬛ and PO ⬛⬛⬛⬛: Called to the scene by someone who complained of cars being doused with water by an "unruly" crowd, ⬛⬛ was found to have wrongfully used force, and both officers had a discourtesy allegation substantiated. The force allegation carries a presumed ten-day penalty with mitigation down to five days. The discourtesy allegations carry a five-day penalty with mitigation down to one day. CCRB recommended an A-CD for both officers. The Police Commissioner went further, imposing no disciplinary action (NDA/DUP) for the force complaint and ordering training for the two discourtesy allegations.

In each case selected for public posting, CCRB recommended penalties which would have been below the Guidelines if CCRB had used the Guidelines at the time its recommendation was made. The Police Commissioner then wrote to confirm a deviation below the Guidelines, noting he agreed with CCRB in imposing lesser discipline than required by the Guidelines. No cases were posted where CCRB's recommended penalty would have been within the Guidelines, but the Police Commissioner departed from both the Guidelines and CCRB's recommendation.

The letters are similar in format to the "conclusory" and "boiler-plate" letters of which the Independent Panel had complained. They are a far cry from the "detailed explanation" with "an explanation of how the final disciplinary outcome was determined" required by the Charter. As just one example, in one case, in a brief paragraph the Police Commissioner found that the officer

---

[1700] In the ⬛⬛ case, since training was a lower level of discipline than CCRB's recommended A-CD with training, an explanation was required by the Charter as well as by the Matrix-MOU. It appears that the Guidelines do not specifically authorize the deviation. "The presumptive penalty [of 10 days] serves as the starting point for analysis during the penalty phase of a case, which must include consideration of the totality of the circumstances and any aggravating and/or mitigating factors." The presumptive penalty is the penalty for first offenders. Mitigation [5 day penalty] is then permitted upon a finding of a "the reasonably limited or lack of knowledge, Training and experience of the member of the service involved that is germane to the incident" and a "[p]otential for Training to correct/rehabilitate behavior." There is no provision for going below the mitigated penalty and outside the Guidelines due to, as described in the departure memo, a ⬛⬛⬛⬛ and "lack of prior substantiated CCRB complaints." Guidelines at 8-9.

"acted reasonably, under confusing circumstances which provided contradictory evidence and diverse claims by several present parties."[1701]  Accordingly, the officer was given Training.

Upon reading all the posted letters, it appears that this letter is not unusual in its opacity. Since the letters do not specify the facts, findings, the penalty recommendation of CCRB, it is impossible to discern the point of departure, since the extent of departure cannot be calculated without knowing the starting point.[1702]  What was recommended by CCRB, and why?  The Police Commissioner's repeated assertion in the "departure" letters typically provide little more than his unexamined assertion that the officer acted "reasonably" or in "good faith."  With time, this may improve, but if not, no conclusion can be drawn other than that the Charter is being ignored.

### viii.    Deviations From Trial Decisions

The Department has begun to post decisions from the Trial Room in a Trial Decisions Library.[1703]  Accompanying the memorandum is an approval or disapproval note from the Police Commissioner.  In the reported decisions, the Trial Commissioners refer to the Disciplinary Guidelines, which, in the long run, may prove useful in measuring compliance with the Guidelines. For example, in one unusual case, the APU prosecuted a Sergeant for authorizing an unwarranted strip search.  The presumptive penalty under the Guidelines would be 20 penalty days, coupled with dismissal probation for one year.  The Trial Commissioner found mitigating circumstances in that the Sergeant acted in "good faith" and in reliance upon a Lieutenant with whom she consulted before authorizing the strip search.  She also pled guilty, accepting responsibility. Nonetheless, the Police Commissioner disapproved the lesser penalty and imposed the presumptive penalty of 20 days along with the one-year dismissal probation.[1704]

In the end, CCRB and the Police Commissioner will need to negotiate and amend several of the various commitments into one integrated system or framework of reconciling and explaining disciplinary decisions as they are made.  At the moment, postings of departure letters, deviation memos, and trial decisions seem to be haphazard and uncoordinated.  Each of the requirements of the MOUs and Charter are not being followed precisely, but that is in part due to internal consistencies in the rules governing when they are to be delivered, to whom they are to be delivered, and when they are to be publicly posted.  These are relatively minor inconsistencies which can, and probably will, be worked out in time.

The most serious defect, however, is in the continued failure of the Department to provide meaningful explanations for variances at the level of detail that was expected when the Charter was adopted and the MOUs were signed.  If the Department can continue to justify deviances and departures with little more explanation than that the officer acted in good faith or reasonably, then

---

[1701] PO ▮▮▮▮▮▮▮▮ (Feb. 14, 2020).  Not mentioned in the letter were the findings or recommendation of CCRB or the underlying facts.  The Board had found him guilty of three allegations— Forcible Removal to a Hospital, Threat of Arrest and Threat of Removal to a Hospital— and had recommended a B-CD.

[1702] CCRB has a separate online posting which contains its recommendation.  By viewing both databases, the recommendation can be read in conjunction with the Police Commissioner's posting.

[1703] Trial Decisions Library, available at https://nypdonline.org/link/1016.

[1704] Sergeant ▮▮▮▮▮▮▮.

the memos are not worth the time it takes to write or read them. [1705]  Also disappointing is the failure of the Department to meet its obligation to report both the level of discipline and the final penalty imposed in non-APU cases, especially SQF cases.

### (1)    Case Study of a "Deviation"

Take as an example, the Deviation letter posted by the Department in the case of Officer ████████.  Officer ███████ had allegations substantiated against him for illegally searching a car and for abusing his authority by wrongfully issuing two summonses for "Disorderly Conduct" in retaliation for the civilian's reaction to the encounter.  The presumptive penalties for the three allegations would normally be 20 days each for the retaliation and 10 days for the search.  The mitigated penalties would be 10 days each for the retaliatory acts and five days for the search.  Finally, if the search was "incidental or de minimis," the penalty for the search of the vehicle could be mitigated as low as Training.  If the summons allegations were deemed to run "concurrently" the mitigated penalty would be 10 days.  The best case scenario for Officer ██████, if the Matrix were applied in his favor, would be a 10-day penalty.

In the end, CCRB and the Police Commissioner deviated from the Matrix, even beyond mitigation.  Both concurred in a disposition of an A-CD as discipline with two days forfeited.  The Deviation Letter was prepared in July 2021, almost two years to the date after the incident and complaint.

In just the past five years, Officer ██████ has been the subject of seven CCRB complaints.  He previously had a substantiated allegation of a wrongful frisk where he received Training.  He also was the named subject of ten lawsuits, five of which are still open and four of which settled for amounts of $5,000, $7,500, $10,000 and $23,595.

Given his track record over the past few years, it is difficult to understand mitigation on the basis of his personnel/disciplinary history record.  The deviation from the presumptive and mitigated penalties is marked; accordingly, a full "detailed explanation" as called for by the MOU and Guidelines would seem necessary.

---

[1705] As just one example, in the case of PO ██████████████, discussed earlier, the Police Commissioner's Departure Letter, written November 8, 2021, explained a reduction from CCRB's recommended B-CD to an A-CD based on a "lack of substantiated CCRB history and the belief that the stop and the question were conducted in good faith."  PO ██████████ had eight previous similar CCRB complaints, none substantiated.  in this incident, the police had received a radio call for a "past" domestic incident.  By mistake they went to the wrong building.  Although the complainant did not fit the description of a suspect, the officers thought he looked "angry."  ████████ and his partner stopped the man, and during the stop, handcuffed, frisked, and detained the complainant for ten minutes, along with other discourteous actions (such as throwing his wallet on the ground when the complainant asked for its return).  The suspect sought by police in that case was described as a Black male, 6'5" tall, heavy set, bald, and walking with a limp.  The record was clear that the wrongly detained complainant was 5'7" ██████████████.  In short, he looked nothing like the suspect.  The officers , in the findings of CCRB, lacked "any credible suspicion."  PO ███████ admitted in his interview that the officers "did not have reason to suspect [the complainant] being involved."  In other words, there is nothing in the record to support the claim that the actions were taken "in good faith."  Instead, it is merely a conclusory assertion, without basis, offered by rote to justify a departure.

Also of interest is the fact that the encounter under examination occurred on the same day the PO ███████ is alleged, according to the sworn complaint in Bronx Supreme Court, to have been part of an encounter with several officers and several complainants, which included wrongful arrests, use of force. and chokeholds.[1706] Even though the encounter is the same day, it is impossible to tell from the Deviation Letter if the lawsuit complaining of a wrongful arrest, force and chokeholds is the same incident for which PO ███████ was given discipline of two penalty days. The Deviation Letter merely says that the intrusion into the vehicle was minimal and solely for identification purposes. There is no explanation in the Deviation Letter of why the retaliatory summonses received relief from the Matrix.

In the end, this would have been an ideal case for a Deviation Letter, as called for in the Charter, to describe the subject officer's disciplinary history fully explain the encounter(s) on that day, and PO ███████ specific role in the encounter(s). Instead, the public was provided with a sugar-coated minimal explanation filled with defensive conclusions, but no analysis of the facts, factors, or precedence.

One of the purposes of explanatory letters, aside from assuring the public that there is accountability, is to provide guidance to fellow officers. Any officers in PO ███████ command who were familiar with the facts could take only one lesson from the experience: regardless of his recent past history and regardless of all the surrounding facts, the prescribed penalties in the Matrix are easily evaded.

## XII.  False Statements – Recent Patrol Guide Amendments And The Disciplinary Guidelines

Integral to any disciplinary system is the ability to compel interviews of subject officers and to demand candor in response to inquiries. The handling of false statements, and whether the Department deals with false testimony with requisite gravity, has been a source of repeated concern and skepticism throughout the saga of civilian oversight of police in New York City.

This is a particularly sensitive matter in connection with stop and frisk compliance. SQF investigations are commonly reliant upon the unsupported word of a witness and a subject officer. Even with video evidence, the entire episode and the reasons for the interaction will rarely be resolved completely by extrinsic evidence. A simple denial or an uncorroborated explanation of the stop by the subject officer will be, in many cases, sufficient cause for a case to fall short of substantiation

As noted by the Commission to Combat Police Corruption (CCPC), following years of analyzing false statement investigations with NYPD, "There continues to be allegations of false testimony regarding the circumstances surrounding stops and searches of individual . . . . In order to prevent the tarnishing of the Department's credibility, those officers who have lied must, in all but the most exceptional of circumstances, be separated from the Department."[1707]

---

[1706] *Castro v. City of New York, P.O.* ███████, Index No. 34384/2018E (Sup. Ct. Bronx Cnty. 2018)

[1707]  Twelfth Annual Report of the Commission at 61 (Feb. 2010). The Annual Reports may be found online at https://www1.nyc.gov/site/ccpc/reports/annual-reports.page.

Since history seems to repeat itself in this area, a brief recitation of the Department's long and twisted history of processing of false statement cases may prove useful.

In 1995, Commissioner Bratton, responding to claims of "pervasive" false testimony by officers, sought to measure the extent of the problem before the courts. He sent a letter to all criminal court judges, the five district attorneys, the two U.S. attorneys, and the Legal Aid Society, asking them to report any instance of suspected police perjury in the prior two years. There were 25 immediate responses. His reaction was to declare, "Based upon the over six hundred thousand arrests made during that same period the Commissioner concludes that the reported instances of 'testifying' are remarkably sparse." Nonetheless, the Commissioner Bratton decided to "form a committee to ensure the integrity, effectiveness and professionalism of police witnesses."[1708] Made up of fourteen officials, it was denominated the "Committee for Excellence in Testimony." Participating in the meetings of the Committee were representatives of the Commission to Combat Police Corruption (CCPC), which continued the mission of analyzing false statement allegations and assessing the Department's handling of those allegations for the following twenty-six years. The CCPC's annual reports have been critical in understanding the depth of the problem of false statements by the Department's officers.

In CCPC's first study, published in 1996, it concluded that:

> "[A]dministrative penalties imposed by the Department in cases involving false statements, which sometimes were accompanied by charges for other misconduct, were insufficient given the nature of the offenses. Traditionally, in the Department's disciplinary system, those found guilty of making false statements . . . were not discharged from the Department, unless the false statements were linked to extremely egregious underlying conduct . . . . Of the cases reviewed by the Commission, the most common penalties for false statements relating to an officer's own misconduct generally involved either suspensions of 30 days or less or the loss of vacation days, accompanied in various cases by some form of probation. In situations where the false statements involved covering up for other officers, the most common penalties involved the loss of 15 days or less . . . . The Commission still believes that more severe penalties are generally warranted in false statement cases."[1709]

After reviewing the Commission's findings, Police Commissioner Howard Safir announced a new policy. The policy statement, issued December 12, 1996, stated that whenever an officer was found to have made an official false statement, either through a decision by a Trial Commissioner or by a guilty plea, the officer would be terminated from the Department absent exceptional circumstances.[1710] CCPC applauded the policy, citing the need to fight a public

---

[1708] First Report of the Commission to Combat Police Corruption, at 76 (Mar. 1996).

[1709] Second Annual Report at 6-8 (Oct. 1997).

[1710] *Id*. at 9. "Absent exceptional circumstances the making of a false official statement will result in dismissal from this Department. Examples of a false official statement include, but are not necessarily limited to, lying under oath during a criminal or civil trial as well as during an official Department interview conducted pursuant to Patrol Guide Section 118-9." (Section 118-9 was the predecessor to the current Patrol Guide provisions). Not included as a "false

perception of a "blue wall of silence," while conceding that "police officers linked together by the danger of the streets, not wanting to disclose a partner's or other officer's misconduct is an understandable, albeit unacceptable, emotional response." The Commission concluded that "lying cannot be allowed to become acceptable conduct, and reversing this climate requires that a strong message of intolerance towards lying be communicated throughout the Department."[1711]

Since then, in its annual reports, CCPC continues to assess discipline for false statements and continued to press for serious sanctions,

> "There continues to be allegations of false testimony regarding the circumstances surrounding the stops and searches of individuals. When officers are found to have made false statements, the public's confidence in the integrity of the policy may be affected. In order to prevent the tarnishing of the Department's credibility, those officers who have lied must, in all but the most exceptional of circumstances, be separated from the Department."[1712]

CCPC has consistently disapproved of a number of loopholes in the termination policy which have emerged as ways by which the Department may avoid imposing significant discipline on officers who make false statements. There are at least 11 separate annual reports where CCPC pursued the subject.[1713]

Listed below are thirteen observations and objections that CCPC has made over the years regarding the issue:

1. CCPC found that the Department invoked the "exceptional circumstances" clause quite frequently. CCPC believed that "the Department needs to better document, where applicable, its reasons for finding exceptional circumstances."[1714] Through the years, the Commission has noted that exceptional circumstances were increasingly becoming standardized, instead of being considered in light of the facts in each individual case.[1715]
2. In cases where DAO decides not to charge a false statement, there should be documentation.[1716] Whenever an officer's testimony is found to be "incredible" by a

---

official statement" were statements to a supervisor in a non-investigatory context or where the statement involved an administrative matter, such as time and leave issues (Fifth Annual Report at 43).

[1711] *Id.* at 6-7.

[1712] Twelfth Annual Report of the Commission at 61 (Feb. 2010).

[1713] Tenth Annual Report of the Commission ("Tenth Annual Report") (Feb. 2008) at 33; Eleventh Annual Report of the Commission ("Eleventh Annual Report") (Feb. 2009) at 39; Twelfth Annual Report of the Commission ("Twelfth Annual Report") (Feb. 2010) at 53-55; Thirteenth Annual Report at 19; Fourteenth Annual Report at 39-45; Fifteenth Annual Report at 73-74; Sixteenth Annual Report at 86-87; Seventeenth Annual Report at 103-104; Eighteenth Annual Report of the Commission (Aug. 2017); Nineteenth Annual Report of the Commission at 107-08 (Dec. 2019).

[1714] Fourth Annual Report of the Commission at 18 (Nov. 1999).

[1715] Eleventh Annual Report of the Commission at 38 (Feb. 2009).

[1716] Sixth Annual Report of the Commission at 85 (Dec. 2001).

factfinder, the Department should conduct further investigation to determine whether the officer testified falsely.[1717]

3. Officers are permitted to "correct" prior falsehoods in a second interview when confronted. These "corrections" should not "routinely" result in lesser penalties.[1718]

4. A "flat denial" where the "underlying misconduct was relatively minor" should not be considered an "exceptional circumstance."[1719]

5. A plea of guilty to avoid a trial should not be used to bargain away discipline.[1720]

6. A "lack of prior disciplinary history and good performance evaluations alone" should not constitute "exceptional circumstances."[1721]

7. The Department should consider termination for all false statements, not just those made in sworn testimony or in a P.G. hearing. "[T]ermination should be consistently applied to falsities made in non-testimonial settings, since the same policy considerations apply."[1722]

8. A "mere denial" absent additional "embellishment" is still a false statement justifying termination.[1723] Analysis revealed that Departmental findings that a lie was a "mere denial" without elaboration, thereby avoiding termination, is extensively used.[1724] "[T]he 'mere denial' exception should not be applied to statements made in an official Department interview. It is all too easy for an officer to couch a false statement as a 'mere denial' and thereby to escape appropriate discipline."[1725]

9. In more recent years, the Department (over objection by CCPC) reduced penalties in false statement cases where "rather than acting with malice aforethought or intent to obtain a personal gain [the] respondent's misconduct appeared to be more the result of carelessness and complacency."[1726] This, of course, elevates the requisite proof from knowing falsity to intentional fraud, a higher standard that is more difficult to prove.

---

[1717] Seventh Annual Report of the Commission at 139-41 (Mar. 2004).

[1718] Fifth Annual Report of the Commission at 47 (Feb. 2001).

[1719] *Id*. at 49.

[1720] *Id*. at 50

[1721] Sixth Annual Report of the Commission at 77 (Dec. 2001).

[1722] *Id.* at 80.

[1723] Seventh Annual Report of the Commission at 136 (Mar. 2004).

[1724] Ninth Annual Report of the Commission at 36 (Feb. 2006). "Due to the Department's revised false statement policy, the Commission removed all of those cases where the false statement could be characterized a mere denial of guilt."

[1725] Nineteenth Annual Report of the Commission at 107-08 (Dec. 2019). "The Commission has repeatedly disagreed with the "mere denial" exclusion in the context of official Department and CCRB interviews." (*Citing* Ninth Annual Report at 35-36; Tenth Annual Report at 34; Eleventh Annual Report at 38; Twelfth Annual Report at 53; Thirteenth Annual Report at 18, n. 61; Fourteenth Annual Report at 41; Fifteenth Annual Report at 60; and Sixteenth Annual Report at 82-83). *Compare with Brogan v. United States*, 522 U.S. 398 (1998) (finding an official guilty of making a false statement, 18 U.S.C. § 1001, who merely replied "No" to an inquiry of wrongdoing).

[1726] Thirteenth Annual Report of the Commission at 21. (Mar. 2011).

10. Over time, the "most commonly charged" offense, in lieu of a false statement charge was Conduct Prejudicial to the Good Order of the Department,[1727] which regularly carries a lesser penalty, thereby avoiding presumptive termination.[1728]

11. "Imposition of penalties for false statement are not significantly different from the penalties that would have been imposed for the underlying misconduct alone . . . [which] undermines the work of investigators, weakens the utility of Department interviews, and sends a message to members of the service that lying to cover up their own misconduct will be tolerated."[1729]

12. "Impeding an Investigation," "Inaccurate Statements," and "Misleading Statements" should not be used as lesser alternatives and a substitute for False Statement charges.[1730] "Often, the circumstances in reviewed cases leave little doubt that the subject officer made statements that were false, official, more elaborate than "mere denials," and by any reasonable estimate, both intentional and material. Yet the Department appears to routinely employ other Patrol Guide Sections to address the misconduct, bypassing the mandatory termination penalty in the process . . . . [B]y levying an alternate charge, the Department need not find that exceptional circumstances exist to retain those officers."[1731]

13. Typically, when an officer makes a false entry in a document, such as a Stop Report, the matter is investigated under Patrol Guide §203-05 (Performance on Duty) and not deemed to be an official false statement under §203-08.[1732]

Despite CCPC entreaties, the Department has persisted in modifications to the termination policy. In 2005, the Department issued Interim Order 4 which prohibited false statement charges where the officer "merely pleads not guilty in a criminal matter, or merely denies a civil claim or an administrative charge of misconduct."[1733] CCPC condemned the change in policy on the ground that a "denial of guilty when it's a false denial, is still a lie and, therefore, directly erodes the credibility of the officer and indirectly affects the public's confidence in the integrity of the Department." This change has a direct impact on CCRB interviews and especially so in stop and frisk interviews before CCRB. To the extent that officers are led to believe that flat-out false denials of conducting illegal stops and frisks, under oath before a CCRB investigator, is not as

---

[1727] Patrol Guide § 203-10 (5).

[1728] Seventeenth Annual Report of the Commission at 103 (Nov. 2015).

[1729] Seventeenth Annual Report of the Commission at 106 (Nov. 2015) and Eighteenth Annual Report at 114 (Aug. 2017).

[1730] *Id*. at 112.

[1731] Eighteenth Annual Report of the Commission at 113-16 (citing to findings of "conduct prejudicial," "inaccurate," and "misleading" in lieu of a false statement). The Commission gave as an example of an officer who was charged with false statements on two separate occasions. In one, the officer falsely claimed to have seen a violation before a stop and search, both in testimony before a grand jury and in interviews with IAB and an ADA. His false statements were considered to be "inaccuracies" and "mistakes," and in all, for both cases, the officer received a 40-day penalty. The Commission concluded that the officer's repeated falsehoods represented an intentional attempt done to cover up his misbehavior. *Id*. at 118-21.

[1732] In June 2021, many of the misconduct provisions of the Patrol Guide were moved to the Administrative Guide. §203-08 (False Statements) became AG 304-10, and PG § 203-05 (Performance on Duty) became AG 304-05, which requires "accurate" entries in Departmental reports.

[1733] *See* former Patrol Guide §203-08, currently Administrative Guide 304-10, which contains similar language.

"serious" as a lie before an IAB investigator, a district attorney, or a court, the integrity of the entire civilian complaint process is called into question. If officers learn that a simple denial of SQF misconduct, even when false, can result in unsubstantiation and that the denial will not be treated as a false statement, Judge Scheindlin's call for "increased deference" to CCRB credibility assessments takes on a new meaning.

In 2007 the Department further modified the 1996 policy as follows:

"The intentional making of a false statement is prohibited, and will be subject to disciplinary action, up to and including dismissal. Intentionally making a false official statement regarding a material matter will result in dismissal from the Department, absent exceptional circumstances. Exceptional circumstances will be determined by the Police Commissioner on a case-by-case basis. Examples of circumstances in which false statements may arise include, but are not limited to, lying under oath during a civil, administrative, or criminal proceedings [sic] or in a sworn document; lying during an official Department interview conducted pursuant to Patrol Guide 206-13, "Interrogation of Members of the Service" or an interview pursuant to Patrol Guide 211-14, "Investigation by Civilian Complaint Review Board;" and lying in an official Department document or report. The Department will not bring false official statement charges in situations where, as opposed to creating a false description of events, the member of the Department merely pleads not guilty in a criminal matter, or merely denies a civil claim or an administrative charge of misconduct."[1734]

In sum, after 25 years of effort exhorting the Department to take false testimony seriously, CCPC was forced to concede, in its Eighteenth Annual Report (after noting a small increase in false statement charges):[1735]

"Yet, even when the false statement provision was utilized, the mandatory termination clause did not appear to factor into the Department's deliberative process when formulating a penalty. In each of the 20 cases from the current review period where officers were found guilty of making false statements under Patrol Guide § 203-08, the Department's Trial Commissioners and assistant department advocates made discretionary decisions to recommend either separation or a less severe penalty. These decisions appeared to be based solely on the severity of the misconduct and the service history of the officer, without reference to the mandatory termination provisions or any exceptional circumstances to exclude application of that provision. In other words, in articulating a rationale for the

---

[1734] Former Patrol Guide § 203-08.

[1735] Eighteenth Annual Report of the Commission at 116 (Aug. 2017). The Commission examined 1225 disciplinary cases adjudicated between October 2014 and August 2016. 171 of them were false statement cases. 161 ended with some form of substantiated misconduct finding. The Commission disagreed with the penalty assessed in 45 of those cases. Of the 161, only 20 were found guilty of making an official false statement. The other 141 were found guilty of alternative provisions - conduct prejudicial (78), misleading, impeding, etc. at 114. In a follow-up review in 2019 the Commission found that only 9 of 82 false statement cases were charged as such. Three officers were terminated. (Nineteenth Annual Report of the Commission at 103).

discipline imposed, the mandatory termination provision of Patrol Guide § 203-08 to which exceptions can only be approved by the Police Commissioner appeared to have been completely ignored."

In one egregious example, flagged by CCPC in its December 2019 report, an officer was found to have provided false information in three separate investigations. On each occasion CCPC complained of inadequate discipline. By the time of the third adjudication, the officer was still able to plead guilty to making improper entries in her activity log and failing to prepare required paperwork, culminating in a forfeiture of only 20 days. CCPC opined that termination, or at least dismissal probation, should have been imposed.[1736]

## A.    False Statement - Jurisdiction

Before the 2019 Charter amendment, the making of a false statement in connection with a citizen encounter or a related CCRB investigation could have easily fallen within the category of Abuse of Authority and CCRB's FADO jurisdiction. However, for reasons unstated, the Department and CCRB agreed years ago that IAB, and not CCRB, would handle those cases. The 2012 APU-MOU specifically excluded the cases from the jurisdiction of CCRB.[1737]

Former Patrol Guide, Section 203-08, provided "Intentionally making a false statement regarding a material matter will result in dismissal from the Department absent exceptional circumstances . . . [as] determined by the Police Commissioner on a case-by-case basis." Note that both intentionality and materiality must be proven. Section 203-08 applied to statements under oath in a civil, administrative or criminal proceeding, in a sworn document, during a Department interview conducted pursuant to Patrol Guide §206-13 (Interrogation within the Department) and in an official Departmental document or report. Also included were Patrol Guide §211-14 (CCRB interviews), which requires officers to cooperate with CCRB investigations by answering interview questions.

False statement allegations have been investigated by IAB and are meant to be treated seriously, as "C" (corruption) cases. Nonetheless, in time, many others joined CCPC in arguing that the Department's enforcement of these provisions was ineffective and called for stringent enforcement of the Department' false statement disciplinary policies.

