

**Research Report**

# An Examination of NYPD Stop and Frisk Practices

Using Body-worn Camera Recordings to Determine the Constitutionality and Documentation of Street Stops

April 2025

**CUNY INSTITUTE FOR STATE & LOCAL GOVERNANCE**

## AUTHORS

Kathleen Doherty
*CUNY Institute for State & Local Governance*

Annie Chen
*CUNY Institute for State & Local Governance*

---

## ACKNOWLEDGEMENTS

The conduct of this study was authorized by an order of United States District Court Judge Analisa Torres of the Southern District of New York. The study was commissioned by the court-appointed Monitor of the New York Police Department, the late Peter L. Zimroth. We are grateful for his leadership and that of his successor, Mylan L. Denerstein. We particularly thank Deputy Monitor Richard Jerome for his consistently wise counsel. In addition, we benefited from the knowledge of other Monitor team members, particularly John MacDonald and James McCabe. We also thank the parties' experts—Jeffrey Fagan, Jack Glaser and Christopher Winship—for feedback on research design and analysis.

This study could not have been performed without relying on the deep experience, thoughtful appreciation of constitutional protections, and diligent work of a dedicated team of retired New York State judges: Efrain Alvarado, Leonard Austin, Denis Boyle, Barry Cozier, Neil Firetog, Priscilla Hall, Barry Kamins, John Leventhal, Angela Mazzarelli, Joseph Kevin McKay, Ruth Shillingford, and Patricia Williams. Nicholas Camp provided important feedback on sampling and the content analysis while Robert Voigt produced the algorithm to group recordings into likely encounters. CUNY ISLG Senior Fellow Oren Root contributed his legal expertise and provided thoughtful advice and support throughout the project. CUNY ISLG Research Associates Alexandra Ponce de Leon-Lebec and Li Sian Goh provided their talented expertise to all aspects of the study—from assisting in its design, to training and supervising the research assistants, coordinating with the judges, analyzing the data, and drafting portions of the report. This study could not have been performed without the painstaking screening and careful coding of video footage by a team of graduate student research assistants: Juan Acevedo, Tanyanne Ball, Laura Charney, Erin Conley, Bridget Degnan, Zachary Del Rosso, Ashta Dutta, Toby Irving, Matthew Jobson, Susan Leibovich, Donnett Lee, Elmer Maldonado, Fareeha Mannan, Alessandra Mularoni, Eva Navon, Katharine Romero, Christina Rose, Juliana Spriggs, and Anna Stenkamp. Finally, we are thankful for the critical guidance and leadership of CUNY ISLG Executive Director Michael Jacobson and Research Director Reagan Daly.

# Contents

**Executive Summary** 1

**Background** 5

**Study Research Design** 7

    **7** Introduction
    **8** Sample Selection
    **11** Screening for Inclusion in the Study
    **12** Study Data

**Substantive Analysis of Stops** 14

    **14** Introduction
    **16** Documentation of Stops
    **25** Compliance
    **45** Fourteenth Amendment Analysis

**Low-level Encounters and the Presence of Undocumented Stops** 54

    **54** Introduction
    **55** Documentation of Stops
    **60** Compliance

**Arrests and Summonses and the Presence of Undocumented Stops** 60

    **60** Introduction
    **61** Documentation of Stops and Compliance

**Key Takeaways** 61

**Conclusion** 63

**Appendix A** 65

    **65** Descriptive Information
    **80** Fourteenth Amendment Analysis Full Regression Tables
    **86** References

## I.     EXECUTIVE SUMMARY

In 2013, the United States District Court for the Southern District of New York ("the Court") ruled in *Floyd v. the City of New York* that stop, question, and frisk practices employed by the New York City Police Department (NYPD) were unconstitutional. Specifically, the Court ruled that they violated both Fourth Amendment protections against unreasonable searches and seizures, and the Fourteenth Amendment's promise of equal protection under the law because of the discriminatory nature of the stops.[1] Along with the liability ruling, the Court ordered the NYPD to implement a variety of measures to ensure compliance with state and federal laws moving forward, and appointed a Monitor to oversee their implementation.[2] In 2021, Judge Analisa Torres, who presides over the *Floyd* case, approved the Monitor's recommendation that a study conducted by the Institute for State & Local Governance at the City University of New York (CUNY ISLG) be part of the remedial process.[3]

The CUNY ISLG study has three primary areas of focus. First, the Remedial Order requires full and accurate documentation of stops conducted by officers in the field through a stop report. The study assesses the prevalence of unreported stops and the conditions in which officers most often fail to document stops appropriately. Second, the study assesses how frequently officers who conduct stops violate the Fourth Amendment, examines the conditions in which unconstitutional stops occur, and identifies the ways in which a stop was unconstitutional. Last, to assess compliance with the Fourteenth Amendment, the study conducts a statistical analysis to assess

---

[1] *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013) ("*Floyd* Liability Opinion").
[2] *Floyd v. City of New York*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013) ("*Floyd* Remedial Order").
[3] *Floyd v. City of New York*, No. 08-cv-1034 (AT) (S.D.N.Y. Feb. 12, 2021), ECF No. 817.

differences by race and ethnicity in the constitutionality of a stop.[4] The results of the study are described in this report.

The study examined police encounters recorded by body-worn cameras (BWCs) between March 16 and May 15 of 2022. A team of retired New York State judges examined the recordings made by police officers and related documentation of those stopped by police, to determine their compliance with the Fourth Amendment, particularly as enunciated in the seminal Supreme Court case of *Terry v. Ohio*[5] and the New York Court of Appeals case, *People v. De Bour*.[6] Participating judges all had years of experience resolving Fourth Amendment search and seizure issues as trial or appellate judges, or both. The concurrence of two judges was required for the identification of an unreported stop or for a finding of constitutionality or unconstitutionality.

### A. Documentation

Officers are required to report every person stopped on a stop form. The study assessed how frequently, among encounters recorded on BWCs, officers stopped individuals but did not report the stop through the required form. Legally, a person is defined as stopped if a reasonable person would feel not free to leave the scene. To identify undocumented stops, the study first examined a sample of encounters that officers reported as including at least one stop to determine whether police submitted a stop report for *every* person stopped during the encounter. Then, the study assessed two distinct samples of encounters without a reported stop to identify whether any individuals were stopped but the stop was not reported. Stop reports provide vital information

---

[4] Consistent with other work conducted by the Monitorship, the study disaggregates race and ethnicity into three categories: Black, Hispanic and all other races and ethnicities. Generally, it is not feasible to disaggregate the "other" category further because the subcategories involve relatively small numbers. For some key results, the results are reported disaggregated in footnotes.

[5] When a police officer temporarily detains a person such that the person is not free to leave, it is called a *Terry* stop, referring to *Terry v. Ohio*, 392 U.S. 1 (1968), in which the Supreme Court ruled that an officer must have reasonable suspicion of criminality before the officer can conduct a stop.

[6] *People v. De Bour*, 40 N.Y.2d 210 (1976).

about the frequency of stops as well as the basis for the stop and whether the individual stopped was searched or frisked. Failure to document a stop affects the NYPD's ability to determine whether stops are justified and inhibits analysis on the incidence of stops. The study found that:

- In the sample of encounters that officers either categorized as a stop in the BWC system[7] or were matched to a stop report, officers often failed to submit a stop report for *all* individuals that were stopped as part of an encounter. Officers did not submit a stop report for 23% of people stopped.[8] Unreported stops involved Black and Hispanic individuals 86% of the time, while reported stops involved Black and Hispanic individuals 90% of the time.

- In the sample of encounters that officers categorized as a low-level investigative encounter (i.e., did not include a stop, arrest, or summons), judges found that officers stopped at least one individual during 3% of encounters. Police often engage multiple individuals during an encounter. Among all individuals in this sample, police stopped 2% of those engaged, but did not report the stop. Analysis of the BWC data reveals that such low-level encounters are extremely numerous. During the two-month study period, officers recorded approximately 200,000 low-level encounters (consisting of over 650,000 recordings).[9] Unreported stops are unlikely to be subject to review by the NYPD because they were not reported using the required stop form.

---

[7] Officers categorize recordings based on the actions taken in an encounter, including stops, arrests, and summonses.

[8] All findings reflect rates drawn from a random sample, but if a different random sample were drawn, the rate might also differ. To account for this uncertainty, the full results below provide 95% confidence intervals for findings related to documentation and constitutionality. The confidence intervals provide a range of values (with an upper and lower bound) that likely includes the true rate of constitutionality or documentation across samples. Uncertainty is higher among smaller subgroups that occur less frequently in the sample.

[9] The number of recordings reflects the number of officers who activated their cameras and labeled them "investigative encounter" and either Level 1 or 2, using the framework of levels established in *De Bour*. An "investigative encounter" is a police interaction with a member of the public for a law enforcement or investigative purpose. Multiple officers are typically present and activate their cameras at an incident. An algorithm was developed to group recordings that likely depict the same incident so the number of encounters is only an estimate.

### B. Compliance

The team of judges reviewed stops conducted by police and found that unconstitutional stops were particularly prevalent among those that were self-initiated by officers and those conducted by officers assigned to a Neighborhood Safety Team (NST)—special units with the aim of securing illegal guns. Self-initiated stops disproportionately impacted Black and Hispanic people. Key findings from the analysis include:

- Judges determined that 72% of the stops were constitutional and 19% were unconstitutional. There was no consensus among the judges in 7% of the stops and insufficient information to reach a determination in the remaining 2%.

- Approximately 35% of stops were found to be unconstitutional when an NST officer was present, compared to 16% of stops where no NST officer was present.

- Judges found 46% of stops self-initiated by officers based on their observations were unconstitutional compared to 11% of stops that resulted from calls for service or information directly provided by a complainant or witness at the scene.[10]

- Self-initiated stops were conducted on Black individuals at a higher rate than stops initiated by other means, leading to Black individuals being subject to a higher rate of unconstitutional stops. Black individuals were the subject of 68% of self-initiated stops versus 58% of all other stops. Hispanic individuals were the subject of 28% of self-initiated stops relative to 29% of all other stops; all other races were the subject of 3% of self-initiated stops versus being the subject of 13% of all other stops. Judges found 48% and 46%, respectively, of the self-initiated stops of Black and Hispanic people to be unconstitutional as compared to 15% of the self-initiated stops of all other races.

---

[10] Among reported stops in the sample, 31% of all stops were self-initiated by officers. It was not possible to determine whether a stop was self-initiated if there was no stop report associated with the encounter.

- NYPD supervisors rarely identified unconstitutional stops. Of 1,178 reported stops in the sample, supervisors found the officers did not have reasonable suspicion for 11 stops (or 1% of reported stops), while judges identified 117 stops (10%) without reasonable suspicion.

- Judges found unreported and reported stops to be constitutional at similar rates (71% versus 72%).

- Statistical analysis of study data examined whether Black and Hispanic people are more likely to experience an unconstitutional stop relative to similarly situated persons of all other races. The results of these analyses are inconclusive because a random sample of stops did not include a sufficient number of individuals who were *not* Black or Hispanic across key encounter contexts (like self-initiated stops). Without sufficient observations of individuals across racial and ethnic groups in key contexts, it was not possible to estimate differences by race and ethnicity with the precision necessary to detect disparities.

## II.    BACKGROUND

The Court ordered the introduction of body-worn cameras (BWCs) as one of its remedial measures. BWCs were piloted from 2017-18 and the NYPD voluntarily expanded their use citywide by the end of 2018. As required by the Remedial Order, the NYPD also developed stop, frisk, and search policies conforming to the precepts set forth in *People v. De Bour*.[11]

In *De Bour,* New York's highest court, the Court of Appeals, set the standards for police interactions in investigatory situations, creating four levels of such interactions and setting forth the degree of information the police need to take action at each of the four levels. Level 1 involves a request for information, which simply requires an "objective credible reason" for the inquiry.

---

[11] *People v. De Bour,* 40 N.Y.2d 210, 223 (1976).

Reports from a crime victim and soliciting information from a possible witness fall into Level 1. Level 2 involves the common law right of inquiry, which requires a "founded suspicion" of criminal activity. Although Level 2 allows a greater intrusion, such as questions of an accusatory nature, it does not allow detention of that person. Level 3 involves a stop and detention of a person, which requires "reasonable suspicion that a particular person has committed, is committing, or is about to commit a felony or [Penal Law] misdemeanor." An officer may frisk a stopped person if the officer has "reasonable suspicion" that the person being stopped is armed and dangerous. Level 3, thus, can involve stops and frisks or what the NYPD calls "stop, question, and frisk." Level 4 involves an arrest or summons, which requires that the police have "probable cause" of the commission of a crime or petty offense.

In 2018, a facilitator appointed by the Court as part of the remedial process recommended that NYPD officers be required to record Level 1 encounters using BWCs and document certain aspects of Level 1 and 2 encounters.[12] Thereafter, in 2020, in response to the Court's order for pilot studies testing these policies,[13] the City of New York ("City") proposed that most Level 1 encounters be recorded on BWCs and the officers create some documentation of Level 1 and Level 2 encounters, including the race and gender of the primary person encountered at Level 2.[14] In 2021, the Court approved the enhanced recording and documentation of Level 1 and Level 2 encounters and also approved the Monitor's recommendation of two studies—one by CUNY ISLG and the other by a team of researchers affiliated with Stanford University. [15]

---

[12] Ariel E. Belen, Final Report and Recommendations, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 597 (S.D.N.Y. May 15, 2018).

[13] *Floyd v. City of New York*, No. 08-cv-1034 (AT) (S.D.N.Y. Aug. 9, 2018), ECF No. 634.

[14] Letter from James E. Johnson to Peter L. Zimroth (Feb. 21, 2020), included as Exhibit A to *Floyd v. City of New York*, No. 08-cv-1034 (AT) (S.D.N.Y. Feb. 12, 2021), ECF No. 817.

[15] *Floyd v. City of New York*, No. 08-cv-1034 (AT) (S.D.N.Y. Feb. 12, 2021), ECF No. 817.

### III.     STUDY RESEARCH DESIGN

#### A. *Introduction*

The CUNY ISLG study has three primary areas of focus. First, the Remedial Order requires full and accurate documentation of stops conducted by officers in the field through a stop report. The study assesses the prevalence of unreported stops and the conditions in which officers most often fail to document stops appropriately. Second, the Court determined that the NYPD has a practice of conducting unconstitutional stops and frisks; the study assesses how frequently officers conduct stops that violate the Fourth Amendment, including an examination of the conditions in which unconstitutional stops occur and the ways in which stops were unconstitutional. Last, as the Court also found that the NYPD violated the Fourteenth Amendment, the study conducts an analysis to assess differences by race and ethnicity in the lawfulness of a stop to evaluate compliance with the Fourteenth Amendment.

BWC data served as the basis for identifying a universe of street encounters and then assessing the content of those encounters. Such an approach became feasible after the NYPD adopted new recording and documentation policies.[16] The Court-ordered policies required that officers record nearly all street encounters and enter information about the *De Bour* level of the encounter into the BWC system for Levels 1, 2, and 3.[17] These new requirements provide a more complete record of street encounters available on BWCs and permit analysis of encounters that were previously not recorded or documented. With the newly available data, it is possible to

---

[16] The NYPD changed the guidance for BWC use in June 2021. Training videos on the new policies were distributed to officers in September 2021 and in-person training commenced in October 2021.

[17] The requirement to report the level of the encounter applies only to investigative encounters and not those recordings that are categorized as an arrest or summons. Officers are required to activate body-worn cameras for all Level 2 and 3 encounters and for all Level 1 encounters except for NYPD-designated "Do Not Record" situations, while taking reports on past crimes, and when responding to a motor vehicle accident. The revised BWC policy is summarized in Patrol Guide 212-123.

identify encounters and view recordings for low-level investigative encounters as well as those
that involve stops, arrests, and summonses.

The CUNY ISLG study selected and analyzed street encounters, including the
identification and analysis of each person engaged by officers as part of the encounter.[18]
**Encounters** are defined as a face-to-face interaction between one or more NYPD officers and one
or more individuals with a law enforcement purpose. The study identified encounters through
BWC recordings of a unique incident. Within an encounter, multiple officers may engage multiple
people, and each engagement with a specific person is called a **contact**. Contacts were identified
through content analysis of the BWC recordings by a team of research assistants who identified
each person substantively engaged by officers in an encounter. The study collected descriptive
information of each engaged person, the actions taken by each person and officers throughout the
interaction, and linked reports (stop and/or arrest reports) to individuals in the recordings.[19] In
addition, the study also collected data on the content and context of each encounter, including
information about where encounters took place and the primary issues involved. The following
describes the process of selecting encounters for the study, screening for inclusion and the process
of utilizing BWC recordings to systematically document the content of encounters and evaluate
encounters for the presence of undocumented and unconstitutional stops.

### B.  Sample Selection

The study examined police encounters with pedestrians recorded on BWCs between March

---

[18] The Technical Appendix describes the research design and data collection process in greater detail.

[19] The study includes each person substantively engaged by officers and does not include information on bystanders.
Substantive engagement was defined as any interaction involving the officer questioning the person, issuing
commands directed at the person, or making any sort of physical contact with the person. Details on the instructions
research assistants used to identify key actions and descriptive data for every variable for every sample are provided
in the Technical Appendix.

16 and May 15 of 2022.[20] Encounters were drawn from three strata based on officer categorization in the BWC metadata: low-level encounters (*De Bour* Levels 1 and 2), stops (*De Bour* Level 3), and arrests or summonses (*De Bour* Level 4). Stratification was necessary because a random sample of all recordings would yield too many recordings categorized as low-level encounters that did not involve a stop, which would prevent analysis of Fourth and Fourteenth Amendment compliance in stops. In addition, each stratum permits investigation of distinct research questions. Table 1 below defines each stratum, and the research questions each stratum aims to address.

