

# Thirty-First Report of the Independent Monitor

## Report on the NYPD's Specialized Units

Mylan Denerstein

August 17, 2026

*Floyd, et al. v. City of New York*

*Davis, et al. v. City of New York*

# MONITOR TEAM

Mylan Denerstein
*Monitor*

Richard Jerome
*Deputy Monitor*

Susan Prosnitz
*Associate Monitor*

Anthony Braga

Jennifer Eberhardt

Rudolph Hall

Demosthenes Long

John MacDonald

James McCabe

Jane Perlov

James Yates

nypdmonitor.org

# Table of Contents


I. Executive Summary ....................1

II. Background ....................3

III. NYPD Failure to Audit CRT Stops ....................4

IV. Compliance by Specialized Units with Required 3Q2025 and 4Q2025 Benchmarks ........5

V. Compliance Trends for Specialized Units for Full-Year 2025 ....................7

A. Compliance By Specialized Units by Month, 2025 ....................8

B. Compliance by Specialized Units by Type of Stop ....................9

C. Boilerplate Stop Reports ....................10

D. Arrests by Specialized Units ....................11

E. Race and Ethnicity of Persons Stopped By NST, PST, and CRT ....................13

F. Community Liaison Reports ....................14

VI. Specialized Units' Compliance Rates Compared to Patrol Officers ....................15

A. Stops by Specialized Units Compared to Other Units ....................15

B. Arrests by Specialized Units Compared to Other Units ....................16

VII. Conclusion ....................18

Appendix ....................19

## I. Executive Summary

This report is focused on the compliance of the New York City Police Department's (the "Department" or "NYPD") Neighborhood Safety Teams ("NST"), Public Safety Teams ("PST"), and Community Response Teams ("CRT") (collectively referred to as "specialized units") with constitutional requirements related to stops, frisks, and searches in 2025.[1] These specialized units engage in proactive enforcement to address violent crime and originated in 2022. Since their inception, the specialized units have had serious compliance challenges with *Terry* stops, frisks, and searches. Despite being highly trained, these units' compliance has been significantly worse than patrol officers' constitutional compliance.

In 2025, the Monitor set compliance requirements for the specialized units to meet. The Monitor directed the NYPD to have NSTs, PSTs, and CRTs achieve a compliance level of 85 percent by the third quarter of 2025 and 90 percent by the end of 2025 for stops, frisks, and searches. These benchmarks were set so the NYPD could improve and do not represent substantial compliance. With the exception of stops in the third quarter of 2025 (July, August, and September 2025), the NYPD failed to meet the established 2025 compliance benchmarks. In fact, the compliance rates for NSTs, PSTs, and CRTs in 2025 were not meaningfully higher than their compliance rates in 2024. Specialized units had a particularly low compliance rate for the most intrusive encounters, frisks and searches, and no sustained improvement over the course of 2025. This is unacceptable because the NYPD has the ability to do better.

The table below summarizes the compliance rates in the third and fourth quarters of 2025 and for the year. As noted, the NYPD generally failed to meet the compliance thresholds.

[1] The NYPD disbanded PSTs on November 7, 2025. This report and audit include stop activities of PST officers from January 1 to November 7, 2025.

**Table 1. Summary of Specialized Unit Compliance Rates Against Benchmarks, 2025[2]**

| Period (Benchmark) | Unit | Stops | Frisks | Searches |
|---|---|---|---|---|
| **3Q 2025 (85%)** | NST | 88.9% | 69.2% | 45.5% |
| | PST | 88.6% | 79.5% | 71.1% |
| | CRT | 92.9% | 73.9% | 84.6% |
| | **Combined** | **89.7%** | **76.3%** | **69.4%** |
| **4Q 2025 (90%)** | NST | 80.9% | 63.3% | 60.0% |
| | PST | 75.8% | 70.8% | 47.6% |
| | CRT | 88.1% | 66.0% | 60.7% |
| | **Combined** | **82.7%** | **66.3%** | **56.8%** |
| **Full Year 2025** | NST | 82.8% | 68.8% | 57.6% |
| | PST | 82.1% | 69.4% | 62.1% |
| | CRT | 86.9% | 67.2% | 65.1% |
| | **Combined** | **83.4%** | **68.6%** | **61.7%** |

- As seen in Table 1:
  - In the third quarter of 2025, stops by the specialized units met the required 85% threshold (90% combined), but frisks (76% combined) and searches (69% combined) did not.
  - In the fourth quarter of 2025, stops, frisks, and searches by the specialized units all fell short of the required 90% threshold—and compliance declined from the third quarter, with combined rates of 83% for stops, 66% for frisks, and 57% for searches.
  - Across the full year 2025, the combined compliance percentages were 83% for stops, 69% for frisks, and 62% for searches, again lowest for the most intrusive encounters. Per-unit rates appear in the summary table above.
- 91% of the persons stopped, frisked, and searched by NST, PST, and CRT officers during *Terry* stops in this audit were Black or Hispanic individuals. Five percent of the persons