The Independent Panel wrote in 2019, "The Department should strengthen enforcement of False Statement disciplinary policies" but the Panel did not recommend specific remedies.[1738]

The 2019 Charter Revision Commission observed that "there is a clear concern that the NYPD currently does not adequately handle false statements made by police officers during the

---

[1736] Nineteenth Annual Report of the Commission at 97 (Dec. 2019).

[1737] APU-MOU, ¶ 7. In accord with the MOU, CCRB Rules (38A RCNY 1-44) provided: "If during the course of a Prosecution the CCRB becomes aware of possible misconduct falling outside its jurisdiction, such as the making of a false statement by an officer . . . [the CCRB] shall not itself prosecute such possible misconduct but shall instead immediately refer such possible misconduct to the Police Department" as Other Misconduct Noted.

[1738] The Report of the Independent Panel on the Disciplinary System of the N.Y.C. Police Department (Jan. 25, 2019), at 53.

course of investigations."[1739]   The Commission noted that the CCRB reported 139 cases of false statements to the NYPD from 2013 to 2017.   In 81 cases tracked by CCRB, the Department imposed discipline in only two.   In the remaining 79 cases, the Police Commissioner either found no wrongdoing or found the officer guilty of lesser misconduct, such as failing to properly fill out a memo book.[1740]   Further, a complete failure to file a report, such as a stop report—whether intentional or not—is handled as an "M" case and not investigated by IAB for falsity.

Finally in November 2019, in a public referendum, over Departmental and Union objection, prosecution of false statements made in the course of a CCRB investigation was included in CCRB's jurisdiction.   The Charter was amended to provide, "The board shall . . . have the power to investigate, hear, make findings and recommend action regarding the truthfulness of any material official statement made by a member of the police department who is the subject of a complaint received by the board, if such statement was made during the course of and in relation to the board's resolution of such complaint."[1741]   CCRB now examines untruthful statements made to CCRB after July 18, 2020.[1742]

While this is a welcome amendment to the Charter, areas of concern remain.

First, an officer's s full disciplinary history and personnel record are not made available to CCRB.   The veracity of an officer's statement, including whether it is a "mere denial," cannot be accurately determined without such information.   The case cited by CCPC in its Nineteenth Annual Report, described above, in which three successive cases questioning a certain officer's truthfulness, provides a prime example of the necessity of access to officers' full disciplinary history and personnel records.   None of those prior cases alleging untruthfulness were CCRB-FADO cases, so as things stand, the CCRB will not be permitted to take them into account.

The *Floyd* liability opinion expressed concern that NYPD tended to reject SQF complaints due to over-reliance upon the officer's account.   In its remedial opinion, the Court ordered increased deference to credibility determinations made by CCRB.   Examination into the truthfulness of a subject officer's testimony in an SQF case could well result in more than a substantiation of the stop/frisk complaint; it could be accompanied by a finding that the officer lied.   The Department would then review the encounter and also weigh the false testimony finding. History teaches that the result may well be a "split" determination which invites inconsistent assessments.   The CCRB may discredit an officer's account, believing that the officer is not credible and substantiate a claim of an illegal stop or search.   At the same time, the NYPD may examine the officer's account and may find the false statement allegation unsubstantiated.   The DAO and the Police Commissioner would then be presented with the CCRB's finding that the encounter was illegal or abusive based in part on an assessment against the officer's credibility and that the officer's explanation or denial was false.   up against the IAB's determination that the

---

[1739] Final Report of the 2019 New York City Charter Revision Commission, at 54.

[1740] *Id* at 54-54 (*citing* Joseph Goldstein, Promotions, Not Punishments, for Officers Accused of Lying, The New York Times (Mar. 19, 2018)).

[1741] NYC Charter § 440.

[1742] CCRB Annual Report 2020 at 17, https://www1 nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2020_Annual.pdf.

same statement by that officer was credible. Given the Department's historical reluctance to substantiate false statement findings, credibility determinations in SQF cases may become entangled in that historical reluctance.

This will become more complicated when statements from outside the CCRB interview are reviewed, raising many unanswered questions. An officer who is questioned about a stop/frisk encounter may have made statements about the encounter in IAB interviews, activity logs, memo books, stop reports, consent forms, Vehicle or Premise Search Reports, Strip-Search Reports, arrest reports, criminal court complaint reports, grand jury testimony, and/or courtroom testimony. If false, they could fall under the category of "Abuse of Authority." Will CCRB jurisdiction extend to the entire range of statements made by the officer about the encounter? If not, will CCRB have access to all those statements? Even where CCRB may not adjudicate the credibility of an outside statement, such as grand jury testimony, it will need access to all prior statements in order to adequately compare and weigh the truthfulness of any statements made in the course of the CCRB investigation. Will IAB run concurrent investigations? Will IAB or DAO "re-examine" false statement findings by CCRB to the point that a CCRB finding will be discredited or reduced to one of the lesser alternative misconduct findings?

Recently, the Department re-wrote the elements of false statement misconduct to concretize many of the practices condemned by CCPC over the years. The Charter Amendment took effect March 31, 2020. The next day, the Police Commissioner substantially revised the definition of a false statement in Administrative Guide 304-10 to codify many of the methods—repeatedly condemned by CCPC— by which the Department has avoided fulfilling its promise to terminate for making false statements.[1743] The revised Guide provisions now explicitly codify the following:

False Statements are distinguished from lesser alternatives such as Misleading Statements, Inaccurate Statements, and Impeding an Investigation.

"False Statements" are defined as requiring proof of an **intentional** presentation of a statement **known to be untrue** and which is **material to the outcome** of the investigation in which the statement was made.

"Misleading Statements" are defined to include most of the items which many observers and the CCPC would argue are false statements:

- Intentionally omitting material facts;
- Denying recall of events when a reasonable person would recall or be aware of the facts;
- Any revision of a false statement after being confronted with contrary proof.

---

[1743] Patrol Guide § 203-08, amended March 30, 2020. In June of 2021 PG § 203-08 was moved to AG 304-10, which was amended again on August 26, 2021.

"Inaccurate Statements" are defined as one known to include material information with gross negligence. [1744]

"Impeding" can include making an impeding action such as failing to produce records, but can also include false, misleading or inaccurate statements to impede. Impeding is punished as "conduct prejudicial" and not as a false statement.

In all, (1) mistakes are not considered misconduct; (2) absent materiality, there is no misconduct; (3) absent *mens rea* of either intent or gross negligence, there is no misconduct; (4) absent personal knowledge that the statement is false there is no misconduct.

Based on past experience as catalogued by CCPC, one can predict that many false statements will not survive this winnowing process and will instead be reduced to lesser alternative forms of misbehavior carrying less severe penalties.

While CCRB is not necessarily bound to the new classification system, the Board is cognizant of the fact that the Police Commissioner will review its findings and apply the revised definitions in AG 304-10. At this time, there have been a few recommendations to the Police Commissioner from CCRB under the new policy, but CCRB only recommends Charges and Specifications, and it is unclear what the Police Commissioner will do with those recommendations.

## B.    CCRB Examination of Untruthful Statement Allegations

CCRB has begun to examine statements under the revised Charter. To some extent the Board has adopted the new NYPD classification system. It subdivides "Untruthful Statement Allegations" into the categories of "False Official Statement," "Misleading Official Statement," Inaccurate Official Statement," and "Impeding an Investigation." This corresponds to the four categories in the Disciplinary Penalty Guidelines System.

CCRB has explained their subdivisions as follows:

> Untruthful statements – statements made by officers shown to be untruthful by evidence gathered during the course of an investigation. A false official statement is knowingly false, rather than merely inaccurate. A misleading statement is when an officer intentionally tries to misdirect an investigator by omitting facts they would be reasonably expected to know or remember. An inaccurate official

---

[1744] "Gross negligence" in a civil context, generally means "conduct that evinces a reckless disregard for the right of others or 'smacks' of intentional wrongdoing." *Colnaghi USA v. Jewelers Protection Servs.*, 81 N.Y. 2d 821 (1993). In criminal law, "[a] person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto." Penal Law 15.05.

statement does not require the officer to intend to deceive but may include material statements so incorrect as to constitute gross negligence.[1745]

### i. False Statements Under the Disciplinary Guidelines

The Disciplinary Guidelines and the 2020 amendments to the Patrol/Administrative Guide replaced a simple one-half page statement banning intentional false statements and replaced it with subcategories and qualifiers. Without repeating them in the entirety, their result is a matrix that essentially divides the inquiry into four categories:

1. Intentionally Making a False Official Statement
   - Mitigated Penalty: Forced Separation
   - Presumptive Penalty—Termination

2. Intentionally Making a Misleading Official Statement
   - Mitigated Penalty: 20 Days
   - Presumptive Penalty: 30 Days + Dismissal Probation
   - Aggravated Penalty: Termination

3. Making an Inaccurate Official Statement, or Causing Same to be Made by Another
   - Mitigated Penalty: 5 Days
   - Presumptive Penalty: 10 Days
   - Aggravated Penalty: 15 Days

4. Impeding an Investigation
   - Mitigated Penalty: 20 Days
   - Presumptive Penalty: 30 Days + Dismissal Probation
   - Aggravated Penalty: Termination

Multiple statements may be charged separately if made in separate interviews. If made in one interview and about the same fact, they may be charged as one false statement.

The Disciplinary Guidelines spends three and one-half pages explaining its application to false statements. The net effect of the Guidelines, when combined with the 2020 revision to the Patrol Guide, is to add elements needed to prove falsity, defenses to prosecution, and lesser alternatives to finding a false official statement. In sum, Commissioner Safir's call for a presumption of termination will become more difficult to implement. His stated policy— a false statement carries automatic termination absent exceptional circumstances— has been reduced to a rule where termination is presumed, but not required, and only subject to the following criteria limitations :

- It must be an "intentional" statement that the officer knows is untrue.
- It must be an asserted falsehood about a "material" fact, i.e., one that is "essential to the determination of the issue" and would result in a different decision or outcome.

---

[1745] CCRB Semi Annual Report - 2022 at 14. https://www.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2022_semi_annual.pdf.

- If it merely "misdirects" the factfinder, that is a "misleading statement" which does not carry presumptive termination.
- Merely "intentionally omitting a material fact or facts" is a misleading statement, not a false statement.
- The declarant must "know" the statement is false. It is not enough that the declarant should have known the statement was false.
- If the declarant makes a statement that he or she the declarant knows to include incorrect material information, but there is "no intent to deceive," " the statement is "inaccurate" and not false—even if the statement is grossly negligent or "causes a material variation."
- Improperly influencing another witness to make a false statement may constitute "impeding an investigation," which does not call for termination unless aggravating circumstances are found.
- Intentionally making statements that "misdirect or misinform the investigator . . . or undermine the goals of the investigation" may constitute "impeding an investigation" but does not automatically qualify as making a false statement.

If APU or IAB satisfied the criteria above, an additional set of factors may be used to mitigate the penalty or reduce a false statement finding to one of the lesser alternatives:

- A false general denial is not a false statement. But if the officer, "after being afforded the opportunity to recollect, intentionally denies specific facts that are proven by credible evidence to have occurred" a denial may be a false statement.
- An officer may retract an intentionally false statement during an interview or "session" or within 24-hours after a PG§ 206-13 interview.

Perhaps the largest "loophole" in the Disciplinary Guidelines is in the paragraph denominated "Mistakes."[1746] There, "errors" in filed reports or other statements are considered clerical mistakes if they have little or no effect on the overall intent of the statement. Again, a "material variation" is not a false statement if "lacking in willful intent."

False stop reports are another easy way for SQF misconduct to be veiled. PG § 203-08 had defined false statement to include "lying in an official Department document or report." The amended Administrative Guide section refers only to "written statements made in a **sworn** document, including affirmations."[1747] And the Disciplinary Guidelines further limits the scope to statements "written or spoken, during an official investigation."[1748] This would seem to exclude stop reports which were intentionally falsified to mis-describe a stop encounter.[1749] While the amended Administrative Guide section retains a minor infraction for failure to file an accurate stop

---

[1746] Disciplinary System Penalty Guidelines at 31-34. Also, in AG § 304-10 ("Mistakes distinguished")

[1747] AG 304-10 at 2 (emphasis added).

[1748] Matrix at 29.

[1749] Disciplinary Penalty Guidelines at 43. "Fail to Document an Investigative Encounter" carries a penalty range from three to ten penalty days. This is included in the section of Violations of Department Rules and Regulations with the heading "Presumptive Penalties . . . Adjudicated by Charges and Specifications. "This would appear to imply that false or missing Stop Reports uncovered in the precinct by audit or otherwise do not carry presumptive penalties.

report, intentionally lying in a report to cover up misbehavior does not seem to be included any longer.

Time will tell whether the gaps written into the Disciplinary Guidelines and the Administrative Guide will impede successful substantiation of cases where an officer has falsified reports and answers in interviews, persuaded others to distort or resist, or omitted necessary information with an intent to deceive. CCRB now plays a partial role in ferreting out untruthful statements. Ultimately, the question will be whether CCRB will adhere to the many restrictions set by the Police Commissioner in the Administrative Guide and Disciplinary Guidelines described above. If not, how will conflicting determinations by CCRB and DAO be reconciled?

Under the Guidelines, the specific sub-category of Untruthful Statement includes a significant difference of available penalties. For example, an intentional false official statement requires termination or forced separation, while an inaccurate statement allows for penalties between five to 15 days.

In 2021, CCRB panels reviewed 31 allegations falling in the general category of untruthful or misleading. The Board substantiated 24 allegations and was unable to determine the remaining seven. [1750]

- 14 were found to be False Official Statements[1751]
- 7 were found to be Misleading Official Statements[1752]
- 1 was found to be an Inaccurate Official Statement[1753]
- 2 were found to Impede an Investigation[1754]

The Police Commissioner has yet to act upon those findings. It is too early to tell if the Police Commissioner will impose presumptive penalties or not in each of the 24. Of importance to this Report would be the overlap between a finding of untruthfulness and SQF findings. At this point in time, the panels also found untruthfulness in four of the of the first 46 substantiated SQF cases.

## ii.    False Statements in SQF Cases Investigated by CCRB

Critical to SQF compliance is the ability to demand candid answers from officers in interviews. Failures to substantiate are frequently the product of a complainant's word against the officer's. Yet the Matrix eviscerates any need for an officer to be forthcoming or careful in his testimony by declaring, "Erroneous statements, lacking in willful intent, and not so unreasonable as to be considered gross negligence are not a basis for finding misconduct."[1755] Knowingly making a false statement, i.e. making a statement and knowing that it is not true, should be

---

[1750] CCRB Annual Report 2021, at 31.

[1751] Presumptive Penalty:  Termination

[1752] Presumptive Penalty:  30 days + Dismissal Probation

[1753] Presumptive Penalty:  10 days

[1754] Presumptive Penalty:  30 days + Dismissal Probation

[1755] NYPD Disciplinary System Guidelines at 31.

sufficient to constitute misconduct; knowledge that the statement is false is all that should be are required.

The potential problem here is the meaning of "willful intent."  If all that were meant by the term was that CCRB needs to prove that the officer intentionally made a statement knowing that it was false, that would be sufficient.  However, generally speaking, intentionality requires proof beyond wrongful knowledge.  Intentionality requires "a conscious objective . . . to cause [the] result or to engage in such conduct."  "Willful intent" has been interpreted to require an intent to violate the applicable statute or regulation.

For example, N.Y. Penal Law § 210.40 (making an apparently sworn false statement) requires proof, not only that a false statement was knowingly made, but also that it was "made with the intent to mislead a public servant in the performance of his official functions."  Thus far, the Department has not indicated that it will require proof of an intent to mislead the CCRB investigator.  But, if not carefully monitored, it will be too easy for IAB investigators or DAO to find that a false statement was made, knowing it was false, but without an intent to deceive, thus exonerating the officer.

## XIII.  Lawsuits And Civil Claims Against Officers

Another check on police misconduct, aside from disciplinary investigations by CCRB, NYPD, or any of the four  oversight agencies,[1756] is the role played by the Comptroller in claim settlements and the courts through civil litigation.  In some cases, a complaint is filed with CCRB or NYPD and is also part of a civil claim or litigation.  Often, civil claims or lawsuits are filed without a complaint to CCRB or NYPD.  Comparatively speaking, more complaints against the police are filed with the Comptroller than with CCRB.  Precise comparisons cannot be made because of overlap in some cases and the fact that classification systems vary.  But for an overall sense of proportion the following look at filings in 2018 is helpful:

- 4,645 complaints were received and retained by CCRB;[1757]
- 1,234 complaints were fully investigated by CCRB;[1758]
- 6,491 civil complaints against the Department were filed with the Comptroller;[1759]
- 3,079 lawsuits were filed in state and federal courts alleging police misconduct.[1760]

---

[1756] Discussed below:  the Inspector General for the NYPD, the Commission to Combat Police Corruption, the Commission on Human Rights and the Attorney General's Law Enforcement Misconduct Investigations Unit.

[1757] Roughly 50% of complaints brought to CCRB each year do not fall within its FADO or personal jurisdiction. Received and retained cases are those which survive initial screening for jurisdiction.

[1758] Most retained cases end up being diverted due to truncation, mediation, lack of witness cooperation, etc.

[1759] This includes police action tort cases, which can include an injury, and civil rights claim.  Roughly one-third (1,541) of the complaints filed with the Comptroller against police are for civil rights violations without an alleged physical injury. Some of the 6,491 complaints with the Comptroller are settled without litigation, and some continue as filings in court. The number here includes both - cases which were settled pre-litigation and those that went on to litigation.

[1760] These include cases which were filed with the Comptroller but were not settled pre-litigation. This includes false arrest, malicious prosecution, excessive force, false imprisonment and assault/battery claims.

In 2017-2018, the City settled 2,027 police misconduct lawsuits at a cost of $194,171,176. One might think that the bulk of the claims were for misuse of force, but in fact there were only 1,379 allegations of use of force or assault and battery, while there were 2,516 allegations of malicious prosecution, false arrest, and false imprisonment.[1761]

Many lesser claims are settled with the Comptroller before litigation, usually for relatively small amounts of money. One could argue that some of those claims were of dubious merit and were settled for their nuisance value. The same assumption should not be made for filings in court. A minority of the settlements and judgments in court are settled for seemingly trivial compensation. In 2018, for example awards for police misconduct were as follows:

| Judgment/Settlement for CY 2018 | Total |
|---|---|
| $250,000 & Greater | 49 |
| $100,000 - $249,999.99 | 80 |
| $50,000 - $99,999.99 | 136 |
| $25,000 - $49,999.99 | 212 |
| $5,000 - $24,999.99 | 357 |
| $1,000 - $4,999.99 | 62 |
| Below $1,000 | 6 |
| GRAND TOTAL | 902 |

As early as 1992, then-Comptroller Elizabeth Holtzman issued a "Report on Police Department Monitoring of Lawsuits and Claims of Misconduct" in which she advised NYPD to "establish a data base which includes notices of claims and civil actions as well as civilian complaints and correlate the data from all three sources" and "the data should be organized by such variables as precinct, commander, type of conduct, characteristics of officers and complainants and any factors which may be significant in analyzing problems in police/civilian relations."[1762]

Seven years later, Comptroller Alan Hevesi renewed the call, writing, "[a]lthough most of these claims are settled by the Comptroller's Office and Corporation Counsel without a direct admission of guilt on the part of the police officers(s) involved, there is enough evidence collected to convince the City that the plaintiff has a serious case. The police department should analyze these settled claims and take steps to review the officers' performance and propensity to commit acts of excessive force."[1763] He went on to complain, "[t]here is a total disconnect between the

---

[1761] NYPD-OIG, 2019 Assessment of Litigation Data Involving NYPD at 12 (Apr. 30, 2019), https://www1.nyc.gov/assets/doi/reports/pdf/2019/Apr/13LitData_pressrelease_report_43019.pdf.

[1762] Repeated requests to the Comptroller's office to obtain a full copy of Comptroller Holtzman's report have been unsuccessful. References to the report can be found in the Written Testimony of the NYC Affairs Committee of the New York City Bar before the City Council Committee on Oversight and Investigations, Hearing on Int. 0119-2014, May 5, 2014, at https://www2.nycbar.org/pdf/report/uploads/20072720-SupportforRequiredQuarterlyReportsfromN YPDInspectorGeneral.pdf. ("City bar testimony").

[1763] Id. at 2 (K. Flynn, Record Payout in Settlements against Police, New York Times (Oct. 1, 1999). See Statement of the New York Civil Liberties Union Before The New York City Council Committee on Government Operations Regarding Int. No. 1025: Reporting by the New York City Corporation Counsel on Civil Damage Claims Related to

settlements of civil claims and police department action; such matters are ordinarily not even noted in an officer's personnel file."

NYPD has traditionally taken the position that the fact "that a lawsuit has been filed does not mean that officer misconduct has occurred or will be proven. The majority of lawsuits involving the NYPD are settled, without admission of fault or liability."[1764] In other words, the officer or Department may or may not have been at fault. [1765]

As one might expect, "nuisance suits" settled at lesser amounts to avoid the cost of litigation predominate. However, the remainder is not insignificant. Over the period 2010 to 2020, NYC paid out $1.779 billion. Over $687 million of that was for cases settled in an amount under $100,000.[1766]

NYPD's argument is justified if one were to look only at filings, without further analysis. Holtzman and Hevesi called for correlation and a deeper look into the underlying merits of claims. Beginning in 2015, efforts have been undertaken to separate the wheat from the chaff. Mayor de Blasio announced on January 30, 2015, that the City would no longer settle frivolous lawsuits.[1767] And since 2015, NYPD's Legal Bureau has conducted litigation data analysis through its Police Action Litigation Section (PALS).[1768] NYPD no longer looks at filings alone. "PALS relies on merit-based litigation information as the basis of its advice and counsel to the agency, not mere filing data."[1769] Without external independent analysis, claims of merit assessment will continue to be questioned. "Merit" is in the eye of the beholder.

---

Police Misconduct, December 11, 2009 (available at: https://www.nyclu.org/en/publications/reporting-new-york-city-corporation-counsel-civil-damage-claims-related-police)

[1764] NYPD Response to OIG "2019 Assessment of Litigation Data Involving NYPD" at 5 (July 29, 2019), https://www1.nyc.gov/assets/doi/oignypd/response/NYPDResponse%20_LitDataReport_72919.pdf.

[1765] Comptroller Alan Hevesi memo (Apr. 12, 1999), as reported in a July 1, 2002, Joint Committee Report of the NY City Affairs Committee and the Criminal Justice, Police Reform & Civil Rights Committee of NY City Bar Association, "The Failure of Civil Damages Claims to Modify Police Practices and Recommendations for Change."

[1766] Keith Alexander, Steven Rich, & Hannah Thacker, The hidden billion - dollar cost of repeated police misconduct, The Washington Post (Mar. 9, 2022), https://www.washingtonpost.com/investigations/interactive/2022/police-misconduct-repeated-settlements/?itid=hp-top-table-main.

[1767] During a January 30, 2015, press conference, the Mayor announced that the City will no longer settle "frivolous" suits. The same day, First Deputy Mayor Shorris made the same announcement in a letter to several police unions about changes in the City's litigation strategy for lawsuits against NYPD. Letter from Anthony E. Shorris, First Deputy Mayor to Mr. Ray Richter, President, Captain's Endowment Association et al. (Jan. 30, 2015).

[1768] PALs was created in conjunction with increased staffing at the Law Department. The aim was to provide an "enhanced defense of officers." NYPD Letter to Mayor de Blasio at 4 (Aug. 7. 2018), 6. https://www1.nyc.gov/assets/doi/oignypd/response/LitigationDataResponse_FINAL_80718.pdf. As well the Risk Assessment Information Liability System (RAILS), the Performance Analysis Section, the Early Intervention System (EIS) and the Civil Lawsuit Monitoring Program, all created within the last decade purport to incorporate litigation data in measuring performance and the need for remedial measures.

[1769] *Id*. at 5.

In 2017, the Comptrollers' bid for correlation was further bolstered by the Association of the Bar for the City of New York in testimony supporting proposed legislation:[1770]

> The defendants usually do not admit liability in a settlement, and cases may be settled merely upon an estimate of the risks involved in the litigation, rather than because of the intrinsic merits of the claim.  Nevertheless, it appears to be the case that the City and its Police Department (NYPD) can make judgments about the behavior of individual officers based on their investigations of cases, and that more general conclusions could be drawn from a range of cases.  A memo of the facts is made as a basis for a recommendation of settlement in a tort case, and as a result, the City usually does have an informed opinion concerning the actual liability of the officers and the City from its own investigation of the case.  Narrative accounts of cases, based upon sometimes undisputed facts, both by the Comptroller and in news accounts, indicate that some very serious abuses have passed through the tort system without any action by the NYPD.  For example, in 1995, the city paid $16.6 million in a case where a man was left a quadriplegic after police allegedly slammed his head into a door with such force that it crushed his spine.  The police officers involved were apparently never disciplined.[1771]

While it is clear that a direct conclusion, without analysis, should not be made between a settlement or verdict in litigation and an individual officer's misconduct, the Bar Association urged nonetheless that "there are factors that can be used to separate cases which may be frivolous or of relatively little merit" if NYPD were to look at:  "the level of culpability of the officer, some evidence of a pattern of conduct of an officer or group of officers, or a precinct . . . [and for] corroborative evidence of misconduct."[1772]

The testimony concluded:

> Then, as now, the NYPD should be giving more attention to the civil cases brought against police officers as part of its routine job performance and discipline reviews. Requiring the reporting called for in Int.  1192 should yield immediate benefits, including:  (1) allowing the NYPD to identify those officers with a possible propensity for violating and/or disregarding New Yorkers' civil rights; (2) notifying and deterring repeat offenders by marking their personnel files; and (3) assisting the NYPD in unearthing practices among officers or department-wide policies that precipitate recurring misconduct.  [1773]

In time, the Comptrollers' proposals became the impetus for Local Law 166 of 2017, which enacted NYC Administrative Code § 7-114 requiring posting of civil actions.

---

[1770] Intro 0119-2017 which was subsequently enacted as LL 166/2017.

[1771] City bar testimony, *supra* at 4.

[1772] *Id* at 4.

[1773] *Id.* at 2.