**Table 1: Sample Selection, by Stratum**

| Stratum | Aim |
|---|---|
| *Low-level* | Identify the frequency of unreported stops in investigative encounters that officers categorize as low-level (i.e., not rising to a stop)<br><br>Assess lawfulness of unreported stops |
| *Stop* | Identify the presence of unreported stops among persons present during a reported stop<br><br>Assess the lawfulness of stops (excluding vehicle stops)[21] and racial disparities in lawfulness |
| *Arrest or Summons* | Identify frequency of unreported stops in arrests and summonses that do not include a reported stop<br><br>Assess lawfulness of unreported stops |

The target sample size of each stratum was determined by the sample's aims. The primary

---

[20] The study period was determined by the NYPD's implementation of the documentation requirements in the BWC system. CUNY ISLG commenced the study when there was evidence that officers were implementing the new recording and documentation requirements. The two-month period was selected as being sufficiently long to capture a variety of circumstances.

[21] Vehicle stops are excluded because it would dramatically broaden the scope and scale of the study. Inclusion of vehicle stops would require collecting data on different officer actions and for different contexts, because they present different issues and trends that require separate analysis and should not be combined with analysis of street stops.

focus of the study was to analyze the constitutionality of stops and to assess whether there are racial disparities in constitutionality. Given this, the stop stratum was the largest of the three strata with a target size of 1,500 encounters to facilitate identification of types of stops associated with constitutionality and analysis of differences by race.[22] The target size for the sample of low-level encounters was 600 encounters. A small, exploratory sample of arrests and summonses was drawn with the target size of 50 encounters.

During the two-month study period, there were 1,542,471 unique BWC recordings. Officer documentation of these recordings served as the basis for selection.[23] Recordings were grouped by algorithm into likely encounters or groups of recordings depicting the same incident and matched to associated reports.[24] There are typically multiple recordings of the same incident, because each officer present is required to activate their BWC. Using the criteria described above, 267,025 encounters were assigned to the three strata: low-level investigative encounters, stops, and arrests or summonses.[25] It is important to note that a recording may be labeled in the BWC system as a stop but not have an accompanying stop report; such encounters are included in the Stop Sample. Also, the exploratory Arrest or Summons Sample was only drawn from the first two weeks of the study period.

Selection anticipated loss of data during the screening process, because some encounters

---

[22] To determine sample size, CUNY ISLG conducted a power analysis assuming the racial breakdown similar to reported stop reports and calculated the sample size required to detect a small effect (.2) with significance level set at .05. The target sample was then adjusted upward to obtain sufficient observations across a variety of key encounter contexts.

[23] Primary BWC recording categories are homicide, arrest, summons, and investigative encounter. Of all recordings, 701,448 (45 percent) were categorized as investigative encounters. Officers are required to provide the investigative encounter level, which they did in 71% of the recordings.

[24] Groupings were confirmed by human reviewers during the screening process described below.

[25] Prior to stratum assignment, encounter groupings that met any of the following criteria were eliminated: (1) all recordings which were less than one minute in total length (including the 30- or 60-second buffer period without audio) (4,723); (2) encounters with more than 30 recordings (241); (3) encounters in which no recording had a primary category or matched report (110,612). Filtering based on these characteristics reduced the universe of encounters from 382,601 to 267,025.

selected would be beyond the scope of the study, or the available recordings would be incomplete or of poor quality. Table 2 below defines the criteria for inclusion, the universe of all encounters eligible for selection, and the target sample size by stratum.

**Table 2: Samples Selected by Stratum**

| Stratum | Criteria for Inclusion in Stratum | Universe of Encounters | Target Sample Size |
|---|---|---|---|
| *Low-level* | Recording is categorized as investigative encounter with Level 1 or 2 and NO recording matched to stop or arrest report | 199,735 | 600 |
| *Stop* | Recording labeled as Level 3 or matched to stop report that is not a car stop | 3,398 | 1,500 |
| *Arrest or Summons* | Recording categorized as arrest or summons and NO recording matched to a stop report | 16,728[26] | 50 |

### C.  Screening for Inclusion in the Study

Following the sampling of encounters from the universe of available recordings, each encounter and all its constituent recordings were screened to determine whether they met criteria for inclusion in the study. The primary goals of the screening process were to ensure that the selected encounters were relevant to the study's scope, and that available recordings were of sufficient completeness and quality to assess their legality. To that end, research assistants reviewed available recordings and followed a sequence of decision rules to evaluate an encounter's eligibility for inclusion in the study based on: the language in the encounter being English or Spanish or both (*Language*), whether the encounter fell within the scope of the study *(Scope),* and

---

[26] The universe of arrest or summons encounters from the full study period is 63,892, but the small exploratory sample of arrests and summons was drawn from March 16-31 only.

whether available BWC recordings depicted the complete encounter *(Completeness)*. Criteria were established to eliminate any recorded encounters that were beyond the scope of the study (i.e., car stops, prisoner transports, execution of warrants) or did not depict any substantive interaction with a person. Research assistants then assessed the completeness and quality of the available recordings, because having a complete record of the encounter was fundamental to an evaluation of its lawfulness.

Table 3 shows the number of encounters that were randomly selected for each sample and the number and percentage of each sample that met the study criteria. Those that met the criteria served as the basis for analysis on the study's substantive questions related to constitutionality and documentation. Officers frequently engage multiple people within an encounter, though only some of whom may be stopped (even in the Stop Sample), so the sample size below reflects the number of encounters rather than the number of people engaged or stopped.

**Table 3: Encounters Which Met the Study Criteria, by Stratum**

| Stratum | Sampled Encounters | Sample Size (N) | Eligible Encounters (%) |
|---|---|---|---|
| *Low-level* | 1,000 | 622 | 62% |
| *Stop* | 2,359 | 1,453 | 62% |
| *Arrest or Summons* | 138 | 58 | 43% |

### D. Study Data

For each selected eligible encounter, CUNY ISLG conducted content analysis of BWC footage to obtain information about each interaction between a person and police. A team of research assistants viewed BWC footage and used a coding instrument to systematically describe the features of encounters and to identify each person engaged by officers as well as the actions

individuals and officers took during the encounter.[27] To identify undocumented stops and assess the legality of police actions, encounters were reviewed by a panel of retired New York State judges who were provided BWC footage and any available police reports associated with an encounter, including stop reports, arrest reports and ICADs (radio dispatch exchanges). Judges' responses were systematically collected using a coding instrument that consisted of questions about the *De Bour* levels present (including the presence of a Level 3 stop), whether police acted lawfully, and, if relevant, the reasons an officer's actions with a particular person were unconstitutional.[28] Each encounter was initially reviewed by two judges, and if the initial two reviewers disagreed on the *De Bour* levels present or lawfulness of the contact, then the contact was assigned to a third judge to establish a consensus position on both levels and lawfulness. Given the complexity of the law, a two-judge consensus was required to identify whether officers stopped an individual (necessary to identify unreported stops) as well as whether the officers' actions were constitutional. A substantial number of encounters required review by a third judge due to disagreement over *De Bour* levels present and the constitutionality of officer actions.[29]

Study data were aggregated from multiple sources to provide information about each encounter and specific contacts. The data on the substance of these encounters—what occurred and with whom—are the result of content analysis of the BWC footage performed by the team of research assistants. Data on legal determinations—whether a stop occurred and whether officer

---

[27] Through content analysis, the study collected data on 25 distinct question categories, resulting in more than 100 individual variables to describe the context of encounters, the actions of individuals engaged by police, and the actions of officers. These are reported in the Technical Appendix.

[28] Judges also could conclude that they did not have sufficient information to determine the levels present or whether officer actions were constitutional.

[29] Across all police contacts with individuals, 8% in the Low-Level Sample, 25% in the Stop Sample, and 25% in the Arrest or Summons Sample were reviewed by a third judge due to disagreement on levels *or* constitutionality. Disagreement could be substantive (constitutional vs. unconstitutional) or relate to whether there was sufficient information available to make a determination (constitutional vs. insufficient information or unconstitutional vs. insufficient information).

actions were lawful—are the result of a review conducted by the team of retired judges. This was supplemented by administrative records, such as stop reports, arrest reports, and ICADs, provided by the NYPD. Researchers obtained neighborhood information by linking encounter locations to Census records, and officer characteristics by linking BWC data to personnel records provided by the NYPD and civilian complaint data provided by the Civilian Complaint Review Board (CCRB). This process yielded information such as the context, officers present, and primary focus of the encounter, as well as specifics on each person engaged by police, the officers' actions related to each person, whether the person was stopped, and the legality of police actions.

## IV.     SUBSTANTIVE ANALYSIS OF STOPS

### A. Introduction

For the Stop Sample, the study examined 1,453 encounters that were either associated with a stop report or labeled a Level 3 stop by at least one officer in the BWC system. Within each encounter, officers frequently interacted with multiple people. In total, officers substantively engaged 4,116 people (or contacts), although not all were stopped. Of the individuals engaged by police, officers stopped 1,569 persons (38%). Among individuals stopped, it was possible that officers initially engaged the person at a lower level or that the stop ended in arrest. In the Stop Sample, officers typically engaged more individuals than just the person who was stopped. In fact, the majority of individuals—2,265 (55%)—were engaged at a level lower than a stop (Level 1 or Level 2). A smaller number of people, 223 persons (5%), were arrested or issued a summons without being first stopped, or officers had probable cause at the outset.[30] Judges could not

---

[30] If an officer has probable cause at the outset, a stop report is not required. For seven contacts, judges determined that there was a Level 3 stop and the contact began with probable cause. It was not possible to determine from data collected whether probable cause was for a crime distinct from the suspected crime that served as the basis for the Level 3 stop so these seven contacts are considered Level 4 only, given there was probable cause at the outset. In four of these contacts, there was no stop report.

determine whether a person was stopped in 54 contacts because there was insufficient information and they concluded that there were no *De Bour* level interactions in five contacts.

A person was considered stopped and included in the analysis of stops if (1) officers submitted a stop report for the person and/or (2) judges determined the individual was stopped (i.e., the person was not free to leave and thus the interaction included Level 3).[31] A small set of people who were stopped are included in the analysis on the documentation of stops, but are excluded from the analysis on constitutionality because the matching stop report was identified after the judges completed their review (26 contacts).[32]

The substantive analysis of stops first examined whether there were stops that were not reported through a stop report (subsection B, below). Although all encounters in the sample had at least one Level 3 stop label or a matched stop report, it is still possible that police did not complete the required stop report for every person who was stopped as part of the encounter. Then, the study describes the extent to which stops conducted were constitutional, including analyses of the initiation of the stop and the conduct of frisks and searches (subsection C). The analysis of constitutionality includes reported stops and unreported stops. Lastly, the study assesses racial disparities in the constitutionality of stops through statistical analyses that assess whether Black and Hispanic individuals were more likely to experience an unconstitutional stop relative to

---

[31] For a limited number of people (40), the judges concluded that the individual was not stopped and the encounter was only low-level or no stop preceded the arrest or summons, although the officer submitted a stop report. These contacts remain in the analysis as a stop because the officer considered the encounter a stop. To remain consistent with the Monitor audits and the NYPD's audits, reported stops that judges find did not in fact include a stop remain in the sample.

[32] Review of the stop report may affect judges' determinations, particularly on whether the stop was constitutional so it cannot be assumed that the judges' original judgments would have been unaffected by information included in the stop report. The baseline number of stops included in analysis of documentation, therefore, is 1,569, and in the analysis of constitutionality is 1,543. The baseline count of stops used in other subanalyses may also differ if they focus on only report or unreported stops.

similarly situated individuals of all other races and ethnicities (subsection D). The results regarding disparities were inconclusive due to limitations in the data.

The study analyzes a sample of all stops to determine the rate of documentation and constitutionality. The analysis below will also report confidence intervals (at the standard 95% level) with the results for documentation and constitutionality (subsection C and D) to communicate uncertainty associated with analyzing a sample.[33] These rates are based on the random sample of stops selected for the study; if a different random sample were drawn, the rate might differ. The confidence intervals provide a range of values (with an upper and lower bound) that likely includes the true rate of constitutionality or documentation across samples.[34] This is especially important for analyses that break down constitutionality by race and ethnicity of the person and type of stop, because the number of contacts in these subcategories are often small and uncertainty higher. Outcomes with a smaller number of interactions will have larger confidence intervals. The results should be interpreted with an understanding of the uncertainty that underlies each estimate to avoid misinterpretation of the data. For example, if confidence intervals are large, then differences between categories may appear larger or smaller than the true difference. The lower and upper bound of the confidence intervals are reported in brackets next to a rate and in bracketed black bars on figures.

### B. Documentation of Stops

The Court's Remedial Order requires the complete and accurate documentation of stops by officers. Documentation is essential for the oversight of stops, including the prevalence of

---

[33] All reported confidence intervals are BCA (Bias-Corrected and Accelerated) bootstrapped confidence intervals.

[34] The confidence intervals convey that 95% of all samples drawn will result in a value for constitutionality or documentation in the range provided by the confidence interval.

unconstitutional stops.[35] Officers are required to report every stop conducted in the field and provide an explanation for the basis of the stop in a stop report. Moreover, accurate documentation of stops is necessary to assess racial disparities in the incidence and conduct of stops.[36] Yet, the Monitor has found evidence that officers do not document all of the stops they conduct.[37] Stop reports provide vital information about the basis for the stop, whether the individual stopped was searched or frisked, whether force was used, and the supervisor's assessment of the stop. Failure to document the stop affects both the NYPD's ability to determine its legitimacy and whether searches, frisks, and force associated with the stop are justified. Unreported stops may be reviewed if captured by an audit by the NYPD or Monitor, but given the scale of recordings, oversight of these stops by the NYPD is unlikely and certainly not at the level of reported stops.[38]

To conduct a comprehensive analysis of documentation, the study selected samples of encounters that were likely to include undocumented stops. More specifically, undocumented stops may arise from five unique situations (listed below in Figure 1). The study's design facilitates the identification and analysis of unreported stops in the first four listed situations across the three samples selected. The Stop Sample includes encounters where officers reported that at least one person was stopped, either through a stop report and/or by categorizing the encounter's recording as a Level 3 stop in the BWC system, allowing the identification of stops that occur in the first two situations listed below. The Low-level Sample and the Arrest or Summons Sample identify

[35] Twenty-Second Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034 (AT) (S.D.N.Y. Oct. 7, 2024), ECF 937-1.
[36] See the Thirteenth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y Sept. 1, 2021), ECF No. 853-1, which finds that evidence of disparities is affected by the extent of underreporting.
[37] See the Twenty-Second Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y Oct. 7, 2024), ECF No. 937-1; and the analysis of CCRB complaints in the Eleventh Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y Oct. 28, 2020), ECF No. 795-1.
[38] Beginning in January 2024, the NYPD Patrol Services Bureau began auditing BWC videos to identify unreported stops, including recordings with the following labels: Stop-pedestrian, Calls for help, Non-crime corrected, Crime in progress, Warn & admonish, Quality of life violation, Level 1 encounter, and Level 2 encounter. The Monitor conducts audits of recordings labeled low-level to identify unreported stops.

unreported stops in situations 3 and 4, respectively. However, it is not possible to identify and evaluate those stops that were neither recorded nor reported (situation 5 below).

**Figure 1: Scenarios for Unreported Stops Mapped to Study Samples**

| | | |
|---|---|---|
| **1** | A stop occurs and officers categorize the encounter as "Level 3-*Terry* Stop" in the BWC system, but do not prepare a stop report | **Stop Sample** |
| **2** | Multiple stops occur during the encounter and officers prepare at least one stop report, but officers do not prepare a stop report for every person stopped | **Stop Sample** |
| **3** | A stop occurs, but recordings are categorized as low-level investigative encounters in the BWC system and officers do not prepare a stop report | **Low-level Sample** |
| **4** | A stop occurs prior to an arrest or summons and officers categorize recordings as "Arrest" or "Summons", but officers do not prepare a stop report | **Arrest or Summons Sample** |
| **5** | A stop occurs, but officers do not activate their BWCs for the stop *and* do not prepare a stop report | **Not addressed in the study** |

This section first specifies how unreported stops were identified in the study, then presents results on the number of unreported stops in the Stop Sample. Lastly, it describes features of unreported stops and their implications. Discussion of unreported stops in the Low-level Sample and in the Arrest or Summons Sample are presented in sections V and VI, respectively.

1. <u>Identifying Unreported Stops</u>

The identification of unreported stops relied on the judges' determinations of the *De Bour* levels present during a contact with police. Levels were aggregated into three categories: below a stop (Level 1 or 2), stop (Level 3), and arrest or summons (Level 4). Unreported stops are defined as contacts that include a Level 3 *Terry* stop but have no associated stop report. The identification of a stop reflects the consensus position of two judges.

To guard against the overidentification of unreported stops, all potential unreported stops in the three samples were subjected to a secondary search of available stop reports that had not been previously matched to a person.[39] This may occur when officers do not include a report number in the BWC system and there are factors, such as clerical errors in the reported date or time of stop, that make it difficult to match a report to its associated recording. This supplementary search was conducted in two steps.

Step 1. Identify possible report matches: Search all stop reports dated within a 48-hour window of the encounter for a report/s submitted by any officer present at the encounter, not already assigned to another person in the encounter.[40]

Step 2. Evaluate matches: Review encounter recordings and all possible matches identified in step 1 to determine if any of the stop reports are associated with the person.

In the Stop Sample, this effort resulted in 26 person-stop report matches. These are considered reported stops for the analysis of documentation, but as noted above, these contacts are excluded from analysis on compliance because the judges' determinations were rendered without information included in the stop report. As a result, the total number of people stopped that are analyzed for the documentation is 1,569 while the number analyzed for constitutionality is 1,543. The following analysis reports estimates with 95% confidence intervals in square brackets to convey the precision of estimates given the sample.[41]

---

[39] To mitigate the overidentification of unreported stops or missing labels in the BWC system, the NYPD waited at least two weeks to export BWC metadata and stop report data from their systems because officers sometimes submit reports or categorize recordings after the date of the encounter.

[40] Officers present at a stop are identified as those who activated their cameras at the incident and were included in the grouping of recordings. Through this search, 122 possible matches were identified for 92 individuals. There are more matches than people, because for some stopped persons, there were multiple possible matches.