[2] Green shaded boxes in Table 1 correspond to compliance at or greater than the benchmarks set for 3Q2025 and 4Q2025. Red shaded boxes correspond to compliance benchmarks not met. The Monitor did not set benchmarks for the full year 2025. However, the full-year 2025 rows in Table 1 were color-coded using 85% as the benchmark. Only 2025 CRT stops at 86.9% exceeded this benchmark.

stopped were white, two percent were Asian, and two percent were Middle Eastern individuals.

- Compliance rates for specialized units remain well below those of officers assigned to routine patrol functions or non-NST, PST or CRT units. Officers in other units had a lawful compliance rate in 2025 of 94% for stops, 83% for frisks, and 79% for searches, compared to specialized units' compliance rates of 83% for stops, 69% for frisks, and 62% for searches.

The NYPD's specialized units continue to engage in unlawful *Terry* stops at rates nowhere near substantial compliance. The NYPD must implement effective strategies, or it will continue to be non-compliant.

## II. Background

In January 2022, then-Mayor Eric Adams announced that the NYPD would establish an NST program in 34 high-crime commands where officers would be focused on taking illegal guns off the street. NST units generally consist of between four and six officers and a sergeant and are supervised by the command's Special Operations Lieutenant ("SOL"). Officers in NSTs are expected to engage in proactive enforcement to address violent crime. In most circumstances, they do not handle 911 calls for service from the public. NST officers drive unmarked cars and wear uniforms distinct from those worn by NYPD patrol officers. As with officers in other assignments, NST officers conduct stops, frisks, and searches, in addition to making arrests, in their assigned neighborhoods.

PSTs were another proactive unit in the NYPD. PSTs were deployed in every command in the NYPD and had an operational mandate similar to NSTs. They worked in unmarked cars, wore

distinctive uniforms, and were expected to engage in proactive enforcement. In November 2025, the NYPD eliminated PSTs, with some officers transitioning to NSTs.

The NYPD announced the establishment of CRTs in July 2022, for the stated purpose of focusing on quality-of-life issues. When CRTs were first created, these teams conducted enforcement on illegal mopeds and other nuisance traffic offenses, responded to demonstrations, and assisted the New York City Sheriff in executing warrants at locations illegally selling marijuana. Since the inception, however, the mission of CRTs has changed, and CRTs now resemble the proactive enforcement practices of NSTs and PSTs. CRT officers are deployed in high-crime neighborhoods, in special uniforms and in unmarked cars, and engage in street stops and motor vehicle enforcement.[3]

Although initially reporting to the Chief of Patrol, in the third quarter of 2024, CRT units were assigned at the patrol borough level, with one unit continuing to operate citywide. As CRTs expanded from the central Patrol Bureau level to deployment in each of the NYPD's patrol boroughs, they began operating like NST and PST teams.

## III. NYPD Failure to Audit CRT Stops

In March 2026, the Monitor and the NYPD determined that the NYPD failed to audit stops conducted by the citywide CRT dating back to March 2023, as required under the Court's orders. The problem was exacerbated in September 2025. Before September 2025, there were CRTs assigned to each Borough command and another citywide CRT unit assigned to the Patrol Services Bureau. The CRTs assigned to the Borough commands were part of the routine Quality Assurance Section ("QAS") audits and had their stops audited. However, the centralized team assigned to the Patrol Services Bureau was not part of the QAS review and thus not audited. After September

[3] *See* Twenty-Fifth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y. June 3, 2025), ECF No. 963-1.

2025, the Borough-based CRTs were transferred to the centralized CRT under the Patrol Services Bureau, which eliminated the QAS auditing of their stops. At that point, none of the stops by any CRT officer were being audited by the Department's QAS. This auditing failure continued until March 2026, when the Department took steps to correct the error following discussions with the Monitor.

The NYPD's failure to perform required auditing and self-inspections is especially troubling because CRT officers conduct a high volume of self-initiated stops, an area that has presented elevated constitutional risk for the NYPD. Since March 16, 2026, the Department's QAS has been auditing CRT stops. At the Monitor's request, the NYPD is retrospectively conducting a citywide CRT audit. The Monitor will continue to assess the adequacy of these remedial efforts. For this Report, the Monitor included a sample of 100 stops from 2025 that had not previously been audited by QAS.