Effective September 2017, the Administrative Code was amended to require the Law Department to post a list of civil actions filed against the Department or officers containing allegations of "improper police conduct" which is defined to include "claims involving the use of force, assault and battery, malicious prosecution, or false arrest or imprisonment."[1774]  The listing is for filings of wrongful police action in both state and federal Court.  The law requires listing for each action:

> [T]he court in which the action was filed; (ii) the name of the law firm representing the plaintiff; (iii) the name of the law firm or agency representing each defendant; (iv) the date the action was filed; and (v) whether the plaintiff alleged improper police conduct, including, but not limited to, claims involving use of force, assault and battery, malicious prosecution, or false arrest or imprisonment; and . . . if an action has been resolved:  (i) the date on which it was resolved; (ii) the manner in which it was resolved; and (iii) whether the resolution included a payment to the plaintiff by the city and, if so, the amount of such payment.

The posting is helpful in that it can be searched by officer name and tax ID as well as by other common signals.[1775]  It is somewhat ironic that this database has been in place for several years while the controversy over § 50-a raged on.  The database gives full exposure to the names and ID numbers of officers and is readily searchable.  With a little effort (and some PACER[1776] fees), the cases may be researched on court electronic filing sites, at which time detailed allegations in a complaint can be uncovered.  In fact, it is somewhat of a further irony that one can easily read unproven allegations in the filed complaint and motions, while the final settlements (many more are settled than decided after trial) are usually listed without details as to what misconduct, if any, was adjudged or conceded.  Thus, while disclosure of unsubstantiated and pending claims at CCRB is highly contentious and the subject of litigation,[1777] the Law Department's posting leads to disclosure of unredacted and unproven claims more readily than to findings of misconduct.

In more recent posting on the Law Department website, tax IDs have been deleted, making it more difficult to search records with precision.  This portends a desire to limit public access to tax IDs.  At the same time, the Department has asserted in litigation seeking access to disciplinary records that a FOIL request by the public requires identification of the record by tax ID.  Simply put, the Department's argument was that a record could not be obtained in a FOIL request unless the requester knew the tax ID of the officer, while at the same time acknowledging that "such identifying information is not publicly available."  This "catch 22" proposition was soundly rejected by the Court.[1778]

---

[1774] Local No. Law 166 (2017) adding NYC Admin. Code § 7-114. (Intro 0119-2014, J. Williams).

[1775] The database may be accessed at https://www1.nyc.gov/site/law/public-resources/nyc-administrative-code-7-114.page.

[1776] Public Access to Court Electronic Records.

[1777] E.g., *UFO, supra.*

[1778] *NYP Holdings v. NY City Police Dep't*, 77 RCNY. 3d 1211 (A), Index 159132/2021 (Sup. Ct. RCNY Cty. Dec. 6, 2022).

A.        Potential Use of Civil Case Information in Disciplinary Proceedings

NYPD has acted to track indicators of potentially at-risk officers in its Early Intervention System (EIS) and through its Risk Assessment Information Liability System (RAILS).[1779] However, the EIS system is divorced from the disciplinary system. The Department does not coordinate an analysis of civil liability with disciplinary investigations. The only time they intersect is when civil litigation is the cause of delay in, or even closure of, a disciplinary proceeding. In practice, disciplinary investigations or adjudications are, from time to time, closed on account of pending litigation. When CCRB closes a case due to pending litigation, it is because "the complainant or victim chose not to cooperate with the investigation on the advice of counsel."[1780] Witnesses, victim/complainants, and subject officers may be reluctant to participate in a CCRB or IAB investigation while either civil or criminal litigation is pending. On occasion, the Police Commissioner will administratively close a disciplinary proceeding which has gone to litigation. This could be either because of a failure of witness cooperation or simply as a matter of discretion on the part of the Department. On the other side of the coin, civil practitioners, if confident of substantiation, may delay litigation until a finding against the officer is made and then seek to present it in court.

On occasion, disciplinary proceedings are closed "pending litigation" when the litigation is unrelated to the investigation that was closed. This situation is unfortunate since allegations of new misconduct do not seem sufficient reason to abandon earlier claims of misconduct, other than to shield the City from adverse material that might be used in the later litigation.

As just one example, take the case of Police Officer ██████████. On May 29, 2020, during a Black Lives Matter protest, he was recorded on video shoving a 20-year-old woman to ground. Officer ██████ was suspended. A review of his disciplinary history revealed five separate complaints to CCRB against him in his five-year career with the force. One of those complaints, alleging an illegal vehicle search in 2019, was open until it was closed pending litigation in the new case.[1781] If the two case are unrelated, it serves no purpose to close the 2019 investigation. The new charges, if supported by evidence, should be considered when reviewing the old case. The new case is not a reason to drop the pending case.

Along with enactment of Section 7-114 (posting of civil actions), the City Council enacted Section 808 of the City Charter. That section directed six agencies: the inspector general, the comptroller, the Department, CCRB, CCPC, and CCHR to work together to collect and evaluate information regarding allegations or findings of improper police conduct and to develop recommendations relating to discipline along with Training, monitoring and related policies.[1782] In

---

[1779] The status of RAILS is currently under review at this time.

[1780] 38-A RCNY 1-33 (e)(11).

[1781] CCRB # ██████; Case No. 20-cv-6070 (E.D.N.Y.).

[1782] N.Y.C. Charter § 808 (b). The inspector general for the police department shall, working with the law department, the comptroller, the police department, the civilian complaint review board, the commission to combat police corruption, and the commission on human rights collect and evaluate information regarding allegations or findings of improper police conduct and develop recommendations relating to the discipline, Training, and monitoring of police officers and related operations, policies, programs, and practices of the police department, including, but not limited

particular, as coordinator and reporter of the group, OIG-NYPD was to consider patterns of actions and claims, and to make comparisons of closed cases listed in § 7-114 with any incidents alleged to have given rise to actions and claims.[1783]  Further, the OIG-NYPD was to report on steps taken by the police department in response to civil actions and claims including investigations and disciplinary actions.

In April 2018, OIG-NYPD published a report, "Ongoing Examination of Litigation Data Involving NYPD" ("Examination").  The Examination was in response to section 808(b) of the Charter.  OIG looked at 541 lawsuits and claims as a representative sample of litigation.  The Examination was limited by NYPD, which led to the conclusion that "DOI cannot state whether NYPD is currently conducting the type of analysis described in [the] Report."[1784]

> [W]hen DOI sought certain information, NYPD withheld it on the basis of legal privilege, although such privileges do not bar disclosure of NYPD information to DOI.  When DOI attempted to interview current NYPD lawyers about the NYPD unit that monitors litigation, NYPD refused to make NYPD lawyers available to DOI, despite DOI's legal mandate and despite NYPD being informed that the interviews would cover general questions at the unit (as opposed to covering specific lawsuits).[1785]

NYPD responded that it had made information and employees available, and that the Examination was "hardly accurate."[1786]

As mentioned, the Department claims to use a "merit-based" analysis rather than merely looking at allegations to weed out "baseless litigation" in its use of data "to adjust policy and training, identify officers in need of intervention and reduce the number of lawsuits."[1787]  But allegations, even if not credited by NYPD or the Law Department are signals which should be accounted for, not ignored.  As the OIG noted, "such data [has] value."[1788]  OIG's examination continued, "the Department should also consider ways to analyze data from all filed lawsuits so that meaningful trends can be identified," citing similar efforts in Los Angeles and Seattle.[1789]  In its March 2022, Eighth Annual Report, the OIG persisted notwithstanding NYPD resistance,

---

to, any system that is used by the police department to identify police officers who may be in need of enhanced Training or monitoring.

[1783] *Id.* § 808 (b)(1),(2).

[1784] Examination at 6 n.9, https://www1.nyc.gov/assets/doi/reports/pdf/2019/Apr/13LitData_pressrelease_report_43019.pdf.

[1785] *Id*. at 6.

[1786] NYPD letter to Mayor de Blasio, at 9 (Aug. 7. 2018), https://www1.nyc.gov/assets/doi/oignypd/response/LitigationDataResponse_FINAL_80718.pdf.

[1787] *Id.* at 2.

[1788] NYPD-OIG, 2019 Assessment of Litigation Data Involving NYPD at 10 (Apr. 30, 2019), https://www1.nyc.gov/assets/doi/reports/pdf/2019/Apr/13LitData_pressrelease_report_43019.pdf.

[1789] *Id*. at 19.

asserting, "NYPD's analysis is too limited . . . there is value in a broader Department-wide analysis of litigation and claims data."[1790]

Even when NYPD finds a case to be "meritorious," there is no mention of potential use of the case in disciplinary cases. The OIG-NYPD examination and the Department's response to Local Law 166 were disappointing in that regard. Charter § 808 called for "disciplinary recommendations" and neither addressed that issue. As one goes through individual case files, it is clear that some officers have a history of disciplinary investigations and civil filings which intertwine. An investigated incident may also be subject of a civil claim. Even when there is no specific overlap for a particular encounter, multiple allegations of similar conduct or disregard of citizen rights and privileges tend to repeat themselves in short time spans where officers are confronted with CCRB investigations, IAB investigations, Comptroller claims, and lawsuits all contemporaneously. Pending litigation is used, from time to time, to discontinue a disciplinary action, but there is no indication that the Department integrates the information in evaluating misconduct allegations or discipline.

More could be done to make use of the information contained in lawsuits and claims to the Comptroller:[1791]

- As is demonstrated in some of the case studies catalogued elsewhere in this Report, patterns of behavior by one officer or a group of officers become readily identifiable in the allegations of a string of what might otherwise seem to be unconnected civil actions and complaints.[1792]
- Civil filings, depositions, and discovery as well as GML 50-h[1793] hearings could be used to aid CCRB, IAB, and DAO in reducing the number of unsubstantiated cases where evidence is otherwise insufficient, or in identifying false or misleading statements given to CCRB and IAB investigators.[1794]

---

[1790] OIG-NYPD, Eighth Annual Report, March 2022 at 25-26. https://www1.nyc.gov/assets/doi/press-releases/2022/March/08OIGNYPDAnnualRpt_Release_3312022.pdf.

[1791] *See*, *generally*, Joanna C. Schwartz, *What Police Learn from Lawsuit*s, 33 Cardozo L. Rev. 841 (Feb. 2012).

[1792] NYPD is reluctant to look at cases it screens out as meritless for trend analysis persists. The NYPD-OIG had urged, in its April 2018 examination of litigation data, that the Department look for precinct or unit level patterns and trends in its internal reports for use by leadership. As recently as April 2021, the Department has continued to reject the call on the ground that "such a report will not provide any benefit and will instead open NYPD up to unnecessary litigation." DOI, Seventh Annual Report at 21 (Apr. 2021), https://www1.nyc.gov/assets/doi/reports/pdf/2020/OIG NYPDAnnualRpt_4012021.pdf

[1793] Examination of claims, NY General Municipal Law § 50-h. A claimant may be required to give testimony describing the basis for claims against the City. "The transcript of the record of an examination shall not be subject to or available for public inspection, except upon court order upon good cause shown, but shall be furnished to the claimant or his attorney upon request." CCRB complainants could, if they choose, voluntarily turn them over to CCRB investigators. It is not clear if the Comptroller shares the interviews with the Law Department or NYPD prior to commencement of litigation.

[1794] One published opinion addresses CCRB's ability to access transcripts of examinations before the Comptroller in order to gather more information during an investigation. In *CCRB v. Office of the Comptroller*, 33 N.Y.S.3d 675 (N.Y. Cty. Sup. Ct. 2016), the Court ruled that the documents could be obtained, after in camera review, if material to CCRB's investigation.

- Transcripts from § 50-h hearings and civil depositions or filings could be presented as evidence in trials before the DCT. The Rules of the NYPD permit hearsay in the case of a witness' absence.[1795] Today, an unfortunate number of cases fail or are negotiated down due to non-appearance of witnesses.

- Corporation Counsel's decision to deny representation to, or deny indemnification for, an officer is a signal that either a conflict exists, or counsel has determined that the officer was acting in violation of NYPD rules or regulations. The basis for any determination to deny indemnification should be analyzed in any disciplinary hearing and considered by the Police Commissioner as he weighs the evidence presented to her.[1796]

- General Municipal Law § 50-k also precludes indemnification where "the injury or damage resulted from intentional wrongdoing or recklessness on the part of the employee." Since NYPD's Disciplinary Guidelines look to intentional or reckless mens rea in assessing penalties, inconsistencies in Corporation Counsel and Police Commissioner determinations in this regard should be analyzed, if not reconciled.

- Civil filings often bring to light acts of misconduct which were not reported to CCRB or IAB.

- Litigation exposes a wealth of information which the ordinary CCRB or IAB investigation will not uncover.

- Transcripts and reports in civil proceedings can expose misleading or untruthful statements given in CCRB or IAB investigations.

A civil filing listed on the Law Department's website may match a claim filed before CCRB or IAB. Reconciling them is a laborious process, sometimes available to the Monitor Team but not the public. The Monitor Team is given access to certain Departmental matrices and files which identify subject officers by name or tax ID.[1797] In particular, the vast number of profiling complaints received by IAB can be reviewed and matched with civil complaints listed on the Law Department's site. Since none of the profiling complaints against a UMOS have been substantiated, it is illuminating to see if profiling complaints or CCRB allegations of force, discourtesy or slurs went unsubstantiated while settlements or judgments for the same encounter or other roughly contemporaneous encounters were resolved by the Law Department.

---

[1795] 38 RCNY § 15-04 (e)(1) ("Hearsay shall be admissible and may form the sole basis for making findings of fact, when consistent with law.").

[1796] It could be argued that Corporation Counsel's decision-making process in this regard is privileged and cannot be shared with the Police Commissioner. Without accepting that claim, there is no reason CCRB, DAO or even the Police Commissioner could not use the decision to deny indemnification as a signal to dig deeper into the facts of the case.

[1797] Tax IDs are a unique number given to each officer. They are invaluable identifiers when name changes, spelling, assignments and other variables arise. The Law Department is required to update its website every six months and to identify the named defendants. The law does not specifically require a listing of tax IDs, but they are commonly used to more accurately search for records regarding a particular officer. Unfortunately, in recent postings, whether by design or inadvertence, the Department has begun to omit tax IDs from filings, leaving the column entry blank. In its 2013-2017 posting, only 450 of 11,005 (4%) filings failed to include a tax ID. In its most recent posting for 2021, 3,096 of 13,869 (22%) filings omitted the tax ID. The failure rate has increased. 407 of 1,149 (35%) postings of cases filed in 2020 failed to include the tax ID. Since DAO, IAB, CCRB, and other units use their own distinctive numbering system for complaints, tax IDs are necessary adjunct to any meaningful research.

Take for example, the case of Sgt. ███████████ of the 101st Precinct.  Sgt. ██████ has been a member of the force for almost sixteen years.  He was promoted to Sergeant in 2015.  During that time, he has been the subject of eight CCRB complaints, mostly for discourtesy, slurs, improper searches, and unlawful use of force.  None have been substantiated. In 2018, two serious sets of allegations were each "closed pending litigation."  On January 11, 2018, he was one of several officers alleged to have wrongfully stopped an employee of Enterprise Rent-A-Car as the driver was entering a car wash.  According to a complaint filed in the Eastern District of New York,[1798] the driver was stopped "because I'm black."  After some exchange of words, Sgt. ██████ allegedly "tased" him several times, cursed at him, assaulted him, denied him medical treatment, and falsely arrested him.  The arrest charges against the complainant were dismissed after an Adjournment in Contemplation of Dismissal was granted.  The driver lodged a complaint with CCRB, alleging discourtesy, wrongful use of force and wrongful tasing.  A profiling complaint was also logged by IAB.

The settlement, in and of itself, should not necessarily require re-opening of the earlier disciplinary non-findings.  But to put the three related matters[1799] (CCRB investigation, profiling investigation, and civil disposition) in perspective and context, one needs to look at the entirety of disciplinary matters involving the officer that were simultaneously "in the air."  In the short period of time between the incident (Nov. 11, 2018) and settlement (Dec. 21, 2019), and while the civil case was pending, a number of other "misconduct" allegations against Sgt. ██████ were concurrently being investigated or closed.

- A second complaint alleging that ██████ supervised an improper stop, frisk and discourtesy in March 2017 was pending.  ██████ was ultimately exonerated.
- A third complaint that ██████ wrongfully refused to identify himself in another encounter in August 2018 went unsubstantiated.
- A fourth complaint that ██████ wrongfully used force and a taser against a second civilian in November 2018 was also Closed Pending Litigation.
- A fifth complaint that ██████ was discourteous to yet another civilian in May 2019 ended with exoneration.
- The profiling complaint for the January 2018, incident was investigated by IAB and unsubstantiated.

As is typical in civil litigation, the details of a settlement are not on file with other court documents, so it is impossible to assign any particular significance to the mere fact that the case was settled.  It cannot be said, by dint of the City's payout of $30,000 alone, that the CCRB complaint or IAB's profiling complaint should have been pursued rather than abandoned or left unsubstantiated.  However, it is noteworthy that a number of citizen encounters generated a similar complaints in the same two-year period, while the only complaint ending with consequence was the court filing.  In part, because two cases were "closed pending litigation," Sgt. ██████ went free of discipline, two complaints went unexamined, and, in the eyes of the Department, he has no disciplinary history.  His online "officer profile" with NYPD, under "Disciplinary History" shows

---

[1798] ██████ *v. City of New York*, 19-cv-2076, Dkt No. 28 (E.D.N.Y.)

[1799] It may be there were four, not three, investigations.  Protocol should have called for a force investigation by IAB or FID as well.  It is unknown if a force investigation was conducted, or the result if one did take place.

"no applicable entries"[1800] and his "CCRB history" also shows no substantiated cases, although he does have two listed force complaints which are "closed pending litigation."

### B.        Identifying Civil Claims of Police Misconduct

NYC Administrative Code § 7-114 ("Civil Actions Regarding the Police Department") requires the Law Department to post "for each such action . . . whether the plaintiff alleged improper police conduct, including, but not limited to, claims involving use of force, assault and battery, malicious prosecution, or false arrest or imprisonment."   Accordingly, the site lists the four categories in columns with a yes ("Y") or no ("N") for each of the four kinds of claims.

The posting is unreliable at best.  As one example, in the posting of the filing against Sgt. ▮▮▮▮▮▮, described above, the Law Department's four columns ("Use of Force Alleged?" "Assault/Battery Alleged?"  Malicious Prosecution Alleged?" and "False Arrest/Imprisonment Alleged?") are all marked with an "N."  Similar failures to comply with the Code or to accurately report the allegations in the complaints are abundant.[1801]  A statistical analysis would be a time-intensive and expensive proposition, but it is this reviewer's anecdotal experience that the column entries commonly fail to reflect the filings in court.  "NNNN" for the four columns means that neither force, assault, malicious prosecution nor false arrest were alleged in the complaint.  The online posting  for July 2021 lists 11,605 of 13,869 "NNNN" cases.  Even a superficial survey of civil complaints filed in state and federal courts for wrongful police action would expose that statistic as highly improbable.

The Law Department's failure to accurately portray causes of action in thousands of cases is not a trivial matter.  Research and statistical evaluation on a simple question such as, "How many false arrest cases are filed against officers and how many are successful?" should be capable of easy and accurate compilation.

Immediately following is a case study involving a Sergeant ▮▮▮▮.  Four lawsuits against the City were settled in which he was a named subject.  Typically, despite multiple claims of assault, false arrest, or malicious prosecution, the Law Department posting of those cases each reports, "NNNN"—as though the allegations in the complaints did not exist.

To lend any utility to the posting, data entry clerks for the Law Department need to read civil complaints and identify the causes of action.  Whether through inadvertence or want of care, the listings by the Law Department in this regard are often inaccurate or incomplete.  For all practical purposes, the column entries are useless.

In the end, the good intentions of the Administrative Code—to provide a useful listing of subcategories of wrongful police action—are not met.   This failure has consequences for

---

[1800] NYPD Online, Officer Profile, https://nypdonline.org/link/2.  Notably, Sgt. ▮▮▮▮▮▮ continued to receive recognition and awards for meritorious and excellent policy duty through November 20, 2018.

[1801] Take the case of Lt. ▮▮▮▮▮▮, discussed below.  The online posting by the Law Department for his most recent ten lawsuits (of 15) lists "N" for each of the four categories (38 out of 40 entries), which, without itemizing each allegation in the ten complaints, is nowhere near accurate.  From 2015 to 2023, Lt. ▮▮▮ has been named in 18 lawsuits, ten of which, so far, have resulted in money settlements/payouts.  Many of the cases named multiple officers as defendants. It cannot be ascertained from the public filings if individual liability was assessed.

transparency in the area of stop and frisk going forward.  Section 7-114 was amended this year to add a fifth column.[1802]  The law now requires the Law Department's online posting to also note whether a "deprivation of a right pursuant to chapter 8 of title 8" is alleged.[1803]  The right that is referenced is a newly created right, within the City of New York, which tracks but does not literally copy federal and state guarantees against unreasonable search and seizure and related wrongful use of force.  The new section reads:

> Right of security against unreasonable search and seizure and against excessive force regardless of whether such force is used in connection with a search or seizure.  The right of natural persons to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and to be secure against the use of excessive force regardless of whether such force is used in connection with a search or seizure, shall not be violated; and no warrants shall be issued but upon probable cause supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[1804]

This amendment to § 7-114, calling for itemization in the Law Department posting, has the potential to go a long way toward increasing transparency and ready access to filings that complain of SQF misconduct.  If followed, the Law Department's online posting would now clearly indicate if illegal seizures were alleged in any court filing.  The listing should include the name of the officer, the docket number, and disposition of the case.  The online posting is in the form of an excel spreadsheet, so it should be readily searchable.

Segregating out SQF allegations for public scrutiny is meaningful because, unlike assault and malicious prosecution cases, SQF cases, standing alone, do not typically resolve with large judgments or draw attention.  But a public listing where an officer or group of officers have multiple search and seizure allegations filed in court against the officer(s) would be telling and worthy of review for intervention, identifying patterns, and maybe discipline (if substantiated).  The fact that one SQF case is settled for a small amount without assessing personal liability may not be significant, but the fact that several cases are brought against the same officer, or many cases against officers of the same precinct, or even that a substantial number are brought with regard to a particular practice, may be of great significance, even if the individual money judgments are relatively small.

There are, however, a few flies in the ointment.  For one, as mentioned above, data entry in the past has been consistently inconsistent.  Unless data entry clerks at the Law Department are pressed, there is no reason to believe that a new column listing allegations of illegal seizures will be employed with greater assiduity than listings in the past.  For another, the precise language of the amended Code calls for listing of alleged "deprivation of a right pursuant to chapter 8 of title

---

[1802] Local Law 48 of 2021 (eff. Apr. 25. 2021); Admin. Code § 7-114 (b).

[1803] The law had an effective date of April 25, 2021.  The latest posting by the Law Department, July 31, 2021, is not yet in compliance with the law's new mandate.

[1804] Admin. Code § 8-802.  The plain intent of the language is to capture the panoply of protection afforded by the fourth amendment to the federal constitution and section 12 of article I of the state constitution.  In fact, new section 8-807 of the Code explicitly calls for this construction.  If so read, the newly created right would include protections of *Terry* and *de Bour.*

8." A natural reading of this section would indicate a legislative command to include all cases that seek to vindicate Fourth Amendment interests, including *Terry* and *Floyd* complaints. If read more narrowly than was probably intended by the Council, the Law Department data entry clerks need only look for causes of action based on NYC Administrative Code § 8-802 and not list allegations of federal and state search and seizure claims.

A readily accessible listing of SQF allegations in lawsuits would be valuable to parties in *Floyd*, but it should not be assumed that this useful and logical interpretation of the statute will be adopted.[1805]

### i.    Posting Individual Officer Liability Online

Another improvement to the Department's online posting made this year by Local Law 48 is the requirement that the Law Department's online posting note whether payments resulting from a judgment or settlement were made by the City or by an individual defendant.[1806] Electronic filings in court terminating a case usually show a discontinuance without the terms of a settlement. Until now, the Law Department's posting would list the "Total City Payout Amount" without indicating whether a named officer contributed. There are occasions when a settlement will include a payout by a named officer, which can be a marker of interest in assessing whether misconduct carries consequences beyond disciplinary penalties authorized by NYC Administrative Code § 14-115. When settlements include personal assessments of liability, that information, if made public, can help to assure that the officer has assumed some personal responsibility for the misconduct alleged, even if the terms of the settlement don't say so.

Currently, it is common practice for the final terms of a settlement in court to be sealed or simply not filed with the court. As such, they are, practically speaking, unavailable to the public. This is especially troubling for the many related disciplinary matters that are "closed pending litigation," never to be revived.

In 2019 and 2020, 716 CCRB investigations were closed "pending litigation."[1807] The combinations of CCRB closure with a private settlement defeats the primary purposes of civilian oversight. There is no transparent accountability. There is no way to assess the officer's individual culpability or lack of culpability and no way to assess the Department's responsibility.

The Administrative Code requires the new postings to be made by January 31, 2022. Unfortunately, the posting for January 31, 2022, does not include the required information.

---

[1805] As of March 1, 2024, the posting indicated that 331 of 4534 civil cases alleging police misconduct in 2022 and 2023 also alleged a deprivation of rights under Chapter 8, Title 8 of the Administrative Code.

[1806] LL 2021/048. In the past, Admin. Code § 7-114 required a posting "of whether the resolution included a payment by the city. . . . and, if so, the amount of such payment." The new law inserted "or by a covered individual or an employer or other person paying on behalf of a covered individual." The law took effect April 25, 2021. The section was further amended on January 19, 2024, LL 2024/027, giving the Law Department until January 31, 2025 to post the actions "in a searchable and machine-readable format," and expanding the look-back period.

[1807] CCRB, Semi-Annual Report at 25 (2021), https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2021_semi-annual.pdf.

One example of how the new law might work is the case of Lieutenant ███████. His case is one of the few cases where public electronic filings itemize information regarding an assessment of personal liability.

Lt. ████ has been with the force seventeen years. He was the subject of nine complaints to CCRB—none of which resulted in penalty or discipline. Two of the investigations were substantiated by CCRB, with recommendation for Charges and Specifications, but the Police Commissioner did not accept the recommendations or findings, and no discipline was imposed.[1808] He has also been named as a defendant in six lawsuits (four in federal court and two in state court). At least two of the lawsuits directly responded to CCRB complaints. As of this writing, four of the lawsuits ended in payouts of $13,500, $20,000, $12,500, and $50,000 respectively. This does not include a $325,000 verdict against fellow officers in his precinct for which, it was later claimed, he personally and wrongfully retaliated against the same complainant.[1809] Without the ability to pierce the terms of three of the settlements before the new law takes effect,[1810] it is unknown if he accepted personal responsibility in any of those cases. However, one of the settlements (for $13,500) did include, in the public file, information that Lt. ████ personally was responsible for a payment of $1,500 to the plaintiff.