[41] These estimates are descriptive and do not account for other factors that may also affect documentation or constitutionality.

2.  <u>Prevalence and Types of Unreported Stops in the Stop Sample</u>

In the 1,453 encounters in the Stop Sample, police engaged 4,116 individuals. During their review, the judges determined that of these 1,569 individuals were stopped by police.[42] Yet police did not report a substantial number of these stops with the required stop form. Judges identified 365 individuals who were stopped but the stop was not documented with a stop report or 23% [21.2%-25.4%] versus 1,204 individuals who were stopped and the stop was reported or 77% [74.5%-78.6%].[43] Across encounters in the sample, unreported stops were found in 297 encounters or 24% [21.7%-26.5%] of encounters while all stops were reported in the remaining 937 encounters.  Below, Figure 2 depicts the rate of unreported stops across individuals and encounters in the Stop Sample.

In the Stop Sample, an unreported stop may result if officers did not report all stops in an encounter or labeled a recording a stop without then preparing a stop report. Most unreported stops were found among encounters where at least one officer labeled a recording Level 3 and no stop report was prepared for *any* person police engaged in the recording.[44] Thus, in 272 of 365, or 75% [69.6%-78.6%], of unreported stops, at least one officer categorized a recording as a stop, but no officer submitted a stop report. This type of unreported stop occurred across 232 of 1,453, or 16% [14.1%-17.8%], of encounters in the Stop Sample. In contrast, during encounters where police engaged multiple people and prepared a stop report for at least one person, 93 people were stopped

---

[42] While the Stop Sample included 1,453 encounters, only 1,234 of those encounters include a Level 3 stop for at least one person. For 219 encounters, at least one officer labeled the encounter a Level 3 in the BWC system, but there is no stop report matched to the encounter and the reviewing judges did not find any person in the encounter stopped.
[43] The Monitor's Twenty-First Report documented a sharp increase in unreported stops in 2022. Twenty-First Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034 (AT) (S.D.N.Y. Sept. 4, 2024), ECF 934-1. Compliance with the requirement to report stops continued to decrease in 2023. Twenty-Second Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034 (AT) (S.D.N.Y. Oct. 7, 2024), ECF 937-1.
[44] There are typically multiple recordings of the same incident and each officer enters information regarding the recording, but recordings of the same incident may have different labels. Any encounter with a recording labeled Level 3 was grouped in the Stop Sample.

yet not documented in a stop report.[45] Supervisors review reported stops, but it is unclear whether they actively identify unreported stops that occur alongside a reported stop.

**Figure 2: Frequency of Unreported Stops in Stop Sample**



Another relevant distinction among unreported stops is that some people were stopped and arrested while others were not.[46] This distinction is important because if an unreported stop ends in arrest, then it is still subject to oversight by the NYPD due to the arrest, while unreported stops that do not end in arrest are more difficult to examine through the NYPD's oversight processes, which audit recordings for unreported stops. In 192 of the 365 unreported stops, or 53% [47.4%-

---

[45] As noted above, there were also *Terry* stops that were undocumented where the officers categorized the encounter as Level 1 or Level 2 (discussed in Section V regarding the Low-level Sample) and unreported stops that were categorized as arrests or summonses (discussed in Section VI regarding the Arrest or Summons Sample). If any officer categorized a recording as a Level 3 regardless of how other officers categorized the encounter, it was included in the Stop Sample.

[46] The NYPD provided arrest reports and arrest reports were associated with an encounter and then matched to a person. Some unreported stops where the person was not arrested concluded with the officer issuing a summons.

57.5%], the interactions did not end in arrest and are unlikely to be captured by NYPD auditing processes because while there is an audit, the number of recordings is vast.[47]

3.  Features of Unreported Stops in the Stop Sample

Unreported stops may present different patterns than reported stops, including in the types of crimes that officers are investigating, the context of the stops, and the actions that officers take throughout the encounter. These differences are important because if unreported stops systematically differ, they may raise concerns that are not being addressed through existing channels of oversight. This section first describes the race and ethnicity of the individuals involved in reported and unreported stops, then examines whether there are differences in the types of crimes under investigation, whether the officers conduct these unreported stops differently from reported stops, and whether different officers are involved.

Overall, unreported stops identified in the Stop Sample are demographically similar to reported stops. That is, all stops—reported and unreported—are primarily of young Black and Hispanic men. Reported and unreported stops both primarily involved Black or Hispanic individuals (90% and 86%, respectively) and men (91% and 88%, respectively). The racial composition of those in both reported and unreported stops is consistent with other audits conducted by the Monitor.[48]

---

[47] Among all people stopped in the sample, judges determined that police engaged 701 individuals at both Level 3 and 4. Of these 701 individuals, 562 individuals were arrested (determined by a match to an arrest report), while the remaining received a summons or no action was taken (despite the Level 4). Of those stops that judges determined began with a stop and ended in arrest, 389 (69%) were reported and 173 (31%) were not reported. In addition, officers are not required to submit a stop report if they had probable cause at the outset. Therefore, if judges determined that officers had probable cause at the outset of a contact, then the individual was not considered stopped (even if judges identified a Level 3) and hence the contact could not counted as an unreported stop.
[48] Twentieth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y Apr. 11, 2024), ECF No. 927-1.

Figure 3 below shows that both reported stops and unreported stops were most often conducted to investigate suspected crimes related to weapons, property, and violence.[49] Relative to reported stops, unreported stops had a larger share related to violence, "other" issues (e.g., disputes; civil code violations) and quality of life crimes (e.g., alcohol law violations). The bracketed black bars on each column represent the 95% confidence intervals.

**Figure 3: Reason for the Encounter, by Type of Stop**



As presented in Table 4 below, the prevalence of frisks was higher in reported stops, but the use of force and handcuffs were more frequent in unreported stops. A closer inspection of the actual uses of force that officers employed in reported and unreported stops shows that the types of force that officers used are largely the same. Unreported stops end in an arrest more frequently than reported stops. This complicates comparing key actions that occur in both because arrests include searches and handcuffing as a matter of lawful procedure. Therefore, comparing the

---

[49] Suspected crimes were identified (whenever possible) during content analysis of each incident on BWC by research assistants. Crimes related to violence include assault, sexual assault, robbery, child abuse, among others. The categories employed are consistent with the expert report in the *Floyd* case and other work conducted by the Monitor.

content of all unreported and reported stops may mask key differences and limit our understanding

of the types of actions that go without oversight in unreported stops.

**Table 4: Officer Actions During All Reported and Unreported Stops**

| Police Action | Reported Stops | | | Unreported Stops | | |
|---|---|---|---|---|---|---|
| | Count (N) | Percent | 95% Confidence Interval | Count (N) | Percent | 95% Confidence Interval |
| *Frisked person or property* | 844 | 70% | 67.4%-72.7% | 221 | 61% | 55.3%-65.6% |
| *Searched person* | 675 | 56% | 53.2%-58.9% | 193 | 53% | 47.4%-57.5% |
| *Searched property* | 285 | 24% | 21.3%-26.2% | 81 | 22% | 18.0%-26.8% |
| *Used force (any)* | 193 | 16% | 14.0%-18.2% | 78 | 21% | 17.3%-25.9% |
| *Handcuffed person* | 548 | 46% | 42.7%-48.4% | 227 | 62% | 57.0%-67.2% |

Figure 4 below compares the investigative actions that took place during unreported stops

that did *not* end in arrest (192 contacts) compared to reported stops that did *not* end in arrest (807

contacts).[50] Again, the percentage of frisks and searches was higher in reported stops, but an

analysis of actions that occur in unreported stops provides insight into the scope of actions that

likely fall outside NYPD oversight because the stop was not reported.

---

[50] All investigative actions identified in the table were obtained from the content analysis of BWC by research assistants. In the section below on compliance, information from stop reports is also included in the count of frisks and searches. Stop reports identify a small number of frisks and searches that were not visible on BWC and were not identified during content analysis. Excluding those actions from this analysis facilitates a comparison between reported and unreported stops. Otherwise, a difference in counts of frisks and searches may be affected by the inclusion of information from the stop reports only and not actual differences in the number of frisks and searches.

**Figure 4: Officer Actions During Reported vs. Unreported Stops *Not* Ending in Arrest**



4. <u>Discussion of Unreported Stops in the Stop Sample</u>

Complete and accurate reporting of stops conducted by officers is fundamental for effective oversight and efforts to reduce unconstitutional stops and racial disparities in the conduct of stops. During this study, officers often conducted a stop and either did not document the stop of every person or, at least one officer recognized the stop and labeled the BWC recording a stop, but no officer completed the required stop report. Being able to identify the different contexts for unreported stops provides direction on how to identify unreported stops through oversight and tailor interventions to improve reporting by officers.[51]

### C. *Compliance*

Officers must abide by the requirements of the Constitution in the conduct of a stop. A key aim of the study is to assess the frequency of unconstitutional stops and key factors associated with improper action by police. This section describes the judges' assessment of constitutionality for

---

[51] Of the 297 encounters involving at least one of the 365 unreported stops, officers in 284 encounters labeled the encounter as a mix of Level 3, lower levels, or did not input a label.

Level 3 *Terry* stops in the Stop Sample, while Sections V and VI discuss the constitutionality of stops from the Low-level and Arrest or Summons samples, respectively.[52] The discussion of compliance is divided into four subsections. The first examines the overall constitutionality of stops for the Stop Sample and the second analyzes the constitutionality of key components of each stop, including the initiation of a stop and the conduct of any search or frisk (if relevant). The remaining two subsections examine whether supervisors identified unconstitutional stops and whether officers offered business cards to individuals stopped as required. While differences by race and ethnicity are discussed throughout this subsection, analysis of Fourteenth Amendment compliance is discussed in the next subsection (D).

To determine the constitutionality of stops, all encounters were reviewed by at least two judges, including each person engaged by police.[53] If a judge deemed the stop unconstitutional, then they identified all the specific reasons the stop was improper, which permitted analysis on overall compliance as well as analyses of the initiation of a stop and any searches and frisks conducted during the course of a stop. If the two judges initially assigned the encounter disagreed about its constitutionality, then it was reviewed by a third judge. For some encounters, it was not possible to establish consensus across reviewers or there was not enough information to reach a decision.[54]

---

[52] This excludes interactions with a person that did not rise to a stop (2,265 contacts) and interactions that include only an arrest or summons and not a stop (216 contacts), as well as those where the level could not be determined (59 contacts).

[53] In their review, judges had access to the BWC recordings of the interaction, stop and arrest reports for any person in the recording, and radio exchanges between officers and dispatch during the encounter—the ICAD—if available.

[54] A finding of no consensus may occur for several reasons. First, three judges may enter a combination of lawful, unlawful, and insufficient information to determine. Second, only reviews that agreed on the presence of the stop (Level 3) and arrest/summons (Level 4), are used to establish the consensus position on whether the contact was lawful. For a limited set of cases where there are only two reviews that agree on levels, the two judges may be split on their compliance determination, which would also result in a finding of no consensus. Non-consensus differs from insufficient information, which relies on a consensus among two judges that it was not possible to reach a determination given available information.

Judges based their decisions on constitutional requirements. For a stop, an officer must have a reasonable suspicion that a person is committing or about to commit a felony or Penal Law misdemeanor. For a frisk, an officer must have further reasonable suspicion that a person is armed and dangerous. For a search of either an individual's person or property, an officer must have probable cause, a higher level of information. Among the circumstances relevant to this study in which a search is constitutionally permitted are when an officer has probable cause of the commission of a crime (including from the results of a frisk) and when knowing and voluntary consent is given for the search.

1.  Overall Constitutionality of Stops

For this subsection, a stop is defined as unconstitutional if the initial stop was determined to be unlawful or officers took action during the course of the stop that was unconstitutional.[55] A contact is defined as unconstitutional if a two-judge consensus finds any unlawful behavior, although the two judges may differ on the precise reason a contact was unlawful. Across 1,543 individuals stopped in the Stop Sample,[56] judges concluded that 1,111, or 72% [69.7%-74.2%], of those stops were constitutional, while 300, or 19% [17.4%-21.5%], were unconstitutional. For the remaining individuals stopped, there was insufficient information to determine compliance in 31 stops or 2% [1.4%-2.7%] or no consensus across reviewers in 101 stops or 7% [5.3%-7.8%].

The prevalence of unconstitutional stops varied by the race and ethnicity of the person stopped. Police conducted more unconstitutional stops of Black and Hispanic individuals relative to those of all other races. Figure 5 below presents information on the constitutionality of stops by

---

[55] Unconstitutional actions taken during the stop could relate to a frisk, search, or force. It was very rare for unlawful force to be the only reason for an unconstitutional stop. There are only three contacts that judges found to be unconstitutional for reasons only related to force, and in all three, two judges agreed on the unlawfulness of the force..

[56] As noted above, the total number of stops that is analyzed for the documentation is 1,569 while the number analyzed for constitutionality is 1,543. This is because reviewers did not have the stop reports when they reviewed the stops of 26 contacts and therefore, did not have the access to information provided by the officer that might have affected determinations of constitutionality.

race and ethnicity, showing that 21% [18.6%-24.0%] and 19% [15.4%-22.8%] of the stops of Black and Hispanic individuals were rated as unconstitutional, respectively, compared to 11% [7.0%-17.2%] of the stops of all other races.[57] While the results include confidence intervals to communicate the precision of estimates (given this is a sample of all contacts), the results only report the frequency of improper stops by key categories. Additional analysis accounting for other factors is reported in subsection D below.[58]

**Figure 5: The Constitutionality of Contacts by Race/Ethnicity**



The overall constitutionality of stops varied, depending on the context of the stop. Specifically, unconstitutional stops were concentrated among stops that were self-initiated by officers and those based on suspected criminal possession of a weapon. In addition, stops involving

---

[57] The "other" category has 167 individuals of which 116 are white, 29 are Asian/Pacific Islander, 14 are Middle Eastern/South Asian, and eight are of unknown race or ethnicity. Stops for each group were unconstitutional at the following rates: 10% for whites, 10% for Asian or Pacific Islanders, 7% for Middle Eastern or South Asians, 38% for individuals of unknown race and ethnicity.

[58] The estimates with confidence intervals are insufficient to determine whether there are statistically significant differences among rates of constitutionality between two groups and do *not* account for other factors that might be associated with race.

officers from a specialized unit—Neighborhood Safety Team (NST)—were more frequently unconstitutional relative to those without NST officers present.

Officers may initiate a stop based on a call for service from 911 or 311 (radio runs), information from a complainant or witness at the scene, or based on observations made in the field. This last type is referred to as "self-initiated." Self-initiated stops were primarily focused on recovering illegal weapons, with 78% [73.6%-82.2%] based on suspected criminal possession of a weapon. It is typically infeasible to determine how an encounter was initiated from the BWC alone, so it is necessary to rely on information from the stop report or radio dispatch transcripts (known as ICADs, Intergraph Computer Aided Dispatch). As a result, the analysis below reports differences between stops that were self-initiated relative to all other stops among the stops that were either 1) reported or 2) occurred at the scene of a reported stop, which includes 1,271 stops.[59]

**Figure 6: The Constitutionality of Self-Initiated Stops vs. All Others**



---

[59] If an unreported stop occurred at the scene of a reported stop, the analysis imputes how the contact was initiated based on information in the reported stop. This includes 1,178 reported stops and 93 unreported stops that occurred at the scene of a reported stop.

Critically, as shown in Figure 6 above, self-initiated stops were much more frequently unconstitutional compared to those based on information from a a radio run or complainant or witness at the scene. As shown in Figure 6, self-initiated stops were unconstitutional in 46% [41.1%-51.0%] of stops while all other stops were unconstitutional in 11% [9.3%-13.6%] of stops. Comparing self-initiated stops to all other stops, judges more frequently found that there was insufficient information to reach a decision or could not reach a consensus among three reviewers (16% vs. 3%, respectively).

All stops primarily involved Black and Hispanic individuals, but it is particularly the case with self-initiated stops, where 68% [63.9%-73.6%] of those stopped were Black, 28% [23.8%-32.8%] were Hispanic, and only 3% [1.7%-5.5%] were of all other races.[60] The constitutionality of self-initiated stops by race and ethnicity is reported in Figure 7 below. The rate of unconstitutional self-initiated stops of Black and Hispanic individuals is 48% [41.8%-53.9%] and 45% [35.8%-54.8%], while it is 15% [0.0%-30.7%] for those of all other races. However, the sample size of self-initiated stops, particularly among people of all other races, is too small to reliably detect statistically significant differences by race, as can be seen in the large confidence intervals. Regardless, there is concern that judges frequently found self-initiated stops unconstitutional, and, as discussed above, nearly all self-initiated stops were of Black or Hispanic people.

---

[60] In comparison, individuals who were stopped as part of an encounter that was initiated by a call for service (radio run) or complainant or witness at the scene were 58% Black, 29% Hispanic, and 13% of all other races.

**Figure 7: Constitutionality of Self-Initiated Stops by Race and Ethnicity**



The constitutionality of stops conducted by officers also differed by the crime suspected. Most often, officers cited criminal possession of a weapon (CPW) as the basis for a stop, but crimes related to violence and property were also frequent. Stops conducted to find an illegal weapon had lower rates of constitutionality. As shown in Figure 8 below, judges found that stops conducted to find illegal weapons were unconstitutional in 36% [32.5%-40.5%] of stops while stops based on suspicion of all other crimes were unconstitutional in 9% [7.3%-11.1%] of stops.[61] There is some variation in constitutionality across other suspected crimes, with stops related to property and violent crimes deemed constitutional in 89% [85.5%-91.6%] and 88% [84.2%-91.3%] of instances, respectively, while stops related to drug crimes were constitutional in 57% [34.0%-

---

[61] The Stop Sample includes reported and unreported stops, so it is not possible to report officer-identified suspected crime for all stops. To identify the suspected crime, we use content analysis of stops that coded the primary issue at stake in the encounter based on categories based on the criminal code, including violence, weapons, property, drugs, quality of life and other. An examination of only reported stops using officer-supplied suspected crime yields very similar results, finding that 35% of CPW stops were unconstitutional versus 9% of all other stops.