## IV. Compliance by Specialized Units with Required 3Q2025 and 4Q2025 Benchmarks

To determine compliance levels of NSTs, PSTs, and CRTs, the Monitor team leveraged the random samples used for the general stop report assessments and isolated stop reports prepared by NST, PST, and CRT officers. The Monitor team assessed these reports for lawfulness of the stop, frisk, and search.[4]

[4] Each month, the Monitor team assesses 100 stop reports with associated BWC videos that are randomly selected from all of the stop reports audited by QAS. In addition, each quarter, the Monitor team reviews 50 stop reports randomly selected from all stop reports prepared for stops made in NYCHA facilities. These stop reports and associated BWC videos are reviewed independently by two members of the Monitor team. Where a disagreement occurs between these two members, the Deputy Monitor reviews the encounter and makes a decision about lawfulness. These results are then shared with the NYPD. The NYPD reviews the Monitor's assessments and then meets with the Monitor to discuss any disagreements that they might have. The Monitor then considers the NYPD's feedback and makes a final determination on the lawfulness of the stops, frisks, and searches. For this Report, because QAS had not audited CRT stops, the Monitor team randomly selected 100 stop reports prepared by CRT officers in 2025, independent of the monthly/quarterly samples and without the disagreements process.

The table below summarizes the Monitor team's assessment of stops for the third quarter of 2025, broken down by NYPD specialized unit.

**Table 2. Monitor Assessment of Stops, Frisks, and Searches, 3Q2025**

| | Stops | | | Frisks | | | Searches | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Stops | Stops Lawful | % Stops Lawful | Total Frisks | Frisks Lawful | % Frisks Lawful | Total Searches | Searches Lawful | % Searches Lawful |
| NST | 18 | 16 | 88.9% | 13 | 9 | 69.2% | 11 | 5 | 45.5% |
| PST | 70 | 62 | 88.6% | 44 | 35 | 79.5% | 38 | 27 | 71.1% |
| CRT | 28 | 26 | 92.9% | 23 | 17 | 73.9% | 13 | 11 | 84.6% |
| 3Q2025 | 116 | 104 | 89.7% | 80 | 61 | 76.3% | 62 | 43 | 69.4% |

Table 2 shows that in the third quarter of 2025, the stops of the specialized units met the 85% compliance threshold, with the compliance rate of the combined units at 89.7%. None of the specialized units met the required benchmark of 85% compliance for frisks or for searches. The compliance rate for frisks for the combined units was 76.3% and the compliance rate for searches for the combined units was 69.4%.

Table 3 below summarizes the Monitor team's assessment of stops for the fourth quarter of 2025, broken down by NYPD unit.

**Table 3. Monitor Assessment of Stops, Frisks, and Searches, 4Q2025**

| | Total Stops | Stops Lawful | % Stops Lawful | Total Frisks | Frisks Lawful | % Frisks Lawful | Total Searches | Searches Lawful | % Searches Lawful |
|---|---|---|---|---|---|---|---|---|---|
| NST | 47 | 38 | 80.9% | 30 | 19 | 63.3% | 25 | 15 | 60.0% |
| PST | 33 | 25 | 75.8% | 24 | 17 | 70.8% | 21 | 10 | 47.6% |
| CRT | 59 | 52 | 88.1% | 50 | 33 | 66.0% | 28 | 17 | 60.7% |
| 4Q2025 | 139 | 115 | 82.7% | 104 | 69 | 66.3% | 74 | 42 | 56.8% |

Compliance rates for the fourth quarter of 2025 did not meet the required benchmark of 90% compliance. Table 3 shows that the lawfulness of stops, frisks, and searches declined in the

fourth quarter compared to the third quarter. None of the specialized units met the required 90% compliance threshold for stops, for frisks, or for searches. The compliance rate for stops for the combined units was 82.7%; the compliance rate for frisks for the combined units was 66.3%; and the compliance rate for searches for the combined units was 56.8%. Not only did the specialized units fail to meet the 90% threshold in the fourth quarter, but their combined rates for stops, frisks, and searches also fell below the earlier 85% threshold, as officers in these units made more improper stops, frisks, and searches than in the prior quarter.

## V. Compliance Trends for Specialized Units for Full-Year 2025

Table 4 below shows the Monitor's assessment of the lawfulness of stops, frisks, and searches for all of 2025. Overall, the specialized units combined had a compliance rate of 83% lawfulness for stops, 69% for frisks, and 62% for searches.