Of interest at this point in the Report is that the personal assessment of $1,500 was made in a case which was also the subject of a complaint to CCRB. In that encounter, the Board substantiated the allegation and recommended Charges. The Police Commissioner retained the case under Provision Two of the APU-MOU (discussed *infra*) and decided to impose "NDA"— No Disciplinary Action.[1811] The Police Commissioner's decision was made four weeks after the federal lawsuit was filed against Lt. ████ for the same encounter.[1812] Six months later, the lawsuit was settled (as indicated for $12,000 against the City and $1,500 against Lt. ████). The City is obligated to represent and indemnify officers unless the Corporation Counsel determines that the misconduct was not in the line of duty or violated NYPD rules and regulations. It is unclear if Lt. ████ is being indemnified in this case but, three months after the case was filed, retained counsel entered an appearance on his behalf. It could be that Corporation Counsel denied indemnification based on factors in § 50-k or it could be that a conflict necessitated separate counsel. It might be that the City is not covering the award, but that is unclear from the public record.

In any event, with the new requirement to post individual assessments in lawsuit settlements in the future, if properly followed, it should be easier to trace, match, and compare

---

[1808] In one case, discussed below, where CCRB recommended Charges, the Police Commissioner retained the case and removed APU from the prosecution. In another case that went to trial, the Police Commissioner overturned a guilty verdict and substituted it with a not-guilty finding.

[1809] The lawsuit claiming retaliation was dismissed.

[1810] Local Law 48 became law on April 25, 2021. But the new listings are not required until July 31, 2021, and are to be updated bi-annually on January 31st and July 31st thereafter.

[1811] CCRB substantiated Charges on two separate occasions against Lt. ████. Neither appears in the NYPD disciplinary history online.

[1812] There is nothing in the records indicating whether the Police Commissioner was aware of the pending lawsuit when he dismissed CCRB's complaint.

civil and disciplinary outcomes.  CCRB should amend its protocols, when an investigation is "closed pending litigation" to specify the litigation at issue.

### ii.    Integrated Reporting of Civil Claims and Citizen Complaints

While it would be worthwhile to consider overlapping and contemporaneous complaints when assessing discipline, the Department's history of resistance to that concept is well-documented.  Nonetheless, at the very least an integrated, seamlessly coordinated database would be of value.  Whether one believes that multiple complaints should be dealt with in isolation or conjunction when considering discipline, it is hard to argue with the proposition that allegations known to IAB, CCRB, OCD, DAO, local CO's, the Comptroller, the Law Department, and District Attorneys, ought to be readily accessible with one user-friendly data search.  That is not the case today.  Search criteria, data access, case identifiers, descriptive entries and results, etc.  are all scattered and non-uniform.  Trying to compile statistics on, for example, wrongful force allegations by reliance on Law Department's online listing of misconduct filings is futile.

An extreme, but not unique, example would be the case of Lieutenant ███████.  The Lieutenant has had 28 CCRB complaints filed against him.  Thirteen of the complaints have been substantiated.  Many of the complaints are recent (after 2017) and contemporaneous.  Multiple investigations of Lt. ████ are, or were, pending simultaneously.  Twelve of the thirteen CCRB substantiations were findings made in the last three years.  Overlapping the CCRB investigations, are eighteen separate lawsuits in New York Supreme Court and Federal Court, all arising from incidents occurring in 2015-2023 and pending while the CCRB investigations were open.  Not all of the lawsuits correspond to a CCRB complaint as the plaintiffs may not have sought CCRB discipline.  Nine of the lawsuits have settled or resulted in payouts ranging from $178,000, $50,000, $860,000, $30,000, $75,000, $52,506, $115,000, $45,000, $417,600 to $20,000.  Others remain open.  Charges and Specifications have been recommended against Lt. ████ by CCRB multiple times, but at the present time, five CCRB of those substantiated cases are open, unresolved, and listed only as "APU decision pending."  Lt. ████ retired with charges pending in two cases.  Those cases remain unresolved.

Pending litigation can cause CCRB cases to close, whether the complaints are for the same incident or merely arising at or about the same time.  On the other hand, a negative CCRB finding can have an impact on legal issues in pending lawsuits, such as indemnification, qualified immunity, representation by the Law Department, and liability.  All in all, each of the charges and complaints against Lt. ████ cannot be looked at in isolation, but need to be examined holistically to arrive at a fair measure of discipline for proven misconduct.

General, civil claims against a respondent officer are discounted as evidence of wrongdoing absent a verdict, admission or finding.  Ironically (or inconsistently), while a civil lawsuit (even one based upon sworn affidavits) is disregarded as evidence of misconduct or a basis for impeachment of the officer's credibility, Departmental Trial Commissioners weigh civil claims brought by a complainant against the citizen on a belief that an interest in the outcome of a court case undermines the complainant's credibility.

Both the officer and the plaintiff have an interest in a court proceeding, but that interest is only weighed against the civilian.  This was explicitly stated in a decision in the case of Lt. ████ .

The complainant was asked if he had "pursued civil litigation." The complainant testified, truthfully, that he had not. But the Trial Commissioner ascertained later that "several weeks after his testimony, [the complainant] filed a civil action against . . . ███ [and] based on this filing, I must consider [the complainant's] financial interest as a factor in my credibility determination."[1813] There is no mention of considering the financial interest, if one existed, of the officer as a factor in the Trial Commissioner's credibility determination.

### iii.     Case Study - Multiple Contemporaneous Actions—The Need for an Accurate Integrated Database

Take the case of Sergeant #1 ███████ [1814] and Sergeant #2 ███████████ [1815] Their disciplinary career paths are not exceptional but highlight the interplay between disciplinary proceedings and civil complaints for officers who work together. Citizen complaints may proceed contemporarily or in tandem. Only with exorbitant effort can a clear picture of potentially troubled paths develop.

Sgt. #1 ███████ has seven known civil actions filed since 2013, naming him as having engaged in wrongful police actions, usually in concert with other named police officers. He has also been the subject of seven CCRB complaints. One of the seven coincided with one of the lawsuits. Otherwise, the CCRB complaints are distinct from the lawsuits.

Sgt. #2 ███████ has been named in four civil suits and eight CCRB complaints.

Of interest is the fact that they have been jointly named in three civil suits, each of which settled with money awards, and in a more recent CCRB complaint which was "closed pending litigation." Their disciplinary odyssey is as follows:

<u>Date of Incident</u> (if known)

<u>Sgt. #1</u> ███████

| | | |
|---|---|---|
| 8/5/11 | - | CCRB: Discourtesy - Exonerated |
| 3/6/12 | - | CCRB: Force with gun as a club - Complainant Uncooperative |
| 7/5/13 | - | CCRB: Force - Unsubstantiated |
| 10/21/14 | - | LAWSUIT: false arrest/Stop/Search/Malicious Prosecution Settled $ 9,750 |
| 12/11/14 | - | CCRB: Force - Unsubstantiated |
| | - | LAWSUIT: Chokehold - open |
| 9/19/15 | - | CCRB: Refusal to Identify - Complainant Uncooperative |
| 1/7/17 | - | LAWSUIT: False arrest, Assault, False Imprisonment - Open |

---

[1813] Hon. Paul M. Gamble, Assistant Deputy Commissioner of Trials, *In the Matter of the Charges and Specifications against Lieutenant Special Assignment* ███████*, et al, Case Nos.* ███████ *and* ███████ at 12. https://oip.nypdonline.org/files/956643_09072022_2022045.pdf.

[1814] Sgt. #1 ███████ was promoted to Detective in November 2017 and to Sergeant on March 18, 2021.

[1815] Sgt. #2 ███████ has been with the force for 20 years and was promoted to Sergeant on June 24, 2011.

| 6/3/17 | - | LAWSUIT: SQF/false arrest, Malicious Prosecution **WITH** ████████ - Settled $14,000. |
| 6/21/17 | - | LAWSUIT: False arrest - Settled $32,500 |
| 7/19/18 | - | LAWSUIT: False arrest - **WITH** ████████ -Settled $9,000 |
| 7/23/18 | - | LAWSUIT: False arrest - **WITH** ████████ Settled $22,500 |
| 10/25/18 | - | CCRB: Stop/Frisk/Search - B-CD reduced to Training |
| 12/6/18 | - | CCRB: Force - **WITH** ████████ - Closed Pending Litigation |

**Sgt. #2** ████████

| 3/17/09 | - | CCRB: Force/Discourtesy - Unsubstantiated |
| 2/24/12 | - | CCRB: Discourtesy - Complainant Uncooperative |
| 7/11/14 | - | CCRB: Refusal Medical Treatment - A-CD, no discipline |
| 12/2/15 | - | CCRB: Force - Unsubstantiated |
| 6/3/17 | - | Lawsuit: False Arrest/Malicious Prosecution **WITH** ████████ - settled $14,000 |
| 7/7/17 | - | CCRB: Strip-search - Complainant Uncooperative Closed Pending Litigation |
| 6/22/18 | - | CCRB: Threat Arrest - Exonerated |
| 7/19/18 | - | Lawsuit: False Arrest - **WITH** ████████ - settled $9000 |
| 7/23/18 | - | Lawsuit: SQF **WITH** ████████ - settled $22,500 |
| 10/25/18 | - | CCRB: Stop/No RTKA Card - B-CD reduced to Training |
| 12/6/18 | - | CCRB: Force - **WITH** ████████ - Closed Pending Litigation |

Without speculating as to the course of their careers, the merit of the claims, or what actions, if any, should have been taken, their history is recounted in this portion of the Report only to highlight weaknesses in the way that data is collected and reported. It is unknown if all this information was presented to the Police Commissioner in a cohesive form and taken into consideration by him when he closed the most recent charges against the pair without a completed investigation.

### C.    Early Settlement Program: Pre-Litigation Settlements for Police Misconduct

Another improvement that should and could be made to the database would be to account for claims that are settled in anticipation of litigation. Claims made for SQF misconduct are screened by the Comptroller before a lawsuit may be commenced. Many of those claims are resolved in an early settlement program and never reach the courthouse. A look at early settlements as well as lawsuits for problems in police conduct, was included in the proposals by Comptroller Holtzman and Hevesi but is not mandated by section 7-114.[1816]

Today, the Comptroller settles many lesser claims of police misconduct under an early settlement program that saves the parties the cost of litigation.[1817] Stop and Frisk misconduct,

---

[1816] City Charter § 808 (b) directs the OIG-NYPD to work with the Comptroller and to look at claims.

[1817] A notable exception is the case against PO ████████ , which the Comptroller settled for $5.9 million.

absent aggravating circumstances, falls readily into this category. A side-by-side comparison of settlements by the Comptroller, pre-litigation, for police misconduct with payouts by the City following commencement of litigation would be worth studying. Better still would be a study of the cost to the City for SQF misconduct in pre-litigation settlements segregated out from other misconduct—not dissimilar to the demarcation required of Corporation Counsel under section 7-114. If done, such a study would accomplish several salutary purposes. For one, it would identify the true cost to the City of alleged SQF improprieties. For another, side by side comparisons of settled claims with CCRB/DAO outcomes might highlight the costs or savings that may accompany a vibrant disciplinary structure and lead to improvements. Additionally, a substantial number of SQF incidents go unreported by the officers. An audit of SQF complaints to the Comptroller matched with Stop Reports might expose some number of unreported incidents—especially incidents causing community friction or resentment. Another number of SQF-CCRB complaints end up truncated. It is worth knowing what number of truncated CCRB complaints ended up with an Early Settlement payout. Finally, matching complaints of SQF misconduct to CCRB with those made to the Comptroller, if segregated by precinct and officer, would be useful in identifying patterns of alleged misconduct and concomitant community concerns.

At the moment, comparisons are difficult for several reasons. For one, Law Department postings are by calendar year and Comptroller listings are by fiscal year. For another, some number of the Comptroller's settlements are for wrongful use of force—even if the complaint only alleged minor injury. Approximately 72% of the Comptroller's settlements are for wrongful "police action" or "civil rights," claims.[1818] Not included in this number are wrongful conviction claims which are quite costly. In 2018 there were five such settlements for $33.3 million and in 2019 there were seven settlements for $30.9 million.

Police action claims are a subset of personal injury claims and are usually associated with allegations of false arrest, false imprisonment, firearm usage, excessive force and assault.

First, when it comes to the specific types of litigation data that is tracked, the Comptroller's Office, the Law Department, and NYPD all collect and track different information from legal claims and lawsuits. For example, the Comptroller's Office tracks the number and type of pre-litigation Notices of Claim filed with the Comptroller's Office, as well as the amount paid in any claim or lawsuit. The Law Department tracks the number of lawsuits filed, the court in which they were filed, and any named defendants; after the cases have closed, it also tracks the disposition type, and if a settlement is involved, the total disposition amount. Both agencies also keep some metrics regarding "police action" matters, but the specific definition of "police action" and the categories of cases that fall under "police action" differ from agency to agency.[1819]

Wrongful SQF conduct falls safely in the early settlement category since, without serious injury or death, victims and the Comptroller are usually willing to avoid court proceedings for wrongful stops and frisks.

---

[1818] *See* Annual Claims Report, Chart 11, N.Y. City Comptroller, available at https://comptroller.nyc.gov/reports/annual-claims-report/.

[1819] NYPD-OIG, *Using Data from Lawsuits and Legal Claims Involving NYPD to Improve Policing*, page 17, April 20, 2015, available at https://www1 nyc.gov/assets/doi/reports/pdf/2015/2015-04-20-Litigation-Data-Report.pdf.

It is difficult to compare the number of cases and amounts paid for non-force, police misconduct cases filed in court and handled by the Law Department, with pre-litigation settlements by the Comptroller for the same class of cases.  A rough calculation can be made by looking at the Law Department section 7-114 filings with the hope that the categorization in the columns describing the action are approximately accurate (see discussion above).  In calendar years 2018 and 2019, 5,747 cases were filed in state and federal Court alleging police misconduct.  4,834 of those cases alleged malicious prosecution or false arrest without alleging an assault or wrongful use of force.  For those court cases, it is reported that the City paid out $55,645,598 in 2018[1820] and $68,688,423 in 2019.[1821]

For the Fiscal Years 2018 and 2019, the Comptroller also settled 2,671 police action claims pre-litigation for a total of $51.3 million (an average pay-out of $19,206).[1822]  The Comptroller settled 2,971 civil rights claims for a total of $194.8 million (not all the civil rights claims are against the Department or its officers).[1823]  Again, it would be useful if the Comptroller were to disaggregate claims made for police action or civil rights claims, indicating when alleged SQF claims were made and settled.[1824]

---

[1820] NYPD-OIG 2019 Assessment of Litigation Data involving NYPD, April 13, 2019, at 10, available at https://www1.nyc.gov/assets/doi/reports/pdf/2019/Apr/13LitData_pressrelease_report_43019.pdf.

[1821] Priscilla DeGregory, City Payouts in NYPD Misconduct cases up by nearly $30m, NY Post, Jan. 31, 2020, available at https://nypost.com/2020/01/31/city-payouts-in-nypd-misconduct-cases-up-by-nearly-30m/.

[1822] Comparisons are difficult for several reasons.  For one, Law Department postings are by calendar year and Comptroller listings are by fiscal year.  For another, some number of the Comptroller's settlements are for wrongful use of force – even if minor injury was all that was alleged.  Approximately 72% of the Comptroller's settlements are for wrongful "police action" or "civil rights," claims.  *See* Chart 11, *supra*, note 776.  Not included in this number are wrongful conviction claims which are quite costly.  In 2018 there were 5 such settlements for $33.3 million and in 2019 there were 7 settlements for $30.9 million.

[1823] *See* Chart 11, *supra*, note 776.  Over the five-year period 2016-2020, 14,459 police misconduct cases were filed in state and federal courts - averaging about 3000/year.  However, even this large number vastly undercounts potential misconduct claims since many cases are disposed of by the Comptroller without litigation and most civil lawsuits contain allegations against multiple officers.  While a civil lawsuit claim, in and of itself, does not necessarily prove misconduct, the expense and effort accompanying a court filing are such that court filings cannot be discounted. The Comptroller's office, for purpose of reporting, separates Personal Injury Police Action Claims from Police Action Civil Rights Claims.  In 2019, there were 3614 personal injury claims and 1468 Civil Rights Claims filed.  Some were settled by Comptroller "Pre-litigation" and some went on to be filed in court. One can assume that some number fell by the wayside between the time they were filed in court as well.  A little more than half (5110 of 9782 = 52 percent) of Personal Injury Police Action Claims were settled Pre-litigation by the Comptroller in the 2017-2020 time period. If about one-half of all police action claims are settled by the Comptroller and about 3000 per year continue on to court filings, we can approximate that a total of 6000 sworn complaints are brought each year.

[1824] The Comptroller separates "police action" claims from "civil rights" claims.  *See* Chart 11, *supra*, note 776.  Police action claims cover false arrest, false imprisonment, assault, failure to provide police protection and excessive force. Civil rights claims arise from alleged statutory or constitutional violations such as discrimination based on sex, race, religion, disability, sexual orientation, or age.  Claims in this category also include alleged constitutional civil rights violations by law enforcement personnel such as false arrest, malicious prosecution, excessive force, or wrongful incarceration claims under 42 U.S.C. section 1983.  In 2019, 16 percent of the claims settled by the Comptroller were police action claims and another 16 percent were civil rights claims.

The Court's order establishing an Early Intervention Program[1825] recognized the need to capture claims of wrongful conduct made to the Comptroller and in court filings as a tool to recognize and intercept potential bad practices.[1826] This information should be used as a tool in weighing allegations or assessing appropriate discipline for SQF misconduct as well. Illegal stops and frisks should not be ignored simply because the monetary claim was low. Settlements follow filings of sworn statements and interviews. Statements given, such as court filings and Comptroller examinations should be available and reviewed, when relevant, in any misconduct investigation.

In particular, General Municipal Law section 50-h transcripts should be obtained and presented to CCRB panels in the ordinary course and, especially, as a mechanism to avoid unnecessary truncations or unsubstantiations. The law provides that a "transcript of the testimony taken at an examination . . . may be read in evidence by either party in an action founded upon the claim . . . ."[1827] Additionally, hearsay is admissible at DCT Trials and should be utilized in CCRB determinations.[1828] GML section 50-h transcripts may be obtained upon a showing of good cause for their need to a court. An agency investigation of allegations of police misconduct as the cause of damages or injury should, by itself, constitute good cause.[1829] An application to a court is not necessary if the claimant or the claimant's attorney is willing to share the transcript. But if a case is settled quickly for a small amount of money, there may be no incentive for the claimant to continue with a CCRB investigation once the civil case is settled. For SQF complaints in CCRB which might fail if the civil claim is settled quickly before the Comptroller, it would be helpful if CCRB asked for permission to obtain a copy at the outset of an investigation.[1830]

Claims made, even when not part of the encounter before the panel should be reviewed as well. While it is clear that many claims, especially for wrongful police action where there is no injury, are settled for their "nuisance value" rather than fully adjudged misconduct, a pattern of claims or multiple claims against one officer or one squad, may demonstrate intent, absence of

---

[1825] *Floyd*, ECF Doc No. 767 (June 2, 2020). In reviewing a draft of this Report, the City asserts that, "The early intervention order does not include 'claims of wrongful conduct made to the Comptroller'" (Item 846, City 09.01.23 Feedback to Yates Discipline). The order itself refers to "any civil lawsuit **or settlement** alleging an unconstitutional stop, an unconstitutional trespass enforcement, or racial profiling, including racial slurs, where there has been a judgment or settlement against a police officer, and where there exists evidence that the police officer violated a rule or regulation of the NYPD, identification of such evidence, including, **but not limited to notices of claims** and civil complaints." (Emphasis in original).

[1826] As well as declined prosecutions, adverse credibility determinations and unsubstantiated profiling allegations. A simple declined prosecution can constitute a "favorable termination" sufficient to permit a section 1983 action for Malicious Prosecution. *Thompson v. Clark*, 142 S. Ct. 1332 (2022).

[1827] N.Y. General Municipal Law § 50-h (4); But see discussion of *CCRB v. Office of the Comptroller*, 52 Misc. 3d 226, 227 (Sup. Ct. NY Cnty. 2016), *supra*.

[1828] 38 RCNY 15-04 (e)(1).

[1829] *CCRB v. Office of the Comptroller, supra*

[1830] CCRB "has requested no more than five 50-h transcripts in the twenty years preceding December 2014 and represented in September 2014 that it plans to request only about seven to ten 50-h transcripts per year going forward." CCRB v. NY City Comptroller, Respondent's Memorandum of Law in Support of Verified Answer and in Opposition to Verified Petition, Sup. Ct. NY Cnty., Index No. 452358/2015, NYSCEF Doc. No. 18 at 12.

mistake, absence of good faith, absence of misunderstanding, a common scheme or plan, or even, in extreme cases, bias.[1831]

The argument against consideration of settlements which have not been fully litigated, expressed by Jim Pasco, executive director of the national Fraternal Order of Police, is: "If there's never been a finding of guilt or anyone's fault, why put that in an officer's record?"[1832] But an unadjudicated payment does not equate to exoneration or even the equivalent of unsubstantiated. Given the realities of qualified immunity, indemnification, and the cost of litigation, it simply is not worth the time or the money to address individual culpability in most cases. Avoiding an accounting for fiscal reasons does not mean that the officer's conduct has been excused or condoned.

Litigation often brings to light complaints of police misconduct which are not made before CCRB and can be useful in identifying problems within the Department. For example, PO ██████ ██████ (no longer with the force) had acquired 29 lawsuits with a total payout of $841,501 before his retirement. At the same time, he had only six complaints filed with CCRB and the only matter which was substantiated by CCRB ended with a not guilty verdict. PO ██████████ (also retired) was named in 33 lawsuits resulting in a payout of $1,402,500 and yet his six complaints investigated by CCRB ended with not one substantiation.[1833] Clearly, one cannot rely exclusively upon CCRB substantiations or even complaints as the sole measure of conduct or misconduct.

## D.    Qualified Immunity and Indemnification

In the main, officers are not personally liable for damages in connection with an improper search or seizure, or excessive use of force in connection with a seizure. They are protected by the doctrine of "qualified immunity"[1834] and, when not so protected, they may still be indemnified by the City.[1835]

The immunity doctrine, explained in 1982 (*Harlow v. Fitzgerald*),[1836] and expanded in 1987 (*Anderson v. Creighton*)[1837] protects officers from financial liability in Civil Rights actions[1838] when

---

[1831] *People v. Rouse*, 34 N.Y.3d 269 (2019). See discussion of use of unsubstantiated allegations, *infra*.

[1832] Keith L. Alexander, Steven Rich & Hannah Thacker, *The hidden billion-dollar cost of repeated police misconduct*, WASHINGTON POST (Mar. 9, 2022), available at https://www.washingtonpost.com/investigations/interactive/2022/police-misconduct-repeated-settlements/?itid=hp-top-table-main.

[1833] *The hidden billion-dollar cost of repeated police misconduct*, *supra*.

[1834] *Conrad v. City of New York,* 192 A.D. 3d 505 (1st Dep't 2021). The historical oddity of *Harlow* is that the appeal was premised upon a claim that "high officials" close to the President enjoyed absolute immunity similar to that claimed by the President in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). The Court in Harlow rejected the claim of absolute immunity. Absent qualified immunity, excessive use of force by an officer may be considered an unreasonable seizure under Fourth Amendment. *Shamir v. City of New York*, 804 F.3d 553 (2d Cir. 2015).

[1835] GML § 50-j.

[1836] 457 U.S. 800 (1982).

[1837] 483 U.S. 635 (1987).

[1838] 42 U.S.C. § 1983. *Harlow* modified earlier cases, *e.g.*, *Pierson v. Ray*, 386 U.S. 547 (1967) that gave qualified immunity to officers who acted in "good faith" and with probable cause.

they violate the Fourth Amendment, unless the United States Supreme Court has, by prior decision, clearly established the right sought to be vindicated under the factual circumstances presented. This translates into a requirement that the violation must be "apparent." Under qualified immunity, an officer is insulated from liability for money damages if the officer acted with objective reasonableness while performing a discretionary governmental function. Further, a lower court is directed to first consider whether there is doubt or lack of clarity from the Supreme Court on the lawfulness of the actions taken under the circumstances presented before reaching the question of whether a violation occurred.[1839] Unless precedent is clear that the officer's actions violated the Constitution, the case will be dismissed on a motion for summary judgment.[1840]

The required "clear precedent" standard presents a significant hurdle to civil rights complainants. Critics point to the difficulty in obtaining clear precedential court rulings if cases are dismissed before the merits of misconduct claims can be reached. They claim the rule precludes development of the law by denying lower courts an opportunity to decide novel questions and it denies appellate courts the power to review and refine decisions in a fluid environment.

In 2021 the Supreme Court reversed two Circuit Courts and applied qualified immunity to protect officers in two cases where the question of "clear" precedent was at issue.[1841] In both cases, the lower courts had cited to precedent that was similar, but not identical, to the condemned actions by officers. The Ninth and Tenth Circuits had denied qualified immunity based on a determination that a reasonable officer should have known that the conduct was unlawful. The Court reversed and emphasized that "[w]e have repeatedly told courts not to define clearly established law at too high a level of generality . . . [to find that precedent is established] the contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted . . . [and] [s]uch specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply."[1842]

Separate from the issue of precedent is the *mens rea* question. Prior to *Harlow*, the common law would look to the officer's intent. Did the officer act maliciously? Did the officer knowingly violate the plaintiff's rights? Instead, *Harlow* opened the door to cases where the officer acted unreasonably. No longer would courts, "inquire into the state of mind of [officers] as to what they did or did not believe. Rather, the question is whether a reasonable officer in the same circumstances would have believed that he [acted] constitutionally."[1843] By extension, if the

---

[1839] *Safford v. Redding*, 557 U.S. 364 (2009).

[1840] *See Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) for a discussion of whether a motion for summary judgment or a motion to dismiss is the correct procedural moment for decision. Complaints are, on occasion, dismissed on a finding of qualified immunity at the earlier procedural opportunity, but that would appear to be premature.

[1841] *City of Tahlequah v. Bond*, 142 S. Ct. 9211 (2021); *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021).