78.2%] of stops.[62] It is worth noting that a slight majority (52%) of stops in this sample based on suspected criminal possession of a weapon were also self-initiated by officers, rather than the result of a radio run or victim or complainant at the scene.

**Figure 8: Stops Based on Criminal Possession of a Weapon vs. All Other Crimes**



Stops conducted by Neighborhood Safety Teams (NST)—created in March 2022 by Mayor Eric Adams and former NYPD Commissioner Keechant Sewell and tasked with the capture of illegal guns across 32 high-crime commands—have been shown in other audits to execute more unconstitutional stops than officers on routine patrol.[63] Consistent with prior findings of the Monitor, stops conducted by NST members in this sample were also more frequently

---

[62] Stops based on drug crimes were less frequent in the data and there is more uncertainty about the rate of constitutionality in these stops as evidenced by the large confidence intervals.

[63] The Monitor's Twenty-First Report found that stops conducted by the specialized units constituted the majority of improper stops and the Monitor's Nineteenth Report presented the results of an audit of NST teams that found extensive evidence of improper stops, searches and frisks. Twenty-First Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034 (AT) (S.D.N.Y. Sept. 4, 2024), ECF 934-1; Nineteenth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034 (AT) (S.D.N.Y. June 5, 2023), ECF 915-1. See also Twenty-Second Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034 (AT) (S.D.N.Y. Oct. 7, 2024), ECF 937-1.

unconstitutional than stops by other officers. [64] In contrast, stops conducted solely by Public Safety Team (PST) officers—uniformed officers designated to engage in more proactive policing, particularly related to violent crime—have similar rates of constitutionality compared to stops with no PST officers present.[65] Figure 9 below, presents the rates that judges determined stops were constitutional when they were conducted by NST officers, PST officers, both NST and PST officers, and officers that are in neither NST nor PST units.

**Figure 9: Stops with NST and/or PST Officers Present vs. Not Present**



_____

[64] Stops with NST and PST officers present were identified by matching officers from the NST and PST roster to BWC metadata of a selected encounter. There are two limitations with the use of the NST roster. First, the personnel list was drawn shortly after the study period and it is not possible to know whether these officers were on the NST at the time of the encounter. Second, NST and PST officers may not always be on an NST or PST shift, so the officer may be on an NST unit but serving a shift as a patrol officer at the time. It is not possible to distinguish between these possibilities with available data.
[65] Former NYPD Commissioner Dermot Shea established Public Safety Teams of uniformed officers to engage in more proactive policing, particularly related to violent crime.

Some circumstances that might have been expected to have higher rates of unconstitutional behavior did not. Unreported stops are those that officers did not document through a stop report. If officers made this choice strategically to hide unconstitutional action from oversight, it would be expected that unreported stops would have higher rates of unconstitutional stops. Yet, as shown in Figure 10 below, reported and unreported stops in this sample are constitutional at similar rates, 72% [69.6%-74.8%] and 71% [66.3%-75.8%], respectively. However, because unreported stops had a higher rate of insufficient information to determine lawfulness, or no consensus on compliance, by reviewing judges, unreported stops had a lower rate of unconstitutional stops at 12% [8.9%-15.8%] relative to reported stops, which were unconstitutional at a rate of 22% [19.4%-24.2%]). It is more difficult to establish whether a stop was lawful without the benefit of information that officers provide in a stop report. These results, of course, do not take away from the fact that accurate reporting is required by the Remedial Order and necessary to assess compliance and racial disparities.

**Figure 10: Constitutionality in Reported vs. Unreported Stops**



There are also substantial differences in constitutionality among those stops that ended in an arrest or summons compared to those that did not. For the unreported stops in this sample, 239 ended in either in an arrest or the issuance of a summons (65% of unreported stops) while 126 (35%) did not end in an arrest or summons. Only eight unreported stops ending in an arrest or summons were unconstitutional, which constituted 3% [1.5%-6.5%]. In contrast, 36 of those that did not end in an arrest or summons were unconstitutional, a rate of 29% [20.9%-37.3%]. Of reported stops that end in arrest or summons, 11% [8.5%-14.4%] were unconstitutional versus 29% [25.4%-32.2%] of reported stops that did not end in arrest or summons. It might be expected that stops that end in arrest are more constitutional since they require probable cause. The rate of unconstitutional stops among unreported stops that do not end in arrest are concerning, because they are less likely to be captured by the NYPD's auditing procedures yet are often unconstitutional.

Another concern relates to the implications of how a stop unfolds, specifically whether escalation occurs. A stop may be initiated in different ways. Officers may approach and immediately detain a person in a stop, or officers may begin an encounter at a lower level where the person is free to leave and then escalate the interaction to a stop. These distinct paths to a stop did not lead to substantial differences in constitutionality, as seen in Figure 11 below.

In this sample, officers primarily began a stop by immediately detaining the individual rather than starting at a lower level and escalating to a stop as their investigation progresses.[66] Of 1,543 people stopped in the sample, 204, or 13% [11.6%-15.0%], began at a lower level (Level 1 or 2)

---

[66] In the screening process, the study excludes encounters with incomplete BWC footage, and it is possible that excluded encounters present different in patterns of escalation.

and then escalated the encounter to a stop (Level 3 stop).[67] The extent to which officers conducted a stop legally did not substantially differ by the level at which the encounter began.[68] As shown in Figure 11, when the encounter was initiated at Levels 1 or 2 and escalated to a stop, the stops were unconstitutional 14% [9.7%-19.8%] of the time versus 20% [18.2%-22.5%] of encounters that began with immediate detention.[69]

**Figure 11: Constitutionality in Escalated Stops vs. Immediate Stops[70]**



[67] For three people stopped in the sample (3 of 1543), it was not possible to determine whether the encounter escalated because there was no consensus on whether the officers engaged the person at a lower level prior to the stop. So, the analysis on compliance of escalated versus immediate stops excludes those three contacts (N=1,540).

[68] The distribution of race and ethnicity in escalated versus non-escalated contacts is similar. In escalated contacts, officers stopped 119 (59%) Black individuals, 50 (24%) Hispanic individuals, and 35 (17%) individuals of all other races and ethnicities. In non-escalated encounters, officers stopped 794 (59%) Black individuals, 410 (31%) Hispanic individuals, and 132 (10%) individuals of all other races.

[69] Of stops that were initiated at a low-level (Level 1 or 2), there were no contacts that judges found were initiated improperly at the outset (either no objective credible reason to approach at Level 1 or no founded suspicion of criminality at Level 2).

[70] The number of contacts in this figure is 1,540 rather than the 1,543 above. There are three contacts where there is consensus that there was a Level 3 stop, but no consensus on whether the encounter escalated from a lower level.

2.  <u>Breaking Down Compliance: Reasonable Suspicion, Frisks, and Searches</u>

The previous subsection described stops that were unconstitutional for *any* violation of the Fourth Amendment. This subsection separately considers the constitutionality of the initiation of the stop and the conduct of frisks and searches. First, the analysis reports how frequently officers initiated a stop without reasonable suspicion that an individual has committed, is committing, or is about to commit a felony or Penal Law misdemeanor. Then, the section reports on how frequently frisks were unconstitutional. Last, the section reports on how frequently searches met the requirements of the Fourth Amendment as well as the requirements of the Right to Know Law related to business cards for stops. Consistent with all the analyses, a determination of a constitutional (or unconstitutional) stop, frisk, or search required a two-judge consensus and again, rates are reported with 95% confidence intervals in brackets to communicate the precision of estimates for this sample.

As noted above, officers must have individualized reasonable suspicion before detaining a person. Judges found that officers had reasonable suspicion prior to stopping a person in 1,267 of the stops, or 82% [80.1%-83.9%], and did not have reasonable suspicion prior to stopping a person in 144 contacts, or 9% [7.9%-10.8%] of individuals stopped. There was insufficient information or no consensus among the judges in 132 of contacts, or 9% [7.1%-10.0%] of the stops. Below, Figure 12 compares the stops with reasonable suspicion with those that failed to have reasonable suspicion, disaggregated by race and ethnicity with confidence intervals in brackets on each column.[71]

---

[71] The "other" category has 167 individuals of which 116 are white, 29 are Asian/Pacific Islander, 14 are Middle Eastern/South Asian, and eight are of unknown race or ethnicity. Officers did not have reasonable suspicion to stop individuals in each group at the following rates: 6% for whites, 3% for Asians and Pacific Islanders, 0% for Middle Easterners and South Asians, 13% for those of unknown race or ethnicity.

**Figure 12: Constitutionality of the Initiation of a Stop, by Race and Ethnicity**



Stops frequently involved frisks. Officers frisked 1,117 of the 1,543 individuals who were stopped in the sample, or 72% [70.1%-74.6%] of individuals.[72] A frisk is unconstitutional if the officer did not have reasonable suspicion to initiate the stop. A frisk is also improper if the officer possessed reasonable suspicion to stop the person, but did *not* have reasonable suspicion that the individual was armed and dangerous or extended the frisk beyond the areas for which there was reasonable suspicion.[73] This is consistent with how the Monitor evaluates frisks in compliance audits.[74] As such, the following analysis distinguishes between unconstitutional frisks conducted

---

[72] An individual is defined as having been frisked (total of 1,117) if *any* of the following is true: 1) the officer reported the frisk on the stop form, 2) a research assistant identified a frisk during content analysis, 3) a judge identified an unlawful frisk when identifying unconstitutional actions. Identification of a frisk does not rely on stop reports alone, because officers do not report all frisks on the stop report and the sample includes stops that do not have a corresponding stop form.

[73] Twenty-First Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034 (AT) (S.D.N.Y. Sept. 4, 2024), ECF 934-1.

[74] The Monitor's compliance review deems any frisk that occurs in a stop that was not based on reasonable suspicion as improper unless there was there was independent reasonable suspicion for the frisk. This change was adopted by the Monitor in 2021 and was subsequently adopted by the NYPD in its own audits.

in stops that were initiated in a constitutional manner (with reasonable suspicion) and those that were not.

Among the 1,117 stops with a frisk, officers unconstitutionally frisked 169 people or 15% of those frisked [13.0%-17.4%] because either the officer did not have reasonable suspicion for the stop and/or the frisk was unconstitutional for another reason.[75] Officers did not have reasonable suspicion to initiate the stop and then proceeded to frisk the individual in 121 stops or 72% [64.2%-78.3%]. Officers had reasonable suspicion to stop the person but then conducted an unconstitutional frisk in 48 stops, or 28% [21.7%-35.8%]. The rate of unconstitutional frisks is lower in this sample than other work conducted by the Monitor, but the difference likely relates to the baseline count of frisks. This study includes any frisk conducted during the encounter and officers may frisk an individual prior to conducting a search while arresting an individual, which increases the number of lawful frisks.

Figure 13 below presents the constitutionality of frisks by race and ethnicity. Among unconstitutional frisks, the figure distinguishes between those where the officer had no reasonable suspicion for the stop (as shown below in dark red) and those where the officer stopped an individual constitutionally, but then proceeded to frisk the individual either without reasonable suspicion that the individual was armed and dangerous or extended the frisk improperly (as shown below in light red). It is important to recognize that some stops with frisks (91) were unconstitutional for a reason unrelated to reasonable suspicion for the stop or frisk and that the figure below *only* reflects the constitutionality of frisks.

---

[75] This includes reported and unreported stops. In 102 contacts with a frisk, it was not possible to assess compliance either because there was insufficient information (27) or no consensus (75).

**Figure 13: Constitutionality of Frisks, By Race and Ethnicity**



Officers frequently conducted searches during encounters that include a stop. Among the 1,543 people who were stopped, 1,000 people, or 65% [62.4%-67.2%], were searched by officers either as part of their investigation or pursuant to an arrest.[76] A search is defined as unconstitutional if the officer did not have reasonable suspicion for the stop and/or the officer searched a person or property without either probable cause or having obtained valid consent, as required by the Fourth Amendment. Among stops with a search, officers conducted an unconstitutional search of 109 people, or 11% [9.0%, 12.0%] of those searched. Among unconstitutional searches, officers had reasonable suspicion to stop 40 people (of 109), but after stopping an individual appropriately, the officers proceeded to conduct an improper search. Among all 109 unconstitutional searches, 73

---

[76] An individual is defined as having been searched if *any* of the following is true (total 1,000): 1) the officer reported the search on the stop form, 2) a research assistant identified a search during content analysis, 3) a judge identified an unlawful search when identifying unconstitutional actions. Identification of a search does not rely on stop reports alone, because officers do not report all searches on the stop report and the sample includes stops that do not have a corresponding stop form. In some instances, a person volunteered to be searched: 153 individuals (of whom 138 were Black or Hispanic) offered to be searched without the officer asking for consent.

individuals were Black, 30 were Hispanic, and six were members of all other races. Among unconstitutional searches that occurred in stops with reasonable suspicion (40 searches), 22 people were Black, 15 were Hispanic and three were members of other races.

The percentage of searches found to be unconstitutional is lower in this study relative to the Monitor's compliance audits. This is explained primarily because this study does not distinguish between searches conducted as part of an investigation versus searches conducted incident to an arrest. The Monitor's audits do not include searches incident to an arrest, which are lawful, in their baseline, so the baseline count of searches in this study is larger than the Monitor's audits.

3. Supervision

Supervisors are required to review each stop report that officers submit, and these reviews provide important feedback to officers in the field about the constitutionality of their actions and provide accountability when officers exceed constitutional limits. Supervisors evaluate both whether the stop and any frisks or searches were proper. The Monitor has found that supervisors frequently fail to identify unconstitutional stops, searches, and frisks.[77] Analysis of the stop forms with supervisor reviews from this study's sample also finds that supervisors rarely identified unconstitutional stops, and in the limited instances when supervisors did identify improper actions, the reviewing judges did not always concur that the stop was unconstitutional.

Supervisor reviews identified very few stops that were initiated without reasonable suspicion. Of 1,178 reported stops in the sample, supervisors found that officers did not have reasonable suspicion to stop 11 people (or 1%), while judges concluded that officers stopped 117 people (10%) without reasonable suspicion. In addition, judges and supervisors did not always

_____

[77] Ninth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y. Jan. 11, 2019), ECF 680-1; Tenth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y. Jan. 7, 2020), ECF 754-1.

agree on the specific stops that were improper. Of the 117 individuals who judges found to be stopped without reasonable suspicion, supervisors only concurred that two of these stops were made with an insufficient basis. Supervisors identified nine people stopped without a proper basis where judges concluded that the officers had reasonable suspicion to make the stop.

In a stop report, supervisors also evaluate whether the frisk, if made, was conducted properly. In reported stops, officers frisked 893 of the 1,178 individuals stopped. (This excludes frisks conducted in stops that were not reported because there was no supervisory review of those stops.) Again, supervisors rarely identified an improper frisk. Of the 893 frisks, supervisors found that only 12 frisks (1%) were improper.[78] In contrast, judges determined the frisk was unconstitutional in 143 reported stops, or 12% [10.2%, 13.9%] of frisks. Supervisors and judges did not always agree on the specific frisks that were improper. Of the 143 unconstitutional frisks found by the reviewing judges, the reviewing supervisor only identified one of these frisks as improper. There were also some frisks that supervisors identified as improper, but the reviewing judges did not find problematic. In 13 stops with a frisk, supervisors found that there was insufficient basis for the stop and/or insufficient basis for the frisk while the judges determined the stop and frisk were constitutional.

Similarly, supervisors infrequently identified unlawful searches. Officers conducted a search in 787 of 1,178 reported stops.[79] Judges found searches to be unconstitutional in 102 of 787, or 13% [10.7%, 15.4%], of searches. Of the 102 searches that judges found to be unconstitutional,

---

[78] In some stop forms, supervisors complete the question on the propriety of the frisk even when officers indicated a frisk did not occur. There are 15 instances where the supervisor identified an improper frisk where the officer failed to indicate that a frisk occurred on the stop form. There also are 29 stop forms where officers indicated that the person was frisked but the supervisor did not review whether the frisk was appropriate. Supervisors found an additional 12 improper frisks, but these frisks were not identified by officers, judges and research assistants as occurring.

[79] This includes all identified searches and not just those reported on the stop form. An individual is defined as having been searched if *any* of the following is true: 1) the officer reported the search on the stop form, 2) a research assistant identified a search during content analysis, 3) a judge identified an unlawful search when identifying unconstitutional actions.

the supervising officer determined there was an insufficient basis for the search in only three instances.

These findings demonstrate that officers are not receiving critical feedback from supervisors when they have made improper stops, frisks, and searches. Additionally, the failure to document all frisks and searches compounds the lack of supervisory feedback. For the constitutionality of stops to improve, supervisors must be able to identify and correct unconstitutional stops, frisks and searches.

4. Officer Compliance with the Business Card Requirement

The New York City Council passed the Right to Know Act ("the Act") in 2017, seeking to eliminate unconstitutional searches and increase transparency and accountability by introducing new requirements for how officers interact with people.[80] As part of the Act, officers are required to provide certain individuals with a business card that includes identifying information to facilitate the person's ability to file a complaint against officers. The Act requires that officers offer the person a business card at the conclusion of every Level 2 and 3 encounter that does not end in an arrest or summons.[81] The Remedial Order also dictates that any "form or card given to stopped persons should provide the stated reasons for the stop, the badge numbers of the stopping officers, and information on how to file a complaint."[82] As shown in Figure 14 below, police offered business cards to 59% [55.6%, 62.3%] of the 893 people who were stopped and not also arrested or issued a summons; however, there was significant variation in the offering of a business card in

---

[80] Administrative Code of City of NY § 14-173 and § 14-174.
[81] Although the Act applies to Level 2 interactions as well as Level 3 stops, the study's business card analysis was restricted to Level 3 stops identified in this sample that do not end in arrest or summons and includes the stops that were excluded from prior analysis because they were matched to stop reports after the judges completed their analysis. The analysis reflects 857 stops without an arrest or summons from the sample of 1,572 reported and unreported Level 3 stops. See *NYPD Patrol Guide Procedure No 212-11, effective 10/19/18* for information about what NYPD officers are required to do at each *De Bour* level.
[82] *Floyd v. City of New York*, 959 F. Supp. 2d 668, 682 (S.D.N.Y. 2013).

unreported stops versus reported stops.[83] Officers offered their business card in 64% [60.6%, 67.8%] of reported stops, but in only 29% [21.6%, 38.1%] of unreported stops. These findings regarding reported stops do not align with what officers state in their stop reports. According to officer reports, they offered a business card to 85% [82.5%, 87.8%] of these same people versus 64% found by the judges. Although it is possible that officer error explains the higher rate, it is also possible that the officers did offer a business card, but the action was not captured in the available recordings, so the reviewing judges were not able to observe it. These findings still suggest that, at the time of this study, officers were frequently not providing business cards despite the legal requirement to do so.