**Table 4. Monitor Lawfulness Assessment of Stops, Frisks, and Searches, 2025[5]**

| | Total Stops | Stops Lawful | % Stops Lawful | Total Frisks | Frisks Lawful | % Frisks Lawful | Total Searches | Searches Lawful | % Searches Lawful |
|---|---|---|---|---|---|---|---|---|---|
| NST | 128 | 106 | 82.8% | 93 | 64 | 68.8% | 66 | 38 | 57.6% |
| PST | 330 | 271 | 82.1% | 222 | 154 | 69.4% | 169 | 105 | 62.1% |
| CRT | 145 | 126 | 86.9% | 122 | 82 | 67.2% | 63 | 41 | 65.1% |
| Specialized Unit Total | 603 | 503 | 83.4% | 437 | 300 | 68.6% | 298 | 184 | 61.7% |

The compliance rate in 2025 has remained essentially unchanged from 2024. Table 5 below shows the compliance rates for specialized units in 2024 in the Monitor's audits. The combined compliance rate of stops was slightly higher in 2024 than 2025 (85% compared to 83%),

[5] The Monitor did not set benchmarks for the full year 2025. However, Table 4 was color-coded using 85% as the benchmark for the full year. Applying this code to the full year results in only CRT stops in compliance at 86.9%.

slightly lower in 2024 than 2025 for frisks (63% compared to 69%) and slightly higher in 2024 than 2025 for searches (63% compared to 62%).

**Table 5. Monitor Lawfulness Assessment of Stops, Frisks, and Searches, 2024**

| | Stops | Stops Lawful | % Stops Lawful | Frisks | # Frisks Lawful | % Frisks Lawful | Searches | Searches Lawful | % Searches Lawful |
|---|---|---|---|---|---|---|---|---|---|
| NST | 175 | 154 | 88.0% | 146 | 99 | 67.8% | 89 | 55 | 61.8% |
| PST | 307 | 254 | 82.7% | 242 | 144 | 59.5% | 165 | 106 | 64.2% |
| CRT | 58 | 51 | 87.9% | 49 | 32 | 65.3% | 44 | 26 | 59.1% |
| Specialized Units | 540 | 459 | 85.0% | 437 | 275 | 62.9% | 298 | 187 | 62.8% |

### A. Compliance By Specialized Units by Month, 2025

Compliance with the law fluctuated over the year with poor performance in the beginning of the year, modest improvement through the third quarter of the year, and declining compliance in the fourth quarter. Table 6 below shows lawful compliance for all the specialized units combined by month. Figure 1, also below, illustrates the compliance rates for stops, frisks, and searches by the specialized units by month, compared to the 90% compliance benchmark.

**Table 6. Lawfulness of Stops, Frisks, and Searches by Specialized Units by Month, 2025**

| | Stops | | | Frisks | | | Searches | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Stops | Stops Lawful | % Stops Lawful | Total Frisks | Frisks Lawful | % Frisks Lawful | Total Searches | Searches Lawful | % Searches Lawful |
| January | 63 | 43 | 68.3% | 47 | 28 | 59.6% | 28 | 9 | 32.1% |
| February | 66 | 49 | 74.2% | 47 | 22 | 46.8% | 29 | 16 | 55.2% |
| March | 48 | 45 | 93.8% | 38 | 29 | 76.3% | 26 | 18 | 69.2% |
| April | 59 | 48 | 81.4% | 40 | 29 | 72.5% | 26 | 15 | 57.7% |
| May | 51 | 43 | 84.3% | 40 | 31 | 77.5% | 24 | 17 | 70.8% |
| June | 61 | 56 | 91.8% | 41 | 31 | 75.6% | 29 | 24 | 82.8% |
| July | 45 | 40 | 88.9% | 29 | 25 | 86.2% | 21 | 15 | 71.4% |
| August | 37 | 32 | 86.5% | 25 | 16 | 64.0% | 20 | 13 | 65.0% |
| September | 34 | 32 | 94.1% | 26 | 20 | 76.9% | 21 | 15 | 71.4% |
| October | 42 | 35 | 83.3% | 34 | 23 | 67.6% | 23 | 11 | 47.8% |
| November | 57 | 48 | 84.2% | 43 | 27 | 62.8% | 35 | 20 | 57.1% |
| December | 40 | 32 | 80.0% | 27 | 19 | 70.4% | 16 | 11 | 68.8% |

**Figure 1. Monitor Lawfulness Assessment of Stops, Frisks, and Searches by Month, 2025**




Although stop compliance reached the 90% benchmark for stops in some months, overall compliance—especially for frisks and searches—remained low for most of 2025. Given that the NYPD was able to achieve a 90% compliance rate in some months, the NYPD can do it; it just has to choose to do so.

### B. Compliance by Specialized Units by Type of Stop

As the Monitor has noted, improper stops, frisks, and searches are particularly prevalent in stops that are self-initiated by officers based on their own observations rather than in response to a 911 call (radio run) or information from a witness or complainant. Figure 2 below illustrates compliance rates for the combined specialized units by the different types of stops.

**Figure 2. Specialized Units Compliance Rate by Type of Stop, 2025**




For self-initiated stops conducted by officers in the specialized units, only 80% of stops, 64% of frisks, and 55% of searches in 2025 were assessed as lawful.