[1842] *City of Tahlequah v. Bond*, at 173 (internal quotations and citations omitted).

[1843] *Bastidas v. City of Los Angeles*, 2006 U.S. Dist. LEXIS 96770 (C.D. Cal. 2006).

violation was clearly established by precedent, then it can be said the officer knew or should have known that his actions were wrongful.

Over time the holding in *Harlow* has been turned on its head; instead of expanding proof of malice to include cases where the officer "should have known" he was in the wrong, today, actual proof that the officer acted with malice no longer suffices. The subjective beliefs or motives of the officer are irrelevant.

> Under the *Harlow* standard . . . an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner . . . . Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.[1844]

An officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of the arrest.

> A police officer has arguable probable cause if either (a) it was objectively reasonable for the officer to believe probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met . . . Put another way, an arresting officer will find protection under the defense of qualified immunity unless 'no reasonably competent officer' could have concluded, based on the facts known at the time of arrest, that probable cause existed.[1845]

Or, in the words of Justice Byron White, "[a]s the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."[1846] This was seconded by Justice Sonia Sotomayor who wrote that the doctrine "renders the protections of the Fourth Amendment hollow."[1847]

The New York Court of Appeals has created and extended a form of qualified immunity to New York common law torts as well. The doctrine of "governmental function immunity" continues to shield public entities and individual officers from liability for discretionary actions taken during the performance of governmental functions by municipal agents. The discretionary act must be the exercise of reasoned judgment.[1848]

Since qualified immunity doctrine is not text-based, it is unclear how much power a legislature (federal, state, or local) has to modify the Court's balancing. If the doctrine is not drawn

---

[1844] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[1845] *Figueroa v. Mazza*, 825 F.3d 89, 101 (2d Cir. 2016).

[1846] *Malley, supra,* at 341.

[1847] *Mullenix v. Luna*, 577 U.S. 7, 26 (2015).

[1848] *Valdez v. City of New York*, 18 N.Y.3d 69 (2011); *see also Jenkins v. City of New York*, 478 F.3d 76 (2d Cir. 2007); *In re World Trade Center Bombing Litigation*, 17 N.Y.2d 428 (2011).

from constitutional interpretation nor an exercise of the supervisory powers of the Supreme Court, is it open to Congressional modification by amendment to section 1983?[1849]  If local legislative bodies wish to grapple with the issue, then that must be done by amendment to state or local rights and causes of action founded in state or local law since they are powerless to affect the application of Section 1983.

The City has acted to some extent.  It did so by codifying the civil rights tort, then limiting the available defenses to that tort.  On April 25, 2021, Local Law 48 of 2021 took effect.[1850]  The intent of the law is to limit "qualified immunity" as a defense in civil actions brought against city police officers for illegal searches and seizures under a newly established cause of action.  The law creates Chapter 8 of Title 8 of the Administrative Code.[1851]  That section establishes:

> The right of natural persons to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and to be secure against the use of excessive force regardless of whether such force is used in connection with a search or seizure, shall not be violated; and no warrants shall be issued but upon probable cause supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[1852]

The language is parallel to that of the Fourth Amendment and Article 1, Section 12 of the New York Constitution.  The new provision creates a private right of action for aggrieved persons.  It speaks to the right of "natural persons" rather than a right of "the People" as contained in the two Constitutions—thereby eliminating a potential claim of inapplicability to non-citizens or non-residents.  Of interest, it also inserts an affirmative right "to be secure against the use of excessive force," which is not explicit in the text of the two Constitutions.[1853]  Exhaustion of administrative remedies is not required, and the right is in addition to any other remedies an aggrieved party may pursue.

The law declares, "[i]t is not a defense to liability . . . that a covered individual [a member of the force] has qualified immunity."[1854]  Prevailing plaintiffs are entitled to compensatory and punitive damages.  Victims may elect to receive $1,000 in place of proving damages.  Attorney's fees may be awarded as well.  Denial of qualified immunity under this provision applies to section 8-802 claims, and not to parallel claims of constitutional tort, section 1983, or state common law.

---

[1849]  Ending Qualified Immunity Act, H.R. 7085, 116th Cong. § 2 (2020), available at https://www.congress.gov/bill/116th-congress/house-bill/7085/text; *see also* Congressional Research Service, https://crsreports.congress.gov/product/pdf/LSB/LSB1049 note 2, at 1.

[1850]  N.Y. City Council, Intro No. 2220 of 2021, enacted April 25, 2021, available at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4771043&GUID=32ED0C83-7506-45F9-81AA-F5144FCA193A&Options=&Search=.

[1851]  Specifically, the bill had been passed by the City Council thirty days earlier and became law when returned unsigned by Mayor.  City Charter § 37(b).

[1852]  N.Y.C. Admin. Code § 8-802.

[1853]  Excessive use of force by an officer may be considered an unreasonable seizure under Fourth Amendment by implication. *Shamir v. City of New York,* 804 F.3d 553 (2d Cir. 2015).

[1854]  NYC Admin. Code § 8-804.

454

The new local law does not address the question of indemnification. When actions are brought under Section 8-802, eligibility for indemnification will still be governed by the General Municipal Law. In essence, for the newly created civil right, elimination of qualified immunity is a cost-shift - making the City liable for the tort. But there are limits to the obligation to indemnify built into GML section 50-k. The first, already described, is that the act must have been within the scope of the officer's duties and not in violation of rules and regulations, i.e., the Patrol Guide.

Section 50-k also denies indemnification if the officer caused the injury intentionally or recklessly.[1855] Even in those cases, however, the officer's representation can be covered by a Legal Services Fund of the Police Benevolent Association to which the City contributes $5.5 million/year.[1856] Unlike qualified immunity, the indemnification statute does look into the officer's mental culpability. Putting the doctrines of qualified immunity and indemnity together, with the exception of the newly created tort in the Administrative Code, NYC officers are personally liable for money damages only if: (1) the actions were not objectively reasonable, and in apparent violation of known rules (qualified immunity); and; (2) if it is demonstrated that the officer, while acting within the scope of the officer's employment, violated a rule or law, or acted intentionally or recklessly. It is easy to see why the Public Safety Committee of the City Council concluded officers are "virtually always indemnified."[1857]

In the event an officer is sued, New York City is obligated to supply counsel to defend on behalf of the officer. If a judgment or award of damages is made, the City, as a self-insurer, pays claims directly.[1858]

In the absence of qualified immunity, indemnification may hinge upon the outcome of disciplinary findings:

> In the event that the act or omission upon which the court proceeding against the employee is based was or is also the basis of a disciplinary proceeding by the employee's agency against the employee, representation by the corporation counsel and indemnification by the city may be withheld (a) until such disciplinary

---

[1855] In 2019, the Law Department declined to represent 48 officers of 562 filed cases.

[1856] Jake Pearson, *NYPD Union Contract Puts Taxpayers on the Hook to Defend Officers When the City Won't*, March 26, 2021, available at https://www.thecity.nyc/2021/3/26/22351475/nypd-union-contract-defend-officers-when-the-city-wont.

[1857] Committee Report on Int 2220-2021 at 14, NYC Council Committee on Public Safety (Mar. 25, 2021), at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4771043&GUID=32ED0C83-7506-45F9-81AA-F5144FCA193A&Options=ID|Text|&Search=2021%2f048. (quoting Joanna C. Schwartz, The Case Against Qualified Immunity, 93 NOTRE DAME L. REV. 1797, 1804 (2018), available at https://scholarship.law.nd.edu/cgi/viewcontent.cgi?article=4796&context=ndlr#page=8; Joanna C. Schwartz, Police Indemnification, 89 N.Y.U. L. REV. 885, 890 (2014), available at https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-89-3-Schwartz.pdf#page=6.)

[1858] The obligation to save the officer harmless is independent of any claim that the municipality is directly responsible for any official government policy, custom or widespread practice that may have caused the violation of constitutional rights. *Monell v. NYC Dep't of Social Services*, 436 U.S. 658 (1978).

proceeding has been resolved and (b) unless the resolution of the disciplinary proceeding exonerated the employee as to such act or omission.[1859]

Under this provision, there will be cases where a finding of "unfounded" or "unsubstantiated" may be insufficient to assure the officer that indemnification will attach. The perceived need to be exonerated will be heightened by the withdrawal of qualified immunity.

An interplay between disciplinary proceedings and civil lawsuits arises on frequent occasion.[1860] It is not uncommon to see cases where Departmental disciplinary proceedings are "closed pending litigation," never to re-surface. Similarly, since Corporation Counsel may withhold a decision on indemnification until the disciplinary proceeding has been resolved, the two events are intertwined. Given the potential for use that might be made in court of disciplinary proceedings and findings it is understandable that the Department would be reluctant to arrive at a finding on the same case during the pendency of a lawsuit. It is less understandable as to why unrelated pending disciplinary cases are closed, which also happens from time to time.

The new law, creating a cause of action and stripping away individual immunity, will lend new and meaningful consequence to disciplinary actions in SQF cases for officers and the City.

If officers do not enjoy qualified immunity, and if they face personal liability based upon the outcome of disciplinary proceedings, then the stakes in SQF decisions before CCRB and before the Police Commissioner will rise considerably. Unless checked, this concern may find its way into decisions by CCRB and the Police Commissioner. Earlier this Report highlighted the lack of clarity and uniformity in the borders between "unsubstantiated," "unfounded," and "exonerated." The potential for personal liability can accentuate those problems and sympathy for the officer's financial peril may improperly sway internal disciplinary findings by the Board or the Police Commissioner. There will be pressure on CCRB and the Police Commissioner by individual officers and union representatives to exonerate misconduct because of the heightened personal consequences for the officer. A predictable and easy way out would be to exonerate the officer because the officer acted "reasonably" or in "good faith" even when the officer acted illegally.

Liability without qualified immunity is a concern for the Department as well as for the officer. With elimination of immunity under the new Administrative Code, the number of cases

---

[1859] GML § 50-k (5). Note that the exclusion arises when there is a disciplinary proceeding by "the employee's agency." If the Department refuses or delays service of Charges, it can be argued that a CCRB decision is not sufficient to preclude indemnification.

[1860] Over the five-year period 2016-2020, 14,459 police misconduct cases were filed in state and federal courts - averaging about 3000/year. However, even this large number vastly undercounts potential misconduct claims since many cases are disposed of by the Comptroller without litigation and most civil lawsuits contain allegations against multiple officers. While there is some probability that a civil lawsuit claim, in and of itself, does not necessarily prove misconduct, the expense and effort accompanying a court filing are such that they do not deserve to be minimized. The Comptroller's office, for purpose of reporting, separates Personal Injury Police Action Claims from Police Action Civil Rights Claims. In 2019, there were 3614 personal injury claims and 1468 Civil Rights Claims filed. Some were settled by Comptroller "Pre-litigation" and some went on to be filed in court. One can assume that some number fell by the wayside between the time they were filed in court as well. A little more than half (5110 of 97 percent = 52 percent) of Personal Injury Police Action Claims were settled Pre-litigation by the Comptroller in the 2017-2020 time period. If about one-half of all police action claims are settled by the Comptroller and about 3000 per year continue on to court filings, it would seem that approximately 6000 sworn complaints are brought each year.

calling for indemnification will swell.  In the past, qualified immunity spared both the officer and the City.  Without immunity, the City will be exposed to greater costs unless it denies indemnification.  In the end, the choice between "Unsubstantiated" and "Exonerated" findings may determine who bears the cost.

### E.    Adverse Credibility Determinations

Aside from the annual consultations and review of disciplinary practices to be conducted by the OIG-NYPD required by Section 808,[1861] the Charter called for a report to the Speaker of the City Council, by September 1, 2018, which was to detail "a plan to establish a system for obtaining and reviewing adverse credibility determinations."  While a look at adverse credibility determinations is now included in the court-ordered Early Intervention Program, the stated purpose of early intervention is "non-disciplinary."

Although Charter section 807 is aimed at identifying police officers who may need enhanced Training or monitoring" the report was to include, as well, a description of the Department's "current policies for the collection and use of such determinations, including, but not limited to, any . . . discipline that may result" from adverse credibility determinations. [1862]

The 2018 Report submitted to the City Council Speaker[1863] described, as required, the creation and workings of a joint effort in 2014, requested by then-Commissioner William Bratton, with the city's five District Attorneys and two United States Attorneys to promptly inform the Department of all adverse credibility rulings.  That effort continues with the Deputy Commissioner of Legal Matters and added the Special Narcotics Prosecutor and the Corporation Counsel's Family Court Division.  In 2016 the process was formalized with the creation of the Adverse Credibility Committee which consisted of the Legal Bureau, the Detective Bureau and the Risk Management Bureau.  Case materials from the prosecutors' offices to the Legal Bureau was described as an ongoing process.  The Committee concentrated primarily on Training and monitoring.  It did, however, explain,

> Generally, in the infrequent instances in which there have been multiple adverse credibility findings with respect to the same officer or the officer's disciplinary history indicated pertinent information, notice is given to the officer and the commanding officer along with a recommendation to the commanding officer that he or she evaluate either the officer's current assignment is the one most appropriate for the officer.

In the five-year period, 2014-2018, the Committee received 81 referrals.  Since much of the work of the Adverse Credibility Committee is being folded into the work of the Early Intervention Committee, as part of the Early Intervention Program (EIP) for SQF misconduct, it is unclear what role adverse credibility determinations will play in disciplinary decisions.  The Department states that the EIP is not part of the disciplinary system, but in its implementation

---

[1861] After May 2020, Local Law 166 only requires a Section 808 report once every three years.

[1862] Section 3 of LL 2017/169 (unconsolidated).

[1863] Supplemental Adverse Credibility Determination Study (SACDS).

order of EIP, the Court specifically directed that "referral for potential disciplinary action to an internal NYPD bureau" shall be made "when appropriate."[1864]

Prior to the Adverse Credibility Committee being "folded" into EIP, according to the SACDS, the Legal Bureau would receive more than a list of judicial findings of adverse credibility rulings. In addition,

> As part of the ongoing relationship between the Legal Bureau and the prosecutors, the Committee[1865] receives: 1) the disclosure letter where applicable, 2) all relevant case materials, including the hearing, grand jury, and or trial transcripts, and 3) the written decision by the Court where applicable . . . [R]eports are not limited to judicial findings of adverse credibility . . . prosecutors may also make in-house determinations of adverse credibility based on, for example, inconsistencies between reports and affidavits or grand jury testimony . . . . In the event that such a determination is made, the prosecutors are similarly expected to forward such cases and associated case materials to the Legal Bureau for review by the Committee . . . . When materials are received, relevant information about the case and officer(s) involved are logged into a data base maintained by the Legal Bureau for tracking purposes.[1866]

Information flowing from prosecutors to NYPD in this regard is ad hoc, typically provided on an informal basis. Each District Attorney has their own policy and practice. To the extent that "lists" are made by prosecutors of questionable credibility, the record is "work product" and entitled to status as a qualified privilege.[1867] This status does not preclude voluntary disclosure by a District Attorney to NYPD, which given the necessity of a cooperative working arrangement would seem to be common sensical.

The question arises as to what role if any this information finds its way into disciplinary decisions. The SACDS advised:

> In the rare instances when the adverse credibility finding suggests possible illegal conduct, such as intentionally lying under oath, no notice is given to the officer and the Committee forwards the case material to the Internal Affairs Bureau along with a recommendation that the matter be investigated and, if appropriate, referred for discipline.

Credibility issues arise when an officer appears before a CCRB investigator. Beginning in 2020, CCRB has the authority to investigate false statements made in the course of a FADO investigation by an officer. In the four years prior to the amendment (2016 to 2019), CCRB referred 65 cases to IAB where it detected mendacity. Six of those cases were substantiated. With CCRB's expanded authorization to conduct its own investigation and recommend discipline for

---

[1864] *Floyd*, ECF Doc. No. 767 (June 20, 2020), *supra*, at 10.

[1865] In this quote, "Committee" refers to the Adverse Credibility Committee.

[1866] SACDS at 3, *supra*

[1867] *Stengel v. Vance*, 192 A.D.3d 571 (1st Dep't 2021).

false statements made to CCRB, it would seem appropriate for CCRB to have access to adverse credibility determinations and the same materials made available to the Legal Bureau or, at a minimum, the materials given to IAB.

In addition to CCRB investigations of a statement made to a CCRB investigator, it is foreseeable that concurrent investigations of multiple statements made by an officer regarding the same encounter will be undertaken. In such cases, it is likely that statements made in departmental filings, in affidavits, to prosecutors, in a grand jury and in court will all relate to the same subject matter as the CCRB investigation. It may also be that IAB is conducting its own investigation, either *sua sponte*, or upon referral by a prosecutor or a court. Cooperation and sharing of information between CCRB and IAB when both are investigating false or misleading statements about the same encounter would seem to be essential.

The Court's remedy opinion called for increased deference by the Department to CCRB credibility determinations. It would be inconsistent with that mandate to have DAO dispute an SQF case which hinged on credibility of the officer while the Department was aware of credibility complaints by prosecutors and hid those complaints from CCRB. It would be doubly problematic if CCRB were investigating a false statement case involving an officer but, again, the Department knew of credibility issues (either in the same case or another case) that it would not share with CCRB. It would be troubling, if not unethical, for a DAO attorney to seek to overturn a CCRB credibility assessment while withholding adverse credibility information.[1868]

## XIV.   EXTERNAL OVERSIGHT BY COMPANION AGENCIES

Aside from Legislative oversight, there are four other Executive agencies with power to review and comment on NYPD's performance, including its disciplinary processes. Their assigned responsibilities overlap to some degree, and redundancies and gaps exist as well. The Department of Investigation concluded, "Having all three review models coexist in New York City, in three separate agencies, creates the potential for dissipation of effectiveness and inefficient use of resources as well as conflict and competition."[1869] The DOI continued:

Based on this review, we have identified five broad areas of recurring concern in external oversight of the NYPD, which inform our ultimate conclusions and recommendations: (i) the potential for redundancy, confusion, and conflict among oversight agencies; (ii) the need for community engagement; (iii) identifying and addressing perceptions of institutional bias; (iv) the challenges in accessing NYPD

---

[1868] *See, e.g.*, *GEICO v. National Ind. Truckers*, 180 A.D.3d 900, 902 (2d Dep't 2020) (lack of candor to an arbitrator constitutes misconduct).

[1869] NYC Department of Investigation, "Investigation into NYPD Response to the George Floyd Protests 90, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12. 18.2020.pdf. Reference is to City agencies and does not include the Office of the Attorney General.

records; and (iv) the effect of oversight recommendations on NYPD policy and procedure.[1870]

Unfortunately, each agency has limited powers of review, and, in the end, their findings are merely advisory. Supervision and discipline remain entirely in the hands of the Police Commissioner. The Department may respond to inquiries and recommendations by each agency, but the level of cooperation and response is ultimately up to the discretion of the Commissioner.

The NYC Police Reform and Reinvention Collaborative Draft Plan submitted by the City to the Governor[1871] called for an expansion of CCRB's authority to incorporate the powers of the Inspector General for the NYPD and the Commission to Combat Police Corruption—thereby consolidating the separate efforts for the first time. According to the submitted plan, "Putting all three under one umbrella will allow a new, stronger entity to establish itself as a trusted and robust oversight voice."[1872] Consolidation would require amendments to the City Charter and Administrative Code, which are yet to be proposed.

However, the implementing Resolution of the Plan, when adopted by the City Council three weeks later,[1873] did not go that far. Without mentioning consolidation, the adopted Resolution merely provided:

> To earn the trust of all the City's communities, the NYPD must be transparent while holding members accountable. New York City has an extensive set of internal and external accountability and oversight mechanisms. These include the Commission to Combat Police Corruption (CCPC) to monitor and evaluate anticorruption programs; the Civilian Complaint Review Board (CCRB), to receive, investigate, mediate, hear, make findings and recommend action on complaints against police officers; and the NYPD Inspector General at the Department of Investigation, charged with investigating, reviewing, studying, auditing, and making recommendations related to the NYPD. The plan proposes strengthening some areas and engaging in structural reform of others.[1874]

A brief introduction to the four companion oversight agencies is helpful.

---

[1870] *Id*. at 92. Adding to the confusion, for the average citizen, is a website maintained by the NY County District Attorney, https://www.manhattanda.org/policemisconduct/, which asks for reports of police misconduct to be made to the Police Accountability Unit within the office.

[1871] NYC Police Reform and Reinvention Collaborative Draft Plan at 8, adopted by the City Council on Mar. 25, 2021, Intro. Res. 1584/2021.

[1872] *Id*. at 15.

[1873] NYC Council Resolution 1584-2021 adopted March 25, 2021, available at https://legistar.council.nyc.gov/Legisl ationDetail.aspx?ID=4890502&GUID=2CB9D744-6371-434F-8331-4A923FF529AB&Options=ID|Text|&Search=police.

[1874] *Id*. at 13.

## A.    Commission to Combat Police Corruption (CCPC)

Shortly after approval in 1966 of the Police Unions' Charter Initiative prohibiting civilian investigations of police misconduct (discussed above), Mayor John Lindsay established the "Knapp Commission." By Executive Order No. 11 of 1970, Whitman Knapp and four other named private citizens were directed to "investigate the extent of police corruption in the City."[1875] They were authorized to "hold hearings, public and private." The Commission was further empowered by accompanying amendments to the Administrative Code to administer oaths and to require and enforce production of witnesses and documents.[1876] The Order and Code were challenged as violative of the newly adopted Charter Section 440 provision, on the grounds that the Mayor and the Police Commissioner were prevented from "authoriz[ing] any person . . . to receive, to investigate, to hear, or to require or recommend action upon, civil complaints against members of the police department."[1877]

The challenge failed. In *Kiernan v. New York*, the court determined that CCRB and the Knapp Commission were of a "wholly different" character.[1878] More specifically, the Knapp Commission was to explore the "over-all situation regarding police corruption" while the CCRB receives and investigates "specific complaints against particular members of the department."[1879]

Twenty-two years later, on July 24, 1992, Mayor Dinkins issued Executive Order 42, creating the "Mollen Commission," named after retired Justice Milton Mollen who chaired the commission.[1880] The Executive Order mandated an evaluation of Internal Affairs procedures, which had been publicly criticized in a series of articles by journalist Michael McAlary. The Commission held public hearings and subpoenaed numerous documents and witnesses. Subpoena power became available when Judge Mollen was designated a Special Deputy Commissioner of the Department of Investigation with authority under Charter Section 802 and 805.[1881]

Once again, the establishment of a commission to investigate police misconduct was challenged in court.[1882] However, the Charter provision cited by the petitioners (Section 440) had changed after amendment by the City Council in 1986. The Court held, once again, that the creation of a commission to investigate general conditions within the Departments as opposed to specific complaints against officers was permissible, even if it entailed public examination of individual allegations.[1883]

---

[1875] The Knapp Commission is famously remembered for the vivid testimony of Frank Serpico.

[1876] NYC Admin. Code § F51-8.0 (repealed).

[1877] NY City Charter § 440 (version repealed, LL 1/1993).

[1878] 64 Misc. 2d 617, 621 (Sup. Ct. N.Y. Cnty. 1970), aff'd 35 A.D.2d 1081 (1970).

[1879] *Id.*

[1880] The Mollen Commission extensively examined allegations regarding Officer Michael Dowd. *See Kelly v. Dinkins*, 155 Misc. 2d 787, 787-89 (Sup. Ct., N.Y. Cnty. 1992).

[1881] *Id.* at 788.

[1882] *Id.*

[1883] *Id.* at 790.

One of the principal recommendations of the Mollen Commission was for the City to establish a permanent independent oversight agency to continually investigate police misconduct. One response to this call was Executive Order No. 18 of 1995 (February 27, 1995, Mayor Giuliani), creating the Commission to Combat Corruption (CCPC), chaired successively by Richard Davis, Mark Pomerantz and by Michael Armstrong until his death on October 17, 2019.[1884]  Kathy Hirata Chin is the current Acting Chair. CCPC has remained in continuous existence since 1995 and has issued 25 subject matter reports and 19 annual reports.  CCPC is authorized to perform audits, studies and analyses to assess the quality of the Department's systems for combatting corruption. If it receives complaints, it is to refer them to the appropriate investigating agency and then to monitor the effectiveness of the response.  It may issue subpoenas with the assistance of the Department of Investigation and conduct hearings.  However, "the Police Department remains responsible for conducting investigations of specific allegations of corruption."[1885]

Regarding its status as a non-statutory "monitor," the Commission wrote in 1996:

The creation of this Commission, by an executive order of the Mayor on February 27, 1995, has been criticized by some.  They have contended that an independent agency to monitor the Police Department's performance of that mission, can only be effective if the agency is empowered to conduct its own parallel investigations in competition with the Police Department.  We regard that contention as without merit.  Indeed, we believe, and our experience has demonstrated, that the Commission's ability to effectively monitor the Police Department's anti-corruption activities has been enhanced substantially for the very reason that it does not compete investigatively with the Internal Affairs Bureau, the Police Department's anti-corruption arm.  Because it is a monitor, and not a rival investigator, the Commission has been able to gain unprecedented and extremely broad access to Police Department personnel, records, processes and strategy formation.  At the same time, the Commission does have the ability in extraordinary circumstances, to conduct its own investigation of specific allegations of misconduct.[1886]

The Executive Order calls for five citizen members appointed by the Mayor.  With the sad passing of long-time Chair Michael Armstrong in 2019, there are only three appointees at this time.  The Commission is authorized to "employ an Executive Director and other appropriate staff sufficient to organize and direct audits, studies and analyses" within its mission.[1887]  At present it appears it has been reduced to a staff of five, though it can work in conjunction with the DOI and utilize DOI staff with consent of the DOI Commissioner.

---

[1884] *See* About the Commission, NYC Commission to Combat Police Corruption, available at https://www1.nyc.gov/site/ccpc/about/about.page.

[1885] Executive Order No. 18 of 1995 at 5, available at http://www.nyc.gov/html/ccpc/assets/downloads/pdf/EXECUTIVE-ORDER-18.pdf.

[1886] First Annual Report, CCPC at 2-3.

[1887] Executive Order No. 18 of 1995.