Some variation in whether officers offered their business card was also apparent when disaggregating by race and ethnicity. Nearly 63% [56.4%, 69.2%] of Hispanic individuals and 60% [55.5%, 64.1%] of Black individuals who were stopped (reported and unreported) but not arrested were offered a business card, compared 44% [33.1%, 54.7%] of those of all other races.[84]

**Figure 14: Officer Offered Business Card, by Type of Stop**



---

[83] The Monitor recently found that officers offered business cards in 79 percent of instances required. Twenty-First Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034 (AT) (S.D.N.Y. Sept. 4, 2024), ECF 934-1.

[84] In the "other" race category, 56 individuals were white, 15 were Asian/Pacific Islander, nine were Middle Eastern/Southwest Asian. It was not possible to determine the race or ethnicity of 7 people.

### D. Fourteenth Amendment Analysis

A key focus of the Monitorship is to assess whether the NYPD's stop, question, and frisk practices abide by the requirements of the Fourteenth Amendment—equal protection under the law. The Monitor has analyzed Fourteenth Amendment compliance by assessing racial disparities in the incidence of stops and investigating practices related to racial profiling and biased policing.[85] This study assesses compliance with the Fourteenth Amendment by examining racial disparities in the constitutionality of stops. The following analysis assesses whether stops of Black and Hispanic people are more likely to be unconstitutional relative to stops of similarly situated individuals of other races and ethnicities. Unlike the analysis in the prior sections, this section accounts for differences in the context of the stop (e.g., location of stop, time of day, crime suspected, whether the stop was self-initiated or the result of a radio run or complainant, etc.) in assessing differences in constitutionality by race and ethnicity. The results are inconclusive. As discussed further below, it is not possible to determine with confidence whether people of different racial and ethnic groups are more likely to experience an unlawful stop, because there are too few individuals in the data who are *not* Black or Hispanic across key encounter contexts. Although, there is one variation of the estimated models that finds Black individuals are more likely to be stopped without reasonable suspicion.

1. <u>Methodology for Assessing Racial Disparities</u>

To assess compliance with the Fourteenth Amendment, the analysis below examines whether the race and ethnicity of the individual stopped is associated with a higher likelihood of experiencing an unconstitutional stop. The analysis uses three outcomes related to the

---

[85] See the Monitor's Fifth Report- Analysis of NYPD Stops Reported 2013-2015, *Floyd v. City of New York*, No. 1:08-cv-01034-AT-HBP (S.D.N.Y. May 30, 2017), ECF 554; Thirteenth Report of the Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y. Sept. 1, 2021), ECF 853-1; Twentieth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y Apr. 11, 2024), ECF No. 927-1.

constitutionality of a stop including: any unconstitutional action during a stop, the unconstitutional initiation of a stop, and the conduct of an unconstitutional frisk during a stop. Each outcome is defined below.[86]

- *Any unconstitutional action*: officer/s employed *any* unlawful action during the encounter.[87]

- *Unconstitutional initiation of stop*: the officer/s did *not* have reasonable suspicion required to stop the person.[88]

- *Unconstitutional frisk*: officer/s did *not* have reasonable suspicion required to stop the person, reasonable suspicion that the person was armed and dangerous, or the frisk extended beyond the area for which officers had reasonable suspicion.

All outcome variables are binary with the model assessing the impact of race and ethnicity on an unlawful stop or frisk.

For each of the three outcome measures, the analysis estimates two versions of a regression model: 1) a logistic model with controls; 2) a logistic model using Doubly Robust (DR) estimation, which is consistent with other work conducted by the Monitor.[89] DR estimation combines regression with propensity score methods, to assess racial and ethnic disparities.[90] Functionally, this approach compares a set of encounters across racial and ethnic groups with the same distribution of contextual features, which facilitates identifying the effect of race and ethnicity

---

[86] As with all prior analysis, these outcomes require a two-judge consensus on constitutionality.
[87] Unconstitutional actions may include the initiation of or escalation to a Level 3 stop, search, frisk, or use of force.
[88] Research on disparities in policing has raised concerns about detecting disparities in downstream decisions, like outcomes that occur after the decision to stop has occurred (e.g., Neil and Winship 2019; Ridgeway and MacDonald 2010; Knox, Lowe and Mummolo 2020). Examination of disparities in whether the stop was initiated appropriately is less subject to post-treatment bias because it measures legality of the initial decision to engage the person and is not affected by diverging outcomes by race and ethnicity that can be explained by the different processes by which individuals are stopped that may be difficult to capture in a model.
[89] Because the outcome variables are binary, the models all use logistic regression.
[90] See Ridgeway 2006; Ridgeway and MacDonald 2010.

relative to the effect of other features of an encounter.[91] Relative to multivariate regression, DR estimation compares the stops of Black and Hispanic people with similarly situated stops of other individuals by reweighting key features of stops so that the contexts are statistically identical across Black, Hispanic, and "other" categories relying on overlap across races in different contexts. This approach is consistent with analyses on disparities in post-stop outcomes conducted by the Monitor as well as academics working in this field.[92] Due to limitations in the data, it is not possible to conclude with confidence whether those of different racial and ethnic groups are equally likely to experience an unlawful stop.

Consistent with other work on disparities completed by the Monitor, the study reports differences between the stops of Black individuals versus others, and Hispanic individuals versus others, with and without DR estimation.[93] In the primary models, individuals for whom it is not possible to determine their race or ethnicity are included with individuals of all other races and ethnicities. A second set of models are estimated that excludes these individuals from the analysis.

The models control for the features and context of the encounter, and were estimated on a reduced and expanded set of controls.[94] Results of models with the reduced set of controls are

---

[91] This approach is necessary because multivariate analysis alone may be insufficient to account for confounding factors in an analysis of post-stop outcomes (Ridgeway and MacDonald 2010; Neil and Winship 2019; Morgan and Winship 2015; Ridgeway 2006). This is especially relevant if race and other contextual variables in the model are correlated (Ridgeway 2006) making it difficult to disentangle the effects of correlated variables on outcomes.

[92] See the Monitor's Fifth Report- Analysis of NYPD Stops Reported 2013-2015, *Floyd v. City of New York*, No. 1:08-cv-01034-AT-HBP (S.D.N.Y. May 30, 2017), ECF 554; Thirteenth Report of the Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y. Sept. 1, 2021), ECF 853-1; Twentieth Report of the Independent Monitor, *Floyd v. City of New York,* No. 1:08-cv-01034-AT (S.D.N.Y Apr. 11, 2024), ECF No. 927-1; MacDonald and Braga 2019; MacDonald and Fagan 2019; Neil and Winship 2019.

[93] The comparison of Black versus other contacts does not include Hispanic individuals in the "other" category and the comparison of Hispanic versus other contacts does not include Black individuals in the "other" category.

[94] Models control for the features and the context of the encounter. Controls include: the suspected crime, whether the encounter was initiated from a radio run, whether patrol officers were involved, and age and gender, as well as encounter time and location (shift, weekday, borough). An expanded set of controls adds the following variables: whether the encounter began indoors, the number of officers in an encounter, the number of individuals in the encounter, the presence of NST officers, average years on force of the lead officer, the presence of bystanders, whether the encounter was conducted in Spanish, whether the stop was documented, and a disadvantage index for where the encounter occurred.

reported below; the results for the expanded set of controls are reported in Appendix A.[95] The sample size in these models is lower than the sample size in the sections above due to missing data on control variables for some individuals. For models estimated with DR estimation, the model matches on a subset of control variables given limitations in sample size.[96] Models were estimated using both a *p*-value of .05 and .10 (equivalently, confidence intervals of 95% and 90%) to assess statistical significance due to concerns about sample size.[97]

There are several challenges and limitations associated with assessing disparities using this approach. First, there must be sufficient individuals of different racial and ethnic groups across relevant encounter contexts in the data. The difficulty is that individuals stopped by police are primarily Black and Hispanic (89% in this dataset). Given the distribution of stops by race and ethnicity, it is difficult to obtain sufficient instances of individuals in the "other" racial category across key contexts to estimate models with precision, thus making it more difficult to discern the effect of race and ethnicity on the constitutionality of stops. For example, whether a stop is self-initiated (as opposed to being based on a radio run) is an important context, but 97% of self-initiated stops involved Black and Hispanic people. This limits the ability to compare self-initiated stops of Black and Hispanic individuals with those of other races and ethnicities, because there are so few self-initiated stops of those of other races and ethnicities in the data. There are also certain geographic areas, particularly the Bronx, where there are very few stops of people who are not Black or Hispanic. It is important to note that analysis of more recent data also finds that the Black

---

[95] The expanded set of controls results in further data loss due to missing data. However, the results do not substantively differ between the reduced and expanded set of controls.

[96] DR estimation requires matching on key contextual variables and reweighting observations (contacts) by apparent race and ethnicity. The same covariates used for balancing are included in the outcome regressions and additional control variables. The analysis matched on the following variables: borough, shift (1- 8-4, 2- 4-12, 3- 12-8), weekend/weekday, gender (male), age (0-17, 18-34, 35-54, 55+, N/A), suspected crime (weapons, violence, other), patrol officer (yes/no), radio run (yes/no).

[97] All standard errors are HC3 robust and clustered by encounter, given contacts within the same encounter are not independent.

and Hispanic individuals are more heavily represented in contexts with higher rates of unconstitutional stops, particularly self-initiated stops and stops by NST officers.[98] Due to these imbalances (instances of particular contexts across racial and ethnic groups), the models rely on a very small number of observations of individuals of all other races and ethnicities to generate estimates, and the weights placed on these individuals in the models are high. After reweighting to account for encounter contexts, the Effective Sample Size (ESS) for non-Black or non-Hispanic individuals in the models is only 50.[99] Post-hoc power analysis of the data indicates that the study would only likely detect large effect sizes and smaller but meaningful effects may go undetected.[100] Further analysis should focus on obtaining a larger sample of observations that do not involve Black or Hispanic individuals across contexts.

    2. Results

The following analysis reports the model results with and without DR estimation for each outcome (any unconstitutional action, unconstitutional initiation of a stop, unconstitutional frisk). With one exception, the effect of race and ethnicity on constitutionality across all model specifications and outcome variables is null or a finding of no statistically significant effect. This is distinct from finding definitive evidence that there are no differences by race and ethnicity in the constitutionality of stops, because there can be multiple reasons for null results, such as imprecision or a degree of uncertainty around estimates. In some cases, the coefficient for Black and Hispanic stops is positive, indicating that Black or Hispanic individuals are more likely to

---

[98] Twenty-Third Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y. Feb. 3, 2025), ECF 952-1.

[99] The unadjusted number of individuals in the "other" category is 167. The ESS is lower than the unadjusted number because it accounts for the variability in the weights assigned to each person.

[100] Assuming a significance level of 0.05 and desired power (probability of detecting an effect) of 0.80, our data and models are only capable of capturing large effects. For our study to detect a difference 80% of the time, Black individuals would have to experience unconstitutional actions at least twice as frequently as non-Black or Hispanic individuals.

experience an unlawful stop relative to individuals of other races, but the effect was not statistically significant. This means the coefficient is not statistically distinguishable from zero when using either a 90% or 95% bootstrapped confidence interval. However, there is one model that finds a statistically significant result, specifically that a Black person is more likely to be stopped without reasonable suspicion. This result is not consistent across specifications (or variations in the model). The details are discussed further below.

Figure 15 presents the predicted probabilities by race and ethnicity for *any* unconstitutional action in a stop. A predicted probability presents the likelihood of experiencing an unconstitutional stop by racial or ethnic group while fixing covariates (or features of encounters included in the model) at their mean or modal values.[101] This allows us to account for other features of stops and compare differences in the likelihood of constitutionality by race and ethnicity. Each predicted probability is presented with 90% and 95% confidence intervals in the figure with light blue and dark blue bars, respectively.

The leftmost panel presents the predicted probabilities from the unweighted model and the rightmost panel presents the results for the weighted model (or DR estimation). In model (2) of Figure 15, the predicted probability of unconstitutional stops is 0.17 or 17% among Black individuals, 0.16 or 16% among Hispanic individuals, and is 0.22 or 22% among all others. The predicted probability for an unconstitutional stop is highest for persons of other races, but the estimates are not precise (confidence intervals are large) and the confidence intervals overlap. The differences between racial and ethnic groups are not statistically significant at either 0.05 or 0.1 significance levels in any model with this outcome.[102] There is thus no statistically distinguishable

---

[101] Continuous variables are fixed at their mean and dichotomous variables are fixed at the mode.
[102] The 95% confidence interval for Black individuals is 10.5%-26.9%, for Hispanic individuals is 9.1%-27.1% and for all others is 9.6%-42.5%.

differences across groups in this sample, but again, there were few stopped who were not Black or Hispanic and it was thus not possible to estimate the effect of race and ethnicity with precision.

**Figure 15: Predicted Probabilities of an Unconstitutional Stop by Race and Ethnicity**



The outcome model in all cases uses logistic regression. Dark (light) blue errorbars are 90% (95%) confidence intervals.

Figure 16 below reports the predicted probabilities by race and ethnicity for the unconstitutional *initiation* of a stop (or instances where the judges determine the officer did not have reasonable suspicion required to stop the person). Again, the figure presents the results for the weighted and unweighted models. While the predicted probability that a stop was improperly initiated for a Black person was 6%, for a Hispanic person was 4%, and for those of all other races was 1%, the differences were not statistically significant at either the 90% or 95% level (in model 4 below). However, if individuals of indeterminate race and ethnicity (eight individuals) are excluded from the model, the differences for Black individuals are statistically significant at the 95% confidence level, which indicates that officers stop Black individuals without reasonable suspicion more often than similarly situated individuals of other races.[103] Despite detecting a statistically significant difference, the exclusion of these eight cases has little impact on the effect size: the predicted probabilities remain at 6% and 4% for Black and Hispanic individuals,

---

[103] These results should be interpreted with caution because a small change in the sample (exclusion of eight individuals) has a large impact on the results because the weights on individuals of all other races are high.

respectively, versus 1% for all other individuals.[104] This result further indicates the need for additional analysis that has a larger sample of individuals who are not Black or Hispanic to better assess differences by race and ethnicity.

**Figure 16: Predicted Probabilities of an Unconstitutional Initiation of a Stop by Race and Ethnicity**



N = 1,192 contacts, 980 encounters.
The outcome model in all cases uses logistic regression. Dark (light) blue errorbars are 90% (95%) confidence intervals.

Finally, the results presented in Figure 17 below report the predicted probability by race and ethnicity for an unconstitutional *frisk*. The predicted probability of an unconstitutional frisk was 11% for individuals of all other races, while the predicted probability of an unconstitutional frisk for a Black person was 4% and for a Hispanic person was 3% (in model 6). However, the estimates were not precise, and the differences are not statistically distinguishable from zero in any model with this outcome. It is not possible to draw conclusions about differences in the constitutionality of frisks from this analysis.

---

[104] This is because when baseline probabilities are near 0 or 1 (as is the case here), the logistic function becomes saturated and its slope is very small. In such cases, even statistically significant changes in the logit translates to only modest differences on the probability scale.

**Figure 17: Predicted Probabilities of an Unconstitutional Frisk by Race and Ethnicity**



N = 1,192 contacts, 980 encounters.

The outcome model in all cases uses logistic regression. Dark (light) blue errorbars are 90% (95%) confidence intervals.

Supplementary models and the full regression tables for the results presented above are reported in Appendix A.[105] Across most versions of the model, there was no statistically significant difference that Black or Hispanic individuals were more likely to be stopped without reasonable suspicion, were subject to an unlawful frisk, or experienced an unlawful action. However, there is one model that finds Black individuals are more likely to be stopped without reasonable suspicion. Generally, these results are inconclusive because of the small sample of individuals who are not Black or Hispanic in the dataset, which make it difficult to detect smaller effects or estimate models with precision.

Although the analysis above is inconclusive, Black and Hispanic people experience a heavier burden from unconstitutional police conduct because they are stopped much more frequently than people of other races and ethnicities. More Black and Hispanic individuals experience an unconstitutional stop compared to those who are white or of other races. This is aggravated by the fact that self-initiated stops and stops conducted by NST officers are

---

[105] Additional alternative specifications were estimated, but none had results that differed meaningfully from those presented here, including with models using alternative outcome measures and sets of covariates.

unconstitutional at higher rates for Black individuals and these stops are rarely conducted on people of other races.

## V.    Low-level Encounters and the Presence of Undocumented Stops

### A. Introduction

The study assessed the prevalence of unreported stops among low-level encounters—i.e., those encounters categorized as Level 1 and 2 by officers. As discussed above, officers are required to report every *Terry* stop conducted in the field and provide an explanation for the basis of the stop in a stop report. The study conducted an analysis of Level 1 and Level 2 encounters because there is limited knowledge about the extent of unreported stops among encounters that officers categorize as low-level. The expansion of the BWC recording policy to include nearly all encounters permits such an evaluation of low-level encounters that was not previously possible. This section of the report presents evidence of unreported stops in low-level encounters and an analysis of constitutional compliance in unreported stops.