**C. Boilerplate Stop Reports**

The Monitor team has noted recurring patterns in stop report narratives that appear to rely on copycat or boilerplate language. Officers often use the same boilerplate language when describing the basis for the stop. For stops, when the suspected crime is criminal possession of a weapon ("CPW"), officers often describe "an L-shaped object resembling a weapon," a "rectangular bulge," or a "straight-edged object" resembling the slide or barrel of a gun. These narratives articulate reasonable suspicion for a CPW stop.

When assessing stops, the Monitor reviews the language in the stop report and compares what is written with what is observable on the BWC video. Unless there is a clear inconsistency between the two, the Monitor accepts the language in the stop report. However, when the same language is used in several stops that appear to be different circumstances, it raises questions about the credibility of the stop report narrative. The Appendix includes examples of stop reports with

boilerplate narratives, non-descript language referencing bulges, and descriptions of individual behavior insufficient to articulate reasonable suspicion to justify stops, frisks, and searches.

### D. Arrests by Specialized Units

The Monitor team conducted a review of a sample of 603 stops in 2025 by specialized unit officers to compare arrest rates for lawful and unlawful investigative encounters.[6] The table below illustrates that arrest rates by specialized units are significantly higher for lawful investigative encounters.

**Table 7. Lawfulness of Stops, Frisks, and Searches and Arrests, 2025**

| | Lawful | | | Unlawful | | | Statistical Comparison | | |
|---|---|---|---|---|---|---|---|---|---|
| Assessment | # | Arrests | Arrest Rate | # | Arrests | Arrest Rate | Odds Ratio | 95% Conf. Interval | p-Value |
| Stops | 503 | 115 | 22.9% | 100 | 10 | 10.0% | 2.67 | 1.34 – 5.30 | 0.005 |
| Frisks | 300 | 56 | 18.7% | 137 | 11 | 8.0% | 2.63 | 1.33 – 5.20 | 0.004 |
| Searches | 184 | 93 | 50.5% | 114 | 27 | 23.7% | 3.29 | 1.96 – 5.54 | <0.001 |

When a stop was assessed as legally sound, officers made an arrest nearly one in four times (23%). By contrast, when the stop was assessed as not meeting legal standards, the arrest rate dropped to one in ten (10%). Officers conducting lawful stops were about two and a half times more likely to make an arrest than those whose stops were unlawful.

The pattern holds for frisks. Lawful frisks led to an arrest about 19% of the time; unlawful frisks only 8%. That is, again, roughly a 2.6 times difference between lawful and unlawful frisks.

The relationship between the lawfulness of searches and arrests is strongest. When a search was assessed as legally justified, officers made an arrest more than half the time (50.5%). When the search lacked legal justification, the arrest rate fell to less than one in four (24%). Officers conducting lawful searches were about three times more likely to make an arrest. Searches incident

[6] The sample of 603 randomly selected reports is sufficiently large to support reliable and generalizable estimates.

to lawful arrests ("SILA") may be a factor in this analysis since every arrest should be accompanied by a lawful search; however, many encounters have searches that were not related to post-arrest processing.[7]

This data shows that legal compliance and enforcement effectiveness are not in tension with each other; they move together. Stops, frisks, and searches grounded in the legal standards officers are trained to follow are not only constitutionally required but are also more likely to produce better public safety results. Encounters that lack the requisite legal foundation are more likely to come up empty. An arrest does not mean that the person arrested is guilty. The lower rate of arrest (or "hit rate") for unlawful stops suggests that officers might not have had a legal basis for the initial stop,[8] let alone that the person was responsible for the underlying accused act. There should be a greater focus on compliance with the Constitution. The 2025 data from the specialized units reflects that when officers have genuine, articulable reasons for a stop, frisk, or search, they are more likely to find what they are looking for.

The Monitor team also reviewed the stops and arrest rates for self-initiated ("SI") stops for suspected CPW by specialized units. The analysis examined 365 SI CPW stops conducted by officers assigned to NST, PST, and CRT, comparing CPW arrest outcomes based on the Monitor's lawfulness determination for stops, frisks, and searches.

---

[7] All three of these findings (stops, frisks and searches) are statistically significant, meaning the differences are large enough and consistent enough that they are very unlikely to be the result of chance alone.

[8] The Court also noted the very low arrest rate for stops in its liability opinion and relied on the hit rate statistics to support its opinion. *Floyd*, No. 1:08-cv-01034 (S.D.N.Y. Aug. 12, 2013), ECF No. 373 at 32 (citing Plaintiffs' expert's reports).