### B.    New York Police Department Office of the Inspector General

In 2013, pursuant to Local Law 70, the New York City Charter was amended to create the Office of the Inspector General for the New York City Police Department (OIG-NYPD).[1888]  The OIG-NYPD was created as a unit within the Department of Investigations (DOI),[1889] which is overseen by a Commissioner, charged with "increasing public safety, protecting civil liberties and civil rights, and increasing the public's confidence in the police force."[1890]  In support of this mission, the OIG-DOI must "investigate, review, study, audit and make recommendations relating to the operations, policies, programs and practices, including ongoing partnerships with other law enforcement agencies, of the New York city police department."[1891]

The DOI Commissioner appoints the Inspector General of the New York Police Department to implement the mandates on behalf of the DOI by filing publicly available reports on the conduct investigated.[1892]  The OIG-NYPD interprets its mandate broadly—including the authority to investigate issues involving use of force, bias and discrimination, and police response to political protest and mass demonstration.[1893]  The OIG-NYPD has the ability to investigate both individual and systemic allegations of misconduct, but generally focuses more broadly on systemic issues in policing.[1894]  In its most recent annual publication, the OIG-NYPD reported having 56 open investigations, both systemic and individual.[1895]  Notably, under the City Charter, the NYPD Commissioner is required to respond to each OIG-NYPD report filed within 90 days.[1896]

The City Charter requires establishment of a "complaint bureau . . . [which] shall receive complaints from the public, including, but not limited to, complaints about any problems and deficiencies relating to the New York city police department's . . . operations, policies, programs and practices."[1897]  The OIG does not read this section as authorization to handle all individual

---

[1888] *See generally* N.Y. City Charter, Chapter 34, §803(c)(1); *see also* Local Law 70, https://www1.nyc.gov/assets/doi/oignypd/local-law/Local-Law-70.pdf.

[1889] The Department of Investigations is considered New York's "corruption watchdog" and is empowered to investigate "any agency, officer, elected official, or employee of the City, as well as those who do business with or receive benefits from the City." *About DOI*, New York City's Inspector General, https://www1 nyc.gov/site/doi/about/about.page.

[1890] N.Y. City Charter, Chapter 34, §803(c)(1).

[1891] *Id*.

[1892] N.Y. City Charter, Chapter 34.§ 803(c)(2).

[1893] First Annual Report, New York City Department of Investigation – The Office of the Inspector General for the NYPD-OIG (Mar. 2015) ii, available at https://www1 nyc.gov/assets/doi/reports/pdf/2015/2015-03-31-Nypdig_annualreport_pr.pdf [hereinafter OIG-NYPD First Annual Report].

[1894] *See* FAQ, Inspector General for the NYPD, available at https://www1 nyc.gov/site/doi/oignypd/faq.page.

[1895] More specifically, the OIG-NYPD has 43 investigations that have been open for six to 12 months, 7 investigations open for 13 to 24 months, five investigations open for 25-36 months, and one investigation open for over 36 months. Fifth Annual Report, New York City Department of Investigation – The Office of the Inspector General for the NYPD-OIG (Apr. 2019) 4, available at https://www1.nyc.gov/assets/doi/press-releases/2019/April/08OIGNYPDAnnualReport04-01-19.Release.pdf [hereinafter OIG-NYPD Fifth Annual Report].

[1896] N.Y. City Charter, Chapter 34, § 803(e)(2).

[1897] N.Y. City Charter, Chapter 34 § 804.

civilian complaints as they come in.[1898]   Instead, as noted in its recent report on the NYPD's response to protests following the killing of George Floyd:

> The OIG-NYPD . . .  receives individual complaints from the public, investigates some of them, and refers other to the CCRB or IAB, as appropriate.  In 2019, for example, the OIG-NYPD received 448 total complaints, referring 235, or more than half, to other entities:  the bulk of the referred complaints went to IAB, some to the CCRB, and a handful to other divisions of DOI, or individual police precincts or commands.  The problem is not inter-agency referrals, per se, but rather that the constitutionally protected right of petitioning the government about an issue with law enforcement ought not resemble a game of telephone.[1899]

In 2017 the City Charter was further amended to provide that:

> The inspector general for the police department shall, working with the law department, the comptroller, the police department, the civilian complaint review board, the commission to combat police corruption, and the commission on human rights collect and evaluate information regarding allegations or findings of improper police conduct and develop recommendations relating to the discipline, training, and monitoring of police officers and related operations, policies, programs, and practices of the police department, including, but not limited to, any system that is used by the police department to identify police officers who may be in need of enhanced training or monitoring.[1900]

In particular, among its responsibilities, the Inspector General is to look at NYPD's "response to actions, claims, complaints, and investigations . . . including disciplinary actions."[1901] This, theoretically, could provide a useful source for analysis of disciplinary outcomes in SQF cases.  Unfortunately, Section 808 also declares, "Nothing in this section shall be construed to require the police department to provide any information or documents pertaining to an ongoing criminal, civil, or administrative investigation or proceeding."[1902]   As discussed earlier in this Report, the Department has a history of limiting access to personnel data surrounding disciplinary investigations and both OIG-NYPD as well as CCRB has found this to be frustrating as they examine disciplinary outcomes.

As noted above, the NYPD-OIG, is charged with the responsibility of evaluating civil claims for the purpose of developing, among other things, disciplinary recommendation based in part on an analysis of patterns and trends.[1903]   Unfortunately, the OIG has run into several

---

[1898] Because of the Covid-19 pandemic and Black Live Matters protests, statistics in 2020 are not generally consistent with prior years or useful for trend analysis. In 2020 OIG-NYPD received 618 complaints.

[1899] NYC Department of Investigation, "Investigation into NYPD Response to the George Floyd Protests," *supra* at 94.

[1900] N.Y. City Charter § 808(b).

[1901] N.Y. City Charter § 808(b)(3).

[1902] N.Y. City Charter § 808(f).

[1903] N.Y. City Charter §§ 803, 808.

informational roadblocks when trying to fulfill its statutory duty.[1904]  The OIG asked the Law Department for incident-location data in order to conduct a geographic trend analysis of cases. However, the data provided by the Law Department "lacked sufficient specificity and could not be geocoded with a high degree of accuracy to identify precinct-level trends."  The NYPD-OIG also asked the Law Department to track dispositions by officer, since lawsuits often name several officers.  This would "facilitate the process of creating a dataset that can generate the most useful information to inform both early intervention and trend analysis."[1905]  The Law Department has not, as of yet, complied with this request either.

The OIG-NYPD has run into similar obstacles in attempts at discerning trend analysis in its dealings with NYPD.  NYPD creates annual internal reports which the OIG recommended be made available and public, but the Department "has declined to adopt this recommendation."[1906]

Additionally, another investigatory unit within the Department called Police Action Litigation Section (PALS) was established in 2015.  Apparently, PALS logs detailed information concerning claims which could be useful in identifying patterns and trends for misconduct, including wrongful stops, frisks and searches.  According to the Inspector General, however, this happens on an ad hoc basis in response to specific requests and does not involve routine data analysis to identify historical trends in allegations or related metrics.  The OIG was unable to specifically follow-up on this issue since the Department denied it access based on a claim of attorney-client privilege, which OIG-NYPD refutes as inapplicable to information sharing between OIG and NYPD.[1907]  According to OIG, NYPD barred interviews of employees whose job was to monitor litigation on the ground that it would reveal "sensitive information" which is protected by City Charter.[1908]  Again, NYPD-OIG argues that the "sensitive information" provision is inapplicable.  The Department denied the accusation, claiming, "In addition to making Department executives available for interviews, and contrary to the narrative put forth by OIG, NYPD also produced more than a hundred pages of sensitive information related to litigation data analysis and monitoring of officer performance.  Thus, OIG's narrative that NYPD has been

---

[1904]    *See, e.g., Inspecting the NYPD 'Puzzle Palace' Topher Sanders*, ProPublica https://www.propublica.org/article/inspecting-the-nypd-puzzle-palace?utm_source=sailthru&utm_medium=email&utm_campaign=dailynewsletter&utm_content=river-links. Describing "Withheld record" "Canceled interviews" and "Slow-walk requests."

[1905]    NYPD-OIG 2019 Assessment of Litigation Data involving NYPD at 17, available at https://www1.nyc.gov/assets/doi/reports/pdf/2019/Apr/13LitData_pressrelease_report_43019.pdf.

[1906]    *Id.* at 15.

[1907]    *Id.* at 18.

[1908]    *See* N.Y. City Charter § 803(c)(3).  "The Mayor, in consultation with the department and the New York City police department, shall have the discretion to determine how sensitive information provided to the department in connection with any investigation, review, study, or audit undertaken pursuant to this section shall be treated. The Mayor shall provide the Council with any guidelines, procedures, protocols or similar measures related to the treatment of sensitive information that he or she puts in place. Sensitive information shall mean information concerning (a) ongoing civil or criminal investigations or proceedings; (b) undercover operations; (c) the identity of confidential sources, including protected witnesses; (d) intelligence or counterintelligence matters; or (e) other matters the disclosure of which would constitute a serious threat to national security or to the safety of the people of the city of New York."

uncooperative and non-compliant is hardly accurate as NYPD fully satisfied OIG's requests for litigation data to the extent possible."[1909]

### C.    Commission on Human Rights - Bias-based Profiling

Title 8 of the NYC Administrative Code establishes the Commission on Human Rights in New York City (CCHR), which, among other things, is tasked with eliminating and preventing discrimination in "employment, public accommodations, and housing and other real estate."[1910] The Commission may also act to protect civil rights threatened by intimidation, coercion, violence, or harassment. Presumably, as with the federal Civil Rights Acts, this could cover coercion under color of state law.[1911]

Title 8 has a carve-out for actions against police officers and the Department.[1912] "Acts committed by members of the police department in the course of performing their official duties as police officers whether the police officer is on or off duty" are exempted from its ambit by Section 8-131. Instead, a private right of action may be brought by a complaint filed with CCHR, but only under the provisions of Section 14-151 of the Administrative Code, which prohibits "Bias-based Profiling," against an individual officer or against the Department. Proceedings under that section are limited to injunctive and declaratory relief. [1913]

Under Section 14-151, CCHR may also receive a complaint against the Department as a whole if a "policy or practice . . . regarding the initiation of law enforcement actions has a disparate impact" on subjects of law enforcement action on the basis of national origin, gender, disability, sexual orientation, immigration or citizenship status, or housing status.[1914] The Department may present an affirmative defense demonstrating that the policy or practice bears a significant relationship to advancing a significant law enforcement objective. If CCHR proposes an alternative policy or practice with less disparate impact, the Department may rebut with proof that the proposed alternative would not serve the law enforcement objective as well.

---

[1909] NYPD Response (Aug. 7, 2018) at 9, available at https://www1 nyc.gov/assets/doi/oignypd/response/Litigation DataResponse_FINAL_80718.pdf.

[1910] N.Y.C. Admin. Code § 8-101.

[1911] Title 8 distinguishes between "Unlawful Discriminatory Practices," under Section 8-107, primarily geared toward employment and housing discrimination, and acts constituting "Discriminatory Harassment or Violence," governed by Section 8-602. The latter is not dissimilar to federal Civil Rights actions under 42 U S C § 1983 in that it protects Constitutional rights and permits the Corporation Counsel, at the request of CCHR or on its own initiative, to bring a civil action with potential monetary damages up to $100,000, and injunctive or declaratory relief.

[1912] NYC Admin. Code § 8-131.

[1913] Pursuant to Title 8 of the Administrative Code, the Commission has the authority to investigate the allegations and make a final disposition. N.Y.C. Admin. Code § 8-109(g). If the Commission determines that probable cause exists, the complaint is referred to an administrative law judge, § 8-116, and the proceedings are governed in accordance with § 8-119. The Commission's Law Enforcement Bureau prosecutes the matter, and the administrative law judge issues the final Report and Recommendation. *See Complaint Process - Detailed*, NYC Human Rights, available at https://www1.nyc.gov/site/cchr/enforcement/complaint-process-detailed.page. Ultimately, however, the Commission's Chairperson issues a Decision and Order adopting or rejecting (in whole or in part) the administrative law judge's report. *Id*.

[1914] N.Y.C. Admin. Code § 14-151(c)(2).

On its website, CCHR offers a few examples of bias-based conduct.[1915]  One example given is when an officer selectively stops and questions a transgender individual, apparently for no reason.  Bias appears to be the sole reason for the stop.  (The posting is merely hypothetical, since CCHR has never actually brought a selective enforcement case.)  In the example posted, reasonable suspicion is absent, so bias is apparent.  The more difficult hypothetical, not posited on the website, would be a case where the officer selectively stops persons in a protected class but where reasonable suspicion exists to justify the stop.

In response to an inquiry by the Monitor Team, CCHR indicated that, as of April 2019, they had reviewed three complaints against individual officers for profiling.[1916]  None have resulted in enforcement actions by the Commission.[1917]  CCHR has sought a "policy or practice" complaint against the Department.

On its website, the Commission cites examples of Bias Based Profiling which, in effect, are examples of an officer engaging in selective enforcement.  They are not cases CCHR pursued, but rather are offered as hypothetical examples.  The CCHR website describes a case where an officer tells African-American students to leave an area, while allowing white students to remain.  It also cites a stop and questioning of a transgender woman, while not questioning the cis-gendered woman with her.  Whether these two encounters would be sufficient to substantiate a claim under AG 304-17, absent a demonstration of motivation or intent, is uncertain.

### D.    The Law Enforcement Misconduct Investigative Office – Deputy Attorney General

In the wake of protests surrounding the death of George Floyd[1918] the Legislature added a new Section 75 to the Executive Law,[1919] which established a Law Enforcement Misconduct Investigative Office (LEMIO) headed by a Deputy Attorney General, to review "operations, policies, programs and practices" of each police agency within the State.  The office can receive and may investigate complaints and, on its own, initiate investigations into fraud, use of excessive force, conflicts of interest and abuse.  Its designated responsibilities include "protecting civil liberties and civil rights, ensuring compliance with constitutional protections and local, state and federal laws, and increasing the public's confidence in law enforcement."[1920]  The first-enacted legislation was to take effect April 1, 2021.  However, with the 2021 budget, Section 75 was

---

[1915] https://www1.nyc.gov/assets/cchr/downloads/pdf/publications/BiasBasedHarassment_Brochure%20Final.pdf.

[1916] April 9, 2019, reply, Damion K.L. Stodola, General Counsel, CCHR. A fourth was received but closed administratively.

[1917] Standing was premised upon a claim of reputational injury to members of the Union.  In upholding the Union's claim of likely injury, the Appellate Division took note of the fact that CCHR had filed complaints against two officers as of the time of the decision (June 23, 2016—two and one-half years after the law took effect on November 20, 2013).

[1918] George Perry Floyd, Jr., murdered in Minnesota in 2020, is no relation to David Floyd, the lead Plaintiff in the present case.

[1919] L. 2020, ch. 104.

[1920] N.Y. Exec. Law § 85(2)(d).  Note the identical language to Local Law 70, the New York City Charter amendment to create the Office of the Inspector General for the New York City Police Department.

amended to take effect October 16, 2021.[1921]  The powers accorded the Office are sweeping. Depending upon the budget assigned[1922] and the efforts the new Office makes, this legislation has the potential to significantly affect Fourth and Fourteenth Amendment compliance.  The Office may:

- Determine if allegations warrant disciplinary action;
- Investigate patterns, practices, systemic issues or trends;
- Subpoena witnesses;
- Require production of records;
- Require officers to answer questions under oath;
- Publish findings (with redactions if required by the Public Officer's Law).

The legislation invests certain authority with the Office that empower it to overcome identified weaknesses in CCRB's set of tools.

- The Office is empowered to investigate broader range of misconduct, since the FADO limits imposed upon CCRB do not apply to it;
- The office will have unlimited access to information and files held by NYPD many of which are not available to CCRB;
- Every officer within the police agency is mandated to report promptly to the Office any corruption, fraud, use of excessive force, criminal abuse by another officer.  The failure to so report "shall be cause for removal from office or employment or other appropriate penalty."[1923]
- The Office is empowered to investigate patterns of misconduct.

This last power (authorization to investigate patterns) is enhanced by a specific mandate that the Police Commissioner must refer any case to the Office when there have been five or more complaints against an officer in a two-year period.  This may help in tackling a persistent problem, under the current system, whereby patterns of stop and frisk abuse are not investigated when complaints fail to be substantiated.  This is especially true for the thousands of racial profiling complaints, none of which have been substantiated against a Uniformed Member of the Service (UMOS).  The Executive Law now requires a search for patterns regardless of whether the prior complaints have been substantiated.[1924]

---

[1921] L. 2021, ch. 59.

[1922] The enacted state budget for FY 2021-22 appropriated $573,000 for the office.

[1923] N.Y. Exec. Law § 85(5).  Compare with Patrol Guide § 207-21 ("All members of the service have an absolute duty to report any corruption or other misconduct or allegation of corruption or other misconduct, of which they become aware.")

[1924] *Cf. Jenkins v. Zambrano*, 1:15-cv-05889 (E D N Y. June 15, 2019), ECF No. 94. (handling of complaint, even though unsubstantiated bespoke indifference).

The Office is under development and time will tell whether it can or will fulfill these promises.[1925]

In its Second Annual Report, LEMIO has made several legislative recommendations, including:

- "Law enforcement agencies should track and report a standardized set of data on traffic and pedestrian stops including the duration and location of each encounter, the reason the encounter was initiated and its result, the perceived race, gender, and age of the person stopped, and actions taken by the officer during the encounter such as handcuffing, ordering a person out of a vehicle, searching people and vehicles, seizing property, and using force.
- Law enforcement agencies should also make their policies publicly available online, except for policies that, if disclosed, would substantially undermine ongoing investigations or endanger officers or members of the public. They also should be required to publish collective bargaining agreements and to disclose annually the amount they spend on settlements relating to alleged misconduct." [1926]

In 2021, LEMIO, in conjunction with the OAG Civil Rights Bureau, focused upon "retaliation by police against people engaging in First Amendment-protected activity, particularly in connection with racial justice protests."[1927] The OAG sued NYPD in federal court "seeking to end the department's pattern of using excessive force and false arrests against New Yorkers during First Amendment protect protests."[1928] The allegations are of violations of First, Fourth and Fourteenth Amendment Rights, in particular against persons attempting to record events. With a claim of a "repeated failure to supervise and discipline demonstrates a de facto policy and custom of deliberate indifference by the City, the NYPD, [the Mayor], the Police Commissioner . . . and other NYPD supervisory personnel."[1929] Doc. 311 at 54 (Nov. 2, 2021).

---

[1925] On December 29, 2023, the agency published the results of an investigation into an individual encounter for the first time. It found that an officer of the Tonawanda Police Department (TPD) had wrongfully arrested two teenagers and used excessive force in the arrest of one of the minors. LEMIO recommended that TPD "review the . . . incident and discipline" the officer. It also recommended an update of the TPD's use of force policy and for further training.. Report and Findings pursuant to Executive Law § 75(3) regarding July 20, 2022 incident and the City of Tonawanda Police Department. (https://ag.ny.gov/sites/default/files/reports/753report-tonawandacity-pd.pdf).

[1926] Second Annual Report Pursuant to Executive Law Section 75, at 8. https://ag ny.gov/sites/default/files/lemio-2022.pdf.

[1927] First Annual Report Pursuant to Executive Law Section 75, at 4. https://ag ny.gov/sites/default/files/lemio-report-final.pdf.

[1928] *Id. In re: New York City Policing During Summer 2020 Demonstrations*, No. 20-cv-8924 (S.D.N.Y. 2021). ("*2020 Demonstrations*")

[1929] *Id.*, Doc. 311 at 54 (Nov. 2, 2021). On March 4, 2022, the Second Circuit directed that the PBA could intervene on behalf of represented officers, reversing a lower court order denying intervention. *New York City Policing* (2d Cir. 2022), ECF 21-1316.

## XV.    RECOMMENDATIONS

Recommendations herein are meant to be specifically aimed at, and limited to, conduct and case processing related to *Floyd* litigation, i.e., Fourth and Fourteenth Amendment compliance in connection with investigative encounters.  Some recommendations may address the disciplinary process as a whole, which would include Stop/Question/Frisk (SQF) along with force, biased-based policing, etc.

### Transparency

1. Any items in the Departmental Manual pertaining to Fourth Amendment or Fourteenth Amendment enforcement, compliance, and related discipline should be made publicly available including: procedures, supervisory responsibility, investigations, interviews, reporting and decision-making regarding misconduct, interaction with Civilian Complaint Review Board (CCRB) or other investigative bodies.  Such provisions in the Departmental Manual, which includes the Patrol Guide and the Administrative Guide, should be publicly posted and available to the public, with exceptions as provided in NYC Admin. Code § 14-164 (confidential information non-routine investigative techniques, material which could compromise safety or ongoing investigations and operations).[1930]

2. Proposed changes to the Disciplinary System Penalty Guidelines or the Department Manual pertaining to Fourth Amendment or Fourteenth Amendment enforcement, compliance, and related discipline, should be made available to the Monitor prior to adoption.  The Monitor, after consultation with the Community Liaison, may direct that such proposed changes be made public or presented for public comment.

3. Complainants and officers should be advised every 60 days of the status of a pending complaint, including where it is pending and causes for delay. When either CCRB or the Internal Affairs Bureau (IAB) sends notice of an outcome to a complainant, the complainant should be advised with particularity which allegations were substantiated along with a listing of any other outcomes and any specific penalty or guidance ordered.

4. Upon receiving notice and a directive to impose discipline or guidance of a substantiated SQFS (Stop, Question, Frisk, Search of Person) finding by CCRB, the CO must report back to the Department Advocates Office (DAO) the final result, including the specific penalty or guidance imposed and the date of imposition, within 30 days.  This should be forwarded immediately to CCRB and be made publicly available. Any complainant should be personally advised of the penalty outcome.

---

[1930] In the course of litigation and discovery in *2020 Demonstrations*, Plaintiffs sought to obtain the entirety of the Administrative Guide with specificity as to the timing of any amendments.  The City objected for several reasons, among them that production of the entirety of the Guide was unnecessary to the litigation and that specifying the timing of amendments would be burdensome.  In support of disclosure, the Attorney General wrote that "The Guide is a policy document that should have long ago been produced." Doc. No. 1004. The City's objection was denied by U.S. Magistrate Judge Gabriel W. Gorenstein with the caveat that production would not be deemed a waiver of any individual claim of protection for "purportedly privileged material." Doc. No. 1006

5. Command disciplines imposed for SQFS misconduct are not "technical" findings under Public Officer's Law § 86 and should be publicly available under FOIL.  *See, e.g.*, *United Fire Officers Ass'n v. de Blasio*, 846 F. App'x 25, 33 (2d Cir. 2021).

6. NYPD's "Officer Profile" (https://nypdonline.org/link/2) posting of "Disciplinary History" should include all substantiated SQFS allegations accepted by the Police Commissioner (with date of incident and specific outcome, including guidance or penalty). This should include SQFS substantiations whether made by CCRB, IAB, or within the Department.

7. When CCRB has referred Other Possible Misconduct Noted (OPMN) to NYPD arising from an SQFS investigation, the Department should promptly advise CCRB of the disposition, level of discipline, and penalty, if any, imposed.  Substantiated dispositions should be listed on the publicly posted online profile and in CCRB's listing of MOS disciplinary outcomes.

8. The Law Department should review and assess the accuracy of its public postings pursuant to Admin. Code § 7-114 (Civil actions regarding the police department and covered individuals), and update or correct if necessary:

    a. The Code requires an online posting indicating whether a case was resolved by payment by the city, employer, or covered individual (officer) or another person paying on behalf of a covered individual and, if so, the amount of such payment. This should specify if the Law Department declined to represent or if indemnification was denied.

    b. The Code requires a delineation of whether the complaint alleges use of force, assault and battery, malicious prosecution false arrest or imprisonment, or deprivation of a right pursuant to chapter 8 of title 8 of the Code (right of security against unreasonable search and seizure and against excessive force regardless of whether such force was used in connection with a search or seizure).

        i. Included therein, the posting should include a column indicating if the complaint alleges an illegal stop, frisk, or search.

**Complaint Processing**

9. CCRB and NYPD should agree upon one set of descriptions for findings and outcomes and apply them uniformly.  In particular:

    a. "Exonerated" in SQFS cases should be reinstated by CCRB as a finding, and reserved exclusively for cases where it is demonstrated that the subject officer engaged in the alleged conduct, but the officer's actions were lawful and proper.

    b. "Unfounded" in SQFS cases should be applied in cases of misidentification or where it is demonstrated that the officer did not perform the acts or engage in the conduct attributed to the officer.

    c. In SQFS cases, if there is insufficient evidence to determine whether or not the acts alleged occurred or that the officer performed the acts or engaged in the conduct attributed to the officer, the case is "unsubstantiated" not "unfounded."

471

10. In any case containing an SQFS allegation where there is overlap of separate investigations or a split in investigations of the same complaint, encounter or subject officer, NYPD and CCRB should coordinate the investigations, sharing information and explaining differences in outcome. CCRB should have access to any interview by IAB of any police witnesses regarding the subject matter of the complaint being investigated by CCRB. Where separate investigations (by NYPD and CCRB) of an encounter have occurred, DAO should present both matters to the Police Commissioner for reconciliation or resolution. If the findings regarding SQFS conduct are inconsistent, the Police Commissioner should describe, in writing, the reasons for the final decision and CCRB should have an opportunity to respond or publicly comment.[1931]

11. Deputy Commissioner of Trials should be provided with a complete CPI (not just a Summary of Employment History) and disciplinary history, including matters which have been sealed or did not result in discipline and including investigations by IAB. While prior unsubstantiated allegations cannot, in and of themselves, form the basis for a finding of misconduct, unsubstantiated matters may be considered in weighing assertions, claims or defenses of good faith, mistake, motive, intent, identity, common scheme or plan, or in identifying patterns of misconduct.

12. When investigating misconduct, CCRB and NYPD should examine and consider allegations, findings, judgments and settlements, made in court or before the Comptroller, for related complaints, inconsistent statements, and in assessing credibility, motive, assertions of good faith or mistake, and in identifying patterns of misconduct, as well as when recommending or imposing a penalty.

13. A CCRB panel should have available upon request a complete disciplinary history of the subject officer, including all Departmental investigations, when recommending a penalty for substantiated SQFS misconduct. The CCRB executive director should be able to obtain this history at an earlier point, upon request, during investigation, when relevant to any of the issues arising in that investigation.