To assess the prevalence of unreported stops among low-level encounters, CUNY ISLG selected a random sample of encounters that officers categorized as low-level investigative encounters in the BWC system. As described above, low-level encounters are defined as investigative encounters that officers labeled Level 1 or Level 2, or investigative encounters with no level label and that were not matched to a stop or arrest report. The Low-level Sample included 622 encounters, in which officers engaged in 1,158 contacts. Of the 1,158 contacts, the judges identified 20 individuals who were stopped by police.[106] None of these stops was reported by officers or subjected to appropriate oversight. Although unreported stops made up only a relatively

---

[106] Of 622 encounters, 19 encounters included a stop that was not reported. In one encounter, two people were stopped by officers.

small percentage of encounters (3% of encounters and 2% of contacts), low-level encounters are so numerous that this finding has substantial implications for the number of unreported stops across all low-level encounters conducted by the NYPD.

**B.  Documentation of Stops**

A central goal of this research is to examine the incidence of stops within this sample of encounters categorized by officers as low-level investigative encounters. This is because they are rarely subject to review, and it is important to identify their prevalence. Review of low-level encounters by judges made it possible to identify stops that officers did not report. This section first specifies how unreported stops were identified and then presents details on unreported stops found in this sample, including key features of those encounters and the demographics of those stopped.

1.  <u>Identifying Unreported Stops in the Low-Level Sample</u>

The identification of unreported stops within low-level investigative encounters relied on the judges' determinations of the *De Bour* levels present. It was not always possible, however, to determine whether a contact included a stop. In the Low-level Sample, there were five contacts about which there was no consensus as to whether the encounter involved a stop (i.e., one judge, but not two judges, thought the contact was at Level 3) after three judges reviewed.[107]

As with the Stop Sample, CUNY ISLG researchers conducted a secondary search of stop reports for each unreported stop identified to prevent the overidentification of unreported stops. They determined that one contact initially identified as an unreported stop could in fact be matched to a stop report. Therefore, this contact was not an unreported stop, but rather an officer

---

[107] Judges enter "Yes," "No," or "Unable to Determine" by level so there can be no consensus on level at the low level (Level 0/1/2), Level 3 or Level 4. In addition to the contacts with no consensus at Level 3, there were four instances of no consensus at Level 1 and Level 2.

documentation error. In addition, we excluded any contacts identified as a Level 3 encounter if the judges indicated that officers had probable cause at the outset. This occurred in one contact. The results presented below reflect the adjusted total of unreported stops.

2.  Unreported Stops in the Low-level Sample

Among contacts categorized as low-level, judges found some unreported stops and miscategorized summonses, but most were appropriately categorized as low-level.[108] After reviewing BWC footage and available radio dispatch information, judges identified 20 people stopped by police out of 1,158 contacts, across 19 out of 622 encounters.[109] This constitutes approximately 3% [1.8%-4.5%] of encounters in the sample, and 2% [1.0%-2.5%] of contacts. Of the 20 individuals stopped, 15 were Black or Hispanic. Of the remaining people stopped, three were white, one was Asian, and it was not possible to determine the race or ethnicity of one person.

3.  Features of Unreported Stops in the Low-level Sample

After identifying unreported stops, a second focus of this research was to examine any noteworthy patterns among unreported stops. The presence of unreported stops among low-level encounters raises questions about the content of these encounters, especially given that they are not subject to the same degree of oversight as reported stops. Unreported stops may present different patterns in the types of crimes officers are investigating, the context of the stops, and in the actions that officers take throughout the encounter.

Officers initiated unreported stops in low-level encounters for a range of reasons. During the content analysis of each encounter, research assistants identified the primary reason an officer

---

[108] There were five contacts which included a Level 4 encounter. Each of these encounters ended in a summons and two began as a stop.

[109] For 13 of the 19 encounters, all videos associated with the encounter were labeled Level 1. There was a mix of Level 1 and no level labels in five encounters. In the remaining encounter, no level labels were present for any recording.

initiated an encounter based on the content of the BWC recording. Using this standard, the most prevalent reason an officer initiated an unreported stop was the investigation of property crime, such as burglary or theft. This accounted for 6 unreported stops found in the sample. The second most frequent reason for an encounter was the investigation of violent crime in four stops. In addition, three stops were initiated in relation to trespass crimes, and one was related to a quality-of-life crime. The remaining six stops were initiated for reasons ranging from medical assistance to safety issues. Although the number of unreported stops found in the Low-level Sample is small, the typical reasons for initiation differ from those of reported stops. In all stop reports from the same period, officers most frequently indicate that the basis for the stop was suspected criminal possession of a weapon (46% of stops).

Stop reports provide important information about whether the individual stopped was searched or frisked. Failure to report the stop also affects accurate documentation of searches, frisks, and force that are incidental to the stop. Of the 20 individuals who were stopped, two were searched by officers and one was both frisked and searched. Officers used force on two people who were stopped, specifically a physical control tactic or compliance hold.

Another point of interest is whether an interaction began as a lower-level encounter and escalated to a stop or whether the individual was stopped from the point of initiation. For eight of 20 people stopped, the person was free to leave at the outset of the encounter (Level 1 or 2) before officers escalated to a Level 3 stop. In the remaining 12 stops, the person was stopped from the outset. For one of these 12 people, the encounter concluded with the issuance of a summons.

4. <u>Discussion of Unreported Stops in Low-level Encounters</u>

Failure to report all stops inhibits the ability of the NYPD and the Monitor to assess compliance in the conduct of stops and detect racial disparities in their incidence. Although the

share of unreported stops among low-level encounters is relatively small (approximately 3%),
officers conduct a large number of low-level encounters, particularly Level 1 encounters. Of the
20 unreported stops across 19 encounters in this study, 17 encounters were labeled Level 1 by
officers and two encounters had no level labels. The implications of these findings are quite
substantial because the number of low-level incidents is so large. Between March 16 and May 15,
2022, there were 5,678 recordings that were labeled Level 3.[110] In comparison, there were 656,126
recordings labeled low-level (including those investigative encounters with no level label, and any
recording with a Level 1 or Level 2 label). These recordings represent approximately 200,000
likely encounters.[111] If even a small share of the encounters recorded reflects a stop, then the
number of unreported stops is considerable.[112]

5. Low-level Encounters with Indicators of a Stop

Content analysis by the research assistants of the Low-level Sample identified officer
actions that indicated a person *may* have been stopped, including instances where an officer used
force, handcuffed the person, searched the person, or frisked the person. During their review,
judges determined that a substantial number of the contacts that included these actions were not,
in fact, stops. More specifically, 43 people experienced use of force, handcuffing, a search and/or
a frisk, but were *not* among the contacts found to have been stopped raising questions about the
nature of these contacts. CUNY ISLG reviewed each contact, and found that 36 of the 43 contacts

---

[110] These figures reflect the number of recordings after the data has been filtered to remove recordings that are beyond the scope of the study (such as car stops).
[111] The algorithm that grouped recordings into encounters identified 199,735 likely encounters from 656,126 recordings.
[112] Using this data, it is difficult to project the precise number of unreported stops among low-level encounters with precision and any estimates would be necessarily involve a large range for two reasons. First, there is only information on the number of recordings, not the number of encounters, and the average number of recordings per encounter does not provide information on how often recordings of the same encounter were not grouped together. Second, it is not possible to know whether encounters excluded during screening due to incomplete recordings have the same rate of undocumented stops as encounters with complete recordings.

fell into two categories: mental health seizures and random mass transit checkpoint searches.

Officers are often called to respond to an individual experiencing a mental health crisis. In response to such individuals, police intervention may involve a mental health seizure. The conduct of such seizures often includes discrete officer actions that indicate a person was not free to leave, such as the use of handcuffs. New York Mental Hygiene Law Section 9.41[113] authorizes a police officer to:

> take into custody [for the purpose of taking the person to a hospital] any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others.

When such encounters do not involve criminality, or the suspicion of criminality, they are outside the analysis set forth by *De Bour*. As a result, a person may not have been free to leave the scene, but the contact was not a Level 3 stop. If, however, the police asked the individual questions indicating the person was suspected of criminal activity, the encounter falls within *De Bour* and was treated as such. Of the 43 contacts that included one of these actions yet were not considered a stop, a second review found that 20 appeared to be mental health seizures that concluded with the person being transported by emergency services.

In addition, officers are authorized to conduct searches at the entrance to subway stations as part of a random checkpoint program. Searches conducted in this context are exempt from the rules governing searches conducted as part of a Level 3 stop. If officers search a bag pursuant to the random subway checkpoint program, without any further questioning or detaining of the person, then the encounter would not fall on the *De Bour* scale.[114] Sixteen people were searched

---

[113] New York Mental Hygiene Law, Section 9.41: Emergency assessment for immediate observation, care, and treatment; powers of certain peace officers and police officers.

[114] The Monitor provided guidance to the judges on this issue: "If officers search a bag at a subway entrance pursuant to the random subway checkpoint program without questioning or detaining a person, then the encounter is not on the De Bour scale and may be categorized as a Level 0. (Check "no" to De Bour Levels 1 through 4.) However, if the

in apparent random subway searches, all of which involved the search of the person's property, but were not considered a stop.

### C. Compliance

The study examined the lawfulness of contacts in the Low-level Sample, particularly those that include unreported stops. Of 20 individuals stopped by police and not reported, there were no contacts that a two-judge majority found to be unconstitutional. None of the stops were found by two judges to have been conducted without reasonable suspicion. However, there were three contacts with insufficient information available to determine whether the stop was constitutional.

## VI.     Arrests and Summonses and the Presence of Undocumented Stops

### A. Introduction

The study also explored whether stops occurred prior to an arrest or summons. As discussed above, the Remedial Order requires that all stops be reported, and documentation is essential to determine whether those stops are constitutional or racially disparate. To assess the prevalence of unreported stops among encounters involving an arrest or summons, CUNY ISLG analyzed a sample of 58 encounters over a two-week period in 2022 that officers categorized as an "Arrest" or "Summons" in the BWC system, but that did not have a corresponding stop report. Of the 58 encounters, officers labeled 30 an arrest, 27 a summons, and one was labeled both. Within those encounters, there were a total of 127 contacts, 66 of which the judges found resulted in either an arrest or a summons.

---

officer searches the bag and then begins to ask the person questions, then the encounter may rise to a Level 1 or, if the questions are accusatory, a Level 2. If the officer detains the person or frisks or searches the person, then the encounter constitutes a Level 3." See the Technical Appendix for all guidance provided to the judges.

### B. Documentation of Stops and Compliance

The identification of unreported stops within arrest or summons encounters relied on the judges' determinations of *De Bour* levels present. Unreported stops are defined as contacts that include a Level 3 interaction but have no associated stop report. Of the 127 contacts across these 58 encounters in this sample, the judges found that 18 individuals in 18 encounters were stopped prior to the person either being arrested or receiving a summons. In one additional contact, a person was stopped during an encounter in which a different person was arrested.[115] The 19 stopped individuals constituted 15% [8.7%, 21.3%] of the contacts in the sample across 33% of the encounters [20.7%, 44.8%].[116] As with prior samples, there are some contacts (nine) for which there was either no consensus among judges as to whether there was a stop or insufficient information to determine whether a stop had occurred.

Of the 19 individuals stopped, 11 were Black and seven were Hispanic, constituting 95% of unreported stops in this small sample. Black and Hispanic individuals were the subjects of 79% of the Level 4 encounters in the sample. Among the 19 unreported stops in this Arrest or Summons Sample, 18 were determined to be constitutional and one unconstitutional. The person in the one unconstitutional stop was Black.

### VII.    Key Takeaways

The following are key takeaways from the Stop Sample of 1,453 encounters involving the stops of 1,569 individuals.

---

[115] As with the Low-level and Stop samples, researchers conducted a secondary search of stop reports to ensure that no match could be made to the 19 identified unreported arrest/summons stops that may have originally been missed due to officer error in recording categorization or stop report information (date or time error). The secondary search confirmed that none of these 19 stops identified as unreported could be matched to a stop report.

[116] There were two additional contacts identified in which the person was not free to leave and there was no stop report, but it was determined that there was probable cause at the outset, so these were excluded from the analysis.

- Officers did not complete a stop report for all persons stopped even among recordings that officers labeled as a Level 3 stop. Specifically, 23% of identified stops did not have a stop report.

- Unconstitutional stops were concentrated among self-initiated stops and stops conducted by members of the NST, where the rates of unconstitutional stops were much higher.

- Unreported stops did not markedly differ from reported stops in their overall rates of constitutionality. However, unreported stops ended in arrest at a higher rate than reported stops and stops ending in arrest are constitutional at a higher rate.

- Supervisors very rarely identified unconstitutional stops, searches, and frisks. As a result, officers did not receive timely notice of improper actions taken the field.

- Statistical analysis on the presence of racial disparities in the constitutionality of stops was inconclusive because there were too few people who were not Black or Hispanic across key encounter contexts in the data.

The following is the key takeaway from the analysis of the Low-level Sample of 622 encounters, involving 1,158 individuals.

- While the percentage of unreported stops is small (3% of encounters), the implications are substantial given the scale of low-level encounters conducted by the NYPD.

The following is the key takeaway from the analysis of the Arrest or Summons Sample of 58 encounters, involving 127 individuals, 66 of which resulted in an arrest or a summons.

- While the Arrest or Summons Sample in the study was small and exploratory, the prevalence of unreported stops—15% of contacts in the sample—suggests the need for

deeper analysis to develop a better understanding of the scope of underreporting among arrests and summonses.

## VIII.    CONCLUSION

The results of the CUNY ISLG study closely mirror the findings in multiple reports of the Monitor, notwithstanding that this study had different people reviewing the encounters. The Monitor team's audits are conducted by individuals with deep experience with law enforcement, many of them retired from the NYPD. This study's judgments on constitutionality were made entirely independently by retired New York State judges, and made only when two judges concurred on constitutionality or unconstitutionality.

The close similarity in findings through these separate analyses lends credibility to both the Monitor's prior findings and those of this study. Although stops generally show some measure of Fourth Amendment violations, the Monitor's audits and this study agree that the incidence of unconstitutionality is far more frequent in self-initiated stops, and when the Neighborhood Safety Teams are involved.[117] Additionally, as the Monitor has also found,[118] the study concluded that reviews by front-line supervisors infrequently identified unconstitutional stops, frisks, and searches when they occur and thus neutering an important procedural safeguard. Similarly, both the Monitor and this study found that officers frequently fail to document stops and this study identifies key places where undocumented stops may be found.[119] Moreover, this study found that

[117] Twenty-Second Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034 (AT) (S.D.N.Y. Oct. 7, 2024), ECF 937-1; Twenty-First Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034 (AT) (S.D.N.Y. Sept. 4, 2024), ECF 934-1; Nineteenth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034 (AT) (S.D.N.Y. June 5, 2023), ECF 915-1.
[118] Ninth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y. Jan. 11, 2019), ECF 680-1; Tenth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y. Jan. 7, 2020), ECF 754-1.
[119] Thirteenth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y Sept. 1, 2021), ECF No. 853-1.

potentially large numbers of Level 3 *Terry* stops are incorrectly classified by officers as low-level investigative encounters.

The protections of the Fourth Amendment are foundational rights that should be strictly honored by those sworn to enforce the law. Rectifying the serious and prevalent issues identified by this study—and by the Monitor's many audits—requires a commitment from the City administration and the NYPD, from its leadership through its officers on the street, to protect New York City while employing only constitutional practices. The people of the city, particularly young Black and Hispanic men, who are most impacted, deserve no less.

# APPENDIX A

## DESCRIPTIVE INFORMATION AND FULL REGRESSION RESULTS

### I.    DESCRIPTIVE INFORMATION

This section presents descriptive information on the encounters that serve as the basis for the analysis in the report. Information was collected on each encounter and then specifically on each person substantively engaged by officers because officers often engage multiple individuals in an encounter.[120] Information on encounters includes the time and place where the encounters occurred, neighborhood characteristics, responding officers and their commands, and the reasons why each encounter was initiated. Information on contacts includes demographic information about each person and details about the specific actions that occurred between each person and the officers on the scene. This information is presented below for each of the three samples in the study.

Encounter-level information provides the backdrop for the time and place of the encounters as well as the types of commands and characteristics of officers who responded. Information about neighborhood, officer, and command was obtained from the Census and administrative records provided by the New York City Police Department (NYPD) and the Civilian Complaint Review Board (CCRB). Data about the actual content of these encounters—what occurred and with whom—is primarily the result of content analysis of BWC footage performed by the CUNY ISLG research assistants. All legal judgments, including whether a Level 3 stop occurred and whether the stop was legal, were the results of review by the panel of judges.

---

[120] The study includes each person substantively engaged by officers and does not include information on bystanders. Substantive engagement was defined as any interaction involving the officer questioning the person, issuing commands directed at the person, or making any sort of physical contact with the person.

#### A.  Stop Sample

The descriptive data presented below includes information on all encounters in the Stop Sample. The descriptive data below first provides information on the encounters and then on each person stopped by police.  At the individual level, the data presented reflects only those stopped by police and excludes all all other individuals engaged, because stopped individuals form the basis of the analysis on the constitutionality of stops. A person is defined as stopped by police if the judges identified the person as stopped (Level 3) and/or officers submitted a stop report for the person.[121]

##### 1. Encounter-level Information

The Stop Sample consists of 1,453 encounters, although not every encounter ultimately included a stop.  In 1,234 encounters, at least one person was stopped. While the remaining encounters were labeled a stop in the BWC system, judges did not identify a stop and officers did not submit a stop report for any person. The encounter-level information that follows reports all encounters in the sample unless specified. Across the 1,453 encounters, officers engaged a total 4,116 individuals or an average of 2.8 individuals per encounter. Of these encounters, 136 or approximately 9% [7.9%-10.9%] contained substantial exchanges in Spanish between officers and individuals.[122]

Encounters were conducted across all boroughs of New York City and during all hours of the day. Figure 1 below depicts the geographic distribution of study encounters using location information from officers' body-worn cameras (BWCs). About 29% of encounters took place in Brooklyn, 29% in Manhattan, 24% in the Bronx, 16% in Queens, and 3% in Staten Island. Overall,

---

[121] For 36 individuals, officers completed a stop report, but judges find that the contact included a Level 3 stop.