**Table 8. Lawfulness of Stops, Frisks, and Searches and CPW Arrests, for Self-Initiated CPW, 2025**

| | Lawful | | | Unlawful | | | Statistical Comparison | | |
|---|---|---|---|---|---|---|---|---|---|
| Assessment | # | Arrests | Arrest Rate | # | Arrests | Arrest Rate | Relative Risk | 95% Conf. Interval | p-Value |
| Stops | 309 | 27 | 8.7% | 56 | 2 | 3.6% | 2.45 | 0.60-10.00 | 0.282 |
| Frisks | 217 | 21 | 9.7% | 113 | 1 | 0.9% | 10.94 | 1.49-80.26 | 0.002 |
| Searches | 87 | 24 | 27.6% | 63 | 4 | 6.4% | 4.35 | 1.59-11.90 | 0.001 |

Across all three encounter types, stops, frisks, and searches assessed as lawful were associated with higher CPW arrest rates than those assessed as unlawful. For stops, the arrest rate was 8.7% when the stop was found lawful versus 3.6% when unlawful. For frisks, lawful encounters produced a 9.7% arrest rate compared to 0.9% for unlawful ones. A lawful frisk is associated with an arrest ten times more than with an unlawful frisk. For searches, lawful searches resulted in a CPW arrest rate of 27.6%, four times the arrest rate of 6.4% arrest rate for unlawful searches. The very low hit rates for SI CPW stops that the Monitor found to be improper support the findings that these stops lacked reasonable suspicion.

### E. Race and Ethnicity of Persons Stopped By NST, PST, and CRT

Table 9 below illustrates the race of the persons stopped by unit for the 2025 stops assessed.

**Table 9. Race of Persons Stopped by Unit**

| | NST | PST | CRT | Total | % of All Stops |
|---|---|---|---|---|---|
| Asian | 2 | 9 | 2 | 13 | 2.2% |
| Black | 96 | 206 | 99 | 401 | 66.5% |
| Hispanic | 27 | 94 | 29 | 150 | 24.9% |
| Middle Eastern | 0 | 4 | 7 | 11 | 1.8% |
| White | 3 | 17 | 8 | 28 | 4.6% |
| Total | 128 | 330 | 145 | 603 | 100% |

These numbers show that 91% of the people stopped by these units were reported as being Black or Hispanic individuals. In addition, 88% (N=532 of 603) of persons stopped by officers in these units during the period were reported as Black or Hispanic men.

### F. Community Liaison Reports

The Office of the Community Liaison ("OCL") also reports community concerns regarding stops, frisks, and searches by the NYPD's specialized units.[9] Several narratives involve encounters in or near New York City Housing Authority ("NYCHA") developments, where participants describe being questioned or frisked by officers operating in unmarked vehicles or wearing non-standard uniforms. Community members also described encounters that began with non-accusatory questioning but escalated into searches or frisks without the officer providing explanation. Several participants in OCL feedback sessions reported being asked for identification or subjected to pat-downs without being informed of the reason for the encounter or whether they were free to leave. Some participants also stated that officers did not provide business cards or other identifying information at the conclusion of the encounter.

Younger participants (typically ages 16–22) in OCL feedback sessions described being stopped in groups while engaged in ordinary activities, such as walking home from school, congregating near residential buildings, or spending time in public spaces. In these accounts, participants emphasized feelings of being targeted based on appearance, location, or prior interactions, rather than specific observed conduct.

[9] Office of the Community Liaison Annual Report – 2025, *Floyd*, No. 1:08-cv-01034-AT (Apr. 29, 2026), ECF No. 984-2.

## VI. Specialized Units' Compliance Rates Compared to Patrol Officers

### A. Stops by Specialized Units Compared to Other Units

Officers in units other than NST, PST, and CRT (such as officers in regular patrol assignments) conducted lawful stops, frisks, and searches at much higher levels than the officers in the specialized units, as shown in the table below. Table 10 illustrates compliance rates of specialized unit officers compared with the compliance rate for stops made by other officers. The stop reports in these groups were randomly selected by the Monitor team during the periodic audits from the population of all stop reports assessed by QAS in 2025.

For officers assigned to routine patrol functions and other non-NST, PST, or CRT units, the Monitor team assessed stops as lawful for 94% of the 2025 encounters. This is 11 percentage points higher than for specialized unit stops. Similarly, frisks and searches conducted by patrol officers were assessed as lawful at significantly higher rates than frisks and searches by specialized unit officers. Frisks by officers not assigned to NSTs, PSTs, or CRTs were assessed as lawful 14 percentage points higher than frisks conducted by the specialized units (83% compared to 69%) and searches by officers not assigned to NSTs, PSTs, or CRTs were assessed as lawful 17 percentage points more often (79% compared to 62%) than their NST, PST, and CRT counterparts.