14. In SQFS investigations, in light of the fact that substantiated CCRB recommendations are reviewed after referral by Departmental employees and, in all cases, are subject to a final outcome determination by the Police Commissioner, preliminary screening by police designees on every CCRB panel is not necessary. In concordance with the City Charter, CCRB should eliminate its supplemental requirement that a police designee must be one of the members of every SQFS panel and, as well, should eliminate the two-step process recently put in place that requires a secondary review by a panel with a police designee before a substantiation.

---

[1931] In its review of a draft of this Report, dated July 12, 2024, CPR expressed concern that "coordination" as recommended herein would result in NYPD's stripping CCRB of authority to conduct investigations. This misapprehends the intent of Recommendation 10, which is merely that concurrent or overlapping investigations should proceed, when appropriate, with full access to all necessary information and recommendations by both parties and that DAO or the Police Commissioner should not judge a case solely upon the recommendation of one agency without receiving and considering any concurrent investigation which may have been undertaken. This should be done with transparency and with an explanation when CCRB's recommendation is not followed. No one is suggesting that CCRB be stripped of jurisdiction or authority. Command discipline should not be utilized to pre-empt an ongoing CCRB investigation.

15. Upon substantiating an SQFS allegation, the CCRB panel should separately and clearly delineate findings of fact.

16. When CCRB cases with SQFS allegations are "closed pending litigation," CCRB should review the matter upon conclusion of the litigation and determine, unless opposed by the complainant, whether to re-open the matter for investigation or recommendation. The Law Department should send a notice to the Legal Bureau or IAB upon conclusion of litigation, when advised that a CCRB investigation was closed pending litigation. The IAB liaison should be responsible for advising CCRB of the status.[1932]

17. Materials or statements presented to the Comptroller while processing a claim which includes a claim of SQFS misconduct should be made available to CCRB upon request. If needed, CCRB should seek consent from complainants to obtain GML § 50-h transcripts.

18. Materials filed or presented in the course of litigation which includes a SQFS claim, unless privileged, should be made available to CCRB, by the Law Department upon request. Such materials should be considered, by CCRB and the Police Commissioner, in a related disciplinary proceeding.

19. In any SQFS investigation, when assessing the credibility of the subject officer's statements, CCRB should seek and have full access to the entire investigative file or court record of any case alleging a Fourth or Fourteenth Amendment violation, where the officer had been the subject of an adverse credibility finding or is the subject of a pending investigation for making an untruthful, misleading, or false statement, whether sworn or not. If IAB is investigating, or has investigated, a subject officer for an untruthful, false or misleading statement in connection with a current CCRB case, the CCRB should have full access to the file of such investigation and any statements the officer made regarding the encounter for consideration in the pending matter, including pertinent officer interviews conducted by IAB. If CCRB finds that an officer testified untruthfully about material facts pertaining to the encounter, it may disregard the officer's testimony. Such a determination, if made, is entitled to deference when reviewed by the Police Commissioner.

20. "Training" as a finding should be individualized, addressing the specific circumstances of SQFS misconduct, performed in-person (not video), and completed within a reasonably short period of time after the misconduct finding is finalized.

21. In any case where an SQFS allegation was substantiated, when writing after a departure or deviation from a panel recommendation or from the Penalty Guidelines, or when retaining a case, the Police Commissioner should separately and clearly delineate findings of fact and conclusions of law if the basis for departure is either.

    a. In finding facts, CCRB's determination is not conclusive but is entitled to deference and weight. If the Police Commissioner does not accept material facts found by CCRB, he should specify the facts which were not accepted. Such determination should not be made upon a credibility assessment of a witness absent identified

---

[1932] In its review of this Report, dated July 12, 2024, CPR recommended that "Cases should never be closed pending litigation, they should be put on pause and reopened automatically when litigation is completed. This Report does not recommend automatic re-opening without either consent of the complainant or a determination by CCRB.

inconsistent statements or extrinsic evidence, in the record, contravening or supporting the witness' statement. If the Police Commissioner has considered evidence outside the record reviewed by CCRB, he should notify CCRB. Upon such notice, CCRB should have the option to re-open the hearing or reconsider the matter.

b. After a substantiated allegation of SQFS misconduct, if the penalty or level of discipline imposed by the Police Commissioner is less than that recommended by the CCRB panel, but the reason for departure or deviation is an act of lenity, separate from a disagreement over the findings of fact or conclusions of law, the Police Commissioner should explain the factors considered in lenity. Along with such explanation, the statement should contain a list all prior disciplinary investigations and their outcome, whether conducted within NYPD or at CCRB.

c. When setting aside a substantiated allegation of SQFS misconduct, or finding of guilt, by either an NDA, DUP or "not guilty" determination, the Police Commissioner should specify any factual finding and any legal conclusions that form the basis for the action. This should be publicly available, and a copy should be sent by CCRB to any complainant in the matter.

22. The Police Commissioner, upon accepting a command discipline recommendation from CCRB in an SQFS case, may direct a specific penalty or guidance. If the choice of penalties is referred to the Commanding Officer (CO), the CO should apply the Disciplinary Guidelines and inform the Police Commissioner and DAO of the penalty imposed. The CO is not free to deviate from the Guidelines without first conferring with DAO.

23. As recommended by the Commission to Combat Police Corruption (CCPC), IAB referrals for Charges and Specifications should be noted in the CPI, as "referred not charged," when DAO declines to bring charges.

**"Good Faith" and "Mistakes"** [1933]

24. If the subject officer asserts "good faith," "inadvertence," "mistake," or asserts that misconduct was an "isolated" incident (under PG 212-11), the panel should have complete access to all prior investigations where an SQFS allegation was investigated at CCRB and/or within NYPD, whether or not prior cases were substantiated or "sealed."

a. If guidance rather than discipline is recommended by CCRB or directed by the Police Commissioner for an SQFS violation, it should be limited to "isolated cases of erroneous but good faith stops or frisks," as specified in PG 212-11 or when permitted under paragraph (b) or (c). Such a finding for an improper stop or frisk, is not permitted more than one time for an officer. The Department should include,

---

[1933] "Good faith" and "mistakes" are commonly asserted as cause of reducing or dismissing substantiated allegations of SQFS misconduct. The problem for CCRB, as explained by NYPD in another context (profiling), is that, "Even the best investigative protocols . . . cannot go inside an officer's mind to glean, and prove by a preponderance of the evidence, intent or motivation." NYPD response to the June 2019 Report of the Office of Inspector General for the NYPD, August 16, 2019, https://www.nyc.gov/assets/doi/oignypd/response/FinalResponse_to_IG_v2_81619.pdf at 7.

in its posted officer profile, a listing, (including identification of the officer) of each time guidance or no penalty, in lieu of an assessment of penalty days or lost time, was ordered as a result of such finding.

b. "Good faith" or "mistakes" are to be measured objectively. The "good faith" or "mistake" asserted in defense must not only be an honestly held belief or a subjectively honest mistake, but it also must be an objectively reasonable belief or an objectively reasonable mistake measured by the standard of a reasonably trained police officer's point of view.

c. "Good faith" or "Complexity" or "Misunderstanding of the Law" is not a basis for NYPD to NDA, DUP, or to find an officer "Not Guilty" of an SQFS violation but may be used in mitigation. "Good faith," "Complexity," or "Misunderstanding of the Law" is not to be considered in mitigation of SQFS allegations against an officer on more than one occasion.

d. CCRB and the Department should maintain a separate descriptive index, publicly available and posted monthly, for each case where a finding of "mistake" or "good faith" is utilized as justification for reducing a discipline recommendation or excusing misconduct, specifically identifying the officer and the circumstances of the complaint and finding.

25. When making a disciplinary recommendation, the CCRB panel should itemize, with specificity any aggravating or mitigating circumstances found and explicitly state whether any assertions of "good faith," "mistake," or "inadvertence," were rejected or accepted.

26. Corporation Counsel's decision to deny representation or indemnification, in litigation involving the same encounter, based upon wrongdoing or recklessness should be taken into consideration by CCRB and the Police Commissioner in assessing a case and should preclude a finding of mitigation, good faith, inadvertence or mistake. Corporation Counsel should notify NYPD Legal Bureau upon each such declination and a record should be kept by DAO, which record will be made available to CCRB during the course of any related investigation or prosecution. CCRB should be advised of the "general basis" for declination or denial, i.e., a brief description of why representation was denied.

27. In cases where SQFS allegations are not substantiated, CCRB should continue to refer failures to file a stop report to NYPD for investigation. However, if CCRB determines that an officer has abused authority by an improper stop or frisk, it should then fully investigate and independently determine if a stop report should have been filed and was not. In such a case if a stop report is "missing," CCRB should list the failure, if substantiated, as either a separately substantiated offense under the Disciplinary System Penalty Guidelines, or as an aggravating factor, rather than referring the matter to NYPD for later, or separate, investigation. The determination by CCRB is entitled to deference and should only be disregarded by the Police Commissioner in extraordinary circumstances, explained in writing.

28. Consecutive/concurrent discipline: a stop, a failure to file a stop report, a frisk, or a search are all separate and distinct acts. Each act should be examined individually and, if substantiated, the penalties assigned in the Disciplinary Guidelines should be applied

consecutively, absent extraordinary circumstances detailed in writing by CCRB or the Police Commissioner, as the case may be.

## Bias-based Policing and Racial Profiling

29. In establishing a protocol for examination of bias-based policing, CCRB should, at a minimum, include the protocol approved by the court in IAB Guide 620-58.

30. CCRB must affirmatively investigate and document whether slurs or profiling allegations are part of a pattern, either by the subject officer or within a squad or group of officers working together. When investigating a complaint with regard to one officer, CCRB should include a review of past discourtesy, slur, and profiling complaints, whether or not substantiated, by all officers involved in the encounter.

31. CCRB should review a past history of allegations, even if unsubstantiated, to assess whether there exist any patterns of discrimination, as well to assess potential motivation. All profiling investigations should state the results of the investigation for a pattern in its closing report.

32. If IAB decides to separately investigate a profiling complaint (either concurrently with CCRB or after the Police Commissioner receives a substantiated profiling complaint from CCRB), the results of the investigation should be shared with CCRB. If there is a material difference in the findings, the full investigative IAB file should be sent to CCRB for reconsideration.

## Accountability

33. In cases where CCRB has substantiated an improper stop, frisk, or search, CCRB should review, as a potential abuse of authority, any supervisor who was present and in a position to observe the stop, question, frisk, or search for an abuse of authority (failure to supervise), regardless of whether the failure was active or passive. In cases where the supervisor did not actively participate, CCRB panels should have the option to refer the matter to NYPD as Other Misconduct Noted.

34. Any disposition by NYPD of a substantiated CCRB finding of SQFS misconduct should be recorded in the subject officer's Central Personnel Index (CPI). This should include cases that result in a DUP, NDA, guidance or penalties.

35. In cases of training, the record maintained by DAO should specify the training or training module mandated along with confirmation of where and when the training took place.

36. When an audit (RAND, PIE, QAD, Monitor) finds a deficiency in a stop report or a failure to file a stop report, it is not enough to correct the report. A review or investigation, as outlined in Admin. Guide § 318-02, by the Command—CO, Integrity Control Officer (ICO) or Executive Officer (XO)—of the circumstances of the SQFS should be made with findings recorded and maintained or forwarded as required by § 318-02. Paragraph 33 of § 318-02 should be amended to require recording in the CPI of all command disciplines for SQFS misconduct (not just B-CDs). If the SQFS was found to be improper, the CO should impose appropriate discipline or take appropriate action, applying the Disciplinary Guidelines when applicable.

37. In all cases where a stop report has been or should have been completed and where a use of force was indicated in a TRI, the CO or XO should review the propriety of the stop/frisk/search independent of the force investigation and report the findings to DAO. If the investigation is done by IAB or FID, there should be a review of the propriety of any accompanying SQFS behavior with a separate recommendation, even if there is no civilian complainant.  DAO should review and assess for further investigation or discipline if misconduct is indicated.

38. In any force investigation, whether done by the CO, IAB, or FID, there should be an inquiry by the Department into whether there is an SQFS complaint being investigated by CCRB for the same or a related encounter.  In any SQFS investigation by CCRB where the complainant alleges use of force, there should be an inquiry by CCRB into whether there is a force investigation by the local command, IAB, or FID.  In either instance, the two investigations should be coordinated with information and interviews being shared.  If there are parallel investigations of racial profiling or bias-based policing, they should be disclosed and coordinated as well.

39. Patrol Guide § 207-21 should be amended to make it clear that the duty to intervene or report fellow officer misconduct includes a supervisor's duty to report intentionally wrongful SQFS encounters, bias-based policing, and racial profiling (as recommended by OIG-NYPD).

40. As recommended by the Independent Panel, ex parte communications with the Police Commissioner and staff reporting directly to the Police Commissioner regarding pending disciplinary decisions should be documented.

41. 38-A RCNY should be amended to make it clear that a failure to supervise SQFS misconduct may be considered as an abuse of authority and investigated by CCRB, whether or not the supervisor was actively involved or passively neglected proper supervision.

42. The Department Manual should be amended to make it explicit that it is a Commanding Officer's obligation to monitor, investigate, and discipline SQFS misconduct even in the absence of a civilian complaint to CCRB. Admin. Guide § 318-01 needs to be amended accordingly.  As well, the Disciplinary Guidelines, in its list of "Violations of Department Rules and Regulations" (offenses for which command discipline can be imposed at the precinct level), should specify that SQFS misconduct is included therein and should explicitly mandate discipline (at levels directed in the Abuse of Authority section of the Guidelines).

43. QAD should audit samples of TRI reports to determine if a stop/frisk occurred, and if so, to ensure that a stop report was filed if required.

44. Commanding Officers should be required to file an annual report demonstrating compliance with the provision in Admin. Guide § 318-01 whereby multiple command disciplines within a six-month period are referred to the borough/bureau adjutant for consideration of whether Charges and Specifications should be filed.  The result should be sent to DAO. A copy of the report should be sent to the Professional Standards Bureau for consideration.

45. Admin. Guide § 329-15 should be amended to make it clear that the Career Advancement Review Board will take substantiated SQFS allegations into account.

46. Notwithstanding the Administrative Guide mandate that A-CDs be expunged after one year and B-CDs be sealed after three years, records of SQFS misconduct should be kept by DAO and considered during the Disciplinary Guidelines prescribed look-back period (three years for A-CDs and for five years for B-CDs) in order to determine whether to apply progressive discipline. Similarly, such records should be made available to DAO for the purpose of assessing whether there is misconduct "demonstrating a pattern of behavior that indicates an inability to adhere to Department rules and standards," as required by the Guidelines.

47. Admin. Guide § 318-12 should be amended such that substantiated SQFS misconduct occurring during the three-year pause period (for B-CDs), and the one-year pause period (for A-CDs), if applicable, would toll the pause-period and delay expungement or sealing, as the case may be, from the time of the alleged misconduct through and until the time of final disposition of the most recent SQFS allegation(s).

48. "Progressive Discipline" as defined in the Guidelines for repeated SQFS misconduct is too narrow.

    a. The Guidelines calculate a "prior" from the date of final approval by the Police Commissioner of the substantiated allegation. If a complaint is pending, following substantiation by CCRB, but has not yet been finally adjudicated by the Police Commissioner, it should be considered as a prior offense for purposes of progressive discipline even if the Commissioner's final approval occurred after the date of the new wrongful act.

    b. Prior substantiated allegations, for purposes of enhancing discipline, should not be limited to the "same misconduct." A prior violation of any of the provisions of PG § 212-11 (investigative encounters) should count as prior misconduct upon a finding of a similar 212-11 violation. E.g., a prior finding of wrongful frisks, should count as a prior offense for a new finding of an illegal stop and questioning of a person, for purposes of progressive discipline.

    c. Repeated acts of similar misconduct should call for enhanced discipline, even if the later acts do not otherwise call for greater penalties than the earlier findings. E.g., a prior slur should count as a prior for purposes of progressive discipline upon a later finding of discourtesy.

### Timeliness

49. All SQFS investigations should be completed by CCRB within 120 days and, if not, the reasons for the delay shall be explained in writing to the subject officer and the complainant.

50. Where CCRB has recommended Charges and Specifications and APU has submitted them to DAO, the subject officer should be notified immediately. The Police Commissioner may delay formal service of the Charges while he considers further action, but for purposes of the Statute of Limitations, the Department should define "commencement" of the action

to be upon written notice received by the subject officer of the specifications requested by CCRB rather than delaying "commencement" while waiting for later approval by DAO and formal service.

51. Where CCRB has recommended command discipline rather than Charges, for purposes of the Statute of Limitations, "commencement" should be determined as of the time CCRB notified DAO and the officer of the recommendation.

## APPENDIX 1:  EXAMINATION OF SQF CASES WHERE A PENALTY WAS IMPOSED

### 2019-2021 CASES WHERE A SUBSTANTIATED SQF ALLEGATION WAS CONTAINED WITHIN FINDINGS AND THE OFFICER RECEIVED A PENALTY OF ONE OR MORE VACATION DAYS.

As noted throughout the body of the Report, officers rarely, if ever, receive a penalty (lost vacation days, suspension, dismissal probation, termination, formal reprimand) for unconstitutional stops/frisks/or searches – even when substantiated by CCRB.

In 2019-2021, for example, as of this writing, 210 cases have been closed by the Police Commissioner after a referral by CCRB of a misconduct complaint where at least one of the allegations substantiated was a stop/question/or frisk violation.  Of those 210, a total of 19 officers received a penalty.

It would be misleading, however, to say that 19 officers received a penalty day for stop/frisk misbehavior.  In almost every case where a penalty is imposed, it is folded into and part of concomitant misbehavior considered to be more serious, such as wrongful force.  As well, a penalty, if rendered, is often in conjunction with a cluster of other investigations or findings, concurrent to or pending at the time of disposition.

The following is a description of the few cases (17) where a penalty was imposed and one of the allegations included in the charges against the officer was for SQF misbehavior.

1.  ███████████████████████████████████

On April 24, 2018, the complainant "HC" approached Sergeant ███ to ask him a question in a subway station.  ███ knew HC from two prior interactions, one of which had resulted in an arrest for possession of a firearm.  He frisked HC, touching his upper thigh and moving to his groin (HC alleged a strip search and sexual harassment as well, but the search was unfounded and the harassment was unsubstantiated).

CCRB recommended Charges and Specifications for the substantiated allegations of an illegal stop and frisk.  DAO asked for reconsideration. DAO recommended a reduction to an A-CD.  While acknowledging the impropriety of the stop and frisk, DAO argued that the known history of firearm possession by HC provided a rationale, if not proper cause, for the frisk.

Although the reconsideration request was denied, APU negotiated a five-day penalty, the equivalent of an A-CD before a Trial Commissioner.  The Trial Commissioner, in accepting the plea, was advised that ███ had no disciplinary history.

Sergeant ███, at the time of the incident, had been with the Department eighteen years. He has subsequently left the force.  The five penalty days were subtracted from his accrued vacation time when he retired.

480

████ had eleven complaints with 32 misconduct allegations brought by civilians to CCRB. Four complaints were substantiated. There were nine allegations of wrongful force or threat of force, including a claim of use of pepper spray and a club. Three of those force allegations were substantiated. The remainder of the allegations were for discourtesy or improper SQF behavior.

In the first substantiated case against ████, Charges were brought for excessive force and an illegal frisk. The Police Commissioner departed from the recommendation and imposed Instructions for the frisk, while deciding on No Disciplinary Action for the force complaint. In the second substantiated case against ████, Charges were again lodged, this time for threat of force and a refusal to identify himself. Once again, the Police Commissioner elected No Disciplinary Action, while ordering instructions. On the third occasion, CCRB recommended Charges for excessive force, and for a third time the Police Commissioner elected to close the case with No Disciplinary Action. This case, the fourth time CCRB recommended Charges, closed in 2019 with a negotiated plea of five days.

Sergeant ████ had two civil lawsuits pending against him as the CCRB cases were proceeding. In the first, it was alleged that he was one of a group of officers who used excessive force, including choking, during the course of an illegal arrest. That case is still pending in federal court. In another case, filed in the Eastern District of New York, ████ was accused of wrongfully stopping and searching a car in 2017. That case settled in 2020 for $40,000.

Sergeant ████ had a profiling complaint made on July 20, 2017, which was left unresolved when he retired.

2. ████████████████████████

Officer ████ had five allegations of misconduct substantiated for an incident arising on 12/2/18. They included wrongful physical force, threat of arrest, interference with recording, search of a recording device. CCRB recommended B-CDs for each of the five allegations.

In all, ████ received a penalty of one-day credit lost and then retired.

████ had a CCRB history of six complaints alleging at various points force, discourtesy, refusal to obtain medical treatment and wrongful use of a restraining device.

Shortly before retiring, ████ had been found guilty in a separate incident, pending since 2017. PO ████ had wrongfully used force against a "much smaller" disabled woman, breaking her arm. A DCT trial commissioner, on August 23, 2021, recommended a loss of 25 days. The Police Commissioner approved the penalty. It is unclear if the one-day penalty for the 2018 incident ran concurrently with the 25-day penalty for the broken-arm incident.

3. ████████████████████████

Sergeant ████ was cited by CCRB for an incident arising on 3/28/19 wherein six of eight allegations were substantiated. Along with an unlawful stop, and a wrongful use of force, he was found to have issued a retaliatory summons, refused to process a civilian complaint, and acted with discourtesy. CCRB recommended a B-CD for each of the



founded allegations. Under the Matrix, a substantial penalty should have ensued. Instead, the Police Commissioner ruled that the force allegation would carry NDA and the remaining five allegations were combined with a final penalty of one day.

Sergeant ▮▮▮▮▮ had four prior and one subsequent CCRB complaints which were investigated. Three were for wrongful force (the latest with a night stick) and two were for stop and frisk violations. None were substantiated.

In a separate incident, pending concurrently, ▮▮▮▮▮ was alleged to have wrongfully used force and interfered with a recording by a civil complainant in a federal civil rights action. That case was resolved on 3/21/2022 with a $25,000 award to the plaintiff.[1934]

Sergeant ▮▮▮▮▮ was promoted to Lieutenant on 10/28/22.

4. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Sergeant ▮▮▮▮▮ received Charges and Specifications in a case where CCRB substantiated twelve allegations of abuse. ▮▮▮▮▮ negotiated an 18-day penalty.

One allegation was for an unlawful frisk. Two substantiated allegations were for stops. Other substantiated allegations included: an unlawful search of person, unlawful entry of premises (2 counts); unlawful search of premises (2 counts); unlawful seizure of property; damage to property (2 counts).

▮▮▮▮▮ has had six CCRB complaints lodged against her. The other five were not substantiated.

▮▮▮▮▮ has seven lawsuits filed against her in the last five years. Two are still open. The others settled for $2,500, $46,001, $6,500, and $55,000.

▮▮▮▮▮ was promoted to Lieutenant on June 24, 2022.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Sergeant ▮▮▮▮▮ was investigated for a complaint arising from an incident on 3/28/19. Two of four allegations were substantiated—an illegal stop and a failure to provide a business card as required. A frisk and improper question allegation were unsubstantiated, along with an OMN for improper BWC activation. ▮▮▮▮▮ received a 3-day deduction and a B-CD.

In all, Sergeant ▮▮▮▮▮ has been the subject of twelve CCRB investigations. Only four were substantiated, including: a discourtesy allegation where APU recommended Charges, but the Police Commissioner decided upon No Disciplinary Action; a refusal to take a civilian complaint for which he received instructions; and a wrongful force (chokehold) case which went to trial and he was found not guilty. A strip search case was "closed

[1934] As commonly occurs and as noted in the body of the accompanying Discipline Report, the Law Department posting for this case, which is required by NYC Admin. Code 7-114 to note if force, assault/battery/malicious prosecution, or false arrest were alleged, affirmatively and wrongly posted an "N" in each of those columns, notwithstanding allegations in the complaint clearly alleging such. This same criticism could be levelled in most of the cases described herein, but to do so would be unnecessarily repetitive. Suffice it to say that it appears that that § 7-114 is customarily honored in the breach.

pending litigation." Over time, twelve allegations against him were for wrongful force, but none were substantiated.

The strip search case is still pending in Brooklyn Supreme Court. ████ has two other civil actions filed against him: a federal civil rights action that ended in a $5,000 settlement and another wrongful stop and search case still open in court as well.

A separate profiling charge, arising from a 9/18/2018 incident not included in the CCRB investigations, went unsubstantiated.

After the CCRB disposition, on 9/30/22, Sergeant ████ was promoted to Lieutenant.

6. ████████████████████████████████████

Officer ████ was alleged to have improperly stopped, unjustifiably threatened the complainant with arrest, and failed to comply with the Right to Know Act (RTKA). The three allegations were substantiated, and ████ accepted a four-day penalty.

████ has only one prior CCRB complaint, an alleged illegal vehicle search, threat to remove to hospital, and seizure of property in 2019. Those allegations were not substantiated.

On the surface, this would appear to be one of the rare cases where penalty days were imposed for SQF misconduct independent of very serious accompanying charges and with a relatively insignificant CCRB history.

However, separate from CCRB complaints, ████ faced Charges and Specifications twice – once in 2015 and again in 2022. After trial in the earlier case, he was found guilty of failing to pay a taxi fare, engaging in a fight while drunk and interfering with the departmental investigation of the incident. For that misconduct he was suspended for 30 days and was penalized with dismissal probation and a thirty-day suspension.

He was demoted from Detective to Police Officer in Housing PSA 2 on 3/31/2016.

Without an opportunity to review internal records, it cannot be determined if the CCRB complaint(s) arose while ████ was on dismissal probation, which would seem to explain the unusually strict 4-day penalty (notwithstanding that it falls within the presumptive range under the disciplinary guidelines). By its terms, dismissal probation authorizes termination for infractions occurring while on probation.

7. ████████████████████████████████████

A complaint filed against Officer ████ alleged that on 3/28/2019, he unlawfully stopped and frisked the complainant with gun drawn, and he subsequently failed to provide an RTKA card. He was also charged with a failure to properly activate his body-worn camera. The frisk and gun charge were unsubstantiated, while the other allegations were substantiated. He received an A-CD and a loss of three days credit.

PO ████ has been a member of the force since 2015. He has had four other CCRB complaints—which were not substantiated. An allegation of excessive physical force was "closed pending litigation," a 2020 allegation of unlawful use of a nightstick as a club went unsubstantiated, and a 2021 charge of unlawful physical force was dropped as the complainant was unavailable.

██████ had a profiling complaint, occurring on 9/30/2018, which was investigated by IAB and went unsubstantiated.