[122] Encounters that contained substantial exchanges in Spanish were assigned to bilingual research assistants for descriptive coding and were translated (if needed) for the judges conducting the legal evaluation. Some judges were bilingual in Spanish.

encounters took place in neighborhoods with higher average rates of poverty and more Black and Hispanic residents compared to citywide averages.

**Figure 1: Stop Encounter BWC Recording Spatial Data Points, Overlaid on NYPD Precinct Map**



Six officers, on average, were present at encounters in the Stop Sample, which is likely an underestimate of officers present.[123] Most encounters were conducted by officers in the Patrol

---

[123] The actual number of officers is very likely higher, because this count excludes any officer who failed to activate their camera and any officers whose recording was not grouped with the other recordings of the incident by the algorithm.

Services Bureau. Across encounters, 90% [88.3%-91.5%] had Patrol officers present. Fewer encounters had Housing or Transit Bureau officers present, about 8% [7.0%-9.8%] and 6% [5.1%-7.5%] respectively. Some encounters had officers from multiple bureaus present, so the summed percentages exceed 100. Officers on the Neighborhood Safety Team (NST) roster were present during 227 encounters in the sample, or 16% [13.8%-17.5%].[124] Nearly all officers (visible in the BWC recordings) were in uniform (99%). Among identified officers, approximately 25% [24.0%-26.3%] had at least one CCRB complaint while 8% [7.2%-8.6%] at least one substantiated complaint.[125]

Encounters in the Stop Sample were conducted for a range of reasons, but the most frequent basis for an encounter was suspected criminal possession of a weapon. Research assistants viewing BWC footage of an encounter identified the principal topic of discussion—or the primary reason for the encounter—using a series of itemized problem codes primarily aligned with New York Penal Law offenses (i.e., Violence, Weapons, Property, Drugs, Trespassing, or Quality of life). Problem codes included an "Other" category for encounters not captured by any of the previous categories and a "Do not know" category to account for those without an obvious basis.[126] Figure 2 below presents the frequency of reasons for encounters and shows that most encounters were

---

[124] The metadata do not indicate whether officers were part of the command's Neighborhood Safety Team (NST). The Monitor provided ISLG with a personnel list of officers on the NST, but the personnel list was drawn after the study period. It is not possible to know whether these officers were on the NST at the time of the study. At the individual-level, NST officers were present during the stop of 308 people or 20% [17.6-21.5%].

[125] Substantiated complaints exclude complaints that were found to be exonerated, unfounded or unsubstantiated. Unsubstantiated means that after an investigation it was not possible determine whether misconduct occurred, but the CCRB now uses the term "Unable to Determine" for unsubstantiated complaints. Unfounded complaints are those with sufficient credible evidence that the officer did not commit the act alleged in the complaint. Exonerated complaints are those where the officer's actions were within policy and not a violation.

[126] Stop reports include information on the suspected crime, which is the basis for an encounter. However, some of stops were not reported so to have information for the full set of stops, information generated by content analysis by the research assistants was utilized. The most prevalent suspected crime among reported stops in the sample is criminal possession of a weapon, which was the stated reason for the stop in 516 of 1,207 (43%) reported stops. This is also the most prevalent suspected crime among all reported stops in the period (including those selected and not selected for the study).

based on suspected crimes related to criminal possession of a weapon, property (e.g., petit larceny; theft of service; intentional damage to property), and violence (e.g., assault). The brackets on each bar reflect the 95% confidence interval for each rate.

**Figure 2: Primary Reason for the Encounter**



## 2. Individual-level Information

In an encounter that includes a stop, officers often engaged multiple individuals, but many were not stopped by police. Of the 4,116 people who were substantively engaged by officers, police stopped 1,569 individuals, or 38% [36.0%-39.0%].[127] Most individuals, 2,265 or 55% [53.4%-56.5%], were engaged at a lower level and not detained. In addition, a small set of individuals, 223 or 5% [4.7%-6.1%], were arrested or issued a summons, but not stopped. Lastly, judges found that it was not possible to determine whether or not a person was stopped in 54 contacts and that five contacts did not fall on the *De Bour* scale.

---

[127] The tally of stops includes stops reported by officers and stops that were not reported.

**Figure 3: Demographic Characteristics of Individuals Stopped**



Overall, people who were stopped were predominantly Black or Hispanic, young, and male, which is consistent with the demographics of all reported stops from this period.[128] The individual-level information in Figure 3 relates only to individuals stopped by police. Officers are required to provide a reason for stopping an individual, but frequently did not explain to the person stopped the reason that they were detained. In addition, when officers did provide a reason for the stop, it most often occurred after a key action had already been initiated, such as questioning, frisking, searching, or making physical contact with the person.[129] Officers provided a reason for the encounter to 58% [55.3%-60.4%] of the people they stopped. These findings do

---

[128] NYPD reports include only male and female categories for gender. To be consistent with the NYPD's categorization, the coding instrument used the same categories although some individuals in the sample might not identify as one of these categories. Demographic data is taken from research assistants' reports of the apparent race, age, and gender of the person when there is no officer-reported race and gender, specifically those without a stop or arrest report. To evaluate the extent to which this determination serves as a reliable proxy for race and ethnicity when a stop or arrest report is not available, a sample of 60 encounters with stop and/or arrest reports matched to contacts was selected and randomly assigned to a research assistant who had not previously viewed the encounter. The research assistant reported the perceived race of the person, the result of which was compared to the person's race documented in the officer's report. Overall, the level of agreement was high (87.6%), and the inter-rater reliability between officer and research assistant (Gwet's AC1 = .775, 95% CI = .636-.914) was good, suggesting that the race reported by research assistants can be used as reliable proxies when documentation by officers is unavailable. See Gwet, 2008; Wongpakaran, et al. 2013.

[129] During their review of the BWC footage of each encounter, research assistants documented whether an officer provided a reason for the encounter to each person with whom they interacted. Research assistants selected "Do not know" when the initial audio of the officers approaching the person was not available.

not align with what officers documented in their stop reports. Officers reported that they provided a reason to the person in 92% (or 1,111 out of 1,204) of reported stops.

Officers engaged in numerous investigative activities during a stop. Below, Table 1 summarizes data on the frequency of key officer actions during the 1,569 stops in the sample as identified through content analysis only.[130] Officers conducted a frisk of the person's person or property in 68% of stops. This count includes any frisks conducted as part of an investigation or pursuant to an arrest. Officers searched the person's person or property in 62% [59.5%-64.3%] of contacts, which includes searches conducted pursuant to an arrest. Officers sought consent to search in 5% [4.0%-6.1%] of stops. In 10% [8.2%-11.1%] of stops, the person volunteered to be searched. Of those who volunteered to be searched, 59% [49.3%-65.8%] were Black, 32% [23.7%-38.8%] were Hispanic, and 10% [5.3%-14.5%] were of another race or ethnicity. Officers also frequently conducted show-ups and checked their names for outstanding warrants.[131]

As observed in the BWC footage, officers sometimes employed force or threatened force during encounters.[132] Officers used force in 271 contacts or 17% [15.4%-19.2%] of individuals.[133]

---

[130] The investigative activities discussed in the following paragraph were identified by research assistants during content analysis of BWC recordings. In the compliance section of the main report, we identify frisks and searches by a combination of the research assistants, stops reports and judge reviews so the number identified here is slightly fewer than in the main report.

[131] A show-up is a prompt, on-the-scene presentation of a suspect singly, to an identifying witness, for expeditious identification or early release of an innocent suspect. A warrant check may occur by a phone search by an officer of a law enforcement database. Research assistants were instructed to be attentive to the conversation of officers with one another and individuals engaged to identify whether the officer conducted a warrant check. They only indicated that police conducted a warrant check in situations where it is explicit that a warrant check was being done. As a result, this is likely an undercount of the warrant checks officers conducted.

[132] Officers were defined as using force if they took any of the following actions: forcible take-down or wrestling/grappling; physical control tactics, such as compliance holds; open-hand or closed-hand strikes or foot strikes; shove or push, including against a wall or car; striking with any object (baton, other equipment, vehicle, etc.); O.C. spray; use or discharge of conducted electrical weapon (Taser); firearm discharge; other lethal force, including chokeholds or head strikes. Officers were not considered to have used force if they verbally threatened to use force on a person or drew a gun or any other weapon on a person. These were classified as threats to use force.

[133] Use of force includes any force identified by research assistants during content analysis.

Use of force most frequently involved control tactics, such as a compliance hold. Officers also sometimes threatened use of force by drawing a weapon or verbally threatening a person, which occurred in 153 or 10% [8.3%-11.3%] of stops.

**Table 1: Actions Taken by Officers During the Stop of a Person**

| Officer Action | Contacts (N) | Percent (%) | 95% Confidence Interval |
|---|---|---|---|
| *Police frisked person or property* | 1,065 | 67.9% | 65.6%-70.0% |
| *Police searched person* | 868 | 55.3% | 52.9%-57.9% |
| *Police searched property* | 366 | 23.3% | 21.2%-25.4% |
| *Police ran a warrant check* | 301 | 19.2% | 17.2%-21.0% |
| *Police conducted a show-up with person* | 416 | 26.5% | 24.3%-28.7% |
| *Police handcuffed person* | 775 | 49.4% | 46.9%-51.9% |

### B. Low-level Sample

The descriptive data presented below provides contextual information on all encounters and contacts in the Low-level Sample, including the individuals who were stopped during an encounter labeled low-level by officers. These encounters reflect a range of individuals, locations, and circumstances.

1. Encounter-level Information

The sample included 622 low-level encounters during which officers engaged 1,158 people or an average of 1.9 individuals per encounter. The encounters in the Low-level Sample occurred across all five New York City boroughs and throughout all hours of the day, with about 30% in Brooklyn, 26% in Manhattan, 21% in the Bronx, and 20% in Queens, and 3% in Staten Island.

Figure 4 overlays the encounter locations drawn from BWC recording data onto the NYPD precinct map for more detailed information about encounter location. Although encounters took place across a wide swath of neighborhoods, the low-level encounters occurred more often in neighborhoods with more Black and Hispanic residents, and more residents living under the poverty line relative to city-wide averages.[134]

**Figure 4: Low-level Encounter BWC Recording Spatial Data Points, Overlaid on NYPD Precinct Map**



In these encounters, an average of two officers was present (with activated BWCs), which is fewer than encounters in the Stop Sample. Most encounters in the sample, 80% [76.7%-83.1%],

---

[134] It should not be assumed that the higher incidence of low-level encounters in Black and Hispanic neighborhoods relative to city-wide averages is the result of discriminatory behavior by officers. These patterns would also be present if individuals in those neighborhoods call 911 or 311 more frequently or if the NYPD deployed more officers to these areas.

were conducted by the Patrol Services Bureau. Housing and Transit bureaus accounted for 11% [8.7%-13.7%] and 9% [6.6%-11.0%], respectively.[135] Officers from different bureaus may be present at the same encounter. Nearly all the visible officers in the encounter were in uniform (99%). Of responding officers, approximately 19% [16.6%-21.2%] had at least one CCRB complaint while 5% [3.6%-6.1%] had at least one substantiated complaint.

**Figure 5: Reasons Officers Initiated Low-level Encounters, by Top-line Category**



Low-level encounters were initiated for a broad range of reasons, many of which were not related to crime. As shown in Figure 5 above, the most common reason for these encounters was "Other." Research assistants assigned each encounter a topline category aligned with the New York Penal Law offenses and an "Other" category and then also identified more specific descriptions within each topline category. As shown in Table 2 below, interpersonal conflict was the most common reason that officers initiated an encounter in the Low-level Sample. Less commonly, the primary reason was criminal in nature.

---

[135] These figures sum to more than 100% due to officer attendance from multiple commands in a subset of encounters.

**Table 2: Most Common Reasons Officers Initiated Encounter, by Specific Problem Code**

| | Top-line Category | Encounters (N) | Percent (%) |
|---|---|---|---|
| *Conflict* | Other | 143 | 23.0% |
| *Officer-initiated wellness check* | Other | 87 | 14.0% |
| *Medical assistance* | Other | 47 | 7.6% |
| *Issues related to safety* | Other | 39 | 6.3% |
| *Trespassing* | Trespass | 36 | 5.8% |
| *Theft* | Property | 34 | 5.5% |
| *Public nuisance; disorderly conduct* | Quality of life | 25 | 4.0% |
| *Simple assault* | Violence | 22 | 3.5% |
| *Domestic assault* | Violence | 20 | 3.2% |
| *Suspected firearm discharge* | Weapons | 14 | 2.3% |

2.   Individual-level Information

As noted, officers substantively engaged 1,158 individuals in the 622 low-level encounters, or an average of 1.9 people per encounter. The apparent gender of 56% [52.8%-58.7%] of those engaged was male and their apparent race and ethnicity was most often Black or Hispanic, 43% [40.2%-45.9%] and 24% [21.7%-26.6%], respectively.[136]

As would be expected from low-level investigative encounters, 87% [84.4%-88.3%] of contacts involved police asking questions to gather information about what occurred. Examples of this type of questioning are those related to what the person witnessed (e.g., what a suspect was

---

[136] In Level 1 encounters, officers are not required to report the race of the person with whom they interact. Therefore, the categorization of race and ethnicity in this sample relies on research assistants' perceptions.

wearing and generally what happened) or the health of the person. A person was also sometimes asked to provide identification (6% [4.8%-7.6%] of contacts), to verify their address (2% [1.3%-2.9%] of contacts), or to establish that they lived at the property where they were engaged (3% [1.6%-3.5%] of contacts). Officers were often called to provide medical assistance. Six percent of people were provided medical services during the encounter by an emergency medical technician (EMT) or paramedic who was at the scene or who transported them to a medical facility for treatment.

Some types of questioning and physical action provide evidence that a person may not be free to leave the scene. Although most of these interactions did not rise above a request for information, a subset of interactions was more involved. Some of the questions posed by officers were pointed or accusatory, with 7% [5.3%-8.2%] of contacts questioned in a way that would reasonably lead a person to believe that they were suspected of a crime. Officers commanded a person to stay at the scene in 6% [4.6%-7.3%] of contacts. Beyond questioning or use of commands, officers used light physical contact in 4% [3.0%-5.4%] of contacts and officers frisked or searched the person or property in 3% [2.2%-4.2%] of contacts. Use of force was rare, but researchers observed use of force during 12 contacts or 1% [0.5%-1.6%] of contacts in this sample. In 15% [12.7%-16.8%] of contacts, officers engaged in at least one of the actions identified in Table 3 below.

It is important to note that while these actions potentially indicate that a person was not free to leave the scene, they do not necessarily mean that the person was stopped. The judges considered the totality of the circumstances in an encounter to determine the *De Bour* levels involved, and the encounters that were reviewed in the Low-level Sample reflect a range of circumstances that affected the judges' determinations. Accusatory questions are permitted

during Level 2 encounters, even when the person is free to leave. Also, when officers responded

with emergency medical services (EMS) to individuals experiencing mental health crises, the

contact may have resulted in a seizure and could include officer actions, such as searches and the

use of handcuffs, but would not be considered a *De Bour* Level 3 stop. The text of the report

discusses this issue.

**Table 3 - Officer Actions Taken During Encounters**

| Officer Action | Contacts (N) | Percent (%) | 95% Confidence Interval |
|---|---|---|---|
| *Police posed a pointed or accusatory statement or question* | 78 | 6.7% | 5.3%-8.2% |
| *Police issued a command indicating the person could not leave, such as "come here," "stop," "wait," or "stay"* | 68 | 5.9% | 4.6%-7.3% |
| *Police used light physical contact, such as light hold, guiding, or leading* | 48 | 4.2% | 3.0%-5.4% |
| *Police searched person* | 7 | 0.6% | 0.2%-1.1% |
| *Police searched person's property* | 26 | 2.3% | 1.4%-3.0% |
| *Police frisked person or property* | 10 | 0.9% | 0.4%-1.5% |
| *Police verbally threatened to use force on person* | 1 | 0.1% | 0.0%-0.3% |
| *Police handcuffed person* | 15 | 1.3% | 0.7%-2.0% |
| *Police used force on person* | 12 | 1.0% | 0.5%-1.6% |

### *C. Arrest or Summons Sample*

Lastly, this section presents limited descriptive information of the small exploratory

sample of arrests or summonses that did not include a reported stop. The sample consisted of 58

encounters labeled by officers as an arrest or summons, during which officers substantively engaged 127 individuals. Judges determined that officers' contacts with 66 people involved Level 4 (either arrested or received a summons).

    1.  <u>Encounter-level Information</u>

       The encounters in the Arrest or Summons Sample occurred across all five boroughs. Of encounters, 30% took place in Brooklyn, 30% in Manhattan, 27% in the Bronx, and 10% in Queens. One encounter occurred in Staten Island, or 2%. Figure 6 below overlays the encounter locations drawn from BWC recording data onto the NYPD precinct map for more detailed information about encounter location.

**Figure 6: Arrest or Summons Encounter BWC Recording Spatial Data Points, Overlaid on NYPD Precinct Map**



An average of 3.6 officers (as identified by BWC activation) participated in encounters in the Arrest or Summons Sample. Most encounters were conducted with officers in the Patrol Services Bureau (57% [41.4%-67.2%] of encounters) and Transit Bureau (38% [24.1%-48.3%]). Fewer encounters in the sample were conducted with Housing Bureau officers present (2% [0.0%-5.2%]).[137] Officers from different bureaus may be present at the same encounter. Officers on the Neighborhood Safety Team (NST) were present during 2% [0.0%-5.3%] of encounters in the sample where a person was being arrested or given a summons. Among officers present at encounters in this sample, approximately 25% [19.6%-31.4%] of officers had at least one CCRB complaint, while 5% [2.0%-7.8%] had at least one substantiated complaint.