**Table 10. Lawfulness of Specialized Unit Stops, Frisks, and Searches Compared to Stops, Frisks, and Searches of Other Units, 2025**

| | Total Stops | Stops Lawful | % Stops Lawful | Total Frisks | Frisks Lawful | % Frisks Lawful | Total Searches | Searches Lawful | % Searches Lawful |
|---|---|---|---|---|---|---|---|---|---|
| Specialized Units | 603 | 503 | 83% | 437 | 300 | 69% | 298 | 184 | 62% |
| Other Unit Stops | 897 | 842 | 94% | 339 | 283 | 83% | 467 | 367 | 79% |
| Total | 1,500 | 1,345 | 90% | 776 | 583 | 75% | 765 | 551 | 72% |

Figure 3 below compares compliance by unit for stops, frisks, and searches.

**Figure 3. Compliance Rate with the Fourth Amendment by Unit Type, 2025**




### B. Arrests by Specialized Units Compared to Other Units

The Monitor reviewed 858 stops in 2025 by officers not in specialized units. Over 44% (399/897) of stops by officers not in specialized units result in an arrest, whereas only 21%

(125/603) of stops by officers in specialized units result in arrests. Figure 4 below shows the arrest rates for stops by specialized units compared to the arrest rates for stops by officers in other units.

**Figure 4. Arrest Rate for All Stops by Unit, 2025**




Even when comparing the arrest rates for self-initiated stops by officers in specialized units compared to the arrest rates of self-initiated stops by officers in other units, the arrest rate for officers in the other units is higher than the arrest rate for officers in the specialized units, as shown in the figure below.

**Figure 5. Arrest Rate for Self-Initiated Stops by Unit, 2025**




## VII. Conclusion

The Department is well aware of the compliance issues it faces. These compliance benchmarks have long been known to the Department, as have the problems contributing to the NYPD's failures. It is time for the Department to take ownership of its issues and solve them. While the Monitor acknowledges some improvements, NSTs, PSTs, and CRTs generally failed to meet the compliance benchmarks for the third and fourth quarters of 2025.

To hold the Department accountable for sustained improvement, the Monitor establishes new compliance benchmarks requiring the specialized units to achieve at least 90% lawful compliance for stops, frisks, and searches by the third quarter of 2026, and to maintain at least 90% compliance through the fourth quarter of 2026. This is achievable.

## Appendix

## Recurring Patterns in Stop Reports

The following 2025 stop report narratives provide examples of recurring patterns of inappropriate reliance by specialized unit officers on boilerplate narratives, non-descript language referencing bulges, and faulty description of individual behavior, to justify stops, frisks, and searches. Problematic language in each stop report example is highlighted to demonstrate the Monitor team's concerns.

### Representative Examples of Similar Stop Report Narratives Among Special Team Members

70-225 11/6/25 23:34 NST

At approximately 2334 hours on 11/06/2025 while conducting neighborhood safety duties in the confines of the 70 Precinct, the undersigned did observe a male black, 6'0", in his 20s, wearing gray sweatshirt, gray Nike sweatpants, black sneakers, black mask and black bag in his right hand appearing heavy in weight and with a rectangle shaped bulge protruding from the side of the bag resembling the outline of a firearm. Upon approach, the subject began walking away at a faster pace from the undersigned looking away in a nervous manner avoiding any eye contact. The undersigned then stopped the subject and an immediate frisk was conducted of the bag yielding negative results. Business card offered and refused.

70-230 11/10/2025 19:03 NST

At approximately 1903 hours on 11/10/2025 while conducting crime reduction duties in the confines of the 70 Precinct. The undersigned did observe a male black, 5'9" in his 20s, wearing a black jacket, black hoodie, dark blue sweatpants, black sneakers, holding his waistband and right pocket with his hand trying to conceal a rectangular shaped bulge protruding from the pocket which resembled the outline of a firearm. Upon approach, the subject began walking and blading his body to the right, away from the undersigned in a nervous manner and entered a store at 1226 Flatbush Avenue. The undersigned then stopped the subject and immediate frisk was conducted of the subject's right pocket and waistband yielding negative results. Business card offered and refused.

*Same NST team. SR prepared by different officers and reviewed by same NST supervisor

48-51 1/7/25 18:32 PST

At T/P/O PD was in a high crime area with known gang activity while in an unmarked vehicle. While on patrol, RO noticed a male wearing a green/blue jacket and black pants. The male looked directly at PD vehicle and became wide eyed and nervous and began walking at a quicker pace. PD then noticed a straight edge object protruding from their left jacket pocket. The object was at least 3 inches long and dense, causing the jacket to slightly stretch and weigh down as if the object

was heavy. Due to training and experience, PD believed the object to be the slide/barrel of a firearm. As PD kept observing male, the male began to use their left arm to hug their left pocket in an attempt to obstruct PD view from listed object. No weapon was felt, male free to leave and become irate and made threatening remarks. In sum and substance, "spin again and see what happens to you."