██████ was a defendant in a federal civil rights case alleging unlawful arrest and excessive force. That case was dismissed in light of the fact that the complainant had entered into a settlement in another unrelated case which covered the case against ██████. He was also sued in Kings County Supreme Court in an incident arising in 2018 which, absent verification, appears to be the same case that caused closure of the excessive physical force CCRB complaint and appears to have been filed around the same time as the profiling complaint.

8.   ████████████████████████████████████

On February 26, 2019, 14-year-old jumped a turnstile in the subway. ██████, with another officer, grabbed him and made him go back to pay. No other action was taken. The next day, February 27, after school, the same officers held the exit doors open as students were returning home from school. They were not required to pay for transit. As the complainant passed through and was walking away, he cursed at the officers. They grabbed him and made him go back through the turnstile to pay. The child sat down on the platform stairs and refused to move. ██████ testified that he seized him "for not showing me respect." PO ██████ arrested him for disorderly conduct. ██████ and another officer PO ██████ pulled him by the arms, and he resisted. ██████ pushed him back onto a bench and through the exit gate. He was handcuffed. Two other officers lifted him and "dragged him down three-fourths of the stairs, causing his buttocks to hit each step along the way. PO ██████ repeatedly pushed [him] while holding his arm, causing him to stumble but not fall down." CCRB exonerated claims of force, but substantiated the stop for the second day's passage on the grounds that cursing at an officer is not disorderly conduct and, as a student, the complainant had the right to continue without paying a fare.

CCRB substantiated an allegation of an illegal stop against both officers. As well, CCRB referred over OMN allegations for failure to file a stop report and for Officer ██████ failure to carry business cards as required by the RTKA.

CCRB recommended a B-CD for both officers. ██████ has a history of two other wrongful force complaints. Both were dropped for lack of complainant follow-through. The Police Commissioner elected to eschew any penalty for ██████, ordering Training in a departure letter that noted that ██████ "was merely present at the scene."

The Police Commissioner departed in ██████ case as well, noting that he has "no prior CCRB complaints against him and is highly rated" (██████ has one Departmental recognition for "Excellent Police Duty" awarded on 1/9/2019). PO ██████ accepted a reduction to an A-CD and one-day forfeited.

Since 2019, Officer ██████ has two other complaints against him, which were not substantiated. One complaint was for excessive force and the other was for discourtesy and use of a slur.

484

9. ████████████████████████████████████████████

Lt. ███ has been a Member of Service for almost 20 years. He has worked with Anti-Crime Units and related service areas. He has accumulated twenty-two separate CCRB complaints, nine of which have been substantiated by CCRB. Thirty-three of the sixty-seven allegations lodged against him have been for wrongful Stop/Frisk/Search/Seizure conduct. Twenty-one allegations lodged against him were for wrongful force-related actions, including two claims of unlawful strip-searches.

Within the nine substantiated complaints, the following fourteen misconduct allegations were substantiated by CCRB resulting in the indicated "penalty."

| | |
|---|---|
| Gun pointed | Instructions |
| Unlawful stop | Instructions |
| Vehicle stop | Instructions |
| Vehicle stop | Charges closed with no penalty due to SOL |
| Premise search | Training |
| Premise entry | Training |
| Property damage | Training |
| Vehicle search | Not guilty at trial |
| Unlawful frisk | Guilty at trial, but Police Commissioner not guilty |
| Premise search | Not guilty at trial |
| Unlawful stop | Guilty—3 vacation days/training |
| RTKA, no card | Guilty—3 vacation days/training |
| Discourtesy | Instructions |
| Discourtesy | A-CD accepted, no penalty |

In July 2018, a DCT Commissioner rendered a decision in two separate sets of Charges and Specifications which had been filed against ███ by CCRB. In the first case, a complainant said he was stopped just after walking away from parking his car at about 11:30 pm, frisked, hit, and had his car searched without caused. ███ claimed that he saw the man urinating, pulled up in an unmarked car, and recognized him from a previous arrest. After the man threatened to call CCRB, ███ remembered that he had also received information from a previous 911 call that a person had been shot at the complainant's address. He claimed that the complainant walked toward him "aggressively." ███ frisked him, took keys from his pocket, asked for ID, which the man said was in the console of his nearby car. At first the victim denied a request to search the car, but ███ testified that he then consented. The trial commissioner found ███ guilty of an unlawful frisk. The Trial Commissioner recommended a two-day penalty in light of ███ "exceptional service history." While the Trial Commissioner was aware that ███ was on level 1 force monitoring at the time, it is unclear if the hearing officer was also aware of his lengthy CCRB record.

The Police Commissioner overturned the finding upon a determination that the "actions were reasonable, in consideration of the relevant Patrol Guide provisions in effect at that time and under the totality of the circumstances."

485

In the second case, ███ and other officers were responding to a noise complaint in a backyard. Apparently, there had been numerous similar complaints of noisy parties. On this occasion, at around 10 pm, as police approached, the speakers were shut off and removed to a portion of the basement of the adjoining house. Officers wrongfully entered the house, notwithstanding objections by the occupants, and seized the speakers. While ███ had been present and had authorized the seizure, the Trial Commissioner found him to be Not Guilty since he was not at the scene at the moment the police entered the house.

In the only case where Lt. ███ received a penalty, CCRB substantiated allegations of an illegal stop, failure to supply a business card and a violation of BWC rules. This incident occurred in June 2019. DAO prosecuted the case at trial. ███, with two other officers, driving an unmarked car, saw the victim place something into a "dusty" car and enter the passenger side. It was raining and shortly before midnight. They pulled him out of the car, frisked and questioned him, then searched the car. When the victim tried to call his father (the owner of the car), they took his cellphone. After the search, they were about to leave the scene, but the victim called them back to complain that they had broken ("cracked") his cellphone. ███ deactivated his BWC during that portion of the encounter. DAO recommended a 4-day penalty—3 for the stop and RTKA violation, 1 more for the BWC violation. The Trial Commissioner reduced the penalty to 3-days because "Respondent has a strong record . . . has been awarded numerous medal . . . and has received consistently exceptional evaluations." The "Summary of Employment Record" noted that "Respondent has no adverse findings in his formal disciplinary record." There is no mention of ███ extensive history with CCRB and previous trials.

Subsequently he was the subject of three more complaints—one for an illegal stop/frisk/search and use of force (he was exonerated on those allegations) and discourtesy which, after substantiation, he received more Training. Another force/search/discourtesy complaint went unsubstantiated. And in March 2020 a discourtesy complaint, when substantiated, resulted in an A-CD with no penalty.

Shortly thereafter, in July 2020, ███ was promoted to Lt. Detective Commander.

10. ████████████████████████████████████

On the afternoon of July 10, 2018, Lt. ███ with two other officers in an unmarked car approached two persons who were smoking in front of a deli. ███ testified that he was familiar with one as gang member "in oppositional gang territory." ███ thought the victim was "evasive" as ███ approached. ███ lifted the complainant's arms, and frisked his waist area and legs. The victim told him "Before you ask me questions, turn on the camera." ███ told him, "I want to make sure you have no weapons, bro." He then proceeded toward the other person, a woman who had objected to the frisk. He grabbed her, pulled her back, slammed her face against the wall, handcuffed her, and arrested her for obstructing governmental administration for blocking his path to the first individual. When asked why she was being arrested, he responded, "You act like an asshole, cause me problems, no sweat." The woman (a confidential informant according to the public online CCRB closing report), did not file a complaint. CCRB substantiated 4 misconduct allegations of 7 allegations in the complaint. CCRB recommended a B-CD for: two stops, 1 frisk and 1 discourtesy findings. A penalty of 10 vacation days was ordered.

According to ███████ "Disciplinary History" as listed in his "Officer Profile" posted by NYPD, "This officer does not have any applicable entries."

In his fourteen years with the Department, ███████ has amassed 30 separate CCRB complaints, eight of which have been substantiated. He has received a penalty (the above-referenced 10-day penalty) only once. CCRB has investigated 95 separate allegations of misconduct contained within the 30 complaints.  In the last 10 years, there have been 15 allegations of unlawful stops brought against him—but only two have been substantiated. There have been 15 allegations of wrongful frisk or search of person, but again only two have been substantiated.  Three allegations of unlawful strip searches went without substantiation.  Twenty allegations of wrongful or excessive force (including one chokehold) resulted in one substantiation.

It should not be assumed that the many allegations which were not substantiated were decisions on the merits, i.e., exonerated, unfounded, or even unsubstantiated. Eleven allegations failed because the complainant was unavailable, uncooperative or unidentified.

Aside from the one 10-day penalty discussed above, throughout his history, of the substantiated allegations, the following penalties were assessed.

| | |
|---|---|
| Vehicle search | A-CD accepted, no penalty |
| RTKA | A-CD accepted, no penalty |
| Frisk | A-CD accepted, no penalty |
| Premise search | B-CD, set aside by Police Commissioner, NDA |
| RTKA | A-CD, set aside by Police Commissioner, NDA |
| Unlawful arrest | Charges pending on 3-year old case |
| Threat of force | Charges pending on 3-year old case |
| Force | Charges pending on second 3-year old case |
| Discourtesy | Charges pending on second 3-year old case |
| Discourtesy | A-CD, set aside by Police Commissioner, NDA |
| Discourtesy | A-CD accepted, no penalty |

In particular, the 10-day penalty cannot be viewed through a narrow telescope—it was not decided in isolation. When the Police Commissioner decides whether to impose a penalty, the PC is undoubtedly aware of other complaints in the mix.  Open CCRB matters, open profiling investigations, and open lawsuits all deserve consideration when considering discipline upon a disposition.

While that case (the one and only case where ███████ was penalized) was pending and before final disposition, ███████ picked up five new complaints with 30 allegations of misconduct.  One of those five newer cases, a discourtesy charge, was substantiated and ended with the acceptance of an A-CD (no penalty).  Two other cases, arising during the same period, resulted in filing of Charges and Specifications which are open and pending.

Aside from CCRB complaints, ███████ had three separate profiling complaints lodged against him, each of which went without substantiation.

Finally, ███ had an astonishing number of cases pending against him in the 2017 to 2020 time period. Without taking the time to analyze each one, or assessing the personal responsibility of ███, it can be noted that three are still open, and nine settled for amounts of: $20,000, $12,000, $50,000, $25,000, $17,500, $80,000, $5,000, $25,000, and $950,000. (The $950,000 lawsuit was not aimed directly at ███. It was a class action brought to challenge arrests under NY's Loitering for Prostitution statute, alleging deliberate indifference to Fourth Amendment rights. ███ was one of five named supervisors charged with planning, ordering, staffing, supervising and/or approving the unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detentions" of four named plaintiffs). It is beyond the scope of this Appendix to determine whether any, some, or all, of the twelve lawsuits overlapped with the many CCRB complaints against him.

11. ████████████████████████

████████████████████████

████████████████████████

On 12/15/19, Sgt. ████████████, along with Police Officers ████████████ and ████████████ of the 47th precinct, all in plainclothes, stopped and frisked twin brothers based upon a description of people involved in a fight. It was also alleged that they interfered with a recording and searched one of the brothers, but those allegations were unfounded by CCRB. The brothers were detained and then permitted to leave. The officers refused a request for the officers to identify themselves. CCRB substantiated the allegations of unlawful stop, frisk, and RTKA violations and recommended a B-CD. Each officer was penalized with a loss of 5 days.

According to a sworn complaint filed in Bronx Supreme Court, the officers pushed one of the brothers against a wall and searched the pockets of both. When one of the brothers attempted to take a photograph of the unmarked police car, they were threatened with arrest. These further allegations were not substantiated by CCRB, and the truthfulness of the allegations in the complaint were not decided in court; the case was settled for $8,500.

<u>Sergeant #1</u> ████████

Sgt. #1 ████████ has had 8 complaints filed against him with CCRB. They include allegations of: stop/frisk/search (9) and; force (4, including one chokehold). This is the only case substantiated and carrying a penalty. He had an earlier unlawful stop substantiated with Charges and Specifications recommended, but it resulted in NDA as a result of the statute of limitations. He had yet another force case substantiated with a recommendation of Charges and Specifications, but the Police Commissioner retained the matter under Provision Two of the APU memo, resulting in no discipline.

In the case retained by the Police Commissioner where Charges were dropped without discipline, in June 2017, Sgt. #1 ████████ had responded to a call of shots fired. He pursued in a car, crashing into a dumpster and according to the CCRB report, hitting the complainant. The complainant's injuries included a dislocated and fractured shoulder, lacerations of the lip and ankle and abrasion of the elbow. In another case, on 12/15/17,

Sgt. #1 ███████ was alleged to have falsely stopped and arrested another individual, which, although not investigated by CCRB, resulted in a $33,750 award.

Sgt. #1 ███████ has been a defendant in 9 civil lawsuits brought in recent years. Six have resulted in awards in the amounts of $90,00, $25,000, $85,000, $25,000, $33,750, and $15,000, respectively.

Sgt. #1 ███████ was promoted to Lieutenant on January 27, 2023.

<u>PO #2</u> █████

At the time of the encounter, PO #2 ███████ had another case pending with APU where Charges and Specifications had been filed based upon an illegal entry into premises. That case remains open at this time. PO #2 ███████ has a total of six complaints, 24 allegations, filed against him in CCRB. They range from ten complaints of illegal SQF conduct, to four allegations of improperly pointing a gun. None, other than the two above-described complaints have been substantiated.

PO #2 ███████ has been the subject of six recent lawsuits for police misconduct. Three ended with awards of $8,500, $10,000 and $77,500.

PO #2 ███████ was promoted to detective in the gun violence task force, on 10/28/2022.

<u>PO #3</u> ███████

PO #3 ███████ received the five-day penalty upon findings of an improper frisk and failure to activate his BWC. This penalty, given the information available at this time, is unusual in light of his relatively minor history of CCRB complaints—one prior force complaint which was dropped when the complainant failed to cooperate—and the fact that he only had one other lawsuit filed against him. He has resigned and is no longer with the Department. Of interest is the fact that the Law Department declined to represent him in the lawsuit brought by the twin brothers. The reason for the declination at the current time is unknown.

12. ████████████████████████████████████

In this case, the Monitor team has not been provided with the CCRB closing report or any of the correspondence between CCRB, DAO, or the Police Commissioner. As such, it is impossible to make any assessment or explanation regarding the penalty in this case based on knowledge of the misconduct itself. According to the sparse files made available, it appears that ████████ was found by CCRB and the Department to have conducted an illegal frisk and search and failed to present a business card upon request in violation of the RTKA. He received a penalty of 3 vacation days and accepted a B-CD. It is unclear whether the penalty is within the Disciplinary Systems Penalty Guidelines or whether there was a deviation.

Officer ████████ has been with the Department twelve years. He has remained an officer in the 34th precinct. He has been the subject of 11 CCRB complaints. Five complaints were of unlawful force. He has been accused of wrongful stop/frisk/search behavior in seven allegations. Prior complaints ended without substantiation by CCRB.

13. ██████████████████████████████████████████████████

Lieutenant ███████ has 15 CCRB complaints filed against him that were fully investigated.[1935] Ten of the complaints were lodged in 2018-2021 alone. Each complaint contains an allegation of wrongful SQF behavior or excessive force (including a chokehold allegation), or both. Sixteen of fifty allegations have been substantiated. Charges and Specifications have been filed against him on four occasions. In total thus far, ███████ has been penalized 5 days for one case and had 5 hours of time credit deducted for another. Two claims of excessive force were closed pending litigation and never resolved. Another two of the substantiated cases were later set aside (NDA) by the Police Commissioner. ███████ has also been the subject of two IAB substantiated investigations, in 2018, not noted in his CCRB records or his "officer profile," for "Invoice Discrepancy," one regarding Marijuana and the other of Controlled Substances.

He has been named as a defendant in eight lawsuits,[1936] complaining of wrongful force or a Fourth Amendment violation, some of which overlap the CCRB complaints and some of which complain of wrongful conduct not noted by CCRB. Some are still open, but records, as incomplete as they are, show that at least four have settled for sums of $7,500, $25,000, $2,000, and $168,000 respectively.

After the first three complaints lodged against him, in November 2015, ███████ was promoted to Sergeant. On December 21, 2021, after another twelve complaints were lodged against him and immediately following settlement of two lawsuits with monetary awards, he was promoted to Lieutenant.

Since one might discern a pattern, involving either force or SQF misbehavior in the complaints, lawsuits, and findings, it is worth a more detailed exploration below of a few of the complaints—with some allegations substantiated, and some not substantiated, for a variety of reasons.

**CCRB** ███████ **(Continued)**

On October 1, 2019, Sgt. ███████ and Officer ███████ allegedly stopped, frisked, and searched two individuals wrongfully. It was also alleged that they interfered with a recording of the event. This was not the first time that year that the two officers were accused of misconduct while acting together. They were named in a CCRB complaint of wrongful use of force a few months earlier in April 2019. A lawsuit was filed regarding the April incident on September 26, 2019, in Kings County Supreme Court, just five days before the two frisked and searched the victims in the more recent case. CCRB has closed the April 2019 case "pending litigation."

In the October incident, CCRB substantiated four allegations of wrongful frisk and search against ███████ and, in addition, referred to NYPD allegations regarding BWC activation

---

[1935] As explained in the body of the Report, fewer than one-half of the complaints brought to CCRB are fully investigated.

[1936] He is specifically named in seven and only identified as "Police Officer John Doe" in an eighth that matches with an April 2019 incident, where he was identified by CCRB in the corresponding complaint.

failure and a missing Activity Log.  CCRB recommended a B-CD, which was accepted, and the Police Commissioner imposed a penalty of five vacation days.

The penalty, five vacation days, in this case needs to be understood in broader context.  At the time the CCRB case was pending, or shortly before, Lt. ▮▮▮ had five other CCRB cases—none of which have resulted in penalty days.  Two cases were ultimately unsubstantiated. One substantiated search case resulted in an A-CD with a five-hour time deduction (CCRB had recommended a B-CD, but the Police Commissioner departed downward).  ▮▮▮ had four lawsuits pending—again, two of them were with PO ▮▮▮.  One of the CCRB complaints, for wrongful use of force, was closed pending litigation and another complaint for wrongful use of force, filed in June 2020, was also closed pending litigation.

**CCRB ▮▮▮▮**

On May 6, 2018, PO ▮▮▮▮▮, an officer with five-year's experience on the force, improperly stop and frisked the complainant who had an "undefined bulge" in his pocket. The bulge was a cellphone. CCRB recommended a B-CD.  A reconsideration request for training was declined.  Nonetheless, the Police Commissioner imposed training instead of discipline.

The complainant swore that three officers jumped out of an unmarked car.  One, Officer ▮▮▮, grabbed him by the neck and arm, while another "checked" his body and pockets. They "got back in they [sic] car and drove away screaming and yelling You a FAGGOT." One of the three officers was Sergeant ▮▮▮▮.

Sgt. ▮▮▮ was alleged to have made the remark and was investigated for the slur and a refusal to provide his name or shield number. The allegations against Sgt. ▮▮▮ were not substantiated.

Officer ▮▮▮ Stop Report described a "bulge in his front hoodie pocket that appeared to be a weapon."  When the officer yelled "stop" the complainant continued walking saying, "I don't have to stop for you" which, according to the officer, caused him "to fear for his safety as well as the safety of other."  Sgt. ▮▮▮, the supervising officer, approved the stop report as "Accurate and Complete" writing that it provided a "Sufficient Basis" for both the stop and the frisk.

CCRB recommended a B-CD for Officer ▮▮▮.  On November 11, 2018, DAO requested CCRB reconsideration and training.  DAO asserted that he had no prior formal disciplinary history and that there was no pattern of similar misconduct in his background. CCRB denied the request, by a vote of 2-1, on April 24, 2019, no disciplinary action was taken against Sgt. ▮▮▮ for approving the improper activity and report.

**CCRB ▮▮▮▮ (Continued)**

Thirteen days after the above incident, on May 19, 2018, four officers, including ▮▮▮, responded to a call regarding a group of individuals drinking, smoking and gambling in front of an apartment building.  As they approached, they noticed some men outside the building and some in the lobby area.  The complainant, according to ▮▮▮ was inside the building, holding a cup and yelling at the officers.  (Two other officers and the complainant

491

said that he was not holding a cup). ███ approached and demanded identification. When that was refused, ███ patted him down and reached into his pocket, retrieving his wallet. ███ handed the wallet to another officer who took it to his car to run a warrant check. After a tenant came downstairs to say that the complainant was a relative and legitimately in the building, the officers left without issuing any summonses or making an arrest.

Both CCRB and DAO recommended a B-CD for the unlawful frisk and search. However, the Police Commissioner reduced the penalty to an A-CD and a time deduction of 5 hours credit.

In the time since the 2019 case where 5 days were assessed, ███ has accumulated five new complaints:

- A chokehold case went unsubstantiated.
- An unlawful frisk allegation went unsubstantiated, but CCRB recommend an A-CD for a RTKA violation. The Police Commissioner, instead, dismissed it with NDA.
- Another stop, frisk and refusal to obtain medical treatment case was substantiated by CCRB, which recommended Charges and Specifications. That case has lingered for almost three years without decision.
- A search/unlawful force case was closed pending litigation.
- Another frisk and discourtesy case which was substantiated by CCRB with a recommendation of Charges and Specifications has remained open and unresolved for 20 months.

14. 

In the afternoon of September 25, 2019, two officers (PO #1 ███ and PO #2 ███) from the 45 Precinct entered a building in response to a domestic incident. They encountered the complainant ("AS") who was not connected to the incident. They demanded ID, which AS refused to produce. AS began to record the incident with a cellphone. The officers took the phone, placed him in handcuffs, frisked him, and took his wallet. AS was kept in handcuffs by PO #2 ███ for 10 minutes until a Lieutenant arrived. PO #2 ███ returned his wallet by throwing it on the ground. No summonses were issued, and no arrest was made.

CCRB substantiated allegations of improper stop and questioning by PO #1 ███. CCRB recommended a B-CD. Absent mitigating circumstances, aggravating circumstances, or progressive discipline, PO #1 ███ would presumptively receive three penalty days under the revised Discipline Guidelines since illegal stops and questioning are combined and treated as one misconduct allegation.

PO #1 ███ has been an officer for almost nineteen years. Nine civilian complaints have been filed against him, primarily alleging wrongful use of force, gun drawn, pepper spray, and forcible removal to a hospital. This is the first substantiated complaint.

The Police Commissioner, in a departure letter, reduced the B-CD to an A-CD and imposed a three-day penalty. The Police Commissioner found that the officer acted in "good faith."

Since illegal stops and illegal questioning are combined in the Guidelines, this would appear to be a proper resolution.

CCRB substantiated allegations of question, stop, threaten arrest, interference with use of a recording devise, frisk, search and discourtesy against PO #2 ███. PO #2 ███ had a CCRB history of five complaints.  Earlier allegations of discourtesy, chokehold, and wrongful threat of arrest were not substantiated.  PO #2 ███, an officer who had been on the force twenty years, was served with Charges and Specifications, but negotiated a loss of 18 days accrued vacation time as she retired.

## APPENDIX 2: GLOSSARY

APU                Administrative Prosecution Unit of CCRB.

BIU                Bureau/Borough Investigating Units within NYPD

BWC                Body-Worn Camera

"C" cases          Corruption Investigations by IAB.

CAR                Case Analysis and Recommendation Report from DAO to Police Commissioner

CARB               Career Advancement Review Board

CBA                Collective Bargaining Agreement

CCRB               NYC Civilian Complaint Review Board

CCPC               Commission to Combat Police Corruption

CD                 Command Discipline, at 3 levels: A-CD, B-CD, C-CD

CCHR               Commission on Human Rights

CPI                Central Personnel Index

CJA                NYC Criminal Justice Agency

CRAFT              Cop's Rapid Assessment Feedback Tool

CTS                Complaint Tracking System (CCRB)

DADS               Disciplinary Administrative Database System (DAO)

DAO                NYPD Department Advocates Office

DAS                Domain Awareness System

DCT                Deputy Commissioner of Trials

DOI                NYC Dep't of Investigation

OIG-NYPD           Office of the Inspector General for NYPD

DUP                Department Unable to Prosecute

494

| | |
|---|---|
| DeBour Levels | Described in P.G. 212-11; *People v. De Bour*, 40 N.Y.2d 210 (1976) |
| Departmental Manual | Patrol Guide<br>Administrative Guide<br>Finest Messages |
| FADO | Force, Abuse of Authority, Discourtesy, Offensive Language |
| FADOU | FADO + Untruthful Statements |
| FID | Force Investigation Division |
| IAB | Internal Affairs bureau |
| ICO | Integrity Control Officer |
| ICAD | Improved Computer Aided Dispatch System |
| JRP | Joint Remedial Process |
| LEMIO | Law Enforcement Misconduct Investigative Office, NYS OAG |
| Liability Opinion | *Floyd v. City of New York*, 959 F. Supp. 2d 540, 562 (S.D.N.Y. 2013) |
| "M" cases | Misconduct Investigations by IAB or BIU |
| MATRIX | NYPD Disciplinary System Penalty Guidelines |
| MOS | NYPD Member of Service |
| MOU | Memorandum of Understanding<br>Matrix -MOU<br>BWC access MOU<br>Discipline Matrix<br>APU MOU |
| NDA | No Disciplinary Action |
| OATH | Office of Administrative Trials and Hearings |
| OCD | Office of the Chief of Department |
| OCD-IRS | Investigation Review Section |
| OG | Outside Guidelines |

495

| | |
|---|---|
| OMN | Other Misconduct Noted |
| OPMN | Other Possible Misconduct Noted |
| PBA | Police Benevolent Association (formerly Patrolmen's Benevolent Assn.) |
| QAD | Quality Assurance Division |
| RAND Audits | Reviews of radio dispatches (ICADs) |
| RMB | Risk Management Bureau (now Professional Standards Bureau) |
| SEH | Summary Employment History |
| SQF | Stop, Question, Frisk |
| SQFS | Stop, Question, Frisk, Search of Person |
| TAP | Trespass Affidavit Program |
| Terry Stop | *Terry v. Ohio*, 392 U.S. 1 (1968) |
| TRI | Threat, Resistance, Injury Report |

Unions

PBA   Police Benevolent Ass'n
SBA   Sergeants Benevolent Ass'n
LBA   Lieutenants Benevolent Ass'n
CBA   Captains Endowment Ass'n
DEA   Detectives' Endowment Ass'n

| | |
|---|---|
| W&A | Warning and Admonition ("Warnings") |
| XO | Executive Officer |