Encounters were conducted for a range of reasons. The most frequent basis for an encounter in the Arrest or Summons Sample involved crimes relating to violence or property, which constituted 47% [37.8%-55.1%] and 34% [25.2%-41.7%], respectively, of encounters.[138]

## 2. Individual-level Information

Of the 66 individuals in this Arrest or Summons Sample who were arrested or issued a summons, 41% [27.3%-51.5%] were Hispanic and  or 36% [27.3%-51.5%] Black, while 20% [10.6%-30.3%] were members of all other races and ethnicities. A sizable majority—74% [60.1%-81.8%]—were male while 26% [15.2%-36.4%] were female. Of the 66 contacts, 19 or 29% [16.7%-39.4%] involved an unreported stop.

---

[137] Additionally, 2% of officers were from special operations units.
[138] Encounters for "Other" constituted 15% [8.7%-21.3%] of incidents. There were also two encounters related to trespass, one related to drugs and one related to quality of life.

## II.  FOURTEENTH AMENDMENT ANALYSIS FULL REGRESSION TABLES

To evaluate compliance with the Fourteenth Amendment, CUNY ISLG analyzed the data to assess whether Black or Hispanic individuals are more likely to experience an unconstitutional stop relative to similarly situated individuals of all other races. The results of this analysis are described in the main body of the report, but the full regression tables are presented below, which include alternative model specifications. All models are logit models because all outcomes are binary. The tables below report results for each of the core outcomes, including 1) any unconstitutional action, 2) unconstitutional initiation of stop (no reasonable suspicion), and 3) an unconstitutional frisk.

There are three tables that reflect variations on the analysis for each outcome. Table 4 below presents the results of models that examine predictors of any unconstitutional action in an encounter. The first column presents results of a logit model without using Doubly Robust (DR) estimation. Column 2 presents the results on a reduced set of covariates with DR estimation, which are the full results of the model that underlies the predicted probabilities presented in the main body of the report (Figure 15). Column 3 presents results using DR estimation, as well as a more extensive set of covariates (or control variables). The inclusion of more control variables reduces the number of encounters included in the analysis, because there are missing values for some variables.[139] To address missingness, Columns 4 and 5 report coefficients for models that use DR estimation and impute values for observations with missingness in any covariates to increase sample size.

---

[139] The covariates with missing values are Radio run (272), Borough (29), Visible bystanders present (13), Age (6), Lead officer year on force (21), Disadvantage index (29). Apart from Radio run, all missing values were imputed with the sample median or mode. For encounters with no information on Radio run, a random forest model was trained to predict whether it began with a radio run. All variables included as controls in the regressions were leveraged for the predictive model. The out-of-bag error was 15.9%.

In the tables that follow, all coefficients (log-odds) are exponentiated and presented as odd ratios (OR) to facilitate interpretation. An OR with a value greater than 1 indicates that the group is more likely than the reference group to experience unconstitutional actions. An OR less than 1 suggests a protective association—the group has lower odds of facing unconstitutional actions. For instance, according to the model in Column 2, the covariate Radio Run has OR=0.44, meaning stops beginning as radio runs have 56% lower odds of being unconstitutional than self-initiated stops and or those initiated by a complainant or witness at the scene.

Table 5 presents the results of models that examine the other two primary outcomes—whether the stop had reasonable suspicion and whether the frisk was constitutional. For each model, the results are presented for a more limited set and full set of control variables.

Lastly, Table 6 presents a variation on the model that excludes individuals for whom it was not possible to determine race or ethnicity (eight individuals) from the analysis.[140] In contrast, the results in Table 4 and 5 included individuals of undetermined race and ethnicity in the "other" category. The results in Table 6 include all three outcomes and also utilize DR estimation with the more extensive set of covariates. It is noteworthy that the coefficient for a Black person is positive and significant in one model (see Table 6 in the middle column). This result indicates that a Black person is more likely to be stopped without reasonable suspicion relative to a person who is not Black or Hispanic (from the "other" race category). While insightful, these findings should be interpreted with caution. The fact that the removal of just a few highly weighted observations, altering the composition of the "other" category, led to a shift in statistical significance indicates that the model is sensitive to specification. This sensitivity

---

[140] While eight individuals of undetermined race and ethnicity were stopped, some of these individuals were already being dropped in Tables 4 and 5 due to missing values. The net number of contacts dropped is three.

implies that the underlying effect may be modest and accompanied by substantial uncertainty. However, it also indicates that further analysis with a larger sample of non-Black and Hispanic individuals is needed and raises questions about differences by race in the initiation of a stop.

**Table 4 – Full Regression Table for the Overall Constitutionality of a Stop**

| | Unconstitutional (Unweighted) | Unconstitutional (DR) | Unconstitutional (DR full model) | Imputed (DR) | Imputed (DR full model) |
|---|---|---|---|---|---|
| Black | 1.038 (0.357) | 0.760 (0.377) | 0.705 (0.362) | 0.636 (0.243) | 0.616 (0.252) |
| Hispanic | 0.999 (0.369) | 0.706 (0.374) | 0.757 (0.419) | 0.568 (0.237) | 0.640 (0.289) |
| Crime: Violence | 0.923 (0.305) | 0.889 (0.335) | 1.099 (0.425) | 0.733 (0.249) | 0.954 (0.336) |
| Crime: Weapons | 3.262 (0.810)*** | 3.531 (0.967)*** | 3.416 (1.073)*** | 3.396 (0.780)*** | 3.510 (0.948)*** |
| Radio run | 0.487 (0.094)*** | 0.440 (0.100)*** | 0.566 (0.170)+ | 0.360 (0.076)*** | 0.495 (0.133)** |
| Male | 1.597 (0.557) | 1.463 (0.585) | 1.244 (0.522) | 1.530 (0.540) | 1.265 (0.483) |
| Age: 18-34 | 0.628 (0.126)* | 0.560 (0.132)* | 0.612 (0.156)+ | 0.625 (0.135)* | 0.668 (0.152)+ |
| Age: 35-54 | 0.674 (0.181) | 0.650 (0.213) | 0.770 (0.293) | 0.629 (0.184) | 0.737 (0.243) |
| Age: 55+ | 0.325 (0.182)* | 0.557 (0.433) | 0.548 (0.428) | 0.527 (0.321) | 0.529 (0.327) |
| Shift: 8AM–4PM | 0.863 (0.220) | 1.110 (0.349) | 1.289 (0.457) | 1.077 (0.312) | 1.181 (0.387) |
| Shift: Midnight–8AM | 0.756 (0.167) | 0.682 (0.177) | 0.653 (0.173) | 0.712 (0.175) | 0.708 (0.174) |
| Brooklyn | 2.724 (3.118) | 1.790 (2.185) | 1.777 (2.412) | 2.303 (2.658) | 2.388 (2.971) |
| Bronx | 5.674 (6.487) | 4.144 (5.054) | 3.818 (5.201) | 5.631 (6.488) | 5.376 (6.731) |
| Queens | 2.211 (2.573) | 1.207 (1.502) | 1.442 (1.985) | 1.422 (1.675) | 1.783 (2.257) |
| Manhattan | 2.657 (3.045) | 1.942 (2.381) | 2.155 (2.943) | 2.611 (3.026) | 3.097 (3.889) |
| Patrol officer(s) | 1.116 (0.299) | 1.180 (0.378) | 1.076 (0.366) | 1.323 (0.386) | 1.110 (0.344) |
| Weekend | 1.305 (0.249) | 1.355 (0.296) | 1.274 (0.277) | 1.244 (0.248) | 1.178 (0.235) |
| Unreported stop | | | 1.663 (1.087) | | 1.004 (0.240) |
| Location: Outside | | | 1.125 (0.368) | | 1.169 (0.343) |
| No NST officer | | | 0.839 (0.208) | | 0.832 (0.191) |
| N officers | | | 0.944 (0.026)* | | 0.925 (0.024)** |
| N contacts | | | 0.890 (0.075) | | 0.914 (0.069) |
| Avg. officer years on force | | | 1.000 (0.027) | | 0.998 (0.027) |
| No bystanders | | | 1.376 (0.335) | | 1.379 (0.306) |
| Disadvantage index | | | 1.050 (0.100) | | 1.064 (0.090) |
| Spanish | | | 0.232 (0.151)* | | 0.231 (0.130)** |
| Num.Obs. | 1192 | 1192 | 1176 | 1543 | 1543 |
| RMSE | 0.371 | 0.371 | 0.364 | 0.354 | 0.346 |
| Log.Lik. | −515.489 | −556.821 | −522.742 | −657.188 | −620.922 |

+ is p less than 0.1; * less than 0.05; ** less than 0.01;*** less than 0.001. All models use Cluster Robust standard errors.

## Table 5 – Full Regression Table for Constitutionality of Stop and Frisk

| | No Reasonable Suspicion (DR) | No Reasonable Suspicion (DR Full model) | Unconstitutional Frisk (DR) | Unconstitutional Frisk (DR Full model) |
|---|---|---|---|---|
| Black | 11.430 (18.694) | 1.090 (0.735) | 0.284 (0.241) | 0.277 (0.235) |
| Hispanic | 6.960 (11.465) | 0.623 (0.445) | 0.230 (0.207) | 0.220 (0.202)+ |
| Crime: Violence | 1.671 (0.873) | 1.928 (0.911) | 3.343 (2.356)+ | 3.479 (2.313)+ |
| Crime: Weapons | 4.742 (1.840)*** | 4.161 (1.572)*** | 13.755 (8.586)*** | 12.766 (9.917)** |
| Radio run | 0.254 (0.084)*** | 0.298 (0.104)*** | 0.265 (0.132)** | 0.308 (0.222) |
| Male | 1.316 (0.793) | 1.379 (0.832) | 1.522 (0.915) | 1.357 (0.878) |
| Age: 18-34 | 0.521 (0.140)* | 0.525 (0.147)* | 0.833 (0.265) | 0.950 (0.324) |
| Age: 35-54 | 0.715 (0.255) | 0.820 (0.298) | 0.850 (0.542) | 1.096 (0.764) |
| Age: 55+ | 0.264 (0.286) | 0.220 (0.248) | 0.000 (0.000) | 0.000 (0.000) |
| Shift: 8AM--4PM | 1.174 (0.460) | 1.256 (0.523) | 0.920 (0.698) | 1.177 (1.027) |
| Shift: Midnight--8AM | 0.761 (0.257) | 1.069 (0.344) | 0.679 (0.261) | 0.722 (0.296) |
| Brooklyn | 566749.039 (464101.447)*** | 1180061.273 (1635744.809)*** | 2354199.414 (1289373.028)*** | 2065470.476 (3972614.815)*** |
| Bronx | 1035003.732 (850519.144)*** | 1700977.294 (2351529.997)*** | 8207313.273 (5065539.580)*** | 6498537.416 (13132461.399)*** |
| Queens | 320156.071 (307013.646)*** | 1313413.541 (1905943.746)*** | 1489243.633 (1508489.432)*** | 1710563.977 (3681357.546)*** |
| Manhattan | 637025.470 (530686.930)*** | 1502916.171 (2113580.288)*** | 5302987.469 (1235748.457)*** | 6197781.145 (13118212.144)*** |
| Patrol officer(s) | 1.627 (0.531) | 1.392 (0.488) | 1.566 (0.858) | 1.480 (0.866) |
| Weekend | 0.979 (0.300) | 0.796 (0.232) | 1.500 (0.549) | 1.392 (0.485) |
| Unreported stop | | 5.619 (4.480)* | | 3.574 (2.623)+ |
| Location: Outside | | 1.539 (0.594) | | 0.897 (0.486) |
| No NST officer | | 0.820 (0.247) | | 0.658 (0.244) |
| N officers | | 0.871 (0.039)** | | 0.915 (0.040)* |
| N contacts | | 0.969 (0.069) | | 0.980 (0.119) |
| Avg. officer years on force | | 0.990 (0.034) | | 1.006 (0.050) |
| No bystanders | | 0.988 (0.285) | | 1.300 (0.511) |
| Disadvantage index | | 1.290 (0.147)* | | 1.098 (0.213) |
| Spanish | | 0.684 (0.537) | | 0.644 (0.560) |
| Num.Obs. | 1192 | 1176 | 1192 | 1176 |
| RMSE | 0.272 | 0.263 | 0.250 | 0.247 |
| Log.Lik. | −301.675 | −274.507 | −277.433 | −263.415 |

+ is p less than 0.1; * less than 0.05; ** less than 0.01;*** less than 0.001. All models use Cluster Robust standard errors.

**Table 6 – Full Regression Table for Constitutionality of Stop Excluding Indeterminate Race**

|  | Overall constitutionality (DR Full model) | No Reasonable Suspicion (DR Full model) | Unconstitutional Frisk (DR Full model) |
|---|---|---|---|
| Black | 0.769 (0.529) | 5.990 (5.238)* | 0.814 (0.863) |
| Hispanic | 0.823 (0.588) | 3.647 (3.278) | 0.637 (0.719) |
| Crime: Violence | 0.926 (0.435) | 1.651 (0.830) | 3.474 (2.247)+ |
| Crime: Weapons | 3.149 (1.016)*** | 3.842 (1.563)*** | 11.643 (8.168)*** |
| Radio run | 0.560 (0.172)+ | 0.318 (0.120)** | 0.319 (0.232) |
| Male | 1.281 (0.546) | 1.190 (0.806) | 1.402 (0.904) |
| Age: 18-34 | 0.656 (0.173) | 0.567 (0.169)+ | 1.022 (0.358) |
| Age: 35-54 | 0.808 (0.311) | 0.899 (0.338) | 1.211 (0.791) |
| Age: 55+ | 0.908 (0.914) | 0.274 (0.317) | 0.000 (0.000) |
| Shift: 8AM–4PM | 1.459 (0.605) | 1.403 (0.580) | 1.219 (1.084) |
| Shift: Midnight–8AM | 0.649 (0.185) | 0.908 (0.321) | 0.859 (0.324) |
| Patrol officer(s) | 1.029 (0.349) | 1.685 (0.616) | 1.322 (0.742) |
| Brooklyn | 1.749 (2.390) | 555290.640 (882694.272)*** | 2269981.965 (4197092.520)*** |
| Bronx | 3.966 (5.440) | 801941.902 (1272406.374)*** | 6406654.099 (12363486.858)*** |
| Queens | 1.446 (2.007) | 417626.314 (702040.936)*** | 1844625.314 (3581477.293)*** |
| Manhattan | 2.065 (2.857) | 766713.809 (1233093.799)*** | 6196221.584 (12417520.493)*** |
| Weekend | 1.220 (0.274) | 0.874 (0.276) | 1.172 (0.385) |
| Unreported stop | 1.477 (1.128) | 6.658 (5.416)* | 3.226 (2.569) |
| Location: Outside | 1.209 (0.412) | 1.770 (0.712) | 0.916 (0.496) |
| No NST officer | 0.869 (0.221) | 0.741 (0.225) | 0.723 (0.264) |
| N officers | 0.948 (0.027)+ | 0.864 (0.041)** | 0.914 (0.039)* |
| N contacts | 0.886 (0.077) | 0.993 (0.066) | 0.985 (0.115) |
| Avg. officer years on force | 1.006 (0.028) | 0.995 (0.036) | 1.011 (0.050) |
| No bystanders | 1.471 (0.453) | 1.075 (0.324) | 1.132 (0.444) |
| Disadvantage index | 1.031 (0.099) | 1.285 (0.153)* | 1.044 (0.178) |
| Spanish | 0.207 (0.143)* | 0.425 (0.383) | 0.660 (0.560) |
| Num.Obs. | 1173 | 1173 | 1173 |
| RMSE | 0.365 | 0.264 | 0.246 |
| Log.Lik. | −527.818 | −274.087 | −258.016 |

+ is p less than 0.1; * less than 0.05; ** less than 0.01;*** less than 0.001. All models use Cluster Robust standard errors.

# References

Fagan, Jeffrey. "Expert report in Davis v City of New York," 08 Civ 01034 (SAS) 2012.

Gwet, Kilem Li. "Computing inter-rater reliability and its variance in the presence of high agreement." *British Journal of Mathematical and Statistical Psychology* 61.1 (2008): 29-48.

Knox, Dean, Will Lowe, and Jonathan Mummolo. "Administrative records mask racially biased policing." *American Political Science Review* 114.3 (2020): 619-637.

MacDonald, John, and Anthony A. Braga. "Did post-Floyd et al. reforms reduce racial disparities in NYPD stop, question, and frisk practices? An exploratory analysis using external and internal benchmarks." *Justice Quarterly* 36.5 (2019): 954-983.

MacDonald, John M., and Jeffrey Fagan. "Using shifts in deployment and operations to test for racial bias in police stops." *AEA Papers and Proceedings*. Vol. 109. 2019.

Morgan, Stephen L., and Christopher Winship. *Counterfactuals and causal inference*. Cambridge University Press, 2015.

Neil, Roland, and Christopher Winship. "Methodological challenges and opportunities in testing for racial discrimination in policing." *Annual Review of Criminology* 2 (2019): 73-98.

Ridgeway, Greg, and John MacDonald. "Methods for assessing racially biased policing." *Race, ethnicity, and policing*. New York University Press, 2010. 180-204.

Ridgeway, Greg. "Assessing the effect of race bias in post-traffic stop outcomes using propensity scores." *Journal of Quantitative Criminology* 22.1 (2006): 1-29.

Wongpakaran, Nahathai, et al. "A comparison of Cohen's Kappa and Gwet's AC1 when calculating inter-rater reliability coefficients: a study conducted with personality disorder samples." *BMC medical research methodology* 13 (2013): 1-7.



The CUNY Institute for State & Local Governance is a good governance think-and-do tank.
We craft the research, policies, partnerships and infrastructures necessary to
help government and public institutions work more effectively, efficiently and equitably.
For more information, visit islg.cuny.edu.