48-54 1/7/25 18:50 PST

At T/P/O PD was in a high crime area with known gang activity while in an unmarked vehicle. While on patrol pd noticed a male wearing a blue hoodies and blue pants with a face mask. The male looked directly at PD vehicle and became hyper vigilant and nervous and began walking at a quicker pace separating himself from the group he was originally walking with. PD then noticed a straight edge object protruding from their right side of the waistband blading his body towards the wall. The object was at least 3 inches long and dense, causing the pants to slightly stretch and weigh down as if object was heavy. Due to training and experience, PD believed the object to be the slide/barrel of a firearm. As PD kept observing male, the male began to resist search and dropping their weight so we could not grab or see the object and attempt to obstruct PD view from the listed object. Barrell of a weapon was felt, imitation pistol was recovered pd noticed after closer look to be a toy. Male was free to leave.

*Same PST team. SR prepared by different officers and reviewed by same PST supervisor.

**Representative Examples of Stop Report Narratives with Non-descript Bulges**

30-1 1/1/2025 19:41 PST

At TPO, officers observed a male approximately 5 feet 6 inches tall, about 125 LBS, wearing a black jacket, grey hoodie, grey sweatpants, and white sneakers at the intersection of West 148 Street and Broadway. Individual did appear to be walking and blading his body to the right while continuously looking back and appeared to have a bulge to the back right jacket area near the waistband area. Upon officer stopping individual did frisk and felt what to be a bag under his jacket. Contact card offered but refused. BWC Activated.

67-50 1/25/2025 23:07 PST

At TPO UMOS assigned to 67 PST were patrolling in an unmarked department vehicle with windows rolled down with department patches clearly visible and attired in full uniform. While traveling W/B on Beverly Road I/O of East 34 Street, UMOS did observe male, black, black pants, black bubble coat, approximately 6'2" with a bulged object underneath subject's bubble coat; said object was protruding through the subject's coat from the rear. When officers attempted to interact with the individual, the sight of caused the male subject to increase his walking pace and continuously look back over his shoulder towards UMOS direction in a nervous manner as he walked N/B on East 34 Street. UMOS then did drive parallel to the male subject and while using department issued flashlight pointed towards the backside of male. UMOS attempted to inquire

what he was concealing underneath his coat due to the heavy budge and the male further refused to acknowledge UMOS interaction by ignoring officers further raising UMOS suspicion that the male was possibly concealing a dangerous weapon.

**Representative Stop Report Narratives with Faulty Interpretation of Individual Behavior**

46-222 2/14/2025 20:19 PST

At TPO while patrolling in a high crime area, officers observed a male wearing a black hoodie, black jacket, gray jeans, and white sneakers walking on Davidson Avenue from Buchanan Place to West 183 Street. As male made eye contact with officers in uniform, male picked up his pace, kept constantly looking over his shoulders for officers' whereabouts, and started hugging/walking closer to the wall on his left side. When officers drove by male, his front jacket pocket seemed heavily weighted and kept bouncing/swinging as he walked. Male then proceeded to slowing his pace down and putting both hands in his front jacket pocket which raised officer's suspicion. Officers attempted to interact with male from the vehicle, and he avoided eye contact by looking to the opposite side. Officers got out of the vehicle to further investigate.

46-292 2/19/2025 16:59 PST

At TPO, PD was on routine patrol in a high crime area in unmarked RMP. PD was patrolling this area due to recent violent crimes such as a confirmed person shot, theft related crimes, and gang related activities. At this time, PD observed a large group of approx. 4-6 people approximately 15-19 years old walking while continuously looking around their surroundings, as if casing or looking for a victim while pointing around in different directions. PD continued to observe the group while now driving alongside the group. When the group noticed PD, they became nervous and looked shocked in their faces. Various members of the group now began to walk faster or slower than previously was, in an attempt to conceal their presence from PD and avoid PD contact. RO did observe males begin to blade their bodies away from PD view while clutching waistband area with their hands in their pocket. In PD training and experience, PD had reasonable suspicion to believe the group was concealing weapons and casing the area for robbery victims. Upon frisk felt a hard object. Upon search a boxcutter knife was recovered in the right coat pocket. Business card offered and refused.

44-151 2/26/2025 17:34 CRT

At TPO undersigned and partners observed 3 subjects walking in street northbound. Undersigned noticed one male make eye contact with MOS vehicle and immediately blading the right side of his body. Undersigned did have windows down and all NYPD patches were showing. Officers exited our vehicle to better observe the individual and they noticed the subject adjust his right side of his jacket pocket in a manner which led MOS to believe subject was attempting to conceal a weapon. The subject behavior led MOS to believe subject was in possession of a firearm. Subject was stopped in a high crime area that includes robberies, weapons possession and shootings.